## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:23 cr 48-MOC |
| | ) | |
| | ) | **BILL OF INDICTMENT** |
| v. | ) | |
| | ) | Violations: |
| | ) | |
| **GREG E. LINDBERG** | ) | 18 U.S.C. § 371 |
| | ) | 18 U.S.C. §§ 1033(a) and (c) |
| | ) | 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 1956(h) |
| _____ | ) | |

### THE GRAND JURY CHARGES:

At the specified times and at all relevant times:

### I.   THE DEFENDANT AND HIS CO-CONSPIRATORS

1.     Defendant GREG E. LINDBERG ("LINDBERG") was the ultimate controlling party with ultimate financial control and interest over multiple insurance companies, dozens of operating companies, and more than one hundred holding and pass-through entities (collectively, "Affiliated Companies"), some of which are detailed below. During certain relevant periods, LINDBERG was the Chairman and on the board of his insurance companies and was a director of a Malta-based investment adviser, Standard Advisory Services Limited ("SASL").

2.     Christopher Herwig ("Herwig") (charged elsewhere), a Chartered Financial Analyst, was the Chief Investment Officer and Portfolio Manager at Eli Global, the trade name for a group of companies that was controlled by LINDBERG. Herwig served in these positions at various times from in or about August 2010 to in or about August 2020. During this period, Herwig also was employed by other entities in the Eli Global family of companies, which were all controlled by LINDBERG. Herwig also served at various times as a Director, Trustee, Chief Investment Officer, and Treasurer of certain of LINDBERG's insurance companies, including Colorado Bankers Life Insurance Company ("CBLIC"), Bankers Life Insurance Company ("BLIC"), Southland National Insurance Company ("SNIC"), and Private Bankers Life and Annuity Co., Ltd. ("PBLA"). Herwig also served in various roles at SASL.

3.     Devin Solow ("Solow") (charged elsewhere) served in various roles at Eli Global, including initially as a Mergers & Acquisitions Associate. At various times after he was hired in or around December 2013, Solow also was employed in assorted roles by other LINDBERG-controlled entities within the Eli Global family of companies, including as Vice President of Investments.

## II.  Overview of the Conspiracy and Scheme

4.  From no later than in or around 2016 through at least in or around 2019, LINDBERG, Herwig, Solow, and others conspired and schemed to deceive and defraud various insurance companies, including Universal Life Insurance Company ("ULICO"), and ultimately thousands of insurance policyholders and others and to deceive the North Carolina Department of Insurance ("NCDOI"), various ratings agencies, and others through materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and omissions.

5.  The purposes of the conspiracy and scheme were to evade regulatory requirements meant to protect policyholders, conceal the true financial condition of LINDBERG's insurance companies, and conceal LINDBERG's improper use of insurance company funds for LINDBERG's personal benefit.

6.  As part of the manner and means of the conspiracy and scheme, LINDBERG and his co-conspirators engaged in circular transactions among LINDBERG's web of entities using insurance company funds, made and caused to be made various materially false and fraudulent representations, concealed and caused to be concealed material facts, and told and caused to be told deceptive half-truths to NCDOI and other third parties regarding these transactions.

7.  For example, as part of the conspiracy and scheme and in furtherance of their purposes, and as alleged in more detail in paragraphs 36 through 186:

a.  In or around December 2015 and January 2016, contrary to representations LINDBERG caused to be made to NCDOI, LINDBERG, Herwig, and Solow caused two of LINDBERG's insurance companies, SNIC and CBLIC, to fund the purchase by their parent company, Southland National Holdings ("SNH"), of CBLIC from SNIC. To conceal the details of this deal, LINDBERG, Herwig, and Solow utilized a complicated set of inter-company transactions, including approximately $46 million in loans from CBLIC and SNIC that were funneled directly and indirectly to SNH, which were designed to circumvent insurance regulations. Moreover, LINDBERG caused the making of various materially false and misleading entries in the books, reports, and statements of SNIC, CBLIC, and SNH, with the intent to deceive NCDOI and others regarding the financial condition of those entities.

b.  Throughout 2017 and 2018, LINDBERG, Herwig, and Solow extracted hundreds of millions of dollars from various insurance companies through a series of loans and related financial transactions to fund the acquisition and operation of other of LINDBERG's companies. This included "skimming" approximately $55 million from insurance companies while repackaging certain of the insurance companies' existing investments into new structured investments referred to as "FinCos," which LINDBERG, Herwig, and Solow falsely represented to NCDOI and others were unaffiliated investments managed by a third party that would benefit the insurance companies. In addition, at LINDBERG's direction, Herwig and Solow caused certain FinCos, which were capitalized with loans from LINDBERG's insurance companies, to fund and refinance millions of dollars in residential real estate purchases by LINDBERG.

2

c.      In or around late December 2017, LINDBERG, Herwig, and Solow caused PBLA to engage in a series of repurchase transactions ("Repos") with various entities affiliated with LINDBERG totaling nearly $96 million. The co-conspirators executed these Repos to, among other things, fraudulently and artificially inflate the capital position of PBLA as of year-end 2017. This inflated capital position caused various materially false entries in the books, reports, and statements of PBLA, and deceived ULICO and others regarding the financial condition of PBLA.

d.      In January 2018, LINDBERG, Herwig, and Solow fraudulently extracted nearly $200 million from CBLIC and a trust that PBLA managed for the benefit of ULICO (the "ULICO 2017 Trust") to amass "show money" in connection with LINDBERG's planned acquisition of another large insurance company, again utilizing Repos. The co-conspirators also fraudulently extracted another $55 million from the ULICO 2017 Trust, again utilizing Repos, which were used to: (a) further artificially inflate the capital position of PBLA; (b) fund LINDBERG's extravagant lifestyle; and (c) make payments on loans that LINDBERG's Affiliated Companies owed to insurance companies. Notwithstanding that these Repos were structured as short-term 90-day transactions, they were not intended to be, and were not in fact, repaid within 90 days. Rather, they were "renewed" or "rolled over" multiple times and remained outstanding through at least on or about March 31, 2019. Nevertheless, LINDBERG and Herwig caused various materially false entries to be made in the books, reports, and statements of PBLA by recording the Repos as "cash equivalents" in order to deceive and defraud ULICO regarding PBLA's compliance with the investment restrictions governing the ULICO 2017 Trust, which were put in place to protect ULICO's policyholders.

e.      LINDBERG caused his insurance companies to enter into investment advisory service agreements with another of his entities, SASL, the Malta-based investment adviser. Although SASL, LINDBERG, and others owed fiduciary duties to LINDBERG's insurance companies, LINDBERG and Herwig frequently put the interests of LINDBERG and certain of his other entities ahead of LINDBERG's insurance companies while also failing to disclose material information to the executives running those insurance companies. For example, at LINDBERG's direction, Herwig caused the ULICO 2017 Trust to purchase mortgages and holding companies for LINDBERG's personal real estate, without disclosing this information to ULICO. Moreover, LINDBERG, Herwig, and Solow used SASL to extract millions of dollars from LINDBERG's insurance companies in the form of investment advisory fees paid to SASL, which they then caused to be "loaned" to other Affiliated Companies.

f.      LINDBERG, Herwig, and Solow caused various insurance companies owned by LINDBERG, including SNIC, CBLIC, BLIC, and PBLA, to invest more than $2 billion in loans and other securities in certain of the Affiliated Companies. As of on or about September 30, 2022, LINDBERG's North Carolina insurance companies still held over $1.1 billion in investments in the Affiliated Companies, and LINDBERG's offshore insurance companies still held hundreds of millions of dollars in investments in other entities affiliated with LINDBERG.

g.      While publicly representing that he never took a "dividend" from an insurance company, LINDBERG instead used loans to extract money from the insurance companies for his personal benefit indirectly, including through (a) transfers that were documented as "loans to shareholder;" and (b) using a series of loans through multiple pass-through entities, the accounts of which he used to fund his extravagant lifestyle. On multiple occasions in late 2018, LINDBERG signed "Loan Forgiveness Agreements" on behalf of various entities, forgiving more than $125 million in loans he essentially made to himself.

8.      Also as part of the conspiracy and scheme and in furtherance of their purposes, LINDBERG, Herwig, and Solow made, and caused to be made, various other materially false and fraudulent representations, concealed material facts, and told deceptive half-truths. For example, LINDBERG made, and caused to be made, various materially false and misleading statements to regulators at NCDOI and to other third parties concerning the purported independence of the FinCos, including that LINDBERG would "have no control" over the FinCos and that the FinCos would be managed by an independent portfolio manager. In truth and fact, LINDBERG did have control over the FinCos, and Herwig and Solow effectively served as the portfolio managers for the FinCos.

9.      The conspiracy and scheme ultimately caused substantial financial hardship to LINDBERG's insurance companies, to third parties like ULICO, and to thousands of policyholders. As a result, certain of LINDBERG's insurance companies were placed into rehabilitation and liquidation.

## III.    BACKGROUND ON INSURANCE REGULATION

10.      Insurance was designed to protect consumers, known as "policyholders," from the risk of financial loss resulting from unknown future events. In a common insurance transaction, a consumer paid a fixed fee – also known as a "premium" – to an insurance company in exchange for the insurer's promise to pay future claims arising from a defined event. Certain insurance companies also offered investment products known as annuities. An insurance company's ability to make claim and annuity payments to its policyholders depended on the insurance company having sufficient assets or funds available. To make claim and annuity payments, an insurance company could draw on policyholder premiums that it had invested or on assets or funds held by the insurance company or its reinsurers.

11.      An insurance company could share its risks of payment on claims with another company through "reinsurance," whereby the insurance company ceded a portion of the premiums earned on its policies – along with the risk of paying claims on those policies – to another company (the "reinsurer"). The reinsurer could then invest its share of the premiums. To ensure that a reinsurer can pay future claims, a reinsurance contract could place restrictions on a reinsurer's investments and require that a reinsurer hold low-risk investments in a trust account.

12.      An insurance company could invest premiums to generate revenue. To ensure that insurance companies or reinsurers could pay future claims, state laws and regulations required regular financial reporting and restricted how insurance companies and reinsurers could operate, including how they invested their funds. State insurance regulators often limited or prohibited

4

investment in certain types of holdings and required a certain percentage to be invested in low-risk holdings, such as government bonds and cash equivalents. State insurance laws also empowered insurance regulators to conduct various forms of oversight, including financial examinations.

13.     Insurance companies domiciled in North Carolina, *i.e.* "Domestic companies," were governed by North Carolina General Statutes Chapter 58, *i.e.*, "North Carolina's Insurance Law." North Carolina's Insurance Law contained a number of restrictions on the operation of insurance companies, including restrictions on how insurance companies invested their assets. North Carolina Insurance Law also contained a number of reporting requirements for insurance companies, including, among others, requirements regarding financial statements, transactions with affiliates, dividend payment, re-domestication, and acquisition.

## IV.     THE DEFENDANT'S ENTITIES AND RELEVANT THIRD PARTIES

14.     At all times following LINDBERG's acquisition or formation of each of the entities set forth in paragraphs 15 through 29 below, LINDBERG was the entity's ultimate controlling party and held ultimate financial interest in the entity.

### A.     LINDBERG's Insurance Companies and Insurance-Related Businesses.

15.     Between in or about August 2014 and in or about December 2017, LINDBERG acquired multiple U.S.-based insurance companies. Some of these he re-domesticated to North Carolina (collectively, the "North Carolina Insurance Companies"). The North Carolina Insurance Companies included the following entities, which had numerous policyholders in the Western District of North Carolina:

    a.     SNIC was an insurance company licensed to transact business in multiple states. In or about August 2014, LINDBERG purchased SNIC through a holding company he owned, SNH. In or about December 2014, SNIC was re-domesticated to North Carolina, with a principal place of business in Charlotte, North Carolina. SNIC was later relocated to Durham, North Carolina.

    b.     CBLIC (or "CBL") was an insurance company that primarily wrote annuities. LINDBERG purchased CBLIC on or about November 30, 2015. CBLIC was initially purchased by and was a subsidiary of SNIC, before being spun-off to become a subsidiary of SNH. On or about December 1, 2015, CBLIC was re-domesticated to North Carolina, with a principal place of business in Charlotte, North Carolina. CBLIC was later relocated to Durham, North Carolina.

    c.     BLIC was an insurance company that primarily wrote annuities. LINDBERG purchased BLIC in or about December 2016.

16.     LINDBERG also acquired control of other various insurance-related businesses, including the following:

    a.     SNH was an insurance holding company formed in or about April 2014 in North Carolina. In or about November 2018, SNH was merged into GBIG Holdings. SNH was a wholly owned subsidiary of SNA Capital, LLC ("SNA").

b.　　Colorado Benefits Administrators, LLC ("CBA") was a company that served as a Third-Party Administrator for CBLIC, providing administrative services. CBA was a wholly owned subsidiary of CBX, LLC. On or about March 7, 2017, CBA's name was changed to Global Bankers Insurance Group, LLC ("GBIG").

c.　　PBLA was incorporated on or about April 17, 2017, as a Bermuda exempted company and was registered as a Class E insurer effective May 15, 2017. PBLA was wholly owned by PBX Bermuda Holdings, Ltd. ("PBX Bermuda"), which was a wholly owned subsidiary of PBX Holdings, LLC, a North Carolina holding company.

d.　　SASL was an investment adviser, based in Malta, that was created by LINDBERG in or about January 2015, and registered in Malta in or about February 2016. LINDBERG caused his insurance companies, directly and indirectly, to enter into investment advisory services agreements with SASL. SASL was paid millions of dollars in fees by those insurance companies pursuant to those agreements. SASL was registered with the U.S. Securities and Exchange Commission ("SEC") as an investment adviser from late 2016 until it withdrew its registration in or around October 2019.

**B.　　LINDBERG's Investment Companies and Related Entities.**

17.　　LINDBERG controlled numerous companies that served as holding companies for his other businesses and for holding investments in his other businesses. These included:

| | |
|---|---|
| a. | Academy Association, Inc. ("AAI"), f/k/a Eli Research, Inc. |
| b. | Academy Financial Assets, LLC ("AFA") |
| c. | Atlas Financial Investments, LLC ("AFI") |
| d. | BRCB Capital Limited ("BRCB Capital") |
| e. | BRCB Holdings, Inc. ("BRCB Holdings") |
| f. | Capital Assets Fund I, LLC ("CAF I") |
| g. | Capital Assets Management II, LLC ("CAM II") |
| h. | Capital Assets Management III, LLC ("CAM III") |
| i. | Capital Lending Partners, Inc. ("Capital Lending") |
| j. | Global Insurance Capital, LLC ("GIC") |
| k. | Parallel Capital Assets, LLC ("PCA") |
| l. | Standard Investment Holdings, Ltd ("SIH") |
| m. | Standard Financial Limited ("SFL") |

18.　　Eli Global was the trade name for a group of privately held non-insurance companies ultimately owned by LINDBERG.

19.　　Eli Research, LLC ("Eli Research") was an entity that LINDBERG used at certain times to pay the salaries of various employees of Eli Global, including himself.

20.　　Itech Funding, LLC ("Itech") was created by LINDBERG in or about July 2016. LINDBERG generally used Itech as an entity that borrowed and used insurance company money to purchase preferred equity in other companies LINDBERG owned.

21.     Special Purpose Vehicles ("SPVs") were investment structures that LINDBERG, Herwig, and Solow used to facilitate loans of insurance company money primarily to LINDBERG's Affiliated Companies.

22.     FinCos were another investment structure that LINDBERG, Herwig, and Solow used to facilitate loans of insurance company money to LINDBERG's Affiliated Companies. The FinCos included:

| | |
|---|---|
| a. | Augusta Asset Management, LLC ("AAM") |
| b. | Baldwin Asset Management, LLC ("BAM") |
| c. | Chatsworth Asset Management, LLC ("CAM") |
| d. | Damascus Asset Management, LLC ("DAM") |
| e. | Ephesus Asset Management, LLC ("EAM") |
| f. | Forest Park Asset Management, LLC ("FPAM") |
| g. | Gilford Asset Management, LLC ("GAM") |
| h. | Hampton Asset Management, LLC ("HAM") |
| i. | Iron City Asset Management, LLC ("ICAM") |
| j. | Jackson Asset Management, LLC ("JAM") |
| k. | Kite Asset Management, LLC ("KAM") |
| l. | Lily Asset Management, LLC ("LAM") |
| m. | Marshall Asset Management, LLC ("MAM") |
| n. | Paradise Asset Management ("PAM") |
| o. | Rockdale Asset Management, LLC ("RAM") |
| p. | Summerville Asset Management, LLC ("SAM") |
| q. | Tybee Island Asset Management, LLC ("TIAM") |

**C.     LINDBERG's Real Estate and Personal Holdings.**

23.     Dunhill Holdings, LLC ("Dunhill") was an entity that LINDBERG generally used to pay for personal expenses.

24.     Erie Properties LLC ("Erie Properties") was an entity that LINDBERG used to purchase, in or about November 2014, a collection of personal residential and real properties, including an island in or around Hope, Idaho, for approximately $10.1 million.

25.     First International Financial, Inc. ("FIF") was an entity that LINDBERG used to purchase a residential property on Gimghoul Road in Chapel Hill, North Carolina ("Gimghoul") on or about August 31, 2017, for approximately $1,995,000 and to pay for various personal expenses.

26.     Morning Mountain Holdings, LLC ("Morning Mountain Holdings") was an entity LINDBERG used to purchase a mansion located at 1624 Morning Mountain Road, Raleigh, North Carolina ("Morning Mountain Property") on or about July 2, 2018, for approximately $5.5 million.

27.     South Hill Holdings, LLC ("South Hill") was an entity LINDBERG generally used to pay for, among other things, gifts and travel for various female companions.

28.     New Hill Asset Management, LLC ("New Hill") was an entity LINDBERG generally used as a pass-through entity, to transfer money originating from insurance companies to other entities such as Dunhill, South Hill, and others to pay for personal expenses.

29.     TUX Holdings, LLC ("TUX") was an entity used by LINDBERG to purchase, among other things, approximately 15 residential and other properties in Chapel Hill and Durham, North Carolina, adjacent to one of his residences, for, collectively, nearly $5.8 million between March and April 2018. TUX was owned by Dunhill until on or about March 13, 2019, when LINDBERG and his co-conspirators caused it to be sold to the ULICO 2017 Trust.

### D.     Third Parties.

### (1) Ratings Agencies

30.     Egan Jones was a rating agency registered with the SEC that provided, among other things, long term credit ratings for issuers, securities, and obligations, including structured financial vehicles.

31.     HR Ratings was a rating agency, based in Mexico, registered with the SEC that provided, among other things, ratings for banks, mutual funds, and corporate entities.

### (2) Other Third Parties

32.     ULICO was an insurance company with its principal place of business in Puerto Rico. On or about June 30, 2017, ULICO entered into a reinsurance agreement with PBLA, wherein ULICO ceded, and PBLA agreed to reinsure, certain parts of ULICO's insurance business. As part of the PBLA-ULICO Reinsurance Agreement, PBLA established the ULICO 2017 Trust and a separate Comfort Trust Account (the "ULICO Comfort Trust"), both of which were for "the sole use and benefit of ULICO."

33.     Lincoln Benefits Life Company ("LBL") was an insurance company formed in Nebraska on or about October 20, 1938.

34.     LS was at certain relevant times a resident of Charlotte, North Carolina and a long-time acquaintance of LINDBERG. Beginning in or about November 2016, LS was retained to provide covenant compliance services to the GAM FinCo. Unbeknownst to LS, he was subsequently represented to various other third parties as the independent Portfolio Manager over several FinCos.

35.     VM was at certain times a resident of Brooklyn, New York. Beginning in or about December 2017, VM was contracted to provide consulting services to one of LINDBERG's affiliated entities and later agreed to serve as the Portfolio Manager for a proposed investment adviser that was never implemented. Unbeknownst to VM, he was subsequently represented to various other third parties as the independent Portfolio Manager over several FinCos.

## V.   LINDBERG'S PURCHASE, RE-DOMESTICATION, AND FRAUDULENT SPINOFF OF CBLIC

36.     In or about June 2015, LINDBERG entered into an agreement for SNIC to purchase the stock of CBLIC for $60 million and CBA to purchase certain assets of CBLIC for approximately $10 million. LINDBERG initially planned to have SNIC purchase and be the parent company of CBLIC. However, because CBLIC had a better rating than SNIC, prior to the closing of SNIC's purchase of CBLIC, LINDBERG advised NCDOI that after acquiring CBLIC, SNIC would spin it off (*i.e.* sell it) to SNH, which would then serve as the parent company for both SNIC and CBLIC.

37.     In anticipation of the eventual re-domestication and sale of CBLIC to SNH from SNIC, LINDBERG caused one of his insurance employees to write to NCDOI, on or about October 14, 2015, confirming that "SNIC will not be financially impacted by [its sale of CBLIC to SNH]." After receiving this confirmation, NCDOI approved the planned sale of CBLIC to SNH. LINDBERG also made, and caused others to make, similar false and misleading representations to NCDOI throughout the remainder of 2015, including that "SNIC will have received $36 million in cash and $24 million in [CBLIC] preferred stock for the spin off of [CBLIC], which is equal to SNIC's purchase price of [CBLIC]."

38.     In truth and fact, on or about December 31, 2015, the day the spinoff of CBLIC from SNIC to SNH purportedly occurred, SNH transferred no money to SNIC. It could not have done so because as of December 31, 2015, SNH had a cash balance of approximately $86,000 in its bank account.

39.     It was not until on or about January 29, 2016, that SNH transferred $36 million to SNIC, after SNH received, between January 28 and 29, 2016, (a) a $9 million loan from SNIC; (b) a $6 million loan from CBLIC; (c) a $20 million loan from AAI; and (d) a $1 million loan from SNA. The loans from AAI and SNA were funded through a series of transactions that originated with CBLIC. That is, of the $36 million SNH wired to SNIC to purchase CBLIC on January 29, 2016, SNH borrowed $9 million from SNIC and $27 million in loans that traced back to CBLIC.

40.     To effectuate these transactions, LINDBERG, Herwig, and Solow caused numerous wire transfers to occur on or about January 28 and 29, 2016, some of which passed through various SPVs. Only after the $36 million of funds that originated with SNIC and CBLIC were wired to SNH, did SNH then wire, on or about January 29, 2016, $36 million to SNIC to purchase CBLIC.

41.     Additionally, LINDBERG also caused representations to be made to NCDOI regarding his purported purchase of CBX (including CBA) from SNIC in the spinoff. For example, on or about December 3, 2015, LINDBERG caused one of his insurance employees to send an email to NCDOI regarding SNIC's sale of CBX representing that, "SNIC will be made whole for the spin out of this entity." In truth and fact, SNIC and CBLIC funded that purchase in another circular transaction. Specifically, LINDBERG's purported $10 million purchase of CBX was funded with $9 million from SNIC and $1 million from CBLIC that was funneled through various entities on or about January 28 and 29, 2016, before ending up at CBA. Approximately two minutes after LINDBERG had finished accumulating the $10 million at CBA, on or about January

9

29, 2016, LINDBERG caused $10 million to be wired from CBA to SNIC to complete his purported purchase of CBX and CBA from SNIC.

42.    The following chart, which is incorporated into this paragraph, depicts the flow of funds for LINDBERG's spinoff of CBLIC and CBA from SNIC:



43.    In sum, of the total of $46 million paid to SNIC by SNH for the spinoff of CBLIC:

a.    A total of $28 million originated with CBLIC, with $27 million originating from funds CBLIC ultimately transferred to SNH and were then used by SNH as part of the funds to purchase CBLIC from SNIC and $1 million originating with CBLIC ultimately transferred to SNIC for the purchase of CBX and CBA; and

b.    A total of $18 million originated with SNIC, with $9 million originating from funds SNIC transferred to SNH and used by SNH to purchase CBLIC from SNIC and $9 million from SNIC transferred through CBA back to SNIC for the purchase of CBX and CBA.

44.    LINDBERG, Herwig, and Solow structured the transactions in this way to, among other things, circumvent North Carolina Insurance Law and to deceive NCDOI, which already had concerns about SNIC's financial condition and its level of affiliated assets. By obscuring the financial realities of the spinoff through this series of complicated transactions, LINDBERG, Herwig, and Solow concealed the fact that the spinoff did not alleviate the concerns about SNIC's financial condition, and deprived NCDOI of material information necessary to fulfill its regulatory duties.

45.     Prior to the wires in furtherance of these transactions occurring on or about January 27, 2016, Solow sent LINDBERG, Herwig, and others, including an employee located in Charlotte, North Carolina, the Commitment Transaction Advice forms ("CTAs"), to approve the loans from SNIC and CBL to SNH, without disclosing in the CTAs the purpose of those loans.

46.     On or about January 29, 2016, LINDBERG sent an email with attached supporting documentation directing that various materially false and misleading entries be made in the books of SNH, SNIC, and other entities "for the settlement of the 12-31-15 purchase of CBLI[C] by SNH."

47.     LINDBERG also caused other materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and material omissions to be made in the books and records and the audited and statutory financial statements of both SNIC and CBLIC, including, that, on or about February 17, 2016, an employee of SNIC's administrator sent an email to various employees, including employees in Charlotte, North Carolina, attaching journal entries related to the CBLIC spinoff from SNIC to SNH. These journal entries were materially false and misleading because, among other things, they reflected that as of December 31, 2015, LINDBERG had contributed $36 million for SNH's purchase of CBLIC from SNIC and $10 million for the purchase of CBA, both of which were falsely described as "Cash in Transit." In truth and fact, as set forth above, the $46 million did not come from LINDBERG but instead came from SNIC and CBLIC, and it was not "in transit" as of December 31, 2015.

48.     These journal entries caused additional false, fraudulent, and misleading statements, representations, deceptive half-truths, and omissions in the SNIC and CBLIC 2015 Statutory and Audited Financial Statements, including but not limited to:

    a.     SNIC's 2015 Statutory Financial Statements and 2015 Audited Financial Statements both overstated the cash balance by at least $46 million because SNIC had not received any of that money prior to December 31, 2015. Further, approximately $28 million of that $46 million was double counted insofar as that same $28 million was fraudulently listed as an "asset" on both the SNIC and CBLIC books as of December 31, 2015, that is, SNIC's books reflected receipt of the cash, but CBLIC's books did not reflect having sent the cash.

    b.     SNIC's 2015 Statutory Financial Statements and 2015 Audited Financial Statements also misrepresented that on "December 31, 2015, SNH contributed $36 million" to SNIC, and they failed to disclose as subsequent events that on or about January 28, 2016, SNIC loaned SNH $9 million and CBA an additional $9 million, which LINDBERG used to finance the CBLIC spinoff.

    c.     CBLIC's 2015 Statutory Financial Statements failed to disclose as subsequent events that on or about January 28, 2016, CBLIC loaned $6 million directly to SNH and loaned another approximately $25,500,000 to three SPVs, most of which LINDBERG also caused to be funneled to SNH to finance the CBLIC spinoff.

    d.     CBLIC's 2015 Audited Financial Statements falsely and misleadingly described the purpose of the $6 million loan to SNH as a "redeployment of assets" and

failed to disclose that CBLIC made millions of dollars of additional affiliated loans that were used to finance its spinoff from SNIC.

49.     LINDBERG also caused materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and material omissions to be made in the books and records and the audited financial statements of SNH for year-end 2015 regarding its purchase of CBLIC from SNIC.

50.     When NCDOI asked for additional information about the spinoff as part of its examination process, LINDBERG caused materially false and misleading statements to be made to NCDOI.

## VI.     LINDBERG AND HIS CO-CONSPIRATORS CREATED "FINCOS" IN ORDER TO ASSUAGE REGULATORY CONCERNS WHILE SIMULTANEOUSLY EXTRACTING MILLIONS OF ADDITIONAL DOLLARS FROM THE INSURANCE COMPANIES

51.     Around the time of the CBLIC spinoff described above, NCDOI began raising concerns about the North Carolina Insurance Companies' investments in Affiliated Companies. In response to those concerns, LINDBERG, Herwig, and Solow began considering different investment structures, purportedly to "disaffiliate" the insurance company investments from LINDBERG. One of the structures proposed to NCDOI was "SPVs," (also known as Loan-Backed and Structured Securities or "LBaSS").

52.     Based on LINDBERG, Herwig, and Solow's representations about the SPVs, NCDOI initially did not take issue with the SPVs, and, beginning in or about 2016, LINDBERG, Herwig, and Solow began to cause SPVs to be created and insurance company money to be invested in the SPVs. In fact, unbeknownst to NCDOI, some of the earliest SPVs were used in connection with the funding of the CBLIC spinoff discussed above.

53.     As 2016 progressed and NCDOI conducted the SNIC and CBLIC 2015 year-end financial examinations, NCDOI raised additional concerns about LINDBERG's affiliated investments, including whether the SPVs were sufficiently "disaffiliated."

54.     On or about November 1, 2016, LINDBERG and Herwig met with representatives from NCDOI to discuss "investment issues and concerns" that NCDOI had raised as a result of the examination of SNIC's 2015 year-end financials.

55.     Around the same time, Herwig and Solow were in discussions with LS regarding whether he would enter into a consulting agreement to provide compliance, *i.e.* credit monitoring and reporting, services with regard to a single new financial structure being considered by Eli Global, the GAM FinCo.

### A.     LINDBERG, Herwig, and Solow Raised the Potential FinCo Structure with NCDOI.

56.     On or about January 10, 2017, Herwig wrote to NCDOI, copying LINDBERG and Solow, explaining a proposed unaffiliated "finance company investment structure (the 'Finance

Co') [FinCo] to further reduce the percentage of SPVs on [the North Carolina Insurance Companies'] balance sheet." In his letter, Herwig represented, among other things, that:

      a.     The investments will be "investment grade loan[s] [from the North Carolina Insurance Companies] to an unaffiliated investment company."

      b.     The FinCo "will have been contributed into a trust managed by an independent trustee with paid in capital…"

      c.     The FinCo "will have a contracted third party employee managing decisions and executing on behalf of the trustee;" that employee "has decades of experience in the middle market lending industry;" and that employee "will have the ability to buy and sell loans in order to generate income that will pay back the loan to the Finance Co. [FinCo]."

      d.     LINDBERG "will have no control over the Finance Co. [FinCo]."

      e.     The FinCo "will have ample capitalization from its initial paid in capital;" and

      f.     The "structure will increase the credit quality of the portfolio by diversifying risk rather than having individual loans."

57.     On or about January 16, 2017, NCDOI responded to Herwig's letter with a number of questions, which Solow responded to, on or about January 16, 2017, copying LINDBERG and Herwig, by providing, among other things, a copy of the GAM Basic Information Memorandum, dated January 2017.

58.     The GAM Memorandum transmitted to NCDOI contained a number of statements and representations that were materially false, fraudulent, and misleading, including that:

      a.     Among the "Key Financing Rationale," that there was a "strong management team" with "decades of debt investment experience;"

      b.     "All underlying investments will be middle market loans to private companies…"

      c.     The FinCo would be "capitalized with paid in capital and a bond offering;" and

      d.     "The management of [LS] provides decades of middle market lending experience," and he was "able to efficiently manage the loan portfolio, assess credit quality and administer the debt."

59.     In truth and fact, LS had explicitly informed Solow and Herwig, on or about January 11, 2017, that he could not serve as a portfolio manager for the FinCos and was planning to provide only "credit monitoring and reporting" consulting, writing, in part:

> From my conversations with Chris [Herwig] last Fall, my understanding was that my responsibilities with GAM would be limited to credit monitoring and reporting. To be the sole Director and Officer of GAM is all encompassing and exposes me to liability and RIA registration exposure that I had not contemplated.

60.    On or about February 7, 2017, LS followed up, reminding Solow that while he stood "ready to help" he "just ask[ed] that [Solow] be careful in describing [his] role in any way of 'managing the portfolio.'"

**B.    NCDOI's Examination of SNIC and CBLIC Led to Further Financial Evaluation of LINDBERG and his North Carolina Insurance Companies.**

61.    On or about March 28, 2017, NCDOI sent GBIG a letter, which was forwarded to LINDBERG, regarding its 2015 year-end financial examination of SNIC and CBLIC, identifying four concerns "regarding the affiliated debt securities and the special purpose vehicles ('SPVs') that [were] held by" SNIC and CBLIC. Specifically, NCDOI expressed concerns that:

a.    "Many of the affiliated debt securities held by SNIC…[were] with borrowers that had negative shareholders' equity" and that attempting to disaffiliate them through the SPVs would "not diminish" this concern.

b.    The affiliated loans were structured in a manner designed to evade statutory reporting requirements as "each individual affiliated loan that had been issued by SNIC as of December 31, 2015, was just below the threshold that would require the Department's review and approval" and that "[t]he funds received by the affiliated borrowers from the affiliated loans were used to provide subsequent dividends to Mr. Greg LINDBERG, the ultimate controlling person."

c.    The annual financial statement submitted for LINDBERG did "not accurately reflect the financial condition of Mr. Greg LINDBERG and his group." As such, NCDOI requested, pursuant to statute, that consolidated GAAP financial statements for 2015 and 2016 for LINDBERG be provided by June 30, 2017, and by April 1 in the following years; and

d.    "[T]he cash flow forecasts for the affiliated borrowers d[id] not accurately reflect the affiliated borrowers' ability to repay debt obligations as they come due."

62.    Over the ensuing six months, NCDOI and GBIG engaged in significant back-and-forth over the examination reports, which would be publicly available, and management letters, which would not be available to the public. LINDBERG had significant involvement in these discussions. A primary focus of these communications was the language regarding NCDOI's concerns about the affiliated investments and LINDBERG's personal financial statement and whether such language would appear in the examination reports (that were available on NCDOI's public website), only in the nonpublic management letters, or in neither. Ultimately, on or about September 15, 2017, NCDOI and GBIG agreed to the Final CBLIC and SNIC 2015 year-end Reports On Examination and Management Letters. As a result of this back-and-forth, several of NCDOI's concerns about these issues were diluted and moved to the nonpublic Management

Letters, and NCDOI's concern that the affiliated borrowers "were used to provide subsequent dividends to [LINDBERG] the Ultimate Controlling Person," was removed altogether from the documents.

63.     In conjunction with NCDOI's agreement to modify the Reports On Examination and Management Letters, LINDBERG consented to NCDOI hiring two external consultants – Rector and Associates ("Rector"), to conduct additional review and analysis concerning NCDOI's concerns about the affiliated Loan Backed and Structured Securities and Noble Consulting Services, Inc. ("Noble"), to prepare certain financial analysis of LINDBERG's assets.

## C.     LINDBERG and His Co-Conspirators Extracted Additional Money from the Insurance Companies through FinCos that They Had Falsely Represented to NCDOI Were Unaffiliated, and Concealed these Transactions from NCDOI.

### (1)     Rector's Preliminary Findings

64.     On or about October 18, 2017, NCDOI representatives had a call with GBIG representatives to provide Rector's "Preliminary Findings Analysis of Loan Backed and Structured Securities Designation." During that call, Rector explained that it had examined certain assets held by CBLIC and SNIC as of December 31, 2016, and March 31, 2017, and determined that SNIC and CBLIC had used Egan Jones to rate a significant number of loan-backed securities, which Egan Jones was not properly qualified to do.

65.     On or about November 7, 2017, in advance of a planned quarterly meeting between NCDOI and LINDBERG and other GBIG representatives, LINDBERG and his co-conspirators caused GBIG to provide NCDOI a slide deck with an agenda and discussion points, in which it made a number of materially false and misleading representations regarding the FinCos, including that:

        a.      "In response to Rector's feedback and discussions with the Department" GBIG would "make sure all Loan-Backed and Structured Securities are either: Rated by an NRSRO [Nationally Recognized Statistical Ratings Organization] acceptable to the Department...Prepaid by the ultimate and intermediate borrower and potentially restructured as a new direct loan with the ultimate borrower put in a trust [or] [s]old to a finance company that will become the borrower from the insurance company;" and

        b.      With regard to the FinCos, LINDBERG, Herwig, and the GBIG team represented that the "Key Characteristics" would include that it would be "[m]anaged by a trust with independent manager and compliance officer...[and include] [e]xtra capital from preferred equity." They also represented that one "advantage" was "[i]ndependent middle market lending expertise."

66.     At LINDBERG's direction, a presentation containing identical materially false and misleading representations also was sent to insurance regulators in Oklahoma.

67.     On or about November 8, 2017, NCDOI sent GBIG representatives, among other things, a copy of Herwig's January 10, 2017 letter regarding the FinCo structure as well as the January 12, 2017 draft of the GAM Basic Information Memorandum, inquiring whether the FinCo

option they wished to discuss was "similar to what's described" in those documents, and asking whether "the Company ha[d] moved forward with any of the remedial strategies with regard to the Egan-Jones LBS issue...."

68.    On or about November 9, 2017, LINDBERG and his co-conspirators caused GBIG to falsely respond "yes" to NCDOI's question with regard to the FinCo structure. GBIG also advised that it had moved forward with certain remedial strategies and would ensure that they would "make sure all Loan-Backed and Structured Securities are either: Rated by an NRSRO acceptable to the Department...Prepaid by the ultimate and intermediate borrower and potentially restructured as a new direct loan with the ultimate borrower put in a trust [or] [s]old to a finance company [FinCo] that will become the borrower from the insurance company."

69.    NCDOI responded that same day, to, *inter alia*, LINDBERG and Herwig, letting them know that NCDOI was "not sure that the proposed solutions [would] address [its] concerns" and that it was NCDOI's understanding that LINDBERG "plan[ned] to reduce each insurer's assets for which he maintain[ed] an economic interest to 10% or less of total assets on an individual company basis by 1Q 2018." NCDOI requested a response by November 13, 2017.

### (2)    Unbeknownst to NCDOI, LINDBERG and His Co-Conspirators had Already Started Setting Up the New FinCo Investment Structure and Then Used the Transition from SPVs to FinCos to "Skim" Approximately $55 Million

70.    In fact, LINDBERG, Herwig, and Solow had started submitting draft FinCo documents to Egan Jones as early as in or around September 2016, including submitting the materially false and misleading initial draft "Basic Information Memorandum" for GAM, discussed above, and causing Egan Jones to provide an "indicative rating letter" for GAM later that month. Then, in or around April and July 2017, LINDBERG, Herwig, and Solow caused an updated GAM Memorandum to be submitted, which continued to include the false and misleading statements set forth above, obtaining a final rating letter for GAM from Egan Jones on or about July 21, 2017.

71.    On or about October 19, 2017, LINDBERG, Herwig, and Solow caused the "Basic Information Memorandum" for another FinCo, SAM, to be submitted to Egan Jones for ratings. The representations in that Memorandum were similar to the initial GAM memo provided to NCDOI, including that:

    a.    Among the "Key Financing Rationale," that there was a "strong management team" with "decades of debt investment experience;"

    b.    "All underlying investments will be middle market loans to private companies..."

    c.    The FinCo would be "capitalized with paid in capital and a bond offering."

    d.    "The management of [LS] provides decades of middle market lending experience" and he was "able to efficiently manage the loan portfolio, assess credit quality and administer the debt;" and

e.     LS's "Management Biograph[y] was also included, stating that he was "now a consultant to [the FinCo] as the manager of the loan portfolio."

72.     In truth and fact, and as LINDBERG knew, LS was not providing any management services to SAM. In fact, LS had not contracted to provide any services with regards to SAM and had explicitly stated he could not provide Portfolio Management services to the FinCos.

73.     Starting in early November 2017, LINDBERG, Herwig, and Solow began the process of transitioning the existing insurance company loans to SPVs into new insurance company loans to the newly created FinCos. Contrary to their representations about this switch being beneficial for the North Carolina Insurance Companies, LINDBERG, Herwig, and Solow inserted AFA as an intermediary in the process to extract millions of dollars in "profit" from the transactions. As set forth below, they did this by causing AFA to purchase the loans from the North Carolina Insurance Companies to the SPVs at a discount, known as the "Book-Adjusted-Carrying-Value" and then causing the underlying SPV loans to be sold to the FinCos at the par (or full) value. The SPVs then repaid the loans now held by AFA at the par value. The fraudulent extractions of insurance companies' funds generally proceeded as follows:

a.     AFA first bought a loan from an insurance company to a SPV at the Book-Adjusted Carrying Value, *i.e.*, discounted price of the loan, plus accrued interest;

b.     The FinCos then used the new insurance company loan proceeds to obtain the underlying loan previously held by the SPV, in whole or part, at the par, *i.e.* full value, plus accrued interest;

c.     The SPVs then sent to AFA the par value of the loan, plus accrued interest.

d.     As a result, AFA "skimmed" the difference between the par value and discounted price of the loan off the top, and the North Carolina Insurance Companies— and, ultimately, their policyholders—did not fully realize the benefit from the fact that they had initially funded the loan at a discount.

74.     On or about November 8, 2017, LINDBERG, Herwig, and Solow caused SAM, the first FinCo deal using the "skim," to close, extracting approximately $4.9 million, which, following the funding of the FinCos, remained with AFA. The funds that AFA used to initiate the skim by purchasing the underlying loans from the insurance companies came from affiliated loans from CBLIC, BLIC and the ULICO 2017 Trust. That is, prior to initiating the closing of SAM, AFA received approximately $24 million that originated with CBLIC, $3.2 million that originated with BLIC, and $13,750,000 that originated with the ULICO 2017 Trust.

75.     On or about November 9, 2017, LINDBERG, Herwig, and Solow caused BAM to close, "skimming" to AFA more than $4 million in the process. Also, on or about November 9, 2017, an Eli Global employee sent LINDBERG a table showing "the breakdown of AFA's profit per Finco deal," indicating an anticipated total profit of nearly $51 million, with an average net profit per deal of more than $4.6 million across 11 FinCos.

76.     Throughout November 2017, NCDOI attempted to obtain additional information about the FinCos for Rector's review. After initially agreeing to provide the requested information,

GBIG changed course and stated it would not provide additional information about the FinCos until January 2018.

77. On or about November 20, 2017, LINDBERG, Herwig, and Solow caused the "Basic Information Memorandum" for BAM, CAM, DAM, EAM and Itech to be submitted to Egan Jones for ratings, containing the same or similar materially false and misleading representations with regard to management of the FinCo and the underlying investments as those that were included in the previously submitted GAM and SAM Memoranda.

78. On or about November 21, 2017, an Eli Global employee sent LINDBERG the "breakdown and total of AFA profit per FinCo deal we closed" as of that date, *i.e.* between on or about November 8 and November 17, 2017, showing a total of more than $27 million profit taken through the funding of SAM, BAM, CAM, DAM, EAM, and FPAM with the insurance company money previously lent to the SPVs.

79. Ultimately, as a result of the "AFA skim," LINDBERG extracted approximately $55 million in the transition from SPVs to FinCos. This included an additional "skim" of more than $4.7 million in cash taken in February 2018 through HAM, JAM, and ICAM, an additional skim of another approximately $3.7 million in cash in May 2018 through various FinCos, and an additional "skim" of more than $23.7 million in cash and preferred equity taken in June 2018 through KAM, LAM, PAM, and RAM.

80. LINDBERG then used the money he "skimmed" in the SPV/FinCo transition, in part, for various personal expenditures including:

    a. On or about June 15 and 19, 2018, LINDBERG caused a total of approximately $389,000 to be transferred to LaSorsa & Associates, a company that had been contracted to surveil women with whom LINDBERG had or sought to have a personal relationship and to provide other services, and which, between in or about January 2018 and September 2018 was paid more than $8 million for such services from Dunhill accounts;

    b. On or about June 15, 2018, LINDBERG caused payments to American Express totaling approximately $750,000;

    c. On or about June 18, 2018, LINDBERG caused approximately $261,000 to be transferred to a contractor related to the Erie Properties personal real estate;

    d. Also on or about June 18, 2018, LINDBERG caused a total of approximately $70,000 to made in branch withdrawals;

    e. On or about June 21, 2018, LINDBERG caused approximately $1.5 million to be sent to the company managing a private jet LINDBERG was leasing; and

    f. On or about June 21 and 22, 2018, LINDBERG caused a total of approximately $740,000 to be transferred to FIF, which was then used to pay personal expenditures, including:

- On or about June 21, 2018, approximately $60,000 went to a Las Vegas party planner that LINDBERG hired as an "event planner, assisting with the coordination of private events, parties and vacations; and booking staff and talent for private events;" and

- Between June 22 and June 26, approximately $620,000 was wired to another travel company in connection with chartering a yacht and other expenses for a trip to Ibiza, a Spanish island in the Mediterranean Sea.

81.    Additionally, SASL served as an investment adviser, with corresponding fiduciary duties to the insurance companies. By causing the insurance companies to transition existing investments from the SPVs to the FinCos to benefit LINDBERG at the expense of the insurance companies, LINDBERG and his co-conspirators caused SASL to breach those fiduciary duties.

### (3)    LINDBERG and His Co-Conspirators Caused GBIG to Report the FinCos as Unaffiliated

82.    After LINDBERG, Herwig, and Solow caused CBLIC and SNIC to invest in the FinCos, GBIG, as LINDBERG knew, almost immediately began reporting those investments as "Unaffiliated Loan-backed LLC Investments" on monthly reports sent to NCDOI. By this point, due to the concerns raised during the year-end examinations and those underlying the Rector and Noble Reports, NCDOI had begun requiring the North Carolina Insurance Companies to provide monthly reports detailing their investment of policyholders' money. As part of that monthly reporting, on or about January 1, 2018, GBIG's Chief Financial Officer ("CFO"), after consulting with Herwig, wrote to NCDOI regarding the "November Investment Report," noting, among other things, that "[t]he asset type 'Unaffiliated Loan-backed LLC Investments' includes the new finance company investments that were started in response to the Rector feedback." In truth and fact, as set forth above, LINDBERG, Herwig, and Solow had started the process of creating the first FinCo, GAM, as early as 2016 and caused numerous additional FinCos to be created and funded in 2017.

83.    After further discussion with NCDOI, as LINDBERG knew, Herwig and Solow caused GBIG to start reporting the FinCos on its monthly reports to NCDOI as "Unaffiliated direct loans to UCP Companies." In truth and fact, as set forth above, there was no valid basis to represent the FinCos, which LINDBERG, Herwig, and Solow controlled and which invested extensively in Affiliated Companies, to be unaffiliated with LINDBERG. Eventually, after signing the Remediation Plan with NCDOI discussed below, GBIG finally started reporting the North Carolina Insurance Companies' investments in FinCos as affiliated in its monthly reports to NCDOI.

84.    In addition to its monthly reports to NCDOI, GBIG also included information about the investments in FinCos in the publicly available Quarterly and Annual Statements of CBLIC and SNIC, which LINDBERG approved. The FinCo investments were not identified as affiliated in those statements, but to the contrary, were falsely and misleadingly reported on Schedule D as "Bonds – Industrial and Miscellaneous (Unaffiliated)," which was the same category used to report the North Carolina Insurance Companies' investments in corporate bonds issued by well-known third parties such as Walt Disney Co. and McDonald's Corp. The FinCo investments also were

19

falsely and misleadingly reported as "Unaffiliated domestic securities" in the North Carolina Insurance Companies' Audited Financial Statements for year-end 2017.

85.     Despite falsely reporting the FinCo investments as unaffiliated, LINDBERG and his co-conspirators used them to finance and refinance LINDBERG's personal real estate. Specifically:

      a.     On or about March 29, 2018, LINDBERG and his co-conspirators caused the SAM FinCo, which was funded with insurance company money, to fund a mortgage for the purchase of various real properties located around one of LINDBERG's homes in Chapel Hill, North Carolina, associated with TUX.

      b.     On or about July 2, 2018, LINDBERG and his co-conspirators caused the KAM FinCo, which was funded with insurance company money, to fund a mortgage for the purchase of the Morning Mountain Property, which LINDBERG purchased for his girlfriend at the time.

86.     In short, LINDBERG, Herwig, and Solow represented that the transition from SPVs to FinCo would be beneficial to the North Carolina Insurance Companies and would help address NCDOI's and Rector's concerns about the affiliated investments, but when NCDOI asked for more information, LINDBERG refused, claiming GBIG would not provide the information for several months. While withholding the requested additional information from NCDOI, LINDBERG, Herwig, and Solow used the transition to FinCos to extract approximately $55 million for LINDBERG's benefit, and falsely reported the FinCos as unaffiliated in publicly available financial statements and elsewhere despite having no valid basis for doing so.

**VII.     ALSO IN LATE DECEMBER 2017 AND JANUARY 2018, LINDBERG AND HIS CO-CONSPIRATORS EXTRACTED MILLIONS OF DOLLARS FROM THE ULICO 2017 TRUST FOR VARIOUS FRAUDULENT PURPOSES, INCLUDING TO AMASS "SHOW MONEY" FOR THE LBL PURCHASE AND TO ARTIFICIALLY INFLATE THE CAPITAL POSITION OF PBLA, USING APPROXIMATELY $257 MILLION OF REPOS**

87.     During the same period that they were responding to and disputing NCDOI's concerns about GBIG's affiliated investments, LINDBERG and his co-conspirators also engaged in numerous fraudulent transactions through an insurance company outside the regulatory authority of NCDOI, namely PBLA and the ULICO 2017 Trust, which PBLA managed. LINDBERG and his co-conspirators engaged in the fraudulent transactions, including a series of sham Repos), to, among other things, (a) inflate PBLA's reported capital position; (b) fund an SNH account to be used as "show money" to the Nebraska Department of Insurance ("Nebraska DOI") in support of the planned LBL acquisition; (c) artificially inflate the "cash equivalents" reported in the ULICO 2017 Trust; and (d) extract money from the ULICO 2017 Trust that LINDBERG then used for various personal expenses and to make payments on outstanding loans to the North Carolina Insurance Companies and to the ULICO 2017 Trust.

88.     PBLA's relationship with ULICO began on or about June 30, 2017, when after months of discussions, PBLA and ULICO entered into various reinsurance agreements. Under those agreements, PBLA was to reinsure certain life insurance and annuities that ULICO had

issued to its policyholders. In exchange, ULICO ceded hundreds of millions of dollars in policyholder reserves to PBLA to manage.

        a.      ULICO had begun looking for a new reinsurer in or about 2016, because of difficulties with its previous reinsurer, including concerns about liquidity and concentration of assets in a single investment. In choosing a new reinsurer, ULICO focused on an entity that would ensure compliance with Chapter 6 of the Puerto Rican Insurance Law ("Chapter 6"), which generally addressed investments of funds from insurance company assets and contained specific requirements concerning Repos and cash equivalents.

        b.      In or about early 2017, LINDBERG began discussions about one of his companies serving as ULICO's new reinsurer. During subsequent negotiations, LINDBERG represented that he had the expertise that would aid in getting ULICO's assets into Chapter 6 compliance as well as making ULICO's portfolio more liquid. To that end, LINDBERG and Herwig presented ULICO with a plan to get the assets in compliance with Chapter 6 by September 30, 2017.

        c.      Based upon LINDBERG's and Herwig's representations, ULICO ultimately chose LINDBERG and his newly formed Bermuda company, PBLA, as its new reinsurer.

89.      The PBLA-ULICO Reinsurance Agreement set forth numerous requirements governing the types of investments that could be made in the ULICO 2017 Trust and the Comfort Trust and the periodic reporting and certification to be made by PBLA to ULICO concerning the assets in these accounts. Attached to and incorporated into the PBLA-ULICO Reinsurance Agreement, as Exhibit A, were Investment Guidelines ("Investment Guidelines") that governed PBLA's investments in the ULICO 2017 Trust and the Comfort Trust Account. The Investment Guidelines required, *inter alia*, PBLA to "ensure it is always in compliance with all applicable regulatory requirements…."

90.      Almost immediately after entering into the PBLA-ULICO Reinsurance Agreement and gaining access to the assets ULICO transferred to the ULICO 2017 Trust, LINDBERG and his co-conspirators began extracting money out of the ULICO 2017 Trust by causing it to invest in Affiliated Companies. As set forth below, LINDBERG and his co-conspirators used the money extracted out of the ULICO 2017 Trust for various purposes, including to fund LINDBERG's planned acquisition of LBL and to fund LINDBERG's extravagant lifestyle. LINDBERG, Herwig, and others at Eli Global concealed this material information from ULICO.

**A.**      **In Late December 2017, LINDBERG and His Co-Conspirators Caused PBLA to Engage in Repos Totaling Nearly $96 Million, which Artificially Inflated PBLA's Capital Position.**

91.      In or about late December 2017, LINDBERG and his co-conspirators caused PBLA to enter into a series of Repos totaling nearly $96 million ("December 2017 Repos"), which artificially overstated PBLA's capital and asset positions and allowed LINDBERG to repatriate

millions of dollars he had accumulated in one of his overseas entities, SFL, while also appearing to pay SFL millions of dollars in fees owed to it by AAI.

92.     The Sale and Repurchase Agreements for the December 2017 Repos ("December Repo Agreements"), each of which was signed by LINDBERG on behalf of both the Buyer (PBLA) and the Affiliated Companies "selling" the assets, "obligated [the Seller] to repurchase the Assets no more than 364 days from the Effective Date" of each agreement.

93.     The December 2017 Repos involved three sets of agreements and corresponding wires, with five agreements executed on each of December 27, 28, and 29, requiring PBLA to lend/wire the monies each day to (1) AFA; (2) AFI; (3) CAF I; (4) CAM II; and (5) GIC. The December 2017 Repos were structured in this way, in part, to circumvent regulatory restrictions, which at the time, limited each PBLA investment into a single entity to less than approximately $30 million.

94.     As a result of the December 2017 Repos, PBLA appeared to have approximately $96 million of additional capital on its books. As LINDBERG knew, this artificially inflated capital number was subsequently reported to several third parties, including ULICO, regulators, and various rating agencies in PBLA's Management Financial Statements and gave the materially false appearance that PBLA was in better financial condition than it was.

95.     The following chart, which is incorporated into this paragraph, depicts the flow of funds for the $26,637,430 December 27 Repos:



96.     The purported collateral for each of these Repos was an investment in an Affiliated Company. For example, the collateral for the $2.7 million repurchase transaction with GIC was a loan to New Hill.

97.     On or about December 28, 2017, LINDBERG and his co-conspirators caused PBLA to enter into a nearly identical set of Repos as the previous day, only in a larger amount. As with the day before, pursuant to the December Repo Agreements executed on or about December 28, 2017, PBLA was supposed to wire approximately $40 million out of the PBLA Main Account to five different affiliated "sellers" in exchange for the securities received from the "sellers." Again, however, the PBLA Main Account lacked sufficient funds, so LINDBERG and his co-conspirators engaged in a second set of circular transactions, starting with transfers from SFL and SASL to the PBLA Main Account. The $12 million transferred from SASL to the PBLA Main Account constituted fees that had been paid to SASL by various Affiliated Companies, including LINDBERG's insurance companies.

98.     The following chart, which is incorporated into this paragraph, depicts the flow of funds for the $40,743,620 December 28 Repos:



99.     The purported collateral for each of these Repos was an investment in an Affiliated Company. For example, the collateral for the $4 million repurchase transaction with GIC and the majority of the collateral for the $13,989,000 million repurchase transaction with CAF I was once again loans to New Hill.

100.    For the third consecutive day, LINDBERG and his co-conspirators caused PBLA to enter into a nearly identical set of Repos as the previous days. As with the previous days,

pursuant to the December Repo Agreements executed on or about December 29, 2017, PBLA was supposed to wire approximately $28.4 million out of the PBLA Main Account to five different affiliated "sellers" in exchange for the securities received from the "sellers." Again, however, the PBLA Main Account lacked sufficient funds, so LINDBERG and his co-conspirators engaged in a third set of circular transactions, as depicted in the following chart, which is incorporated into this paragraph:



101. The purported collateral for each of these Repos was an investment in an Affiliated Company. For example, the collateral for $750,000 of the $5.5 million repurchase agreement with GIC was a loan to New Hill.

102. As a result of these three sets of Repo Transactions, LINDBERG and his co-conspirators were able to artificially inflate PBLA's capital by nearly $96 million without leaving PBLA with any additional cash. In truth and in fact, and contrary to the materially false and misleading appearance that LINDBERG and his co-conspirators created using these transactions, PBLA was essentially left with nearly $96 million in "IOUs" from various affiliated pass-through entities, which were, in part, backed by loans certain of those companies had made to New Hill, which were later forgiven by LINDBERG.

103. In January 2019, after the term of each of the December 2017 Repos already had expired and the loans to New Hill had already been forgiven, LINDBERG caused the Repos to be retroactively rolled over for another 364 days.

**B.** **LINDBERG and His Co-Conspirators Accumulated "Show Money" for LINDBERG's Planned Acquisition of LBL, Extracting Nearly $200 Million of Additional Cash from the ULICO 2017 Trust and CBLIC and Engaging in a Second Series of Repos.**

104. On or about October 1, 2017, LINDBERG and various insurance entities he controlled agreed to purchase LBL, an insurance company that had nearly $10 billion in assets, for approximately $585 million. As a result, LINDBERG caused, on or about October 2, 2017, a $29.5 million escrow payment to be sent from SNH. LINDBERG and his co-conspirators caused this escrow payment to be funded by CBLIC and the ULICO 2017 Trust through a series of transactions funneled through various Affiliated Companies.

105. In order to complete his planned acquisition of LBL, LINDBERG had to satisfy concerns that the Nebraska DOI had about his business practices. As part of that process, LINDBERG and other GBIG executives planned to meet with the Nebraska DOI on or about January 26, 2018. Prior to that meeting, the Nebraska DOI had written to various GBIG executives to outline a number of "significant concerns" including, (a) "[a]ffiliated loans and SPV disaffiliation;" (b) "UCP (LINDBERG) valuation;" (c) "obtaining a full list and evaluating any loans, guarantees, and/or commitments" with regard to (a) and (b); and (d) "funding of the LBL purchase."

106. As a result, and in anticipation of that meeting, LINDBERG determined to present a "tangible number" to the Nebraska DOI demonstrating that he had sufficient cash available for the purchase. To do this, LINDBERG decided it would be "[b]etter to move $400M to SNH," telling a GBIG executive, on or about January 4, 2018, that he would "have north of $400M by end of this month-ish at SNH."

107. To reach that goal, LINDBERG and his co-conspirators caused approximately $350 million in "show money" to be aggregated in an SNH account prior to their January 26, 2018 meeting with the Nebraska DOI through a series of deceptive financial transactions that ultimately included $133 million from the ULICO 2017 Trust and $60 million from CBLIC. Of this $350 million, approximately $312 million was lent to SNA and then transferred to SNH on or about January 25, 2018.

108. Approximately $106 million of the $350 million in "show money" was sourced through a series of 90-day Repos involving the ULICO 2017 Trust on or about January 22 and 23, 2018 ("Show Money Repos"). The Show Money Repos contained terms similar to the December 2017 Repos, except that they required the Seller to repurchase the assets within "90 days," as opposed to the 364-term in the December 2017 Repos and were funded out of the ULICO 2017 Trust, not the PBLA Main Account. As before, the purported collateral for each of these Repos was some type of investment in an Affiliated Company, and LINDBERG signed on behalf of both parties to each repurchase agreement. LINDBERG and his co-conspirators structured these Repos as 90-day agreements so that, as discussed below, PBLA could falsely and misleadingly claim they qualified as "cash equivalents," which gave them the appearance to ULICO of being safer, more liquid investments than they actually were. They also were structured as 90-day Repos so that PBLA could fraudulently circumvent the investment restrictions and regulatory requirements

governing the ULICO 2017 Trust. This $106 million was combined with other funds and transferred to SNA and then ultimately to SNH on or about January 25, 2018.

109.    Approximately $60 million of the $350 million in "show money" was sourced through loans from CBLIC to two Affiliated Companies on or about January 23, 2018, the proceeds of which were funneled through a series of circular transactions before ending up at SNH on or about January 25, 2018.

110.    Approximately $27 million of the $350 million in "show money" was sourced through the proceeds of purported investments from the ULICO 2017 Trust into two SPVs, on or about December 29, 2017, which had then been converted to Euros and back to U.S. Dollars and routed through a series of Affiliated Companies before ending up back at SNH on or about January 25, 2018.

111.    LINDBERG caused the Nebraska DOI to be presented with materials for the meeting, summarizing GBIG's response to the Rector Report and representing that LINDBERG's planned $585 million purchase of LBL would be funded in part by $350 million "[c]ash in SNH operating account" and $30 million "[c]ash in SNH escrow for LBL." The materials provided to the Nebraska DOI were materially misleading because they omitted the material fact that at least $193 million of the $350 million at SNH constituted the proceeds of loans and Repos that LINDBERG and his co-conspirators caused the ULICO 2017 Trust and CBLIC to engage in, and that LINDBERG's Affiliated Companies were required to repay at least $106 million of that $193 million back to the ULICO 2017 Trust within 90 days pursuant to the terms of those Repos.

112.    Moreover, in compiling the "show money" at SNH, LINDBERG and his co-conspirators also caused a number of Affiliated Companies to engage in a series of transactions on or about January 24 and 25, 2018, that resulted in the same $99 million being misleadingly booked as "additional paid-in-capital" to three different Affiliated Companies, including PBLA and SNH. LINDBERG acknowledged that this $99 million was not intended to be permanent capital for any of those entities, writing to his team: "We just put $99M into PBLA as APIC as excess surplus. This is now a loan from PBLA to SNA for LBL purchase price." Like the December 2017 Repos, these transactions caused PBLA to appear to have approximately $99 million of additional capital and assets on its books. As LINDBERG knew, this misleading inflated capital number was subsequently reported to, among others, ULICO, regulators, and various rating agencies in PBLA's Management Financial Statements and gave the materially false appearance that PBLA was in better financial condition than it was.

**C.    Almost Immediately After the Meeting with the Nebraska DOI, LINDBERG Began Transferring the "Show Money" Out of the SNH Account and Failed to Repay the Show Money Repos.**

113.    Shortly after the January 26, 2018, meeting with the Nebraska DOI, LINDBERG began transferring the "show money" out of the SNH account, including, (a) transfers totaling more than $990,000 on or about January 29, 2018; (b) an approximately $50,000 check that cleared on or about January 30, 2018; (c) an approximately $7,600 check that cleared on or about January 31, 2018; and (d) nearly $12 million in wire transfers on or about February 2, 2018. At least some

of this money was used to make loan payments to SNIC for loans SNIC had made to certain Affiliated Companies.

114.    Although LINDBERG began spending the SNH "show money" almost immediately, he did not use the money to repay the January Show Money Repos, notwithstanding that the transactions were short-term 90-day Repos, which LINDBERG's co-conspirators caused PBLA to report to ULICO as "cash equivalents." Rather, the Show Money Repos were "renewed" or "rolled over" multiple times and remained outstanding through at least on or about March 31, 2019.

> **D.     LINDBERG and His Co-Conspirators Extracted an Additional $55 Million from the ULICO 2017 Trust Through a Third Set of Repos, Utilizing FinCos, Which LINDBERG Used on Personal Expenditures and to Make Payments on Loans to Affiliated Companies.**

115.    From on or about January 24 through on or about January and 26, 2018, LINDBERG and his co-conspirators caused the ULICO 2017 Trust to fund three additional 90-day Repos ("January FinCo Repos") totaling approximately $55 million.

116.    The January FinCo Repos contained terms similar to the Show Money Repos. In addition, LINDBERG signed on behalf of both parties to each repurchase agreement, and the agreements were structured as 90-day agreements so that, as discussed below, PBLA could claim they qualified as "cash equivalents," which gave them the appearance to ULICO of being safer, more liquid investments than they actually were. LINDBERG and his co-conspirators also structured these transactions as 90-day Repos so that PBLA could circumvent the investment restrictions and regulatory requirements governing the ULICO 2017 Trust.

117.    The FinCo Repos were funded out of the ULICO 2017 Trust and involved three agreements and corresponding wires, which resulted in the ULICO 2017 Trust wiring the following amounts to the following FinCos on or about January 25 and 26, 2018:

        a.      Approximately $17 million wired to HAM;

        b.      Approximately $17 million wired to ICAM; and

        c.      Approximately $20.9 million wired to JAM.

118.    The purported collateral for each of these Repos was an investment in an Affiliated Company owned by each respective FinCo. However, at the time that LINDBERG and his co-conspirators caused the ULICO 2017 Trust to wire the funds to the three FinCos, none of the FinCos had assets to serve as collateral. As a result, and as LINDBERG knew, the FinCos had to use the funds from the ULICO 2017 Trust to purchase the very collateral that was supposed to have collateralized the transaction in the first place.

119.    Thus, by the end of the day on January 26, 2018, LINDBERG and his co-conspirators had caused nearly $55 million in additional funds to be transferred out of the ULICO 2017 Trust to three FinCos, which at the time had no other assets. In exchange, those FinCos promised to repay the ULICO 2017 Trust within 90 days.

120.     Following the transfers above, LINDBERG and his co-conspirators further directed the transfer of the $34 million in FinCo Repo proceeds that were originally wired to HAM and ICAM from the ULICO 2017 Trust to be funneled back to PBLA as additional paid in capital on or about February 1, 2018.

121.     On or about that same day, PBLA then loaned the combined $34 million to AFA. That is, the same $34 million that the ULICO 2017 Trust loaned to HAM and ICAM in the FinCo Repos was then loaned by PBLA to AFA.

122.     After receipt of that $34 million, AFA, on or about February 2, 2018, used a portion of the proceeds to initiate the "skim" for HAM, ICAM, and JAM discussed above by purchasing various SPV loans from the insurance companies. In connection with funding HAM, ICAM, and JAM, LINDBERG, Herwig, and Solow caused the "Basic Information Memorandum" for each of them to be submitted to Egan Jones to obtain ratings. These memoranda contained the same or similar false and misleading representations regarding management of the FinCo and the underlying investments as were included in the previously submitted Memoranda. The HAM, JAM, and ICAM memoranda also omitted the material fact of the January FinCo Repos.

123.     A few days later, on or about February 5 and 7, 2018, AFA "loaned" $800,000 and $1,000,000 to New Hill and, on those same days, New Hill transferred $810,000 and $995,000, respectively, to Dunhill. Those transfers, which were almost entirely sourced by the funds originating from the ULICO 2017 Trust, were then combined with other funds and used by LINDBERG to pay various personal expenses including:

> a.     A $400,000 wire transfer to LINDBERG's personal bank account;
>
> b.     A $400,000 transfer to South Hill, another pass-through entity LINDBERG used to support his personal lifestyle, which was combined with other monies to make payments for, among other things, personal expenses, including payments to women with whom he had or was seeking a relationship;
>
> c.     A $400,000 payment to American Express;
>
> d.     A $200,000 check to Lasorsa & Associates, a company that LINDBERG had contracted to surveil women;
>
> e.     A $100,000 check to Fitzpatrick Investigations, Inc., a company that had been contracted to conduct investigations into women with whom LINDBERG had or sought to have a personal relationship, and which, between in or about July 2017 and in or about January 2019 was paid more than $700,000 from Dunhill accounts;
>
> f.     A $11,000 check to an interior design company for a down payment on window coverings;
>
> g.     A $6,000 mortgage payment for LINDBERG's personal residence on Stagecoach Road in Durham, North Carolina;

h.     A $5,505 mortgage payment for one of LINDBERG's family member's mortgage; and

i.     An approximately $96,000 payment to Ostrov Realty Group, Limited, a brokerage firm that represented the landlord of a luxury condominium at the Mandarin Oriental Residences in New York that LINDBERG had leased through South Hill, on or about February 6, 2018, for $32,000 a month.

124.     Throughout February 2018, LINDBERG caused more than $3 million in additional transfers to New Hill using the proceeds of HAM and ICAM Repos and the associated "skim."

125.     Regarding the nearly $21 million in proceeds from the JAM repo, LINDBERG and Solow directed a series of transactions to funnel a portion of those proceeds back to SNIC to make payments on loans to Affiliated Companies, including loans from SNIC, CBLIC, BLIC, and the ULICO 2017 Trust.

126.     Notwithstanding that the January FinCo Repo transactions were short-term 90-day Repos, which LINDBERG's co-conspirators caused PBLA to report to ULICO as "cash equivalents," they were not repaid within 90 days. Rather, they were "renewed" or "rolled over" multiple times and remained outstanding through at least on or about March 31, 2019.

E.     **LINDBERG and His Co-Conspirators caused PBLA to Falsely Represent the Show Money and January FinCo Repos as "Cash Equivalents" in Reporting to ULICO.**

127.     Lindberg and his Co-Conspirators caused PBLA to falsely represent to ULICO that the Show Money Repos and the January FinCo Repo Transactions were "Cash Equivalents," for example:

a.     On or about April 30, 2018, PBLA provided ULICO its First Quarter 2018 Report, in which it falsely represented that as of March 31, 2018, the ULICO 2017 Trust had approximately $204 million in "Cash Equivalents," representing approximately 33% of its investment portfolio, and that such investments complied with the Investment Guidelines and, therefore, Chapter 6. The Show Money and FinCo Repo Transactions comprised approximately $162 million or 79% of the approximately $204 million "Cash Equivalents" reported.

b.     On or about August 9, 2018, PBLA provided ULICO its Second Quarter 2018 Report, in which it falsely represented that as of June 30, 2018, the ULICO 2017 Trust had approximately $169 million as "Cash Equivalents," representing approximately 27% of its investment portfolio, and that such investments complied with the Investment Guidelines, and, therefore, Chapter 6. The Show Money and FinCo Repo Transactions comprised approximately $163 million or 96% of the approximately $169 million "Cash Equivalents" reported.

128.     These representations were materially false and misleading. In truth and fact, these were the Show Money and FinCo Repo Transactions, which did not qualify as "Cash Equivalents" because they were not "short term investments…of high credit classification and great liquidity,

easily convertible into known amounts of cash…" and were not truly intended to be "investments… with a maturity term of ninety (90) days or less."

## VIII. NCDOI FINALLY LEARNED MORE INFORMATION ABOUT THE FINCOS AND WAS IMMEDIATELY CONCERNED

129.     After receiving the reports of the North Carolina Insurance Companies' investments as of December 31, 2017, in early January 2018, NCDOI immediately began asking for more information about the FinCo investments. On or about January 10, 2018, an NCDOI regulator emailed GBIG a summary of his understanding of the FinCos and asked GBIG to let it know "if anything appears to be wrong or if I'm missing something that is important." The summary emailed by the NCDOI regulator stated, among other things, "The finance company [FinCo] will be managed by a trust with an independent manager and compliance officer" and "Additional capital support from preferred equity will be provided, if needed." GBIG replied to this summary with a "few comments," none of which suggested that NCDOI's understanding of the management of the FinCos was incorrect.

130.     Over the next few days, NCDOI continued to exchange emails with GBIG regarding, among other things, the details of the FinCos. During that exchange, NCDOI continued to ask for additional information about the FinCos and expressed a lack of understanding of them and their purpose and GBIG's rationale for classifying them as corporate debt. As GBIG provided additional information to NCDOI, NCDOI began to express concerns that the FinCos were a form of "circular loans" in which the "loans owned by the insurance company will be paid off by additional money borrowed from the insurance company."

## IX. AFTER DISPUTING RECTOR'S AND NOBLE'S FINDINGS, LINDBERG ENTERED INTO A REMEDIATION AGREEMENT WITH NCDOI AND THEN SURREPTITIOUSLY INCREASED AFFILIATE EXPOSURE

### A.     Rector and Noble Issued Their Reports, which LINDBERG Disputed.

131.     On or about December 1, 2017, NCDOI emailed GBIG the Rector "Report of Financial Analysis and Findings" for SNIC and CBLIC, dated November 30, 2017 (the "Rector Report"). Among the findings in the Rector Report were a number of concerns with LINDBERG's affiliated loan investments, including that the substantial amount of affiliated lending "represent[ed] as [sic] increased enterprise risk to the Companies that [wa]s likely to have an immediate material adverse effect upon the financial condition and liquidity of the Companies" and that "the [NCDOI] Commissioner may consider that the Companies' current continued operations are hazardous to its policyholders."

132.     That same day, LINDBERG wrote to NCDOI to take issue with the "recently circulated draft Rector & Associates report," asserting that it contained "very material misstatements and defamatory conclusions that are contrary to NC law and regulatory precedent" as the "new interpretation of NC law from Rector appears to be arbitrary and capricious." LINDBERG threatened litigation if the report was not changed and attached a letter from outside counsel who had been retained to represent SNIC and CBLIC.

133.    On or about January 29, 2018, Houlihan Lokey Financial Advisors, Inc. ("Houlihan Lokey"), a company engaged by Eli Global to prepare a written report in response to the Rector Report, provided its final Report of the "Summary of Certain Investments held by" CBLIC and SNIC ("Houlihan Lokey Report"). As set forth below, the Houlihan Lokey Report, which was based largely on information provided by Solow and other Eli Global employees without any independent review or verification by Houlihan Lokey, was effectively used by Eli Global to substitute for work Rector had originally been asked to do.

134.    LINDBERG and his co-conspirators caused the Houlihan Lokey Report to contain a number of materially false and misleading statements, primarily concerning the nature of various Affiliated Companies' investments in New Hill and the management of certain Affiliated Companies, including the GAM FinCo and SASL. At LINDBERG's direction, the Houlihan Lokey Report was sent to various insurance regulators and third parties, including NCDOI and Nebraska DOI.

135.    On or about February 23, 2018, NCDOI sent GBIG the "final UCP report from Noble" as well as NCDOI's "proposed voluntary settlement agreement or memorandum of understanding" regarding both the Rector and Noble Report findings. Among the findings in the Noble report were that:

      a.    "The GAAP equity on a combined basis as of December 31, 2016" for LINDBERG was ($196,311,871), *i.e.*, approximately negative $196 million; and

      b.    Noble had "received numerous variations of the financial statements and at times, the financial statements had changed" and that LINDBERG "was unable to timely provide a listing of all intercompany transactions" as "[t]he number of companies to be included in the combined balance sheet seemed to be a moving target" and "[i]t appear[ed] that [LINDBERG did] not have a formal process to track all intercompany transactions."

## B.    LINDBERG Agreed to a Remediation Plan with NCDOI, While Also Taking Steps to Undermine It.

136.    On or about May 2, 2018, LINDBERG, on behalf of GBIG, entered into a Remediation Plan with NCDOI that was "intended to address the matters previously identified by the Department." Pursuant to the Remediation Plan, LINDBERG agreed, among other things, that the North Carolina Insurance Companies would reduce the amount of their affiliated investments, including to limit their investments to "an aggregate amount of 10% of each company's admitted assets in the securities that the UCP directly or indirectly maintains an economic interest in the direct or underlying borrower" by December 31, 2018.

137.    Throughout May 2018, GBIG executives asked Herwig and Solow to stop "funding any more private loans" without a "documented plan to comply with the NCDOI MOU, specifically the 10% affiliated limit," that had just been agreed to in the Remediation Plan. However, LINDBERG, Herwig, and Solow continued to fund loans to Affiliated Companies.

138.    For example, on or about May 18, 2018, LINDBERG, Herwig, and Solow "upsized" multiple additional FinCos, including SAM, BAM, CAM, DAM, EAM, HAM, ICAM, and JAM. By that point, CBLIC's assets had grown through the sale of additional insurance

31

products to policyholders, resulting in additional CBLIC policyholder funds available for investment. LINDBERG, Herwig, and Solow extracted those policyholder funds through a series of amended loans to existing FinCos, *i.e.*, they "upsized" the existing loans from CBLIC to the existing FinCos.

139.    On or about May 21, 2018, LINDBERG, Herwig, and Solow caused LINDBERG to purchase Boston Laser Eye Institute ("Boston Laser"), using a $23.5 million loan sourced primarily through FinCos. Six days earlier, LINDBERG, Herwig, and Solow had attempted to close the Boston Laser purchase with a $23.5 million direct loan from CBLIC. But after GBIG pushed back because of concerns about the investment of insurance company money generally and the fact the purchase would "increase [their] affiliate concentration in CBL with no specific plan to bring it down to the 10% agreed with the Department," the newly upsized FinCos were used to fund the purchase, which did not require GBIG's approval.

### C.    LINDBERG and His Co-Conspirators Continued to Increase and Misrepresent the Extent of Affiliate Investments.

140.    In or about June 2018, LINDBERG, Herwig, and others from PBLA met with representatives from ULICO. During that meeting, they falsely and misleadingly represented to ULICO that the "Cash Equivalents" on ULICO's books went from approximately $35 million as of on or about December 31, 2017, to approximately $204 million as of the date of the presentation. That is, LINDBERG, Herwig, and others falsely led ULICO to believe that these were short term investments with the safety and liquidity of cash. In truth and fact, by this time, LINDBERG and his co-conspirators had already caused the PBLA Repos to be rolled over for an additional term and they were not backed by safe, highly liquid collateral. As a result, and as LINDBERG knew, they did not qualify as "cash equivalents."

141.    In June and July 2018, LINDBERG, Herwig, and Solow caused the "Basic Information Memorandum" for numerous additional FinCos, including the "upsized" FinCos, to be submitted to Egan Jones for ratings. Those Memoranda continued to contain the same or similar false and misleading representations with regards to management of the FinCo and the underlying investments as those that were included in the previously submitted GAM and SAM Memoranda. Additionally, the loans were represented as middle market loans to private companies, when in reality SAM's portfolio included a loan associated with TUX, which held private properties acquired by LINDBERG.

142.    In an effort to gain more insight into and oversight of the investment of policyholder money by Eli Global and to look better to NCDOI and other regulators, in spring 2018 GBIG executives sought to hire a Chief Investment Officer ("CIO") for GBIG who was not affiliated with LINDBERG's non-insurance companies. As a result of that process, on or about July 16, 2018, the GBIG CIO was hired.

143.    On or about July 16, 2018, a GBIG employee wrote to Herwig and Solow that "[t]he affiliate amount is currently outside of compliance compared to the target percentages" for CBLIC, BLIC and SNIC. In the ensuing email conversation, Herwig discussed "how to spin" the failure to decrease the amount of affiliated investments to NCDOI.

144.    On or about August 10, 2018, a GBIG employee emailed LS informing him that "[i]n addition to GAM, there are a number of other fincos that were set up between late 4Q17 and early 3Q18" and asking "if [he] had interest in monitoring these 16 additional fincos?" LS responded "yes" and that he was "excited to undertake the covenant compliance/monitoring for these additional SPVs" but they'll "probably need to update the existing Consulting Agreement to include the new SPVs since the parties are currently Border and GAM."

145.    In or about the week of August 20, 2018, disagreements between GBIG executives, on the one hand, and Herwig and Solow, on the other, with regards to how insurance company money could be invested and what constituted an affiliated investment, particularly in light of the Remediation Plan, came to a head. This resulted in Herwig, as LINDBERG knew, attempting to circumvent the GBIG CFO and CIO to extract an additional $60 million from CBLIC to fund a new FinCo, NAM. After learning that Herwig had initiated the transaction over their objection, the GBIG CFO had the transaction cancelled citing "a violation of our investment compliance policy and insurance regulation." After talking with LINDBERG about the episode, GBIG's CIO resigned.

146.    During that same week, on or about August 22, 2018, *i.e.* after the funding of NAM was delayed, LINDBERG "swiped" $1 million that was supposed to be used as preferred equity for NAM from the AFA account, causing it to be transferred to New Hill, for his personal use. At LINDBERG's direction, Solow had the $1 million transfer booked as a "loan" to New Hill.

X.    AS REGULATORY PRESSURE INCREASED, LINDBERG DOUBLED DOWN ON HIS EFFORTS TO CONCEAL HIS FINANCIAL FRAUD AND SELF-DEALING

A.    LINDBERG "Loaned" Himself Millions of Dollars, Some of Which Originated from the North Carolina Insurance Companies, and Then Subsequently Forgave Over $125 Million of Those "Loans."

147.    From in or around early 2016 through August 28, 2018, LINDBERG took at least $75 million from various Affiliated Companies, including AFA, AAI, and Eli Research, and caused these transfers to be documented as "loans to shareholder" or "notes receivable" from shareholder. While representing these distributions on the books and records of the various affiliated entities as "loans," LINDBERG represented this money as "dividends/interest" when it was in his personal interest to do so.

148.    Separately, from in or around late 2016 through on or about August 28, 2018, LINDBERG also transferred more than $158 million for his personal use through various "loans" made to New Hill from various Affiliated Companies, some of which had originated from the North Carolina Insurance Companies and were funneled through various pass-through entities before being transferred to New Hill. As discussed above, this included (a) the $1 million LINDBERG "swiped" from AFA during the attempt to fund the NAM FinCo in August 2018; (b) the $4.3 million from AFA's "skim" profits transferred in June 2018; and (c) the nearly $4 million in FinCo Repo proceeds and "skim" transferred from AFA in February 2018.

149.    On or about October 31 and December 20, 2018, LINDBERG signed on behalf of the borrower, New Hill, a series of Loan Forgiveness Agreements, which forgave the numerous

loans from Affiliated Companies to New Hill, totaling more than $125 million. Some of the entities that forgave loans to New Hill, like AFA, CAM III, and CAF I, for example, had received loans directly from the North Carolina Insurance Companies.

**B.      Beginning in the Fall of 2018, Eli Global Sought New Ratings for the FinCos from an Alternative Ratings Agency, HR Ratings.**

150.    In or about August 2018, as part of their efforts to find a replacement for Egan Jones, Eli Global representatives began discussions with HR Ratings about rating corporate credits like the FinCos.

151.    On or about October 6, 2018, Eli Global entered into an Agreement with HR Ratings for HR Ratings to provide credit ratings for "Senior Secured Debt by December 31, 2018," with Herwig signing on behalf of Eli Global.

152.    Throughout October 2018, LINDBERG, Herwig, and Solow caused rating requests, with the accompanying false and misleading "Basic Information Memorandum," to be submitted to HR Ratings for the FinCos. At the time these requests were submitted, LINDBERG, Herwig and Solow knew that neither LS, VM, nor any other independent third party was serving as a portfolio manager for any of the FinCos.

153.    The FinCo Memoranda submitted to HR Ratings, however, continued to contain a number of materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and omissions, including, that:

        a.      "Key Financing Rationale" included that the "management of [the FinCo] has decades of debt investment experience."

        b.      "All underlying investments will be middle market loans…to private companies."

        c.      "Competitive Advantages" included that the FinCo "represented by [VM and an Eli Global employee], provides decades of middle market lending experience. [VM and an Eli Global employee] are able to efficiently manage the loan portfolio, assess credit quality, and administer [the FinCo's] capital structure."

        d.      VM was listed as "Senior Portfolio Manager."

154.    In truth and fact:

        a.      VM was not a Portfolio Manager for any FinCos. Instead, the FinCo investments were generally directed and managed by LINDBERG, Herwig, and Solow and others who reported to them; and

        b.      Not all of the assets held by the FinCos were "middle market loans." For example, KAM held as an asset on its books a loan associated with LINDBERG's Morning Mountain Property, and SAM held as an asset on its books loans regarding LINDBERG's private properties, including those associated with Gimghoul and TUX. LINDBERG and

his co-conspirators had previously caused SAM to loan approximately $990,000 to FIF, which was collateralized by the Gimghoul property.

155.    On or about December 7, 2018, LINDBERG, Herwig, and Solow caused a fraudulent rating request with the accompanying "Basic Information Memorandum" to be submitted to HR Ratings for Itech, which included the same or similar materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and material omissions discussed above, including falsely identifying LS as the "manager of the loan portfolio" for Itech.

156.    Between on or about December 14 and December 19, 2018, based upon the false and misleading information provided by Eli Global in the Memoranda, HR Ratings provided initial ratings reports for the FinCos, which were then circulated internally at GBIG and Eli Global.

157.    The initial ratings from HR Ratings were lower than those that Egan Jones had provided, which threatened to cause significant regulatory and capital issues for Eli Global and GBIG. Thus, following receipt of those initial ratings, LINDBERG's co-conspirators, with his approval, caused the FinCos to "swap" various assets among themselves and other Affiliated Companies in an effort to improve the ratings from HR Ratings for some FinCos at the expense of others. In so doing, they ignored and thereby violated the fiduciary duties owed to the various insurance companies that had invested in each FinCo and any pretense of the FinCos being independent from LINDBERG or each other and, instead, treated all of the FinCos as interchangeable.

158.    Following these "swaps" and to avoid getting poor ratings, on or about January 25, 2019, Eli Global requested that HR Ratings not rate certain FinCos and submitted updated information reflecting final FinCo portfolios for new ratings for the remaining FinCos. As a result, on or about February 8, 2019, HR Ratings provided final ratings for numerous additional FinCos, which were misleadingly higher than the initial ratings.

C.    **LINDBERG and His Co-Conspirators Caused the ULICO 2017 Trust to Purchase Mortgages and Other "Assets" Tied to LINDBERG Personal Property While Continuing to Misrepresent the Nature of the Assets to ULICO.**

159.    On or about November 19, 2018, after receiving a letter from ULICO about its lack of compliance for the third quarter of 2018, LINDBERG's co-conspirators caused PBLA to provide ULICO its Third Quarter 2018 Investment Report. The cover email sent to ULICO stated, "the 9/30 numbers are not in compliance but we have a plan to rectify this issue." In particular, PBLA represented that it "w[ould] be contributing assets consisting of mortgages, income generating real estate, preferred debt, and cash before year-end to bring the trust into full compliance."

     a.    The attached Third Quarter 2018 Investment Report represented, among other things, that as of September 30, 2018, the ULICO 2017 Trust had approximately $178 million in "Cash Equivalents," and that these cash investments complied with the Investment Guidelines and, therefore, Chapter 6.

b.     In truth and fact, these purported "Cash Equivalents" included the Show Money and FinCo Repo Transactions, which, as discussed above, were funded, in part, in a series of circular transactions and were not, in part, properly collateralized. Additionally, these loans did not qualify as "Cash Equivalents" because they were not "short term investments…of high credit classification and great liquidity, easily convertible into known amounts of cash…" and were not truly intended to be "investments… with a maturity term of ninety (90) days or less."

160.     On or about December 12, 2018, ULICO emailed PBLA a letter questioning whether the ULICO 2017 Trust was in compliance, setting forth a number of questions and concerns, including a request for information about cash equivalents to "validate that all assets identified as cash complies with the cash definition as stated on Chapter 6."

161.     On or about December 17, 2018, Herwig responded by falsely and misleadingly stating that "[a]ll investments identified as cash meet the definition of cash in Chapter 6, which is 'investments or stocks with a maturity term of 90 days or less.'" In truth and fact, as set forth above, the Repos making up the bulk of the purported "cash equivalents" did not meet the requirements of Chapter 6. Herwig's response also contained the materially false and misleading representation that "[n]one of the assets in the trust fit the definition of affiliated as noted in chapter 6 which defines affiliates as being under common control."

162.     Starting later that month, LINDBERG and his co-conspirators transferred additional personal properties of LINDBERG to the ULICO 2017 Trust. For example:

a.     On or about December 28, 2018, LINDBERG and his co-conspirators caused the approximately $3.37 million mortgage and interest then due on LINDBERG's Morning Mountain Property to be sold from KAM to the ULICO 2017 Trust; and

b.     On or about January 16, 2019, LINDBERG and his co-conspirators caused Erie Properties to be transferred to the ULICO 2017 Trust effective December 31, 2018. At the time of the transfer, Erie Properties was the borrower on a loan of more than $5 million to Spokane Teacher Credit Union, which was secured by the properties owned by Erie Properties.

163.     On or about February 15, 2019, LINDBERG's co-conspirators caused PBLA to send ULICO the Final Third Quarter 2018 Investment Report and a Draft Fourth Quarter 2018 Investment Report. Both of these reports continued to materially misrepresent the approximately $163 million in "Cash Equivalents" that consisted of the two sets of January Repos. Further, the Draft Fourth Quarter Report included the Morning Mountain Mortgage and Erie Properties as assets while omitting the material fact that they were related to LINDBERG's personal real estate and falsely and misleadingly characterizing the Erie Properties asset as "Income Generating Real Estate." In addition, the Report falsely valued Erie Properties at nearly $14.4 million.

164.     On or about February 20, 2019, representatives from PBLA, including Herwig, had a call with ULICO to discuss, among other things, the investments in the ULICO 2017 Trust. Later that day, Herwig and one of his co-conspirators caused a "Compliance Certificate" dated February 20, 2019, to be emailed to ULICO. In that Compliance Certificate, Herwig falsely and

misleadingly certified as "Chief Investment Officer of PBLA" that "the assets held in the ULICO 2017 Trust and Comfort Trust Account, as identified in the Investment Report, comply in all material respects with the Investment Guidelines."

165.    In further response to the February 20, 2019 call and subsequent emails, on or about February 28, 2019, Herwig wrote to ULICO regarding its concerns about the Fourth Quarter Portfolio report, including the amount of affiliated investments. Among the representations Herwig made were that:

      a.     LINDBERG "and his affiliates have also invested $300 million of capital into PBLA since inception, providing very solid excess capital levels."

      b.     LINDBERG "established a no-dividend policy for each insurance company…"; that the "no dividend policy remains in place…for all of his insurers, including PBLA"; and that he "has never taken a dividend from PBLA and has no plans to do so;" and

      c.     "This means that the $300 million in capital Mr. LINDBERG and his affiliates have invested in PBLA is permanent capital to protect policyholders."

166.    These representations were materially false and misleading. In truth and fact, of the $300 million in purported "permanent capital," a significant portion came from illusory circular Repos described above, and while LINDBERG represented he had never taken a "dividend" from an insurance company, he had, instead, used "loans" to extract money from the insurance companies. Further, at least some of the money LINDBERG purportedly "invested" in PBLA was money from the ULICO 2017 Trust, including, (a) approximately $52 million of the $99 million purported additional paid-in-capital to PBLA as part of the Show Money Repos; and (b) $34 million from the FinCo Repos.

167.    Additionally, transmitted with Herwig's letter on or about February 28, 2019, was the Final Fourth Quarter 2018 Investment Report, which again materially misrepresented the nature of the approximately $163 million in "Cash Equivalents" that consisted of the two sets of January Repos. The transmittal email also falsely represented that, "these are acceptable investments per Chapter 6 given the structures in place." Further, the Report, for the first time, identified certain investments as being "affiliated" with LINDBERG, identifying more than $548 million of the nearly $680 million in assets as affiliated. While the report identified the Morning Mountain Mortgage as one of those affiliated assets, it again misleadingly characterized the Erie Properties investment as "income generating property" not affiliated with LINDBERG and again materially overstated its true value.

    **D.**    **Following Negative Publicity Regarding LINDBERG's Financial Dealings, LINDBERG and His Co-Conspirators Doubled Down on Their False and Misleading Statements to ULICO, While Also Causing Additional LINDBERG Personal Assets to be Transferred to the ULICO 2017 Trust.**

168.    On or about February 28, 2019, the *Wall Street Journal* published an article questioning LINDBERG's business practices.

169.     On or about March 3, 2019, Herwig forwarded to ULICO various materials, including the statement LINDBERG caused his counsel to make in response to the *Wall Street Journal* article and media and other inquiries. That response contained a number of materially misleading statements and deceptive half-truths, and it omitted material information.

170.     Herwig also attached to the March 3, 2019, email a copy of the Houlihan Lokey Report containing the materially false, fraudulent, and misleading statements, representations, deceptive half-truths, and material omissions noted above.

171.     On or about March 6, 2019, PBLA provided ULICO the PBLA "Management Financial Statements" for the period ending September 30, 2018, which contained a number of materially false and misleading statements and deceptive half-truths and omitted material information, including:

     a.     That PBLA had $34 million in External Borrowings. In truth and in fact, the $34 million constituted the proceeds of the January HAM and ICAM FinCo Repos, which originated with the ULICO 2017 Trust and were funneled through various Affiliated Companies before being transferred back to PBLA; and

     b.     That PBLA received $99 million in additional paid-in-capital between December 31, 2017, and September 30, 2018. In truth and in fact, $52 million of this $99 million originated from the ULICO 2017 Trust, $25 million of which was transferred out as part of the Show Money Repos and combined with $27 million in other loans taken from the ULICO 2017 Trust and funneled through SPVs and other Affiliated Companies. It was then combined with other monies and transferred back to PBLA as additional paid-in-capital.

172.     Also, on or about March 6, 2019, approximately a week after the *Wall Street Journal* article, LINDBERG and his co-conspirators caused the approximately $3.1 million mortgage on the TUX private properties to be sold from the SAM FinCo to the ULICO 2017 Trust.

173.     On or about March 11, 2019, Herwig forwarded to ULICO representatives "a letter to the WSJ in response to the article" for potential discussion during their upcoming meeting. The letter contained a number of materially false and misleading statements and deceptive half-truths and omitted material information similar to the statement Herwig sent to ULICO on or about March 3, 2019.

174.     On or about March 13, 2019, LINDBERG directed Herwig to cause the ULICO 2017 Trust to purchase the purported "equity" in Morning Mountain Holdings and TUX for a total of nearly $3.6 million. While others at Eli Global were working on effecting this purchase, LINDBERG, Herwig, and other Eli Global employees met with ULICO representatives. During the meeting, LINDBERG promised to infuse $200 million of additional capital into PBLA to help ease ULICO's concerns about the safety of the ULICO 2017 Trust. LINDBERG and his co-conspirators did not disclose to ULICO that assets associated with LINDBERG's personal real estate had just been sold to the ULICO 2017 Trust.

175.    After the meeting, on or about March 15, 2019, LINDBERG, in response to an email from ULICO, represented to ULICO that "We will add the extra capital into PBLA next week."

176.    Five days later, on or about March 20, 2019, one of LINDBERG's co-conspirators sent an email to ULICO (copying LINDBERG) attaching a list of Affiliated Companies LINDBERG was considering selling to raise as much as $3 billion in additional capital. In a separate email the co-conspirator sent to ULICO the same day (also copying LINDBERG), he further represented that LINDBERG planned to infuse "$200,000,000 of additional capital in PBLA; plan to execute this week."

177.    On or about March 22, 2019, one of LINDBERG's co-conspirators sent an update to ULICO (copying LINDBERG), representing that "for the capital infusion to PBLA, we are finalizing the documentation and will execute early next week." After the following week passed without the promised capital infusion, one of LINDBERG's co-conspirators sent an email to ULICO (copying Herwig and Solow) on or about April 2, 2019, representing that, "We are still working through the tax planning issues related to the additional capital infusion and should have a resolution on that by the end of the week."

178.    On or about April 4, 2019, one of LINDBERG's co-conspirators (copying Herwig and Solow) emailed ULICO another version of the Fourth Quarter 2018 Investment Report. This Report continued to include the various materially false and misleading information discussed above about the "Cash Equivalents," and assets affiliated with LINDBERG's personal properties, although it, without explanation, lowered the value of the Erie Properties "Income Generating Real Estate" by more than $5.5 million.

179.    On or about May 9, 2019, Herwig received a "noncompliance letter for the 1st quarter of 2019" because PBLA had failed to provide the required investment report and related materials for the first quarter for the ULICO 2017 Trust Account. About a week later, one of LINDBERG's co-conspirators caused PBLA to provide ULICO its First Quarter 2019 Investment Report, in which it acknowledged that the "portfolio was not in compliance…. due to an unforeseen writedown" in the value of certain investments as of the end of the first quarter but promised that "we will ensure that the portfolio is in compliance with Chapter 6 as of next quarter-end." This Report continued to include the various materially false and misleading information discussed above about the "Cash Equivalents" and assets affiliated with LINDBERG's personal properties. It also, for the first time, reported the purported investments in TUX and Morning Mountain Holdings, misleadingly characterizing them as "Income Generating Real Estate."

E.    **LINDBERG Reneged on His Promise to Infuse PBLA with Additional Capital and ULICO Sought to Recapture Its Business as LINDBERG's Insurance Companies Faced Regulatory Action.**

180.    Despite his repeated promises, by June 2019, LINDBERG still had not infused PBLA with the $200 million in additional capital that he had promised.

181.    On or about June 11, 2019, ULICO wrote to PBLA seeking to recapture the business pursuant to the June 30, 2017 Coinsurance Reinsurance Agreement.

182.    On or about June 27, 2019, SNIC, BLIC, and CBLIC consented to an Order of Rehabilitation, pursuant to a petition filed by NCDOI, who "took action after determining that the long-term liquidity of the investment portfolios of the Companies had deteriorated to the point that [NCDOI] needed to act to protect the policyholders of the Companies."

183.    On or about June 29, 2019, noting their efforts to contact Eli Global that week, HR Ratings informed Eli Global that it was withdrawing its ratings for certain Eli Global related entities, and "due to the recent news related to the seize [sic] of Global Bankers by State authorities" it decided to "put the remaining entities [on] a Negative Observation until [they] have more information."

184.    In September 2020, the Bermuda Monetary Authority ("BMA") petitioned for PBLA and other Bermudian insurance companies owned by LINDBERG to be placed into liquidation due to PBLA's inability to pay its debts, its failure to make required regulatory filings, and the BMA's concern that "the asset values of the Company's investments held in affiliated companies may be overvalued." On or about September 25, 2020, a Court in Bermuda placed PBLA and the other Bermudian companies into liquidation and appointed Joint Provisional Liquidators for the companies.

185.    The conspiracy and scheme ultimately caused substantial financial hardship to LINDBERG's insurance companies, to third parties like ULICO, and to thousands of policyholders. For example, as of as of September 30, 2022, the North Carolina Insurance Companies continued to hold more than $1.1 billion of investments in Affiliated Companies, plus more than $170 million in interest due and accrued on such investments, as such, they were all statutorily insolvent.

186.    By no later than November 1, 2022, NCDOI had petitioned to place SNIC, CBLIC, and BLIC into liquidation.

## COUNT ONE

### 18 U. S. C. § 371
### (Conspiracy)

187.    The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 186 of the Bill of Indictment, and further alleges that:

188.    From at least in or around 2016 through at least in or around 2019, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

### GREG E. LINDBERG,

did willfully combine, conspire, confederate, and agree with Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is, violations of Title 18, United States Code, Sections 1033 and 1343 and Title 15, United States Code, Sections 80b-6 and 80b-17.

### Objects of the Conspiracy

189.    ***Crimes in connection with Insurance Business.*** It was a part and an object of the conspiracy that Defendant, Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, while engaged in the business of insurance and whose activities affected interstate commerce, and while acting as, or being, an officer, director, agent, or employee of such a person engaged in the business of insurance, and while being involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business of insurance would and did:

      a.    knowingly, with the intent to deceive, make any false material statement or report and willfully and materially overvalue any land, property, or security, in connection with any financial reports or documents presented to any insurance regulatory official or agency, and an agent or examiner appointed by such official or agency to examine the affairs of such person, for the purpose of influencing the actions of such official or agency and such an appointed agent or examiner, in violation of Title 18, United States Code, Section 1033(a); and

      b.    knowingly make a false entry of material fact in a book, report and statement of such person engaged in the business of insurance with the intent to deceive any person, including any officer, employee, or agent of such person engaged in the business of insurance, any insurance regulatory official or agency, or any agent or examiner appointed by such official or agency to examine the affairs of such person, about the financial condition or solvency of such business, in violation of Title 18, United States Code, Section 1033(c).

190.    ***Wire Fraud.*** It was a part and an object of the conspiracy that Defendant, Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent

pretenses, representations, and promises, and by concealment of material facts, for the purpose of executing and attempting to execute the scheme and artifice, would and did cause to be transmitted by means of wire communications in interstate commerce any writing, signal, or sound, in that, among other things, Defendant sent and caused to be sent electronic communications and electronic financial transactions in interstate commerce, in violation of Title 18, United States Code Section 1343.

191. ***Investment Adviser Fraud.*** It was a part and an object of the conspiracy that the Defendant, Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury willfully and knowingly, would and did cause an investment adviser to use the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an act, practice, and course of business which was fraudulent, deceptive, and manipulative, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

## Purposes of the Conspiracy

192. The purposes of the conspiracy were to deceive and defraud various insurance companies, including ULICO, and ultimately thousands of insurance policyholders and others and to deceive NCDOI, various ratings agencies, and others, evade regulatory requirements meant to protect policyholders, conceal the true financial condition of LINDBERG's insurance companies, and conceal LINDBERG's true use of insurance company funds for LINDBERG's benefit.

## Manner and Means

193. Defendant and others known and unknown to the Grand Jury carried out the conspiracy in the manner and means described in paragraphs 36 through 186 of the Bill of Indictment, among others.

## Overt Acts

194. In furtherance of the conspiracy, and to accomplish the objects thereof, Defendant and his co-conspirators committed one or more of the overt acts set forth in paragraphs 36 through 186 of this Bill of Indictment in the Western District of North Carolina and elsewhere.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
## 18 U. S. C. § 1343
### (Wire Fraud)

195.    The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 186 of the Bill of Indictment, and further alleges that:

196.    From at least in or around 2016 through at least in or around 2019, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

### GREG E. LINDBERG,

and others known and unknown to the Grand Jury, knowingly and with the intent to defraud, having devised the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, for the purpose of executing and attempting to execute the scheme and artifice, would and did cause to be transmitted by means of wire communications in interstate commerce any writing, signal, or sound, in that, among other things, LINDBERG sent and caused to be sent in interstate commerce the electronic communications and electronic financial transactions described above in furtherance of the above-described scheme to defraud various insurance companies, policyholders, ULICO, and other third parties.

All in violation of Title 18, United States Code, Section 1343.

## COUNTS THREE THROUGH SIX

### 18 U. S. C. § 1033(a)
### (False Insurance Business Statements Presented to Regulators)

197.    The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 3 and 15 through 50 of the Bill of Indictment, and further alleges that:

198.    On or about the dates set forth below, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

### GREG E. LINDBERG,

while engaged in the business of insurance and whose activities affected interstate commerce, knowingly, with the intent to deceive, made and caused to be made a false material statement and report and willfully and materially overvalued any land, property, and security in connection with any financial reports or documents presented to any insurance regulatory official and agency and an agent and examiner appointed by such official and agency to examine the affairs of such person, and for the purpose of influencing the actions of such official and agency and such an appointed agent and examiner, each statement and report constituting a separate count:

| COUNT | APPROXIMATE DATE | DESCRIPTION |
|---|---|---|
| 3 | February 24, 2016 | SNIC's 2015 Statutory Financial Statements, as described in paragraphs 47-48; |
| 4 | February 25, 2016 | CBLIC's 2015 Statutory Financial Statements, as described in paragraphs 47-48; |
| 5 | May 31, 2016 | CBLIC's 2015 Audited Financial Statements, as described in paragraphs 47-48; |
| 6 | May 31, 2016 | SNIC's 2015 Audited Financial Statements, as described in paragraphs 47-48; |

All in violation of Title 18, United States Code, Sections 1033(a) and 2.

## COUNTS SEVEN THROUGH TWELVE

### 18 U. S. C. § 1033(c)
### (False Entries about the Financial Condition or Solvency of an Insurance Business)

199.   The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 3 and 15 through 50 of the Bill of Indictment, and further alleges that:

200.   On or about the dates set forth below, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

### GREG E. LINDBERG,

while engaged in the business of insurance and whose activities affected interstate commerce and while being involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business of insurance, knowingly made and caused to be made a false entry of material fact in a book, report, and statement of such person engaged in the business of insurance with the intent to deceive any person, including any officer, employee, and agent of such person engaged in the business of insurance, any insurance regulatory official and agency, and any agent or examiner appointed by such official and agency to examine the affairs of such person, about the financial condition or solvency of such business, each such book, report and statement constituting a separate count:

| COUNT | APPROXIMATE DATE | DESCRIPTION |
|---|---|---|
| 7 | January 29, 2016 | Email and backup documentation directing various journal entries for the CBLIC spinoff, as described in paragraph 46; |
| 8 | February 17, 2016 | Email with attached journal entries for the CBLIC spinoff, as described in paragraph 47 |
| 9 | February 24, 2016 | SNIC's 2015 Statutory Financial Statements, as described in paragraphs 47-48; |
| 10 | February 25, 2016 | CBLIC's 2015 Statutory Financial Statements, as described in paragraphs 47-48; |
| 11 | May 31, 2016 | CBLIC's 2015 Audited Financial Statements, as described in paragraphs 47-48; |
| 12 | May 31, 2016 | SNIC's 2015 Audited Financial Statements, as described in paragraphs 47-48; |

All in violation of Title 18, United States Code, Sections 1033(c) and 2.

## COUNT THIRTEEN

### 18 U. S. C. § 1956(h)
### (Money Laundering Conspiracy)

201.    The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 186 of the Bill of Indictment, and further alleges that:

202.    From in or around 2016 through at least in or around 2019, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

### GREG E. LINDBERG,

did knowingly combine, conspire, confederate, and agree with Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, to commit money laundering offenses in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957.

### Objects of the Conspiracy

203.    It was a part and an object of the conspiracy that Defendant, Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, would and did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, namely wire fraud, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, with the intent to conceal and disguise in whole and in part the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

204.    It was a part and an object of the conspiracy that Defendant, Christopher Herwig, Devin Solow, and others known and unknown to the Grand Jury, would and did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce of value greater than $10,000, which involved the proceeds of a specified unlawful activity, namely wire fraud, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

## **NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE**

Notice is hereby given of 18 U. S. C. § 982 and 28 U. S. C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U. S. C. § 981 and all specified unlawful activities listed or referenced in 18 U. S. C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and 2461(c):

        a.      All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment;

        b.      All property involved in the money laundering violations set forth this Bill of Indictment or traceable to property involved in such violations; and

        c.      If, as set forth in 21 U. S. C. § 853(p), any property described in (a) or (b) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a) and (b).

The Grand Jury finds probable cause that the following property is subject to forfeiture on one or more of the grounds stated above:

- A forfeiture money judgment in the amount of at least approximately $230 million, such amount constituting the proceeds of and property involved in the violations set forth in this Bill of Indictment;

- Any and all interest in Dunhill Holdings, LLC, First International Financial, Inc., South Hill Holdings, LLC, and New Hill Asset Management, LLC;

- Any and all interest in Standard Malta Holdings Limited and its subsidiary Standard Advisory Services Limited; and

- Any and all interest in Global Growth Holdings, Inc. and its predecessors or successors including Academy Association, Inc. and Eli Research, Inc., and all entities doing business under the trade name "Global Growth" and/or "Eli Global."

A TRUE BILL:

_____
FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF
CRIMINAL DIVISION, FRAUD SECTION

_____
DANIEL RYAN
ASSISTANT UNITED STATES ATTORNEY

_____
LYNDIE FREEMAN
TRIAL ATTORNEY, CRIMINAL DIVISION, FRAUD SECTION