IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>      Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br>      Defendant. | Case No. 3:23-CR-48-MOC |

## SPECIAL MASTER'S FIRST STATUS REPORT

NOW COMES Joseph W. Grier, III, as special master appointed pursuant to 18 U.S.C. § 3664(d)(6) (the "Special Master"), by and through counsel, who files this *Special Master's First Status Report* pursuant to this Court's *Order Appointing Special Master* (the "Special Master Order") entered on January 23, 2025 (Doc. No. 56), covering the period beginning with the initiation of this proceeding through June 23, 2025 (this "Reporting Period").

### I. PROCEDURAL BACKGROUND

On February 23, 2023, in a thirteen-count Bill of Indictment, Greg E. Lindberg ("Defendant") was charged with: conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Doc. No. 1.

The indictment alleged, among other things, that as of September 30, 2022, Defendant owed certain insurance companies more than $1.1 billion. *Id.* at ¶ 185. The losses catalogued by the Bill of Indictment focus primarily on those suffered by the following insurance company victims (and their constituent individual policyholders): (1) Southland National Insurance Company ("SNIC"), Southland National Reinsurance Corporation ("SNRC"), Colorado Bankers

1
Case 3:23-cr-00048-MOC-DCK    Document 65    Filed 07/02/25    Page 1 of 13

Life Insurance Company ("CBL"), and Bankers Life Insurance Company ("BLIC," and, collectively with SNIC, SNRC, and CBL, the "North Carolina Insurance Companies"); (2) PB Life and Annuity Co., Ltd. ("PBLA"), PB Investment Holdings Ltd. ("PBIHL"), Omnia Ltd. ("Omnia."), and Northstar Financial Services (Bermuda) Ltd. ("North Star," and, collectively with PBLA, PBIHL, and Omnia, the "Bermuda Insurance Companies"); and (3) Universal Life Insurance Company ("ULICO"). *See* Doc. No. 1.

On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant to a written plea agreement. In the plea agreement, Defendant agreed, among other things, to pay full restitution to all victims of the conduct charged in the Bill of Indictment and to the appointment of a special master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." Doc. No. 40.

On December 12, 2024, the U.S. Attorney's Office for the Western District of North Carolina and Defendant jointly moved for the appointment of the Special Master given the complexity of the issues incidental to navigating the existing state court litigation, to interacting with existing trustees and receivers appointed to preserve assets, to valuing the various assets, and to calculating and paying victim restitution in the above-captioned case (this "Case"). Doc. No. 54. The Special Master Order was entered in this Case on January 23, 2025.

## II. SUMMARY OF SPECIAL MASTER'S ACTIVITIES

### A. Communications with Stakeholders

Upon appointment, the Special Master (including the Special Master's attorneys at Grier Wright Martinez, PA ("Grier Law") and Financial Advisor (partners and staff from Paladin Management Group ("Paladin")) conducted several introductory video conferences, telephone conversations, and in-person meetings with various stakeholders in the restitution process, including, without limitation:

- John N. Johnston of Deloitte Ltd., a court-appointed liquidator for the Bermuda Insurance Companies, other professionals at Deloitte, and their outside counsel, primarily Nicholas F. Kajon of Stevens & Lee, P.C.;

- Various officers of ULICO and its outside counsel, primarily Luis F. Llach-Zúñiga of Casillas Santiago & Torres, LLC and Charles A. "Tony" Jones of Troutman Pepper Locke LLP;

- Wes J. Camden and Caitlin M. Poe of Williams Mullen P.C., counsel for the North Carolina Insurance Companies;

- William P. Janvier, who holds multiple court-appointed roles relating to Defendant's collapsed insurance empire (including [i] limited receiver in a Wake County action by the North Carolina Insurance Companies against Defendant, [ii] special master in that same action, and [iii] general receiver in a Wake County action by ULICO against Defendant) and his counsel, Margaret R. Westbrook of K&L Gates LLP;

- Mohsin (Mo) Meghji, Matthew Manning, and William Gallagher of M3 Advisory Partners, LP, providers of outside professional advisory services to NHC Holdings, LLC ("NHC"), a Primary Restitution Asset, Don A. Harrington of Goodbody (provider of investment banking services for NHC), and NHC's outside counsel, John W. Babcock of Waldrep Wall Babcock & Bailey PLLC;

- Ryan J. Meyer and Brandon N. McCarthy of Katten Muchin Rosenman LLP and James F. Wyatt, III of Wyatt & Blake, LLP, Defendant's criminal defense counsel;

- Daniel Ryan, Benjamin Bain-Creed, Taylor Stout, and Julia Park with the U.S. Attorney's Office for the Western District of North Carolina and Lyndie Freeman with the U.S. Department of Justice;

- John Hulbert, in-house corporate counsel for AAPC Holdings, LLC ("AAPC"), a Primary Restitution Asset, and AAPC's outside counsel, Layne T. Smith of Dorsey & Whitney LLP;

- Jeffrey E. Oleynik of Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, outside counsel for Conservatrix N.V., a Dutch insurance company with a sizeable arbitration award and judgment against Defendant;

- H. Steve Wilson, trustee for various "change of control" or "change of ownership" trusts that effectively control or oversee numerous entities affiliated with Defendant, including some of the Specified Affiliated Companies ("SACs") within the meaning of that certain Memorandum of Understanding (the "MOU") dated as of June 27, 2019 by and among the North Carolina Insurance Companies and Global Growth Holdings, LLC ("GGH"), which are Primary Restitution Assets, and Mr. Wilson's counsel, John Bash of Quinn Emanuel Urquhart and Sullivan, LLP; and

- In-house counsel for a prospective buyer of one of the SACs, one of the restitution assets anticipated to generate the largest return to victims, and in-house counsel for the corresponding SAC.

The Special Master has held recurring conferences with many of these stakeholders. Similarly, the Special Master conducts weekly video conferences, jointly, with the prosecution team and Defendant's defense team in this Case.

During the Reporting Period, the Special Master's initial goal from these communications was to gather information about Defendant's various victims and assets. These communications also served (i) to keep all constituencies well-apprised of the Special Master's efforts and (ii) to identify concerns and friction points among the various stakeholders.

### B. Understanding Defendant's Various Assets

The Special Master Order directs the Special Master to, *inter alia*: (1) "identify all assets available for liquidation . . . for the benefit of the victims"; (2) select an appropriate method and timetable and seek Court approval to liquidate . . . any available assets for the benefit of victims; and (3) "oversee and help accomplish the liquidation with Court approval." ECF No. 56, at 6. The Special Master Order then instructs the Special Master to determine whether what the Special Master Order refers to as "the Primary Restitution Assets" (*i.e.*, the interests of Defendant and GGH in NHC, the SACs, and AAPC) will be sufficient to satisfy Defendant's restitution obligations in full before seeking to liquidate Defendant's assets other than the Primary Restitution Assets (referred to as "the Secondary Restitution Assets" by the Special Master Order). *Id.*, at 7–8.

As can be gleamed from the Bill of Indictment, Defendant amassed ownership in a complicated web of hundreds of companies across various industries financed through an even more complicated web of lending arrangements with Defendant's insurance company affiliates that the Special Master is investigating. For example, NHC, one of the Primary Restitution Assets, comprises more than three hundred (300) individual SACs. The corporate governance structure of NHC and the SACs is not simple. Prior to the formation of NHC, demands for repayments of

4

Case 3:23-cr-00048-MOC-DCK    Document 65    Filed 07/02/25    Page 4 of 13

loans from lenders and/or pressure from regulators resulted in Defendant and GGH contributing their equity interests in SACs (and certain Secondary Restitution Assets) to various "change of control" or "change of ownership" trusts, thereby effectively divesting Defendant of all, or almost all, power over such entities. As to NHC itself, pursuant to a judgment and various orders entered by the Wake County Superior Court, Defendant's only power at the time the Special Master order was entered was the power to appoint two, non-controlling, directors to NHC's board. Similarly, AAPC's corporate governance structure limits Defendant's influence over that entity. In addition to complicated governance structures, Defendant, GGH, and others appear to have placed upon some of the Primary Restitution Assets less than favorable secured debt obligations that include hefty interest rates, prepayment penalties, strict financial covenants, and other burdensome fees and other provisions.

The above-referenced corporate governance and lending structures not only complicate the Special Master's efforts to value the Primary Restitution Assets, but also, and perhaps more importantly, complicate the Special Master's ability to compel the monetization of those assets. During the Reporting Period, the Special Master worked to achieve a rudimentary understanding of these various hurdles, especially those preventing an otherwise more immediate recovery for victims.

Primarily due to competing interpretations of the meaning of the Special Master Order (discussed in more detail below), as well as third parties' general distrust of Defendant, the Special Master's efforts to obtain documents and information necessary to evaluate the Primary Restitution Assets met more resistance, at least initially, than the Special Master anticipated. Notwithstanding, Paladin has persisted in working diligently—given the hurdles presented—toward understanding the SACs and assessing the value that might be available for victims through the SACs. Notably,

the Special Master has witnessed a marked improvement in the flow of information to the Special Master from various third parties in the latter months of the Reporting Period. During the Reporting Period, the Special Master reviewed previously generated valuation assessments and related information for the Primary Restitution Assets that were made available to the Special Master.

### C. Documenting the Transfer of Power from Defendant to the Special Master

The Special Master Order provides that, "[t]o assist in meeting his restitution obligations, Defendant has agreed to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the [S]pecial [M]aster, . . . within 21 days of the entry of this [Special Master] Order, all of Defendant's [and GGH's] rights and interests, whether held directly or indirectly, in [the Primary Restitution Assets]." ECF No. 56, at 3–4. The Special Master Order later directly mandates that Defendant take such necessary and reasonable steps within 21 days. *See id.* at 7.

Accordingly, during the first few weeks following entry of the Special Master Order, the Special Master and Defendant's counsel devoted significant time toward working with the attorneys and board members for certain of the Primary Restitution Assets (and certain of those entities' lenders), to prepare documentation (namely, assignment agreements) evidencing the transition of Defendant's and GGH's interests in the Primary Restitution Assets from Defendant to the Special Master. Indeed, Defendant timely executed such assignment agreements within the 21-day window established by the Special Master Order, and relinquished all his rights in these Primary Restitution Assets to the Special Master.

Unfortunately, not all third parties having a relationship with the Primary Restitution Assets were initially willing to recognize the Special Master's authority. For example, one of the lenders for one of the most valuable Primary Restitution Assets refused to affirmatively consent to

Defendant's assignment to the Special Master, at least not unless someone paid this lender a consent fee of at least $2,000,000. Shortly before the close of the Reporting Period, and after months of negotiating, this lender eventually agreed to formally condone the assignment of Defendant's and GGH's interests in the corresponding entity to the Special Master so long as (i) the Special Master agreed not to veto a sale of the company conducted pursuant to an appropriate marketing process and (ii) the entity pay some of the lender's attorneys' fees incurred in deciding whether to recognize the Special Master's authority.

### D. Calculating Victim Losses

In addition to generally charging the Special Master with the obligation to fashion a proposed restitution order for the Court's consideration, the Special Master Order specifically directs the Special Master to "verify and quantify the losses suffered by each victim and any amounts already received by each victim to compensate for such losses." ECF No. 56, at 6. While some insurance company victims immediately produced all documents and information requested by the Special Master to help assess victim loss amounts, the Special Master did not immediately receive full cooperation from all victims. However, similar to the Special Master's investigation into Defendant's assets, the Special Master witnessed a marked improvement in the flow of victim information to the Special Master approaching the close of the Reporting Period. Again, Paladin has worked diligently toward understanding the specifics of the various methods of calculating losses to the various victims.

### E. Understanding Pending Litigation

Essentially all facets of the Special Master's efforts have been complicated—and delayed—by an array of civil litigation involving Defendant and his host of affiliated entities. The Special Master devoted substantial time during the Reporting Period toward understanding the scope of the relief requested in the outstanding civil actions and the potential disruption to, and

7

interference with, the Special Master's responsibilities that may result from such litigation. Some civil actions that were pending when the Special Master Order was entered include, without limitation:

- *Mike Causey, Commissioner of Insurance of North Carolina v. Southland National Insurance Company* et al., Case No. 19-CV-008664 (Wake County, NC Super. Ct.);
- *Southland National Insurance Company* et al. *v. Lindberg* et al., Case No. 19-CVS-13093 (Wake County, NC Super Ct.);
- *S.E.C. v. Lindberg* et al., Case No. 1:22-cv-00715 (M.D.N.C.);
- *In re PB Life and Annuity Co., Ltd.*, Case No. 20-12791 (Bankr. S.D.N.Y.);
- *Johnston* et al. *v. Lindberg* et al., Case No. 23-01000 (Bankr. S.D.N.Y.);
- Liquidation proceedings for the Bermuda Insurance Companies pending before the Bermuda Supreme Court;
- *ULICO v. Lindberg*, Case No. 1:20-cv-00681 (M.D.N.C.);
- *In re Eye Care Leaders Portfolio Holdings, LLC*, Lead Case No. 24-80001 (Bankr. N.D. Tex.).

Across these litigation matters, orders imposing various injunctive and equitable relief have been entered, some of which, on their face, undermine—or at least cause tension with—the powers and duties conferred to the Special Master by the Special Master Order, including, without limitation, prohibitions on the liquidation of Defendant's assets and appointments of other special master(s), limited receiver(s), and general receiver(s) concerning Defendant and Defendant's assets.

In addition to the above-referenced matters that existed at the time of the Special Master's appointment, Defendant has filed, or caused to be filed, several civil actions following the entry of the Special Master Order, including:

- *Lindberg v. Wilson* et al., Case No. 1:25-cv-00133 (W.D. Tex.);
- *Lindberg v. Wilson*, Case No. 1:25-cv-00317 (D. Colo.); and
- *Gaddy v. Wilson*, Case No. PT-2025-000213 (High Court of Justice, Business & Property Courts of England & Wales).

The Special Master (a) never requested that the suits referenced immediately above be filed, (b) does not believe these suits should be pursued, at least not at this time; and (c) intends to facilitate the dismissal of these suits, *in toto*, in the weeks following the close of the Reporting Period.

To complicate matters further, various creditors of Defendant and/or GGH have converted their claims into final judgments against Defendant and/or GGH and are actively seeking to collect on those judgments. Some of these judgment creditors have obtained charging orders directing any monies that would otherwise be available to pay restitution in this Case from the Primary Restitution Assets to instead go to pay down the corresponding judgment debt. By the close of the Reporting Period, the Special Master has not achieved a comprehensive understanding of all of the various judgment creditors pursuing Defendant and/or GGH at this time, to what extent such judgment creditors could or should be characterized as victims for purposes of this Case, or, if not victims, to what extent such judgment creditors are junior or senior to Defendant's restitution victims in the overarching priority of payment of Defendant's debts.

### F. Understanding the Scope of the Special Master's Authority and Duty

Perhaps more than any other single topic or issue, the Special Master spent a substantial amount of time during the Reporting Period attempting to reach consensus among the various constituencies to this Case (prosecution, defense, victims and certain third parties impacted by this Case) concerning the scope of the Special Master's authority under the Special Master Order. Indeed, the extent of the Special Master's role regarding NHC and the SACs has been the subject of widespread disagreement among the victim constituencies, the Department of Justice, Defendant, and other parties. Absent something more (*e.g.*, a forfeiture of assets or equitable relief in some form or fashion unwinding or modifying prior transactions), because Defendant had limited rights with respect to NHC and the SACs when the Special Master Order was entered, the

Special Master arguably received only those limited rights from Defendant. Pursuant to the corporate governance documents of NHC, the Special Master has the right to appoint minority board seats to the NHC board of directors but otherwise has minimal or no power to direct NHC to liquidate assets for the benefit of victims. The Special Master's negotiations to reach a mutual agreement among all constituencies concerning the Special Master's role vis-à-vis NHC and the SACs are ongoing, and Defendant has been supportive of these efforts.

However, during the latter half of the Reporting Period, the negotiations over how the Special Master could and should fit in to the process of liquidating *all* SACs generally yielded to negotiations specific to the net proceeds to be generated from the sale of a single group of SACs, known colloquially as the Clanwilliam group of companies (collectively, "Clanwilliam"). During the Reporting Period, the potential purchaser of Clanwilliam—who had been pursuing the acquisition of Clanwilliam for years preceding the Special Master Order and who had entered into a purchase contract with Clanwilliam for a transaction that is anticipated to generated more than $300,000,000 for Defendant's victims—completed due diligence under the purchase contract. All closing conditions were resolved during the Reporting Period, other than certain consents needed from the Special Master, Defendant, and the Bermuda Insurance Companies. In addition, a substantial secured loan owed by Clanwilliam is maturing sometime in the coming months. Given these time pressures and the desire not to lose the opportunity to generate substantial sums for victims soon, the Special Master's attention has been focused on facilitating the closing of the sale of Clanwilliam, rather than determining the Special Master's roles and responsibilities as pertains to the liquidation of Primary Restitution Assets, in general.

If the Special Master succeeds in helping to broker a consensual resolution among all interested parties concerning the distribution of the Clanwilliam net proceeds, then the Special

Master will bring the compromise to the Court for approval. Defendant has facilitated a consensual resolution of the Clanwilliam transaction by relinquishing a $40,000,000 escrow set aside by a state court judge to fund Defendant's personal income tax liabilities. Once the Clanwilliam transaction is consummated, the Special Master anticipates resuming efforts to obtain clarity and consensus regarding the Special Master's role and responsibilities as to NHC and the SACs.

## G. Appointment of Board Members

Pursuant to the corporate governance documents of NHC, Defendant has the right to appoint two members to the board of directors of NHC. As part of the assignment of his interests in NHC, Defendant assigned that appointment power to the Special Master. During the Reporting Period, the Special Master exercised such power to remove Kathy Million and Lonna Carter, both affiliates of the Defendant, from the NHC board and appointed Don Harer, a member of the Paladin team, as one of the Special Master's board designees.[1] The Special Master did not name his second NHC board designee during the Reporting Period. In addition, although the Special Master did not formally appoint one or more board designee(s) for any other Primary Restitution Assets during the Reporting Period, the Special Master contemplates removing Defendant's affiliate(s) from such board(s)—and naming Scott Avila of Paladin as the replacement—shortly after the close of the Reporting Period.

## H. Assistance with Depository Issues

During the Reporting Period, counsel for, and other representatives of, NHC notified the Special Master that NHC was encountering difficulties in managing depository services at banking institutions. Specifically, a bank with which many of the SACs maintained their operating accounts, had announced its intention to close the SACs' accounts, citing know-your-customer

---

[1] The Special Master verified that appropriate directors' and officers' liability insurance was in place prior to Don Harer's appointment.

("KYC") regulations and the generic problem of having Defendant listed as the ultimate beneficial owner of the entities with funds deposited at the bank. After investigation and discussion with NHC and its representatives, the Special Master authorized NHC to list the Special Master as the ultimate beneficial owner to satisfy the KYC regulations and to minimize the operational disruption to NHC and the SACs that would result from a forced, rapid migration of accounts to a different banking institution. The Special Master worked with NHC's counsel to prepare and execute the necessary paperwork as swiftly as possible.

## I. Other Liquidation Efforts

During the Reporting Period, investment bankers were interviewed and retained for the purpose of creating and implementing a marketing process for monetizing the other Primary Restitution Asset(s).

## III. Receipts and Disbursements

The Special Master neither received nor disbursed any funds during the Reporting Period.

## IV. Request for Approval of Compensation

Soon after the submission of this report, the Special Master intends to file a separate application for compensation seeking court approval of the fees and expenses incurred by Paladin and Grier Law in connection with this Case during the Reporting Period.

## V. Report Intended as a Summary

The narrative description of the Special Master's activities in this report is intended to summarize some of the more significant tasks that the Special Master undertook—through Paladin, Grier Law, or otherwise—in connection with this Case during the Reporting Period and is not intended to reflect a detailed account of the same. Similarly, the narrative description of the Special Master's activities in this report is not a comprehensive accounting of each and every task performed by the Special Master during the Reporting Period. The Special Master is ready to

provide additional documents or information to the Court pertaining to any of the matters referenced in this report upon request, provided that any confidential proprietary information be provided to the Court under seal.

Respectfully submitted this 2d day of July, 2025.

> /s/ Michael L. Martinez
> Joseph W. Grier, III (State Bar No. 7764)
> Michael L. Martinez (State Bar No. 39885)
> Benjamin D. Rhodes (State Bar No. 62618)
> Grier Wright Martinez, PA
> 521 East Morehead Street, Suite 440
> Charlotte, North Carolina 28202
> Telephone: 704.375-3720; Fax: 704.332.0215
> Email: mmartinez@grierlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing *Special Master's First Status Report* were served on following parties by electronic mail as indicated below.

Daniel Ryan (Daniel.ryan@usdoj.gov)
Benjamin Bain-Creed (Benjamin.Bain-Creed@usdoj.gov)
Julia Park (JULIA.PARK@usdoj.gov)
Taylor Stout (Taylor.Stout2@usdoj.gov)
Assistant U.S. Attorney
U.S. Attorney's Office

Lyndie Freeman (Lyndie.Freeman@usdoj.gov)
Criminal Division
U.S. Department of Justice

James F. Wyatt, III (jwyatt@wyattlaw.net)
Wyatt & Blake, LLP
*Attorneys for Defendant*

Ryan J. Meyer (ryan.meyer@katten.com)
Brandon McCarthy (brandon.mccarthy@katten.com)
Katten Muchin Rosenman LLP
*Attorneys for Defendant*

Respectfully submitted this 2d day of July, 2025.

> /s/ Michael L. Martinez
> Michael L. Martinez (State Bar No. 39885)
> Grier Wright Martinez, PA
> 521 East Morehead Street, Suite 440
> Charlotte, North Carolina 28202
> Telephone: 704.375-3720; Fax: 704.332.0215
> Email: mmartinez@grierlaw.com