# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

GREG E. LINDBERG,

    Defendant.

Case No. 3:23-CR-48-MOC

## REPORT AND RECOMMENDATIONS REGARDING RESTITUTION

NOW COMES Joseph W. Grier, III, as special master appointed pursuant to 18 U.S.C. § 3664(d)(6) (the "Special Master"), by and through counsel, who hereby files this *Report and Recommendations Regarding Restitution* (this "Report") recommending entry of a preliminary order of restitution in the amount of $1,625,000,000 as detailed below pursuant to this Court's *Order Appointing Special Master* entered on January 23, 2025 (Doc. No. 56) (the "Special Master Order"), and respectfully represents to the Court as follows:

## I.     SUMMARY OF SPECIAL MASTER'S FINDINGS AND CONCLUSIONS[1]

The primary purpose of this Report is to obtain a preliminary order from the Court narrowing the unresolved issues concerning restitution as this Case heads toward sentencing. More specifically, the Special Master seeks an order from the Court establishing: (A) the persons due restitution in this Case; and (B) those persons' outstanding restitution losses. Not only would such an order vastly simplify the sentencing process in this Case, but it will also facilitate resolution of the other restitution questions thereafter remaining, primarily those concerning the

---

[1]     Capitalized terms not previously defined in this Report shall have the meanings prescribed later in this Report or in the appendices attached hereto.

payment priority—and precise recipients—of future restitution payments to be made by the Special Master in this Case.

Many persons have sought restitution in this Case. To evaluate whether any given person should receive restitution, the Special Master: (a) reviewed the Indictment, case law interpreting the MVRA, and voluminous records made available to the Special Master by Defendant, the alleged victims, and other interested parties; (b) engaged in a thorough colloquy with each of the alleged institutional victims; and (c) discussed the various positions and arguments presented with both the government and Defendant's counsel on a weekly basis. Based on the information gathered, the Special Master determined, as explained further in this Report, that **only those persons identified as persons due restitution in the Indictment** (*i.e.*, the "Pre-Designated Restitution Parties," more accurately defined below) **should be considered primary payees of restitution in this Case**.[2] Most fundamentally, those asserting victims status that the Special Master is not including as a person due restitution in this Report failed to demonstrate how Defendant defrauded them in the same manner, or how they were injured in the same manner, as those victims described in the Indictment.

Just as narrowing the universe of potential restitution payees was difficult, so, too, was identifying the proper measure of restitution losses. Some alleged victims of the insurance fraud scheme described in the Indictment asserted damages in terms of the insurance company's

---

[2] The Special Master seeks an immediate Court order identifying the persons directly due restitution from Defendant and how much. This Report explicitly seeks to reserve all parties' rights concerning whether creditors of those persons due restitution (*e.g.*, ULICO or the Guaranty Associations) should receive restitution payments from the Special Master in lieu of the debtor-entity, including whether any such creditor should be considered a "provider of compensation" within the meaning of 18 U.S.C. § 3664(j)(1) entitled to payments from the Special Master in lieu of the corresponding debtor-entity and at a lower priority level than other restitution payees. For the avoidance of doubt, NOLHGA has represented to the Special Master that none of the Guaranty Associations take the position that it is entitled to restitution in this Case in lieu of the North Carolina Insurance Companies. After entry of an order establishing the persons due restitution from Defendant and corresponding amounts, the Special Master intends to file a subsequent report, motion, or other pleading seeking to resolve various outstanding payment and priority issues.

outstanding liabilities to its policyholders, some asserted damages as the amounts awarded in final civil judgments entered against Defendant, some asserted damages in terms of how much money it would take to winddown each insolvent insurance company after factoring in the company's assets, other non-policyholder liabilities, and projected administrative expenses, and some asserted damages in terms of how much money Defendant diverted from the victimized insurance company. After reviewing the case law interpreting the MVRA and the arguments made by all constituencies, the Special Master determined that **the proper method for calculating restitution loss should focus on how much money was extracted from the corresponding insurance company by Defendant** as part of the fraud described in the Indictment. Under these circumstances, the outstanding unpaid principal balances due on the "loans" Defendant received from the insurance companies (more accurately defined below as "Affiliate Investments") serves as the best metric for the amounts taken by Defendant.

The Special Master has worked closely with Defendant's counsel and the government to reach consensus on as many victim restitution issues as possible. Throughout this Report, the Special Master endeavors to highlight those recommendations (or decisions embedded within those recommendations) with which either the government and/or Defendant do not concur. At a high level, the Special Master is informed and believes that the government and Defendant concur with the Special Master's primary conclusions that: (A) the "Pre-Designated Restitution Parties" (or certain of their creditors) are the only persons due restitution in this Case; and (B) that the "Affiliate Investment" balances, using the principal balances shown in the IALA[3] as the starting point, are the best metric for quantifying losses. That said, whereas the government and the Special Master agree that some interest component should be applied to those "Affiliate Investment"

---

[3]     *See* Appendix 3 for definition and discussion of IALA.

balances to account for the time value of money, Defendant disagrees with any interest component factoring into the restitution analysis.[4]

Ultimately, the Special Master seeks entry of a preliminary order of restitution—in a form substantially similar that appearing as Exhibit A attached hereto—that awards restitution to the following persons in the following amounts.

| NAME OF PAYEE | AMOUNT OF RESTITUTION |
|---|---|
| CBL | $821,000,000 |
| BLIC | $21,000,000 |
| SNIC | $131,000,000 |
| SNRC | $0.00 |
| Northstar | $159,000,000 |
| Omnia | $43,000,000 |
| PBLA (including ULICO) | $406,000,000 |
| PBIHL | $44,000,000 |
| **TOTAL** | **$1,625,000,000** |

The Bermuda Insurance Companies take the position that: the amounts listed for the North Carolina Insurance Companies above technically reflect claims of the various state Guaranty Associations that satisfied the North Carolina Insurance Companies' policyholder liabilities; the Bermuda Insurance Companies are "direct victims" of Defendant; and, therefore, those amounts shown above for the North Carolina Insurance Companies should be paid only after all victim claims have been fully satisfied.[5] NOLHGA represents to the Special Master that the Guaranty Associations take the position that: the Guaranty Associations are not insurers; statutory benefits protect policyholders but do not satisfy debts, extinguish obligations, or release insurers or any third parties; the North Carolina Insurance Companies are victims of Defendant entitled to

---

[4]    In addition, the Special Master rejected many of Defendant's arguments for various "offsets" or "credits" against the loss amounts. These offsets, and why the Special Master rejected them, are discussed later in this Report.

[5]    18 U.S.C. § 3664(j)(1) provides that "[i]f a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation."

payment on an equal priority basis with other victims; and the Guaranty Associations have claims against the North Carolina Insurance Companies along with other creditors.

Considering the complexity of the factual and legal issues discussed in this Report and the numerous persons impacted by the preliminary order sought by the Special Master, the Special Master recommends that interested persons be given at least thirty (30) days to submit to the Court objections or other responses to this Report. Depending on the responses that are filed (and the arguments made therein), the Special Master anticipates that interested persons may further seek to reply to those responses.

Thereafter, the Special Master envisions separately petitioning the Court to resolve the remaining restitution issues (*i.e.*, payment and priority issues) in connection with sentencing or at some other appropriate time.

## II.    PROCEDURAL BACKGROUND

On February 23, 2023, in a thirteen-count Bill of Indictment (the "Indictment"), Greg E. Lindberg ("Defendant") was charged with: conspiracy, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. § 1343; making false insurance business statements presented to regulators, in violation of 18 U.S.C. § 1033(a); making false entries about the financial condition or solvency of an insurance business, in violation of 18 U.S.C. § 1033(c); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Doc. No. 1.

On or around November 1, 2024, Defendant entered into a Plea Agreement with the United States of America, by and through the U.S. Attorney for the Western District of North Carolina and the Fraud Section Chief of the Department of Justice's Criminal Division (the "Plea Agreement"). Doc. No. 40. Pursuant to the Plea Agreement, in addition to and in consideration of various other concessions by Defendant and the government, Defendant agreed to: (a) enter a voluntary plea of guilty to Counts One and Thirteen of the Indictment; (b) entry of an order directing Defendant to

pay full restitution to all persons directly or indirectly harmed by Defendant's criminal conduct, including not only the crime of conviction but also all relevant conduct and all conduct pertaining to any dismissed counts in the Indictment or uncharged conduct; and (c) the appointment of a special master.[6] The Plea Agreement also specifically identified the following entities as persons due restitution in connection with the above-captioned case (this "Case"): Southland National Insurance Company ("SNIC"); Southland National Reinsurance Corporation ("SNRC"); Colorado Bankers Life Insurance Company ("CBL"); Bankers Life Insurance Company ("BLIC," and collectively with SNIC, SNRC, and CBL, the "North Carolina Insurance Companies"); Universal Life Insurance Company and Universal Life Insurance Company of Puerto Rico (together, "ULICO"); PB Life and Annuity Co., Ltd. ("PBLA"); PB Investment Holdings Ltd. ("PBIHL"); Omnia Ltd. ("Omnia"); and Northstar Financial Services (Bermuda) Ltd. ("Northstar," and, collectively with PBLA, PBIHL, and Omnia, the "Bermuda Insurance Companies").[7]

On December 12, 2024, the U.S. Attorney's Office for the Western District of North Carolina and Defendant jointly moved for the appointment of the Special Master given the complexity of the issues relative to navigating the existing state court litigation, interacting with existing trustees and receivers appointed to preserve assets, valuing the various assets, and calculating and paying victim restitution in this Case. Doc. No. 54. The Special Master Order was entered in this Case on January 23, 2025.

Among other powers and duties, the Special Master Order empowers the Special Master to: (a) verify and quantify the losses suffered by each victim and any amounts already received

---

[6] Defendant also agreed to complete a personal financial statement under penalty of perjury by no later than December 5, 2024 and to update that statement within seven (7) days of any material change with respect thereto. Defendant did not deliver such personal financial statement until March 16, 2026 and, as a result, the Special Master has not yet had an opportunity to meaningfully review the same.

[7] This Report refers to the North Carolina Insurance Companies, the Bermuda Insurance Companies, and ULICO as the "Pre-Designated Restitution Parties."

by each victim to compensate for such losses; and (b) fashion a proposed restitution order. As set forth in the Special Master Order, in order to "fashion a restitution order, the Court must consider and determine: (a) which entities and individuals are properly considered "victims" pursuant to 18 U.S.C. § 3663A(a)(2); (b) the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e); and (c) an appropriate payment schedule pursuant to, among other sections, 18 U.S.C. § 3664(i)." This Report focuses on the first two of those three determinations (and seeks entry of a preliminary order from the Court concerning the same), and the Special Master seeks to defer establishing an appropriate payment schedule and other related payment priority issues until the forthcoming sentencing hearing or some other time following entry of the preliminary restitution order. The Special Master's proposed preliminary restitution order is attached hereto as Exhibit A.

### III. FACTUAL BACKGROUND

The Indictment details a massive insurance fraud conspiracy, the purposes of which "were to evade regulatory requirements meant to protect policyholders, conceal the true financial condition of [Defendant's] insurance companies, and conceal [Defendant's] improper use of insurance company funds for [Defendant's] personal benefit." *See* Doc. No. 1 at 2 (¶ 5). The Indictment catalogues losses suffered primarily by the Pre-Designated Restitution Parties, averring that Defendant owed the Pre-Designated Restitution Parties more than $1.1 billion as a result of Defendant's conduct described in the Indictment. *See id.* at 40 (¶ 185). The Indictment more specifically describes the scheme as summarized in Appendix 1, attached hereto and incorporated herein by reference.

7

## IV.   PERSONS POTENTIALLY DUE RESTITUTION

### A.   General Parameters

Based on the Indictment's allegations, the provisions of the Mandatory Victims Restitution Act of 1996 (the "MVRA"), and case law interpreting the MVRA, the Special Master believes that a person[8] must meet the following criteria in order to potentially qualify as a person due restitution in connection with this Case (the "Special Master's Definition"):

Either (1)

- an insurance company,
- the assets of which Defendant or Defendant's agents had some power to invest or otherwise control, directly or indirectly,
- which assets were in fact diverted to a Defendant-affiliated entity,
- to whom, or to whose regulators, Defendant or Defendant's agents made material misrepresentations or omissions concerning those affiliated investments or asset management strategies, and
- which diverted assets actually lost value as a proximate result of Defendant's activities.

Or (2)

- an insured of an insurance company described above (or a subrogee thereof),
- which actually suffered damages as a proximate result of Defendant's fraudulent activities.

### B.   Pre-Designated Restitution Parties

In addition to the government and Defendant having already agreed to the Pre-Designated Restitution Parties qualifying as persons due restitution in this Case, the Pre-Designated Restitution Parties meet the Special Master's Definition.   Appendix 2, attached hereto and incorporated herein by reference, provides background on each of the Pre-Designated Restitution

---

[8]   This Report's use of the term "person" includes both natural human beings and legal entities created pursuant to a state or federal statute.

Parties and explains why the Pre-Designated Restitution Parties qualify for restitution pursuant to the Special Master's Definition.

### 1. THE NORTH CAROLINA INSURANCE COMPANIES

The Pre-Designated Restitution Parties in this Case include a group of North Carolina domiciled insurance companies (defined above as the North Carolina Insurance Companies) that were acquired and controlled by Defendant between approximately 2014 and 2017 and subsequently placed into receivership by the North Carolina Commissioner of Insurance (the "NCCOI"). Each company was re-domesticated to North Carolina and operated as a subsidiary of GBIG Capital LLC (NC) ("GBIG"), an entity owned and controlled by Defendant. On June 27, 2019, the Wake County Superior Court ("Wake County Court") issued Orders of Rehabilitation against the North Carolina Insurance Companies, appointing the NCCOI as Rehabilitator (each a "Rehabilitation Order"). SNIC, BLIC, and CBL were subsequently placed into liquidation. As set forth in detail in Appendix 2, the North Carolina Insurance Companies, their policyholders, and creditors suffered substantial financial harm as a direct result of Lindberg's criminal conduct. Even though these entities are in liquidation, Defendant remains their ultimate beneficial owner.[9]

### a. SNIC

Financial Condition. As there are multiple victims identified in the Indictment and as SNIC is being liquidated by the NCCOI, assessing SNIC's economic circumstances informs the Special Master's restitution analysis, as permitted by the MVRA. SNIC reported ~84,000 policyholders and a financial position as of September 30, 2023 consisting of:

---

[9] On information and belief, Defendant's interests in the insurance companies may be subject to divestiture on account of Defendant having pled guilty in this Case. In any event, there are no other ultimate beneficial owners of the insurance companies besides Defendant.

| Summary Balance Sheet | Amount |
|---|---|
| Cash and Investments | $39,576,948 |
| Other Assets | $3,688 |
| **Total Admitted Assets (excluding non-admitted affiliated investments)** | **$39,580,636** |
| Claims Against the Estate — Policyholders | $41,000 |
| Claims Against the Estate — Guaranty Associations | $131,363,363 |
| Claims Against the Estate — NC Mutual Life Ins. Co. | $49,331,149 |
| Other Liabilities and Creditor Claims | $2,303,238 |
| **Total Liabilities** | **$183,038,750** |
| **Excess of Liabilities over Assets (Deficit)** | **$(143,458,114)** |

Overall, SNIC's liabilities exceed its total admitted assets[10] by approximately $144 million. Importantly, by operation of state law (and the laws of the District of Columbia), Guaranty Associations from each jurisdiction where SNIC was licensed provided statutory benefits to policyholders and beneficiaries in the aggregate amount of approximately $131 million, thereby substituting Guaranty Association claims on SNIC's balance sheet for policyholder claims.[11] Additionally, SNIC reported a liability totaling $49 million representing unpaid obligations owed to North Carolina Mutual Life Insurance Company as a direct beneficiary of a reinsurance trust established to secure SNIC's obligations under a Reinsurance and Administration Agreement.

Affiliated Securities. For statutory reporting purposes, non-admitted assets are excluded from an insurer's balance sheet. SNIC's non-admitted assets consisted primarily of Affiliate Investments with a carrying value of approximately $126 million[12] as of September 30, 2023.

---

[10]    "Admitted assets" are specific assets allowed by state insurance laws and the NAIC to be included in an insurance company's annual financial statements to measure solvency. They are highly liquid, easily convertible to cash, and used to cover liabilities, ensuring policyholder protection. Non-liquid assets are generally excluded from the balance sheet because they cannot be easily liquidated to pay claims.

[11]    There were a relatively *de minimis* amount ($41,000 worth) of SNIC policyholder claims that were not entitled to statutory benefits from the Guaranty Associations. Those policyholder claims were satisfied when the Special Master made payments at the end of 2025 in accordance with the CWG compromise. *See Order* granting consent motion to approve distribution of CWG sale proceeds (Doc. No. 68).

[12]    September 2023 Quarterly Report, Exhibit A (Southland National Insurance Corporation), p. 45.

Pursuant to statutory accounting principles, these investments were assigned a value of zero and are therefore excluded from the balance sheet presented above.

Nature of the Fraud Executed Against SNIC. The conduct underlying SNIC's insolvency is the subject of the Indictment. As summarized herein, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in SNIC's statutory financial statements, and other activities described therein.

*b.* *BLIC*

Financial Condition. As there are multiple victims identified in the Indictment and as BLIC is being liquidated by the NCCOI, assessing BLIC's economic circumstances informs the Special Master's restitution analysis, as permitted by the MVRA. BLIC reported 8,313 policyholders and a financial position as of December 31, 2024 consisting of:

| Summary Balance Sheet | Amount |
|---|---:|
| Cash and Investments | $242,101,619 |
| Other Assets | $4,249,683 |
| **Total Admitted Assets (excluding non-admitted affiliated investments)** | **$246,351,302** |
| Claims Against the Estate — Policyholders | $34,938,003 |
| Claims Against the Estate — Guaranty Associations | $447,888,444 |
| Claims Against the Estate — GA Administrative Expense | $2,600,000 |
| Other Liabilities and Creditor Claims | $564,799 |
| **Total Liabilities** | **$485,991,247** |
| **Excess of Liabilities over Assets (Deficit)** | **$(239,639,945)** |

Overall, BLIC's liabilities exceed its total admitted assets[13] by approximately $240 million. Importantly, by operation of state law (and the laws of the District of Columbia), Guaranty Associations from each jurisdiction where BLIC was licensed provided statutory benefits to policyholders and beneficiaries in the aggregate amount of approximately $448 million, thereby

---

[13]    *See supra* n.10.

substituting Guaranty Association claims on BLIC's balance sheet for policyholder claims.  In addition, approximately $35 million in BLIC policyholder claims were not entitled to statutory benefits from the Guaranty Associations.  These policyholder claims were satisfied when the Special Master made payments at the end of 2025 in accordance with the CWG compromise.[14]

Affiliated Securities.  For statutory reporting purposes, non-admitted assets are excluded from an insurer's balance sheet. BLIC's non-admitted assets consisted primarily of Affiliate Investments with a carrying value of approximately $48 million[15] as of December 31, 2024. Pursuant to statutory accounting principles, these investments were assigned a value of zero and are therefore excluded from the balance sheet presented above.

Nature of the Fraud Executed Against BLIC.  The conduct underlying BLIC's insolvency is the subject of the Indictment. As summarized at further length herein, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in BLIC's statutory financial statements, and other activities described therein.

*c.     CBL*

Financial Condition.  As there are multiple victims identified in the Indictment and as CBL is being liquidated by the NCCOI, assessing CBL's economic circumstances informs the Special Master's restitution analysis, as permitted by the MVRA.  CBL reported 122,485 policyholders and a financial position as of December 31, 2024 consisting of:

---

[14]     *See Order* granting consent motion to approve distribution of CWG sale proceeds (Doc. No. 68).

[15]     September 2023 Quarterly Report, Exhibit C (Bankers Life Insurance Company), Exhibit C, p. 40.

| Summary Balance Sheet | Amount |
|---|---|
| Cash and Investments | $550,306,995 |
| Other Assets | $24,464,822 |
| **Total Admitted Assets (excluding non-admitted affiliated investments)** | **$574,771,817** |
| Claims Against the Estate — Policyholders | $118,772,730 |
| Claims Against the Estate — Guaranty Associations | $1,270,591,872 |
| Claims Against the Estate — GA Administrative Expense | $7,400,000 |
| Other Liabilities and Creditor Claims | $195,887,742 |
| **Total Liabilities** | **$1,592,644,344** |
| **Excess of Liabilities over Assets (Deficit)** | **$(1,017,872,527)** |

Overall, CBL's liabilities exceed its total admitted assets[16] by approximately $1.0 billion. Importantly, by operation of state law (and the laws of the District of Columbia), Guaranty Associations from each jurisdiction where CBL was licensed provided statutory benefits to policyholders and beneficiaries in the aggregate amount of approximately $1.3 billion, thereby substituting Guaranty Association claims on CBL's balance sheet for policyholder claims. In addition, approximately $119 million of CBL policyholder claims were not entitled to statutory benefits from the Guaranty Associations. These policyholder claims were satisfied when the Special Master made payments at the end of 2025 in accordance with the CWG compromise.[17]

Affiliated Securities. In addition to the admitted assets reported above, CBL reported a carrying value of $892 million in Affiliate Investments at December 31, 2024. Pursuant to statutory accounting principles, these investments were assigned a value of zero and are therefore excluded from the balance sheet presented above.

Nature of the Fraud Executed Against CBL. The conduct underlying CBL's insolvency is the subject of the Indictment. As summarized herein, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into

---

[16] *See supra* n.10.

[17] *See Order* granting consent motion to approve distribution of CWG sale proceeds (Doc. No. 68).

Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in CBL's statutory financial statements, and other activities described therein.

### d. SNRC

Although SNRC is postured somewhat similarly to the other North Carolina Insurance Companies in terms of history, corporate ownership structure, and being subject to a Rehabilitation Order, SNRC does not appear to be a person truly due restitution in this Case. SNRC had no Affiliate Investments on its balance sheet immediately prior to the Rehabilitation Order, nor did (or does) SNRC have any policyholder liabilities. Accordingly, the Special Master believes SNRC is either: (i) not a restitution payee in this Case; or (ii) a restitution payee with $0.00 in restitution losses.

### 2. THE BERMUDA INSURANCE COMPANIES

The Pre-Designated Restitution Parties in this Case include the Bermuda Insurance Companies that were acquired and controlled by Defendant between approximately 2017 and 2018. The Bermuda Insurance Companies were issued "Windup Orders" by the Supreme Court of Bermuda.[18] Defendant remains the ultimate beneficial owner of the Bermuda Insurance Companies.

### a. Omnia and PBIHL

Omnia and PBIHL are Bermuda entities acquired by Defendant in June 2017 in a single transaction from Beechwood, LLC ("Beechwood"), an entity linked to the Platinum Partners ("Platinum") receivership. The two entities share substantially overlapping facts relating to their

---

[18] In the Matter of Northstar Financial Services (Bermuda) Ltd., No. 2020-304 (Sup. Ct. Bermuda Mar. 26, 2021); In the Matter of Omnia Ltd., No. 2020-305 (Sup. Ct. Bermuda Mar. 26, 2021); In the Matter of PB Investment Holdings Ltd., No. 2020-441 (Sup. Ct. Bermuda Apr. 9, 2021); In the Matter of PB Life and Annuity Co., Ltd., No. 2020-306 (Sup. Ct. Bermuda Feb. 17, 2023) (Winding-Up Orders).

acquisition, the fraud perpetrated against them, and their subsequent liquidation proceedings. They are addressed together in this section.

Financial Condition.  As there are multiple victims identified in the Indictment and as Omnia and PBIHL are being liquidated, assessing each entity's economic circumstances informs the Special Master's restitution analysis, as permitted by the MVRA.  Omnia reported a financial position as of September 24, 2021 consisting of:

| Summary Balance Sheet | September 24, 2021 |
|---|---|
| Cash – Unrestricted | $1,943,434 |
| Cash – Restricted | $17,702,453 |
| Investments | Nil or unknown |
| Separate Asset Accounts | $128,608,796 |
| Other | $4,405,970 |
| **Total Assets** | **$152,660,655** |
| Fixed Product Future Policy Benefit Reserve | $36,517,510 |
| Separate Liability Accounts | $128,608,796 |
| Current Outstanding Surrenders | $22,793,270 |
| Intercompany & Other | $3,704,770 |
| **Total Liabilities** | $191,624,346 |
| **Excess of Liabilities over Assets (Deficit)** | $(38,963,691) |

Overall, Omnia's liabilities at the time of winding-up exceeded its total admitted assets[19] by approximately $39 million. Omnia's variable policyholders were protected through segregated accounts totaling approximately $129 million; however, fixed policyholder claims are limited to a remaining investment portfolio heavily concentrated in Affiliate Investments.

Although the financial information provided to the Special Master for PBIHL is less detailed than that for Omnia, the Bermuda Insurance Companies provided spreadsheets to the Special Master representing that, as of December 31, 2024, PBIHL had balance sheet assets

---

[19]    The assets generally disclosed in the above balance sheet would be characterized as "admitted assets" under the phrasing used by the North Carolina Insurance Companies.  *See supra* n.10.  The "Investments" refer to the affiliated investments that would not appear on the North Carolina Insurance Companies' balance sheets as "non-admitted" assets.

totaling approximately $6 million, policyholder liabilities totaling $42 million, and other liabilities totaling $3 million.

Nature of the Fraud Executed Against Omnia and PBIHL  The conduct underlying Omnia and PHIHL's wind-down is the same fraud outlined in the Indictment.  As summarized in Appendix 1, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of policyholder funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in Omnia's and PBIHL's financial statements, and other activities described therein.

#### b.    Northstar

Financial Condition.  As there are multiple victims identified in the Indictment and as Northstar is being liquidated, assessing Northstar's economic circumstances informs the Special Master's restitution analysis, as permitted by the MVRA.  Northstar reported a financial position as of September 25, 2020 consisting of:

| Summary Balance Sheet | September 25, 2020 |
|---|---|
| Cash & Cash Equivalent | $3,494,262 |
| Investment in Affiliated Investments | $1 |
| Non-affiliated Investments | $142,231,160 |
| Intercompany Recharges | $1 |
| **Total Assets** | **$145,725,424** |
| Fixed Active and Surrendered Contracts | 248,099,183 |
| Variable Active and Surrendered Contracts | 104,923,170 |
| General Active and Surrendered Contracts | 53,840,716 |
| General Creditors | 465,750 |
| **Total Liabilities** | **$407,328,819** |
| **Excess of Liabilities over Assets (Deficit)** | **$(261,603,395)** |

Overall, Northstar's liabilities at the time of winding-up exceeded its total admitted assets[20] by approximately $262 million. Northstar's variable policyholders were protected through

---

[20]    The assets generally disclosed in the above balance sheet would be characterized as "admitted assets" under the phrasing used by the North Carolina Insurance Companies.  *See supra* n.10.  The "Investment in Affiliated

segregated accounts totaling approximately $105 million; however, fixed policyholder claims are limited to a remaining investment portfolio heavily concentrated in Affiliate Investments.

Nature of the Fraud Executed Against Northstar.    The conduct underlying Northstar's wind-down is the same fraud outlined in the Indictment.  As summarized herein, the Indictment alleges a multi-layered scheme sustained over several years, including the systematic extraction of funds into Defendant-controlled entities, the false reporting of affiliated investments as unaffiliated in financial statements, and other activities described therein.

### 3.    ULICO AND PBLA

ULICO is a life insurance company with its principal place of business in Puerto Rico. PBLA is a Bermuda-based life insurance and reinsurance company formed and controlled by Defendant.  Defendant is the ultimate beneficial owner of PBLA.  ULICO's involvement with Defendant stems from the PBLA-ULICO Reinsurance Agreement.

Following the execution of the PBLA-ULICO Reinsurance Agreement and PBLA gaining access to the assets transferred to the ULICO 2017 Trust, Defendant began extracting money through a coordinated series of fraudulent transactions. These included: (i) causing the ULICO 2017 Trust to invest in Defendant-affiliated companies in violation of the Investment Guidelines; (ii) engineering sham repurchase agreements ("Repos"); and (iii) extracting funds that were then used, among other purposes, to make payments on outstanding loans owed to affiliated entities, and to finance Defendant's personal expenses.

In January 2020, ULICO further initiated arbitration proceedings against PBLA. In May 2020, the arbitration panel held a hearing on ULICO's motion for interim relief. In June 2020, the

---

Investments" refer to the affiliated investments that would not appear on the North Carolina Insurance Companies' balance sheets as "non-admitted" assets.

arbitration panel issued an award granting ULICO's motion, requiring PBLA, among other things, to deposit $524 million into a segregated bank account to secure its obligations under the Reinsurance Agreement and to satisfy any liabilities arising from ULICO's policyholder obligations. PBLA failed to make that deposit, and the obligation remains outstanding.

Separately, in May 2022, the United States District Court for the Middle District of North Carolina entered a $524 million judgment against Defendant[21] for the breach of his personal guarantee of PBLA's obligations. That judgment remains unsatisfied. ULICO has since pursued enforcement actions in both the Middle District of North Carolina and the Superior Court for Durham County, North Carolina. On information and belief, ULICO has not forcibly recovered any assets from Defendant through those enforcement actions. It is important to note that, unlike the North Carolina Insurance Companies or Bermuda Insurance Companies, ULICO is not in rehabilitation or liquidation. Rather, it has instead protected its policyholders by using other corporate assets to make over $200 million in payments that should have been covered under the reinsurance that it obtained through PBLA.

The Bermuda Insurance Companies provided spreadsheets to the Special Master representing that, as of December 31, 2024, PBLA had balance sheet assets totaling approximately $3 million, policyholder liabilities totaling $520 million (*i.e.*, the obligation owed to ULICO), and other liabilities totaling $3 million.

### C. Other Insurance-Related Persons Seeking Restitution

In addition to the Pre-Designated Restitution Parties, other persons that claimed to have sustained damages as a result of Defendant's insurance business activities have contacted the

---

[21] *See Universal Life Insurance Co. v. Lindberg*, No. 1:20-CV-681 (M.D.N.C. May 3, 2022) [D.E. 122] (entering judgment against Lindberg for breach of personal guarantee of PBLA's reinsurance obligations to ULICO).

Special Master seeking to be paid from the funds administered by the Special Master in this Case, including:  Vista Life & Casualty Reinsurance Company, f/k/a Alpha Re (U.S.) Inc. ("Vista"); Vista Life & Casualty Reinsurance Company's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16"); United Security Assurance Company of Pennsylvania ("USAP"); Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V. ("Conservatrix"); employees and agents of certain of the North Carolina Insurance Companies; and individual policyholders, primarily those insured through the Bermuda Insurance Companies.  Appendix 2 includes further information concerning each of these constituencies and why the Special Master believes each either:  (a) does not meet the Special Master's Definition; or (b) has interests adequately represented by the Pre-Designated Restitution Parties such that they need not be itemized or otherwise independently accounted for in any restitution order.

### D.    Others Seeking Restitution

In addition to the foregoing persons seeking restitution in this Case based on an alleged harm having some nexus to Defendant's insurance enterprise, the Special Master has received victim impact statements from, or has otherwise been contacted by, various other persons seeking restitution for alleged harms having nothing to do with Defendant's insurance enterprise.  These include, without limitation:  Defendant's ex-wife; one or more of Defendant's ex-girlfriends; judgment creditors; disgruntled investors or former business partners; and other of Defendant's general creditors.  Although Defendant agreed to full restitution—in the broadest sense—for "all conduct pertaining to any . . . uncharged conduct," some nexus must exist between the harm complained of by the person seeking restitution and the conduct described in the Indictment.  These other persons seeking restitution have failed to demonstrate a connection between their alleged damages and the crimes described in the Indictment (or any crime at all).  Therefore, the Special Master does not recommend that these claimants receive restitution in this Case.

### A.  Summary of Different Methodologies

In determining the appropriate loss amounts for purposes of restitution, three primary categories of monetary damages bear on the analysis:  (1) the loss amounts asserted by the putative victim; (2) the outstanding balances of the Affiliate Investments representing the vehicles through which funds were misappropriated; and (3) the policyholder liabilities representing the unpaid obligations owed to individual policyholders as consequential victims.  Because these three categories overlap and seek to measure different dimensions of the same underlying harm, a consistent set of criteria is necessary to determine which amounts most accurately and defensibly quantify the losses caused by the conduct underlying the thirteen counts of the Indictment.  Such criteria are discussed in detail in Appendix 3, attached hereto and incorporated herein by reference.

### B.  Affiliate Investments

This section quantifies the current outstanding balances for Affiliate Investments held by the North Carolina Insurance Companies and the Bermuda Insurance Companies, being the most readily ascertainable shorthand for calculating how much money Defendant took from the Pre-Designated Restitution Parties.  Although the calculation of the outstanding principal balances for these investments is imperfect as explained in Appendix 3, the amounts set forth below represent the Special Master's best estimate of the original loss sustained by the insurance companies after giving credit to Defendant for various documented recoveries and offsets.  As set forth below, the two primary issues with these calculations are (1) whether any interest should be included and, if so, how much; and (2) what credit Defendant should receive for claimed recoveries and offsets.

#### 1.  Different Interest Methodologies

Within this framework for calculating loss amounts, primarily three interest methodologies were evaluated to quantify the current outstanding balances due to the North Carolina Insurance

Companies and the Bermuda Insurance Companies and include: (1) Unpaid Principal (no interest); (2) Unpaid Principal Plus Time Value of Money Interest; and (3) Unpaid Principal Plus IALA Contractual Interest. Again, further detail is provided in Appendix 3 regarding how the Special Master's financial advisors accounted for accruing interest (or not) and applied intervening partial payments under each of the three methodologies.

The following table summarizes the outstanding and unpaid Affiliate Investment balances projected through March 31, 2026 under each methodology:

| $ in millions | Unpaid Principal | Unpaid Principal Plus Time Value of Money Interest | Unpaid Principal Plus IALA Contractual Interest |
|---|---|---|---|
| North Carolina Insurance Companies: | | | |
| CBL | $688 | $821 | $1,218 |
| BLIC | 13 | 21 | 45 |
| SNIC | 113 | 131 | 189 |
| Subtotal | $814 | $973 | $1,452 |
| Bermuda Insurance Companies: | | | |
| Northstar | $134 | $159 | $194 |
| OMNIA | 37 | 43 | 38 |
| PBLA | 339 | 406 | 620 |
| PBIHL | 38 | 44 | 50 |
| Subtotal | $548 | $652 | $902 |
| **Total** | **$1,362** | **$1,625** | **$2,354** |

### 2. Special Master's Recommendation on Interest Rate

Of the three methodologies for calculating interest outlined above, the Special Master believes that the middle approach—Unpaid Balance Plus Time Value of Money Interest—mostly closely aligns with the purposes of the MVRA. On one end of the spectrum, restitution under the MVRA is aimed at quantifying the actual loss suffered, not necessarily awarding a victim the benefit of the victim's bargain with the defendant; this reasoning leads the Special Master to shy away from recommending interest at the contractual rate. On the other end of the spectrum,

awarding only principal—especially when the losses occurred nearly a decade ago—deprives the victim of the time value of money. Accordingly, the Special Master believes that a method that incorporates a "time value of money" interest rate is fair and appropriate under the circumstances. *See United States v. Fike*, 140 F.4th 351, 355-59 (6th Cir. 2025) (court did not err in including time value of money interest as part of restitution because it more fully compensated victim's losses) (collecting cases); *see also United States v. Hoyle*, 33 F.3d 415 (4th Cir. 1994) (no error in including loan interest in restitution amount). Using a time value of money interest rate will also promote more equal treatment among the different Pre-Designated Restitution Parties, whose affiliated investments may not have all had the same contractual interest rates. As set forth above, Defendant disagrees with the position of the government and Special Master that some interest component is an appropriate element of restitution under these circumstances.

### 3. Offsets Considered but Not Assumed

Defendant has identified various payments and transfers that he characterizes as presently existing offsets against any restitution awarded in this Case ("Asserted Recoveries"). These Asserted Recoveries total at least $1.6 billion and encompass a wide range of business transactions that took place between 2019 and 2025. For purposes of determining restitution, Qualifying Recoveries (discussed further in Appendix 3) are generally defined as payments made for the benefit of the victim insurance companies or their policyholders, but exclude payments made for Defendant's own strategic, business, or self-preservation purposes or for other independent consideration.

The Special Master has determined that some elements of the Asserted Recoveries satisfy these criteria. As such, they are incorporated in the Unpaid Principal amounts above, which include the following:

- quarterly interest payments and other partial payments of principal or interest that Defendant made to some of the Pre-Designated Restitution Parties;

- a $25 million partial payment made directly to ULICO; and

- The $289 million in aggregate CWG sale proceeds distributed to the Pre-Designated Restitution Parties and the holders of claims not entitled to statutory benefits from the Guaranty Associations.

The Special Master has determined that the remaining Asserted Recoveries do not presently satisfy the applicable criteria. The following is a list of these Asserted Recoveries rejected by the Special Master with a brief explanation of the Special Master's primary rationale for rejecting the same.

- A credit for all of the assets on the victims' balance sheets, or, at least, a credit for those assets that are ultimately distributed to the victims' creditors, and/or a credit for the enterprise value of each victim at the time the applicable supervising governmental authority took control of the victim.

  - If, in this Case, the victims are the insurance companies and the loss amounts are based on Affiliate Investment balances, then a victim's other assets (or enterprise value) are irrelevant to the calculation of loss amounts. As the assets and liabilities correspondingly decrease on the victims' balance sheets over time, the victims are in no better (or worse) of a financial condition. The Special Master's recommended methodology ignores, and does not otherwise make Defendant responsible for, the victims' policyholder liabilities (or other liabilities). As such, Defendant should receive no restitution credit as the victims pay their obligations from other assets available to each entity.

- Defendant's transfer of a preferred equity position in one of the Primary Restitution Assets to ULICO, for which ULICO agreed to reduce the amount of ULICO's civil judgment against Defendant by at least $218 million.

  - The Special Master believes this offset should occur if and when the preferred equity position is liquidated into cash. Based on the Special Master's investigation, this asset is not freely transferable and is subject to too many unknowns and variables concerning potential market conditions to accurately estimate the amount ULICO is likely to recover on this asset. The Special Master believes ULICO's purported agreement(s) as to how to reduce its civil judgment on account of this transfer should not influence the Special Master's calculation of criminal restitution losses. The Court's standard

restitution order language that no victim can recover more than its losses should adequately protect Defendant if and when this asset can be monetized by ULICO.

- CBL's receipt of a $3 million subordination fee in connection with a new loan to some of Defendant's other companies.

  - CBL agreed to subordinate its priority position to clear the way for certain of the Specified Affiliated Companies to obtain new capital, thereby increasing the risk of recovering on the corresponding Affiliate Investments. In other words, fresh consideration was given by CBL for the $3 million payment.

- SNIC's receipt of approximately $28 million in expense reimbursements from Defendant in 2021–2022.

  - The NCCOI sought to move SNIC from rehabilitation to liquidation in 2021. To delay this from occurring, Defendant agreed to reimburse SNIC's operating costs in continuing to operate per Defendant's wishes. SNIC is no better off after having received these reimbursements from Defendant than SNIC would have been had it gone straight to liquidation over Defendant's objections in 2021. In other words, fresh consideration (continued operations per Defendant's request) was given by SNIC for the $28 million.

- Approximately $59 million in payments made to the Pre-Designated Restitution Parties for debts not included in the IALA.

  - The Special Master's advisors learned very recently that some affiliated loans that had been subsequently fully satisfied do not appear in the IALA. The Special Master has not counted this "Cash Out" against Defendant in the Affiliate Investment loss amounts outlined in this Report; accordingly, Defendant should get no credit for the "Cash In" Defendant put back on account of these loans.

- CBL's receipt of a $5 million transaction fee in connection with a debt restructuring of one of the Primary Restitution Assets.

  - Probably the closest call of all the Asserted Recoveries rejected by the Special Master, CBL received some sort of transaction fee for serving as some kind of agent or servicer on some loans made between Defendant's affiliated entities. In other words, fresh consideration (loan agent services) was given by CBL for the $5 million. That said, the Special Master questions whether this fee reflected reasonably equivalent value for the services rendered, hence making this determination a "close call" in the mind of the Special Master.

24

- Various reductions totaling at least $129 million relating to one or more entity(ies) referred to as "Agera."

  - The crux of Defendant's offset request here is that Agera is not an affiliated entity, is an investment Defendant assumed upon purchase of Omnia and PBIHL (and upon PBLA's assumption of the obligation to reinsure ULICO's liabilities), and, as such, does not fall under the terms of the Indictment. It appears to the Special Master, based on the information available, that Defendant purchased Omnia and PBIHL for $1.00 each (and agreed to reinsure ULICO) having full knowledge of (i) those companies' ownership of debt and/or equity in Agera, (ii) Agera's troubled financial situation, (iii) that, for Omnia (and maybe others) to avoid regulatory supervision and otherwise succeed, Defendant would need to maintain Agera's value. Despite all of this, Defendant shortly thereafter acquired a controlling ownership stake in Agera. Thus, it appears to the Special Master that Defendant benefitted from all of the investments into Agera by the Pre-Designated Restitution Parties, whether before Defendant's acquisition of Agera or afterward.

- A reduction in the amount of $118.3 million based on CBL's purchase of a group of affiliated companies known as "Eye Care Leaders."

  - Eye Care Leaders filed for bankruptcy in January of 2024, owing $17 million to the Pre-Designated Restitution Parties in outstanding Affiliate Investments at that time. To finance the bankruptcy process, CBL loaned fresh capital to Eye Care Leaders separate and apart from the Affiliate Investments, and then purchased Eye Care Leaders out of bankruptcy with a credit bid based on the new debtor-in-possession financing amount plus additional cash. The Special Master does NOT agree (1) that Defendant should get a credit against his restitution obligations for the outstanding amount of Eye Care Leaders Affiliate Investments because CBL purchased Eye Care Leaders or (2) that the outstanding amount of those Affiliate Investments total $118.3 million.

Obviously, Defendant disagrees with the Special Master's conclusions on these points. On information and belief, the government agrees with the Special Master's conclusions, although perhaps on additional or different rationales.

### C.      Policyholder Liabilities

This section quantifies the outstanding policyholder liabilities for the North Carolina Insurance Companies and the Bermuda Insurance Companies for purposes of assessing

consequential damages.  Again, further explanation regarding how the Special Master's financial advisors determined policyholder liability amounts is provided in Appendix 3.  To be clear, the Special Master disagrees with using outstanding policyholder liabilities as the primary metric for restitution losses in this Case.  The principal harm resulting from the conduct described in the Indictment was the conversion of conservative, liquid investments into riskier more illiquid investments, a harm most directly expressed by the outstanding Affiliate Investment balances. While the consequential harm to individual policyholders is an important metric to examine if evaluating the comprehensive fallout of Defendant's activities, using outstanding policyholder liabilities to calculate loss amounts in this Case is too indirect, and subject to too many variables outside of Defendant's control, to act as the basis for the Special Master's recommendation on restitution loss amounts.  Moreover, through the actions of the Guaranty Associations (as coordinated by NOLHGA), the Special Master, and the North Carolina Insurance Companies, among others, all of the North Carolina Insurance Companies' individual policyholders have had their claims paid by the Special Master and/or through statutory benefits provided by the Guaranty Associations.

As illustrated below, policyholder liabilities across the North Carolina Insurance Companies (now owed to the state Guaranty Associations) and the Bermuda Insurance Companies approximate $2.8 billion and comprise $1.8 billion for the North Carolina Insurance Companies as of February 16, 2026 and $1 billion for the Bermuda Insurance Companies as of December 31, 2025.  Policyholder claims not entitled to statutory benefits from the Guaranty Associations have been fully paid by the Special Master in the amount of approximately $157 million from Primary Restitution Assets and are excluded from the noted $2.8 billion policyholder liability figure.

| $ in millions | Policyholder Liabilities | Segregated Assets | Net Policyholder Liabilities |
|---|---|---|---|
| Owed to Guaranty Associations (NCICs): | | | |
| CBL | $1,277 | – | $1,277 |
| BLIC | 447 | – | 447 |
| SNIC | 132 | – | 132 |
| Subtotal | $1,856 | – | $1,856[22] |
| Bermuda Insurance Companies: | | | |
| Northstar | $478 | $(136) | $342 |
| OMNIA | 152 | (105) | 47 |
| PBLA | 499 | – | 499 |
| PBIHL | 45 | (2) | 43 |
| Subtotal | $1,174 | $(243) | $931 |
| **Total** | **$3,030** | **$(243)** | **$2,787** |

Even when taken together with other available non-affiliated assets, the Special Master's recommended loss amounts based on current Affiliate Investment balances with "time value of money interest" are insufficient to satisfy (a) Northstar's individual policyholder liabilities and (b) PBLA's debts owed to ULICO and other policyholders. There are several potential reasons for this, but one significant cause of the discrepancy lies in the application of the "time value of money" interest rate which is understood to be below the interest rate earned by the fixed-rate insurance products sold by Northstar, which have continued to accrue interest at that higher rate as reflected in the above numbers. Moreover, as set forth above, as least as far back as 2020, Northstar's assets appear to have been insufficient to meet its policyholder liabilities even if affiliated investments were included on the balance sheet in their face amount. The Special Master lacks sufficient information to fully explain why that is the case.

---

[22] The North Carolina Insurance Companies held in excess of $890 million in balance sheet assets, exclusive of any affiliated investments in Defendant's other companies, at June 30, 2025 as set out in the Commissioner of Insurance of the State of North Carolina Receiver's Quarterly Report filed March 16, 2026. These assets would be available to pay both liquidation expenses as well as policyholder liabilities.

The North Carolina Insurance Companies have been approved to use its available assets to pay down the liabilities owed to the state Guaranty Associations in an aggregate amount equal to $512 million.

### D.     Claimed Losses

This section quantifies the losses claimed by each of the Pre-Designated Restitution Parties. On or about the first week of March 2026, a current update of claimed losses was requested from the North Carolina Insurance Companies and Bermuda Insurance Companies.  The claimed loss figures for the North Carolina Insurance Companies and Bermuda Insurance Companies presented below differ in several key manners:

1.  North Carolina Insurance Company claimed losses are as of March 31, 2026 while the Bermuda Insurance Company claimed losses are as of December 31, 2025.

2.  North Carolina Insurance Company claimed losses are based solely on the outstanding Affiliate Investment balances and contractual interest thereon and do not include any professional costs, wind-down estimates, or non-affiliated loan or investment amounts due.[23]

3.  Bermuda Insurance Company claimed losses are based on policyholder liabilities adjusted by:

    a.  additional amounts for "Other Creditors";

    b.  additional amounts for estimated liquidation and legal costs to complete the liquidation;

    c.  a reduction for assets held, both segregated and general, available to meet policyholder liabilities.

---

[23]     On information and belief, the only reason the North Carolina Insurance Companies' claimed loss amounts differ from the "Unpaid Principal Plus IALA Contractual Interest" amounts included in § V.B.1, *supra*, is due to the fact the North Carolina Insurance Companies have not been asked to submit an updated claim to the Special Master since various adjustments to their figures were made, working together with the Special Master's financial advisors.

28

Total claimed losses are approximately $2.5 billion with the North Carolina Insurance Companies at approximately $1.6 billion and the Bermuda Insurance Companies at approximately $900 million, as set forth in the chart immediately below.

| $ in millions | Claimed Losses |
|---|---|
| North Carolina Insurance Companies (March 31, 2026): | |
|     CBL | $1,355 |
|     BLIC | 81 |
|     SNIC | 191 |
| Subtotal | $1,627 |
| Bermuda Insurance Companies (December 31, 2025): | |
|     Northstar | $325 |
|     OMNIA | 51 |
|     PBLA | 503 |
|     PBIHL | 43 |
| Subtotal | $922 |
| **Total** | **$2,549** |

The primary distinction between the losses claimed by the North Carolina insurance companies and the Special Master's recommendation is whether contract interest is applied (the North Carolina Insurance Companies' method) or a more conservative equalized interest rate is applied (the Special Master's method). The Bermuda Insurance Companies use an entirely different framework for assessing losses (amount necessary to complete their winddown and liquidation).

### VI.    ASSETS AVAILABLE TO PAY RESTITUTION

#### A.    Primary Restitution Assets

As discussed in the Special Master Order, Defendant agreed to immediately provide the Special Master exclusive possession and control of Defendant's direct or indirect interests in certain specified companies for the purpose of using the same to wholly or partially satisfy Defendant's restitution obligations (the "Primary Restitution Assets"). Importantly, Defendant is not the only person with legally recognized interests in the Primary Restitution Assets, and, in

many cases, Defendant's interests in those assets are subordinated to those of other persons. Although the Special Master has not commissioned his own independent valuation of the Primary Restitution Assets, the Special Master has investigated the value of the Primary Restitution Assets[24] and believes that the likely aggregate amount to be recovered for restitution purposes from Defendant's interests in the Primary Restitution Assets ranges as set forth in the chart immediately below.[25]

| $ in millions | Low | Mid | High |
|---|---|---|---|
| Primary Restitution Assets | $1,162 | $1,454 | $1,878 |

Upon request by the Court, the Special Master could provide additional detail concerning the Special Master's estimates under seal or in an *in camera* setting.[26]

### B.      Secondary Restitution Assets

The Special Master Order additionally provides that, in the event the Special Master determines that the Primary Restitution Assets will likely be insufficient to fully satisfy Defendant's restitution obligations, then the Special Master may seek to liquidate other assets besides the Primary Restitution Assets that Defendant owns (the "Secondary Restitution Assets").

---

[24]    The estimated values included below are derived, in part, from (a) market pricing estimates obtained through past and present sale activities and (b) illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC. These illustrative analyses do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise employing discounted cash flow methodologies, comparable transaction analyses, and the financial projections provided by portfolio company management.  Subject to these limitations and qualifications, market pricing estimates and illustrative valuations provide the most current available basis for estimating the realizable value of Defendant's interests in the Primary Restitution Assets that may be available for restitution.  These estimates reflect a blended range incorporating current market pricing from active sale processes and rolled-forward illustrative valuations.

[25]    The range provided above excludes the approximately $289 million in payments previously made to or for the benefit of the Pre-Designated Restitution Parties from the proceeds generated from the sale of CWG, which amounts have otherwise been deducted by the Special Master from the restitution amounts recommended through this Report.

[26]    Publicly disclosing too much detail regarding the Primary Restitution Assets and the Special Master's value determinations concerning the same would negatively impact liquidation efforts and could, in itself, decrease the value of the Primary Restitution Assets.  Thus, the Special Master errs on the side of caution by including in this Report a range that encompasses all Primary Restitution Assets lumped together.

Thus, the Special Master's investigation and other activities to date have not focused on the Secondary Restitution Assets, and, at this time, the Special Master lacks sufficient information as to the value of the Secondary Restitution Assets, what encumbrances may exist thereon, or Defendant's ability to exempt those assets under otherwise applicable law. That said, the Special Master does not believe that Secondary Restitution Assets are likely to yield a significant amount of funds available to pay restitution, especially in comparison to the Primary Restitution Assets.

As set forth in this Report, the Special Master believes that the value to be extracted from Defendant's interests in the Primary Restitution Assets to pay restitution will not likely satisfy Defendant's restitution obligations in full.[27]

Although the Special Master Order mandates that Defendant provide a personal financial statement detailing the Secondary Restitution Assets by December 4, 2024, Defendant did not deliver such personal financial statement until March 16, 2026. As a result, the Special Master has not yet had an opportunity to meaningfully review the personal financial statement.

## VII. SPECIAL MASTER'S RECOMMENDATIONS

Based on the foregoing and for the reasons set forth above and in the Appendices attached hereto, the Special Master recommends that: the only parties due restitution in this Case are the Pre-Designated Restitution Parties; the Unpaid Principal Plus Time Value of Money Interest method of calculating Affiliate Investment balances reflects the method for calculating restitution in this Case that most closely aligns with the purposes of the MVRA; and that the restitution should be ordered in favor of the persons listed, and in the amounts shown, in the chart immediately below.

---

[27] In the event the Court agrees with the Special Master's recommendations, the Special Master intends to notify the Court through a subsequent Case filing that the Special Master will seek to liquidate any available Secondary Restitution Assets in addition to the Primary Restitution Assets.

| NAME OF PAYEE | AMOUNT OF RESTITUTION |
|---|---|
| CBL | $821,000,000 |
| BLIC | $21,000,000 |
| SNIC | $131,000,000 |
| SNRC | $0.00 |
| Northstar | $159,000,000 |
| Omnia | $43,000,000 |
| PBLA (including ULICO) | $406,000,000 |
| PBIHL | $44,000,000 |
| **TOTAL** | **$1,625,000,000** |

Accordingly, the Special Master seeks entry of an order of restitution in a form substantially similar that appearing as Exhibit A attached hereto. The Special Master has proposed language in the proposed order appearing as Exhibit A that seeks to ensure that the victims do not receive a double recovery from the Special Master, including language relating to a certain interest that Defendant agreed to convey to ULICO but has not yet been converted to cash.

The Special Master (A) has been in communication with counsel for various persons who seek restitution in this Case but for whom the Special Master recommends no restitution and/or restitution in amounts lower than requeste and (B) understands that these parties may seek to be heard on their objections to this Report. Given the complex and unique nature of the facts and legal issues underlying this Report, the Special Master recommends that Defendant and other interested persons be given thirty (30) days following the filing of this Report to submit to the Court objections or other responses to this Report.

## VIII. RESERVATION OF RIGHTS

Through this Report and the requested preliminary order of restitution, the Special Master is not seeking to resolve, and makes no recommendations at this stage concerning, how partial restitution payments through the Special Master should be applied, including whether partial restitution payments should be divided proportionately among the foregoing payees or whether some payees should receive some priority in payment over other payees. All parties' rights

concerning those payment and priority issues, as well as Defendant's ability to pay, the timing of future restitution payments, and whether, and to what extent, the restitution imposed by this Order shall accrue interest—are expressly reserved. This reservation of rights expressly includes rights relating to arguments concerning whether the Guaranty Associations (as coordinated by NOLHGA) should be classified as providers of compensation to some extent and substituted to that extent as a direct payee of restitution in lieu of the North Carolina Insurance Companies. The Special Master proposes to continue investigating these issues and will make further report to the Court concerning the same, either in connection with sentencing or at some other appropriate point in the future.

Although this Report does not focus on reporting Defendant's cooperation with the Special Master's efforts, the Special Master reserves the right to advise the Court concerning Defendant's cooperation during the sentencing hearing or at some other appropriate time in the future.

Respectfully submitted this 3d day of April, 2026.

*/s/ Michael L. Martinez*
Joseph W. Grier, III (State Bar No. 7764)
Michael L. Martinez (State Bar No. 39885)
Benjamin D. Rhodes (State Bar No. 62618)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

*Attorneys for the Special Master*

33

# CERTIFICATE OF SERVICE

Consistent with the Court's victim noticing *Order* entered on October 18, 2023 (Doc. No. 21), a copy of the foregoing *Report and Recommendations Regarding Restitution* will be posted on the public Department of Justice website, available at:

https://www.justice.gov/criminal-vns/case/united-states-v-greg-e-lindberg

In addition, the undersigned hereby certifies that copies of the foregoing *Report and Recommendations Regarding Restitution* were served on the persons listed below at the addresses listed by U.S. mail, postage prepaid, and/or by electronic mail, as indicated.

Daniel Ryan (Daniel.ryan@usdoj.gov)
Benjamin Bain-Creed (Benjamin.Bain-Creed@usdoj.gov)
Assistant U.S. Attorney
U.S. Attorney's Office

Lyndie Freeman (Lyndie.Freeman@usdoj.gov)
Criminal Division
U.S. Department of Justice

James F. Wyatt, III (jwyatt@wyattlaw.net)
Wyatt & Blake, LLP
*Attorneys for Defendant*

Ryan J. Meyer (ryan.meyer@katten.com)
Brandon McCarthy (brandon.mccarthy@katten.com)
Katten Muchin Rosenman LLP
*Attorneys for Defendant*

Wes J. Camden (wcamden@williamsmullen.com)
Caitlin M. Poe (cpoe@williamsmullen.com)
Williams Mullen
*Attorneys for the N.C. Insurance Companies*

Nicholas F. Kajon (nicholas.kajon@stevenslee.com)
Constantine D. Pourakis (constantine.pourakis@stevenslee.com)
Stevens & Lee
*Attorneys for the Bermuda Ins. Companies*

Luis F. Llach-Zúñiga (LLlach@cstlawpr.com)
Casillas Santiago Torres LLC
*Attorneys for ULICO*

Charles A. (Tony) Jones (tony.jones@troutman.com)
troutman pepper locke
*Attorneys for ULICO*

John W. Babcock (jbabcock@waldrepwall.com)
James C. Lanik (jlanik@waldrepwall.com)
Waldrep Wall Babcock & Bailey PLLC
*Attorneys for NHC Holdings*

Don Solow (dsolow@vistare.us)
Vista Life & Casualty Reinsurance Company

Cameron Waite (cwaite@usa-cal.com)
United Security Assurance Company of PA

Byron L. Saintsing (bsaintsing@smithdebnamlaw.com)
Joe Davies (jdavies@smithdebnamlaw.com)
Smith Debnam Narron Drake Saintsing & Myers, LLP
*Attorneys for Galen Publishing, LLC*

Jeffrey E. Oleynik (JOleynik@BrooksPierce.com)
Kate E. Giduz (KGiduz@BrooksPierce.com)
Brooks, Pierce, McLendon, Humphrey & Leonard, LLP
*Attorneys for Nederlandsche Algemeene Maatschappij van Levensverzekering "CONSERVATRIX" N.V.*

Margaret R. Westbrook (Margaret.Westbrook@klgates.com)
K&L Gates LLP
*Attorneys for William P. Janvier*

William P. Janvier (wjanvier@smvt.com)
Receiver & Special Master in Various Actions

John W. Fletcher III (JFletcher@fletchertydings.com)
Fletcher, Tydings, Williams-Tracy & Gott, PLLC
*Attorneys for ICP Services, Peter & Carol Pinto, & Rob Hirsch*

34

Jason Cowley (jcowley@mcguirewoods.com)
McGuireWoods LLP
*Attorneys for NOLHGA*

Joel Glover (joel.glover@faegredrinker.com)
Faegre Drinker Biddle & Reath LLP
*Attorneys for NOLHGA*

Daniel E. Rohner (DROHNER@shb.com)
Shook, Hardy & Bacon L.L.P.
*Attorneys for Wells Family Trust, Richard and
Michelle Dowdican Revocable Trust, Mason Wells,
Robert M. Nelson, and David Evans*

Tisha Lindberg (lindbergtisha@icloud.com)

Jana C. Barnett (jana@barnettgill.com)
Barnett Gill
*Attorneys for Olivia Molina*

GeoAlaska, LLC
2440 E. Tudor Road, Suite 230
Anchorage, AK 99507
Attn: Paul Craig

American GeoPower, LLC
3790 El Camino Real, Suite 113
Palo Alto, CA 94306
Attn: David McBay\

Respectfully submitted this 3d day of April, 2026.

 */s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax:  704.332.0215
Email:  mmartinez@grierlaw.com