# EXHIBIT

# 1

## COINSURANCE AGREEMENT

**THIS COINSURANCE AGREEMENT ("Agreement") is** effective as of the 31st day of March, 2016 (the "Effective Date"), between United Security Assurance Company of Pennsylvania, a Pennsylvania domiciled insurer, with an address at 673 E. Cherry Lane, P.O. Box 64477, Souderton, Pennsylvania 18964 (the "Company"), and Alpha Re (U.S.) Inc., an insurance company organized under the laws of the State of Vermont, with an address at 76 Saint Paul Street, Suite 500, Burlington, VT 05401 (the "Reinsurer").

## W I T N E S S E T H:

The Reinsurer hereby reinsures the Company to the extent and on the terms and conditions and subject to the exceptions, exclusions and limitations hereinafter set forth and nothing hereinafter shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third parties or any persons not parties to this Agreement.

## ARTICLE I
## BUSINESS COVERED

The Company hereby agrees to cede to the Reinsurer and the Reinsurer agrees to assume a Quota Share portion of the Company's Long Term Care Claims Liability with respect to Reinsured Policies.

## ARTICLE II
## TERM AND CANCELLATION

A.      This Agreement shall take effect as of 11:59 p.m. Eastern Standard Time, March 31, 2016. The reinsurance under this Agreement shall remain in force so long as the liability of the Company under the Reinsured Policies remains in force.

B.      Notwithstanding the termination of this Agreement, the provisions of this Agreement shall continue to apply to all unfinished business hereunder to the end that all obligations and liabilities incurred hereunder prior to such termination shall be fully performed and discharged.

## ARTICLE III
## DEFINITIONS

A.      The term "Administration Expenses" as used herein means any and all loss adjustment expenses (whether allocated or unallocated), overhead, services fees, court costs, legal fees and expenses, and other expenses incurred by or on behalf of the Company in connection with the administration of the Reinsured Policies and claims thereunder.

B.      "Authorized Control Level Risk Based Capital" shall be calculated in accordance with Title 8, Part 3, Chapter 159 of the Vermont Statutes Annotated.

C. The term "Business Day" as used herein means a Monday, Tuesday, Wednesday, Thursday or Friday on which banking institutions in the Commonwealth of Pennsylvania or the State of Vermont are not obligated by applicable law to close.

D. The term "Closing Date" as used herein shall be as defined in Article VII(A).

E. The term "Extra Contractual Liabilities" as used herein means all liabilities of any nature for damages (including compensatory, consequential, exemplary, punitive, bad faith or similar or other damages), fines or penalties arising out of or relating to any alleged or actual acts, errors or omissions by the Company or any of its affiliates or representatives, whether intentional or otherwise, including any alleged or actual reckless or wrongful conduct or bad faith in connection with the marketing, sale, underwriting, issuance, delivery, cancellation or administration of, or the handling of any claim arising out of or under any Reinsured Policy, but excluding any liability for a pre-Effective Date claim, in each case including any expenses incurred in connection with any of the foregoing.

F. The term "Governmental Authority" as used herein means any domestic, foreign, or alien governmental, legislative, judicial, administrative or regulatory authority, agency, commission, body, court, association (including the National Association of Insurance Commissioners) or entity.

G. The term "Guaranty Fund Liability" as used herein means any and all liability or other obligations arising by contract, operation of law, or otherwise from the Company's participation or membership, whether voluntary or involuntary, in any Insolvency Fund.

H. The term "Insolvency Fund" as used herein means any guarantee fund, insolvency fund, plan, pool, association, fund or other arrangement, however denominated, established or governed, which provides for any assessment of or payment or assumption by the Company of part or all of any claim, debt, charge, fee or other obligation of an insurer or reinsurer, or its successors or assigns, which has been declared by any competent authority to be insolvent, or which is otherwise deemed unable to meet any claim, debt, charge, fee or other obligation in whole or in part.

I. The term "Internal Replacement Program" as used herein means a program offered to all or any portion of the holders of Reinsured Policies structured with the intended or reasonably expected result to be the exchange of Reinsured Policies, or any portion thereof, to any other Policy of (i) the Company or its affiliates or (ii) a third party with whom the Company has entered into a reinsurance, risk pooling or similar agreement with respect to such Policies.

J. The term "Long Term Care Claims Liability" as used herein means, with respect to any month, all of the Company's liability for long term care claims payments and waived premiums during such month, in each case to the extent expressly provided for under the Reinsured Policies. For purposes of clarity, and without limiting the foregoing, such liability shall exclude any (i) Administration Expenses; (ii) Extra-Contractual Liabilities; or (iii) Guaranty Fund Liability.

K. The term "Manager" as used herein means Coventry CareLink Insurance Services, LLC, 1302 Concourse Drive-Suite 303, Linthicum, Maryland 21090.

2

L.      The term "Net Subject Written Premium" as used herein means the gross insurance premiums or considerations collected by the Company for the Reinsured Policies, less any return premiums or considerations due and paid under the Reinsured Policies.  For the avoidance of doubt, the Net Subject Written Premium calculation includes 100% of any policy premium rate increases, if any, approved by any state insurance departments and due under the Reinsured Policies after the Effective Date.

M.      The term "Policies" as used herein means insurance policies, contracts, binders, and slips, including (i) all supplements, endorsements, riders and agreements in connection therewith, (ii) all renewals thereof, and (iii) all replacements thereof issued at the request of the relevant policyholder, but excluding any replacement thereof issued as a result of an Internal Replacement Program.  The term "Policies" shall include any of the foregoing that have lapsed and that otherwise would be eligible for inclusion hereunder, subject to reinstatement procedures contained in such policies, contracts, binders and slips.

N.      The term "Quota Share" as used herein means one hundred percent (100%).

O.      The term "Reinsured Policies" as used herein means those Policies classified in the books and records of the Company as "long term care insurance" policies in force on the Effective Date (i) acquired by the Company through various assumption reinsurance agreements and issued by National States Insurance Company, Great Republic Life Insurance Company, Capital Blue Cross, Trigon Insurance Company, Blue Cross and Blue Shield of Virginia, and Colonial American Life Insurance Company, and (ii) issued by the Company prior to January 1, 2015, all such Policies to be listed in an electronic file and transmitted to the Reinsurer within 10 days of the execution of this agreement.  Notwithstanding the foregoing, the term "Reinsured Policies" shall exclude any Policies ("Modified Policies") that the Company, at any time from and after the Effective Date and without the prior written consent of the Reinsurer, in any respect amends or modifies (or permits to be amended and modified) in whole or in part (or as to which the Company in any manner waives any provision or permits any provision to be waived.). Modified Policies shall be treated under this Agreement as if they were lapsed Policies without value, with all premium paid to the Reinsurer hereunder fully earned.  For the avoidance of doubt, the term "Reinsured Policies" shall include those Policies that the Company amends or modifies at the request of a policyholder as part of an actuarially sound benefit modification alternative to a rate increase; provided, however, that the Reinsurer shall have provided the Company its prior written consent to the actuarially sound benefit modification alternatives offered to the policyholder, which prior written consent will not be unreasonably withheld.

P.      "Total Adjusted Capital" shall be calculated in accordance with Title 8, Part 3, Chapter 159 of the Vermont Statutes Annotated.  Every part of the calculation of Total Adjusted Capital will be determined in accordance with statutory accounting principles applicable to insurers domiciled in Vermont that file an annual statement in accordance with Title 8, Chapter 101, Section 3561 of the Vermont Statutes Annotated.

3

## ARTICLE IV
## EXCLUSIONS

The Reinsurer shall assume no liability for, and shall not be obligated under this Agreement to indemnify the Company for: (i) Extra-Contractual Liabilities; (ii) *ex gratia* payments or other voluntary payments to claimants under the Reinsured Policies; (iii) insurance benefits in litigation as of the Effective Date of this Agreement; (iv) amounts in excess of the benefit amounts set forth in the Reinsured Policies, regardless of reason; (v) punitive, compensatory, or other sorts of damages; or, (vi) liabilities not arising under the express terms and conditions of the Reinsured Policies.

## ARTICLE V
## TERRITORY

The territorial limits of this Agreement shall be identical with those of the Reinsured Polices and shall follow the terms of such Reinsured Policies.

## ARTICLE VI
## CLAIMS HANDLING STANDARDS

The Company agrees that, consistent with industry standards, the Company and the Manager will adjust, administer and pay claims arising under the Reinsured Policies in compliance with applicable law, as well as all pertinent rules and regulations adopted pursuant to such laws. Except as provided in Article IV, any claim payment made by the Company is binding upon the Reinsurer to the extent of its Quota Share liability on the Reinsured Policies.

## ARTICLE VII
## REINSURANCE PREMIUM

A.      On the Closing Date, the Company shall pay to the Reinsurer an amount equal to the Quota Share of the Company's best estimate of the statutory active life reserves, unearned premium reserves, disabled life reserves, and IBNR held by the Company as of the Effective Date with respect to the Reinsured Policies, plus $12 million, less an initial ceding commission of one per cent (1%) of the active life reserves, plus interest from the Effective Date to the Closing Date at an effective annual interest rate of four percent (4%) (collectively, the "Initial Reinsurance Premium"). "Closing Date" means the date such payment is actually made by the Company. Not later than ninety (90) days following the Closing Date, the Company and the Reinsurer shall exchange funds so as to reconcile the difference between the estimated amounts paid on the Closing Date and the true amount due as of the Closing Date. The Initial Reinsurance Premium, both at the Closing Date and as reconciled, will be calculated in accordance with the worksheet attached as Exhibit 1.

B.      Not later than forty-five (45) days following the end of each calendar month, the Company shall pay to the Reinsurer the Quota Share of the Net Subject Written Premium, as adjusted, on all Reinsured Policies (collectively, the "Ongoing Premium"). In the event the calculation of Ongoing Premium results in a negative number, the absolute value of such amount

4

shall be paid by the Reinsurer to the Company. Ongoing Premium will be calculated in accordance with the worksheet attached as Exhibit 2.

C.     If any portion of the Ongoing Premium is not paid by the Company or the Reinsurer, as the case may be, when due in accordance with this Article VII, the party to which the payment is due has the right to terminate this Agreement by giving the other party sixty (60) days' advance written notice.   If the delinquent premiums have not been paid as of the close of the sixtieth (60th) day after the party to which the payment is due has provided such notice, this Agreement will terminate effective as of the date the other party failed to pay such Ongoing Premium.   If the party to which the payment is due does not elect to terminate this Agreement in accordance with this Article VII, any late payments of Ongoing Premium shall accrue interest at a rate of twelve percent (12%) per annum calculated from the applicable payment date. Regardless of any such termination, each party will continue to be liable to the other for all unpaid reinsurance premium of whatsoever kind earned through the date of such termination.

D.     The Company shall pay the Reinsurer all amounts owed as Initial Reinsurance Premium, in cash by bank wire.

## ARTICLE VIII
## PAYMENTS BY REINSURER

A.     The Reinsurer shall pay to the Company the Quota Share of all benefits due and paid by the Company under the Reinsured Policies.  In no event shall the Reinsurer's liability with respect to any Reinsured Policy exceed the amount set forth in such Reinsured Policy.  For the avoidance of doubt, payments due or payable under any Reinsured Policy prior to the Effective Date are not covered by this Agreement.

B.     The Reinsurer shall pay to the Company an allowance on all gross premiums or considerations ceded under this agreement, including an amount per Reinsured Policy per month, a percentage of ceded premium, a percentage of claims paid, and a commission allowance as set forth in Exhibit 3.  The Company shall pay the Reinsurer return allowances on any return premiums at the same rate. It is expressly agreed that the expense allowances include provision for all underwriting costs, claims management expenses, sales commissions, state premium taxes (both Company's and Reinsurer's), assessments, and all other expenses of whatever nature.

## ARTICLE IX
## REPORTS AND REMITTANCES

A.     The accounting period for this Agreement shall be calendar month.

B.     The Company and the Reinsurer shall reconcile their obligations to one another under the Agreement within forty (40) days following the end of each calendar month.  Any amounts due from such reconciliation shall be remitted by the Company or the Reinsurer, as the case may be, within five (5) days following such reconciliation.

# ARTICLE X
## REPRESENTATIONS, WARRANTIES, AND COVENANTS

A.    For the purposes of this Agreement, the Company represents and warrants to the Reinsurer that there is no reinsurance agreement effective prior to the Effective Date covering the Reinsured Policies. The Company covenants that it will file for premium rate increases with the appropriate Governmental Authority as reasonably actuarially justified. Further, the Company warrants that it will notify the Reinsurer within thirty (30) days of any premium rate increase approved by a Governmental Authority with regard to the Reinsured Policies.

B.    The Company represents and warrants that the Manager administers all claims under the Policies pursuant to a claims management agreement ("Claims Agreement"). The Company represents and warrants that the Claims Agreement: (i) requires the Manager to indemnify the Company for liabilities arising from the Manager's gross negligence; and, (ii) contains a mechanism for replacing the Manager if it does not meet best professional standards and practices. The Company acknowledges that it will be required to obtain the Reinsurer's express written consent before the preceding provisions may be amended or deleted from the Claims Agreement. A copy of the Claims Agreement is annexed hereto as Exhibit 4.

C.    The Company warrants that: (i) the Reinsurer shall be a third party beneficiary of the indemnification to be provided by the Manager under the Claims Agreement; (ii) the Reinsurer shall in no event be liable for errors and omissions of the Manager or the Company; (iii) the Company shall pay to the Reinsurer all proceeds received from the Manager as a result of the Manager's duty to indemnify the Company for amounts due and not previously paid to the Reinsurer by the Company; and, (iv) the Company shall hold the Reinsurer harmless for the errors and omissions of the Manager and/or the Company.

D.    The Reinsurer covenants to the Company that: (i) it will maintain at least the minimum unimpaired paid-in capital and surplus required for an insurance company licensed by the Vermont Department of Financial Regulation; and (ii) it will maintain in the protected cell Total Adjusted Capital in excess of (x) 500% of its Authorized Control Level Risk-Based Capital through its financial statement as of December 31, 2020, (y) 400% of its Authorized Control Level Risk-Based Capital through its financial statement as of December 31, 2025, and (z) 300% of its Authorized Control Level Risk-Based Capital through the year-end financial statement in the year in which the last liability of the Company under the Reinsured Policies is paid. The calculations under this paragraph will be performed on a statutory accounting basis pursuant to Title 8, Part 3, Chapter 159 of the Vermont Statutes Annotated. Every part of the calculations under this paragraph will be determined in accordance with statutory accounting principles applicable to insurers domiciled in Vermont that file an annual statement in accordance with Title 8, Chapter 101, Section 3561 of the Vermont Statutes Annotated.

E.    The Reinsurer covenants that, on or prior to the Closing Date and as a condition to closing, it will obtain investment in the protected cell holding this reinsurance agreement in the amount of $12.5 million. This investment will remain as surplus in the protected cell as needed to support the Reinsurer's RBC covenant. The agreement with the investors governing the

6

investment will provide that any dividends or other distributions to the investors from the protected cell may only be declared in an amount above the Reinsurer's RBC covenant and will be paid only upon the approval of the Captive Insurance Division of the Vermont Department of Financial Regulation.

F.     The Reinsurer covenants that, for so long as this Agreement remains in effect, it will undertake to obtain and to provide the Company the following reports and statements within twenty (20) Business Days of the filing of the report or statement with any Governmental Authority (or completion of the statement in the case of item (v), below): (i) the Reinsurer's annual audited financial statement; (ii) the Reinsurer's annual actuarial opinion and memorandum; and (iii) a material change in the Reinsurer's business plan unless such material change relates to a transaction of the Reinsurer other than the transaction subject to this Agreement.

G.     The Company will submit the reports and statements described in section F of this Article to the Pennsylvania Insurance Department within twenty (20) Business Days of receipt from the Reinsurer. The Company will report any material change to this Agreement to the Pennsylvania Insurance Department, even if such material change does not require the approval of the Pennsylvania Insurance Department, within twenty (20) Business Days of the amendment to the Agreement.

## ARTICLE XI
## OVERSIGHTS

Any inadvertent delays, errors or omissions on the part of one party occurring in connection with its obligations under this Agreement or any transaction hereunder shall not relieve the other party from any liability which would have otherwise attached had such delay, error or omission not occurred.

## ARTICLE XII
## CONFIDENTIAL INFORMATION

A.     Each of the Company and the Reinsurer hereby agree to hold confidential and not disclose any client or proprietary information (each as described in the succeeding paragraph) of the other party, except as set forth in this Agreement, unless otherwise agreed to in writing. The foregoing limitation shall not apply to proprietary information to the extent such proprietary information otherwise becomes publicly available, or the disclosure: (i) has been mandated by law; or (ii) is duly required by external auditors.

B.     Client information includes medical, financial and other personal information about proposed, current and former policy owners, insureds, applicants, and beneficiaries of Policies. Proprietary information includes but is not limited to underwriting manuals and guidelines, applications and contract forms and premium rates and allowances of the Reinsurer and the Company. In addition, the Company and the Reinsurer will comply with relevant privacy laws. Notwithstanding any provision herein to the contrary, the confidentiality provisions of this Agreement shall survive the termination hereof.

7

## ARTICLE XIII
## AUDIT AND ACCESS TO RECORDS

A.      Upon twenty (20) Business Days advance written notice, the Reinsurer and/or its duly appointed representatives, may, at the offices of the Company or such other reasonable and appropriate location or locations to be designated by agreement of the Company and the Reinsurer, audit any and all books, records, systems, statements, correspondence, reports and other documentation that relate to the Reinsured Policies, this Agreement, related agreements or the subject matter hereof. The Company shall provide reasonable access to all appropriate senior personnel and workspace during normal business hours for such audit and shall cooperate with and disclose and produce any and all documentation reasonably requested by the auditors. The right to audit shall include the right to make copies of any documentation which the Reinsurer is entitled to review. The Reinsurer shall keep all information disclosed or produced for audit, including all audit reports and analyses, confidential, except as required by law. The Reinsurer's right to audit, as specified in this Article XIII(A), shall survive termination of this Agreement for so long as the Reinsurer has any obligations under this Agreement or related agreements.

B.      Upon twenty (20) Business Days advance written notice, the Company and/or its duly appointed representatives, may, at the offices of the Reinsurer or such other reasonable and appropriate location or locations to be designated by agreement of the Company and the Reinsurer, audit any and all books, records, systems, statements, correspondence, reports and other documentation that relate to the Reinsured Policies, this Agreement, related agreements or the subject matter hereof. The Reinsurer shall provide reasonable access to all appropriate senior personnel and workspace during normal business hours for such audit and shall cooperate with and disclose and produce any and all documentation reasonably requested by the auditors. The right to audit shall include the right to make copies of any documentation which the Company is entitled to review. The Company shall keep all information disclosed or produced for audit, including all audit reports and analyses, confidential, except as required by law. The Company's right to audit, as specified in this Article XIII(B), shall survive termination of this Agreement for so long as the Company has any obligations under this Agreement or related agreements.

## ARTICLE XIV
## INSOLVENCY

A.      In the event of the insolvency, liquidation or rehabilitation of the Reinsurer, the Company may provide the Reinsurer, its receiver, rehabilitator, conservator, liquidator or statutory successor with written notice of its intent to terminate or to recapture, at the election of the Company, all reinsurance in force under this Agreement, regardless of the duration the reinsurance has been in force or the amount retained by the Company on the Reinsured Policies. The effective date of a termination or recapture due to the insolvency, liquidation or rehabilitation of the Reinsurer would be at the election of the Company. Irrespective of the insolvency, liquidation or rehabilitation of the Reinsurer and irrespective of whether or not this Agreement is terminated or the Reinsured Policies recaptured, Article XV shall remain in full force and effect and continue to govern the relationship of the parties hereto.

B.     In the event of insolvency, liquidation or rehabilitation of the Company or the appointment of a liquidator, receiver or statutory successor of the Company, the reinsurance coverage provided hereunder shall be payable by Reinsurer directly to the Company or to its liquidator, receiver or statutory successor, on the basis of the liability of the Company under the Reinsured Policy or Reinsured Policies reinsured and without diminution because of such insolvency, liquidation, rehabilitation or appointment or, subject to Article VII(C), because such liquidator, receiver or statutory successor has failed to pay any claims or any portion thereof.  In any such event, the reinsurance being provided hereunder shall be payable immediately upon demand, with reasonable provision for verification, on the basis of claims allowed against the Company by any court of competent jurisdiction or by any liquidator, receiver or statutory successor.  In any such event, the liquidator, receiver or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of each claim against the Company with respect to such reinsured policy within a reasonable time after each such claim is filed in the insolvency, liquidation or rehabilitation proceeding.  During the pendency of any such claims, the Reinsurer may, at its own expense, investigate such claim and interpose in the proceeding in which such claim is to be adjudicated any defense or defenses that the Reinsurer may reasonably deem available to the Company or its liquidator, receiver or statutory successor.  The expenses incurred in connection therewith by the Reinsurer shall be chargeable, subject to court approval, against the Company as part of the expense of such insolvency, liquidation or rehabilitation to the extent of any benefit that accrues to the Company, solely as a result of the defense or defenses undertaken by the Reinsurer.     Irrespective of the insolvency, liquidation or rehabilitation of the Company and irrespective of whether or not this Agreement is terminated, Article XV shall remain in full force and effect and continue to govern the relationship of the parties hereto.

## ARTICLE XV
### OFFSET

Any debts or credits, matured or unmatured, liquidated or unliquidated, regardless of when they arose or were incurred, in favor of or against either the Company or the Reinsurer with respect to this Agreement, are deemed mutual debts or credits, as the case may be, and shall be set off, and only the balance shall be allowed or paid.  In the event of insolvency, liquidation or rehabilitation of either party, offsets shall be allowed in accordance with applicable law.

## ARTICLE XVI
### GOVERNING LAW; SUBMISSION TO JURISDICTION; CONSENT TO SERVICE OF PROCESS

A.     This Agreement and any other document or instrument delivered pursuant hereto, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, termination, performance or nonperformance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation, warranty, or covenant made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed by the internal Laws of the Commonwealth of Pennsylvania, without regard to its conflicts of law principles.

9

B.    In the event of a dispute arising out of or relating to this Agreement, the parties agree to the following process of dispute resolution. Within fifteen (15) days after the Company or the Reinsurer has first given the other party written notification of a specific dispute, each party will appoint a designated company officer to attempt to resolve the dispute. The officers will meet at a mutually agreeable location as soon as possible and as often as necessary, in order to gather and furnish the other with all appropriate and relevant information concerning the dispute. The officers will discuss the problem and will negotiate in good faith without the necessity of any formal arbitration proceedings. During the negotiation process, all reasonable requests made by one officer to the other for information will be honored. The designated officers will decide the specific format for such discussions.

C.    The parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal or state court located within the Commonwealth of Pennsylvania over any dispute arising out of or relating to this Agreement or any of the transactions contemplated hereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action proceeding related thereto may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

D.    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by the delivery of a copy thereof in accordance with the provisions of Article XXII(D).

## ARTICLE XVII
## SPECIFIC PERFORMANCE

The parties hereto each agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, that monetary damages may be inadequate and that a party may have no adequate remedy at law. It is accordingly agreed that, without the necessity of posting bond or other undertaking, each of the parties hereto shall be entitled to an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Agreement, this being in addition to any other remedy to which such party is entitled at law or in equity. In the event that any claim, action, suit, arbitration or proceeding by or before any Governmental Authority or arbitral body is brought in equity to enforce the provisions of this Agreement, no party hereto shall allege, and each party hereto hereby waives the defense or counterclaim that there is an adequate remedy at law.

## ARTICLE XVIII
## TERMINATION

A.    This Agreement shall commence on the Effective Date and continue until the date on which this Agreement is terminated under Section B, C or D of this Article XVIII below, or

10

under Article VII(C), except that under no circumstances shall any termination of this Agreement relieve either party from liability for any breach of this Agreement occurring prior to such termination. Each party may pursue any available remedy for breach of this Agreement without terminating this Agreement.

B.      The Company, in its sole discretion, shall have the option to terminate this Agreement upon the occurrence of any of the following events:

1.      The Reinsurer is placed in receivership, conservatorship, rehabilitation or liquidation by any insurance regulatory authority having jurisdiction over the Reinsurer.

C.      This Agreement may be terminated by the mutual written consent of the Reinsurer and the Company. The Company shall not withhold its consent in the event it determines in good faith that there is no further current or potential future liability of the Reinsurer hereunder.

D.      This Agreement will be terminated upon the extinguishment of all of the Company's obligations under the Reinsured Policies.

E.      Notwithstanding anything in this Agreement to the contrary, Article XII, Article XV, Article XVI, Article XVII and Article XXII shall survive any termination of this Agreement.

F.      In the event that this Agreement is terminated pursuant to this Article XVIII, a net accounting and settlement as to any balance due under this Agreement shall be undertaken by the parties to this Agreement. The balance due shall equal the Quota Share of the net statutory active life reserves, unearned premium reserves, disabled life reserves, and IBNR of the Reinsured Policies.

## ARTICLE XIX
## UTMOST GOOD FAITH

The relationship of such parties with respect to the matters covered by this Agreement, including with respect to information provided by the Company relating to the Reinsured Policies, shall be in accordance with utmost good faith and fair dealing.

## ARTICLE XX
## CREDIT FOR REINSURANCE AND SECURITY

A.      Effective as of the Closing Date, the Reinsurer shall enter into a trust agreement substantially in the form attached hereto as Exhibit 5 (the "Trust Agreement"), and establish and maintain as security for its obligations hereunder a trust account (the "Trust Account") for the sole benefit of the Company. The Fair Value of the Assets (as such term is defined in the Trust Agreement) deposited in the Trust Account shall be at least equal to one hundred percent (100%) of the Quota Share of the Company's statutory active life reserves, unearned premium reserves, disabled life reserves, and IBNR (the "Required Level") with respect to Reinsured Policies as of the Effective Date as measured in accordance with statutory accounting principles and at all times thereafter shall be maintained in an amount at least equal to the Required Level. The trustee of the Trust Account and the Trust Agreement (the "Trustee") shall comply with all

11

applicable requirements of regulatory authorities having jurisdiction over the Company, and shall also comply with 31 Pa. Code, § 163.1, et seq. Within forty-five (45) days of the receipt by the Reinsurer of each of the Company's monthly reports (as set forth on Exhibit 2), the Reinsurer shall, if necessary, increase the Assets held in the Trust Account so that the Fair Value of such Assets meets or exceeds the amounts required by this Agreement. The Company shall calculate the statutory reserves for business subject to this Agreement each month consistent with Pennsylvania law and using the same actuarial assumptions, methods, procedures, Actuarial Standards of Practice, and algorithms used by the Company in computing the statutory reserves for such business as of the most recent financial statement filed with the Pennsylvania Insurance Department.

B.      The Assets deposited in the Trust Account shall be valued according to their Fair Value, and shall, as provided in the Pennsylvania Insurance Laws (40 P.S. § 442.1(b)), consist only of (1) Cash; (2) Securities listed by the Securities Valuation Office of the National Association of Insurance Commissioners or any successor thereto, including those exempted from filing under the Purposes and Procedures Manual of the Securities Valuation Office of the National Association of Insurance Commissioners, and qualifying as admitted assets (collectively, "Eligible Securities"); (3) Clean, irrevocable, unconditional and evergreen letters of credit issued or confirmed by a qualified United States financial institution; or (4) Any other form of security acceptable to the Pennsylvania Insurance Commissioner. Prior to depositing Assets with the Trustee, the Reinsurer shall execute assignments, endorsements in blank, or transfer legal title to the Trustee of all shares, obligations or any other Assets requiring assignments, in order that the Company or the Trustee upon the direction of the Company may whenever necessary negotiate any such Assets without consent or signature from the Reinsurer or any other entity. So long as there is no deficiency in the Trust Account, the Reinsurer shall have the full and un-qualified right to vote and execute consents with respect to any shares of voting stock deposited in the Trust Account and shall be entitled to receive, from time to time, from the Trustee payments of any dividends, interest or other income upon any shares of stock or obligations included in the Trust Account; otherwise, such right to vote and execute consents shall reside with the Company and any such dividends, interest or other income shall be deposited in such Trust Account.

C.      Not more than forty (40) days following the end of each calendar month, the Company will send to the Trustee a letter signed by the Company's corporate actuary certifying the amount required to fund the Trust Account. If the amount held in the Trust Account exceeds the amount required to fund the Reinsurer's obligations to the Company under this Agreement, the Company will include in such letter an instruction to the Trustee to directly remit the excess amount to the Reinsurer within three (3) Business Days; provided, however, withdrawals and transfers to the Reinsurer of excess amounts shall be made only if, after such withdrawal and transfer, the Fair Value of the Trust Account is not less than the one hundred and two percent (102%) of the Required Level.

D.      The Assets in the Trust Account may be withdrawn by the Company at any time, notwithstanding any other provisions in this Agreement, and shall be utilized and applied by the Company, its successors in interest, by operation of law or otherwise, including, without limitation, any liquidator, rehabilitator, receiver or conservator, without diminution because of insolvency on the part of the Company or the Reinsurer, only for the following purposes:

12

(i)     to reimburse the Company for the Reinsurer's Quota Share portion of the Company's Long Term Care Claims Liability with respect to Reinsured Policies; and

(ii)    to pay any other amounts due to the Company under this Agreement.

E.     The Company acknowledges that any withdrawn Assets not used for the purposes enumerated in the Trust Agreement shall remain property of the Reinsurer.  The Company undertakes to promptly return such Assets to the Trust Account.

F.     All settlements of account under the Trust Agreement between the Company and the Reinsurer shall be made in cash or its equivalent.

G.     The Reinsurer shall have the right to substitute Assets in the Trust Account pursuant to a written notice to the Trustee (which  shall also certify that such substituted Assets are Eligible Securities or otherwise qualify as "Assets" under Article XX(B) above and Section  1(c) of the Trust Agreement) (the "Substitution Notice"), provided that either the Reinsurer or its Investment Manager (as such term is defined in the Trust Agreement) certifies to the Trustee in the Substitution Notice that:

(i)     The aggregate Fair Value of the Assets to be deposited or credited to the Trust Account pursuant to such substitution is at least equal to the aggregate Fair Value of the Assets being removed from the Trust Account; or

(ii)    After such substitution, the aggregate Fair Value of Assets in the Trust Account is not less than the Required Level.

No other substitutions of Assets in the Trust Account by the Reinsurer or its Investment Manager shall be permissible without the Company's prior written consent, which consent shall be obtained by the Reinsurer or its Investment Manager and provided to the Trustee.  To the extent written instructions from the Company are required under 31 Pa. Code, § 163.6(b-c) to permit substitutions of Assets from the Trust Account, the Company shall issue such written instructions within two (2) Business Days following the request of the Reinsurer or its Investment Manager.

H.     The Reinsurer shall be entitled to provide a letter of credit complying with 31 Pa. Code, §163.14 et seq. in place of part or all of its obligations to maintain the Trust Account hereunder. The amount of any such letter of credit shall be subject to conditions and limitations equivalent to those applicable to the Trust Account hereunder.  The Reinsurer shall provide thirty (30) days prior written notice to the Company of the nonrenewal of a letter of credit that is used to satisfy this Article XX.  This written notice of nonrenewal is a reason that the Company may draw down the full amount of the letter of credit.

I.     All costs and expenses of establishing and maintaining any Trust Account or letter of credit shall be paid by the Reinsurer.

**ARTICLE XXI**

13

## SERVICE OF SUIT

A.     It is agreed that in the event of the failure of the Reinsurer hereon to pay any amount claimed to be due hereunder, the Reinsurer hereon, at the request of the Company, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this Article constitutes or should be understood to constitute a waiver of the Reinsurer's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon Katten Muchin Rosenman LLP, 575 Madison Avenue, New York, New York 10022, and that in any suit instituted, the Reinsurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

B.     The above-named are authorized and directed to accept service of process on behalf of the Reinsurer in any such suit and/or upon the request of the Company to give a written undertaking to the Company that they will enter a general appearance upon the Reinsurer's behalf in the event such a suit shall be instituted.

C.     Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Reinsurer hereon hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this Agreement of reinsurance, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## ARTICLE XXII
## MISCELLANEOUS

A.     Entire Contract.

This Agreement and associated Trust Agreement, with any attached Exhibits, shall constitute the entire agreement between the parties with respect to the Reinsured Policies being reinsured hereunder, and there are no understandings between the parties other than as expressed herein.

B.     Amendments; Waiver.

1.     Any modification or change to the provisions of this Agreement shall be null and void unless set forth in a written amendment to the Agreement signed by both parties to this Agreement.

2.     No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or

14

privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

C.     Currency.

All amounts payable under this Agreement shall be payable in the lawful money of the United States.

D.     Notices.

All notices, requests, demands, approvals and other communications under this Agreement shall be in writing and shall be (i) delivered personally, (ii) sent by certified, registered or express mail, postage prepaid, or (iii) sent by overnight courier (with written confirmation of receipt), in each case at the following addresses. Any such notice or other communication shall be deemed given: (a) upon actual delivery, if presented personally, (b) three (3) Business Days following deposit in the United States mail, if sent by certified, registered or express mail, postage prepaid, or (iv) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case to the following addresses:

If to the Company:

United Security Assurance Company of Pennsylvania
673 E. Cherry Lane
P.O. Box 64477
Souderton, Pennsylvania 18964
Attn: William Neugroschel
Telephone No.: (215) 723-3044

with a copy to (which shall not constitute notice for purposes of this section):

Funk & Bolton, P.A.
36 South Charles Street, 12th Floor
Baltimore, Maryland 21201
Attn: Ren L. Tundermann
Telephone No.: (410) 659-7700

If to Reinsurer:

Alpha Re (U.S.) Inc.
76 Saint Paul Street, Suite 500
Burlington, VT 05401
Attn: Donald D. Solow, President
Telephone No.: (908) 219-7050

With a copy to (which shall not constitute notice for purposes of this section):

Donald D. Solow

15

235 Main Street, Suite 224
Madison, NJ 07940

And with a further copy to (which shall not constitute notice for purposes of this section):

Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022
Attn: Marc M. Tract
Telephone No.: (212) 940-8760

E.    Successors and Assigns; Third Party Beneficiaries.

1.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto, and that any purported assignment without the consent of the other party shall be void and of no force or effect; provided, further that nothing in this Agreement shall be construed in any manner to directly or indirectly prohibit or limit (i) the Reinsurer from further retroceding all or any portion of the liabilities reinsured hereunder or (ii) any party hereto from selling, encumbering or otherwise transferring all or substantially all of its assets, merging or consolidating with any other entity, selling or otherwise issuing equity or debt securities, or effecting similar transactions.

2.    No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder.

F.    Duty of Cooperation.

Each party hereto shall cooperate fully with the other party hereto in all reasonable respects in order to accomplish the objectives of this Agreement.

G.    Expenses.

The Company and Reinsurer shall each bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

H.    Severability.

If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect

16

the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

To the extent that this Agreement conflicts with any provision in the Trust Agreement, it is agreed that the Trust Agreement shall control.

I.  Parties.

All claims or causes of action (whether in contract, tort or other theory) that may be based upon, arise out of or relate to this Agreement or any other document or instrument delivered pursuant hereto, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the entities that are expressly identified as parties hereto or thereto, as applicable; and no past, present or future director, officer, employee, incorporator, member, partner, stockholder, affiliate, agent, attorney or representative of any party hereto (including any person negotiating or executing this Agreement on behalf of a party hereto) shall have any liability or obligation with respect to this Agreement or with respect any claim or cause of action (whether in contract, tort or other theory) that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including a representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement).

J.  Calculation of Losses.

Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

K.  Counterparts.

This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall be deemed to have been executed and delivered when each party hereto shall have received a counterpart hereof signed by the other party hereto and then become effective upon the Effective Date.

L.  Intermediary.

Wealth Protection Specialists, LLC, 15 Ardsley Way, Avon, Connecticut 06001 is hereby recognized as the intermediary negotiating this Agreement for all business hereunder. Any fees due the Intermediary shall be paid by the Reinsurer.

*[Remainder of this page intentionally left blank]*

17

**IN WITNESS WHEREOF,** the parties hereto have caused this Coinsurance Agreement to be signed in duplicate by their duly authorized representatives.

Signed this 2nd day of august, 2016

Signed this ___ day of _____, 2016

Accepted by:

Accepted by:

**UNITED SECURITY ASSURANCE COMPANY OF PENNSYLVANIA**

**ALPHA RE (U.S.) INC.**

William Neugroschel

Name: _____

Name: _____

Title: _____

Title: _____

President and CEO

Attested by

Attested by

18

**IN WITNESS WHEREOF,** the parties hereto have caused this Coinsurance Agreement to be signed in duplicate by their duly authorized representatives.

Signed this ___ day of _____, 2016                    Signed this 2nd day of August, 2016

Accepted by:                                             Accepted by:

**UNITED SECURITY
ASSURANCE COMPANY OF
PENNSYLVANIA**                                           **ALPHA RE (U.S.) INC.**

_____                                 _____
Name:                                                   Name: Donald D. Solow
Title:                                                   Title: President


_____                                 _____

Attested by                                             Attested by

18

Case 3:23-cr-00048-MOC-DCK    Document 113-1    Filed 05/03/26    Page 20 of 20