IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:23-CR-48 |
| | ) | |
| GREG E. LINDBERG, | ) | |
| | ) | |
| Defendant. | ) | |

**NORTH CAROLINA INSURANCE COMPANIES' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING RESTITUTION**

Now come victims Colorado Bankers Life Insurance Company ("CBL"), Bankers Life Insurance Company ("BLIC"), Southland National Insurance Corporation ("SNIC"), and Southland National Reinsurance Corporation (collectively, "the North Carolina Insurance Companies") and submit these objections to the Special Master's Report and Recommendations Regarding Restitution ("Report") [D.E. 106].

The North Carolina Insurance Companies are supportive of the Report's conclusions and recommendations, including the using the Affiliate Investments'[1] outstanding balance plus some amount of interest as the methodology for calculating the victims' loss, rejecting Defendant Lindberg's requests for certain spurious "offsets" to his restitution obligations, and identification of the victims. However, the

---

[1] Any capitalized terms not defined herein shall have the same meaning as stated in the Report and Appendices to the Report.

North Carolina Insurance Companies object to using the "time value of money" interest percentage proposed by the Special Master, the Special Master's characterization of one of Defendant Lindberg's proposed offsets as a "close call," and the noted Bermudan Insurance Companies' position that the North Carolina Insurance Companies are subordinate victims.

## I. The interest rate recommended by the Special Master is too low.

The North Carolina Insurance Companies agree with the Report's recommendation that the outstanding balances of the Affiliate Investments with some amount of noncontractual interest applied is the appropriate loss methodology for the reasons stated in the Report. [Report pp 20-22, Report App'x 3 at pp 3-9]. Defendant Lindberg's fraud, as charged in the Indictment and as pled to, involved fraudulently extracting funds from the North Carolina Insurance Companies, and other insurers, through concealment, obfuscation, and affirmative fraudulent misstatements to regulators regarding the nature of the Affiliate Investments. Defendant Lindberg and his coconspirators perpetrated this fraud by, among other actions, creating various investment and loan structures whereby the North Carolina Insurance Companies "loaned" money to Defendant Lindberg's non-insurance affiliated entities. These Affiliate Investments were not conservative, liquid investments that are prudent for, and required of, insurance company investments but instead were risky, illiquid loans, preferred equity, and similar financial vehicles in Defendant Lindberg's private companies. Defendant Lindberg and his coconspirators then lied to the North Carolina Insurance Companies' regulators

2

regarding the amount and nature of the Affiliate Investments. The North Carolina Insurance Companies' losses result from the improper, illiquid, and underperforming Affiliate Investments. The outstanding balance on those Affiliate Investments is the most direct and ascertainable measure of loss for restitution purposes.[2]

The North Carolina Insurance Companies also agree with the Special Master that some amount of non-contractual interest should be applied to the outstanding principal balances of the Affiliate Investments to account for the time value of money. (Report pp 20-21). However, the Report's recommended rate of 2.19%—based on the 30-day U.S. Treasury return—is too low as a matter of law. Pursuant to §§ 483 and 7872 of the Internal Revenue Code, the interest should be at least equal to the applicable federal rate ("AFR") for June 2019.[3] The Affiliate Investments are multi-million-dollar long term loans with maturity dates approximately 10 years from the original loan execution date.[4] Accordingly, the interest rate should at least equal 2.76%, the June 2019 AFR for long-term debt instruments of nine or more years. Rev. Rul. 2019-14, 2019-23 I.R.B. 1275 (2019).

The North Carolina Insurance Companies agree that they are not entitled to a windfall through the restitution process.[5] However, reimagining the interest rates

---

[2] As the Report correctly notes, Defendant Lindberg's fraud ultimately caused harm to the North Carolina Insurance Companies' policyholders. (Report p 26). However, using the companies' policyholder obligations—or another measure of loss—ignores the principal and most direct harm caused to the victim insurance companies. The Special Master appropriately rejected the other proposed calculation methodologies for the reasons stated in the Report.

[3] AFRs are used to establish a baseline for determining the minimum interest rate that should be charged to avoid tax consequences and are used to prevent tax avoidance through artificially low or interest-free loans. The Internal Revenue Service publishes the AFR monthly.

[4] The IALA also extended these loans maturity dates even further into 2029 for the majority of the loans.

[5] The North Carolina Insurance Companies note that even using the contractual interest rates established in the IALA, Defendant Lindberg, via his affiliate entities, already received a significant

3

on over \$1 billion of business loans below the IRS' minimum interest rate only serves to reward Defendant Lindberg for the fraud.

## II.    None of Defendant Lindberg's asserted offsets are "close calls."

The Report outlines various Asserted Recoveries Defendant Lindberg claimed should offset his restitution obligations. (Report pp 22-25). After applying the Special Master's criteria to determine whether an Asserted Recovery qualifies as an offset, the Report concludes that eight of Defendant Lindberg's Asserted Recoveries do not meet those requirements. (*Id.* pp 23-25). The North Carolina Insurance Companies agree with the Special Master's conclusions on those eight assertions. However, the North Carolina Insurance Companies object to the Special Master's characterization of a transaction fee paid to CBL as a "close call." (*Id.* p 24). It is not. Instead, CBL received the funds in exchange for providing certain releases of one of Defendant Lindberg's companies during a refinancing transaction, thereby meeting the independent consideration criteria.

In February 2022, Defendant Lindberg and Global Growth wanted to pursue a refinance transaction of a Primary Restitution Assets—one of Defendant Lindberg's most valuable companies. While controlling the North Carolina Insurance Companies' assets, Defendant Lindberg directed CBL, BLIC, and SNIC to obtain preferred equity in this company, causing them to purchase units that held limited redemption and repayment rights. Some of the Affiliate Entities also held preferred

---

financial benefit. The IALA *reduced* or in some instances eliminated the original contractual interest rates (established in the loan agreements executed as part of the fraudulent conduct charged in the Indictment) to rates of 0%, 5%, 5.5%, and 6%.

4

equity units, with CBL serving as uncompensated administrative agent for those loans.[6]

The Lindberg company, in order to close the refinancing transaction, desired to obtain full and complete releases as it related to the redemption of the North Carolina Insurance Companies' and the Affiliated Entities' preferred units, in addition to CBL providing the free loan agent services that the Report discusses (Report p 24). To that end, the company agreed to pay CBL, on Global Growth's behalf, a $5 million "transaction fee"[7] and pay off the preferred unit redemption amounts. In exchange, the North Carolina Insurance Companies agreed that all of the preferred units shall be redeemed free and clear of all liens and security interests held by any North Carolina Insurance Company (whether in its individual capacity, as a lender, as an agent for lenders, or otherwise) and any and all such liens and security interests shall be promptly released and terminated by the North Carolina Insurance Companies. The Lindberg company desired these releases in order to close the refinance—which also benefitted Defendant Lindberg and Global Growth. The

---

[6] During the time Defendant Lindberg controlled the North Carolina Insurance Companies, he installed CBL as an administrative loan agent on dozens of loans and other financing agreements between and amongst the insurance company lenders and Affiliate Entity borrowers. However, CBL was not compensated for these services—even when it served as administrative loan agent on loans where it was not a lender.

[7] Pursuant to the terms of the agreement, portions of the transaction fee were then paid to BLIC and SNIC. Additionally, $2 million of the transaction fee was applied toward the outstanding money judgment CBL holds against Defendant Lindberg's company, Academy Financial Assets. Notice of Partial Satisfaction of Judgment, *Colorado Bankers Life Ins. Co. v. Acad. Fin. Assets, Inc.*, No. 5:20-CV-185-D (E.D.N.C. Sept. 20, 2022). CBL's judgment arises from Academy Financial Assets' breach of the Revolving Credit Agreement—a $40 million loan CBL made to Defendant Lindberg's company the same day the IALA was executed. Order, *Colorado Bankers Life Ins. Co. v. Acad. Fin. Assets, Inc.*, No. 5:20-CV-185-D (E.D.N.C. Dec. 22, 2021).

North Carolina Insurance Companies agreed to provide the releases for a fee. This meets the independent consideration criteria, and there can be no offset for that fee.

### III. The North Carolina Insurance Companies are victims entitled to full and complete restitution.

The Report correctly concludes that the North Carolina Insurance Companies are the victims of Defendant Lindberg's crimes charged in the Indictment and are entitled to restitution. In fact, the North Carolina Insurance Companies have been identified as victims in practically every relevant document—the Indictment [D.E. 1], Defendant Lindberg's Plea Agreement [D.E. 40], Factual Basis [D.E. 42], the Court's Order Appointing Special Master [D.E. 56], the Consent Motion for Order Approving the Disposition of Net Proceeds From the Sale of the Clanwilliam Group of Companies [D.E. 66], the Court's Order [Approving the Distribution From the Sale of The Clanwilliam Group of Companies] [D.E. 68], and the Report.

The Bermudan Insurance Companies' noted position as to the North Carolina Insurance Companies is the only allusion in the Report to a concept that the North Carolina Insurance Companies are not victims. (Report p 4). The Bermudan Insurance Companies' position rests on two fundamentally incorrect assumptions.

First, the Bermudan Insurance Companies state that the amounts listed in the Special Master's recommended Amount of Restitution table "technically reflect claims of the various state Guaranty Associations that satisfied the North Carolina Insurance Companies' policyholder liabilities." (*Id.*) This statement by the Bermudan Insurance Companies is not true. The table shows the outstanding balances plus noncontractual interest of the North Carolina Insurance Companies'

6

(and the Bermudan Insurance Companies') Affiliate Investments, *i.e.* the amount of outstanding loans set forth in the IALA. Neither the table nor the Report's recommended restitution amount reflect the North Carolina Insurance Companies' policyholder obligations or any claims the state Guaranty Associations have against the North Carolina Insurance Companies.

Second, the Bermudan Insurance Companies take the position that the North Carolina Insurance Companies should be paid after the Bermudan Insurance Companies' restitution amounts are fully satisfied because the state Guaranty Associations have fulfilled their statutory obligations to pay limited policy benefits to the North Carolina Insurance Companies' policyholders. This position is inconsistent with the Court's sentencing requirements because the North Carolina Insurance Companies have not received any compensation or other benefits from the state Guaranty Associations. 18 U.S.C. § 3664(j)(1) ("If a *victim received compensation* from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order to be paid to the victims before any restitution is paid to such a provider of compensation.") (emphasis added).

The North Carolina Insurance Companies have not received any amount of compensation from the state Guaranty Associations. The state Guaranty Associations paid the North Carolina Insurance Companies' policyholders certain policy benefits up to a statutorily required threshold. Those state Guaranty

Associations are now statutory claimants *against* the North Carolina Insurance Companies for all amounts paid to policyholders plus the state Guaranty Associations' administrative expenses. In fact, the North Carolina Insurance Companies owe the state Guaranty Associations over $1.8 billion for amounts paid to policyholders and $14 million for the state Guaranty Associations' administrative expenses. *See* Receiver's Quarterly Report Ex. A p 21, Ex. C p 17, Ex. D p 26, *Causey v. Southland Nat'l Ins. Corp.*, No. 19CVS8664-910 (N.C. Super. Mar. 16, 2026).[8] To suggest that the North Carolina Insurance Companies have received any funds from the state Guaranty Associations that reduce or subordinate their restitution award is simply untrue and contrary to law.[9]

For the reasons stated herein, the North Carolina Insurance Companies request that the Special Master's recommendations on the identification of victims and the amounts of restitution proposed in the Report be adopted by the Court except for the limited objections set forths herein.

Respectfully submitted, this the 4th day of May, 2026.

---

[8] Also available here: https://www.ncdoi.gov/documents/regulatory-actions/snic-cbl-blic-snrc-receivers-quarterly-report-june-30-2025

[9] The approach to restitution payments proposed by the Bermudan Insurance Companies would, essentially, preference them above the North Carolina Insurance Companies in a manner that could also implicate the McCarran-Ferguson Act. *See* 15 U.S.C. §§ 1011–1015.

8

**WILLIAMS MULLEN**

*/s/Wes J. Camden*
Wes J. Camden
NC State Bar No. 33190
Caitlin M. Poe
NC State Bar No. 44713
Lauren E. Fussell
NC Bar No. 49215
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
wcamden@williamsmullen.com
cpoe@williamsmullen.com
lfussell@wiliamsmullen.com
Telephone:   (919) 981-4000
Facsimile:   (919) 981-4300

*Counsel for Victims Colorado Bankers Life
Insurance Company, Bankers Life Insurance
Company, Southland National Insurance
Corporation, and Southland National
Reinsurance Corporation*

9

## CERTIFICATE OF SERVICE

The undersigned certifies that copies of the foregoing were served on all counsel of record and parties requesting notice via the Court's ECF system.

This the 4th day of May, 2026.

**WILLIAMS MULLEN**

*/s/Wes J. Camden*
Wes J. Camden
NC State Bar No. 33190

Case 3:23-cr-00048-MOC-DCK   Document 123   Filed 05/04/26   Page 10 of 10