# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

     *Plaintiff*,

 v.

GREG E. LINDBERG,

     *Defendant.*

Case No. 3:23-CR-48-MOC

## DEFENDANT GREG E. LINDBERG'S RESPONSE AND OBJECTION TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING RESTITUTION

James F. Wyatt III
Robert A. Blake, Jr.
WYATT & BLAKE LLP
402 W. Trade Street, Suite 101
Charlotte, NC 28202
Tel: 704.331.0767
jwyatt@wyattlaw.net
rblake@wyattlaw.net

Brandon N. McCarthy
Ryan J. Meyer
KATTEN MUCHIN ROSENMAN LLP
2121 North Pearl Street, Suite 1100
Dallas, TX 75201
Tel: 214.765.3600
brandon.mccarthy@katten.com
ryan.meyer@katten.com

*Counsel for Defendant Greg E. Lindberg*

# TABLE OF CONTENTS

Table of Authorities.................................................................................................................................ii

Introduction.........................................................................................................................................1

Legal Standard ...................................................................................................................................4

Discussion ...........................................................................................................................................5

I.      The Restitution figure is overinflated.................................................................................7

        A.      Interest on the Affiliate Investments should not be included. ......................................7

        B.      The principal balance of the Affiliate Investments must be reduced. ..........................10

II.     Mr. Lindberg should receive additional credit for at least $740 million for valuable transfers to certain Pre-Designated Restitution Parties....................................................11

        A.      Mr. Lindberg is entitled to an additional credit of $352.9 million for the current value of AAPC preferred equity transferred to ULICO in December 2022.................................................................................................................13

        B.      Mr. Lindberg is entitled to an additional credit of $27.8 million for capital contributions to SNIC. ...........................................................................................................15

        C.      Mr. Lindberg is entitled to credit of $79.6 million in cash payments to Pre-Designated Restitution Parties.......................................................................................16

        D.      Mr. Lindberg is entitled to credit for a $3 million cash payment to CBL in connection with the Beckett refinance amendment. ......................................................19

        E.      Mr. Lindberg is entitled to a credit of $20 million for additional proceeds from the sale of the Clanwilliam Group........................................................................19

        F.      Mr. Lindberg is entitled to a credit of approximately $13.6 million for the proceeds of real estate that he contributed to ULICO. .................................................20

        G.      Mr. Lindberg is entitled to a credit of $243.4 million for the sale proceeds of certain zero-coupon bonds.........................................................................................20

III.    The final restitution amount awarded must be limited to losses proximately caused by Mr. Lindberg's conduct..................................................................................................22

IV.     A jury must decide Mr. Lindberg's restitution obligation, if any.................................24

Conclusion .........................................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apprendi v. New Jersey,*
530 U.S. 466 (2000)..................................................................................2, 24, 25

*Ellingburg v. United States,*
146 S. Ct. 564 (2026)...............................................................................2, 3, 4, 24

*Hester v. United States,*
586 U.S. 1104 (2019)..............................................................................24

*Lagos v. United States,*
584 U.S. 577 (2018)..................................................................................22

*Robers v. United States,*
572 U.S. 639 (2014)....................................................................................*passim*

*Sec. Exchange Comm'n v. Jarkesy,*
603 U.S. 109 (2024)..................................................................................25

*Southern Union Co. v. United States,*
567 U.S. 343 (2012)..................................................................................24

*United States v. Arrington,*
97 F.4th 593 (8th Cir. 2024) ....................................................................14

*United States v. Boccagna,*
450 F.3d 107, 109 (2d Cir. 2006) ............................................................9

*United States v. Coats,*
487 B.R. 648 (E.D.N.C. 2013) ................................................................9

*United States v. Davenport,*
445 F.3d 366 (4th Cir. 2006)....................................................................22

*United States v. Davis,*
714 F.3d 809 (4th Cir. 2013)....................................................................4

*United States v. Day,*
700 F.3d 713 (4th Cir. 2012)....................................................................3, 25

*United States v. Fike,*
140 F.4th 351 (6th Cir. 2025) ..................................................................8, 9

*United States v. Freeman*,
741 F.3d 426 (4th Cir. 2014)........................................................................................4

*United States v. Gallant*,
537 F.3d 1202 (10th Cir. 2008) ..................................................................................14

*United States v. Harvey*,
532 F.3d 326 (4th Cir. 2008)......................................................................................12

*United States v. Hoyle*,
33 F.3d 415 (4th Cir. 1994)..........................................................................................9

*United States v. Jesenik*,
702 F. Supp. 3d 1024 (D. Ore. 2023) ..........................................................................9

*United States v. Karam*,
201 F.3d 320 (4th Cir. 2000)........................................................................................5

*United States v. Leahy*,
438 F.3d 328 (3d Cir. 2006).......................................................................................24

*United States v. Leftwich*,
628 F.3d 665 (4th Cir. 2010)........................................................................................4

*United States v. Malone*,
747 F.3d 481 (7th Cir. 2014)......................................................................................14

*United States v. Purdue Frederick Co.*,
495 F. Supp. 2d 569 (W.D. Va. 2007) ................................................................. 22, 23

*United States v. Qurashi*,
634 F.3d 699 (2d Cir. 2011) .....................................................................................8, 9

*United States v. Qurashi*,
No. 050-cr-498, 2009 WL 10677000 (E.D.N.Y. Sept. 1, 2009) .......................... 22, 23

*United States v. Rahal*,
No. 08-cr-566, 2015 WL 13736602 (E.D. Cal. Nov. 1, 2015)...................................22

*United States v. Reifler*,
446 F.3d 65 (2d Cir. 2006) .........................................................................................22

*United States v. Ritchie*,
858 F.3d 201 (4th Cir. 2017).....................................................................................4, 5

*United States v. Smerling*,
No. 21-cr-317, 2022 WL 1806300 (S.D.N.Y. June 1, 2022). .....................................10

*United States v. Steele*,
   897 F.3d 606 (4th Cir. 2018)................................................................................15

*United States v. Stone*,
   866 F.3d 219 (4th Cir. 2017)...............................................................................5, 9

*United States v. Thompson*,
   792 F.3d 273 (2d Cir. 2015) .............................................................................. 12, 16

## Docketed Cases

*Universal Life Insurance Co. [ULICO] v. Lindberg*,
   No. 1:20-cv-861 (M.D.N.C.) ................................................................................13

## Constitutional Amendments

U.S. Const., Amend. VI ...............................................................................2, 5, 24, 25

U.S. Const. Amend. VII.......................................................................................25

## Statutes

18 U.S.C. § 3663A(a)(1) .........................................................................................4

18 U.S.C. § 3663A(a)(2) .......................................................................................22

18 U.S.C. § 3663A(b)............................................................................................4

18 U.S.C. § 3663A(b)(1)(A) ...................................................................................8

18 U.S.C. § 3663A(b)(1)(B)...................................................................................8, 9

18 U.S.C. § 3663A(b)(1)(B)(ii)...............................................................................4

18 U.S.C. § 3663A(c)(1) .........................................................................................4

18 U.S.C. § 3663A(c)(3) .................................................................................. 22, 24

18 U.S.C. § 3663A(c)(3)(B)...................................................................................22

18 U.S.C. § 3664(j)(2)(A), (B) ...............................................................................5

## Other Authorities

*The Restitution Process (Fraud and/or Financial Crimes)*, DEP'T OF JUSTICE, CRIMINAL
   DIVISION,  https://www.justice.gov/criminal/criminal-vns/restitution-process
   (updated Oct. 10, 2023)........................................................................................7

# INTRODUCTION

Greg E. Lindberg, through undersigned counsel, hereby respectfully submits this response and objection ("Response") to the Special Master's Report and Recommendations Regarding Restitution (the "Restitution Report") (ECF No. 106).[1]

The Mandatory Victims Recovery Act ("MVRA"), 18 U.S.C. § 3663A, *et seq.*, is narrowly circumscribed by both the statute and well-established constitutional principles. It provides that a court may only order restitution in the amount of actual, pecuniary loss directly and proximately caused by a defendant. A court cannot order restitution for losses unrelated to the conduct for which a defendant was convicted. Nor can a court unfairly punish a defendant by making him pay back more than a victim lost.

In this case, the Special Master recommends entry of a preliminary order of restitution that orders Mr. Lindberg to pay $1.625 billion in restitution to eight parties (identified as the "Pre-Designated Restitution Parties"). Restitution Rpt. at 4. Although Mr. Lindberg agrees with several portions of the Special Master's Restitution Report, it nevertheless invites the Court to exceed the authority under the MVRA in several ways:

*First*, the Restitution Report improperly inflates the losses incurred by the Pre-Designated Restitution Parties. The Special Master improperly adds $263 million in interest to the principal amount of Affiliate Investments to be repaid. This award is contrary to the purpose and plain text of the MVRA, exceeds the type of harm that the MVRA authorizes this Court to recompense, and contradicts the Justice Department's own policy on criminal restitution, which expressly recognizes that **"interest" is a financial loss that is <u>not</u> eligible for restitution**. Any purported "interest" should, therefore, be removed from any restitution figure.

---

[1] Capitalized terms and abbreviations not defined in this Response shall have the meanings prescribed in the Restitution Report or in the appendices attached thereto.

The Special Master also overstates the starting principal balance of the Affiliate Investments by approximately $141 million. Based on the agreement reached in the MOU, and subsequently relied on by the NCICs in litigation against Mr. Lindberg, those balances should total *no more* than $1.250 billion. Accordingly, the proposed restitution figure must be reduced.

*Second*, the Restitution Report gives the Pre-Designated Restitution Parties an impermissible windfall by giving them a recovery greater than the amount they lost. The Special Master declined to credit Mr. Lindberg with at least $740 million in **undisputed cash payments and other valuable consideration** that he provided to certain Pre-Designated Restitution Parties to compensate them for the Affiliate Investments. By excluding these amounts from the restitution order, the Special Master asks this Court to enter a restitution order that would allow those parties to recover more than they lost—a result the MVRA expressly forbids.

*Third,* the restitution figures in the Restitution Report include certain losses that were not caused by Mr. Lindberg. For instance, the report improperly penalizes Mr. Lindberg by including $129 million relating to certain losses associated with Agera Energy, LLC ("Agera"). Restitution Rpt. at 25. But Agera was involved in a widely publicized large-scale fraud case that had nothing to do with Mr. Lindberg nor this Indictment. Although there are people and entities who lost money on Agera, they are not Mr. Lindberg's victims. Increasing Mr. Lindberg's restitution obligation by piling on unrelated losses tied to someone else's fraud exceeds the authority provided by the MVRA.

*Fourth*, Mr. Lindberg maintains that an order of restitution decided by the Court, rather than a jury, is constitutionally impermissible. After Mr. Lindberg entered his plea agreement, the Supreme Court clarified that restitution under the MVRA constitutes a punitive, criminal punishment. *Ellingburg v. United States*, 146 S. Ct. 564, 567 (2026), and under the Sixth Amendment, facts that increase a defendant's punishment must be found by a jury, *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). As a result, any facts relating to an award of restitution must be proven to a jury beyond a reasonable

2

doubt. Although Mr. Lindberg recognizes that this Court is bound to follow Fourth Circuit precedent decided prior to *Ellingburg* that forecloses this argument, *see United States v. Day*, 700 F.3d 713, 732 (4th Cir. 2012), he raises it here to preserve the issue for appeal, if necessary.

In Mr. Lindberg's view, the Restitution Report contains several additional errors, including failing to credit Mr. Lindberg with additional payments and offsets; and attributing to Mr. Lindberg certain losses that he did not cause. Mr. Lindberg sets forth those additional objections in detail in **Exhibit 1: Greg Lindberg's Statement of Facts In Support of Defendant's Response and Objection to Special Master's Report,** attached hereto. The position espoused in Exhibit 1 are the personal views of Mr. Lindberg and are included at his express instruction.[2]

At the end of the day, Mr. Lindberg takes full responsibility for the conduct detailed in his Plea Agreement. But at no time was he attempting to steal money from policyholders. **Indeed, his actions last year facilitated over $157 million in payments to over 43,000 excess policyholders in December 2025, ensuring that every policyholder of his American insurance companies has been made whole**. He has paid cash or transferred assets equal to or greater than any actual loss directly and proximately caused to the affected insurance companies by the indicted conduct. Accordingly, if the Court were to sustain all of Mr. Lindberg's objections, the restitution owed is zero.

Attached hereto as **Exhibit 2** is a summary chart identifying all of the offsets and credits to the Special Master's proposed restitution amount. If credited to Mr. Lindberg, then he arguably has more than fully satisfied his restitution obligations. But in any event, the objections set forth herein show disagreements with the Restitution Report and a preliminary order of restitution entered in reliance on it would exceed this Court's authority under the MVRA and the U.S. Constitution.

---

[2] Counsel's current position is not a negative comment on the validity of Mr. Lindberg's additional arguments, but counsel simply lacks enough factual information at this time, in part because of Mr. Lindberg's lack of access to information, to take a position on the arguments. Exhibit 1 is not encompassed by Counsel's Artificial Intelligence certification.

3

**LEGAL STANDARD**

Federal courts do not have inherent authority to order restitution and, instead, must rely on a statutory source to do so. *United States v. Ritchie*, 858 F.3d 201, 206 (4th Cir. 2017). A court's discretion in ordering restitution is therefore "circumscribed by the procedural and substantive protections of the statute authorizing restitution." *United States v. Freeman*, 741 F.3d 426, 431 (4th Cir. 2014) (citing *United States v. Leftwich*, 628 F.3d 665, 667 (4th Cir. 2010)). Because restitution constitutes a "criminal punishment," any restitution order is also subject to the protections under the Sixth Amendment. *See Ellingburg*, 146 S. Ct. at 567. "A restitution order that exceeds the authority of the statutory source is no less illegal than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013).

Outside of the probation context, restitution to victims of federal crimes is generally governed by either the Victim and Witness Protection Act of 1982 or the MVRA. *Ritchie*, 858 F.3d at 206-07. Here, the relevant statute is the MVRA, due to the nature of the offenses for which Mr. Lindberg was convicted. *See generally* 18 U.S.C. § 3663A(c)(1) (providing that the MVRA "shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for," among other offenses, "an offense against property under this title . . . including any offense committed by fraud or deceit.").

Under the MVRA, a court is required to order the payment of restitution for direct or proximate loss caused by a defendant. 18 U.S.C. § 3663A(a)(1). In the case of an offense causing damage to or loss of property, restitution must be determined in one of two ways: (i) by ordering the defendant to return the property stolen or damaged; or (ii) if return of the property is "impossible, impracticable, or inadequate," by ordering the defendant to pay an amount equal to the *greater* of (1) the value of the property on the date of the damage, loss, or destruction, or (2) the value of the property on the date of sentencing. *Id.* § 3663A(b). In the latter case, the amount of restitution must be reduced by "the value . . . of any part of the property that is returned." *Id.* § 3663A(b)(1)(B)(ii).

4

The fundamental purpose of the MVRA, however, is compensatory. Therefore, the MVRA "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole." *United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017). The statute provides for credits against the offender's restitution obligation for amounts that the victim has received for the same loss. *See Ritchie*, 858 F.3d at 215. For example, "[t]he defendant is . . . entitled to an offset for any amount that the victim recovered as compensatory damages for the same loss in federal or state civil proceedings." *Id.* (citing 18 U.S.C. § 3664(j)(2)(A), (B)). The defendant has the burden to show that an offset or reduction in a restitution order should apply. *United States v. Karam*, 201 F.3d 320, 327 (4th Cir. 2000). "Calculations of the appropriate amount of restitution will always rest upon the unique circumstances of each case." *Ritchie*, 858 F.3d at 214.

## DISCUSSION

Mr. Lindberg agrees with several of the Special Master's recommendations in the Restitution Report. Specifically, Mr. Lindberg agrees that the Pre-Designated Restitution Parties are the only "persons due restitution" in this case. *See* Restitution Rpt. at 2, 7-19, 31. Moreover, Mr. Lindberg agrees that the principal balance of the Affiliate Investments, rather than policyholder losses, is an appropriate methodology for calculating restitution. *See id.* at 20-22, 31.

In Mr. Lindberg's view, however, the Restitution Report invites this Court to exceed its statutory and constitutional authority: (1) it improperly inflates the "principal balance" of the Affiliate Investments; (2) it fails to credit Mr. Lindberg with valuable cash and asset payments made to Pre-Designated Restitution Parties, giving those parties more than they are statutorily entitled to under the MVRA; (3) it includes as "losses" certain amounts not proximately caused by Mr. Lindberg; and (4) it asks the Court to invade the province of the jury by finding facts that would increase Mr. Lindberg's criminal punishment—a violation of core Sixth Amendment protections.

5

If the Court agrees with all of Mr. Lindberg's arguments, including the credits and offsets described in Exhibit 1, no restitution is appropriate. The chart set forth below summarizes the offsets and credits to which Mr. Lindberg maintains he is entitled.

| Description | Amount | Body § |
|---|---|---|
| **Special Master's Proposed Restitution Figure** | **$1,625,000,000** | — |
| **Improper Additions to Affiliate Investment Balances** | | I. |
| Pre-Judgment Interest | ($263,000,000) | I.A |
| Corrected Starting Balance of Affiliate Investments | ($141,000,000) | I.B |
| **Additional Credits** | | II. |
| AAPC Preferred Equity Par Value as of May 26, 2026 | ($352,906,240) | II.A |
| SNIC Payments | ($27,823,425) | II.B |
| Cash Payments to Pre-Designated Restitution Parties Not Captured by the Special Master | (79,655,289) | II.C |
| CBL Subordination Fee (Beckett refinancing) | ($3,000,000) | II.D |
| Additional Clanwilliam Sale Proceeds | ($20,000,000) | II.E |
| ULICO Sale of Contributed Real Estate | ($13,596,013) | II.F |
| Sale Proceeds of Zero-Coupon Bonds in PPNs | ($243,452,385) | II.G |
| Value of NCICs as of October 2018 | ($454,000,000) | Exh. 1 |
| Bermuda ICs' Proceeds from Sales of Affiliated Assets | ($9,800,076) | Exh. 1 |
| **Losses Not Proximately Caused by Mr. Lindberg** | | III. |
| Loss on Agera | ($129,398,324) | III. |
| ECL Losses | ($22,288,826) | Exh. 1 |
| Loss on UKAT | ($39,000,000) | Exh. 1 |
| Insurance-Holdco Debt Portion | ($14,897,805) | Exh. 1 |
| Loss on Clanwilliam Below-Market Sale | ($474,000,000) | Exh. 1 |
| Loss on Early Zero Coupon Bond sales | ($611,600,000) | Exh. 1 |
| **TOTAL MINIMUM OFFSETS AND REDUCTIONS** | **($2,899,418,383)** | |
| **NET RESTITUTION OWED** | **$0** | |

Even if the Court accepts only some of these objections, it is clear that the Restitution Report's initial recommendation must be modified.

## I. The Restitution figure is overinflated.

Mr. Lindberg agrees that the outstanding unpaid principal balances due on the Affiliate Investments constitutes the appropriate method for determining any actual loss to the Pre-Designated Restitution Parties for purposes of a restitution order. As the Special Master recognizes, this is the only method "for calculating restitution loss" as it appropriately focuses on "how much money was extracted from the corresponding insurance company" because of Mr. Lindberg's conduct. Restitution Rpt. at 3. Nevertheless, the Restitution Report overinflates that amount in two ways: (1) it improperly adds "interest" to the principal balance, in contravention of the MVRA; and (2) it overstates the principal balance of the Affiliate Investments as of the date of the MOU/IALA.

### A. Interest on the Affiliate Investments should not be included.

The Special Master recommends that "some interest component" should be applied to the Affiliate Investment balances "to account for the time value of money." *Id.* at 3-4. Based on a 2.19% interest rate (representing the 30-Day U.S. Treasury rate as of June 27, 2019 through March 31, 2026), the Special Master proposes adding an additional $263 million in restitution for "post-IALA interest." App'x 3 at 8. This is legal error.

As a threshold matter, the MVRA does not expressly include interest among the compensable forms of financial loss recoverable through restitution. And more specifically, DOJ policy recognizes this fact; it expressly excludes interest as a "financial loss," clarifying that interest is "not eligible for restitution."[3] Therefore, any interest should be excluded from any restitution calculation.

---

[3] *The Restitution Process (Fraud and/or Financial Crimes)*, DEP'T OF JUSTICE, CRIMINAL DIVISION, https://www.justice.gov/criminal/criminal-vns/restitution-process (updated Oct. 10, 2023).

An award of interest is also contrary to the plain language of the MVRA. As explained above, the MVRA requires "offenders to restore property lost by their victims as a result of the crime." *Robers v. United States*, 572 U.S. 639, 640 (2014). And it provides two ways for a sentencing court to accomplish that: by ordering a defendant to either "return the property to the owner," 18 U.S.C. § 3663A(b)(1)(A) or, "if return of the property . . . is impossible, impracticable, or inadequate," to pay an amount equal to "the greater of (I) the value of the property on the date of the [loss]; or (II) the value of the property on the date of sentence" less the value of any part of the property that is returned, *id.* § 3663A(b)(1)(B).

Notably, there is no provision under the first option—subsection (b)(1)(A)—for a court to add interest when the defendant can return the property at issue. Where, as here, the "property" at issue is cash, the only option for the Court is to order Mr. Lindberg to "return the property to the owner" under subsection (b)(1)(A). As the Supreme Court taught in *Robers,* if "the 'property that was 'damage[d],' 'los[t],' or 'destr[oyed]' was the money, then 'the property . . . returned' must also be the money." 572 U.S. at 643 (alterations in original). And "money being fungible," the return of any cash equivalent to the amount the victim lost satisfies the statute. *Id.* In contrast, where a defendant takes something other than cash and cannot return that specific piece of property (e.g., a necklace) because it would be impossible, impracticable, or inadequate to do so, then the Court must determine the "value of the property" on the date of the loss or at the time of sentencing under subsection (b)(1)(B).

The property that the Pre-Designated Restitution Parties lost is cash—the money taken out of the companies via Affiliate Investments. And an order directing Mr. Lindberg to return that "property"—the amount of cash taken—fully satisfies the MVRA. 18 U.S.C. § 3663A(b)(1)(A). Accordingly, under a straightforward application of the MVRA, any award of interest is inappropriate.

To be sure, a handful of other circuit courts have allowed prejudgment interest to be included in a restitution order. *See, e.g.*, *United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011); *United States v. Fike*, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). But these cases were wrongly decided, and

8

none is binding on this Court. Both the Second Circuit in *Qurashi* and the Sixth Circuit in *Fike* incorrectly assumed that the amount of restitution in the case was governed by subsection (b)(1)(B). *See Fike*, 140 F.4th at 356 (citing 18 U.S.C. § 3663A(b)(1)(B) for the proposition that "a victim's losses may change in value between the date of the loss and the date of sentencing"); *Qurashi*, 634 F.3d at 703 (similar). But as explained above, a court may apply subsection (b)(1)(B) only where a defendant returns *substitute* property because it is impossible, impracticable, or inadequate to return the property that was taken; that subsection has no application where, as here and in both *Fike* and *Qurashi*, a victim lost cash that a defendant can return.

Nor has the Fourth Circuit held that prejudgment interest may be awarded under the MVRA. Although the Special Master claims the Fourth Circuit authorized interest on restitution in *United States v. Hoyle*, 33 F.3d 415, 420 (4th Cir. 1994), *see* App'x 3, at 10, *Hoyle* was decided prior to the enactment of the MVRA and focuses on the unremarkable proposition that the determination of loss for sentencing and restitution are separate inquiries. It therefore does not speak directly to when interest qualifies as a compensatory form of damages under the MVRA. *See* 33 F.3d at 420.

At bottom, the Special Master's proposal cannot be squared with the law. Restitution is not concerned with a victim's "disappointed expectations but only with his actual loss." *United States v. Boccagna*, 450 F.3d 107, 109 (2d Cir. 2006); *Stone*, 866 F.3d at 226. Thus, restitution is not meant to "guarantee the benefit of any bargain." *Id.* And, it "cannot include consequential damages." *United States v. Coats*, 487 B.R. 648, 653 (E.D.N.C. 2013).

Here, interest is not part of the Pre-Designated Restitution Parties' actual loss. Instead, it constitutes recompense for the benefit of the parties' bargain—the time value of money while the insurance companies provided loans covering the Affiliated Investments. Accordingly, any interest would exceed the restitution statutorily allowed by the MVRA.

Courts applying these principles have excluded interest from restitution awards, or at least reduced the amount of the award to avoid giving the victims more than they are statutorily eligible to receive. In *United States v. Jesenik*, the court explained that **"accrued but unpaid interest" on an investment does not constitute part of a victim's actual losses**. 702 F. Supp. 3d 1024, 1039 (D. Ore. 2023). Similarly, in *United States v. Smerling*, the defendant and government agreed that a restitution award based on fraudulently obtained loans should not include interest based on the loan agreement's post-default rate, because "including such interest in the restitution order would inappropriately award [the victim] its expectation under the loan agreement, not merely compensate it for its loss." No. 21-cr-317, 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022).

In this case, including only the principal amount of the Affiliate Investments serves the purposes of restitution. It redresses the actual loss caused by Mr. Lindberg's conduct but avoids imposing undue punishment on him and exceeding the bounds of what the MVRA authorizes.

For these reasons, neither the MVRA nor the principles of restitution support adding any interest to the restitution award. Accordingly, the amount of restitution ordered should be further reduced by at least $263 million.

### B. The principal balance of the Affiliate Investments must be reduced.

The Restitution Report states that the "IALA Principal" of the Affiliate Investments is $2.179 billion. This includes $1.391 billion in Affiliate Investments held by the NCICs (CBL, BLIC, and SNIC). *Id.*[4] But that is incorrect. According to repeated, verified statements from the NCICs themselves, the principal balance of Affiliate Investments held at those entities following the execution of the MOU and IALA is $1.250 billion. Accordingly, the Restitution Report overstates the "IALA Principal" by at least $141 million and must be reduced.

---

[4] According to the chart included by the Special Master, CBL held $1,145 million in Affiliate Investments as of the IALA, BLIC held $73 million, and SNIC held $173 million. App'x 3 at 6.

The NCICs have consistently relied on this $1.25 billion figure in verified pleadings. For example, in both a Verified Complaint and Amended Verified Complaint, filed by the NCICs against Mr. Lindberg in the General Court of Justice of Wake County, North Carolina in October 2019, the NCICs stated that the amount of Affiliate Investments they held was "approximately $1.25 billion." Declaration of Ryan Meyer ("Meyer Decl."), Exh. 3-A at ¶ 29; *accord* Meyer Decl., Exh. 3-B at ¶ 29. Similarly, in a pre-trial order in that case, the parties stipulated that entities affiliated with Mr. Lindberg "have combined debt totals of approximately $1.25 billion to Plaintiffs pursuant to the terms of various direct and indirect loans and financing arrangements." Meyer Decl., Exh. 3-C at 5. There is no basis to allow the NCICs to back away from these verified pleadings to claim a higher amount now.

That figure is also consistent with the parties' agreement at the time of the MOU, as shown on the "Summary" tab of the spreadsheet calculating the various Affiliate Investments for purposes of the MOU. *See* Meyer Decl., Exh. 3-D. Accordingly, the "IALA Principal" set forth in the Restitution Report must be reduced by at least $141 million.

## II. Mr. Lindberg should receive additional credit for at least $740 million for valuable transfers to certain Pre-Designated Restitution Parties.

Mr. Lindberg cooperated fully in connection with the preparation of the Restitution Report. As the Special Master acknowledges, Mr. Lindberg provided "voluminous records" to the Special Master, directed his counsel to engage with the Special Master and the Government on a weekly basis for over a year, and shared feedback on issues relevant to a restitution order. *See, e.g.*, Restitution Rpt. at 2. As part of the process, Mr. Lindberg identified at least $1.6 billion of payments and transfers to the Pre-Designated Restitution Parties, including cash payments and transfers of valuable equity. *Id.* at 22. The Special Master correctly found that certain of these payments and transfers should be credited against any restitution obligation because they "qualify" as "payments made for the benefit of the victim insurance companies or their policyholders." *Id.* Based on the Restitution Report, it

appears that the Special Master credited Mr. Lindberg with approximately $818 million in transfers, comprising certain quarterly interest and principal payments to some of the Pre-Designated Restitution Parties; a $25 million partial payment to ULICO; and $289 million from the proceeds of the Clanwilliam Group ("CWG") sale distributed to the Pre-Designated Restitution Parties. *Id.* at 22-23; *see also* Restitution Rpt., App'x 3, at 6.

But the Special Master excluded more than $110.4 million that Mr. Lindberg paid to the Pre-Designated Restitution Parties because those transfers "do not presently satisfy the applicable criteria." *Id.* at 23. Respectfully, that exclusion is legal error.

As the Supreme Court has explained, when fashioning a restitution award, a court should credit a defendant with property that was in fact returned to a victim. *Robers*, 572 U.S. at 640-41. As explained above, the only "property" at issue is cash taken from the various insurance companies in the form of the Affiliate Investments. Therefore, cash payments from a defendant to a victim of his crime should presumptively reduce any subsequent restitution obligation.

The Special Master states that payments to Pre-Designated Restitution Parties "made for [Mr. Lindberg's] own strategic, business, or self-preservation purposes or for other independent consideration" do not qualify as a credit or offset against the restitution obligation. Restitution Rpt. at 22. But the Special Master provides no authority to support that limitation, and there is none. That's for good reason: The Special Master's "criteria" for evaluating recoveries invites subjective interpretation of intent and perceived benefits to dictate the parameters of restitution, rather than adherence to the MVRA—that a victim must be compensated for actual losses, and no more.

Indeed, the MVRA is ambivalent as to a defendant's motivations or purpose for making a payment to a victim. A defendant may choose to compensate victims for losses for a number of self-serving purposes. The only question relevant under the MVRA is whether the victim suffered a loss and subsequently received compensation from the defendant for that loss. *United States v. Thompson*,

12

792 F.3d 273, 280 (2d Cir. 2015) (defendant could not be held liable in restitution for property returned to the victim). For this reason, several courts have recognized that benefits to a defendant are not the proper measure of restitution under the MVRA. *See, e.g.*, *United States v. Harvey*, 532 F.3d 326, 339 (4th Cir. 2008)(collecting cases). Accordingly, the Special Master's proposed limitation on "qualifying recoveries" is without merit and should be rejected. Mr. Lindberg should be credited with at least $740 million in cash or other valuable transfers made to the Pre-Designated Restitution Parties.

### A. Mr. Lindberg is entitled to an additional credit of $352.9 million for the current value of AAPC preferred equity transferred to ULICO in December 2022.

It is error for the Special Master to refuse to credit Mr. Lindberg with the value of preferred equity transferred to ULICO in satisfaction of a judgment arising from the very conduct at issue in this case (and compensating Puerto Rico policyholders).

In May 2022, the United States District Court for the Middle District of North Carolina entered a $524 million judgment against Mr. Lindberg for breach of his personal guarantee of PBLA's obligations. *See Universal Life Insurance Co. [ULICO] v. Lindberg*, No. 1:20-cv-861 (M.D.N.C. May 3, 2022) [D.E. 122]. In December 2022, ULICO agreed to accept a cash payment of $25 million *and* a transfer of $218 million of preferred equity in AAPC Holdings, LLC in partial satisfaction of that judgment. *See* Meyer Decl., Exh. 3-E. Mr. Lindberg made the cash payment and caused the rights in the preferred equity to be transferred to ULICO.

Notably, the parties agreed that Mr. Lindberg should receive a "dollar-for-dollar credit" against the balance owing on the Middle District judgment for the value transferred. *Id.* at 2. And as part of the settlement agreement, ULICO and Mr. Lindberg agreed that the transfer of preferred equity constituted "a payment towards the satisfaction and/or to pay down the Middle District Judgment." *Id.*; *see also* Meyer Decl., Exh. 3-F. Accordingly, ULICO has already agreed in writing that its receipt of $218 million in preferred equity partially satisfies the losses caused by Mr. Lindberg. There is no reason to refuse to give Mr. Lindberg credit for that transfer in connection with the restitution amount.

As several courts have recognized, "**[a]ny amount** the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution amount to prevent double recovery by the victim." *United States v. Malone*, 747 F.3d 481, 485 (7th Cir. 2014) (quoting *United States v. Gallant*, 537 F.3d 1202, 1250 (10th Cir. 2008)).

The Eighth Circuit's decision in *United States v. Arrington*, 97 F.4th 593 (8th Cir. 2024), is instructive. In that case, the defendant was convicted of defrauding his employer. After his fraud had been discovered, the defendant returned $50,000 worth of shares to the company. The district court refused to credit the defendant with the value of those shares because it determined that he "had failed to establish his intention behind the sale." *Id.* at 596.

The Eighth Circuit reversed. It explained that the value of the shares returned to the company was "supported by the record" and there was "sufficient evidence to establish that he sold the shares as partial payment of the loss amount." *Id.* Accordingly, "the district court clearly erred when it failed to offset the amount of restitution by the value of shares sold." *Id.*

The same result is warranted here. ULICO agreed to accept AAPC's preferred equity as partial satisfaction of the amount owed by Mr. Lindberg for the same losses at issue under the restitution order. And there is no question as to the value of the shares: the AAPC preferred equity accrued 18% paid-in-kind interest per year. That is, the shares increased in value by $8,797,500 per quarter. As of May 26, 2026, ULICO's preferred equity interest in AAPC will be worth $352.9 million. Accordingly, it would be error to refuse to give Mr. Lindberg credit for that transfer and allow ULICO to collect twice for the same harm.

Moreover, declining to give Mr. Lindberg credit for the minimum value of the preferred equity gives ULICO an unwarranted windfall. If Mr. Lindberg is obligated to pay restitution to ULICO that *does not* include the value of the AAPC preferred equity, and ULICO later sells that equity for a profit,

ULICO would effectively receive a double recovery. That is fundamentally contrary to the purpose of the MVRA. *See United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018).

The Special Master suggests this "offset should occur if and when the preferred equity position is liquidated into cash" because "this asset is not freely transferable and is subject to too many unknowns and variables concerning potential market conditions." Restitution Rpt. at 23. But that is factually incorrect. The equity was only restricted for four months. ULICO has been free to sell its rights in the preferred equity for more than three years now—since March 31, 2023. *See* Meyer Decl., Exh. 3-F at 2. Additionally, having senior lenders bless such a transaction is standard protocol and a normal part of any sale—not a restriction. As Justice Sotomayor explained, "[i]f a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." *Robers v. United States*, 572 U.S. 639, 647 (2014) (Sotomayor, J., concurring). ULICO's unilateral decision to hold the preferred equity should not be attributed to Mr. Lindberg.

Accordingly, Mr. Lindberg is entitled to an additional credit for the current value of the preferred equity transferred to ULICO to reflect ULICO's acceptance of that equity in satisfaction of the amount owed.[5]

### B. Mr. Lindberg is entitled to an additional credit of $27.8 million for capital contributions to SNIC.

Between 2021 and 2022, Mr. Lindberg made payments totaling $27,823,425 to SNIC in connection with an escrow agreement (the "Escrow Agreement") among SNIC, GBIG Holdings, Inc. ("GBIG"), and Dogwood State Bank. Meyer Decl., Exh. 3-G. These payments were made to compensate SNIC for those losses. As such, Mr. Lindberg's restitution obligation should be offset by the amount of those payments.

---

[5] If the value of the preferred equity is subsequently determined to be greater than $352.9 million, Mr. Lindberg should receive an additional offset to any remaining restitution obligation at that time.

The Special Master rejected this "credit" because, in his view, Mr. Lindberg "agreed to reimburse SNIC's operating costs [to] continu[e] to operate" and therefore received "fresh consideration" in the form of continued operations." Restitution Rpt. at 24. But again, a perceived benefit to Mr. Lindberg is irrelevant under the MVRA. He either paid the victim back money or he did not. And the offered basis for rejection is factually flawed as well.

In June 2019, the Commissioner of Insurance for the North Carolina Department of Insurance filed a petition for rehabilitation of SNIC. *See* Meyer Decl., Exh. 3-G at ¶ R1. In March 2021, the Commissioner then filed a petition seeking liquidation of SNIC pursuant to Article 30 of Chapter 58 of the North Carolina General Statutes. *Id.* ¶ R2. GBIG objected to the liquidation petition, and to delay that process, the parties negotiated the terms of the Escrow Agreement. *Id.* ¶¶ R3-R6.

Pursuant to the Escrow Agreement, GBIG was **obligated to deposit** $9 million in an escrow account. *Id.*¶ 1.2. GBIG was also **required to pay SNIC's monthly expenses** from funds other than the deposited escrow funds. *Id.* ¶ 2.3. The $27 million in contributions from Mr. Lindberg constitute the GBIG payments owed to SNIC for its monthly operating costs.

Admittedly, the only reason that SNIC was at risk of rehabilitation and liquidation was because of cash taken out through Affiliate Investments. But by paying SNIC this cash in 2021 and 2022, Mr. Lindberg compensated SNIC for money it had lost as a result of those Affiliated Investments— the same thing restitution is supposed to accomplish. That *SNIC* received a separate benefit (in the form of staving off liquidation) is of no moment. At the end of the day, SNIC received $27 million from Mr. Lindberg on account of cash removed *via* Affiliate Investments, and therefore the return of that money should be credited against his restitution obligation. *See Thompson*, 792 F.3d at 280.

**C.      Mr. Lindberg is entitled to credit of $79.6 million in cash payments to Pre-Designated Restitution Parties.**

It is undisputed by either the Special Master or the Government that Mr. Lindberg has made

at least an additional $79.6 million in cash payments to certain Pre-Designated Restitution Parties.[6]

These payments include:

- Payments totaling $9.4 million to CBL and ULICO (via PBLA ULICO), in connection with the sale of Finnazen/Blue Violet[7] in August 2019;

- Approximately $29.5 million in preferred equity payments to CBL;[8]

- Approximately $4.2 million in preferred equity payments to BLIC;

- Approximately $6.8 million in preferred equity payments to SNIC;

- Approximately $21.9 million in preferred equity payments to PBLA;

- Approximately $2.6 million in preferred equity payments to Northstar; and

- A $5 million redemption fee paid to CBL as part of the March 2022 refinancing of AAPC's preferred equity.

As the Supreme Court has explained, when fashioning a restitution award, a court should credit a defendant with property that was in fact returned to a victim. *Robers*, 572 U.S. at 640-41. The money at issue here was returned to the victims. More specifically, the only "property" at issue is cash taken from the Pre-Designated Restitution Parties because of the Affiliate Investments. And these

---

[6] The Restitution Report states that Mr. Lindberg was not given credit for $59 million in cash payments. Restitution Rpt. at 24. On information and belief, this appears to be an outdated figure from earlier discussions between the parties.

[7] Blue Violet was a Principal Protected Note ("PPN"), which was a disaffiliation strategy approved by NCDOI as a part of its first Memorandum of Understanding with Mr. Lindberg in April 2018. The PPNs combined zero-coupon notes issued by third-party financial institutions with underlying investments into entities where Mr. Lindberg was the ultimate beneficial owner. Here, that affiliated entity was an operating company known as Finnazen. As a part of the June 2019 MOU and IALA, Mr. Lindberg was directed to unwind the PPNs and dispose of the third-party assets, including the zero-coupon bonds. As a part of that effort, Blue Violet and Finnazen were liquated in August 2019 and the proceeds paid to the victim insurers.

[8] Mr. Lindberg has made approximately $165 million in payments to certain Bermuda ICs and NCICs on account of AAPC preferred equity held by those entities. Although Mr. Lindberg understands that the Special Master has given him credit for approximately $100 million in such payments, he understands that the payments identified herein have been excluded.

payments undisputably reflect a return of that value by Mr. Lindberg. Therefore, he should presumptively receive a credit for those payments.

The Special Master asserts that Mr. Lindberg should not be given credit for these payments because they are purportedly for "debts not included in the IALA." Restitution Rpt. at 24. But that is irrelevant. The Pre-Designated Restitution Parties acknowledged upon receipt of these payments that they represented a "return of capital" and "preferred returns" on account of the Affiliate Investments. *See, e.g.*, Meyer Decl., Exh. 3-H. And in any event, the Special Master does not (and cannot) dispute that these payments were, in fact, made by Mr. Lindberg.

Moreover, the AAPC preferred equity and other cash payments were provided to the NCICs and Bermuda insurance companies (the "Bermuda ICs") as a part of the PPN affiliate investment process. Specifically, Mr. Lindberg transferred the preferred equity to the Bermuda ICs (along with the NCICs) in 2019 as a part of the unwinding of the PPNs required by the NCDOI as a part of the MOU and IALA. As a result of those regulatory-required transfers, Mr. Lindberg transferred to the NCICs and Bermuda ICs approximately $105,067,765 in principal of AAPC preferred equity. That included four tranches of preferred equity to PBLA ($913,000 principal; $10.023M principal; $1.190M principal; and $7.478M principal) and one tranche of preferred equity to Northstar ($1.654M principal). In other words, rather than putting cash back into the NCICs and Bermuda ICs after unwinding the NCDOI-mandated unwinding of the PPNs, the NCICs and Bermuda ICs received AAPC preferred equity. Any cash payments made because of that equity therefore are directly related to the losses associated with the Affiliate Investments and should be credited as a payment against those losses.

At its core, restitution in this matter should be focused on "cash in for cash out." *See* Restitution Rpt. at 2. Because the Pre-Designated Restitution Parties received the $79.4 million in cash

18

payments from Mr. Lindberg to compensate them for the Affiliate Investments, those payments should be credited to Mr. Lindberg.

**D.      Mr. Lindberg is entitled to credit for a $3 million cash payment to CBL in connection with the Beckett refinance amendment.**

Like the payments above, Mr. Lindberg made a cash transfer of $3 million to CBL in 2022. The Special Master appears to have rejected this credit because Mr. Lindberg received "fresh consideration" in the form of CBL's subordination of "its priority position" with respect to certain Specified Affiliated Companies. Restitution Rpt. at 24. But again, a perceived benefit to Mr. Lindberg is irrelevant under the MVRA. He either paid the victim back money or he did not. And the offered basis is also factually inaccurate.

Mr. Dinius (the state-court receiver) supported this refinance because it capitalized a turnaround strategy, provided funds for two significant acquisitions, and enabled the payoff of insurance loans in support of a refinancing. Mr. Dinius renegotiated the North Carolina court-approved loan documents to insert this unnecessary and unapproved fee. Not Mr. Lindberg.

Absent the payment of the fee, Mr. Dinius said he would withhold his assent from the transaction, despite recognizing its significant value for policyholders. To protect this Affiliate Investment, Mr. Lindberg authorized the $3 million payment to CBL. Mr. Lindberg did not receive any "fresh consideration" or other "strategic, business, or self-preservation" benefit because of this payment. Accordingly, Mr. Lindberg should also receive credit for the $3 million payment to CBL. He paid this money to the victim due to his indicted offense conduct.

**E.      Mr. Lindberg is entitled to a credit of $20 million for additional proceeds from the sale of the Clanwilliam Group.**

As noted above, the Special Master agreed that Mr. Lindberg should receive credit against any restitution obligation for the proceeds of the sale of CWG. Restitution Rpt. at 23. But pursuant to the Court's Order approving the distribution of those proceeds, $20 million was held back in escrow for

"reasonable and necessary Irish Tax Liabilities and Triton Closing Costs." *See* Dkt. No. 68 at 3-4.

Mr. Lindberg maintains that no Irish Tax Liabilities or Triton Closing costs have or will materialize. To avoid any depletion of the reserve, and make funds available to the victims, the remaining proceeds should be distributed to the Special Master for distribution and that amount credited against Mr. Lindberg's restitution obligation.

**F.     Mr. Lindberg is entitled to a credit of approximately $13.6 million for the proceeds of real estate that he contributed to ULICO.**

In 2018 and 2019, Mr. Lindberg contributed 100% of the equity interests in four separate entities that held real-estate assets in Idaho (Erie Properties, LLC) and North Carolina (Morning Mountain House, LLC, Tux Holdings, LLC, and Paradigm Park Holdings, LLC) to the PBLA ULICO 2017 Reinsurance Trust. *See* Dkt. No. 1¶ 162. Subsequently, Mr. Lindberg understands that ULICO sold those real-estate assets for cash proceeds of $13,596,013. *See* Meyer Decl., Exh. 3-I.

The proceeds of those sales represent direct recoveries by ULICO of cash from the sale of collateral it held as a result of the Affiliate Investments. Therefore, the proceeds of the sale of the "collateral" provided by Mr. Lindberg must be credited against Mr. Lindberg's restitution obligations.

**G.     Mr. Lindberg is entitled to a credit of $243.4 million for the sale proceeds of certain zero-coupon bonds.**

Following the execution of the MOU and IALA on June 27, 2019, the NCICs sold off certain zero-coupon bonds (the "Zero-Coupon Bonds") that they held as a result of the Affiliate Investments for approximately $243.4 million. Those proceeds represent a direct recoupment of money taken out of the NCICs via the Affiliate Investments. Accordingly, Mr. Lindberg must receive credit in the full amount of the Zero Coupon Bonds.

In connection with the Affiliate Investments, the NCICs held a set of Principal Protected Notes ("PPNs"). Each PPN was a special-purpose vehicle that paired (i) an investment grade zero-coupon bond issued by a major bank with (ii) underlying investments into entities where Mr. Lindberg

was the ultimate beneficial owner. The NCICs would not have held the Zero-Coupon Bonds *but for* the associated affiliate loan such that they are inextricably intertwined. Indeed, Mr. Lindberg understands that all of the Zero-Coupon Bonds still outstanding as of the IALA are included as a part of the Special Master's starting balances.

As part of the June 2019 MOU and IALA, Mr. Lindberg was directed to unwind the PPNs and dispose of third-party assets, including the Zero-Coupon Bonds. And contemporaneous emails indicate that he did just that. In October 2019, Paul Brown, the NCICs Chief Investment Officer sent an email to Mr. Lindberg noting the "final outcome" of the PPN issue. Meyer Decl., Exh. 3-J. He explained that, as a result of negotiations with the issuers of the Zero-Coupon Bonds, the NCICs "ended up making +6mm on the disposals." *Id.* What's more, he attached a spreadsheet summarizing the "total cash proceeds" by lender of the Zero-Coupon Bonds, which provides that the "recent" proceeds (i.e. post-MOU/IALA) is $243,452,385. *Id.*

There is no basis to refuse to credit Mr. Lindberg for these funds. The Zero-Coupon Bonds constitute losses to the Pre-Designated Restitution Parties as a result of the Affiliate Investments, and the Special Master captured those losses in the principal balance of those loans when calculating the restitution obligation. Because the NCICs received cash back in as a result of disposing of the Zero-Coupon Bonds, the proceeds from those sales must be credited to Mr. Lindberg. To date, the NCICs have failed to produce data sufficient to demonstrate that they have fully accounted for the proceeds of the Zero-Coupon Bonds. Accordingly, any restitution figure must be reduced by $243.4 million.

*   *   *

For the reasons explained above , Mr. Lindberg should receive credit for at least $740 million in payments and other valuable transfers to the Pre-Designated Restitution Parties.

21

**The final restitution amount awarded must be limited to losses proximately caused by Mr. Lindberg's conduct.**

For a court to order a defendant to pay restitution to a victim under the MVRA, the defendant's offense of conviction must be a proximate cause of the victim's loss. 18 U.S.C. § 3663A(a)(2); *United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006). This concept plays a role not only in ascertaining who is a "victim" for purposes of the MVRA, but also in limiting which losses a victim may recover. *Lagos v. United States*, 584 U.S. 577, 584 (2018). Where the harm alleged did not result from conduct underlying an element of the offense or conduct that is part of a pattern of criminal activity that is an element of the offense, restitution is inappropriate. *United States v. Purdue Frederick Co.*, 495 F. Supp. 2d 569, 575 (W.D. Va. 2007).

Notably, courts must be careful not to become embroiled in intricate issues of proof, as the MVRA provides that it is "inapplicable if the court finds that the determination of complex factual issues related to the cause or amount of the victims' losses would unduly burden the sentencing process." *United States v. Reifler*, 446 F.3d 65, 136 (2d Cir. 2006) (citing 18 U.S.C. § 3663A(c)(3)(B)). Indeed, the MVRA provides that a court may decline to enter a restitution order if (A) "the number of identifiable victims is so large as to make restitution impracticable;" or (B) "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3).

This discretion is particularly applicable when there are questions about the cause of relevant "loss" or where a causation determination would require "the equivalent of full-blown civil litigation." *United States v. Qurashi*, No. 05-cr-498, 2009 WL 10677000, at *34-35 (E.D.N.Y. Sept. 1, 2009). For instance, in *United States v. Rahal*, Frito-Lay sought restitution relating to the difference between what it paid for a particular product because of racketeering and bribery versus what it would have paid another company for the product in the absence of that criminal conduct. No. 08-cr-566, 2015 WL

13736602, at *10 (E.D. Cal. Nov. 1, 2015). The court refused to grant such restitution, explaining that "unresolved and complex issues of fact" relating to whether Frito-Lay would have purchased the product at issue, absent the defendant's wrongdoing, and whether it would have offset the higher cost through other means, made the determination of the proper loss amount unduly burdensome. *Id.*

Here, the Special Master included $129 million in losses associated with Agera that were not directly or even proximately caused by Mr. Lindberg (an undisputed fact). In the Special Master's view, Mr. Lindberg "benefited from all of the investments into Agera by the Pre-Designated Restitution Parties, whether before Defendant's acquisition of Agera or afterward." Restitution Rpt. at 25. Benefit is legally irrelevant. As explained below, Mr. Lindberg is not responsible for the Agera losses because (1) ULICO's exposure to Agera *pre-dated* **Mr. Lindberg** and (2) Agera subsequently collapsed for reasons (fraud) *entirely unrelated* **to Mr. Lindberg**.

*First*, it is undisputable that Mr. Lindberg inherited the Agera-related debt. As GBIG's former Co-CEO and former Head of Capital and Mergers and Acquisitions both testified, ULICO required any buyer of its Bermuda-based reinsurance portfolio (which subsequently became PBLA-ULICO) to assume its Agera exposure, which was approximately $129 million as of the June 30, 2017 purchase and reinsurance treaty with ULICO. As a part of that reinsurance treaty, ULICO then *required* Mr. Lindberg to reduce the Agera exposure from 19.99% of ULICO's Bermuda-based reinsurance portfolio to near zero. In furtherance of his obligations, Mr. Lindberg complied with ULICO's directive. Mr. Lindberg then invested tens of millions more into Agera to try and save ULICO's pre-existing investment, only for Agera to collapse into bankruptcy in 2019 because of the separate, newly-discovered financial fraud of Agera's independent Chief Financial Officer. As Mr. Lindberg neither originated ULICO's $129 million in Agera exposure nor was his indicted conduct responsible for its collapse, it is entirely inappropriate to assess the Agera debt as a *restitution* damage.

In any event, an inquiry into the cause of these harms is likely to devolve into the "equivalent of full-blown civil litigation" to determine what amount, if any, was "caused" by Mr. Lindberg. *Qurashi*, 2009 WL 10677000, at \*35. As it would "unduly complicate and prolong the sentencing process" to figure out what portion of those losses were caused by the problems that existed prior to Mr. Lindberg's involvement versus any harm caused by Mr. Lindberg's conduct, *Purdue Frederick Co.*, 495 F. Supp. 2d at 575, the better course for the Court is to exclude these losses from the restitution figure, 18 U.S.C. § 3663A(c)(3). Mr. Lindberg therefore respectfully requests that the Court reduce the restitution obligation by an additional $129 million.

## IV.      A jury must decide Mr. Lindberg's restitution obligation, if any.

It is well-established that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490; *Southern Union Co. v. United States*, 567 U.S. 343 (2012) (holding that the *Apprendi* rule precludes "judicial factfinding that enlarges the maximum punishment a defendant faces beyond what the jury's verdict or the defendant's admissions allow."). Because restitution under the MVRA constitutes a punitive measure, and because the statutorily authorized maximum amount of restitution is dependent on facts that establish that the defendant was the proximate cause of a victim's loss, those facts must be decided by a jury.

After Mr. Lindberg entered his plea agreement in this case, the Supreme Court clarified in *Ellingburg* that restitution awarded under the MVRA constitutes a "criminal punishment" for purposes of the Ex Post Facto Clause—meaning the full protections of the Sixth Amendment attach. 146 S. Ct. at 567. The Court carefully reviewed the history, precedent, and the purpose of restitution and explained that, notwithstanding its compensatory goals, restitution under the MVRA is "part of [a criminal defendant's] sentence" and considered a "penalty" predicated on a criminal conviction. *Id.* at 568. It therefore should fall within the scope of the rule announced in *Apprendi*, and any facts relating

24

Case 3:23-cr-00048-MOC-DCK     Document 132     Filed 05/04/26     Page 29 of 32

to such restitution must be found beyond a reasonable doubt by a jury. *See Hester v. United States*, 586 U.S. 1104, 1107 (2019) (Gorsuch, J., dissenting from the denial of certiorari); *see also United States v. Leahy*, 438 F.3d 328, 339 (3d Cir. 2006) (McKee, J., concurring).

Mr. Lindberg recognizes that, prior to the Supreme Court's decision in *Ellingburg*, the Fourth Circuit held that the "rule of *Apprendi* is simply not implicated" with respect to a restitution order because "there is no prescribed statutory maximum in the restitution context." *Day*, 700 F.3d at 732. But *Day* was wrongly decided. There is a statutorily prescribed maximum under the MVRA; it does not allow restitution unless the Government proves that there were losses proximately caused by the defendant's criminal conduct, and those losses must be established by facts. As a result, a jury must determine the facts that increase a defendant's restitution beyond the baseline of no restitution. Indeed, it would be an odd result if a civil defendant has greater rights under the Seventh Amendment than a criminal defendant would under the Sixth. *Cf. Sec. Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 120-40 (2024) (holding that it violates the Seventh Amendment for the Government to impose a fine based on facts not found by a jury where the Government's claims replicate an action brought under the common law). To the extent this Court deems itself bound by *Day*, Mr. Lindberg raises this argument to preserve it for a potential appeal.

## **CONCLUSION**

For these reasons, the Court should reject the Restitution Report's proposed restitution figure. Moreover, in light of the significant cash and other valuable assets Mr. Lindberg transferred to the Pre-Designated Restitution Parties, no restitution should be ordered.[9]

---

[9] Consistent with the Court's Order bifurcating sentencing and restitution hearings in this case, Dkt. No. 108 at 4, Mr. Lindberg, the Special Master, and the United States anticipate the Court will set a separate hearing regarding a final order of restitution. Mr. Lindberg respectfully reserves all rights to supplement this Response with additional factual information, if and as appropriate, prior to such a hearing.

25

Dated: May 4, 2026

Respectfully submitted,

*/s/ James F. Wyatt, III*
James F. Wyatt, III
NC State Bar No. 13766
Robert A. Blake, Jr.
NC State Bar No. 20858
WYATT & BLAKE LLP
402 W. Trade Street, Suite 101
Charlotte, NC 28202
Tel: 704.331.0767
jwyatt@wyattlaw.net
rblake@wyattlaw.net

Brandon N. McCarthy (pro hac vice)
TX State Bar No. 24027486
Ryan J. Meyer (pro hac vice)
TX State Bar No. 24088053
KATTEN MUCHIN ROSENMAN LLP
2121 North Pearl Street, Suite 1100
Dallas, TX 75201
Tel: 214.765.3600
brandon.mccarthy@katten.com
ryan.meyer@katten.com

**Counsel for Defendant Greg E. Lindberg**

## <u>ARTIFICAL INTELLIGENCE CERTIFICATION</u>

Pursuant to the Court's June 18, 2024 Standing Order, which was published to the Bar of the

Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this Response and Objection or its Exhibits B and C, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this Response and Objection and its Exhibits B and C has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: May 4, 2026

/s/ James F. Wyatt, III
James F. Wyatt, III
WYATT & BLAKE, LLP


*Counsel for Defendant Greg E. Lindberg*
