# Exhibit I3

# Investor Presentation

January 2024

 

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 2 of 508

# About this Presentation

The presentation is provided by Quadro Acquisition One Corp. ("Quadro") to provide information that would allow interested parties in making their own evaluation with respect to a proposed financing and simultaneous business combination (together with the related transactions, the "proposed transaction") between Quadro and seven operational divisions and their subsidiaries (collectively the "Operating Businesses" or "Global Growth Businesses") that comprise Global Growth Holdings, Inc. ("Global Growth").

Presently, the 7 Operating Businesses are held by Global Growth LLC and it is contemplated that after the completion of the financing and business combination, following the transaction, the Operating Businesses will be fully owned by NHC Merger Sub, Inc., which in turn will be owned by Quadro and will be referred to as "The Post-Transaction Holding Group".

The proposed transaction will be completed only upon completion of the financing transaction and approval of the business combination. This presentation is not a free writing prospectus or proxy statement, and the proxy solicitation will only be provided pursuant to a separate proxy statement of Quadro filed with and declared by the Securities and Exchange Commission (the "SEC").

The information contained herein does not purport to be all inclusive and no representations or warranties, expressed or implied, are given in, or in respect of, this presentation or any other written or oral communication communicated to the recipient during the recipient's evaluation of the Global Growth Businesses , Quadro, or their respective affiliates. The information contained in this presentation is preliminary in nature and is subject to change, and any such changes may be material. You should consult your own counsel and tax and financial advisors as to legal and related matters concerning the matters described herein, and, by accepting this presentation, you confirm that you are not relying upon the information contained herein to make any decision. The recipient shall not rely upon any statement, representation or warranty made by any other person, firm or corporation in making its investment or decision to invest in The Pre-Transaction Companies, Quadro, or their respective affiliates. To the fullest extent permitted by law, in no circumstances will The Pre-Transaction Companies, Quadro, or any of their respective subsidiaries, interest holders, representatives, partners, directors, officers, employees, advisers or agents be responsible or liable for any direct, indirect or consequential loss or loss of profit arising from the use of this presentation, its contents, its omissions, reliance on the information contained within it, or on opinions communicated in relation thereto or otherwise arising in connection therewith. Please refer to the definitive merger agreement and other related transaction documents, when available, for the full terms of the proposed transaction. The distribution of this presentation may also be restricted by law and persons into whose possession this presentation comes should inform themselves about and observe any such restrictions. The recipient acknowledges that it is (a) aware that the United States securities laws prohibit any person who has material, non-public information concerning a company from purchasing or selling securities of such company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (b) familiar with the United State Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (collectively, the "Exchange Act") and that the recipient will neither use, nor cause any third party to use, this presentation or any information contained herein in contravention of the Exchange Act, including, without limitation, Rule 10b-5 thereunder.

**Forward Looking Statements**

This presentation includes "forward-looking statements" within the meaning of the "safe harbor" provision of the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of words such as "estimate," "plan," "project," "forecast," "intend," "will," "expect," "anticipate," "believe," "seek," "target," "continue," "could," "may," "might," "possible," "potential," "predict" or other similar expressions that predict or indicate future events or trends or that are not statements of historical matters. The Pre-Transaction Companies and Quadro have based these forward-looking statements on each of its current expectations and projections about future event. These forward-looking statements include, but are not limited to, statements regarding estimates and forecasts of financial and operation metrics. These statements are based on various assumptions, whether or not identified in this communication, and on the current expectation of The Pre-Transaction Companies' and Quadro's respective management teams and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and may materially differ from assumptions. Many actual events and circumstances are beyond the control of The Pre-Transaction Companies and Quadro. These forward-looking statements are subject to known and unknown risks, uncertainties and assumptions about The Pre-Transaction Companies and Quadro that may cause each of its actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by such forward-looking statements.

Such risks and uncertainties include: (i) changes in domestic and foreign business changes in the competitive environment in which The Pre-Transaction Companies operate; (ii) the ability of The Pre-Transaction Companies to manage its growth prospects, meet its operational and financial targets, and execute its strategies; (iii) the impact of any economic disruptions, decreased market demand and other macroeconomic factors, including the effect of a global pandemic, to The Pre-Transaction Companies' business, projected results of operations, financial performance or other financial metrics; (iv) expectations as to future growth in demand for The Pre-Transaction Companies' products and services; (v) The Pre-Transaction Companies' reliance on its senior management team and key employees; (vi) risks related to liquidity, capital resources and capital expenditures; failure to comply with applicable laws and regulations or changes in the regulatory environment in which The Pre-Transaction Companies operate; (vii) the outcome of any potential litigation, government and regulatory proceedings, investigations and inquiries that The Pre-Transaction Companies may face; (viii) assumptions or analyses used for The Pre-Transaction Companies' forecasts proving to be incorrect and causing its actual operating and financial results to be significantly below their forecasts; (ix) The Pre-Transaction Companies failing to maintain their current level of acquisitions or an acquisition not occurring as planned and negatively affecting operating results, the inability of the parties to successfully or timely consummate the proposed transaction, including the risk that any required regulatory approvals are not obtained, are delayed or are subject to unanticipated conditions that could adversely affect The Post-Transaction Holding Group, or the expected benefits of the proposed transaction or that the approval of the shareholders of Quadro is not obtained; (x) the risk that shareholders of Quadro could elect to have their shares redeemed by Quadro, thus leaving The Pre-Transaction Companies insufficient cash to complete the proposed transaction or grow their business; (xi) the outcome of any legal proceedings that may be instituted against The Pre-Transaction Companies or Quadro; failure to realize the anticipated benefits of the proposed transaction; (xii) risks relating to the uncertainty of the projected financial information with respect of The Pre-Transaction Companies; (xiii) the effects of competition; (xiv) changes in applicable laws or regulations; (xv) the ability of The Pre-Transaction Companies to manage expenses and recruit and retain key employees; (xvi) the ability of The Pre-Transaction Companies or Quadro to issue equity or equity linked securities in connection with the proposed transaction or in the future; (xvii) the outcome of any potential litigation, government and regulatory proceedings, investigation and inquiries; (xviii) the potential U.S. government shutdown; the impact or certain geopolitical events, including wars in Ukraine and the surrounding region and between Israel and Hamas; (xix) the impact of a current or future pandemic or any future pandemic on The Pre-Transaction Companies, Quadro or The Post-Transaction Holding Group's projected results of operations, financial performance or other financial metrics, or on any of the foregoing risks; and (xx) those factors discussed under the heading "Risk Factors" in the registration statement on [Form F-4 (the "Registration Statement") filed with the SEC by The Post-Transaction Holding Group on November 17th, 2023], as may be amended from time to time, and other documents filed, or to be filed, with the SEC by Quadro or The Post-Transaction Holding Group. If any of these risks materialize or The Pre-Transaction Companies or Quadro's assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. In addition, forward looking statements reflect The Pre-Transaction Companies and Quadro's expectations, plans or forecasts of future events and views as of the date of this presentation. The Pre-Transaction Companies and Quadro anticipate that subsequent events and developments will cause The Pre-Transaction Companies and Quadro's assessments to change. However, while The Pre-Transaction Companies and Quadro may elect to update these forward-looking statements at some point in the future, The Pre-Transaction Companies and Quadro specifically disclaim any obligation to do so. These forward-looking statements should not be relied upon as representing The Pre-Transaction Companies or Quadro's assessments as of any date subsequent to the date of this presentation. Accordingly, undue reliance should not be placed upon the forward-looking statements. An investment in The Pre-Transaction Companies or Quadro is not an investment in any of The Pre-Transaction Companies or Quadro's founders' or sponsors' past investments or companies or any funds affiliated with any of the foregoing. The historical results of these investments are not indicative of future performance of The Pre-Transaction Companies or Quadro, which may differ materially from performance of past investments, companies or affiliated funds. [NTD: What does this F-4 refer to.]

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 3 of 508

# About this Presentation

**Financial Information**
The Financial information contained in this presentation has been taken from or prepared based on the historical financial statements of The Pre-Transaction Companies for the periods presented. The Pre-Transaction Companies historical financial information prior to 2021 was prepared in accordance with the generally accepted accounting practice in the U.S. ("U.S. GAAP"). Such information has not been audited in accordance with Public Company Accounting Oversight Board ("PCAOB") standards. Neither Quadro nor The Pre-Transaction Companies can assure you that, had the financial statements been compliant with Regulation S-X under the United States Securities Act of 1933, as amended (the "Securities Act"), and the regulations of the SEC promulgated thereunder or audited in accordance with PCAOB standards, there would not be differences and such differences could be material. The Pre-Transaction Companies' financial statements included in the registration statement have been prepared in **accordance with IFRS.** Furthermore, all financial information of The Pre-Transaction Companies included in this presentation subsequent to June 30, 2023, is preliminary and unaudited. The Pre-Transaction Companies' independent auditors have not reviewed or performed any procedures on the preliminary, unaudited financial results included in this presentation. Accordingly, there may be material differences between the presentation of the financial information included in the presentation and in the Registration Statement. Certain monetary amounts, percentages and other figures included in this presentation have been subject to rounding adjustments. Certain other amounts that appear in this presentation may not sum due to rounding.

**Non-GAAP Financial Measures**
This presentation includes certain financial measures not presented in accordance with U.S. GAAP or IFRS including, but not limited to, Adjusted revenues, Adjusted EBITDA, Free Cash Flow, Margin, ROIC and certain ratios and other metrics derived therefrom. These non-GAAP financial measures are not measures of financial performance in accordance with U.S. GAAP, or IFRS or any other GAAP and may exclude items that are significant in understanding and assessing The Pre-Transaction Companies' financial results. Therefore, these measures should not be considered in isolation or as an alternative to net income, cash flows from operations or other measures of profitability, liquidity or performance under U.S. GAAP, IFRS, or any other GAAP. You should be aware that The Pre-Transaction Companies presentation of these measures may not be comparable to similarly-titled measures used by other companies.

The Pre-Transaction Companies believe these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to The Pre-Transaction Companies' financial condition and results of operations. The Pre-Transaction Companies believe that the use of these non-GAAP financial measures provides an additional tool for investors to use in evaluating ongoing operating results and trends and in comparing The Pre-Transaction Companies' financial measures with other similar companies, many of which present similar non-GAAP financial measures to investors. These non-GAAP measures are subject to inherent limitations as they reflect the exercise of judgments by management about which expense and income are excluded or included in determining these non-GAAP financial measures.

This presentation also includes certain projections of non-GAAP financial measures. Due to the high variability and difficulty in making accurate forecasts and projections of some of the information excluded from these projected measures, together with some of the excluded information not being ascertainable or accessible, The Pre-Transaction Companies are unable to quantify certain amounts that would be required to be included in the most directly comparable GAAP financial measures without unreasonable effort. Consequently, no disclosure of estimated comparable GAAP measures is included and no reconciliation of the forward-looking non-GAAP financial measures is included. Please see the appendix to this presentation for reconciliation of non-GAAP financial measures used in this presentation to their most directly comparable GAAP metric.

**Industry and Market Data; Trademarks**
This presentation also contains certain statistical data, estimates and forecasts that are based on independent industry publications or other publicly available information, as well as information based on other third-party or internal sources. This information involves many assumptions and limitations, and you are cautioned not to give undue weight to such information. None of The Pre-Transaction Companies, Quadro or any placement agent has independently verified the accuracy or completeness of the information contained in the industry publications and other publicly available information. Accordingly, none of The Pre-Transaction Companies, Quadro or any placement agent makes any representation as to the accuracy or completeness of that information nor does The Pre-Transaction Companies, Quadro or any placement agent undertake to update such information after the date of this presentation. In addition, this presentation does not purport to be all-inclusive or to contain all information that may be required to make a full analysis of The Pre-Transaction Companies or the proposed transaction. You should make your own evaluation of The Pre-Transaction Companies and of the relevance and adequacy of the information and should make such other investigations as you deem necessary. The information contained in the third-party citations referenced in this presentation is not incorporated by reference into this presentation.

This presentation may contain trademarks, service marks, trade names and copyrights of other companies, which are property of their respective owners. Solely for convenience, some of the trademarks, service marks, trade names and copyrights referred to in this presentation may be listed without the TM, SM, (c) or (r)-symbols, but The Pre-Transaction Companies and Quadro will assert, to the fullest extent under applicable law, the right of the applicable owners, if any, to these trademarks, service marks, trade names and copyrights.

**Additional Information about the Proposed Transaction and Where to Find It**
This presentation does not contain all the information that should be considered concerning the proposed transactions and is not intended to form the basis of any investment decision or any other decision in respect of the proposed transaction. The Post-Transaction Holding Group has filed a Registration Statement with the SEC, which includes a proxy statement/prospectus to be distributed to Quadro's shareholders and warrant holders in connection with Quadro's solicitation for proxies for the votes by Quadro's shareholders and warrant holders in connection with the proposed transaction and other matters described in the Registration Statement, as well as the prospectus relating to the offer of the securities to be issued by The Post-Transaction Holding Group to Quadro shareholders and warrant holders in connection with the completion of the proposed transaction. Before making any voting or other investment decisions, Quadro's shareholders and warrant holders and other interested persons are advised to read the Registration Statement and any amendments thereto and, once available, the definitive proxy statement/prospectus, in connection with Quadro's solicitation of proxies for its special meeting of shareholders and its special meeting of warrant holders to be held to approve, among other things, the proposed transaction, as well as other documents filed with the SEC by Quadro, The Pre-Transaction Companies or The Post-Transaction Holding Group in connection with the proposed transaction, as these documents will contain important information about The Pre-Transaction Companies, The Post-Transaction Holding Group, Quadro and the proposed transaction. After the Registration Statement has been declared effective, Quadro will mail a definitive proxy statement/prospectus and other relevant documents to its shareholders and warrant holders as of the record date established for voting on the proposed transaction. Quadro's shareholders and warrant holders may also obtain a copy of the Registration Statement or definitive proxy statement/prospectus, once available, as well as other documents filed by Quadro with the SEC, without charge, at the SEC's website located at www.sec.gov or by directing a written request to Quadro at 2685 Nottingham Avenue, Los Angeles, CA 90027.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 4 of 508

# About this Presentation

**Participants in the Solicitation**

The Pre-Transaction Companies, The Post-Transaction Holding Group, Quadro and their respective directors and executive officers may be deemed participants in the solicitation of proxies from Quadro's shareholders and warrant holders with respect to the proposed transaction. A list of the names of Quadro's directors and executive officers and a description of their interests in Quadro is set forth in Quadro's filings with the SEC (including the Registration Statement and the Annual Reports and Quarterly Reports filed by Quadro with the SEC on Forms 10-K and 10-Q, respectively, and any other documents filed in connection with the proposed transaction) and are available free of charge at the SEC's website located at www.sec.gov, or by directing a written request to Quadro at 2685 Nottingham Avenue, Los Angeles, CA 90027.

Additional information regarding the participants in the proxy solicitation and a description of their direct and indirect interests will be included in the definitive proxy statement/prospectus when it becomes available. Shareholders, potential investors and other interested persons should read each of the Registration Statement, and the definitive proxy statement/prospectus carefully when it becomes available before making any voting or investment decisions. You may obtain free copies of these documents from the sources indicated above.

**No Offer or Solicitation**

This presentation and the information contained herein does not constitute (i) (a) an offer to sell or the solicitation of an offer to buy any securities, or a solicitation of any vote or approval, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction or (b) a proxy statement or solicitation of a proxy, a prospectus, an advertisement or a public offering of the securities described herein in the United States or any other jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act or exemptions therefrom. Investment in any securities described herein has not been approved by the SEC or any other regulatory authority nor has any authority passed upon or endorsed the merits of the offering or the accuracy or adequacy of the information contained herein, any representation to the contrary is a criminal offense.

**Risk Factors**

For a non-exhaustive description of certain risks relating to The Pre-Transaction Companies and The Post-Transaction Holding Group, including their business and operations, and the proposed transaction, we refer you to "Risk Factors" at the end of this presentation. Please also see the section titled "Risk Factors" in the Registration Statement for more information.

**Use of Projections**

This presentation contains certain financial forecast information of The Pre-Transaction Companies, including, but not limited to, estimated results for fiscal year 2023, including Adjusted EBITDA, revenue and gross margin, and The Pre-Transaction Companies' long-term business model. Such financial forecast information constitutes forward-looking information and is for illustrative purposes only and should not be relied upon as necessarily being indicative of future results. The assumptions and estimates underlying such financial forecast information are inherently uncertain and are subject to a wide variety of significant business, economic, competitive and other risks and uncertainties. See "Forward-Looking Statements" above and "Selected Risk Factors" at the end of this presentation. Actual results may differ materially from the results contemplated by the financial forecast information contained in this presentation, and the inclusion of such information in this presentation should not be regarded as a representation by any person that the results reflected in such forecasts will be achieved. None of The Pre-Transaction Companies or Quadro's independent auditors have audited, reviewed, complied or performed any procedures with respect to the projections for the purpose of their inclusion in this presentation; and, accordingly, neither of them expressed an opinion or provided any other form of assurance with respect thereto for the purpose of this presentation. In addition, the analyses of The Pre-Transaction Companies and Quadro contained herein are not, and do not purport to be, appraisals of the securities, assets or business of The Pre-Transaction Companies or Quadro.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 5 of 508

# Today's Presenters – 1 of 3: Global Growth



**Greg Lindberg**
Board Observer

Greg is a successful entrepreneur, philanthropist, and author.

- **Current Role:** Founder of Global Growth Holdings with over 120 acquisitions over 20 years. As a 100% ultimate beneficiary of the holding, Greg provides shareholder oversight of the holding's strategies.
- Throughout his career, he has acquired and transformed more than 100 companies that were either failing or underperforming. Today, these companies are worth over $6 billion and employ 7,000 people.
- Lindberg has authored three books: *Failing Early & Failing Often*, *633 Days Inside*, and *Lifelong*.



**Prashant Upadhyaya**
CEO

Prashant is a seasoned business executive with over 28 years of experience in Advertising and Marketing, Media and Publishing, Certifications, Research & Consulting as well as Healthcare IT.

- **Current Role:** Portfolio Leader of SixSails, a portfolio with 15 businesses, and CEO of ShopperLocal and Certitrek Group.
- Prashant has worked in COO, CEO and Portfolio Manager roles in his career.
- He has led turnarounds for multiple companies, grown sales teams, and launched startups that have grown to profitable multi-million dollar businesses.
- He has led teams across multiple geographies, like the US, UK, India, and the Philippines.



**Surinder Jain**
CFO

Surinder is a Certified Public Accountant and Indian Chartered Accountant with 20+ years of experience in consulting with large corporations across sectors.

- **Current Role:** CFO of New Degree Growth.
- Surinder has significant experience working for US public companies during the IPO process and complying with various SEC regulations including periodic and annual reporting.
- A seasoned professional who has dealt with IPOs, debt financing, transactions, divestitures, complex accounting, and regulatory matters.
- Surinder has consulted with teams in the US, UK, Europe, Middle East, and Philippines.



**Bob Alban**
Chairman of the Board

Bob is an insurance industry entrepreneur and advisor with expertise in risk-based capital models, reinsurance, Federal Home Loan Bank ("FHLB") matters, insurance tax and accounting considerations, and the insurance product and distribution marketplace.

- **Current Role:** Principal of Montshire Advisors, a firm he co-founded in 2011, where he brokers reinsurance, advises insurers on product, distribution, and FHLB matters, and represents investments and investment firms for the US insurance industry.
- Bob brings business development and M&A experience to the team.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 6 of 508

# Today's Presenters – 2 of 3: Global Growth



**Craig Ive**
Company CEO

Craig brings 35 years of experience in the global technology industry. He had two successful bootstrap technology business exits and eight successful technology business turnarounds in his career.

- **Current Role:** CEO of Damovo and Clanwilliam.
- Craig has extensive global executive experience within the SaaS, Outsourcing, Data and Enterprise Software marketplaces.



**Abhinav Khattar**
VP Finance

As a CFA Charterholder, Abhinav excels in Financial Analysis and has experience in debt financing.

- **Current Role:** VP of Finance for Global Growth
- He has been heavily involved in the corporate finance side as the former Sr. Vice President, Reports & Analytics and the Director of M&A.
- Abhinav is a financial leader with 18+ years of experience driving efficiency, transparency, and increased profitability for global tech & service businesses.



**Kathy Million**
VP of M&A

Kathy is a multi-talented professional with 25+ years of experience implementing and managing organization-wide initiatives and programs.

- **Current Role:** Chief of Staff
- She manages critical initiatives across portfolios and projects like this SPAC engagement.
- She has experience directing local and international M&A functions to drive efficiencies in managing deals and corporate compliance.
- Kathy built a team and managed the buy-side engagement processes, delivering a 95% on-time close rate.
- She is a results-driven professional with a solid career track leading customer service, business development, M&A, and operations.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 7 of 508

# Today's Presenters – 3 of 3: Quadro Acquisition One Corp.



**Dimitri Elkin**
CEO

Dimitri has served as the CEO of Quadro Acquisition One Corp. since June 2022.

- **Current Role:** CEO of Quadro Acquisition One Corp since June 2022. Chief Executive Officer and Director of Twelve Seas Investment Company II. From December 2017 - December 2019, he served as CEO of Twelve Seas Investment Company I.

- Since April 2013, Dimitri has been a Founding Partner of Twelve Seas Limited.

- Dimitri has held several leadership positions as a General Partner of UFG Private Equity, an investment executive at Kohlberg Kravis Roberts & Co. and an investment banker at Lehman Brothers.



**Giedrius Pukas**
Managing Member

Giedrius has served as a Managing Member of Quadro Sponsor LLC since June 2022.

- **Current Role:** Founder and Managing Partner at Quadro Capital Partners.

- Prior to establishing Quadro Capital Partners in 2009, Mr. Pukas worked as a managing director at Troika Capital Partners, a leading private equity fund in Russia.

- Giedrius has held several leadership positions as an Investment Director at Alfa Capital Partners, an Investment Director responsible for the CIS with Swiss fund management company Finartis Capital in Moscow, and Managing Partner at the investment boutique MAS Consult, where he was a lead manager on several private equity transactions that took place across the Baltic States and Scandinavia.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 8 of 508

**GU0**     Need to confirm with Dimitri who should be on this slide.  KM  We will likely just have Dimitri and Giedrius and the a slide with all of the Board Members.

Guest User, 2024-01-02T17:55:26.436

# Quadro Acquisition One Corp. Board of Directors



**Jonathan Morris**
Independent Director

**Jonathan Morris** is a Partner/Member of Investment Committee at **The Lawrie Group**. Jonathan has a strong operational and execution track record with over 20 years of experience with leading financial institutions.

Jonathan led principal investments and structuring at a large family office, which has signed over $1.3 billion committed capital agreements. Prior to that, Morris was an Investment Banker with the Blackstone Group where he oversaw several transactions and from 2012-16 served on the Board of SunGard AS. Before joining Blackstone, Morris was in the TMT Investment Banking Group of Credit Suisse where he successfully completed ~100 billion of transactions.

Jonathan was a capital founder of GAIN Capital, a start-successfully IPO'd.

Jonathan joined the Quadro Acquisition One Corp. Board in January of 2024.



**Gregory Nelson**
Independent Director

**Gregory D. Nelson** currently serves as Managing Director at **TAG Financial Institutions Group, LLC** a New York City investment banking boutique focused on the financial services industry, with an emphasis on executing M&A and capital raising services for clients operating within the global insurance and broader financial services sectors.

Formerly, he was Senior Vice President of U.S. RE Securities LLC where his responsibilities included sourcing and executing insurance and reinsurance industry investment banking assignments including mergers and acquisitions advisory, private debt and equity capital-raising activities, and risk securitizations.

Prior to joining U.S. RE Securities, Mr. Nelson was a member of the Financial Institutions Group of Banc of America Securities in New York, where he was responsible for executing merger and acquisition transactions and public / private capital-raising assignments primarily for mid-cap and large-cap insurance industry clients.

Gregory joined the Quadro Acquisition One Corp. Board in January of 2024



**Konstantin Tourevski**
Independent Director

**Konstantin Tourevski** is a managing partner at **New Age Alpha, LLC**, an asset management firm, where he oversees fixed-income and alternative investments.

Prior to Joining New Age Alpha in 2019, Konstantin managed investments at Loews Corporation (NYSE: L) for 16 years and worked in fixed-income research at JP Morgan Investment Management from 1999 to 2001. Throughout his career he focused on issuers in technology, telecom, media, gaming, and leisure industries.

He is a CFA Charterholder.

Konstantin has been an Independent Director of Quadro Acquisition One Corp. since March 2023.

**Slide 8**

**GU0**      Need to confirm with Dimitri who should be on this slide.  KM  We will likely just have Dimitri and Giedrius and the a slide with all of the Board Members.

Guest User, 2024-01-02T17:55:26.436

# Agenda



- Executive Summary
- Platform Overview
- Value Creation
- Tangible Upside Levers
- Compounding Returns
- Selected Risk Factors
- Appendix
  - Pre-Transaction Group
  - Pre-Transaction Companies



9

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 12 of 508

# Executive Summary



Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 13 of 508

# Executive Summary

- Rare opportunity to invest in a "buy and hold" group of companies assembled by founder Greg Lindberg over the last 20+ years.

- Lindberg's exit from the insurance sector creates an opportunity to invest in this group of companies for the first time. This will also entail payment of $509M insurance debt over and above third-party debt.

- Proven platform model that has delivered 22%+ CAGR in EBITDA over the last 5 years.

- Proven acquisition model with $75M in EBITDA in pipeline deals.

- Globally diversified group of companies in counter-cyclical markets with hundreds of add-on acquisition targets identified.

- Closing expected by mid 2024.

**Key Benefits to the Merger
with Quadro Acquisition One Corporation**

- Provides over $2 billion of cash and public securities for Lindberg's exit from the insurance sector.
- Replaces independent trusts with public-company oversight for improved accountability and performance focus.
- Enhances transparency with public-company financial report and governance.
- Allows Lindberg's insurers to exit rehabilitation so that policyholders can access their full policy benefits.
- Eliminates a significant amount of litigation "noise" with Lindberg's exit from the insurance business.
- Policyholder reserves will be backed by cash and publicly traded securities which will replace the private placements currently backing policyholder reserves.
- Improves access to capital markets with public-company debt and equity financing.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 14 of 508

# Subset of Global Growth Assets to Go Public in Partnership with Quadro Acquisition One Corp.

### $3.15 Billion deal for 38% of Lindberg's portfolio.

Greg Lindberg to merge a group of his investments with Quadro Acquisition One Corp. in a $3.15 billion deal. This group of Lindberg's investments, a portion of Lindberg's Global Growth portfolio, will go public via a business combination agreement with Quadro Acquisition One Corp.

### 22% EBITDA CAGR over last 5 years.

The group of investments consists of 7 operating companies that make up approximately 38% of Lindberg's investment portfolio. These operating companies generated $1.1 billion in revenues and $142 million in Adj. EBITDA in 2023. From 2019 to 2023 the group delivered organic Adj. EBITDA CAGR of 22% and total revenue CAGR of 23%.

### $75M in EBITDA from acquisitions lined up to close with public company debt and equity financing.

In partnership with Quadro Acquisition One Corp., this group of companies, to be known as Beckett Corporation, will accelerate its successful platform acquisition strategy with improved access to capital markets. The public-company structure will significantly increase access to debt and equity markets which will allow the group to rapidly close acquisitions from a $75M EBITDA pipeline of deals that have been sourced globally.

### Significantly improved performance with public company oversight and accountability.

Currently, the group of companies operates within independent trusts without any shareholder accountability and with little oversight and performance focus. Terminating these trusts and placing this group of companies under one public-company CEO and CFO will significantly enhance the performance culture and accountability to improve returns.

### Proven acquisition track record with over 100 deals.

Lindberg and his team have completed over 100 acquisitions over the last 20 years and have become a preferred buyer for founder-led companies across the US and Europe.
The group of companies has a unique model that allows each operating company to maintain its own brand, identity, and customers as the original founder envisioned.

### Closing expected by mid-2024.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 15 of 508

# Transaction Summary

### Transaction Overview

- Pro forma pre-money enterprise value of **$3.2 billion**, including debt (22.1x 2023E Adj. EBITDA)
- Current shareholders rolling over **100% of equity** with cash proceeds used to pay down existing debt and pay insurance obligations
- Pro forma net leverage of **4.42x** 2023E Adj. EBITDA

## Sources & Uses

| Cash sources | $M |
| --- | --- |
| First Lien Term Loan | 630 |
| Preferred Equity | 350 |
| Trust Roll | 6 |
| Total sources | 986 |

| Cash uses | $M |
| --- | --- |
| 3rd Party Debt | 444 |
| Insurance Debt & Preferred Equity | 509 |
| Deal Fees | 33 |
| Total uses | 986 |

*Executives/ Sellers payouts are to be determined and not considered in above calculations.*

## Illustrative Pro Forma Equity Ownership



Greg Lindberg, 96.3%

Quadro Sponsor, 2.9%

Quadro Public Shareholders, 0.8%

## Pro Forma Valuation (at closing)

| Enterprise value | $M |
| --- | --- |
| Shares outstanding (M) (x) Share price | 216.7 $10.0 |
| Equity value | 2,167.0 |
| (+) Pro forma net debt | 986.0 |
| Proforma enterprise value | 3,153.0 |

| Transaction multiples | |
| --- | --- |
| Enterprise value / 2023E Adj. EBITDA 2023E Adj. EBITDA pro forma net leverage | 22.14x 4.42x |

Global Growth | Quadro Acquisition One Corp.

13

# Platform Overview



14

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 17 of 508

# The Combined Platform of Pre-Transaction Companies

A diversified platform underpinned by a foundation of proven assets and supplemented by an acquisition engine that is expected to drive shareholder returns

**Current Key Statistics of
7 Pre-Transaction Companies**



**28** years
average age of subsidiaries

**7** years
average age in portfolio

**38\***
Acquisitions completed by the Pre-Transaction Companies

**2,500+**
Employees

**$142M**
EBITDA 2023

**$1.1B**
Revenue 2023

\* Total history of acquisitions by Pre-Transaction Companies

**Engine for Value Creation**



Stable, Cash Generative Companies + Consistent and Accretive Acquisition Engine

**Acquisition Engine**

**$88M**
Revenue acquired by the Pre-Transaction Companies every year (2019-2023)

**Stable**
Retained proven management team

**$10M**
EBITDA acquired by the Pre-Transaction Companies every year (2019-2023)

Global Growth | Quadro Acquisition One Corp.

15

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 18 of 508

# Global Growth's Acquisition Structure Focuses on Lowering Risk and Driving Returns

Pre-Transaction Companies achieve consistently attractive returns on their deployed capital partially through acquisition structures

## Acquisition structure

Acquisition cost at
**Single**
digits of EV/EBITDA multiple

**$109M**
Investment for acquisitions since 2019

Achieved
**+17%**
return on investments

## Acquisition structure benefits

Status of
**"Preferred Buyer"**
enables owners to continue to grow their business at attractive multiples

Immediate and growing
**FCF**

Potential to add
**attractive**
returns on deployed capital

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 19 of 508

# Financial Overview of Pre-Transaction Companies

Pre-Transaction Companies demonstrate high top-line growth and profit generation, driven by their acquisition strategy



**Historical Financial Performance**
2019-2023, US$ million

**Growth metrics**

**Diversified portfolio**

13% Current Adj. EBITDA margin

23% Revenues CAGR 2019-2023

22% EBITDA CAGR 2019-2023

Revenues by geography, 2023, %

Revenues by industry, 2023, %

Revenues by company, 2023, %

EBITDA by company, 2023, %

# The Compounding Platform Strategy of Pre-Transaction Companies has Delivered Profits, Growth, and Significant Funding Capabilities

Combining its diversified portfolio of stable growing companies and a low-risk, high-cash return acquisition strategy has provided the base for significant growth of cash-generating capabilities



**Historical Roadmap for Achieving Compounding Profits Growth, $M**

62.8     Organic growth     28.9

50.7

142.4

EBITDA from operating entities acquired by Pre-Transaction Companies

**Adj. EBITDA, 2019**

**Adj. EBITDA, 2023**

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 21 of 508

# Partnership with Quadro Anticipated to Help Unlock Next Leg of Growth for Pre-Transaction Companies

## Pre-Transaction Companies

- Founder-led, scaled, profitable, and diversified compounder
- Established M&A playbook with flexible structures in a large pool of potential acquisitions
- Proprietary sourcing channels developed on the back of strong reputation and trust
- Perpetual ownership horizon, prudent leverage focused on long-term value creation
- Decentralized operation style empowering management and fostering autonomy
- Strong net surplus cash flow and potential ability for large-scale reinvestments in development
- Scalable model with a track record of growth and resilience through cycles

## Quadro

- Aligned interests and complementary skills to the management team and shareholders
- Strong leadership team with extensive networks of corporates, advisors and investors
- Access to capital with potential to accelerate the growth and the pace of further acquisitions
- Infrastructure to assist financing the growth and value enhancement
- Significant experience in capital markets, M&A, private equity investments and bringing companies public
- Line-up of former executives of S&P 500 companies with significant operational experience across industries
- Multiple M&A and investment transactions closed recently



**Group's revenues and adj. EBITDA,** 2019-2028F, US$ million

| | CAGR, 2019-2023 | CAGR**, 2023-2028 |
| --- | --- | --- |
| Revenues | 23% | 6.4% |
| Adj. EBITDA | 22.0% | 6.5% |

Revenues: 473.4 (2019), 1,095.4 (2023), 1,493.3 (2028F)

Adj. EBITDA: 62.8 (2019), 142.4 (2023), 195.5 (2028F)

*** Includes organic growth only*

Global Growth | Quadro Acquisition One Corp.

19

**GU0**   we are reviewing the forecast & financial model to refine our assumption for forecasts. We will update the 2028 numbers accordingly (week of 15th jan)
Guest User, 2024-01-12T12:13:18.130

# Opportunity to Own a Differentiated Growth Story

## 1. Platform for Value Creation

| | |
|---|---|
| **1A** | Proven strategy to drive value creation |
| **1B** | Existing diversified portfolio |
| **1C** | "Preferred buyer" status drives accretive values |
| **1D** | Established and respected owner & management team |

**+**

## 2. Tangible Growth Drivers
Adj. EBITDA CAGR of 22%

| | |
|---|---|
| **2A** | Multiple opportunities to drive growth supported by industry trends |
| **2B** | Established M&A playbook and tight parameters for acquisitions |
| **2C** | Access to capital designed to accelerate acquisition pace |
| **2D** | Robust pipeline of attractive business acquisitions |

## 3. Compounding Returns
EBITDA Growth + Acquisitions = Long-Term Shareholder Value

MS0

| | |
|---|---|
| **3A** | Compelling financial profile designed to deliver compounding returns |
| **3B** | Market Leadership and comparative analysis |
| **3C** | Total return story fueled by attractive acquisitions |
| **3D** | Compelling cash profile with strong capital returns |

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 24 of 508

**Slide 20**

**MS0**  This doesn't seem to correspond with the 3B slides. Should we change to something like "Comparable company analysis demonstrates market leadership"
Miranda Satterly, 2024-01-10T19:46:23.370

# Value Creation



21

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 26 of 508

# Proven Strategy to Drive Value Creation

The value creation ability of Pre-Transaction Companies has been refined since 2018 into a well-oiled acquisition and operations machine

## AAA Score Selection System

| Parameters | Weight | AAA Rating |
|---|---|---|
| Barriers to entry | 3 | 1-5 points |
| Company's growth rate | 1 | 1-5 points |
| Industry growth rate | 3 | 1-5 points |
| Place in the industry | 1.5 | 1-5 points |
| Physical CAPEX requirements | 2 | 1-5 points |
| % of revenue that is recurring | 3 | 1-5 points |
| Diversity of customer base | 1.5 | 1-5 points |
| Offshore labor potential | 3 | 1-5 points |
| Platform potential | 1 | 1-5 points |
| Existing roll-in potential | 1 | 1-5 points |
| TOTAL AAA Scoring | | to be >85 |

## Approach to Acquisitions

Employs a lower-risk strategy to acquire stable and profitable founder-led SMEs with operating track records

Retention of founders and management teams ensures continued entrepreneurial approach

Helps drive organic growth across the portfolio

Leverages scale to professionalize portfolio companies

M&A track record and market reputation

## Track Record

| >28 years<br>Average age of companies | Established and profitable |
|---|---|
| Aligned interests with founder-sellers post-acquisition | Drives "preferred buyer" status |
| 9.5%<br>Organic Adj. EBITDA CAGR | Cross-selling opportunities |
| Back-office support | Deploy best practices across portfolio |
| 12.9%<br>EBITDA CAGR through acquisitions | Growth Opportunities |

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 27 of 508

# Existing Diversified Portfolio

Seven diversified portfolio comprises of several business help to mitigate risk through cycles

## Select End Markets Served

| | |
|---|---|
| Collectibles | Business Software Solutions |
| Specialty Pharmacy | Healthcare Software |
| Medical Equipment | Gaming Accessories |
| Communication solutions | Billing |
| Analytics | Media |

### Headquarter locations with customer base across 20+ countries



Diversified and large end markets help the overall portfolio risk mitigation

Global Growth | Quadro Acquisition One Corp.

Case 3:23-cr-00048-MOC-DCK      Document 132-2      Filed 05/04/26      Page 28 of 508

# "Preferred Buyer" Status on the Back of Management-Empowered Value Proposition Drives Accretive Values

The "preferred buyers" status and patience are key to driving accretive acquisition

## Preserving the Entrepreneurial Spirit

Keeping founder management teams in place and allowing them to continue to execute successful business strategy after acquisition

Management teams can benefit from the group's deep commercial expertise, portfolio knowledge, and best practices to achieve next-level growth

The group supports investment into business and management for long-term performance, rather than deploying quick, short-sighted, cost-cutting initiatives often employed by trade buyers or PE firms

Succession plans are established for each portfolio company to help ensure a smooth transition in management roles post-retirement of founders

**Retained owner managers** at acquisition still actively engaged in business

At least one member of **underlying management** remained with new group for at least three years

## "Preferred Buyer" Status

Strong **reputation** paired with in-depth industry and geographical **knowledge**

Strategic partner interested in **long-term performance and not forced to sell** the business to satisfy any PE-like fund returns

Allows successful businesses to continue to thrive **independently**

Support for **personal and professional development**

Opportunities to extract operational **synergies** via cross-fertilization with other portfolio companies

Forming deep relationships with and allowing independent businesses to execute their own strategy enables the group to purchase off-market assets for attractive multiples

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 29 of 508

# Established and Respected Owner & Management Team

**1D**

| Relationship-focused management team creates opportunities to find target companies through existing networks |
|---|

Highly qualified executive leadership team, led by Greg Lindberg, who identified the potential in the SME markets across the world and founders' reluctance to sell to PE and trade buyers

Management forms deep relationships with subsidiaries, understanding their vision and giving them autonomy in running their business – this allows management to purchase off-market assets for attractive multiples

Senior management brings together the necessary commercial knowledge, extensive networks, and operational awareness to make successful acquisitions

| Strong organic growth compounded with disciplined M&A that has diversified and enhanced the platform of Pre-Transaction Companies |
|---|



**Adj. EBITDA growth breakdown, $M**

62.8 — Adj. EBITDA, 2019
28.9 — Organic growth
50.7 — EBITDA from operating entities acquired by Pre-Transaction Companies
142.4 — Adj. EBITDA, 2023

**History of portfolio build-up**

| YEAR | # OF COMPANIES ACQUIRED |
|---|---|
| 2022 | 3 |
| 2021 | 1 |
| 2020 | 3 |
| 2019 | 1 |
| 2018 | 8 |
| 2017 | 8 |
| 2016 | 5 |
| 2015 | 3 |
| 2014 | 5 |
| Pre-2014 | 1 |
| **Total** | **38** |

Global Growth | Quadro Acquisition One Corp.

25

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 30 of 508

# Tangible Upside Levers



26

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 31 of 508

# Multiple Opportunities to Drive Future Growth (1 of 2)

Combination of strong organic foundation and M&A playbook aims to deliver compounding long-term performance



| Grow Core Initiatives | | Expand the Core: M&A and Targeted Support | | |
|---|---|---|---|---|
| | Proven M&A playbook for compounding growth | | Target-rich environment for growth | Target greater scale and new geographies |
| Organic growth from existing businesses | | Accelerate growth via access to capital | | |
| Secular trends in core business | Continue accretive M&A strategy | Accessing liquid, public markets capital | Large pipeline of opportunities | Scale the model to larger transactions and new geographies |

## Select End Markets Served Currently

| | |
|---|---|
| Collectibles | Business Software Solutions |
| Specialty Pharmacy | Healthcare Software |
| Medical Equipment | Gaming Accessories |
| Communication Solutions | Billing |
| Analytics | Media |

| | |
|---|---|
| **$41Tn** Total GDP of the served countries | **3.2%** Nominal exp. GDP CAGR 2023-2028 |
| **$589B** Total value of the target markets in served countries | **~9%** Exp. markets CAGR 2023-2028 in served countries |

Global Growth | Quadro Acquisition One Corp.

27

**Key Underlying Macro Trends**

 **Healthcare & Healthcare-Related Markets**

Healthcare and Healthcare-related markets, including medical software, home medical devices, hospital medical equipment and specialty pharmacy are driven by an aging population, a growing chronic condition population, the expansion of compensation coverage from state funding and insurance companies, incl. from Medicare, growth in regulatory approvals, deepening digitalization, stricter data security enforcement, the need for the growth of operational efficiencies and budgeting pressures. The markets are expected to grow at 9-18% CAGR (depending on the market segment) in the next 5 years.

 **Business Software Markets**

Further digitalization of all processes, cybersecurity, AI and advancements in cloud technologies and multichannel touchpoints, as well as the need for storing and analyzing ever-growing volumes of data, drive the growth of Business Software markets. It is expected that these markets will grow at 11% CAGR.

 **Collectibles Markets**

The Collectibles industry is going through a major re-engineering driven by improving economic conditions, increasing leisure time and popularity of hobbies, digitalization and AI penetration, the appearance of intangible collectible segments, and the professionalization of investment activities in collectible items. The market is expected to grow more than 6% CAGR over the next ten years.

 **Communications Solutions Markets**

The shift of communication and marketing efforts to online solutions, an increase in the value of peer-to-peer promotion and the growing significance of regulations drive the growth of the Communication Solutions market, with an exp. CAGR of 10%.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 33 of 508

# Established M&A Playbook and Tight Parameters for Acquisitions

Pre-Transaction Companies have a strong investment methodology and track record

## Established Acquisition Strategy + Excellent Execution = Attractive Statistics
of the Resulting Portfolio

**TARGET**
- Self-originated
- Off-market
- Strong business-wise with long operating histories

**SUPPORT**
- Retain existing management
- Support strategic direction
- Develop high operational efficiency

**INVEST**
- Re-invest in continued growth

- Founder-led profitable business with long operating history
- Strong management team committed to growth
- EBITDA $1M-$45M
- EBITDA margin >10%
- Cash-generating
- Attractive EBITDA multiple <6x
- High barriers to entry

### AAA Score Selection System

**Barriers to entry**
*Points: 1-5; Weight:3*

**Company's growth rate**
*Points: 1-5; Weight:1*

**Industry growth rate**
*Points: 1-5; Weight:3*

**Place in the industry**
*Points: 1-5; Weight:1.5*

**Physical CAPEX requirements**
*Points: 1-5; Weight:2*

**% of revenue that is recurring**
*Points: 1-5; Weight:3*

**Diversity of customer base**
*Points: 1-5; Weight:1.5*

**Offshore labor potential**
*Points: 1-5; Weight:3*

**Platform potential**
*Points: 1-5; Weight:1*

**Existing roll-in potential**
*Points: 1-5; Weight:1*

*Any opportunity needs to score >85 for acquisition*

**Pre-Acquisition Phase**
- Originate by the internal team
- Select stringently
- Do not overpay, link to future performance

**Post-Acquisition Phase**
- Offer, perform DD and acquire
- Onboard, exercise immediate synergies
- Monitor, exercise ongoing synergies, add to growth

**38**
acquisition completed

**$659M**
Deal Value

**$878M**
Revenue of acquired companies

**3**
acquisitions per year in last 10 years

Global Growth | Quadro Acquisition One Corp.

29

# Significant New Capital to Accelerate Growth

The transaction provides capital to optimize the balance sheet of Pre-Transaction Companies and fuel future growth

## Capital Raised in the Transaction

| Cash sources | $M |
|---|---|
| First Lien Term Loan | 630 |
| Preferred Equity | 350 |
| Trust Roll | 6 |
| Total sources | 986 |

| Cash uses | $M |
|---|---|
| 3rd Party Debt | 444 |
| Insurance Debt & Preferred Equity | 509 |
| Deal Fees | 33 |
| Total uses | 986 |

*Executives/ Sellers payouts are to be determined and not considered in above calculations.*

## Proforma Capital Structure

| Enterprise value | $M |
|---|---|
| Shares outstanding (M) (x) Share price | 216.7 $10.0 |
| Equity value | 2,167 |
| (+) Pro forma net debt | 986 |
| Proforma enterprise value | 3,153 |

| Transaction multiples | |
|---|---|
| Enterprise value / 2023E Adj. EBITDA | 22.14x |
| 2023E Adj. EBITDA pro forma net leverage | 4.42x |

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 35 of 508

# 2D

# Pipeline for Growth

Pre-Transaction Companies have a deep pool of their existing target areas to expand the business via acquisitions

## Robust Acquisition Pipeline

Current prospects:
**1,150**

Active dialogue:
**31**

Advanced:
**13**

## Advanced Targets

| | |
|---|---|
| Total revenues | **$176M** |
| Total EBITDA | **$43M** |
| Average expected EBITDA multiple | **6X** |
| Total expected value of acquisitions | **$250M** |

### Acquisition Targets – Addressable Market

- Target list of **8400+** companies and growing
- Target revenue of **$51Bn** and growing
- Target EBITDA of **$8Bn** and growing

# Compounding Returns



32

# Compelling Set-Up to Seek Compounding Returns (1 of 2)

**3A**

The platform of Pre-Transaction Companies and upside levers provide several compelling opportunities that aim to compound returns to investors

| | | |
|---|---|---|
| **A** | Compelling Financial Profile For Compounding | Top-line Growth + Cash Flow Generation + Acquisitions + Dividends |
| **B** | Attractive Entry Point With a Differentiated Story | Proforma Enterprise Value of $3.2 billion |
| **C** | High Risk-Adjusted Cash Returns via Lower-Risk Acquisition Strategy | Potential for >20% Annual Return on Investment |
| **D** | Strong Dividend Capacity Potential | Maximize Payout Ratio |

**Combining its diversified portfolio of stable companies and a low-risk, high cash return acquisition strategy has provided the base for dividend capacity growth.**



Organic + Acquisition-driven growth

Strong Free Cash Flow Growth & Dividend Potential

Deep pool of founder-led companies

Organic GDP+ top-line growth combined with operational support and exposure to essential end-markets

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 38 of 508

## 3A

# Top-Line Growth and Margin Expansion (2 of 2)

Management has consistently grown the platform of the Pre-Transaction Companies with a focus on revenue and cash flow generation



**Revenue, 2019-2023**
US$ million

| | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 473 | 489 | 760 | 1,054 | 1,095 |
| YoY Growth | | 3% | 56% | 39% | 4% |

CAGR; 23%



**Adj. EBITDA, 2019-2023**
US$ million

| | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Adj. EBITDA | 62.8 | 78.2 | 132.3 | 139.5 | 142.4 |
| YoY Growth | | 25% | 61% | 11% | 2% |

CAGR; 22%

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 39 of 508

# Market Leadership Analysis – Key Comparable Companies Deep Dive

Closest comparable companies have slightly different acquisition strategies based on industry, value-add, and multiples paid, but execution is a key factor

| | Quadro SPAC / Beckett Corp. | Addtech | Indutrade | Lifco | Diploma | Beijer / ALMA |
|---|---|---|---|---|---|---|
| **Primary End-Markets** | | | | | | |
| Diversified Industrials | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Trade | | | | | | ✓ |
| Life Sciences | ✓ | | ✓ | ✓ | ✓ | |
| Business Software, Post-Acute Health Services, and others | ✓ | ✓ | ✓ | | | ✓ |
| Key Geographies | North America, Europe | Nordics, DACH, UK | Global (>30 Countries) | Global (>30 Countries) | North America, Europe, Australia | Europe, Asia, North America |
| **M&A Approach** | | | | | | |
| # of Portfolio Companies | 38 | 156 | 238 | 211 | 142 | 39 |
| # of Acquisitions per Year | ~3 | ~10 | ~15 | ~10 | ~10 | ~5 |
| Target Business Size | $1-30M EBITDA | $1-3M EBITDA | $1-3M EBITDA | $1-40M Revenues | $1-7M EBITDA | $1-7M EBITDA |
| **Financial Metrics** | | | | | | |
| Equity Value ($M) | $2,167 | $4,822 | $7,778 | $9,701 | $4,735 | $1,051 |
| 3Y EPS CAGR (2019-2022) | N/A* | 19.6% | 21.7% | 22.7% | 16.0% | 9.9% |
| LTM Dividend Yield | N/A | 1.3% | 1.2% | 1.0% | 1.9% | 2.3% |
| TEV / FY 2023 EBITDA | 22.1x | 26.4x | 25.1x | 21.0x | 23.9x | 14.3x |

\* In some of the earlier years, net income was negative

Global Growth | Quadro Acquisition One Corp.

*Source: Company filings and websites; market prices as of 11/15/2023.*

35

**3B**

# Market Leadership Analysis – Key Financial Metrics

Deep comparable universe creates a compelling starting point for entrance of Pre-Transaction Companies into public markets

| | Sales Growth | EBITDA Growth | EPS CAGR | EBITDA Margin | Net Debt/EBITDA | ROIC |
|---|---|---|---|---|---|---|
| | FY2018-FY2022 | FY2018-FY2022 | 3-Year | LTM | LTM | LTM |
| Quadro SPAC / Beckett Corp. | **36%** | **29%** | **N/A** | **13%** | 4.42x | **17%** |
| CorpAcq | 17% | 19% | 20% | 17% | 3.0x/2.2x | 16% |
| ADDTECH | 17% | 26% | 20% | 15% | 1.6x | 19% |
| Indutrade | 13% | 19% | 22% | 18% | 1.7x | 15% |
| LIFCO | 16% | 21% | 23% | 25% | 1.3x | 15% |
| DIPLOMA | 22% | 27% | 16% | 21% | 1.1x | 15% |
| BEIJER • ALMA | 7% | 9% | 10% | 18% | 1.9x | 11% |
| Comparables Average | **15%** | **20%** | **18%** | **20%** | **1.5x** | **15%** |

Global Growth | Quadro Acquisition One Corp.

36

**Slide 36**

**GU0**   Guest User, 2024-01-09T19:23:22.890

**GU0 0**   For comepetitive analysis, we are keeping 2018-22. It will be updated for 19-23 once we will get complete 23 numbers (likely in Mar'23)
Guest User, 2024-01-11T11:13:09.994

# Total Return Story Fueled by Acquisitions

The Post-Transaction Holding Group offers an opportunity to own a growth platform strategy that has generated high risk-adjusted returns at an attractive valuation



Companies have been rewarded for execution and growth

Focus on quality and strong, attainable cash returns has led to historical double-digit EBITDA growth

The Group aims to accelerate and expand its strategy and drive growth

In addition to strong earnings growth potential, the Group expects to manage its long-term debt obligations

Acquisitions at Single Digits EBITDA multiples have led to high cash returns and earnings growth

Global Growth | Quadro Acquisition One Corp.

37

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 43 of 508

# Compelling Cash Profile Should Provide a Strong Capital Returns Story from Inception

The Group's strong cash generation aims to provide significant dividend capacity that is expected to grow with the portfolio

## Adj. EBITDA Conversion Rate





| | | | |
|---|---|---|---|
| **Conversion Rate (%)** | 85% | 58% | 68% |



*Conversion Rate: (EBITDA – change in net working capital – CapEx – Tax)/ EBITDA*

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 44 of 508

# Compelling Public Investment Thesis

Opportunity to own an attractive and differentiated investment / acquisition platform that provides a compelling combination of top-line growth and profitability

**1** **Differentiated opportunity to own a platform composed of global companies** with a proven acquisition model that generates high risk-adjusted cash returns supported by mature, stable businesses

**2** **Experienced management team** that has executed a proven repeatable and scalable acquisition strategy

**3** **Attractive and successful acquisition strategy** that can be augmented with public currency to move into even deeper acquisition markets

**4** **Seven diversified portfolio comprises of several business operating in North America, UK, Ireland, Europe, Australia and New Zealand** serving across markets with proven resilience to economic cycle.

**5** **Profitable with strong top-line growth potential** and cash flow generation allows for enhanced acquisition pace and dividend* payout to cultivate investor base

*\* Note that no dividends will be paid until 2029*

Global Growth | Quadro Acquisition One Corp.

39

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 45 of 508

# Selected Risk Factors



40

# Selected Risk Factors

Unless the context otherwise requires, all references in this subsection to the "Company," "Global Growth," "The 7 Companies," "we," "us" or "our" refer to The Pre-Transaction Companies. The risks presented below are some of the general risks to the business and operations of The Pre-Transaction Companies, Quadro and The Post-Transaction Holding Group following the consummation of the proposed transaction (the "Post-Combination Company") and are not exhaustive. The list below is qualified in its entirety by disclosures contained in future documents to be filed or furnished by us with the SEC. The risks presented in such filings may differ significantly from those presented below. The list below is not exhaustive, and you are encouraged to perform you own investigation with respect to the business, financial condition and prospects of The Pre-Transaction Companies and The Post-Transaction Holding.

Certain of The Pre-Transaction Companies are held directly or indirectly by a trustee pursuant to trusts designed to distribute funds to affiliated insurance companies (the "Insurance Companies") that are under administrative supervision, under a Court Action, in the Wake County General Court of Justice – Superior Court Division of North Carolina (the "Action").  The trustee of the trusts also acts on behalf of the State of North Carolina as the court appointed rehabilitator of the Insurance Companies.  Among other risks, all of the terms of the proposed transactions must be approved by the court in the foregoing Action.

The Pre-Transaction Companies and The Post-Transaction Holding may face additional risks and uncertainties that are not presently known to them or that they currently deem immaterial, which may also impair The Pre-Transaction Companies and The Post-Transaction Holding's business or their financial condition. These risks speak only as of the date of this presentation, and neither The Pre-Transaction Companies nor Quadro undertake any obligation to update the disclosure contained herein. In making any investment decision, you should rely solely upon independent investigation made by you. You acknowledge that you are not relying upon, and have not relied upon, any of the summary of risks or any other statement, representation or warranty made by any person or entity other than the statements, representations and warranties of The Pre-Transaction Companies and Quadro explicitly contained in any definitive agreement you enter into. You acknowledge that you have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Company and you have sought such accounting, legal and tax advice from your own advisors as you have considered necessary to make an informed decision.

**Risks Related to The Court Approval Process**
- The Pre-Transaction Companies are currently under the control of a trustee that holds control over certain assets so as to ensure the financial liquidity of the Insurance Companies that are now in rehabilitation.
- In order to consider any transaction or restructuring, The Pre-Transaction Companies must first apply to the court in the Action, and the trustee/rehabilitator, for approval which will require, among other things, that we can show that the Insurance Companies will be rehabilitated and that insurance policy holders will be able to realize their full policy benefits.
- As part of this plan, and among other criteria, we will be required to raise substantial amount of capital in order to repay debts of The Pre-Transaction Companies owed to the Insurance Companies, in the amount of approximately $509 M.
- We will be required to prove to the rehabilitator and court in the Action, that the debts being repaid will fully rehabilitate the Insurance Companies and ensure that the insurance policy holders will be able to realize the full benefit of their respective policies if and as they come due.
- We will be required to close our financing and obtain approval of the contemplated transaction by the court in the Action, prior to any closing of the acquisition.

# Selected Risk Factors

**Pre-Transaction Companies and The Post-Transaction Holding's Business and Industry**

- We are subject to risks relating to due diligence of our acquisition targets, which may not identify all material risks relating to their businesses, and we may not realize the expected benefits of such arrangements. Competition for suitable acquisition targets may lead us to not being able to carry out future acquisitions at a reasonable cost or at all, which could adversely affect our operating results.
- There are risks to our acquisition strategy, and there are no guarantees that we will be able to carry out acquisitions as planned, or with favorable conditions or at all.
- The acquisitions and investments we conduct could be unsuccessful or consume significant resources, which could adversely affect our operating results.
- Our growth and pension strategy may not materialize as planned or at all.
- We are dependent on cash flows from our portfolio companies.
- Many of our portfolio companies operate in sectors that are vulnerable to competition, and failure of our portfolio companies to adequately compete in their respective industries could have an adverse effect on our results of operations.
- Our insurance coverage, including any insurance coverage held by our portfolio companies, may not cover all potential losses and there are no guarantees that we or our portfolio companies can retain such insurance coverage at a reasonable cost or at all.
- Potential divestments of our portfolio companies may give rise to us becoming subject to additional risks and costs.
- We are subject to risks relating to partly owned portfolio companies.
- We are a decentralized company and place significant decision-making authority, including decisions regarding operations, governance and finance, with our subsidiaries' management and we may not always have visibility into or control over such decisions.
- We are subject to risks relating to our information technology systems, financial accounting and other data processing systems, such as cybersecurity risks and risks related to data privacy.
- The industries we serve can be seasonal cyclical and affected by weather conditions, the combined effects of which can adversely impact our results of operations.
- A portion of our future growth is based on the ability and willingness of public and private entities to invest in infrastructure.
- Our business will be adversely affected if we are unable to protect our intellectual property rights from unauthorized use or infringement by third parties.
- Our operating and financial results forecast rely in large part on assumptions and analyses that we have developed and if these assumptions or analyses prove to be incorrect, our actual operating and financial results may be significantly below our forecasts.
- Our forecasts are predicated on maintaining our current acquisition pipeline. Failure to maintain this pipeline, or if acquisitions are different than we've predicted, our financial results may be negatively affected.
- The Pre-Transaction Companies and The Post-Transaction Holdings ability to continue as a going concern depends in part on obtaining sufficient funding to finance their operations.
- Certain of The Post-Transaction Holding's subsidiaries are subject to increasing risks arising from climate change, environmental considerations and broader environmental, social and governance considerations, together with the requirement to comply with, and associated costs of, increased regulation or changes in regulatory regimes.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 48 of 508

# Selected Risk Factors

**Risks Related to Indebtedness and Financing Transactions**
- We are subject to financing risks. Failure to raise at least $[ ] will likely result in inability to obtain court approval and close the contemplated transaction.  There are no guarantees that we can meet our financing needs for our operations and future investments at a reasonable cost or at all.
- We will require a significant amount of cash to service our debt or preferred equity obligations, and our ability to generate cash depends on many factors beyond our control and any failure to meet financial obligations could materially adversely affect our business, results of operations and financial condition.
- We are subject to risks relating to increased interest rates and any adverse developments in the credit markets generally.
- Our failure to comply with the agreements relating to our outstanding indebtedness, including as a result of events beyond our control, could result in an event of default that could materially adversely affect our business, results of operations and financial condition.
- Our debt or preferred financing and the history of our Pre-Transaction Companies, could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry and prevent us from meeting our obligations.

**Risks Related to Human Capital**
- There are no guarantees that we are able to retain and recruit key personnel, including our senior management, and other employees to meet current or future needs at a reasonable cost or at all.
- There are no guarantees that our portfolio companies will be able to retain and recruit key personnel, including senior management, and other employees to meet current or future needs at a reasonable cost or at all.
- We and our portfolio companies are subject to risks relating to workspace accidents, investigations and claims for compensation as a consequence of compliance deficiencies. We may also be subject to disruptions in the business due to work stoppage and strikes.
- Misconduct by our employees, subcontractors or partners or our overall failure to comply with laws or regulations could harm our reputation, damage our relationships with customers, reduce our revenue and profits, and subject us to criminal and civil enforcement actions.

**Risks Related to Legal, Regulatory and Compliance Matters**
- We are subject to evolving laws and regulations that could impose substantial costs, legal prohibitions or unfavorable changes upon our operations, and any failure to comply with these laws and regulations, including as they evolve, could result in litigation and substantially harm our business and results of operations.
- We are subject to risks relating to disputes and other legal proceedings that may be time consuming and costly.
- We and our portfolio companies could be subject to increased regulation or changes in regulatory regimes which will impact our financial performance.
- If we fail in complying with applicable data protection regulations, such as the GDPR, our compliance costs may increase and in the event of compliance deficiencies, we may become subject to significant fines and liable for damages.

**Risks Related to Tax**
- We may be treated as a U.S. corporation for U.S. federal income tax purposes.
- U.S. holders of Quadro will be subject to U.S. federal income tax on any gain (but not loss) resulting from the merger without the corresponding receipt of cash.
- The issuance or transfer of the Post-Combination Company's securities into DTC may be subject to stamp duty or stamp duty reserve tax in the UK, which would result in additional expenses incurred in connection with the consummation of the proposed transaction.
- Unanticipated tax laws or any changes in tax rates or in the application of the existing tax laws may adversely impact our results of operations.

# Selected Risk Factors

**Risks Related to Quadro**

- Quadro's public shareholders will experience dilution as a consequence of the issuance of Post-Combination Company securities as consideration in the proposed transaction and may experience dilution from several additional sources in connection with and after the closing of the proposed transaction. Having a minority share position may reduce the influence that Quadro's public shareholder have on the management of the Post-Combination Company.
- [The estimated net cash per share of Quadro's class A common stock that will be contributed to the combined company in the proposed transaction is less than the redemption price. Accordingly, Quadro's public shareholders who do no exercise redemption rights will receive Post-Combination Company securities that may have a value less than the amount they would receive upon exercise of their redemption rights. Further, the shares of most companies that have recently completed business combinations between a special purpose acquisition company and an operating company have traded at prices below $10.00 per share. Accordingly, Quadro's public stockholders who do not exercise redemption rights may hold securities that never obtain a value equal to or exceeding the per share value of Churchill's trust account.]
- Quadro, Quadro's funds and their respective directors, officers or affiliates may purchase shares from Quadro's public stockholders, which could reduce the number of shares of Quadro's class A common stock that may be redeemed in connection with the special meeting or shareholders, which may reduce the public "float" of Quadro's class A common stock (or, following the closing of the proposed transaction, the Post-Combination Company ordinary A1 shares).
- There can be no assurance that Quadro will be able to consummate the proposed transaction or another initial business combination by February 17, 2024, in which case Quadro will cease all operations except for the purpose of winding up and would redeem Quadro's class A common stock and liquidate, in which case Quadro's public stockholders would only receive approximately $10.00 per share, or less than such amount in certain circumstances.
- The exercise price for Quadro's public warrants and the Post-Combination Company's class C-1 shares are higher than in many similar blank check company offerings in the past, and, accordingly, the Quadro's public warrants and the Post-Combination Company's class C-1 shares are more likely to expire worthless.

**Risks Related to the Post-Combination Company following the Proposed Transaction**

- If the proposed transaction's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of the Post-Combination Company's securities may decline.
- Investors will experience dilution as a result of the issuance of equity securities in the Post-Combination Company as consideration in the potential transaction and may experience dilution from additional sources in connection with and following the proposed transaction, including upon exercise of certain equity securities of the Post-Combination Company.
- The Post-Combination Company's management team will have limited experience managing a public company.
- The Company and Quadro expect to incur significant transaction costs in connection with the proposed transaction. Whether or not the proposed transaction is completed, the incurrence of these costs will reduce the amount of cash available to be used for other corporate purposes by the Post-Combination Company.
- The requirements of being a public company may strain the Post-Combination Company's resources and distract its management, which could make it difficult to manage its business.
- Following the proposed transaction, the Post-Combination Company will be a holding company and will depend on the cash flows from its subsidiaries to pay dividends.
- The Pre-Transaction Companies have identified material weaknesses in its internal control over financial reporting. If The Pre-Transaction Companies and the Post-Combination Company are unable to remediate these material weaknesses or identify additional material weaknesses, it could lead to errors in the Post-Combination Company's financial reporting, which could adversely affect the Post-Combination Company's business and the market of the Post-Combination securities.
- If the Post-Combination Company fails to comply or lacks the appropriate internal controls, it could be subject to sanctions or investigations by the Commission or other regulatory authorities.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 50 of 508

# Selected Risk Factors

**Risks Related to the Post-Combination Company Following the Proposed Transaction**

- If the proposed transaction's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of the Post-Combination Company's securities may decline.

- Investors will experience dilution as a result of the issuance of equity securities in the Post-Combination Company as consideration in the potential transaction and may experience dilution from additional sources in connection with and following the proposed transaction, including upon exercise of certain equity securities of the Post-Combination Company

- The Post-Combination Company's management team will have limited experience managing a public company.

- The Company and Quadro expect to incur significant transaction costs in connection with the proposed transaction. Whether or not the proposed transaction is completed, the incurrence of these costs will reduce the amount of cash available to be used for other corporate purposes by the Post-Combination Company.

- The requirements of being a public company may strain the Post-Combination Company's resources and distract its management, which could make it difficult to manage its business.

- Following the proposed transaction, the Post-Combination Company will be a holding company and will depend on the cash flows from the subsidiaries to pay dividends. Risk already included above in "Risk Related to the Company's Business and Industry."

- The Pre-Transaction Companies have identified material weaknesses in its internal control over financial reporting. If The Pre-Transaction Companies and the Post-Combination Company are unable to remediate these material weaknesses or identify additional material weaknesses, it could lead to errors in the Post-Combination Company's financial reporting, which could adversely affect the Post-Combination Company's business and the market of the Post-Combination securities.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 51 of 508

# Appendix

Pre-Transaction Group



Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 52 of 508

# The Pre-Transaction Companies

| Company | Industry | Key Target Markets | Revenues, 2023, $M | Adj. EBITDA, 2023, $M |
|---|---|---|---|---|
| Southern Hobby Distribution – Part of Beckett Group http://www.southernhobby.com/ | Collectibles Distribution | USA | 535.1 | 54.1 |
| Damovo http://www.damovo.com/ | Business Software Solutions | Germany, EU | 166.9 | 16.8 |
| HPC Specialty Infusion https://www.hpcinfusion.com | Specialty Pharmacy | USA | 105.3 | 5.8 |
| Clanwilliam Group https://www.clanwilliam.com | Healthcare Software | Ireland, UK, EU, APAC | 102.1 | 36.3 |
| Home Medical Equipment Specialists https://hmespecialists.com | Medical Equipment | USA | 90.8 | 8.8 |
| Beckett Collectibles – Part of Beckett Group https://www.beckett.com | Collectibles Platform | USA | 48.4 | 6.4 |
| Arcane Tinmen – Part of Beckett Group https://www.arcanetinmen.com | Gaming Accessories | Denmark, EU | 46.7 | 14.3 |









Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 53 of 508

# Financial Summary

| USD | 2019A | 2020A | 2021A | 2022A | 2023E |
|---|---|---|---|---|---|
| **Revenue** | **473,388,060** | **488,898,292** | **760,281,143** | **1,053,824,896** | **1,095,383,757** |
| COGS | 269,578,157 | 258,914,938 | 452,539,497 | 706,048,060 | 740,273,185 |
| SG&A | 178,289,629 | 191,784,353 | 214,368,709 | 262,086,223 | 267,514,955 |
| Other Income/Expense | 3,095,859 | 14,374,672 | -5,066,290 | -2,807,857 | -3,880,985 |
| **EBIT** | **22,424,416** | **23,824,329** | **98,439,227** | **88,498,470** | **91,476,603** |
| *EBIT Margin* | *4.7%* | *4.9%* | *12.9%* | *8.4%* | *8.4%* |
| | | | | | |
| D&A | 30,381,023 | 31,808,489 | 33,817,757 | 33,712,083 | 31,631,922 |
| **EBITDA** | **52,805,438** | **55,632,819** | **132,256,984** | **122,210,552** | **123,108,525** |
| *EBITDA Margin* | *11.2%* | *11.4%* | *17.4%* | *11.6%* | *11.2%* |
| | | | | | |
| Addbacks/Adjustments | 10,032,972 | 22,614,667 | 40,075 | 17,298,925 | 19,310,466 |
| **Adj. EBITDA** | **62,838,410** | **78,247,486** | **$132,297,060** | **139,509,477** | **142,418,991** |
| *Adj. EBITDA Margin* | *13.3%* | *16.0%* | *16.5%* | *13.2%* | *13.0%* |

Global Growth | Quadro Acquisition One Corp.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 54 of 508

# Appendix

Pre-Transaction Companies

 

49

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 55 of 508

# Origins Of The Group: Global Growth Holdings, GGHI

https://www.globalgrowth.com

## Overview

**Background:** Global private investment firm with investments in healthcare technology, financial services, collectibles, alternative assets, and communications. The portfolio of assets is independently valued at more than $5 billion. Recently, the holding has rebuilt its products in the healthcare space and expanded from healthcare media into healthcare accreditation and technology, collectibles pricing and authentication, and business software and financial services.

**History:** Eli Research, Global Growth's predecessor, began in 1991 with a folding table and a $5,000 investment from the parents of GGHI's founder, Greg Lindberg. As a 21-year-old Yale college student, he read a medical newsletter and thought "I can do better." He soon published Eli's Home Care Week, which over time became a significant competitor in the medical media industry. By 1998, Eli Research had grown to 12 people working out of one room. The company published Home Care Week and Rehab Report and was preparing to launch Home Care Compliance Alert. That same year, cuts to home care funding from the Balanced Budget Act of 1997 hit the company hard, forcing the company to let go of quality team members, worry about meeting payroll, and work with vendors to pay its printing bills. While painful, those challenges helped Eli Research grow up. By 2020, the company had renamed itself Global Growth and built a portfolio of investments that included more than 120 companies and over 6,800 employees. Today, Global Growth's team of world-class investment professionals steward a portfolio of assets valued at more than $5 billion. GGHI pursues a buy-and-hold strategy of investment that prioritizes long-term value creation, conservative cash management, and constant innovation. GGHI's group of world-class and independent CEOs are a testament to these investment ideals.

## Summary of Investments

- **Healthcare Technology Group** is a market leader in general practitioner software platforms, healthcare communication tools, and compliance and audit technology products that help healthcare professionals across the globe provide efficient and safe healthcare to patients. GGHI also invests in clinical practices, addiction treatment centers, and ophthalmology groups.

- **Financial Services Group** provides lenders, businesses, and consumers with revenue cycle management solutions, mortgage origination, refinancing and mortgage servicing, and financial analytics support.

- **Business Services Group** provides technology-enabled automation, security, and unified communication technologies to small and large enterprises, enabling them to stay ahead in a rapidly evolving digital world. GGHI supports customers across Europe, Africa, Asia, and North America.

- **Collectibles and Alternative Assets Group** includes market leaders in the gaming, collectibles and NFT spaces, allowing collectors to authenticate, value, and trade prized alternative assets. GGHI's investments include the North American leader in collectibles distribution, the most iconic American brand in sports card pricing and authentication, and a leading manufacturer of gaming accessories.

- **Communications Group** provides media, forecasting, and industry intelligence tools to small and large businesses. GGHI's general circulation print magazines include publications such as Atomic Ranch, Cottages and Bungalows, Diesel World, and Knives Illustrated, which offer unique content for enthusiast, residential, and business subscribers, as well as the original healthcare newsletters GGHI started in 1994.

# Damovo

https://www.damovo.com

**DAMOVO**

**Background.** International ICT service provider headquartered in Germany supports business customers across the world on their path to digitization. The company enables seamless connection across people, processes and systems - creating transparency and agility, whilst providing the network stability and security that customers require in today's business environment. Damovo delivers completely integrated solutions that continually improve business performance and end user experience. There are 1.9 million endpoints under Damovo's management. The number of customers exceeds 2,850. Customer churn is below 1%.

## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|------|------|------|------|------|------|
| Revenue | 147.1 | 179.6 | 197.7 | 171.2 | 167 |
| *Growth* | | *22.1%* | *10.1%* | *-13.4%* | *-2.5%* |
| Adj. EBITDA | 10.6 | 17.3 | 24.1 | 19.9 | 16.8 |
| *Growth* | | *62.8%* | *39.0%* | *-17.4%* | *-15.7* |

**\*** EBITDA accounts impact of FX fluctuation

## Company Overview

| | |
|---|---|
| Headquartered | **Germany** |
| Total Staff | **650+ FTEs and 2,500 contingent workers** |
| Countries operated | **16 countries in Europe, Americas and APAC with support in 150 countries** |
| Recurring revenue | **c.60%** |

## Management



**Jeff McFarlane, CEO**
30 years of industry experience across global Enterprise IT solutions, Infrastructure-as-a-Service and leasing. Graduate of University of Toronto.



**Ralf Jödicke, CFO**
20 years of finance experience, most notably as a partner at KPMG and Deloitte. Graduate of Ruhr University Bochum

## Key Products

- Unified Communications & Collaboration
- Enterprise Networks
- Contact Centre
- Security
- Cloud Services
- Global Managed Services

## Industry Overview

- UCC market in US was $14.3 Billion in 2020. It is expected to grow by 13% and reach $23.1 Billion by 2025.
- UCC market in Europe was $19.8 Billion in 2020. It is expected to grow by 12% and reach $35.1 Billion by 2025.
- Main growth drivers are – Remote working, Enterprise adoption, Cloud migration and People focus.

Global Growth | Quadro Acquisition One Corp.

51

# HPC Specialty Infusion
https://www.hpcinfusion.com

**Background.** HPC Specialty Infusion, formerly known as Hemophilia Preferred Care, is a specialty infusion pharmacy with expertise in serving Immune Globulin and Bleeding Disorders patients in the home setting. The company empowers patients with independence, knowledge and the ability to achieve the highest quality of life by providing professional and compassionate care with education and community support. HPC has a Comprehensive System of Care for Individuals Experiencing Chronic Medical Con

## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 115.2 | 85.8 | 81.9 | 92.1 | 105.3 |
| *Growth* | | *-25.6%* | *-4.5%* | *12.5%* | *14.4* |
| Adj. EBITDA | 3.5 | 4.7 | 4.8 | 4.9 | 5.8 |
| *Growth* | | *35.0%* | *0.5%* | *3.2%* | *18.8%* |

## Company Overview

| | |
|---|---|
| Year founded | **2002** |
| Year acquired | **2018** |
| Total Staff | **+65** |
| Headquartered | **Alabama, US** |
| Countries operated | **US** |

## Management



**Michael Pereira, CEO**
Over 20 years of experience in healthcare and Technology. Chairman at HME Specialists. Graduate of Fordham University School of Law and University of Pennsylvania.



**Nickolas Shoemaker, CFO**
20 years of experience in accounting and finance. Former CFO in hospitals topping $1billion in gross revenues. Graduate of Colorado State University. IWU National & Global and Indiana Institute of Technology

## Key Products

- Oral and retail branded generics by Amerisource Bergen
- IG and Factor by ASD Healthcare
- IG and Factor by BioCare
- Eloctate and Alprolix by Genzyme
- IG and Factor along with medical supplies by McKesson
- Factor product by Shire
- Hemlibra by Genentech
- Rental pumps by Adepto Medical

## Industry Overview

- Annual revenue generated by infusion services market expected to grow by $37 billion from 2019-2023.
- Hemophilia market was around $9.8 Billion in 2019. It is expected to grow up to $14 Billion by 2025 which would CAGR of around 5%.
- Growth drivers of this industry are – Aging population, Infusion drug Medicare eligibility, FDA approval growth of Biologics and Infusion Drugs are 55% of Pharma Pipeline.

# Clanwilliam Group



**Background.** With more than 25 years on the market, Clanwilliam is a global healthcare technology group with the mission to remove the care delivery challenges faced by clinicians in Ireland and technology designed specifically for healthcare professionals. Today, 25+ core products and services empower over 1.5 million healthcare professionals worldwide from pharmacy to GP systems, hospitals to aged care, analytics to messaging platforms. Clanwilliam supports Irish Defense Forces, the NHS, the HSE, Medicare, the Australian Antarctic Division Polar Medicine Unit, Exeter University, Cancer Research UK and the Royal Flying Doctor Service of Australia etc.

## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 94.5 | 91.1 | 104.8 | 95.9 | 102.1 |
| *Growth* | | -3.6 | 15.0% | -8.4% | 6.4% |
| Adj. EBITDA* | 25.2 | 29.4 | 33.8 | 31.2 | 36.3 |
| *Growth* | | 16.6% | 15.2% | -7.9% | 16.5% |

**\*** EBITDA accounts impact of FX fluctuation

## Company Overview

| | |
|---|---|
| Year founded | **1996 (2014 – merger, Helix Health & Socrates)** |
| Total Staff | **+1,000 FTEs** |
| Headquartered | **Ireland** |
| Countries Operated | **20+, incl. UK, Ireland, Australia** |
| Recurring revenue | **75%** |

## Management



**Howard Beggs, Founder and CEO**
Irish entrepreneur and investor. With a background in technology, Beggs founded the original company, Medicom, in 1996. Graduate of Stanford University Graduate School of Business and University College Dublin.



**Gerry Hunt, CFO**
6 years of experience with Clanwilliam. Former Partner at CSI Chartered Accountants and Head of Strategy and Finance at National Irish Bank. Graduate of University College Dublin.

## Key Products

The services include Virtual Clinics, Practice Management Platform, Outsourced Transcription, Population Health Management, Theatre Management Systems, Data Analytics, Clinical Coding Software, Digital Dictation, Secure Healthcare Messaging, Integration Solutions, Medical Education & Communications, Aged-Care Management Systems, Pharmacy Management Systems, Voice Recognition Software and other

- CW Health is a provider of Electronic Medical Records and Revenue Management software
- Obsidian is a UK and European medcomms agency working with pharma leaders like Gilead, Amgen, Roche etc.

## Industry Overview

- Total Global Healthcare IT market was at $115Bn at end of 2016. It is expected to grow by CAGR of 16% and reach $365Bn by end of 2024 with this rate.
- It is driven by digitization, the need for data security and government support for efficiencies.
- Among the key target markets, UK is anticipated to grow fastest, driven by government initiatives around NHS Digital, and in particular the push by new regional bodies, e.g., LHCREs to improve interoperability of systems and build a single read-write patient view.

Case 3:23-cr-00048-MOC-DCK　　Document 132-2　　Filed 05/04/26　　Page 59 of 508

# Home Medical Equipment Specialists

https://hmespecialists.com

**Background.** Delivers equipment and services for medical independence – from crutches to complex wheelchairs, nutritional services to wound care and from oxygen and sleep therapy to infusion pharmacy services. Cares for children and adults of all ages in communities throughout New Mexico and West Texas from its 13 store front locations.
Contracted with 300 local and national health plans. Numerous partnerships with non-profit organizations.



## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 74.5 | 80.4 | 84.3 | 87.8 | 90.8 |
| *Growth* | | *8.0%* | *4.8%* | *4.2%* | *3.4%* |
| Adj. EBITDA | 10.1 | 5.6 | 12.0 | 9.7 | 8.8 |
| *Growth* | | *-44.6%* | *114.0%* | *-19.2%* | *-9.1%* |

## Company Overview

| | |
|---|---|
| Year founded | **2001** |
| Locations | **14 (+150 Consignment Closet locations), all leased** |
| Total Staff | **434** |
| Headquartered | **New Mexico, US** |
| Countries Operated | **US** |

## Management



**Michael Pereira, Chairman**
Over 20 years of experience in healthcare and Technology. CEO at HPC Specialty Infusion. Graduate of Fordham University School of Law and University of Pennsylvania.



**Eric De Garceau, CFO**
Over 25 years of experience, most notably with Apria Healthcare and Molina Healthcare. Graduate of USC Marshall School of Business and UC Santa Barbara.

## Key Products

- Home Oxygen Therapy – traditional oxygen concentrators, home filling devices, portable oxygen concentrators, conserving devices, oxygen cylinders, ventilator management services and alike
- Supply Program – for patients with respiratory, gastrointestinal, urological, incontinence and wound related conditions. Includes catheters, drainage bags, trays, syringes, disposables, etc.
- Other products - Home Infusion Therapy, Breast Pumps, Non-Invasive Ventilation, Specialty Mobility and Seating, Incontinence & Urology, Sleep Therapy, Enteral Nutrition, Wound Care, Long-Term Care and Hospice, Rehab etc.

## Industry Overview

- Home Medical Equipment Market revenue size was valued at USD 11.5 Billion in 2019 and is projected to reach USD 20.4 Billion by 2027, growing at a CAGR of 7.4% from 2019 to 2027.
- Chronic condition population was around 133 Million in 2005 and is projected to reach 171 Million by 2030.
- Aging population is one of the reason of increasing demand of home medical equipment.

Case 3:23-cr-00048-MOC-DCK　　　Document 132-2　　　Filed 05/04/26　　　Page 60 of 508

# Beckett Collectibles – Part of Beckett Group

https://www.beckett.com

**Background.** Original collectibles platform for pricing, analysis, grading, and authentication for collectors and investors. Beckett's data-driven offerings pair physical collectibles with innovative products in digital collectibles. The Beckett family of companies also includes Southern Hobby, the leader in sports cards, gaming products, supplies, pop culture & entertainment merchandise; CBCS, a premier grading and authentication platform for comics; and Arcane Tinmen, specializing in fabricating premier-level gaming accessories.

## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 26.0 | 35.6 | 56.5 | 56.2 | 48.3 |
| Growth | | 36.8% | 58.9% | -0.6% | -13.9% |
| Adj. EBITDA | 8.2 | 15.9 | 29.3 | 14.2 | 6.4 |
| Growth | | 94.1% | 84.1% | -51.6% | -54.6% |

## Company Overview

| | |
|---|---|
| Year founded | **1980** |
| Total Subscribers | **+20,000** |
| Total Staff | **+225 FTEs** |
| Headquartered | **Texas, US** |
| Countries Operated | **US** |

## Management



**Kevin Isaacson, CEO, Beckett Group**
CEO and Executive Officer of Beckett Group, Southern Hobby, Eye Care Leaders, and Entrust Global Group. Publisher and columnist. BA from University of Wisconsin Oshkosh.



**Erik Bordwell, CFO of Beckett Collectibles**
13 years of experience in collectibles industry. Sr. Director, Richmond American Homes. CPA. University of Denver.

## Key Products

- Pricing data. Beckett provides the most comprehensive pricing data in collectibles with 425 million card transaction datapoints over 40 years
- Grading & Authentication. Beckett brings value and credibility to cards and comics based on rigorous assessment criteria, and also verifies authenticity of autographs, signatures, cards and comics. Grading by Beckett adds 125% more value than grading by major competitors. Overall, over 15 million cards were graded by Beckett over its history.

## Industry Overview

- Total Collectible market was at $378Bn at end of 2021. It is expected to grow by CAGR of 7% and reach $529Bn by end of 2027.
- Total Sports cards was at $29Bn at end of 2021. It is expected to grow by CAGR of 23% and reach $99Bn by end of 2027.
- Reason of this growth rate is social media presence, renewed interest in the hobby and influencer engagement.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 61 of 508

# Arcane Tinmen – Part of Beckett Group

https://www.arcanetinmen.com

**Background.** Founded in 1999, Arcane Tinmen (AT) is the leading manufacturer of high-quality gaming accessories. Specialized in physical and digital gaming & collector accessories represented by AT's three brands: Dragon Shield, Board Game Sleeves, and Beckett Shield. The focus is on providing high quality. The presence is worldwide and taps into global communities of dedicated players and collectors, leveraging their experience through the products. The company values inclusion in AT's company as well as in the communities that have adopted AT's brands. For that reason, AT encourages continuous dialogue with the end users.



## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 16.1 | 16.4 | 28.9 | 35.7 | 46.7 |
| *Growth* | | *2.4%* | *75.9%* | *23.6%* | *30.7%* |
| Adj. EBITDA | 5.2 | 5.3 | 8.0 | 10.6 | 14.3 |
| *Growth* | | *2.6%* | *51.3%* | *31.6%* | *34.9%* |

## Company Overview

| | |
|---|---|
| Year founded | **1999** |
| Total Staff | **+70 FTEs** |
| Headquartered | **Denmark** |
| Countries Operated | **EU, US, Mexico, Japan, China** |
| Countries of availability | **30+** |

## Management



**Kevin Isaacson, CEO, Beckett Group**
CEO and Executive Officer of Beckett Group, Southern Hobby, Eye Care Leaders, and Entrust Global Group. Publisher and columnist. BA from University of Wisconsin Oshkosh.



**Michael Andersen, CEO at Arcane Tinmen**
8 years of experience with Arcane Tinmen. Graduate of Militæret Skive kaserne and Silkeborg handelsskole (HHX).

## Key Products

- Dragon Shield is the most trusted card protection brand in trading and gaming card sleeves, boxes, and other protective accessories, with unique customization capability. The brand is available in 30+ countries. Over 300 million sleeves are sold annually. Over 10-15% price premium to the nearest competitor
- Beckett Shield is a brand in protection and storage line for sports cards collections
- Board Game Sleeves is protection and preservation sleeves for all genres of board games

## Industry Overview

- Board Games Market size was valued at USD 13.33 Billion in 2021 and is projected to reach USD 37.82 Billion by 2030, growing at a CAGR of 12.29% from 2021 to 2030.
- The growing customer base and interest for board games around the world is led by e-commerce expansion and is one of the major driving factors for the board games industry.
- The growing emphasis on fostering unity through traditional tabletop games is a significant growth driver for the industry, as these games play a vital role in bringing people together.

# Southern Hobby Distribution – Part of Beckett Group

https://www.southernhobby.com



**Background.** One-stop shopping experience for all customers' needs in Sports Cards, Gaming Products, Supplies, and Pop Culture and Entertainment Merchandise. Teamed with industry leading manufacturers to bring in-store programs and organized play to consumers. Nearly 70% of hobby shops in the US listed Southern Hobby as their #1 preferred distributor. Southern Hobby is #1 distributor in the US by share of market.

## Financials, $million

| Year | 2019 | 2020 | 2021* | 2022 | 2023 |
|------|------|------|-------|------|------|
| Revenue | | | 206.1 | 514.9 | 535.1 |
| Growth | | | | | 63.9% |
| Adj. EBITDA | | | 20.3 | 49.1 | 54.0 |
| Growth | | | | | 10.0% |

## Company Overview

| | |
|------|------|
| Year founded | **1991** |
| Warehouses | **5** |
| Total Staff | **+60** |
| Headquartered | **Tennessee, US** |
| Countries operated | **US** |

## Management



**Kevin Isaacson, CEO, Beckett Group**
CEO and Executive Officer of Beckett Group, Southern Hobby, Eye Care Leaders, and Entrust Global Group. Publisher and columnist. BA from University of Wisconsin Oshkosh.



**Erik Bordwell, CFO of Beckett Collectibles**
13 years of experience in collectibles industry. Sr. Director, Richmond American Homes. CPA. University of Denver.

- Acquired in July'21

## Key Products

- Sport cards, collectible card games, supplies, toys, board games
- Customers are mainly regional/local independent retailers that operate hobby shop storefronts and robust ecommerce channels
- Key suppliers in Collectible Card Games are Magic the Gathering, Pokémon, Yu-Gi-Oh!, and Flesh Blood, in Sports Cards are Panini, Tops, Upper Deck, Leaf and Tristar, and in Supplies are Arcane Tinmen, Ultra Pro and Ultimate Guard. Only hobby distributor that has mass retail capabilities

## Industry Overview

- US Collectible distribution market was around $1.7 Billion in 2021. Southern Hobby captures around $410 Million market which is approximately 24% of total market.
- There are total 8500 hobby stores in the US and Southern Hobby has presence in around 2900 stores.
- European Collectible distribution market was estimated around $350 Million in 2022. Southern Hobby is expecting $75 Million potential opportunity in this European market in coming years.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 63 of 508

# Exhibit I4

# Quadro Comparables —

*Yahoo Finance*

| Company | Jan-24 | Apr-26 |
|---|---|---|
| Addtech | 26.40x | 31.46x |
| Indutrade | 25.10x | 21.31x |
| Lifco | 21.00x | 21.47x |
| Diploma | 23.90x | 26.66x |
| Beijer/ALMA | 14.30x | 20.51x |
| Average | 22.14x | 24.28x |

# Exhibit J



# Project Triangle
## Confidential Information Memorandum

November 2018

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 67 of 508

# Disclaimer

This Confidential Information Memorandum (this "Memorandum") is based on information provided by Global Bankers Insurance Group, LLC and its relevant insurance affiliates ("Global Bankers" or the "Company"). It is being delivered by the Company subject to the prior execution of a Confidentiality Agreement and/or on the condition that is it held in strict confidence by each recipient, to a limited number of parties who may be interested in a transaction with the Company. The sole purpose of this Memorandum is to assist the recipient in deciding whether to proceed with a further investigation of the Company. This Memorandum does not purport to be all-inclusive or to necessarily contain all the information that a prospective purchaser may desire in investigating the Company.

By accepting this Memorandum, the recipient agrees to keep permanently confidential the information contained herein and made available in connection with any further investigation of the Company and to cause all of the recipient's directors, officers, employees, and advisors who have received such information to keep it permanently confidential. The recipient should become familiar with this and other obligations which the recipient may be subject to pursuant to any Confidentiality Agreement. This Memorandum may not be photocopied, reproduced, or distributed to others, except for the recipient's directors, officers, employees, and advisors who have a need to know, at any time, without the prior written consent of the Company. Upon request, the recipient will promptly return or certify the destruction of all material received from the Company (including this Memorandum) without retaining any copies thereof, all in accordance with the terms of any applicable Confidentiality Agreement.

This Memorandum has been prepared for informational purposes relating to this transaction only and upon the express understanding that it will be used for only the purposes set for above. Neither the Company nor any of its respective affiliates or its or their respective officers, directors, employees, or agents makes any express or implied representation or warranty as to (i) the achievement or reasonableness of future projections, management targets, estimates, prospects, or returns contained in this Memorandum, if any, or (ii) the accuracy or completeness of the information contained herein or any other oral or written information made available in connection with any further investigation of the Company. Each the Company and its respective affiliates, or its or their respective officers, directors, employees or agents expressly disclaims any and all liability or obligation which may be based on or related to such information, errors therein, or omissions therefrom.

This Memorandum: (i) is not an offer or invitation by the Company to purchase or sell securities or assets, whether in relation to this transaction or otherwise nor any form of commitment or recommendation by the Company; (ii) will not, nor will any other oral or written information made available to a prospective purchaser , other than a definitive and binding transaction agreement, form the basis of any contractual or other agreement in relation to this transaction; and (iii) does not contain all the information that a prospective purchaser may wish to have in determining whether to enter into the transaction. The Company will only accept obligations in relation to the transaction that arise out of a definitive and binding transaction agreement. Furthermore, the recipient shall be entitled to rely solely on the representations and warranties made to it by the Company in any definitive transaction agreement, when, as and if it is executed and subject to such limitations and restrictions as may be specified in such definitive agreement.

In furnishing this Memorandum, the Company does not undertake any obligation to provide the recipient with access to any additional information, or to correct or update any inaccuracies which may become apparent or information in this Memorandum. The provisions of this Memorandum does not place the Company under any obligation to consider or accept any offer, irrespective of whether such offer is the only offer or one of a number of offers representing the highest price. This Memorandum shall not be deemed an indication of the state of affairs of the Company, nor shall it constitute an indication that there has been no change to the business or affairs of the Company since the date hereof.

The Company reserves the right, at any time, to (i) terminate the solicitation of indications of interests for a transaction with the Company or the further participation in the investigation and proposal process by any party, (ii) negotiate with one or more interested parties and enter into a definitive agreement with any such party without prior notice to the recipient or any other parties, or (iii) modify any procedures related to such process without assigning any reason therefore. The Company reserves the right, at any time, to take any action with respect to the Company or its business, whether in or out of the ordinary course of business, including, but not limited to, the sale of any property or assets. In no circumstances will the Company or its respective affiliates or any of its or their respective officers, directors, employees, or agents be responsible for any costs or expenses incurred in connection with any investigation of the Company or for any other costs and expenses incurred by interested parties in connection with any possible transaction with the Company.



# Table of Contents

| Section | Page |
| --- | --- |
| 1. Executive Summary | 4 |
| 2. Business Overview: | |
| A. U.S. New Business | 18 |
| B. U.S. In Force & Runoff | 42 |
| C. Europe | 50 |
| 3. Financials | 57 |
| 4. Appraisal | 60 |
| 5. Appendices | 65 |



Confidential Information

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 69 of 508



![Global Bankers logo]

# SECTION 1:
# EXECUTIVE SUMMARY

# Global Bankers – At a Glance



### Business Overview

- Global Bankers Insurance Group represents a group of life and annuity insurance and reinsurance companies based out of:
  - The United States
  - Western Europe
  - Bermuda & Barbados[3]

- Pro forma for signed transactions, Global Bankers has $17.8 billion in assets and $1.5 billion in total capital

- Global Bankers is wholly-owned by Greg Lindberg whose first insurance acquisition of Southland National took place in August 2014

- The Global Bankers brand and new management team launched in September 2016

- Since then, a world-class team of insurance professionals and scalable infrastructure have helped drive significant growth

- Headquartered in Durham, North Carolina

## U.S. at a Glance[1]

| | | |
|---|---|---|
| **$4.7 Billion** | **$494 Million** | **100%** |
| **Total Assets** | **Total Adjusted Capital & Surplus** | **General Account Assets** |
| **>$1.3 Billion** | **195** | **2014** |
| **2018 YTD New Sales** | **Employees** | **Year Founded** |

## Overall at a Glance[2,3]

| | | |
|---|---|---|
| **$17.8 Billion** | **$1.5 Billion** | **584** |
| **Total Assets** | **Total Capital** | **Employees in 9 Countries** |



Confidential Information

(1) Pro forma 12/31/18 estimate. U.S. Capital & Surplus adjusted to include IMR and AVR. Includes intercompany preferred stock and common notes currently subject to reduction.
(2) Includes U.S., Europe and Offshore. Pro forma for European deals that are signed but not closed. Includes amounts not included in the transaction.
(3) As indicated later, includes entities not currently in scope of transaction.

5

# Global Bankers – Emerging Strategy

## Build / Grow
### 2016 – 2Q 2018

- Focus on M&A to add scale, first in the U.S. and then Europe and Bermuda
- Complete block and operating company acquisitions
- Build new insurance shared services platform and team in Durham, NC, including: actuarial, finance, investments, IT platforms, legal / compliance, reinsurance, and in force management
- Relocate CBLife business from Denver to Durham
- Identify and build out new policy administration system for new products and state-of-the-art digital platform
- Launch annuity product line serving financial institutions and independent agent distribution channels
- Grow organically through MYGA sales and expansion of product portfolio to include FIAs with hedging platform
- Thoughtfully integrate new entities - what, how and when

## Transition
### 3Q 2018 – 1Q 2019

- Close pending European acquisitions
- Respond to recent media events
- Pull back on large annuity momentum, run-rate in excess of $2.5B
- Refinance affiliated investments and remove from insurance co. balance sheets
- Transition investments to Goldman Sachs Asset Management
- Evaluate high level changes to worksite product portfolio (i.e. reduce number of products, automated UW, simplify commission structure)
- Explore strategic options given regulatory standstill / noise
- Retain employees and execute on change of control

## Post-Close
### 2Q 2019+

- Rebrand post close, re-establish regulatory relations with new owner, and start / accelerate distribution
- Enhance investment capabilities with new buyer
- Agree to pricing metrics and governance
- Optimize group capital usage and taxes by restructuring U.S. insurance holdings and establishing offshore reinsurance capabilities
- Continue dual approach of organic growth and M&A growth
- Exercise disciplined approach to M&A and reinsurance transactions
- Continue investment in robust IT platform
- Reprice life portfolio in 2019 under new actuarial guidelines (CSO / PBR) and align to digital processes
- Focus on internal processes, monthly reporting, controls and risk management buildout to be in a position to scale

**Continue to hire and develop the best talent that will support and enable our growth strategy**

| 2020 | Financial Success | | AUM<br>>$7 billion | | Expense Ratio<br>80bps | | Annuity Sales<br>1.8 billion | | Sales Mix<br>FIA >70% |
|---|---|---|---|---|---|---|---|---|---|
| | **Financial Success** |  | AUM<br>>$7 billion |  | Expense Ratio<br>80bps |  | Annuity Sales<br>1.8 billion |  | Sales Mix<br>FIA >70% |
| | **Non-financial Success** |  | Digital<br>100% |  | Rating<br>A- (A.M. Best) |  | Accretive<br>M&A / Blocks |  | Expanded<br>Distribution |



# Global Bankers – Overview

## U.S.

   

## Europe



**Pending**

## Offshore

   

---

**Global Bankers Insurance Group is the overarching brand and management company for our global insurance operations, with the following foundational goals:**

 **Hire and develop** the best talent

 **Create** shared service model leveraging efficiencies and consistency across:

- Actuarial
- Finance
- Investments
- IT Platforms
- Legal / Compliance
- Reinsurance
- In Force Management

 **M&A Growth**

 **Organic Growth** – via portfolio of insurance companies

- Manage by product lines for Annuities, Life, and Runoff
- Build end-to-end digital platform for optimal customer and agent experience
- Evaluate global branding initiative



# Global Bankers – Acquisition History

**Since 2014**, Global Bankers has **acquired 9** insurance companies and closed **6 reinsurance** transactions, with **2 more deals currently signed** and pending completion.

## 2014



**Southland National Insurance**
AUGUST

Life Reinsurance
DECEMBER

**$0.3B** Assets

## 2015



**Colorado Bankers Life Insurance®**
DECEMBER

**$0.6B** Assets

## 2016

**MOTHE**

**Mothe & DLE Life Insurance Companies**
MARCH

Annuity Reinsurance
DECEMBER

**BANKERS LIFE INSURANCE COMPANY**

**Bankers Life Insurance Company**
DECEMBER

Life Reinsurance
DECEMBER

**$1.3B** Assets

## 2017



**Conservatrix (Netherlands)**
MAY

Annuity Reinsurance
JUNE

**Private Bankers**

**Omnia Ltd. & PB Investment Holdings (Bermuda)**
JUNE

Annuity Reinsurance
AUGUST

**GB Life Luxembourg**
OCTOBER

Annuity Reinsurance
DECEMBER

**PAVONIA**

**Pavonia Holdings (US), Inc.**
DECEMBER

**$8.2B** Assets

## 2018



**Northstar Financial Services (Bermuda) Ltd.**
AUGUST

**(DEFINITIVE AGREEMENT)**

**Pramerica S.p.A**

**GNB Companhia de Seguros de Vida, S.A**

**$17.8B PF** Assets

**Global Bankers** INSURANCE GROUP

Confidential Information

# Global Bankers – PF Assets, Capital and Business Mix

## Pro Forma Assets, Capital and Business Mix

| U.S. ($M) | Assets[1] | Adj. C&S[1] |
|---|---|---|
| Colorado Bankers Life Insurance Company[2] | $2,785 | $222 |
| Southland National Insurance Corporation | 370 | 39 |
| Bankers Life Insurance Company | 414 | 35 |
| Pavonia Life Insurance Company of Michigan | 1,129 | 169 |
| Southland National Reinsurance Corporation | Incl. above | 30 |
| **Total U.S.** | **$4,728** | **$494** |

**Business Mix (% of Assets)**



- Life  - Fixed Annuity

| Europe (€M) | Assets[3] | SH Equity[3] |
|---|---|---|
| Conservatrix | €588 | €73 |
| GB Life Luxembourg S.A | 2,271 | 14 |
| **Total Europe** | **€2,859** | **€87** |
| Pramerica S.p.A[4] | 1,231 | 66 |
| GNB Vida[4] | 5,213 | 433 |
| **Total Europe incl. Pending** | **€9,302** | **€586** |

**Business Mix (% of Assets)**



- Life  - Guaranteed  - Unit-Linked

| Barbados ($M) | Assets | Capital[1] |
|---|---|---|
| Bankers Reinsurance Co. | Incl. above | $27 |
| **Total** | **$8,186** | **$625** |
| **Total incl. Pending** | **$15,918** | **$1,225** |

## Total incl. Pending Business Mix
### (% of Assets)



- Life Insurance
- Fixed Annuity / Guaranteed
- Unit-Linked

| Bermuda ($M) | Assets[5] | Capital[5] |
|---|---|---|
| Total Remaining Bermuda Entities | $1,870 | $271 |
| **Total incl. Pending and Bermuda** | **$17,788** | **$1,496** |





Confidential Information

(1) Pro forma 12/31/18 estimate.  U.S. Capital & Surplus adjusted to include IMR and AVR.  Includes intercompany preferred stock and surplus notes, as currently structured.
(2) Assumes $60 million 4Q '18 capital infusion and ~$200 million 4Q '18 sales.
(3) As of 6/30/18. 1.2x Euro/USD FX. Pramerica figures from S2 balance sheet.
(4) Pending Completion.
(5) Draft estimate as of 6/30/18.

9

# Appraisal – U.S. Insurance Group Summary

## High level process summary

- The Value of In-Force calculations use the liability projections from the CFT models (2017 or 09/30/18).

- The liability model assumptions are mostly aligned with 12/31/17 CFT. Differences are noted.

- The VIF investment income is projected assuming a 5% earned rate.

- The New Business models are pricing models and assumptions. The annuities are spread based so the earned rate is the credited rate plus the pricing spread.

## Appraisal Value – Group Level

| | Risk Discount Rate | | |
|---|---|---|---|
| ($ in millions) | 8% | 10% | 12% |
| Stat Surplus | $305 | $305 | $305 |
| *Plus* AVR | 15 | 15 | 15 |
| *Plus* IMR | 109 | 109 | 109 |
| *Less* DTA | (13) | (13) | (13) |
| Other Adjustments | (27) | (27) | (27) |
| **Adjusted Book Value** | **$390** | **$390** | **$390** |
| Value of In-force Before Taxes and Cost of Capital | 288 | 249 | 219 |
| Taxes | (38) | (32) | (28) |
| Cost of Capital | (51) | (69) | (84) |
| **Total VIF** | **$199** | **$147** | **$107** |
| Value of New Business | 234 | 103 | 9 |
| **Total Appraisal Value** | **$823** | **$641** | **$505** |

## Appraisal Value – Insurance Company Level

| | Global Bankers Insurance Group | | | | | | |
|---|---|---|---|---|---|---|---|
| ($ in millions) | CBL | Pavonia | SNIC | BLIC | SNRC | Other[1,2] | Total |
| Stat Surplus | $156 | $60 | $30 | $36 | $22 | - | $305 |
| *Plus* AVR | 6 | 4 | 3 | 2 | - | - | 15 |
| *Plus* IMR | 4 | 102 | 4 | 0 | - | - | 109 |
| *Less* DTA | (7) | (3) | (0) | (2) | - | - | (13) |
| Other Adjustments | - | 19 | - | - | (5) | (41) | (27) |
| **Adjusted Book Value** | **$159** | **$182** | **$36** | **$36** | **$18** | **($41)** | **$390** |
| **Value of In-Force** | | | | | | | |
| 8% | 229 | (5) | (17) | 14 | 13 | (34) | 199 |
| 10% | 195 | (19) | (18) | 11 | 7 | (29) | 147 |
| 12% | 167 | (28) | (18) | 9 | 2 | (25) | 107 |
| **Value of New Business** | | | | | | | |
| 8% | 234 | - | - | - | - | - | 234 |
| 10% | 103 | - | - | - | - | - | 103 |
| 12% | 9 | - | - | - | - | - | 9 |
| **Total Appraisal Value** | | | | | | | |
| 8% | 622 | 177 | 19 | 50 | 31 | (76) | 823 |
| 10% | 458 | 163 | 18 | 47 | 24 | (70) | 641 |
| 12% | 335 | 154 | 18 | 45 | 20 | (66) | 505 |

Note: the figures are based on version 2.2 of the appraisal distributed on November 2, 2018. Subsequent changes will be provided in the data room.

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 76 of 508

Confidential Information

(1) Adjusted book value of "Other" includes deduction of related stock investments in GBIG plus notes; however, this does not reflect a lower cost of capital. See pg. 67 for more detail.
(2) Value of in-force: "Other" includes expense overhang.

# Global Bankers – Team

## Our GBIG team has an average tenure of 25+ years in the insurance industry with leading insurance/reinsurance companies

**Lou Hensley**
Chief Executive Officer

27 Years Experience

| **Brian Stewart** Chief Financial Officer | **Tamre Edwards** Chief Legal Officer | **Mike Farley** Chief Actuary | **Joe Lurie** Chief Information Officer | **Paul Brown** Chief Investment Officer |
|---|---|---|---|---|
| 18 Years Experience | 18 Years Experience | 33 Years Experience | 37 Years Experience | 24 Years Experience |
| • Financial Reporting<br>• FP&A<br>• Capital Planning<br>• Legal Entity Structuring<br>• M&A<br>• Tax | • Legal<br>• Compliance<br>• Claims<br>• Regulatory matters<br>• Contracting/licensing<br>• M&A | • Appointed Actuary<br>• ERM<br>• Core Assumptions<br>• Product Pricing<br>• Reinsurance<br>• CFT/Asset Adequacy | • IT Infrastructure<br>• IT Security<br>• Admin Platforms<br>• Digital Technology<br>• Acquisition Integration<br>• Customer Connectivity | • Investments<br>• Cash Management<br>• M&A<br>• Reinsurance<br>• Capital Structuring and Planning |

| **Sandy Ball** Chief Human Resources Officer | **Jeff Levin** President–CBLife | **Chad Burns** SVP, Annuities | **Scott Boug** President–Offshore | **Matteo Castelvetri** Chief Executive Officer, Europe |
|---|---|---|---|---|
| 21 Years Experience | 25 Years Experience | 13 Years Experience | 37 Years Experience | 21 Years Experience |
| • HR<br>• Leadership Development<br>• Benefits<br>• Recruitment<br>• Training<br>• Facilities<br>• Marketing | • Sales Production<br>• Distribution Relationships<br>• Front-end Operations<br>• Strategy<br>• Product Design/Rollout | • Sales Production<br>• Distribution Relationships<br>• Strategy<br>• Product Design / Rollout | • Sales Production<br>• Distribution Relationships<br>• Front-end Operations<br>• Marketing<br>• Strategy<br>• Product Design/Rollout | • M&A<br>• Strategy<br>• Oversight of Portfolio Companies<br>• Reinsurance<br>• Capital Structuring and Planning |

## 584 employees globally…154 employees in Durham, NC headquarters(1)



Confidential Information

Note: Biographies in b2 appendix
1. Pro forma employee headcount as of 12/31/2018; includes European deals that are signed and not closed.

# Global Bankers – Milestones

## Corporate & People

**2014 August**
Acquired Southland National Ins. Co

**2014 December**
Completed reinsurance w/ N.C. Mutual

**2015 December**
Initiated nationwide TPA license

Acquired Colorado Bankers Life Ins. Co.

**2016 March**
Opened India office

Acquired Mothe & DLE Life Ins. Co.'s

**2016 September**
Hired Executive team (CEO, CFO, CIO, M&A, CA)

Officially announced closing of Denver and move to Durham

**2016 October**
New Global Bankers brand established

Acquired & began renovating 40,000sq ft. HQ

**2016 December**
Acquired Bankers Life Ins. Co.

**2017 March**
Hired CHRO

BLIC integrated into shared services model

**2017 May**
Acquired Conservatrix (Netherlands)

**2017 June**
New operations back office 100% functional in Durham

Acquired Omnia Ltd. & PB Inv. Holdings (Bermuda)

Merged Mothe / DLE into SNIC

**2017 July**
Hired SVP, Annuities

**2017 August**
Hired President, Life & Worksite

Customer service team in Philippines & Cebu live

**2017 September**
Completed move of associates from Denver to Durham

HQ grand opening & open house

**2017 October**
Revamped benefits and 401k offering

Acquired GBLife Luxembourg

**2017 December**
Acquired Pavonia Holdings (U.S.), Inc.

**2018 March**
Sponsored employee program for LOMA Life & Annuity certifications

**2018 April**
Focused approach to community sponsorship (Habitat for Humanity and Durham Elementary School)

**2018 May**
Designed internship program for 12 students with diverse cultural and educational backgrounds to promote insurance as a career

**2018 June**
Designed 6-month leadership development program, "Managing with Moxie"

**2018 July**
Completed Pavonia integration

**2018 September**
Promoted CEO of Europe

Hired Life Biz. Dev. Leader

**2018 October**
Consolidated SNIC & BLIC

Completed full renovation of GBIG HQ



Confidential Information

# Global Bankers – Milestones

## Technology & Infrastructure

**2016 December**
Chose Axis as platform for valuation and CFT analysis

Migrated investment accounting to Clearwater

**2017 February**
Completed migration to cloud and Office 365

**2017 May**
Converted BLIC valuation to Axis

Moved FAST policy admin system in production

**2017 October**
Launched Global Bankers intranet

**2017 December**
Implemented Oracle GL – GBIG, LLC

**2017 January**
Selected FAST as annuity policy administration system

**2017 April**
Migrated CBL infrastructure to co-location facility

Implemented Chrome River expense reporting

Implemented BoardVantage system

**2017 June**
Launched Life & Worksite eApp

**2017 November**
Launched Private Bankers website

Completed redesign of GBIG website

Launched MYGAs on FAST

**2018 January**
Implemented Oracle GL – CBLife / PFC

Completed redesign of CBLife website

**2018 February**
Launched annuity eApp

**2018 April**
Implemented Loan IQ

**2018 June**
Launched on DTCC

Launched AnnuityNet order entry platform

Launched on NFS

Instituted company wide cyber/phishing training

**2018 August**
Converted and consolidated CBL & BLIC valuation models

**2018 October**
Automated underwriting – Milliman Intelliscript

Implemented Oracle GL - SNIC

**2018 March**
Completed redesign of BLIC website

**2018 May**
Installed dual factor authentication and advanced threat protection

Implemented Foresight Illustration system

**2018 July**
Launched eDelivery for annuities

**2018 September**
Built FIA infrastructure (outsourced hedging program, ISDA, derivative database, & risk management platform)

Launched FIAs on FAST



Confidential Information

# Global Bankers – Milestones

## Products & Sales

**2017 October**
Signed master selling agreement with Citizens Securities, Inc. to offer CBLife Annuities

**2017 November**
Signed distribution agreement with Wealthvest marketing

Signed distribution agreement with Market Synergy Group

Launched MYGA product line in bank channel

Released Lifestyle Assurance in 15 additional states

**2018 January**
Launched IMO Channel

**2018 May**
Formed product approval committee process

Co-developed and priced FIA product with Oliver Wyman

**2018 June**
Implemented routine pricing process for annuity suite

**2018 August**
Signed Janus Henderson & Société Générale FIA partnership

**2018 September**
Internally developed and priced 3 new products for 2019

Crossed $1B sales threshold

Launched Wealthlock & Income Builder 7 (FIA)

Launched Wealthlock & Income Builder 10 (FIA)

**2018 October**
Signed distribution agreement with DPL Financial

Launched no-fee RIA MYGA

**2018 November**
Roll out Security Builder enhancements

**2019 January**
Launch MYGAs w/ market value adjustment

Launch 10 year FIA with MSG

**2019**
Launch FIA designed for RIAs

Launch SPIA / DIA

Develop laddered MYGA

Scope "structured VAs"

**2019 (Cont'd)**
Reprice life & worksite portfolio to align with new actuarial requirements (CSO and PBR)

Redesign worksite portfolio



Confidential Information

# Global Bankers – Strategic Advantages

Deliver simple and valuable products to propel growth.

Revolutionize legacy financial systems with an innovative, digital platform to fulfill needs instantaneously.

Leverage technology and relationships to be the obvious provider of high value products for consumers.

ORGANIC GROWTH

DIGITAL SOLUTIONS

DISTRIBUTION MODEL

INNOVATION

PASSION & FOCUS

AGILITY

PEOPLE MOXIE

UNIQUE BUSINESS PHILOSOPHY

Fuel a dynamic culture that encourages taking risks and learning from mistakes, ingrains accountability, and keeps communication open and transparent.

Value speed over perfection, innovate, and challenge the status quo.

Drive powerful growth by identifying and executing acquisition opportunities quickly.

STRATEGIC M&A GROWTH

LEVERAGE INVESTMENT PLATFORM

Enhance investment capabilities with new owner.



# Global Bankers – Investment Considerations

### 1   Attractive Industry Trends

- Favorable demographics with aging U.S. population projected to increase by 48% over the next 15+ years, which will continue to drive demand for protection, savings, and retirement income[1]
- Fixed index annuities represent an expanding market, growing at a CAGR of 10.5% since 2003

### 2   Well-Positioned For New Business Growth

- Strategic growth opportunities across multiple distribution channels with existing product portfolio
- Expanding product portfolio with consumer centric designs will increase market presence
- Opportunity to accelerate growth with A.M. Best ratings upgrade

### 3   Scalable Operating Platform

- Licensed in 49 states (excl. NY), D.C. and Puerto Rico
- Ability to manager several times the current capacity of additional of in-force, either through new business production or block acquisitions
- Robust, next generation technology platform delivering end-to-end digital new business and administration, and best in class systems for finance, actuarial, and compliance

### 4   Highly Experienced Management Team

- Highly capable and experienced management team with an average 25+ years of industry experience
- Strong entrepreneurial culture with a highly engaged and enthusiastic staff

### 5   Proven M&A and Reinsurance Capabilities

- Dedicated M&A and actuarial teams in the U.S. and internationally to cover opportunities across geographies
- Track record of structuring, pricing, and executing transactions in the U.S., Europe, and Bermuda
- Demonstrated ability to successfully integrate acquisitions into the Global Bankers business model



Confidential Information

(1) U.S. Census Bureau

16

# Transaction Overview

**Since inception of Global Bankers in 2016, Eli Global has committed the capital necessary to build a first-rate team, infrastructure, and new business capabilities, creating an industry leading insurance company.**

**Our strong growth profile has pushed Eli's insurance concentration beyond its desired limits, and as a result Eli has decided to divest its U.S. insurance operations.**

## ① U.S. Platform [1,2,3]

- Colorado Bankers Life Insurance Co.
- Bankers Life Insurance Co.
- Pavonia Life Insurance Co. of Michigan
- Southland National Life Insurance Corp.
- Southland National Reinsurance Corporation

- North Carolina DOI
- Michigan DIFS

- Assets = $4.7B
- Adj. Capital & Surplus = $494M

- Headcount = 315
- Office locations = 2

## Insurance Entities

## Regulatory Jurisdictions

## Assets & Capital

## Employees & Locations

## ② European Partnership [4,5]

- Conservatrix
- GBLife Luxembourg
- Bankers Reinsurance Co., Ltd.
- G.N.B Seguros Vida (Pending)
- Pramerica (Pending)

- DNB (Netherlands)
- CAA (Luxembourg)
- ASF (Portugal)
- IVASS (Italy)
- FSC (Barbados)

- Assets = $11.2B
- Shareholders' Equity = $704M

- Headcount = 250
- Office locations = 5

---

(1) Pro forma 12/31/18 estimate. U.S. Capital & Surplus adjusted to include IMR and AVR. Includes intercompany preferred stock and surplus notes, as currently structured.
(2) Assumes $80 million 4Q '18 capital infusion and $200 million 4Q '18 sales.
(3) Headcount includes dedicated resources in the Philippines and India.
(4) Pro forma for European deals that are signed but not yet closed.
(5) As of 6/30/18. 1.2x Euro/USD FX. Pramerica figures from S2 balance sheet.



Confidential Information

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 83 of 508

17



# SECTION 2A:
# U.S. NEW BUSINESS

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 84 of 508

# U.S. - Operations Overview[1]

## Colorado Bankers Life Insurance Co.

- U.S. flagship company
- Historically Life/Worksite products
- Expanded into annuities and financial institution channel in 2017
- Moved operations to NC in 2017

**$2.8B** Assets

**2015** Acquired by GBIG

## Bankers Life Insurance Company

- Primarily sold SPDA products through independent agencies
- In runoff as of 10/1/18
- Transitioning operations from FL to NC

**$0.4B** Assets

**2016** Acquired by GBIG

## Pavonia Life Insurance Co. of MI - Basking Ridge, NJ

- Run-off portfolio - primarily credit, term, payout annuities

**$1.1B** Assets

**31** Employees

**2017** Acquired by GBIG

## Global Bankers Insurance Group - Durham, NC

- U.S. headquarters for Global Bankers Insurance Group
- Provides shared services across operating insurance companies

**154** Employees[2]

## Southland National Insurance Corp

- Run-off portfolio - primarily preneed
- Moving legacy LA operations to NJ office

**$0.4B** Assets

**2014** Acquired by GBIG

Confidential Information

(1) Approximately as of 12/31/18
(2) Pro forma 12/31/18 estimate does not include 10 remote employees.

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 85 of 508

# CBLife – Flagship New Business Platform



**B++** A.M. Best rating[1]



**49** States licensed for life, annuity and A&H*

*Excluding New York. Also licensed in District of Columbia and Puerto Rico.



**Competitive, Customer-Centric Annuity Products**

- MYGA and FIA
- Strong distribution partners in bank and IMO channels
- Developing end-to-end digital platform



**Unique Combination Life & Worksite Products**

- Whole life insurance with annuity rider
- Term life insurance with critical illness rider
- A&H products that complement life insurance offerings
- Target middle-income market through independent agency distribution

## CBLife Strategic Focus



**Efficiency**

- Scalable platform to enable low cost administration of new business and management of in force
- Simple, repeatable, and automated business processes

+



**Customer Value**

- Simple & transparent products
- Lower sales commissions

+



**Innovation**

- Digital, simple, and personalized
- Instant delivery
- Developing industry-leading customer & agent technology

## Our Advantage

- Modern and agile systems
- Speed-to-market capabilities
- Investment platform
- Distribution agnostic
- Entrepreneurial mindset
- People "Moxie"



# New Business
## *Annuity Product Line*

Confidential Information

21

# Growing Market Opportunity

## Retirement Population Growth[1]
### U.S. Population Age 65+

| 2016 | | 2035 |
|------|---|------|
| 49.2M | | 78.0M |
| 15.2% | **%** of total U.S. population | 21.4% |

## Total Annuity Sales[2,3]
### ($ billions)

Total · Fixed Annuity · Variable Annuity

| Year | Total | Fixed Annuity | Variable Annuity |
|------|-------|---------------|------------------|
| 2008 | $265 | | |
| 2009 | $239 | | |
| 2010 | $222 | | |
| 2011 | $238 | | |
| 2012 | $220 | | |
| 2013 | $230 | | |
| 2014 | $237 | | |
| 2015 | $236 | | |
| 2016 | $222 | | |
| 2017 | $204 | | |
| 2018E | $223 | $122 | $101 |

- Significant growth in retirement population is expected to occur over the next 15+ years
- Only 25% of Baby Boomers are confident that their savings will last throughout their retirement
- Monthly guaranteed income is the most important single feature Boomers look for in a retirement investment
- Fixed annuity sales overtook variable annuity sales for the first time during 2016
- Fixed annuity sales have outperformed variable annuity sales in eight of the last nine quarters
- FIAs are an expanding market with room to grow as retirement income becomes an increasing focus



Confidential Information

(1) U.S. Census Bureau.
(2) LIMRA Secure Retirement Institute, U.S. Individual Annuities Survey.
(3) 2018E reflects annualized sales through 6/30/2018. YTD 6/30/18 actual sales are $61B and $50B for fixed and variable annuities, respectively.

Case 3:23-cr-00048-MOC-DCK Document 132-2 Filed 05/04/26 Page 88 of 508

22

# Attractive Fixed Annuity Sales Trends

## Multi-Year Guaranteed Annuity Sales[1, 2]

($ billions)



| | | | |
|---|---|---|---|
| 18 | 27 | 26 | 36 |
| 2015 | 2016 | 2017 | 2018E |

## CBLife - by the Numbers (YTD) [3]

| **#8** | **#6** | **#2** |
|---|---|---|
| MYGA Sales | Bank Sales | IMO Sales |

### Strategic benefits for FIA launch

- ✓ Credibility
- ✓ Scale
- ✓ Access to agents

## Fixed Indexed Annuity Sales[1,2]

($ billions)

| | | | |
|---|---|---|---|
| 53 | 58 | 54 | 63 |
| 2015 | 2016 | 2017 | 2018E |

### Capitalize on strong FIA trends to drive organic growth and diversify product mix

- Historically sold by independent agents, representing 56% of total FIA sales in 2017

- Banks & BDs have shown increasing market share over past few years, up from 20% in 2014 to 30% in 2017

- 2Q 2018 was a record-setting quarter for FIA sales, topping the prior 4Q 2015 record by 11.4%



Confidential Information

(1) Sales Data from Wink
(2) 2018E reflects annualized sales through 6/30/2018.
(3) YTD as of 6/30/2018; Rankings from Wink Quarterly Sales Report

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 89 of 508

23

# FIA Competitive Landscape

## Top 10 FIA Providers (YTD 6/30/2018 ) [1,2]

($ billions)



- Competing with well-established FIA providers with "A" ratings

- Crowded market requires pricing discipline to develop products that align with competitive advantages

- Emphasis on simple, well understood design that delivers high consumer value

- Recently launched first FIA - balanced product with competitive accumulation and income rider features, a first for the FIA space

  - Attractive rates through simple design and strong distribution relationship

- Anticipate launching additional FIA targeting the accumulation segment of the independent channel

Global Bankers INSURANCE GROUP
Confidential Information

(1) Sales data from Wink
(2) Excludes Direct Response

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 90 of 508

# CBLife – Positioned as a Multi-channel Distributor

## CBLife has quickly built a high-quality, multi-channel distribution network


Bank[1]
**54%**


IMO[1]
**46%**


RIA[2]
**--%**

**+14**



Master selling agreements signed

**+4,700**



New appointed agents & subgroups

**100%**
Electronic applications starting 10/1/2018



## Strong execution of distribution strategy

- Integrate deeply with each partner

- Apply discipline to growth within existing channels

- Remain distribution agnostic and act opportunistically

- Collaborate on product development to target segments where we maximize value

## Why they choose to partner with CBLife

- Competitive product portfolio

- Experienced team, anchored by strong national account support

- Speed, responsiveness, and quality of agent/customer service

- Shared vision of end-to-end digital platform

Global Bankers INSURANCE GROUP

Confidential Information

(1) Total sales as of 9/30/2018
(2) Launched channel on 10/1/18, no meaningful sales to report

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 91 of 508

# Annuities – Enhanced Product Portfolio

| Nov 2017 | Sept 2018 | Oct 2018 | Jan 2019 | Jan 2019 |
|---|---|---|---|---|
| **CBLA 357** | **Wealthlock & Income Builder** | **CBLA 4** | **CBLA 357 w/ MVA** | **FIA 10** |

    

**CBLA 357**
- Bank/BD & IMO distribution
- Multi-year (3, 5, or 7 yrs.) guaranteed annuity

**Wealthlock & Income Builder**
- Bank/BD & IMO distribution
- 7yr delivers strong accumulation
- 10yr focused on guaranteed income with optional GLWB
- Crediting options include S&P500 capped and uncapped, Janus SG Guidance uncapped, and a fixed rate

**CBLA 4**
- RIA distribution
- No-fee product structure
- Multi-year (4 yrs.) guaranteed annuity

**CBLA 357 w/ MVA**
- IMO distribution
- Rollout will include a rebranding of CBLA 357 for the Bank/BD channel

**FIA 10**
- IMO Distribution
- First product will focus on 10yr accumulation
- Second product will include GLWB to target guaranteed income
- Crediting options include S&P500 capped and uncapped, a volatility controlled index, and a fixed rate



# Global Bankers Pricing Process











| **Product Ideation and Framework** | **Strategic Partnerships** | **Pricing, Filing, Systems Build** | **Approval, Launch, Documentation** | **Routine Pricing, Monitor, Maintenance** |
|---|---|---|---|---|

- Preliminary analysis to assess feasibility, design, and market
- Establish objectives & philosophy
- Define profitability metrics and targets

**Distribution Partners:**
- Align with product company vision
- Controlled growth and branding

**Actuarial Consultants:**
- Assist with model build & assumption setting
- Industry experts with leading knowledge and best practices

- Iterate on design features, competitiveness, tradeoffs, and sensitivity analysis
- Assist in contract development and produce actuarial memorandum for filing
- Build internal processes to manage business, such as:
  – Datawarehouse capabilities
  – Hedging infrastructure

- Various checkpoints with Product Implementation Committee; **seek launch approval**
- Document final model, results, and product memorandums
- Host education sessions on product features and business profile

- Biweekly pricing exercises to evaluate profitability based on economic conditions, investment strategy, and internal profitability/sales goals; **adjust rates as needed**
- Autonomous ownership of models and results
- Monitor competitive landscape and internal experience for emerging trends

 Confidential Information

# Pricing Assumptions & Specs – MYGAs

Executive Summary | **Business Overview: U.S. New Business** | Financials | Appraisal | Appendices

| Policy Specs | 3yr MYGA | 5yr MYGA | 7yr MYGA |
|---|---|---|---|
| Initial Guarantee Period | 3 | 5 | 7 |
| Renewal Guarantee Period | 1 | 1 | 1 |
| Surrender Charge Schedule | 3 years (9,8,7) | 5 years (9,8,7,6,5) | 7 years (9,8,7,6,5,4,3) |
| Free Withdrawal Amount | 2% - 5% | 2% - 5% | 2% - 5% |
| GMAB % | N/A | N/A | N/A |
| MVA | No | No | No |
| **Policy Holder Info** | | | |
| Average Premium | $95,000 | $95,000 | $95,000 |
| Average Issue Age | 69 | 69 | 69 |
| **Key Assumptions** | | | |
| Total Commission (yr. 1 / yr. 2+) | 2.50% | 3.50% | 4.00% |
| Shock Lapse % | 50% | 50% | 50% |
| Lapse Rates during SC | 0.5%-1% | 1%-3% | 1%-3.5% |
| Post SC Lapses | 10% | 10% | 10% |
| Dynamic Lapses | Yes | Yes | Yes |
| Mortality | 2012 IAM Basic | 2012 IAM Basic | 2012 IAM Basic |
| Mortality Improvement | Scale G2 | Scale G2 | Scale G2 |
| Post SC Pricing Spread | 200bps | 200bps | 200bps |
| Acquisition Expense (per pol) | $125 | $125 | $125 |
| Maintenance Expense (per pol) | $75 | $75 | $75 |
| Expense Inflation | 2% | 2% | 2% |
| Tax Rate | 21% | 21% | 21% |
| **Reserves / Capital / Return** | | | |
| Statutory Valuation Rate | 3.50% | 3.50% | 3.50% |
| C1 Factor | 3.15% | 3.15% | 3.15% |
| C3 Factor (In/Post SC) | 3.66% / 7.29% | 3.66% / 7.29% | 3.66% / 7.29% |
| C4 Factor (Yr1 Only) | 7.29% | 7.29% | 7.29% |
| RBC Multiple (21% tax rate basis) | 300% | 300% | 300% |
| IRR | 10%-11% | 10%-11% | 10%-11% |

- MYGAs emphasize simplicity and transparency
- No riders or overly sophisticated options

- Adding MVA to product line in early 2019 to help with capital strain and surrender risks

- Assumptions developed in collaboration with Oliver Wyman actuarial consultants

Global Bankers INSURANCE GROUP

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 94 of 508

Confidential Information

28

# Pricing Assumptions & Specs – FIAs

| Policy Specs | FIA 7 | FIA 10 |
|---|---|---|
| Initial Guarantee Period | 1-2 | 1-2 |
| Renewal Guarantee Period | 1-2 | 1-2 |
| Surrender Charge Schedule | 7 years (9,8,7,6,5,4,3) | 10 years (9,9,...,1) |
| Free Withdrawal Amount | 1.2% - 3% | 1.2% - 3% |
| GMAB % | 107% (base only) | N/A |
| MVA | Yes | Yes |
| **Policy Holder Info** | | |
| Average Premium | $95,000 (90 base, 100 WB) | $95,000 (90 base, 100 WB) |
| Average Issue Age | 66 | 66 |
| **Key Assumptions** | | |
| Total Commission (yr. 1 / yr. 2+) | 6.45% / .05% | 7.95% / .05% |
| Shock Lapse % | 40% base / 20% WB | 40% base / 20% WB |
| Lapse Rates during SC | 0.4%-4.5% | 0.4%-4.5% |
| Post SC Lapses | 7.5%-20% | 7.5%-20% |
| Dynamic Lapses | Yes | Yes |
| Mortality | 2012 IAM Basic | 2012 IAM Basic |
| Mortality Improvement | Scale G2 | Scale G2 |
| Post SC Pricing Spread | 200bps | 200bps |
| Acquisition Expense (per pol) | $125 | $125 |
| Maintenance Expense (per pol) | $150 + 10bps AV | $150 + 10bps AV |
| Expense Inflation | 2% | 2% |
| Tax Rate | 21% | 21% |
| **Reserves / Capital / Return** | | |
| Statutory Valuation Rate | 3.50% | 3.50% |
| C1 Factor | 3.15% | 3.15% |
| C3 Factor (In/Post SC) | 1.83% / 7.29% | 1.83% / 7.29% |
| C4 Factor (Yr1 Only) | 7.29% | 7.29% |
| RBC Multiple (21% tax rate basis) | 300% | 300% |
| IRR | 12%-15% | 10%-13% |

- Like MYGAs, FIAs emphasize simplicity and transparency in design
- Optional Guaranteed Living Withdrawal Benefit (GLWB) rider available on FIA products

- Assumptions developed in collaboration with Oliver Wyman actuarial consultants.
- Commissions are lower than FIA industry standard; increases consumer value.
- Expect higher persistency when GLWB rider is elected.
- GLWB rider has simple and competitive design
- Increases in value based on strong guarantee with upside potential from indexed strategies

**Global Bankers** INSURANCE GROUP
Confidential Information

# Illustrative Economics for New Business

## Fixed Index Annuity – 7 Year Base – Return on Asset Walk

**Items use cost of funds approach to allocate earned rate**

**Cash flows from model yielding 13% IRR**

5.25%

**Credited Rate / Option Budget: 3.3%**

0.7%

**Hedge G/L:** PV of hedge (equity) payoffs vs. option budget spent. Passed to policyholder.

(3.5%)

(1.1%)

(0.5%)

(0.2%)

0.6%

**Spread: 1.95%**

| Earned Rate | Hedge G/L[1] | Surrenders / Benefits | Commissions / Expenses | Reserve Drag[2] | Tax | Net Margin |

- Interest income on bond portfolio
- Investment strategy drives new business returns
- Modest increase in yield significantly improves returns

- Compelling liability pricing
- Highly efficient, variable cost model
- Assumes 21% tax rate

- Net margin shown pre-capital. Asset-liability mix and regulatory requirements drive capital requirements


Global Bankers
INSURANCE GROUP

Confidential Information

 Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26  Page 96 of 508

(1) Assumes increase benefit accrues to surrenders. Leakage tied to account value and reserves. Does not directly net against final ROA.

(2) Reserve drag is the timing difference between modeled reserve releases and cash flows.

30

# Summary Pricing Returns / Use of Capital

| Product | Pricing Spread (bps) | IRR | VNB @ 8% | Breakeven Year | 1st Year Strain | Adj. Strain – No C4 | Pricing Distribution |
|---|---|---|---|---|---|---|---|
| **3yr MYGA** | 140 | 10% / 11%* | 1.0% | 5 | 16% | 9% | 7% |
| **5yr MYGA** | 130 | 10% / 11%* | 1.1% | 6 | 18% | 11% | 75% |
| **7yr MYGA** | 135 | 10% / 11%* | 1.1% | 8 | 19% | 12% | 18% |
| **Overall Blend** | 132 | 10% | 1.1% | 6 | 18% | 11% | 100% |

| Product | Pricing Spread (bps) | IRR | VNB @ 8% | Breakeven Year | 1st Year Strain | Adj. Strain – No C4 | Pricing Distribution |
|---|---|---|---|---|---|---|---|
| **7yr Base** | 195 | 13% | 2.1% | 6 | 11% | 3% | 45% |
| **10yr Base** | 190 | 13% | 2.0% | 9 | 12% | 5% | 5% |
| **7yr WB** | 180 | 12% / 15%** | 3.7% | 9 | 20% | 13% | 10% |
| **10yr WB** | 180 | 10% / 13%** | 2.6% | 9 | 25% | 18% | 40% |
| **Overall Blend** | 187 | 12% | 2.5% | 8 | 18% | 10% | 100% |

1. Pricing spread is approximate and assumed during surrender charge period; spread increases to 200bps thereafter.
   a) *Adding MVA to MYGAs can reduce necessary pricing spread by 10-15bps, or increase IRR by ~100bps at given spreads.
2. Breakeven year based on distributable earnings (includes capital).
3. MYGA 1st year strain is dependent on credited rate and starting reserve (typically 98% to 103% of premium, based on credited rate relation to statutory valuation rate). Strain excludes starting reserve impact.
4. **FIA IRR shown excluding and including reserve financing on WB products. WB strain reduced by ~7% with financing.



Confidential Information

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 97 of 508

# Annuities – Sales Trends

## Annuity Sales(1)

$MM

**Bar chart (Annuity Sales, $MM by quarter):**

- 1Q'16 — ~10
- 2Q'16 — ~10
- 3Q'16 — ~20
- 4Q'16 — ~15
- 1Q'17 — ~5
- 2Q'17 — ~55
- 3Q'17 — ~85
- 4Q'17 — ~230
- 1Q'18 — ~250
- 2Q'18 — ~420
- 3Q'18 — ~680

**$1,354 2018 YTD Total**

BLIC acquisition closes 12/15

Launched BLIC SPDA products on CBL

Legend: ■ CBL  ■ BLIC



**Pie chart:**
- CBL - IMOs 47%
- CBL - Banks 37%
- BLIC 16%

- Built momentum with distribution partners; recent actions/news impacting short-term outlook

- Significant growth in the IMO channel throughout the year by consistently adding new agencies

- CBL YTD Average face amount is $92k

- Monitoring surrenders closely

Global Bankers INSURANCE GROUP

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 98 of 508

Confidential Information    (1) Sales defined as annualized new issued premium

32

# New Business
## *Life Insurance Product Line*

Global Bankers
INSURANCE GROUP

Confidential Information

# Life & Worksite – Environment

## Commercial/Market Trends

 Underserved "blue collar," middle market with incomes ranging from $35K - $100K

 Ever shifting ACA creates opportunity

 Continued coverage gaps in traditional employee benefits

 Increasing demand for workplace-provided access to broad array of insurance & investment solutions

## Competition

 No single carrier dominates across all worksite products

 46 carriers, representing 90% of the total employment-based life market, provided data for LIMRA's U.S. Workplace Life Insurance Sales Survey 2Q'17

 M&A activity in the form of mergers/consolidation

Global Bankers INSURANCE GROUP
Confidential Information

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 100 of 508

# Life & Worksite – Overview

## Life & Worksite Sales (Annualized)

*$MM*

Sales slow due to operations transition

$15    $15    $20

2016    2017    2018    2019    2020

■ Security Builder  ■ Timber Ridge  ■ Other

| New Agencies | Type of Distribution | Projected Annual Premium ($MM) | Status |
|---|---|---|---|
| #1 | Fed / State / Military / Agriculture / Unions | $2.00 | Signed |
| #2 | Postal/Federal | $2.00 | Signed |
| #3 | Critical Illness | $1.00 | Signed |
| #4 | Life, Critical Illness, Final Expense | $0.50 | Signed |
| #5 | Life, Critical Illness, Final Expense | $0.50 | Signed |
| #6 | Life, Critical Illness, Final Expense | $0.50 | Signed |
| #7 | Final Expense, Life | $0.25 | Signed |
| #8 | Final Expense, Life | $0.10 | Signed |
| #9 | Life, Critical Illness, Final Expense | $0.10 | Signed |
| #10 | Critical Illness, Accident | $0.05 | Signed |
| #11 | Life, Critical Illness, Final Expense | $1.00 | Verbal |
| #12 | Life, Critical Illness, Final Expense | $1.00 | Verbal |
| #13 | Final Expense, Life | $0.05 | Verbal |
| #14 | Postal/Federal | $0.25 | Verbal |
| #15 | Postal/Federal | $1.25 | Pending |
| #16 | Final Expense, Life | $0.50 | Pending |

- Hired dedicated, focused business development leader
- 16 distribution partners in the pipeline have either signed an agreement, given verbal approval, or are pending further discussions
- BD pipeline represents $7MM - $11MM in new premium growth
- Due to transaction and recent headwinds, no growth assumed until 2020



Global Bankers
INSURANCE GROUP

Confidential Information

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 101 of 508

35

# Life & Worksite - Product Refresh Timeline

**Today**     **4Q 2018**     **Future**

### Security Builder



### Preferred Golden Protector



### Financial Security Plan



### Security Builder





### Timber Ridge



### LifeStyle Assurance



### Paycheck Protection Plus



**4Q 2018**

- New streamlined paper app
- Automated underwriting
- New eApp
- ePolicy delivery

**Future**

- Refresh Security Builder, Timber Ridge, Preferred Golden Protector, and expand Lifestyle Assurance
  – Meet 2017 CSO and PBR requirements

- Evaluating other solutions to complete life product portfolio
  – Life/LTC Hybrid, Riders on existing products

Confidential Information

# End-to-End Technology Platform

Global Bankers
INSURANCE GROUP

Confidential Information

37

# Technology Investments

Global Bankers is committed to developing an industry leading technology platform. Some of the key initiatives to enable this include:



### Enhance straight-through web and mobile digital experience

- Leverage science of UX (user experience) to ensure easy to use and elegant designs
- Drive interactions to web, tablet, and mobile; offer user choices of device and paradigm
- Lower operational costs by significantly reducing paper and phone transactions
- Improve support through on-line interactive methods like chat, AI robots, and FAQs
- Widen the point of sale opportunities including offering products at claim, from web leads, FAQs, AI, etc.



### Develop full service agency and agent platforms

- Expedite agency, agent, and channel onboarding and eliminate manual and paper processes
- Eliminate reliance on expensive outside training / agency platforms
- Allow full self-service agency and agent management, including choosing new products to sell
- Be easy to do business with: integrate with CRMs, provide real-time agent productivity reporting, and more



### Build a single source of truth, next-generation analytics platform

- Glean insights from customer, agent, financial, and product data and strong portfolio management
- Improve product manufacturing through integration with external data sources and predictive analytics
- Self-service actuarial modeling, analysis, and valuation capability
- Capture and examine customer behavior to generate custom, personalized recommendations and experiences



### Continue to build and improve upon a strong technology infrastructure

- Focus on continuous improvement of security stack allowing quick responses to emerging threats
- Leverage cost efficiencies with centralized operations and IT support
- Build strong disaster recovery and business continuity plans to protect against uncontrollable threats
- Continue investing in modern commodity IT capabilities to support these key digital build initiatives



Confidential Information

# End-to-End Digital Platform

🔍 Scoping   ⚙️ In Development   ✓ Live

## OPERATIONS

AGENCY ONBOARDING & AGENT L&C

STRAIGHT THROUGH PROCESSING: ILLUSTRATION / QUOTING EAPPLICATION (QUICKAPP, AN4), INSTANT RESPONSE & EDELIVERY

CUSTOMER PORTAL WITH SELF SERVICE

| ⚙️ PRODUCT DEVELOPMENT | 🔍 AGENCY MANAGEMENT | ✓ NEW BUSINESS | ✓ UNDERWRITING & POLICY ISSUE | ✓ POLICY ADMIN. | ⚙️ CUSTOMER SERVICE & REPORTING | ⚙️ CLAIMS MANAGEMENT |
|---|---|---|---|---|---|---|

ACTUARIAL DATA PROCESSING

DOC. ACCESS / STORAGE & COMPLIANCE MANAGEMENT

MULTIPLE HIERARCY SUPPORT

IDENTITY VERIFICATION

AUTO ISSUE & UNDERWRITING SYSTEM

COMPLIANCE APPROVAL PORTAL

MODERN ADMIN SYSTEM, AUTO PROCESSING & WORKFLOW TOOLS

ACCOUNT STATEMENTS

PREMIUM ACCOUNTING

BI REPORTING

AUTOMATED CLAIMS

## ENTERPRISE DATA WAREHOUSE ⚙️

## SUPPORT

| ✓ GENERAL LEDGER | ✓ ACTUARIAL PLATFORM | ⚙️ TREASURY SYSTEM | ⚙️ INVESTMENT PLATFORMS | ⚙️ EXPERIENCE ANALYSIS | ⚙️ ERM DASHBOARD |
|---|---|---|---|---|---|



Confidential Information

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 105 of 508

# Digitalization – Uber Case Study

## What if Uber operated like the current insurance industry?



- 7 individual applications
- Multiple days to onboard drivers
- Multiple individual apps/tools to ride
- Multiple days to get drivers paid

## Now, what if an insurance company operated like Uber?



- Single platform, straight-through processing
- Intuitive customer/agent experience
- Real–time service and support

Confidential Information

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 106 of 508

40

# Our Approach – Digital Differentiation

## Create a world class insurance platform by building game changers and buying commodities

| Who Benefits? | Features / Capabilities | Competitor Platforms | GBIG Target Platform |
|---|---|---|---|
| Customer, Agency / Agent | Optimized self-service functionality | ◐ | ✓ |
| Customer, Agency / Agent | Consistent personalized recommendations and experience across all mediums | ◔ | ✓ |
| Customer, Agency / Agent, GBIG | Advanced analytics | ◔ | ✓ |
| Customer, Agency / Agent, GBIG | Ability to identify and implement changes to workflow, business process, back office automation, and integrations | ◐ | ✓ |
| Customer, Agency / Agent, GBIG | Fast to market – and fast to capture market opportunities | ◔ | ✓ |
| GBIG | Monetizable, lower cost platform and services | ○ | ✓ |
|  | Customer-focused vs. Policy-focused | ◔ | ✓ |
| Agency / Agent, GBIG | Agent / customer retention | ◐ | ✓ |





**Global Bankers**

# SECTION 2B:
# U.S. IN-FORCE & RUNOFF

# U.S. In-force Portfolio by Entity by Product



*$Millions*

Pie chart centered on **$3.7 Billion Total Stat Reserves[1]**

- Payout Annuities $5 / <1%
- Assumed Deferred Annuities $36 / 1%
- Assumed Life $103[2] / 3%
- Deferred Annuities $309 / 8%
- Life[2] $179 / 5%
- COLI/Other $75 / 2%
- Assumed Life $90 / 2%
- Term Life $101 / 3%
- Assumed Payout Annuities $653 / 18%
- Worksite Life $106 / 3%
- Worksite - Annuity[2] / Other $227 / 6%
- Assumed Deferred Annuities $527 / 14%
- Deferred Annuities $1,293 / 35%

Entity rings:
- BANKERS LIFE INSURANCE COMPANY $314 / 8%
- southland NATIONAL insurance $319[2] / 9%
- PAVONIA $919 / 25%
- CBLife $2,154[2] / 58%

## Commentary

- CBLife is GBIG's new business platform
- CBLife's mix of business in 2018 consists of worksite life, MYGA and FIA products
- All other U.S. companies are in run-off: Pavonia, Bankers Life, SNIC and SNRC captive
- Direct deferred annuity Q3 '18 YTD sales: >$1.3 billion with $680 million in the Q3 alone
- Direct deferred annuity Q3 '18 YTD distribution mix: 54% bank, 46% IMO
- Approximately 92% of the CBL and BLIC deferred annuities in surrender period

Global Bankers INSURANCE GROUP — Confidential Information

(1) Estimated as of 09/30/18
(2) Shown gross of reinsurance to SNRC captive. Reinsurance used to optimize capital efficiency and release redundant IMR.

43

# CBLife – In Force Overview

## Overview

- $1.1B of MYGAs sold in YTD 2018
- Started selling market-leading FIA product in September 2018
- Strong distribution partners in bank & IMO channels
- Majority of assumed deferred annuities from BLIC reinsurance
- AM Best Rating: B++
- Worksite experience is running better than expected and modeled assumptions including first year persistency
- Focus on 5 year MYGAs thru the first half of 2018, expanded focus to 3 year and 7 year MYGAs in the past quarter
- Introduced the 4 year MYGA, with very limited distribution expenses into RIA channel in October
- Worksite in force life products are not interest sensitive and provide a balance to the MYGA block
- $196m worksite annuities issued prior to 2016 with a guaranteed minimum credited rate of 4% ceded to SNRC; $20m net retained by CBL

## In Force Summary Data (Estimated as at 9/30/18E)

| Segment | Net Stat Rsv. ($MM) | Face Amt. ($MM) | No. of Policies | Net Stat Rsv. / Policy ($) | Face Amt. / Policy ($) |
|---|---|---|---|---|---|
| **Life Insurance** | | | | | |
| Worksite | 106 | 2,409 | 119,140 | 894 | 20,217 |

| | Net Stat Rsv. ($MM) | Account Value ($MM) | No. of Policies | Net Stat Rsv. / Policy ($) | AV / Policy ($) | Avg. Crediting Rate (%) |
|---|---|---|---|---|---|---|
| **Annuities** | | | | | | |
| Worksite | 20 | 21 | 19,449 | 1,017 | 1,056 | 4.0% |
| Deferred Annuities | 1,293 | 1,286 | 13,250 | 97,587 | 97,037 | 3.6% |
| Assumed Deferred Annuities | 527 | 536 | 8,454 | 62,364 | 63,364 | 3.1% |
| Assumed Payout Annuities | 8 | N/A | 293 | 28,488 | N/A | N/A |
| Passthrough Conservatrix XOL | 3 | N/A | N/A | N/A | N/A | N/A |

## Net Stat Reserve Composition (Estimated as at 9/30/18E)

| Product Type | Net Stat Reserves $MM | % |
|---|---|---|
| Worksite - Life | 106 | 5% |
| Worksite - Annuity | 20 | 1% |
| MYGA3 | 95 | 5% |
| MYGA5 | 955 | 49% |
| MYGA7 | 237 | 12% |
| Other Direct Deferred Annuities | 6 | 0% |
| Assumed Deferred Annuities | 527 | 27% |
| Assumed Payout Annuities | 8 | 0% |
| Passthrough Conservatrix XOL | 3 | 0% |
| **Total** | **1,958** | **100%** |

**Remaining Yrs. of Annuity Surrender Charges**

- 4-5 Yrs 56%
- 5-6 Yrs 1%
- 6-7 Yrs 13%
- 0 Yrs 6%
- 0-1 Yrs 4%
- 1-2 Yrs 4%
- 2-3 Yrs 8%
- 3-4 Yrs 8%


Global Bankers
INSURANCE GROUP

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 110 of 508

Confidential Information

44

# BLIC – In Force Overview

## Overview

- Primarily sold fixed deferred annuity products through independent agencies
- Ceased new business Oct. 1, 2018 and effectively in run-off
- Transitioning operations from Florida to Durham
- AM Best Rating: B
- Consists of a combination of business that was written recently and some that is close to or out of the surrender charge period
- Historically, crediting rates have been set to minimum after initial guarantee period
  - Currently evaluating optimal strategy for renewal rates
- BLIC has written business that has been reinsured to affiliates including: ~75% of the deferred and payout annuities issued prior to 4/1/18

## In Force Summary Data (Estimated as at 9/30/18)

| Segment | Net Stat Rsv. ($MM) | Account Value ($MM) | No. of Policies | Net Stat Rsv. / Policy ($) | AV / Policy ($) | Avg. Crediting Rate (%) |
|---|---|---|---|---|---|---|
| **Annuities** | | | | | | |
| Deferred Annuities | 309 | 309 | 3,809 | 81,189 | 81,186 | 3.2% |
| Payout Annuities | 5 | N/A | N/A | N/A | N/A | N/A |

## Net Stat Reserve Composition (Estimated as at 9/30/18)



**Net Stat Reserves**

| Product Type | $MM | % |
|---|---|---|
| Deferred Annuities | 309 | 98% |
| Payout Annuities | 5 | 2% |
| **Total** | **314** | **100%** |

**Remaining Yrs. Of Annuity Surrender Charges**

- 5-6 Yrs 0%
- 6-7 Yrs 10%
- 0 Yrs 2%
- 0-1 Yrs 8%
- 1-2 Yrs 4%
- 2-3 Yrs 6%
- 3-4 Yrs 11%
- 4-5 Yrs 59%

 

Confidential Information

45

# In Force MYGA Reserves by Product & Crediting Rate

## Commentary

- In BLIC the MYGA product was sold using the "SPDA" name, which was launched on CBL paper in 4Q '17, along with a re-vamped distribution strategy for both CBL and BLIC

- In CBL, the MYGA uses the "CBLA" name

- 3, 5 and 7 next to the product name refers to the term length in years

- The table to the right shows stat reserves by crediting rate for 2017 and 2018 issued MYGAs (the period of time sales were led under Global Bankers)

- Blue highlighted cells to the far right are the top 3 largest crediting rate buckets in terms of stat reserve size

### 2017-2018 Issued In Force MYGA Reserves by Product and by Crediting Rate (9/30/18E)

*$000's*

| Crediting Rate | Colorado Bankers Life | | | BLIC Ceded to CBL | | Bankers Life | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | CBLA 3 | CBLA 5 | CBLA 7 | SPDA 5 | SPDA 7 | SPDA 3 | SPDA 5 | SPDA 7 | |
| 2.10% | $1,429 | - | - | - | - | - | - | - | **$1,429** |
| 2.20% | 20 | - | - | - | - | - | - | - | **20** |
| 2.50% | 1,667 | - | - | - | - | - | - | - | **1,667** |
| 2.60% | - | - | - | 5,004 | - | - | 1,773 | - | **6,777** |
| 2.85% | 2,660 | - | - | - | - | - | - | - | **2,660** |
| 2.90% | - | - | - | - | 603 | - | - | - | **603** |
| 3.00% | 285 | - | - | 32,116 | - | - | 7,107 | - | **39,508** |
| 3.10% | 88,919 | - | - | - | 193 | 7,268 | - | - | **96,380** |
| 3.25% | - | 299,961 | 177 | 116,640 | - | - | 32,866 | - | **449,644** |
| 3.35% | - | 46,588 | 2,107 | 13,223 | - | - | 2,189 | - | **64,107** |
| 3.40% | - | - | - | - | 6,291 | - | - | - | **6,291** |
| 3.50% | - | - | 1,698 | - | 1,660 | - | - | - | **3,358** |
| 3.60% | - | 269,767 | 3,183 | 18,578 | 1,525 | - | 89,334 | - | **382,387** |
| 3.65% | - | 36,980 | - | - | - | - | 9,009 | - | **45,990** |
| 3.80% | - | 301,217 | - | - | - | - | 71,681 | - | **372,899** |
| 3.85% | - | - | 48,305 | - | 2,528 | - | - | 9,336 | **60,169** |
| 3.90% | - | - | 7,830 | - | - | - | - | 723 | **8,553** |
| 4.10% | - | - | 174,025 | - | - | - | - | 20,650 | **194,674** |
| Product $ Total | 94,981 | 954,513 | 237,324 | 185,562 | 12,799 | 7,268 | 213,959 | 30,709 | **1,737,115** |
| Entity/Block $ Total | | 1,286,818 | | 198,361 | | | 251,936 | | |
| Avg. Product CR | 3.07% | 3.54% | 4.02% | 3.23% | 3.50% | 3.10% | 3.58% | 4.02% | **3.56%** |
| Avg. Entity/Block CR | | 3.60% | | 3.25% | | | 3.62% | | |



Confidential Information

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 112 of 508

46

# Pavonia – In Force Overview

## Overview

- Efficient run-off platform
- Primarily consists of payout annuities (71% by reserves) with avg. liability duration of 12 yrs.
  - Majority of payout annuities are structured settlement annuities issued during the late 1980s through mid 1990s
  - Block is not interest sensitive as there is no surrender option available to policyholder
  - Contracts may include both recurring payment streams and pre-scheduled lump sum payments
  - Payments may be level or subject to contractually defined growth rate
- Term life consists of 10, 15, 20, and 30 yr. terms directly written between 2006 and 2012
- Assumed life block comprised of mostly 15, 20, and 30 year term insurance written between 2005 to 2008 and senior life products
- Corporate Owned Life Insurance (COLI) consists of 5 group policies assumed from Lincoln National; minimum guaranteed interest rate of 4%
- Credit insurance products include monthly premium paying life and A&H coverage written by the company in the U.S. and Canada

## In Force Summary Data (Estimated as at 9/30/18)

| Segment | Net Stat Rsv. ($MM) | Face Amt. ($MM) | No. of Policies | Net Stat Rsv. / Policy ($) | Face Amt. / Policy ($) |
|---|---|---|---|---|---|
| **Life Insurance** | | | | | |
| Term Life | 101 | 4,550 | 26,680 | 3,788 | 170,528 |
| Assumed Life | 90 | 2,818 | 72,156 | 1,248 | 39,048 |
| Credit Life / A&H | 6 | N/A | 58,780 | 95 | N/A |
| Assumed COLI | 61 | 1,215 | 7,918 | 7,654 | 153,502 |
| AD&D | 9 | 1,691 | 317,265 | 27 | 5,330 |

| | Net Stat Rsv. ($MM) | Account Value ($MM) | No. of Policies | Net Stat Rsv. / Policy ($) | AV / Policy ($) | Avg. Crediting Rate (%) |
|---|---|---|---|---|---|---|
| **Annuities** | | | | | | |
| Assumed Payout Annuities | 653 | N/A | 1,629 | 400,677 | N/A | N/A |

## Net Stat Reserve Composition (Estimated as at 9/30/18)

| | Net Stat Reserves | |
|---|---|---|
| **Product Type** | **$MM** | **%** |
| Term Life | 101 | 11% |
| Assumed Life | 90 | 10% |
| Credit Life / A&H | 6 | 1% |
| Assumed COLI | 61 | 7% |
| AD&D | 9 | 1% |
| Assumed Payout Annuities | 653 | 71% |
| **Total** | **919** | **100%** |

**Annuity Cashflow Breakdown**

- Life-contingent (SS) $277 52%
- Certain (S) $88 16%
- Certain (SS) $36 7%
- Life-contingent (S) $133 25%

(S) = Standard
(SS) = Sub-standard



# SNIC – In Force Overview

## Overview

- Run-off platform
- In force consists primarily of pre-need / funeral life insurance
- Moving legacy Louisiana operations to New Jersey
- Very stable and persistent block of business that was written mostly between 2003-2011
- Original products included discretionary death benefit growth rates in the product which were set to the guaranteed minimums prior to Global Bankers purchasing the entity
- Majority of pre-need business is paid up: ~98% by count
- The assumed annuities block fairly evenly distributed by issue year between 1980-2016 with a heavier concentration in the 2003+ era
- $107m assumed life block from NC Mutual is ceded $103m to SNRC and $4m to Barbados
- $33m direct pre-need reserves also ceded to SNRC

## In Force Summary Data (Estimated as at 9/30/18)

| Segment | Net Stat Rsv. ($MM) | Face Amt. ($MM) | No. of Policies | Net Stat Rsv. / Policy ($) | Face Amt. / Policy ($) |
|---|---|---|---|---|---|
| **Life Insurance** | | | | | |
| Life | 147 | 348 | 81,187 | 1,807 | 4,290 |

| | Net Stat Rsv. ($MM) | Account Value ($MM) | No. of Policies | Net Stat Rsv. / Policy ($) | AV / Policy ($) | Avg. Crediting Rate (%) |
|---|---|---|---|---|---|---|
| **Annuities** | | | | | | |
| Assumed Annuities | 36 | 37 | 6,349 | 5,718 | 6,390 | 2.7% |

## Net Stat Reserve Composition  (Estimated as at 9/30/18)

**Net Stat Reserves**

| Product Type | $MM | % |
|---|---|---|
| Life | 147 | 80% |
| Assumed Life | - | 0% |
| Assumed Annuities | 36 | 20% |
| **Total** | **183** | **100%** |



**Remaining Yrs. Of Annuity Surrender Charges**

0-1 Yrs 5%
1-2 Yrs 6%
2-3 Yrs 6%
3-4 Yrs 6%
4-5 Yrs 0%
5-6 Yrs 0%
6-7 Yrs 0%
0 Yrs 77%

Global Bankers INSURANCE GROUP — Confidential Information

48

# SNRC – In Force Overview

## Overview

- Serving as GBIG's on-shore run-off captive
- In force consists of business assumed from affiliates (i.e. CBL, SNIC)
- $196m annuities from CBL issued prior to 2016 with a guaranteed minimum credited rate of 4%
- $33m of pre-need reserves from SNIC
- $103m of NC Mutual reserves which were retroceded from SNIC to SNRC consisting of small face amount life insurance
- Reports financial results on a US GAAP basis using a permitted practice allowed by the NC Department of Insurance

## In Force Summary Data (Estimated as at 9/30/18)

| Segment | Net Stat Rsv. ($MM) | Face Amt. ($MM) | No. of Policies | Net Stat Rsv. / Policy ($) | Face Amt. / Policy ($) |
|---|---|---|---|---|---|
| **Life Insurance** | | | | | |
| Assumed Life | 136 | 517 | 100,383 | 1,354 | 5,150 |

| Segment | Net Stat Rsv. ($MM) | Account Value ($MM) | No. of Policies | Net Stat Rsv. / Policy ($) | AV / Policy ($) | Avg. Crediting Rate (%) |
|---|---|---|---|---|---|---|
| **Annuities** | | | | | | |
| Assumed Annuities | 196 | 193 | 57,129 | 3,424 | 3,381 | 4.0% |

## Net Stat Reserve Composition (Estimated as at 9/30/18)

### Net Stat Reserves

| Product Type | $MM | % |
|---|---|---|
| Assumed Life | 136 | 41% |
| Assumed Annuities | 196 | 59% |
| **Total** | **331** | **100%** |

**Remaining Yrs. Of Annuity Surrender Charges**



Global Bankers INSURANCE GROUP
Confidential Information

49



# SECTION 2C: EUROPE

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 116 of 508

# European Operations – At a Glance



## Business Overview

- Global Bankers' European business consists of 4 insurance companies domiciled in:
  - Luxembourg
  - The Netherlands
  - Portugal (signed, pending completion)
  - Italy (signed, pending completion)

- Pro forma for signed transactions, Europe has €9.3 billion in assets and €586 million in shareholders' equity

- €570 million current annual GWP; recently peaked at €2 billion

- New group-level executive team launched in August 2017 with the hiring of Matteo Castelvetri (Chief Executive Officer, Europe)

- Headquartered in London



### Europe at a Glance[1]

| €9.3 Billion | €586 Million | 61% |
|---|---|---|
| Total Assets | Shareholders' Equity | General Account Assets |
| €570 Million | 250 | 5 |
| Annual GWP | Employees | Countries including London HQ |

Confidential Information

(1) As of 6/30/18 pro forma for the pending acquisitions of Premerica and GNB Vida.

51

# European Life Market – Consolidators Landscape

## European Life Consolidators Landscape[1] (€bn)

UK and Offshore Assets

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 53.1 | 48.0 | 41.1 | 41.0 | 31.3 | 19.9 | 18.0 | 17.8 | 12.3 | 9.5 | 8.6 | 1.9 |
| VIRIDIUM GRUPPE | ReAssure | Rothesaylife | LCCG | PENSION INSURANCE CORPORATION | FOSUN 复星 RL360° | EUROVITA | ATHORA | qb | Chesnara | Mediterráneo Vida S.A. de Seguros y Reaseguros |

| Cinven | Swiss Re | Blackstone | OAKTREE | CVC Capital Partners | | VITRUVIAN PARTNERS | Cinven | APOLLO | | EMBER CAPITAL / ELLIOTT |

**Key Active Sponsors**

(1) Based on latest available data, pro-forma for the signed transactions as of 28th of September 2018 (Viridium for the acquisition of Generali Leben, LCCG for the acquisitions of Aegon Ireland's Internal investment bond business, Equitable Life and Generali Worldwide, RL 360 for the acquisition of Friends Provident International, Athora for the sale of Aegon Ireland's Internal investment bond business, Global Bankers for the acquisitions of Pramerica and GNB Vida) and exchange rates as of 28.09.2018. Assets shown gross of reinsurance.

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 118 of 508



Global Bankers INSURANCE GROUP | Confidential Information

# Europe – Operations Overview



### GB Life Luxembourg – Luxembourg
- Acquired in Oct '17 from NN Group
- European flagship platform
- Traditionally unit-linked sales to high net worth individuals
- Expanding into fixed products and retail market

**1994** Year Founded

**50** Employees

### Conservatrix – Utrecht, Netherlands
- Run-off company acquired in May '17
- Specialized in life insurance, pensions and mortgages

**1872** Year Founded

**37** Employees

### GNB Seguros Vida – Lisbon, Portugal [pending]
- Signed agreement with Novo Banco in September 2018
- Focused on retirement, savings and capitalization life insurance products
- Long-term distribution agreement with selling bank

**1993** Year Founded

**54** Employees

### Global Bankers Insurance Group – London, UK
- Europe headquarters for Global Bankers Insurance Group
- Asset Management, M&A and Executive office

**2016** Year Founded

**3** Employees

### Pramerica – Milan, Italy [pending]
- Signed agreement with Prudential Financial in June 2018
- Focused on protection-oriented life insurance products
- Captive distribution network of over 100 agents

**1990** Year Founded

**106** Employees

 Global Bankers INSURANCE GROUP

Confidential Information

# Global Bankers Europe – Investment Highlights

**1** Well positioned European Life insurance consolidator with nearly €10bn of assets and pan-European presence (Benelux and Southern Europe)

**2** Unique and differentiated position of being considered a part-strategic/ part-financial buyer with long term focus and nimble approach

**3** Experienced central management team with proven ability to execute highly bespoke and value-accretive transactions and with solid relationships with four EU insurance regulators

**4** Largely untapped asset base with over €1bn available to be deployed in illiquid strategies in the next 12 months

**5** Existing businesses with significant room for cost efficiencies and development of shared services and central functions

**6** Strongly capitalized business with focus on cash-flows and economic value rather than accounting profitability and top line growth



Global Bankers INSURANCE GROUP

Confidential Information

54

# Global Bankers Europe – Ambitions and Strategy

**Ambitions**

- Over €20bn of Assets by 2021
- At least 1 - 5% market shares[1] in chosen markets
- Scalable platform with AM and IT savvy strategies
- Reputable player in full-risk Reinsurance

## Strategy

1. **Acquire licensed life insurance** companies in **stable, economically-prosperous EU countries** with **reputable regulatory regimes**, primarily focused on Western Europe
2. **Optimise and grow acquired businesses**
3. **Acquire blocks of insurance assets and liabilities**, and
4. **Reinsure new business and in-force** internally or for quality EU cedants

## Target Operating Model

1. **Small and experienced** management team
2. **Centrally-coordinated** M&A, Asset Management, Capital Management and key third-party providers (IT, other consultants)
3. **In-sourced shared-services** at the functional level
4. **Critical business control functions** retained at **the entity level**



Confidential Information

(1) Market share based on combination of terms of premiums or assets.

# European Operations – Key Figures

| Entity | % General Account / Unit Linked | Total Assets[1] | Shareholders' Equity[1] |
|---|---|---|---|
| Conservatrix levensverzekeringen | 6% / 94% | €0.6bn | €73m |
| GB Life Luxembourg | 2% / 98% | €2.3bn | €14m |
| Pramerica | 0% / 100% | €1.2bn | €66m |
| GNB SEGUROS VIDA | 26% / 74% | €5.2bn | €433m |

■ General Account
■ Unit Linked

Confidential Information

(1) As of 6/30/18.



56



# SECTION 3: FINANCIALS

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 123 of 508

# Global Bankers – Proformas

## Pre-tax Operating Income - Base Case Projections[1]

$MM

Legend:
- CBL/BLIC Annuities
- All Other

Loss driven by new business strain from MYGA sales

Chart values by year:
- 2017: **15** (23, (8))
- 2018: **(46)** (3, (49))
- 2019: **59** (23, 36)
- 2020: **61** (20, 41)
- 2021: **82** (18, 64)
- 2022: **111** (19, 92)

| ($MM) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Life/Worksite Sales | 13 | 15 | 15 | 20 | 25 | 30 |
| Annuity Sales | 374 | 1,500 | 750 | 1,800 | 2,100 | 2,400 |
| Assets | 2,982 | 4,728 | 5,167 | 6,954 | 9,008 | 11,187 |
| Net Investment Yield | 5.8% | 4.8% | 4.9% | 4.9% | 4.9% | 5.0% |
| General Exp / Assets | 1.5% | 1.2% | 1.1% | 0.8% | 0.7% | 0.5% |
| In-force Capital Contr./(Release) | 78 | 93 | (208) | (58) | (56) | (63) |
| New Business Capital Contr./(Release) | 0 | 60 | 121 | 194 | 141 | 134 |
| **Total Contribution/(Release)** | **78** | **153** | **(88)** | **135** | **85** | **71** |
| **Total Capital & Surplus** | **286** | **372** | **352** | **529** | **669** | **815** |

## Comments

### Sales decline initially and recover in late 2019 after transaction closes

- Lower sales results in less new business strain and drives significant decline in required capital

### General expenses grow modestly… project spend declines and is replaced by costs supporting new business growth

- Expense ratio approaching peer group as annuity sales build scale

### Operating income growth driven primarily by annuities as other blocks run-off and life new business maintains steady profits

- 2018 losses from new business strain on MYGAs… 2019+ strain much less due to lower sales levels and sales mix shift to FIAs

### Key Assumptions

- Contribute $60MM to CBL in 4Q'18
- Target RBC of 400% for CBL, 300% for runoff businesses at 2017 RBC factors and tax rates
- ~5% net investment yield



Confidential Information

(1) Legal entities included: CBL, BLIC, PLACM, SNIC, SNRC; All entities on statutory accounting basis with exception of SNRC, which is on GAAP basis; small variances vs appraisal due to IMR amortization and miscellaneous items not modeled

58

# Global Bankers – General Expense Forecast

## General Expense Run-Rate

| $MM | Maintenance | Acquisition | Projects / Overhead | Total Expense |
|---|---|---|---|---|
| India Team | 2.0 | 0.7 | 0.7 | 3.3 |
| Rent / Facilities | 1.0 | 0.2 | 0.0 | 1.2 |
| Insurance | 0.6 | 0.1 | 0.0 | 0.7 |
| Recruiting | 0.2 | 0.2 | 0.0 | 0.5 |
| Training / Coaching | 0.1 | 0.1 | 0.0 | 0.2 |
| Software / Hardware | 3.2 | 3.2 | 0.0 | 6.4 |
| Law Firms | 0.6 | 0.6 | 0.1 | 1.3 |
| Agency Development | 0.1 | 1.0 | 0.0 | 1.1 |
| Admin Fees | 2.8 | 0.0 | 0.0 | 2.8 |
| Underwriting & Onboarding | 0.8 | 0.3 | 0.0 | 1.1 |
| Printing / Postage | 0.3 | 0.3 | 0.1 | 0.6 |
| Professional Fees | 1.5 | 0.6 | 0.0 | 2.1 |
| Other | 1.0 | 0.8 | 0.2 | 2.1 |
| Projects | 0.0 | 0.0 | 5.0 | 5.0 |
| **Total ex Comp & Benefits** | **14.0** | **8.2** | **6.0** | **28.2** |
| **Comp & Benefits** | | | | |
| Executive | 0.2 | 0.4 | 1.3 | 1.9 |
| Finance | 1.9 | 1.3 | 1.5 | 4.7 |
| Billing & Commissions | 0.4 | 0.4 | 0.0 | 0.8 |
| Investments | 1.2 | 1.2 | 0.0 | 2.5 |
| Actuarial | 1.3 | 1.0 | 0.7 | 3.0 |
| Operations | 3.7 | 1.7 | 0.2 | 5.6 |
| Sales | 0.0 | 1.9 | 0.0 | 1.9 |
| Legal / Compliance | 0.6 | 0.6 | 0.3 | 1.5 |
| HR / Marketing | 0.1 | 0.4 | 0.5 | 1.1 |
| IT | 2.4 | 2.4 | 0.0 | 4.7 |
| **Total Comp & Benefits** | **11.8** | **11.3** | **4.6** | **27.8** |
| **Grand Total** | **25.8** | **19.5** | **10.7** | **56.0** |

## Comments

**Expense run-rate of ~$56MM … 110bps of assets declining to ~50bps over next few years with expected asset growth**

**Large portion of expense base related to new business activities**

**Budgeting significant project spend to build efficient and scalable infrastructure**

## Peer Ratio Comparison

| Expense Ratios (Exp / Assets) | |
|---|---|
| Global Atlantic | 98bps |
| Athene | 44bps |
| Guggenheim | 88bps |
| F&G Life | 83bps |
| American Equity | 16bps |
| Kuvare | 62bps |
| Security Benefit | 78bps |
| **Peer Average** | **67bps** |
| GBIG 2018 Estimate | 110bps |
| GBIG 2022 Estimate | 50bps |


Confidential Information (1) Source: 2017 statutory filings from SNL for SNL Life Group 59

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 125 of 508



Global Bankers

# SECTION 4: APPRAISAL

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 126 of 508

# Appraisal – U.S. Insurance Group Summary

## High level process summary

- The Value of In-Force calculations use the liability projections from the CFT models (2017 or 09/30/18).

- The liability model assumptions are mostly aligned with 12/31/17 CFT. Differences are noted.

- The VIF investment income is projected assuming a 5% earned rate.

- The New Business models are pricing models and assumptions. The annuities are spread based so the earned rate is the credited rate plus the pricing spread.

### Appraisal Value – Group Level

| ($ in millions) | Risk Discount Rate 8% | 10% | 12% |
|---|---|---|---|
| Stat Surplus | $305 | $305 | $305 |
| *Plus* AVR | 15 | 15 | 15 |
| *Plus* IMR | 109 | 109 | 109 |
| *Less* DTA | (13) | (13) | (13) |
| Other Adjustments | (27) | (27) | (27) |
| **Adjusted Book Value** | **$390** | **$390** | **$390** |
| Value of In-force Before Taxes and Cost of Capital | 288 | 249 | 219 |
| Taxes | (38) | (32) | (28) |
| Cost of Capital | (51) | (69) | (84) |
| **Total VIF** | **$199** | **$147** | **$107** |
| Value of New Business | 234 | 103 | 9 |
| **Total Appraisal Value** | **$823** | **$641** | **$505** |

### Appraisal Value – Insurance Company Level

| ($ in millions) | Global Bankers Insurance Group CBL | Pavonia | SNIC | BLIC | SNRC | Other[1,2] | Total |
|---|---|---|---|---|---|---|---|
| Stat Surplus | $156 | $60 | $30 | $36 | $22 | - | $305 |
| *Plus* AVR | 6 | 4 | 3 | 2 | - | - | 15 |
| *Plus* IMR | 4 | 102 | 4 | 0 | - | - | 109 |
| *Less* DTA | (7) | (3) | (0) | (2) | - | - | (13) |
| Other Adjustments | - | 19 | - | - | (5) | (41) | (27) |
| **Adjusted Book Value** | **$159** | **$182** | **$36** | **$36** | **$18** | **($41)** | **$390** |
| **Value of In-Force** | | | | | | | |
| 8% | 229 | (5) | (17) | 14 | 13 | (34) | 199 |
| 10% | 195 | (19) | (18) | 11 | 7 | (29) | 147 |
| 12% | 167 | (28) | (18) | 9 | 2 | (25) | 107 |
| **Value of New Business** | | | | | | | |
| 8% | 234 | - | - | - | - | - | 234 |
| 10% | 103 | - | - | - | - | - | 103 |
| 12% | 9 | - | - | - | - | - | 9 |
| **Total Appraisal Value** | | | | | | | |
| 8% | 622 | 177 | 19 | 50 | 31 | (76) | 823 |
| 10% | 458 | 163 | 18 | 47 | 24 | (70) | 641 |
| 12% | 335 | 154 | 18 | 45 | 20 | (66) | 505 |

Note: the figures are based on version 2.2 of the appraisal distributed on November 2, 2018. Subsequent changes will be provided in the data room.



Confidential Information

(1) Adjusted book value "Other" includes minority interest on preferred stock investments and surplus notes; however, this does not reflect a lower cost of capital. See pg. 67 for more detail.
(2) Value of in-force: "Other" includes expense overhang.

61

# Appraisal – U.S. Insurance Group Summary (cont'd)

## Appraisal Value – Sensitivity Analysis

| ($ in millions) | Risk Discount Rate | | |
|---|---|---|---|
| | 8% | 10% | 12% |
| **Baseline** | **$823** | **$641** | **$505** |
| IMR runoff over time | 803 | 614 | 472 |
| Pavonia reinsurance | 813 | 632 | 496 |
| 0% Corp tax rate | 899 | 706 | 563 |
| CBL 350% RBC | 826 | 645 | 511 |
| (Inforce) earned rate -50 bps | 728 | 556 | 429 |
| (Inforce) earned rate +50 bps | 918 | 725 | 582 |
| (Inforce) FDA 100% shock lapse | 790 | 614 | 484 |
| (Inforce) +10% mortality rate to Pavonia Term & Assumed Life | 803 | 623 | 489 |
| (Inforce) -10% mortality rate to Pavonia Lincoln Annuities | 811 | 630 | 497 |
| (NB) FIA 10-year GMWB no reserve financing | 789 | 569 | 409 |

Global Bankers
INSURANCE GROUP
Confidential Information

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 128 of 508

# Appraisal – Assumptions

**General**

- Model is broken down as follows: 1. Summary tables / assumptions, 2. VIF by Legal entity, 3. VIF by book of business, 4. VNB by products sold in CBL, 5. Sensitivities
- Values and projections as of 09/30/18, NPV over 50 years. 9/30 balance sheets used are not yet final and subject to change
- 9/30/18 RBC estimated based on 12/31/17 RBC calculations where original factors and 35% tax rate are still utilized
- IMR is included in adjusted book value calculation and excluded from VIF calculation. See sensitivities for impact to appraisal value if IMR runs off according to schedule
- Affiliate preferred stock and surplus notes are removed from Adjusted Book Value calculation
- New business ("NB") cash tax projection properly reflects the underlying tax basis. In force cash tax projection, for the most part is approximated by 21% of statutory income. Modeling of tax reserve and DAC tax for in force will be added at a later date
- Investment Yields / Asset portfolio - In force projections are based on a net yield held flat all years out.  However, NB on annuities assume a spread by individual product
- Modeled maintenance and acquisition expenses are reasonable per block. Appraisal includes initial expense overhang that runs off after 3 years
- In force models use cashflow testing and its assumptions as its basis for corresponding assumptions
- New business - CBL is the only entity with new business production, all other entities assume runoff status
- Expense overhang is solved such that total modeled expense (excluding expense allowances on key assumed blocks) matches the projected Target Expense.
- Required capital is assumed to run-off with stat reserve

**Value of New Business**

- The liability projections for the MYGA and FIA NB are from AXIS pricing models. The Worksite NB projections are from the TAS pricing models using assumptions consistent with 2016 CFT (no major changes were made in 2017 to the assumptions)
- Volume in accordance with management's business plan
- For FIA 10 Year GMWB, assumes financing on the difference between statutory reserve and economic reserve with 3% cost of financing. See sensitivities for impact without reserve financing.
- Worksite Life 50% ceded through YRT



Confidential Information

63

# Appraisal – Assumptions (cont'd)

**Value of In-Force**

- **CBLife** – 400% RBC
  - Liability projections for VIF are from the 9/30/18 AXIS model
  - Consists of worksite life and fixed annuity products. Only company producing new sales
  - 5% flat net asset earned rate over time with the exception of CBL MYGA block where net earned rate assumed is 4%, which corresponds to 150 bps spread for post-surrender charge period
  - $17m tax credit is a proxy for stat tax reserve difference amortized over seven years
  - No economic gain or loss to CBL arising from the Conservatrix passthrough treaty

- **Pavonia** – 300% RBC
  - Liability projections for VIF are from the 12/31/17 TAS model used for CFT work, rolled forward to 9/30/18
  - Runoff block
  - $102m IMR balance due to capital gain realized from turning over a portion of fixed income portfolio in Q1 2018
  - Reinsurance of the structured settlement block could harvest IMR and potentially release some CFT.
  - Current tax liability of 19 mil is assumed to be neutralized by year-end 2018. This can achieved if the above-mentioned reinsurance is approved. If not, this can be achieved by adjusting the statutory valuation basis and subsequently the tax basis for the structured settlement block

- **BLIC** – 300% RBC
  - Liability projections for VIF are from the 9/30/18 AXIS model
  - Put into runoff on October 1, 2018.   Book of business is all annuities, primarily MYGA

- **SNIC** – 300% RBC
  - Liability projections for VIF are from the 12/31/17 AXIS model used for CFT work, rolled forward to 9/30/18
  - Preneed business in runoff. Also assumed some reinsurance

- **SNRC** – 200% RBC
  - The liability projections for the VIF are from the AXIS models for CFT.   SNIC and NCM blocks are as of 12/31/17 and CBL worksite annuities as of 9/30/18
  - Captive established for SNIC acquisition. Assumed business from CBL and a third party preneed block
  - CAL RBC is 2.9% net reserve
  - GAAP captive domiciled in NC. Currently using 9/30/18 GAAP surplus, excluding DAC

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 130 of 508



Global Bankers

# SECTION 5: APPENDICES

# Table of Contents – Appendix

| Section | Page |
|---|---|
| Organizational Structure | 67 |
| M&A Capabilities | 70 |
| Reinsurance Dashboard | 72 |
| Proforma Financials | 74 |
| U.S. Asset Mix Detail | 84 |
| Enterprise Risk Management | 85 |
| Management Biographies | 93 |
| Human Resources Dashboard | 99 |


Global Bankers INSURANCE GROUP

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 132 of 508

Confidential Information

# Current Structure – U.S. Insurance Group

Denotes Insurance Co.

Greg Lindberg[1]

GBIG Capital, LLC[2]
[NC]
46-5639371

GBIG Holdings, Inc.[3]
[DE]
81-1075158

• $3M unaffiliated surplus note from previous seller

Pavonia Holdings (US), Inc. [DE]
46-0927525

Colorado Bankers Life Insurance Company [NC] 84-0674027
84786

Southland National Reinsurance Corporation [NC]
47-2580033
15697

Southland National Insurance Corporation [NC] 63-0572745
79057

Preferred Financial Corporation, LLC [NC]
84-0508741

Global Bankers Insurance Group, LLC [NC]
47-4223933

Bankers Life Insurance Company [NC]
59-1460067
81043

SN Group Development, LLC [NC] 47-4756034

Pavonia Life Insurance Company of Michigan [MI] 38-2341728
93777

American Funeral and Cremation Plans, LLC [AL] 02-0714173

Northstar Financial Insurance Services, LLC [DE]
98-0643261

Sirius Capital Holdings Limited [Malta]

Pavonia Life, Inc. [DE]
36-4769080

• SNIC owns $24.0M of CBL preferred stock
• SNIC owns $8.31M of BLIC preferred stock
• SNIC invested $9M in CBL surplus note

SN Malta Services Limited [Malta]

Common stock ownership 100% unless otherwise indicated



Confidential Information

(1) Does not show entities owned by Greg Lindberg.
(2) Does not show GBIG Capital subsidiaries that are irrelevant to the transaction.
(3) Formerly known as Southland National Holdings, Inc.

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 133 of 508

67

# U.S. Transaction Scope

Denotes Insurance Co.

In Scope

Out of Scope

Greg Lindberg[1]

GBIG Capital, LLC[2]
[NC]
46-5639371

GBIG Holdings, Inc.[3]
[DE]
81-1075158

- $3M unaffiliated surplus note from previous seller

Pavonia Holdings (US), Inc. [DE]
46-0927525

Colorado Bankers Life Insurance Company [NC] 84-0674027
84786

Southland National Reinsurance Corporation [NC] 47-2580033
15697

Southland National Insurance Corporation [NC] 63-0572745
79057

Preferred Financial Corporation, LLC [NC]
84-0508741

Global Bankers Insurance Group, LLC [NC]
47-4223933

Bankers Life Insurance Company [NC]
59-1460067
81043

SN Group Development, LLC [NC] 47-4756034

Pavonia Life Insurance Company of Michigan [MI] 38-2341728
93777

American Funeral and Cremation Plans, LLC [AL] 02-0714173

Northstar Financial Insurance Services, LLC [DE]
98-0643261

Sirius Capital Holdings Limited [Malta]

Pavonia Life, Inc. [DE]
36-4769080

- SNIC owns $24.0M of CBL preferred stock
- SNIC owns $8.31M of BLIC preferred stock
- SNIC invested $9M in CBL surplus note

SN Malta Services Limited [Malta]

Common stock ownership 100% unless otherwise indicated



Confidential Information

(1) Does not show Lindberg entities not owned by GBIG Capital, LLC.
(2) Does not show GBIG Capital subsidiaries that are irrelevant to the transaction.
(3) Formerly known as Southland National Holdings, Inc.

68

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 134 of 508

# Current Structure – International Insurance Group

Denotes Insurance Co.

Greg Lindberg[1]

- BMX Holdings, LLC [NC]
  - BMX Bermuda Holdings, Ltd. [Bermuda]
    - PB Investment Co., Ltd. [Bermuda]
    - PB Investment Holdings Ltd. [Bermuda]
    - Northstar Financial Services (Bermuda) Ltd.[2] [Bermuda]

- PBX Holdings, LLC [NC] 82-1085454
  - PBX Bermuda Holdings, Ltd. [Bermuda]
    - Omnia Ltd. [Bermuda]
    - Private Bankers Life and Annuity Co., Ltd. [Bermuda]

- BRC Capital, LLC [NC] 82-1827400
  - BRC Holdings, Inc. [DE] 82-1817030
    - BRCB (Barbados) Capital, Ltd. [Barbados]
      - BRCB (Barbados) Holdings, Ltd. [Barbados]
        - Bankers Reinsurance Company Ltd. [Barbados]

- Southeast Insurance Capital, LLC [NC]
  - Northeast Insurance Holdings, Inc. [DE]
    - Beaufort Holding S.A. [Luxembourg]
      - Bankers Insurance Holdings S.A. [Luxembourg]
        - GB Life Luxembourg S.A. [Luxembourg]

- NIH Capital, LLC [NC]
  - Netherlands Insurance Holdings, Inc. [DE]
    - Trier Holding B.V. [Netherlands]
      - Nederlandsche Algemeene Maatschappij van Levensverzekering 'Conservatrix' N.V. [Netherlands]

Common stock ownership 100% unless otherwise indicated



Confidential Information

(1) Does not show entities owned by Greg Lindberg in his personal capacity that are irrelevant to the transaction.
(2) Does not show Northstar subsidiaries.

69

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 135 of 508

# Global Bankers has a seasoned M&A team with extensive reinsurance experience

## 2019 GBIG Pipeline – Select Opportunities

### U.S. Deals

**Acquisition**
$62B Reserves
Closed block of annuities

**Acquisition**
$30B Reserves
Life, annuity, and A&H

**Reinsurance**
$5.5B Reserves
Life and annuity

**Acquisition**
$17B Reserves
Variable annuities

**Acquisition**
$3.5B Reserves
Closed blocks of annuities

**Reinsurance**
$5.0B Reserves
Life and annuity

### European Deals

**Acquisition**
€0.6 Reserves
Irish reinsurer

**Reinsurance**
€0.7B Reserves
Life

**Acquisition**
€30B Reserves
Life, annuity, A&H

**Acquisition**
€5.5B Reserves
Life and A&H

**Acquisition**
€4.8B Reserves
Life and annuity

**Acquisition**
€3.0B Reserves
Annuity

## Differentiated Approach to M&A

 The M&A team leverages decades of transactional experience and strong relationships with business leaders and intermediaries to stay abreast of M&A / reinsurance opportunities
- Led by Paul Brown, the Global Bankers M&A team consists of seven members, each with extensive M&A experience at top-tier investment banks, consultants, and / or insurance companies

 We employ a holistic diligence framework with input from finance, actuarial, IT, sales, and operations leaders to give GBIG a high degree of confidence in the value proposition of each transaction
- We target 12 – 14% returns / 3.5 – 5.5x MOIC on underlying business

 We have a fully loaded M&A pipeline for 2019 and are prepared to opportunistically deploy capital under new ownership

 

Confidential Information

70

# Strong track record of deal sourcing and execution

## M&A Team Track Record*



Expanded U.S. distribution capabilities
**PF 12/31 Assets: $414m**
**Acquired Dec 2016**



GBIG's entry into the European market
**Current Assets: €588m**
**Acquired May 2017**

**B** Private Bankers

GBIG's entry into the Bermuda market
**Current Assets: $443m**
**Acquired Jun 2017**



Quota share on
**$564m in-force annuities** and **annual flow**
**Reinsured Jun 2017**

 Grange

Quota share on
**$54m in-force annuities**
**Reinsured Jul 2017**

 GB Life Luxembourg

Established EU new business capabilities
**Current Assets: €2,271m**
**Acquired Oct 2017**

 PAVONIA

Provided asset growth via book of in-force liabilities
**PF 12/31 Assets: $1,129m**
**Acquired Dec 2017**

 Motorists Life

Coinsurance on
**$109m in-force annuities**
**Reinsured Dec 2017**

NORTHSTAR FINANCIAL SERVICES (BERMUDA) LTD.

Expanded Bermuda distribution capabilities
**Current Assets: $554m**
**Acquired Aug 2018**

 Pramerica

Expands Europe distribution capabilities
**Current Assets: €1,231m**
**Est. Closing Q4 2018**

GNB SEGUROS VIDA

Expands Europe distribution capabilities
**Current Assets: €5,213m**
**Est. Closing Q4 2018**

## 2017 GBIG Pipeline

**Deals Sourced**
Re: 26    M&A: 31

**Deals Evaluated**
Re: 19    M&A: 25

**Non-Binding**
Re: 17    M&A: 19

**Definitive**
Re: 7   M&A: 9

**Signed**
Re: 4
M&A: 7

**Offer Stage**

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 137 of 508


Confidential Information

\* Since GBIG M&A team was formed in 2016.

71

# Global Bankers – Unaffiliated Reinsurance Program

| Reinsurer | AMB Rating | Cedent | Products | Effective Date | Stat Reserves 9/30/18 ($m) | Structure |
|---|---|---|---|---|---|---|
| **Inwards Re Programs:** | | | | | | |
| Colorado Bankers Life Ins. Co. | B++ | Motorists | Annuities | 12/1/2017 | 109 | 100% QS Coinsurance |
| Southland National Ins. Co. | Not Rated | N.C. Mutual | Life | 12/31/2014 | 107 | 100% QS Coinsurance |
| Southland National Ins. Co. | Not Rated | Investors Heritage Life | Annuities | 9/30/2016 | 36 | 100% QS Coinsurance |
| Pavonia Life Ins. Co. | Not Rated | Lincoln National Life Ins. Co. | Annuities, COLI, AD&D | 10/1/1995 | 715 | 100% QS Coinsurance |
| Pavonia Life Ins. Co. | Not Rated | F&G Life | Life | 4/1/2005 | 72 | 50% QS Coinsurance |
| Pavonia Life Ins. Co. | Not Rated | First Allmerica Financial Life Ins. Co. | Life | 1/1/2000 | 18 | 25% & 50% QS Modified Coinsurance |
| Pavonia Life Ins. Co. | Not Rated | Guarantee Trust Life | Life | 7/1/2006 | 14 | 100% QS Coinsurance |
| Private Bankers Life and Annuity Co. | Not Rated | Universal Life Insurance Co. | Annuities | 6/30/2017 | 607 | 75% QS (Annuities) / 100% QS (Riders) + NB Flow |
| | | | | **Total:** | **1,678** | |
| **Outwards Re Programs:** | | | | | | |
| Guggenheim | B++ | Bankers Life Ins. Co. | Annuities | 7/1/2010 | 55 | 100% QS Coinsurance |
| Security National Life | Not Rated | Southland National Ins. Co. | Life | 11/1/2012 | 36 | 100% QS Coinsurance |
| | | | | **Total:** | **92** | |

 

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 138 of 508

# Global Bankers – Affiliated Reinsurance Program

| Reinsurer | AMB Rating | Cedent | Products | Effective Date | Stat Reserves 9/30/18 ($m) | Structure |
|---|---|---|---|---|---|---|
| Colorado Bankers Life Ins. Co. | B++ | Bankers Life Ins. Co. | Annuities | 6/30/2017 | 427 | 100% QS Coinsurance |
| Colorado Bankers Life Ins. Co. | B++ | Conservatrix | Life & Annuities | 5/15/2017 | 121 | Excess of Loss (XoL) |
| Bankers Reinsurance Company | Not Rated | Colorado Bankers Life Ins. Co. | Life & Annuities | 12/31/2017 | 118 | 100% QS Coinsurance FWH |
| Southland National Reinsurance Co. | Not Rated | Colorado Bankers Life Ins. Co. | Life & Annuities | 12/31/2015 | 196 | 100% QS Coinsurance FWH |
| Southland National Reinsurance Co. | Not Rated | Southland National Ins. Co. | Life | 1/1/2015 | 136 | 100% QS Coinsurance FWH |


Confidential Information

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 139 of 508

Note: Includes only material insurance contracts. Does not include soon-to-be dissolved/recaptured SNIC to Standard Re Malta treaty.

# Global Bankers U.S. Group Proformas[1]

| $MM | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | |
| Invested assets | 2,887 | 4,669 | 5,111 | 6,901 | 8,958 | 11,139 |
| Other assets | 96 | 58 | 55 | 53 | 50 | 48 |
| **Total Assets** | **2,982** | **4,728** | **5,167** | **6,954** | **9,008** | **11,187** |
| Reserves | 2,070 | 3,598 | 4,070 | 5,689 | 7,615 | 9,659 |
| Other liabilities | 626 | 758 | 745 | 736 | 725 | 713 |
| **Total Liabilities** | **2,697** | **4,356** | **4,815** | **6,425** | **8,340** | **10,372** |
| Contributed Capital | 306 | 459 | 371 | 506 | 592 | 663 |
| Retained Earnings | (20) | (87) | (19) | 22 | 77 | 152 |
| **Capital & Surplus** | **286** | **372** | **352** | **529** | **669** | **815** |
| | | | | | | |
| **Income Statement** | | | | | | |
| Premiums and annuity considerations | 703 | 1,745 | 893 | 1,943 | 2,257 | 2,559 |
| Net investment income | 146 | 180 | 241 | 295 | 390 | 498 |
| Other revenue | 30 | 25 | 18 | 39 | 50 | 59 |
| **Total Revenue** | **879** | **1,950** | **1,151** | **2,276** | **2,698** | **3,116** |
| Policyholder benefits | 195 | 240 | 361 | 375 | 446 | 694 |
| Increase in aggregate reserves | 535 | 1,588 | 580 | 1,619 | 1,921 | 2,039 |
| General Expenses | 43 | 57 | 56 | 59 | 61 | 62 |
| Commissions & other expenses | 90 | 111 | 95 | 163 | 187 | 211 |
| **Total Expenses** | **864** | **1,996** | **1,092** | **2,216** | **2,615** | **3,005** |
| **Pre-tax Op Income** | **15** | **(45)** | **59** | **61** | **83** | **111** |
| Tax | 12 | 21 | 12 | 20 | 28 | 36 |
| **After-tax Op Income** | **3** | **(67)** | **47** | **41** | **55** | **75** |
| RCG/(L) - Net of Tax | 11 | 1 | - | - | - | - |
| **Net Income** | **14** | **(65)** | **47** | **41** | **55** | **75** |
| | | | | | | |
| **Metrics** | | | | | | |
| Net Investment Yield | 5.8% | 4.8% | 4.9% | 4.9% | 4.9% | 5.0% |
| Gen Expense to Assets | 1.5% | 1.2% | 1.1% | 0.8% | 0.7% | 0.5% |
| Required Capital @ target / Reserves | 11% | 11% | 9% | 9% | 9% | 8% |
| Infusions / (Dividends) | 78 | 153 | (88) | 135 | 85 | 71 |

Includes $41M of related preferred stock and surplus notes, as currently structured.

- SNIC owns $24.0M of CBL preferred stock
- SNIC owns $8.31M of BLIC preferred stock
- SNIC invested $9.0M in CBL surplus note

Confidential Information

(1) Legal entities included: CBL, BLIC, PLACMI, SNIC, SNRC. All entities on statutory accounting basis with exception of SNRC, which is on GAAP basis; small variances vs appraisal due to IMR amortization and miscellaneous items not modeled.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 140 of 508

# CBL Proformas[1,2]

| $MM | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | |
| Invested assets | 1,275 | 2,772 | 3,315 | 5,165 | 7,283 | 9,551 |
| Other assets | 44 | 13 | 13 | 12 | 12 | 12 |
| **Total Assets** | **1,318** | **2,785** | **3,327** | **5,178** | **7,296** | **9,563** |
| Reserves | 839 | 2,195 | 2,726 | 4,391 | 6,362 | 8,477 |
| Other liabilities | 357 | 378 | 377 | 383 | 386 | 387 |
| **Total Liabilities** | **1,197** | **2,573** | **3,104** | **4,774** | **6,748** | **8,864** |
| Contributed Capital | 97 | 233 | 198 | 354 | 458 | 549 |
| Retained Earnings | 24 | (21) | 26 | 49 | 89 | 150 |
| **Capital & Surplus** | **122** | **212** | **224** | **404** | **548** | **699** |
| **Income Statement** | | | | | | |
| Premiums and annuity considerations | 783 | 1,460 | 819 | 1,877 | 2,198 | 2,507 |
| Net investment income | 35 | 94 | 153 | 210 | 308 | 421 |
| Other revenue | 10 | 7 | (0) | 23 | 35 | 45 |
| **Total Revenue** | **829** | **1,561** | **972** | **2,109** | **2,541** | **2,972** |
| Policyholder benefits | 24 | 78 | 183 | 215 | 287 | 516 |
| Increase in aggregate reserves | 732 | 1,411 | 636 | 1,665 | 1,971 | 2,115 |
| General Expenses | 14 | 23 | 31 | 33 | 38 | 42 |
| Commissions & other expenses | 43 | 70 | 87 | 156 | 181 | 206 |
| **Total Expenses** | **813** | **1,582** | **936** | **2,069** | **2,477** | **2,878** |
| **Pre-tax Op Income** | **15** | **(21)** | **35** | **40** | **65** | **94** |
| Tax | 11 | 21 | 9 | 16 | 24 | 33 |
| **After-tax Op Income** | **5** | **(42)** | **26** | **23** | **40** | **61** |
| RCG/(L) - Net of Tax | 10 | (2) | - | - | - | - |
| **Net Income** | **15** | **(45)** | **26** | **23** | **40** | **61** |
| **Metrics** | | | | | | |
| Net Investment Yield | 4.3% | 4.7% | 5.0% | 5.0% | 5.0% | 5.0% |
| Gen Expense to Assets | 1.1% | 0.8% | 0.9% | 0.6% | 0.5% | 0.4% |
| Required Capital @ target / Reserves | 8% | 12% | 8% | 9% | 9% | 8% |
| Infusions / (Dividends) | 60 | 136 | (35) | 157 | 104 | 90 |



Confidential Information

(1) Statutory accounting basis; small variances vs appraisal due to IMR amortization and miscellaneous items reconciliation
(2) Includes funds withheld assets/liabilities that are also included on SNRC's balance sheet.

75

# CBL In Force Proformas [1]

| $MM | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | |
| Invested assets | 1,275 | 2,772 | 2,331 | 2,247 | 2,160 | 1,932 |
| Other assets | 44 | 13 | 13 | 12 | 12 | 12 |
| **Total Assets** | **1,318** | **2,785** | **2,343** | **2,260** | **2,172** | **1,944** |
| Reserves | 839 | 2,195 | 1,856 | 1,772 | 1,687 | 1,469 |
| Other liabilities | 357 | 378 | 377 | 383 | 386 | 387 |
| **Total Liabilities** | **1,197** | **2,573** | **2,234** | **2,155** | **2,072** | **1,856** |
| Contributed Capital | 97 | 233 | 77 | 40 | 3 | (41) |
| Retained Earnings | 24 | (21) | 32 | 65 | 97 | 129 |
| **Capital & Surplus** | **122** | **212** | **109** | **105** | **100** | **88** |
| **Income Statement** | | | | | | |
| Premiums and annuity considerations | 783 | 1,460 | 54 | 47 | 43 | 38 |
| Net investment income | 35 | 94 | 112 | 108 | 104 | 96 |
| Other revenue | 10 | 7 | 6 | 6 | 5 | 5 |
| **Total Revenue** | **829** | **1,561** | **172** | **161** | **151** | **139** |
| Policyholder benefits | 24 | 78 | 169 | 165 | 161 | 286 |
| Increase in aggregate reserves | 732 | 1,411 | (84) | (84) | (85) | (217) |
| General Expenses | 14 | 23 | 23 | 18 | 14 | 9 |
| Commissions & other expenses | 43 | 70 | 26 | 25 | 25 | 25 |
| **Total Expenses** | **813** | **1,582** | **134** | **123** | **114** | **102** |
| **Pre-tax Op Income** | **15** | **(21)** | **38** | **38** | **37** | **37** |
| Tax | 11 | 21 | 5 | 6 | 5 | 5 |
| **After-tax Op Income** | **5** | **(42)** | **32** | **32** | **32** | **32** |
| RCG/(L) - Net of Tax | 10 | (2) | - | - | - | - |
| **Net Income** | **15** | **(45)** | **32** | **32** | **32** | **32** |
| **Metrics** | | | | | | |
| Net Investment Yield | 4.3% | 4.7% | 4.4% | 4.7% | 4.7% | 4.7% |
| Gen Expense to Assets | 1.1% | 0.8% | 1.0% | 0.8% | 0.6% | 0.4% |
| Required Capital @ target / Reserves | 8% | 12% | 6% | 6% | 6% | 6% |
| Infusions / (Dividends) | 60 | 136 | (156) | (37) | (37) | (44) |

(1) Statutory accounting basis; small variances vs appraisal due to IMR amortization and intercompany items eliminated

(2) Includes funds withheld assets/liabilities that are also included on SNRC's balance sheet.



Confidential Information

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 142 of 508

76

# CBL New Business Proformas [1,2]

| $MM | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | |
| Invested assets | - | - | 984 | 2,918 | 5,124 | 7,619 |
| Other assets | - | - | - | - | - | - |
| **Total Assets** | - | - | **984** | **2,918** | **5,124** | **7,619** |
| Reserves | - | - | 870 | 2,619 | 4,676 | 7,008 |
| Other liabilities | - | - | - | - | - | - |
| **Total Liabilities** | - | - | **870** | **2,619** | **4,676** | **7,008** |
| Contributed Capital | - | - | 121 | 314 | 455 | 590 |
| Retained Earnings | - | - | (6) | (15) | (7) | 22 |
| **Capital & Surplus** | - | - | **114** | **299** | **448** | **611** |
| **Income Statement** | | | | | | |
| Premiums and annuity considerations | - | - | 764 | 1,829 | 2,155 | 2,468 |
| Net investment income | - | - | 41 | 102 | 205 | 325 |
| Other revenue | - | - | (6) | 17 | 30 | 40 |
| **Total Revenue** | - | - | **800** | **1,949** | **2,390** | **2,833** |
| Policyholder benefits | - | - | 14 | 51 | 126 | 230 |
| Increase in aggregate reserves | - | - | 720 | 1,749 | 2,057 | 2,332 |
| General Expenses | - | - | 8 | 16 | 24 | 33 |
| Commissions & other expenses | - | - | 60 | 131 | 156 | 182 |
| **Total Expenses** | - | - | **802** | **1,947** | **2,363** | **2,776** |
| **Pre-tax Op Income** | - | - | **(3)** | **2** | **27** | **56** |
| Tax | - | - | 4 | 11 | 19 | 27 |
| **After-tax Op Income** | - | - | **(6)** | **(9)** | **8** | **29** |
| RCG/(L) - Net of Tax | - | - | - | - | - | - |
| **Net Income** | - | - | **(6)** | **(9)** | **8** | **29** |
| **Metrics** | | | | | | |
| Net Investment Yield | | | 5.2% | 5.2% | 5.1% | 5.1% |
| Gen Expense to Assets | | | 0.8% | 0.5% | 0.5% | 0.4% |
| Required Capital @ target / Reserves | | | 13% | 11% | 10% | 9% |
| Infusions / (Dividends) | - | - | 121 | 194 | 141 | 134 |

(1) Statutory accounting basis; small variances vs appraisal due to IMR amortization and miscellaneous items reconciliation.

(2) Includes funds withheld assets/liabilities that are also included on SNRC's balance sheet.

Confidential Information



# PLIC MI Proformas [1]

| $MM | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | |
| Invested assets | 1,006 | 1,109 | 1,072 | 1,039 | 1,010 | 971 |
| Other assets | 28 | 20 | 19 | 19 | 18 | 17 |
| **Total Assets** | **1,035** | **1,129** | **1,091** | **1,057** | **1,028** | **988** |
| Reserves | 898 | 881 | 851 | 829 | 811 | 783 |
| Other liabilities | 70 | 183 | 172 | 162 | 152 | 143 |
| **Total Liabilities** | **968** | **1,064** | **1,023** | **991** | **963** | **926** |
| Contributed Capital | 87 | 87 | 73 | 58 | 45 | 33 |
| Retained Earnings | (21) | (23) | (5) | 9 | 20 | 29 |
| **Capital & Surplus** | **67** | **65** | **68** | **66** | **65** | **63** |
| **Income Statement** | | | | | | |
| Premiums and annuity considerations | 52 | 46 | 42 | 37 | 34 | 30 |
| Net investment income | 50 | 39 | 53 | 52 | 50 | 49 |
| Other revenue | 6 | 9 | 11 | 10 | 9 | 9 |
| **Total Revenue** | **108** | **94** | **106** | **99** | **94** | **88** |
| Policyholder benefits | 99 | 91 | 97 | 85 | 81 | 89 |
| Increase in aggregate reserves | (13) | (16) | (30) | (22) | (18) | (28) |
| General Expenses | 10 | 14 | 10 | 11 | 10 | 8 |
| Commissions & other expenses | 11 | 11 | 10 | 9 | 8 | 7 |
| **Total Expenses** | **107** | **99** | **86** | **83** | **80** | **76** |
| **Pre-tax Op Income** | **1** | **(5)** | **20** | **17** | **14** | **12** |
| Tax | (0) | 0 | 3 | 3 | 2 | 2 |
| **After-tax Op Income** | **1** | **(5)** | **17** | **14** | **11** | **9** |
| RCG/(L) - Net of Tax | 1 | 4 | - | - | - | - |
| **Net Income** | **3** | **(1)** | **17** | **14** | **11** | **9** |
| **Metrics** | | | | | | |
| Net Investment Yield | 4.9% | 3.7% | 4.9% | 4.9% | 4.9% | 4.9% |
| Gen Expense to Assets | 1.0% | 1.2% | 0.9% | 1.0% | 0.9% | 0.9% |
| Required Capital @ target / Reserves | 10% | 8% | 8% | 8% | 8% | 8% |
| Infusions / (Dividends) | - | (0) | (14) | (16) | (13) | (12) |



Confidential Information

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 144 of 508

(1) Statutory accounting basis. Total advances vs approach due to MR amortization and miscellaneous items not modeled.

# BLIC Proformas [1]

| $MM | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | |
| Invested assets | 168 | 398 | 360 | 345 | 325 | 290 |
| Other assets | 15 | 17 | 15 | 13 | 12 | 11 |
| **Total Assets** | **183** | **414** | **375** | **359** | **337** | **301** |
| Reserves | 102 | 346 | 327 | 313 | 294 | 260 |
| Other liabilities | 45 | 35 | 33 | 32 | 30 | 29 |
| **Total Liabilities** | **147** | **381** | **361** | **345** | **325** | **290** |
| Contributed Capital | 38 | 48 | 25 | 21 | 16 | 11 |
| Retained Earnings | (2) | (14) | (11) | (7) | (4) | (0) |
| **Capital & Surplus** | **36** | **33** | **14** | **14** | **13** | **11** |
| | | | | | | |
| **Income Statement** | | | | | | |
| Premiums and annuity considerations | (176) | 244 | - | - | - | - |
| Net investment income | 10 | 11 | 18 | 17 | 16 | 14 |
| Other revenue | 4 | 2 | 0 | 0 | 0 | 0 |
| **Total Revenue** | **(161)** | **258** | **18** | **17** | **16** | **15** |
| Policyholder benefits | 7 | 12 | 29 | 24 | 28 | 42 |
| Increase in aggregate reserves | (178) | 243 | (19) | (14) | (19) | (34) |
| General Expenses | 4 | 6 | 3 | 3 | 3 | 2 |
| Commissions & other expenses | 10 | 9 | 0 | 0 | 0 | 0 |
| **Total Expenses** | **(157)** | **270** | **13** | **13** | **12** | **10** |
| **Pre-tax Op Income** | **(4)** | **(12)** | **5** | **4** | **4** | **4** |
| Tax | (0) | 1 | 1 | 1 | 1 | 1 |
| **After-tax Op Income** | **(4)** | **(13)** | **4** | **4** | **3** | **4** |
| RCG/(L) - Net of Tax | - | (0) | - | - | - | - |
| **Net Income** | **(4)** | **(13)** | **4** | **4** | **3** | **4** |
| | | | | | | |
| **Metrics** | | | | | | |
| Net Investment Yield | 4.2% | 4.0% | 4.8% | 4.8% | 4.8% | 4.7% |
| Gen Expense to Assets | 2.4% | 1.3% | 0.7% | 0.8% | 0.8% | 0.7% |
| Required Capital @ target / Reserves | 32% | 10% | 4% | 4% | 4% | 4% |
| Infusions / (Dividends) | 11 | 10 | (23) | (4) | (4) | (5) |



Confidential Information

(1) Statutory accounting basis; small variances vs appraisal due to IMR amortization and miscellaneous items not modeled.

79

# SNIC Proformas [1,2]

| $MM | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | |
| Invested assets | 410 | 361 | 339 | 326 | 314 | 302 |
| Other assets | 8 | 9 | 9 | 8 | 8 | 8 |
| **Total Assets** | **418** | **370** | **348** | **335** | **322** | **310** |
| Reserves | 231 | 175 | 165 | 156 | 147 | 138 |
| Other liabilities | 154 | 163 | 163 | 160 | 157 | 154 |
| **Total Liabilities** | **385** | **338** | **328** | **315** | **304** | **293** |
| Contributed Capital | 72 | 72 | 60 | 58 | 56 | 54 |
| Retained Earnings | (39) | (40) | (39) | (38) | (37) | (36) |
| **Capital & Surplus** | **34** | **32** | **21** | **20** | **18** | **17** |
| | | | | | | |
| **Income Statement** | | | | | | |
| Premiums and annuity considerations | 8 | (38) | 4 | 3 | 3 | 2 |
| Net investment income | 22 | 18 | 17 | 16 | 16 | 15 |
| Other revenue | 8 | 7 | 7 | 6 | 6 | 5 |
| **Total Revenue** | **38** | **(12)** | **27** | **25** | **24** | **22** |
| Policyholder benefits | 28 | 23 | 19 | 18 | 16 | 15 |
| Increase in aggregate reserves | (12) | (56) | (10) | (9) | (9) | (8) |
| General Expenses | 11 | 10 | 9 | 8 | 7 | 6 |
| Commissions & other expenses | 18 | 12 | 8 | 8 | 8 | 8 |
| **Total Expenses** | **45** | **(10)** | **26** | **25** | **23** | **21** |
| **Pre-tax Op Income** | **(7)** | **(2)** | **1** | **1** | **1** | **1** |
| Tax | (1) | (1) | (0) | (0) | (0) | (0) |
| **After-tax Op Income** | **(6)** | **(2)** | **1** | **1** | **1** | **1** |
| RCG/(L) - Net of Tax | (0) | (0) | - | - | - | - |
| **Net Income** | **(6)** | **(2)** | **1** | **1** | **1** | **1** |
| | | | | | | |
| **Metrics** | | | | | | |
| Net Investment Yield | 5.3% | 4.8% | 4.9% | 4.9% | 4.9% | 4.9% |
| Gen Expense to Assets | 2.7% | 2.8% | 2.6% | 2.5% | 2.3% | 2.1% |
| Required Capital @ target / Reserves | 10% | 13% | 13% | 13% | 13% | 13% |
| Infusions / (Dividends) | 5 | (1) | (12) | (2) | (2) | (2) |



Global Bankers INSURANCE GROUP

Confidential Information

(1)   Statutory accounting basis; small variances vs appraisal due to IMR amortization and other balance sheet items reconciliation

(2)   Includes funds withheld assets/liabilities that are also included on SNRC's balance sheet.

80

# SNRC Proformas [1]

| $MM | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | |
| Invested assets | 339 | 351 | 349 | 348 | 344 | 337 |
| Other assets | 9 | 1 | 1 | 1 | 1 | 1 |
| **Total Assets** | **348** | **352** | **350** | **349** | **345** | **338** |
| Reserves | 311 | 317 | 319 | 318 | 314 | 308 |
| Other liabilities | 9 | 5 | 5 | 5 | 5 | 5 |
| **Total Liabilities** | **320** | **322** | **325** | **324** | **320** | **314** |
| Contributed Capital | 11 | 19 | 15 | 16 | 16 | 16 |
| Retained Earnings | 17 | 12 | 10 | 9 | 9 | 9 |
| **Capital & Surplus** | **28** | **30** | **26** | **25** | **25** | **25** |
| | | | | | | |
| **Income Statement** | | | | | | |
| Premiums and annuity considerations | 36 | 33 | 29 | 26 | 22 | 20 |
| Net investment income | 28 | 16 | 17 | 17 | 17 | 17 |
| Other revenue | 0 | 0 | - | - | - | - |
| **Total Revenue** | **65** | **49** | **46** | **43** | **39** | **36** |
| Policyholder benefits | 37 | 36 | 34 | 34 | 34 | 33 |
| Increase in aggregate reserves | 6 | 6 | 3 | (1) | (4) | (6) |
| General Expenses | 4 | 4 | 4 | 4 | 4 | 3 |
| Commissions & other expenses | 8 | 9 | 8 | 7 | 6 | 6 |
| **Total Expenses** | **55** | **55** | **48** | **44** | **40** | **36** |
| **Pre-tax Op Income** | **10** | **(6)** | **(2)** | **(1)** | **(0)** | **0** |
| Tax | 3 | (1) | (0) | (0) | (0) | (0) |
| **After-tax Op Income** | **7** | **(5)** | **(1)** | **(1)** | **(0)** | **0** |
| RCG/(L) - Net of Tax | - | - | - | - | - | - |
| **Net Income** | **7** | **(5)** | **(1)** | **(1)** | **(0)** | **0** |
| | | | | | | |
| **Metrics** | | | | | | |
| Net Investment Yield | 8.6% | 4.7% | 4.9% | 4.9% | 4.9% | 4.9% |
| Gen Expense to Assets | 1.0% | 1.2% | 1.1% | 1.1% | 1.0% | 0.9% |
| Required Capital @ target / Reserves | 8% | 8% | 8% | 8% | 8% | 8% |
| Infusions / (Dividends) | 2 | 8 | (3) | 1 | 0 | (1) |


Global Bankers INSURANCE GROUP

Confidential Information

(1) Current accounting basis; small variances vs. appraisal due to miscellaneous items not modeled.

81

# Runoff Businesses - 2018/2019 RBC Sensitivities[1]

| $MM | 2018 | | | 2019 | | | | |
| Business | Available Capital | Required Capital | CAL RBC% | Available Capital | Required Capital | CAL RBC% | Excess Capital[3] | Comments |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| BLIC | 35 | 12 | 305% | 37 | 5 | 715% | 22 | Jump in 2019 due to C4 release from no new business |
| SNIC | 34 | 8 | 455% | 32 | 7 | 435% | 10 | Decline with loss… close to breakeven depending on exact overhead expense allocation |
| PLICMI (No Reinsurance) | 69 | 24 | 285% | 82 | 23 | 350% | 13 | Capital grows with profits but required capital declines as business runs off |
| PLICMI (With Reinsurance) | 118 | 13 | 895% | 130 | 13 | 1000% | 91 | Assumes reinsurance deal… flat without it depending on timing of portfolio reinvestment |
| BLIC/SNIC Merged[2] | 61 | 19 | 320% | 60 | 12 | 470% | 24 | Eliminate BLIC preferred stock upon merger ($8.3MM)… impacts RBC as currently in SNRC FW account.  Minimal covariance benefit. |
| BLIC/SNIC/PLICMI Merged[2] (No Reinsurance) | 130 | 34 | 380% | 141 | 34 | 405% | 39 | More covariance benefit with all 3 combined |
| BLIC/SNIC/PLICMI Merged[2] (With Reinsurance) | 179 | 29 | 620% | 187 | 25 | 748% | 112 | |

Confidential Information



(1) All scenarios on 2017 RBC factors / updates.
(2) SNIC owns BLIC preferred stock of $8.3MM that is eliminated upon merger.
(3) Based on 300% target for runoff companies.

82

# Global Bankers – Proformas (w/ Block Reinsurance Illustration)

## Pre-tax Operating Income – w/ Block Reinsurance Deals [1]

$MM



- CBL/BLIC Annuities
- All Other
- Block deals

Loss driven by new business strain from MYGA sales

| ($MM) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Block Annuity Deal Premium | 0 | 0 | 2,000 | 2,000 | 2,000 | 2,000 |
| Life/Worksite Sales | 13 | 15 | 15 | 20 | 25 | 30 |
| Annuity Sales | 374 | 1,500 | 750 | 1,800 | 2,100 | 2,400 |
| Assets | 2,982 | 4,728 | 7,242 | 11,123 | 15,257 | 19,489 |
| Net Investment Yield | 5.8% | 4.8% | 4.9% | 4.8% | 4.8% | 4.9% |
| General Exp / Assets | 1.5% | 1.2% | 0.8% | 0.5% | 0.4% | 0.3% |
| | | | | | | |
| In-force Capital Contr./(Release) | 78 | 93 | (208) | (58) | (56) | (63) |
| New Business Capital Contr./(Release) | 0 | 60 | 121 | 194 | 141 | 134 |
| Block Deal Capital Contr./(Release) | 0 | 0 | 174 | 149 | 123 | 95 |
| **Total Contribution/(Release)** | **78** | **153** | **87** | **284** | **208** | **166** |
| | | | | | | |
| **Total Capital & Surplus** | **286** | **372** | **481** | **787** | **1,056** | **1,330** |

## Comments

**Illustration shows how reinsurance could be used to reach scale quicker**

**Expense ratios pushed lower by adding assets without needing additional overhead**
- Pay expense allowance to ceding company equal to maintenance expenses

**Initial ceding commission drives loss in 2019/2020... more than offset by profits on blocks in 2021/2022**

**Modeled $1B of 5 year MYGA's and $1B of FIA 10 WB each year for purpose of illustration**

### Key Assumptions

- $2B per year of annuity block deals (50/50 MYGA/FIA)
- Contribute $60MM to CBL in 4Q'18
- Target RBC of 400% for CBL, 300% for runoff businesses at 2017 RBC factors and tax rates
- ~5% net investment yield for in-force



Confidential Information

(1) Legal entities included: CBL, BLIC, PLACA, SNIC, SNRC; All entities on statutory accounting basis with exception of SNRC, which is on GAAP basis; small variances vs appraisal due to IMR amortization and miscellaneous items not modeled.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 149 of 508

83

# Asset Mix – U.S. Summary[1]

## Global Bankers Total Investable Assets - Current [2]



**$4,187MM**

- PPNs 20%
- Other 4%
- Cash & short-term 24%
- Public Corp Debt / ABS 21%
- Private Unaffil. Corp Debt 9%
- Affiliated Debt 22%

## Global Bankers PF Total Investable Assets – At Close[3]



**$4,187MM**

- Other 4%
- Private Unaffil. Corp Debt 9%
- Public Corp Debt / ABS 21%
- Cash & short-term 66%

## Commentary

- Proforma asset mix reflects refinancing and payoff of affiliated assets before closing
- Actual asset mix at closing would likely reflect a higher concentration in Public Corps/ABS (1-3 year duration)
- As of 9/30/2018, the liability durations of the in force books of business are as follows:
  - CBL = 7.9 yrs.
  - BLIC = 6.3 yrs.
  - Pavonia = 11.8 yrs.
  - SNIC = 9.5 yrs.
  - SNRC = 11.1 yrs.



Confidential Information

(1) Investable Assets. Excludes goodwill/VOBA, and contract loans
(2) As of 9/30/2018.
(3) Pro-forma for asset restructuring pre-close, but does not reflect any new business.

84

# Global Bankers – Enterprise Risk Management

- **Enterprise Risk Management is a formal process with an annual board approved policy and risk appetite**

- **Significant focus on building out governance and maturing the ERM process in 2018**

- **Key 2018 enhancements include:**



### Established key Senior Management meetings

- Monthly financial business review
- Quarterly ERM review
- Bi-monthly executive management meetings



### Systems and Data Initiatives

- Reduce number of actuarial platforms to foster better model governance and uniform methodology
- Use single system for general ledger across enterprise
- Utilization of R Shiny as an actuarial tool



### Formation of a Product Approval Committee

- Facilitates discussion pertaining to new and existing products
- Tollgates implemented at critical steps



### Model Audit Rule

- Documents our as-is processes
- Remediates control deficiencies within our statutory financial statements
- Resolves control language, documentation and performance deficiencies



### Improvements to Risk Assessment

- Moved from high, medium, low assessment to survey with ranges for frequency and severity
- Allows more differentiation on risks and facilitates discussions on mitigation priorities



### Improvements to Risk Dashboards

- Integrate newly acquired entities into risk monitor process



Confidential Information

85

# Global Bankers – ERM and Governance Structure

## Governance Structure



- **Board of Directors**
- **Audit, Risk, Compliance Committee**
- **CEO**
- **Chief Actuary**
- **Management Team Responsible for Risk Assessment**

 **Executive team** focused on educating staff and promoting a culture of risk awareness and management

 **Business units** are responsible for day to day risk management and mitigation

**Board approved ERM policy and risk appetite**

| Credit | Market | Insurance | Model | Operational | Legal & Regulatory |
|---|---|---|---|---|---|
| • Payment Default<br>• Migration<br>• Credit Spread<br>• Alternative Investments | • Interest Rate<br>• Equity Returns<br>• Liquidity<br>• FX Risk | • Mortality/Morbidity/ Longevity<br>• Catastrophe<br>• Lapse<br>• Policyholder Behavior<br>• Expense<br>• Product Design and Pricing | • Data and Assumption<br>• Model Fit for Purpose<br>• Use of Models<br>• Modeling of Regulatory Requirements | • Cyber Security<br>• Business Continuity<br>• 3rd Party<br>• Process Execution and Delivery<br>• Fraud<br>• Personnel | • Litigation<br>• Non-Compliance in Business Practice<br>• Changes in Regulatory Requirements<br>• DOI Relationship Management |

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 152 of 508

Global Bankers
INSURANCE GROUP

Confidential Information

# Global Bankers – Risk Identification and Management

## Risk Identification

**Quarterly executive meetings are held to address ERM related topics. The agenda covers two tools used for risk metric reporting:**

- The Risk Monitoring Dashboard - developed to highlight the key risk or pricing indicators specific to each GBIG insurance company. When an indicator becomes close to or outside of defined limits, monitoring or actionable steps are triggered

- The ERM Qualitative Dashboard – this document started as a risk registry, either from identifying risks our organization was willing to accept in pursuit of our objectives or they emerged as the business evolved

  – These risks were initially analyzed based upon a Low/Medium/High classification

  – As we sought to enhance our risk management framework, the next progression is to view these risks from a quantitative perspective

    - Considers both frequency and severity impacts

**The monthly financial business review:**

- This review encompasses our strategic goals and how the organization is tracking against those anticipated accomplishments. The meeting also discusses potential areas of focus for the company (e.g. new business strain or expense pressure) as our executive team reviews the financials against our business plan.

## Risk Mitigation

**The process starts with adhering to and then annually reviewing (along with updating accordingly) our Enterprise Risk Policy**

- Define risk limits that the organization is comfortable accepting as part of our overall business strategy

- Proactively assessing the Risk Identification tools noted above

  – Consider scenarios or trends to understand the impact they may pose to our organization

- Establishing protocols for the identification and/or mitigation plans for emerging risks

**The quarterly ERM discussion lead to risk mitigation discussions on current and emerging risks**

**Bi-monthly meetings are held to discuss current topics pertinent to current state of the organization, including mitigation activities**

Global Bankers INSURANCE GROUP

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 153 of 508

Confidential Information

# Global Bankers – ERM Risk Review: 2018 forward

## Process

- Enhanced quarterly process to access both severity (1 in 10 years) and frequency to differentiate risk

- Have developed an R Shiny database and reporting platform that will illustrate trending and track individual views



| Top Risks | Frequency | Severity |
|-----------|-----------|----------|
| Reputation Risk | 6.0 | 9.4 |
| Regulatory Environment | 5.9 | 9.4 |
| Investments | 6.2 | 8.2 |
| Source of Capital | 5.1 | 9.1 |
| Cybersecurity | 5.8 | 7.0 |

## Benefits

- Facilitates more in-depth discussions as to scenarios leading to severity

- It should translate into better decisions on organization focus for mitigation

- Will be able to measure the high level effectiveness of the mitigation over time

Global Bankers INSURANCE GROUP

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 154 of 508
Confidential Information

88

# Global Bankers – Assessment of Top 4 Risks: Today's View



## Regulatory Environment

**Mitigation:**

- Proactive and transparent communication with regulators
- Involvement in industry associations and activities to stay abreast with changes and trends in the industry

## Investments

**Mitigation:**

- Closer interaction with the Eli investment department on asset discussions and modeling
- Engaged with a 3rd Party to review and restructure our portfolios. Viewed positively with the states to which we are domiciled

## Sources of Capital

**Mitigation:**

- Working with Eli on capital contributions as part of the planning process for becoming self-sufficient
- Consideration for alternate sources of funding
- More robust scenario testing and capital modeling as part of planning process

## Reputation

**Mitigation:**

- Active and transparent interaction with distributors and partners
- Transparency with regulatory bodies and rating agencies
- Continue to focus and build digital platform
- Provide a top rated customer experience

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 155 of 508

Confidential Information     Cybersecurity is one of our Top 5 risks – this risk is addressed within the next two slides.     89

# Global Bankers – Cybersecurity: IT Security Stack

## We need to safeguard the company and our customers.



### Email Hardening

- O365 Advanced Threat Protection
- Multifactor Authentication
- Email Archiving
- Email Security Gateway



### Device Protection

- Mobile Device Management
- Endpoint Protection
- MFA and Radius Services



### Network Protection

- Perimeter Firewall
- Vulnerability Scanning
- Data Loss Protection



### Identity Protection

- Identity & Access Management
- Identity Verification
- Identity Governance & Administration
- Password Vaulting



**Policy Management Platform**



**Security Event & Information Management Platform**



# Global Bankers – IT Security Processes

## Work efforts currently underway to invest in hardening our IT Security Processes:

### Governance & Education

Establish Security Review Committee
**Complete**

Phishing Simulation Tests
**Complete**

Security Education Program
**Complete**

### Controls & Frameworks

Adhere to ISO27001 Control Framework
**12/31/2018**

Adhere to NIST 800-30 Risk Framework
**12/31/2018**

Security Metrics & Reporting
**10/31/2018**

Industry Research & Advisors
**Subscribing in 2019**

### Policies

Create IT Policy Set
**Complete**

Finalize Mainframe DR/ BCP Plans
**Complete**

GDPR-Compliant Privacy Policy
**Under Review with Legal**

Create Conditional Access Rules
**Complete**

### Security Operations

Current State Gap/ Threat Analysis
**Complete; to be updated periodically**

Ticketing System & Incident Management
**Complete**

Risk Register
**Complete**

Data Classification
**12/31/2018**



Confidential Information

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 157 of 508

91

# Global Bankers – Ongoing ERM Initiatives



## ORSA

- **Insurance group required to submit ORSA Summary report by end of 2019.**

- Enhancing stress test methodology for analyzing solvency position.

- Continue to build out our capital planning as the organization continues to mature.

- Develop US ORSA initially, and then an overall GBIG summary report utilizing ORSA



## Improvements to Risk Dashboards

- Integrate newly acquired entities into risk monitor process.

- Uniform methodology and reports across insurance group - incorporate best capabilities from newly added business.

- **Automate more of the analysis and align with monthly reporting processes.**



## Enhance Quantitative Guidelines and Risk Limits

- Adopt quantitate framework for measuring capital requirements across the insurance group.

- Supplement strong qualitative risk limits with quantifiable metrics–particularly for the modeling of solvency position in stress scenarios.



## Systems and Data Initiatives

- Reduce number of actuarial platforms to foster better model governance and uniform methodology

- Use single system for general ledger across enterprise

- **Build a data warehouse that contains transactional data and is used across the organization as the single source of truth**



## Granular Analysis of Business Performance to Improve Monitoring

- Enhance analysis of business performance by understanding results more granularly.

- Assist in monitoring insurance and pricing risk and allow us to react to adverse experience.

- Develop automated reporting and metrics that sit on top of the new data warehouse

- **Continue to expand the use of R Shiny to improve monitoring, reporting and analysis across our business.**



Confidential Information

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 158 of 508

# Global Bankers - Biographies (1 of 7)



## Sandy Ball - Chief Human Resources Officer

Sandy's career began at the American Red Cross where she was the Training Leader in both the Princeton, NJ and Richmond, VA organizations. She joined General Electric in 1998 it then went on to become Genworth Financial in 2004, where she held a series of progressive roles in the Training and Development and HR Director responsibilities before becoming a Vice President, HR in 2013.

As a member of the Executive leadership team, she brings a background of strategic partnership, change management, executive coaching, and people engagement and development. Sandy is also engaged in serving the community as a mentor through Partnership for the Future, coaching job seekers through CARITAS and JAM, has also led projects for the Boys and Girls Club and Appalachian Service Project.

Sandy has a BS degree from Lynchburg College and a Masters in Human Resource Development from George Washington University. She also holds the SPHR and SCP designations from the Society of Human Resource Management.



## Scott Boug, FSA, FCIA, MAAA and CFA - Private Bankers Life and Annuity Co., President and Chief Actuary

Scott joined Global Bankers with over twenty-five years of experience in the insurance and reinsurance industries. He most recently served as Head of Financial Solutions for SCOR Global Life Americas, sourcing and structuring non-traditional life reinsurance solutions.

Prior to that, he worked as Chief Risk Officer and Run-Off Segment Leader at Genworth Financial, maximizing financial value and managing quarterly financial reporting. He also held high-level positions at Munich RE, Transamerica and Aegon.

He is a Fellow of the Society of Actuaries, Canadian Institute of Actuaries and a CFA Charterholder. He holds a B.S in Statistics from Western University.

Global Bankers INSURANCE GROUP — Confidential Information

93

# Global Bankers - Biographies (3 of 7)



## Paul Brown, J.D. - Chief Investment Officer

Paul came to Global Bankers from J.P. Morgan, where he served as Managing Director of JP Morgan's Insurance Investment Banking Group focused on Life & Annuity, Property & Casualty, M&A and capital raising. He previously held leadership positions in insurance investment banking at Merrill Lynch and Credit Suisse First Boston, where he advised on the acquisitions of United Investors Life and Old Mutual US, as well as the recapitalizations of Lincoln Financial and Protective Life. Paul has advised on more than one hundred M&A transactions and more than fifty significant capital raising transactions.

Before moving into investment banking, he worked as an attorney at Cravath Swaine & Moore LLP, specializing in M&A and corporate law. Paul received his B.A. with honors and distinction in Economics from Yale College and his J.D. from the University of Virginia School of Law.



## Chad Burns - SVP, Annuities

Chad joins CBLife from Transamerica where he served as Regional Vice President overseeing annuity sales and corporate retirement plan sales in North Carolina, including business development strategies, plan design analysis, investment benchmarking and analyses and employee education plans.

Prior to joining Transamerica in 2012, Chad worked for The Hartford as the Regional Sales Director for corporate retirement plan sales in North Carolina. Formerly, he served as Regional Vice President for Prudential Financial where he led the company's distribution of fixed and variable annuities to major multi-national distribution partners in South Carolina, eastern Tennessee and western North Carolina. Before Prudential Financial, Chad also held positions as Regional Vice President for variable annuity and fixed annuity sales for AXA Distributors and Planco – Hartford.

Chad holds a B.A. in Business Management from North Carolina State University.

# Global Bankers - Biographies (4 of 7)



## Matteo Castelvetri - Chief Executive Officer, Europe

Matteo joined GBIG after spending 19 years in Investment Banking at Morgan Stanley and Goldman Sachs.

As a Managing Director of Morgan Stanley's Financial Institution Group, he led the European Insurance effort and held primary coverage responsibility for several European large cap insurers.

He has advised on over 50 transactions and has originated and executed some of the most prominent insurance M&A events, restructuring and IPOs in Europe.

Matteo started his career at Goldman Sachs as a government bond and distressed debt investor first and then as an advisor to banks and insurers.

He received a summa cum laude Bachelor Degree in Economics from Bocconi University in Milan and also holds a Bachelor Degree in Classical Guitar.



## Tamre Edwards - Chief Legal Officer

Tamre comes to Global Bankers with 16 years of legal experience, having most recently served as AVP, Associate General Counsel – Mergers & Acquisitions for Nationwide Insurance. In that role, he led the legal team responsible for advising Nationwide in connection with mergers, acquisitions, divestitures, joint ventures, financings, and other strategic initiatives.

Prior to joining Nationwide, he worked in Chicago at Sidley Austin LLP and Locke Lord LLP. His practice focused on corporate, transactional and regulatory matters relating to the insurance and financial services industries.

He holds a B.A. in English from the University of Michigan, Ann Arbor, and a J.D. with honors from The Ohio State University, Moritz College of Law.

**Global Bankers** INSURANCE GROUP

Confidential Information

# Global Bankers - Biographies (5 of 7)



## Mike Farley - Chief Actuary

Mike joined Global Bankers with over 30 years of experience in the insurance and reinsurance industries.  Mike is a senior financial executive and actuary with significant experience as a strategic member of management teams.  He has held various senior roles in his career including Chief Actuary, CFO, COO, and CRO. He most recently worked for Munich Re but has also worked at Transamerica Re, CNO Financial, ING, Allianz, LifeUSA and Federated Insurance. As part of his responsibilities over the years, he has been involved with a wide range of individual and group life, health and annuity products.

Mike is a Fellow of the Society of Actuaries, a Chartered Enterprise Risk Analyst, and a Member of the American Academy of Actuaries.  He holds a B.S in Chemistry from St. John's University in Minnesota.



## Lou E. Hensley - CEO & President

Lou has over 25 years of experience in the insurance industry and has played an instrumental part in leading/building successful teams, M&A, product design, capital management, and corporate strategy. Prior to joining Global Bankers, he served in two roles at Genworth Financial: President of Life & Annuities and Chief Commercial Officer. As President of Life & Annuities at Genworth, he had full P&L responsibilities for the life, annuities and run-off businesses, representing a balance sheet in excess of $30B.

He also spent ten years as a senior vice president with Wells Fargo & Co., and was executive vice president of Wells Fargo's Bermuda-based reinsurance subsidiary, Union Hamilton Reinsurance, Ltd. He was instrumental in helping Union Hamilton grow from a start-up to a multi-billion dollar reinsurance company. He joined Wells Fargo and Union Hamilton as a result of Wells Fargo's acquisition of Pivot, a leading insurance-focused technology and financial information services company of which he was co-founder and President.   He also held corporate development positions with Jackson National Life (a subsidiary of Prudential plc), The Midland Life Insurance Company (a Swiss Re affiliate), and Conseco.

He holds a BS in Actuarial Science and Accounting from Ball State University, in addition to having executive training with the London Business School.

Global Bankers INSURANCE GROUP

Confidential Information

96

# Global Bankers - Biographies (6 of 7)



## Jeff Levin - President, Life & Worksite

Jeff Levin joins Global Bankers Insurance Group after 20+ years with Genworth Financial. A successful commercial leader, Jeff has deep expertise gained through progressively larger roles in Sales Leadership, Relationship Management, Business and Strategy Development, Product Development, Sales Force Effectiveness, and Wholesaling. In his most recent role as Vice President, Long Term Care Sales, Jeff lead the Long Term Care Insurance distribution organization across all distribution channels. Included in his responsibilities were external sales of both Individual and Employer Group LTC insurance products, Account Development, Internal Sales, Learning and Development, and Business Development. Prior to his current role, Jeff was Vice President, Sales Growth and Development, where he was responsible for leading a multi-faceted team that included Account Management, Learning and Development, and Internal Sales for Genworth's US Life Insurance business including Annuities, Life, and Long Term Care.

A native of the San Francisco Bay Area, Jeff started with the Long Term Care business after graduating from the University of California at Santa Barbara with a BA in Communication Studies. In addition to his career at Genworth, Jeff has also held other sales leadership and wholesaling positions. His collaborative, motivating style along with his proven record of winning strategies will foster a shared commitment to success and to effective growth. Jeff currently resides in the Richmond, Virginia area with his wife and three children.



## Joe Lurie - Chief Information Officer

Joe joined Global Bankers as a seasoned Information Technology Executive with over 30 years of experience building Insurance Technology Solutions at several large insurers, including Amex Life Assurance, GE Financial and Genworth. He held multiple roles during his tenure at Genworth, including VP of New Product Initiatives, VP of Technology Operations, CIO of Genworth Mortgage and most recently VP of Digital Technology and Distribution Solutions.

During his time in the industry, he has built and supported technology solutions in support of the sale and administration of Life, Annuity, Long Term Care and Medicare Supplemental Products, supporting a portfolio of products containing over 4 million policies. He holds a B.S. in Information and Computer Science from Georgia Tech.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 163 of 508

# Global Bankers - Biographies (7 of 7)



## Brian Stewart - Chief Financial Officer

Before coming to Global Bankers, Brian held numerous roles over a 15-year career with Genworth Financial, most recently as the Chief Financial Officer of the Life & Annuity business, with over $30B in invested assets. As CFO of Life & Annuities, he had full P&L responsibility as well as management responsibility for the Actuarial function. He spent 3 years in London in a senior finance role with responsibility over FP&A, Capital Management, Expenses, Sourcing & Facilities across 23 countries.

Additionally, he worked as the CFO of the Medicare Supplement business after completing Genworth's first acquisition after the IPO from GE. Brian and the leadership team increased the valuation of the business by 65% in the 5 years following the acquisition. He also helped lead the conversion of the administrative system from a mainframe platform to a Microsoft-supported platform.

Brian began his career by completing GE's Financial Management Program, which included five roles across consumer credit cards, vendor financial services, commercial equipment financing, and insurance. He holds a B.S. in Finance from Bentley University, with a concentration in Computer Information Systems.

Confidential Information

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 164 of 508

# Global Bankers – HR Dashboard



# Global Bankers – Headcount Summary

| Function[1] | Executive / Functional Leader | Proforma 12/31/18 Headcount | Key Assumptions |
|---|---|---|---|
| Executive | Lou Hensley | 3 | Fill open executive admin. position |
| Finance | Brian Stewart | 44 | |
| Investments | Paul Brown | 6 | |
| Actuarial | Mike Farley | 11 | |
| IT | Joe Lurie | 34 | Fill 4 open positions |
| Legal/Compliance/Claims | Tamre Edwards | 14 | |
| HR/MarComm/Facilities | Sandy Ball | 11 | |
| Government Relations | Rod Perkins | 2 | |
| Training | N/A | 3 | |
| Life & Worksite | Jeff Levin | 36 | |
| Annuities | Chad Burns | 15 | BLIC office closed |
| Preneed | N/A | 0 | Responsibilities transferred to Runoff team (NJ) |
| Runoff | Kristan VanDerMeer | 16 | |
| **GBIG U.S. Employee Headcount[2]** | | **195** | |
| | | | |
| M&A Europe (London) | Matteo Castelvetri | 3 | |
| GB Life (Luxembourg) | Pieter Coopmans | 50 | |
| Conservatrix (Netherlands) | Erwin van der Wal | 37 | |
| Pramerica (Italy) | | 106 | |
| G.N.B. Seguros Vida (Portugal) | | 54 | |
| **GBIG Europe Employee Headcount** | | **250** | Pro-forma for acquisitions signed but not yet closed |
| | | | |
| GB - Business Solutions (India) | Rengarajan Appan | 99 | |
| GBIG Dedicated Resources (Philippines) | N/A | 21 | |
| Offshore Annuities (Bermuda/Barbados) | Scott Boug | 19 | |
| **GBIG Offshore & Dedicated Resources** | | **139** | |
| | | | |
| **Global Headcount** | | **584** | |
| **In Durham** | | **154** | |
| **Remote (GBIG U.S.)** | | **10** | |

Note: The Global Headcount, In Durham, and Remote count excludes contractors, TPAs, part time, and interns
(1) Functional Leader Executives are included in the count for their department.
(2) Includes employees located in Durham office (154), New Jersey office (31), and remote (10).



Confidential Information

# Exhibit K1

**NHC Debt Structure (Proposed Revised)**

| Total outstanding less adjustments: | | $ | 2,485,569,090 | Terms | Pay Off Source: |
|---|---|---|---|---|---|
| Less all Agera to 10 year zero (loans not part of NHC) | | $ | (186,702,332) | Unsecured 10 year zero coupon note with GEL PG | NHC cash flow or refi within 10 years |
| Less all PBLA main to 10 year zero on NHC | | $ | (259,399,370) | Unsecured 10 year zero coupon note with GEL PG | $300M of PBLA surplus will cover |
| Less all NHC Exclusions | | $ | (86,121,265) | 4 year PIK at 5% with 5 year bullet | Refi of NHC Exclusions group |
| Less all AAH pref (remains at AAH) | | $ | (126,317,964) | Amended to 6%, 10 year term | AAH Refi |
| Less NHC debt related to loans to insurance hold cos (7 year zero)* | | $ | (276,372,192) | Senior secured 7 year zero coupon note with GEL PG | $350M value of CBL, SNIC, BLIC covers this |
| Less NHC pref 10 year | | $ | (200,022,425) | Amended to 6%, 10 year term | NHC cash flow or refi within 10 years |
| Less NHC junior 10 year | | $ | (50,627,880) | Amended to 5.5%, 10 year term, cash pay starting Q1, 2021 | NHC cash flow |
| | | | | | |
| New NHC Senior, Cash Pay, due 6-30-23 | | $ | 1,300,005,663 | Amended to 5% cash pay starting April 1st 2020 | NHC cash flow or refi by 6-30-23 |

**Summary of bullet payments:**

| | | | | |
|---|---|---|---|---|
| NHC Term Loan A Bullet, due 12-31-21 | $ | 400,000,000 | *partially paid earlier via ECF sweep* |
| NHC Term Loan B Bullet, due 6-30-23 | $ | 900,005,663 | *partially paid earlier via ECF sweep* |
| NHC Exclusions Bullet due 6-30-24 | $ | 86,121,265 | *paid via Refi of NHC Exclusions group* |
| NHC Ins Hold Co Debt Bullet due 6-30-26 | $ | 276,372,192 | *partially paid earlier via ECF sweep or via sale of CBL, SNIC, BLIC ($350M value)* |
| NHC junior due 6-30-29 | $ | 50,627,880 | *likely paid earlier via ECF sweep from NHC* |
| NHC Pref due 6-30-29 | $ | 200,022,425 | *Pay from cash flow or NHC refi* |
| Agera/PBLA Main bullets due 6-30-29 | $ | 446,101,701 | *$300M of PBLA surplus to cover substantial portion of this* |
| AAH Pref due 6-30-29 | $ | 126,317,964 | *likely paid earlier via refi of AAH* |

*\*NHC debt related to loans to insurance hold cos:  7 year zero note from insurance cos to NHC, then 7 year zero note from NHC to insurance hold co*
*All proceeds from insurance co sales paydown insurance hold co debt owed to NHC and then in turn paydown NHC debt owed to insurance cos*

**List of NHC Exclusions/Loans Excluded from NHC (Exhibit F to the Interim Loan Amendment and Exhibit D to the MOU)**

| | TTM Revenue | TTM EBITDA | Debt | Pref | Total Insurance Debt/Pref | Seller Notes/EEAs | Total Liabilities Assumed |
|---|---|---|---|---|---|---|---|
| UKAT | 19,882,918 | 5,925,012 | 20,454,632 | 18,552,987 | 39,007,619 | 44,072,263 | 83,079,882 |
| Proactive | 2,936,189 | 793,000 | 4,105,152 | 708,000 | 4,813,152 | | 4,813,152 |
| Fleet Assist | 10,841,990 | 1,661,160 | 10,225,163 | 5,813,153 | 16,038,316 | 1,300,000 | 17,338,316 |
| Future Source | 9,443,000 | 2,560,000 | 16,331,857 | - | 16,331,857 | 1,393,000 | 17,724,857 |
| BCC Research | 6,752,896 | 1,554,855 | 9,806,956 | - | 9,806,956 | | 9,806,956 |
| Shopper Local | 16,516,265 | (917,632) | - | - | - | | - |
| Targeted Metrics | 750,593 | (53,692) | - | - | | | - |
| PBO | 1,659,577 | (1,316,774) | 123,365 | - | 123,365 | | 123,365 |
| ProEd Tech | 1,759,060 | (1,442,000) | - | - | - | | - |
| | | | | | | | |
| **TOTALS:** | **70,542,488** | **8,763,929** | **61,047,124** | **25,074,140** | **86,121,265** | **46,765,263** | **132,886,528** |

\* All obligations are converted to 4 years PIK at 5% with 5 year bullet

\* Subordination to a third party lender is allowed to pay seller notes and EEAs

\* No restrictions on distributions or management fees

\* Principal and Interest

**Affiliate Exposure**

*Direct holdings of companies below only- See data tab for full list that includes underlying investments
*Principal Only

| | Senior | Junior | Preference Shares | AAPC | PBLA Main | Insurance | Agera | Other Exclusions | Total Principal |
|---|---|---|---|---|---|---|---|---|---|
| CBL | 632,110,464.35 | 31,216,732.27 | 83,026,291.28 | 69,916,155.75 | - | 80,606,516.55 | 86,953,983.22 | 42,883,123.51 | **983,830,143.41** |
| BLIC | 30,734,348.70 | 2,597,057.88 | 8,831,148.60 | 7,748,225.33 | - | 5,082,517.44 | 5,799,971.72 | 2,174,739.91 | **60,793,269.67** |
| SNIC | 78,643,967.23 | 5,194,115.75 | 14,229,097.16 | 16,888,467.16 | - | 21,160,934.01 | 7,112,222.74 | 7,598,441.70 | **143,228,804.03** |
| **Total GBIG** | 741,488,780.28 | 39,007,905.90 | 106,086,537.04 | 94,552,848.23 | - | 106,849,967.99 | 99,866,177.68 | 52,656,305.13 | **1,187,852,217.12** |
| | | | | | | | | | |
| PBLA | 409,364,370.69 | 686,668.05 | 5,304,224.84 | 9,807,106.21 | - | 55,296,322.45 | 882,058.68 | 3,470,664.89 | **481,340,750.92** |
| Northstar | 39,691,386.11 | 8,499,478.66 | 51,688,649.49 | 1,663,346.13 | - | 60,328,062.73 | 9,041,487.31 | 24,658,336.71 | **170,912,410.43** |
| PBIHL | - | - | 29,361,871.49 | - | - | 958,353.38 | 13,039,280.00 | - | **43,359,504.87** |
| OMNIA | - | - | 2,308,395.21 | - | - | 172,503.61 | 40,651,552.91 | - | **43,132,451.73** |
| **Total Bermuda** | 449,055,756.81 | 9,186,146.71 | 88,663,141.02 | 11,470,452.34 | 254,540,394.99 | 116,755,242.17 | 63,614,378.89 | 28,129,001.60 | **993,285,512.94** |
| | | | | | | | | | |
| Standard Re | - | 822,836.17 | - | - | - | 675,000.00 | - | - | **1,497,836.17** |
| Vista/USAP | 89,861,728.41 | - | 5,272,747.31 | 6,183,381.89 | - | 40,179,865.99 | 19,326,567.75 | 3,156,111.35 | **160,824,291.35** |
| Vista/AIC | - | - | (0.00) | 14,111,281.23 | - | - | - | - | **14,111,281.23** |
| **Total Others** | 89,861,728.41 | 822,836.17 | 5,272,747.31 | 20,294,663.12 | - | 40,854,865.99 | 19,326,567.75 | 3,156,111.35 | **176,433,408.75** |
| | | | | | | | | | |
| **Total All** | 1,280,406,265.49 | 49,016,888.78 | 200,022,425.37 | 126,317,963.69 | 254,540,394.99 | 264,460,076.15 | 182,807,124.32 | 83,941,418.07 | **2,441,512,556.87** |
| **Total on Schedule** | 1,280,406,265.49 | 49,016,888.78 | 200,022,425.37 | 126,317,963.69 | 254,540,394.99 | 264,460,076.15 | 182,807,124.32 | 83,941,418.07 | |
| Difference | - | - | - | 0.00 | - | (0.00) | 0.00 | (0.00) | |
| | | | | | | | | | |
| **Pro Forma Addbacks** | | | | | | | | | |
| SPA signed   Finanzen Holdings Inc | 69,800,433.82 | - | 1,100,000.00 | | | | | | |
| LOI Signed   Medical Physics LLC | 4,000,947.07 | - | - | | | | | | |
| **Total Addbacks** | 73,801,380.89 | - | 1,100,000.00 | | | | | | |
| | | | | | | | | | |
| **Proforma Total** | 1,206,604,884.60 | 49,016,888.78 | 198,922,425.37 | 126,317,963.69 | 254,540,394.99 | 264,460,076.15 | 182,807,124.32 | 83,941,418.07 | **2,366,611,175.98** |

*Addback trache is based on paydown from insurance company perspective.*

---

**Affiliate Exposure P+I**

*Direct holdings of companies below only- See data tab for full list that includes underlying investments
*Principal and Accrued

| | Senior | Junior | Preference Shares | AAPC | PBLA Main | Insurance | Agera | Other Exclusions | Total Principal |
|---|---|---|---|---|---|---|---|---|---|
| CBL | 638,075,132.59 | 31,886,511.00 | 83,026,291.28 | 69,918,045.14 | - | 84,902,942.79 | 89,499,510.03 | 44,468,694.60 | **997,308,432.83** |
| BLIC | 30,799,768.33 | 2,652,779.73 | 8,831,148.60 | 7,748,307.31 | - | 5,398,553.03 | 5,981,081.48 | 2,229,544.08 | **61,411,638.49** |
| SNIC | 78,997,855.97 | 5,305,559.45 | 14,229,097.16 | 16,889,029.65 | - | 22,075,534.65 | 7,316,625.45 | 7,856,197.00 | **144,813,702.33** |
| **Total GBIG** | 747,872,756.90 | 39,844,850.19 | 106,086,537.04 | 94,555,382.10 | - | 112,377,030.47 | 102,797,216.96 | 54,554,435.68 | **1,203,533,773.66** |
| | | | | | | | | | |
| PBLA | 415,906,331.13 | 707,793.68 | 5,304,224.84 | 9,807,387.89 | - | 57,210,743.65 | 883,090.76 | 3,552,088.24 | **489,819,571.95** |
| Northstar | 42,098,299.98 | 9,111,350.46 | 51,688,649.49 | 1,663,188.47 | - | 62,195,681.23 | 9,326,587.68 | 24,668,308.29 | **176,083,757.30** |
| PBIHL | - | - | 29,361,871.49 | - | - | 958,353.38 | 13,039,280.00 | - | **43,359,504.87** |
| OMNIA | 84,443.83 | - | 2,308,395.21 | - | - | 172,503.61 | 40,651,552.91 | - | **43,216,895.56** |
| **Total Bermuda** | 458,089,074.94 | 9,819,144.14 | 88,663,141.02 | 11,470,576.36 | 259,399,369.50 | 120,537,281.87 | 63,900,511.35 | 28,220,396.53 | **1,011,879,099.18** |
| | | | | | | | | | |
| Standard Re | - | 963,885.57 | - | - | - | 686,650.68 | - | - | **1,650,536.25** |
| Vista/USAP | 94,043,831.30 | - | 5,272,747.31 | 6,180,724.01 | - | 42,771,228.70 | 20,004,603.54 | 3,346,432.61 | **168,273,134.85** |
| Vista/AIC | - | - | (0.00) | 14,111,281.23 | - | - | - | - | **14,111,281.23** |
| **Total Others** | 94,043,831.30 | 963,885.57 | 5,272,747.31 | 20,292,005.23 | - | 43,457,879.38 | 20,004,603.54 | 3,346,432.61 | **184,034,952.33** |
| | | | | | | | | | |
| **Total All** | 1,300,005,663.14 | 50,627,879.90 | 200,022,425.37 | 126,317,963.69 | 259,399,369.50 | 276,372,191.72 | 186,702,331.84 | 86,121,264.82 | **2,485,569,089.98** |
| **Total on Schedule** | 1,300,005,663.14 | 50,627,879.90 | 200,022,425.37 | 126,317,963.69 | 259,399,369.50 | 276,372,191.73 | 186,702,331.85 | 86,121,264.82 | |
| Difference | - | - | - | (0.00) | - | (0.00) | (0.01) | 0.00 | |
| | | | | | | | | | |
| **Pro Forma Addbacks** | | | | | | | | | |
| SPA signed   Finanzen Holdings Inc | 69,800,433.82 | - | 1,100,000.00 | | | | | | |
| LOI Signed   Medical Physics LLC | 4,000,947.07 | - | - | | | | | | |
| **Total Addbacks** | 73,801,380.89 | - | 1,100,000.00 | | | | | | |
| | | | | | | | | | |
| **Proforma Total** | 1,226,204,282.25 | 50,627,879.90 | 198,922,425.37 | 126,317,963.69 | 259,399,369.50 | 276,372,191.72 | 186,702,331.84 | 86,121,264.82 | **2,410,667,709.09** |

**TOTAL SUBTRACTIONS**

|  | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC |  |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Senior | 215,786,742.08 | 17,225,749.92 | 36,446,720.40 | 37,537,930.94 | 9,820,904.03 | - | 1,861,231.77 | - | 68,845,926.97 | - | 387,525,206.11 |
| Pref | 116,169,036.30 | 12,626,835.26 | 28,206,079.19 | 16,217,518.42 | - | - | - | - | 4,181,196.12 | 22,313,974.73 | 199,714,640.02 |
|  |  |  |  |  |  |  |  |  |  |  | 587,239,846.13 |

**Zero Subtraction**

|  | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC |  |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Carson's Ledger- used in 6/3 |  |  |  |  |  |  |  |  |  |  |  |
| Senior | $ 49,631,957.47 | $ 4,430,380.69 | $ 7,737,405.17 | - | - | - | - | - | - | - | 61,799,743.33 |
| Pref | $ 53,563,876.58 | $ 5,375,983.19 | $ 12,253,614.88 | 8,738,632.13 | - | - | - | - | 4,181,196.12 | 8,202,693.50 | 92,315,996.40 |
|  |  |  |  |  |  |  |  |  |  |  | 154,115,739.73 |

| Assumed AFA Pass Through of AFA | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC |  |
| 50% | 4% | 8% | 24% | 0% | 0% | 0% | 0% | 14% | 0% |  |

**Agera**

| | Amount | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | Total | Difference | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Academy Financial Assets LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | Write off |
| Baldwin Asset Management Inc | 400,401.49 | 282,213.47 | 11,618.85 | 94,621.01 | - | 11,948.16 | - | - | - | - | - | 400,401.49 | - | Senior |
| Capital Asset Fund II LLC | 2,354,228.51 | 1,851,368.61 | 168,252.15 | 334,607.75 | - | - | - | - | - | - | - | 2,354,228.51 | - | Pref |
| Capital Asset Fund IV LLC | 10,000,000.00 | 8,000,000.00 | 800,000.00 | 1,200,000.00 | - | - | - | - | - | - | - | 10,000,000.00 | - | Senior |
| Capital Asset Fund V LLC | 5,300,000.00 | 4,240,000.00 | 424,000.00 | 636,000.00 | - | - | - | - | - | - | - | 5,300,000.00 | - | Senior |
| CBL | 35,000,000.00 | 35,000,000.00 | - | - | - | - | - | - | - | - | - | 35,000,000.00 | - |  |
| Derry LLC | 7,579,173.44 | - | - | - | - | - | - | - | - | 7,579,173.44 | - | 7,579,173.44 | - | Senior |
| Effingham LLC | 6,027,503.01 | - | - | - | - | - | - | - | - | 6,027,503.01 | - | 6,027,503.01 | - | Senior |
| Iron City Asset Management Inc | 3,958,719.38 | 3,385,560.97 | 114,631.68 | 458,526.72 | - | - | - | - | - | - | - | 3,958,719.38 | - | Senior |
| Littleton LLC | 1,430,826.56 | - | - | - | - | - | - | - | - | 1,430,826.56 | - | 1,430,826.56 | - | Senior |
| McKinley Ventures Group | 6,410,111.96 | - | - | - | - | - | - | - | - | - | - | - | (6,410,111.96) | Accounted for |
| NORTHSTAR | 695.00 | - | - | - | - | 695.00 | - | - | - | - | - | 695.00 | - |  |
| OMNIA | 38,790,321.14 | - | - | - | - | - | - | 38,790,321.14 | - | - | - | 38,790,321.14 | - |  |
| Paradise Asset Management Inc | 10,326,347.61 | 10,326,347.61 | - | - | - | - | - | - | - | - | - | 10,326,347.61 | - | Senior |
| PBIHL | 13,039,280.00 | - | - | - | - | - | 13,039,280.00 | - | - | - | - | 13,039,280.00 | - |  |
| PBLA | 819,335.00 | - | - | - | 819,335.00 | - | - | - | - | - | - | 819,335.00 | - |  |
| Rockdale Asset Management Inc | 10,696,296.96 | 10,696,296.96 | - | - | - | - | - | - | - | - | - | 10,696,296.96 | - | Senior |
| Stoddard LLC | 4,232,550.00 | - | - | - | - | - | - | - | - | 4,232,550.00 | - | 4,232,550.00 | - | Senior |
| Summerville Asset Management Inc | 648,369.37 | 382,557.89 | 18,256.47 | 125,254.68 | 62,723.68 | 3,061.92 | - | - | - | 56,514.73 | - | 648,369.37 | 0.00 | Senior |
| Yarrow Three LLC | 32,203,076.86 | 12,789,637.72 | 4,263,212.57 | 4,263,212.57 | - | 9,025,782.23 | - | 1,861,231.77 | - | - | - | 32,203,076.86 | 0.00 | Senior |
| **Total** | 189,217,236.28 | 86,953,983.22 | 5,799,971.72 | 7,112,222.74 | 882,058.68 | 9,041,487.31 | 13,039,280.00 | 40,651,552.91 | - | 19,326,567.75 | - | 182,807,124.32 | | |
| **Total Excluding Direct Holding** | | 50,102,614.61 | 5,631,719.57 | 6,777,614.99 | 62,723.68 | 9,040,792.31 | - | 1,861,231.77 | - | 19,326,567.75 | - | | | |
| **Total Excluding Direct Pref** | | 1,851,368.61 | 168,252.15 | 334,607.75 | - | - | - | - | - | - | - | | | |

**Insurance**

| | Amount | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | Total | Difference | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alstead LLC | 3,756,216.05 | 1,871,803.02 | 168,102.03 | 281,966.49 | 920,043.84 | - | - | - | - | 514,300.67 | - | 3,756,216.05 | - | senior |
| Augusta Asset Management Inc | 7,382,701.16 | 1,059,971.45 | 1,059,971.46 | 1,271,965.74 | 1,670,515.01 | - | - | - | - | 2,320,277.51 | - | 7,382,701.16 | - | senior |
| Baldwin Asset Management Inc | 5,078,531.70 | 3,579,482.31 | 147,368.83 | 1,200,134.91 | - | 151,545.65 | - | - | - | - | - | 5,078,531.70 | - | senior |
| BLIC | 759,233.10 | - | 759,233.10 | - | - | - | - | - | - | - | - | 759,233.10 | - |  |
| Bow LLC | 4,200,000.00 | - | - | - | - | - | - | - | - | 4,200,000.00 | - | 4,200,000.00 | - | senior |
| Canaan LLC | 3,000,000.00 | - | - | - | - | - | - | - | - | 3,000,000.00 | - | 3,000,000.00 | - | senior |
| Capital Asset Fund II LLC | 624,905.00 | 300,000.00 | 124,905.00 | 200,000.00 | - | - | - | - | - | - | - | 624,905.00 | - | senior |
| Capital Asset Fund IV LLC | 14,913,991.07 | 11,931,192.86 | 1,193,119.29 | 1,789,678.93 | - | - | - | - | - | - | - | 14,913,991.07 | - | senior |
| Capital Asset Fund V LLC | 6,745,206.86 | 5,396,165.49 | 539,616.55 | 809,424.82 | - | - | - | - | - | - | - | 6,745,206.86 | - | senior |
| CBL | 16,599,834.70 | 16,599,834.70 | - | - | - | - | - | - | - | - | - | 16,599,834.70 | - |  |
| Chatsworth Asset Management Inc | 3,000,000.00 | 2,232,357.48 | - | - | 658,509.09 | 109,133.43 | - | - | - | - | - | 3,000,000.00 | - | senior |
| Chrysanthemum Two LLC | 10,568,653.51 | - | - | - | 10,568,653.51 | - | - | - | - | - | - | 10,568,653.51 | - | senior |
| Claremont LLC | 4,131,410.89 | - | - | - | - | - | - | - | - | 4,131,410.89 | - | 4,131,410.89 | - | senior |
| Daisy Seven LLC | 16,830,000.00 | - | - | - | 16,830,000.00 | - | - | - | - | - | - | 16,830,000.00 | - | senior |
| Damascus Asset Management Inc | 4,487,419.18 | 3,240,952.70 | - | 1,190,661.89 | - | 55,804.60 | - | - | - | - | - | 4,487,419.18 | - | senior |
| Dunbarton LLC | 3,000,000.00 | - | - | - | - | - | - | - | - | 3,000,000.00 | - | 3,000,000.00 | - | senior |
| Ephesus Asset Management Inc | 4,000,000.00 | 2,816,193.97 | - | 1,061,333.34 | - | 122,472.69 | - | - | - | - | - | 4,000,000.00 | - | senior |
| Hampton Asset Management Inc | 9,611,435.37 | 7,060,205.26 | 278,316.02 | 2,272,914.10 | - | - | - | - | - | - | - | 9,611,435.37 | - | senior |
| Henniker LLC | 4,500,000.00 | - | - | - | - | - | - | - | - | 4,500,000.00 | - | 4,500,000.00 | - | senior |
| Iron City Asset Management Inc | 2,268,045.58 | 1,939,669.34 | 65,675.25 | 262,700.99 | - | - | - | - | - | - | - | 2,268,045.58 | - | senior |
| Jackson Asset Management Inc | 3,622,198.30 | 3,097,762.69 | 104,887.12 | 419,548.48 | - | - | - | - | - | - | - | 3,622,198.30 | - | senior |
| Kite Asset Management Inc | 925,000.00 | 925,000.00 | - | - | - | - | - | - | - | - | - | 925,000.00 | - | senior |
| Lily Asset Management Inc | 425,000.00 | 425,000.00 | - | - | - | - | - | - | - | - | - | 425,000.00 | - | senior |
| Londonderry LLC | 4,712,337.06 | - | - | - | - | - | - | - | - | 4,712,337.06 | - | 4,712,337.06 | - | senior |
| Marshall Asset Management Inc | 3,735,092.67 | 3,735,092.67 | - | - | - | - | - | - | - | - | - | 3,735,092.67 | - | senior |
| Meredith LLC | 4,131,410.90 | - | - | - | - | - | - | - | - | 4,131,410.90 | - | 4,131,410.90 | - | senior |

| | Amount | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | Total | Difference | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nashua LLC | 3,000,000.00 | - | - | - | - | - | - | - | - | 3,000,000.00 | - | 3,000,000.00 | - | senior |
| New Ipswich LLC | 4,200,000.00 | 2,092,950.08 | 187,962.71 | 315,279.86 | 1,028,743.84 | - | - | - | - | 575,063.52 | - | 4,200,000.00 | - | senior |
| NORTHSTAR | 59,849,108.79 | - | - | - | - | 59,849,108.79 | - | - | - | - | - | 59,849,108.79 | - | |
| Paradise Asset Management Inc | 350,000.00 | 350,000.00 | - | - | - | - | - | - | - | - | - | 350,000.00 | - | senior |
| Pierre Mendes | 675,000.00 | 540,000.00 | 54,000.00 | 81,000.00 | - | - | - | - | - | - | - | 675,000.00 | - | senior |
| OMNIA | 172,503.61 | - | - | - | - | - | - | 172,503.61 | - | - | - | 172,503.61 | - | |
| PBIHL | 958,353.38 | - | - | - | - | - | 958,353.38 | - | - | - | - | 958,353.38 | - | |
| PBLA | 21,920,000.00 | - | - | - | 21,920,000.00 | - | - | - | - | - | - | 21,920,000.00 | - | |
| Rockdale Asset Management Inc | 400,000.00 | 400,000.00 | - | - | - | - | - | - | - | - | - | 400,000.00 | - | senior |
| SNIC | 8,098,286.06 | - | - | 8,098,286.06 | - | - | - | - | - | - | - | 8,098,286.06 | - | |
| STANDARD RE | 675,000.00 | - | - | - | - | - | - | - | 675,000.00 | - | - | 675,000.00 | - | |
| Stratham LLC | 3,594,788.31 | 1,791,360.12 | 160,877.65 | 269,848.65 | 880,503.88 | - | - | - | - | 492,198.00 | - | 3,594,788.31 | - | senior |
| Summerville Asset Management Inc | 8,469,585.83 | 4,997,316.37 | 238,482.44 | 1,636,189.74 | 819,353.29 | 39,997.57 | - | - | - | 738,246.42 | - | 8,469,585.83 | (0.00) | senior |
| Tybee Island Asset Management Inc | 4,957,416.17 | 4,224,206.03 | - | - | - | - | - | - | - | 733,210.13 | - | 4,957,416.17 | - | senior |
| Wolfeboro LLC | 4,131,410.90 | - | - | - | - | - | - | - | - | 4,131,410.90 | - | 4,131,410.90 | - | senior |
| **Total** | 264,460,076.15 | 80,606,516.55 | 5,082,517.44 | 21,160,934.01 | 55,296,322.45 | 60,328,062.73 | 958,353.38 | 172,503.61 | 675,000.00 | 40,179,865.99 | - | 264,460,076.15 | (0.00) | |
| **Total Excluding Direct Holding** | | 64,006,681.85 | 4,323,284.34 | 13,062,647.95 | 33,376,322.45 | 478,953.94 | - | - | - | 40,179,865.99 | - | | | |

**Other Exclusions**

| | Amount | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | Total | Difference | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Baldwin Asset Management Inc | 3,620,762.50 | 2,552,008.35 | 105,067.28 | 855,641.70 | - | 108,045.17 | - | - | - | - | - | 3,620,762.50 | - | senior |
| Capital Asset Fund I LLC | 690,616.68 | 476,022.64 | 25,384.87 | 50,693.19 | 137,790.15 | - | - | - | - | 725.83 | - | 690,616.68 | 0.00 | senior |
| Capital Asset Fund II LLC | 2,398,140.03 | 1,885,900.69 | 171,390.42 | 340,848.92 | - | - | - | - | - | - | - | 2,398,140.03 | - | pref |
| Gilford Asset Management Inc | 2,209,656.30 | - | 441,931.26 | - | 1,031,172.94 | - | - | - | - | 736,552.10 | - | 2,209,656.30 | - | senior |
| Kite Asset Management Inc | 3,261,092.98 | 3,261,092.98 | - | - | - | - | - | - | - | - | - | 3,261,092.98 | - | senior |
| Marshall Asset Management Inc | 3,787,803.72 | 3,787,803.72 | - | - | - | - | - | - | - | - | - | 3,787,803.72 | - | senior |
| Iron City Asset Management Inc | 4,175,862.39 | 3,571,265.20 | 120,919.44 | 483,677.75 | - | - | - | - | - | - | - | 4,175,862.39 | - | senior |
| NORTHSTAR | 24,366,140.37 | - | - | - | - | 24,366,140.37 | - | - | - | - | - | 24,366,140.37 | - | |
| Capital Asset Fund IV LLC | 317,525.01 | 254,020.01 | 25,402.00 | 38,103.00 | - | - | - | - | - | - | - | 317,525.01 | - | senior |
| Capital Asset Fund V LLC | 337,065.01 | 269,652.01 | 26,965.20 | 40,447.80 | - | - | - | - | - | - | - | 337,065.01 | - | senior |
| Chatsworth Asset Management Inc | 856,890.01 | 637,628.27 | - | - | 188,089.95 | 31,171.78 | - | - | - | - | - | 856,890.01 | - | senior |
| Damascus Asset Management Inc | 3,447,398.90 | 2,489,817.93 | - | 914,709.84 | - | 42,871.13 | - | - | - | - | - | 3,447,398.90 | - | senior |
| Ephesus Asset Management Inc | 2,936,732.38 | 2,067,602.01 | - | 779,212.99 | - | 89,917.38 | - | - | - | - | - | 2,936,732.38 | - | senior |
| Forest Park Asset Management Inc | 3,452,559.72 | 2,367,469.52 | - | 1,085,090.20 | - | - | - | - | - | - | - | 3,452,559.72 | - | senior |
| Hampton Asset Management Inc | 2,097,021.66 | 1,540,394.62 | 60,722.95 | 495,904.09 | - | - | - | - | - | - | - | 2,097,021.66 | - | senior |
| Jackson Asset Management Inc | 1,012,602.70 | 865,994.24 | 29,321.69 | 117,286.77 | - | - | - | - | - | - | - | 1,012,602.70 | - | senior |
| Lily Asset Management Inc | 3,364,894.67 | 3,364,894.67 | - | - | - | - | - | - | - | - | - | 3,364,894.67 | - | senior |
| PBLA | 1,700,000.00 | - | - | - | 1,700,000.00 | - | - | - | - | - | - | 1,700,000.00 | - | |
| Pierre Mendes | 13,090,602.34 | 10,472,481.87 | 1,047,248.19 | 1,570,872.28 | - | - | - | - | - | - | - | 13,090,602.34 | - | senior |
| Summerville Asset Management Inc | 4,275,470.70 | 2,522,659.33 | 120,386.61 | 825,953.17 | 413,611.84 | 20,190.88 | - | - | - | 372,668.86 | - | 4,275,470.70 | (0.00) | senior |
| Swanzey LLC | 1,960,000.00 | - | - | - | - | - | - | - | - | 1,960,000.00 | - | 1,960,000.00 | - | senior |
| Tybee Island Asset Management Inc | 582,580.00 | 496,415.44 | - | - | - | - | - | - | - | 86,164.56 | - | 582,580.00 | - | senior |
| **Total** | 83,941,418.07 | 42,883,123.51 | 2,174,739.91 | 7,598,441.70 | 3,470,664.89 | 24,658,336.71 | - | - | - | 3,156,111.35 | - | 83,941,418.07 | | |
| **Total Excluding Direct Holding** | | 40,997,222.82 | 2,003,349.49 | 7,257,592.78 | 1,770,664.89 | 292,196.34 | - | - | - | 3,156,111.35 | - | | | |
| **Total Excluding Direct Pref** | | 1,885,900.69 | 171,390.42 | 340,848.92 | - | - | - | - | - | - | - | 2,398,140.03 | | |

**AAPC**

| | Amount | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | Total | Difference | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Academy Financial Assets LLC | 8,755,829.00 | 4,363,217.39 | 391,849.84 | 657,270.60 | 2,144,644.08 | - | - | - | - | 1,198,847.10 | - | 8,755,829.00 | - | senior |
| Barclays | 52,096,269.00 | 39,101,150.57 | 3,078,505.21 | 5,097,482.29 | - | - | - | - | - | 4,819,130.92 | - | 52,096,269.00 | - | pref |
| Capital Asset Fund II LLC | 63,232.00 | 49,725.73 | 4,519.07 | 8,987.20 | - | - | - | - | - | - | - | 63,232.00 | - | pref |
| Pierre Mendes Capital Asset Fund III LLC | 2,743,503.00 | 2,194,802.40 | 219,480.24 | 329,220.36 | - | - | - | - | - | - | - | 2,743,503.00 | - | senior |
| Capital Asset Fund IV LLC | 577,114.00 | 461,691.20 | 46,169.12 | 69,253.68 | - | - | - | - | - | - | - | 577,114.00 | - | senior |
| Capital Asset Fund V LLC | 1,576,059.00 | 1,260,847.20 | 126,084.72 | 189,127.08 | - | - | - | - | - | - | - | 1,576,059.00 | - | senior |
| Franklin Street | 19,577,230.00 | 14,917,428.78 | 1,552,003.56 | 3,107,797.66 | - | - | - | - | - | - | - | 19,577,230.00 | - | pref |
| Nom GB 2018 | 35,728,675.00 | 4,799,585.33 | 2,276,181.65 | 7,062,740.50 | 7,478,886.29 | - | - | - | - | - | 14,111,281.23 | 35,728,675.00 | 0.00 | pref |
| Northstar | 1,654,384.69 | - | - | - | - | 1,654,384.69 | - | - | - | - | - | 1,654,384.69 | - | |
| Paradise Asset Management Inc | 1,648,060.00 | 1,648,060.00 | - | - | - | - | - | - | - | - | - | 1,648,060.00 | - | senior |
| Summerville Asset Management Inc | 1,897,608.00 | 1,119,647.14 | 53,431.92 | 366,587.79 | 183,575.84 | 8,961.44 | - | - | - | 165,403.87 | - | 1,897,608.00 | (0.00) | senior |
| **Total** | 126,317,963.69 | 69,916,155.75 | 7,748,225.33 | 16,888,467.16 | 9,807,106.21 | 1,663,346.13 | - | - | - | 6,183,381.89 | 14,111,281.23 | 126,317,963.69 | 0.00 | |
| **Total Excluding Direct Senior** | | 11,048,265.33 | 837,015.83 | 1,611,459.51 | 2,328,219.92 | 8,961.44 | - | - | - | 6,183,381.89 | - | | | |
| **Total Excluding Direct Pref** | | 58,867,890.42 | 6,911,209.50 | 15,277,007.64 | 7,478,886.29 | - | - | - | - | - | 14,111,281.23 | | | |
| Difference | | - | - | - | - | 1,654,384.69 | - | - | - | - | - | | | |

**TOTAL SUBTRACTIONS**

| | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Senior | 222,277,090.89 | 17,728,394.90 | 37,586,498.63 | 39,434,813.10 | 10,128,706.73 | - | 1,861,231.77 | - | 72,302,988.85 | - | 401,319,724.88 |
| Pref | 116,169,036.30 | 12,626,835.26 | 28,206,079.19 | 16,217,518.42 | - | - | - | - | 4,181,196.12 | 22,313,974.73 | 199,714,640.02 |
| | | | | | | | | | | | 601,034,364.90 |
| Pref | 116,169,036.30 | 12,626,835.26 | 28,206,079.19 | 16,217,518.42 | - | - | - | - | 4,181,196.12 | 22,313,974.73 | 199,714,640.02 |
| | - | - | - | - | - | - | - | - | - | - | - |

*Assumes no accrual for pref*

**Zero Subtraction**

| Carson's Ledger- used in 6/: | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Senior | $ 49,631,957.47 | $ 4,430,380.69 | $ 7,737,405.17 | - | - | - | - | - | | | 61,799,743.33 |
| Pref | $ 53,563,876.58 | $ 5,375,983.19 | $ 12,253,614.88 | 8,738,632.13 | - | - | - | - | 4,181,196.12 | 8,202,693.50 | 92,315,996.40 |
| | | | | | | | | | | | 154,115,739.73 |

**Assumed AFA Pass Through of AFA**

| CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC |
|---|---|---|---|---|---|---|---|---|---|
| 50% | 4% | 8% | 24% | 0% | 0% | 0% | 0% | 14% | 0% |

**Agera**

| | Total_P_I | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | Total | Difference | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Academy Financial Assets LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | Write off |
| Baldwin Asset Management Inc | 400,401.49 | 282,213.47 | 11,618.85 | 94,621.01 | - | 11,948.16 | - | - | - | - | - | 400,401.49 | - | Senior |
| Capital Asset Fund II LLC | 2,354,228.51 | 1,851,368.61 | 168,252.15 | 334,607.75 | - | - | - | - | - | - | - | 2,354,228.51 | - | Pref |
| Capital Asset Fund IV LLC | 10,408,082.19 | 8,326,465.75 | 832,646.57 | 1,248,969.86 | - | - | - | - | - | - | - | 10,408,082.19 | - | Senior |
| Capital Asset Fund V LLC | 5,300,000.00 | 4,240,000.00 | 424,000.00 | 636,000.00 | - | - | - | - | - | - | - | 5,300,000.00 | - | Senior |
| CBL | 36,060,939.75 | 36,060,939.75 | - | - | - | - | - | - | - | - | - | 36,060,939.75 | - | |
| Derry LLC | 7,891,892.21 | - | - | - | - | - | - | - | - | 7,891,892.21 | - | 7,891,892.21 | - | Senior |
| Effingham LLC | 6,027,503.01 | - | - | - | - | - | - | - | - | 6,027,503.01 | - | 6,027,503.01 | - | Senior |
| Iron City Asset Management Inc | 4,018,683.13 | 3,436,842.95 | 116,368.04 | 465,472.14 | - | - | - | - | - | - | - | 4,018,683.13 | - | Senior |
| Littleton LLC | 1,489,392.45 | - | - | - | - | - | - | - | - | 1,489,392.45 | - | 1,489,392.45 | - | Senior |
| McKinley Ventures Group | 6,410,111.96 | - | - | - | - | - | - | - | - | - | - | - | (6,410,111.96) | Accounted for |
| NORTHSTAR | 695.00 | - | - | - | - | 695.00 | - | - | - | - | - | 695.00 | - | |
| OMNIA | 38,790,321.14 | - | - | - | - | - | - | 38,790,321.14 | - | - | - | 38,790,321.14 | - | |
| Paradise Asset Management Inc | 10,588,466.63 | 10,588,466.63 | - | - | - | - | - | - | - | - | - | 10,588,466.63 | - | Senior |
| PBIHL | 13,039,280.00 | - | - | - | - | - | 13,039,280.00 | - | - | - | - | 13,039,280.00 | - | |
| PBLA | 819,335.00 | - | - | - | 819,335.00 | - | - | - | - | - | - | 819,335.00 | - | |
| Rockdale Asset Management Inc | 11,095,383.75 | 11,095,383.75 | - | - | - | - | - | - | - | - | - | 11,095,383.75 | - | Senior |
| Stoddard LLC | 4,539,380.88 | - | - | - | - | - | - | - | - | 4,539,380.88 | - | 4,539,380.88 | - | Senior |
| Summerville Asset Management Inc | 658,028.29 | 388,912.13 | 18,556.87 | 127,315.69 | 63,755.76 | 3,052.86 | - | - | - | 56,434.98 | - | 658,028.29 | (0.00) | Senior |
| Yarrow Three LLC | 33,220,318.41 | 13,228,916.99 | 4,409,639.00 | 4,409,639.00 | - | 9,310,891.65 | - | 1,861,231.77 | - | - | - | 33,220,318.40 | (0.00) | Senior |
| **Total** | 193,112,443.81 | 89,499,510.03 | 5,981,081.48 | 7,316,625.45 | 883,090.76 | 9,326,587.68 | 13,039,280.00 | 40,651,552.91 | - | 20,004,603.54 | - | 186,702,331.84 | | |
| **Total Excluding Direct Holding** | | 51,587,201.67 | 5,812,829.33 | 6,982,017.71 | 63,755.76 | 9,325,892.68 | - | 1,861,231.77 | - | 20,004,603.54 | - | | | |
| **Total Excluding Direct Pref** | | 1,851,368.61 | 168,252.15 | 334,607.75 | - | - | - | - | - | - | - | | | |

**Insurance**

| | Total_P_I | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | Total | Difference | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alstead LLC | 4,006,239.26 | 1,996,394.95 | 179,291.33 | 300,734.89 | 981,284.27 | - | - | - | - | 548,533.82 | - | 4,006,239.26 | - | senior |
| Augusta Asset Management Inc | 8,528,652.72 | 1,224,501.47 | 1,224,501.47 | 1,469,401.76 | 1,929,814.31 | - | - | - | - | 2,680,433.71 | - | 8,528,652.72 | - | senior |
| Baldwin Asset Management Inc | 5,195,857.77 | 3,662,176.80 | 150,773.40 | 1,227,860.86 | - | 155,046.71 | - | - | - | - | - | 5,195,857.77 | - | senior |
| BLIC | 804,200.04 | - | 804,200.04 | - | - | - | - | - | - | - | - | 804,200.04 | - | |
| Bow LLC | 4,515,348.89 | - | - | - | - | - | - | - | - | 4,515,348.89 | - | 4,515,348.89 | - | senior |
| Canaan LLC | 3,051,780.82 | - | - | - | - | - | - | - | - | 3,051,780.82 | - | 3,051,780.82 | - | senior |
| Capital Asset Fund II LLC | 656,331.28 | 516,139.84 | 46,906.73 | 93,284.71 | - | - | - | - | - | - | - | 656,331.28 | - | senior |
| Capital Asset Fund IV LLC | 15,713,333.00 | 12,570,666.40 | 1,257,066.64 | 1,885,599.96 | - | - | - | - | - | - | - | 15,713,333.00 | - | senior |
| Capital Asset Fund V LLC | 7,089,027.17 | 5,671,221.74 | 567,122.17 | 850,683.26 | - | - | - | - | - | - | - | 7,089,027.17 | - | senior |
| CBL | 17,429,328.71 | 17,429,328.71 | - | - | - | - | - | - | - | - | - | 17,429,328.71 | - | |
| Chatsworth Asset Management Inc | 3,051,780.82 | 2,270,888.58 | - | - | 669,875.14 | 111,017.10 | - | - | - | - | - | 3,051,780.82 | - | senior |
| Chrysanthemum Two LLC | 10,832,752.58 | - | - | - | 10,832,752.58 | - | - | - | - | - | - | 10,832,752.58 | - | senior |
| Claremont LLC | 4,487,630.32 | - | - | - | - | - | - | - | - | 4,487,630.32 | - | 4,487,630.32 | - | senior |
| Daisy Seven LLC | 17,826,786.86 | - | - | - | 17,826,786.86 | - | - | - | - | - | - | 17,826,786.86 | - | senior |
| Damascus Asset Management Inc | 4,570,125.28 | 3,300,685.59 | - | 1,212,606.57 | - | 56,833.11 | - | - | - | - | - | 4,570,125.28 | - | senior |
| Dunbarton LLC | 3,051,780.82 | - | - | - | - | - | - | - | - | 3,051,780.82 | - | 3,051,780.82 | - | senior |
| Ephesus Asset Management Inc | 4,069,041.10 | 2,864,802.25 | - | 1,079,652.24 | - | 124,586.61 | - | - | - | - | - | 4,069,041.10 | - | senior |
| Hampton Asset Management Inc | 9,925,762.94 | 7,291,098.68 | 287,417.92 | 2,347,246.34 | - | - | - | - | - | - | - | 9,925,762.94 | - | senior |
| Henniker LLC | 4,577,671.23 | - | - | - | - | - | - | - | - | 4,577,671.23 | - | 4,577,671.23 | - | senior |
| Iron City Asset Management Inc | 2,300,854.57 | 1,967,728.12 | 66,625.29 | 266,501.16 | - | - | - | - | - | - | - | 2,300,854.57 | - | senior |
| Jackson Asset Management Inc | 3,881,149.44 | 3,319,221.90 | 112,385.51 | 449,542.03 | - | - | - | - | - | - | - | 3,881,149.44 | - | senior |
| Kite Asset Management Inc | 993,240.09 | 993,240.09 | - | - | - | - | - | - | - | - | - | 993,240.09 | - | senior |
| Lily Asset Management Inc | 450,171.39 | 450,171.39 | - | - | - | - | - | - | - | - | - | 450,171.39 | - | senior |
| Londonderry LLC | 5,118,640.44 | - | - | - | - | - | - | - | - | 5,118,640.44 | - | 5,118,640.44 | - | senior |
| Marshall Asset Management Inc | 3,876,749.79 | 3,876,749.79 | - | - | - | - | - | - | - | - | - | 3,876,749.79 | - | senior |
| Meredith LLC | 4,487,630.33 | - | - | - | - | - | - | - | - | 4,487,630.33 | - | 4,487,630.33 | - | senior |
| Nashua LLC | 3,051,780.82 | - | - | - | - | - | - | - | - | 3,051,780.82 | - | 3,051,780.82 | - | senior |

| | Total_P_I | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | Total | Difference | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Ipswich LLC | 4,515,348.89 | 2,250,095.20 | 202,075.52 | 338,952.04 | 1,105,985.08 | - | - | - | - | 618,241.05 | - | 4,515,348.89 | - | senior |
| NORTHSTAR | 61,703,838.87 | - | - | - | - | 61,703,838.87 | - | - | - | - | - | 61,703,838.87 | - | |
| Paradise Asset Management Inc | 373,638.63 | 373,638.63 | - | - | - | - | - | - | - | - | - | 373,638.63 | - | senior |
| Pierre Mendes | 719,929.70 | 575,943.76 | 57,594.38 | 86,391.56 | - | - | - | - | - | - | - | 719,929.70 | - | senior |
| OMNIA | 172,503.61 | - | - | - | - | - | - | 172,503.61 | - | - | - | 172,503.61 | - | |
| PBIHL | 958,353.38 | - | - | - | - | - | 958,353.38 | - | - | - | - | 958,353.38 | - | |
| PBLA | 21,991,243.84 | - | - | - | 21,991,243.84 | - | - | - | - | - | - | 21,991,243.84 | - | |
| Rockdale Asset Management Inc | 429,509.23 | 429,509.23 | - | - | - | - | - | - | - | - | - | 429,509.23 | - | senior |
| SNIC | 8,327,039.65 | - | - | 8,327,039.65 | - | - | - | - | - | - | - | 8,327,039.65 | - | |
| STANDARD RE | 686,650.68 | - | - | - | - | - | - | - | 686,650.68 | - | - | 686,650.68 | - | |
| Stratham LLC | 3,864,696.05 | 1,925,860.93 | 172,956.84 | 290,109.72 | 946,614.82 | - | - | - | - | 529,153.74 | - | 3,864,696.05 | - | senior |
| Summerville Asset Management Inc | 9,561,310.91 | 5,650,987.70 | 269,635.80 | 1,849,927.89 | 926,386.75 | 44,358.83 | - | - | - | 820,013.93 | - | 9,561,310.91 | (0.00) | senior |
| Tybee Island Asset Management Inc | 5,036,849.47 | 4,291,891.02 | - | - | - | - | - | - | - | 744,958.45 | - | 5,036,849.47 | - | senior |
| Wolfeboro LLC | 4,487,630.33 | - | - | - | - | - | - | - | - | 4,487,630.33 | - | 4,487,630.33 | - | senior |
| **Total** | 276,372,191.73 | 84,902,942.79 | 5,398,553.03 | 22,075,534.65 | 57,210,743.65 | 62,195,681.23 | 958,353.38 | 172,503.61 | 686,650.68 | 42,771,228.70 | - | 276,372,191.72 | (0.00) | |
| **Total Excluding Direct Holding** | | 67,473,614.08 | 4,594,352.99 | 13,748,495.00 | 35,219,499.81 | 491,842.36 | - | - | - | 42,771,228.70 | - | | | |

**Other Exclusions**

| | Total_P_I | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | Total | Difference | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Baldwin Asset Management Inc | 3,730,200.75 | 2,629,143.30 | 108,242.96 | 881,503.64 | - | 111,310.85 | - | - | - | - | - | 3,730,200.75 | - | senior |
| Capital Asset Fund I LLC | 713,807.42 | 492,007.37 | 26,237.28 | 52,395.45 | 142,417.11 | - | - | - | - | 750.20 | - | 713,807.42 | 0.00 | senior |
| Capital Asset Fund II LLC | 2,459,979.89 | 1,934,531.65 | 175,810.00 | 349,638.25 | - | - | - | - | - | - | - | 2,459,979.89 | - | pref |
| Gilford Asset Management Inc | 2,265,640.48 | - | 453,128.10 | - | 1,057,298.89 | - | - | - | - | 755,213.50 | - | 2,265,640.48 | - | senior |
| Kite Asset Management Inc | 3,384,495.71 | 3,384,495.71 | - | - | - | - | - | - | - | - | - | 3,384,495.71 | - | senior |
| Marshall Asset Management Inc | 4,033,641.97 | 4,033,641.97 | - | - | - | - | - | - | - | - | - | 4,033,641.97 | - | senior |
| Iron City Asset Management Inc | 4,249,650.66 | 3,634,370.12 | 123,056.11 | 492,224.43 | - | - | - | - | - | - | - | 4,249,650.66 | - | senior |
| NORTHSTAR | 24,366,140.37 | - | - | - | - | 24,366,140.37 | - | - | - | - | - | 24,366,140.37 | - | |
| Capital Asset Fund IV LLC | 322,947.65 | 258,358.12 | 25,835.81 | 38,753.72 | - | - | - | - | - | - | - | 322,947.65 | - | senior |
| Capital Asset Fund V LLC | 342,821.35 | 274,257.08 | 27,425.71 | 41,138.56 | - | - | - | - | - | - | - | 342,821.35 | - | senior |
| Chatsworth Asset Management Inc | 892,214.15 | 663,913.64 | - | - | 195,843.71 | 32,456.80 | - | - | - | - | - | 892,214.15 | - | senior |
| Damascus Asset Management Inc | 3,526,955.18 | 2,547,275.94 | - | 935,818.78 | - | 43,860.47 | - | - | - | - | - | 3,526,955.18 | - | senior |
| Ephesus Asset Management Inc | 3,072,348.36 | 2,163,082.23 | - | 815,196.43 | - | 94,069.70 | - | - | - | - | - | 3,072,348.36 | - | senior |
| Forest Park Asset Management Inc | 3,695,206.89 | 2,533,856.15 | - | 1,161,350.74 | - | - | - | - | - | - | - | 3,695,206.89 | - | senior |
| Hampton Asset Management Inc | 2,133,549.58 | 1,567,226.69 | 61,780.68 | 504,542.22 | - | - | - | - | - | - | - | 2,133,549.58 | - | senior |
| Jackson Asset Management Inc | 1,029,895.76 | 880,783.55 | 29,822.44 | 119,289.77 | - | - | - | - | - | - | - | 1,029,895.76 | - | senior |
| Lily Asset Management Inc | 3,618,114.06 | 3,618,114.06 | - | - | - | - | - | - | - | - | - | 3,618,114.06 | - | senior |
| PBLA | 1,729,032.32 | - | - | - | 1,729,032.32 | - | - | - | - | - | - | 1,729,032.32 | - | |
| Pierre Mendes | 13,422,214.53 | 10,737,771.62 | 1,073,777.16 | 1,610,665.74 | - | - | - | - | - | - | - | 13,422,214.53 | - | senior |
| Summerville Asset Management Inc | 4,412,222.20 | 2,607,740.05 | 124,427.82 | 853,679.27 | 427,496.21 | 20,470.10 | - | - | - | 378,408.74 | - | 4,412,222.20 | (0.00) | senior |
| Swanzey LLC | 2,123,863.09 | - | - | - | - | - | - | - | - | 2,123,863.09 | - | 2,123,863.09 | - | senior |
| Tybee Island Asset Management Inc | 596,322.43 | 508,125.34 | - | - | - | - | - | - | - | 88,197.08 | - | 596,322.43 | - | senior |
| **Total** | 86,121,264.82 | 44,468,694.60 | 2,229,544.08 | 7,856,197.00 | 3,552,088.24 | 24,668,308.29 | - | - | - | 3,346,432.61 | - | 86,121,264.82 | | |
| **Total Excluding Direct Holding** | | 42,534,162.96 | 2,053,734.08 | 7,506,558.75 | 1,823,055.93 | 302,167.92 | - | - | - | 3,346,432.61 | - | | | |
| **Total Excluding Direct Pref** | | 1,934,531.65 | 175,810.00 | 349,638.25 | - | - | - | - | - | - | - | 2,459,979.89 | | |
| Difference | | - | - | - | 1,729,032.32 | 24,366,140.37 | - | - | - | - | - | | | |

**AAPC**

| | Total_P_I | CBL | BLIC | SNIC | PBLA | Northstar | PBIHL | OMNIA | Standard Re | Vista/USAP | Vista/AIC | Total | Difference | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Academy Financial Assets LLC | 8,755,829.00 | 4,363,217.39 | 391,849.84 | 657,270.60 | 2,144,644.08 | - | - | - | - | 1,198,847.10 | - | 8,755,829.00 | - | senior |
| Barclays | 52,096,269.00 | 39,101,150.57 | 3,078,505.21 | 5,097,482.29 | - | - | - | - | - | 4,819,130.92 | - | 52,096,269.00 | - | pref |
| Capital Asset Fund II LLC | 63,232.00 | 49,725.73 | 4,519.07 | 8,987.20 | - | - | - | - | - | - | - | 63,232.00 | - | pref |
| Pierre Men Capital Asset Fund III LLC | 2,743,503.00 | 2,194,802.40 | 219,480.24 | 329,220.36 | - | - | - | - | - | - | - | 2,743,503.00 | - | senior |
| Capital Asset Fund IV LLC | 577,114.00 | 461,691.20 | 46,169.12 | 69,253.68 | - | - | - | - | - | - | - | 577,114.00 | - | senior |
| Capital Asset Fund V LLC | 1,576,059.00 | 1,260,847.20 | 126,084.72 | 189,127.08 | - | - | - | - | - | - | - | 1,576,059.00 | - | senior |
| Franklin Street | 19,577,230.00 | 14,917,428.78 | 1,552,003.56 | 3,107,797.66 | - | - | - | - | - | - | - | 19,577,230.00 | - | pref |
| Nom GB 2018 | 35,728,675.00 | 4,799,585.33 | 2,276,181.65 | 7,062,740.50 | 7,478,886.29 | - | - | - | - | - | 14,111,281.23 | 35,728,675.00 | 0.00 | pref |
| Northstar | 1,654,384.69 | - | - | - | - | 1,654,384.69 | - | - | - | - | - | 1,654,384.69 | - | |
| Paradise Asset Management Inc | 1,648,060.00 | 1,648,060.00 | - | - | - | - | - | - | - | - | - | 1,648,060.00 | - | senior |
| Summerville Asset Management Inc | 1,897,608.00 | 1,121,536.53 | 53,513.90 | 367,150.28 | 183,857.52 | 8,803.78 | - | - | - | 162,745.99 | - | 1,897,608.00 | (0.00) | senior |
| **Total** | 126,317,963.69 | 69,918,045.14 | 7,748,307.31 | 16,889,029.65 | 9,807,387.89 | 1,663,188.47 | - | - | - | 6,180,724.01 | 14,111,281.23 | 126,317,963.69 | (0.00) | |
| **Total Excluding Direct Senior** | | 11,050,154.72 | 837,097.82 | 1,612,022.00 | 2,328,501.59 | 8,803.78 | - | - | - | 6,180,724.01 | - | | | |
| **Total Excluding Direct Pref** | | 58,867,890.42 | 6,911,209.50 | 15,277,007.64 | 7,478,886.29 | - | - | - | - | - | 14,111,281.23 | | | |
| Difference | | - | - | - | - | 1,654,384.69 | - | - | - | - | - | | | |

| | | | | | | | | 865,271,779 | | 904,109,766 | 68,513,383 | 905,637,963 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lender | Borrower | Underlying Borrower | Underlying Borrower2 | Direct Loan / Through SPV - FinCo. | Industry | Type (Junior/Senior/Pref) | Payment Type (PIK,Partial PIK,Cash) | Underlying Loan Amount | Underlying Loan Amount2 | Amount | Total Accrued | Total P+I | Data Source | Type Note |
| Academy Financial Assets LLC | Academy Financial Assets LLC | AAPC Holdings LLC | AAPC Holdings LLC | Investment in Pref. | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 8,755,829 | - | 8,755,829 | - | 8,755,829 | Eli | Preference Shares |
| Capital Asset Fund II LLC | Capital Asset Fund II LLC | AAPC Holdings LLC | AAPC Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 63,232 | - | 63,232 | - | 63,232 | Eli | Preference Shares |
| Capital Asset Fund III LLC | Capital Asset Fund III LLC | AAPC Holdings LLC | AAPC Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 2,743,503 | - | 2,743,503 | - | 2,743,503 | Eli | Preference Shares |
| Capital Asset Fund IV LLC | Capital Asset Fund IV LLC | AAPC Holdings LLC | AAPC Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 577,114 | - | 577,114 | - | 577,114 | Eli | Preference Shares |
| Capital Asset Fund V LLC | Capital Asset Fund V LLC | AAPC Holdings LLC | AAPC Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 1,576,059 | - | 1,576,059 | - | 1,576,059 | Eli | Preference Shares |
| Paradise Asset Management Inc | Paradise Asset Management Inc | AAPC Holdings LLC | AAPC Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 1,648,060 | - | 1,648,060 | - | 1,648,060 | Eli | Preference Shares |
| PBLA Main | AAPC Holdings LLC | AAPC Holdings LLC | AAPC Holdings LLC | Investment in Pref. | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 913,970 | - | 913,970 | - | 913,970 | Eli | Preference Shares |
| Academy Financial Assets LLC | Academy Financial Assets LLC | Agera Holdings LLC | Agera Holdings LLC | Investment in Pref. | Utilities | Agera | PIK | 45,551,034 | - | 45,551,034 | - | 45,551,034 | Eli | Preference Shares |
| Baldwin Asset Management Inc | Baldwin Asset Management Inc | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 400,401 | - | 400,401 | - | 400,401 | Eli | Preference Shares |
| Capital Asset Fund II LLC | Capital Asset Fund II LLC | AGH Parent LLC | AGH Parent LLC | Fin. Co. Investment in Pref. Shares | Utilities | Agera | PIK | 2,354,229 | - | 2,354,229 | - | 2,354,229 | Eli | Preference Shares |
| Effingham LLC | Effingham LLC | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 6,027,503 | - | 6,027,503 | - | 6,027,503 | Eli | Preference Shares |
| McKinley Ventures Group | McKinley Ventures Group | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 4,204,910 | - | 4,204,910 | - | 4,204,910 | Eli | Preference Shares |
| McKinley Ventures Group | McKinley Ventures Group | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 2,205,202 | - | 2,205,202 | - | 2,205,202 | Eli | Preference Shares |
| NORTHSTAR | AGH Parent LLC | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 57,544 | - | 695 | - | 695 | Eli | Preference Shares |
| BLIC | BLIC | Capital Asset Management II LLC | Capital Asset Management II LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | | | 1,870,357 | - | 1,870,357 | Eli | |
| PBLA Main | AGH Parent LLC | | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | | | 7,472 | - | 7,472 | Eli | Preference Shares |
| OMNIA | AGH Parent LLC | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 15,882,097 | - | 15,882,097 | - | 15,882,097 | Eli | Preference Shares |
| OMNIA | AGH Parent LLC | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 2,265,925 | - | 2,265,925 | - | 2,265,925 | Eli | Preference Shares |
| Paradise Asset Management Inc | Paradise Asset Management Inc | Agera Holdings LLC | Agera Holdings LLC | Fin. Co. Investment in Pref. Shares | Utilities | Agera | PIK | 4,548,966 | - | 4,548,966 | - | 4,548,966 | Eli | Preference Shares |
| PBIHL | AGH Parent LLC | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 9,781,992 | - | 9,781,992 | - | 9,781,992 | Eli | Preference Shares |
| Augusta Asset Management Inc | Augusta Asset Management Inc | GBIG Capital LLC | GBIG Capital LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Insurance | PIK | 500,387 | - | 500,387 | 749,633 | 1,250,019 | Eli | Insurance |
| Augusta Asset Management Inc | Augusta Asset Management Inc | GBIG Holdings Inc | GBIG Holdings Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Insurance | PIK | 6,882,315 | - | 6,882,315 | 396,319 | 7,278,633 | Eli | Insurance |
| BLIC | CV Investments LLC | CV Investments LLC | CV Investments LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | | | 1,183,512 | | 1,183,512 | Eli | |
| Damascus Asset Management Inc | Damascus Asset Management Inc | GBIG Holdings Inc | GBIG Holdings Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Insurance | PIK | 4,187,419 | - | 4,187,419 | 60,574 | 4,247,993 | Eli | Insurance |
| Hampton Asset Management Inc | Hampton Asset Management Inc | GBIG Holdings Inc | GBIG Holdings Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Insurance | PIK | 4,244,272 | - | 4,244,272 | 64,313 | 4,308,585 | Eli | Insurance |
| Iron City Asset Management Inc | Iron City Asset Management Inc | GBIG Holdings Inc | GBIG Holdings Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Insurance | PIK | 2,268,046 | - | 2,268,046 | 32,809 | 2,300,855 | Eli | Insurance |
| BLIC | Gilford Asset Management Inc | Gilford Asset Management Inc | Gilford Asset Management Inc | Investment in Pref. through SPV | Financial Services | Preference Shares | PIK | 116,904 | 2,330,067 | 2,213,163 | - | 2,213,163 | Eli | |
| NORTHSTAR | Beaufort Holding S.A. | Beaufort Holding S.A. | Beaufort Holding S.A. | Insurance Investment in Pref. | Financial Services | Insurance | PIK | 14,252,312 | - | 14,252,312 | - | 14,252,312 | Eli | Insurance |
| NORTHSTAR | Beaufort Holding S.A. | Beaufort Holding S.A. | Beaufort Holding S.A. | Insurance Investment in Pref. | Financial Services | Insurance | PIK | 2,270,310 | - | 2,270,310 | - | 2,270,310 | Eli | Insurance |
| NORTHSTAR | GBIG Capital LLC | GBIG Capital LLC | GBIG Capital LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Insurance | PIK | 10,900,000 | - | 10,900,000 | - | 10,900,000 | Eli | Insurance |
| PBIHL | AGH Parent LLC | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 2,600,000 | | 2,600,000 | - | 2,600,000 | Eli | Preference Shares |
| Jackson Asset Management Inc | Jackson Asset Management Inc | Standard Malta Holdings Limited | Standard Malta Holdings Limited | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 20,944,000 | | 20,944,000 | - | 20,944,000 | Eli | Preference Shares |
| CBL | CBL | Capital Asset Management II LLC | Capital Asset Management II LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 36,478 | 268,849 | 20,580,545 | - | 20,580,545 | Eli | |
| Academy Association, Inc | Academy Association, Inc | ASL Holding LLC | ASL Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 1,539,966 | - | 1,539,966 | - | 1,539,966 | Eli | |
| Academy Association, Inc | Academy Association, Inc | Flagship Holding LLC | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 1,601,200 | - | 1,601,200 | - | 1,601,200 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 246,681 | - | 246,681 | - | 246,681 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | BMX Holdings LLC | BMX Holdings LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 33,000,000 | - | 33,000,000 | - | 33,000,000 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | CAPLOC LLC | CAPLOC LLC | Investment in Pref. | Mortgage | Preference Shares | PIK | 200,000 | - | 200,000 | - | 200,000 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | CLTC Holdings LLC | CLTC Holdings LLC | Investment in Pref. | Healthcare | Preference Shares | PIK | 2,562,718 | - | 2,562,718 | - | 2,562,718 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | CLTC Holdings LLC | CLTC Holdings LLC | Investment in Pref. | Healthcare | Preference Shares | PIK | 225,000 | - | 225,000 | - | 225,000 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | CV Investments LLC | CV Investments LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 5,887,988 | - | 5,887,988 | - | 5,887,988 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | CWNP LLC | CWNP LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 200,000 | - | 200,000 | - | 200,000 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | DGX Holdings LLC | DGX Holdings LLC | Investment in Pref. | Software | Preference Shares | PIK | 16,923,004 | - | 16,923,004 | - | 16,923,004 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | Flagship Holding LLC | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 8,735,279 | - | 8,735,279 | - | 8,735,279 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | Fortrex LLC | Fortrex LLC | Investment in Pref. | Information Technology | Preference Shares | PIK | 1,450,910 | - | 1,450,910 | - | 1,450,910 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | GBIG Capital LLC | GBIG Capital LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 27,500,000 | - | 27,500,000 | - | 27,500,000 | Eli | Preference Shares |
| Academy Financial Assets LLC | Academy Financial Assets LLC | GAM Holdings I Inc | Gilford Asset Management Inc | Investment in Pref. | Financial Services | Preference Shares | Dividend Accrual through Maturity | 786,900 | - | 786,900 | - | 786,900 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | itech Funding LLC | itech Funding LLC | Investment in Pref. | Financial Services | Preference Shares | Dividend Accrual through Maturity | 796,033 | - | 796,033 | - | 796,033 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | Lily Asset Management Inc | Lily Asset Management Inc | Investment in Pref. | Financial Services | Preference Shares | Dividend Accrual through Maturity | 3,155,027 | - | 3,155,027 | - | 3,155,027 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | MAM Holding LLC | MAM Holding LLC | Investment in Pref. | Financial Services | Preference Shares | Dividend Accrual through Maturity | 935,928 | - | 935,928 | - | 935,928 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | Medclaims International LLC | Medclaims International LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 1,249,792 | - | 1,249,792 | - | 1,249,792 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | Nationwide Recovery Holdings LLC | Nationwide Recovery Holdings LLC | Investment in Pref. | Debt Collection | Preference Shares | PIK | 1,125,071 | - | 1,125,071 | - | 1,125,071 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | NEBB Holdings LLC | NEBB Holdings LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 570,431 | - | 570,431 | - | 570,431 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | Paradise Asset Management Inc | Paradise Asset Management Inc | Investment in Pref. | Financial Services | Preference Shares | Dividend Accrual through Maturity | 4,000,000 | - | 4,000,000 | - | 4,000,000 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | PBX Holdings LLC | PBX Holdings LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 26,000,000 | - | 26,000,000 | - | 26,000,000 | Eli | Preference Shares |
| Academy Financial Assets LLC | Academy Financial Assets LLC | Prolimiate Solutions Holdings LLC | Prolimiate Solutions Holdings LLC | Investment in Pref. | Healthcare Tech | Preference Shares | Dividend Accrual through Maturity | 408,098 | - | 408,098 | - | 408,098 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | Rockdale Asset Management Inc | Rockdale Asset Management Inc | Investment in Pref. | Financial Services | Preference Shares | Dividend Accrual through Maturity | 4,000,000 | - | 4,000,000 | - | 4,000,000 | Eli | |
| Academy Financial Assets LLC | Academy Financial Assets LLC | WW Staffing LLC | WW Staffing LLC | Investment in Pref. | Commercial Services | Preference Shares | PIK | 1,541,892 | - | 1,541,892 | - | 1,541,892 | Eli | |
| Augusta Asset Management Inc | Augusta Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 3,024,000 | - | 3,024,000 | - | 3,024,000 | Eli | |
| Augusta Asset Management Inc | Augusta Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 2,884,002 | - | 2,884,002 | - | 2,884,002 | Eli | |
| Augusta Asset Management Inc | Augusta Asset Management Inc | Boston Laser - Eye & Lasik Specialist Holdings LLC | Boston Laser - Eye & Lasik Specialist Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 40,000 | - | 40,000 | - | 40,000 | Eli | |
| Augusta Asset Management Inc | Augusta Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 4,099,205 | - | 4,099,205 | - | 4,099,205 | Eli | |
| Augusta Asset Management Inc | Augusta Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 4,357,320 | - | 4,357,320 | - | 4,357,320 | Eli | |
| Baldwin Asset Management Inc | Baldwin Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 1,370,013 | - | 1,370,013 | - | 1,370,013 | Eli | |
| Baldwin Asset Management Inc | Baldwin Asset Management Inc | Boston Laser - Eye & Lasik Specialist Holdings LLC | Boston Laser - Eye & Lasik Specialist Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 95,000 | - | 95,000 | - | 95,000 | Eli | |
| Baldwin Asset Management Inc | Baldwin Asset Management Inc | CCM Investments | CCM Investments | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 2,771,155 | - | 2,771,155 | - | 2,771,155 | Eli | |
| Baldwin Asset Management Inc | Baldwin Asset Management Inc | Damovo | Damovo | Investment in Pref. | Technology Services | Preference Shares | PIK | 3,882,098 | - | 3,882,098 | - | 3,882,098 | Eli | |
| Baldwin Asset Management Inc | Baldwin Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 3,069,429 | - | 3,069,429 | - | 3,069,429 | Eli | |
| CBL | CBL | CV Investments LLC | CV Investments LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | | | 13,022,822 | - | 13,022,822 | Eli | |
| CBL | Gilford Asset Management Inc | Gilford Asset Management Inc | Gilford Asset Management Inc | Investment in Pref. through SPV | Financial Services | Preference Shares | PIK | | | 1,740,435 | - | 1,740,435 | Eli | |
| Capital Asset Fund I LLC | Capital Asset Fund I LLC | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 266,386 | - | 266,386 | - | 266,386 | Eli | |
| Capital Asset Fund I LLC | Capital Asset Fund I LLC | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 29,294 | - | 29,294 | - | 29,294 | Eli | |
| Capital Asset Fund I LLC | Capital Asset Fund I LLC | Harvard Collect LLC | Harvard Collect LLC | Investment in Pref. | Debt Collection | Preference Shares | PIK | 318,000 | - | 318,000 | - | 318,000 | Eli | |
| Capital Asset Fund I LLC | Capital Asset Fund I LLC | Nationwide Recovery Holdings LLC | Nationwide Recovery Holdings LLC | Investment in Pref. | Debt Collection | Preference Shares | PIK | 881,586 | - | 881,586 | - | 881,586 | Eli | |
| Capital Asset Fund II LLC | Capital Asset Fund II LLC | ASL Holding LLC | ASL Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 820,642 | - | 820,642 | - | 820,642 | Eli | |
| Capital Asset Fund II LLC | Capital Asset Fund II LLC | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 65,264 | - | 65,264 | - | 65,264 | Eli | |
| Capital Asset Fund II LLC | Capital Asset Fund II LLC | Flagship Holding LLC | Flagship Holding LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 11,596,475 | - | 11,596,475 | - | 11,596,475 | Eli | |
| Capital Asset Fund II LLC | Capital Asset Fund II LLC | Kite Asset Management Inc | Kite Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 81,791 | - | 81,791 | - | 81,791 | Eli | |
| Capital Asset Fund IV LLC | Capital Asset Fund IV LLC | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 95,899 | - | 95,899 | - | 95,899 | Eli | |
| Capital Asset Fund IV LLC | Capital Asset Fund IV LLC | Boston Laser - Eye & Lasik Specialist Holdings LLC | Boston Laser - Eye & Lasik Specialist Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 120,000 | - | 120,000 | - | 120,000 | Eli | |
| Capital Asset Fund IV LLC | Capital Asset Fund IV LLC | Flagship Holding LLC | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | | | - | | - | Eli | |
| Capital Asset Fund IV LLC | Capital Asset Fund IV LLC | MAM Holding LLC | MAM Holding LLC | Investment in Pref. | Financial Services | Preference Shares | Dividend Accrual through Maturity | 4,864,072 | - | 4,864,072 | - | 4,864,072 | Eli | |
| Capital Asset Fund V LLC | Capital Asset Fund V LLC | ASL Holding LLC | ASL Holding LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 260,000 | - | 260,000 | - | 260,000 | Eli | |
| Capital Asset Fund V LLC | Capital Asset Fund V LLC | Flagship Holding LLC | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 6,405,037 | - | 6,405,037 | - | 6,405,037 | Eli | |
| Capital Asset Management II LLC | Capital Asset Management II LLC | Finanzen Holdings Inc | Finanzen Holdings Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 1,100,000 | - | 1,100,000 | - | 1,100,000 | Eli | |
| Capital Asset Management II LLC | Capital Asset Management II LLC | Paradise Asset Management Inc | Paradise Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 1,344,383 | - | 1,344,383 | - | 1,344,383 | Eli | |
| Capital Asset Management III LLC | Capital Asset Management III LLC | Finanzen Holdings Inc | Finanzen Holdings Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 31,101,444 | - | 31,101,444 | - | 31,101,444 | Eli | |
| Capital Asset Management III LLC | Capital Asset Management III LLC | iTech Funding LLC | iTech Funding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 4,629,350 | - | 4,629,350 | - | 4,629,350 | Eli | |
| Chatsworth Asset Management Inc | Chatsworth Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 3,521,440 | - | 3,521,440 | - | 3,521,440 | Eli | |
| Chatsworth Asset Management Inc | Chatsworth Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 2,082,159 | - | 2,082,159 | - | 2,082,159 | Eli | |
| Chatsworth Asset Management Inc | Chatsworth Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 5,124,006 | - | 5,124,006 | - | 5,124,006 | Eli | |
| Chatsworth Asset Management Inc | Chatsworth Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 109,889 | - | 109,889 | - | 109,889 | Eli | |
| Chatsworth Asset Management Inc | Chatsworth Asset Management Inc | The River Source Solutions LLC | The River Source Solutions LLC | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | Dividend Accrual through Maturity | 694,759 | - | 694,759 | - | 694,759 | Eli | Preference Shares |
| Conway LLC | Conway LLC | Academy Financial Assets LLC | Academy Financial Assets LLC | Investment in Pref. | Financial Services | Preference Shares | | | | - | - | - | Loan IQ | |
| Damascus Asset Management Inc | Damascus Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 3,822,059 | - | 3,822,059 | - | 3,822,059 | Eli | |
| Damascus Asset Management Inc | Damascus Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 2,561,220 | - | 2,561,220 | - | 2,561,220 | Eli | |
| Damascus Asset Management Inc | Damascus Asset Management Inc | Boston Laser - Eye & Lasik Specialist Holdings LLC | Boston Laser - Eye & Lasik Specialist Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 54,000 | - | 54,000 | - | 54,000 | Eli | |
| Damascus Asset Management Inc | Damascus Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 2,081,740 | - | 2,081,740 | - | 2,081,740 | Eli | |
| Damascus Asset Management Inc | Damascus Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 163,405 | - | 163,405 | - | 163,405 | Eli | |
| Deering LLC | Deering LLC | Capital Asset Management II LLC | Capital Asset Management II LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 4,719,475 | - | 4,719,475 | - | 4,719,475 | Eli | |
| Durham LLC | Durham LLC | Capital Asset Fund I LLC | Capital Asset Fund I LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 3,881,822 | - | 3,881,822 | - | 3,881,822 | Eli | |
| Durham LLC | Durham LLC | Capital Asset Fund I LLC | Capital Asset Fund I LLC | Investment in Pref. | Financial Services | Preference Shares | | | | - | - | - | Loan IQ | |
| Eli Research | Eli Research | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 892,028 | - | 892,028 | - | 892,028 | Eli | |
| Ephesus Asset Management Inc | Ephesus Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 666,258 | - | 666,258 | - | 666,258 | Eli | |
| Ephesus Asset Management Inc | Ephesus Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 5,069,150 | - | 5,069,150 | - | 5,069,150 | Eli | |
| Ephesus Asset Management Inc | Ephesus Asset Management Inc | Capital Asset Management II LLC | Capital Asset Management II LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 232,371 | - | 232,371 | - | 232,371 | Eli | |
| Ephesus Asset Management Inc | Ephesus Asset Management Inc | CCM Investments | CCM Investments | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 2,764,833 | - | 2,764,833 | - | 2,764,833 | Eli | |
| Ephesus Asset Management Inc | Ephesus Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 4,236,137 | - | 4,236,137 | - | 4,236,137 | Eli | |
| Ephesus Asset Management Inc | Ephesus Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 10,747,188 | - | 10,747,188 | - | 10,747,188 | Eli | |
| Ephesus Asset Management Inc | Ephesus Asset Management Inc | MBW Interco LLC | MBW Interco LLC | Fin. Co. Investment in Pref. Shares | Debt Collection | Preference Shares | Dividend Accrual through Maturity | 1,900,000 | - | 1,900,000 | - | 1,900,000 | Eli | |
| Farmington LLC | Farmington LLC | Capital Asset Fund I LLC | Capital Asset Fund I LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 3,881,822 | - | 3,881,822 | - | 3,881,822 | Eli | |
| Farmington LLC | Farmington LLC | Capital Asset Fund I LLC | Capital Asset Fund I LLC | Investment in Pref. | Financial Services | Preference Shares | | | | - | - | - | Loan IQ | |
| Forest Park Asset Management Inc | Forest Park Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 4,911,236 | - | 4,911,236 | - | 4,911,236 | Eli | |
| Forest Park Asset Management Inc | Forest Park Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 1,157,238 | - | 1,157,238 | - | 1,157,238 | Eli | |
| Forest Park Asset Management Inc | Forest Park Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 2,575,306 | - | 2,575,306 | - | 2,575,306 | Eli | |
| Forest Park Asset Management Inc | Forest Park Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 1,929,723 | - | 1,929,723 | - | 1,929,723 | Eli | |
| Franconia LLC | Franconia LLC | Capital Asset Management III LLC | Capital Asset Management III LLC | Investment in Pref. | Financial Services | Preference Shares | | | | - | - | - | Loan IQ | |
| GB Capital | GB Capital | Flagship Holding LLC | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 48,823 | - | 48,823 | - | 48,823 | Eli | |
| Gilford Asset Management Inc | Gilford Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 2,577,037 | - | 2,577,037 | - | 2,577,037 | Eli | |

| Entity 1 | Entity 2 | Entity 3 | Entity 4 | Investment Type | Industry | Security | Payment | Amount 1 | | Amount 2 | Amount 3 | | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gilford Asset Management Inc | Gilford Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 1,833,415 | - | 1,833,415 | 1,833,415 | Eli | |
| Gilford Asset Management Inc | Gilford Asset Management Inc | CCM Investments | CCM Investments | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 1,200,000 | - | 1,200,000 | 1,200,000 | Eli | |
| Gilford Asset Management Inc | Gilford Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 2,000,000 | - | 2,000,000 | 2,000,000 | Eli | |
| Gilford Asset Management Inc | Gilford Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 1,876,538 | - | 1,876,538 | 1,876,538 | Eli | |
| Goffstown LLC | Goffstown LLC | Capital Asset Management III LLC | Capital Asset Management III LLC | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| Goshen LLC | Goshen LLC | Capital Asset Management II LLC | Capital Asset Management II LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 4,951,846 | - | 4,951,846 | 4,951,846 | Eli | |
| Goshen LLC | Goshen LLC | Capital Asset Management II LLC | Capital Asset Management II LLC | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| Hampton Asset Management Inc | Hampton Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 6,086,408 | - | 6,086,408 | 6,086,408 | Eli | |
| Hampton Asset Management Inc | Hampton Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 1,780,365 | - | 1,780,365 | 1,780,365 | Eli | |
| Hampton Asset Management Inc | Hampton Asset Management Inc | Boston Laser - Eye & Lasik Specialist Holdings LLC | Boston Laser - Eye & Lasik Specialist Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 70,000 | - | 70,000 | 70,000 | Eli | |
| Hampton Asset Management Inc | Hampton Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 4,143,666 | - | 4,143,666 | 4,143,666 | Eli | |
| Hampton Asset Management Inc | Hampton Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 149,399 | - | 149,399 | 149,399 | Eli | |
| Hampton Asset Management Inc | Hampton Asset Management Inc | Triton Financial Limited | Triton Financial Limited | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 18,700,000 | - | 18,700,000 | 18,700,000 | Eli | |
| Healthlink Holdings, LLC | Healthlink Holdings, LLC | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 213,708 | - | 213,708 | 213,708 | Eli | |
| Hopkinton LLC | Hopkinton LLC | Academy Financial Assets LLC | Academy Financial Assets LLC | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| Iron City Asset Management Inc | Iron City Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 3,125,408 | - | 3,125,408 | 3,125,408 | Eli | |
| Iron City Asset Management Inc | Iron City Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 1,335,274 | - | 1,335,274 | 1,335,274 | Eli | |
| Iron City Asset Management Inc | Iron City Asset Management Inc | BRC Holdings Inc. | BRC Holdings Inc. | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 17,000,000 | - | 17,000,000 | 17,000,000 | Eli | |
| Iron City Asset Management Inc | Iron City Asset Management Inc | CCM Investments | CCM Investments | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 4,084,029 | - | 4,084,029 | 4,084,029 | Eli | |
| Iron City Asset Management Inc | Iron City Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | | 3,108,171 | - | 3,108,171 | 3,108,171 | Eli | |
| iTech Funding LLC | iTech Funding LLC | Augusta Asset management Inc | Augusta Asset management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 3,500,000 | - | 3,500,000 | 3,500,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | Baldwin Asset Management Inc | Baldwin Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 3,500,000 | - | 3,500,000 | 3,500,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | Chatsworth Asset Management Inc | Chatsworth Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 3,500,000 | - | 3,500,000 | 3,500,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | Damascus Asset Management Inc | Damascus Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 3,500,000 | - | 3,500,000 | 3,500,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | Ephesus Asset Management Inc | Ephesus Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 3,500,000 | - | 3,500,000 | 3,500,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | Forest Park Asset Management Inc | Forest Park Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 3,500,000 | - | 3,500,000 | 3,500,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | Hampton Asset Management Inc | Hampton Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 3,500,000 | - | 3,500,000 | 3,500,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | Iron City Asset Management Inc | Iron City Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 3,500,000 | - | 3,500,000 | 3,500,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | Jackson Asset Management Inc | Jackson Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | Dividend Accrual through Maturity | 3,500,000 | - | 3,500,000 | 3,500,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | Summerville Asset Management Inc | Summerville Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 4,625,000 | - | 4,625,000 | 4,625,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | The River Source Solutions LLC | The River Source Solutions LLC | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 3,589,588 | - | 3,589,588 | 3,589,588 | Eli | Preference Shares |
| iTech Funding LLC | iTech Funding LLC | Tybee Island Asset Management Inc | Tybee Island Asset Management Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 3,500,000 | - | 3,500,000 | 3,500,000 | Eli | |
| iTech Funding LLC | iTech Funding LLC | WesternB Holdings LLC | WesternB Holdings LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 4,991,106 | - | 4,991,106 | 4,991,106 | Eli | |
| iTech Funding LLC | iTech Funding LLC | WesternB Holdings LLC | WesternB Holdings LLC | Fin. Co. Investment in Pref. Shares | Commercial Services | Preference Shares | PIK | 837,198 | - | 837,198 | 837,198 | Eli | |
| iTech Funding LLC | iTech Funding LLC | WesternB Investments LLC | WesternB Investments LLC | Fin. Co. Investment in Pref. Shares | Commercial Services | Preference Shares | PIK | 882,473 | - | 882,473 | 882,473 | Eli | |
| Jackson Asset Management Inc | Jackson Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 2,282,403 | - | 2,282,403 | 2,282,403 | Eli | |
| Jackson Asset Management Inc | Jackson Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 3,872,018 | - | 3,872,018 | 3,872,018 | Eli | |
| Jackson Asset Management Inc | Jackson Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 3,425,000 | - | 3,425,000 | 3,425,000 | Eli | |
| Jackson Asset Management Inc | Jackson Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 203,556 | - | 203,556 | 203,556 | Eli | |
| Jaffrey LLC | Jaffrey LLC | Capital Asset Management III LLC | Capital Asset Management III LLC | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| Kite Asset Management Inc | Kite Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 5,016,298 | - | 5,016,298 | 5,016,298 | Eli | |
| Kite Asset Management Inc | Kite Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 1,104,178 | - | 1,104,178 | 1,104,178 | Eli | |
| Kite Asset Management Inc | Kite Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 2,800,156 | - | 2,800,156 | 2,800,156 | Eli | |
| Kite Asset Management Inc | Kite Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 3,319,897 | - | 3,319,897 | 3,319,897 | Eli | |
| Kite Asset Management Inc | Kite Asset Management Inc | The River Source Solutions LLC | The River Source Solutions LLC | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | Dividend Accrual through Maturity | 2,894,829 | - | 2,894,829 | 2,894,829 | Eli | Preference Shares |
| Laconia LLC | Laconia LLC | Capital Asset Management III LLC | Capital Asset Management III LLC | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| Lily Asset Management Inc | Lily Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 4,324,940 | - | 4,324,940 | 4,324,940 | Eli | |
| Lily Asset Management Inc | Lily Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 2,225,457 | - | 2,225,457 | 2,225,457 | Eli | |
| Lily Asset Management Inc | Lily Asset Management Inc | Boston Laser - Eye & Lasik Specialist Holdings LLC | Boston Laser - Eye & Lasik Specialist Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 95,000 | - | 95,000 | 95,000 | Eli | |
| Lily Asset Management Inc | Lily Asset Management Inc | CBCS Operations LLC | CBCS Operations LLC | Fin. Co. Investment in Pref. Shares | Commercial Services | Preference Shares | PIK | 1,507,284 | - | 1,507,284 | 1,507,284 | Eli | |
| Lily Asset Management Inc | Lily Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 5,931,493 | - | 5,931,493 | 5,931,493 | Eli | |
| Lily Asset Management Inc | Lily Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 43,941 | - | 43,941 | 43,941 | Eli | |
| Loudon LLC | Loudon LLC | Academy Financial Assets LLC | Academy Financial Assets LLC | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| Madbury LLC | Madbury LLC | Academy Association Inc | Academy Association Inc | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| Marshall Asset Management Inc | Marshall Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 4,453,180 | - | 4,453,180 | 4,453,180 | Eli | |
| Marshall Asset Management Inc | Marshall Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 59,937 | - | 59,937 | 59,937 | Eli | |
| Marshall Asset Management Inc | Marshall Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 4,955,609 | - | 4,955,609 | 4,955,609 | Eli | |
| Marshall Asset Management Inc | Marshall Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 3,143,629 | - | 3,143,629 | 3,143,629 | Eli | |
| Merrimack LLC | Merrimack LLC | Capital Asset Management II LLC | Capital Asset Management II LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 4,951,846 | - | 4,951,846 | 4,951,846 | Eli | |
| Merrimack LLC | Merrimack LLC | Capital Asset Management II LLC | Capital Asset Management II LLC | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| Paradise Asset Management Inc | Paradise Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 2,994,269 | - | 2,994,269 | 2,994,269 | Eli | |
| Paradise Asset Management Inc | Paradise Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 89,000 | - | 89,000 | 89,000 | Eli | |
| PBLA Main | Flagship Holding LLC | Flagship Holding LLC | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 14,000,000 | - | 14,000,000 | 14,000,000 | Eli | |
| Pierre Mendes | Pierre Mendes | Capital Asset Fund III LLC | ASL Holding LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 1,134,294 | - | 1,134,294 | 1,134,294 | Eli | |
| Pierre Mendes | Pierre Mendes | Capital Asset Fund III LLC | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 56,830 | - | 56,830 | 56,830 | Eli | |
| Pierre Mendes | Pierre Mendes | Capital Asset Fund III LLC | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 472,000 | - | 472,000 | 472,000 | Eli | |
| Pierre Mendes | Pierre Mendes | Capital Asset Fund III LLC | LAM Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 844,973 | - | 844,973 | 844,973 | Eli | |
| Pierre Mendes | Pierre Mendes | Capital Asset Fund III LLC | PCF LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 343,462 | - | 343,462 | 343,462 | Eli | |
| Pierre Mendes | Pierre Mendes | Capital Asset Fund III LLC | Stratford HoldCo | Investment in Pref. | Financial Services | Preference Shares | PIK | 6,187,481 | - | 6,187,481 | 6,187,481 | Eli | |
| Plaistow LLC | Plaistow LLC | Academy Financial Assets LLC | Academy Financial Assets LLC | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| Raymond LLC | Raymond LLC | Academy Financial Assets LLC | Academy Financial Assets LLC | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| Rockdale Asset Management Inc | Rockdale Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 498,821 | - | 498,821 | 498,821 | Eli | |
| Rockdale Asset Management Inc | Rockdale Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 240,940 | - | 240,940 | 240,940 | Eli | |
| Rumney LLC | Rumney LLC | Capital Asset Management II LLC | Capital Asset Management II LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 3,137,811 | - | 3,137,811 | 3,137,811 | Eli | |
| Rumney LLC | Rumney LLC | Capital Asset Management II LLC | Capital Asset Management II LLC | Investment in Pref. | Financial Services | Preference Shares | | | - | | - | Loan IQ | |
| NORTHSTAR | AAPC Holdings LLC | AAPC Holdings LLC | AAPC Holdings LLC | Investment in Pref. | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 1,654,385 | - | 1,654,385 | 1,654,385 | Eli | Preference Shares |
| PBIHL | AGH Parent LLC | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 657,288 | - | 657,288 | 657,288 | Eli | Preference Shares |
| NORTHSTAR | ASL Holding LLC | ASL Holding LLC | ASL Holding LLC | Insurance Investment in Pref. | Financial Services | Preference Shares | | 10,363,000 | | 10,363,000 | 10,363,000 | | |
| Summerville Asset Management Inc | Summerville Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 5,960,965 | - | 5,960,965 | 5,960,965 | Eli | |
| Summerville Asset Management Inc | Summerville Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Commercial Services | Preference Shares | PIK | 404,000 | - | 404,000 | 404,000 | Eli | |
| Summerville Asset Management Inc | Summerville Asset Management Inc | Litigation Funding | Litigation Funding | Fin. Co. Investment in Pref. Shares | Commercial Services | Preference Shares | PIK | 402,500 | - | 402,500 | 402,500 | Eli | |
| Summerville Asset Management Inc | Summerville Asset Management Inc | PCF LLC | PCF LLC | Fin. Co. Investment in Pref. Shares | Commercial Services | Preference Shares | Dividend Accrual through Maturity | 300,000 | - | 300,000 | 300,000 | Eli | |
| Tybee Island Asset Management Inc | Tybee Island Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 3,000,000 | - | 3,000,000 | 3,000,000 | Eli | |
| Tybee Island Asset Management Inc | Tybee Island Asset Management Inc | Autonomy Investments | Autonomy Investments | Fin. Co. Investment in Pref. Shares | Healthcare Services | Preference Shares | PIK | 1,780,365 | - | 1,780,365 | 1,780,365 | Eli | |
| Tybee Island Asset Management Inc | Tybee Island Asset Management Inc | CCM Investments | CCM Investments | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 2,000,000 | - | 2,000,000 | 2,000,000 | Eli | |
| Tybee Island Asset Management Inc | Tybee Island Asset Management Inc | Damovo | Damovo | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | PIK | 4,804,539 | - | 4,804,539 | 4,804,539 | Eli | |
| Tybee Island Asset Management Inc | Tybee Island Asset Management Inc | Flagship Holding LLC | Flagship Holding LLC | Fin. Co. Investment in Pref. Shares | Technology Services | Preference Shares | Dividend Accrual through Maturity | 3,906,373 | - | 3,906,373 | 3,906,373 | Eli | |
| NORTHSTAR | Daisy Seven LLC | Daisy Seven LLC | Daisy Seven LLC | Investment in Pref. | Technology Services | Preference Shares | PIK | 1,753,310 | - | 1,753,310 | | | |
| NORTHSTAR | Damovo | Damovo | Damovo | Investment in Pref. | Technology Services | Preference Shares | PIK | 2,640,975 | - | 2,640,975 | 2,640,975 | Eli | |
| NORTHSTAR | iTech Funding LLC | iTech Funding LLC | iTech Funding LLC | Insurance Investment in Pref. | Financial Services | Preference Shares | Dividend Accrual through Maturity | 13,439,503 | - | 13,439,503 | 13,439,503 | Eli | |
| NORTHSTAR | Konnect Net Holdings LLC | Konnect Net Holdings LLC | Konnect Net Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | Preference Shares | PIK | 763,012 | - | 763,012 | 763,012 | Eli | |
| NORTHSTAR | Triton Financial Limited | Triton Financial Limited | Triton Financial Limited | Insurance Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 22,728,850 | - | 22,728,850 | 22,728,850 | Eli | |
| PBLA | AGH Parent LLC | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 15,241,713 | - | 3,300 | 3,300 | Eli | Preference Shares |
| PBLA | AGH Parent LLC | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 9,763,859 | - | 110,460 | 110,460 | Eli | Preference Shares |
| OMNIA | Flagship Holding LLC | Flagship Holding LLC | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 89,654 | - | 89,654 | 89,654 | Eli | |
| OMNIA | MBW Interco LLC | MBW Interco LLC | MBW Interco LLC | Investment in Pref. | Commercial Services | Preference Shares | Cash Pay | 2,218,741 | - | 2,218,741 | 2,218,741 | Eli | |
| Rockdale Asset Management Inc | Rockdale Asset Management Inc | Agera Holdings LLC | Agera Holdings LLC | Fin. Co. Investment in Pref. Shares | Utilities | Agera | PIK | 1,900,000 | - | 1,900,000 | 1,900,000 | Eli | |
| PBIHL | Flagship Holding LLC | Flagship Holding LLC | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 29,361,871 | - | 29,361,871 | 29,361,871 | Eli | Preference Shares |
| Yarrow Three LLC | Yarrow Three LLC | AGH Parent LLC | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 9,781,992 | - | 9,781,992 | 9,781,992 | Eli | Preference Shares |
| PBLA | BRC Holding LLC | BRC Holding LLC | BRC Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 3,575,000 | - | 3,575,000 | 3,575,000 | Eli | |
| Iron City Asset Management Inc | Iron City Asset Management Inc | Proactive Software Holdings | Proactive Software Holdings | Fin. Co. Investment in Pref. Shares | Commercial Services | Other Exclusions | Dividend Accrual through Maturity | 708,000 | - | 708,000 | 708,000 | Eli | |
| Lily Asset Management Inc | Lily Asset Management Inc | ASL Holding LLC | ASL Holding LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Senior | PIK | 1,691,099 | 145,116 | 1,691,099 | 1,836,215 | Eli | |
| NORTHSTAR | Automotive Fleet Inv. Ltd | Automotive Fleet Inv. Ltd | Automotive Fleet Inv. Ltd | Insurance Investment in Pref. | Technology Services | Other Exclusions | Dividend Accrual through Maturity | 5,250,000 | - | 5,813,153 | 5,813,153 | Eli | Preference Shares |
| NORTHSTAR | UKAT Investment | UKAT Investment | UKAT Investment | Investment in Pref. | Healthcare Services | Other Exclusions | PIK | 18,552,987 | - | 18,552,987 | 18,552,987 | Eli | Preference Shares |
| PBLA | iTech Funding LLC | iTech Funding LLC | iTech Funding LLC | Insurance Investment in Pref. | Financial Services | Preference Shares | Dividend Accrual through Maturity | 5,727,000 | - | 5,727,000 | 5,727,000 | Eli | |
| PBLA | LMG Holding LLC | LMG Holding LLC | LMG Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 393,483 | - | 393,483 | 393,483 | Eli | |
| SNIC | SNIC | Capital Asset Management II LLC | Capital Asset Management II LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 3,719,632 | - | 3,719,632 | 3,719,632 | Eli | |
| SNIC | SNIC | CV Investments LLC | CV Investments LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 2,353,684 | - | 2,353,684 | 2,353,684 | Eli | |
| SNIC | Gilford Asset Management Inc | Gilford Asset Management Inc | Gilford Asset Management Inc | Investment in Pref. through SPV | Financial Services | Preference Shares | PIK | 314,558 | - | 314,558 | 314,558 | Eli | |
| Tybee Island Asset Management Inc | Tybee Island Asset Management Inc | GBIG Capital LLC | GBIG Capital LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Insurance | PIK | 400,000 | - | 400,000 | 13,507 | 413,507 | Eli | Insurance |
| Tybee Island Asset Management Inc | Tybee Island Asset Management Inc | GBIG Holdings Inc | GBIG Holdings Inc | Fin. Co. Investment in Pref. Shares | Financial Services | Insurance | PIK | 4,557,416 | - | 4,557,416 | 65,926 | 4,623,343 | Eli | Insurance |

| Lender | Underlying Borrower2 | Direct Loan / Through SPV - FinCo. | Industry | Type (Junior/Senior/Pref) | Payment Type (PIK,Partial PIK,Cash) | Amount | Total Accrued | Total P+I |
|---|---|---|---|---|---|---|---|---|
| BLIC | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 3,146,256.83 | 86,607.74 | 3,232,864.57 |
| BLIC | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 2,170,000.00 | 108,722.94 | 2,278,722.94 |
| BLIC | Augusta Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 4,271,473.84 | 43,471.79 | 4,314,945.63 |
| BLIC | Baldwin Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 1,062,928.14 | 9,994.49 | 1,072,922.63 |
| BLIC | BMO | Direct Loan - Insurance | PPN | Senior | Cash Pay | 5,000,000.00 | - | 5,000,000.00 |
| BLIC | Capital Asset Fund I LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 3,187,785.99 | 176,843.34 | 3,364,629.33 |
| BLIC | Capital Asset Fund IV LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 4,291,011.11 | (145,785.18) | 4,145,225.93 |
| BLIC | Capital Asset Fund V LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 4,291,011.11 | 47,645.90 | 4,338,657.01 |
| BLIC | Gilford Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 4,495,895.15 | 52,204.64 | 4,548,099.79 |
| BLIC | Hampton Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 871,090.97 | 9,392.50 | 880,483.47 |
| BLIC | Iron City Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 855,817.94 | 9,238.30 | 865,056.24 |
| BLIC | iTech Funding LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 1,021,304.36 | 28,855.62 | 1,050,159.98 |
| BLIC | Jackson Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 762,154.28 | 8,206.68 | 770,360.96 |
| BLIC | Pierre Mendes | PPN Loans | Financial Services | Senior | Cash Pay | 6,000,000.00 | 14,000.00 | 6,014,000.00 |
| BLIC | Summerville Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Partial PIK | 1,089,065.10 | 36,089.72 | 1,125,154.82 |
| BLIC | TAC Investments LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 5,444,303.80 | 82,576.16 | 5,526,879.96 |
| CBL | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 21,700,000.00 | 1,087,229.46 | 22,787,229.46 |
| CBL | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 19,698,000.00 | 373,226.80 | 20,071,226.80 |
| CBL | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 8,462,891.30 | 232,959.96 | 8,695,851.26 |
| CBL | Alpharetta LLC | Direct Loan - Insurance | PPN | Senior | Cash Pay | 2,097,464.00 | 182,570.08 | 2,280,034.08 |
| CBL | AR Purchasing Solutions 2 LLC | Direct Loan - Insurance | Commercial Services | Senior | Cash | 2,841,811.21 | 202,918.07 | 3,044,729.28 |
| CBL | AR Purchasing Solutions LLC | Direct Loan - Insurance | Commercial Services | Senior | Cash | 2,311,061.00 | 340,020.36 | 2,651,081.36 |
| CBL | AT Denmark Investments ApS - (Arcane Tinmen) | Direct Loan - Insurance | Commercial Services | Senior | Cash | 8,534,551.36 | 190,710.16 | 8,725,261.52 |
| CBL | Augusta Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 4,271,473.83 | 43,471.79 | 4,314,945.62 |
| CBL | Baldwin Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 25,817,755.86 | 242,758.90 | 26,060,514.76 |
| CBL | Blue Violet | Direct Loan - Insurance | NA | Senior | Cash | 21,674,261.89 | 32,659.85 | 21,706,921.74 |
| CBL | BMO | Direct Loan - Insurance | PPN | Senior | Cash Pay | 62,200,000.00 | - | 62,200,000.00 |
| CBL | Capital Asset Fund I LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 60,007,145.76 | 3,328,913.53 | 63,336,059.29 |
| CBL | Capital Asset Fund IV LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 42,910,111.11 | (1,457,851.83) | 41,452,259.28 |
| CBL | Capital Asset Fund V LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 42,910,111.11 | 476,458.98 | 43,386,570.09 |
| CBL | Capital Asset Management III LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 29,625,000.00 | 430,675.26 | 30,055,675.26 |
| CBL | Chatsworth Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 22,384,147.96 | 174,394.80 | 22,558,542.76 |
| CBL | ComplySmart LLC | Direct Loan - Insurance | Technology Services | Senior | Cash | 3,002,000.00 | 86,811.42 | 3,088,811.42 |
| CBL | Damascus Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 18,791,159.95 | 132,152.25 | 18,923,312.20 |
| CBL | Ephesus Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 25,185,031.87 | 173,688.04 | 25,358,719.91 |
| CBL | Forest Park Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 17,246,459.09 | 116,224.89 | 17,362,683.98 |
| CBL | Hampton Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 22,097,474.40 | 238,265.04 | 22,335,739.44 |
| CBL | HPCSP Investments LLC | Direct Loan - Insurance | Healthcare Services | Senior | Cash | 7,016,140.11 | 149,506.64 | 7,165,646.75 |
| CBL | Intralan Investments Limited | Direct Loan - Insurance | Technology Services | Senior | Cash | 4,152,310.22 | 93,124.94 | 4,245,435.16 |
| CBL | Iron City Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 25,275,942.62 | 272,846.24 | 25,548,788.86 |
| CBL | iTech Funding LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 19,281,368.23 | 564,035.10 | 19,845,403.33 |
| CBL | Jackson Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 22,509,656.68 | 242,378.17 | 22,752,034.85 |
| CBL | Kite Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 34,622,922.98 | 587,272.47 | 35,210,195.45 |
| CBL | Lares LLC | Direct Loan - Insurance | Commercial Services | Senior | Cash | 4,489,111.29 | 63,396.14 | 4,552,507.43 |
| CBL | Lily Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 33,084,925.22 | 550,693.18 | 33,635,618.40 |
| CBL | Marshall Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 31,082,941.17 | 428,199.37 | 31,511,140.54 |
| CBL | Medical Physics LLC | Direct Loan - Insurance | Health Services | Senior | Cash | 2,882,150.67 | 91,044.53 | 2,973,195.20 |
| CBL | Medical Physics LLC | Direct Loan - Insurance | Health Services | Senior | Cash | 900,000.00 | 28,430.19 | 928,430.19 |
| CBL | Paradise Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Partial PIK | 39,700,000.00 | 777,331.11 | 40,477,331.11 |
| CBL | PCF LLC | Direct Loan - Insurance | Commercial Services | Senior | PIK | 3,196,275.10 | 30,252.22 | 3,226,527.32 |
| CBL | Pierre Mendes | PPN Loans | Financial Services | Senior | Cash Pay | 60,000,000.00 | 140,000.00 | 60,140,000.00 |
| CBL | Rockdale Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 39,700,000.00 | 737,952.74 | 40,437,952.74 |
| CBL | Standard Financial Limited | Direct Loan - Insurance | Commercial Services | Senior | Cash | 3,819,821.67 | 158,462.34 | 3,978,284.01 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CBL | Summerville Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Partial PIK | 23,752,824.00 | 791,045.25 | 24,543,869.25 |
| CBL | Tybee Island Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 28,662,904.77 | 120,788.59 | 28,783,693.36 |
| SNIC | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 5,425,000.00 | 271,807.36 | 5,696,807.36 |
| SNIC | Augusta Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 5,125,768.58 | 52,166.14 | 5,177,934.72 |
| SNIC | Baldwin Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 8,656,221.08 | 81,392.61 | 8,737,613.69 |
| SNIC | BMO | Direct Loan - Insurance | PPN | Senior | Cash Pay | 10,000,000.00 | | 10,000,000.00 |
| SNIC | Capital Asset Fund I LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 6,375,571.98 | 353,686.68 | 6,729,258.66 |
| SNIC | Capital Asset Fund IV LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 6,436,516.67 | (218,677.78) | 6,217,838.89 |
| SNIC | Capital Asset Fund V LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 6,436,516.67 | 71,468.84 | 6,507,985.51 |
| SNIC | Damascus Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 6,903,500.34 | 48,550.12 | 6,952,050.46 |
| SNIC | Ephesus Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 9,491,432.09 | 65,457.45 | 9,556,889.54 |
| SNIC | Forest Park Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 7,904,627.09 | 53,269.75 | 7,957,896.84 |
| SNIC | Hampton Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 7,113,909.47 | 76,705.41 | 7,190,614.88 |
| SNIC | HPCSP Investments LLC | Direct Loan - Insurance | Healthcare Services | Senior | Cash | 1,084,395.05 | 23,107.33 | 1,107,502.38 |
| SNIC | Iron City Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 3,423,271.71 | 36,953.20 | 3,460,224.91 |
| SNIC | iTech Funding LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 7,468,288.19 | 211,006.73 | 7,679,294.92 |
| SNIC | Jackson Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Cash | 3,048,617.10 | 32,826.72 | 3,081,443.82 |
| SNIC | Pierre Mendes | PPN Loans | Financial Services | Senior | Cash Pay | 9,000,000.00 | 21,000.00 | 9,021,000.00 |
| SNIC | Summerville Asset Management Inc | Direct Loan - Insurance | Financial Services | Senior | Partial PIK | 7,963,788.58 | 263,906.07 | 8,227,694.65 |
| SNIC | TAC Investments LLC | Direct Loan - Insurance | Financial Services | Senior | Cash | 3,233,263.03 | 49,040.33 | 3,282,303.36 |
| | **Subtractions (Read Through)** | | | | | (387,525,206.11) | | (401,319,724.88) |
| | **Total (net subtractions)** | | | | | 1,280,406,265.49 | | 1,300,005,663.14 |
| | | | | | | 1,667,931,471.60 | | |
| | | | | | | 49,016,888.78 | | |
| | | | | | | 399,737,065.39 | | |
| | | | | | | 254,540,395 | | |
| | | | | | | 182,807,124 | | |

| Lender | Underlying Borrower2 | Direct Loan / Through SPV - FinCo. | Industry | Type (Junior/Senior/Pref) | Payment Type (PIK,Partial PIK,Cash) | Amount | Total Accrued | Total P+I | Data Source |
|---|---|---|---|---|---|---|---|---|---|
| BLIC | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Junior | PIK | 2,013,040.35 | 39,602.98 | 2,052,643.33 | Loan IQ |
| BLIC | HPCSP Investments LLC | Direct Loan - Insurance | Healthcare Services | Junior | PIK | 584,017.53 | 16,118.87 | 600,136.40 | Loan IQ |
| CBL | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Junior | PIK | 24,196,819.87 | 476,029.34 | 24,672,849.21 | Loan IQ |
| CBL | HPCSP Investments LLC | Direct Loan - Insurance | Healthcare Services | Junior | PIK | 7,019,912.40 | 193,749.39 | 7,213,661.79 | Loan IQ |
| SNIC | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Junior | PIK | 4,026,080.70 | 79,205.97 | 4,105,286.67 | Loan IQ |
| SNIC | HPCSP Investments LLC | Direct Loan - Insurance | Healthcare Services | Junior | PIK | 1,168,035.05 | 32,237.74 | 1,200,272.79 | Loan IQ |
| | | | | | | 49,016,888.78 | | 50,627,879.90 | |

| Lender | Underlying Borrower2 | Direct Loan / Through SPV - FinCo. | Industry | Type (Junior/Senior/Pref) | Payment Type (PIK,Partial PIK,Cash) | Amount | Total Accrued | Total P+I | Data Source |
|---|---|---|---|---|---|---|---|---|---|
| BLIC | Barclays | Direct Loan - Insurance | PPN | Preference Shares | Cash Pay | 6,039,266.13 | - | 6,039,266.13 | Eli |
| BLIC | Capital Asset Fund II LLC | Direct Loan - Insurance | Financial Services | Preference Shares | Cash Pay | 3,358,609.70 | - | 3,358,609.70 | Eli |
| BLIC | Capital Asset Management II LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 1,870,357.43 | - | 1,870,357.43 | Eli |
| BLIC | CV Investments LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 1,183,512.44 | - | 1,183,512.44 | Eli |
| BLIC | Franklin Street | Direct Loan - Insurance | PPN | Preference Shares | Cash Pay | 4,993,750.00 | - | 4,993,750.00 | Eli |
| BLIC | Gilford Asset Management Inc | Investment in Pref. through SPV | Financial Services | Preference Shares | PIK | 2,213,163.00 | - | 2,213,163.00 | Eli |
| BLIC | Nom GB 2018 | Direct Loan - Insurance | PPN | Preference Shares | Cash Pay | 1,799,325.15 | - | 1,799,325.15 | Eli |
| CBL | Barclays | Direct Loan - Insurance | PPN | Preference Shares | Cash Pay | 76,706,790.43 | - | 76,706,790.43 | Eli |
| CBL | Capital Asset Fund II LLC | Direct Loan - Insurance | Financial Services | Preference Shares | Cash Pay | 36,956,582.72 | - | 36,956,582.72 | Eli |
| CBL | Capital Asset Management II LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 20,580,545.36 | - | 20,580,545.36 | Eli |
| CBL | CV Investments LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 13,022,821.79 | - | 13,022,821.79 | Eli |
| CBL | Franklin Street | Direct Loan - Insurance | PPN | Preference Shares | Cash Pay | 47,998,543.20 | - | 47,998,543.20 | Eli |
| CBL | Gilford Asset Management Inc | Investment in Pref. through SPV | Financial Services | Preference Shares | PIK | 1,740,434.55 | - | 1,740,434.55 | Eli |
| CBL | Nom GB 2018 | Direct Loan - Insurance | PPN | Preference Shares | Cash Pay | 2,189,609.53 | - | 2,189,609.53 | Eli |
| SNIC | Barclays | Direct Loan - Insurance | PPN | Preference Shares | Cash Pay | 10,000,000.00 | - | 10,000,000.00 | Eli |
| SNIC | Capital Asset Fund II LLC | Direct Loan - Insurance | Financial Services | Preference Shares | Cash Pay | 6,679,360.82 | - | 6,679,360.82 | Eli |
| SNIC | Capital Asset Management II LLC | Fin. Co. Investment in Pref. Shares | Financial Services | Preference Shares | PIK | 3,719,632.02 | - | 3,719,632.02 | Eli |
| SNIC | CV Investments LLC | Investment in Pref. | Healthcare Tech | Preference Shares | PIK | 2,353,684.22 | - | 2,353,684.22 | Eli |
| SNIC | Franklin Street | Direct Loan - Insurance | PPN | Preference Shares | Cash Pay | 9,999,696.50 | - | 9,999,696.50 | Eli |
| SNIC | Gilford Asset Management Inc | Investment in Pref. through SPV | Financial Services | Preference Shares | PIK | 314,558.04 | - | 314,558.04 | Eli |
| SNIC | Nom GB 2018 | Direct Loan - Insurance | PPN | Preference Shares | Cash Pay | 9,368,244.75 | - | 9,368,244.75 | Eli |
| | Total (net subtractions) | | | | | 200,022,425.37 | - | 200,022,425.37 | |

| | Lender | Underlying Borrower2 | Direct Loan / Through SPV - FinCo. | Industry | Type (Junior/Senior/Pref) | Payment Type (PIK,Partial PIK,Cash) | Amount | Total Accrued | Total P+I | Data Source | Column1 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Should hav | PBLA Main | AAPC Holdings LLC | Investment in Pref. | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 913,970 | - | 913,970 | Eli | |
| | PBLA Main | AGH Parent LLC | Investment in Pref. | Utilities | Agera | PIK | 7,472.00 | | 7,472.00 | Eli | |
| February 2 | PBLA Main | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Junior | Cash | 34,000,000 | 1,080,571 | 35,080,571 | Loan IQ | |
| SNA Capita | PBLA Main | GBIG Capital LLC | Direct Loan - Insurance | Financial Services | Junior | PIK | 718,765 | - | 718,765 | Eli | |
| SNA Capita | PBLA Main | GBIG Capital LLC | Direct Loan - Insurance | Financial Services | Junior | PIK | 106,920,000 | 3,679,220 | 110,599,220 | Loan IQ | |
| | PBLA Main | Flagship Holding LLC | Investment in Pref. | Financial Services | Preference Shares | PIK | 14,000,000 | | 14,000,000 | Eli | |
| 12/17 Rep | PBLA Main | Academy Financial Assets LLC | Direct Loan - Insurance | Financial Services | Repo Loan | Cash Pay | 56,078,258 | - | 56,078,258 | Eli | |
| 12/17 Rep | PBLA Main | Capital Asset Fund I LLC | Direct Loan - Insurance | Financial Services | Repo Loan | Cash Pay | 28,023,819 | - | 28,023,819 | Eli | |
| 12/17 Rep | PBLA Main | Capital Asset Management II LLC | Direct Loan - Insurance | Financial Services | Repo Loan | Cash Pay | 11,692,000.00 | - | 11,692,000.00 | Eli | |
| | PBLA Main | Yarrow Three LLC | Direct Loan - Insurance | NA | Senior | PIK | 2,186,110.96 | 99,183.55 | 2,285,294.51 | Loan IQ | Agera |
| | | | | | | | 254,540,395 | | 259,399,370 | | |

| Lender | Underlying Borrower2 | Direct Loan / Through SPV - FinCo. | Industry | Type (Junior/Senior/ Pref) | Payment Type (PIK,Partial PIK,Cash) | Amount | Total Accrued | Total P+I | Data Source |
|---|---|---|---|---|---|---|---|---|---|
| BLIC | Netherlands Insurance Holdings Inc | Direct Loan - Insurance | Financial Services | Insurance | Cash | 759,233.10 | 44,966.94 | 804,200.04 | Loan IQ |
| CBL | Beaufort Holding S.A. | Direct Loan - Insurance | Financial Services | Insurance | PIK | 5,192,357.40 | 153,865.76 | 5,346,223.16 | Loan IQ |
| CBL | Netherlands Insurance Holdings Inc | Direct Loan - Insurance | Financial Services | Insurance | Cash | 11,407,477.30 | 675,628.25 | 12,083,105.55 | Loan IQ |
| SNIC | GBIG Holdings Inc | Direct Loan - Insurance | Financial Services | Insurance | Cash | 6,000,000.00 | 103,561.64 | 6,103,561.64 | Loan IQ |
| SNIC | Netherlands Insurance Holdings Inc | Direct Loan - Insurance | Financial Services | Insurance | Cash | 1,898,082.74 | 112,417.35 | 2,010,500.09 | Loan IQ |
| SNIC | PBX Bermuda Holdings Ltd | Direct Loan - Insurance | Financial Services | Insurance | Cash | 200,203.32 | 12,774.60 | 212,977.92 | Loan IQ |
| | | | | | | 264,460,076 | | 276,372,192 | |

| Lender | Underlying Borrower2 | Direct Loan / Through SPV - FinCo. | Industry | Type (Junior/Senior/ Pref) | Payment Type (PIK,Partial PIK,Cash) | Amount | Total Accrued | Total P+I | Data Source | Type Note |
|---|---|---|---|---|---|---|---|---|---|---|
| CBL | Agera Energy LLC | Direct Loan - Insurance | Utilities | Agera | Cash | 35,000,000.00 | 1,060,939.75 | 36,060,939.75 | Loan IQ | Junior |
| | | | | | | 182,807,124 | | 186,702,332 | | |

| Lender | Underlying Borrower2 | Direct Loan / Through SPV - FinCo. | Industry | Type (Junior/Senior/Pref) | Payment Type (PIK,Partial PIK,Cash) | Amount | Total Accrued | Total P+I | Data Source | Type Note |
|---|---|---|---|---|---|---|---|---|---|---|
| Academy Financial Assets LLC | AAPC Holdings LLC | Investment in Pref. | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 8,755,829 | - | 8,755,829 | Eli | Preference Shares |
| Barclays | AAPC Holdings LLC | PPN Loans | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 52,096,269 | - | 52,096,269 | Eli | Preference Shares |
| Capital Asset Fund II LLC | AAPC Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 63,232 | - | 63,232 | Eli | Preference Shares |
| Capital Asset Fund III LLC | AAPC Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 2,743,503 | - | 2,743,503 | Eli | Preference Shares |
| Capital Asset Fund IV LLC | AAPC Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 577,114 | - | 577,114 | Eli | Preference Shares |
| Capital Asset Fund V LLC | AAPC Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 1,576,059 | - | 1,576,059 | Eli | Preference Shares |
| Franklin Street | AAPC Holdings LLC | PPN Loans | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 19,577,230 | - | 19,577,230 | Eli | Prefernce Shares |
| Nom GB 2018 | AAPC Holdings LLC | PPN Loans | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 35,728,675 | - | 35,728,675 | Eli | Preference Shares |
| Paradise Asset Management Inc | AAPC Holdings LLC | Fin. Co. Investment in Pref. Shares | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 1,648,060 | - | 1,648,060 | Eli | Preference Shares |
| Summerville Asset Management Inc | AAPC Holdings LLC | Fin. Co. Investment in Loan | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 1,897,608 | - | 1,897,608 | Eli | Preference Shares |
| NORTHSTAR | AAPC Holdings LLC | Investment in Pref. | Healthcare Tech | AAPC | Dividend Accrual through Maturity | 1,654,385 | - | 1,654,385 | Eli | Preference Shares |
| | | | | | | 126,317,964 | | 126,317,964 | | |

| Account | Origination | Repo Counterparty | Underlying Asset | Value |
|---|---|---|---|---|
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC (fka AFI) | Atlas Global | 4,340,801.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | BCC Research LLC | 190,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | Caploc Holdings | 435,000.00 |
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC | Flagship Pref | 2,329,760.00 |
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC (fka AFI) | CMC Holdings LLC | 5,170,027.00 |
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC | Flagship Pref | 2,550,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Management II LLC | See Further Breakout | 9,297,670.00 |
| PBLA MAIN | Dec-16 | Capital Asset Management II LLC | See Further Breakout | 14,413,819.00 |
| PBLA MAIN | Dec-16 | Capital Asset Management II LLC | See Further Breakout | 6,251,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | Eye Reach  Patient LLC | 297,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | GB Capital | 500,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | Health Care Cloud Services | 129,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | Lens on Demand | 76,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | GBIG Capital LLC | 260,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | New England Capital | 4,155,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | GBIG Capital LLC | 13,460,000.00 |
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC | Flagship Pref | 2,700,000.00 |
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC | Flagship Pref | 4,000,000.00 |
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC | Flagship Pref | 750,000.00 |
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC | NIH Capital | 2,200,000.00 |
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC | GBIG Capital LLC | 2,700,000.00 |
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC | GBIG Capital LLC | 4,000,000.00 |
| PBLA MAIN | Dec-16 | Academy Financial Assets LLC | GBIG Capital LLC | 6,500,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | SN Group Development LLC | 525,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | Standard Holdings Ltd | 339,000.00 |
| PBLA MAIN | Dec-16 | Capital Asset Fund I LLC | VR Collections | 3,500,000.00 |
| PBLA ULICO 2017 | Jan-17 | Academy Financial Assets LLC | Flagship Pref | 6,000,000.00 |
| PBLA ULICO 2017 | Jan-17 | Capital Asset Management III LLC | GBIG Capital LLC | 25,000,000.00 |
| PBLA ULICO 2017 | Jan-17 | Paralell Capital Assets | GBIG Capital LLC | 14,000,000.00 |
| PBLA ULICO 2017 | Jan-17 | Netherlands Insurance Holdings | Academy Financial Assets LLC | 8,000,000.00 |
| PBLA ULICO 2017 | Jan-18 | Iron City Asset Management LLC | BRC Holdings | 17,000,000.00 |
| PBLA ULICO 2017 | Jan-17 | Capital Asset Management II LLC | See Further Breakout | 6,000,000.00 |

| PBLA ULICO 2017 | Jan-17 Academy Financial Assets LLC | Engaged Media Inc | 6,000,000.00 |
|---|---|---|---|
| PBLA ULICO 2017 | Jan-17 GBIG Capital LLC (fka BLH Capital) | Academy Financial Assets LLC | 10,000,000.00 |
| PBLA ULICO 2017 | Jan-17 Standard Investment Capital Ltd | Standard Investments Holdings | 25,000,000.00 |
| PBLA ULICO 2017 | Jan-18 Jackson Asset Management LLC | See Further Breakout | 17,000,000.00 |
| PBLA ULICO 2017 | Jan-17 Academy Financial Assets LLC | GBIG Capital LLC | 6,000,000.00 |
| PBLA ULICO 2017 | Jan-18 Hampton Asset Management LLC | Triton Financial Ltd | 17,000,000.00 |

### Further Breakout

| Asset in Repo | Counterparty/Amount | |
|---|---|---|
| **CAM II** | | |
| ASL Holdings Pref | $ | 17,123,000.00 |
| GBIG Capital LLC | $ | 18,839,489.00 |
| **CAM II Total** | **$** | **35,962,489.00** |
| | | |
| **JAM** | | |
| Atlanta Topco Limited | $ | 3,425,000.47 |
| Autonomy Investments, LLC | $ | 3,872,018.48 |
| Boston Laser - Eye and Lasik Specialist Holding, LLC | $ | 3,081,996.41 |
| DJRTC, LLC | $ | 1,254,347.88 |
| MBW Interco, LLC | $ | 452,518.32 |
| MNI Holdings, LLC | $ | 1,587,500.00 |
| Standard Financial Ltd. | $ | 3,134,207.56 |
| Standard Malta Holdings Ltd. | $ | 1,352,339.88 |
| Southland National Holdings, Inc. | $ | 1,771,468.30 |
| UKAT Investments Limited | $ | 1,012,602.70 |
| **JAM Total** | **$** | **20,944,000.00** |

| Lender | Underlying Borrower2 | Direct Loan / Through SPV - FinCo. | Industry | Type(Junior/Senior) | Payment Type (PIK,Partial PIK,Cash) | Amount | Total Accrued | Total P+I | Data Source | Type Note |
|---|---|---|---|---|---|---|---|---|---|---|
| Baldwin Asset Management Inc | BCC Research | Fin. Co Investment in Loan | Commercial Services | Other Exclusions | Cash | 1,413,186.40 | 71,737.64 | 1,484,924.04 | Loan IQ | Junior |
| Baldwin Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 2,207,576.10 | 37,700.62 | 2,245,276.72 | Loan IQ | Senior |
| Capital Asset Fund I LLC | BCC Holdings LLC | Debt | Research | Other Exclusions | PIK | 370,477.53 | 10,718.47 | 381,196.00 | Eli | Junior |
| Capital Asset Fund I LLC | BCC Research | Debt | Research | Other Exclusions | PIK | 201,400.00 | 7,846.32 | 209,246.32 | Eli | Junior |
| Capital Asset Fund I LLC | PBO Holdings Inc | Debt | Financial Services | Other Exclusions | PIK | 118,739.15 | 4,625.95 | 123,365.10 | Eli | Senior |
| Capital Asset Fund II LLC | BCC Research | Inv. Co Investment in Loan | Commercial Services | Other Exclusions | Cash | 620,000.00 | 31,473.09 | 651,473.09 | Loan IQ | Junior |
| Capital Asset Fund II LLC | UKAT Investment | Inv. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 1,778,140.03 | 30,366.78 | 1,808,506.81 | Loan IQ | Senior |
| Capital Asset Fund IV LLC | UKAT Investment | Inv. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 317,525.01 | 5,422.64 | 322,947.65 | Loan IQ | Senior |
| Capital Asset Fund V LLC | UKAT Investment | Inv. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 337,065.01 | 5,756.34 | 342,821.35 | Loan IQ | Senior |
| Chatsworth Asset Management Inc | Automotive Fleet Inv. Ltd | Fin. Co Investment in Loan | Technology Services | Other Exclusions | Cash | 300,000.00 | 25,813.66 | 325,813.66 | Loan IQ | Senior |
| Chatsworth Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 556,890.01 | 9,510.47 | 566,400.48 | Loan IQ | Senior |
| Damascus Asset Management Inc | Automotive Fleet Inv. Ltd | Fin. Co Investment in Loan | Technology Services | Other Exclusions | Cash | 255,000.00 | 21,941.61 | 276,941.61 | Loan IQ | Senior |
| Damascus Asset Management Inc | Proactive Software Holdings | Fin. Co Investment in Loan | Commercial Services | Other Exclusions | Cash | 997,456.69 | 20,129.81 | 1,017,586.50 | Loan IQ | Senior |
| Damascus Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 2,194,942.21 | 37,484.86 | 2,232,427.07 | Loan IQ | Senior |
| Ephesus Asset Management Inc | Automotive Fleet Inv. Ltd | Fin. Co Investment in Loan | Technology Services | Other Exclusions | Cash | 1,239,173.42 | 106,625.35 | 1,345,798.77 | Loan IQ | Senior |
| Ephesus Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 1,697,558.96 | 28,990.63 | 1,726,549.59 | Loan IQ | Senior |
| Forest Park Asset Management Inc | Automotive Fleet Inv. Ltd | Fin. Co Investment in Loan | Technology Services | Other Exclusions | Cash | 2,663,346.86 | 229,169.13 | 2,892,515.99 | Loan IQ | Senior |
| Forest Park Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 789,212.86 | 13,478.05 | 802,690.91 | Loan IQ | Senior |
| Gilford Asset Management Inc | BCC Research | Fin. Co Investment in Loan | Commercial Services | Other Exclusions | Cash | 541,722.74 | 27,499.49 | 569,222.23 | Loan IQ | Junior |
| Gilford Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 1,667,933.56 | 28,484.69 | 1,696,418.25 | Loan IQ | Senior |
| Hampton Asset Management Inc | Global Data Insights Limited | Fin. Co Investment in Loan | Commercial Services | Other Exclusions | Cash | 79,321.97 | 2,069.99 | 81,391.96 | Loan IQ | Senior |
| Hampton Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 2,017,699.69 | 34,457.94 | 2,052,157.63 | Loan IQ | Senior |
| Iron City Asset Management Inc | Automotive Fleet Inv. Ltd | Fin. Co Investment in Loan | Technology Services | Other Exclusions | Cash | 75,000.00 | 6,453.42 | 81,453.42 | Loan IQ | Senior |
| Iron City Asset Management Inc | Proactive Software Holdings | Fin. Co. Investment in Pref. Shares | Commercial Services | Other Exclusions | Dividend Accrual through Maturity | 708,000.00 | | 708,000.00 | Eli | Preference Shares |
| Iron City Asset Management Inc | Proactive Software Holdings | Fin. Co Investment in Loan | Commercial Services | Other Exclusions | Cash | 3,026,487.39 | 61,077.96 | 3,087,565.35 | Loan IQ | Senior |
| Iron City Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 366,375.00 | 6,256.89 | 372,631.89 | Loan IQ | Senior |
| Jackson Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 1,012,602.70 | 17,293.06 | 1,029,895.76 | Loan IQ | Senior |
| Kite Asset Management Inc | BCC Research | Fin. Co Investment in Loan | Commercial Services | Other Exclusions | Cash | 2,010,090.86 | 102,038.32 | 2,112,129.18 | Loan IQ | Junior |
| Kite Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 1,251,002.12 | 21,364.41 | 1,272,366.53 | Loan IQ | Senior |
| Lily Asset Management Inc | Automotive Fleet Inv. Ltd | Fin. Co Investment in Loan | Technology Services | Other Exclusions | Cash | 2,838,346.88 | 244,227.10 | 3,082,573.98 | Loan IQ | Senior |
| Lily Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 526,547.79 | 8,992.30 | 535,540.09 | Loan IQ | Senior |
| Marshall Asset Management Inc | Automotive Fleet Inv. Ltd | Fin. Co Investment in Loan | Technology Services | Other Exclusions | Cash | 1,569,173.42 | 135,020.38 | 1,704,193.80 | Loan IQ | Senior |
| Marshall Asset Management Inc | BCC Research | Fin. Co Investment in Loan | Commercial Services | Other Exclusions | Cash | 2,165,000.00 | 109,901.98 | 2,274,901.98 | Loan IQ | Junior |
| Marshall Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 53,630.30 | 915.89 | 54,546.19 | Loan IQ | Senior |
| NORTHSTAR | Automotive Fleet Inv. Ltd | Insurance Investment in Pref. | Technology Services | Other Exclusions | Dividend Accrual through Maturity | 5,813,153.37 | | 5,813,153.37 | Eli | Preference Shares |
| NORTHSTAR | UKAT Investment | Investment in Pref. | Healthcare Services | Other Exclusions | PIK | 18,552,987.00 | | 18,552,987.00 | Eli | Preference Shares |
| PBLA | UKAT Investment | Direct Loan - Insurance | Healthcare Services | Other Exclusions | Cash | 1,700,000.00 | 29,032.32 | 1,729,032.32 | Loan IQ | Senior |
| Pierre Mendes | Global Data Insights Limited | PPN Loans | Commercial Services | Other Exclusions | Cash | 11,981,707.33 | 312,674.67 | 12,294,382.00 | Loan IQ | Senior |
| Pierre Mendes | UKAT Investment | PPN Loans | Healthcare Services | Other Exclusions | Cash | 1,108,895.01 | 18,937.52 | 1,127,832.53 | Loan IQ | Senior |
| Summerville Asset Management Inc | Automotive Fleet Inv. Ltd | Fin. Co Investment in Loan | Technology Services | Other Exclusions | Cash | 420,000.00 | 36,139.13 | 456,139.13 | Loan IQ | Senior |
| Summerville Asset Management Inc | Global Data Insights Limited | Fin. Co Investment in Loan | Commercial Services | Other Exclusions | Cash | 3,855,470.70 | 100,612.37 | 3,956,083.07 | Loan IQ | Senior |
| Swanzey LLC | BCC Holdings LLC | Insurance Loan Through SPV | Commercial Services | Other Exclusions | Cash | 1,960,000.00 | 163,863.09 | 2,123,863.09 | Loan IQ | Senior |
| Tybee Island Asset Management Inc | Automotive Fleet Inv. Ltd | Fin. Co Investment in Loan | Technology Services | Other Exclusions | Cash | 55,000.00 | 4,732.50 | 59,732.50 | Loan IQ | Senior |
| Tybee Island Asset Management Inc | UKAT Investment | Fin. Co Investment in Loan | Healthcare Services | Other Exclusions | Cash | 527,580.00 | 9,009.92 | 536,589.92 | Loan IQ | Senior |
| | | | | | | 83,941,418.07 | | 86,121,264.82 | | |

# Exhibit L

# Investor Presentation

January 2024

 

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 189 of 508

# About this Presentation

The presentation is provided by Quadro Acquisition One Corp. ("Quadro") to provide information that would allow interested parties in making their own evaluation with respect to a proposed financing and simultaneous business combination (together with the related transactions, the "proposed transaction") between Quadro and seven operational divisions and their subsidiaries (collectively the "Operating Businesses" or "Global Growth Businesses") that comprise Global Growth Holdings, Inc. ("Global Growth").

Presently, the 7 Operating Businesses are held by Global Growth LLC and it is contemplated that after the completion of the financing and business combination, following the transaction, the Operating Businesses will be fully owned by NHC Merger Sub, Inc., which in turn will be owned by Quadro and will be referred to as "The Post-Transaction Holding Group".

The proposed transaction will be completed only upon completion of the financing transaction and approval of the business combination. This presentation is not a free writing prospectus or proxy statement, and the proxy solicitation will only be provided pursuant to a separate proxy statement of Quadro filed with and declared by the Securities and Exchange Commission (the "SEC").

The information contained herein does not purport to be all inclusive and no representations or warranties, expressed or implied, are given in, or in respect of, this presentation or any other written or oral communication communicated to the recipient during the recipient's evaluation of the Global Growth Businesses , Quadro, or their respective affiliates. The information contained in this presentation is preliminary in nature and is subject to change, and any such changes may be material. You should consult your own counsel and tax and financial advisors as to legal and related matters concerning the matters described herein, and, by accepting this presentation, you confirm that you are not relying upon the information contained herein to make any decision. The recipient shall not rely upon any statement, representation or warranty made by any other person, firm or corporation in making its investment or decision to invest in The Pre-Transaction Companies, Quadro, or their respective affiliates. To the fullest extent permitted by law, in no circumstances will The Pre-Transaction Companies, Quadro, or any of their respective subsidiaries, interest holders, representatives, partners, directors, officers, employees, advisers or agents be responsible or liable for any direct, indirect or consequential loss or loss of profit arising from the use of this presentation, its contents, its omissions, reliance on the information contained within it, or on opinions communicated in relation thereto or otherwise arising in connection therewith. Please refer to the definitive merger agreement and other related transaction documents, when available, for the full terms of the proposed transaction. The distribution of this presentation may also be restricted by law and persons into whose possession this presentation comes should inform themselves about and observe any such restrictions. The recipient acknowledges that it is (a) aware that the United States securities laws prohibit any person who has material, non-public information concerning a company from purchasing or selling securities of such company or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (b) familiar with the United State Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (collectively, the "Exchange Act") and that the recipient will neither use, nor cause any third party to use, this presentation or any information contained herein in contravention of the Exchange Act, including, without limitation, Rule 10b-5 thereunder.

**Forward Looking Statements**

This presentation includes "forward-looking statements" within the meaning of the "safe harbor" provision of the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of words such as "estimate," "plan," "project," "forecast," "intend," "will," "expect," "anticipate," "believe," "seek," "target," "continue," "could," "may," "might," "possible," "potential," "predict" or other similar expressions that predict or indicate future events or trends or that are not statements of historical matters. The Pre-Transaction Companies and Quadro have based these forward-looking statements on each of its current expectations and projections about future event. These forward-looking statements include, but are not limited to, statements regarding estimates and forecasts of financial and operation metrics. These statements are based on various assumptions, whether or not identified in this communication, and on the current expectation of The Pre-Transaction Companies' and Quadro's respective management teams and are not predictions of actual performance. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and may materially differ from assumptions. Many actual events and circumstances are beyond the control of The Pre-Transaction Companies and Quadro. These forward-looking statements are subject to known and unknown risks, uncertainties and assumptions about The Pre-Transaction Companies and Quadro that may cause each of its actual results, levels of activity, performance or achievements to be materially different from any future results, levels of activity, performance or achievements expressed or implied by such forward-looking statements.

Such risks and uncertainties include: (i) changes in domestic and foreign business changes in the competitive environment in which The Pre-Transaction Companies operate; (ii) the ability of The Pre-Transaction Companies to manage its growth prospects, meet its operational and financial targets, and execute its strategies; (iii) the impact of any economic disruptions, decreased market demand and other macroeconomic factors, including the effect of a global pandemic, to The Pre-Transaction Companies' business, projected results of operations, financial performance or other financial metrics; (iv) expectations as to future growth in demand for The Pre-Transaction Companies' products and services; (v) The Pre-Transaction Companies' reliance on its senior management team and key employees; (vi) risks related to liquidity, capital resources and capital expenditures; failure to comply with applicable laws and regulations or changes in the regulatory environment in which The Pre-Transaction Companies operate; (vii) the outcome of any potential litigation, government and regulatory proceedings, investigations and inquiries that The Pre-Transaction Companies may face; (viii) assumptions or analyses used for The Pre-Transaction Companies' forecasts proving to be incorrect and causing its actual operating and financial results to be significantly below their forecasts; (ix) The Pre-Transaction Companies failing to maintain their current level of acquisitions or an acquisition not occurring as planned and negatively affecting operating results, the inability of the parties to successfully or timely consummate the proposed transaction, including the risk that any required regulatory approvals are not obtained, are delayed or are subject to unanticipated conditions that could adversely affect The Post-Transaction Holding Group, or the expected benefits of the proposed transaction or that the approval of the shareholders of Quadro is not obtained; (x) the risk that shareholders of Quadro could elect to have their shares redeemed by Quadro, thus leaving The Pre-Transaction Companies insufficient cash to complete the proposed transaction or grow their business; (xi) the outcome of any legal proceedings that may be instituted against The Pre-Transaction Companies or Quadro; failure to realize the anticipated benefits of the proposed transaction; (xii) risks relating to the uncertainty of the projected financial information with respect to The Pre-Transaction Companies; (xiii) the effects of competition; (xiv) changes in applicable laws or regulations; (xv) the ability of The Pre-Transaction Companies to manage expenses and recruit and retain key employees; (xvi) the ability of The Pre-Transaction Companies or Quadro to issue equity or equity linked securities in connection with the proposed transaction or in the future; (xvii) the outcome of any potential litigation, government and regulatory proceedings, investigation and inquiries; (xviii) the potential U.S. government shutdown; the impact or certain geopolitical events, including wars in Ukraine and the surrounding region and between Israel and Hamas; (xix) the impact of a current or future pandemic or any future pandemic on The Pre-Transaction Companies, Quadro or The Post-Transaction Holding Group's projected results of operations, financial performance or other financial metrics, or on any of the foregoing risks; and (xx) those factors discussed under the heading "Risk Factors" in the registration statement on [Form F-4 (the "Registration Statement") filed with the SEC by The Post-Transaction Holding Group on November 17th, 2023], as may be amended from time to time, and other documents filed, or to be filed, with the SEC by Quadro or The Post-Transaction Holding Group. If any of these risks materialize or The Pre-Transaction Companies or Quadro's assumptions prove incorrect, actual results could differ materially from the results implied by these forward-looking statements. In addition, forward looking statements reflect The Pre-Transaction Companies and Quadro's expectations, plans or forecasts of future events and views as of the date of this presentation. The Pre-Transaction Companies and Quadro anticipate that subsequent events and developments will cause The Pre-Transaction Companies and Quadro's assessments to change. However, while The Pre-Transaction Companies and Quadro may elect to update these forward-looking statements at some point in the future, The Pre-Transaction Companies and Quadro specifically disclaim any obligation to do so. These forward-looking statements should not be relied upon as representing The Pre-Transaction Companies or Quadro's assessments as of any date subsequent to the date of this presentation. Accordingly, undue reliance should not be placed upon the forward-looking statements. An investment in The Pre-Transaction Companies or Quadro is not an investment in any of The Pre-Transaction Companies or Quadro's founders' or sponsors' past investments or companies or any funds affiliated with any of the foregoing. The historical results of these investments are not indicative of future performance of The Pre-Transaction Companies or Quadro, which may differ materially from performance of past investments, companies or affiliated funds. [NTD: What does this F-4 refer to.]

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 190 of 508

# About this Presentation

**Financial Information**

The Financial information contained in this presentation has been taken from or prepared based on the historical financial statements of The Pre-Transaction Companies for the periods presented. The Pre-Transaction Companies historical financial information prior to 2021 was prepared in accordance with the generally accepted accounting practice in the U.S. ("U.S. GAAP"). Such information has not been audited in accordance with Public Company Accounting Oversight Board ("PCAOB") standards. Neither Quadro nor The Pre-Transaction Companies can assure you that, had the financial statements been compliant with Regulation S-X under the United States Securities Act of 1933, as amended (the "Securities Act"), and the regulations of the SEC promulgated thereunder or audited in accordance with PCAOB standards, there would not be differences and such differences could be material. The Pre-Transaction Companies' financial statements included in the registration statement have been prepared in <u>accordance with IFRS.</u> Furthermore, all financial information of The Pre-Transaction Companies included in this presentation subsequent to June 30, 2023, is preliminary and unaudited. The Pre-Transaction Companies' independent auditors have not reviewed or performed any procedures on the preliminary, unaudited financial results included in this presentation. Accordingly, there may be material differences between the presentation of the financial information included in the presentation and in the Registration Statement. Certain monetary amounts, percentages and other figures included in this presentation have been subject to rounding adjustments. Certain other amounts that appear in this presentation may not sum due to rounding.

**Non-GAAP Financial Measures**

This presentation includes certain financial measures not presented in accordance with U.S. GAAP or IFRS including, but not limited to, Adjusted revenues, Adjusted EBITDA, Free Cash Flow, Margin, ROIC and certain ratios and other metrics derived therefrom. These non-GAAP financial measures are not measures of financial performance in accordance with U.S. GAAP, or IFRS or any other GAAP and may exclude items that are significant in understanding and assessing The Pre-Transaction Companies' financial results. Therefore, these measures should not be considered in isolation or as an alternative to net income, cash flows from operations or other measures of profitability, liquidity or performance under U.S. GAAP, IFRS, or any other GAAP.  You should be aware that The Pre-Transaction Companies presentation of these measures may not be comparable to similarly-titled measures used by other companies.

The Pre-Transaction Companies believe these non-GAAP measures of financial results provide useful information to management and investors regarding certain financial and business trends relating to The Pre-Transaction Companies' financial condition and results of operations. The Pre-Transaction Companies believe that the use of these non-GAAP financial measures provides an additional tool for investors to use in evaluating ongoing operating results and trends and in comparing The Pre-Transaction Companies' financial measures with other similar companies, many of which present similar non-GAAP financial measures to investors. These non-GAAP measures are subject to inherent limitations as they reflect the exercise of judgments by management about which expense and income are excluded or included in determining these non-GAAP financial measures.

This presentation also includes certain projections of non-GAAP financial measures. Due to the high variability and difficulty in making accurate forecasts and projections of some of the information excluded from these projected measures, together with some of the excluded information not being ascertainable or accessible, The Pre-Transaction Companies are unable to quantify certain amounts that would be required to be included in the most directly comparable GAAP financial measures without unreasonable effort. Consequently, no disclosure of estimated comparable GAAP measures is included and no reconciliation of the forward-looking non-GAAP financial measures is included. Please see the appendix to this presentation for reconciliation of non-GAAP financial measures used in this presentation to their most directly comparable GAAP metric.

**Industry and Market Data; Trademarks**

This presentation also contains certain statistical data, estimates and forecasts that are based on independent industry publications or other publicly available information, as well as information based on other third-party or internal sources. This information involves many assumptions and limitations, and you are cautioned not to give undue weight to such information. None of The Pre-Transaction Companies, Quadro or any placement agent has independently verified the accuracy or completeness of the information contained in the industry publications and other publicly available information. Accordingly, none of The Pre-Transaction Companies, Quadro or any placement agent makes any representation as to the accuracy or completeness of that information nor does The Pre-Transaction Companies, Quadro or any placement agent undertake to update such information after the date of this presentation. In addition, this presentation does not purport to be all-inclusive or to contain all information that may be required to make a full analysis of The Pre-Transaction Companies or the proposed transaction. You should make your own evaluation of The Pre-Transaction Companies and of the relevance and adequacy of the information and should make such other investigations as you deem necessary. The information contained in the third-party citations referenced in this presentation is not incorporated by reference into this presentation.

This presentation may contain trademarks, service marks, trade names and copyrights of other companies, which are property of their respective owners. Solely for convenience, some of the trademarks, service marks, trade names and copyrights referred to in this presentation may be listed without the TM, SM, (c) or (r)-symbols, but The Pre-Transaction Companies and Quadro will assert, to the fullest extent under applicable law, the right of the applicable owners, if any, to these trademarks, service marks, trade names and copyrights.

**Additional Information about the Proposed Transaction and Where to Find It**

This presentation does not contain all the information that should be considered concerning the proposed transactions and is not intended to form the basis of any investment decision or any other decision in respect of the proposed transaction. The Post-Transaction Holding Group has filed a Registration Statement with the SEC, which includes a proxy statement/prospectus to be distributed to Quadro's shareholders and warrant holders in connection with Quadro's solicitation for proxies for the votes by Quadro's shareholders and warrant holders in connection with the proposed transaction and other matters described in the Registration Statement, as well as the prospectus relating to the offer of the securities to be issued by The Post-Transaction Holding Group to Quadro shareholders and warrant holders in connection with the completion of the proposed transaction. Before making any voting or other investment decisions, Quadro's shareholders and warrant holders and other interested persons are advised to read the Registration Statement and any amendments thereto and, once available, the definitive proxy statement/prospectus, in connection with Quadro's solicitation of proxies for its special meeting of shareholders and its special meeting of warrant holders to be held to approve, among other things, the proposed transaction, as well as other documents filed with the SEC by Quadro, The Pre-Transaction Companies or The Post-Transaction Holding Group in connection with the proposed transaction, as these documents will contain important information about The Pre-Transaction Companies, The Post-Transaction Holding Group, Quadro and the proposed transaction. After the Registration Statement has been declared effective, Quadro will mail a definitive proxy statement/prospectus and other relevant documents to its shareholders and warrant holders as of the record date established for voting on the proposed transaction. Quadro's shareholders and warrant holders may also obtain a copy of the Registration Statement or definitive proxy statement/prospectus, once available, as well as other documents filed by Quadro with the SEC, without charge, at the SEC's website located at www.sec.gov or by directing a written request to Quadro at 2685 Nottingham Avenue, Los Angeles, CA 90027.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 191 of 508

# About this Presentation

**Participants in the Solicitation**

The Pre-Transaction Companies, The Post-Transaction Holding Group, Quadro and their respective directors and executive officers may be deemed participants in the solicitation of proxies from Quadro's shareholders and warrant holders with respect to the proposed transaction. A list of the names of Quadro's directors and executive officers and a description of their interests in Quadro is set forth in Quadro's filings with the SEC (including the Registration Statement and the Annual Reports and Quarterly Reports filed by Quadro with the SEC on Forms 10-K and 10-Q, respectively, and any other documents filed in connection with the proposed transaction) and are available free of charge at the SEC's website located at www.sec.gov, or by directing a written request to Quadro at 2685 Nottingham Avenue, Los Angeles, CA 90027.

Additional information regarding the participants in the proxy solicitation and a description of their direct and indirect interests will be included in the definitive proxy statement/prospectus when it becomes available. Shareholders, potential investors and other interested persons should read each of the Registration Statement, and the definitive proxy statement/prospectus carefully when it becomes available before making any voting or investment decisions. You may obtain free copies of these documents from the sources indicated above.

**No Offer or Solicitation**

This presentation and the information contained herein does not constitute (i) (a) an offer to sell or the solicitation of an offer to buy any securities, or a solicitation of any vote or approval, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction or (b) a proxy statement or solicitation of a proxy, a prospectus, an advertisement or a public offering of the securities described herein in the United States or any other jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act or exemptions therefrom. Investment in any securities described herein has not been approved by the SEC or any other regulatory authority nor has any authority passed upon or endorsed the merits of the offering or the accuracy or adequacy of the information contained herein, any representation to the contrary is a criminal offense.

**Risk Factors**

For a non-exhaustive description of certain risks relating to The Pre-Transaction Companies and The Post-Transaction Holding Group, including their business and operations, and the proposed transaction, we refer you to "Risk Factors" at the end of this presentation. Please also see the section titled "Risk Factors" in the Registration Statement for more information.

**Use of Projections**

This presentation contains certain financial forecast information of The Pre-Transaction Companies, including, but not limited to, estimated results for fiscal year 2023, including Adjusted EBITDA, revenue and gross margin, and The Pre-Transaction Companies' long-term business model. Such financial forecast information constitutes forward-looking information and is for illustrative purposes only and should not be relied upon as necessarily being indicative of future results. The assumptions and estimates underlying such financial forecast information are inherently uncertain and are subject to a wide variety of significant business, economic, competitive and other risks and uncertainties. See "Forward-Looking Statements" above and "Selected Risk Factors" at the end of this presentation. Actual results may differ materially from the results contemplated by the financial forecast information contained in this presentation, and the inclusion of such information in this presentation should not be regarded as a representation by any person that the results reflected in such forecasts will be achieved. None of The Pre-Transaction Companies or Quadro's independent auditors have audited, reviewed, complied or performed any procedures with respect to the projections for the purpose of their inclusion in this presentation; and, accordingly, neither of them expressed an opinion or provided any other form of assurance with respect thereto for the purpose of this presentation. In addition, the analyses of The Pre-Transaction Companies and Quadro contained herein are not, and do not purport to be, appraisals of the securities, assets or business of The Pre-Transaction Companies or Quadro.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 192 of 508

# Today's Presenters – 1 of 3: Global Growth



**Greg Lindberg**
Board Observer

Greg is a successful entrepreneur, philanthropist, and author.

- **Current Role:** Founder of Global Growth Holdings with over 120 acquisitions over 20 years. As a 100% ultimate beneficiary of the holding, Greg provides shareholder oversight of the holding's strategies.
- Throughout his career, he has acquired and transformed more than 100 companies that were either failing or underperforming. Today, these companies are worth over $6 billion and employ 7,000 people.
- Lindberg has authored three books: *Failing Early & Failing Often*, *633 Days Inside*, and *Lifelong*.



**Prashant Upadhyaya**
CEO

Prashant is a seasoned business executive with over 28 years of experience in Advertising and Marketing, Media and Publishing, Certifications, Research & Consulting as well as Healthcare IT.

- **Current Role:** Portfolio Leader of SixSails, a portfolio with 15 businesses, and CEO of ShopperLocal and Certitrek Group.
- Prashant has worked in COO, CEO and Portfolio Manager roles in his career.
- He has led turnarounds for multiple companies, grown sales teams, and launched startups that have grown to profitable multi-million dollar businesses.
- He has led teams across multiple geographies, like the US, UK, India, and the Philippines.



**Surinder Jain**
CFO

Surinder is a Certified Public Accountant and Indian Chartered Accountant with 20+ years of experience in consulting with large corporations across sectors.

- **Current Role:** CFO of New Degree Growth.
- Surinder has significant experience working for US public companies during the IPO process and complying with various SEC regulations including periodic and annual reporting.
- A seasoned professional who has dealt with IPOs, debt financing, transactions, divestitures, complex accounting, and regulatory matters.
- Surinder has consulted with teams in the US, UK, Europe, Middle East, and Philippines.



**Bob Alban**
Chairman of the Board

Bob is an insurance industry entrepreneur and advisor with expertise in risk-based capital models, reinsurance, Federal Home Loan Bank ("FHLB") matters, insurance tax and accounting considerations, and the insurance product and distribution marketplace.

- **Current Role:** Principal of Montshire Advisors, a firm he co-founded in 2011, where he brokers reinsurance, advises insurers on product, distribution, and FHLB matters, and represents investments and investment firms for the US insurance industry.
- Bob brings business development and M&A experience to the team.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 193 of 508

# Today's Presenters – 2 of 3: Global Growth



**Craig Ive**
Company CEO

Craig brings 35 years of experience in the global technology industry. He had two successful bootstrap technology business exits and eight successful technology business turnarounds in his career.

- **Current Role:** CEO of Damovo and Clanwilliam.
- Craig has extensive global executive experience within the SaaS, Outsourcing, Data and Enterprise Software marketplaces.



**Abhinav Khattar**
VP Finance

As a CFA Charterholder, Abhinav excels in Financial Analysis and has experience in debt financing.

- **Current Role:** VP of Finance for Global Growth
- He has been heavily involved in the corporate finance side as the former Sr. Vice President, Reports & Analytics and the Director of M&A.
- Abhinav is a financial leader with 18+ years of experience driving efficiency, transparency, and increased profitability for global tech & service businesses.



**Kathy Million**
VP of M&A

Kathy is a multi-talented professional with 25+ years of experience implementing and managing organization-wide initiatives and programs.

- **Current Role:** Chief of Staff
- She manages critical initiatives across portfolios and projects like this SPAC engagement.
- She has experience directing local and international M&A functions to drive efficiencies in managing deals and corporate compliance.
- Kathy built a team and managed the buy-side engagement processes, delivering a 95% on-time close rate.
- She is a results-driven professional with a solid career track leading customer service, business development, M&A, and operations.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 194 of 508

# Today's Presenters – 3 of 3: Quadro Acquisition One Corp.



**Dimitri Elkin**
CEO

Dimitri has served as the CEO of Quadro Acquisition One Corp. since June 2022.

- **Current Role:** CEO of Quadro Acquisition One Corp since June 2022. Chief Executive Officer and Director of Twelve Seas Investment Company II. From December 2017 - December 2019, he served as CEO of Twelve Seas Investment Company I.
- Since April 2013, Dimitri has been a Founding Partner of Twelve Seas Limited.
- Dimitri has held several leadership positions as a General Partner of UFG Private Equity, an investment executive at Kohlberg Kravis Roberts & Co. and an investment banker at Lehman Brothers.



**Giedrius Pukas**
Managing Member

Giedrius has served as a Managing Member of Quadro Sponsor LLC since June 2022.

- **Current Role:** Founder and Managing Partner at Quadro Capital Partners.
- Prior to establishing Quadro Capital Partners in 2009, Mr. Pukas worked as a managing director at Troika Capital Partners, a leading private equity fund in Russia.
- Giedrius has held several leadership positions as an Investment Director at Alfa Capital Partners, an Investment Director responsible for the CIS with Swiss fund management company Finartis Capital in Moscow, and Managing Partner at the investment boutique MAS Consult, where he was a lead manager on several private equity transactions that took place across the Baltic States and Scandinavia.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 195 of 508

**Slide 7**

**GU0**     Need to confirm with Dimitri who should be on this slide.  KM  We will likely just have Dimitri and Giedrius and the a slide with all of the Board Members.
Guest User, 2024-01-02T17:55:26.436

# Quadro Acquisition One Corp. Board of Directors



**Jonathan Morris**
Independent Director

**Jonathan Morris** is a Partner/Member of Investment Committee at **The Lawrie Group**. Jonathan has a strong operational and execution track record with over 20 years of experience with leading financial institutions.

Jonathan led principal investments and structuring at a large family office, which has signed over $1.3 billion committed capital agreements. Prior to that, Morris was an Investment Banker with the Blackstone Group where he oversaw several transactions and from 2012-16 served on the Board of SunGard AS. Before joining Blackstone, Morris was in the TMT Investment Banking Group of Credit Suisse where he successfully completed ~100 billion of transactions.

Jonathan was a capital founder of GAIN Capital, a start-successfully IPO'd.

Jonathan joined the Quadro Acquisition One Corp. Board in January of 2024.



**Gregory Nelson**
Independent Director

**Gregory D. Nelson** currently serves as Managing Director at **TAG Financial Institutions Group, LLC** a New York City investment banking boutique focused on the financial services industry, with an emphasis on executing M&A and capital raising services for clients operating within the global insurance and broader financial services sectors.

Formerly, he was Senior Vice President of U.S. RE Securities LLC where his responsibilities included sourcing and executing insurance and reinsurance industry investment banking assignments including mergers and acquisitions advisory, private debt and equity capital-raising activities, and risk securitizations.

Prior to joining U.S. RE Securities, Mr. Nelson was a member of the Financial Institutions Group of Banc of America Securities in New York, where he was responsible for executing merger and acquisition transactions and public / private capital-raising assignments primarily for mid-cap and large-cap insurance industry clients.

Gregory joined the Quadro Acquisition One Corp. Board in January of 2024



**Konstantin Tourevski**
Independent Director

**Konstantin Tourevski** is a managing partner at **New Age Alpha, LLC**, an asset management firm, where he oversees fixed-income and alternative investments.

Prior to Joining New Age Alpha in 2019, Konstantin managed investments at Loews Corporation (NYSE: L) for 16 years and worked in fixed-income research at JP Morgan Investment Management from 1999 to 2001. Throughout his career he focused on issuers in technology, telecom, media, gaming, and leisure industries.

He is a CFA Charterholder.

Konstantin has been an Independent Director of Quadro Acquisition One Corp. since March 2023.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 197 of 508

**Slide 8**

**GU0**    Need to confirm with Dimitri who should be on this slide.  KM  We will likely just have Dimitri and Giedrius and the a slide with all of the Board Members.

Guest User, 2024-01-02T17:55:26.436

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 198 of 508

# Agenda



- Executive Summary
- Platform Overview
- Value Creation
- Tangible Upside Levers
- Compounding Returns
- Selected Risk Factors
- Appendix
  - o Pre-Transaction Group
  - o Pre-Transaction Companies



9

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 199 of 508

# Executive Summary



Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 200 of 508

# Executive Summary

- Rare opportunity to invest in a "buy and hold" group of companies assembled by founder Greg Lindberg over the last 20+ years.

- Lindberg's exit from the insurance sector creates an opportunity to invest in this group of companies for the first time. This will also entail payment of $509M insurance debt over and above third-party debt.

- Proven platform model that has delivered 22%+ CAGR in EBITDA over the last 5 years.

- Proven acquisition model with $75M in EBITDA in pipeline deals.

- Globally diversified group of companies in counter-cyclical markets with hundreds of add-on acquisition targets identified.

- Closing expected by mid 2024.

### Key Benefits to the Merger with Quadro Acquisition One Corporation

- Provides over $2 billion of cash and public securities for Lindberg's exit from the insurance sector.
- Replaces independent trusts with public-company oversight for improved accountability and performance focus.
- Enhances transparency with public-company financial report and governance.
- Allows Lindberg's insurers to exit rehabilitation so that policyholders can access their full policy benefits.
- Eliminates a significant amount of litigation "noise" with Lindberg's exit from the insurance business.
- Policyholder reserves will be backed by cash and publicly traded securities which will replace the private placements currently backing policyholder reserves.
- Improves access to capital markets with public-company debt and equity financing.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 201 of 508

# Subset of Global Growth Assets to Go Public in Partnership with Quadro Acquisition One Corp.

### $3.15 Billion deal for 38% of Lindberg's portfolio.
Greg Lindberg to merge a group of his investments with Quadro Acquisition One Corp. in a $3.15 billion deal. This group of Lindberg's investments, a portion of Lindberg's Global Growth portfolio, will go public via a business combination agreement with Quadro Acquisition One Corp.

### 22% EBITDA CAGR over last 5 years.
The group of investments consists of 7 operating companies that make up approximately 38% of Lindberg's investment portfolio. These operating companies generated $1.1 billion in revenues and $142 million in Adj. EBITDA in 2023. From 2019 to 2023 the group delivered organic Adj. EBITDA CAGR of 22% and total revenue CAGR of 23%.

### $75M in EBITDA from acquisitions lined up to close with public company debt and equity financing.
In partnership with Quadro Acquisition One Corp., this group of companies, to be known as Beckett Corporation, will accelerate its successful platform acquisition strategy with improved access to capital markets. The public-company structure will significantly increase access to debt and equity markets which will allow the group to rapidly close acquisitions from a $75M EBITDA pipeline of deals that have been sourced globally.

### Significantly improved performance with public company oversight and accountability.
Currently, the group of companies operates within independent trusts without any shareholder accountability and with little oversight and performance focus. Terminating these trusts and placing this group of companies under one public-company CEO and CFO will significantly enhance the performance culture and accountability to improve returns.

### Proven acquisition track record with over 100 deals.
Lindberg and his team have completed over 100 acquisitions over the last 20 years and have become a preferred buyer for founder-led companies across the US and Europe.
The group of companies has a unique model that allows each operating company to maintain its own brand, identity, and customers as the original founder envisioned.

### Closing expected by mid-2024.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 202 of 508

# Transaction Summary

## Transaction Overview

- Pro forma pre-money enterprise value of **$3.2 billion**, including debt (22.1x 2023E Adj. EBITDA)
- Current shareholders rolling over **100% of equity** with cash proceeds used to pay down existing debt and pay insurance obligations
- Pro forma net leverage of **4.42x** 2023E Adj. EBITDA

## Sources & Uses

| Cash sources | $M |
|---|---|
| First Lien Term Loan | 630 |
| Preferred Equity | 350 |
| Trust Roll | 6 |
| Total sources | 986 |

| Cash uses | $M |
|---|---|
| 3rd Party Debt | 444 |
| Insurance Debt & Preferred Equity | 509 |
| Deal Fees | 33 |
| Total uses | 986 |

*Executives/ Sellers payouts are to be determined and not considered in above calculations.*

## Illustrative Pro Forma Equity Ownership



Greg Lindberg, 96.3%

Quadro Sponsor, 2.9%

Quadro Public Shareholders, 0.8%

## Pro Forma Valuation (at closing)

| Enterprise value | $M |
|---|---|
| Shares outstanding (M) (x) Share price | 216.7 $10.0 |
| Equity value | 2,167.0 |
| (+) Pro forma net debt | 986.0 |
| Proforma enterprise value | 3,153.0 |

| Transaction multiples | |
|---|---|
| Enterprise value / 2023E Adj. EBITDA 2023E Adj. EBITDA pro forma net leverage | 22.14x 4.42x |

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 203 of 508

# Platform Overview



Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 204 of 508

# The Combined Platform of Pre-Transaction Companies

A diversified platform underpinned by a foundation of proven assets and supplemented by an acquisition engine that is expected to drive shareholder returns

**Current Key Statistics of
7 Pre-Transaction Companies**



**28** years
average age of subsidiaries

**7** years
average age in portfolio

**38\***
Acquisitions completed by the Pre-Transaction Companies

**2,500+**
Employees

**$142M**
EBITDA 2023

**$1.1B**
Revenue 2023

*\* Total history of acquisitions by Pre-Transaction Companies*

**Engine for Value Creation**



Stable, Cash Generative Companies + Consistent and Accretive Acquisition Engine

**Acquisition Engine**

**$88M**
Revenue acquired by the Pre-Transaction Companies every year (2019-2023)

**Stable**
Retained proven management team

**$10M**
EBITDA acquired by the Pre-Transaction Companies every year (2019-2023)

Global Growth | Quadro Acquisition One Corp.

15

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 205 of 508

# Global Growth's Acquisition Structure Focuses on Lowering Risk and Driving Returns

Pre-Transaction Companies achieve consistently attractive returns on their deployed capital partially through acquisition structures

## Acquisition structure

Acquisition cost at
**Single**
digits of EV/EBITDA multiple

**$109M**
Investment for acquisitions since 2019

Achieved
**+17%**
return on investments

## Acquisition structure benefits

Status of
**"Preferred Buyer"**
enables owners to continue to grow their business at attractive multiples

Immediate and growing
**FCF**

Potential to add
**attractive**
returns on deployed capital

Global Growth | Quadro Acquisition One Corp.

16

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 206 of 508

# Financial Overview of Pre-Transaction Companies

Pre-Transaction Companies demonstrate high top-line growth and profit generation, driven by their acquisition strategy



Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 207 of 508

# The Compounding Platform Strategy of Pre-Transaction Companies has Delivered Profits, Growth, and Significant Funding Capabilities

Combining its diversified portfolio of stable growing companies and a low-risk, high-cash return acquisition strategy has provided the base for significant growth of cash-generating capabilities

**Historical Roadmap for Achieving Compounding Profits Growth, $M**



Adj. EBITDA, 2019

62.8

Organic growth

28.9

EBITDA from operating entities acquired by Pre-Transaction Companies

50.7

142.4

Adj. EBITDA, 2023

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 208 of 508

# Partnership with Quadro Anticipated to Help Unlock Next Leg of Growth for Pre-Transaction Companies

## Pre-Transaction Companies



Founder-led, scaled, profitable, and diversified compounder

Established M&A playbook with flexible structures in a large pool of potential acquisitions

Proprietary sourcing channels developed on the back of strong reputation and trust

Perpetual ownership horizon, prudent leverage focused on long-term value creation

Decentralized operation style empowering management and fostering autonomy

Strong net surplus cash flow and potential ability for large-scale reinvestments in development

Scalable model with a track record of growth and resilience through cycles

## Quadro

Aligned interests and complementary skills to the management team and shareholders

Strong leadership team with extensive networks of corporates, advisors and investors

Access to capital with potential to accelerate the growth and the pace of further acquisitions

Infrastructure to assist financing the growth and value enhancement

Significant experience in capital markets, M&A, private equity investments and bringing companies public

Line-up of former executives of S&P 500 companies with significant operational experience across industries

Multiple M&A and investment transactions closed recently



Group's revenues and adj. EBITDA, 2019-2028F, US$ million

| | CAGR, 2019-2023 | CAGR**, 2023-2028 |
|---|---|---|
| Revenues | 23% | 6.4% |
| Adj. EBITDA | 22.0% | 6.5% |

Revenues: 2019: 473.4 | 2023: 1,095.4 | 2028F: 1,493.3

Adj. EBITDA: 2019: 62.8 | 2023: 142.4 | 2028F: 195.5

** Includes organic growth only

Global Growth | Quadro Acquisition One Corp.

19

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 209 of 508

**GU0**      we are reviewing the forecast & financial model to refine our assumption for forecasts. We will update the 2028 numbers accordingly (week of 15th jan)

Guest User, 2024-01-12T12:13:18.130

# Opportunity to Own a Differentiated Growth Story

## 1. Platform for Value Creation

| | |
|---|---|
| **1A** | Proven strategy to drive value creation |
| **1B** | Existing diversified portfolio |
| **1C** | "Preferred buyer" status drives accretive values |
| **1D** | Established and respected owner & management team |

## 2. Tangible Growth Drivers
Adj. EBITDA CAGR of 22%

| | |
|---|---|
| **2A** | Multiple opportunities to drive growth supported by industry trends |
| **2B** | Established M&A playbook and tight parameters for acquisitions |
| **2C** | Access to capital designed to accelerate acquisition pace |
| **2D** | Robust pipeline of attractive business acquisitions |

## 3. Compounding Returns
EBITDA Growth + Acquisitions = Long-Term Shareholder Value

| | |
|---|---|
| **3A** | Compelling financial profile designed to deliver compounding returns |
| **3B** | Market Leadership and comparative analysis |
| **3C** | Total return story fueled by attractive acquisitions |
| **3D** | Compelling cash profile with strong capital returns |

MS0

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 211 of 508

**Slide 20**

**MS0**   This doesn't seem to correspond with the 3B slides. Should we change to something like "Comparable company analysis demonstrates market leadership"
Miranda Satterly, 2024-01-10T19:46:23.370

# Value Creation



Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 213 of 508

# Proven Strategy to Drive Value Creation

The value creation ability of Pre-Transaction Companies has been refined since 2018 into a well-oiled acquisition and operations machine

## AAA Score Selection System

| Parameters | Weight | AAA Rating |
|---|---|---|
| Barriers to entry | 3 | 1-5 points |
| Company's growth rate | 1 | 1-5 points |
| Industry growth rate | 3 | 1-5 points |
| Place in the industry | 1.5 | 1-5 points |
| Physical CAPEX requirements | 2 | 1-5 points |
| % of revenue that is recurring | 3 | 1-5 points |
| Diversity of customer base | 1.5 | 1-5 points |
| Offshore labor potential | 3 | 1-5 points |
| Platform potential | 1 | 1-5 points |
| Existing roll-in potential | 1 | 1-5 points |
| TOTAL AAA Scoring | | to be >85 |

## Approach to Acquisitions



Employs a lower-risk strategy to acquire stable and profitable founder-led SMEs with operating track records

Retention of founders and management teams ensures continued entrepreneurial approach

Helps drive organic growth across the portfolio

Leverages scale to professionalize portfolio companies

M&A track record and market reputation

## Track Record

| >28 years Average age of companies | Established and profitable |
|---|---|
| Aligned interests with founder-sellers post-acquisition | Drives "preferred buyer" status |
| 9.5% Organic Adj. EBITDA CAGR | Cross-selling opportunities |
| Back-office support | Deploy best practices across portfolio |
| 12.9% EBITDA CAGR through acquisitions | Growth Opportunities |

Global Growth | Quadro Acquisition One Corp.

22

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 214 of 508

# Existing Diversified Portfolio

Seven diversified portfolio comprises of several business help to mitigate risk through cycles

## Select End Markets Served

| | |
|---|---|
| Collectibles | Business Software Solutions |
| Specialty Pharmacy | Healthcare Software |
| Medical Equipment | Gaming Accessories |
| Communication solutions | Billing |
| Analytics | Media |

## Headquarter locations with customer base across 20+ countries



Diversified and large end markets help the overall portfolio risk mitigation

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 215 of 508

# "Preferred Buyer" Status on the Back of Management-Empowered Value Proposition Drives Accretive Values

The "preferred buyers" status and patience are key to driving accretive acquisition

## Preserving the Entrepreneurial Spirit

Keeping founder management teams in place and allowing them to continue to execute successful business strategy after acquisition

Management teams can benefit from the group's deep commercial expertise, portfolio knowledge, and best practices to achieve next-level growth

The group supports investment into business and management for long-term performance, rather than deploying quick, short-sighted, cost-cutting initiatives often employed by trade buyers or PE firms

Succession plans are established for each portfolio company to help ensure a smooth transition in management roles post-retirement of founders

**Retained owner managers** at acquisition still actively engaged in business

At least one member of **underlying management** remained with new group for at least three years

## "Preferred Buyer" Status

Strong **reputation** paired with in-depth industry and geographical **knowledge**

Strategic partner interested in **long-term performance and not forced to sell** the business to satisfy any PE-like fund returns

Allows successful businesses to continue to thrive **independently**

Support for **personal and professional development**

Opportunities to extract operational **synergies** via cross-fertilization with other portfolio companies

Forming deep relationships with and allowing independent businesses to execute their own strategy enables the group to purchase off-market assets for attractive multiples

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 216 of 508

# Established and Respected Owner & Management Team

Relationship-focused management team creates opportunities to find target companies through existing networks

Strong organic growth compounded with disciplined M&A that has diversified and enhanced the platform of Pre-Transaction Companies

Highly qualified executive leadership team, led by Greg Lindberg, who identified the potential in the SME markets across the world and founders' reluctance to sell to PE and trade buyers

Management forms deep relationships with subsidiaries, understanding their vision and giving them autonomy in running their business – this allows management to purchase off-market assets for attractive multiples

Senior management brings together the necessary commercial knowledge, extensive networks, and operational awareness to make successful acquisitions



**Adj. EBITDA growth breakdown, $M**

62.8 — Adj. EBITDA, 2019
28.9 — Organic growth
50.7 — EBITDA from operating entities acquired by Pre-Transaction Companies
142.4 — Adj. EBITDA, 2023

**History of portfolio build-up**

| YEAR | # OF COMPANIES ACQUIRED |
|---|---|
| 2022 | 3 |
| 2021 | 1 |
| 2020 | 3 |
| 2019 | 1 |
| 2018 | 8 |
| 2017 | 8 |
| 2016 | 5 |
| 2015 | 3 |
| 2014 | 5 |
| Pre-2014 | 1 |
| **Total** | **38** |

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 217 of 508

# Tangible Upside Levers



Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 218 of 508

# Multiple Opportunities to Drive Future Growth (1 of 2)

Combination of strong organic foundation and M&A playbook aims to deliver compounding long-term performance



| Grow Core Initiatives | | Expand the Core: M&A and Targeted Support | | |
|---|---|---|---|---|
| Organic growth from existing businesses | Proven M&A playbook for compounding growth | Accelerate growth via access to capital | Target-rich environment for growth | Target greater scale and new geographies |
| Secular trends in core business | Continue accretive M&A strategy | Accessing liquid, public markets capital | Large pipeline of opportunities | Scale the model to larger transactions and new geographies |

## Select End Markets Served Currently

| | |
|---|---|
| Collectibles | Business Software Solutions |
| Specialty Pharmacy | Healthcare Software |
| Medical Equipment | Gaming Accessories |
| Communication Solutions | Billing |
| Analytics | Media |

| | |
|---|---|
| **$41Tn** Total GDP of the served countries | **3.2%** Nominal exp. GDP CAGR 2023-2028 |
| **$589B** Total value of the target markets in served countries | **~9%** Exp. markets CAGR 2023-2028 in served countries |

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 219 of 508

**Key Underlying Macro Trends**

 **Healthcare & Healthcare-Related Markets**

Healthcare and Healthcare-related markets, including medical software, home medical devices, hospital medical equipment and specialty pharmacy are driven by an aging population, a growing chronic condition population, the expansion of compensation coverage from state funding and insurance companies, incl. from Medicare, growth in regulatory approvals, deepening digitalization, stricter data security enforcement, the need for the growth of operational efficiencies and budgeting pressures. The markets are expected to grow at 9-18% CAGR (depending on the market segment) in the next 5 years.

 **Business Software Markets**

Further digitalization of all processes, cybersecurity, AI and advancements in cloud technologies and multichannel touchpoints, as well as the need for storing and analyzing ever-growing volumes of data, drive the growth of Business Software markets. It is expected that these markets will grow at 11% CAGR.

 **Collectibles Markets**

The Collectibles industry is going through a major re-engineering driven by improving economic conditions, increasing leisure time and popularity of hobbies, digitalization and AI penetration, the appearance of intangible collectible segments, and the professionalization of investment activities in collectible items. The market is expected to grow more than 6% CAGR over the next ten years.

 **Communications Solutions Markets**

The shift of communication and marketing efforts to online solutions, an increase in the value of peer-to-peer promotion and the growing significance of regulations drive the growth of the Communication Solutions market, with an exp. CAGR of 10%.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 220 of 508

## 2B Established M&A Playbook and Tight Parameters for Acquisitions

Pre-Transaction Companies have a strong investment methodology and track record

**Established Acquisition Strategy**  +  **Excellent Execution**  =  **Attractive Statistics**
of the Resulting Portfolio

**TARGET**
- Self-originated
- Off-market
- Strong business-wise with long operating histories

**SUPPORT**
- Retain existing management
- Support strategic direction
- Develop high operational efficiency

**INVEST**
- Re-invest in continued growth

- Founder-led profitable business with long operating history
- Strong management team committed to growth
- EBITDA $1M-$45M
- EBITDA margin >10%
- Cash-generating
- Attractive EBITDA multiple <6x
- High barriers to entry

**AAA Score Selection System**

**Barriers to entry**
*Points: 1-5; Weight:3*

**Company's growth rate**
*Points: 1-5; Weight:1*

**Industry growth rate**
*Points: 1-5; Weight:3*

**Place in the industry**
*Points: 1-5; Weight:1.5*

**Physical CAPEX requirements**
*Points: 1-5; Weight:2*

**% of revenue that is recurring**
*Points: 1-5; Weight:3*

**Diversity of customer base**
*Points: 1-5; Weight:1.5*

**Offshore labor potential**
*Points: 1-5; Weight:3*

**Platform potential**
*Points: 1-5; Weight:1*

**Existing roll-in potential**
*Points: 1-5; Weight:1*

*Any opportunity needs to score >85 for acquisition*

**Pre-Acquisition Phase**
- Originate by the internal team
- Select stringently
- Do not overpay, link to future performance

**Post-Acquisition Phase**
- Offer, perform DD and acquire
- Onboard, exercise immediate synergies
- Monitor, exercise ongoing synergies, add to growth

**38**
acquisition completed

**$659M**
Deal Value

**$878M**
Revenue of acquired companies

**3**
acquisitions per year in last 10 years

Global Growth | Quadro Acquisition One Corp.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 221 of 508

# Significant New Capital to Accelerate Growth

The transaction provides capital to optimize the balance sheet of Pre-Transaction Companies and fuel future growth

## Capital Raised in the Transaction

| Cash sources | $M |
|---|---|
| First Lien Term Loan | 630 |
| Preferred Equity | 350 |
| Trust Roll | 6 |
| Total sources | 986 |

| Cash uses | $M |
|---|---|
| 3rd Party Debt | 444 |
| Insurance Debt & Preferred Equity | 509 |
| Deal Fees | 33 |
| Total uses | 986 |

*Executives/ Sellers payouts are to be determined and not considered in above calculations.*

## Proforma Capital Structure

| Enterprise value | $M |
|---|---|
| Shares outstanding (M)<br>(x) Share price | 216.7<br>$10.0 |
| Equity value | 2,167 |
| (+) Pro forma net debt | 986 |
| Proforma enterprise value | 3,153 |

| Transaction multiples | |
|---|---|
| Enterprise value / 2023E Adj. EBITDA<br>2023E Adj. EBITDA pro forma net leverage | 22.14x<br>4.42x |

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 222 of 508

# Pipeline for Growth

Pre-Transaction Companies have a deep pool of their existing target areas to expand the business via acquisitions

## Robust Acquisition Pipeline

Current prospects:
**1,150**

Active dialogue:
**31**

Advanced:
**13**

## Advanced Targets

| | |
|---|---|
| Total revenues | **$176M** |
| Total EBITDA | **$43M** |
| Average expected EBITDA multiple | **6X** |
| Total expected value of acquisitions | **$250M** |

### Acquisition Targets – Addressable Market

- Target list of **8400+** companies and growing
- Target revenue of **$51Bn** and growing
- Target EBITDA of **$8Bn** and growing

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 223 of 508

# Compounding Returns



32

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 224 of 508

# Compelling Set-Up to Seek Compounding Returns (1 of 2)

The platform of Pre-Transaction Companies and upside levers provide several compelling opportunities that aim to compound returns to investors

| | | |
|---|---|---|
| **A** | Compelling Financial Profile For Compounding | Top-line Growth + Cash Flow Generation + Acquisitions + Dividends |
| **B** | Attractive Entry Point With a Differentiated Story | Proforma Enterprise Value of $3.2 billion |
| **C** | High Risk-Adjusted Cash Returns via Lower-Risk Acquisition Strategy | Potential for >20% Annual Return on Investment |
| **D** | Strong Dividend Capacity Potential | Maximize Payout Ratio |

**Combining its diversified portfolio of stable companies and a low-risk, high cash return acquisition strategy has provided the base for dividend capacity growth.**



Organic + Acquisition-driven growth

Strong Free Cash Flow Growth & Dividend Potential

Deep pool of founder-led companies

Organic GDP+ top-line growth combined with operational support and exposure to essential end-markets

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 225 of 508

**3A**

# Top-Line Growth and Margin Expansion (2 of 2)
Management has consistently grown the platform of the Pre-Transaction Companies with a focus on revenue and cash flow generation



**Revenue, 2019-2023**
US$ million

CAGR; 23%

| | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Value | 473 | 489 | 760 | 1,054 | 1,095 |
| **YoY Growth** | | 3% | 56% | 39% | 4% |



**Adj. EBITDA, 2019-2023**
US$ million

CAGR; 22%

| | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Value | 62.8 | 78.2 | 132.3 | 139.5 | 142.4 |
| **YoY Growth** | | 25% | 61% | 11% | 2% |

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 226 of 508

# Market Leadership Analysis – Key Comparable Companies Deep Dive

Closest comparable companies have slightly different acquisition strategies based on industry, value-add, and multiples paid, but execution is a key factor

|  | Quadro SPAC / Beckett Corp. | Addtech | Indutrade | Lifco | Diploma | Beijer / ALMA |
|---|---|---|---|---|---|---|
| **Primary End-Markets** | | | | | | |
| Diversified Industrials | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Trade | | | | | | ✓ |
| Life Sciences | ✓ | | ✓ | ✓ | ✓ | |
| Business Software, Post-Acute Health Services, and others | ✓ | ✓ | ✓ | | | ✓ |
| Key Geographies | North America, Europe | Nordics, DACH, UK | Global (>30 Countries) | Global (>30 Countries) | North America, Europe, Australia | Europe, Asia, North America |
| **M&A Approach** | | | | | | |
| # of Portfolio Companies | 38 | 156 | 238 | 211 | 142 | 39 |
| # of Acquisitions per Year | ~3 | ~10 | ~15 | ~10 | ~10 | ~5 |
| Target Business Size | $1-30M EBITDA | $1-3M EBITDA | $1-3M EBITDA | $1-40M Revenues | $1-7M EBITDA | $1-7M EBITDA |
| **Financial Metrics** | | | | | | |
| Equity Value ($M) | $2,167 | $4,822 | $7,778 | $9,701 | $4,735 | $1,051 |
| 3Y EPS CAGR (2019-2022) | N/A* | 19.6% | 21.7% | 22.7% | 16.0% | 9.9% |
| LTM Dividend Yield | N/A | 1.3% | 1.2% | 1.0% | 1.9% | 2.3% |
| TEV / FY 2023 EBITDA | 22.1x | 26.4x | 25.1x | 21.0x | 23.9x | 14.3x |

* In some of the earlier years, net income was negative

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 227 of 508

**3B**

# Market Leadership Analysis – Key Financial Metrics

Deep comparable universe creates a compelling starting point for entrance of Pre-Transaction Companies into public markets

| | Sales Growth | EBITDA Growth | EPS CAGR | EBITDA Margin | Net Debt/EBITDA | ROIC |
|---|---|---|---|---|---|---|
| | FY2018-FY2022 | FY2018-FY2022 | 3-Year | LTM | LTM | LTM |
| Quadro SPAC / Beckett Corp. | **36%** | **29%** | **N/A** | **13%** | 4.42x | **17%** |
| CorpAcq | 17% | 19% | 20% | 17% | 3.0x/2.2x | 16% |
| ADDTECH | 17% | 26% | 20% | 15% | 1.6x | 19% |
| Indutrade | 13% | 19% | 22% | 18% | 1.7x | 15% |
| LIFCO | 16% | 21% | 23% | 25% | 1.3x | 15% |
| DIPLOMA | 22% | 27% | 16% | 21% | 1.1x | 15% |
| BEIJER • ALMA | 7% | 9% | 10% | 18% | 1.9x | 11% |
| Comparables Average | **15%** | **20%** | **18%** | **20%** | **1.5x** | **15%** |

Global Growth | Quadro Acquisition One Corp.

36

**GU0**   Guest User, 2024-01-09T19:23:22.890

**GU0 0**   For comepetitive analysis, we are keeping 2018-22. It will be updated for 19-23 once we will get complete 23 numbers (likely in Mar'23)
Guest User, 2024-01-11T11:13:09.994

**3C**

# Total Return Story Fueled by Acquisitions
The Post-Transaction Holding Group offers an opportunity to own a growth platform strategy that has generated high risk-adjusted returns at an attractive valuation



Companies have been rewarded for execution and  growth

Focus on quality and strong, attainable cash returns has led to historical double-digit EBITDA growth

The Group aims to accelerate and expand its strategy and drive growth

In addition to strong earnings growth potential, the Group expects to manage its long-term debt obligations

Acquisitions at Single Digits EBITDA multiples have led to high cash returns and earnings growth

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 230 of 508

# Compelling Cash Profile Should Provide a Strong Capital Returns Story from Inception

The Group's strong cash generation aims to provide significant dividend capacity that is expected to grow with the portfolio

**Adj. EBITDA Conversion Rate**





| Conversion Rate (%) | 85% | 58% | 68% |



*Conversion Rate: (EBITDA – change in net working capital – CapEx – Tax)/ EBITDA

Global Growth | Quadro Acquisition One Corp.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 231 of 508

# Compelling Public Investment Thesis

Opportunity to own an attractive and differentiated investment / acquisition platform that provides a compelling combination of top-line growth and profitability

**1**    **Differentiated opportunity to own a platform composed of global companies** with a proven acquisition model that generates high risk-adjusted cash returns supported by mature, stable businesses

**2**    **Experienced management team** that has executed a proven repeatable and scalable acquisition strategy

**3**    **Attractive and successful acquisition strategy** that can be augmented with public currency to move into even deeper acquisition markets

**4**    **Seven diversified portfolio comprises of several business operating in North America, UK, Ireland, Europe, Australia and New Zealand** serving across markets with proven resilience to economic cycle.

**5**    **Profitable with strong top-line growth potential** and cash flow generation allows for enhanced acquisition pace and dividend* payout to cultivate investor base

*\* Note that no dividends will be paid until 2029*

Global Growth | Quadro Acquisition One Corp.

39

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 232 of 508

# Selected Risk Factors



40

# Selected Risk Factors

Unless the context otherwise requires, all references in this subsection to the "Company," "Global Growth," "The 7 Companies," "we," "us" or "our" refer to The Pre-Transaction Companies. The risks presented below are some of the general risks to the business and operations of The Pre-Transaction Companies, Quadro and The Post-Transaction Holding Group following the consummation of the proposed transaction (the "Post-Combination Company") and are not exhaustive. The list below is qualified in its entirety by disclosures contained in future documents to be filed or furnished by us with the SEC. The risks presented in such filings may differ significantly from those presented below. The list below is not exhaustive, and you are encouraged to perform you own investigation with respect to the business, financial condition and prospects of The Pre-Transaction Companies and The Post-Transaction Holding.

Certain of The Pre-Transaction Companies are held directly or indirectly by a trustee pursuant to trusts designed to distribute funds to affiliated insurance companies (the "Insurance Companies") that are under administrative supervision, under a Court Action, in the Wake County General Court of Justice – Superior Court Division of North Carolina (the "Action").  The trustee of the trusts also acts on behalf of the State of North Carolina as the court appointed rehabilitator of the Insurance Companies.  Among other risks, all of the terms of the proposed transactions must be approved by the court in the foregoing Action.

The Pre-Transaction Companies and The Post-Transaction Holding may face additional risks and uncertainties that are not presently known to them or that they currently deem immaterial, which may also impair The Pre-Transaction Companies and The Post-Transaction Holding's business or their financial condition. These risks speak only as of the date of this presentation, and neither The Pre-Transaction Companies nor Quadro undertake any obligation to update the disclosure contained herein. In making any investment decision, you should rely solely upon independent investigation made by you. You acknowledge that you are not relying upon, and have not relied upon, any of the summary of risks or any other statement, representation or warranty made by any person or entity other than the statements, representations and warranties of The Pre-Transaction Companies and Quadro explicitly contained in any definitive agreement you enter into. You acknowledge that you have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Company and you have sought such accounting, legal and tax advice from your own advisors as you have considered necessary to make an informed decision.

**Risks Related to The Court Approval Process**
- The Pre-Transaction Companies are currently under the control of a trustee that holds control over certain assets so as to ensure the financial liquidity of the Insurance Companies that are now in rehabilitation.
- In order to consider any transaction or restructuring, The Pre-Transaction Companies must first apply to the court in the Action, and the trustee/rehabilitator, for approval which will require, among other things, that we can show that the Insurance Companies will be rehabilitated and that insurance policy holders will be able to realize their full policy benefits.
- As part of this plan, and among other criteria, we will be required to raise substantial amount of capital in order to repay debts of The Pre-Transaction Companies owed to the Insurance Companies, in the amount of approximately $509 M.
- We will be required to prove to the rehabilitator and court in the Action, that the debts being repaid will fully rehabilitate the Insurance Companies and ensure that the insurance policy holders will be able to realize the full benefit of their respective policies if and as they come due.
- We will be required to close our financing and obtain approval of the contemplated transaction by the court in the Action, prior to any closing of the acquisition.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 234 of 508

# Selected Risk Factors

**Pre-Transaction Companies and The Post-Transaction Holding's Business and Industry**

- We are subject to risks relating to due diligence of our acquisition targets, which may not identify all material risks relating to their businesses, and we may not realize the expected benefits of such arrangements. Competition for suitable acquisition targets may lead us to not being able to carry out future acquisitions at a reasonable cost or at all, which could adversely affect our operating results.
- There are risks to our acquisition strategy, and there are no guarantees that we will be able to carry out acquisitions as planned, or with favorable conditions or at all.
- The acquisitions and investments we conduct could be unsuccessful or consume significant resources, which could adversely affect our operating results.
- Our growth and pension strategy may not materialize as planned or at all.
- We are dependent on cash flows from our portfolio companies.
- Many of our portfolio companies operate in sectors that are vulnerable to competition, and failure of our portfolio companies to adequately compete in their respective industries could have an adverse effect on our results of operations.
- Our insurance coverage, including any insurance coverage held by our portfolio companies, may not cover all potential losses and there are no guarantees that we or our portfolio companies can retain such insurance coverage at a reasonable cost or at all.
- Potential divestments of our portfolio companies may give rise to us becoming subject to additional risks and costs.
- We are subject to risks relating to partly owned portfolio companies.
- We are a decentralized company and place significant decision-making authority, including decisions regarding operations, governance and finance, with our subsidiaries' management and we may not always have visibility into or control over such decisions.
- We are subject to risks relating to our information technology systems, financial accounting and other data processing systems, such as cybersecurity risks and risks related to data privacy.
- The industries we serve can be seasonal cyclical and affected by weather conditions, the combined effects of which can adversely impact our results of operations.
- A portion of our future growth is based on the ability and willingness of public and private entities to invest in infrastructure.
- Our business will be adversely affected if we are unable to protect our intellectual property rights from unauthorized use or infringement by third parties.
- Our operating and financial results forecast rely in large part on assumptions and analyses that we have developed and if these assumptions or analyses prove to be incorrect, our actual operating and financial results may be significantly below our forecasts.
- Our forecasts are predicated on maintaining our current acquisition pipeline. Failure to maintain this pipeline, or if acquisitions are different than we've predicted, our financial results may be negatively affected.
- The Pre-Transaction Companies and The Post-Transaction Holdings ability to continue as a going concern depends in part on obtaining sufficient funding to finance their operations.
- Certain of The Post-Transaction Holding's subsidiaries are subject to increasing risks arising from climate change, environmental considerations and broader environmental, social and governance considerations, together with the requirement to comply with, and associated costs of, increased regulation or changes in regulatory regimes.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 235 of 508

# Selected Risk Factors

**Risks Related to Indebtedness and Financing Transactions**
- We are subject to financing risks. Failure to raise at least $[ ] will likely result in inability to obtain court approval and close the contemplated transaction. There are no guarantees that we can meet our financing needs for our operations and future investments at a reasonable cost or at all.
- We will require a significant amount of cash to service our debt or preferred equity obligations, and our ability to generate cash depends on many factors beyond our control and any failure to meet financial obligations could materially adversely affect our business, results of operations and financial condition.
- We are subject to risks relating to increased interest rates and any adverse developments in the credit markets generally.
- Our failure to comply with the agreements relating to our outstanding indebtedness, including as a result of events beyond our control, could result in an event of default that could materially adversely affect our business, results of operations and financial condition.
- Our debt or preferred financing and the history of our Pre-Transaction Companies, could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry and prevent us from meeting our obligations.

**Risks Related to Human Capital**
- There are no guarantees that we are able to retain and recruit key personnel, including our senior management, and other employees to meet current or future needs at a reasonable cost or at all.
- There are no guarantees that our portfolio companies will be able to retain and recruit key personnel, including senior management, and other employees to meet current or future needs at a reasonable cost or at all.
- We and our portfolio companies are subject to risks relating to workspace accidents, investigations and claims for compensation as a consequence of compliance deficiencies. We may also be subject to disruptions in the business due to work stoppage and strikes.
- Misconduct by our employees, subcontractors or partners or our overall failure to comply with laws or regulations could harm our reputation, damage our relationships with customers, reduce our revenue and profits, and subject us to criminal and civil enforcement actions.

**Risks Related to Legal, Regulatory and Compliance Matters**
- We are subject to evolving laws and regulations that could impose substantial costs, legal prohibitions or unfavorable changes upon our operations, and any failure to comply with these laws and regulations, including as they evolve, could result in litigation and substantially harm our business and results of operations.
- We are subject to risks relating to disputes and other legal proceedings that may be time consuming and costly.
- We and our portfolio companies could be subject to increased regulation or changes in regulatory regimes which will impact our financial performance.
- If we fail in complying with applicable data protection regulations, such as the GDPR, our compliance costs may increase and in the event of compliance deficiencies, we may become subject to significant fines and liable for damages.

**Risks Related to Tax**
- We may be treated as a U.S. corporation for U.S. federal income tax purposes.
- U.S. holders of Quadro will be subject to U.S. federal income tax on any gain (but not loss) resulting from the merger without the corresponding receipt of cash.
- The issuance or transfer of the Post-Combination Company's securities into DTC may be subject to stamp duty or stamp duty reserve tax in the UK, which would result in additional expenses incurred in connection with the consummation of the proposed transaction.
- Unanticipated tax laws or any changes in tax rates or in the application of the existing tax laws may adversely impact our results of operations.

Global Growth | Quadro Acquisition One Corp.

43

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 236 of 508

# Selected Risk Factors

**Risks Related to Quadro**

- Quadro's public shareholders will experience dilution as a consequence of the issuance of Post-Combination Company securities as consideration in the proposed transaction and may experience dilution from several additional sources in connection with and after the closing of the proposed transaction. Having a minority share position may reduce the influence that Quadro's public shareholder have on the management of the Post-Combination Company.
- [The estimated net cash per share of Quadro's class A common stock that will be contributed to the combined company in the proposed transaction is less than the redemption price. Accordingly, Quadro's public shareholders who do no exercise redemption rights will receive Post-Combination Company securities that may have a value less than the amount they would receive upon exercise of their redemption rights. Further, the shares of most companies that have recently completed business combinations between a special purpose acquisition company and an operating company have traded at prices below $10.00 per share. Accordingly, Quadro's public stockholders who do not exercise redemption rights may hold securities that never obtain a value equal to or exceeding the per share value of Churchill's trust account.]
- Quadro, Quadro's funds and their respective directors, officers or affiliates may purchase shares from Quadro's public stockholders, which could reduce the number of shares of Quadro's class A common stock that may be redeemed in connection with the special meeting or shareholders, which may reduce the public "float" of Quadro's class A common stock (or, following the closing of the proposed transaction, the Post-Combination Company ordinary A1 shares).
- There can be no assurance that Quadro will be able to consummate the proposed transaction or another initial business combination by February 17, 2024, in which case Quadro will cease all operations except for the purpose of winding up and would redeem Quadro's class A common stock and liquidate, in which case Quadro's public stockholders would only receive approximately $10.00 per share, or less than such amount in certain circumstances.
- The exercise price for Quadro's public warrants and the Post-Combination Company's class C-1 shares are higher than in many similar blank check company offerings in the past, and, accordingly, the Quadro's public warrants and the Post-Combination Company's class C-1 shares are more likely to expire worthless.

**Risks Related to the Post-Combination Company following the Proposed Transaction**

- If the proposed transaction's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of the Post-Combination Company's securities may decline.
- Investors will experience dilution as a result of the issuance of equity securities in the Post-Combination Company as consideration in the potential transaction and may experience dilution from additional sources in connection with and following the proposed transaction, including upon exercise of certain equity securities of the Post-Combination Company.
- The Post-Combination Company's management team will have limited experience managing a public company.
- The Company and Quadro expect to incur significant transaction costs in connection with the proposed transaction. Whether or not the proposed transaction is completed, the incurrence of these costs will reduce the amount of cash available to be used for other corporate purposes by the Post-Combination Company.
- The requirements of being a public company may strain the Post-Combination Company's resources and distract its management, which could make it difficult to manage its business.
- Following the proposed transaction, the Post-Combination Company will be a holding company and will depend on the cash flows from its subsidiaries to pay dividends.
- The Pre-Transaction Companies have identified material weaknesses in its internal control over financial reporting. If The Pre-Transaction Companies and the Post-Combination Company are unable to remediate these material weaknesses or identify additional material weaknesses, it could lead to errors in the Post-Combination Company's financial reporting, which could adversely affect the Post-Combination Company's business and the market of the Post-Combination securities.
- If the Post-Combination Company fails to comply or lacks the appropriate internal controls, it could be subject to sanctions or investigations by the Commission or other regulatory authorities.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 237 of 508

# Selected Risk Factors

**Risks Related to the Post-Combination Company Following the Proposed Transaction**

- If the proposed transaction's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of the Post-Combination Company's securities may decline.

- Investors will experience dilution as a result of the issuance of equity securities in the Post-Combination Company as consideration in the potential transaction and may experience dilution from additional sources in connection with and following the proposed transaction, including upon exercise of certain equity securities of the Post-Combination Company

- The Post-Combination Company's management team will have limited experience managing a public company.

- The Company and Quadro expect to incur significant transaction costs in connection with the proposed transaction. Whether or not the proposed transaction is completed, the incurrence of these costs will reduce the amount of cash available to be used for other corporate purposes by the Post-Combination Company.

- The requirements of being a public company may strain the Post-Combination Company's resources and distract its management, which could make it difficult to manage its business.

- Following the proposed transaction, the Post-Combination Company will be a holding company and will depend on the cash flows from the subsidiaries to pay dividends. Risk already included above in "Risk Related to the Company's Business and Industry."

- The Pre-Transaction Companies have identified material weaknesses in its internal control over financial reporting. If The Pre-Transaction Companies and the Post-Combination Company are unable to remediate these material weaknesses or identify additional material weaknesses, it could lead to errors in the Post-Combination Company's financial reporting, which could adversely affect the Post-Combination Company's business and the market of the Post-Combination securities.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 238 of 508

# Appendix

Pre-Transaction Group

 

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 239 of 508

# The Pre-Transaction Companies

| Company | Industry | Key Target Markets | Revenues, 2023, $M | Adj. EBITDA, 2023, $M |
|---|---|---|---|---|
| Southern Hobby Distribution – Part of Beckett Group<br>http://www.southernhobby.com/ | Collectibles Distribution | USA | 535.1 | 54.1 |
| Damovo<br>http://www.damovo.com/ | Business Software Solutions | Germany, EU | 166.9 | 16.8 |
| HPC Specialty Infusion<br>https://www.hpcinfusion.com | Specialty Pharmacy | USA | 105.3 | 5.8 |
| Clanwilliam Group<br>https://www.clanwilliam.com | Healthcare Software | Ireland, UK, EU, APAC | 102.1 | 36.3 |
| Home Medical Equipment Specialists<br>https://hmespecialists.com | Medical Equipment | USA | 90.8 | 8.8 |
| Beckett Collectibles – Part of Beckett Group<br>https://www.beckett.com | Collectibles Platform | USA | 48.4 | 6.4 |
| Arcane Tinmen – Part of Beckett Group<br>https://www.arcanetinmen.com | Gaming Accessories | Denmark, EU | 46.7 | 14.3 |









Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 240 of 508

# Financial Summary

| USD | 2019A | 2020A | 2021A | 2022A | 2023E |
|---|---|---|---|---|---|
| **Revenue** | **473,388,060** | **488,898,292** | **760,281,143** | **1,053,824,896** | **1,095,383,757** |
| COGS | 269,578,157 | 258,914,938 | 452,539,497 | 706,048,060 | 740,273,185 |
| SG&A | 178,289,629 | 191,784,353 | 214,368,709 | 262,086,223 | 267,514,955 |
| Other Income/Expense | 3,095,859 | 14,374,672 | -5,066,290 | -2,807,857 | -3,880,985 |
| **EBIT** | **22,424,416** | **23,824,329** | **98,439,227** | **88,498,470** | **91,476,603** |
| *EBIT Margin* | *4.7%* | *4.9%* | *12.9%* | *8.4%* | *8.4%* |
| | | | | | |
| D&A | 30,381,023 | 31,808,489 | 33,817,757 | 33,712,083 | 31,631,922 |
| **EBITDA** | **52,805,438** | **55,632,819** | **132,256,984** | **122,210,552** | **123,108,525** |
| *EBITDA Margin* | *11.2%* | *11.4%* | *17.4%* | *11.6%* | *11.2%* |
| | | | | | |
| Addbacks/Adjustments | 10,032,972 | 22,614,667 | 40,075 | 17,298,925 | 19,310,466 |
| **Adj. EBITDA** | **62,838,410** | **78,247,486** | **$132,297,060** | **139,509,477** | **142,418,991** |
| *Adj. EBITDA Margin* | *13.3%* | *16.0%* | *16.5%* | *13.2%* | *13.0%* |

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 241 of 508

# Appendix

Pre-Transaction Companies

 

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 242 of 508

# Origins Of The Group: Global Growth Holdings, GGHI

https://www.globalgrowth.com

## Overview

**Background:** Global private investment firm with investments in healthcare technology, financial services, collectibles, alternative assets, and communications. The portfolio of assets is independently valued at more than $5 billion. Recently, the holding has rebuilt its products in the healthcare space and expanded from healthcare media into healthcare accreditation and technology, collectibles pricing and authentication, and business software and financial services.

**History:** Eli Research, Global Growth's predecessor, began in 1991 with a folding table and a $5,000 investment from the parents of GGHI's founder, Greg Lindberg. As a 21-year-old Yale college student, he read a medical newsletter and thought "I can do better." He soon published Eli's Home Care Week, which over time became a significant competitor in the medical media industry. By 1998, Eli Research had grown to 12 people working out of one room. The company published Home Care Week and Rehab Report and was preparing to launch Home Care Compliance Alert. That same year, cuts to home care funding from the Balanced Budget Act of 1997 hit the company hard, forcing the company to let go of quality team members, worry about meeting payroll, and work with vendors to pay its printing bills. While painful, those challenges helped Eli Research grow up. By 2020, the company had renamed itself Global Growth and built a portfolio of investments that included more than 120 companies and over 6,800 employees. Today, Global Growth's team of world-class investment professionals steward a portfolio of assets valued at more than $5 billion. GGHI pursues a buy-and-hold strategy of investment that prioritizes long-term value creation, conservative cash management, and constant innovation. GGHI's group of world-class and independent CEOs are a testament to these investment ideals.

## Summary of Investments

- **Healthcare Technology Group** is a market leader in general practitioner software platforms, healthcare communication tools, and compliance and audit technology products that help healthcare professionals across the globe provide efficient and safe healthcare to patients. GGHI also invests in clinical practices, addiction treatment centers, and ophthalmology groups.
- **Financial Services Group** provides lenders, businesses, and consumers with revenue cycle management solutions, mortgage origination, refinancing and mortgage servicing, and financial analytics support.
- **Business Services Group** provides technology-enabled automation, security, and unified communication technologies to small and large enterprises, enabling them to stay ahead in a rapidly evolving digital world. GGHI supports customers across Europe, Africa, Asia, and North America.
- **Collectibles and Alternative Assets Group** includes market leaders in the gaming, collectibles and NFT spaces, allowing collectors to authenticate, value, and trade prized alternative assets. GGHI's investments include the North American leader in collectibles distribution, the most iconic American brand in sports card pricing and authentication, and a leading manufacturer of gaming accessories.
- **Communications Group** provides media, forecasting, and industry intelligence tools to small and large businesses. GGHI's general circulation print magazines include publications such as Atomic Ranch, Cottages and Bungalows, Diesel World, and Knives Illustrated, which offer unique content for enthusiast, residential, and business subscribers, as well as the original healthcare newsletters GGHI started in 1994.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 243 of 508

# Damovo

https://www.damovo.com

**Background.** International ICT service provider headquartered in Germany supports business customers across the world on their path to digitization. The company enables seamless connection across people, processes and systems - creating transparency and agility, whilst providing the network stability and security that customers require in today's business environment. Damovo delivers completely integrated solutions that continually improve business performance and end user experience. There are 1.9 million endpoints under Damovo's management. The number of customers exceeds 2,850. Customer churn is below 1%.

## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 147.1 | 179.6 | 197.7 | 171.2 | 167 |
| *Growth* | | *22.1%* | *10.1%* | *-13.4%* | *-2.5%* |
| Adj. EBITDA | 10.6 | 17.3 | 24.1 | 19.9 | 16.8 |
| *Growth* | | *62.8%* | *39.0%* | *-17.4%* | *-15.7* |

**\*** EBITDA accounts impact of FX fluctuation

## Company Overview

| | |
|---|---|
| Headquartered | **Germany** |
| Total Staff | **650+ FTEs and 2,500 contingent workers** |
| Countries operated | **16 countries in Europe, Americas and APAC with support in 150 countries** |
| Recurring revenue | **c.60%** |

## Management



**Jeff McFarlane, CEO**
30 years of industry experience across global Enterprise IT solutions, Infrastructure-as-a-Service and leasing. Graduate of University of Toronto.



**Ralf Jödicke, CFO**
20 years of finance experience, most notably as a partner at KPMG and Deloitte. Graduate of Ruhr University Bochum

## Key Products

- Unified Communications & Collaboration
- Enterprise Networks
- Contact Centre
- Security
- Cloud Services
- Global Managed Services

## Industry Overview

- UCC market in US was $14.3 Billion in 2020. It is expected to grow by 13% and reach $23.1 Billion by 2025.
- UCC market in Europe was $19.8 Billion in 2020. It is expected to grow by 12% and reach $35.1 Billion by 2025.
- Main growth drivers are – Remote working, Enterprise adoption, Cloud migration and People focus.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 244 of 508

# HPC Specialty Infusion

https://www.hpcinfusion.com

**Background.** HPC Specialty Infusion, formerly known as Hemophilia Preferred Care, is a specialty infusion pharmacy with expertise in serving Immune Globulin and Bleeding Disorders patients in the home setting. The company empowers patients with independence, knowledge and the ability to achieve the highest quality of life by providing professional and compassionate care with education and community support. HPC has a Comprehensive System of Care for Individuals Experiencing Chronic Medical Con

## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 115.2 | 85.8 | 81.9 | 92.1 | 105.3 |
| *Growth* | | *-25.6%* | *-4.5%* | *12.5%* | *14.4* |
| Adj. EBITDA | 3.5 | 4.7 | 4.8 | 4.9 | 5.8 |
| *Growth* | | *35.0%* | *0.5%* | *3.2%* | *18.8%* |

## Company Overview

| | |
|---|---|
| Year founded | **2002** |
| Year acquired | **2018** |
| Total Staff | **+65** |
| Headquartered | **Alabama, US** |
| Countries operated | **US** |

## Management



**Michael Pereira, CEO**
Over 20 years of experience in healthcare and Technology. Chairman at HME Specialists. Graduate of Fordham University School of Law and University of Pennsylvania.



**Nickolas Shoemaker, CFO**
20 years of experience in accounting and finance. Former CFO in hospitals topping $1billion in gross revenues. Graduate of Colorado State University. IWU National & Global and Indiana Institute of Technology

## Key Products

- Oral and retail branded generics by Amerisource Bergen
- IG and Factor by ASD Healthcare
- IG and Factor by BioCare
- Eloctate and Alprolix by Genzyme
- IG and Factor along with medical supplies by McKesson
- Factor product by Shire
- Hemlibra by Genentech
- Rental pumps by Adepto Medical

## Industry Overview

- Annual revenue generated by infusion services market expected to grow by $37 billion from 2019-2023.
- Hemophilia market was around $9.8 Billion in 2019. It is expected to grow up to $14 Billion by 2025 which would CAGR of around 5%.
- Growth drivers of this industry are – Aging population, Infusion drug Medicare eligibility, FDA approval growth of Biologics and Infusion Drugs are 55% of Pharma Pipeline.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 245 of 508

# Clanwilliam Group

https://www.clanwilliam.com



**Background.** With more than 25 years on the market, Clanwilliam is a global healthcare technology group with the mission to remove the care delivery challenges faced by clinicians in Ireland and technology designed specifically for healthcare professionals. Today, 25+ core products and services empower over 1.5 million healthcare professionals worldwide from pharmacy to GP systems, hospitals to aged care, analytics to messaging platforms. Clanwilliam supports Irish Defense Forces, the NHS, the HSE, Medicare, the Australian Antarctic Division Polar Medicine Unit, Exeter University, Cancer Research UK and the Royal Flying Doctor Service of Australia etc.

## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 94.5 | 91.1 | 104.8 | 95.9 | 102.1 |
| *Growth* | | *-3.6* | *15.0%* | *-8.4%* | *6.4%* |
| Adj. EBITDA* | 25.2 | 29.4 | 33.8 | 31.2 | 36.3 |
| *Growth* | | *16.6%* | *15.2%* | *-7.9%* | *16.5%* |

**\*** EBITDA accounts impact of FX fluctuation

## Company Overview

| | |
|---|---|
| Year founded | **1996 (2014 – merger, Helix Health & Socrates)** |
| Total Staff | **+1,000 FTEs** |
| Headquartered | **Ireland** |
| Countries Operated | **20+, incl. UK, Ireland, Australia** |
| Recurring revenue | **75%** |

## Management



**Howard Beggs, Founder and CEO**
Irish entrepreneur and investor. With a background in technology, Beggs founded the original company, Medicom, in 1996. Graduate of Stanford University Graduate School of Business and University College Dublin.



**Gerry Hunt, CFO**
6 years of experience with Clanwilliam. Former Partner at CSI Chartered Accountants and Head of Strategy and Finance at National Irish Bank. Graduate of University College Dublin.

## Key Products

The services include Virtual Clinics, Practice Management Platform, Outsourced Transcription, Population Health Management, Theatre Management Systems, Data Analytics, Clinical Coding Software, Digital Dictation, Secure Healthcare Messaging, Integration Solutions, Medical Education & Communications, Aged-Care Management Systems, Pharmacy Management Systems, Voice Recognition Software and other

- CW Health is a provider of Electronic Medical Records and Revenue Management software
- Obsidian is a UK and European medcomms agency working with pharma leaders like Gilead, Amgen, Roche etc.

## Industry Overview

- Total Global Healthcare IT market was at $115Bn at end of 2016. It is expected to grow by CAGR of 16% and reach $365Bn by end of 2024 with this rate.
- It is driven by digitization, the need for data security and government support for efficiencies.
- Among the key target markets, UK is anticipated to grow fastest, driven by government initiatives around NHS Digital, and in particular the push by new regional bodies, e.g., LHCREs to improve interoperability of systems and build a single read-write patient view.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 246 of 508

# Home Medical Equipment Specialists

https://hmespecialists.com

**Background.** Delivers equipment and services for medical independence – from crutches to complex wheelchairs, nutritional services to wound care and from oxygen and sleep therapy to infusion pharmacy services. Cares for children and adults of all ages in communities throughout New Mexico and West Texas from its 13 store front locations. Contracted with 300 local and national health plans. Numerous partnerships with non-profit organizations.



## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 74.5 | 80.4 | 84.3 | 87.8 | 90.8 |
| *Growth* | | *8.0%* | *4.8%* | *4.2%* | *3.4%* |
| Adj. EBITDA | 10.1 | 5.6 | 12.0 | 9.7 | 8.8 |
| *Growth* | | *-44.6%* | *114.0%* | *-19.2%* | *-9.1%* |

## Company Overview

| | |
|---|---|
| Year founded | **2001** |
| Locations | **14 (+150 Consignment Closet locations), all leased** |
| Total Staff | **434** |
| Headquartered | **New Mexico, US** |
| Countries Operated | **US** |

## Management



**Michael Pereira, Chairman**
Over 20 years of experience in healthcare and Technology. CEO at HPC Specialty Infusion. Graduate of Fordham University School of Law and University of Pennsylvania.



**Eric De Garceau, CFO**
Over 25 years of experience, most notably with Apria Healthcare and Molina Healthcare. Graduate of USC Marshall School of Business and UC Santa Barbara.

## Key Products

- Home Oxygen Therapy – traditional oxygen concentrators, home filling devices, portable oxygen concentrators, conserving devices, oxygen cylinders, ventilator management services and alike

- Supply Program – for patients with respiratory, gastrointestinal, urological, incontinence and wound related conditions. Includes catheters, drainage bags, trays, syringes, disposables, etc.

- Other products - Home Infusion Therapy, Breast Pumps, Non-Invasive Ventilation, Specialty Mobility and Seating, Incontinence & Urology, Sleep Therapy, Enteral Nutrition, Wound Care, Long-Term Care and Hospice, Rehab etc.

## Industry Overview

- Home Medical Equipment Market revenue size was valued at USD 11.5 Billion in 2019 and is projected to reach USD 20.4 Billion by 2027, growing at a CAGR of 7.4% from 2019 to 2027.

- Chronic condition population was around 133 Million in 2005 and is projected to reach 171 Million by 2030.

- Aging population is one of the reason of increasing demand of home medical equipment.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 247 of 508

# Beckett Collectibles – Part of Beckett Group

https://www.beckett.com

**BECKETT**

**Background.** Original collectibles platform for pricing, analysis, grading, and authentication for collectors and investors. Beckett's data-driven offerings pair physical collectibles with innovative products in digital collectibles. The Beckett family of companies also includes Southern Hobby, the leader in sports cards, gaming products, supplies, pop culture & entertainment merchandise; CBCS, a premier grading and authentication platform for comics; and Arcane Tinmen, specializing in fabricating premier-level gaming accessories.

## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 26.0 | 35.6 | 56.5 | 56.2 | 48.3 |
| *Growth* | | *36.8%* | *58.9%* | *-0.6%* | *-13.9%* |
| Adj. EBITDA | 8.2 | 15.9 | 29.3 | 14.2 | 6.4 |
| *Growth* | | *94.1%* | *84.1%* | *-51.6%* | *-54.6%* |

## Company Overview

| | |
|---|---|
| Year founded | **1980** |
| Total Subscribers | **+20,000** |
| Total Staff | **+225 FTEs** |
| Headquartered | **Texas, US** |
| Countries Operated | **US** |

## Management



**Kevin Isaacson, CEO, Beckett Group**
CEO and Executive Officer of Beckett Group, Southern Hobby, Eye Care Leaders, and Entrust Global Group. Publisher and columnist. BA from University of Wisconsin Oshkosh.



**Erik Bordwell, CFO of Beckett Collectibles**
13 years of experience in collectibles industry. Sr. Director, Richmond American Homes. CPA. University of Denver.

## Key Products

- Pricing data. Beckett provides the most comprehensive pricing data in collectibles with 425 million card transaction datapoints over 40 years

- Grading & Authentication. Beckett brings value and credibility to cards and comics based on rigorous assessment criteria, and also verifies authenticity of autographs, signatures, cards and comics. Grading by Beckett adds 125% more value than grading by major competitors. Overall, over 15 million cards were graded by Beckett over its history.

## Industry Overview

- Total Collectible market was at $378Bn at end of 2021. It is expected to grow by CAGR of 7% and reach $529Bn by end of 2027.

- Total Sports cards was at $29Bn at end of 2021. It is expected to grow by CAGR of 23% and reach $99Bn by end of 2027.

- Reason of this growth rate is social media presence, renewed interest in the hobby and influencer engagement.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 248 of 508

# Arcane Tinmen – Part of Beckett Group

https://www.arcanetinmen.com

**Background.** Founded in 1999, Arcane Tinmen (AT) is the leading manufacturer of high-quality gaming accessories. Specialized in physical and digital gaming & collector accessories represented by AT's three brands: Dragon Shield, Board Game Sleeves, and Beckett Shield. The focus is on providing high quality. The presence is worldwide and taps into global communities of dedicated players and collectors, leveraging their experience through the products. The company values inclusion in AT's company as well as in the communities that have adopted AT's brands. For that reason, AT encourages continuous dialogue with the end users.



## Financials, $million

| Year | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Revenue | 16.1 | 16.4 | 28.9 | 35.7 | 46.7 |
| *Growth* | | *2.4%* | *75.9%* | *23.6%* | *30.7%* |
| Adj. EBITDA | 5.2 | 5.3 | 8.0 | 10.6 | 14.3 |
| *Growth* | | *2.6%* | *51.3%* | *31.6%* | *34.9%* |

## Company Overview

| | |
|---|---|
| Year founded | **1999** |
| Total Staff | **+70 FTEs** |
| Headquartered | **Denmark** |
| Countries Operated | **EU, US, Mexico, Japan, China** |
| Countries of availability | **30+** |

## Management



**Kevin Isaacson, CEO, Beckett Group**
CEO and Executive Officer of Beckett Group, Southern Hobby, Eye Care Leaders, and Entrust Global Group. Publisher and columnist. BA from University of Wisconsin Oshkosh.



**Michael Andersen, CEO at Arcane Tinmen**
8 years of experience with Arcane Tinmen. Graduate of Militæret Skive kaserne and Silkeborg handelsskole (HHX).

## Key Products

- Dragon Shield is the most trusted card protection brand in trading and gaming card sleeves, boxes, and other protective accessories, with unique customization capability. The brand is available in 30+ countries. Over 300 million sleeves are sold annually. Over 10-15% price premium to the nearest competitor
- Beckett Shield is a brand in protection and storage line for sports cards collections
- Board Game Sleeves is protection and preservation sleeves for all genres of board games

## Industry Overview

- Board Games Market size was valued at USD 13.33 Billion in 2021 and is projected to reach USD 37.82 Billion by 2030, growing at a CAGR of 12.29% from 2021 to 2030.
- The growing customer base and interest for board games around the world is led by e-commerce expansion and is one of the major driving factors for the board games industry.
- The growing emphasis on fostering unity through traditional tabletop games is a significant growth driver for the industry, as these games play a vital role in bringing people together.

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 249 of 508

# Southern Hobby Distribution – Part of Beckett Group

https://www.southernhobby.com



**Background.** One-stop shopping experience for all customers' needs in Sports Cards, Gaming Products, Supplies, and Pop Culture and Entertainment Merchandise. Teamed with industry leading manufacturers to bring in-store programs and organized play to consumers. Nearly 70% of hobby shops in the US listed Southern Hobby as their #1 preferred distributor. Southern Hobby is #1 distributor in the US by share of market.

## Financials, $million

| Year | 2019 | 2020 | 2021* | 2022 | 2023 |
|------|------|------|-------|------|------|
| Revenue | | | 206.1 | 514.9 | 535.1 |
| *Growth* | | | | | *63.9%* |
| Adj. EBITDA | | | 20.3 | 49.1 | 54.0 |
| *Growth* | | | | | *10.0%* |

## Company Overview

| | |
|---|---|
| Year founded | **1991** |
| Warehouses | **5** |
| Total Staff | **+60** |
| Headquartered | **Tennessee, US** |
| Countries operated | **US** |

## Management



**Kevin Isaacson, CEO, Beckett Group**
CEO and Executive Officer of Beckett Group, Southern Hobby, Eye Care Leaders, and Entrust Global Group. Publisher and columnist. BA from University of Wisconsin Oshkosh.



**Erik Bordwell, CFO of Beckett Collectibles**
13 years of experience in collectibles industry. Sr. Director, Richmond American Homes. CPA. University of Denver.

- Acquired in July'21

## Key Products

- Sport cards, collectible card games, supplies, toys, board games
- Customers are mainly regional/local independent retailers that operate hobby shop storefronts and robust ecommerce channels
- Key suppliers in Collectible Card Games are Magic the Gathering, Pokémon, Yu-Gi-Oh!, and Flesh Blood, in Sports Cards are Panini, Tops, Upper Deck, Leaf and Tristar, and in Supplies are Arcane Tinmen, Ultra Pro and Ultimate Guard. Only hobby distributor that has mass retail capabilities

## Industry Overview

- US Collectible distribution market was around $1.7 Billion in 2021. Southern Hobby captures around $410 Million market which is approximately 24% of total market.
- There are total 8500 hobby stores in the US and Southern Hobby has presence in around 2900 stores.
- European Collectible distribution market was estimated around $350 Million in 2022. Southern Hobby is expecting $75 Million potential opportunity in this European market in coming years.

# Exhibit M



## MONTSHIRE ADVISORS

Montshire Advisors
19 Essex Road
Bedford, NH 03110

October 19, 2023

Mike Dinius
Special Deputy Rehabilitator
Colorado Bankers Life Insurance Company

Re: UKAT

Mr. Dinius;

Montshire Advisors was engaged by UKAT Investments to arrange a loan to refinance UKAT Group's senior debt.

Montshire Advisors brought BC Partners forward as a lender to refinance UKAT Group. Working together along with UKAT Investments, their counsel Avonhurst, and BC Partners, and their counsel Hogan Lovells, while coordinating with the administrator, over several months, we negotiated the terms of a refinancing that will repay the senior loan at UKAT Group and bring the company out of administration. The administrators provided a comfort letter indicating their support for the refinancing transaction. The sources and uses for the refinancing are summarized below.

10/31/23 Refi Estimated Sources and Uses £GBP

| Sources | | Uses | |
|---|---|---|---|
| BCP Loan | 32,000 | Cap 10 Loan | 20,294 |
| Cash on BS | 3,895 | Cap 10 Deal Fee + Indemnity | 998 |
| | | Cap 10 Acrued to date | 1,080 |
| | | Cap 10 Acrued to close | 1,258 |
| | | Teneo Fees | 3,000 |
| | | Mischcon Fees | 500 |
| | | Inv. Limited Legal | 500 |
| | | s249 Tax Obligation | 3,900 |
| | | Tax Penalty | 670 |
| | | Brad Fee | 450 |
| | | Montshire Fee | 450 |
| | | Trust Fees Accrued | 476 |
| | | Eytan Employment Settlement | 250 |
| | | Unpaid PAYE to HMRC | 109 |
| | | Cash to Balance Sheet | 1,961 |
| **Total Sources** | **35,895** | **Total Uses** | **35,895** |

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 252 of 508

**Montshire Advisors**                **www.montshireadvisors.com**                **617-500-0008**


MONTSHIRE
ADVISORS

Colorado Bankers Life is the agent for an approximately $25 million USD loan to UKAT Investments from PBLA ULICO and several FINCOs.

Avonhurst, counsel for UKAT Investments has repeatedly reached out to CBL via its UK Counsel, Norton Rose, to facilitate the reaffirmation of subordination of indebtedness, a requirement to close the refinancing.

Subsequent to this outreach, on September 28, 2023, Colorado Bankers Life as agent for the UKAT Investment loans sent UKAT Investments a notice of default.

UKAT Investments, and their counsel Avonhurst, and BC Partners, and their counsel Hogan Lovells sought to engage Norton Rose, Colorado Bankers Life and their US counsel Williams Mullen in a discussion of the subordination agreement, and to clarify the default notice and obtain relief, and other matters related to the refinancing. Only Norton Rose would attend the call which was finally scheduled on October 13th.

The message delivered by Norton Rose was Colorado Bankers Life wouldn't engage in any substantive discussion of these matters until they could analyze the bids to sell the company.

Subsequently, we were informed by BC Partners that they instructed their legal counsel to pause all further work on the refinancing effort thus putting the refinancing effort in jeopardy.

In parallel to the refinancing initiative led by UKAT Investments, the administrator has been pursuing bids to sell the company. We understand that the administrator received 14 first round offers and invited 6 of the parties to participate in a second-round bid. We understand that only two of the six bidders submitted second round bids on or around October 13th. The administrators have not been willing to disclose the names of these bidders, but presumably one of the bidders is CAP 10. We are told the bids are between GBP £60-64 million. It is unclear if there is any holdback amount for indemnifications of reps and warranties. It is unclear what the working capital or minimum cash requirement would be for the sale. One of the bids has a financing contingency and the other is contingent on investment committee approval. The bidders say they can close in four weeks after completing remaining diligence and negotiating agreements. Given the associated legal complexities, it is likely to take a lot longer, if it ever closes. Meanwhile, every month UKAT Group remains in administration, it accrues approximately GBP £1 million of additional administration expenses and default interest.

As I summarized below, if the sale transaction were to close at 12/31/23, I estimate approximately GBP £29 million would be available to distribute to UKAT Investments. While the proceeds may be sufficient to repay the UKAT Investments, Northstar who owns approximately USD $19 million of preferred at a UKAT holding company would be wiped out. In addition, the equity would be wiped out. As a non-SAC asset, the UKAT equity supports the repayment of obligations to PBLA ULICO.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 253 of 508


MONTSHIRE
ADVISORS

12/31/23 Sale Estimated Sources and Uses £GBP

| Sources | | Uses | |
|---|---|---|---|
| Sale Proceeds | 62,000 | Cap 10 Loan | 20,294 |
| Cash on BS | 3,895 | Cap 10 Deal Fee + Indemnity | 998 |
| | | Cap 10 Acrued to date | 1,080 |
| | | Cap 10 Acrued to close | 1,987 |
| | | Teneo Fees | 4,000 |
| | | Mischcon Fees | 500 |
| | | Inv. Limited Legal | 500 |
| | | s249 Tax Obligation | 3,900 |
| | | Tax Penalty | 670 |
| | | Trust Fees Accrued | 476 |
| | | Eytan Employment Settlement | 250 |
| | | Unpaid PAYE to HMRC | 109 |
| | | Cash to Balance Sheet | 1,961 |
| | | Cash to UKAT Investments | 29,171 |
| Total Sources | 65,895 | Total Uses | 65,895 |

Thus Northstar, ULICO, and Global Growth would be damaged by the distressed sale transaction. These parties could potentially bring litigation to protect their interests. Such litigation could foreseeable make it more challenging or impossible for the sale transaction to be completed. In the meantime, every month UKAT Group remains in administration, it accrues approximately GBP £1 million of additional administration expenses and default interest.

The UKAT Investments loan was not contemplated to be repaid until 2029. Under the refinancing scenario, the UKAT Group loan would be repaid by December 31, 2025. The UKAT Investments loan could be amended to have a concurrent maturity date, thus being repaid four years earlier than contemplated.

Even in the distressed sale scenario, the bids have come in at a value that can cover the UKAT Investments loan. The performance of the company has been stable as summarized below.

UKAT EBITDA:
2020: £5.7m
2021: £7.4m
2022: £7.4m
2023 Estimate: £6.4m

After emerging from administration, the company would be expected to have a rebound in earnings from alleviating this distraction to operations.

Thus, after a short period to stabilize the business, UKAT can be sold at a price similar to the previously negotiated price with CAP 10, making all stakeholders whole (including the UKAT Investments lenders), or the company could be refinanced with a larger loan to take out the UKAT Investments indebtedness.

{ 3 }



MONTSHIRE
ADVISORS

Lastly, in the event CAP 10 is successful in acquiring UKAT, it establishes a playbook for other investment firms to identify assets in the Lindbergh estate, buy the loans, seek an opportunity to declare a default and then subsequently buying the company at a significant discount to its market value. This would hurt all stakeholders.

Can you please let me know if you would enter into a forbearance agreement for the UKAT Investments loan with an amended maturity date of December 31, 2025 and reaffirm the subordination of the UKAT Investments debt to the UKAG Group debt? Provided a forbearance and subordination agreement acceptable to BC Partners is provided within the next seven days, UKAT Investments is willing to agree to stipulate that the current balance on the UKAT Investments loan is $29 million as you have claimed as well as agree to a $35 million payoff at the new maturity date of December 31, 2025 which represents a 10% paid-in-kind return on the $29 million over 24 months.

Time is of the essence here to preserve the value of UKAT for Northstar, PBLA ULICO, and all other stakeholders.

Sincerely,

MONTSHIRE ADVISORS, a New Hampshire limited liability company

By:

Name: Bob Alban
Title: Principal

CC:
Wes Camden, Williams Mullen
Emmanuel Amos, Avonhurst

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 255 of 508

# Exhibit M2

**Total Fees & Expenses Paid Out By Rehabilitator**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 Est. | Estimated Total |
|---|---|---|---|---|---|---|---|---|
| CBL | $ 18,806,452 | $ 19,420,163 | $ 29,450,443 | $ 14,675,507 | $ 17,541,389 | $ 16,228,383 | $ 16,228,383 | $ 132,350,720 |
| BLIC | $ 3,780,277 | $ 2,753,501 | $ 1,870,006 | $ 722,666 | $ 988,761 | $ 903,493 | $ 903,493 | $ 11,922,197 |
| SNIC | $ 6,932,430 | $ 5,004,830 | $ 3,347,689 | $ 2,447,889 | $ 1,562,232 | $ 1,090,703 | $ 1,090,703 | $ 21,476,476 |
| Combined | $ 29,519,158 | $ 27,178,494 | $ 34,668,138 | $ 17,846,062 | $ 20,092,382 | $ 18,222,579 | $ 18,222,579 | $ 165,749,392 |

**Total Estimated Fees to Largest Vendors:**

| | | |
|---|---|---|
| $ | 25,000,000 | Noble Consulting/Mike Dinius (Appointed by Mike Causey) |
| $ | 30,000,000 | Williams Mullen (Appointed by Mike Causey) |

Source Data:

https://cblife.com/quarterly-rehabilitation-reports/

**Fees, Expenses, and Losses Incurred by Receiver of NC Ins Cos**

| | | | |
|---|---|---|---|
| Total est. fees through Q4 2025 | $ | 165,749,392 | *see "fees and expenses" tab* |
| Total losses on unaffiliated bonds | $ | 137,759,892 | *see "losses on bonds" tab* |
| **Total fees & losses** | **$** | **303,509,284** | |

**Current Est. Monthly Fees of Receiver and Advisors:**     **$**     **2,744,743**   *per month -- see "monthly receiver fees" tab*

*Source data:*
https://cblife.com/quarterly-rehabilitation-reports/

**Total losses on third party bonds incurred by the NC insurance companies**     $    137,759,892

**From CBL Q2 2022 Report**

CAPITAL AND SURPLUS ACCOUNT

| | | | | |
|---|---|---|---|---|
| 36 | Capital and surplus, December 31, prior year (Page 3, Line 38, Col. 2) | (75,632,662) | 15,185,568 | 15,185,568 |
| 37 | Net income (Line 35) | 41,850,674 | 3,506,418 | 7,543,422 |
| 38 | Change in net unrealized capital gains or (losses) less capital gains tax | (115,426,823) | (742,399) | (1,355,417) |

**From BLIC Q2 2022 Report:**

CAPITAL AND SURPLUS ACCOUNT

| | | | | |
|---|---|---|---|---|
| 36 | Capital and surplus, December 31, prior year (Page 3, Line 38, Col. 2) | (18,330,859) | (7,351,847) | (7,351,847) |
| 37 | Net income (Line 35) | 4,747,256 | (2,395,805) | (7,027,207) |
| 38 | Change in net unrealized capital gains or (losses) less capital gains tax | (20,847,069) | (36,000) | (129,000) |

See:

https://cblife.com/quarterly-rehabilitation-reports/

**Current Est. Monthly Fees of Receiver and Advisors:**

|  | | *Per Month:* | |
|---|---|---|---|
| Noble Consulting | $ | 368,372 | *see Q2 2024 tab here* |
| Williams Mullen | $ | 472,287 | *see Q2 2024 tab here* |
| Squire Patton Boggs | $ | 257,675 | *see Q2 2024 tab here* |
| M3 Partners | $ | 600,000 | *see NHC fees tab* |
| Waldrep Wall | $ | 200,000 | *see NHC fees tab* |
| Janvier & advisors | $ | 358,151 | *see "Janvier fees" tab* |
| Other vendors | $ | 488,259 | *see Q2 2024 tab here* |
| **Total monthly fees:** | $ | 2,744,743 | |

# NHC Cash Forecast ($ in '000s)

**The cashflow forecast at NHC shown below reflects a cash deficit of ~$0.8MM by early February 2025, excluding any repayment of the outstanding CBL loan or payment of interest**

- Pursuant to the loan agreement 50% of the amount advanced ($2.5MM) was due to be repaid on November 12, 2024; NHC and CBL are working proactively on a deferral of this repayment requirement as the NHC CEO and advisors work with the operating entities to gain access to cash not needed by the businesses

- While access to this cash may provide operating cushion for NHC over the next several months, asset monetization will be required to fund operating needs and a repayment of the CBL loan

| Period Beginning | 11/11 | 11/18 | 11/25 | 12/2 | 12/9 | 12/16 | 12/23 | 12/30 | 1/6 | 1/13 | 1/20 | 1/27 | 2/3 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Period Ending | 11/17 | 11/24 | 12/1 | 12/8 | 12/15 | 12/22 | 12/29 | 1/5 | 1/12 | 1/19 | 1/26 | 2/2 | 2/9 |
| **Receipts:** | | | | | | | | | | | | | |
| SAC Funding | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Asset Sales | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Other Receipts | – | – | – | – | – | – | – | – | – | – | – | – | – |
| **Total Receipts** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** | **–** |
| **Operating Disbursements:** | | | | | | | | | | | | | |
| M3 Partners | – | (385) | – | – | (450) | – | – | (600) | – | – | – | (600) | – |
| Waldrep | – | (200) | – | – | (200) | – | – | (200) | – | – | – | (200) | – |
| Quarterly Board Compensation | – | – | – | – | – | – | – | (188) | – | – | – | – | – |
| Tharrington Smith | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Contingency | – | (50) | – | – | (50) | – | – | (50) | – | – | – | (50) | – |
| **Total Operating Disbursements** | **–** | **($635)** | **–** | **–** | **($700)** | **–** | **–** | **($1,038)** | **–** | **–** | **–** | **($850)** | **–** |
| **Net Cash Flow** | **–** | **($635)** | **–** | **–** | **($700)** | **–** | **–** | **($1,038)** | **–** | **–** | **–** | **($850)** | **–** |
| Beginning Cash | $2,398 | $2,398 | $1,764 | $1,764 | $1,764 | $1,064 | $1,064 | $1,064 | $26 | $26 | $26 | $26 | ($824) |
| (+/-) Net Cash Flow | – | (635) | – | – | (700) | – | – | (1,038) | – | – | – | (850) | – |
| (+/-) Debt Proceeds / (Repayment) | – | – | – | – | – | – | – | – | – | – | – | – | – |
| **Ending Cash** | **$2,398** | **$1,764** | **$1,764** | **$1,764** | **$1,064** | **$1,064** | **$1,064** | **$26** | **$26** | **$26** | **$26** | **($824)** | **($824)** |
| *Memo: Secured Promissory Note Balance* | $5,191 | $5,206 | $5,221 | $5,236 | $5,251 | $5,266 | $5,281 | $5,295 | $5,310 | $5,325 | $5,340 | $5,355 | $5,370 |

**Assumptions:**

- SAC Funding: Funding from non-Trust SACs as well as entities in-Trust to the extent there is sufficient cash and the Trust agreements / credit agreements permit the distribution of cash to the settlor
- Asset Sales: M3 continues to evaluate ongoing sale processes for CWG and Damovo; any proceeds available to NHC depends on final bids from buyers as well as negotiations with Bermuda and ULICO
- Quarterly Board Compensation: $62.5K of quarterly fees for 3 board members
- Contingency: Cushion for miscellaneous expenses and reimbursements (such as legal bills, bonds, D&O insurance, audits, etc.)
- Debt proceeds / repayment: $5.0MM Secured Promissory Note proceeds received 9/5; Prime + 8.00% (15.00% floor); 2.00% default interest; 1.00% origination fee; 1.00 exit fee; 50% / 100% due 90 days / 180 days after Closing

| DATE | REPORT | JANIVER - SPECIAL MASTER | JANVIER - RECEIVER | K&L GATES | M3 PARTNERS |
|---|---|---|---|---|---|
| 1/16/25 | Receiver's 9th Monthly Report and Request for Approval of Expenses | | $3,062.00 | $57,762.29 | $12,247.00 |
| 1/15/25 | Fifth Monthly Notice of Special Master Fees for December | $1,890.00 | | $15,186.00 | |
| 12/20/24 | Fourth Monthly Notice of Special Master Fees for November | $3,132.00 | | $9,901.00 | |
| 12/16/24 | Receiver's 8th Monthly Report and Request for Approval of Expenses | | $24,433.00 | $62,539.50 | |
| 12/6/24 | Supplement to Receiver's Fifth Monthly Report and Request for Approval of Expenses | | | $400,469.75 | |
| 12/6/24 | Third Monthly Notice of Special Master Fees for October | $9,558.00 | | $116,121.19 | |
| 11/15/24 | Receiver's Seventh Monthly Report and Request for Approval of Expenses | | $40,361.89 | $101,586.00 | $1,701.50 |
| 10/15/24 | Receiver's Sixth Monthly Report and Request for Approval of Expenses | | $15,552.00 | $84,949.88 | $12,173.00 |
| 10/10/24 | Second Monthly Notice of Speical Master Fees for September | $10,854.00 | | $34,921.00 | |
| 9/17/24 | Receiver's Fifth Monthly Report and Request for Approval of Expenses | | $8,763.00 | | $952.00 |
| 9/12/24 | First Monthly Notice of Special Master Fees for July and August | $25,516.00 | | $71,214.00 | |
| 8/15/24 | Receiver's Fourth Monthly Report and Request for Approval of Expenses | | $40,150.00 | $365,067.21 | $245,226.75 |
| 7/15/24 | Receiver's Third Monthly Report and Request for Approval of Expenses | | $59,562.00 | $111,347.26 | $146,277.30 |
| 7/13/24 | Supplement to Receiver's Third Monthly Report | | | | |
| 6/24/24 | Supplement to Receiver's Second Monthly Report | | | | |
| 6/18/24 | Receiver's Second Monthly Report and Request for Approval of Expenses | | $45,150.69 | $78,963.66 | $93,403.90 |
| 5/16/24 | Receiver's First Monthly Report and Request for Approval of Expenses | | $50,394.65 | $95,284.50 | $140,798.00 |
| **TOTAL** | | **$50,950.00** | **$287,429.23** | **$1,605,313.24** | **$652,779.45** |

**GRAND TOTAL** $2,596,471.92

2020

| ::CBL:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AAM | 165,280 | 217,376 | 0 | 0 | 382,656 | investment advisory |
| AMR | 0 | 0 | 0 | 0 | 0 | investment advisory |
| Bryan Cave | 17,662 | 56,646 | 62,145 | 76,917 | 213,370 | legal services |
| Consilio | 0 | 0 | 15,701 | 174,533 | 190,234 | legal services |
| Federal Arbitration Inc | 0 | 77,520 | 116,280 | 110,880 | 304,680 | services |
| Gordian | 251,041 | 370,420 | 210,234 | 186,228 | 1,017,923 | investment advisory |
| Noble Consulting | 344,659 | 782,745 | 740,141 | 913,974 | 2,781,519 | rehabilitation services |
| Tharington | 0 | 0 | 0 | 14,848 | 14,848 | legal services |
| Veris Consulting | 0 | 72,838 | 505,848 | 772,860 | 1,351,546 | Forensic accounting |
| Aspida/GBIG LLC | 0 | 0 | 3,884,051 | 3,997,671 | 7,881,722 | transition services |
| Williams Mullen | 524,622 | 909,080 | 949,140 | 1,061,847 | 3,444,689 | legal services |
| UFLIC | 0 | 0 | 0 | 0 | 0 | TPA |
| Dentons | 17,528 | 3,546 | 0 | 0 | 21,074 | legal services |
| KCC | 0 | 0 | 0 | 225,368 | 225,368 | services |
| Epiq | 0 | 0 | 0 | 36,680 | 36,680 | legal services |
| Kirsch | 26,886 | 18,042 | 554 | 2,890 | 48,372 | legal services |
| Davis Polk | 285,200 | 783,584 | 0 | 0 | 1,068,784 | legal services |
| Delloitte | 38,409 | 0 | 0 | 0 | 38,409 | tax services |
| Ellis | 123,311 | 2,288 | 0 | 0 | 125,599 | legal services |
| FTI Consulting | 74,400 | 187,981 | 0 | 0 | 262,381 | Forensic accounting |
| Arkin | 0 | 10,309 | 0 | 0 | 10,309 | legal services |
| | | | | | 19,420,163 | |

2020

| ::SNIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AAM | 69,311 | 2,995 | 0 | 0 | 72,306 | investment advisory |
| AMR | 0 | 0 | 0 | 0 | 0 | TPA |
| Bryan Cave | 7,407 | 94,163 | 17,448 | 7,817 | 126,835 | legal services |
| Consilio | 0 | 0 | 4,849 | 1,522 | 6,371 | legal services |
| Federal Arbitration Inc | 0 | 23,940 | 35,910 | 11,340 | 71,190 | services |
| Gordian | 105,275 | 114,394 | 64,925 | 19,046 | 303,640 | investment advisory |
| Noble Consulting | 144,535 | 241,730 | 228,573 | 93,475 | 708,313 | rehabilitation services |
| Tharington | 0 | 0 | 0 | 0 | 0 | legal services |
| Veris Consulting | 0 | 22,494 | 156,218 | 79,043 | 257,755 | Forensic accounting |
| Aspida / GBIG LLC | 0 | 0 | 1,426,624 | 703,818 | 2,130,442 | transition services |
| Williams Mullen | 220,003 | 265,645 | 236,845 | 101,766 | 824,259 | legal services |
| UFLIC | 0 | 0 | 0 | 0 | 0 | TPA |
| Dentons | 7,350 | 0 | 0 | 0 | 7,350 | legal services |
| KCC | 0 | 0 | 0 | 0 | 0 | services |
| Epiq | 0 | 0 | 0 | 3,751 | 3,751 | legal services |
| Kirsch | 11,275 | 5,572 | 171 | 296 | 17,314 | legal services |
| Davis Polk | 119,600 | 241,989 | 0 | 0 | 361,589 | legal services |
| Delloitte | 16,107 | 0 | 0 | 0 | 16,107 | tax services |
| Ellis | 5,171 | 0 | 0 | 0 | 5,171 | legal services |
| FTI Consulting | 31,200 | 58,053 | 0 | 0 | 89,253 | Forensic accounting |
| Arkin | 0 | 3,184 | 0 | 0 | 3,184 | legal services |
| | | | | | 5,004,830 | |

| ::BLIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AAM | 31,990 | 34,478 | | 0 | 66,468 | investment advisory |
| AMR | 0 | 0 | 0 | 0 | 0 | TPA |
| Bryan Cave | 3,418 | 268,909 | 9,140 | 2,606 | 284,073 | legal services |
| Consilio | 0 | 0 | 2,540 | 507 | 3,047 | legal services |
| Federal Arbitration Inc | 0 | 12,540 | 18,810 | 3,780 | 35,130 | services |
| Gordian | 48,589 | 59,921 | 34,008 | 6,349 | 148,867 | investment advisory |
| Noble Consulting | 66,708 | 126,620 | 119,729 | 31,158 | 344,215 | rehabilitation services |
| Tharington | 0 | 0 | 0 | 0 | 0 | legal services |
| Veris Consulting | 0 | 11,783 | 81,828 | 26,348 | 119,959 | Forensic accounting |
| Aspida / GBIG LLC | 0 | 0 | 681,435 | 459,002 | 1,140,437 | transition services |
| Williams Mullen | 101,540 | 99,434 | 113,165 | 32,580 | 346,719 | legal services |
| UFLIC | 0 | 0 | 0 | 0 | 0 | TPA |
| Dentons | 3,393 | 0 | 0 | 0 | 3,393 | legal services |
| KCC | 0 | 0 | 0 | 11,861 | 11,861 | services |
| Epiq | 0 | 0 | 0 | 1,250 | 1,250 | legal services |
| Kirsch | 5,204 | 2,919 | 90 | 99 | 8,312 | legal services |
| Davis Polk | 55,200 | 126,756 | 0 | 0 | 181,956 | legal services |
| Delloitte | 7,434 | 0 | 0 | 0 | 7,434 | tax services |
| Ellis | 2,387 | 0 | 0 | 0 | 2,387 | legal services |
| FTI Consulting | 14,400 | 30,409 | 0 | 0 | 44,809 | Forensic accounting |
| Arkin | 0 | 3,184 | 0 | 0 | 3,184 | legal services |
| | | | | | 2,753,501 | |

| ::Combined:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AAM | 266,581 | 254,849 | 0 | 0 | 521,430 | investment advisory |
| AMR | 0 | 0 | 0 | 0 | 0 | TPA |
| Bryan Cave | 28,487 | 419,718 | 88,733 | 87,340 | 624,278 | legal services |
| Consilio | 0 | 0 | 23,090 | 176,562 | 199,652 | legal services |
| Federal Arbitration Inc | 0 | 114,000 | 171,000 | 126,000 | 411,000 | services |
| Gordian | 404,905 | 544,735 | 309,167 | 211,623 | 1,470,430 | investment advisory |
| Noble Consulting | 555,902 | 1,151,095 | 1,088,443 | 1,038,607 | 3,834,047 | rehabilitation services |
| Tharington | 0 | 0 | 0 | 14,848 | 14,848 | legal services |
| Veris Consulting | 0 | 107,115 | 743,894 | 878,251 | 1,729,260 | Forensic accounting |
| Aspida / GBIG LLC | 0 | 0 | 5,992,110 | 5,160,491 | 11,152,601 | transition services |
| Williams Mullen | 846,165 | 1,274,159 | 1,299,150 | 1,196,193 | 4,615,667 | legal services |
| UFLIC | 0 | 0 | 0 | 0 | 0 | TPA |
| Dentons | 28,271 | 3,546 | 0 | 0 | 31,817 | legal services |
| KCC | 0 | 0 | 0 | 237,229 | 237,229 | services |
| Epiq | 0 | 0 | 0 | 41,681 | 41,681 | legal services |
| Kirsch | 43,365 | 26,533 | 815 | 3,285 | 73,998 | legal services |
| Davis Polk | 460,000 | 1,152,329 | 0 | 0 | 1,612,329 | legal services |
| Delloitte | 61,950 | 0 | 0 | 0 | 61,950 | tax services |
| Ellis | 130,869 | 2,288 | 0 | 0 | 133,157 | legal services |
| FTI Consulting | 120,000 | 276,443 | 0 | 0 | 396,443 | Forensic accounting |
| Arkin | 0 | 16,677 | 0 | 0 | 16,677 | legal services |

2021

| ::CBL:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 0 | 33,250 | 451,172 | 931,114 | 1,415,536 | TPA |
| Bryan Cave | 33,751 | 20,960 | 11,791 | 17,810 | 84,312 | legal services |
| Consilio | 40,204 | 21,663 | 16,637 | 24,349 | 102,853 | legal services |
| Federal Arbitration Inc | 110,880 | 113,080 | 110,080 | 110,080 | 444,120 | services |
| Gordian | 293,294 | 133,971 | 38,274 | 55,209 | 520,748 | investment advisory |
| Noble Consulting | 804,368 | 839,443 | 788,984 | 795,007 | 3,227,802 | rehabilitation services |
| Tharington | 3,230 | 6,698 | 31,174 | 52,232 | 93,334 | legal services |
| Veris Consulting | 837,738 | 625,277 | 470,374 | 360,112 | 2,293,501 | Forensic accounting |
| Aspida / GBIG LLC | 4,952,439 | 4,952,439 | 5,095,200 | 2,730,000 | 17,730,078 | transition services |
| Williams Mullen | 1,261,794 | 1,134,874 | 526,396 | 546,542 | 3,469,606 | legal services |
| UFLIC | 0 | 0 | 0 | 0 | 0 | TPA |
| Dentons | 0 | 3,694 | 0 | 0 | 3,694 | legal services |
| KCC | 62,092 | 2,767 | 0 | 0 | 64,859 | services |
| | | | | | 29,450,443 | |

| ::SNIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 0 | 0 | 0 | 0 | 0 | TPA |
| Bryan Cave | 3,452 | 2,065 | 1,105 | 1,821 | 8,443 | legal services |
| Consilio | 1,401 | 7,196 | 1,073 | 1,947 | 11,617 | legal services |
| Federal Arbitration Inc | 11,340 | 11,565 | 11,340 | 11,340 | 45,585 | services |
| Gordian | 29,996 | 13,702 | 3,912 | 5,647 | 53,257 | investment advisory |
| Noble Consulting | 82,265 | 85,852 | 80,692 | 81,308 | 330,117 | rehabilitation services |
| Tharington | | | | | 0 | legal services |
| Veris Consulting | 85,678 | 63,949 | 48,106 | 36,830 | 234,563 | Forensic accounting |
| Aspida / GBIG LLC | 637,268 | 637,268 | 521,100 | 209,700 | 2,005,336 | transition services |
| Williams Mullen | 172,465 | 194,424 | 55,626 | 59,287 | 481,802 | legal services |
| UFLIC | 0 | 0 | 0 | 176,969 | 176,969 | TPA |
| Dentons | 0 | 0 | 0 | 0 | 0 | legal services |
| KCC | 0 | 0 | 0 | 0 | 0 | services |
| | | | | | 3,347,689 | |

| ::BLIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 0 | 1,750 | 41,740 | 88,671 | 132,161 | TPA |
| Bryan Cave | 1,151 | 688 | 368 | 607 | 2,814 | legal services |
| Consilio | 467 | 330 | 291 | 451 | 1,539 | legal services |
| Federal Arbitration Inc | 3,780 | 3,855 | 3,780 | 3,780 | 15,195 | services |
| Gordian | 9,999 | 4,567 | 1,304 | 1,882 | 17,752 | investment advisory |
| Noble Consulting | 27,422 | 28,618 | 26,897 | 27,103 | 110,040 | rehabilitation services |
| Tharington | | | | | 0 | legal services |
| Veris Consulting | 28,559 | 21,316 | 16,035 | 12,277 | 78,187 | Forensic accounting |
| Aspida / GBIG LLC | 579,310 | 579,310 | 173,700 | 69,900 | 1,402,220 | transition services |
| Williams Mullen | 35,927 | 34,726 | 17,812 | 18,219 | 106,684 | legal services |
| UFLIC | | | | | 0 | TPA |
| Dentons | 0 | 0 | 0 | 0 | 0 | legal services |
| KCC | 3,268 | 146 | 0 | 0 | 3,414 | services |
| | | | | | 1,870,006 | |

| ::Combined:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 0 | 35,000 | 492,912 | 1,019,785 | 1,547,697 | TPA |
| Bryan Cave | 38,354 | 23,713 | 13,264 | 20,238 | 95,569 | legal services |
| Consilio | 42,072 | 29,189 | 18,001 | 26,747 | 116,009 | legal services |
| Federal Arbitration Inc | 126,000 | 128,500 | 125,200 | 125,200 | 504,900 | services |
| Gordian | 333,289 | 152,240 | 43,490 | 62,738 | 591,757 | investment advisory |
| Noble Consulting | 914,055 | 953,913 | 896,573 | 903,418 | 3,667,959 | rehabilitation services |
| Tharington | 3,230 | 6,698 | 31,174 | 52,232 | 93,334 | legal services |
| Veris Consulting | 951,975 | 710,542 | 534,515 | 409,219 | 2,606,251 | Forensic accounting |
| Aspida / GBIG LLC | 6,169,017 | 6,169,017 | 5,790,000 | 3,009,600 | 21,137,634 | transition services |
| Williams Mullen | 1,470,186 | 1,364,024 | 599,834 | 624,048 | 4,058,092 | legal services |
| UFLIC | 0 | 0 | 0 | 176,969 | 176,969 | TPA |
| Dentons | 0 | 3,694 | 0 | 0 | 3,694 | legal services |
| KCC | 65,360 | 2,913 | 0 | 0 | 68,273 | services |

2022

| ::CBL:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 730,214 | 944,447 | 606,474 | 620,287 | 2,901,422 | TPA |
| Bryan Cave | 26,769 | 14,978 | 15,623 | 19,195 | 76,565 | legal services |
| Consilio | 43,142 | 44,742 | 50,742 | 33,716 | 172,342 | legal services |
| Federal Arbitration Inc | 110,080 | 88,880 | 111,654 | 119,541 | 430,155 | services |
| Gordian | 25,648 | 128,260 | 219,080 | 224,239 | 597,227 | investment advisory |
| Noble Consulting | 968,817 | 934,296 | 967,184 | 791,770 | 3,662,067 | rehabilitation services |
| Johnson & Lambert | | | 32,023 | 174,768 | 206,791 | Auditing Services |
| Tharington | 4,035 | 16,575 | | 8,525 | 29,135 | legal services |
| Veris Consulting | 393,338 | 401,203 | 332,834 | 594,865 | 1,722,240 | Forensic accounting |
| Aspida / GBIG LLC | | | | 3,240 | 3,240 | transition services |
| Williams Mullen | 842,508 | 1,407,442 | 1,251,373 | 1,141,232 | 4,642,555 | legal services |
| UFLIC | | | | | - | TPA |
| Milliman | | | 26,571 | 154,374 | 180,945 | Actuarial Services |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| Kroll Restructuring Admin | | | 23,750 | 27,073 | 50,823 | Policy Holder Services |
| | | | | | 14,675,507 | |

| ::SNIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 183,250 | 183,250 | 183,250 | 183,250 | 733,000 | TPA |
| Bryan Cave | 2,586 | 896 | 1,598 | 1,963 | 7,043 | legal services |
| Consilio | 5,284 | 4,561 | 4,620 | 3,081 | 17,546 | legal services |
| Federal Arbitration Inc | 11,340 | 9,090 | 11,419 | 12,226 | 44,075 | services |
| Gordian | 2,623 | 13,118 | 22,406 | 22,934 | 61,081 | investment advisory |
| Noble Consulting | 99,084 | 95,553 | 98,917 | 80,976 | 374,530 | rehabilitation services |
| Johnson & Lambert | | | 2,717 | 17,874 | 20,591 | Auditing Services |
| Tharington | | | | | - | legal services |
| Milliman | | | 3,275 | 15,788 | 19,063 | Actuaries Services |
| Veris Consulting | 40,228 | 41,032 | 34,040 | 60,849 | 176,149 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 143,986 | 127,675 | 118,833 | 104,217 | 494,711 | legal services |
| UFLIC | 126,000 | 126,000 | 123,900 | 124,200 | 500,100 | TPA |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| | | | | | 2,447,889 | |

| ::BLIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 85,415 | 95,405 | 82,110 | 80,538 | 343,468 | TPA |
| Bryan Cave | 862 | 299 | 533 | 654 | 2,348 | legal services |
| Consilio | 1,078 | 1,237 | 1,290 | 743 | 4,348 | legal services |
| Federal Arbitration Inc | 3,780 | 3,030 | 3,806 | 4,075 | 14,691 | services |
| Gordian | 874 | 4,373 | 7,469 | 7,645 | 20,361 | investment advisory |
| Noble Consulting | 33,028 | 31,851 | 32,972 | 26,992 | 124,843 | rehabilitation services |
| Johnson & Lambert | | | 1,092 | 5,958 | 7,050 | Auditing Services |
| Tharington | | | | | - | legal services |
| Veris Consulting | 13,409 | 13,677 | 11,347 | 20,283 | 58,716 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 25,006 | 42,588 | 39,502 | 34,739 | 141,835 | legal services |
| Kroll Restructuring Admin | | | 1,250 | 1,425 | 2,675 | Policy Holder Service |
| UFLIC | | | | | - | TPA |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| Milliman | | | 906 | 1,425 | 2,331 | Actuarial Services |
| | | | | | 722,666 | |

2022

| Combined | | | | | | |
|---|---|---|---|---|---|---|
| AMR | 998,879 | 1,223,102 | 871,834 | 884,075 | 3,977,890 | TPA |
| Bryan Cave | 30,217 | 16,173 | 17,754 | 21,812 | 85,956 | legal services |
| Consilio | 49,504 | 50,540 | 56,652 | 37,540 | 194,236 | legal services |
| Federal Arbitration Inc | 125,200 | 101,000 | 126,879 | 135,842 | 488,921 | services |
| Gordian | 29,145 | 145,751 | 248,955 | 254,818 | 678,669 | investment advisory |
| Noble Consulting | 1,100,929 | 1,061,700 | 1,099,073 | 899,738 | 4,161,440 | rehabilitation services |
| Johnson & Lambert | 0 | 0 | 35,832 | 198,600 | 234,432 | Auditing Services |
| Tharington | 4,035 | 16,575 | 0 | 8,525 | 29,135 | legal services |
| Veris Consulting | 446,975 | 455,912 | 378,221 | 675,997 | 1,957,105 | Forensic accounting |
| Aspida / GBIG LLC | 0 | 0 | 0 | 3,240 | 3,240 | transition services |
| Williams Mullen | 1,011,500 | 1,577,705 | 1,409,708 | 1,280,188 | 5,279,101 | legal services |
| UFLIC | 126,000 | 126,000 | 123,900 | 124,200 | 500,100 | TPA |
| Milliman | 0 | 0 | 30,752 | 171,587 | 202,339 | Actuarial Services |
| Dentons | 0 | 0 | 0 | 0 | 0 | legal services |
| KCC | 0 | 0 | 0 | 0 | 0 | services |
| Kroll Restructuring Admi | 0 | 0 | 25,000 | 28,498 | 53,498 | Policy Holder Services |

17,846,062
17,846,062

| ::CBL:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 596,294 | 995,873 | 628,484 | 683,886 | 2,904,537 | TPA |
| Bryan Cave | 36,924 | | | | 36,924 | legal services |
| Consilio | 206,895 | 23,865 | 26,864 | 27,006 | 284,630 | legal services |
| Federal Arbitration Inc | 108,638 | | | | 108,638 | services |
| Gordian | 233,275 | 171,114 | 353,494 | 281,870 | 1,039,753 | investment advisory |
| Noble Consulting | 1,031,944 | 986,755 | 895,339 | 757,801 | 3,671,839 | rehabilitation services |
| Johnson & Lambert | 16,950 | | 5,506 | 7,918 | 30,374 | Auditing Services |
| Resor | | 1,020 | | 1,406 | 2,426 | legal services |
| Tharington | | 1,000 | 3,628 | | 4,628 | legal services |
| Veris Consulting | 609,483 | 447,115 | 456,082 | 304,985 | 1,817,665 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 997,685 | 901,522 | 599,139 | 964,666 | 3,463,012 | legal services |
| Norton Rose Fullbright | | | 69,018 | 127,072 | 196,090 | |
| UFLIC | | | | | - | TPA |
| Milliman | | | | | - | Actuarial Services |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| Kroll Restructuring Adm | 465,436 | 917,955 | 1,488,600 | 1,108,882 | 3,980,873 | Policy Holder Services |
| | | | | | 17,541,389 | |

2023

| ::SNIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 183,250 | 121,729 | 183,250 | - | 488,229 | TPA |
| Bryan Cave | 3,504 | | | | 3,504 | legal services |
| Consilio | 20,780 | 1,985 | 3,321 | 3,169 | 29,255 | legal services |
| Federal Arbitration Inc | 11,111 | | | | 11,111 | services |
| Gordian | 23,858 | 17,500 | 36,153 | 28,828 | 106,339 | investment advisory |
| Noble Consulting | 105,540 | 100,918 | 91,569 | 77,502 | 375,529 | rehabilitation services |
| Johnson & Lambert | 1,734 | | 563 | 810 | 3,107 | Auditing Services |
| Tharington | | | | | - | legal services |
| Milliman | | | | | - | Actuaries Services |
| Veris Consulting | 62,333 | 45,728 | 46,645 | 31,139 | 185,845 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 96,896 | 97,637 | 58,788 | 85,937 | 339,258 | legal services |
| UFLIC | | | | | - | TPA |
| Norton Rose Fullbright | | | 7,059 | 12,996 | 20,055 | |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| | | | | | 1,562,232 | |

| ::BLIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 86,026 | 118,778 | 107,915 | 113,112 | 425,831 | TPA |
| Bryan Cave | 1,168 | | | | 1,168 | legal services |
| Consilio | 6,644 | 379 | 451 | 448 | 7,922 | legal services |
| Federal Arbitration Inc | 3,704 | | | | 3,704 | services |
| Gordian | 7,953 | 5,833 | 12,051 | 9,609 | 35,446 | investment advisory |
| Noble Consulting | 35,180 | 33,639 | 30,523 | 25,834 | 125,176 | rehabilitation services |
| Johnson & Lambert | 578 | | 188 | 270 | 1,036 | Auditing Services |
| Tharington | | | | | - | legal services |
| Veris Consulting | 20,778 | 15,243 | 15,548 | 10,380 | 61,949 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 31,842 | 30,531 | 19,378 | 28,574 | 110,325 | legal services |
| Kroll Restructuring Adm | 24,497 | 48,313 | 78,347 | 58,362 | 209,519 | Policy Holder Service |
| UFLIC | - | - | - | - | - | TPA |
| Dentons | - | - | - | - | - | legal services |
| KCC | - | - | - | - | - | services |
| Milliman | - | - | - | - | - | Actuarial Services |
| Norton Rose Fullbright | - | - | 2,353 | 4,332 | 6,685 | |
| | | | | | 988,761 | |

| Combined | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 865,570 | 1,236,380 | 919,649 | 796,998 | 3,818,597 | TPA |
| Bryan Cave | 41,596 | 0 | 0 | 0 | 41,596 | legal services |
| Consilio | 234,319 | 26,229 | 30,636 | 30,623 | 321,807 | legal services |
| Federal Arbitration Inc | 123,453 | 0 | 0 | 0 | 123,453 | services |
| Gordian | 265,086 | 194,447 | 401,698 | 320,307 | 1,181,538 | investment advisory |
| Noble Consulting | 1,172,664 | 1,121,312 | 1,017,431 | 861,137 | 4,172,544 | rehabilitation services |
| Johnson & Lambert | 19,262 | 0 | 6,257 | 8,998 | 34,517 | Auditing Services |
| Resor | 0 | 1,020 | 0 | 1,406 | 2,426 | legal services |
| Tharington | 0 | 1,000 | 3,628 | 0 | 4,628 | legal services |
| Veris Consulting | 692,594 | 508,086 | 518,275 | 346,504 | 2,065,459 | Forensic accounting |
| Aspida / GBIG LLC | 0 | 0 | 0 | 0 | 0 | transition services |
| Williams Mullen | 1,126,423 | 1,029,690 | 677,305 | 1,079,177 | 3,912,595 | legal services |
| Norton Rose Fullbright | 0 | 0 | 78,430 | 144,400 | 222,830 | |
| UFLIC | 0 | 0 | 0 | 0 | 0 | TPA |
| Milliman | 0 | 0 | 0 | 0 | 0 | Actuarial Services |
| Dentons | 0 | 0 | 0 | 0 | 0 | legal services |
| KCC | 0 | 0 | 0 | 0 | 0 | services |
| Kroll Restructuring Adm | 489,933 | 966,268 | 1,566,947 | 1,167,244 | 4,190,392 | Policy Holder Services |
| | 0 | | | | 20,092,382 | |
| | | | | | 20,092,382 | |
| | | | | | - | |

Prior to rehabilitation, SNIC had entered into an agreement with Southland Business Solutions, LLC ("SBS"). SBS services a portion of SNIC's business. During the quarter, SNIC paid SBS $183,250 for these services.

### DISBURSEMENTS

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $2,586 to Bryan Cave Leighton Paisner for legal services
- $5,284 to Consilio for legal support services
- $11,340 to Federal Arbitration, Inc. for services regarding the review panel
- $2,623 to Gordian Group for investment advisory services
- $99,084 to Noble Consulting Services, Inc. for rehabilitation services
- $40,228 to Veris Consulting, Inc. for forensic accounting services
- $143,986 to Williams Mullen for legal services

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $862 to Bryan Cave Leighton Paisner for legal services
- $1,078 to Consilio for legal support services
- $3,780 to Federal Arbitration, Inc. for services regarding the review panel
- $874 to Gordian Group for investment advisory services
- $33,028 to Noble Consulting Services, Inc. for rehabilitation services
- $13,409 to Veris Consulting, Inc. for forensic accounting services
- $25,006 to Williams Mullen for legal services

| ::CBL:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 629,090 | 719,245 | 743,102 | 825,055 | 2,916,492 | TPA |
| Bryan Cave | | | | | - | legal services |
| Consilio | 26,199 | 28,835 | 26,453 | 27,647 | 109,134 | legal services |
| Federal Arbitration Inc | | | | | - | services |
| Gordian | 428,967 | 163,513 | 141,944 | 20,306 | 754,730 | investment advisory |
| Noble Consulting | 1,042,159 | 972,502 | 898,718 | 793,615 | 3,706,994 | rehabilitation services |
| Johnson & Lambert | | | 2,320 | | 2,320 | Auditing Services |
| Resor | | | | | - | legal services |
| Tharington | | 35,862 | 29,262 | | 65,124 | legal services |
| Veris Consulting | 449,009 | 433,002 | 144,067 | | 1,026,078 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 849,024 | 1,252,280 | 1,059,135 | 702,982 | 3,863,421 | legal services |
| Norton Rose Fullbright | 59,143 | 40,504 | 59,703 | 20,373 | 179,723 | |
| UFLIC | | | | | - | TPA |
| Milliman | | | | | - | Actuarial Services |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| Kroll Restructuring Admin | 768,401 | 630,200 | 94,763 | 386,347 | 1,879,711 | Policy Holder Services |
| Squire Patton Boggs | 865,855 | 745,026 | 62,332 | 35,603 | 1,708,816 | legal services |
| EDM Research | | | | 15,840 | 15,840 | consulting services |
| **Total** | **5,117,847** | **5,020,969** | **3,261,799** | **2,827,768** | **16,228,383** | |

| ::SNIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | | | | | - | TPA |
| Bryan Cave | | | | | - | legal services |
| Consilio | 5,082 | 5,351 | 5,092 | 5,153 | 20,678 | legal services |
| Federal Arbitration Inc | | | | | - | services |
| Gordian | 43,872 | 16,717 | 14,517 | 2,077 | 77,183 | investment advisory |
| Noble Consulting | 106,584 | 99,460 | 91,914 | 81,165 | 379,123 | rehabilitation services |
| Johnson & Lambert | | | 237 | | 237 | Auditing Services |
| Tharington | | | | | - | legal services |
| Milliman | | | | | - | Actuaries Services |
| Veris Consulting | 45,921 | 44,284 | 14,734 | | 104,939 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 80,750 | 123,673 | 104,209 | 71,775 | 380,407 | legal services |
| UFLIC | | | | | - | TPA |
| Norton Rose Fullbright | 4,142 | | 6,106 | 2,084 | 12,332 | |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| Squire Patton Boggs | 83,169 | 20,999 | 6,375 | 3,641 | 114,184 | legal services |
| EDM Research | | | | 1,620 | 1,620 | consulting services |
| **Total** | **369,520** | **310,484** | **243,184** | **167,515** | **1,090,703** | |

| ::BLIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 120,969 | 107,207 | 112,988 | 117,829 | 458,993 | TPA |
| Bryan Cave | | | | | - | legal services |
| Consilio | 436 | 526 | 440 | 460 | 1,862 | legal services |
| Federal Arbitration Inc | | | | | - | services |
| Gordian | | 5,572 | 4,839 | 692 | 11,103 | investment advisory |
| Noble Consulting | 35,528 | 33,153 | 30,638 | 27,055 | 126,374 | rehabilitation services |
| Johnson & Lambert | | | 79 | | 79 | Auditing Services |
| Tharington | | | | | - | legal services |
| Veris Consulting | 15,307 | 14,761 | 4,911 | | 34,979 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 26,873 | 40,908 | 34,736 | 23,925 | 126,442 | legal services |
| Kroll Restructuring Admin | 40,442 | 33,168 | 4,988 | 20,334 | 98,932 | Policy Holder Service |
| UFLIC | | | | | - | TPA |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| Milliman | | | | | - | Actuarial Services |
| Norton Rose Fullbright | 2,016 | 1,381 | 2,035 | 695 | 6,127 | |
| Squire Patton Boggs | 27,723 | 7,000 | 2,125 | 1,214 | 38,062 | legal services |
| EDM Research | | | | 540 | 540 | consulting services |
| **Total** | **269,294** | **243,676** | **197,779** | **192,744** | **903,493** | |

| Combined | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 750,059 | 826,452 | 856,090 | 942,884 | 3,375,485 | TPA |
| Bryan Cave | - | - | - | - | - | legal services |
| Consilio | 31,717 | 34,712 | 31,985 | 33,260 | 131,674 | legal services |
| Federal Arbitration Inc | - | - | - | - | - | services |
| Gordian | 472,839 | 185,802 | 161,300 | 23,075 | 843,016 | investment advisory |
| Noble Consulting | 1,184,271 | 1,105,115 | 1,021,270 | 901,835 | 4,212,491 | rehabilitation services |
| Johnson & Lambert | - | - | 2,636 | - | 2,636 | Auditing Services |
| Resor | - | - | - | - | - | legal services |
| Tharington | - | 35,862 | 29,262 | - | 65,124 | legal services |
| Veris Consulting | 510,237 | 492,047 | 163,712 | - | 1,165,996 | Forensic accounting |
| Aspida / GBIG LLC | - | - | - | - | - | transition services |
| Williams Mullen | 956,647 | 1,416,861 | 1,198,080 | 798,682 | 4,370,270 | legal services |
| Norton Rose Fullbright | 63,285 | 40,504 | 65,809 | 22,457 | 198,182 | |
| UFLIC | - | - | - | - | - | TPA |
| Milliman | - | - | - | - | - | Actuarial Services |
| Dentons | - | - | - | - | - | legal services |
| KCC | - | - | - | - | - | services |
| Kroll Restructuring Admin | 808,843 | 663,368 | 99,751 | 406,681 | 1,978,643 | Policy Holder Services |
| Squire Patton Boggs | 976,747 | - | - | - | 1,861,062 | |
| EDM Research | - | - | - | - | 18,000 | |
| **Total** | **5,754,645** | **4,800,723** | **3,629,895** | **3,128,874** | **18,222,579** | |
| | | | | | 18,222,579 | |

2024 Q1

**THIRD PARTY ADMINISTRATOR**

On June 30, 2021, CBL obtained the Court's permission to transfer the servicing of its business to a new third party administrator ("TPA") at a reduced cost from the CSA. Actuarial Management Resources ("AMR") began servicing CBL's business on October 1, 2021. Policyholders and agents were notified in writing of the transition. During the quarter, CBL paid AMR $629,090 for these services.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $26,199 to Consilio for legal support services
- $428,967 to Gordian Group for investment advisory services
- $768,401 to Kroll Restructuring Administration for policyholder services
- $1,042,159 to Noble Consulting Services, Inc. for rehabilitation services
- $59,143 to Norton Rose Fullbright for legal services
- $449,009 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $865,855 to Squire Patton Boggs for legal services*
- $849,024 to Williams Mullen for legal services*

*The sanctions award against opposing counsel Stevens & Lee in the matter of *Johnston, et al. v. Lindberg, et al* (see page 7) represents a return of $589,857 in legal fees to the Company, which would net against these amounts.

2024 Q2

EXHIBIT D
PAGE 71

agents were notified in writing of the transition. During the quarter, CBL paid AMR $719,245 for these services.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $28,835 to Consilio for legal support services
- $163,451 to Gordian Group for investment advisory services
- $630,200 to Kroll Restructuring Administration for policyholder services
- $972,502 to Noble Consulting Services, Inc. for rehabilitation services
- $40,504 to Norton Rose Fullbright for legal services
- $433,002 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $745,026 to Squire Patton Boggs for legal services
- $35,862 to Tharrington Smith for legal services
- $1,252,280 to Williams Mullen for legal services

**THIRD PARTY ADMINISTRATOR**

On October 13, 2021, SNIC obtained the Court's permission to transfer the servicing of a portion of its business to a new third-party administrator ("TPA") at a reduced cost from the prior cost sharing agreement. United Fidelity Life Insurance Company ("UFLIC") began servicing a portion of SNIC's business on October 1, 2021. Policyholders and agents were notified in writing of the transition. Effective May 2, 2023, all TPA services have been terminated as a result of the liquidation.

Prior to rehabilitation, SNIC had entered into an agreement with Southland Business Solutions, LLC ("SBS"). SBS services a portion of SNIC's business. Effective May 2, 2023, all TPA services have been terminated as a result of the liquidation.

**EXHIBIT A**
**PAGE 45**

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $5,082 to Consilio for legal support services
- $43,872 to Gordian Group for investment advisory services
- $106,584 to Noble Consulting Services, Inc. for rehabilitation services
- $6,049 to Norton Rose Fullbright for legal services
- $45,921 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $83,169 to Squire Patton Boggs for legal services*
- $80,750 to Williams Mullen for legal services*

*The sanctions award against opposing counsel Stevens & Lee in the matter of *Johnston, et al. v. Lindberg, et al* (see page 7) represents a return of $60,326 in legal fees to the Company, which would net against these amounts.

**THIRD PARTY ADMINISTRATOR**

On October 13, 2021, SNIC obtained the Court's permission to transfer the servicing of a portion of its business to a new third-party administrator ("TPA") at a reduced cost from the prior cost sharing agreement. United Fidelity Life Insurance Company ("UFLIC") began servicing a portion of SNIC's business on October 1, 2021. Policyholders and agents were notified in writing of the transition. Effective May 2, 2023, all TPA services have been terminated as a result of the liquidation.

**EXHIBIT A**
**PAGE 50**

Prior to rehabilitation, SNIC had entered into an agreement with Southland Business Solutions, LLC ("SBS"). SBS services a portion of SNIC's business. Effective May 2, 2023, all TPA services have been terminated as a result of the liquidation.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $5,351 to Consilio for legal support services
- $16,717 to Gordian Group for investment advisory services
- $99,460 to Noble Consulting Services, Inc. for rehabilitation services
- $4,142 to Norton Rose Fullbright for legal services
- $44,284 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $20,999 to Squire Patton Boggs for legal services
- $123,673 to Williams Mullen for legal services

**THIRD PARTY ADMINISTRATOR**

On June 30, 2021, BLIC obtained the Court's permission to transfer the servicing of its business to a new third-party administrator ("TPA") at a reduced cost from the prior cost sharing agreement. Actuarial Management Resources ("AMR") began servicing BLIC's business on October 1, 2021. Policyholders and agents were notified in writing of the transition. During the quarter, BLIC paid AMR $120,969 for these services.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $436 to Consilio for legal support services
- $14,624 to Gordian Group for investment advisory services
- $40,442 to Kroll Restructuring Administration for policyholder services
- $35,528 to Noble Consulting Services, Inc. for rehabilitation services
- $2,016 to Norton Rose Fullbright for legal services
- $15,307 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $27,723 to Squire Patton Boggs for legal services*
- $26,873 to Williams Mullen for legal services*

*The sanctions award against opposing counsel Stevens & Lee in the matter of *Johnston, et al. v. Lindberg, et al* (see page 7) represents a return of $20,109 in legal fees to the Company, which would net against these amounts.

**THIRD PARTY ADMINISTRATOR**

On June 30, 2021, BLIC obtained the Court's permission to transfer the servicing of its business to a new third-party administrator ("TPA") at a reduced cost from the prior cost sharing agreement. Actuarial Management Resources ("AMR") began servicing BLIC's business on October 1, 2021. Policyholders and agents were notified in writing of the transition. During the quarter, BLIC paid AMR $107,207 for these services.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $526 to Consilio for legal support services
- $5,572 to Gordian Group for investment advisory services
- $33,168 to Kroll Restructuring Administration for policyholder services
- $33,153 to Noble Consulting Services, Inc. for rehabilitation services
- $1,381 to Norton Rose Fullbright for legal services
- $14,761 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $7,000 to Squire Patton Boggs for legal services
- $40,908 to Williams Mullen for legal services

**THIRD PARTY ADMINISTRATOR**

On June 30, 2021, CBL obtained the Court's permission to transfer the servicing of its business to a new third party administrator ("TPA") at a reduced cost from the CSA. Actuarial Management Resources ("AMR") began servicing CBL's business on October 1, 2021. Policyholders and

agents were notified in writing of the transition. During the quarter, CBL paid AMR $743,102 for these services.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $26,453 to Consilio for legal support services
- $141,944 to Gordian Group for investment advisory services
- $94,763 to Kroll Restructuring Administration for policyholder services
- $898,718 to Noble Consulting Services, Inc. for rehabilitation services
- $59,703 to Norton Rose Fullbright for legal services
- $2,320 to Johnson & Lambert for tax services
- $144,067 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $62,332 to Squire Patton Boggs for legal services
- $29,262 to Tharrington Smith for legal services
- $1,059,135 to Williams Mullen for legal services

**THIRD PARTY ADMINISTRATOR**

On October 13, 2021, SNIC obtained the Court's permission to transfer the servicing of a portion of its business to a new third-party administrator ("TPA") at a reduced cost from the prior cost sharing agreement. United Fidelity Life Insurance Company ("UFLIC") began servicing a portion of SNIC's business on October 1, 2021. Policyholders and agents were notified in writing of the transition. Effective May 2, 2023, all TPA services have been terminated as a result of the liquidation.

Prior to rehabilitation, SNIC had entered into an agreement with Southland Business Solutions, LLC ("SBS"). SBS services a portion of SNIC's business. Effective May 2, 2023, all TPA services have been terminated as a result of the liquidation.

**EXHIBIT A**
**PAGE 54**

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $5,092 to Consilio for legal support services
- $14,517 to Gordian Group for investment advisory services
- $91,914 to Noble Consulting Services, Inc. for rehabilitation services
- $6,106 to Norton Rose Fullbright for legal services
- $237 to Johnson & Lambert for tax services
- $14,734 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $6,375 to Squire Patton Boggs for legal services
- $104,209 to Williams Mullen for legal services

**THIRD PARTY ADMINISTRATOR**

On June 30, 2021, BLIC obtained the Court's permission to transfer the servicing of its business to a new third-party administrator ("TPA") at a reduced cost from the prior cost sharing agreement. Actuarial Management Resources ("AMR") began servicing BLIC's business on October 1, 2021. Policyholders and agents were notified in writing of the transition. During the quarter, BLIC paid AMR $112,988 for these services.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $440 to Consilio for legal support services
- $4,839 to Gordian Group for investment advisory services

**EXHIBIT C**
**PAGE 46**

- $4,988 to Kroll Restructuring Administration for policyholder services
- $30,638 to Noble Consulting Services, Inc. for rehabilitation services
- $2,035 to Norton Rose Fullbright for legal services
- $79 to Johnson & Lambert for tax services
- $4,911 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $2,125 to Squire Patton Boggs for legal services
- $34,736 to Williams Mullen for legal services

2024 Q4

**THIRD PARTY ADMINISTRATOR**
On June 30, 2021, CBL obtained the Court's permission to transfer the servicing of its business to a new third party administrator ("TPA") at a reduced cost from the CSA. Actuarial Management Resources ("AMR") began servicing CBL's business on October 1, 2021. Policyholders and

**EXHIBIT D
PAGE 81**

agents were notified in writing of the transition. During the quarter, CBL paid AMR $825,055 for these services.

**DISBURSEMENTS**
During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $27,647 to Consilio for legal support services
- $15,840 to EDM Research for consulting services
- $20,306 to Gordian Group for investment advisory services
- $386,347 to Kroll Restructuring Administration for policyholder services
- $793,615 to Noble Consulting Services, Inc. for rehabilitation services
- $20,373 to Norton Rose Fullbright for legal services
- $35,603 to Squire Patton Boggs for legal services
- $702,982 to Williams Mullen for legal services

**THIRD PARTY ADMINISTRATOR**

On October 13, 2021, SNIC obtained the Court's permission to transfer the servicing of a portion of its business to a new third-party administrator ("TPA") at a reduced cost from the prior cost sharing agreement. United Fidelity Life Insurance Company ("UFLIC") began servicing a portion

**EXHIBIT A**
**PAGE 57**

of SNIC's business on October 1, 2021. Policyholders and agents were notified in writing of the transition. Effective May 2, 2023, all TPA services have been terminated as a result of the liquidation.

Prior to rehabilitation, SNIC had entered into an agreement with Southland Business Solutions, LLC ("SBS"). SBS services a portion of SNIC's business. Effective May 2, 2023, all TPA services have been terminated as a result of the liquidation.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $5,153 to Consilio for legal support services
- $1,620 to EDM Research for consulting services
- $2,077 to Gordian Group for investment advisory services
- $81,165 to Noble Consulting Services, Inc. for rehabilitation services
- $2,084 to Norton Rose Fullbright for legal services
- $3,641 to Squire Patton Boggs for legal services
- $71,775 to Williams Mullen for legal services

**THIRD PARTY ADMINISTRATOR**

On June 30, 2021, BLIC obtained the Court's permission to transfer the servicing of its business to a new third-party administrator ("TPA") at a reduced cost from the prior cost sharing agreement. Actuarial Management Resources ("AMR") began servicing BLIC's business on October 1, 2021. Policyholders and agents were notified in writing of the transition. During the quarter, BLIC paid AMR $117,829 for these services.

**DISBURSEMENTS**

**EXHIBIT C**
**PAGE 49**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $460 to Consilio for legal support services
- $540 to EDM Research for consulting services
- $692 to Gordian Group for investment advisory services
- $20,334 to Kroll Restructuring Administration for policyholder services
- $27,055 to Noble Consulting Services, Inc. for rehabilitation services
- $695 to Norton Rose Fullbright for legal services
- $1,214 to Squire Patton Boggs for legal services
- $23,925 to Williams Mullen for legal services

| ::CBL:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 170,424 | | | | 170,424 | TPA |
| Bryan Cave | | | | | - | legal services |
| Consilio | 26,586 | | | | 26,586 | legal services |
| Federal Arbitration Inc | | | | | - | services |
| Gordian | | | | | - | investment advisory |
| Noble Consulting | 877,247 | | | | 877,247 | rehabilitation services |
| Johnson & Lambert | | | | | - | Auditing Services |
| Resor | | | | | - | legal services |
| Tharington | | | | | - | legal services |
| Veris Consulting | 2,400 | | | | 2,400 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 576,449 | | | | 576,449 | legal services |
| Norton Rose Fullbright | 21,743 | | | | 21,743 | |
| UFLIC | | | | | - | TPA |
| Milliman | | | | | - | Actuarial Services |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| Kroll Restructuring Admin | 49,665 | | | | 49,665 | Policy Holder Services |
| Squire Patton Boggs | 15,370 | | | | 15,370 | legal services |
| EDM Research | 23,760 | | | | 23,760 | Consulting Services |
| **Total** | **1,763,644** | **-** | **-** | **-** | **1,763,644** | |

| ::SNIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | | | | | - | TPA |
| Bryan Cave | | | | | - | legal services |
| Consilio | 5,106 | | | | 5,106 | legal services |
| Federal Arbitration Inc | | | | | - | services |
| Gordian | | | | | - | investment advisory |
| Noble Consulting | 89,718 | | | | 89,718 | rehabilitation services |
| Johnson & Lambert | | | | | - | Auditing Services |
| Tharington | | | | | - | legal services |
| Milliman | | | | | - | Actuaries Services |
| Veris Consulting | 245 | | | | 245 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 58,805 | | | | 58,805 | legal services |
| UFLIC | | | | | - | TPA |
| Norton Rose Fullbright | 2,224 | | | | 2,224 | |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| Squire Patton Boggs | 1,572 | | | | 1,572 | legal services |
| EDM Research | 2,430 | | | | 2,430 | Consulting Services |
| **Total** | **160,100** | **-** | **-** | **-** | **160,100** | |

| ::BLIC:: | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 52,638 | | | | 52,638 | TPA |
| Bryan Cave | | | | | - | legal services |
| Consilio | 436 | | | | 436 | legal services |
| Federal Arbitration Inc | | | | | - | services |
| Gordian | | | | | - | investment advisory |
| Noble Consulting | 29,906 | | | | 29,906 | rehabilitation services |
| Johnson & Lambert | | | | | - | Auditing Services |
| Tharington | | | | | - | legal services |
| Veris Consulting | 82 | | | | 82 | Forensic accounting |
| Aspida / GBIG LLC | | | | | - | transition services |
| Williams Mullen | 19,602 | | | | 19,602 | legal services |
| Kroll Restructuring Admin | 2,614 | | | | 2,614 | Policy Holder Service |
| UFLIC | | | | | - | TPA |
| Dentons | | | | | - | legal services |
| KCC | | | | | - | services |
| Milliman | | | | | - | Actuarial Services |
| Norton Rose Fullbright | 741 | | | | 741 | |
| Squire Patton Boggs | 524 | | | | 524 | |
| EDM Research | 810 | | | | 810 | |
| **Total** | **107,353** | **-** | **-** | **-** | **107,353** | |

| Combined | Q1 | Q2 | Q3 | Q4 | FY | |
|---|---|---|---|---|---|---|
| AMR | 223,062 | - | - | - | 223,062 | TPA |
| Bryan Cave | - | - | - | - | - | legal services |
| Consilio | 32,128 | - | - | - | 32,128 | legal services |
| Federal Arbitration Inc | - | - | - | - | - | services |
| Gordian | - | - | - | - | - | investment advisory |
| Noble Consulting | 996,871 | - | - | - | 996,871 | rehabilitation services |
| Johnson & Lambert | - | - | - | - | - | Auditing Services |
| Resor | - | - | - | - | - | legal services |
| Tharington | - | - | - | - | - | legal services |
| Veris Consulting | 2,727 | - | - | - | 2,727 | Forensic accounting |
| Aspida / GBIG LLC | - | - | - | - | - | transition services |
| Williams Mullen | 654,856 | - | - | - | 654,856 | legal services |
| Norton Rose Fullbright | 24,708 | - | - | - | 24,708 | |
| UFLIC | - | - | - | - | - | TPA |
| Milliman | - | - | - | - | - | Actuarial Services |
| Dentons | - | - | - | - | - | legal services |
| KCC | - | - | - | - | - | services |
| Kroll Restructuring Admin | 52,279 | - | - | - | 52,279 | Policy Holder Services |
| Squire Patton Boggs | 17,466 | - | - | - | 17,466 | legal services |
| EDM Research | 27,000 | - | - | - | 27,000 | Consulting Services |
| **Total** | **2,031,097** | **-** | **-** | **-** | **2,031,097** | |

**IN-FORCE BUSINESS**

The Receiver is currently working in conjunction with applicable Guaranty Associations regarding the Company's in-force business and reinsurance programs.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $170,424 to Actuarial Management Resources for third party administration services
- $26,586 to Consilio for legal support services
- $23,760 to EDM Research for consulting services
- $49,665 to Kroll Restructuring Administration for policyholder services
- $877,247 to Noble Consulting Services, Inc. for rehabilitation services
- $21,743 to Norton Rose Fullbright for legal services
- $15,370 to Squire Patton Boggs for legal services
- $2,400 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services

**EXHIBIT D**
**PAGE 22**

- $576,449 to Williams Mullen for legal services

SNIC obtained Tennessee Department of Insurance approval to terminate the Tennessee trust. That trust has been terminated. SBS administers the SNIC policies that are no longer held in trust.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $5,106 to Consilio for legal support services
- $2,430 to EDM Research for consulting services
- $89,718 to Noble Consulting Services, Inc. for rehabilitation services
- $2,224 to Norton Rose Fullbright for legal services
- $1,572 to Squire Patton Boggs for legal services
- $245 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $58,805 to Williams Mullen for legal services

**IN-FORCE BUSINESS**

The Receiver is currently working in conjunction with applicable Guaranty Associations regarding the Company's in-force business and reinsurance programs.

**DISBURSEMENTS**

During the period, the following expenses related to the rehabilitation and litigation to recover the affiliated investments were incurred and allocated in a manner consistent with prior accounting practices:

- $52,638 to Actuarial Management Resources for third party administration services
- $436 to Consilio for legal support services
- $810 to EDM Research for consulting services
- $2,614 to Kroll Restructuring Administration for policyholder services
- $29,906 to Noble Consulting Services, Inc. for rehabilitation services
- $741 to Norton Rose Fullbright for legal services
- $524 to Squire Patton Boggs for legal services
- $82 to J.S. Held, LLC (f/k/a Veris Consulting) for forensic accounting services
- $19,602 to Williams Mullen for legal services

# Exhibit M5



**Global Bankers**
INSURANCE GROUP

North Carolina Department of Insurance
Attn: Commissioner Mike Causey
1203 Mail Service Center
Raleigh, NC 27699

April 20, 2018

**Re:     Remediation Plan – Global Bankers Insurance Group, LLC**

Dear Commissioner Causey,

Global Bankers Insurance Group, LLC ("GBIG") and its affiliated North Carolina domestic insurance companies, Southland National Insurance Corporation ("SNIC"), Bankers Life Insurance Company ("BLIC") and Colorado Bankers Life Insurance Company ("CBL") (collectively, the "Companies"), propose the following Remediation Plan to the North Carolina Department of Insurance ("Department") intending to address the matter raised in the final reports from Rector& Associates, Inc. and Noble Consulting Service, Inc.:

1.  All securities held by the Companies will comply with all North Carolina laws, including being appropriately rated and reported.

2.  All securities shall be rated in accordance with the laws of North Carolina by June 30, 2018 pursuant to G.S. 58-7-197.

3.  The ratings to be received will be on the actual securities held by the Companies.

4.  By June 30, 2018, at least 95% of the securities held by the Companies in which Mr. Greg Lindberg, the Ultimate Controlling Person ("UCP"), directly or indirectly maintains a substantial (i.e., more than 50%) economic interest in either the direct or underlying borrower will be investment grade.

5.  Beginning with the December 31, 2018 annual reporting period, all securities in which the UCP directly or indirectly maintains a substantial economic interest in the direct or underlying borrower shall be reported as affiliated securities in all financial statements submitted by the Companies. Notwithstanding the foregoing, this restriction does not apply to any investments where the principal of the underlying investment is guaranteed or otherwise protected by a third-party (please see Exhibit A for an example structure), whether or not the UCP directly or indirectly maintains an economic interest in the direct or underlying borrower.

6.  The Companies will provide the Department with a monthly investment report that will include a detailed overview of all investments in which the UCP maintains substantial economic interest in the direct or underlying borrower.

Hire the Best | Expect the Best | Keep Climbing | Never Stop Learning | Get Our Hands Dirty | Think Globally

Global Bankers Insurance Group
2327 Englert Dr. Durham, NC 27713
919.864.2680
www.globalbankers.com

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 302 of 508



7. The Companies will comply with G.S. 58-19-30 for all investments made or restructured in securities that the UCP directly or indirectly maintains an economic interest in the direct or underlying borrower. If the investment does not trigger the filing of a Form D under G.S. 58-19-30, then the Companies will comply with G.S. 58-7-185 and receive the Commissioner's prior approval for the investment. In the event G.S. 58-19-30 does not apply, the Commissioner hereby grants prior approval pursuant to G.S. 58-7-185 for each of SNIC, CBL and BLIC to invest an aggregate amount of 10% of each company's admitted assets in the securities that the UCP directly or indirectly maintains an economic interest in the direct or underlying borrower. The Commissioner further agrees that the Companies shall have until December 31, 2018 to be in compliance with the aggregate 10% limit set forth in the preceding sentence. **[NOTE: We need some lead time to be in compliance with this limit.]** Notwithstanding the foregoing, these restrictions shall not apply to any investments where the principal of the underlying investment is guaranteed or otherwise protected by a third-party, regardless of whether or not the UCP directly or indirectly maintains an economic interest in the direct or underlying borrower.

8. The Companies will establish and maintain a formal process to track all intercompany transactions. The Companies will track all intercompany transactions on an ongoing basis and reconcile the transactions on at least an annual basis.

9. The Companies will annually complete a combined balance sheet on a best-efforts GAAP basis of the entities controlled by the Companies and submit to the Department annually.

10. For the subsidiaries that comprise 85% or more of the UCP's equity holdings, all future appraisals will carry an appraiser's certification as required by the USPAP and conform to any of the reporting requirements expressly required under USPAP or the business valuation standards promulgated by the American Institute of Certified Public Accountants, the American Society of Appraisers, or the National Association of Certified Valuation Analysts.

*  *  *  *



Please feel free to contact us if you have any questions or comments regarding this Remediation Plan. Please sign the below acknowledgement if you agree to this Remediation Plan. We look forward to moving ahead and continuing to be a collaborative/compliant partner while growing our Companies and employee base in North Carolina.

Sincerely,

Greg Lindberg
Chairman
Global Bankers Insurance Group, LLC

Acknowledged and agreed to this ___ day of April 2018:

North Carolina Department of Insurance

_____

Name: _____

Title: _____

Hire the Best | Expect the Best | Keep Climbing | Never Stop Learning | Get Our Hands Dirty | Think Globally

Global Bankers Insurance Group
2327 Englert Dr. Durham, NC 27713
919.864.2680

# Exhibit M7

STATE OF NORTH CAROLINA

WAKE COUNTY

FILED

2020 MAR -3 PM 12:44

BY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CV 008664

MIKE CAUSEY,
COMMISSIONER OF INSURANCE
OF NORTH CAROLINA,

        Petitioner,

v.

SOUTHLAND NATIONAL INSURANCE
CORPORATION, SOUTHLAND NATIONAL
REINSURANCE CORPORATION, BANKERS
LIFE INSURANCE COMPANY, COLORADO
BANKERS LIFE INSURANCE COMPNAY
North Carolina Domiciled Insurance Companies,

        Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

REHABILITATOR'S
QUARTERLY REPORT

        NOW COMES the Commissioner of Insurance of State of North Carolina, in his capacity as Court appointed Rehabilitator of Southland National Insurance Corporation, Southland National Reinsurance Corporation, Bankers Life Insurance Company and Colorado Bankers Life Insurance Company (Rehabilitator), and hereby makes this report pursuant to North Carolina General Statute § 58-30-80(b) and the Order of this Court dated June 27, 2019, which requires the Rehabilitator, until further order of this Court, to make a quarterly report to the Court including a statement of receipts and disbursements to date and a statement of financial position (balance sheet). Attached hereto and incorporated herein by reference as Exhibits A - D, are the quarterly reports of activity of the Rehabilitator as of December 31, 2019, and a balance sheet, summary of operations and statement of cash flow and schedule of affiliated investments as of December 31, 2019, of Southland National Insurance Corporation, Southland National Reinsurance Corporation, Bankers Life Insurance Company and Colorado Bankers Life Insurance Company, as prepared by the Special Deputy Rehabilitator on behalf of the Rehabilitator.

This the 3rd day of March, 2020.

                                JOSH STEIN
                                ATTORNEY GENERAL
                                Attorney for Petitioner,

                                Heather H. Freeman
                                Assistant Attorney General
                                N. C. State Bar No. 28272
                                N. C. Department of Justice
                                P. O. Box 629
                                Raleigh, NC 27602-0629
                                (919) 716-6610
                                hfreeman@ncdoj.gov

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do certify that a copy of the foregoing pleading or paper was served as follows:

Honorable A. Graham Shirley, II
Wake County Superior Court
Post Office Box 351
Raleigh, NC 27602-0351

Zachary H. Smith
Hillary B. Crabtree
Julia A. May
Moore & Van Allen PLLC
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003

Christopher J. Blake
Joseph W. Eason
Nelson Mullins Riley & Scarborough, LLP
Glenlake One, Suite 200
4140 Parklake Avenue
Raleigh, NC 27612

Mark A. Finkelstein
Stephen W. Petersen
Fox Rothschild LLP
434 Fayetteville St. Suite 2800
Raleigh, NC 27601-2943

Gregory M. Petrick
Cadwalader, Wickersham & Taft LLP
200 Liberty Street
New York, NY 10281

in the following manner:

(xx) by United States mail, first class postage prepaid, as provided by Rule 5(b) of the North Carolina Rules of Civil Procedure, or

( ) by facsimile transmission to the facsimile number set out above, as provided by Rule 5 of the North Carolina Rules of Civil Procedure.

This the 3rd day of March, 2020.

JOSH STEIN
ATTORNEY GENERAL
Attorney for Petitioner,

Heather H. Freeman
Assistant Attorney General
N. C. State Bar No. 28272
N. C. Department of Justice
P. O. Box 629
Raleigh, NC 27602-0629
(919) 716-6610
hfreeman@ncdoj.gov

SOUTHLAND NATIONAL INSURANCE CORPORATION

NORTH CAROLINA COMMISSIONER OF INSURANCE AS REHABILITATOR

AS OF DECEMBER 31, 2019,

A BALANCE SHEET

AS OF DECEMBER 31, 2019

A SUMMARY OF OPERATIONS AND STATEMENT OF CASH FLOW

THROUGH DECEMBER 31, 2019

AND

A SCHEDULE OF AFFILIATED INVESTMENTS

AS OF DECEMBER 31, 2019

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 309 of 508

## INTRODUCTION

### BACKGROUND

Southland National Insurance Corporation (hereinafter," SNIC" or "Company") was originally formed in 1950 as an Alabama mutual aid association under the name of Southland National Insurance Company. In January 1969, the Company was incorporated in Alabama under the name Southland National Insurance Company. In 1988, the Company adopted its current name Southland National Insurance Corporation. In December 2015, the Company redomesticated to North Carolina. On June 27, 2019, the Wake County Superior Court (hereinafter, the "Court") issued an Order of Rehabilitation (hereinafter, "Order") against the Company and appointed the Commissioner of Insurance for the State of North Carolina as Rehabilitator (hereinafter, the "Rehabilitator"). On June 27, 2019, the Court also entered an Order Granting Motion for Moratorium on Policy Surrenders and Other Relief (hereinafter "Moratorium").

The Company is part of a group of insurance companies known as Global Bankers Insurance Group (hereinafter, "GBIG"). GBIG is part of a larger group of companies known as Eli Global. Eli Global is owned by Greg Lindberg.

### PURPOSE OF THIS REPORT

The purpose of this report is to provide a quarterly update to the Court, as required by the Order, on the work that the Rehabilitator and his staff have carried out since the issuance of the Order, to set out the present situation of the Company, and to provide a balance sheet and schedule of affiliated investments as of December 31, 2019, and a summary of operations and statement of cash flow through December 31, 2019.

### LIMITATIONS

This report is based only on the knowledge that the Rehabilitator and his staff have gained from the work performed since the issuance of the Order. Facts may exist that the Rehabilitator is unaware of that may have a material effect on the information provided in this report. The Rehabilitator will update the information in future quarterly reports as additional facts are discovered.

## SUMMARY

### COMPANY PROPERTY

- In accordance with the Order, the Rehabilitator has taken possession of all known assets and property of the Company.
- The Rehabilitator is currently evaluating the Company's in-force business and reinsurance programs in furtherance of determining the feasibility of a successful rehabilitation.

### MEMORANDUM OF UNDERSTANDING AND INTERIM LOAN AGREEMENT

On June 27, 2019, the Company entered into a Memorandum of Understanding ("MOU") and Interim Loan Amendment ("ILA") with Greg E. Lindberg, Academy Association, Inc. and Edwards Mill Asset Management, LLC. The Parties executed this MOU to set forth their agreements regarding, amount other things, (i) the immediate partial amendment of, among other things, the interest rate and repayment terms of various affiliated loans through the ILA; (ii) the

global restructuring of various affiliated companies through the formation of a new holding company; and (iii) the global restructuring and modifications of all affiliated loans, including assignment of the loans to such new holding company. The restructuring was to be completed by September 30, 2019. The restructuring was not completed by this date. The Company, along with the other insurance companies in rehabilitation, filed a complaint against the other parties to the MOU on October 1, 2019. See the Investment Portfolio and Litigation sections for more information.

## INVESTMENT PORTFOLIO

The goal of the Rehabilitator is to reduce the amount of affiliated investments and to increase long-term liquidity. The non-affiliated investments are invested in publicly traded securities. The Rehabilitator is working on a plan for the Eli Global non-insurance operating companies to repay the affiliated investments.

- The Company has approximately 61% of its assets invested in affiliated investments as of December 31, 2019.
- Affiliated assets represent 1,450% of surplus.
- Per the ILA, interest on the senior loans was reduced to 5% and was deferred for six months until December 27, 2019 and then is to be capitalized as part of the principal balance. Interest is payable quarterly beginning in 2020. The balance for the affiliated investments reflects the capitalized interest. The maturity date is December 31, 2029.
- Per the ILA, interest on the junior loans was reduced to 5.5% and was deferred for twelve months until June 27, 2020 and then is to be capitalized as part of the principal balance. Interest is payable quarterly beginning in 2021. The balance for the affiliated investments reflects the capitalized interest. The maturity date is June 30, 2029.
- Per the ILA, the return on the preferred equity was reduced to 6%.
- Per the ILA, interest on the insurance holding company loans was reduced to 0.0%. The maturity date is June 30, 2026.

## EXPENSE REDUCTIONS
- The Rehabilitator is evaluating the Company's contracts to identify those that are essential for ongoing operations. As part of this effort, the Rehabilitator is also attempting to negotiate more favorable terms of essential contracts.

## LITIGATION

To the Rehabilitator's knowledge, the Company is a party to the following lawsuits:

***Ehmann, Schiffli and Throneberg v. Medflow, Inc., Medflow Holdings, LLC, Southland National Insurance Corporation, et al.*; Case No. 15 CVS 3098, Superior Court of North Carolina, Mecklenburg County**

The case was filed on February 18, 2015, and amended on December 2, 2015 to add the Company as a defendant, alleging misrepresentation, fraudulent suppression, breach of fiduciary duty, negligence, negligent hiring/training/supervision, and conspiracy regarding sale of life insurance policies. This case is assigned to the North Carolina Business Court.

Mediation in April 2019 was unsuccessful. A bifurcated trial of some of the issues occurred in late-April to early-May of 2019. The trial resulted in a mistrial of certain issues and did not resolve the matter.

The parties filed post-trial motions which remain pending. On July 23, 2019, the Court unsevered the case, declared a mistrial on some of the issues tried, and took judicial notice of SNIC's status in Rehabilitation. On October 11, 2019, Counsel for the Rehabilitator filed a motion to vacate the order entered by the Superior Court of Wake County modifying the automatic stay provided in the Order of Rehabilitation which allows this case to proceed.

*Claritte Lumar nee Smith and the Succession of Byron Smith v. Lafourche Life Insurance Company and Southland National Insurance Corporation;* **Case No. C-73440, 40th Judicial District Court, Parish of St. John the Baptist, State of Louisiana**

The case was filed on May 8, 2019, which appealed a denied accidental death claim and petitioned for payment of insurance proceeds.

A response was filed in early June 2019.

Counsel for defendants requested counsel for plaintiffs dismiss or stay the case which he has thus far declined to do. Defendants are in the process of filing a motion to stay this litigation under the authority of the North Carolina Rehabilitation order staying and granting and injunctive relief.

*Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company in Rehabilitation, Colorado Bankers Life Insurance Company in Rehabilitation, and Southland National Reinsurance Corporation in Rehabilitation v. Greg Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, New England Capital, LLC, and Private Bankers Life and Annuity Co., Ltd.,* **Case No. 19 CVS 013093, Wake County, North Carolina.**

This case was filed on October 1, 2019, alleging a breach of the contract entered into by the parties on June 27, 2019. An Amended Complaint was filed on October 28, 2019, and added claims for fraud and negligent misrepresentation arising from statements contained in the June 27, 2019 contract and the Defendants' conduct.

On October 1, 2019, the Wake County Superior Court entered a Temporary Restraining Order ("TRO"), which will remain in place, by consent of the parties, until the Court enters an order on Plaintiffs' Motion for Preliminary Injunction. Essentially, the TRO prohibits the Defendants from taking any action that would negatively impact the value of Plaintiffs' investments into Defendants' companies. In their Motion for Preliminary Injunction, Plaintiffs' have requested that the relief granted in the TRO be extended through the pendency of the litigation, and that a receiver be appointed to, among other things, monitor compliance with the TRO.

The Defendants moved to dismiss the original complaint and the amended complaint on various grounds. The Court denied those motions in an Order filed on January 21, 2020.

**OTHER MATTERS**

- Pursuant to the Moratorium Order, the Rehabilitator has imposed a moratorium on cash surrenders, annuitizations, and policy loans against the Company's policies until such time as the Court approves lifting of the moratorium.
- In accordance with the Moratorium Order, the Rehabilitator has adopted and implemented a policy to provide substitute benefits in lieu of the contractual obligations of the Company for annuity benefits and cash withdrawals for policyholders who petition for payment under claims of legitimate hardship. As of February 12, 2020, 5 hardship cases have been received. 1 was approved and 3 were denied due to insufficient information.

**CONTINUATION OF BUSINESS**

- The Company has ceased writing all new business as of the date of the Order and is only renewing business that it is obligated to renew. A final decision as to the course of action to take with the Company has not yet been determined.

### INTRODUCTION TO SOUTHLAND NATIONAL INSURANCE CORPORATION
### FINANCIAL STATEMENTS
### AS OF DECEMBER 31, 2019

<u>Introduction and Basis of Presentation:</u> The Company is a North Carolina domiciled life, accident and health insurance company that was placed in rehabilitation by the Wake County Superior Court on June 27, 2019. The Company is under the control of the Commissioner of Insurance of the State of North Carolina, in his capacity as Court appointed Rehabilitator. It is the Rehabilitator's responsibility to take possession of the assets of the Company and to administer them under the general supervision of the Court.

The accompanying unaudited financial statements were prepared by the Company's staff for the period of April 1, 2019, to June 26, 2019, and subsequent to the Order under the direct supervision of the Rehabilitator's staff, as of December 31, 2019. The financial statements have been prepared in accordance with Statutory Accounting Principles promulgated by the National Association of Insurance Commissioners, except as noted in the following paragraph.

On July 26, 2019, the Governor of North Carolina signed into law, House Bill 220. This bill amends N.C. Gen. Stat §58-19-10(b), which limits the amount of investments in affiliates and subsidiaries to the lessor of ten percent (10%) of the insurer's admitted assets or fifty percent (50%) of the insurer's policyholders' surplus, provided that after those investments, the insurer's policyholders' surplus will be reasonable in relation to the insurers' outstanding liabilities and adequate to its financial needs. The excess amount of affiliated investments should be non-admitted. As of December 31, 2019, the Company has $177m of excess affiliated investments. Should this amount be non-admitted, the Company would have a negative surplus of $190m.

The December 31, 2019 balance of the investments listed on the Affiliated Investment schedule include the capitalized amount of interest deferred on the senior loans through December 27, 2019 in accordance with the Interim Loan Amendment. The amount of capitalized interest has been estimated based on all available information. Once a final reconciliation is complete, the amount of capitalized interest may change.

## ASSETS

| | | Current Year | | | Prior Year |
|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 |
| | | Assets | Nonadmitted Assets | Net Admitted Assets (Cols. 1 - 2) | Net Admitted Assets |
| 1. | Bonds (Schedule D) | 162,280,018 | | 162,280,018 | 256,201,649 |
| 2. | Stocks (Schedule D): | | | | |
| | 2.1 Preferred stocks | 43,458,667 | | 43,458,667 | 32,310,000 |
| | 2.2 Common stocks | 6,119 | 271 | 5,848 | 4,990 |
| 3. | Mortgage loans on real estate (Schedule B): | | | | |
| | 3.1 First liens | 959,684 | | 959,684 | 2,380,170 |
| | 3.2 Other than first liens | | | | |
| 4. | Real estate (Schedule A): | | | | |
| | 4.1 Properties occupied by the company (less $ _____ encumbrances) | | | | |
| | 4.2 Properties held for the production of income (less $ _____ encumbrances) | | | | |
| | 4.3 Properties held for sale (less $ _____ encumbrances) | 170,930 | | 170,930 | 376,913 |
| 5. | Cash ($ 1,900,014 , Schedule E-Part 1), cash equivalents ($ 69,820,141 , Schedule E-Part 2) and short-term investments ($ _____ , Schedule DA) | 71,720,155 | | 71,720,155 | 37,252,738 |
| 6. | Contract loans (including $ _____ premium notes) | 5,153,440 | | 5,153,440 | 364,213 |
| 7. | Derivatives (Schedule DB) | | | | |
| 8. | Other invested assets (Schedule BA) | 9,000,000 | 9,000,000 | | 9,000,000 |
| 9. | Receivables for securities | 303 | | 303 | 5,690,080 |
| 10. | Securities lending reinvested collateral assets (Schedule DL) | | | | |
| 11. | Aggregate write-ins for invested assets | | | | |
| 12. | Subtotals, cash and invested assets (Lines 1 to 11) | 292,749,315 | 9,000,271 | 283,749,044 | 343,580,752 |
| 13. | Title plants less $ _____ charged off (for Title insurers only) | | | | |
| 14. | Investment income due and accrued | 815,033 | | 815,033 | 3,170,301 |
| 15. | Premiums and considerations: | | | | |
| | 15.1 Uncollected premiums and agents' balances in the course of collection | 363,232 | | 363,232 | 80,815 |
| | 15.2 Deferred premiums, agents' balances and installments booked but deferred and not yet due (including $ _____ earned but unbilled premiums) | 1,741,922 | | 1,741,922 | 610,244 |
| | 15.3 Accrued retrospective premiums ($ _____ ) and contracts subject to redetermination ($ _____ ) | | | | |
| 16. | Reinsurance: | | | | |
| | 16.1 Amounts recoverable from reinsurers | 18,145 | | 18,145 | 3,037,144 |
| | 16.2 Funds held by or deposited with reinsured companies | | | | |
| | 16.3 Other amounts receivable under reinsurance contracts | 391,378 | 347,410 | 43,968 | 961,232 |
| 17. | Amounts receivable relating to uninsured plans | | | | |
| 18.1 | Current federal and foreign income tax recoverable and interest thereon | 2,477,835 | | 2,477,835 | 1,547,515 |
| 18.2 | Net deferred tax asset | 9,631,822 | 9,631,821 | 1 | 872,246 |
| 19. | Guaranty funds receivable or on deposit | | | | |
| 20. | Electronic data processing equipment and software | | | | |
| 21. | Furniture and equipment, including health care delivery assets ($ _____ ) | | | | |
| 22. | Net adjustment in assets and liabilities due to foreign exchange rates | | | | |
| 23. | Receivables from parent, subsidiaries and affiliates | 25 | | 25 | 250 |
| 24. | Health care ($ _____ ) and other amounts receivable | 5,277 | 5,277 | | 550 |
| 25. | Aggregate write-ins for other-than-invested assets | 382,877 | 295,457 | 87,420 | 146,131 |
| 26. | Total assets excluding Separate Accounts, Segregated Accounts and Protected Cell Accounts (Lines 12 to 25) | 308,576,861 | 19,280,236 | 289,296,625 | 354,007,180 |
| 27. | From Separate Accounts, Segregated Accounts and Protected Cell Accounts | | | | |
| 28. | Total (Lines 26 and 27) | 308,576,861 | 19,280,236 | 289,296,625 | 354,007,180 |

**DETAILS OF WRITE-INS**

| | | | | | |
|---|---|---|---|---|---|
| 1101. | | | | | |
| 1102. | | | | | |
| 1103. | | | | | |
| 1198. | Summary of remaining write-ins for Line 11 from overflow page | | | | |
| 1199. | Totals (Lines 1101 through 1103 plus 1198) (Line 11 above) | | | | |
| 2501. | Prepaid Expense Deposit & Returned Checks | 295,457 | 295,457 | | |
| 2502. | Miscellaneous Receivable | 67,496 | | 67,496 | 83,013 |
| 2503. | Premiums In Transit | 19,924 | | 19,924 | 63,118 |
| 2598. | Summary of remaining write-ins for Line 25 from overflow page | | | | |
| 2599. | Totals (Lines 2501 through 2503 plus 2598) (Line 25 above) | 382,877 | 295,457 | 87,420 | 146,131 |

## LIABILITIES, SURPLUS AND OTHER FUNDS

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| 1. Aggregate reserve for life contracts $ _____ (Exhibit 5, Line 9999999) less $ _____ included in Line 6.3 (including $ _____ Modco Reserve) | 276,819,757 | 184,078,945 |
| 2. Aggregate reserve for accident and health contracts (including $ _____ Modco Reserve) | 87,539 | 87,280 |
| 3. Liability for deposit-type contracts (Exhibit 7, Line 14, Col. 1) (including $ _____ Modco Reserve) | | |
| 4. Contract claims: | | |
| 4.1 Life (Exhibit 8, Part 1, Line 4.4, Col. 1 less sum of Cols. 9, 10 and 11) | 2,958,129 | 1,227,266 |
| 4.2 Accident and health (Exhibit 8, Part 1, Line 4.4, sum of Cols. 9, 10 and 11) | 279,032 | 573,103 |
| 5. Policyholders' dividends/refunds to members $ _____ and coupons $ _____ due and unpaid (Exhibit 4, Line 10) | | |
| 6. Provision for policyholders' dividends, refunds to members and coupons payable in following calendar year—estimated amounts: | | |
| 6.1 Policyholders' dividends and refunds to members apportioned for payment (including $ _____ Modco) | 83,057 | 92,349 |
| 6.2 Policyholders' dividends and refunds to members not yet apportioned (including $ _____ Modco) | | |
| 6.3 Coupons and similar benefits (including $ _____ Modco) | | |
| 7. Amount provisionally held for deferred dividend policies not included in Line 6 | | |
| 8. Premiums and annuity considerations for life and accident and health contracts received in advance less $ _____ discount; including $ _____ accident and health premiums (Exhibit 1, Part 1, Col. 1, sum of Lines 4 and 14) | 260,874 | 289,742 |
| 9. Contract liabilities not included elsewhere: | | |
| 9.1 Surrender values on canceled contracts | | |
| 9.2 Provision for experience rating refunds, including the liability of $ _____ accident and health experience rating refunds of which $ _____ is for medical loss ratio rebate per the Public Health Service Act | | |
| 9.3 Other amounts payable on reinsurance, including $ 27,151 assumed and $ _____ ceded | 27,151 | 4,058,433 |
| 9.4 Interest Maintenance Reserve (IMR, Line 6) | 8,339,666 | 3,307,086 |
| 10. Commissions to agents due or accrued-life and annuity contracts $ _____ accident and health $ _____ and deposit-type contract funds $ _____ | | |
| 11. Commissions and expense allowances payable on reinsurance assumed | | |
| 12. General expenses due or accrued (Exhibit 2, Line 12, Col. 7) | 335,077 | 428,933 |
| 13. Transfers to Separate Accounts due or accrued (net) (including $ _____ accrued for expense allowances recognized in reserves, net of reinsured allowances) | 392,807 | 59,613 |
| 14. Taxes, licenses and fees due or accrued, excluding federal income taxes (Exhibit 3, Line 9, Col. 6) | | |
| 15.1 Current federal and foreign income taxes, including $ _____ on realized capital gains (losses) | | |
| 15.2 Net deferred tax liability | | |
| 16. Unearned investment income | | |
| 17. Amounts withheld or retained by reporting entity as agent or trustee | 36,004 | 3,841 |
| 18. Amounts held for agents' account, including $ _____ agents' credit balances | 60,078 | 7,374 |
| 19. Remittances and items not allocated | | |
| 20. Net adjustment in assets and liabilities due to foreign exchange rates | 64,602 | 364,589 |
| 21. Liability for benefits for employees and agents if not included above | | |
| 22. Borrowed money $ _____ and interest thereon $ _____ | | |
| 23. Dividends to stockholders declared and unpaid | | |
| 24. Miscellaneous liabilities: | | |
| 24.01 Asset valuation reserve (AVR, Line 16, Col. 7) | 8,190,901 | 2,057,080 |
| 24.02 Reinsurance in unauthorized and certified ($ _____ ) companies | | 749,364 |
| 24.03 Funds held under reinsurance treaties with unauthorized and certified ($ _____ ) reinsurers | | 133,007,438 |
| 24.04 Payable to parent, subsidiaries and affiliates | 1,409,887 | 1,345,457 |
| 24.05 Drafts outstanding | | |
| 24.06 Liability for amounts held under uninsured plans | | |
| 24.07 Funds held under coinsurance | | |
| 24.08 Derivatives | | |
| 24.09 Payable for securities | | |
| 24.10 Payable for securities lending | 238,801 | |
| 24.11 Capital notes $ _____ and interest thereon $ _____ | | |
| 25. Aggregate write-ins for liabilities | 443,566 | 365,586 |
| 26. Total liabilities excluding Separate Accounts business (Lines 1 to 25) | 300,026,928 | 332,103,479 |
| 27. From Separate Accounts statement | | |
| 28. Total liabilities (Lines 26 and 27) | 300,026,928 | 332,103,479 |
| 29. Common capital stock | 1,502,718 | 1,502,718 |
| 30. Preferred capital stock | | |
| 31. Aggregate write-ins for other than special surplus funds | 7,382,942 | 5,379,354 |
| 32. Surplus notes | | |
| 33. Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 65,283,086 | 65,283,086 |
| 34. Aggregate write-ins for special surplus funds | | |
| 35. Unassigned funds (surplus) | (84,899,049) | (47,075,257) |
| 36. Less treasury stock, at cost: | | |
| 36.1 _____ shares common (value included in Line 29 $ _____ ) | | |
| 36.2 _____ shares preferred (value included in Line 30 $ _____ ) | | 3,186,200 |
| 37. Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) | (12,233,021) | 20,400,983 |
| 38. Totals of Lines 29, 30 and 37 (Page 4, Line 55) | (10,730,303) | 21,903,701 |
| 39. Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 289,296,625 | 354,007,180 |

DETAILS OF WRITE-INS

| | | 1 | 2 |
|---|---|---|---|
| 2501. | Deferred Compensation Liability | 381,719 | 355,371 |
| 2502. | Micellaneous liabilites | | 10,215 |
| 2503. | Escheal | 61,847 | |
| 2598. | Summary of remaining write-ins for Line 25 from overflow page | | |
| 2599. | Totals (Lines 2501 through 2503 plus 2598) (Line 25 above) | 443,566 | 365,586 |
| 3101. | Deferred Reinsurance Gain | 7,382,942 | 5,379,354 |
| 3102. | | | |
| 3103. | | | |
| 3198. | Summary of remaining write-ins for Line 31 from overflow page | | |
| 3199. | Totals (Lines 3101 through 3103 plus 3198) (Line 31 above) | 7,382,942 | 5,379,354 |
| 3401. | Common Stock Retired | | |
| 3402. | | | |
| 3403. | | | |
| 3498. | Summary of remaining write-ins for Line 34 from overflow page | | |
| 3499. | Totals (Lines 3401 through 3403 plus 3498) (Line 34 above) | | |

# SUMMARY OF OPERATIONS

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| 1. Premiums and annuity considerations for life and accident and health contracts (Exhibit 1, Part 1, Line 20.4, Col. 1, less Col. 11) | 117,994,495 | (36,050,690) |
| 2. Considerations for supplementary contracts with life contingencies | | |
| 3. Net investment income (Exhibit of Net Investment Income, Line 17) | 13,457,058 | 15,337,803 |
| 4. Amortization of Interest Maintenance Reserve (IMR, Line 5) | 1,122,313 | 728,807 |
| 5. Separate Accounts net gain from operations excluding unrealized gains or losses | | |
| 6. Commissions and expense allowances on reinsurance ceded (Exhibit 1, Part 2, Line 26.1, Col. 1) | (1,296,487) | 7,321,170 |
| 7. Reserve adjustments on reinsurance ceded | | |
| 8. Miscellaneous Income: | | |
| 8.1 Income from fees associated with investment management, administration and contract guarantees from Separate Accounts | | |
| 8.2 Charges and fees for deposit-type contracts | | |
| 8.3 Aggregate write-ins for miscellaneous income | 36,897 | 18,074 |
| 9. Totals (Lines 1 to 8.3) | 131,314,276 | (12,644,836) |
| 10. Death benefits | 18,875,455 | 14,999,472 |
| 11. Matured endowments (excluding guaranteed annual pure endowments) | 10,688 | |
| 12. Annuity benefits (Exhibit 8, Part 2, Line 6.4, Cols. 4 + 8) | 2,004,899 | 4,715,768 |
| 13. Disability benefits and benefits under accident and health contracts | 4,695,983 | 2,252,911 |
| 14. Coupons, guaranteed annual pure endowments and similar benefits | | (98) |
| 15. Surrender benefits and withdrawals for life contracts | 822,498 | 914,532 |
| 16. Group conversions | | |
| 17. Interest and adjustments on contract or deposit-type contract funds | | |
| 18. Payments on supplementary contracts with life contingencies | | |
| 19. Increase in aggregate reserves for life and accident and health contracts | 92,741,069 | (46,743,601) |
| 20. Totals (Lines 10 to 19) | 119,150,592 | (23,861,016) |
| 21. Commissions on premiums, annuity considerations and deposit-type contract funds (direct business only) (Exhibit 1, Part 2, Line 31, Col. 1) | 5,985 | 685,061 |
| 22. Commissions and expense allowances on reinsurance assumed (Exhibit 1, Part 2, Line 26.2, Col. 1) | 4,242,126 | 3,438,475 |
| 23. General insurance expenses and fraternal expenses (Exhibit 2, Line 10, Columns 1, 2, 3, 4 and 6) | 13,684,859 | 9,842,842 |
| 24. Insurance taxes, licenses and fees, excluding federal income taxes (Exhibit 3, Line 7, Cols. 1 + 2 + 3 + 5) | 598,234 | 661,386 |
| 25. Increase in loading on deferred and uncollected premiums | 847,289 | (125,809) |
| 26. Net transfers to or (from) Separate Accounts net of reinsurance | | |
| 27. Aggregate write-ins for deductions | 3,953,262 | 8,110,864 |
| 28. Totals (Lines 20 to 27) | 142,482,347 | (1,248,197) |
| 29. Net gain from operations before dividends to policyholders, refunds to members and federal income taxes (Line 9 minus Line 28) | (11,168,071) | (11,396,639) |
| 30. Dividends to policyholders and refunds to members | 81,377 | 78,511 |
| 31. Net gain from operations after dividends to policyholders, refunds to members and before federal income taxes (Line 29 minus Line 30) | (11,249,448) | (11,475,150) |
| 32. Federal and foreign income taxes incurred (excluding tax on capital gains) | (930,320) | (1,543,694) |
| 33. Net gain from operations after dividends to policyholders, refunds to members and federal income taxes and before realized capital gains or (losses) (Line 31 minus Line 32) | (10,319,128) | (9,931,456) |
| 34. Net realized capital gains (losses) (excluding gains (losses) transferred to the IMR) less capital gains tax of $ ____ (excluding taxes of $ ____ (140,611) transferred to the IMR). | (3,385,949) | (450,210) |
| 35. Net income (Line 33 plus Line 34) | (13,705,077) | (10,381,666) |
| **CAPITAL AND SURPLUS ACCOUNT** | | |
| 36. Capital and surplus, December 31, prior year (Page 3, Line 38, Col. 2) | 21,903,701 | 33,801,008 |
| 37. Net income (Line 35) | (13,705,077) | (10,381,666) |
| 38. Change in net unrealized capital gains (losses) less capital gains tax of $ | 2,335 | (101,221) |
| 39. Change in net unrealized foreign exchange capital gain (loss) | 52,015 | |
| 40. Change in net deferred income tax | 5,493,195 | 3,182,529 |
| 41. Change in nonadmitted assets | (15,984,754) | (2,571,814) |
| 42. Change in liability for reinsurance in unauthorized and certified companies | 749,364 | (749,363) |
| 43. Change in reserve on account of change in valuation basis, (increase) or decrease | | |
| 44. Change in asset valuation reserve | (6,133,821) | 646,324 |
| 45. Change in treasury stock (Page 3, Lines 36.1 and 36.2 Col. 2 minus Col. 1) | | |
| 46. Surplus (contributed to) withdrawn from Separate Accounts during period | | |
| 47. Other changes in surplus in Separate Accounts statement | | |
| 48. Change in surplus notes | | |
| 49. Cumulative effect of changes in accounting principles | | |
| 50. Capital changes: | | |
| 50.1 Paid in | | |
| 50.2 Transferred from surplus (Stock Dividend) | | |
| 50.3 Transferred to surplus | | |
| 51. Surplus adjustment: | | |
| 51.1 Paid in | | |
| 51.2 Transferred to capital (Stock Dividend) | | |
| 51.3 Transferred from capital | | |
| 51.4 Change in surplus as a result of reinsurance | (5,110,849) | |
| 52. Dividends to stockholders | | |
| 53. Aggregate write-ins for gains and losses in surplus | 2,003,588 | (1,922,096) |
| 54. Net change in capital and surplus for the year (Lines 37 through 53) | 32,634,004 | (11,897,307) |
| 55. Capital and surplus, December 31, current year (Lines 36 + 54) (Page 3, Line 38) | (10,730,303) | 21,903,701 |
| **DETAILS OF WRITE-INS** | | |
| 08.301 Other Income | 36,897 | 18,074 |
| 08.302 | | |
| 08.303 | | |
| 08.398 Summary of remaining write-ins for Line 8.3 from overflow page | | |
| 08.399 Totals (Lines 08.301 through 08.303 plus 08.398) (Line 8.3 above) | 36,897 | 18,074 |
| 2701. Investment Credits to Reinsurers | 3,942,348 | 8,110,864 |
| 2702. Fines and Penalties | 10,914 | |
| 2703. | | |
| 2798. Summary of remaining write-ins for Line 27 from overflow page | | |
| 2799. Totals (Lines 2701 through 2703 plus 2798) (Line 27 above) | 3,953,262 | 8,110,864 |
| 5301. Initial Ceding Commission STD RE Less Amortization - SNRC/SNG/STD RE | | (1,922,096) |
| 5302. Reinsurance recapture | 2,003,588 | |
| 5303. | | |
| 5398. Summary of remaining write-ins for Line 53 from overflow page | | |
| 5399. Totals (Lines 5301 through 5303 plus 5398) (Line 53 above) | 2,003,588 | (1,922,096) |

## CASH FLOW

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| **Cash from Operations** | | |
| 1. Premiums collected net of reinsurance | 116,621,507 | (32,306,497) |
| 2. Net investment income | 10,578,329 | 17,836,506 |
| 3. Miscellaneous income | (1,259,590) | 7,339,244 |
| 4. Total (Lines 1 through 3) | 125,940,246 | (7,130,747) |
| 5. Benefit and loss related payments | 25,985,012 | (20,330,994) |
| 6. Net transfers to Separate Accounts, Segregated Accounts and Protected Cell Accounts | | |
| 7. Commissions, expenses paid and aggregate write-ins for deductions | 22,245,128 | 22,753,695 |
| 8. Dividends paid to policyholders | 90,669 | 94,810 |
| 9. Federal and foreign income taxes paid (recovered) net of $ _____ tax on capital gains (losses) | | 3,821 |
| 10. Total (Lines 5 through 9) | 48,320,809 | 2,521,332 |
| 11. Net cash from operations (Line 4 minus Line 10) | 77,619,437 | (9,652,079) |
| **Cash from Investments** | | |
| 12. Proceeds from investments sold, matured or repaid: | | |
| 12.1 Bonds | 168,549,802 | 209,182,303 |
| 12.2 Stocks | 132,606 | |
| 12.3 Mortgage loans | 1,319,943 | 882,799 |
| 12.4 Real estate | 218,976 | 699,000 |
| 12.5 Other invested assets | | |
| 12.6 Net gains or (losses) on cash, cash equivalents and short-term investments | 5,527,429 | (12,075) |
| 12.7 Miscellaneous proceeds | 5,928,578 | |
| 12.8 Total investment proceeds (Lines 12.1 to 12.7) | 181,677,334 | 210,752,027 |
| 13. Cost of investments acquired (long-term only): | | |
| 13.1 Bonds | 72,915,799 | 229,388,032 |
| 13.2 Stocks | 11,626,672 | |
| 13.3 Mortgage loans | | 29,014 |
| 13.4 Real estate | | 2,006 |
| 13.5 Other invested assets | | |
| 13.6 Miscellaneous applications | 5,013,758 | 1,144,001 |
| 13.7 Total investments acquired (Lines 13.1 to 13.6) | 89,556,230 | 230,563,053 |
| 14. Net increase (decrease) in contract loans and premium notes | | (434,234) |
| 15. Net cash from investments (Line 12.8 minus Line 13.7 minus Line 14) | 92,121,105 | (19,376,792) |
| **Cash from Financing and Miscellaneous Sources** | | |
| 16. Cash provided (applied): | | |
| 16.1 Surplus notes, capital notes | | |
| 16.2 Capital and paid in surplus, less treasury stock | | |
| 16.3 Borrowed funds | | |
| 16.4 Net deposits on deposit-type contracts and other insurance liabilities | | |
| 16.5 Dividends to stockholders | | |
| 16.6 Other cash provided (applied) | (135,273,125) | (1,149,463) |
| 17. Net cash from financing and miscellaneous sources (Lines 16.1 to 16.4 minus Line 16.5 plus Line 16.6) | (135,273,125) | (1,149,463) |
| **RECONCILIATION OF CASH, CASH EQUIVALENTS AND SHORT-TERM INVESTMENTS** | | |
| 18. Net change in cash, cash equivalents and short-term investments (Line 11, plus Lines 15 and 17) | 34,467,417 | (30,178,334) |
| 19. Cash, cash equivalents and short-term investments: | | |
| 19.1 Beginning of year | 37,252,739 | 67,431,073 |
| 19.2 End of year (Line 18 plus Line 19.1) | 71,720,155 | 37,252,739 |

SOUTHLAND NATIONAL INSURANCE CORPORATION
SCHEDULE OF AFFILIATED INVESTMENTS
SEPTEMBER 30, 2019 AND DECEMBER 31, 2019 COMPARISON

| Trust account | CUSIP Identification | Description | Actual Cost | Book/ Adjusted Carrying Value September 30, 2019 | Book/ Adjusted Carrying Value December 31, 2019 | Change |
|---|---|---|---|---|---|---|
| NC Mutual | 9941328T5 | Academy Financial Assets, LLC | $ 4,026,081 | $ 4,026,081 | 4,026,081 | $ (0) |
| N/A | 9941328T5 | Academy Financial Assets, LLC | 1,661,739 | - | 1,661,739 | 1,661,739 |
| N/A | 9941327T4 | AFA fka AFI Term | 1,182,114 | - | 1,239,746 | 1,239,746 |
| NC Mutual | 9941329T6 | AFA FKA GIC SR. NOTE | 1,627,500 | - | 1,748,169 | 1,748,169 |
| N/A | 9941329T6 | AFA FKA GIC SR. NOTE | 3,797,500 | - | 4,079,061 | 4,079,061 |
| NC Mutual | 04686@AA9 | Augusta Asset Management, LLC | 5,125,769 | 5,125,769 | 5,303,356 | 177,588 |
| N/A | 05777@AA6 | Baldwin Asset Management, LLC | 8,561,868 | 8,561,868 | 8,854,050 | 292,182 |
| NC Mutual | 06367UAA5 | BANK MONTREAL MEDIUM TERM SR BK NTS BOOK ENTRY 144 | 10,000,000 | 10,000,000 | 6,008,500 | (3,991,500) |
| N/A | 06625@126 | BANKERS LIFE INSURANCE COMPANY | 8,310,000 | 8,310,000 | 8,309,075 | (925) |
| N/A | 06739FJM4 | BARCLAYS BANK PLC | 10,000,000 | 10,000,000 | 5,577,299 | (4,422,701) |
| N/A | 13973@AA2 | CAPITAL ASSETS FUND I LLC | 6,375,572 | 6,375,572 | 6,882,532 | 506,960 |
| NC Mutual | 9941317T1 | CAPITAL ASSETS FUND II, LLC | 5,258,038 | 5,258,038 | 5,258,038 | - |
| NC Mutual | 9941317V6 | CAPITAL ASSETS FUND IV, LLC | 5,236,750 | 5,236,750 | 5,236,750 | - |
| NC Mutual | 9941317U8 | CAPITAL ASSETS FUND V, LLC | 5,800,589 | 5,800,589 | 6,026,499 | 225,910 |
| NC Mutual | 9941318T3 | Capital Assets Management II, LLC | 1,775,937 | 1,775,937 | 1,770,915 | (5,022) |
| N/A | 9941318T3 | Capital Assets Management II, LLC | 1,775,938 | 1,775,938 | 1,770,915 | (5,023) |
| N/A | 19633@129 | COLORADO BANKERS LIFE INSURANCE COMPANY, INC. | 24,000,000 | 24,000,000 | 24,000,000 | - |
| N/A | 19633@AA1 | COLORADO BANKERS LIFE INSURANCE COMPANY, INC. | 9,000,000 | - | - | - |
| NC Mutual | 9944639X1 | CV Investments, LLC | 2,055,028 | 2,055,028 | 2,055,028 | - |
| NC Mutual | 23570*AA0 | Damascus Asset Management, LLC | 5,020,727 | 5,020,727 | 5,178,859 | 158,132 |
| N/A | 23570*AA0 | Damascus Asset Management, LLC | 1,882,773 | 1,882,773 | 1,942,072 | 59,299 |
| NC Mutual | 29412#AA5 | Ephesus Asset Management, LLC | 3,261,153 | 3,261,153 | 3,363,976 | 102,823 |
| N/A | 29412#AA5 | Ephesus Asset Management, LLC | 6,179,026 | 6,179,026 | 6,373,849 | 194,823 |
| NC Mutual | 34610#AA5 | Forest Park Asset Management, LLC | 4,311,615 | 4,311,615 | 4,446,149 | 134,534 |
| N/A | 34610#AA5 | Forest Park Asset Management, LLC | 3,593,012 | 3,593,012 | 3,705,124 | 112,112 |
| N/A | 35472MAA4 | FRANKLIN STR 2018-1 LLC | 6,153,762 | 6,153,762 | 3,400,000 | (2,753,762) |
| NC Mutual | 9942228W1 | Gilford Asset Management, LLC | 294,695 | 294,695 | 294,695 | (0) |
| NC Mutual | 40905#AA6 | Hampton Asset Management, LLC | 3,629,545 | 3,629,545 | 3,757,052 | 127,507 |
| N/A | 40905#AA6 | Hampton Asset Management, LLC | 3,484,364 | 3,484,364 | 3,606,771 | 122,407 |
| N/A | HPCSP_SENIOR | HPCSP INVESTMENTS | 1,084,395 | 1,084,395 | 1,133,486 | 49,091 |
| NC Mutual | 9941557U3 | HPCSP Investments, LLC | 1,168,035 | 1,168,035 | 1,168,035 | - |
| NC Mutual | 46275@AA7 | Iron City Asset Management, LLC | 2,964,896 | 2,964,896 | 3,085,198 | 120,302 |
| NC Mutual | 46563@AA8 | ITECH FUNDING LLC | 3,223,492 | 3,223,492 | 3,392,882 | 169,390 |
| N/A | 46563@AA8 | ITECH FUNDING LLC | 4,244,796 | 4,244,796 | 4,467,854 | 223,058 |
| NC Mutual | 46662#AA6 | Jackson Asset Management, LLC | 3,048,617 | 3,048,617 | 3,155,671 | 107,054 |
| NC Mutual | 9947669V1 | NIH Capital, LLC | 949,042 | 949,042 | 949,042 | - |
| N/A | 9947669V1 | NIH Capital, LLC | 949,042 | 949,042 | 949,042 | - |
| NC Mutual | 65532NAA7 | NOM GB 2018 I LLC | 9,472,165 | 9,466,965 | 5,494,135 | (3,972,830) |
| N/A | G6846#AA2 | PBX Bermuda Holdings, LTD. | 200,203 | 200,335 | 200,387 | 52 |
| NC Mutual | 72083RAA7 | PIERRE MENDES LLC | 8,999,999 | 8,999,999 | 6,275,253 | (2,724,746) |
| NC Mutual | 78013GSS5 | ROYAL BK CDA | 1,627,500 | 1,627,500 | - | (1,627,500) |
| N/A | 78013GSS5 | ROYAL BK CDA | 3,797,500 | 3,797,500 | - | (3,797,500) |
| N/A | 86576#AA7 | Summerville Asset Management, LLC | 7,358,541 | 7,358,541 | 7,814,178 | 455,637 |
| NC Mutual | 87339#AA3 | TAC INVESTMENTS LLC | 3,233,263 | 3,233,263 | 3,360,141 | 126,878 |
| | | Total Affiliated Investments | $ 205,702,581 | $ 188,428,661 | $ 177,321,607 | $ (11,107,054) |

**Summary of activity (rounded to hundred-thousands)**

| | |
|---|---|
| Decrease in PPN positions due to unwinding activities | (24,325,000) |
| Increase in loans due to PPN underlying assignments | 8,325,000 |
| Increase due to capitalization of interest for senior loans | 4,927,000 |
| Total | (11,073,000) |

# SOUTHLAND NATIONAL REINSURANCE CORPORATION

## NORTH CAROLINA COMMISSIONER OF INSURANCE AS REHABILITATOR

### AS OF DECEMBER 31, 2019,

### A BALANCE SHEET

### AS OF DECEMBER 31, 2019

### A SUMMARY OF OPERATIONS AND STATEMENT OF CASH FLOW

### THROUGH DECEMBER 31, 2019

## INTRODUCTION

### BACKGROUND

Southland National Reinsurance Corporation (hereinafter, "Company") was created as a pure captive insurance company on December 3, 2014, in North Carolina under the Captive Insurance Act of 2013, as amended. On June 27, 2019, the Wake County Superior Court (hereinafter, the "Court") issued an Order of Rehabilitation (hereinafter, "Order") against the Company and appointed the Commissioner of Insurance for the State of North Carolina as Rehabilitator (hereinafter, the "Rehabilitator"). On June 27, 2019, the Court also entered an Order Granting Motion for Moratorium on Policy Surrenders and Other Relief (hereinafter "Moratorium").

The Company is part of a group of insurance companies known as Global Bankers Insurance Group (hereinafter, "GBIG"). GBIG is part of a larger group of companies known as Eli Global. Eli Global is owned by Greg Lindberg.

The Company has no active business and only reinsures business from other GBIG insurance companies.

### PURPOSE OF THIS REPORT

The purpose of this report is to provide a quarterly update to the Court, as required by the Order, on the work that the Rehabilitator and his staff have carried out since the issuance of the Order, to set out the present situation of the Company, and to provide a balance sheet and schedule of affiliated investments as of December 31, 2019, and a summary of operations and statement of cash flow through December 31, 2019.

### LIMITATIONS

This report is based only on the knowledge that the Rehabilitator and his staff have gained from the work performed since the issuance of the Order. Facts may exist that the Rehabilitator is unaware of that may have a material effect on the information provided in this report. The Rehabilitator will update the information in future quarterly reports as additional facts are discovered.

## SUMMARY

### COMPANY PROPERTY

- In accordance with the Order, the Rehabilitator has taken possession of all known assets and property of the Company.

### MEMORANDUM OF UNDERSTANDING AND INTERIM LOAN AGREEMENT

On June 27, 2019, the Company entered into a Memorandum of Understanding ("MOU") and Interim Loan Amendment ("ILA") with Greg E. Lindberg, Academy Association, Inc. and Edwards Mill Asset Management, LLC. The Parties executed this MOU to set forth their agreements regarding, amount other things, (i) the immediate partial amendment of, among other things, the interest rate and repayment terms of various affiliated loans through the ILA; (ii) the global restructuring of various affiliated companies through the formation of a new holding company; and (iii) the global restructuring and modifications of all affiliated loans, including

assignment of the loans to such new holding company. The restructuring was to be completed by September 30, 2019. The restructuring was not completed by this date. The Company, along with the other insurance companies in rehabilitation, filed a complaint against the other parties to the MOU on October 1, 2019. The Company has no affiliated loans and therefore, the MOU and ILA have minimal impact on the Company. See the Litigation section for more information.

## LITIGATION
To the Rehabilitator's knowledge, the Company is a party to the following lawsuit.

*Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company in Rehabilitation, Colorado Bankers Life Insurance Company in Rehabilitation, and Southland National Reinsurance Corporation in Rehabilitation v. Greg Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, New England Capital, LLC, and Private Bankers Life and Annuity Co., Ltd.,* **Case No. 19 CVS 013093, Wake County, North Carolina.**

This case was filed on October 1, 2019, alleging a breach of the contract entered into by the parties on June 27, 2019. An Amended Complaint was filed on October 28, 2019, and added claims for fraud and negligent misrepresentation arising from statements contained in the June 27, 2019 contract and the Defendants' conduct.

On October 1, 2019, the Wake County Superior Court entered a Temporary Restraining Order ("TRO"), which will remain in place, by consent of the parties, until the Court enters an order on Plaintiffs' Motion for Preliminary Injunction. Essentially, the TRO prohibits the Defendants from taking any action that would negatively impact the value of Plaintiffs' investments into Defendants' companies. In their Motion for Preliminary Injunction, Plaintiffs' have requested that the relief granted in the TRO be extended through the pendency of the litigation, and that a receiver be appointed to, among other things, monitor compliance with the TRO.

The Defendants moved to dismiss the original complaint and the amended complaint on various grounds. The Court denied those motions in an Order filed on January 21, 2020.

## OTHER MATTERS
- Pursuant to the Moratorium Order, the Rehabilitator has imposed a moratorium on cash surrenders, annuitizations, and policy loans against the Company's policies until such time as the Court approves lifting of the moratorium.
- Since all reinsurance agreements were recaptured as of July 1, 2019, the Company no longer has any business on its books. Remaining assets and liabilities are in the process of being liquidated.

## CONTINUATION OF BUSINESS
All business for the Company has been recaptured and the Company no longer has any operations and will be dissolved at a future date.

## INTRODUCTION TO SOUTHLAND NATIONAL REINSURANCE CORPORATION
## FINANCIAL STATEMENTS
## AS OF DECEMBER 31, 2019

<u>Introduction and Basis of Presentation:</u> The Company is a North Carolina domiciled pure captive insurance company that was placed in rehabilitation by the Wake County Superior Court on June 27, 2019. The Company is under the control of the Commissioner of Insurance of the State of North Carolina in his capacity as Court appointed Rehabilitator. It is the Rehabilitator's responsibility to take possession of the assets of the Company and to administer them under the general supervision of the Court.

The accompanying unaudited financial statements were prepared by the Company's staff for the period of April 1, 2019, to June 26, 2019, and subsequent to the Order under the direct supervision of the Rehabilitator's staff, as of December 31, 2019. The financial statements have been prepared in accordance with Generally Accepted Accounting Principles.

Southland National Reinsurance Corporation

Balance Sheet

December 31, 2019

| | Dec-19 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Fifth Third Bank - 5666 | 256,599 |
| **Wells Fargo** | - |
| **Total Checking/Savings** | 256,599 |
| **Total Current Assets** | 256,599 |
| **Other Assets** | |
| **Deferred Acquisition Cost- NCM** | - |
| **Deferred Tax Asset** | (186,305) |
| **Total Other Assets** | (186,305) |
| **TOTAL ASSETS** | 70,294 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| **Due to Affiliates** | |
| Due to ELI Research LLC | 7,005 |
| Due to GBIG | 5,116,522 |
| Due to Eli Global | - |
| **Total Due to Affiliates** | 5,123,527 |
| **Accrued Expenses** | 9,596 |
| **Federal Income Taxes Payable** | (5,504,022) |
| **Total Other Current Liabilities** | (370,899) |
| **Total Current Liabilities** | (370,899) |
| **Total Liabilities** | (370,899) |
| **Equity** | |
| **Capital Stock** | 100 |
| **Additional Paid in Capital** | 18,851,565 |
| **Retained Earnings** | (5,990,168) |
| **Net Income** | (12,420,304) |
| **Total Equity** | 441,193 |
| **TOTAL LIABILITIES & EQUITY** | 70,294 |

Southland National Reinsurance Corporation

Income Statement

Year ended December 31, 2019

| | Jan - Dec 19 |
|---|---|
| **Ordinary Income/Expense** | |
| Income | |
| Change in Due & Deferred- NCM | (41,966) |
| Change in Due & Deferred- SNIC | 13,581 |
| Change in Policy Loans- NCM | 236,553 |
| Gain on Reinsurance | 5,115,817 |
| Premium- CBL | (189,308,344) |
| Premium- NCM | |
| Policy Loans Assumed | - |
| Premium- NCM - Other | (97,894,985) |
| Total Premium- NCM | (97,894,985) |
| Premium- SNIC | (30,453,933) |
| Total Income | (312,333,277) |
| Expense | |
| Bank Service Charges | 1,345 |
| Benefit Payments- CBL | 13,162,672 |
| Benefit Payments- NCM | 4,069,442 |
| Benefit Payments- SNIC | 2,426,902 |
| Board of Director Fees | |
| Change in Agg Reserves- CBL | (195,774,138) |
| Change in Agg Reserves- NCM | (90,585,065) |
| Change in Agg. Reserves- SNIC | (30,311,445) |
| Change in DAC- NCM | 4,684,074 |
| Expense Allowance- CBL | 2,285,509 |
| Expense Allowance- SNIC | 3,213,560 |
| Premium Tax Expense | 3,102 |
| Admin Fee- GBIG | 3,241,868 |
| Professional Fees | |
| Accounting | (80,000) |
| Audit | 9,596 |
| Professional Fees - Other | - |
| Total Professional Fees | (70,404) |
| Travel Expense | - |
| Total Expense | (283,652,579) |
| **Net Ordinary Income** | (28,680,699) |
| Other Income/Expense | |
| Other Income | |
| Investment Income | |
| Unrealized Gain on Funds Held | 4,686,620 |
| Income- Funds Withheld- CBL | 8,826,852 |
| Income- Funds Withheld- NCM | 3,630,182 |
| Income-Funds Withheld-SNIC | 1,060,535 |
| Interest Income | 512 |
| Management Fees- GBIG | (446,522) |
| Management Fees- SNH | - |
| Total Investment Income | 17,758,178 |
| Total Other Income | 17,758,178 |
| Other Expense | |
| Federal Income Taxes- Current | - |
| Federal Income Taxes- Deferred | 1,497,784 |
| Total Other Expense | 1,497,784 |
| **Net Other Income** | 16,260,394 |
| **Net Income** | (12,420,304) |

Southland National Reinsurance Corporation

Statement of Cash Flows

Year ended December 31, 2019

| | |
|---|---:|
| Cash flows from operating activities: | |
| Net income | (12,420,304) |
| | |
| Adjustments to reconcile net income to net cash | |
| Deferred tax | 1,497,784 |
| Deferred gain on reinsurance | (5,750,555) |
| Unrealized Gain on Funds Held | (55,300) |
| | |
| Cash flows from changes in: | |
| Receivables from affiliates | (606,332) |
| Deferred acquisition costs | 4,684,074 |
| Future policy benefits | (316,670,648) |
| Unearned premium | (143,473) |
| Accrued expenses | (75,404) |
| Federal income tax receivable | 1,900,000 |
| Net cash provided by operating expenses | (327,640,158) |
| | |
| Cash flows from investing activities: | |
| Funds held by affiliates | 321,958,944 |
| Policy loans | 5,076,599 |
| Net cash used in investing activities | 327,035,543 |
| | |
| Net decrease in cash | (604,614) |
| | |
| Cash beginning of year | 861,213 |
| | |
| Cash end of period | 256,599 |

**EXHIBIT C**
**PAGE 1**

**BANKERS LIFE INSURANCE COMPANY**

**NORTH CAROLINA COMMISSIONER OF INSURANCE AS REHABILITATOR**

**AS OF DECEMBER 31, 2019,**

**A BALANCE SHEET**

**AS OF DECEMBER 31, 2019**

**A SUMMARY OF OPERATIONS AND STATEMENT OF CASH FLOW**

**THROUGH DECEMBER 31, 2019**

**AND**

**A SCHEDULE OF AFFILIATED INVESTMENTS**

**AS OF DECEMBER 31, 2019**

**EXHIBIT C**
**PAGE 2**

## INTRODUCTION

### BACKGROUND

Bankers Life Insurance Company (hereinafter, "Company") was originally incorporated under the laws of the State of Florida as a stock life insurance company on May 9, 1973. On December 15, 2016, the Company redomesticated to North Carolina. On June 27, 2019, the Wake County Superior Court (hereinafter, the "Court") issued an Order of Rehabilitation (hereinafter, "Order") against the Company and appointed the Commissioner of Insurance for the State of North Carolina as Rehabilitator (hereinafter, the "Rehabilitator"). On June 27, 2019, the Court also entered an Order Granting Motion for Moratorium on Policy Surrenders and Other Relief (hereinafter "Moratorium").

The Company is part of a group of insurance companies known as Global Bankers Insurance Group (hereinafter, "GBIG"). GBIG is part of a larger group of companies known as Eli Global. Eli Global is owned by Greg Lindberg.

### PURPOSE OF THIS REPORT

The purpose of this report is to provide a quarterly update to the Court, as required by the Order, on the work that the Rehabilitator and his staff have carried out since the issuance of the Order, to set out the present situation of the Company, and to provide a balance sheet and schedule of affiliated investments as of December 31, 2019, and a summary of operations and statement of cash flow through December 31, 2019.

### LIMITATIONS

This report is based only on the knowledge that the Rehabilitator and his staff have gained from the work performed since the issuance of the Order. Facts may exist that the Rehabilitator is unaware of that may have a material effect on the information provided in this report. The Rehabilitator will update the information in future quarterly reports as additional facts are discovered.

## SUMMARY

### COMPANY PROPERTY

- In accordance with the Order, the Rehabilitator has taken possession of all known assets and property of the Company.
- The Rehabilitator is currently evaluating the Company's in-force business and reinsurance programs in furtherance of determining the feasibility of a successful rehabilitation.

### MEMORANDUM OF UNDERSTANDING AND INTERIM LOAN AGREEMENT

On June 27, 2019, the Company entered into a Memorandum of Understanding ("MOU") and Interim Loan Amendment ("ILA") with Greg E. Lindberg, Academy Association, Inc. and Edwards Mill Asset Management, LLC. The Parties executed this MOU to set forth their agreements regarding, amount other things, (i) the immediate partial amendment of, among other things, the interest rate and repayment terms of various affiliated loans through the ILA; (ii) the global restructuring of various affiliated companies through the formation of a new holding company; and (iii) the global restructuring and modifications of all affiliated loans, including

# EXHIBIT C
## PAGE 3

assignment of the loans to such new holding company. The restructuring was to be completed by September 30, 2019. The restructuring was not completed by this date. The Company, along with the other insurance companies in rehabilitation, filed a complaint against the other parties to the MOU on October 1, 2019. See the Investment Portfolio and Litigation sections for more information.

## INVESTMENT PORTFOLIO

The goal of the Rehabilitator is to reduce the amount of affiliated investments and to increase long-term liquidity. The non-affiliated investments are invested primarily in publicly traded securities. The Rehabilitator is working on a plan for the Eli Global non-insurance operating companies to repay the affiliated investments.

- The Company has approximately 16% of its assets invested in affiliated investments as of December 31, 2019.
- Affiliated assets represent 315% of surplus.
- Per the ILA, interest on the senior loans was reduced to 5% and was deferred for six months until December 27, 2019 and then is to be capitalized as part of the principal balance. Interest is payable quarterly beginning in 2020. The balance for the affiliated investments reflects the capitalized interest. The maturity date is December 31, 2029.
- Per the ILA, interest on the junior loans was reduced to 5.5% and was deferred for twelve months until June 27, 2020 and then is to be capitalized as part of the principal balance. Interest is payable quarterly beginning in 2021. The balance for the affiliated investments reflects the capitalized interest. The maturity date is June 30, 2029.
- Per the ILA, the return on the preferred equity was reduced to 6%.
- Per the ILA, interest on the insurance holding company loans was reduced to 0.0%. The maturity date is June 30, 2026.

## EXPENSE REDUCTIONS

- The Rehabilitator is evaluating the Company's contracts to identify those that are essential for ongoing operations. As part of this effort, the Rehabilitator is also attempting to negotiate more favorable terms of essential contracts.

## LITIGATION

To the Rehabilitator's knowledge, the Company is party to the following lawsuit.

*Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company in Rehabilitation, Colorado Bankers Life Insurance Company in Rehabilitation, and Southland National Reinsurance Corporation in Rehabilitation v. Greg Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, New England Capital, LLC, and Private Bankers Life and Annuity Co., Ltd.,* **Case No. 19 CVS 013093, Wake County, North Carolina.**

This case was filed on October 1, 2019, alleging a breach of the contract entered into by the parties on June 27, 2019. An Amended Complaint was filed on October 28, 2019, and added claims for

EXHIBIT C
PAGE 4

fraud and negligent misrepresentation arising from statements contained in the June 27, 2019 contract and the Defendants' conduct.

On October 1, 2019, the Wake County Superior Court entered a Temporary Restraining Order ("TRO"), which will remain in place, by consent of the parties, until the Court enters an order on Plaintiffs' Motion for Preliminary Injunction. Essentially, the TRO prohibits the Defendants from taking any action that would negatively impact the value of Plaintiffs' investments into Defendants' companies. In their Motion for Preliminary Injunction, Plaintiffs' have requested that the relief granted in the TRO be extended through the pendency of the litigation, and that a receiver be appointed to, among other things, monitor compliance with the TRO.

The Defendants moved to dismiss the original complaint and the amended complaint on various grounds. The Court denied those motions in an Order filed on January 21, 2020.

## OTHER MATTERS
- Pursuant to the Moratorium Order, the Rehabilitator has imposed a moratorium on cash surrenders, annuitizations, and policy loans against the Company's policies until such time as the Court approves lifting of the moratorium.
- In accordance with the Moratorium Order, the Rehabilitator has adopted and implemented a policy to provide substitute benefits in lieu of the contractual obligations of the Company for annuity benefits and cash withdrawals for policyholders who petition for payment under claims of legitimate hardship. As of February 12, 2020, 119 hardship cases have been received. 27 were approved, 28 were denied due to insufficient information, 25 were denied due to not meeting the hardship qualifications and 39 are in process.

## CONTINUATION OF BUSINESS
The Company reduced writing the majority of new business in October 2018 and ceased all new business as of the date of the Order. A final decision as to the course of action to take with the Company has not yet been determined.

**EXHIBIT C**
**PAGE 5**

## INTRODUCTION TO BANKERS LIFE INSURANCE COMPANY
## FINANCIAL STATEMENTS
## AS OF DECEMBER 31, 2019

Introduction and Basis of Presentation: The Company is a North Carolina domiciled life, accident and health insurance company that was placed in rehabilitation by the Wake County Superior Court on June 27, 2019. The Company is under the control of the Commissioner of Insurance of the State of North Carolina, in his capacity as Court appointed Rehabilitator. It is the Rehabilitator's responsibility to take possession of the assets of the Company and to administer them under the general supervision of the Court.

The accompanying unaudited financial statements were prepared by the Company's staff for the period of April 1, 2019 to June 26, 2019, and subsequent to the Order under the direct supervision of the Rehabilitator's staff, as of December 31, 2019. The financial statements have been prepared in accordance with Statutory Accounting Principles promulgated by the National Association of Insurance Commissioners.

On July 26, 2019, the Governor of North Carolina signed into law, House Bill 220. This bill amends N.C. Gen. Stat §58-19-10(b), which limits the amount of investments in affiliates and subsidiaries to the lessor of ten percent (10%) of the insurer's admitted assets or fifty percent (50%) of the insurer's policyholders' surplus, provided that after those investments, the insurer's policyholders' surplus will be reasonable in relation to the insurers' outstanding liabilities and adequate to its financial needs. The excess amount of affiliated investments should be non-admitted. As of December 31, 2019, the Company has $51m of excess affiliated investments. Should this amount be non-admitted, the Company would have a negative surplus of $32m.

The December 31, 2019 balance of the investments listed on the Affiliated Investment schedule include the capitalized amount of interest deferred on the senior loans through December 27, 2019 in accordance with the Interim Loan Amendment. The amount of capitalized interest has been estimated based on all available information. Once a final reconciliation is complete, the amount of capitalized interest may change.

# ASSETS

| | | Current Year | | | Prior Year |
|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 |
| | | Assets | Nonadmitted Assets | Net Admitted Assets (Cols. 1 - 2) | Net Admitted Assets |
| 1. | Bonds (Schedule D) | 348,362,918 | | 348,362,918 | 296,024,422 |
| 2. | Stocks (Schedule D): | | | | |
| | 2.1 Preferred stocks | 5,243,409 | | 5,243,409 | 0 |
| | 2.2 Common stocks | 357,700 | | 357,700 | 402,700 |
| 3. | Mortgage loans on real estate (Schedule B): | | | | |
| | 3.1 First liens | | | 0 | 0 |
| | 3.2 Other than first liens | | | 0 | 0 |
| 4. | Real estate (Schedule A): | | | | |
| | 4.1 Properties occupied by the company (less $ _____ encumbrances) | | | 0 | 0 |
| | 4.2 Properties held for the production of income (less $ _____ encumbrances) | | | 0 | 0 |
| | 4.3 Properties held for sale (less $ _____ encumbrances) | | | 0 | 0 |
| 5. | Cash ($ ____3,070,914 , Schedule E-Part 1), cash equivalents ($ ____15,374,579 , Schedule E-Part 2) and short-term investments ($ ____2,503,054 , Schedule DA) | 20,948,547 | | 20,948,547 | 78,316,450 |
| 6. | Contract loans (including $ _____ premium notes) | 5,116 | | 5,116 | 41,759 |
| 7. | Derivatives (Schedule DB) | 0 | | 0 | 0 |
| 8. | Other invested assets (Schedule BA) | 0 | | 0 | 0 |
| 9. | Receivables for securities | 24,897 | | 24,897 | 13 |
| 10. | Securities lending reinvested collateral assets (Schedule DL) | | | 0 | 0 |
| 11. | Aggregate write-ins for invested assets | 0 | 0 | 0 | 0 |
| 12. | Subtotals, cash and invested assets (Lines 1 to 11) | 374,942,587 | 0 | 374,942,587 | 374,785,344 |
| 13. | Title plants less $ _____ charged off (for Title insurers only) | | | 0 | 0 |
| 14. | Investment income due and accrued | 2,272,119 | 84,980 | 2,187,139 | 3,515,345 |
| 15. | Premiums and considerations: | | | | |
| | 15.1 Uncollected premiums and agents' balances in the course of collection | | | 0 | 0 |
| | 15.2 Deferred premiums, agents' balances and installments booked but deferred and not yet due (including $ _____ earned but unbilled premiums) | 472 | | 472 | 470 |
| | 15.3 Accrued retrospective premiums ($ _____ ) and contracts subject to redetermination ($ _____ ) | | | 0 | 0 |
| 16. | Reinsurance: | | | | |
| | 16.1 Amounts recoverable from reinsurers | 5,318,621 | | 5,318,621 | 16,108,622 |
| | 16.2 Funds held by or deposited with reinsured companies | | | 0 | 0 |
| | 16.3 Other amounts receivable under reinsurance contracts | | | 0 | 0 |
| 17. | Amounts receivable relating to uninsured plans | | | 0 | 0 |
| 18.1 | Current federal and foreign income tax recoverable and interest thereon | | | 0 | 0 |
| 18.2 | Net deferred tax asset | 7,734,484 | 7,734,484 | 0 | 2,973,336 |
| 19. | Guaranty funds receivable or on deposit | | | 0 | 0 |
| 20. | Electronic data processing equipment and software | | | 0 | 0 |
| 21. | Furniture and equipment, including health care delivery assets ($ _____ ) | | | 0 | 0 |
| 22. | Net adjustment in assets and liabilities due to foreign exchange rates | | | 0 | 0 |
| 23. | Receivables from parent, subsidiaries and affiliates | 107,523 | | 107,523 | 0 |
| 24. | Health care ($ _____ ) and other amounts receivable | | | 0 | 0 |
| 25. | Aggregate write-ins for other-than-invested assets | 544,553 | 544,553 | 0 | 20,111 |
| 26. | Total assets excluding Separate Accounts, Segregated Accounts and Protected Cell Accounts (Lines 12 to 25) | 390,920,359 | 8,364,017 | 382,556,342 | 397,403,227 |
| 27. | From Separate Accounts, Segregated Accounts and Protected Cell Accounts | | | 0 | 0 |
| 28. | Total (Lines 26 and 27) | 390,920,359 | 8,364,017 | 382,556,342 | 397,403,227 |

DETAILS OF WRITE-INS

| | | | | | |
|---|---|---|---|---|---|
| 1101. | | | | | |
| 1102. | | | | | |
| 1103. | | | | | |
| 1198. | Summary of remaining write-ins for Line 11 from overflow page | 0 | 0 | 0 | 0 |
| 1199. | Totals (Lines 1101 through 1103 plus 1198) (Line 11 above) | 0 | 0 | 0 | 0 |
| 2501. | Miscellaneous Receivables | 230,266 | 230,266 | 0 | 20,111 |
| 2502. | Negative Interest Maintenance Reserve | 314,287 | 314,287 | 0 | |
| 2503. | | | | 0 | |
| 2598. | Summary of remaining write-ins for Line 25 from overflow page | 0 | 0 | 0 | 0 |
| 2599. | Totals (Lines 2501 through 2503 plus 2598) (Line 25 above) | 544,553 | 544,553 | 0 | 20,111 |

# LIABILITIES, SURPLUS AND OTHER FUNDS

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| 1. Aggregate reserve for life contracts $ _____ _____ D (Exhibit 5, Line 9999999) less $ _____ included in Line 6.3 (including $ _____ Modco Reserve) _____ | 346,671,162 | 356,702,874 |
| 2. Aggregate reserve for accident and health contracts (including $ _____ 0 Modco Reserve) _____ | 0 | 0 |
| 3. Liability for deposit-type contracts (Exhibit 7, Line 14, Col. 1) (including $ _____ Modco Reserve) _____ | 5,028,193 | 4,730,744 |
| 4. Contract claims: | | |
| 4.1 Life (Exhibit 8, Part 1, Line 4.4, Col. 1 less sum of Cols. 9, 10 and 11) _____ | 212.063 | 242,728 |
| 4.2 Accident and health (Exhibit 8, Part 1, Line 4.4, sum of Cols. 9, 10 and 11) _____ | 0 | 0 |
| 5. Policyholders' dividends/refunds to members $ _____ and coupons $ _____ due and unpaid (Exhibit 4, Line 10) _____ | 0 | 0 |
| 6. Provision for policyholders' dividends, refunds to members and coupons payable in following calendar year—estimated amounts: | | |
| 6.1 Policyholders' dividends and refunds to members apportioned for payment (including $ _____ Modco) | | 0 |
| 6.2 Policyholders' dividends and refunds to members not yet apportioned (including $ _____ Modco) | | 0 |
| 6.3 Coupons and similar benefits (including $ _____ Modco) _____ | | 0 |
| 7. Amount provisionally held for deferred dividend policies not included in Line 6 _____ | | 0 |
| 8. Premiums and annuity considerations for life and accident and health contracts received in advance less $ _____ discount; including $ _____ 0 accident and health premiums (Exhibit 1, Part 1, Col. 1, sum of Lines 4 and 14) _____ | 0 | 0 |
| 9. Contract liabilities not included elsewhere: | | |
| 9.1 Surrender values on canceled contracts _____ | | |
| 9.2 Provision for experience rating refunds, including the liability of $ _____ accident and health experience rating refunds of which $ _____ is for medical loss ratio rebate per the Public Health Service Act _____ | | 0 |
| 9.3 Other amounts payable on reinsurance, including $ _____ assumed and $ _____ ceded _____ | 17,660 | 25,612 |
| 9.4 Interest Maintenance Reserve (IMR, Line 6) _____ | 0 | 144,227 |
| 10. Commissions to agents due or accrued-life and annuity contracts $ _____ accident and health $ _____ and deposit-type contract funds $ _____ | | 0 |
| 11. Commissions and expense allowances payable on reinsurance assumed _____ | | 0 |
| 12. General expenses due or accrued (Exhibit 2, Line 12, Col. 7) _____ | 271.390 | 39,794 |
| 13. Transfers to Separate Accounts due or accrued (net) (including $ _____ accrued for expense allowances recognized in reserves, net of reinsured allowances) _____ | | 0 |
| 14. Taxes, licenses and fees due or accrued, excluding federal income taxes (Exhibit 3, Line 9, Col. 6) _____ | 0 | 0 |
| 15.1 Current federal and foreign income taxes, including $ _____ on realized capital gains (losses) _____ | 0 | 0 |
| 15.2 Net deferred tax liability _____ | 694.120 | 437,662 |
| 16. Unearned investment income _____ | | 0 |
| 17. Amounts withheld or retained by reporting entity as agent or trustee _____ | | 304 |
| 18. Amounts held for agents' account, including $ _____ agents' credit balances _____ | 238.430 | 292,714 |
| 19. Remittances and items not allocated _____ | | 0 |
| 20. Net adjustment in assets and liabilities due to foreign exchange rates _____ | 213.840 | 158,455 |
| 21. Liability for benefits for employees and agents if not included above _____ | | 0 |
| 22. Borrowed money $ _____ and interest thereon $ _____ | | 0 |
| 23. Dividends to stockholders declared and unpaid _____ | | 0 |
| 24. Miscellaneous liabilities: | | |
| 24.01 Asset valuation reserve (AVR, Line 16, Col. 7) _____ | 4,483,482 | 1,939,775 |
| 24.02 Reinsurance in unauthorized and certified ($ _____) companies _____ | 0 | 0 |
| 24.03 Funds held under reinsurance treaties with unauthorized and certified ($ _____) reinsurers _____ | | 0 |
| 24.04 Payable to parent, subsidiaries and affiliates _____ | 1,023,920 | 109,015 |
| 24.05 Drafts outstanding _____ | | 0 |
| 24.06 Liability for amounts held under uninsured plans _____ | | 0 |
| 24.07 Funds held under coinsurance _____ | | 0 |
| 24.08 Derivatives _____ | | 0 |
| 24.09 Payable for securities _____ | 0 | 0 |
| 24.10 Payable for securities lending _____ | 1,549,998 | 0 |
| 24.11 Capital notes $ _____ and interest thereon $ _____ | | 0 |
| 25. Aggregate write-ins for liabilities _____ | 0 | 120 |
| 26. Total liabilities excluding Separate Accounts business (Lines 1 to 25) _____ | 360,404,258 | 364,824,024 |
| 27. From Separate Accounts statement _____ | 0 | 0 |
| 28. Total liabilities (Lines 26 and 27) _____ | 360,404,258 | 364,824,024 |
| 29. Common capital stock _____ | 2,176,504 | 2,176,504 |
| 30. Preferred capital stock _____ | 823,496 | 823,496 |
| 31. Aggregate write-ins for other than special surplus funds _____ | (1) | 24,541 |
| 32. Surplus notes _____ | 3,000,000 | 3,000,000 |
| 33. Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) _____ | 41,623,795 | 41,623,795 |
| 34. Aggregate write-ins for special surplus funds _____ | 0 | 0 |
| 35. Unassigned funds (surplus) _____ | (25,471,710) | (15,069,133) |
| 36. Less treasury stock, at cost: | | |
| 36.1 _____ shares common (value included in Line 29 $ _____) _____ | | 0 |
| 36.2 _____ shares preferred (value included in Line 30 $ _____) _____ | | 0 |
| 37. Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) _____ | 19,152,084 | 29,579,203 |
| 38. Totals of Lines 29, 30 and 37 (Page 4, Line 55) _____ | 22,152,084 | 32,579,203 |
| 39. Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) _____ | 382,556,342 | 397,403,227 |
| DETAILS OF WRITE-INS | | |
| 2501. Unclaimed Property _____ | | |
| 2502. _____ | | 120 |
| 2503. _____ | | |
| 2598. Summary of remaining write-ins for Line 25 from overflow page _____ | | |
| 2599. Totals (Lines 2501 through 2503 plus 2598) (Line 25 above) _____ | 0 | 0 |
| 3101. Deferred Gain on Ceded Reinsurance _____ | 0 | 120 |
| 3102. _____ | (1) | 24,541 |
| 3103. _____ | | |
| 3198. Summary of remaining write-ins for Line 31 from overflow page _____ | | |
| 3199. Totals (Lines 3101 through 3103 plus 3198) (Line 31 above) _____ | 0 | 0 |
| 3401. _____ | (1) | 24,541 |
| 3402. _____ | | |
| 3403. _____ | | |
| 3498. Summary of remaining write-ins for Line 34 from overflow page _____ | | |
| 3499. Totals (Lines 3401 through 3403 plus 3498) (Line 34 above) _____ | 0 | 0 |
| | 0 | 0 |

# SUMMARY OF OPERATIONS

| | 1<br>Current Year | 2<br>Prior Year |
|---|---|---|
| 1. Premiums and annuity considerations for life and accident and health contracts (Exhibit 1, Part 1, Line 20.4, Col. 1, less Col. 11) | 263,354 | 267,922,351 |
| 2. Considerations for supplementary contracts with life contingencies | | 0 |
| 3. Net investment income (Exhibit of Net Investment Income, Line 17) | 18,448,829 | 13,036,213 |
| 4. Amortization of Interest Maintenance Reserve (IMR, Line 5) | (13,364) | 100,537 |
| 5. Separate Accounts net gain from operations excluding unrealized gains or losses | 0 | 0 |
| 6. Commissions and expense allowances on reinsurance ceded (Exhibit 1, Part 2, Line 26.1, Col. 1) | 93,671 | 1,941,191 |
| 7. Reserve adjustments on reinsurance ceded | | 0 |
| 8. Miscellaneous Income: | | |
| 8.1 Income from fees associated with investment management, administration and contract guarantees from Separate Accounts | | 0 |
| 8.2 Charges and fees for deposit-type contracts | 44,280 | 123,336 |
| 8.3 Aggregate write-ins for miscellaneous income | 22,564 | 28,639 |
| 9. Totals (Lines 1 to 8.3) | 18,859,334 | 283,152,267 |
| 10. Death benefits | 147,593 | 238,564 |
| 11. Matured endowments (excluding guaranteed annual pure endowments) | 0 | 0 |
| 12. Annuity benefits (Exhibit 8, Part 2, Line 6.4, Cols. 4 + 8) | 197,002 | 43,524 |
| 13. Disability benefits and benefits under accident and health contracts | | 0 |
| 14. Coupons, guaranteed annual pure endowments and similar benefits | | 0 |
| 15. Surrender benefits and withdrawals for life contracts | 21,813,671 | 20,573,519 |
| 16. Group conversions | | 0 |
| 17. Interest and adjustments on contract or deposit-type contract funds | 199,509 | 249,571 |
| 18. Payments on supplementary contracts with life contingencies | 205,432 | 294,349 |
| 19. Increase in aggregate reserves for life and accident and health contracts | (10,031,712) | 257,752,188 |
| 20. Totals (Lines 10 to 19) | 12,531,495 | 279,151,715 |
| 21. Commissions on premiums, annuity considerations and deposit-type contract funds (direct business only) (Exhibit 1, Part 2, Line 31, Col. 1) | 22,547 | 9,250,504 |
| 22. Commissions and expense allowances on reinsurance assumed (Exhibit 1, Part 2, Line 26.2, Col. 1) | 0 | 0 |
| 23. General insurance expenses and fraternal expenses (Exhibit 2, Line 10, Columns 1, 2, 3, 4 and 6) | 7,560,554 | 6,327,869 |
| 24. Insurance taxes, licenses and fees, excluding federal income taxes (Exhibit 3, Line 7, Cols. 1 + 2 + 3 + 5) | 530,297 | 691,412 |
| 25. Increase in loading on deferred and uncollected premiums | (4) | 0 |
| 26. Net transfers to or (from) Separate Accounts net of reinsurance | | 0 |
| 27. Aggregate write-ins for deductions | 65,011 | 1,140,270 |
| 28. Totals (Lines 20 to 27) | 20,709,900 | 296,561,770 |
| 29. Net gain from operations before dividends to policyholders, refunds to members and federal income taxes (Line 9 minus Line 28) | (1,850,566) | (13,409,503) |
| 30. Dividends to policyholders and refunds to members | | 0 |
| 31. Net gain from operations after dividends to policyholders, refunds to members and before federal income taxes (Line 29 minus Line 30) | (1,850,566) | (13,409,503) |
| 32. Federal and foreign income taxes incurred (excluding tax on capital gains) | 256,458 | 524,766 |
| 33. Net gain from operations after dividends to policyholders, refunds to members and federal income taxes and before realized capital gains or (losses) (Line 31 minus Line 32) | (2,107,024) | (13,934,269) |
| 34. Net realized capital gains (losses) (excluding gains (losses) transferred to the IMR) less capital gains tax of $_____ (excluding taxes of $_____ transferred to the IMR) | (2,289,117) | 34,202 |
| 35. Net income (Line 33 plus Line 34) | (4,396,141) | (13,900,068) |
| **CAPITAL AND SURPLUS ACCOUNT** | | |
| 36. Capital and surplus, December 31, prior year (Page 3, Line 38, Col. 2) | 32,579,203 | 35,728,324 |
| 37. Net income (Line 35) | (4,396,141) | (13,900,068) |
| 38. Change in net unrealized capital gains (losses) less capital gains tax of $ | 110,000 | 11,203 |
| 39. Change in net unrealized foreign exchange capital gain (loss) | | (390,784) |
| 40. Change in net deferred income tax | 1,741,945 | 3,584,125 |
| 41. Change in nonadmitted assets | (5,314,675) | (1,528,482) |
| 42. Change in liability for reinsurance in unauthorized and certified companies | 0 | 0 |
| 43. Change in reserve on account of change in valuation basis, (increase) or decrease | 0 | 0 |
| 44. Change in asset valuation reserve | (2,543,706) | (675,031) |
| 45. Change in treasury stock (Page 3, Lines 36.1 and 36.2 Col. 2 minus Col. 1) | 0 | 0 |
| 46. Surplus (contributed to) withdrawn from Separate Accounts during period | | 0 |
| 47. Other changes in surplus in Separate Accounts statement | 0 | 0 |
| 48. Change in surplus notes | 0 | 0 |
| 49. Cumulative effect of changes in accounting principles | | 0 |
| 50. Capital changes: | | |
| 50.1 Paid in | | |
| 50.2 Transferred from surplus (Stock Dividend) | | 0 |
| 50.3 Transferred to surplus | | 0 |
| 51. Surplus adjustment: | | 0 |
| 51.1 Paid in | | |
| 51.2 Transferred to capital (Stock Dividend) | | 10,000,000 |
| 51.3 Transferred from capital | | 0 |
| 51.4 Change in surplus as a result of reinsurance | | 0 |
| 52. Dividends to stockholders | | 0 |
| 53. Aggregate write-ins for gains and losses in surplus | (24,542) | (250,085) |
| 54. Net change in capital and surplus for the year (Lines 37 through 53) | (10,427,119) | (3,149,122) |
| 55. Capital and surplus, December 31, current year (Lines 36 + 54) (Page 3, Line 38) | 22,152,084 | 32,579,202 |
| **DETAILS OF WRITE-INS** | | |
| 08.301 Administrative and Service Fee Income | 22,564 | 28,639 |
| 08.302 | | |
| 08.303 | | |
| 08.398 Summary of remaining write-ins for Line 8.3 from overflow page | 0 | 0 |
| 08.399 Totals (Lines 08.301 through 08.303 plus 08.398) (Line 8.3 above) | 22,564 | 28,639 |
| 2701. Reinsurance Funds Withheld Investment Income | | 1,140,270 |
| 2702. Miscellaneous Expenses | 63,383 | |
| 2703. Fines & Penalties | 1,628 | |
| 2798. Summary of remaining write-ins for Line 27 from overflow page | 0 | 0 |
| 2799. Totals (Lines 2701 through 2703 plus 2798) (Line 27 above) | 65,011 | 1,140,270 |
| 5301. Deferred Gain on Ceded Reinsurance | | (250,085) |
| 5302. Deferred Gain on Reinsurance | | |
| 5303. | (24,542) | |
| 5398. Summary of remaining write-ins for Line 53 from overflow page | 0 | 0 |
| 5399. Totals (Lines 5301 through 5303 plus 5398) (Line 53 above) | (24,542) | (250,085) |

# CASH FLOW

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| **Cash from Operations** | | |
| 1. Premiums collected net of reinsurance | 263,356 | 267,929,580 |
| 2. Net investment income | 17,286,978 | 10,609,368 |
| 3. Miscellaneous income | 160,515 | 2,093,166 |
| 4. Total (Lines 1 through 3) | 17,710,849 | 280,632,113 |
| 5. Benefit and loss related payments | 11,811,823 | 59,936,646 |
| 6. Net transfers to Separate Accounts, Segregated Accounts and Protected Cell Accounts | 0 | 0 |
| 7. Commissions, expenses paid and aggregate write-ins for deductions | 7,946,813 | 17,490,280 |
| 8. Dividends paid to policyholders | 0 | 0 |
| 9. Federal and foreign income taxes paid (recovered) net of $ _____ tax on capital gains (losses) | 0 | 0 |
| 10. Total (Lines 5 through 9) | 19,758,636 | 77,426,926 |
| 11. Net cash from operations (Line 4 minus Line 10) | (2,047,786) | 203,205,187 |
| **Cash from Investments** | | |
| 12. Proceeds from investments sold, matured or repaid: | | |
| 12.1 Bonds | 110,916,444 | 148,809,301 |
| 12.2 Stocks | 111,303 | 0 |
| 12.3 Mortgage loans | 0 | 14,754,982 |
| 12.4 Real estate | 0 | 0 |
| 12.5 Other invested assets | 0 | 0 |
| 12.6 Net gains or (losses) on cash, cash equivalents and short-term investments | 810 | (18,164) |
| 12.7 Miscellaneous proceeds | 4,709,698 | 4,623,211 |
| 12.8 Total investment proceeds (Lines 12.1 to 12.7) | 115,738,254 | 168,169,330 |
| 13. Cost of investments acquired (long-term only): | | |
| 13.1 Bonds | 163,322,448 | 329,596,380 |
| 13.2 Stocks | 5,477,963 | 0 |
| 13.3 Mortgage loans | 0 | 14,754,982 |
| 13.4 Real estate | 0 | 0 |
| 13.5 Other invested assets | 0 | 0 |
| 13.6 Miscellaneous applications | 3,371,438 | 262,611 |
| 13.7 Total investments acquired (Lines 13.1 to 13.6) | 172,171,849 | 344,613,972 |
| 14. Net increase (decrease) in contract loans and premium notes | (36,643) | 0 |
| 15. Net cash from investments (Line 12.8 minus Line 13.7 minus Line 14) | (56,396,952) | (176,444,642) |
| **Cash from Financing and Miscellaneous Sources** | | |
| 16. Cash provided (applied): | | |
| 16.1 Surplus notes, capital notes | 0 | 0 |
| 16.2 Capital and paid in surplus, less treasury stock | 0 | 10,000,000 |
| 16.3 Borrowed funds | 0 | 0 |
| 16.4 Net deposits on deposit-type contracts and other insurance liabilities | 297,449 | 1,294,600 |
| 16.5 Dividends to stockholders | 0 | 0 |
| 16.6 Other cash provided (applied) | 779,385 | (58,224,264) |
| 17. Net cash from financing and miscellaneous sources (Lines 16.1 to 16.4 minus Line 16.5 plus Line 16.6) | 1,076,835 | (46,929,664) |
| **RECONCILIATION OF CASH, CASH EQUIVALENTS AND SHORT-TERM INVESTMENTS** | | |
| 18. Net change in cash, cash equivalents and short-term investments (Line 11, plus Lines 15 and 17) | (57,367,904) | (20,169,120) |
| 19. Cash, cash equivalents and short-term investments: | | |
| 19.1 Beginning of year | 78,316,451 | 98,485,571 |
| 19.2 End of year (Line 18 plus Line 19.1) | 20,948,547 | 78,316,451 |

EXHIBIT C
PAGE 10

**BANKERS LIFE INSURANCE COMPANY**
**SCHEDULE OF AFFILIATED INVESTMENTS**
**SEPTEMBER 30, 2019 AND DECEMBER 31,2019 COMPARISON**

| Trust Account | CUSIP Identification | Description | Actual Cost | Book/ Adjusted Carrying Value September 30, 2019 | Book/ Adjusted Carrying Value December 31, 2019 | Change |
|---|---|---|---|---|---|---|
| N/A | 9947669V1 | NIH CAPITAL, LLC | 759,233 | 759,233 | 759,233 | - |
| N/A | 9941328T5 | ACADEMY FINANCIAL ASSETS, LLC | 2,842,897 | 2,013,040 | 2,842,897 | 829,856 |
| N/A | 9941557U3 | HPCSP INVESTMENTS, LLC | 584,018 | 584,018 | 584,018 | - |
| N/A | 9941327T4 | AFA fka AFI Term | 590,336 | - | 619,117 | 619,117 |
| N/A | 9941329T6 | AFA FKA GIC SR. NOTE | 2,170,000 | - | 2,330,892 | 2,330,892 |
| N/A | 04686@AA9 | AUGUSTA ASSET MANAGEMENT, LLC | 4,271,474 | 4,271,474 | 4,419,464 | 147,990 |
| N/A | 05777@AA6 | BALDWIN ASSET MANAGEMENT, LLC | 1,051,309 | 1,051,309 | 1,087,187 | 35,878 |
| N/A | 06367UAA5 | BANK MONTREAL MEDIUM TERM SR BK NTS BOOK ENTRY 144 | 2,816,332 | 5,000,000 | 3,004,250 | (1,995,750) |
| N/A | 06739FJM4 | BARCLAYS BANK PLC | 3,368,280 | 6,022,138 | 3,368,280 | (2,653,858) |
| N/A | 13973@AA2 | CAPITAL ASSETS FUND I LLC | 3,187,786 | 3,187,786 | 3,441,266 | 253,480 |
| N/A | 37562#AA6 | Gilford Asset Management, LLC | 4,495,895 | 4,495,895 | 4,657,319 | 161,424 |
| N/A | 37940*AA3 | Academy Financial Assets, LLC | 3,136,069 | 3,136,069 | 3,298,955 | 162,886 |
| N/A | 40905#AA6 | HAMPTON ASSET MANAGEMENT, LLC | 871,091 | 871,091 | 901,693 | 30,602 |
| N/A | 46275@AA7 | IRON CITY ASSET MANAGEMENT, LLC | 741,186 | 741,186 | 771,262 | 30,076 |
| N/A | 46563@AA8 | ITECH FUNDING LLC | 1,021,304 | 1,021,304 | 1,074,972 | 53,668 |
| N/A | 46662#AA6 | JACKSON ASSET MANAGEMENT, LLC | 762,154 | 762,154 | 788,918 | 26,764 |
| N/A | 78013GSS5 | ROYAL BK CDA | 2,170,000 | 2,170,000 | - | (2,170,000) |
| N/A | 86576#AA7 | SUMMERVILLE ASSET MANAGEMENT, LLC | 1,005,189 | 1,005,189 | 1,067,498 | 62,309 |
| N/A | 87339#AA3 | TAC INVESTMENTS LLC | 5,444,304 | 5,444,304 | 5,657,946 | 213,642 |
| N/A | 9941317U8 | CAPITAL ASSETS FUND V, LLC | 3,867,012 | 3,867,012 | 4,017,619 | 150,607 |
| N/A | 9941317V6 | CAPITAL ASSETS FUND IV, LLC | 3,491,012 | 3,491,012 | 3,490,995 | (17) |
| N/A | 35472MAA4 | FRANKLIN STR 2018-1 LLC | 1,700,000 | 3,073,128 | 1,700,000 | (1,373,128) |
| N/A | 65532NAA7 | NOM GB 2018 I LLC | 1,055,913 | 1,818,308 | 1,055,252 | (763,056) |
| N/A | 72083RAA7 | PIERRE MENDES LLC | 3,766,200 | 5,999,999 | 4,183,502 | (1,816,498) |
| N/A | 9944639X1 | CV INVESTMENTS, LLC | 1,102,461 | 1,102,461 | 1,102,461 | - |
| N/A | 9942228W1 | GILFORD ASSET MANAGEMENT, LLC | 147,347 | 147,347 | 147,347 | - |
| N/A | 9941318T3 | CAPITAL ASSETS MANAGEMENT II, LLC | 1,365,633 | 1,365,633 | 1,365,629 | (4) |
| N/A | 9941317T1 | CAPITAL ASSETS FUND II, LLC | 2,627,968 | 2,627,968 | 2,627,968 | - |
| | | **Total Affiliated Investments** | 60,412,402 | 66,029,059 | 60,365,938 | (5,663,120) |

**Summary of activity (rounded to hundred-thousands)**

| | |
|---|---|
| Decrease in PPN positions due to unwinding activities | (11,400,000) |
| Increase in loans due to PPN underlying assignments | 3,600,000 |
| Increase due to capitalization of interest for senior loans | 2,100,000 |
| Total | (5,700,000) |

COLORADO BANKERS LIFE INSURANCE COMPANY

NORTH CAROLINA COMMISSIONER OF INSURANCE AS REHABILITATOR

AS OF DECEMBER 31, 2019,

A BALANCE SHEET

AS OF DECEMBER 31, 2019

A SUMMARY OF OPERATIONS AND STATEMENT OF CASH FLOW

THROUGH DECEMBER 31, 2019

AND

A SCHEDULE OF AFFILIATED INVESTMENTS

AS OF DECEMBER 31, 2019

## INTRODUCTION

### BACKGROUND

Colorado Bankers Life Insurance Company (hereinafter, "Company") was originally incorporated under the laws of the State of Colorado as a stock life insurance company on May 28, 1974. On December 14, 2015, the Company redomesticated to North Carolina. On June 27, 2019, the Wake County Superior Court (hereinafter, the "Court") issued an Order of Rehabilitation (hereinafter, "Order") against the Company and appointed the Commissioner of Insurance for the State of North Carolina as Rehabilitator (hereinafter, the "Rehabilitator"). On June 27, 2019, the Court also entered an Order Granting Motion for Moratorium on Policy Surrenders and Other Relief (hereinafter "Moratorium").

The Company is part of a group of insurance companies known as Global Bankers Insurance Group (hereinafter, "GBIG"). GBIG is part of a larger group of companies known as Eli Global. Eli Global is owned by Greg Lindberg.

### PURPOSE OF THIS REPORT

The purpose of this report is to provide a quarterly update to the Court, as required by the Order, on the work that the Rehabilitator and his staff have carried out since the issuance of the Order, to set out the present situation of the Company, and to provide a balance sheet and schedule of affiliated investments as of December 31, 2019, and a summary of operations and statement of cash flow through December 31, 2019.

### LIMITATIONS

This report is based only on the knowledge that the Rehabilitator and his staff have gained from the work performed since the issuance of the Order. Facts may exist that the Rehabilitator is unaware of that may have a material effect on the information provided in this report. The Rehabilitator will update the information in future quarterly reports as additional facts are discovered.

## SUMMARY

### COMPANY PROPERTY

- In accordance with the Order, the Rehabilitator has taken possession of all known assets and property of the Company.
- The Rehabilitator is currently evaluating the Company's in-force business and reinsurance programs in furtherance of determining the feasibility of a successful rehabilitation.

### MEMORANDUM OF UNDERSTANDING AND INTERIM LOAN AGREEMENT

On June 27, 2019, the Company entered into a Memorandum of Understanding ("MOU") and Interim Loan Amendment ("ILA") with Greg E. Lindberg, Academy Association, Inc. and Edwards Mill Asset Management, LLC. The Parties executed this MOU to set forth their agreements regarding, amount other things, (i) the immediate partial amendment of, among other things, the interest rate and repayment terms of various affiliated loans through the ILA; (ii) the global restructuring of various affiliated companies through the formation of a new holding company; and (iii) the global restructuring and modifications of all affiliated loans, including

assignment of the loans to such new holding company. The restructuring was to be completed by September 30, 2019, so The Company, along with the other insurance companies in rehabilitation, filed a complaint against the other parties to the MOU on October 1, 2019. See the Investment Portfolio and Litigation sections for more information.

## INVESTMENT PORTFOLIO

The goal of the Rehabilitator is to reduce the amount of affiliated investments and to increase long-term liquidity. The non-affiliated investments are invested primarily in publicly traded securities. The Rehabilitator is working on a plan for the Eli Global non-insurance operating companies to repay the affiliated investments.

- The Company has approximately 38% of its assets invested in affiliated investments as of December 31, 2019.
- Affiliated assets represent 1,148% of surplus.
- In June 2019, the Company extended a $40m line of credit (LOC) to American Financial Academy, LLC, an affiliate, for liquidity purposes. As of December 31, 2019, $39.9m had been advanced. The LOC requires monthly interest payments and matures on June 27, 2020.
- Per the ILA, interest on the senior loans was reduced to 5% and was deferred for six months until December 27, 2019 and then is to be capitalized as part of the principal balance. Interest is payable quarterly beginning in 2020. The balance for the affiliated investments reflects the capitalized interest. The maturity date is December 31, 2029.
- Per the ILA, interest on the junior loans was reduced to 5.5% and was deferred for twelve months until June 27, 2020 and then is to be capitalized as part of the principal balance. Interest is payable quarterly beginning in 2021. The balance for the affiliated investments reflects the capitalized interest. The maturity date is June 30, 2029.
- Per the ILA, the return on the preferred equity was reduced to 6%.
- Per the ILA, interest on the insurance holding company loans was reduced to 0.0%. The maturity date is June 30, 2026.

## REINSURANCE

The Company entered into a reinsurance agreement with Nederlandsche Algemeene Maatschappij Van Levensversichering "Conservatrix" N.V. (Conservatrix). The agreement was originally effective March 31, 2017 and provided for CBLIC to reinsure Conservatrix on an aggregate excess of loss basis with treaty. The Rehabilitator disavowed the reinsurance agreement on December 22, 2019. See the Litigation section for additional information.

## EXPENSE REDUCTIONS

- The Rehabilitator is evaluating the Company's contracts to identify those that are essential for ongoing operations. As part of this effort, the Rehabilitator is also attempting to negotiate more favorable terms of essential contracts.

## LITIGATION

To the Rehabilitator's knowledge, at the time of the Order, the Company is a party to the following lawsuits:

*Nathan Safford v. Colorado Bankers Life Insurance Company, Benefits for America, William Maxwell McMullen, et al.,* **Case No. CV-17-900014, Circuit Court for Bullock County, State of Alabama**

The case was filed on February 7, 2019, alleging misrepresentation, fraudulent suppression, breach of fiduciary duty, negligence, negligent hiring/training/supervision, and conspiracy regarding sale of life insurance policies.

Plaintiff filed a second amended complaint on February 7, 2019, along with written discovery. The complaint joined new party defendants. Those new defendants were: Greg Lindberg; Southland National Holdings, Inc.; Global Bankers Insurance Group, LLC; SNA Capital, LLC; and Bankers Reinsurance Company Ltd. The newly-joined defendants, including Southland National Holdings, Inc., moved to dismiss the complaint on March 18. This motion remains pending. Further, the Court entered an order continuing the April 23, 2019 trial setting, did not provide a new trial date, nor did it enter a new scheduling order.

On September 4, 2019, the trial court stayed the case on notice of the North Carolina North Carolina Rehabilitation order staying and granting and injunctive relief. The case was placed on the Administrative Docket.

*Harry Smith v. Colorado Bankers Life Insurance Company, Benefits for America, William Maxwell McMullen, et al.,* **Case No. CV-17-000485, Circuit Court for Montgomery County, State of Alabama**

The case was filed on February 8, 2019, alleging misrepresentation, fraudulent suppression, breach of fiduciary duty, negligence, negligent hiring/training/supervision, and conspiracy regarding sale of life insurance policies.

Discovery was conducted with an anticipated trial date in December 2019.

On September 15, 2019, the trial court stayed the case on notice of the North Carolina Rehabilitation order staying and granting and injunctive relief and scheduled a status conference for September 15, 2020. The case was placed on the Administrative Docket.

*Colorado Bankers Life Insurance Company v. Avalon by the Sea AC, LLC, et al.,* **Case no. 18-SM-cv-00144, Superior Court of California, Los Angeles County**

The case was filed on October 17, 2018. The Company sued Avalon, alleging default on credit facility for mental health and drug/alcohol rehabilitation facilities in Southern California and seeking appointment of a receiver. Alpine Capital is the agent/servicer.

The appointed receiver is attempting to maximize value and ultimately sell assets of Avalon. Following reports of the Receiver and at the request of Colorado Bankers Life Insurance Company, the court extended the Receivership through April 20, 2020.

*In re Marriage of Alice C. Lager v. Howard E. Lager and Global Bankers Insurance Group (potential joinder of Colorado Bankers Life Insurance Company),* **Case No. 18WHFL00213, Superior Court of California, County of Los Angeles**

The case was filed on May 22, 2019. This is a divorce proceeding in which Petitioner alleges an interest in the Colorado Bankers Life Insurance Company's policies of Respondent.

Joinder was filed adding GBIG, LLC as defendant in divorce proceeding on May 22, 2019. Defendant/Husband is a policyholder of Colorado Bankers Life Insurance Company. Counsel for Petitioner has been advised she joined the wrong party.

*Estate of Douglas S. Long v. Colorado Bankers Life Insurance Co., et al,* **Case No. VCU 281258, Tulare County, State of California.**

The case was filed on January 2, 2020. This is a claim for payment on a life insurance policy. Counsel for the estate has been requested to dismiss or stay the case due the rehabilitation order and injunction.

*Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company in Rehabilitation, Colorado Bankers Life Insurance Company in Rehabilitation, and Southland National Reinsurance Corporation in Rehabilitation v. Greg Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, New England Capital, LLC, and Private Bankers Life and Annuity Co., Ltd.,* **Case No. 19 CVS 013093, Wake County, North Carolina.**

This case was filed on October 1, 2019, alleging a breach of the contract entered into by the parties on June 27, 2019. An Amended Complaint was filed on October 28, 2019, and added claims for fraud and negligent misrepresentation arising from statements contained in the June 27, 2019 contract and the Defendants' conduct.

On October 1, 2019, the Wake County Superior Court entered a Temporary Restraining Order ("TRO"), which will remain in place, by consent of the parties, until the Court enters an order on Plaintiffs' Motion for Preliminary Injunction. Essentially, the TRO prohibits the Defendants from taking any action that would negatively impact the value of Plaintiffs' investments into Defendants' companies. In their Motion for Preliminary Injunction, Plaintiffs' have requested that the relief granted in the TRO be extended through the pendency of the litigation, and that a receiver be appointed to, among other things, monitor compliance with the TRO.

The Defendants moved to dismiss the original complaint and the amended complaint on various grounds. The Court denied those motions in an Order filed on January 21, 2020.

*Colorado Bankers Life Insurance Company v. Nederlandsche Algemeene Maatschappij Van Levensversichering Conservatrix N.V., et al.,"* **Case No. 19 CVS 17191, Wake County, North Carolina**

On December 22, 2019, the Rehabilitator advised Nederlandsche Algemeene Maatschappij Van Levensversichering Conservatrix N.V. ("Conservatrix") that he was disavowing a 2017 reinsurance agreement and related trust agreement between Conservatrix and Colorado Bankers Life. Later that same day, Conservatrix presented its arbitration demand to the Rehabilitator, and the following day - on December 23, 2019 - the Rehabilitator applied for and obtained a Temporary Restraining Order ("TRO") from the Wake County Superior Court ("Court"), restraining Conservatrix and the trustee for the trust account - Fifth Third Bank - from removing, disturbing, or otherwise interfering with any of the assets in the trust account and restraining Conservatrix from proceeding or acting upon its arbitration demand. The return date for the TRO was extended by agreement of the parties until March 2, 2020, at which time the Court will hold a hearing to determine whether to convert the TRO into a preliminary injunction.

## OTHER MATTERS
- Pursuant to the Moratorium Order, the Rehabilitator has imposed a moratorium on cash surrenders, annuitizations, and policy loans against the Company's policies until such time as the Court approves lifting of the moratorium.
- In accordance with the Moratorium Order, the Rehabilitator has adopted and implemented a policy to provide substitute benefits in lieu of the contractual obligations of the Company for annuity benefits and cash withdrawals for policyholders who petition for payment under claims of legitimate hardship. As of February 12, 2020, 674 hardship cases have been received. 223 were approved, 165 were denied due to insufficient information, 47 were denied due to not meeting the hardship qualifications and 239 are in process.

## CONTINUATION OF BUSINESS
The Company reduced writing the majority of new business in October 2018 and ceased all new business as of the date of the Order. A final decision as to the course of action to take with the Company has not yet been determined.

## INTRODUCTION TO COLORADO BANKERS LIFE INSURANCE COMPANY
### FINANCIAL STATEMENTS
### AS OF DECEMBER 31, 2019

<u>Introduction and Basis of Presentation:</u> The Company is a North Carolina domiciled life, accident and health insurance company that was placed in rehabilitation by the Wake County Superior Court on June 27, 2019. The Company is under the control of the Commissioner of Insurance of the State of North Carolina, in his capacity as Court appointed Rehabilitator. It is the Rehabilitator's responsibility to take possession of the assets of the Company and to administer them under the general supervision of the Court.

The accompanying unaudited financial statements were prepared by the Company's staff for the period of April 1, 2019, to June 26, 2019, and subsequent to the Order under the direct supervision of the Rehabilitator's staff, as of December 31, 2019. The financial statements have been prepared in accordance with Statutory Accounting Principles promulgated by the National Association of Insurance Commissioners.

On July 26, 2019, the Governor of North Carolina signed into law, House Bill 220. This bill amends N.C. Gen. Stat §58-19-10(b), which limits the amount of investments in affiliates and subsidiaries to the lessor of ten percent (10%) of the insurer's admitted assets or fifty percent (50%) of the insurer's policyholders' surplus, provided that after those investments, the insurer's policyholders' surplus will be reasonable in relation to the insurers' outstanding liabilities and adequate to its financial needs. The excess amount of affiliated investments should be non-admitted. As of December 31, 2019, the Company has $939m of excess affiliated investments. Should this amount be non-admitted, the Company would have a negative surplus of $854m.

The December 31, 2019 balance of the investments listed on the Affiliated Investment schedule include the capitalized amount of interest deferred on the senior loans through December 27, 2019 in accordance with the Interim Loan Amendment. The amount of capitalized interest has been estimated based on all available information. Once a final reconciliation is complete, the amount of capitalized interest may change.

ANNUAL STATEMENT FOR THE YEAR 2019 OF THE Colorado Bankers Life Insurance Company

## ASSETS

| | | Current Year | | | Prior Year |
|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 |
| | | Assets | Nonadmitted Assets | Net Admitted Assets (Cols. 1 - 2) | Net Admitted Assets |
| 1. | Bonds (Schedule D) | 2,412,238,874 | | 2,412,238,874 | 2,206,581,762 |
| 2. | Stocks (Schedule D): | | | | |
| | 2.1 Preferred stocks | 67,412,249 | | 67,412,249 | 0 |
| | 2.2 Common stocks | 2,409,400 | | 2,409,400 | 1,186,700 |
| 3. | Mortgage loans on real estate (Schedule B): | | | | |
| | 3.1 First liens | | | 0 | 0 |
| | 3.2 Other than first liens | | | 0 | 0 |
| 4. | Real estate (Schedule A): | | | | |
| | 4.1 Properties occupied by the company (less $ ____ encumbrances) | 5,927,200 | | 5,927,200 | 0 |
| | 4.2 Properties held for the production of income (less $ ____ encumbrances) | | | 0 | 0 |
| | 4.3 Properties held for sale (less $ ____ encumbrances) | | | 0 | 0 |
| 5. | Cash ($ ____ 40,409,412 , Schedule E-Part 1), cash equivalents ($ ____ 16,507,686 , Schedule E-Part 2) and short-term investments ($ ____ 24,762,384 , Schedule DA) | 81,623,302 | | 81,623,302 | 403,894,420 |
| 6. | Contract loans (including $ ____ premium notes) | 8,206,865 | | 8,206,865 | 7,591,174 |
| 7. | Derivatives (Schedule DB) | 835,687 | | 835,687 | 287,827 |
| 8. | Other invested assets (Schedule BA) | 0 | | 0 | 0 |
| 9. | Receivables for securities | 33,728 | | 33,728 | 6,100,000 |
| 10. | Securities lending reinvested collateral assets (Schedule DL) | | | 0 | 0 |
| 11. | Aggregate write-ins for invested assets | 0 | 0 | 0 | 0 |
| 12. | Subtotals, cash and invested assets (Lines 1 to 11) | 2,578,687,305 | 0 | 2,578,687,305 | 2,625,641,883 |
| 13. | Title plants less $ ____ charged off (for Title insurers only) | | | 0 | 0 |
| 14. | Investment income due and accrued | 13,555,979 | | 13,555,979 | 26,409,206 |
| 15. | Premiums and considerations: | | | | |
| | 15.1 Uncollected premiums and agents' balances in the course of collection | 819,559 | 229,559 | 590,000 | 628,065 |
| | 15.2 Deferred premiums, agents' balances and installments booked but deferred and not yet due (including $ ____ earned but unbilled premiums) | 8,853,863 | | 8,853,863 | 9,653,509 |
| | 15.3 Accrued retrospective premiums ($ ____ ) and contracts subject to redetermination ($ ____ ) | | | 0 | 0 |
| 16. | Reinsurance: | | | | |
| | 16.1 Amounts recoverable from reinsurers | 316,740 | 109,428 | 207,312 | 56,989 |
| | 16.2 Funds held by or deposited with reinsured companies | | | 0 | 0 |
| | 16.3 Other amounts receivable under reinsurance contracts | 28,113 | | 28,113 | 2,345,475 |
| 17. | Amounts receivable relating to uninsured plans | | | 0 | 0 |
| 18.1 | Current federal and foreign income tax recoverable and interest thereon | 2,804,722 | | 2,804,722 | 905,067 |
| 18.2 | Net deferred tax asset | 54,497,343 | 54,497,343 | 0 | 11,168,457 |
| 19. | Guaranty funds receivable or on deposit | | | 0 | 0 |
| 20. | Electronic data processing equipment and software | | | 0 | 0 |
| 21. | Furniture and equipment, including health care delivery assets ($ ____ ) | | | 0 | 0 |
| 22. | Net adjustment in assets and liabilities due to foreign exchange rates | | | 0 | 0 |
| 23. | Receivables from parent, subsidiaries and affiliates | 582,248 | | 582,248 | 312 |
| 24. | Health care ($ ____ ) and other amounts receivable | 19,647 | | 19,647 | 5,485 |
| 25. | Aggregate write-ins for other-than-invested assets | 3,694,863 | 3,194,863 | 500,000 | 290,988 |
| 26. | Total assets excluding Separate Accounts, Segregated Accounts and Protected Cell Accounts (Lines 12 to 25) | 2,663,860,382 | 58,031,193 | 2,605,829,189 | 2,677,105,437 |
| 27. | From Separate Accounts, Segregated Accounts and Protected Cell Accounts | | | 0 | 0 |
| 28. | Total (Lines 26 and 27) | 2,663,860,382 | 58,031,193 | 2,605,829,189 | 2,677,105,437 |

**DETAILS OF WRITE-INS**

| | | | | | |
|---|---|---|---|---|---|
| 1101. | | | | 0 | 0 |
| 1102. | | | | 0 | 0 |
| 1103. | | | | 0 | 0 |
| 1198. | Summary of remaining write-ins for Line 11 from overflow page | 0 | 0 | 0 | 0 |
| 1199. | Totals (Lines 1101 through 1103 plus 1198) (Line 11 above) | 0 | 0 | 0 | 0 |
| 2501. | Miscellaneous Receivables | 1,529,045 | 1,029,045 | 500,000 | 290,988 |
| 2502. | Negative Interest Maintenance Reserve | 2,165,818 | 2,165,818 | 0 | 0 |
| 2503. | | | | 0 | 0 |
| 2598. | Summary of remaining write-ins for Line 25 from overflow page | 0 | 0 | 0 | 0 |
| 2599. | Totals (Lines 2501 through 2503 plus 2598) (Line 25 above) | 3,694,863 | 3,194,863 | 500,000 | 290,988 |

# LIABILITIES, SURPLUS AND OTHER FUNDS

| | 1 Current Year | 2 Prior Year |
|---|---|---|
| 1. Aggregate reserve for life contracts $ _____ 0 (Exhibit 5, Line 9999999) less $ _____ included in Line 6.3 (including $ _____ Modco Reserve) | 2,327,663,534 | 2,112,238,757 |
| 2. Aggregate reserve for accident and health contracts (including $ _____ 0 Modco Reserve) | 885,671 | 1,034,240 |
| 3. Liability for deposit-type contracts (Exhibit 7, Line 14, Col. 1) (including $ _____ Modco Reserve) | 11,827,425 | 13,910,151 |
| 4. Contract claims: | | |
| 4.1 Life (Exhibit 8, Part 1, Line 4.4, Col. 1 less sum of Cols. 9, 10 and 11) | 10,374,710 | 21,276,062 |
| 4.2 Accident and health (Exhibit 8, Part 1, Line 4.4, sum of Cols. 9, 10 and 11) | 160,723 | 287,206 |
| 5. Policyholders' dividends/refunds to members $ _____ and coupons $ _____ due and unpaid (Exhibit 4, Line 10) | 0 | 0 |
| 6. Provision for policyholders' dividends, refunds to members and coupons payable in following calendar year—estimated amounts: | | |
| 6.1 Policyholders' dividends and refunds to members apportioned for payment (including $ _____ Modco) | | 0 |
| 6.2 Policyholders' dividends and refunds to members not yet apportioned (including $ _____ Modco) | | 0 |
| 6.3 Coupons and similar benefits (including $ _____ Modco) | | 0 |
| 7. Amount provisionally held for deferred dividend policies not included in Line 6 | | 0 |
| 8. Premiums and annuity considerations for life and accident and health contracts received in advance less $ _____ discount; including $ _____ 0 accident and health premiums (Exhibit 1, Part 1, Col. 1, sum of Lines 4 and 14) | 1,069,916 | 1,569,822 |
| 9. Contract liabilities not included elsewhere: | | |
| 9.1 Surrender values on canceled contracts | | 0 |
| 9.2 Provision for experience rating refunds, including the liability of $ _____ accident and health experience rating refunds of which $ _____ is for medical loss ratio rebate per the Public Health Service Act | | 0 |
| 9.3 Other amounts payable on reinsurance, including $ _____ assumed and $ _____ ceded | 5,338,382 | 571,164 |
| 9.4 Interest Maintenance Reserve (IMR, Line 6) | 0 | 3,161,888 |
| 10. Commissions to agents due or accrued-life and annuity contracts $ _____ accident and health $ _____ and deposit-type contract funds $ _____ | 15,313 | 8,439 |
| 11. Commissions and expense allowances payable on reinsurance assumed | | 0 |
| 12. General expenses due or accrued (Exhibit 2, Line 12, Col. 7) | 1,236,593 | 139,484 |
| 13. Transfers to Separate Accounts due or accrued (net) (including $ _____ accrued for expense allowances recognized in reserves, net of reinsured allowances) | | 0 |
| 14. Taxes, licenses and fees due or accrued, excluding federal income taxes (Exhibit 3, Line 9, Col. 6) | 38,494 | 2,238,141 |
| 15.1 Current federal and foreign income taxes, including $ _____ on realized capital gains (losses) | | 0 |
| 15.2 Net deferred tax liability | | 0 |
| 16. Unearned investment income | | 0 |
| 17. Amounts withheld or retained by reporting entity as agent or trustee | 1,455,378 | 0 |
| 18. Amounts held for agents' account, including $ _____ agents' credit balances | | 0 |
| 19. Remittances and items not allocated | 3,018,552 | 1,179,638 |
| 20. Net adjustment in assets and liabilities due to foreign exchange rates | | 0 |
| 21. Liability for benefits for employees and agents if not included above | | 0 |
| 22. Borrowed money $ _____ and interest thereon $ _____ | | 0 |
| 23. Dividends to stockholders declared and unpaid | | 0 |
| 24. Miscellaneous liabilities: | | |
| 24.01 Asset valuation reserve (AVR, Line 16, Col. 7) | 24,841,014 | 8,610,198 |
| 24.02 Reinsurance in unauthorized and certified ($ _____ ) companies | 0 | 0 |
| 24.03 Funds held under reinsurance treaties with unauthorized and certified ($ _____ ) reinsurers | 118,172,454 | 313,331,261 |
| 24.04 Payable to parent, subsidiaries and affiliates | 11,081,622 | 2,604,674 |
| 24.05 Drafts outstanding | | 0 |
| 24.06 Liability for amounts held under uninsured plans | | 0 |
| 24.07 Funds held under coinsurance | | 0 |
| 24.08 Derivatives | 0 | 0 |
| 24.09 Payable for securities | | 0 |
| 24.10 Payable for securities lending | | 0 |
| 24.11 Capital notes $ _____ and interest thereon $ _____ | | 0 |
| 25. Aggregate write-ins for liabilities | 286,561 | 360,084 |
| 26. Total liabilities excluding Separate Accounts business (Lines 1 to 25) | 2,517,466,342 | 2,482,521,209 |
| 27. From Separate Accounts statement | 0 | 0 |
| 28. Total liabilities (Lines 26 and 27) | 2,517,466,342 | 2,482,521,209 |
| 29. Common capital stock | 1,500,000 | 1,500,000 |
| 30. Preferred capital stock | 1,000,000 | 1,000,000 |
| 31. Aggregate write-ins for other than special surplus funds | 8,425,878 | 9,417,399 |
| 32. Surplus notes | 9,000,000 | 9,000,000 |
| 33. Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 204,976,020 | 204,976,020 |
| 34. Aggregate write-ins for special surplus funds | 0 | 0 |
| 35. Unassigned funds (surplus) | (136,539,051) | (31,309,191) |
| 36. Less treasury stock, at cost: | | |
| 36.1 _____ shares common (value included in Line 29 $ _____ ) | | 0 |
| 36.2 _____ shares preferred (value included in Line 30 $ _____ ) | | 0 |
| 37. Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) | 85,862,847 | 192,084,228 |
| 38. Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 88,362,847 | 194,584,228 |
| 39. Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 2,605,829,189 | 2,677,105,437 |
| DETAILS OF WRITE-INS | | |
| 2501. Unclaimed Property | 286,561 | 360,084 |
| 2502. | | 0 |
| 2503. | | 0 |
| 2598. Summary of remaining write-ins for Line 25 from overflow page | 0 | 0 |
| 2599. Totals (Lines 2501 through 2503 plus 2598) (Line 25 above) | 286,561 | 360,084 |
| 3101. Deferred Gain on Reinsurance | 8,425,878 | 9,417,399 |
| 3102. | | 0 |
| 3103. | | 0 |
| 3198. Summary of remaining write-ins for Line 31 from overflow page | 0 | 0 |
| 3199. Totals (Lines 3101 through 3103 plus 3198) (Line 31 above) | 8,425,878 | 9,417,399 |
| 3401. | | 0 |
| 3402. | | 0 |
| 3403. | | 0 |
| 3498. Summary of remaining write-ins for Line 34 from overflow page | 0 | 0 |
| 3499. Totals (Lines 3401 through 3403 plus 3498) (Line 34 above) | 0 | 0 |

# SUMMARY OF OPERATIONS

| | 1<br>Current Year | 2<br>Prior Year |
|---|---|---|
| 1. Premiums and annuity considerations for life and accident and health contracts (Exhibit 1, Part 1, Line 20.4, Col. 1, less Col. 11) | 273,736,519 | 1,333,935,404 |
| 2. Considerations for supplementary contracts with life contingencies | 112,190 | 0 |
| 3. Net investment income (Exhibit of Net Investment Income, Line 17) | 116,422,980 | 92,304,865 |
| 4. Amortization of Interest Maintenance Reserve (IMR, Line 5) | 292,842 | 1,608,632 |
| 5. Separate Accounts net gain from operations excluding unrealized gains or losses | 0 | 0 |
| 6. Commissions and expense allowances on reinsurance ceded (Exhibit 1, Part 2, Line 26.1, Col. 1) | 2,337,164 | 5,426,617 |
| 7. Reserve adjustments on reinsurance ceded | | 0 |
| 8. Miscellaneous Income: | | |
| 8.1 Income from fees associated with investment management, administration and contract guarantees from Separate Accounts | | 0 |
| 8.2 Charges and fees for deposit-type contracts | | 54,848 |
| 8.3 Aggregate write-ins for miscellaneous income | 1,242,998 | 1,624,826 |
| 9. Totals (Lines 1 to 8.3) | 394,144,693 | 1,434,955,192 |
| 10. Death benefits | 10,964,490 | 13,168,739 |
| 11. Matured endowments (excluding guaranteed annual pure endowments) | 0 | 0 |
| 12. Annuity benefits (Exhibit 8, Part 2, Line 6.4, Cols. 4 + 8) | 5,241,430 | 6,681,952 |
| 13. Disability benefits and benefits under accident and health contracts | 6,111,267 | 3,095,446 |
| 14. Coupons, guaranteed annual pure endowments and similar benefits | | 0 |
| 15. Surrender benefits and withdrawals for life contracts | 85,254,667 | 65,189,448 |
| 16. Group conversions | | 0 |
| 17. Interest and adjustments on contract or deposit-type contract funds | 493,304 | 630,682 |
| 18. Payments on supplementary contracts with life contingencies | 60,509 | 166,454 |
| 19. Increase in aggregate reserves for life and accident and health contracts | 215,319,006 | 1,273,096,361 |
| 20. Totals (Lines 10 to 19) | 323,444,673 | 1,362,029,082 |
| 21. Commissions on premiums, annuity considerations and deposit-type contract funds (direct business only) (Exhibit 1, Part 2, Line 31, Col. 1) | 13,479,662 | 61,867,833 |
| 22. Commissions and expense allowances on reinsurance assumed (Exhibit 1, Part 2, Line 26.2, Col. 1) | 581,258 | (1,508,868) |
| 23. General insurance expenses and fraternal expenses (Exhibit 2, Line 10, Columns 1, 2, 3, 4 and 6) | 37,612,903 | 25,659,886 |
| 24. Insurance taxes, licenses and fees, excluding federal income taxes (Exhibit 3, Line 7, Cols. 1 + 2 + 3 + 5) | 3,193,727 | 4,270,179 |
| 25. Increase in loading on deferred and uncollected premiums | (1,847,550) | 1,165,396 |
| 26. Net transfers to or (from) Separate Accounts net of reinsurance | | 0 |
| 27. Aggregate write-ins for deductions | 8,499,917 | 9,982,340 |
| 28. Totals (Lines 20 to 27) | 384,964,590 | 1,463,465,850 |
| 29. Net gain from operations before dividends to policyholders, refunds to members and federal income taxes (Line 9 minus Line 28) | 9,180,103 | (28,510,658) |
| 30. Dividends to policyholders and refunds to members | | 0 |
| 31. Net gain from operations after dividends to policyholders, refunds to members and before federal income taxes (Line 29 minus Line 30) | 9,180,103 | (28,510,658) |
| 32. Federal and foreign income taxes incurred (excluding tax on capital gains) | 2,564,741 | 21,035,654 |
| 33. Net gain from operations after dividends to policyholders, refunds to members and federal income taxes and before realized capital gains or (losses) (Line 31 minus Line 32) | 6,615,362 | (49,546,312) |
| 34. Net realized capital gains (losses) (excluding gains (losses) transferred to the IMR) less capital gains tax of $_____ (excluding taxes of $_____ transferred to the IMR). | (77,598,650) | (2,872,152) |
| 35. Net income (Line 33 plus Line 34) | (70,983,288) | (52,418,464) |
| **CAPITAL AND SURPLUS ACCOUNT** | | |
| 36. Capital and surplus, December 31, prior year (Page 3, Line 38, Col. 2) | 194,584,228 | 121,737,730 |
| 37. Net income (Line 35) | (70,983,288) | (52,418,464) |
| 38. Change in net unrealized capital gains (losses) less capital gains tax of $ | 1,534,023 | (385,542) |
| 39. Change in net unrealized foreign exchange capital gain (loss) | (1,265,948) | (5,835,349) |
| 40. Change in net deferred income tax | 19,933,610 | 28,676,030 |
| 41. Change in nonadmitted assets | (34,179,665) | (19,174,192) |
| 42. Change in liability for reinsurance in unauthorized and certified companies | 0 | 0 |
| 43. Change in reserve on account of change in valuation basis, (increase) or decrease | 0 | 0 |
| 44. Change in asset valuation reserve | (16,230,816) | (6,531,125) |
| 45. Change in treasury stock (Page 3, Lines 36.1 and 36.2 Col. 2 minus Col. 1) | 0 | 0 |
| 46. Surplus (contributed to) withdrawn from Separate Accounts during period | | 0 |
| 47. Other changes in surplus in Separate Accounts statement | 0 | 0 |
| 48. Change in surplus notes | 0 | 0 |
| 49. Cumulative effect of changes in accounting principles | | 0 |
| 50. Capital changes: | | |
| 50.1 Paid in | | |
| 50.2 Transferred from surplus (Stock Dividend) | | 0 |
| 50.3 Transferred to surplus | | 0 |
| 51. Surplus adjustment: | | |
| 51.1 Paid in | | |
| 51.2 Transferred to capital (Stock Dividend) | | 130,184,854 |
| 51.3 Transferred from capital | | 0 |
| 51.4 Change in surplus as a result of reinsurance | | 0 |
| 52. Dividends to stockholders | (4,037,777) | 0 |
| 53. Aggregate write-ins for gains and losses in surplus | (991,520) | (1,669,714) |
| 54. Net change in capital and surplus for the year (Lines 37 through 53) | (106,221,381) | 72,846,498 |
| 55. Capital and surplus, December 31, current year (Lines 36 + 54) (Page 3, Line 38) | 88,362,847 | 194,584,228 |
| **DETAILS OF WRITE-INS** | | |
| 08.301 Commissions, Service & Issue Fees and Other | 455,162 | 628,142 |
| 08.302 Amortization of Surplus due to IMR | 787,836 | 996,684 |
| 08.303 | | 0 |
| 08.398 Summary of remaining write-ins for Line 8.3 from overflow page | 0 | 0 |
| 08.399 Totals (Lines 08.301 through 08.303 plus 08.398) (Line 8.3 above) | 1,242,998 | 1,624,826 |
| 2701. Modified Coinsurance Expense | (75,525) | 90,467 |
| 2702. Reinsurance funds withheld Investment Income | 8,529,606 | 10,072,169 |
| 2703. Fines and penalties | 22,809 | 638 |
| 2798. Summary of remaining write-ins for Line 27 from overflow page | 23,027 | 0 |
| 2799. Totals (Lines 2701 through 2703 plus 2798) (Line 27 above) | 8,499,917 | 9,982,340 |
| 5301. Deferred Gain on Reinsurance | (991,520) | (1,669,714) |
| 5302. | | 0 |
| 5303. | | 0 |
| 5398. Summary of remaining write-ins for Line 53 from overflow page | 0 | 0 |
| 5399. Totals (Lines 5301 through 5303 plus 5398) (Line 53 above) | (991,520) | (1,669,714) |

## CASH FLOW

| | 1<br>Current Year | 2<br>Prior Year |
|---|---|---|
| **Cash from Operations** | | |
| 1. Premiums collected net of reinsurance | 76,622,716 | 1,373,434,134 |
| 2. Net investment income | 95,701,475 | 78,645,994 |
| 3. Miscellaneous income | 3,580,162 | 7,106,291 |
| 4. Total (Lines 1 through 3) | 175,904,353 | 1,459,186,419 |
| 5. Benefit and loss related payments | 114,607,599 | 72,716,389 |
| 6. Net transfers to Separate Accounts, Segregated Accounts and Protected Cell Accounts | 0 | 0 |
| 7. Commissions, expenses paid and aggregate write-ins for deductions | 64,463,131 | 98,260,815 |
| 8. Dividends paid to policyholders | 0 | 0 |
| 9. Federal and foreign income taxes paid (recovered) net of $ _____ tax on capital gains (losses) | 4,464,396 | 10,000,000 |
| 10. Total (Lines 5 through 9) | 183,535,126 | 180,977,204 |
| 11. Net cash from operations (Line 4 minus Line 10) | (7,630,773) | 1,278,209,214 |
| **Cash from Investments** | | |
| 12. Proceeds from investments sold, matured or repaid: | | |
| 12.1 Bonds | 1,031,166,855 | 967,408,963 |
| 12.2 Stocks | 17,125,229 | 0 |
| 12.3 Mortgage loans | 0 | 0 |
| 12.4 Real estate | 0 | 0 |
| 12.5 Other invested assets | 0 | 0 |
| 12.6 Net gains or (losses) on cash, cash equivalents and short-term investments | (169,021) | 2,957,045 |
| 12.7 Miscellaneous proceeds | 102,229,119 | 0 |
| 12.8 Total investment proceeds (Lines 12.1 to 12.7) | 1,150,352,182 | 970,366,008 |
| 13. Cost of investments acquired (long-term only): | | |
| 13.1 Bonds | 1,285,632,267 | 2,498,867,439 |
| 13.2 Stocks | 93,282,020 | 868,000 |
| 13.3 Mortgage loans | 0 | 0 |
| 13.4 Real estate | 6,100,000 | 0 |
| 13.5 Other invested assets | 0 | 0 |
| 13.6 Miscellaneous applications | 93,594,336 | 19,461,632 |
| 13.7 Total investments acquired (Lines 13.1 to 13.6) | 1,478,608,622 | 2,519,197,071 |
| 14. Net increase (decrease) in contract loans and premium notes | 0 | 878,766 |
| 15. Net cash from investments (Line 12.8 minus Line 13.7 minus Line 14) | (328,256,440) | (1,549,709,829) |
| **Cash from Financing and Miscellaneous Sources** | | |
| 16. Cash provided (applied): | | |
| 16.1 Surplus notes, capital notes | 0 | 0 |
| 16.2 Capital and paid in surplus, less treasury stock | 0 | 90,800,000 |
| 16.3 Borrowed funds | 0 | 0 |
| 16.4 Net deposits on deposit-type contracts and other insurance liabilities | (2,082,726) | (1,859,799) |
| 16.5 Dividends to stockholders | 0 | 0 |
| 16.6 Other cash provided (applied) | 15,698,821 | 5,013,603 |
| 17. Net cash from financing and miscellaneous sources (Lines 16.1 to 16.4 minus Line 16.5 plus Line 16.6) | 13,616,095 | 93,953,804 |
| **RECONCILIATION OF CASH, CASH EQUIVALENTS AND SHORT-TERM INVESTMENTS** | | |
| 18. Net change in cash, cash equivalents and short-term investments (Line 11, plus Lines 15 and 17) | (322,271,118) | (177,546,811) |
| 19. Cash, cash equivalents and short-term investments: | | |
| 19.1 Beginning of year | 403,894,420 | 581,441,231 |
| 19.2 End of year (Line 18 plus Line 19.1) | 81,623,302 | 403,894,420 |

Note: Supplemental disclosures of cash flow information for non-cash transactions:

| | | |
|---|---|---|
| 20.0001. Transfer of premium related to affiliated reinsurance recapture | 201,532,461 | 0 |
| 20.0002. Settlement of CY FIT payable through surplus contribution | | 12,526,317 |
| 20.0003. Capital Contribution in the form of bonds | | 26,858,537 |
| 20.0004. | | 0 |
| 20.0005. | | 0 |
| 20.0006. | | 0 |
| 20.0007. | | 0 |
| 20.0008. | | 0 |
| 20.0009. | | 0 |
| 20.0010. | | 0 |

# OVERFLOW PAGE FOR WRITE-INS

L004 Additional Aggregate Lines for Page 04 Line 27.
*SUMOPS – Summary of Operations

|  | 1<br>Current Year | 2<br>Prior Year |
|---|---|---|
| 2704. Other miscellaneous expenses | 23.027 |  |
| 2797. Summary of remaining write-ins for Line 27 from Page 4 | 23.027 | 0 |

**COLORADO BANKERS LIFE INSURANCE COMPANY**
**SCHEDULE OF AFFILIATED INVESTMENTS**
**09/30/2019 and 12/31/2019 COMPARISON**

| Trust Account | CUSIP Identification | Description | Actual Cost | Book/ Adjusted Carrying Value September 30, 2019 | Book/ Adjusted Carrying Value December 31, 2019 | Change |
|---|---|---|---|---|---|---|
| N/A | 00405@AA7 | ACADEMY FINANCIAL ASSETS | $ 19,698,000 | $ 19,634,178 | $ 20,484,799 | $ 850,620 |
| N/A | 37940*AA3 | ACADEMY FINANCIAL ASSETS | 8,462,891 | 8,435,725 | 8,873,861 | 438,136 |
| N/A | 9941326T3 | ACADEMY FINANCIAL ASSETS - REVOLVER | 33,905,524 | 39,905,524 | 39,905,524 | - |
| N/A | 9941328T5 | ACADEMY FINANCIAL ASSETS FKA AFI PROMISSORY NOTE | 24,196,820 | 24,196,820 | 32,173,169 | 7,976,349 |
| N/A | 9941327T4 | AFA FKA AFI TERM | 5,674,149 | - | 5,950,782 | 5,950,782 |
| N/A | 9941329T6 | AFA FKA GIC SR. NOTE | 21,700,000 | - | 23,308,921 | 23,308,921 |
| N/A | 00856#AD3 | AGERA ENERGY LLC | 35,000,000 | 1 | 1 | - |
| N/A | 9941268Z6 | ALPHARETTA | 2,097,465 | 1,979,348 | 1,979,348 | - |
| N/A | 00224#AA4 | AR PURCHASING SOLUTIONS 2, LLC | 2,841,811 | 2,841,811 | 3,111,299 | 269,488 |
| N/A | 00223@AA7 | AR PURCHASING SOLUTIONS, LLC | 2,140,418 | 2,182,589 | 2,579,609 | 397,020 |
| N/A | K0004@AA0 | AT DENMARK INVESTMENTS | 8,534,551 | 8,534,551 | 8,934,166 | 399,614 |
| N/A | 04686@AA9 | AUGUSTA ASSET MANAGEMENT, INC | 4,271,474 | 4,271,474 | 4,419,464 | 147,990 |
| N/A | 05777@AA6 | BALDWIN ASSET MANAGEMENT, INC | 21,225,457 | 20,943,243 | 21,656,067 | 712,824 |
| N/A | 06367UAA5 | BANK MONTREAL MEDIUM TERM SR BK NTS BOOK ENTRY 144 | 62,212,661 | 62,212,926 | 37,385,743 | (24,827,182) |
| N/A | 06739FJM4 | BARCLAYS BANK PLC | 76,399,342 | 76,398,455 | 42,758,514 | (33,639,941) |
| N/A | L0770#AA9 | BEAUFORT HOLDINGS S.A. | 6,009,693 | 5,666,850 | 5,865,113 | 198,263 |
| N/A | 13972#AA1 | CAPITAL ASSET MANAGEMENT III, LLC | 29,625,000 | 28,272,026 | 29,420,746 | 1,148,719 |
| N/A | 13973@AA2 | CAPITAL ASSETS FUND I, LLC | 60,007,146 | 60,007,581 | 64,779,275 | 4,771,694 |
| N/A | 9941317V6 | CAPITAL ASSETS FUND IV, LLC | 42,910,111 | 34,910,113 | 34,909,950 | (163) |
| N/A | 9941317U8 | CAPITAL ASSETS FUND V, LLC | 41,443,522 | 37,203,522 | 38,612,150 | 1,408,628 |
| N/A | 16230#AA2 | CHATWORTH ASSET MANAGEMENT, INC. | 22,384,145 | 22,384,145 | 23,106,101 | 721,956 |
| N/A | 20465#AA0 | COMPLYSMART, LLC | 3,002,000 | 3,002,000 | 3,161,427 | 159,427 |
| N/A | 23570*AA0 | DAMASCUS ASSET MANAGEMENT, INC. | 18,791,160 | 18,791,160 | 19,383,002 | 591,842 |
| N/A | 29412#AA5 | EPHESUS ASSET MANAGEMENT, INC. | 21,139,806 | 21,026,497 | 21,687,850 | 661,353 |
| N/A | 34610#AA5 | FOREST PARK ASSET MANAGEMENT, INC. | 17,246,459 | 17,246,459 | 17,784,595 | 538,135 |
| N/A | 35472MAA4 | FRANKLIN STR 2018-1 LLC | 47,990,349 | 29,538,060 | 16,320,000 | (13,218,060) |
| N/A | 40905#AA6 | HAMPTON ASSET MANAGEMENT, INC | 22,097,474 | 22,097,661 | 22,873,984 | 776,323 |
| N/A | 9941557U3 | HPCSP INVESTMENTS PROMISORY NOTE | 4,051,293 | 4,051,293 | 4,051,293 | - |
| N/A | 9941556V4 | HPCSP INVESTMENTS SENIOR NOTE | 7,016,140 | 7,016,140 | 7,333,764 | 317,624 |
| N/A | G4919@AA1 | INTRALAN INVESTMENTS LIMITED | 4,152,310 | 4,152,310 | 4,345,388 | 193,078 |
| N/A | 46275@AA7 | IRON CITY ASSET MANAGEMENT, INC. | 25,275,943 | 21,890,569 | 22,778,831 | 888,262 |
| N/A | 46563@AA8 | ITECH FUNDING LLC | 19,281,368 | 19,281,368 | 20,313,840 | 1,032,472 |
| N/A | 46662#AA6 | JACKSON ASSET MANAGEMENT, INC. | 20,725,423 | 20,725,610 | 21,452,108 | 726,498 |
| N/A | 49803@AA2 | KITE ASSET MANAGEMENT INC | 34,622,923 | 34,624,363 | 36,059,207 | 1,434,844.09 |
| N/A | 51703#AA7 | LARES, LLC | 4,489,111 | 4,489,111 | 4,661,314 | 172,202 |
| N/A | 53250#AA0 | LILY ASSET MANAGEMENT INC | 33,084,925 | 32,684,928 | 34,045,395 | 1,360,466 |
| N/A | 57187#AA9 | MARSHALLA ASSET MANAGEMENT, LLC | 31,082,941 | 31,082,941 | 32,271,283 | 1,188,342 |
| N/A | 9947669V1 | NIH CAPITAL, LLC | 11,407,477 | 11,407,477 | 11,407,477 | - |
| N/A | 65532NAA7 | NOM GB 2018 I LLC | 2,213,899 | 2,212,709 | 1,284,142 | (928,567) |
| N/A | 69902#AA8 | PARADISE ASSET MANAGEMENT INC | 39,700,000 | 28,574,289 | 30,317,533 | 1,743,244 |
| N/A | 69322@AA2 | PCF LLC | 3,196,289 | 3,196,289 | 3,303,149 | 106,860 |
| N/A | 72083RAA7 | PIERRE MENDES LLC | 59,999,993 | 59,999,993 | 41,835,018 | (18,164,975) |
| N/A | 77294@AA9 | ROCKDALE ASSET MANAGEMENT INC | 39,700,000 | 29,003,704 | 30,706,053 | 1,702,348 |
| N/A | 78013GSS5 | ROYAL BK CDA | 21,700,000 | 21,700,000 | - | (21,700,000) |
| N/A | X7552#AC1 | STANDARD FINANCIAL LIMITED | 3,819,822 | 3,819,822 | 4,069,925 | 250,104 |
| N/A | 86576#AA7 | SUMMERVILLE ASSET MANAGEMENT, INC. | 23,752,824 | 21,939,073 | 23,301,977 | 1,362,904 |
| N/A | 90225@AA6 | TYBEE ISLAND ASSET MANAGEMENT, INC. | 28,743,436 | 28,733,301 | 29,553,578 | 820,277 |
| N/A | 9944639X1 | CV INVESTMENTS, LLC | 12,590,691 | 12,590,691 | 12,590,627 | (64) |
| N/A | 9942228W1 | GILFORD ASSET MANAGEMENT, LLC | 1,771,121 | 1,771,121 | 1,771,121 | - |
| N/A | 9941318T3 | CAPITAL ASSETS MANAGEMENT II, LLC | 21,346,767 | 21,346,767 | 21,346,767 | - |
| N/A | 9941317T1 | CAPITAL ASSETS FUND II, LLC | 33,555,104 | 31,703,735 | 31,703,735 | - |
| | | Total Affiliated Investments | $ 1,148,287,229 | $ 1,029,680,326 | $ 981,928,985 | $ (47,751,341) |

**Summary of activity (rounded to hundred-thousands)**

| | |
|---|---|
| Decrease in PPN positions due to unwinding | (118,000,000) |
| Increase due to capitalization of interest for senior loans | 35,400,000 |
| Increase in Loans due to PPN underlying assignments | 34,900,000 |
| | (47,700,000) |

**NORTH CAROLINA**

**DURHAM COUNTY**

## VERIFICATION

MICHAEL DINIUS, being first duly sworn, deposes and says that he is appointed as Special Deputy Rehabilitator for Southland National Insurance Corporation, Southland National Reinsurance Corporation, Bankers Life Insurance Company and Colorado Bankers Life Insurance Company by the Commissioner of Insurance for the State of North Carolina, and in his capacity as Rehabilitator, that he has read the foregoing quarterly report of activity of the Rehabilitator as of December 31, 2019, and a balance sheet, summary of operations, statement of cash flow, and schedule of affiliated investments as of December 31, 2019, of Southland National Insurance Corporation, Southland National Reinsurance Corporation, Bankers Life Insurance Company and Colorado Bankers Life Insurance Company for the period from June 27, 2019, the date of rehabilitation, through December 31, 2019, and that the contents of same are true and correct to the best of his knowledge and belief, based on the books and records of the Companies.

This the **13** day of February, 2020.

Special Deputy Rehabilitator for
Southland National Insurance Corporation
Southland National Reinsurance Corporation
Bankers Life Insurance Company
Colorado Bankers Life Insurance Company

NORTH CAROLINA

DURHAM COUNTY

Sworn to and subscribed before me this

The **13** day of February, 2020.
(Official Seal)

> BRITTANIE BOONE
> NOTARY PUBLIC
> WAKE COUNTY
> North Carolina
> My Commission Expires Nov. 11, 2024

Notary Public

My Commission Expires: **NOV. 11, 2024**

# Exhibit N

Berkeley Research Group, LLC
810 Seventh Avenue | Suite 4100
New York, NY 10019
O 646.205.9320
F 646.454.1174
thinkbrg.com



**PRIVILEGED AND CONFIDENTIAL**

July 30, 2020

Aaron Tobin, Esq.
Condon Tobin Sladek Thornton PLLC
808 Park Lane, #700
Dallas, Texas 75231

Dear Mr. Tobin:

Pursuant to an agreement dated December 2, 2019, Berkeley Research Group, LLC ("BRG") has been engaged by Condon Tobin Sladek Thornton PLLC to provide certain consulting services and, at your request, below are written summaries and updates of a few of the work streams. I want to emphasize that the observations below are still preliminary and subject to change as we receive additional information and update our work.

Damages

BRG has identified damages in excess of $400 million as a result of the alleged actions of the North Carolina Commissioner of Insurance. BRG has been asked to create a model reflecting the damages caused to selected Lindberg companies. The analysis reviews 2017 and 2019 valuations, the performance of the subject companies as well as the performance of comparable public companies and their industries. Although BRG's analysis is still ongoing, the companies already reviewed by BRG are:

- Colorado Bankers Life Insurance Company
- Private Bankers Life and Annuity Co, Ltd.
- Pavonia Life Insurance Company of Michigan
- Bankers Life Insurance Company
- Southland National Reinsurance Corporation
- Southland National Insurance Corporation
- Standard Advisory Services Limited

Personal Net Worth/Solvency

Mr. Lindberg directly and indirectly owns companies (the "Affiliated Companies") that have borrowed from insurance companies also indirectly owned by Mr. Lindberg. He personally guarantees this affiliated debt. BRG was engaged to review the solvency of the Affiliated Companies and estimate



Aaron Tobin, Esq.
Condon Tobin Sladek Thornton PLLC

July 30, 2020

Mr. Lindberg's personal net worth. Although work is ongoing, BRG's valuation of the Affiliated Companies indicates that the aggregate value of the Affiliated Companies exceeds their debt and other obligations. Furthermore, BRG estimates that Mr. Lindberg's personal net worth is between $860 million and $1.46 billion, net of liabilities of between $2.6 billion and $2.7 billion including the debts of the Affiliated Companies.

Capital Contributions

BRG has been asked to identify and compile the amount of capital contributions and other financial support made by Mr. Greg Lindberg to certain insurance companies. The support for the insurance companies was typically made directly by GBIG Holdings Inc, an investment company owned 100% by Mr. Lindberg. Although its work is ongoing, BRG has estimated that capital contributions, consisting of cash infusions, foregone dividends and certain non-cash transactions, amount to at least $377 million.

Furthermore, BRG's review of the respective financial information of the insurance companies did not find uncover payment of any dividends to Mr. Lindberg, GBIG or any Lindberg-affiliated companies. The insurance companies subject to BRG's work were:

- Bankers Life Insurance Company
- Global Bankers Insurance Group, LLC (f/k/a Colorado Benefits Administrators, LLC)
- Cincinnati Equitable
- Colorado Bankers Life Insurance Company
- Pavonia Life Insurance of Michigan
- Preferred Financial Corporation LLC
- SN Group Development, LLC
- Southland National Reinsurance Corporation
- Southland National Insurance Corporation

Let me know if you have any questions. I will update you as we continue with our work.

Best Regards,

William Epstein
Managing Director

# Exhibit O

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 355 of 508

**Affiliate Exposure**

*Direct holdings of companies below only - See data tab for full list that includes underlying investments

*Principal Only

| | Senior | Junior | Preference Shares | AAPC | PBLA Main | Insurance | Agora | Other Exclusions | Total Principal |
|---|---|---|---|---|---|---|---|---|---|
| CBL | 632,110,464.35 | 31,216,732.27 | 83,026,291.28 | 69,316,155.75 | - | 80,606,516.55 | 86,953,983.22 | 42,883,123.51 | 983,836,143.41 |
| BLIC | 30,734,348.70 | 2,597,057.88 | 8,831,148.60 | 7,748,225.33 | - | 5,082,517.44 | 5,799,971.72 | 2,174,739.91 | 60,793,269.67 |
| SNIC | 78,643,967.23 | 5,194,115.75 | 14,229,097.16 | 16,888,467.16 | - | 21,160,934.01 | 7,112,222.74 | 7,598,441.70 | 143,228,804.03 |
| **Total GBIG** | 741,488,780.28 | 39,007,905.90 | 106,086,537.04 | 94,552,848.23 | - | 106,849,967.99 | 99,866,177.68 | 52,656,305.13 | 1,187,852,217.12 |
| | | | | | | | | | |
| PBLA | 409,364,370.69 | 686,668.05 | 5,304,224.84 | 9,807,106.21 | - | 55,296,322.45 | 882,058.68 | 3,470,664.89 | 481,340,750.92 |
| Northstar | 39,691,386.11 | 8,499,478.66 | 51,688,649.49 | 1,663,346.13 | - | 60,328,062.73 | 9,041,487.31 | 24,658,336.71 | 170,912,410.43 |
| PBIHL | - | - | 29,361,871.49 | - | - | 958,353.38 | 13,039,280.00 | - | 43,359,504.87 |
| OMNIA | - | - | 2,308,395.21 | - | - | 172,503.61 | 40,651,552.91 | - | 43,132,451.73 |
| **Total Bermuda** | 449,055,756.81 | 9,186,146.71 | 88,663,141.02 | 11,470,452.34 | 254,540,394.99 | 116,755,242.17 | 63,614,378.89 | 28,129,001.60 | 993,285,512.94 |
| | | | | | | | | | |
| Standard Re | - | 822,836.17 | - | - | - | 675,000.00 | - | | 1,497,836.17 |
| VirtusUSAP | 89,861,728.41 | - | 5,272,747.31 | 6,183,381.89 | - | 40,179,865.93 | 19,326,567.75 | 3,156,111.35 | 160,824,291.35 |
| VirtusAIC | - | - | (0.00) | 14,111,281.23 | - | - | - | - | 14,111,281.23 |
| **Total Others** | 89,861,728.41 | 822,836.17 | 5,272,747.31 | 20,294,663.12 | - | 40,854,865.93 | 19,326,567.75 | 3,156,111.35 | 176,433,408.75 |
| | | | | | | | | | |
| **Total All** | 1,280,406,265.49 | 49,016,888.78 | 200,022,425.37 | 126,317,963.69 | 254,540,394.99 | 264,460,076.15 | 182,807,124.32 | 83,941,418.07 | 2,441,512,556.87 |
| **Total on Schedule** | 1,280,406,265.49 | 49,016,888.78 | 200,022,425.37 | 126,317,963.69 | 254,540,394.99 | 264,460,076.15 | 182,807,124.32 | 83,941,418.07 | |
| **Difference** | - | - | - | 0.00 | - | (0.00) | 0.00 | (0.00) | |
| | | | | | | | | | |
| **Pro Forma Addbacks** | | | | | | | | | |
| Assigned Finanzen Holdings Inc | 69,800,433.82 | - | 1,100,000.00 | | Addback tranche is based on paydown from insurance company | | | | |
| Signed Medical Physics LLC | 4,000,947.07 | - | - | | | | | | |
| **Total Addbacks** | 73,801,380.89 | - | 1,100,000.00 | | | | | | |
| | | | | | | | | | |
| **Proforma Total** | 1,206,604,884.60 | 49,016,888.78 | 198,922,425.37 | 126,317,963.69 | 254,540,394.99 | 264,460,076.15 | 182,807,124.32 | 83,941,418.07 | 2,366,611,175.98 |

**Affiliate Exposure P+I**

*Direct holdings of companies below only - See data tab for full list that includes underlying investments

*Principal and Accrued

| | Senior | Junior | Preference Shares | AAPC | PBLA Main | Insurance | Agora | Other Exclusions | Total Principal |
|---|---|---|---|---|---|---|---|---|---|
| CBL | 638,075,132.59 | 31,886,511.00 | 83,026,291.28 | 69,918,045.14 | - | 84,902,942.79 | 89,499,510.03 | 44,468,634.60 | 997,398,432.83 |
| BLIC | 30,799,768.33 | 2,652,779.73 | 8,831,148.60 | 7,748,307.31 | - | 5,398,553.03 | 5,981,081.48 | 2,229,544.08 | 61,411,638.49 |
| SNIC | 78,997,855.97 | 5,305,559.45 | 14,229,097.16 | 16,889,029.65 | - | 22,075,534.65 | 7,316,625.45 | 7,856,197.00 | 144,813,702.33 |
| **Total GBIG** | 747,872,756.90 | 39,844,850.19 | 106,086,537.04 | 94,555,382.10 | - | 112,377,030.47 | 102,797,216.96 | 54,554,435.68 | 1,203,533,773.66 |
| | | | | | | | | | |
| PBLA | 415,906,331.13 | 707,793.68 | 5,304,224.84 | 9,807,387.89 | - | 57,210,743.65 | 883,090.76 | 3,552,088.24 | 489,819,571.95 |
| Northstar | 42,098,299.98 | 9,111,350.46 | 51,688,649.49 | 1,663,188.47 | - | 62,195,681.23 | 9,326,587.68 | 24,668,308.29 | 176,083,757.30 |
| PBIHL | - | - | 29,361,871.49 | - | - | 958,353.38 | 13,039,280.00 | - | 43,359,504.87 |
| OMNIA | 84,443.83 | - | 2,308,395.21 | - | - | 172,503.61 | 40,651,552.91 | - | 43,216,895.56 |
| **Total Bermuda** | 458,089,074.94 | 9,819,144.14 | 88,663,141.02 | 11,470,576.36 | 259,399,369.50 | 120,537,281.87 | 63,900,511.35 | 28,220,396.53 | 1,011,879,099.18 |
| | | | | | | | | | |
| Standard Re | - | 963,885.57 | - | - | - | 686,650.68 | - | - | 1,650,536.25 |
| VirtusUSAP | 94,043,831.30 | - | 5,272,747.31 | 6,180,724.01 | - | 42,771,228.70 | 20,004,603.54 | 3,346,432.61 | 168,273,134.85 |
| VirtusAIC | - | - | (0.00) | 14,111,281.23 | - | - | - | - | 14,111,281.23 |
| **Total Others** | 94,043,831.30 | 963,885.57 | 5,272,747.31 | 20,292,005.23 | - | 43,457,879.38 | 20,004,603.54 | 3,346,432.61 | 184,034,952.33 |
| | | | | | | | | | |
| **Total All** | 1,300,005,663.14 | 50,627,879.90 | 200,022,425.37 | 126,317,963.69 | 259,399,369.50 | 276,372,191.72 | 186,702,331.84 | 86,121,264.82 | 2,485,569,089.98 |
| **Total on Schedule** | 1,300,005,663.14 | 50,627,879.90 | 200,022,425.37 | 126,317,963.69 | 259,399,369.50 | 276,372,191.73 | 186,702,331.85 | 86,121,264.82 | |
| **Difference** | - | - | - | (0.00) | - | (0.00) | (0.01) | 0.00 | |
| | | | | | | | | | |
| **Pro Forma Addbacks** | | | | | | | | | |
| Assigned Finanzen Holdings Inc | 69,800,433.82 | - | 1,100,000.00 | | | | | | |
| Signed Medical Physics LLC | 4,000,947.07 | - | - | | | | | | |
| **Total Addbacks** | 73,801,380.89 | - | 1,100,000.00 | | | | | | |
| | | | | | | | | | |
| **Proforma Total** | 1,226,204,282.25 | 50,627,879.90 | 198,922,425.37 | 126,317,963.69 | 259,399,369.50 | 276,372,191.72 | 186,702,331.84 | 86,121,264.82 | 2,410,667,709.09 |

MOU DEBT STRUCTURE EXHIBIT E | MOU Exhibit D -- NHC Exclusions | Summary | Read Through- Principal

# Exhibit O3

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 008664

MIKE CAUSEY, COMMISSIONER )
OF INSURANCE OF NORTH )
CAROLINA, )
)
     Petitioner, )
)
    v. )
)
SOUTHLAND NATIONAL )
INSURANCE CORPORATION, )
SOUTHLAND NATIONAL )
REINSURANCE CORPORATION, )
BANKERS LIFE INSURANCE )
COMPANY, COLORADO BANKERS )
LIFE INSURANCE COMPANY, )
North Carolina Domiciled Insurance )
Companies, )
)
    Respondents. )

**JOINT MOTION FOR INJUNCTION
TO PROHIBIT INTERFERENCE
WITH REHABILITATION AND
LIQUIDATION PROCEEDINGS**

NOW COME Respondents Bankers Life Insurance Company ("BLIC"),

Colorado Bankers Life Insurance Company ("CBL"), and Southland National

Reinsurance Corporation ("SNRC"), all in rehabilitation, and Southland National

Insurance Corporation in liquidation ("SNIC") (collectively, "Respondents"), and

Petitioner, Commissioner of Insurance Mike Causey, as the duly-appointed

Rehabilitator and Liquidator of Respondents, and jointly move for an injunction

pursuant to N.C. Gen. Stat. §§ 58-19-45 and 58-30-20(a) prohibiting GBIG

Holdings, LLC ("GBIG"), Universal Financial Holdings, LLC ("Universal"), and

Robert Alban ("Alban") from interfering with these rehabilitation and liquidation

1

proceedings. In support of this request, Respondents and Petitioner show the following:

1. At the November 21, 2022 liquidation hearing for Respondents BLIC and CBL, Alban testified—on behalf of his client GBIG–that he, through his company Universal, intended to submit a Form A request to approve the transfer of ownership and control of CBL, BLIC, and SNIC to Universal. Ex. 1, Hrg. Tr. 217:1-23; 226:13-227:6 (Nov. 21, 2022). At the hearing, Alban provided an unexecuted, non-binding letter of intent between Universal and GBIG setting forth that proposal. Ex. 1 at 246:4-25.

2. In April 2023, in support of GBIG's Motion to Reconsider this Court's prior order denying GBIG's Motion to Propose a Plan of Rehabilitation, Alban submitted a declaration and an executed Letter of Intent where Universal agreed to purchase Respondents from GBIG. Alban Dec., ¶ 10 (April 18, 2023). In connection with the transaction contemplated by that letter, Alban testified that Universal intended to submit a Form A for approval to operate SNIC. *Id.*

3. On May 15, 2023, Universal and Alban[1] submitted three separate Statements Regarding the Acquisition of Control of or Merger with a Domestic Insurer on Form A in connection with acquiring "control" of each of the Respondents except Southland National Reinsurance Corporation (the "Insolvent Insurance

[1] Universal and Alban subjected themselves to the jurisdiction of this Court by filing the Form A. N.C. Gen. Stat. § 58-19-15(j).

2

Companies"), pursuant to N.C. Gen. Stat. § 58-19-15 (the "Form A").[2] Ex. 2 – Form A Filings.

4. The Form A applications anticipate Universal acquiring "control" of the Insolvent Insurance Companies through the purchase of their parent company, GBIG. Ex. 2 at 3, 24.

5. However, GBIG does not presently have "control" of the Insolvent Insurance Companies, as defined by N.C. Gen. Stat. § 58-19-5(2). Specifically, GBIG lacks the "direct or indirect possession of the power to direct or cause the direction of the management and policies of [the Insolvent Insurance Companies], whether through the ownership of voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise." N.C. Gen. Stat. § 58-19-5(2). As such, GBIG has no "control" of the Insolvent Insurance Companies that it can lawfully offer to Universal.

6. Rather, "control" of Respondents CBL and BLIC is vested in the Petitioner as Rehabilitator, pursuant to N.C. Gen. Stat. § 58-30-85(a)(19) and (c) and this Court's order of June 27, 2019. Similarly, "control" of Respondent SNIC is vested in the Petitioner as Liquidator pursuant to N.C. Gen. Stat. § 58-30-120(a)(19) and this Court's order of May 2, 2023.

7. Sections 58-30-85(a)(19) and 58-30-120(a)(19) expressly provide that the Rehabilitator and/or Liquidator has the authority to "exercise and enforce all rights,

---

[2] The Form A submitted by Universal is materially different from the letter of intent discussed at the liquidation hearing for BLIC and CBL.

3

remedies, and powers of any creditor, *shareholder*, policyholder, or member."
(emphasis added). That "control" of the Insolvent Insurance Companies is vested in
the Rehabilitator is further evidenced by the language of section 58-30-85(c), which
states in relevant part that the Rehabilitator has "all the powers of the directors,
officers, and managers, whose authority shall be suspended."

8.      Put simply, GBIG lacks the authority to sell or transfer "control" of the
Insolvent Insurance Companies to Universal.

9.      Any agreement to transition control of the Insolvent Insurance
Companies from the Rehabilitator and Liquidator must first be negotiated with and
approved by the Special Deputy Rehabilitators and Special Deputy Liquidators on
behalf of the Insolvent Insurance Companies.  Only then would such agreement be
ripe for Form A review.[3]

10.      The proposed transaction between Universal and GBIG was not
approved by the Special Deputy Rehabilitators and Special Deputy Liquidators.  *See*
Ex. 3, Aff. of J. Murphy at ¶ 8.  Moreover, the details of the transaction were first
provided to the Special Deputy Rehabilitators and Special Deputy Liquidators when
the Form A submissions were forwarded to them by the North Carolina Department
of Insurance.  *See id.*; N.C. Gen. Stat. § 58-19-15(a) (requiring the Form A to be filed
with the domestic insurer when it is filed with the Commissioner).

---

[3] Any approved sale would also need to satisfy the Form A regulatory review process and be approved
by this Court as the Court overseeing the rehabilitation and liquidation of Respondents.  Because the
Form A submitted does not meet the first requirement—approval of the sale or transfer by the persons
in control of the domestic insurer—the remaining hurdles are not discussed herein.

4

11. Based on a preliminary review, it appears that the Form A submissions would require the Rehabilitator and Liquidator and Special Deputy Rehabilitators and Special Deputy Liquidators, (or this Court) to approve certain transactions that the Rehabilitator has previously opposed due to the use of funds, such as the sale and refinancing of certain SACs, including the Clanwilliam Group, Castle & Cooke Mortgage ("CCM"), Claris Vision Group ("CVG"), and the ARM group of companies. Ex. 2 at 3, 47, 56; Ex. 3 at ¶ 9.

12. Each of these transactions are included in Global Growth Holdings Inc.'s alternative "Global Rehabilitation Plan for North Carolina and Bermuda Policyholders." Ex. 3 at ¶ 10.

13. On February 17, 2022, this Court entered an order finding that "GBIG Holdings lack the authority to sell or otherwise encumber [the Insolvent Insurance Companies'] assets while they are in Rehabilitation as such power lies with the Rehabilitator pursuant to N.C.G.S. 58-30-85." Order Denying GBIG Holdings, LLC's Motion for Authority to Propose Plan of Rehabilitation, ¶ 17 (Feb. 17, 2022).

14. In the face of that finding, GBIG went a step further and sought to sell not only the Insolvent Insurance Companies' assets, but the Insolvent Insurance Companies themselves.

15. In that same February 17, 2022 Order, this Court found that "allowing GBIG Holdings to propose a plan or rehabilitation is not appropriate and would interfere with the authority provided to the Commissioner as Rehabilitator pursuant to Chapter 58 of the North Carolina General Statutes." *Id.* at ¶ 15.

5

16. The agreements contained in the Form A submissions are conditioned on the Rehabilitator and Liquidator, essentially, consenting to Global Growth's alternative plan of rehabilitation. Ex. 3 at ¶ 11.

17. GBIG has once again flouted this Court's orders and interfered with these insolvency proceedings by both unlawfully agreeing to sell the Insolvent Insurance Companies without proper legal authority and, again, attempting to implement its alternative plan of rehabilitation. Ex. 3 at ¶ 12.

18. Universal did not negotiate the terms of the transactions set out in the Form A filings with the Insolvent Insurance Companies, the Special Deputy Rehabilitators, or the Special Deputy Liquidators, and those terms have not been approved by the parties currently in "control" of the Insolvent Insurance Companies.

19. Universal and Alban have also interfered with these insolvency proceedings by submitting the Form A applications to the North Carolina Department of Insurance knowing that GBIG lacks the authority to sell the Insolvent Insurance Companies. *See id.*

WHEREFORE, Respondents respectfully request the Court enter an order that:

1. Enjoins GBIG from further attempts to act on behalf of Respondents;

2. Enjoins GBIG from further interfering with these insolvency proceedings;

3. Directs Universal and Alban to withdraw the Form A applications submitted on May 15, 2023, and submit any proposed transaction involving

6

the Respondents to the Rehabilitator and/or Liquidator through the Special Deputy Rehabilitators and/or Special Deputy Liquidators; and

4. Enjoins Universal and Alban from any further attempt to acquire Respondents without receiving the Special Deputy Rehabilitators' or Special Deputy Liquidators' approval of those terms on behalf of the Insolvent Insurance Companies.

Respectfully submitted, this the 30th day of May, 2023.

JOSHUA H. STEIN
ATTORNEY GENERAL

WILLIAMS MULLEN

By: *Daniel S. Johnson* (signature)

Daniel S. Johnson
North Carolina State Bar No. 9289
Special Deputy Attorney General
Insurance Section
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6620
Email: djohnson@ncdoj.gov

By: /s/ *Wes J. Camden*

Wes J. Camden
NC State Bar No. 33190
Caitlin M. Poe
NC State Bar No. 44713
Lauren E. Fussell
NC State Bar No. 49215
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
wcamden@williamsmullen.com
cpoe@williamsmullen.com
lfussell@williamsmullen.com

By: *M. Denise Stanford (by D.S.J.)* (signature)

M. Denise Stanford
North Carolina State Bar No. 17601
Special Deputy Attorney General
Insurance Section
N. C. Department of Justice
P.O. Box 629
Raleigh, N.C. 27602-0629
Telephone: (919) 716-6621
Email: dstanford@ncdoj.gov

Telephone: (919) 981-4000
Facsimile: (919) 981-4300

*Attorneys for the Respondents*

*Attorneys for Petitioner*

7

**CERTIFICATE OF SERVICE**

I, the undersigned attorney, do hereby certify that a copy of the foregoing pleading or paper was served by electronic mail on the following:

> Matthew N. Leerberg
> Mark A. Finkelstein
> Stephen W. Petersen
> Fox Rothschild LLP
> 434 Fayetteville St., Suite 2800
> Raleigh, NC 27601-2943
> mleerberg@foxrothschild.com
> mfinkelstein@foxrothschild.com
> spetersen@foxrothschild.com
> *Attorneys for GBIG Holdings, LLC*
>
> Aaron Z. Tobin
> Jared T.S. Pace
> Condon Tobin Sladek Thornton PLLC
> 8080 Park Lane, Suite 700
> Dallas, TX 75231
> atobin@condontobin.com
> jpace@condontobin.com
> *Attorneys for GBIG Holdings, LLC*
>
> Universal Financial Holdings, LLC
> Robert Alban
> 19 Essex Road
> Bedford, NH 03110
> alban@montshireadvisors.com
>
> David Liggett
> Ragsdale Liggett
> 2840 Plaza Place, Suite 400
> Raleigh, NC 27612
> dliggett@rl-law.com
> *Attorneys for Robert Alban and Universal Financial Holdings, LLC*

to the email addresses of record with the court set forth above in accordance with Rule 5(b)(1)a. of the North Carolina Rules of Civil Procedure. Universal Financial Holdings, LLC and Robert Alban were also served via designated delivery service authorized pursuant to 28 U.S.C. § 7502(f)(2) at the address above.

8

This 30th day of May, 2023.

<span style="display:block; text-align:right;">

_Daniel S. Johnson_ (signature)

Daniel S. Johnson
Special Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6620
N.C. State Bar # 9289
djohnson@ncdoj.gov

</span>

9

IN THE NORTH CAROLINA GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

MIKE CAUSEY, COMMISSIONER OF
INSURANCE OF NORTH CAROLINA,

            Petitioner,

   v.

SOUTHLAND NATIONAL INSURANCE
CORPORATION, SOUTHLAND NATIONAL
REINSURANCE CORPORATION, BANKERS
LIFE INSURANCE COMPANY, COLORADO
BANKERS LIFE INSURANCE COMPANY,
North Carolina Domiciled Insurance
Companies,

            Respondents.

WAKE COUNTY

19 CVS 008664

*TRANSCRIPT - HEARING*

*Monday, November 21, 2022*

Transcript of proceedings in the General Court of Justice, Superior Court Division, Wake County, North Carolina at the November 21, 2022, Civil Session, before the Honorable A. Graham Shirley, III, Judge Presiding.

Tammy L. Johnson, CVR-CM-M, RVR
Official Court Reporter
Tenth Judicial District
Wake County, North Carolina



EXHIBIT
1

PENGAD 800-631-6989

TAMMY JOHNSON, CVR-CM-M, RVR
OFFICIAL COURT REPORTER

Q.   So what are you proposing to buy in this transaction?  What would Universal be buying?

A.   I'm proposing to buy GBIG Holdings, which is the holding company of the three insurance companies.

Q.   Okay.  Would that require any type of -- based on your experience in the insurance industry, would that require any type of regulatory approval?

A.   It would -- it would require Form A approval for change of control of the three insurance companies.

Q.   Okay.  And so that Form A approval would be applied for where?

A.   It would be applied for in the -- in the domiciliary reg- -- from the domiciliary regulator.  I -- I have --

Q.   Which is who here?

A.   Well, it would be -- it would -- we've also proposed for the Department to consider redomestication, so it would be the -- the new domicile or this domicile, depending on whether redomestication is pursued or not.

Q.   Now, you say "this domicile."  What do you mean?  What domicile --

A.   North Carolina.  North Carolina Department of Insurance.

Q.   And you said you may apply for redomestication to Oklahoma.  Is that a necessary prerequisite to close this

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 367 of 508

Q.   We have $15 million in capital that you're prepared to infuse either through your own personal wealth or through your investor relationships?

A.   Yes.

Q.   And how much of your own personal wealth are you contemplating putting into this transaction?

A.   Two million.

Q.   Okay.  So, again, I do lawyer math, which is not necessarily helpful here, but rough math is we're talking over $500 million capital that's going into the insurance companies in this transaction that could close?

A.   Yes.

Q.   Okay.  And what is your estimation of when this transaction, given -- you've spelled out some regulatory commitments that would be required.  given that, what is your estimation of when realistically this transaction could close?

A.   Realistically, I believe this is a transaction that would close in April or May.  The LOI sets forth the transaction closing date of May 31st, so I think we can try to improve upon that, but it's -- it's in that vicinity.

Q.   Okay.  And so that's -- that's roughly six months from now, right?

A.   Yes.

Q.   And why would it take six months to go through a

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 368 of 508

transaction?

A.   Well, there's a lot of steps involved here, and some of it is outside of my control.  It requires regulatory approval.  In the Michigan transaction, we -- it took 110 days to get Form A approval, so that consumes a big chunk of the six months.

Q.   And in this cover letter, you mentioned talking to Mr. Dinius about the concept of redomesticating to Oklahoma, right?

A.   Yes.

Q.   Okay.  But, again, is that necessary to be able to close this transaction?

A.   No.

Q.   But if that were to happen as part of this transaction, the net effect of that would be these companies would no longer be domiciled in North Carolina and they'd be domiciled in Oklahoma?

A.   Correct.

Q.   Okay.  Now, if this Court grants the liquidation petition today for -- first of all, do you know who I'm talking about when I say BLIC?

A.   Yes.

Q.   And you know who I'm talking about when I say CBL?

A.   Yes.

Q.   You understand those are the two life insurance

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 369 of 508

Causey v. Southland National, et al. - 19 CVS 8664
November 21, 2022
Robert Thomas Alban - Examination by the Court     Page 246

"For Discussion Purposes Only," doesn't it?

THE WITNESS:  That's -- yes, that's -- but that's a normal thing you find in a term sheet.

THE COURT:  And it says, "The summary of proposed terms of acquisition sets forth the principal terms of the proposed acquisition of GBIG Holdings, LLC, and is an expression of intent only and is not a binding agreement or commitment to execute the proposed transaction.  There is no binding obligation on the part of any party to proceed with the proposed transaction described in the Acquisition Term Sheet unless and until definitive agreements regarding the proposed transaction are signed by the relevant parties and all required internal approvals of each party are secured"; is that correct?

THE WITNESS:  That -- that's correct.  I --

THE COURT:  That's bold, isn't it?

THE WITNESS:  Yeah, I've sent about a hundred of those, and I'm a business guy, but my lawyers always tell me to put that kind of language in there.

THE COURT:  Because this is essentially an agreement to agree, isn't it?

THE WITNESS:  That's, I guess, how you would characterize a Letter of Intent.

THE COURT:  I don't have any further questions. Do you have any further questions?

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 370 of 508



**RAGSDALE LIGGETT**PLLC

LAWYERS

David K. Liggett | D 919.881.2206 | dliggett@rl-law.com

May 15, 2023

*Via Hand Delivery and Electronic Mail, Susan.Coble@ncdoi.gov*

Susan Coble, Chief Regulatory Specialist
Financial Analysis & Receivership Division
N.C. Department of Insurance
325 N. Salisbury Street
Raleigh, NC 27603

> *Re:* *Form A*
> *Universal Financial Holdings, LLC, Applicant*

Dear Susan,

As discussed, enclosed are three hard copies of three separate Statements Regarding the Acquisition of Control of or Merger with a Domestic Insurer on Form A. In each case, the Applicant is Universal Financial Holdings LLC, a Missouri limited liability company controlled by Robert Alban. The North Carolina domestic insurers the Applicant seeks to acquire are Southland National Insurance Company, Bankers Life Insurance Company and Colorado Bankers Life Insurance Company.

I will send three separate electronic files to you via email to ensure that the files are not too large to open.

Yours truly,

RAGSDALE LIGGETT PLLC

David K. Liggett

Enclosures

EXHIBIT

2

PENGAD 800-631-6989

FORM A

STATEMENT REGARDING THE ACQUISITION OF CONTROL OF
OR MERGER WITH A DOMESTIC INSURER
(this "Statement")

**COLORADO BANKERS LIFE INSURANCE COMPANY**

(the "Domestic Insurer - CBL")

BY

**UNIVERSAL FINANCIAL HOLDINGS LLC**
**ROBERT ALBAN**

(each an "Applicant")

**Filed with the North Carolina Department of Insurance and Financial Services**

(the "Department")

Dated: May 2, 2023

Name, Title, Address and Telephone Number of Individuals to Whom Notices and
Correspondence Concerning this Statement Should Be Addressed:

To:

Bob Alban
CEO, Universal Financial Holdings
Principal, Montshire Advisors
19 Essex Road
Bedford NH 03110
Telephone: 617-500-0008
Email: alban@montshireadvisors.com

With a copy to:
David Liggett
Ragsdale Liggett
2840 Plaza Place,
Suite 400,
Raleigh NC 27612
Telephone: 919.881.2209
Email: dliggett@rl-law.com

1007716119v3

## Item 1.    METHOD OF ACQUISITION

### (a)    Domestic Insurer - CBL

This Form A Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer (this "Application") relates to a proposed acquisition of control of the Domestic Insurer, Bankers Life Insurance Company. The Domestic Insurer - CBL's statutory home office and is located at 2327 Englert Drive Durham North Carolina 27713. The Domestic Insurer - CBL is currently in rehabilitation pursuant to order of rehabilitation issued by Wake County Superior Court on June 27, 2019. (the "Rehabilitation").

### (b)    Method of Acquisition

The Domestic Insurer - CBL is a direct wholly-owned subsidiary of GBIG Holdings, LLC, a limited liability company organized under the laws of the State of Delaware ("GBIG Holdings"). GBIG Holdings is a wholly owned subsidiary of GBIG Capital LLC, a limited liability company organized under the laws of the State of Delaware ("Seller")

On December 2, 2022, Universal Financial Holdings, LLC ("UFH") entered into an agreement to acquire GBIG Holdings from Seller as amended by that certain First Amendment to the Purchase Agreement (collectively, the "Purchase Agreement"), pursuant to which UFH agreed to purchase from Seller all of the membership interests of GBIG Holdings (the "Proposed Acquisition"), subject to satisfaction of all conditions to closing, including receipt of required regulatory approvals from the North Carolina Department of Insurance (the "Department") of this Application approving the change of control of GBIG's wholly owned subsidiary, the Domestic Insurer - CBL and Form D application relating to the issuance of a surplus note by Domestic Insurer – CBL. The Proposed Acquisition is also conditioned upon and subject to regulatory approvals from the Department of a Form A approving the change of control of GBIG Holding's wholly owned subsidiaries, Southland National Insurance Company ("SNIC") and Bankers Life Insurance Company ("BLIC") and the Rehabilitation Court approval of the termination of the Rehabilitation Proceeding of SNIC, BLIC, and CBL, the approval of the sale of Clanwilliam and UKAT, and the approval of refinancing of ARM.

A copy of the Purchase Agreement and the First Amendment thereto is attached as Exhibit 1 to this Statement and incorporated herein by reference.

Universal Financial Holdings is controlled by Robert Alban. Universal Financial Holdings was formed for the purpose of acquiring insurance companies and, as of the date hereof, has no assets or liabilities. Universal Financial Holdings will issue $30 million of preferred equity to outside investors concurrent with the closing of the Proposed Acquisition. Such preferred equity investors will be passive investors who will not control the Domestic Insurer - CBL. No investors will transact any business in Universal Financial Holdings or the Domestic Insurer - CBL or will have the power to sign documents for or otherwise bind Universal Financial Holdings.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 373 of 508

**Item 2.    IDENTITY AND BACKGROUND OF THE APPLICANTS**

### (a)    Name and Address of the Applicants

The names and principal business addresses of the Applicants are as follows:

Universal Financial Holdings
Robert Alban
19 Essex Road
Bedford, NH 03110

### (b)    The Applicants' Business Operations

Universal Financial Holdings is a newly formed limited liability company organized under the laws of the State of Missouri for the purpose of acquiring insurance related businesses.

Robert Alban is an insurance industry entrepreneur and advisor with expertise in risk based capital models, reinsurance, Federal Home Loan Bank ("FHLB") matters, as well as an understanding of insurance tax and accounting considerations and the insurance product and distribution marketplace. Mr Alban is currently Principal of Montshire Advisors, a firm he co-founded in 2011, where he brokers reinsurance, advises insurers on product, distribution, and FHLB matters, and represents investments and investment firms to the US insurance industry. Montshire's clients have included numerous insurance companies, investment managers, and regional Federal Home Loan banks. Mr Alban is also a shareholder in an insurance distribution business focused on marketing insurance and administering benefits for federal employees and employer groups. In 2020, Mr Alban acquired intellectual property from Great American Insurance Company for a supplemental unemployment insurance product which he is in the process of commercializing. Prior to forming Montshire, Mr. Alban led corporate development at National Life Group, a Fortune 1000 insurance company where he focused on capital optimization structures and transactions such as reinsurance, corporate owned life insurance, certified capital companies and other tax advantaged investments, interest rate and equity market hedging, and Federal Home Loan bank programs. Prior to National Life, Mr. Alban led mergers and acquisitions at Sentry Insurance, a Fortune 1000 property and casualty insurer. Prior to Sentry, Mr Alban held business development positions with GXS (formerly GE Information Services), ITOCHU International (an $86 Billion Japanese conglomerate) and Westinghouse. Mr Alban has a BS in Mechanical Engineering from West Virginia University and an MBA from Georgetown University. Mr Alban has his Series 7 and Series 66 securities licenses and is a registered representative of Castle Hill Partners. Mr Alban has his life producer and reinsurance intermediary licenses.

### (c)    Applicants' Organizational Charts

Attached to this Application as Exhibit 2 is the current organizational chart of the Domestic Insurer - CBL immediately prior to the Proposed Acquisition.

A simplified organizational chart presenting the identities of, and interrelationships among, the Applicants and their subsidiaries and affiliates, including the ultimate controlling persons, prior to consummation of the Proposed Acquisition is attached hereto as Exhibit 3. The

2

organizational chart indicates the percentage of voting securities of each entity owned or controlled by the Applicants or any other such persons, the type of organization (e.g., corporation, trust, partnership) and the state or other jurisdiction of domicile or incorporation, as applicable. Unless otherwise indicated on such organizational charts or in this Application, each entity is a corporation and control is maintained by the ownership or control of all outstanding voting securities.

An abbreviated post-closing organizational chart of the Applicants, showing the Domestic Insurer - CBL's place within the Applicants' organizational structure after consummation of the Proposed Acquisition, is attached hereto as Exhibit 4.

There are currently no pending court proceedings involving a reorganization or liquidation of the Applicants or any of the subsidiaries or affiliates of the Applicants.

## Item 3. IDENTITY AND BACKGROUND OF INDIVIDUALS ASSOCIATED WITH THE APPLICANTS

The directors, executive officers and natural persons controlling 10% or more of the voting security of the Applicants are listed in Exhibit 5 hereto. Completed NAIC biographical affidavits of such individuals are attached hereto as Exhibit 6. Third party background checks will be also be performed in connection with this Statement's submission.

A list setting forth the names and business addresses of the prospective members of the board of the Domestic Insurer - CBL is set forth below under Item 5.

## Item 4. NATURE, SOURCE AND AMOUNT OF CONSIDERATION

### (a) Nature, Source and Amount of Consideration

The total consideration for the Proposed Acquisition of GBIG Holdings is $1 plus deferred consideration of $290 million payable concurrent with the redemption of the remaining Global Growth related assets. Prior to closing, Domestic Insurer – CBL shall convert $200 million of GBIG Holding's equity in CBL into a $200 million face amount surplus note with the following terms:

- 10-year term

- 10% interest, can be accrued at borrower's option for the first three years

- Repayable in cash or Global Growth related assets

- The surplus note shall become an asset of GBIG Holdings and be acquired by UFH.

### (b) Criteria in Determining Consideration

The basis and terms of the Purchase Agreement, including the nature and amount of consideration, were determined through arms' length negotiations between representatives of the Applicants and Seller, and their respective financial, legal and other advisors. The amount and type of consideration were determined in view of the consideration paid in other recent acquisitions

3

of similar businesses, as well as the financial position and results of operations of the business to be acquired, including the past and present business operations, historical and potential earnings, financial condition and prospects, assets and liabilities and such other factors and information as the Applicants considered relevant under the circumstances.

### Item 5. FUTURE PLANS FOR DOMESTIC INSURER - CBL

#### (a) Plans for Domestic Insurer - CBL

A Plan of Operations describing the Applicants' intentions with respect to the operations of the Domestic Insurer - CBL following the consummation of the Proposed Acquisition is attached hereto as Exhibit 7.

The tables below set forth a list of all individuals who are proposed to be directors and officers of the Domestic Insurer - CBL following the closing of the Proposed Acquisition:

Directors:

| Name | Title |
| --- | --- |
| Robert Alban | Executive Chairman |
| Michael Reidy | Director |

Officers:

| Name | Title |
| --- | --- |
| Robert Alban | President, Secretary |

Biographical affidavits for Robert Alban are included in Exhibit 8 hereto. The Applicants intend to identify several additional directors for appointment to the Board of the Domestic Insurer – CBL at or shortly after the closing of the Proposed Acquisition. Once these directors are identified, biographical affidavits will be filed.

The Domestic Insurer - CBL is being acquired without a management team, officers or employees. The Applicants' will have an initial management team engaged upon the closing of the Proposed Acquisition to manage third-party service providers and to ensure operational continuity. Over the near-to-medium term, the Applicants expect to continue hiring additional members of Management and support staff and thoughtfully, in a fully coordinated strategy with all parties, transition away from third-party support.

Other than as set forth herein or in the Plan of Operations attached hereto as Exhibit 7, the Applicants have no plans for the Domestic Insurer – CBL to pay a dividend (whether extraordinary or otherwise), liquidate the Domestic Insurer - CBL, sell its assets or merge it with any person or persons or make any other material change in its business operations or corporate structure or management.

4

Applicant intends to pursue discussions with other state regulators regarding re-domestication. Applicant shall file a copy of any UCAA primary application filings it makes with other state insurance departments for approval of re-domestication.

### (b) Five-Year Financial Projections

Five-year financial projections for the Domestic Insurer - CBL are also attached as Exhibit 7 hereto.

### (c) Absence of Other Proposed Changes

There are no proposed changes with respect to the Domestic Insurer – CBL's compliance plan.

### Item 6. VOTING SECURITIES TO BE ACQUIRED

The Applicants will acquire, indirectly, 100 percent of the Domestic Insurer - CBL's capital stock.

Please refer to Item 4(b) above for a description of the method by which the terms of the Purchase Agreement were determined.

### Item 7. OWNERSHIP OF VOTING SECURITIES

None of the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement beneficially owns or has, directly or indirectly, a right to acquire beneficially any voting securities of the Domestic Insurer - CBL or any securities convertible into or evidencing a right to acquire any such voting securities whether or not such right of conversion or acquisition is exercisable immediately or at some future time.

### Item 8. CONTRACTS, ARRANGEMENTS OR UNDERSTANDINGS WITH RESPECT TO VOTING SECURITIES OF THE DOMESTIC INSURER - CBL

Except for the Purchase Agreement, which provides for the acquisition of all of the shares of capital stock of the Domestic Insurer - CBL, there are no contracts, arrangements or understandings with respect to any voting securities of the Domestic Insurer - CBL in which the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement is involved, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits, or the giving or withholding of proxies.

### Item 9. RECENT PURCHASES OF VOTING SECURITIES

There have been no purchases of any voting securities of the Domestic Insurer - CBL by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants,

5

any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

## Item 10.     RECENT RECOMMENDATIONS TO PURCHASE

Except in connection with the execution of the Purchase Agreement, there have been no recommendations to purchase any voting security of the Domestic Insurer - CBL made by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement, or by anyone based upon interviews or at the suggestion of the Applicants, any person controlling, controlled by or under common control with the Applicants or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

## Item 11.     AGREEMENTS WITH BROKER-DEALERS

There are no written or oral agreements, arrangements or understandings made or proposed to be made by any Applicants or any affiliate of the Applicants with any broker-dealer as to solicitation of voting securities of the Domestic Insurer - CBL for tender.

## Item 12.     FINANCIAL STATEMENTS AND EXHIBITS

### (a)     <u>Exhibits and Financial Statements</u>

The financial statements and exhibits attached to this Statement are as follows:

Exhibit 1.     Purchase Agreement

Exhibit 2.     Pre-Acquisition Organizational Chart of the Domestic Insurer - CBL

Exhibit 3.     Pre-Acquisition Organizational Chart of the Applicants

Exhibit 4.     Simplified Organizational Chart of the Applicants and Domestic Insurer - CBL Following the Proposed Acquisition

Exhibit 5.     Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 6.     Biographical Affidavits of Current Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 7.     Plan of Operations and Five Year Financial Projections for the Domestic Insurer - CBL

Exhibit 8.     Personal financial statements of Robert Alban as of April 17, 2023

6

The Applicants respectfully request that Exhibit 8, the personal financial statements of Mr. Alban and Exhibit 6, biographical affidavits of directors be afforded confidential treatment and be excepted from disclosure under G.S. 132-1.2. The information in Mr. Alban's personal financial statement and biographical affidavit contains information of a personal nature. Disclosure of such information would constitute a clearly unwarranted invasion of the relevant individuals' privacy.

### Financial Statements

Attached as Exhibit 8 hereto are the personal financial statements of Robert Alban as of April 17, 2023. Universal Financial Holdings is a newly formed entity and does not have financial statements.

**(c)**      **Tender Offers, Agreements for Voting Securities, Annual Reports**

Other than the Purchase Agreement, which provides for the change of control of all of the shares of capital stock of the Domestic Insurer - CBL, there are no tender offers for, requests or invitations for, tenders of, exchange offers for or agreements to acquire or exchange any voting security of the Domestic Insurer - CBL or additional soliciting materials relating thereto. Other than as indicated herein, there will be no employment, consultation, advisory, managing general agent, controlling producer, or management contracts concerning the Domestic Insurer - CBL, and there have been no annual reports to stockholders of the Domestic Insurer – CBL for the last two (2) fiscal years.

**Item 13.**      **ENTERPRISE RISK MANAGEMENT**

The Applicants agree to provide, to the best of their knowledge and belief, the information required by Form F within fifteen (15) days after the end of the month in which the acquisition of control occurs.

**Item 14.**      **SIGNATURE AND CERTIFICATION**

*[Signature Pages Follow]*

7

## SIGNATURE

Pursuant to the requirements of NC General Statutes - Chapter 58 Article 19, Universal Financial Holdings, LLC has caused this application to be duly signed on its behalf in the City of *Bedford* and State of *NH* on the *2nd* day of *MAY*, 2023.

(Seal)

UNIVERSAL FINANCIAL HOLDINGS, LLC

By: _____

Name: Robert Alban

Title: Authorized Person

Attest:

By: _____

Name: *Caitlin Loving*

Title: *Notary Public*

CAITLIN E. LOVING
Notary Public - New Hampshire
My Commission Expires June 30, 2026

## CERTIFICATION

The undersigned deposes and says that he has duly executed the attached application dated *MAY 2*, 2023, for and on behalf of Universal Financial Holdings, LLC; that he is the authorized signatory of such company and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with the instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information and belief.

_____
(Signature)

_____
Robert Alban
(Type or Print Name)

Exhibit 1 Purchase Agreement and First Amendment

**First Amendment To The Purchase Agreement Executed December 2nd 2022 Between GBIG Capital, LLC and Universal Financial Holdings, LLC**

Section I.2, entitled PURCHASE PRICE shall be hereby amended as per the below:

The amount of "$307 million" shall be replaced with "$290 million" in the sentence, "In addition, within 36 months following the Closing, the Buyer shall deliver to the Seller additional consideration consisting of Seller-Related Assets, as listed on Schedule 1.02 which the parties have agreed to collectively to have cash and accrued interest equal to $307 million"

Section VII.1, entitled CONDITIONS TO CLOSING AND RELATED MATTERS shall be hereby amended to add item (k) as per the below:

(k) The sale of Clanwilliam, the sale of UKAT, and the closing of the ARM refinancing, or the closing of alternative transactions having the same effect in the sole discretion of the Buyer, shall be conditions precedent to the obligations of the Buyer hereunder.

Section IX.1, entitled TERMINATION shall be hereby amended to modify item (e) and item (f) as per the below:

(e) The June 30, 2023 and September 30, 2023 referenced dates shall be increased by 90 days to September 30, 2023, and December 31, 2023, respectively.

(f) "180 days" shall be replaced by "270 days"

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date the first written above by their respective duly authorized officers.

GBIG Capital, LLC
a Delaware limited liability company

By: _____
Name: Greg E. Lindberg
Title: Sole Member

UNIVERSAL FINANCIAL HOLDINGS, LLC a Missouri limited liability company

By: _____
Name: Robert T. Alban
Title: CEO

# LIMITED LIABILITY COMPANY INTEREST PURCHASE AGREEMENT

Dated as of December 2, 2022

between

## GBIG CAPITAL, LLC

and

## UNIVERSAL FINANCIAL HOLDINGS, LLC

This LIMITED LIABILITY COMPANY INTEREST PURCHASE AGREEMENT (including all schedules, exhibits and amendments hereto, this "Agreement"), dated as of December 2, 2022, is made by and between GBIG CAPITAL, LLC, a Delaware limited liability company ("Seller"), and Universal Financial Holdings, LLC a Missouri limited liability company ("Buyer"). Capitalized terms not otherwise defined herein used in this Agreement have the meanings given to such terms herein. In this Agreement, Seller or Buyer may be referred individually as "Party" or collectively as "Parties".

## PRELIMINARY STATEMENTS

A. Seller is the beneficial and record owner of 100% of the membership interests in GBIG Holdings, LLC (the "Company");

B. Company owns all of the issued and outstanding shares of Colorado Bankers Life Insurance Company, a life insurance company domiciled under the laws of North Carolina ("CBL"); Bankers Life Insurance Company, a life insurance company domiciled under the laws of North Carolina ("BLIC"); Southland National Reinsurance Corporation, an insurance company domiciled under the laws of North Carolina ("SNRC"); and Southland National Insurance Corporation, a life insurance company domiciled under the laws of North Carolina ("SNIC"), together the "Acquired Insurance Companies;

C. On June 27, 2019, the Superior Court for Wake County, North Carolina (the "Rehabilitation Court") placed the Acquired Insurance Companies into rehabilitation (the "Rehabilitation Proceeding") under Article 30 of Chapter 58 of the North Carolina General Statutes, such that title to their assets was vested in the Commissioner of Insurance of the State of North Carolina as Rehabilitator;

D. On November 21, 2022, the Rehabilitation Court rendered an oral ruling that CBL and BLIC would be placed into liquidation under Article 30 of Chapter 58 of the North Carolina General Statutes, but the Rehabilitation Court has not yet identified the future date on which such liquidation would be effective; and

E. Seller desires to sell to Buyer and Buyer desires to purchase from Seller all of Seller's membership interest in the Company, ("Seller's Interest") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

2

**Section I.1     Purchase and Sale of the Seller's Interest**. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer (or to an Affiliate or to a designated assignee of Buyer approved in writing by Buyer), free and clear of all Liens, and Buyer shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to all of the Seller's Interest for the Purchase Price set forth in Section 1.02, and in accordance with the wire transfer instructions set forth in Section 1.02 of the Disclosure Schedules. The term "Disclosure Schedules" means the disclosure schedules, attached hereto and made a part hereof, either delivered by Seller and Buyer at least two Business Days prior to the execution and delivery of this Agreement or subsequent thereto, but in any event prior to the Closing, consistent with the requirements of Section 4.09(b). For avoidance of doubt any Disclosure Schedule or Exhibit not attached hereto upon execution of this Agreement shall be assumed to be delivered prior to Closing.

**Section I.2     Purchase Price.** The Parties agree that the "Purchase Price", subject to adjustments in this Agreement, will be $1.00 and other valuable consideration which shall be paid in United States currency. In addition, within 36 months following the Closing, the Buyer shall deliver to the Seller additional consideration consisting of a combination of Seller-Related Assets, as listed on Schedule 1.02, which the Parties have agreed to collectively to have cash and accrued interest equal to $307 million at Closing. Each Seller-Related Asset shall consist of assets related to the Seller or related to Global Growth Holdings, Inc. and shall be selected at the Buyer's sole discretion.

**Section 1.02B Withholding**. Notwithstanding any other provision of this Agreement, and for the avoidance of doubt, (a) each payment made pursuant to this Agreement shall be made net of any Taxes required by applicable Law to be deducted or withheld from such payment and (b) any amounts deducted or withheld from any such payment shall be remitted to the applicable taxing authority and shall be treated for all purposes of this Agreement as having been paid. Seller shall provide Buyer with a valid IRS Form W-9 on or prior to the Closing, or other documentation reasonably satisfactory to Buyer to establish that no withholding under Section 1445 of the Code is required with respect to the Purchase Price.

**Section I.3     Expense Deposit**. Contemporaneous with the execution hereof, the Seller transfers to the Buyer the sum of five hundred thousand dollars ($500,000) (the "**Expense Deposit**"). The Buyer shall use the Expense Deposit to pay the Buyer's reasonable and necessary, actually-incurred third party expenses incurred in connection with the transactions contemplated hereby. Upon written request at any time prior to the Closing, the Buyer shall produce to the Seller, which shall maintain a detailed accounting of all debits from the expense deposit, evidence of the balance of the Expense Deposit and such reasonable documentation as the Seller may require of the expenses funded thereby prior to the date of such request. As of the Closing, the Seller shall return the balance of the Expense Deposit, if any, to the Buyer.

**Section I.4     Redomestication**. As a condition precedent to the Closing of this Stock Purchase Agreement, the Buyer shall cause to be filed a redomestication application and/or whatever similar documentation as may be required for the Acquired Insurance Companies with the Oklahoma Insurance Department ("OID") and shall cause a similar motion or petition to be filed with the Rehabilitation Court. The Parties acknowledge that this is a material term of this agreement and that this term constitutes valuable consideration to the Seller. If the OID does not

3

grant the Buyer's request for redomestication within 90 days from the date that the redomestication petition is filed with the OID, then this Stock Purchase Agreement shall have no further force or effect.

## ARTICLE II
## CLOSING

**Section II.1** **Closing**. In accordance with the terms and subject to the conditions set forth in this Agreement, the closing of the purchase and sale of the Seller's Interest contemplated by this Agreement (the "Closing") shall take place remotely by electronic exchange of documents and electronic signatures, or at such other physical location as the parties may mutually agree, as soon as reasonably practicable upon fulfillment or waiver of all conditions precedent to Closing (the "Closing Date").

**Section II.2** **Payments**. At the Closing, Buyer shall deliver to Seller payment, by wire transfer of immediately available funds, an amount determined in accordance with Section 1.02(a) in accordance with the wire transfer instructions set forth in Section 1.02 of the Disclosure Schedules.

**Section II.3** **Seller Closing Deliverables**. At the Closing, Seller shall deliver to Buyer the following:

(a) an Assignment and Assumption of Limited Liability Company Interest, substantially in the form attached hereto as Exhibit B, duly executed by Company's Manager.

(b) the resignation of the Manager of the Company, duly executed by the Company's Manager;

(c) The Excluded Items Assignment and Assumption (as defined below), in form and substance reasonably acceptable to the Buyer, effective as of the Closing, executed by each of the Seller, the Company, and any third parties required to consent to the Excluded Items Assignment and Assumption.

(d) Share certificates for the Acquired Insurance Companies evidencing the Company's Interest, free and clear of all Encumbrances, accompanied by stock powers or other instruments of transfer duly executed substantially in the form of **Exhibit 2.03(a)** (the "CBL, BLIC, SNRC, and SNIC Stock Powers").

(e) a true and correct copy of the unanimous written consent of the Members of Company, authorizing the execution and delivery of this Agreement and the consummation of the transaction contemplated hereby;

(f) Certificates of Authority of CBL, BLIC, SNRC, and SNIC for the State of North Carolina and for the applicable states which it is qualified to do business as foreign insurance corporation.

4

(g)    Certificate of nonforeign status pursuant to Treasury Regulation Section 1.1445-2(b)(2) (the Foreign Investment in Real Property Tax Act of 1980; "FIRPTA") substantially in the form of **Exhibit 2.03(d)**.

(h)    All Third-Party Consents, if any, contemplated by Sections 3.02 and 3.03, and set forth in Disclosure Schedules, including but not limited to any and all consents required by any applicable Rehabilitation Court orders.

(i)    A certificate, in the form and substance reasonably satisfactory to Buyer, certifying that all of the closing conditions have been fulfilled or waived.

(j)    Evidence of repayment of all indebtedness that would affect the purchase and transfer of the Seller's Interest.

(k)    Written resignations of each of the directors, officer and managers of CBL,BLIC, and SNIC, if any, effective as of the date of the Closing.

(l)    A release agreement in the form of **Exhibit 2.03(i)** from Seller of any and all Seller's claims against CBL, BLIC, and SNIC (the "CBL, BLIC, SNRC, and SNIC Release Agreement").

(m)    Evidence of the resolution, to the satisfaction of Buyer, of any pending litigation or regulatory action, including but not limited to all mattes relating to rehabilitation and liquidation which may apply to the Acquired Insurance Companies.

(n)    Evidence of the approval of the redomestication applications for the Acquired Insurance Carriers by the Oklahoma Department of Insurance, as further described herein.

**Section II.4**    **Buyer's Closing Deliverables**.    At Closing, Buyer shall deliver the following to Seller:

(a)    The portion of the Purchase Price payable to Seller pursuant to Section 1.02(a).

(b)    A certificate of the Secretary (or other officer) of Buyer certifying: (i) that attached thereto are true and complete copies of all resolutions of the board of directors or governing body of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and that such resolutions are in full force and effect; and (ii) the names, titles and signatures of the officers of Buyer authorized to sign this Agreement.

(c)    The Form A acquisition of control approval of the OID as contemplated by Section 5.02 and set forth in the Buyer Disclosure Schedules.

(d)    Any necessary approvals of the transactions contemplated by this Agreement, including but not limited to the purchase and re-domestication, as may be

5

required from the North Carolina Department of Insurance ("NCDOI") pursuant to North Carolina law.

(e) A certificate, in the form and substance reasonably satisfactory to Seller, certifying all of the Closing conditions have been fulfilled or waived.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to and as qualified by the matters set forth in the Disclosure Schedules, Seller hereby represents and warrants to Buyer as follows that as of the Closing Date (except for such representations and warranties which address matters only as of a specific date, which representations and warranties shall be true and correct as of such specific date):

**Section III.1    Incorporation and Authority of Seller.**

(a) Seller is a Delaware limited liability company, duly incorporated, validly existing and in good standing under the Laws of Delaware.

(b) Seller has all requisite corporate power to enter into this Agreement and, consummate the Transaction, and carry out its obligations under this Agreement, *provided however* that Closing may not occur until such conditions precedent and closing deliverables set forth in Sections 2.03, 2.04, 7.01, and 7.02 have been satisfied. The execution and delivery by Seller of this Agreement and the consummation by Seller of the Transaction by, and the performance by Seller of its obligations under, this Agreement have been duly authorized by all requisite corporate action on the part of Seller. The execution and delivery by Seller and the Company of this Agreement and each other agreement related to the Transaction to which Seller and the Company is or will be a party, the consummation by Seller and the Company of the Transaction, and the performance by Seller and the Company of its obligations under this Agreement, have been duly authorized by all requisite corporate action on the part of Seller and the Company (including the approval of Seller's and Acquired Insurance Companies' board of directors). No other corporate proceedings on the part of Seller or the Company, and no other votes or approvals of any membership interests of Company or class or series of Capital Stock of the Acquired Insurance Companies, are necessary to authorize this Agreement or to consummate the Transaction. This Agreement has been duly executed and delivered by Seller, this Agreement constitutes (and at Closing, will constitute) the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, rehabilitation, liquidation, fraudulent conveyance or similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law); provided, that the fact that the Acquired Insurance Companies are under a Rehabilitation order will not be deemed to provide any exception to the enforceable nature of this Agreement as against Seller, except to the

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 388 of 508

extent of the required government approvals provided under <u>Section 7.02(f)</u> and <u>Section 7.02(g)</u>.

(C)    The Acquired Insurance Companies are under the control and supervision of the Rehabilitator. As a result, Seller cannot make any representations as to their current internal workings, financial statements, assets, insurance coverages, or otherwise. To the extent any portion of this Agreement includes a Seller representation about the Acquired Insurance Companies, such statement shall be construed only as Seller's reasonable belief based on information made available to it by the Rehabilitator in public filings.

**Section III.2**    **No Conflict**. Except as set forth in <u>Section 3.02</u> of the Disclosure Schedules, as set forth in the conditions precedent and closing deliverables appearing in Sections 2 and 7, and, in the case of clauses (b) and (c) below, except as may result from any facts or circumstances solely relating to Buyer or its Affiliates (as opposed to any other third party), the execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the Transaction do not (a) violate, conflict with or require a Consent under the organizational documents of Seller, the company the Acquired Insurance Companies, (b) subject to the required resolution of the pending regulatory action and court orders governing the Acquired Insurance Companies prior to Closing, violate or conflict with any Law, Permit or other Governmental Order applicable to Seller, Company or the Acquired Insurance Companies or by which any of them or any of their respective properties or assets is bound or subject or (c) result in any breach of, or constitute a default (or event which, with the giving of notice or lapse of time, or both, would become a default) under, result in the loss of any right, entitlement or obligation in, or give to any Person any entitlement or right under, including rights of termination, acceleration or cancellation of, or result in the loss of any right or benefit to which Seller, Company, or the Acquired Insurance Companies is entitled under, or result in the creation of any Lien on any of the assets or properties of Seller, Company, or the Acquired Insurance Companies pursuant to, any Contract to which Seller, Company, or the Acquired Insurance Companies or any of their properties or assets are bound, other than, in the case of clauses (b) and (c), any such conflicts, violations, breaches, defaults, rights or Liens that, individually or in the aggregate, do not have, and would not reasonably be expected to result in, (i) a material impairment or delay of the ability of Seller to perform its material obligations under this Agreement taken as a whole or (ii) an Acquired Insurance Companies Material Adverse Effect. For the purposes of this Agreement, an Acquired Insurance Companies Material Adverse Effect shall mean any event, <u>change or effect that is materially adverse to the condition (financial or otherwise), properties, assets, liabilities, business, operations or results of operations of the Acquired Insurance Companies.</u>

**Section III.3**    **Consents and Approvals**. Except as set forth in <u>Section 7.02(f)</u>, <u>Section 7.02(g)</u>, or in <u>Section 3.03</u> of the Disclosure Schedules, or as may result from any facts or circumstances solely relating to Buyer or its Affiliates (as opposed to any other third party), the execution and delivery by Seller of this Agreement to which Seller is or will be a party does not, and the performance by Seller of, and the consummation by Seller of the Transaction, does not require any material Governmental Authority approval to be obtained or made by Seller prior to the Closing.

7

**Section III.4    Title to the Seller's Interest.**  Seller is the sole record and beneficial owner of the Membership Interest of Company. The Membership Interests are owned by Seller, and are free and clear of all Liens, other than any restrictions put in place by the Rehabilitation Court. The Company is the sole record and beneficial owner of all of the outstanding shares of each of CBL, BLIC, and SNIC.

**Section III.5    Undisclosed Liabilities.**  To the knowledge of the Seller, the Company has no liabilities, obligations or commitments of any sort that would be required to be reflected on a balance sheet prepared in accordance with GAAP, except (i) those which are adequately reflected or reserved against in the Section 3.05 of the Disclosure Schedules; and (ii) those which have been incurred in the ordinary course of business since December 31, 2021 and which are not, individually or in the aggregate, material in amount. The Acquired Insurance Companies have no liabilities, obligations or commitments of any sort that would be required to be reflected on a balance sheet prepared in accordance with SAP, except (i) those which are adequately reflected or reserved against in the Section 3.05 of the Disclosure Schedules; and (ii) those which have been incurred in the ordinary course of business since December 31, 2021 and which are not, individually or in the aggregate, material in amount.

**Section III.6    Financial Statements; Reserves; Investment Assets; Accounting Controls.**

The following representations are based solely on the reasonable belief of the Seller, given that the Acquired Insurance Companies are in rehabilitation supervised by the NCDOI. Seller has access only to quarterly statements prepared by the NCDOI and the following representations are based solely on such public filings.

(a)    Seller has made available to Buyer copies of the following financial statements (collectively, the "Financial Statements"):   (i) the audited financial statements of the Company as of December 31, 2019, December 31, 2020, and December 31, 2021, (ii) the quarterly financial statements of the Company for the fiscal quarter ended March 31, 2022, June 31, 2022, and September 30, 2022, (iii) the annual statutory statement of the Acquired Insurance Companies as of and for the annual periods ended December 31, 2019, December 31, 2020, and December 31, 2021 in each case, as filed with the Rehabilitation Court and (iv) the quarterly statutory statement of the Acquired Insurance Companies for the fiscal quarters ended March 31, 2022 and June 30, 2022.   The financial statements of the Company have been prepared in accordance with GAAP applied on a consistent basis (except as may be indicated in the notes thereto) and present fairly in all material respects as of their respective dates and for the respective periods indicated thereby. The financial statements of the Acquired Insurance Companies have been prepared in accordance with SAP applied on a consistent basis (except as may be indicated in the notes thereto) and present fairly in all material respects the statutory financial position, admitted assets, liabilities, capital and surplus and results of operations of the applicable entity as of their respective dates and for the respective periods indicated thereby.

(b)    The statutory reserves carried on the financial statements of the Acquired Insurance Companies (i) were or will be computed in all material respects in accordance

8

with generally accepted actuarial principles consistently applied throughout the periods covered by such Financial Statements taken together; (ii) are fairly stated, in all material respects, in accordance with sound actuarial principles; (iii) have been based on actuarial assumptions and methods which produced reserves at least as great as those called for in any applicable Insurance Contract and (iv) satisfied or will satisfy all applicable Law and the requirements of SAP, as the case may be, in all material respects.

(c) Seller has made available to Buyer (i) a true and complete list of all Investment Assets of the Acquired Insurance Companies as of September 30, 2022 and (ii) true and complete copies of the investment policies and guidelines applicable to the Acquired Insurance Companies' investment activities as of the date hereof.

(d) The Acquired Insurance Companies has designed and maintained systems of internal accounting controls sufficient to provide reasonable assurances that, in all material respects, (i) all transactions are executed in accordance with management's general or specific authorization, (ii) all transactions are recorded as necessary to permit the preparation of financial statements in conformity with SAP, (iii) access to its property and assets is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for items is compared with the actual levels at reasonable intervals and appropriate action is taken with respect to any differences.

**Section III.7** **Insurance**. Section 3.07 of the Disclosure Schedules sets forth a list, as of the date hereof, of all material insurance policies maintained by the Company and the Acquired Insurance Companies or with respect to which the Acquired Insurance Companies is a named insured or otherwise the beneficiary of coverage (collectively, the "Insurance Policies"). Such Insurance Policies are in full force and effect on the date of this Agreement and all premiums due on such Insurance Policies have been paid, except as would not have an Acquired Insurance Companies Material Adverse Effect.

**Section III.8** **Legal Proceedings; Governmental Orders**.

(a) Except as set forth in Section 3.08(a) of the Disclosure Schedules, there are no Actions pending or, to Seller's knowledge, threatened against or by the Company or the Acquired Insurance Companies affecting the Seller's Interest or assets (or by or against Seller or any Affiliate thereof and relating to the Acquired Insurance Companies), which if determined adversely to the Acquired Insurance Companies (or to Seller or any Affiliate thereof) would be reasonably likely to result in an Acquired Insurance Companies Material Adverse Effect.

(b) Except as set forth in Section 3.08(b) of the Disclosure Schedules, there are no outstanding Governmental Orders against, relating to, or affecting the Seller or any Affiliate thereof or the Company or the Acquired Insurance Companies or any of its properties or assets which would be reasonably likely to have an Acquired Insurance Companies Material Adverse Effect.

**Section III.9** **Compliance with Laws; Permits**.

9

(a)    Except as set forth in Section 3.09(a) of the Disclosure Schedules, the Acquired Insurance Companies is and has been since January 1, 2019, in compliance with all material Laws applicable to it or its business, properties or assets.

(b)    All material Permits required to be obtained from Governmental Authorities for the Acquired Insurance Companies to conduct its business have been obtained and are valid and in full force and effect.

**Section III.10  Taxes.**

(a)    Except as set forth in Section 3.10(a) of the Disclosure Schedules:

(i)  The Acquired Insurance Companies has filed (taking into account any valid extensions) all material Tax Returns. Such Tax Returns are true, complete and correct in all material respects. The Acquired Insurance Companies is not currently the beneficiary of any extension of time within which to file any material Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business. All material Taxes due and owing by the Acquired Insurance Companies (whether or not reflected on such Tax Returns) have been paid or accrued.

(ii)  No extensions or waivers of statutes of limitations have been given or requested with respect to any material Taxes of the Acquired Insurance Companies.

(iii)  There are no ongoing Actions by any taxing authority against the Acquired Insurance Companies.

(iv)  The Acquired Insurance Companies is not a party to any Tax-sharing agreement.

(v)  All material Taxes which the Acquired Insurance Companies is obligated to withhold have been duly and timely withheld, and such withheld Taxes have been either duly and timely paid to the proper governmental authority or properly set aside in accounts for such purpose and has complied in all material respects with applicable Tax information reporting requirements.

(vi)  All accounting entries (including charges and accruals) for Taxes with respect to the Acquired Insurance Companies reflected on the books of the Acquired Insurance Companies (excluding any provision for deferred income taxes reflecting either differences between the treatment of items for accounting and income tax purposes or carryforwards) are adequate to cover any material Tax liabilities accruing through the end of the last period for which the Acquired Insurance Companies ordinarily records items on its books. Since the end of the last period for which the Acquired Insurance Companies ordinarily records items on its books, the Acquired Insurance Companies has not engaged in any transaction, or taken any other action, other than in the ordinary course of

10

business, that would reasonably be expected to result in a materially increased Tax liability or materially reduced Tax asset.

(vii) The time for filing any Tax Return with respect to the Acquired Insurance Companies has not been extended to a date later than the date of this Agreement except that the Acquired Insurance Companies has filed an extension for its federal and state 2020 tax year return. No Taxes with respect to the Acquired Insurance Companies are currently under audit, examination or investigation by any governmental authority or the subject of any judicial or administrative proceeding. No governmental authority has asserted or threatened to assert any deficiency, claim or issue with respect to Taxes or any adjustment to Taxes against the Acquired Insurance Companies with respect to any taxable period for which the period of assessment or collection remains open. No jurisdiction (whether within or without the United States) in which the Acquired Insurance Companies has not filed a particular type of Tax Return or paid a particular type of Tax has asserted that the Acquired Insurance Companies is required to file such Tax Return or pay such type of Tax in such jurisdiction.

(viii) The Acquired Insurance Companies (i) has not received or applied for a Tax ruling or entered into a closing agreement pursuant to Section 7121 of the Code (or any predecessor provision or any similar provision of state or local law), in either case that would be binding upon the Acquired Insurance Companies after the Closing Date, (ii) is not or has not been a member of any affiliated, consolidated, combined or unitary group for purposes of filing Tax Returns or paying Taxes (other than a group of which Seller is the common parent) or (iii) has not had any liability for the Taxes of any Person (whether under Treasury Regulation Section 1.1502-6 or any similar provision of state, local or foreign law, as a transferee or successor, pursuant to any Tax sharing or indemnity agreement or other contractual agreements ("Tax Agreements"), or otherwise).

(ix) The Acquired Insurance Companies will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date, as a result of any (i) change in method of accounting for a taxable period ending on or prior to the Closing Date under Section 481 of the Code (or any corresponding provision of state, local or foreign income Tax law), (ii) installment sale or open transaction disposition made prior to the Closing Date, or (iii) prepaid amount received on or prior to the Closing Date. The Acquired Insurance Companies has not participated in a listed transaction within the meaning of Treasury Regulations Section 1.6011-4(c). The Acquired Insurance Companies has not been a "distributing corporation" or a "controlled corporation" within the meaning of Section 355 of the Code (x) in the two years prior to the date of this Agreement or (y) in a distribution that could otherwise constitute a "plan" or "series of related transactions" in conjunction with the transaction contemplated by this Agreement. The Acquired Insurance Companies is not party to a "gain recognition agreement" within the meaning of the Treasury Regulations under Section 367 of the Code.

11

(x)  The Tax treatment of each Reinsured Insurance Policy is not, and since the time of issuance (or subsequent modification) has not been, less favorable to the purchaser, policyholder or intended beneficiaries thereof, than the Tax treatment either that was purported to apply in materials provided at the time of issuance (or any subsequent modification of such policy) or for which such policy was intended or reasonably expected to apply at the time of issuance (or subsequent modification).  For purposes of this Section 3.9(a)(x), the provisions of law relating to the Tax treatment of such Reinsured Insurance Policies shall include, but not be limited to, Sections 72, 101, 401 through 409A, 412, 415, 417, 457, 817, 7702 and 7702A of the Code and any Treasury Regulations and administrative guidance issued thereunder.

**Section III.11  Brokers**.  Seller agrees to pay any broker, consultant and banker fees relating to the Transaction directly and to indemnify, defend and hold Buyer harmless from any such fees or expenses owed to any broker, consultant or banker.

**Section III.12  Transactions with Affiliates**.  All agreements, arrangements and other commitments or transactions to or by which the Acquired Insurance Companies, on the one hand, and Seller or any of its Affiliates, on the other hand, are parties or are otherwise bound or affected are set forth in Section 3.12 of the Disclosure Schedules.  At the Closing, all such agreements, arrangement and other commitments or transactions shall have been terminated, with no liability to the Acquired Insurance Companies, with the exception of agreements related to those assets listed in Section 3.12 of the Disclosure Schedules which shall be retained by the Buyer (the "Retained Assets").  At Closing the Retained Assets shall be at no greater than $462 million of Seller-Related Assets with Closing expected by the Parties to occur after closing of the sale of the Castle & Cook Mortgage, Claris Vision Group, and the Clanwilliam Group. The Retained Assets shall be collateralized with $200 million of AAPC preferred stock and $252 million of junior debt issued by the Beckett Group (together the "Additional Collateral").  The Buyer shall have the right to sell all of the Retained Assets to the Seller, and the Seller shall the obligation to purchase the same for a price equal to the original principal value as of the date of Closing plus 12 percent interest at 60 months from the date hereof. Upon purchase of the Retained Assets by the Seller, the Additional Collateral shall be released.  The Buyer's right to sell the Retained Assets to the Seller shall be guaranteed by an unconditional guarantee from Global Growth Holdings, Inc. which is attached as Schedule XX hereto. The Seller shall have the right to purchase the Retained Assets at any time prior to the 60 months required purchase date for a price equal to the original principal value plus 12 percent interest.

**Section III.13  Employees and Employee Benefits**.

(a)  The Acquired Insurance Companies is not a party to or otherwise bound by any collective bargaining agreement with respect to its employees and, as of the date of this Agreement, there are no labor unions or other organizations or groups representing, purporting to represent or attempting to represent any employees.  The Acquired Insurance Companies is in material compliance with all applicable Laws respecting labor, employment, fair employment practices, terms and conditions of employment, disability, immigration, health and safety, harassment, non-discrimination, workers' compensation, unemployment compensation, sick leave and leaves of absence,

12

including those related to the COVID-19 pandemic, employee privacy, employee classification, and wages and hours, and the collection and payment of withholding and payroll Taxes and similar Taxes with respect to its employees.

(b)     Section 3.13(b) of the Disclosure Schedules sets forth a true and correct list of all material employee benefit plans, policies and programs, including any long term incentive plans, in which any current or former Acquired Insurance Companies employee is entitled to participate. There is no material liability under ERISA or with respect to any employee benefit plan that provides or promises benefits beyond retirement or other termination of service, except for coverage mandated by applicable Law. The Acquired Insurance Companies does not contribute to and is not obligated to contribute to a Multiemployer Plan or a "multiple employer plan" within the meaning of section 4063 or 4064 of ERISA.

(c)     Neither the execution, delivery and performance of this Agreement by Seller nor the consummation of the transactions contemplated by this Agreement will (alone or in combination with any other event) result in an increase in the amount of compensation or benefits or the acceleration of the vesting or timing of payment of any compensation or benefits payable to or in respect of any employee or any increased or accelerated funding obligation with respect to any employee benefit plan, (B) require the Acquired Insurance Companies to fund any liabilities or place in trust or otherwise set aside any amounts in respect of any employee benefit plan, (C) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code (or any comparable provision of state, local or foreign Tax Laws), or (D) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code (or any comparable provision of state, local or foreign Tax Laws).

## Section III.14  Contracts.

(a)     Section 3.14(a) of the Disclosure Schedules sets forth to Seller's Knowledge: (i) any contract that is material to the business or operations of the Company or the Acquired Insurance Companies; (ii) any contract containing covenants binding upon the Company or the Acquired Insurance Companies that materially restricts the ability of the Acquired Insurance Companies to compete in any business or in any geographic area that is material to the Acquired Insurance Companies; (iii) any contract with respect to a joint venture or partnership agreement; (iv) any contract which provides for any guarantee of third party obligations; (v) any contract which provides for payments to be made by the Company or the Acquired Insurance Companies upon a change in control thereof (other than a Benefit Plan); (vi) any reinsurance agreement; and (vii) any contract relating to indebtedness of any sort. Each such contract described in clauses (i) through (vii) is referred to herein as a "Material Contract." To Seller's Knowledge, each of the Material Contracts is valid and binding on the Acquired Insurance Companies and each other party thereto and is in full force and effect. To Seller's Knowledge, there is no default under any Material Contract by the Company or the Acquired Insurance Companies or any other party thereto, and no event has occurred that with the lapse of time or the giving of notice or both would

13

constitute a default thereunder by the Acquired Insurance Companies or any other party thereto.

(b)  With respect to each Material Contract that is an assumed reinsurance agreement, the Acquired Insurance Companies is in full compliance with all the terms and conditions thereof, there is no active dispute with any cedant thereunder, and no cedant currently has asserted any right to recapture or terminate the agreement; provided, that Section 3.14(b) of the Disclosure Schedules sets forth any formal waivers that have been received from cedants under any such reinsurance agreements.

**Section III.15  Insurance Policies**. Subject to orders issued by the Rehabilitation Court regarding the Acquired Insurance Companies, all policies, binders, slips, certificates, guaranteed insurance contracts, annuity contracts and participation agreements and other agreements of insurance, whether individual or group, in effect as of the date hereof (including all applications, supplements, endorsements, riders and ancillary documents in connection therewith) that are issued by the Acquired Insurance Companies, and any and all marketing materials are, to the extent required under applicable Laws, on forms and at rates approved by the insurance regulatory authority of the jurisdiction where issued or, to the extent required by applicable Laws, have been filed with and not objected to by such authority within the period provided for objection. The Acquired Insurance Company has made available to Buyer true and complete copies of (i) any material reports on financial examination (including draft reports where final reports are not yet available) and (ii) any material reports on market conduct examination (including draft reports where final reports are not yet available), in the case of each of (i) and (ii) delivered by any insurance regulatory authority in respect of the Acquired Insurance Companies since January 1, 2019.

**Section III.16  Real Property; Environmental**. Section 3.16 of the Disclosure Schedules sets forth a true and complete list as of the date hereof of each lease and/or sublease to which the Company or the Acquired Insurance Companies Subsidiaries is a party. Other than the leases and/or subleases set forth in Section 3.16 of the Disclosure Schedules, the Company or the Acquired Insurance Companies does not own or hold any interest in any real property. The Acquired Insurance Companies or the Company (a) has not received written notice from any Governmental Authority or other Person alleging that the Company or the Acquired Insurance Companies is in violation of any applicable environmental Law and (b) the Company or the Acquired Insurance Companies is in compliance with applicable environmental Laws.

**Section III.17  No Other Representations and Warranties**. Except for the representations and warranties contained in this ARTICLE III (including the related portions of the Disclosure Schedules), none of the Seller, the Company, the Acquired Insurance Companies or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, Company, or the Acquired Insurance Companies, including any representation or warranty as to the accuracy or completeness of any information regarding the Company or the Acquired Insurance Companies furnished or made available to Buyer any information, documents or material delivered to Buyer/made available to Buyer in the Seller's virtual data room maintained by Seller for purposes of this Agreement or any management presentations made in expectation of the transactions contemplated hereby or as to

14

the future revenue, profitability or success of the Acquired Insurance Companies, or any representation or warranty arising from statute or otherwise in law.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller as follows as of the date hereof and as of the Closing Date (except for such representations and warranties which address matters only as of a specific date, which representations and warranties shall be true and correct as of such specific date):

**Section IV.1** **Incorporation and Authority of Buyer**.

(a) Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Missouri.

(b) Buyer and, as of the Closing Date, has all requisite power to enter into, consummate the Transaction, and carry out its obligations under this Agreement. The execution and delivery by Buyer of this Agreement, the consummation by Buyer of the Transaction and the performance by Buyer of its obligations under this Agreement has been duly authorized by all requisite action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, rehabilitation, liquidation, fraudulent conveyance or similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section IV.2** **No Conflicts**. Provided that all consents, approvals, authorizations and other actions described in Section 4.03 have been obtained or taken, except as otherwise provided in this ARTICLE IV and except in the case of clauses (b) and (c) below as may result from any facts or circumstances solely relating to Seller or its Affiliates (as opposed to any other third party), the execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the Transaction do not (a) violate, conflict with or require a Consent under the organizational documents of Buyer, (b) violate or conflict with any Law, Permit or other Governmental Order applicable to Buyer or by which Buyer or its properties or assets is bound or subject or (c) result in any breach of, or constitute a default (or event which, with the giving of notice or lapse of time, or both, would become a default) under, result in the loss of any right, entitlement or obligation in, or give to any Person any rights of termination, acceleration, or cancellation of, or result in the creation of any Lien on any of the assets or properties of Buyer pursuant to, any material note, bond, mortgage, indenture or Contract to which Buyer is a party or by which any of such assets or properties is bound, other than, in the case of clauses (b) and (c), any such conflicts, violations, breaches, defaults, rights or Liens that, individually or in the aggregate, do not have, and would not reasonably be expected to have, a Buyer Material Adverse Effect. For the purposes of this Agreement, a Buyer Material Adverse Effect shall mean any

15

event, change or effect that is materially adverse to the condition (financial or otherwise), properties, assets, liabilities, business, operations or results of operations of the Buyer.

**Section IV.3** **Consents and Approvals.** Except as set forth in Section 4.03 of the Buyer Disclosure Schedules, or as may result from any facts or circumstances solely relating to Seller or its Affiliates (as opposed to any other third party), the execution and delivery by Buyer of this Agreement does not, and the performance by Buyer and each other Buyer Party of, and the consummation by Buyer of the Transactions and this Agreement do not, require any Governmental Approval to be obtained or made by Buyer prior to the Closing, except for such Governmental Approvals, the failure of which to be obtained or made has not had, and would not reasonably be expected to have a Buyer Material Adverse Effect.

**Section IV.4** **Absence of Litigation.** There are no Actions pending or, to the Knowledge of Buyer, threatened in writing, against Buyer or any other Buyer Party that question the validity of, seek injunctive relief with respect to, this Agreement or the Ancillary Agreements or the right of Buyer to enter into this Agreement or the Ancillary Agreements to which Buyer or any other Buyer Party is or will be a party, and would reasonably be expected to have a Buyer Material Adverse Effect.

**Section IV.5** **Financial Ability.** Buyer will have at the Closing sufficient immediately available funds (including through available capacity under revolving debt facilities, loans or other debt and equity investments) to pay, in cash, the Purchase Price and all other amounts payable pursuant to this Agreement or otherwise necessary to timely consummate the Transaction. None of Buyer or any of its Affiliates has incurred any Liabilities or obligations, or is contemplating or aware of any Liabilities or obligations, in either case, that would impair or adversely affect such resources and capabilities. The obligations of Buyer to effect the Transaction is not conditioned upon the availability to Buyer or any of its Affiliates of any debt, equity or other financing in any amount whatsoever.

**Section IV.6** **Investment Purpose.** Buyer is acquiring the Seller's Interest solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof or any other security related thereto within the meaning of the Securities Act. Buyer acknowledges that Seller has not registered the offer and sale of the Seller's Interest under the Securities Act or any state securities laws, and that the Seller's Interest may not be pledged, transferred, sold, offered for sale, hypothecated or otherwise disposed of except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Buyer is able to bear the economic risk of holding the Seller's Interest for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

**Section IV.7** **Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section IV.8** **Legal Proceedings.** Except as set forth in Section 4.09 of the Buyer Disclosure Schedules, there are no Actions pending or, to Buyer's knowledge, threatened against

16

or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

### Section IV.9    Independent Investigation.

(a)    Buyer has conducted its own independent investigation, review and analysis of the Acquired Insurance Companies, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Seller and the Acquired Insurance Companies for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in ARTICLE III of this Agreement (including related portions of the Disclosure Schedules); and (b) none of Seller, the Acquired Insurance Companies or any other Person has made any representation or warranty as to Seller, the Company or this Agreement, except as expressly set forth in Article III of this Agreement (including the related portions of the Disclosure Schedules).

(b)    Updates to Exhibits and Schedules. Seller shall have the right to supply or supplement the Exhibits or Disclosure Schedules prior to the Closing by delivery to the Buyer of one or more Exhibit, Schedule, or supplement thereto (each, an "Exhibit Supplement" or "Disclosure Supplement," respectively), provided that any matter set forth in an Exhibit Supplement or Disclosure Supplement shall not be deemed to amend or supplement any Exhibit or Disclosure Schedule attached hereto at the time of execution of this Agreement  or to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement for purposes of determining whether or not the conditions to Closing set forth in Article VII have been satisfied, provided, further that if the disclosure  shall have given rise to the right to terminate this Agreement under Section 9.01(b), the Buyer may either (i) terminate this Agreement by written notice to Seller within five (5) Business Days after receipt of the Disclosure Supplement and all information regarding such Exhibit Supplement or Disclosure Supplement that may be reasonably requested by Buyer or (ii) consummate the Transaction, in which case the applicable Exhibit or Disclosure Schedules shall be deemed amended and supplemented as set forth in such Exhibit Supplement or Disclosure Supplement, and no Person may make any claim in respect thereof following the Closing.

Section IV.10    Regulatory Matters.  Within the past five (5) years, no Governmental Authority has revoked any license or status held by Buyer or any of its Affiliates to conduct insurance operations. Buyer and its Affiliates and the investors in Buyer or its Affiliates meet all of the requirements on the part of such respective entity set forth by applicable Law (including the Laws of its jurisdiction of formation) for all necessary Consents from Governmental Authorities for the consummation of the Transactions to be obtained, and there are no facts, events or circumstances, involving or relating to Buyer or any of its Affiliates or the investors in Buyer or its Affiliates, that may prevent or delay the granting of any such Consents from Governmental Authorities.

17

**Section IV.11** Buyer expressly represents and warrants that it is aware that the Acquired Insurance Companies are the subject of rehabilitation orders, and that CBL and BLIC are the subject of an orally rendered liquidation order, and recognizes that the closing of the transaction contemplated herein is subject to the resolution of such matters pursuant to ordinary legal processes. To the extent such matters are not resolved in a manner which would permit the contemplated transactions to close, Buyer hereby agrees that this Agreement shall be of no force or effect and that it shall have no claims of any kind against the Seller or Seller's affiliates concerning the transaction described herein.

**ARTICLE V**
**COVENANTS**

The Seller and Buyer covenant and agree as follows:

**Section V.1      General.** In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement or any Ancillary Document, each of the Parties shall take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party with respect to reasonable out-of-pocket costs.  Seller shall use commercially reasonable efforts to cooperate with and assist Buyer in obtaining, after the Acquired Insurance Companies Closing, any regulatory approvals required to enable the Seller to make the appropriate closings or transfers, including transfers of signature authorization, and in providing all notices thereof as may be required by appropriate Governmental Authorities.

**Section V.2      Regulatory Approvals.**

(a)      Each Party shall furnish to each other Party all information reasonably required for any application or other filing to be made pursuant to any applicable Law and any written materials to be furnished to any Governmental Authority in connection with the Transaction contemplated by this Agreement (including, to the extent permitted by applicable Law, providing to such other Party a reasonable opportunity to comment thereon prior to filing, and considering in good faith all reasonable additions, deletions or changes suggested in connection therewith).  Each Party shall use its commercially reasonable efforts to obtain (and to cooperate with the other Parties hereto to obtain) any consent, authorization, order or approval of, any exemption by, or any waiver from, any Governmental Authority required to be obtained by the Buyer, the Acquired Insurance Companies, the Seller or any of their respective Affiliates in connection with the Transaction, specifically including but not limited to Seller's engagement in efforts within the Rehabilitation Court to obtain the approval by the Rehabilitation Court or termination of the Rehabilitation Proceeding required by Section 7.02(f).  Each Party shall (i) keep the other Parties informed of the status of the filings, consents and approvals pursuant to this Section 5.02, (ii) inform the other Parties of any material oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or any such transaction, and provide copies of the Transaction Regulatory Filings, if any, and each amendment or supplement

18

Case 3:23-cr-00048-MOC-DCK      Document 132-2      Filed 05/04/26      Page 400 of 508

thereto in final form upon the submission thereof to the applicable Governmental Authority, and (iii) to the extent permitted by the applicable Governmental Authority and to the extent related to the transactions contemplated hereby, give the other Parties prior written notice of the time and place of any meetings, hearings or other proceedings with any Governmental Authority regarding any such filings or the transactions contemplated hereby and the opportunity for such other Parties (and their representatives) to attend and participate in any such meetings, hearings or proceedings (other than telephone calls initiated by such Governmental Authority and not scheduled in advance or ministerial telephone calls not expected to invoke a substantive discussion of the transactions contemplated hereunder). Notwithstanding the foregoing, nothing in this Agreement shall require any Party to provide to the other Party any information or materials that (A) are commercially sensitive, (B) are sensitive personally identifiable information, or (C) are legally privileged.

(b)     Without limiting the foregoing, Buyer shall (i) file or cause to be filed with OID (A) the Form A filing with OID, and (B) if required, any transaction notifications on "Form D" or similar notifications; (collectively, the "Transaction Regulatory Filings"), in each case, as promptly as practicable and, in any event, within twenty (20) Business Days after the date of the completion of the redomestication of the Acquired Insurance Companies to Oklahoma, and (ii) comply as promptly as practicable with any request by OID for additional information, documents, or other materials (including supplements or amendments to the Transaction Regulatory Filings). Each Party shall provide the other Party with prompt notice of any consent, notice or other communication of any Authority with respect to the Transaction Regulatory Filings.

(c)     Notwithstanding anything the contrary contained in this Section 5.02, Section 5.07 or otherwise in this Agreement, in no event shall Buyer or any of its Affiliates, be required to agree to or accept (and Seller and its Affiliates shall not agree to or accept) any action, restriction, limitation, obligation, requirement or condition requested or imposed by any Governmental Authority that would, individually or in the aggregate with any other such actions, restrictions, limitations, obligations, requirements or conditions, reasonably be expected to constitute a Burdensome Condition.

Section V.3     Access to Information; Due Diligence. To the extent available to the Seller, during the period between the date of this Agreement and the Closing Date, Buyer shall be entitled, through its employees, agents and representatives, to make such reasonable investigation of the assets, liabilities, financial condition, properties, business and operations of the Acquired Insurance Companies as Buyer reasonably deems to be necessary or appropriate, and for such purposes to have access to the Books and Records and of the Acquired Insurance Companies Tax Returns and other Tax information of the Acquired Insurance Companies in each case wherever located (including, without limitation, access to the amount of Unrealized Gains as reported in the Clearwater accounting system as of any time prior to the Closing), and provided the same shall not require the Acquired Insurance Companies to provide any such access or furnish any such information that in its reasonable judgment would (A) result in the disclosure of any protected confidential information or trade secrets of third parties, (B) violate any applicable Law, or (C) compromise or constitute a waiver of any attorney-client or work product privilege of the Acquired Insurance Companies or the Seller. Buyer shall conduct any such investigation, access

19

and examination during regular business hours upon reasonable prior notice in a manner that would not cause undue disruption of the business activities of the Acquired Insurance Companies. To the extent permitted by the limitations in existence as a result of the Rehabilitation Proceeding, Seller shall cause the Acquired Insurance Companies to, and Seller shall, cooperate as reasonably requested with Buyer's employees, agents and representatives in connection with such investigation, access and examination. Buyer shall hold all documents and other materials accessed, obtained or otherwise reviewed in connection with such investigation, access and examination, in confidence unless and until such time as such documents and other materials become publicly available. In the event of the termination of this Agreement, upon the Seller's request in the event of termination of this Agreement, Buyer shall deliver to Seller all of such documents and other materials so obtained by Buyer, including all excerpts, abstracts and copies thereof.

**Section V.4** **Confidentiality**. Buyer acknowledges and agrees that the Confidentiality Agreement, dated as of June 2, 2021 (set forth in an agreement entitled "Joinder Agreement") between Buyer and Seller (the "Confidentiality Agreement") remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement.

**Section V.5** **Excluded Assets and Liabilities.** Contemporaneous with the Closing, each of the Seller and the Company shall cause the Company to assign and distribute to the Seller those assets and liabilities that are not assets and liabilities of the Acquired Insurance Companies to the Seller (such assets and liabilities, the "Excluded Assets and Liabilities," and the instruments effecting such assignment and assumption, the "Excluded Items Assignment and Assumption"). For the avoidance of doubt, the Buyer shall purchase the Seller's Interest free and clear of the Excluded Assets and Liabilities including all assets and liabilities that are not related to the Acquired Insurance Companies or are not assets of liabilities of the Acquired Insurance Companies.

**Section V.6** **Cooperation**.

(a) Between the date of this Agreement and the Closing Date, the Parties shall each use his, her or its commercially reasonable efforts to cause the conditions in ARTICLES II and VII to be satisfied, and the Parties shall cooperate with each other, to take or cause to be taken all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement.

(b) Between the date of this Agreement and the Closing Date, the Parties shall each use his, her or its commercially reasonable efforts to review and amend this Agreement as may be necessary to effect the contemplated transactions based on future developments in the Rehabilitation Court affecting the Acquired Insurance Companies.

**Section V.7** **Notification**. During the Pre-Closing Period, Seller shall promptly notify Buyer in writing if the Acquired Insurance Companies or Seller becomes aware of any fact or condition that causes or constitutes a breach of any representations and warranties of the Seller contained herein, or if Seller becomes aware of the occurrence after the date hereof of any fact or

Case 3:23-cr-00048-MOC-DCK     Document 132-2     Filed 05/04/26     Page 402 of 508

condition that would (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty. During the same period, Seller shall notify Buyer of the occurrence of any breach of any covenant of the Acquired Insurance Companies or the Seller or of the occurrence of any event that may make the satisfaction of the conditions contained in this Agreement impossible or unlikely. The closing conditions set forth in ARTICLES II and VII shall be read without giving effect to any notices delivered pursuant to this Section 5.08.

**Section V.8    Exclusive Dealing.** Until the earlier of the Closing Date or the date this Agreement is terminated pursuant to ARTICLE IX below, neither the Acquired Insurance Companies nor the Seller, nor any of their officers, directors, employees, Affiliates or representatives shall:  (a) solicit, initiate, or encourage the submission of any proposal or offer from any Person relating to the acquisition of all or any substantial part of the Acquired Insurance Companies (including any acquisition structured as an asset sale, merger, consolidation, reinsurance transaction, or share exchange);  (b) assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing; or (c) taken any actions that would be reasonably likely to interfere with the ability of Buyer to consummate the Transaction (any of the foregoing, an "Acquisition Proposal").  The Seller shall promptly inform Buyer of any inquiries or proposals for and provide Buyer with copies of all related documentation concerning, any Acquisition Proposal.

**Section V.9    Termination of Services Agreement.** Prior to the Closing, Seller and the Acquired Insurance Companies shall take all steps necessary to terminate, without any liability to the Acquired Insurance Companies, the agreements listed in Schedule 5.10:  provided that Seller shall and shall cause the Acquired Insurance Companies to cooperate with Buyer to determine and provide any ongoing services that may be necessary following Closing in order to ensure continuity of operations and policyholder servicing in the event that Buyer has not been able to identify a satisfactory replacement service provider by such time.

**Section V.10    Tax Matters.**

(a)    Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with transactions contemplated by this Agreement (including any real property transfer tax and any similar Tax) shall be paid when due, 50% by Seller and 50% Buyer, and each party will, at its own expense, file all necessary Tax returns and other documentation with respect to all such Taxes and fees.

(b)    Consolidated Return Elections.  Seller shall make or cause to be made (and shall refrain from making or causing to be made, as applicable) Tax elections (including on a protective basis) so that the Acquired Insurance Companies shall suffer any reduction in tax basis or other attributes pursuant to Treasury Regulations Section 1.1502-36.

(c)    Tax Returns.  From the date of this Agreement through and after the Closing Date, Seller shall prepare and file as required by applicable Law with the appropriate taxing authority (or cause to be prepared and filed) in a timely manner (i) all consolidated, combined, unitary, affiliated or similar Tax Returns that include the

21

Acquired Insurance Companies on the one hand and Seller or any Affiliate thereof on the other hand for all Pre-Closing Periods and (ii) all other Tax Returns of the Acquired Insurance Companies that are required to be filed on or prior to the Closing Date. All such Tax Returns shall be prepared in a manner consistent with most recent past practice, except as otherwise required by applicable Law.

(d)     Tax Agreements; Powers of Attorney. Prior to the Closing Date, Seller shall terminate all Tax Agreements to which the Acquired Insurance Companies is a party such that the Company shall not have any obligations thereunder following the Closing. Seller shall cause any and all existing powers of attorney with respect to Taxes or Tax Returns to which the Company or any of its Subsidiaries is a party to be terminated as of the Closing.

**Section V.11     Reserved.**

**ARTICLE VI**
**NON-SURVIVAL OF REPRESENTATIONS, WARRANTIES AND PRE-CLOSING COVENANTS**

**Section VI.1     Non-Survival of Representations, Warranties and Pre-Closing Covenants**. None of the representations or warranties of any party hereto contained in this Agreement or any of the other documents contemplated hereby (including any certificate to be delivered under Article VII) shall survive the Closing. None of the covenants of any party hereto required to be performed by such party before the Closing shall survive the Closing and unless otherwise indicated, the covenants and agreements set forth in this Agreement which by their terms are required to be performed after the Closing shall survive the Closing until they have been performed and satisfied. Notwithstanding anything to the contrary herein, nothing herein shall be deemed to apply to, or limit in any way, any party's rights and remedies in the case of intentional fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement.

**Section VI.2     No Indemnity.** No indemnification is provided by this agreement. The parties agree to bear their respective liability for any acts or omissions resulting under this agreement as the same shall be determined under the laws of the state of New York.

**ARTICLE VII**
**CONDITIONS TO CLOSING AND RELATED MATTERS**

**Section VII.1     Conditions Precedent to Obligation of Buyer**. The obligation of Buyer to consummate the Closing is subject to satisfaction of the following conditions on or before the Closing Date (unless expressly waived in writing by Buyer on or before the Closing Date):

(a)     Compliance by Seller. All of the terms, covenants and conditions of this Agreement to be complied with and performed by Seller and the Acquired Insurance Companies before the Closing Date shall have been complied with and performed by it in all material respects; and the representations and warranties made by Seller in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the

22

Closing Date, except that any such representations and warranties that relate to a particular date or period shall be true and correct as of such date or period.

(b) <u>Compliance Certificate</u>. The Seller shall have delivered to Buyer a certificate dated the Closing Date and signed by the Seller certifying on behalf of the Seller that the conditions specified in Section 7.01(a) have been fulfilled.

(c) <u>No Injunctions or Restraints</u>. No temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation of the Closing shall be in effect.

(d) <u>Closing Deliveries</u>. Sellers shall have delivered to Buyer the items described in ARTICLES II and VII.

(e) <u>No Material Adverse Effect</u>. During the period between the date of this Agreement and the Closing Date, there shall not have occurred an Acquired Insurance Companies Material Adverse Effect or any change, event or state of circumstances or facts that may reasonably be expected to have an Acquired Insurance Companies Material Adverse Effect.

(f) The approvals or prior written non-approvals from Governmental Authorities listed on **Schedule 2.03(e)** shall have been obtained and be in full force and effect, in each case, without imposition of any Burdensome Condition;

(g) All other required consents listed on **Schedule 2.03(e)**, including but not limited to any consent, approval or authorization required under any Material Contract as a result of the Transaction, shall have been made or obtained and shall be in full force and effect at the Closing; and

(h) The Buyer shall have underwritten in its sole discretion $462 million of Seller-Related Assets to be retained on the CBL and BLIC balance sheets as Retained Assets and the Buyer shall be satisfied in its sole discretion with the Additional Collateral provided for the same.

(i) Seller shall have delivered evidence reasonably satisfactory to Buyer of the cancellation of any previously issued and outstanding membership interests of the Company and the cancellation of any previously issued and outstanding shares of CBL, BLIC, and SNIC, including any such shares that may have been lost, stolen or the transfer of which is otherwise not recorded in the stock transfer records.

(j) The redomestication of the Acquired Insurance Companies to Oklahoma shall be complete.

**Section VII.2    Conditions Precedent to Obligation of Sellers as to Buyer**. The obligation of the Seller to consummate the Closing is subject to satisfaction of the following conditions on or before the Closing Date (unless expressly waived in writing by the Seller on or before the Closing Date):

23

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 405 of 508

(a)     Compliance by Buyer.  All of the terms, covenants and conditions of this Agreement to be complied with and performed by Buyer on or before the Closing Date shall have been complied with and performed by it in all material respects, and the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except that any such representations and warranties that relate to a particular date or period shall be true and correct in all material respects as of such date or period.

(b)     Compliance Certificate.  Buyer shall have delivered to Seller a certificate dated the Closing Date and signed by an officer of Buyer certifying that the conditions specified in Section 7.2(a) have been fulfilled.

(c)     No Injunctions or Restraints.  No temporary restraining order, preliminary or permanent injunction or other order issued by any Authority or other legal restraint or prohibition preventing the consummation of the Closing shall be in effect.

(d)     Closing Deliveries.  Buyer shall have delivered the items described in Section 2.04 to the Sellers or other Persons, as applicable.

(e)     Rehabilitation Court Approval or Termination.  The Rehabilitation Court shall have entered an Order either: (a) approving the sale of the Acquired Insurance Companies by Seller to Buyer; or (b) terminating the Rehabilitation Proceeding.

(f)     Regulatory Approval.  Prior to Closing, Buyer and Seller shall have received approval to purchase the Acquired Insurnace Companies from the OID and the NCDOI, as applicable, and shall provide evidence of such approval to Seller.

## ARTICLE VIII
## MISCELLANEOUS

**Section VIII.1**     **Expenses**.  Except as set forth in Section 1.04 above, all costs and expenses (including, without limitation, the fees and disbursements of legal counsel) incurred in connection with this Agreement and the transaction contemplated under this Agreement shall be paid by the Party incurring such expenses.

**Section VIII.2**     **Notices**.  All notices, requests, consents, claims, demands and other communications under this Agreement shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile or electronic mail with receipt confirmed or if no failure message is generated (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02:

(a) If to Seller:
GBIG Capital, LLC

4750 New Broad Street, Suite 125
Orlando, FL 32814


Attention:          Greg Lindberg
                    Justin Holbrook
                    Peter Nordberg (General Counsel)

                    Telephone:    919-246-9409
                    E-mail:       pnordberg@globalgrowth.com

With a copy to:

Condon Tobin Sladeck Thornton Nerenberg PLLC
8080 Park Lane Suite 700
Dallas, TX 75231

Attention:          Aaron Z. Tobin, Esq.
Office:             (214) 265-3800
Mobile:             (214) 448-4835
E-mail:             atobin@condontobin.com




(b) If to Buyer:
UNIVERSAL FINANCIAL HOLDINGS, LLC

209 West Lexington Avenue
Independence Missouri

Attention:          Bob Alban
Telephone:          (617) 500-0008
E-mail:             alban@montshireadvisors.com


**Public Announcements**. No party to this Agreement shall, and each party shall cause its respective Affiliates and Representatives not to, issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of this Agreement or the Transaction without the prior written consent of the other parties (which consent shall not be unreasonably withheld, conditioned or delayed), except as may be required by Law or applicable securities exchange or listing authority rules or except with respect to the press releases to be issued by Seller and Buyer in respect of the execution and delivery of this Agreement, the forms of which were approved in advance of the execution and delivery of this Agreement. In such case the party required to publish such press release or public announcement

25

shall allow the other parties a reasonable opportunity to the extent reasonably practicable and permitted by applicable Law to comment on such press release or public announcement in advance of such publication. Prior to the Closing, neither of the parties to this Agreement, nor any of their respective Affiliates or Representatives, shall make any public disclosure concerning plans or intentions relating to the customers, agents, producers or employees of, or other Persons with significant business relationships with, the Acquired Insurance Companies without first obtaining the prior written approval of the other parties, which approval shall not be unreasonably withheld, conditioned or delayed.

**Section VIII.3** **Severability**. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transaction is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner so that the Transactions be consummated as originally contemplated to the greatest extent possible.

**Section VIII.4** **Entire Agreement**. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement, any Exhibits, or Ancillary Agreements, and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section VIII.5** **Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, that the Buyer may assign its rights under this Agreement to another Person. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section VIII.6** **Amendment and Modification; Waiver**. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof. No single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section VIII.7** **Schedules**. Any disclosure set forth in the Disclosure Schedules with respect to any Section of this Agreement shall be deemed to be disclosed for purposes of other Sections of this Agreement to the extent that such disclosure sets forth facts in sufficient detail so that the relevance of such disclosure would be reasonably apparent to a reader of such disclosure. Matters reflected in any Section of the Disclosure Schedules are not necessarily

26

limited to matters required by this Agreement to be so reflected. Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature. No reference to or disclosure of any item or other matter in the Disclosure Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in this Agreement. Without limiting the foregoing, no such reference to or disclosure of a possible breach or violation of any Contract, Law or Governmental Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred.

**Section VIII.8** **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a) Seller and Buyer irrevocably and unconditionally submits for itself and its property in any Action arising out of or relating to this Agreement, the Transaction, the formation, breach, termination or validity of this Agreement or the recognition and enforcement of any judgment in respect of this Agreement, to the exclusive jurisdiction of any federal court sitting in the Borough of Manhattan in the City of New York, State of New York or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and any appellate court from any thereof, over any suit, action or proceeding arising out of or relating to the transactions contemplated by this Agreement, and agrees that all claims in respect to any such action or proceeding shall be heard and determined in such New York state or, to the extent permitted by law, in such federal court. Each party hereto irrevocably waiver, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding arising out of or relating to this Agreement or transactions contemplated hereby (whether based on contract, tort or any other theory).

(b) Any such Action may and shall be brought in such courts and each of Seller and Buyer irrevocably and unconditionally waives any objection that it may now or hereafter have to the venue or jurisdiction of any such Action in any such court or that such Action was brought in an inconvenient court and shall not plead or claim the same.

(c) Service of process in any Action may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage repaid, to such party at its address as provided in Section 8.02.

(d) Nothing in this Agreement shall affect the right to effect service of process in any other manner permitted by the Laws of the State of New York.

(e) Governing Law. This Agreement, and the formation, termination or validity of any part of this Agreement shall in all respects be governed by, and construed in accordance with, the Laws of the State of New York, excluding any of its conflict-of-law provisions that would cause the laws of any other jurisdiction to be applied.

(f) Waiver of Jury Trial. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHER THEORY)

27

ARISING OUT OF OR RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ITS PERFORMANCE UNDER OR THE ENFORCEMENT OF THIS AGREEMENT. ANY PARTY HERETO MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT BY AND AMONG THE PARTIES TO WAIVE IRREVOCABLY THEIR RIGHT TO TRIAL BY JURY IN ANY SUCH ACTION. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) EACH PARTY HERETO UNDERSTANDS AND HAS CONSIDERED THE IMPLICATION OF THIS WAIVER, (c) EACH PARTY HERETO MAKES THIS WAIVER VOLUNTARILY, AND (d) EACH PARTY HERETO HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.09

**Section VIII.9** **Specific Performance**. The Parties agree that irreparable damage would occur in the event that any of the covenants or obligations contained in this Agreement are not performed in accordance with their specific terms or were otherwise breached. Subject to any termination of this Agreement pursuant to ARTICLE IX each of the Parties hereto shall be entitled to injunctive or other equitable relief to prevent or cure any breach by the other parties of its covenants or obligations contained in this Agreement and to specifically enforce such covenants and obligations in any court referenced in Section 8.09 having jurisdiction, such remedy being in addition to any other remedy to which any party may be entitled at law or in equity. The Parties acknowledge and agree that, in the event that the other parties seek an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement, the party seeking an injunction will not be required to provide any bond or other security in connection with any such order or injunction.

**Section VIII.10** **Waivers**. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, in writing at any time by the party or parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any party, it is authorized in writing executed by an authorized officer of such party. The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any preceding or subsequent breach.

**Section VIII.11** **Rules of Construction**. Interpretation of this Agreement shall be governed by the following rules of construction: (a) defined terms in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include all other genders as the context clearly requires; (b) references to Articles, Sections, paragraphs, Exhibits and Schedules are references to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified; (c) references to "*$*" shall mean United States Dollars; (d) the word "*including*" and words of similar import when used in this Agreement shall mean

28

*"including without limiting the generality of the foregoing,"* unless otherwise specified; I the word *"or"* shall not be exclusive, unless the context clearly otherwise requires; (f) the table of contents, articles, titles and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (g) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted; (h) the Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein; (i) unless the context otherwise requires, the words *"hereof,"* *"herein"* and *"hereunder"* and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (j) all terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein; (k) any agreement or instrument defined or referred to herein or any agreement or instrument that is referred to herein means such agreement or instrument as from time to time amended, modified or supplemented, including by waiver or consent, as permitted under this Agreement and references to all attachments thereto and instruments incorporated therein; (l) any statement that a document has been *"delivered,"* *"provided"* or *"made available"* (or any phrase of similar import) to Buyer means that such document has been uploaded to the electronic data room maintained by Seller at least two (2) Business Days prior to the date of this Agreement; (m) any statute or regulation referred to herein means such statute or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, includes any rules and regulations promulgated under such statute), and references to any section of any statute or regulation include any successor to such section; (n) all time periods within or following which any payment is to be made or act to be done shall be calculated by excluding the date on which the period commences and including the date on which the period ends and by extending the period to the first succeeding Business Day if the last day of the period is not a Business Day; (o) references to any Person include such Person's predecessors or successors, whether by merger, consolidation, amalgamation, reorganization or otherwise; and (p) references to any Contract (including this Agreement) or organizational document are to the contract or organizational document as amended, modified, supplemented or replaced from time to time, unless otherwise stated.

**Section VIII.12** **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

## ARTICLE IX
## TERMINATION AND WAIVER

**Section IX.1** **Termination**. This Agreement may be terminated at any time before the Closing:

    (a)    By mutual written consent of the Buyer and the Seller;

    (b)    By Buyer if the Acquired Insurance Companies or the Seller breaches or fails in any material respect to perform or comply with any of its representations,

29

warranties, covenants or agreements set forth in this Agreement, so as to cause any of the conditions set forth in Section 2.03 and Section 7.01 not to be satisfied, and either:

(i) Such breach or default in performance is not capable of being cured or shall not have been cured or waived within thirty (30) days after written notice thereof from the Buyer to the Seller, or

(ii) The Acquired Insurance Companies or the Seller shall not have provided reasonable written assurance that such breach or default in performance shall be cured on or before the expected Closing Date;

(c) By the Seller, if Buyer breaches or fails in any material respect to perform or comply with any of its representations, warranties, covenants or agreements set forth in this Agreement, so as to cause any of the conditions set forth in Sections 2.04 or 7.02 not to be satisfied, and either:

(i) Such breach or default in performance is not capable of being cured or shall not have been cured or waived within thirty (30) days after written notice thereof from the Seller to Buyer, as applicable, or

(ii) Buyer, as applicable, shall not have provided reasonable written assurance that such breach or default in performance shall be cured on or before the expected Closing Date; or

(d) By the Seller or Buyer if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited or if consummation of the Transactions contemplated under this Agreement would violate any non-appealable final order, decree or judgment of any court or Authority having competent jurisdiction;

(e) By the Seller or Buyer if the Closing shall not have occurred on or before June 30, 2023, or such other date as may be mutually agreed to by the Parties, and provided that if Buyer is pursuing regulatory approval of the Transaction in good faith, and such approval has not been obtained by June 30, 2023, then Buyer shall have the option to extend the date of termination until September 30, 2023 (such date, as it may be extended, the "End Date"), but the right to terminate this Agreement under this Section 9.01(e) shall not be available to any Party whose failure to fulfil any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date; or

(f) If the Buyer's redomestication petition to Oklahoma is not granted by the OID within 180 days from the date hereof.

(g) By the Seller if at any time the Rehabilitation Court or present regulator of the Acquired Insurance Companies orders or directs withholds or denies approval for same.

The termination of this Agreement shall be effectuated by the delivery of a written notice of termination from the Party terminating this Agreement to the other Party.

30

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 412 of 508

**Section IX.2** **Effect of Termination**. If this Agreement is terminated under Section 9.01 above:

    (a)    (a)    This Agreement shall immediately become void and there shall be no liability or obligation on the part of the Sellers or Buyers or their respective officers, directors, stockholders, general or limited partners, members or Affiliates, except that the provisions of Sections 9.02 (Effect of Termination), 9.03 (Limited Remedies Upon Termination), and Article VIII (Miscellaneous), shall remain in full force and effect and survive any termination of this Agreement; and

    (b)    Such termination shall relieve each Party to this Agreement from all breaches or defaults under this Agreement except as provided in this Section 9.02 or Section 9.03, below.

**Section IX.3** **Limited Remedies Upon Termination**. In the event of termination of this Agreement under Section 9.01(b), Section 9.01(c), or Section 9.01(e), any Party shall have the right to recover direct out-of-pocket damages sustained by such Party as a result of any knowing and intentional breach of any representation, warranty, covenant or agreement contained in this Agreement by another Party before such termination, but such damages shall be limited to the reasonable and documented costs and expenses incurred by such Party in connection with the negotiation of, and the performance under, this Agreement.

[SIGNATURE PAGE FOLLOWS]

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 413 of 508

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date the first written above by their respective duly authorized officers.

GBIG Capital, LLC
  a Delaware limited liability company

By: _____
Name:  Greg E. Lindberg
Title:  Sole Member

UNIVERSAL FINANCIAL HOLDINGS, LLC  a Missouri limited liability company

By: _____
Name: Robert T. Alban
Title:  CEO

32

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date the first written above by their respective duly authorized officers.

GBIG Capital, LLC
a Delaware limited liability company

By: _____
Name:  Greg E. Lindberg
Title:  Sole Member

UNIVERSAL FINANCIAL HOLDINGS, LLC  a
Missouri limited liability company

By: _____
Name: Robert T. Alban
Title:  CEO

32

FORM A

STATEMENT REGARDING THE ACQUISITION OF CONTROL OF
OR MERGER WITH A DOMESTIC INSURER
(this "Statement")

**BANKERS LIFE INSURANCE COMPANY**
(the "Domestic Insurer - BLIC")

BY

**UNIVERSAL FINANCIAL HOLDINGS LLC**
**ROBERT ALBAN**
(each an "Applicant")

**Filed with the North Carolina Department of Insurance and Financial Services**
(the "Department")

Dated: May 2, 2023

Name, Title, Address and Telephone Number of Individuals to Whom Notices and
Correspondence Concerning this Statement Should Be Addressed:

To:

Bob Alban
CEO, Universal Financial Holdings
Principal, Montshire Advisors
19 Essex Road
Bedford NH 03110
Telephone: 617-500-0008
Email: alban@montshireadvisors.com

With a copy to:
David Liggett
Ragsdale Liggett
2840 Plaza Place,
Suite 400,
Raleigh NC 27612
Telephone: 919.881.2209
Email: dliggett@rl-law.com

1007716119v3

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 416 of 508

## Item 1. METHOD OF ACQUISITION

### (a) Domestic Insurer - BLIC

This Form A Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer (this "Application") relates to a proposed acquisition of control of the Domestic Insurer, Bankers Life Insurance Company. The Domestic Insurer - BLIC's statutory home office and is located at 2327 Englert Drive Durham North Carolina 27713. The Domestic Insurer - BLIC is currently in rehabilitation pursuant to order of rehabilitation issued by Wake County Superior Court on June 27, 2019. (the "Rehabilitation").

### (b) Method of Acquisition

The Domestic Insurer - BLIC is a direct wholly-owned subsidiary of GBIG Holdings, LLC, a limited liability company organized under the laws of the State of Delaware ("GBIG Holdings"). GBIG Holdings is a wholly owned subsidiary of GBIG Capital LLC, a limited liability company organized under the laws of the State of Delaware ("Seller")

On December 2, 2022, Universal Financial Holdings, LLC ("UFH") entered into an agreement to acquire GBIG Holdings from Seller as amended by that certain First Amendment to the Purchase Agreement (collectively, the "Purchase Agreement"), pursuant to which UFH agreed to purchase from Seller all of the membership interests of GBIG Holdings (the "Proposed Acquisition"), subject to satisfaction of all conditions to closing, including receipt of required regulatory approvals from the North Carolina Department of Insurance (the "Department") of this Application approving the change of control of GBIG's wholly owned subsidiary, the Domestic Insurer – BLIC and a Form D application relating to the issuance of surplus note by Domestic Insurer - BLIC. The Proposed Acquisition is also conditioned upon and subject to regulatory approvals from the Department of a Form A approving the change of control of GBIG Holding's wholly owned subsidiaries, Southland National Insurance Company ("SNIC") and Colorado Bankers Life Insurance Company ("CBL") and the Rehabilitation Court approval of the termination of the Rehabilitation Proceeding of SNIC, BLIC, and CBL, the approval of the sale of Clanwilliam and UKAT, and the approval of refinancing of ARM.

A copy of the Purchase Agreement and the first amendment thereto is attached as Exhibit 1 to this Statement and incorporated herein by reference.

Universal Financial Holdings is controlled by Robert Alban. Universal Financial Holdings was formed for the purpose of acquiring insurance companies and, as of the date hereof, has no assets or liabilities. Universal Financial Holdings will issue $30 million of preferred equity to outside investors concurrent with the closing of the Proposed Acquisition. Such preferred equity investors will be passive investors who will not control the Domestic Insurer - BLIC. No investors will transact any business in Universal Financial Holdings or the Domestic Insurer - BLIC or will have the power to sign documents for or otherwise bind Universal Financial Holdings, or Domestic Insurer – BLIC.

1007716119v3

1

### Item 2.   IDENTITY AND BACKGROUND OF THE APPLICANTS

#### (a)   Name and Address of the Applicants

The names and principal business addresses of the Applicants are as follows:

> Universal Financial Holdings
> Robert Alban
> 19 Essex Road
> Bedford, NH 03110

#### (b)   The Applicants' Business Operations

Universal Financial Holdings is a newly formed limited liability company organized under the laws of the State of Missouri for the purpose of acquiring insurance related businesses.

Robert Alban is an insurance industry entrepreneur and advisor with expertise in risk based capital models, reinsurance, Federal Home Loan Bank ("FHLB") matters, as well as an understanding of insurance tax and accounting considerations and the insurance product and distribution marketplace. Mr Alban is currently Principal of Montshire Advisors, a firm he co-founded in 2011, where he brokers reinsurance, advises insurers on product, distribution, and FHLB matters, and represents investments and investment firms to the US insurance industry. Montshire's clients have included numerous insurance companies, investment managers, and regional Federal Home Loan banks. Mr Alban is also a shareholder in an insurance distribution business focused on marketing insurance and administering benefits for federal employees and employer groups. In 2020, Mr Alban acquired intellectual property from Great American Insurance Company for a supplemental unemployment insurance product which he is in the process of commercializing. Prior to forming Montshire, Mr. Alban led corporate development at National Life Group, a Fortune 1000 insurance company where he focused on capital optimization structures and transactions such as reinsurance, corporate owned life insurance, certified capital companies and other tax advantaged investments, interest rate and equity market hedging, and Federal Home Loan bank programs. Prior to National Life, Mr. Alban led mergers and acquisitions at Sentry Insurance, a Fortune 1000 property and casualty insurer. Prior to Sentry, Mr Alban held business development positions with GXS (formerly GE Information Services), ITOCHU International (an $86 Billion Japanese conglomerate) and Westinghouse. Mr Alban has a BS in Mechanical Engineering from West Virginia University and an MBA from Georgetown University. Mr Alban has his Series 7 and Series 66 securities licenses and is a registered representative of Castle Hill Partners. Mr Alban has his life producer and reinsurance intermediary licenses.

#### (c)   Applicants' Organizational Charts

Attached to this Application as Exhibit 2 is the current organizational chart of the Domestic Insurer - BLIC immediately prior to the Proposed Acquisition.

A simplified organizational chart presenting the identities of, and interrelationships among, the Applicants and their subsidiaries and affiliates, including the ultimate controlling persons, prior to consummation of the Proposed Acquisition is attached hereto as Exhibit 3. The

2

organizational chart indicates the percentage of voting securities of each entity owned or controlled by the Applicants or any other such persons, the type of organization (e.g., corporation, trust, partnership) and the state or other jurisdiction of domicile or incorporation, as applicable. Unless otherwise indicated on such organizational charts or in this Application, each entity is a corporation and control is maintained by the ownership or control of all outstanding voting securities.

An abbreviated post-closing organizational chart of the Applicants, showing the Domestic Insurer - BLIC's place within the Applicants' organizational structure after consummation of the Proposed Acquisition, is attached hereto as Exhibit 4.

There are currently no pending court proceedings involving a reorganization or liquidation of the Applicants or any of the subsidiaries or affiliates of the Applicants.

### Item 3.    IDENTITY AND BACKGROUND OF INDIVIDUALS ASSOCIATED WITH THE APPLICANTS

The directors, executive officers and natural persons controlling 10% or more of the voting security of the Applicants are listed in Exhibit 5 hereto. Completed NAIC biographical affidavits of such individuals are attached hereto as Exhibit 6. Third party background checks will be also be performed in connection with this Statement's submission.

A list setting forth the names and business addresses of the prospective members of the board of the Domestic Insurer - BLIC is set forth below under Item 5.

### Item 4.    NATURE, SOURCE AND AMOUNT OF CONSIDERATION

#### (a)    Nature, Source and Amount of Consideration

The total consideration for the Proposed Acquisition of GBIG Holdings is $1 plus deferred consideration of $290 million payable concurrent with the redemption of the remaining Global Growth related assets. Concurrent with closing, UFH shall buy a $30m surplus note in Domestic Insurer – BLIC shall to recapitalize and provide additional liquidity to BLIC. The surplus note shall have the following terms:

- 10-year term

- 10% interest, can be accrued at borrower's option for the first three years

- Repayable in cash or Global Growth related assets

- The surplus note shall become an asset of GBIG Holdings and be acquired by UFH.

#### (b)    Criteria in Determining Consideration

The basis and terms of the Purchase Agreement, including the nature and amount of consideration, were determined through arms' length negotiations between representatives of the

3

Applicants and Seller, and their respective financial, legal and other advisors. The amount and type of consideration were determined in view of the consideration paid in other recent acquisitions of similar businesses, as well as the financial position and results of operations of the business to be acquired, including the past and present business operations, historical and potential earnings, financial condition and prospects, assets and liabilities and such other factors and information as the Applicants considered relevant under the circumstances.

### Item 5.     FUTURE PLANS FOR DOMESTIC INSURER - BLIC

#### (a)     Plans for Domestic Insurer - BLIC

A Plan of Operations describing the Applicants' intentions with respect to the operations of the Domestic Insurer - BLIC following the consummation of the Proposed Acquisition is attached hereto as Exhibit 7.

The tables below set forth a list of all individuals who are proposed to be directors and officers of the Domestic Insurer - BLIC following the closing of the Proposed Acquisition:

Directors:

| Name | Title |
| --- | --- |
| Robert Alban | Executive Chairman |
| Michael Reidy | Director |

Officers:

| Name | Title |
| --- | --- |
| Robert Alban | President, Secretary |

Biographical affidavits for Robert Alban are included in Exhibit 8 hereto. The Applicants intend to identify several additional directors for appointment to the Board of the Domestic Insurer – BLIC at or shortly after the closing of the Proposed Acquisition. Once these directors are identified, biographical affidavits will be filed.

The Domestic Insurer - BLIC is being acquired without a management team, officers or employees. The Applicants' will have an initial management team engaged upon the closing of the Proposed Acquisition to manage third-party service providers and to ensure operational continuity. Over the near-to-medium term, the Applicants expect to continue hiring additional members of Management and support staff and thoughtfully, in a fully coordinated strategy with all parties, transition away from third-party support.

Other than as set forth herein or in the Plan of Operations attached hereto as Exhibit 7, the Applicants have no plans for the Domestic Insurer – BLIC to pay a dividend (whether extraordinary or otherwise), liquidate the Domestic Insurer - BLIC, sell its assets or merge it with any person or persons or make any other material change in its business operations or corporate structure or management.

4

Applicant intends to pursue discussions with other state regulators regarding re-domestication. Applicant shall file a copy of any UCAA primary application filings it makes with other state insurance departments for approval of re-domestication.

### (b)     Five-Year Financial Projections

Five-year financial projections for the Domestic Insurer - BLIC are also attached as Exhibit 7 hereto.

### (c)     Absence of Other Proposed Changes

There are no proposed changes with respect to the Domestic Insurer – BLIC's compliance plan.

### Item 6.     VOTING SECURITIES TO BE ACQUIRED

The Applicants will acquire, indirectly, 100 percent of the Domestic Insurer - BLIC's capital stock.

Please refer to Item 4(b) above for a description of the method by which the terms of the Purchase Agreement were determined.

### Item 7.     OWNERSHIP OF VOTING SECURITIES

None of the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement beneficially owns or has, directly or indirectly, a right to acquire beneficially any voting securities of the Domestic Insurer - BLIC or any securities convertible into or evidencing a right to acquire any such voting securities whether or not such right of conversion or acquisition is exercisable immediately or at some future time.

### Item 8.     CONTRACTS, ARRANGEMENTS OR UNDERSTANDINGS WITH RESPECT TO VOTING SECURITIES OF THE DOMESTIC INSURER - BLIC

Except for the Purchase Agreement, which provides for the acquisition of all of the shares of capital stock of the Domestic Insurer - BLIC, there are no contracts, arrangements or understandings with respect to any voting securities of the Domestic Insurer - BLIC in which the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement is involved, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits, or the giving or withholding of proxies.

### Item 9.     RECENT PURCHASES OF VOTING SECURITIES

There have been no purchases of any voting securities of the Domestic Insurer - BLIC by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants,

5

any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

## Item 10. RECENT RECOMMENDATIONS TO PURCHASE

Except in connection with the execution of the Purchase Agreement, there have been no recommendations to purchase any voting security of the Domestic Insurer - BLIC made by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement, or by anyone based upon interviews or at the suggestion of the Applicants, any person controlling, controlled by or under common control with the Applicants or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

## Item 11. AGREEMENTS WITH BROKER-DEALERS

There are no written or oral agreements, arrangements or understandings made or proposed to be made by any Applicants or any affiliate of the Applicants with any broker-dealer as to solicitation of voting securities of the Domestic Insurer - BLIC for tender.

## Item 12. FINANCIAL STATEMENTS AND EXHIBITS

### (a) Exhibits and Financial Statements

The financial statements and exhibits attached to this Statement are as follows:

Exhibit 1.   Purchase Agreement

Exhibit 2.   Pre-Acquisition Organizational Chart of the Domestic Insurer - BLIC

Exhibit 3.   Pre-Acquisition Organizational Chart of the Applicants

Exhibit 4.   Simplified Organizational Chart of the Applicants and Domestic Insurer - BLIC Following the Proposed Acquisition

Exhibit 5.   Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 6.   Biographical Affidavits of Current Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 7.   Plan of Operations and Five Year Financial Projections for the Domestic Insurer - BLIC

Exhibit 8.   Personal financial statements of Robert Alban as of April 17, 2023.

6

Case 3:23-cr-00048-MOC-DCK   Document 132-2   Filed 05/04/26   Page 422 of 508

The Applicants respectfully request that <u>Exhibit 8</u>, the personal financial statements of Mr. Alban and <u>Exhibit 6</u>, biographical affidavits of directors be afforded confidential treatment and be excepted from disclosure under G.S. 132-1.2. The information in Mr. Alban's personal financial statement and biographical affidavit contains information of a personal nature. Disclosure of such information would constitute a clearly unwarranted invasion of the relevant individuals' privacy.

### Financial Statements

Attached as <u>Exhibit 8</u> hereto are the personal financial statements of Robert Alban as of April 17, 2023. Universal Financial Holdings is a newly formed entity and does not have financial statements.

### (c)     Tender Offers, Agreements for Voting Securities, Annual Reports

Other than the Purchase Agreement, which provides for the change of control of all of the shares of capital stock of the Domestic Insurer - BLIC, there are no tender offers for, requests or invitations for, tenders of, exchange offers for or agreements to acquire or exchange any voting security of the Domestic Insurer - BLIC or additional soliciting materials relating thereto. Other than as indicated herein, there will be no employment, consultation, advisory, managing general agent, controlling producer, or management contracts concerning the Domestic Insurer - BLIC, and there have been no annual reports to stockholders of the Domestic Insurer – BLIC for the last two (2) fiscal years.

### Item 13.     ENTERPRISE RISK MANAGEMENT

The Applicants agree to provide, to the best of their knowledge and belief, the information required by Form F within fifteen (15) days after the end of the month in which the acquisition of control occurs.

### Item 14.     SIGNATURE AND CERTIFICATION

*[Signature Pages Follow]*

7

## SIGNATURE

Pursuant to the requirements of NC General Statutes - Chapter 58 Article 19, Universal Financial Holdings, LLC has caused this application to be duly signed on its behalf in the City of _Bedford_ and State of _NH_ on the _2nd_ day of _MAY_, 2023.

(Seal)

UNIVERSAL FINANCIAL HOLDINGS, LLC

By: _____

Name: Robert Alban

Title: Authorized Person

Attest:

By: _____

Name: _Caitlin Loving_

Title: _Notary Public_

**CAITLIN E. LOVING**
**Notary Public - New Hampshire**
**My Commission Expires June 30, 2026**

## CERTIFICATION

The undersigned deposes and says that he has duly executed the attached application dated _MAY 2_, 2023, for and on behalf of Universal Financial Holdings, LLC; that he is the authorized signatory of such company and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with the instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information and belief.

_____
(Signature)

_Robert Alban_
(Type or Print Name)

FORM A

STATEMENT REGARDING THE ACQUISITION OF CONTROL OF
OR MERGER WITH A DOMESTIC INSURER
(this "Statement")

**SOUTHLAND NATIONAL INSURANCE COMPANY**
(the "Domestic Insurer - SNIC")

BY

**UNIVERSAL FINANCIAL HOLDINGS LLC**
**ROBERT ALBAN**
(each an "Applicant")

**Filed with the North Carolina Department of Insurance and Financial Services**
(the "Department")

Dated: May 2, 2023

Name, Title, Address and Telephone Number of Individuals to Whom Notices and
Correspondence Concerning this Statement Should Be Addressed:

To:

Bob Alban
CEO, Universal Financial Holdings
Principal, Montshire Advisors
19 Essex Road
Bedford NH 03110
Telephone: 617-500-0008
Email: alban@montshireadvisors.com

With a copy to:
David Liggett
Ragsdale Liggett
2840 Plaza Place,
Suite 400,
Raleigh NC 27612
Telephone: 919.881.2209
Email: dliggett@rl-law.com

## Item 1.   METHOD OF ACQUISITION

### (a)   Domestic Insurer - SNIC

This Form A Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer (this "Application") relates to a proposed acquisition of control of the Domestic Insurer, Southland National Insurance Company. The Domestic Insurer - SNIC's statutory home office and is located at 2327 Englert Drive Durham North Carolina 27713. The Domestic Insurer - SNIC is currently in rehabilitation pursuant to order of rehabilitation issued by Wake County Superior Court on June 27, 2019. (the "Rehabilitation").

### (b)   Method of Acquisition

The Domestic Insurer - SNIC is a direct wholly-owned subsidiary of GBIG Holdings, LLC, a limited liability company organized under the laws of the State of Delaware ("GBIG Holdings"). GBIG Holdings is a wholly owned subsidiary of GBIG Capital LLC, a limited liability company organized under the laws of the State of Delaware ("Seller")

On December 2, 2022, Universal Financial Holdings, LLC ("UFH") entered into an agreement to acquire GBIG Holdings from Seller as amended by that certain First Amendment to Purchase Agreement (collectively, the "Purchase Agreement"), pursuant to which UFH agreed to purchase from Seller all of the membership interests of GBIG Holdings (the "Proposed Acquisition"), subject to satisfaction of all conditions to closing, including receipt of required regulatory approvals from the North Carolina Department of Insurance (the "Department") of this Application approving the change of control of GBIG's wholly owned subsidiary, the Domestic Insurer - SNIC and a Form D application relating to the issuance of a surplus note by Domestic Insurer – SNIC. The Proposed Acquisition is also conditioned upon and subject to regulatory approvals from the Department of a Form A approving the change of control of GBIG Holding's wholly owned subsidiaries, Bankers Life Insurance Company ("BLIC") and Colorado Bankers Life Insurance Company ("CBL") and the Rehabilitation Court approval of the termination of the Rehabilitation Proceeding of SNIC, BLIC, and CBL, the approval of the sale of Clanwilliam and UKAT, and the approval of refinancing of ARM and GGHI.

A copy of the Purchase Agreement and the First Amendment thereto is attached as Exhibit 1 to this Statement and incorporated herein by reference.

Universal Financial Holdings is controlled by Robert Alban. Universal Financial Holdings was formed for the purpose of acquiring insurance companies and, as of the date hereof, has no assets or liabilities. Universal Financial Holdings will issue $30 million of preferred equity to outside investors concurrent with the closing of the Proposed Acquisition. Such preferred equity investors will be passive investors who will not control the Domestic Insurer - SNIC. No investors will transact any business in Universal Financial Holdings or the Domestic Insurer - SNIC or will have the power to sign documents for or otherwise bind Universal Financial Holdings.

1007716119v3

1

### Item 2. IDENTITY AND BACKGROUND OF THE APPLICANTS

#### (a) Name and Address of the Applicants

The names and principal business addresses of the Applicants are as follows:

Universal Financial Holdings
Robert Alban
19 Essex Road
Bedford, NH 03110

#### (b) The Applicants' Business Operations

Universal Financial Holdings is a newly formed limited liability company organized under the laws of the State of Missouri for the purpose of acquiring insurance related businesses.

Robert Alban is an insurance industry entrepreneur and advisor with expertise in risk based capital models, reinsurance, Federal Home Loan Bank ("FHLB") matters, as well as an understanding of insurance tax and accounting considerations and the insurance product and distribution marketplace. Mr Alban is currently Principal of Montshire Advisors, a firm he co-founded in 2011, where he brokers reinsurance, advises insurers on product, distribution, and FHLB matters, and represents investments and investment firms to the US insurance industry. Montshire's clients have included numerous insurance companies, investment managers, and regional Federal Home Loan banks. Mr Alban is also a shareholder in an insurance distribution business focused on marketing insurance and administering benefits for federal employees and employer groups. In 2020, Mr Alban acquired intellectual property from Great American Insurance Company for a supplemental unemployment insurance product which he is in the process of commercializing. Prior to forming Montshire, Mr. Alban led corporate development at National Life Group, a Fortune 1000 insurance company where he focused on capital optimization structures and transactions such as reinsurance, corporate owned life insurance, certified capital companies and other tax advantaged investments, interest rate and equity market hedging, and Federal Home Loan bank programs. Prior to National Life, Mr. Alban led mergers and acquisitions at Sentry Insurance, a Fortune 1000 property and casualty insurer. Prior to Sentry, Mr Alban held business development positions with GXS (formerly GE Information Services), ITOCHU International (an $86 Billion Japanese conglomerate) and Westinghouse. Mr Alban has a BS in Mechanical Engineering from West Virginia University and an MBA from Georgetown University. Mr Alban has his Series 7 and Series 66 securities licenses and is a registered representative of Castle Hill Partners. Mr Alban has his life producer and reinsurance intermediary licenses.

#### (c) Applicants' Organizational Charts

Attached to this Application as Exhibit 2 is the current organizational chart of the Domestic Insurer - SNIC immediately prior to the Proposed Acquisition.

A simplified organizational chart presenting the identities of, and interrelationships among, the Applicants and their subsidiaries and affiliates, including the ultimate controlling persons, prior to consummation of the Proposed Acquisition is attached hereto as Exhibit 3. The

2

organizational chart indicates the percentage of voting securities of each entity owned or controlled by the Applicants or any other such persons, the type of organization (e.g., corporation, trust, partnership) and the state or other jurisdiction of domicile or incorporation, as applicable. Unless otherwise indicated on such organizational charts or in this Application, each entity is a corporation and control is maintained by the ownership or control of all outstanding voting securities.

An abbreviated post-closing organizational chart of the Applicants, showing the Domestic Insurer - SNIC's place within the Applicants' organizational structure after consummation of the Proposed Acquisition, is attached hereto as Exhibit 4.

There are currently no pending court proceedings involving a reorganization or liquidation of the Applicants or any of the subsidiaries or affiliates of the Applicants.

## Item 3.  IDENTITY AND BACKGROUND OF INDIVIDUALS ASSOCIATED WITH THE APPLICANTS

The directors, executive officers and natural persons controlling 10% or more of the voting security of the Applicants are listed in Exhibit 5 hereto. Completed NAIC biographical affidavits of such individuals are attached hereto as Exhibit 6. Third party background checks will be also be performed in connection with this Statement's submission.

A list setting forth the names and business addresses of the prospective members of the board of the Domestic Insurer-SNIC is set forth below under Item 5.

## Item 4.  NATURE, SOURCE AND AMOUNT OF CONSIDERATION

### (a)  Nature, Source and Amount of Consideration

The total consideration for the Proposed Acquisition of GBIG Holdings is $1 plus deferred consideration of $290 million payable concurrent with the redemption of the remaining Global Growth related assets. Prior to closing, Domestic Insurer – SNIC shall convert $40 million of GBIG Holding's equity in SNIC into a $40 million face amount surplus note with the following terms:

- 10-year term

- 10% interest, can be accrued at borrower's option for the first three years

- Repayable in cash or Global Growth related assets

- The surplus note shall become an asset of GBIG Holdings and be acquired by UFH.

### (b)  Criteria in Determining Consideration

The basis and terms of the Purchase Agreement, including the nature and amount of consideration, were determined through arms' length negotiations between representatives of the

3

Applicants and Seller, and their respective financial, legal and other advisors. The amount and type of consideration were determined in view of the consideration paid in other recent acquisitions of similar businesses, as well as the financial position and results of operations of the business to be acquired, including the past and present business operations, historical and potential earnings, financial condition and prospects, assets and liabilities and such other factors and information as the Applicants considered relevant under the circumstances.

## Item 5.     FUTURE PLANS FOR DOMESTIC INSURER - SNIC

### (a)     Plans for Domestic Insurer - SNIC

A Plan of Operations describing the Applicants' intentions with respect to the operations of the Domestic Insurer - SNIC following the consummation of the Proposed Acquisition is attached hereto as Exhibit 7.

The tables below set forth a list of all individuals who are proposed to be directors and officers of the Domestic Insurer - SNIC following the closing of the Proposed Acquisition:

Directors:

| Name | Title |
| --- | --- |
| Robert Alban | Executive Chairman |
| Michael Reidy | Director |

Officers:

| Name | Title |
| --- | --- |
| Robert Alban | President, Secretary |

Biographical affidavits for Robert Alban are included in Exhibit 8 hereto. The Applicants intend to identify several additional directors for appointment to the Board of the Domestic Insurer – SNIC at or shortly after the closing of the Proposed Acquisition. Once these directors are identified, biographical affidavits will be filed.

The Domestic Insurer - SNIC is being acquired without a management team, officers or employees. The Applicants' will have an initial management team engaged upon the closing of the Proposed Acquisition to manage third-party service providers and to ensure operational continuity. Over the near-to-medium term, the Applicants expect to continue hiring additional members of Management and support staff and thoughtfully, in a fully coordinated strategy with all parties, transition away from third-party support.

Other than as set forth herein or in the Plan of Operations attached hereto as Exhibit 7, the Applicants have no plans for the Domestic Insurer – SNIC to pay a dividend (whether extraordinary or otherwise), liquidate the Domestic Insurer - SNIC, sell its assets or merge it with any person or persons or make any other material change in its business operations or corporate structure or management.

4

Applicant intends to pursue discussions with other state regulators regarding re-domestication. Applicant shall file a copy of any UCAA primary application filings it makes with other state insurance departments for approval of re-domestication.

**(b)** **Five-Year Financial Projections**

Five-year financial projections for the Domestic Insurer - SNIC are also attached as <u>Exhibit 7</u> hereto.

**(c)** **Absence of Other Proposed Changes**

There are no proposed changes with respect to the Domestic Insurer SNIC's compliance plan.

## Item 6.       VOTING SECURITIES TO BE ACQUIRED

The Applicants will acquire, indirectly, 100 percent of the Domestic Insurer - SNIC's capital stock.

Please refer to Item 4(b) above for a description of the method by which the terms of the Purchase Agreement were determined.

## Item 7.       OWNERSHIP OF VOTING SECURITIES

None of the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement beneficially owns or has, directly or indirectly, a right to acquire beneficially any voting securities of the Domestic Insurer - SNIC or any securities convertible into or evidencing a right to acquire any such voting securities whether or not such right of conversion or acquisition is exercisable immediately or at some future time.

## Item 8.       CONTRACTS, ARRANGEMENTS OR UNDERSTANDINGS WITH RESPECT TO VOTING SECURITIES OF THE DOMESTIC INSURER - SNIC

Except for the Purchase Agreement, which provides for the acquisition of all of the shares of capital stock of the Domestic Insurer - SNIC, there are no contracts, arrangements or understandings with respect to any voting securities of the Domestic Insurer - SNIC in which the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement is involved, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits, or the giving or withholding of proxies.

## Item 9.       RECENT PURCHASES OF VOTING SECURITIES

There have been no purchases of any voting securities of the Domestic Insurer - SNIC by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants,

5

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 430 of 508

any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

## Item 10. RECENT RECOMMENDATIONS TO PURCHASE

Except in connection with the execution of the Purchase Agreement, there have been no recommendations to purchase any voting security of the Domestic Insurer - SNIC made by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement, or by anyone based upon interviews or at the suggestion of the Applicants, any person controlling, controlled by or under common control with the Applicants or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

## Item 11. AGREEMENTS WITH BROKER-DEALERS

There are no written or oral agreements, arrangements or understandings made or proposed to be made by any Applicants or any affiliate of the Applicants with any broker-dealer as to solicitation of voting securities of the Domestic Insurer - SNIC for tender.

## Item 12. FINANCIAL STATEMENTS AND EXHIBITS

### (a) Exhibits and Financial Statements

The financial statements and exhibits attached to this Statement are as follows:

Exhibit 1.    Purchase Agreement

Exhibit 2.    Pre-Acquisition Organizational Chart of the Domestic Insurer - SNIC

Exhibit 3.    Pre-Acquisition Organizational Chart of the Applicants

Exhibit 4.    Simplified Organizational Chart of the Applicants and Domestic Insurer - SNIC Following the Proposed Acquisition

Exhibit 5.    Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 6.    Biographical Affidavits of Current Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 7.    Plan of Operations and Five Year Financial Projections for the Domestic Insurer - SNIC

Exhibit 8.    Personal financial statements of Robert Alban as of April 17, 2023

6

The Applicants respectfully request that <u>Exhibit 8</u>, the personal financial statements of Mr. Alban and <u>Exhibit 6</u>, biographical affidavits of directors be afforded confidential treatment and be excepted from disclosure under G.S. 132-1.2. The information in Mr. Alban's personal financial statement and biographical affidavit contains information of a personal nature. Disclosure of such information would constitute a clearly unwarranted invasion of the relevant individuals' privacy.

### Financial Statements

Attached as <u>Exhibit 8</u> hereto are the personal financial statements of Robert Alban as of April 17, 2023. Universal Financial Holdings is a newly formed entity and does not have financial statements.

### (c)     Tender Offers, Agreements for Voting Securities, Annual Reports

Other than the Purchase Agreement, which provides for the change of control of all of the shares of capital stock of the Domestic Insurer - SNIC, there are no tender offers for, requests or invitations for, tenders of, exchange offers for or agreements to acquire or exchange any voting security of the Domestic Insurer - SNIC or additional soliciting materials relating thereto. Other than as indicated herein, there will be no employment, consultation, advisory, managing general agent, controlling producer, or management contracts concerning the Domestic Insurer - SNIC, and there have been no annual reports to stockholders of the Domestic Insurer – SNIC for the last two (2) fiscal years.

### Item 13.     ENTERPRISE RISK MANAGEMENT

The Applicants agree to provide, to the best of their knowledge and belief, the information required by Form F within fifteen (15) days after the end of the month in which the acquisition of control occurs.

### Item 14.     SIGNATURE AND CERTIFICATION

*[Signature Pages Follow]*

7

## SIGNATURE

Pursuant to the requirements of NC General Statutes - Chapter 58 Article 19, Universal Financial Holdings, LLC has caused this application to be duly signed on its behalf in the City of _Bedford_ and State of _NH_ on the _2nd_ day of _MAY_, 2023.

(Seal)

UNIVERSAL FINANCIAL HOLDINGS, LLC

By: _____

Name:   Robert Alban
Title:    Authorized Person

Attest:

By: _____
Name: _Caitlin Loving_
Title: _Notary Public_

**CAITLIN E. LOVING**
**Notary Public - New Hampshire**
**My Commission Expires June 30, 2026**

## CERTIFICATION

The undersigned deposes and says that he has duly executed the attached application dated _MAY 2_, 2023, for and on behalf of Universal Financial Holdings, LLC; that he is the authorized signatory of such company and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with the instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information and belief.

_____
(Signature)

Robert Alban
(Type or Print Name)

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 008664

MIKE CAUSEY, COMMISSIONER
OF INSURANCE OF NORTH
CAROLINA,

              Petitioner,

              v.

SOUTHLAND NATIONAL
INSURANCE CORPORATION,
SOUTHLAND NATIONAL
REINSURANCE CORPORATION,
BANKERS LIFE INSURANCE
COMPANY, COLORADO BANKERS
LIFE INSURANCE COMPANY,
North Carolina Domiciled Insurance
Companies,

              Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF JOHN MURPHY**

I, John Murphy, after being sworn, do hereby state the following to be true and accurate based upon my firsthand knowledge:

1. I am a resident of Indiana, am more than eighteen years old, and am not subject to any legal disabilities. I make the following statements on my own personal knowledge.

2. I am an employee of Noble Consulting Services, Inc., and one of the appointed Special Deputy Rehabilitators for Respondents Colorado Bankers Life Insurance Company ("CBL"), Bankers Life Insurance Company ("BLIC") and,



Southland National Reinsurance Corporation ("SNRC"), as well as one of the Special Deputy Liquidators for Respondent Southland National Insurance Corporation ("SNIC") (collectively, the "Receiver").

3.     The court-appointed Rehabilitator and Liquidator of Respondents delegated his statutory powers set out in N.C. Gen. Stat. §§ 58-30-85, and 58-30-120 to me as one of the Special Deputy Rehabilitators and Special Deputy Liquidators.

4.     The Rehabilitator, Liquidator, and Special Deputy Rehabilitators and Special Deputy Liquidators have "control" of each of the Respondents, in that they are the only persons who have "direct or indirect possession of the power to direct or cause the direction of the management and policies of [Respondents], whether through the ownership of voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise," which I understand to be the definition of control set out in N.C. Gen. Stat. § 58-19-5(2).

5.     I have reviewed each of the three Form A submissions filed by Universal Financial Holdings, LLC ("Universal") on May 15, 2023.

6.     In those Form A submissions, Universal seeks to acquire "control" of each of Respondents CBL, BLIC, and SNIC, (collectively, the "Insolvent Insurance Companies") by purchasing all of the membership interests of GBIG Holdings, LLC ("GBIG") (the "Proposed Transaction").

7.     GBIG lacks the ability to offer "control" of the Insolvent Insurance Companies. Control of those companies is vested in the Rehabilitator and Liquidator, and therefore his appointed Special Deputy Rehabilitators and Special Deputy

2

Liquidators, for the reasons set out above and as set out in this Court's June 27, 2019 Order of Rehabilitation relating to CBL and BLIC, and this Court's May 2, 2023 Order of Liquidation relating to SNIC. Any proposal for change of control of Respondents would need to be approved first by the Special Deputy Rehabilitators and Special Deputy Liquidators.

8. The Proposed Transaction between Universal and GBIG was not approved by the Special Deputy Rehabilitators and Special Deputy Liquidators. Moreover, the details of the Proposed Transaction as set out in the Form A application were first provided to the Special Deputy Rehabilitators and Special Deputy Liquidators when the Form A submissions were forwarded to them by the North Carolina Department of Insurance.

9. Based on a preliminary review, it appears that the Form A submissions would require the Rehabilitator and Liquidator and Special Deputy Rehabilitators and Special Deputy Liquidators, (or this Court) to approve certain transactions that the Rehabilitator has previously opposed due to the use of funds, such as the sale and refinancing of certain SACs, including the Clanwilliam Group, Castle & Cooke Mortgage ("CCM"), Claris Vision Group ("CVG"), and the ARM group of companies.

10. Each of these transactions is included in Global Growth Holdings Inc.'s alternative "Global Rehabilitation Plan for North Carolina and Bermuda Policyholders."

11. The agreements contained in the Form A submissions are conditioned on the Rehabilitator and Liquidator, and Special Deputy Rehabilitators and Special

3

Deputy Liquidators, essentially, consenting to Global Growth's alternative plan of rehabilitation.

12. The actions of GBIG Holdings, LLC and Universal Financial Holdings, LLC have and continue to interfere with the insolvency proceedings conducted under Chapter 58 of the North Carolina General Statutes, by diverting resources of the Receiver and seeking to take unauthorized control of the Respondents.

Declarant sayeth nothing further.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

4

I declare under penalty of perjury under the laws of Indiana that the foregoing is true and correct.

_John Murphy_      _May 30, 2023_
John Murphy            Date

STATE OF _Indiana_

COUNTY OF _Hendricks_

Sworn to and subscribed before me

this the _30th_ day of May, 2023.

_Rochelle Atkins_

Notary Public

_Rochelle Atkins_

Printed Name

My Commission expires:

_November 8, 2026_

(Notarial stamp or seal)

ROCHELLE ATKINS
Notary Public, State of Indiana
Hendricks County
Commission Number NP0716900
My Commission Expires
November 08, 2026

5

# Exhibit O4

Confidential

Universal Financial Holdings LLC
1120 S 6th Street
Suite 501
Saint Louis, Missouri 63104

November 17, 2022

GBIG Capital, Inc.
2222 Sedwick Road
Durham, North Carolina 27713
Attn: Justin Holbrook

Re: Indication of Interest

Ladies and Gentlemen:

Based on our review of information previously provided, Universal Financial Holdings LLC ("UFH") is pleased to provide this indication of interest ("Indication of Interest") to GBIG Capital, LLC. ("GBIG Capital") to acquire 100% of the membership interest of GBIG Holdings, LLC ("GBIG Holdings") pursuant to the general terms and conditions contained in the summary of proposed terms attached hereto and included herein by reference (the "Acquisition Term Sheet").

UFH requires 30 days to complete confirmatory financial, actuarial, tax and legal due diligence on GBIG Holdings and its wholly owned subsidiaries Bankers Life Insurance Company ("BLIC"), Colorado Bankers Life Insurance Company ("CBL"), and Southland National Insurance Company ("SNIC"). Upon completion of diligence, UFH will immediately sign a binding purchase agreement to acquire GBIG Holdings.

Within 15 days of signing the binding purchase agreement, UFH shall submit a Form A to approve the sale of BLIC, CBL, and SNIC. Subject to the consent of North Carolina Insurance Department, UFH shall file a Form R to approve the re-domestication of BLIC, CBL, and SNIC to Oklahoma.

The terms set forth in the Acquisition Term Sheet are subject to the absence of a material adverse change in the condition (whether financial or otherwise) or results of operations of GBIG Holdings, BLIC, CBL, and SNIC.

Further, you agree to pay UFH a work fee in the amount of $250,000.00. Such work fee will not be subject to counterclaim or set-off or be otherwise affected by any claim or dispute relating to any other matter. The work fee shall be non refundable regardless of whether the transaction closes and shall not be creditable against any other amounts payable. The work fee shall be paid as follows: a) $125,000.00 immediately upon execution of this Indication of Interest, and b) $125,000.00 upon execution of a binding purchase agreement for GBIG Holdings.

In the event GBIG Capital elects not to proceed with the transaction for any reason or GBIG Capital consummates a sale or other transaction for BLIC, CBL, and SNIC, with similar effects

1

with a party other than UFH or any of its affiliates, in each case, prior to March 31, 2023 (an "Alternate Transaction"), then GBIG Capital shall promptly pay to UFH as liquidated damages, the sum of $500,000.00 (the "Break-Up Fee") by wire transfer of immediately available funds, provided that the Break-Up Fee shall not be payable if (a) UFH has declined, refused, failed or otherwise not made reasonable and good faith efforts to pursue the transaction upon the terms contained in the Acquisition Term Sheet or UFH fails, following a request by GBIG Capital, to reaffirm promptly in writing UFH's willingness to pursue the transaction on the terms and conditions contained in the Acquisition Term Sheet, or (b) UFH or any of its affiliates participates in an Alternate Transaction.

The parties hereto shall each indemnify and hold the other party and its respective affiliates and its and their respective directors, officers, members, managers, employees, and agents harmless from and against all claims, losses, damages, and liabilities (including reasonable attorneys' fees) resulting from or arising out of any act or omission of such party or its directors, officers, managers, employees or agents taken with respect to or in furtherance of this Indication of Interest, other than such losses and damages which are found by a final, non-appealable judgment of a court of competent jurisdiction to arise out of the indemnified person's gross negligence or willful misconduct, provided, that any indemnification with respect to the transaction contemplated hereby shall be set forth in the definitive agreements for the transaction and shall supersede and replace the indemnity contained herein.

This Indication of Interest and any claim, controversy or dispute related to or in connection with this Indication of Interest or the relationship of the parties hereto and the interpretation and enforcement of the rights and duties of the parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware, excluding any of its conflict-of-law provisions that would cause the laws of any other jurisdiction to be applied. Each of the parties hereto irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any federal court sitting in the State of Delaware, and any appellate court from any thereof, over any suit, action or proceeding arising out of or relating to the transactions contemplated by this Indication of Interest and agrees that all claims in respect of any such action or proceeding shall be heard and determined in such Delaware state or, to the extent permitted by law, in such federal court. Each party hereto irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding arising out of or relating to this Indication of Interest or the transactions contemplated hereby (whether based on contract, tort or any other theory). None of the parties hereto shall be liable for any special, indirect, consequential or punitive damages in connection with this Indication of Interest, the Acquisition Term Sheet, the transaction or any related transaction.

This Indication of Interest may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Indication of Interest by facsimile or other electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.

2

Sincerely,

UNIVERSAL FINANCIAL HOLDINGS LLC, a Missouri limited liability company

By: _____
Name: Robert Alban
Title: CEO

Accepted and agreed as of the date first written above:

SPONSOR:

GBIG CAPITAL, LLC., a Delaware corporation

By: _____
Name:
Title:

3

Confidential

**Acquisition Term Sheet**
**Summary of Proposed Terms of Acquisition**
*For Discussion Purposes Only*

This Summary of proposed terms of acquisition sets forth the principal terms of a proposed acquisition of GBIG Holdings, LLC and is an expression of intent only and is not a binding agreement or commitment to execute the proposed transaction. There is no binding obligation on the part of any party to proceed with the proposed transaction described in this Acquisition Term Sheet unless and until definitive agreements regarding the proposed transaction are signed by the relevant parties and all required internal approvals of each party are secured.

**Fundamental Terms:**   At the Closing (defined hereinafter), Universal Financial Holdings ("UFH") will purchase all of the outstanding membership interests of GBIG Holdings LLC ("GBIG Holdings") for $1 of consideration plus UFH shall be required to deliver to GBIG Capital, LLC $317 Million of Seller Related Assets on the terms and conditions described below. Seller-Related Assets shall be assets that are related to the seller or related to Global Growth Holdings, Inc. and shall be selected at the UFH's sole discretion.

At the Closing, UFH or an affiliate shall purchase HME, HPC, and Fiasco Fine for $150 Million. Subject to regulatory approval, UFH intends to assign its purchase obligation to SNIC.

On or before the Closing of GBIG Holdings:

1) Global shall close the ARM refinancing providing $4 Million, $86 Million, and $13 Million of liquidity to BLIC, CBL and SNIC, respectively.

2) Global shall complete additional refinancings to provide $198.5 Million of liquidity to CBL and $67.0 Million of liquidity to SNIC. See Exhibit A for pro forma sources of this $265.5 Million in liquidity transactions.

Concurrent with Closing of GBIG Holdings:

1) CBL shall novate the BLIC reinsurance treaty to AxarRe (Cayman). CBL shall transfer non-Seller related assets with a book value equal to reserves less a 5% novation fee paid by AxarRe. The reinsurance shall be restructured to provide reserve credit to CBL.

2) CBL shall reinsure 90% of its annuity reserves to AxarRe (Cayman). CBL shall transfer $347 Million of Seller related assets to AxarRe and additional non-Seller related assets. The total book value of such assets shall be equal to the reserves transferred less a 5% ceding commission paid by AxarRe. The reinsurance shall be structured to provide reserve credit to CBL

3) CBL shall reinsure 100% of its worksite reserves to Liberty Bankers Life (Oklahoma). CBL shall transfer non-Seller related assets with a book value equal to reserves less a $50 Million ceding commission paid by Liberty Bankers. CBL and Liberty Bankers shall file under

4

the Oklahoma insurance business transfer law for approval to novate the worksite policies to Liberty Bankers.

4) BLIC shall reinsure 90% of its annuity reserves to AxarRe (Cayman). BLIC shall transfer $53 Million of Seller related assets to AxarRe and additional non-Seller related assets. The total book value of such assets shall be equal to the reserves transferred less a 5% ceding commission paid by AxarRe. The reinsurance shall be structured to provide reserve credit to BLIC.

5) UFH shall recapitalize BLIC with a $15 Million cash investment.

6) Global Growth shall guarantee the approximately $475 Million of Seller related assets retained by CBL and SNIC. Such Seller related assets shall pay cash interest at a rate of 5.0% beginning 12 months after Closing with such amounts capitalized as PIK until that time.

7) Beckett Group or an affiliate thereof shall provide AxarRe a guarantee on the approximately $400 Million of Seller related assets assumed by AxarRe. Such Seller related assets shall pay cash interest at a rate of 50% beginning 12 months after Closing with such amounts capitalized as PIK until that time.

8) Global shall commit to repurchase the $400 Million of Seller related assets from AxarRe in 2032. Such commitment shall be guaranteed by the Beckett Group or an affiliate thereof.

**Delivery of Seller Related Assets:**

Within 6 months of i) the sum of CBL's cash and non-Seller related invested assets exceeding its policyholder liabilities and ii) the sum of CBL and SNIC's Seller related assets totaling $317 Million or less, UFH shall request regulatory approval for an extraordinary dividend for CBL and SNIC consisting of Seller related assets and UFH shall simultaneously purchase any remaining Seller related assets owned by CBL and SNIC. Seller shall simultaneously deliver to GBIG Capital deferred contingent consideration consisting of Seller related assets and cash in an amount equal to $317 Million less the amount of any defaults of Seller related assets that have occurred since Closing and less a provision for any tax owed by UFH and its affiliates and members as a result of the Seller related asset distribution. The parties shall cooperate to structure the transaction to optimize for tax. Notwithstanding the preceding, the parties shall make best efforts to complete the delivery of the deferred contingent consideration within 24 months of Closing and in no event shall the delivery of the deferred contingent consideration occur more than 42 months after Closing.

**Conditions to Obligation:**

UFH and GBIG's obligation to consummate the transaction contemplated hereby is specifically subject to the following conditions: (i) negotiation and timely execution of the definitive stock purchase agreement (the "SPA") with such terms, provisions and additional conditions as shall be mutually acceptable to the parties hereto, (ii) satisfactory completion of the Purchaser's due diligence investigation, (iii) UFH securing $75 Million of

5

financing for the HME, HPC, and Fiasco Fine Wine acquisition or obtaining agreement from the existing third party lenders to roll their financing, and (iv) all governmental and third party certificates, permits and approvals that are required in connection with Purchaser's acquisition and operation of business shall have been obtained including:

- Form A approval and approval to exit rehabilitation.
- Form R approval. UFH will submit a plan for redomestication for regulatory consideration.
- Form D approval for the contemplated reinsurance transactions

**Pre-Closing Covenants:**

The parties agree to use their reasonable best efforts to obtain all necessary third-party and governmental consents (including all certificates, permits and approvals required in connection with the acquisition or operation of SNIC and the consummation of the transaction).

**Best Efforts**

The parties agree to negotiate in good faith and to use their best efforts to (i) execute the Definitive Agreements providing for the transaction as expeditiously as possible, but in any event before 5:00 p.m. EDT on January 15, 2023 (the "Signing Deadline") and (ii) close the transaction as soon as is reasonably practicable, but in no event after May 31, 2023 (the "Closing"). Time is of the essence. The Definitive Agreements shall provide in detail the terms and conditions of the transaction including such representations, warranties, non-compete/non-solicitation covenants, indemnities and other conditions as are customary in similar transactions and shall be reasonably satisfactory to each of the parties hereto.

**Public Announcements**

The existence, terms and conditions of this Acquisition Term Sheet are confidential and any press release or other public announcement relating to the transaction shall not be issued by any party hereto without the prior written consent of the other.

**Governing Law:**

Delaware

**Closing Conditions:**

Closing the proposed transaction is subject to conditions precedent customary for transactions of this type, including:

1) completion of all business, legal and financial due diligence of GBIG Holdings, BLIC, CBL and SNIC;

2) completion of legal documentation for the transaction on mutually satisfactory terms;

3) receipt of all necessary governmental and third-party consents, authorizations, and approvals, including, without limitation, as required as a result of the Rehabilitation Proceeding;

6

## Exhibit A: Sources of Liquidity:

| | |
|---|---|
| HME/HPC / Fiasco Fine Wine Sale | $125.0m |
| Clanwilliam Sale | $145.5m |
| **Total** | **$265.5m** |

7

Confidential

# Exhibit B: Pro Forma BLIC Balance Sheet

| ASSETS | 6/30/2022 | ARM Refi | Other Refinancings | Annuity Reinsurance | Recap | Pro Forma Closing Balance Sheet |
|---|---|---|---|---|---|---|
| Cash | 48,800,984 | 4,000,000 | 0 | -64,300,984 | 15,000,000 | 3,500,000 |
| Public Investment Grade Bonds | 190,933,496 | | | -161,028,128 | | 29,905,368 |
| Other | 1,378,369 | | | -1,378,369 | | 0 |
| Total Liquid Investments | 241,112,849 | 4,000,000 | 0 | -225,329,112 | 15,000,000 | 33,405,368 |
| **Total Global Related Exposure** | **55,881,815** | -3,000,000 | 0 | -52,881,815 | | 0 |
| Private Debt Portfolio | 17,671,790 | | | -17,671,790 | | 0 |
| Reinsurance Recievable | 2,330,627 | | | | | 2,330,627 |
| Recievable from Parent / Affiliate | 0 | | | | | 0 |
| DTA | 15,273,004 | | | -7,972,949 | | 7,300,055 |
| Other Assets | 1,307,119 | | | | | 1,307,119 |
| **TOTAL ASSETS** | **333,577,204** | 1,000,000 | 0 | -303,855,666 | 15,000,000 | 44,343,169 |
| **LIABILITIES** | | | | | | |
| Policyholder Liabilites | 346,061,657 | | | -311,455,491 | | 34,606,166 |
| Other Liabilities | 2,164,090 | | | | | 2,164,090 |
| Asset Valuation Reserve | 5,836,995 | | | | | 5,836,995 |
| **TOTAL LIABILITIES** | **354,062,742** | 0 | 0 | -311,455,491 | 0 | 42,607,251 |
| **CAPITAL & SURPLUS** | | | | | | |
| Pro Forma Surplus | -20,485,538 | 1,000,000 | 0 | 7,599,825 | 15,000,000 | 1,735,918 |
| Pro Forma Total Available Capital | -14,648,543 | 1,000,000 | 0 | 7,599,825 | 15,000,000 | 7,572,913 |

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 447 of 508

Confidential

## Exhibit C: Pro Forma CBL Balance Sheet

| ASSETS | 6/30/2022 | ARM Refi | Other Refinancings | Worksite Reinsurance | Annuity Reinsurance | Total |
|---|---|---|---|---|---|---|
| Cash | 162,423,000 | 86,000,000 | 198,482,986 | -200,000,000 | -221,905,986 | 25,000,000 |
| Public Investment Grade Bonds | 1,273,703,751 | | | | -1,210,752,858 | 62,950,893 |
| Other | 22,218,868 | | | | -22,218,868 | 0 |
| **Total Liquid Investments Available** | **1,458,345,619** | 86,000,000 | 198,482,986 | -200,000,000 | -1,432,658,844 | **87,950,893** |
| **Total Global Related Exposure** | 1,029,060,947 | -74,000,000 | -198,482,986 | | -347,118,185 | 409,459,776 |
| Private Debt Portfolio | 18,548,829 | | | | -18,548,829 | 0 |
| Uncollected & Deferred Premium | 13,304,059 | | | | | 13,304,059 |
| DTA | 57,286,821 | | | -14,274,750 | -48,458,256 | -5,446,185 |
| Other Assets | 12,631,023 | | | | | 12,631,023 |
| **TOTAL ASSETS** | **2,589,177,298** | 12,000,000 | 0 | -214,274,750 | -1,846,784,114 | **517,899,565** |
| **LIABILITIES** | | | | | | |
| Policyholder Liability | 2,312,193,986 | | | -250,000,000 | -1,892,974,587 | 169,219,399 |
| Other Liabilities | 55,622,448 | | | | | 55,622,448 |
| Asset Valuation Reserve | 141,137,086 | | | | | 141,137,086 |
| **TOTAL LIABILITIES** | **2,508,953,520** | 0 | 0 | -250,000,000 | -1,892,974,587 | 365,978,933 |
| **CAPITAL & SURPLUS** | | | | | | |
| Pro Forma Surplus | 80,223,778 | 12,000,000 | 0 | 35,725,250 | 46,190,473 | 151,920,633 |
| Pro Forma Total Available Capital | 221,360,864 | 12,000,000 | 0 | 35,725,250 | 46,190,473 | 293,057,719 |

9

# Exhibit D: Pro Forma SNIC Balance Sheet

| ASSETS | 6/30/2022 | ARM Transaction | Other Refinancings | HME, HPC, and FFW Purchase | Pro Forma Closing Balance Sheet |
|---|---|---|---|---|---|
| Cash | 26,563,815 | 13,000,000 | 67,000,000 | -75,000,000 | 31,563,815 |
| Public Investment Grade Bonds | 13,160,548 | | | | 13,160,548 |
| Other | 5,073,650 | | | 75,000,000 | 80,073,650 |
| **Total Liquid Investments Available** | **44,798,013** | **13,000,000** | **67,000,000** | **0** | **124,798,013** |
| **Total Global Related Exposure** | **144,153,123** | **-11,000,000** | **-67,000,000** | **0** | **66,153,123** |
| **Total Insurance Company Investments** | **41,310,000** | | | | 41,310,000 |
| Uncollected & Deferred Premium | 1,544,968 | | | | 1,544,968 |
| Recievable from Parent | 0 | | | | 0 |
| Other Recievables | 543,097 | | | | 543,097 |
| Funds Held with Reinsured Companies | 59,930,904 | | | | 59,930,904 |
| Federal Tax Due & Accrued | 1,484,925 | | | | 1,484,925 |
| DTA | 13,438,067 | | | | 13,438,067 |
| **TOTAL ASSETS** | **307,203,097** | **2,000,000** | **0** | **0** | **309,203,097** |
| **LIABILITIES** | | | | | |
| Policyholder Liabilites | 251,431,654 | | | | 251,431,654 |
| Other Liabilities | 13,320,287 | | | | 13,320,287 |
| Interest Maintenance Reserve | 6,834,850 | | | | 6,834,850 |
| Asset Valuation Reserve | 23,233,428 | | | | 23,233,428 |
| **TOTAL LIABILITIES** | **294,820,219** | **0** | **0** | **0** | **294,820,219** |
| **CAPITAL & SURPLUS** | | | | | |
| Pro Forma Surplus | 12,382,878 | 2,000,000 | 0 | 0 | 14,382,878 |
| Pro Forma Total Available Capital | 35,616,306 | 2,000,000 | 0 | 0 | 37,616,306 |

# Exhibit S

Greg Lindberg
P.O. Box 159
Thonotosassa, FL 33692

**January 24, 2025**

<u>**VIA FED EX**</u>
U.S. District Clerk
U.S. Courthouse
501 West 5th Street, Suite 1100
Austin, Texas 78701

**RE: PRO SE FILING – NEW CASE – FEE PAID**

Dear Sir or Madam:

I have enclosed the following for filing in the United States District Court for the Western District of Texas, Austin Division:

1. Civil Cover Sheet
2. Petitioner's Verified Complaint and Request for Injunctive Relief
3. Summons for Issuance – Hugh Steven Wilson
4. Summons for Issuance – TA Associates, L.P.
5. Permission to File Electronically

Also enclosed is a check in the amount of $405.00 made payable to: "Clerk, U.S. District Court" for the filing of the Verified Complaint.

If you have any questions, or if you need any additional information, please do not hesitate to contact me.

Sincerely,

/s/ *Greg E. Lindberg*

Greg E. Lindberg

Enclosures – As stated

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
GREG E. LINDBERG

**(b)** County of Residence of First Listed Plaintiff   <u>HILLSBOROUGH</u>
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Greg E. Lindberg, Pro Se
10652 Broadland Pass
Thonotosassa, FL 33592; 919-308-9686

## DEFENDANTS
HUGH STEVEN WILSON and TA Associates, L.P.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [x] 2 | [x] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[x] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | **LABOR**<br>[ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act | **SOCIAL SECURITY**<br>[ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g)) | |
| **REAL PROPERTY**<br>[ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | **CIVIL RIGHTS**<br>[ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |
| | | **IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 USC 1116

Brief description of cause:
Injunctive Relief

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
Jan 24, 2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Greg E. Lindberg, Pro Se

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

GREG E. LINDBERG )
            )
    **Petitioners,** )
            )    **Case No._____**
    **v.** )
            )
**HUGH STEVEN WILSON and** )
**TA ASSOCIATES, L.P.** )
            )
    **Respondent.** )

## PETITIONER'S VERIFIED COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF

### Introduction

1. A trustee who refuses to serve the interests of the trust's beneficiary should be removed.

2. A trustee who violates federal law and the trust instrument's explicit provisions, then engages in self-dealing to sell off trust assets for hundreds of millions of dollars less than their market value, should be suspended immediately.

3. In this case, the Trustee was entrusted with the exclusive right to control several entities valued at hundreds of millions of dollars.

4. Instead of doing so for the benefit of the beneficiary, the Trustee has collected millions of dollars in administration fees to sell off trust assets for a fraction of their actual value.

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 453 of 508

5.      In each transaction Trustee championed himself, his law firm, and his associates over the interests of the trust's beneficiary, causing over a hundred million dollars damage.

6.      Petitioner sues for breach of fiduciary duty seeking monetary damages in the amount of $300 million dollars related to Conspiracy and Tortious Interference with Prospective Business Relations in his gross negligence and mismanagement of the Clanwilliam trust assets.

### Parties, Jurisdiction and Venue

7.      This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as it is a diversity action in which the amount in controversy exceeds $75,000.00, exclusive of interest, costs, and attorney's fees, and complete diversity exists as Mr. Lindberg is a resident of Florida, Trustee is a resident of Colorado and TAA has regional headquarters in Texas.

8.      Petitioner Greg E. Lindberg is a natural person over the age of eighteen (18) and a resident of the State of Florida and is otherwise *sui juris*.

9.      Respondent, Hugh Steven Wilson, Trustee of the Trusts, is a natural person over the age of eighteen (18) and a resident of the State of Colorado and is otherwise *sui juris*. This Court has personal jurisdiction over Respondent. Respondent managed substantial trust assets related to Lindberg that are based in Texas (specifically the assets of Beckett Collectibles, headquartered in Plano, TX and the assets of Home Medical Equipment Specialists which has an office in El Paso, TX and is authorized to do business

**Petitioner's Original Complaint and Request for Injunctive Relief**

in with the Texas Secretary of State) and the allegations complained of in this petition occurred while he was performing his duties as Trustee in Texas.

10. TA Associates, L.P. is a limited partnership organized and existing under Delaware law, and is the successor to TA Associates, Inc. It has offices in Austin, Texas.

11. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1)-(3) because this is the judicial district in which Respondent TA Associates, Inc. is subject to the court's personal jurisdiction.

12. All conditions precedent to bringing this action have been satisfied, performed or have otherwise been waived.

FACTUAL ALLEGATIONS

I.     <u>Background</u>

13. Petitioner Greg Lindberg is the beneficial owner of significant interests in hundreds of companies throughout the world.

14. The collective enterprise value of these entities is several billion dollars.

15. Over time Lindberg established several trusts, to manage certain of these interests.

16. These Trusts include the Clanwilliam Group Trust, the Beckett Group Trust, the Home Medical Equipment (HME) Specialists Trust, the Eye Care Leaders (ECL) Trust, and the Fleet Assist Group Trust, collectively the "Trusts".

17. Lindberg funded the Trusts by irrevocably transferring his (direct or indirect) interests in certain entities to each trust.

18. Lindberg entrusted the management of these holdings to Respondent Hugh Steven Wilson, appointing Wilson to act as sole Trustee for each of the Trusts.

19. For all entities relevant to this dispute, Lindberg was the sole beneficial holder of all the stock or membership rights in each entity.

20. Accordingly, Lindberg conferred upon Wilson the exclusive right to manage and/or vote for the management of each entity.

21. Simply put, Wilson was the sole person controlling hundreds of millions of dollars' worth of assets and securities, earned and acquired by Lindberg, and placed into the Trusts for the benefit of his beneficiaries.

22. Wilson was actively involved in managing the Trusts and their assets on a daily basis—as his seven-figure fees demonstrate.

23. However, Lindberg has learned that Wilson has acted at all times directly contrary to his role as fiduciary, championing his own interests and those of third parties over the designated beneficiaries of the Trusts.

24. Wilson was bound to take reasonable steps to take control of and protect the property of the Trusts and he did not.

25. Wilson was required to exercise reasonable care, skill, and caution and he failed to do so.

26. Wilson agreed to "administer the trust as a prudent person would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. Instead, Wilson exceeded and abused his authority by a) refusing to provide financial

**Petitioner's Original Complaint and Request for Injunctive Relief**  <span style="float:right">P a g e | **4**</span>

records and accountings as required by the Trust Instruments and applicable law, b) actively working to devalue the assets of the Trusts instead of working to preserve and/or increase assets of the Trusts for the interest of the beneficiaries, c) jeopardizing the assets of the Trusts by precluding income tax filings required by the United States government; and d) colluding with third parties to sell assets for less than their value; and overall working to serve his own interests rather than his fiduciary duties.

## II. Trusts Settled by Triton Financial Limited

27. Greg Lindberg is the sole ultimate beneficial owner of Triton Financial Limited ("Triton").

28. Before the formation of the Trusts, Triton was the sole owner of Clanwilliam Headquarters Limited and thereby, its subsidiaries, collectively referred to as the Clanwilliam Group.

29. Triton was also the sole owner of Fleet Assist Interco Limited and thereby, its subsidiaries, collectively referred to as the Fleet Assist Group.

30. On or about November 4, 2020, Lindberg caused Triton to establish the Clanwilliam Group Trust ("**Clanwilliam Trust**") to hold the Clanwilliam Group business interests for the benefit of his designated beneficiary, George A. Vandeman.

31. On or about July 29, 2021, Lindberg caused Triton to establish the Fleet Assist Group Trust ("**Fleet AGT Trust**") to hold the Fleet Assist Group business interests for the benefit of his designated beneficiary, Robert Gaddy.

32. Lindberg entrusted Respondent Hugh Steven Wilson to serve as Trustee for

both the Clanwilliam Trust and the Fleet Trust as well as the other Trusts.

33. By appointing Wilson Trustee and contributing *all* the shares of the Clanwilliam Group and Fleet Assist Group, Lindberg relinquished all control over holdings worth hundreds of millions of dollars to one person—Hugh Steven Wilson.

34. Wilson alone votes for all Clanwilliam Group and Fleet Assist Group's directors and is thereby completely in control of the management of both the holding companies and all subsidiaries they hold.

### III. <u>Wilson's Self-Dealing and Willful Devaluation of the Clanwilliam Trust's Assets</u>

35. The Clanwilliam Trust Instrument restricts the Trustee from making any Disposition of trust property without the written consent of the Settler. *See* Ex. A at p. 9 §5.2(a).

36. Wilson is attempting to sell the Clanwilliam Group to TA Associates, LLP ("TAA") over the objection of Lindberg who holds a veto right on the sale of any assets of the Clanwilliam Trust.

37. Lindberg objects to the sale in large part because Clanwilliam Group is worth almost double what TAA is willing to pay for it.

    a) Clanwilliam Group is worth between five and eight hundred million dollars ($500,000,000-$800,000,000).

    b) TAA is only offering $450,000,000.

38. In conflict with his duties to use best efforts to maintain or increase the value

of trust assets, Wilson has actively campaigned to *decrease* the asking price for Clanwilliam Group in favor of his chosen purchaser.

    a) In January 2024, Quadro One Acquisition Corp., a special purchase acquisition company trading on NASDAQ as QDRO (hereinafter, "Quadro"), signed a purchase agreement offering to purchase the Clanwilliam Group for $800,000,000 as part of a purchase agreement for a larger group of Lindberg's companies.

    b) Wilson took specific actions to undermine the Quadro deal including refusing to provide necessary information for the SEC filings required by Quadro. Without access to the necessary information for completion of the required SEC filings and related financial audits, Quadro was unable to close the purchase of Clanwilliam Group at the $800,000,000 price.

    c) The Quadro purchase of Clanwilliam was terminated in March of 2024.

    d) A few months later, Apax Partners offered $500,000,000 to purchase the Clanwilliam Group.

    e) Wilson's elected director advanced false and misleading information that caused Apax Partners to withdraw their offering, clearing the way for lower bids.

    f) After Apax withdrew from the bidding on Clanwilliam, two other well-qualified buyers approached Lindberg's representatives in November of 2024 about purchasing Clanwilliam. Both of these parties were referred to

Wilson who refused to engage or discuss anything with them. One of these buyers is a well-known large public acquiror of companies like Clanwilliam.

39. TAA has been trying to acquire Clanwilliam since 2019, before Wilson was even appointed Trustee of Clanwilliam.

40. Wilson and his law firm Latham & Watkins stand on both sides of the contemplated TAA transaction.

a) TAA is represented by Nicholas Cline of Latham & Watkins.

b) Wilson is a retired partner, but on information and belief, still accepts distributions of fees and other renumeration, at Latham & Watkins.

c) Nicholas Cline called Lindberg in 2023 and demanded that Lindberg agree to sell Clanwilliam to TAA.

d) Nicholas Cline was Lindberg's counsel and drafted the Clanwilliam Trust Instrument.

e) Nicholas Cline did not secure Lindberg's waiver of any conflict of interest as his former client, serving an opposing client, in a transaction Lindberg is clearly opposed to.

f) The Clanwilliam Trust Instrument does not permit the Settlor to remove the Trustee for cause.

g) The Clanwilliam Trust Instrument does not provide Lindberg with an ability to designate Board seats, as a number of the other trusts do.

h) The Clanwilliam Trust was drafted by Nick Cline, as counsel to

Lindberg, upon information and belief, to undermine Lindberg's ultimately ability to regain control of Clanwilliam and to favor Cline's other clients and partners such as Wilson.

41. Wilson is attempting to stack Triton's board to secure a vote to sell the Clanwilliam Group to TAA for hundreds of millions less than its true value.

42. In so doing, Wilson will secure to his law firm substantial legal fees (which, on information and belief, he shares in directly or indirectly) while simultaneously charging his own substantial Trustee fees, collecting fees on both sides of a deal that robs the beneficiary of tens, if not hundreds, of millions of dollars.

## FIRST CLAIM FOR RELIEF
**(Breach of Fiduciary Duties: All Trusts)**

43. Petitioner incorporates and realleges the previous paragraphs *in haec verba*.

44. The Trustee has failed to administer the trust solely in the interest of its Beneficiary.

45. When exercising his right to vote the Trustee did not act in the best interests of the Beneficiary.

46. The Trustee elected or appointed directors and other managers who did not manage the corporation or enterprise in the best interests of the Beneficiary.

47. The Trustee otherwise exercised his powers of control over the entities in a manner inconsistent with the best interests of the Beneficiary.

48. The Trustee failed to administer the trust as a prudent person would, by considering the purposes, terms, distribution requirements, and other circumstances of the

**Petitioner's Original Complaint and Request for Injunctive Relief** <span>P a g e | **9**</span>

trust.

    a) A prudent person would not discourage interested purchasers.

    b) A prudent person would not sell assets for less than their true market value.

    c) A prudent person would not accept compensation on both sides of a transaction.

    d) A prudent person would not fail to respond to several interested purchasers.

49. The Trustee failed to exercise reasonable care, skill, and caution.

50. The Trustee incurred costs that were not appropriate and reasonable in relation to the trust property.

51. The Trustee incurred costs that were not appropriate and reasonable in relation to the purposes of the trust.

52. The Trustee incurred costs that were not appropriate and reasonable in relation to the skills of the trustee.

53. The Trustee has or had special skills and expertise that should have been applied for the interests of the beneficiary but were instead applied in the interests of others and the Trustee himself.

54. In exercising his right to delegate duties and powers, the Trustee failed to exercise reasonable care, skill, and caution in selecting said agents.

55. In exercising his right to delegate duties and powers, the Trustee failed to exercise reasonable care, skill, and caution in establishing the scope and terms of said delegation to ensure they were exercised consistently with the purposes and terms of the

trust.

56. In exercising his right to delegate duties and powers, the Trustee failed to exercise reasonable care, skill, and caution when reviewing said agents' performance and compliance.

57. The Trustee failed to take reasonable steps to take control of and protect the trust property.

58. On information and belief, by his refusal to disclose, the Trustee has failed to keep adequate records of the administration of the trust.

59. On information and belief, the Trustee has failed to take reasonable steps to enforce the claims of the trust.

60. The Trustee has failed to keep the beneficiary reasonably informed about the administration of the trust.

61. The Trustee has failed to keep the beneficiary reasonably informed of the material facts necessary for the beneficiary to protect his interests.

62. The Trustee has refused to promptly respond to the beneficiary's request for information related to the administration of the trust.

63. The Trustee has failed to report to the beneficiary regarding the trust's assets and each asset's respective market value.

64. The Trustee failed to exercise his discretionary powers in good faith.

## SECOND CLAIM FOR RELIEF
### (Conspiracy)

65. Petitioner incorporates and realleges the previous paragraphs *in haec verba.*

66.     Petitioner would show that Wilson and TAA have entered into a civil conspiracy to injure Petitioner. More specifically, Respondents have combined to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. Respondents had (1) an end to be accomplished; (2) there was a meeting of the minds on the end or course of action; (3) one or both of Respondents committed one or more overt, unlawful acts; and (4) Petitioner was injured as proximate result of those acts.

**A.     The Civil Conspiracy as Applicable to All Counts of Recovery:**

67.     The acts and conduct of Respondents set out in paragraphs 1 through 42 above were undertaken and accomplished as a result of Respondents knowingly participated in an illegal civil conspiracy, through a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, and at all relevant times acting under color of state law (herein the "Civil Conspiracy") namely to deprive Petitioner of the real value of his assets. This illegal civil conspiracy was designed and implemented to injure and damage Petitioner in his person, business and business reputation, and property. Accordingly, the liability of each Respondent co-conspirator is joint and several liability for all damages suffered and there is no right of contribution or indemnity among these co-conspirator Respondents.

68.     As a result of the foregoing, Petitioner suffered actual, consequential and pecuniary damages as set out herein. As a result of the intentional and knowing design of the Respondents, through their illegal conspiracy, to injure and cause damage to the Petitioner, the Petitioner is entitled to recover punitive damages.

69. Accordingly, each Respondent is liable in the capacity of co-conspirators for tortious and unlawful conduct of the other Respondents as outlined above

**B. Tortious Interference with Prospective Business Relations**

70. Petitioner incorporates and realleges the previous paragraphs *in haec verba.*

71. Additionally, and in the alternative, the Petitioner would show that Respondents' actions, as set forth in the paragraphs above, have caused potential buyers to terminate their offers to purchase Clanwilliam.

72. The acts of Wilson were intentional and willful. Wilson intentionally, maliciously and unlawfully undermined a competitive bid from Apax Partners, LLP and Wilson refused to consider bids from Constellation Software and another buyer represented by Donal O'Sullivan.

73. Wilson also intentionally, maliciously, and unlawfully refused to provide necessary information required for SEC filings and related audits in order to complete the Quadro Acquisition One Corp. (NASDAQ: QRDO) purchase of Clanwilliam for $800 million, and as a result, the purchase by Quadro was ultimately terminated.

74. Wilson's acts were calculated to cause damage to Petitioner. Wilson knew full well that undermining competing higher bids and steering the business towards his favored bidder at a lower price would cause damage to the business since TAA's bid was over $300 million dollars lower than the purchase agreement signed with Quadro.

75. Wilson also knew full well that by undermining the Quadro purchase of Clanwilliam by refusing to supply necessary information that the Petitioner would be damaged by over $300 million dollars.

76. Wilson's acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of Wilson. Wilson's actions constitute malice. As an independent trustee, Wilson had no justifiable cause to favor one bidder over another. However, Wilson favored TAA solely because he was advancing his own economic interests at the expense of the settlor and beneficiary to the trust.

77. There was no privilege or justification for Wilson's actions.

78. As a result of foregoing, Petitioner suffered actual, consequential and pecuniary damages as both Quadro and Apax Partners terminated their bids as a result of Wilson's efforts to undermine these bids in favor of TAA as set out herein and Petitioner is entitled to recover punitive damages.

## THIRD CLAIM FOR RELIEF
### (Removal of Trustee: All Trusts)

77. Petitioner incorporates and realleges the previous paragraphs *in haec verba*.

78. Trustee has committed a serious breach of trust.

79. Trustee has been unfit, unwilling, and/or has persistently failed to administer the trust effectively.

    a) The Trustee is selling off trust assets for a fraction of their actual value.

b)       The Trustee is authorizing dispositions he does not have the power to make.

80.     Removal of the Trustee best serves the interests of the beneficiaries.

81.     Removal of the Trustee is requested by all the qualified beneficiaries.

82.     Removal of the Trustee is consistent with the material purposes of the Trust.

83.     A suitable successor trustee is available.

84.     Pending final decision, Petitioner requests that the Court grant the relief requested within.

### FORTH CLAIM FOR RELIEF
**(Demand for Accounting)**

85.     Petitioner incorporates and realleges the previous paragraphs *in haec verba.*

86.      The Trustee has failed in all instances to provide even basic financial documents to the beneficiaries he serves.

87.     Both the beneficiaries and the Settlors are entitled to review basic records for each asset the Trustee manages, and each of their subsidiaries, to oversee the Trustee's management and ensure decisions have been made in the best interest of the beneficiaries.

88.     Petitioner demands a full and complete accounting of the Trust in accordance with the Texas Trust Code Section 113.151.  The accounting should comply with the Texas Trust Code Section 113.152.

### PRELIMINARY AND PERMANENT INJUNCTION

89.     Petitioner incorporates and realleges the previous paragraphs *in haec verba.*

90.     "The decision whether to grant a preliminary injunction is within the

**Petitioner's Original Complaint and Request for Injunctive Relief**                    P a g e | **15**

discretion of a district court." *United States v. Texas,* No. EP-21-CV-173-KC, 2021 WL 4848743 at \*1 (W.D. Tex. Aug. 26, 2021) citing *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989). "[A] preliminary injunction is [meant] to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *Id*. quoting *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp*., 441 F.2d 560, 560 (5th Cir. 1971).

91.     To succeed on a preliminary injunction, a movant must establish four factors: (1) likelihood of success on the merits; (2) that he is likely to suffer irreparable harm in the absence of such relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 20 (2008).

92.     Of the four factors above, the principal factor is the first – the likelihood of success. *See Belknap v. Bank of America, N.A*., 2012 WL 3150271, at \*3 (S.D. Tex. August 1, 2012). "The Fifth Circuit has previously stated '[t]he importance of this requirement varies with the relative balance of threatened hardships facing each of the parties.'" *Texas v. United States*, 328 F.Supp.3d 662, 710 (S.D. Tex. 2018) (citing *Canal Auth. of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)). A plaintiff does not have to show a certainty of winning to meet this factor. *See Texas v. United States*, 328 F.Supp.3d at 710.

93.     Petitioner additionally petitions this Court to issue relief in the way of a preliminary injunction, as monetary damages cannot adequately compensate Petitioner for the harm caused to Petitioner including the depletion of the businesses main assets due to

the conduct of Respondents; and Respondents will cause the business' assets to be sold for hundreds of millions of dollars less than their market value, causing potentially hundreds of millions in losses and damages Clanwilliam's hard earned reputation in a relevant market.

94.     The Petitioner has demonstrated a reasonable probability of success on the merits of Petitioner's cause of action to remove Wilson as trustee from all of the Trusts. Wilson's actions as Trustee have repeatedly violated the fiduciary duty requirements pursuant to the Texas Trust Code:

a)     The duty of loyalty and utmost good faith;

b)     The duty of candor;

c)     The duty to refrain from self-dealing;

d)     The duty to act with integrity; and

e)     The duty of fair, honest dealing.

95.     Wilson breached his fiduciary duties by:

a)     Discouraging interested purchasers.

b)     Failing to provide required information for SEC filings and related audits in order to block a transaction that was worth more than $300 million above previous bids.

c)     Attempting to sell assets for less than their true market value.

d)     By accepting compensation on both sides of a transaction.

e)     By intentionally failing to respond to several interested purchasers.

96.     "An injury is irreparable if the party seeking the injunction cannot be adequately compensated by monetary damages, or if those damages are incapable of calculation—that is, if there is no adequate remedy at law." *Ayiba v. Wells Fargo Bank, N.A.*, No. H-10-5017, 2011 WL 13248493, at *12 (S.D. Tex. Dec. 5, 2011).  The danger of a sale of Clanwilliam at a price far below the value of the assets is real and immediate given that Wilson is currently negotiating terms with TAA for the sale of Clanwilliam and is expected to sign a binding purchase agreement in a matter of weeks if the requested relief is not granted.

97.     Wilson has already shown he is ready and willing to violate the terms of the Trust and sell assets far below their actual value in transactions related to the ECL Trust and the UKAT Trust.

98.     Lindberg, as ultimate beneficial owner of the Clanwilliam Trust assets, will suffer irreparable harm of potentially over $300 million in damages if a sale of Clanwilliam is permitted to go forward at a below market valuation.

99.     Lindberg has no other remedy at law or by contract to prevent the sale of Clanwilliam since Wilson has ignored Lindberg's veto rights on the sale.

100.     When the Petitioner and Respondents are the only parties affected by an injunction, the public interest is a neutral factor. *Belknap*, 2012 WL 3150271, at *3 (citing *Stomans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)). To the extent this court considers the public interest, granting a preliminary injunction to prevent any action to further the sale of Clanwilliam will serve the public interest by ensuring that Clanwilliam

**Petitioner's Original Complaint and Request for Injunctive Relief**     P a g e | **18**

is only sold at its fair market value, thus providing maximum benefit to the insurance lenders which are relying on Clanwilliam as collateral for their loans.

101. Ultimately, thousands of insurance company policyholders are relying on the value of Clanwilliam assets as security for their policy benefits. Allowing Wilson to pursue a sale of Clanwilliam for his own interests directly harms these policyholders by up to $300 million.

102. There is no harm in enjoining any sale from occurring given that the largest insurance lender to the intermediate holding company that owns Clanwilliam has stated that they "are not interested in payoffs at this time" and the debt owed by the parent company of Clanwilliam to this insurance lender is not due until June 30, 2029.

103. Wilson is pursuing a sale of Clanwilliam for his own interests and the interests of his law partners at Latham & Watkins, not because of any demand from the largest insurance lender to Lindberg's group of companies for a payoff.

104. Furthermore, the sale is being advanced without any comprehensive plan on how the proceeds from the sale of Clanwilliam will ultimately be part of the full payoff of policyholders of the insurance lenders which have lent funds to Clanwilliam's parent company.

105. Lindberg has repeatedly demanded a full global resolution for policyholder payoffs and these requests have been repeatedly ignored. Lindberg has also presented numerous plans for a full global resolution of all obligations owed to the insurance lenders and Lindberg's proposals have been repeatedly rejected without explanation.

106. Upon information and belief, the sale of Clanwilliam is being undertaken solely for the benefit of Wilson, his partners, his partner's clients, and for the benefit of M3 Partners, a financial consultant and "chief restructuring officer" for the intermediary holding company which owns Clanwilliam.

107. Over Lindberg's objections, M3 Partners has demanded over $1 million per month in fees and has suggested that the Clanwilliam sale proceeds be used to pay these fees through the maturity date of the debt to the insurance lenders of June 30 2029, amounting to over $52 million in fees.

108. At a board meeting in December of the intermediary holding company which owns Clanwilliam, one of the directors which has a business relationship with M3 Partners was explicit in requesting that the minutes of the meeting reflect that "proceeds of the sale of Clanwilliam can be used to pay M3 Partner's fees."

109. Upon information and belief, Wilson has made a side deal with M3 Partners where he agreed to resign from the trust that owns Beckett Collectibles (which is headquartered in Plano, TX) in exchange for M3 Partners appointing its own employees to the Triton board to attempt to force a sale of Clanwilliam despite Mr. Lindberg's veto rights over such sale.

110. On December 23, 2024, acting primarily to secure access to a source of funding for its large fees, M3 Partners did in fact appoint three of its own employees to the Triton board.

111. After stacking the Triton board with three of its own employees, these M3

employees proceeded to conduct a wholly unlawful vote in favor of the Clanwilliam sale in violation of Lindberg's veto right over such sale as provided by the operating agreement of the intermediary holding company which owns Clanwilliam.

112. Triton is a company incorporated in Ireland and under Irish law if a director has a conflict of interest, they are required to abstain from voting on the relevant decision.

113. M3's employees voting for the sale of Clanwilliam to allow M3 to receive large fees from the proceeds of such sale is clear conflict of interest that requires these directors to abstain from the vote under Irish law.

114. Given the above, it's clear that the threat of up to $300 million in irreparable harm to policyholders, lenders, and Lindberg from the sale of Clanwilliam at far below its market value is imminent. An injunction will preserve the status quo while the claims herein are adjudicated by this court.

115. An injunction will also preserve the status quo relating to recent joint filings by Lindberg and the United States of America in Federal Court.

116. Upon a joint motion of Lindberg and the United States of America on December 20, 2024, a Special Master relating to certain of Lindberg's assets including Clanwilliam was requested to be appointed by the Federal Court for the Western District of North Carolina. An injunction will preserve the status quo until such Special Master is in place and able to exercise the authority granted by the Federal Court.

117. The joint motion of Lindberg and the United States of America specifically proposes that the Special Master shall seek approval from the Federal Court in the Western

District of North Carolina before any asset sale occurs related to assets under the Special Master's authority.

118. Upon entry of the order jointly requested by Lindberg and the United States of America, Clanwilliam will be included in the assets under the Special Master's authority. An injunction will preserve the status quo until such time as the Federal Court in the Western District of North Carolina approves any transaction recommended by the Special Master.

119. In light of the above, the Petitioner has demonstrated all of the *Winter* factors required for the issuance of a preliminary injunction. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

120. The Preliminary Injunction is necessary to prevent immediate irreparable harm to Petitioner. The damage incurred to Petitioner from Respondents' continuing breach of contractual duties, tortious interference with prospective business relations cannot be offset by monetary damages at trial.

121. Such an injunction is necessary to ensure the continued and successful operation of Clanwilliam, the preservation of the value of Clanwilliam for policyholders, and to ensure that Clanwilliam is not sold primarily for the purpose of funding over $50 million in fees to M3 Partners and Wilson's own interests.

**JURY DEMAND**

122. Petitioner requests a jury trial. See FRCP §38(b)

**WHEREFORE**, Petitioner Greg E. Lindberg, respectfully requests the Court enter

judgment in his favor and against Respondent as follows:

- a. **Void all transactions** entered into by the Trustee to sell assets of the Trusts over the objection of Petitioner and/or the beneficiaries or to impose a lien or constructive trust on trust property;

- b. **Enjoin** the sale of Clanwilliam Group and any other asset of the Trusts to any party until a replacement trustee can be named and until the Federal Court in the Western District of North Carolina approves any such transaction;

- c. Ordering the Trustee to perform the Trustee's duty to provide **financial records** for all entities the trusts hold interests;

- d. Appoint a **special fiduciary** to take possession of all property of the Trusts and administer each trust related to Lindberg's assets with such special fiduciary being approved in all cases by the Special Master relating to certain of Lindberg's assets that has been requested to be appointed by the Federal Court for the Western District of North Carolina;

- e. **Remove** the Trustee from all Trusts;

- f. Enjoin the Trustee from **selling any property** held in any of the Trusts while these matters are being adjudicated;

- g. Compel the Trustee to return excess fees billed to each Trust and to **disgorge all compensation** billed during his period of

mismanagement and self-dealing;

h.      **Sanction** the Trustee;

i.      **Awarding** Petitioner Attorney's fees; and

j.      For any such further relief as the Court deems just and proper.

<u>**VERIFICATION AND ACKNOWLEDGEMENT**</u>

**I declare under the penalty of perjury under the laws of Texas that the foregoing is true and correct.**

_____
Greg Lindberg, Petitioner, Pro Se

Dated: January 9th, 2025

# EXHIBIT A

DATED      4 November      2020

# TRITON FINANCIAL LIMITED

## AND

## GEORGE A. VANDEMAN

## AND

## HUGH S. WILSON

_____

## IRREVOCABLE TRUST INSTRUMENT

RELATING TO A CHANGE OF CONTROL TRUST
FOR THE CLANWILLIAM GROUP
_____

# LATHAM&WATKINS

London
99 Bishopsgate
London EC2M 3XF
(44) 020 7710 1000 (Tel)
(44) 020 7374 4460 (Fax)

EU-DOCS\29987307

**TABLE OF CONTENTS**

**CONTENTS**

| Clause | | Page |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 3 |
| 2. | ESTABLISHMENT OF TRUST | 7 |
| 3. | DURATION OF THE TRUST | 8 |
| 4. | POWERS OF THE TRUSTEE | 8 |
| 5. | EXERCISE OF POWERS AND RESTRICTIONS ON EXERCISE | 9 |
| 6. | TRUSTEE WARRANTIES AND UNDERTAKINGS | 10 |
| 7. | POWERS OF THE BENEFICIARY | 11 |
| 8. | PROVISION OF INFORMATION TO TRUSTEES | 11 |
| 9. | CONFIDENTIALITY | 11 |
| 10. | RESIDUAL TRUSTS AND END OF TRUST PERIOD | 12 |
| 11. | TREATMENT OF DIVIDENDS | 12 |
| 12. | VOTING | 12 |
| 13. | INDEPENDENCE OF CLANWILLIAM GROUP BOARDS | 13 |
| 14. | EXONERATION OF TRUSTEES | 13 |
| 15. | INDEMNITY | 14 |
| 16. | APPOINTMENT, RETIREMENT AND REMOVAL OF TRUSTEES | 14 |
| 17. | REMUNERATION AND PAYMENT OF TRUST COSTS | 16 |
| 18. | CLAIMANT'S OBLIGATIONS | 16 |
| 19. | RIGHTS OF SETTLOR CREDITORS | 16 |
| 20. | TAX MATTERS | 16 |
| 21. | NOTICES | 17 |
| 22. | AMENDMENT OF TRUST INSTRUMENT | 17 |
| 23. | ACKNOWLEDGMENTS REGARDING SECURITY INTERESTS | 17 |
| 24. | COUNTERPARTS | 18 |
| 25. | ASSIGNMENT | 18 |
| 26. | THIRD PARTY RIGHTS | 18 |
| 27. | LAW | 18 |
| SCHEDULE 1 ADMINISTRATIVE POWERS | | 1 |
| SCHEDULE 2 TRUSTEE REMUNERATION | | 2 |

EU-DOCS\29987307

**THIS TRUST INSTRUMENT** is made the    4    day of    November 2020

**BETWEEN**:

(1)    **TRITON FINANCIAL LIMITED** a company registered in Ireland (no. 534652) whose registered office is at Office Suite 17, The Courtyard Carmanhall Road Sandyford, Dublin 18 Ireland ("**the Settlor**");

(2)    **GEORGE A. VANDEMAN** whose address is at 7906 Berger Avenue, Playa Del Rey, CA 90293 USA ("**George A. Vandeman**");

(3)    **HUGH S. WILSON** whose address is at 575 Circle Drive, Denver, Colorado 80206-4112 USA ("**the Original Trustee**"); and

each, a "**Party**" and together, the "**Parties**"

**RECITALS**

A.    The Settlor, as legal and beneficial owner of the entire issued share capital of the Company (as defined below), has resolved to put in place the trust constituted by this Instrument so that, during its term, GL (as defined below) shall not have any ability to direct or influence save in the limited situations specified by this Instrument, or continue to be the ultimate beneficial owner of, the Clanwilliam Group (as defined below).

B.    As more particularly set out in the terms of this Instrument the assets to be acquired by the Trust shall be the entire issued and outstanding and future class of A Ordinary shares of EUR 0.00001 each in the capital of the Company (as defined below) (the "**A Ordinary Shares**") representing 100 per cent of the voting rights available to members of the Company and related rights, the Trust is irrevocable and only capable of dissolution in limited, prescribed circumstances, the Trustees are and will be independent of GL and shall not include a Restricted Person and the Beneficiaries shall not include GL or any GL Affiliate (as defined below).

C.    The Settlor and the Original Trustee shall enter into the Trust Note (as defined below).

D.    The Trust hereby created shall, save to the extent expressly or impliedly excluded, be made subject to the provisions of the Trustee Act 1925 and the Trustee Act 2000.

**NOW THIS INSTRUMENT WITNESSES** as follows:

**1.    DEFINITIONS AND INTERPRETATION**

1.1    In this Instrument unless the context otherwise requires the following expressions have the following meanings respectively:-

"**Adverse Proceeding**" means the appeal and final resolution of the jury verdict in the trial of Greg Lindberg in the Western District of North Carolina;

"**Beneficiary**" means George A. Vandeman or such other person or persons as designated from time to time by the Settlor as a Beneficiary in addition to or in place of George A. Vandeman or any other Beneficiary so designated (or both) by giving no less than 5 business days' notice in writing of such designation to the Trustees, provided that such person shall not include GL or any GL Affiliate;

"**Clanwilliam Group**" means together or separately the Company and any subsidiaries and subsidiary undertakings of the Company from time to time;

3

"**Code**" means the Internal Revenue Code of 1986 of the United States, as amended from time to time;

"**Company**" means Clanwilliam Headquarters Limited a company registered in Ireland (no. 607970) whose registered office is at Office Suite 17, The Courtyard Carmanhall Road Sandyford, Dublin 18 Ireland;

"**Control**" means with respect to any specified person, the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" shall have meanings relative to the foregoing. Without limiting the generality of the foregoing, a person shall be deemed to Control any other person in which it owns, directly or indirectly, more than 50% of the ownership interests;

"**Disposition**" means a sale encumbrance, lien on or other disposition or disposal of all or any portion of the Trust Assets directly or indirectly; any partial disposition via issuance of shares, restricted shares; any issuance of employee stock-based compensation; the sale or other disposition of all or a material portion of the assets of the Company or any subsidiary; or the merger or other conversion of the Company; other than by reason of (i) any enforcement action taken under any of the Security Documents; or (ii) the application of such Trust Assets towards the Trust Costs as permitted herein;

"**Facility Agent**" means Global Loan Agency Services Limited in its capacity as facility agent for the Finance Parties as defined in the Senior Facility;

"**Further Share Charge and Security Assignment**" means a share charge and security assignment entered into on or about the date of this Instrument by the Original Trustee in favour of the Security Agent, granting security over the Shares, Receivables and related rights;

"**GL**" means Greg Lindberg whose address is at 410 S. Rampart #390, Las Vegas, NV 89145.

"**GL Affiliate**" means (i) Global Growth Holdings Inc.; (ii) a corporation, limited partnership, general partnership, limited liability company, joint venture, association, company or other organisation under the Control of GL or Global Growth Holdings Inc.; and (iii) any person with a familial relationship with GL including, but not limited to, GL's current, former or (if applicable) future spouse or any of GL's children (natural or adopted);

"**Global Growth Holdings Inc**." means Global Growth Holdings Inc., a company registered in Delaware (no. 7918372) whose registered office is at 251 Little Falls Drive, Wilmington, Delaware 19808, c/o Corporation Service Company, United States;

"**Group Company**" means any company within the Clanwilliam Group;

"**Intercreditor Agreement**" means the intercreditor agreement dated 8 November 2018, as amended from time to time, made between, among others, the Company, the Debtors (as defined in the Intercreditor Agreement), the Security Agent, the Facility Agent and the Settlor (as Original Subordinated Creditor);

"**Maturity Date**" means the earlier of:

(a)     the occurrence of a Disposition involving the sale or transfer of all Trust Assets;

(b)     the enforcement of Transaction Security (as defined in the Intercreditor Agreement) pursuant to clause 10 (*Enforcement of Transaction Security*) of the Intercreditor Agreement, which results in the sale or transfer of all Trust Assets; or

(c)     the date of 30 September 2030;

4

"**Original Security Assignment**" means a security assignment entered into by the Settlor in favour of the Security Agent, in respect of any Receivables and Related Rights (as defined therein), dated 8 January 2019;

"**Original Share Charge**" means a share charge entered into by the Settlor in favour of the Security Agent, granting security over the Shares and Related Investment Rights (as defined therein), dated 8 November 2018;

"**Original Trustee**" has the meaning given in the Parties section of this Instrument;

"**person**" means a natural person, corporation, limited partnership, general partnership, limited liability company, joint venture, association, company, trust, bank trust company, land trust, business trust, statutory trust, or other organisation, whether or not a legal entity, and a government or agency or political subdivision thereof;

"**Receivables**" has the meaning given in the Original Security Assignment;

"**Regulations**" means U.S. Treasury Regulations promulgated under the Code;

"**Related Trustee**" means a trustee in respect of a trust settled by Global Growth Holdings, Inc. or any other GL Affiliate or business interest of GL from time to time where such trustee is required pursuant to the relevant terms of the trust to act independently from GL, any GL Affiliate or any business interest of GL provided that such trustee does not have a personal or other relationship (apart from a business relationship in its role as such a trustee);

"**Representatives**" means, in relation to a Party, its respective employees, agents, external legal advisers, accountants, consultants and financial advisers and, in the case of a company, also its respective directors and officers and providers of finance (and any of their respective employees, agents and external advisors);

"**Restricted Person**" means GL, any GL Affiliate and any other person who has personal, contractual, business, familial or other relationship with GL, Global Growth Holdings Inc. or any other of GL's Affiliates or business interests from time to time, in each case extending to any entity that was a GL Affiliate even if they are no longer a GL Affiliate but for the purposes of this definition: (i) a GL Affiliate shall exclude any existing member of the board of directors of an existing Group Company; and (ii) an individual shall not be considered to be a Restricted Person solely by reason of being a Related Trustee (and being party to agreements relating to their performance of that role);

"**Security Agent**" means GLAS Trust Corporation Limited in its capacity as security agent for the Secured Parties as defined in the Senior Facility;

"**Security Documents**" means the Original Share Charge, the Original Security Assignment, the Further Share Charge and Security Assignment; and the Intercreditor Agreement;

"**Senior Facility**" means the senior term facilities agreement dated 8 November 2018, as amended from time to time, made between: (i) the Company; (ii) the Original Borrowers (as defined therein); (iii) the Original Guarantors (as defined therein); (iv) CEDL I S.À R.L., CEDL 1 (Levered) S.À R.L., Alcentra European Direct Lending (Levered) Fund II (Holding) SCSP, CEDL SMA S.À R.L., CEDL III S.À R.L., CEDL III (Levered) S.À.R.L. and Alcentra European Direct Lending (Levered) Fund III (Holding) SCSP (together, the "**Alcentra Lenders**"); (v) the Original Lenders (as defined therein); (vi) the Facility Agent; and (vii) the Security Agent;

"**Senior Lenders**" means the Alcentra Lenders or the Lenders (as defined in the Senior Facility);

EU-DOCS\29987307

"**Settlor Group**" means together or separately the Settlor and any subsidiaries and subsidiary undertakings of the Settlor from time to time;

"**Shares**" means all of the class A Ordinary shares in the Company issued and outstanding on or around the date of this Instrument pursuant to the Subscription Letter, together with any future class A Ordinary shares in the Company issued or transferred to the Trustees to hold on the terms of the Trust;

"**Subscription Letter**" means the letter dated the same date as this Instrument pursuant to which the Original Trustee subscribes for the Shares;

"**Tax**" means:

(a)     all taxes, levies, imposts, duties, social security contributions, surcharges, charges or withholdings, in each case in the nature of taxes, whether of Ireland or elsewhere and shall include any amount payable as a consequence of any claim, direction, order or determination of any tax authority competent to impose, administer, levy, assess or collect any of the foregoing;

(b)     any amount of tax which is the subject of or results in a charge, security or right to sell imposed by, or provided by statute to, a tax authority over any of the assets of the Trust; and

(c)     all interest, penalties, surcharges, fines and other charges relating to any of the above or to a failure to make any return, comply with any reporting requirements or supply any information in connection with any of the above and the cost of removing any charge or other encumbrance imposed by a tax authority,

whether or not directly or primarily chargeable against or attributable to the Trustees and regardless of whether any Trustees has, or may have any right of reimbursement against any other person;

"**Trust**" means the trust created by this Instrument;

"**Trust Assets**" means the Shares, and all cash, property income, capital accretion or otherwise representing or derived from the Shares, any receivables and all related rights during the Trust Period (including all Related Investment Rights under and as defined in the Original Share Charge) and such other assets (if any) as the Trustees may come to hold on the terms of the Trust following the date of this Instrument;

"**Trust Costs**" has the meaning given in Clause 17.2;

"**Trust Documents**" means this Instrument and the Trust Note;

"**Trust Note**" means the promissory note dated on or around the date of this Instrument issued to the Settlor by the Trustees;

"**Trust Period**" has the meaning given in Clause 3; and

"**Trustees**" means the Original Trustee while serving as trustee and such other person or persons as may be the trustees or trustee in place of or in addition to the Original Trustee for the time being, appointed by the Settlor in accordance with Clause 14 and "**Trustee**" means any one of them.

For the purpose of the interpretation of this Instrument:

(a)     words denoting the singular shall include the plural and vice versa;

6

EU-DOCS\29987307

(b)     words denoting the masculine gender shall include the feminine gender and vice versa;

(c)     no account shall be taken of clause headings which have been inserted for ease of reference only;

(d)     references to any statutory provision shall be read and construed to references to such provision as is amended or re-enacted from time to time;

(e)     references to clauses and Schedules are to be read and construed as references to clauses and Schedules of this Instrument;

(f)     general words shall not be given a restrictive meaning because they are followed by words which are particular examples of the acts, matters or things covered by the general words and "including", "include" and "in particular" shall be construed without limitation;

(g)     references to a person's loss of or ceasing to have "capacity" or being subject to an "incapacity" or similar shall mean any legal, physical or mental disability which renders that person incapable of managing his own affairs or in the case of a Trustee the administration of the Trust and the decision of the Settlor reached in good faith and after such inquiry as the Settlor deems appropriate as to when such disability exists or ceased to exist or does not exist shall be conclusive and binding and neither the Settlor nor the Trustees shall be liable for any action which may be taken by them or any other person pursuant to any such decision;

(h)     a reference to the Settlor shall include, where appropriate, any successor company resulting from any reconstruction or amalgamation of the Settlor; and

(i)     a reference to the Facility Agent and the Security Agent shall include that person's (and any subsequent) successors in title, permitted assignees and permitted transferees and any person for the time being appointed Facility Agent in accordance with the Senior Facility and any person for the time being appointed as Security Agent in accordance with the Debt Documents (as defined in the Security Documents), as the case may be.

## 2.    ESTABLISHMENT OF TRUST

2.1     The Settlor and the Original Trustee by execution of this Instrument intend to and establish the Trust which shall operate as an irrevocable trust and shall be administered by the Trustees in accordance with this Instrument.

2.2     The Original Trustee shall be the first Trustee of the Trust.

2.3     The Settlor shall have the power to designate from time to time any person or persons to be a Beneficiary whether in addition to or in place of George A. Vandeman or any other Beneficiary so designated (or both) by giving no less than 5 business days' notice in writing of such designation to the Trustees, provided that such person shall not include GL or any GL Affiliate and such a designation may specify the shares in which the Beneficiaries shall be entitled to the Trust Assets. The Settlor shall promptly provide a copy of any such notice to the Facility Agent.

2.4     On every change in the Beneficiaries in accordance with Clause 2.3 a memorandum should be endorsed on or permanently annexed to this Instrument stating the names and addresses of the persons who are the Beneficiaries for the time being. The Trustee shall be entitled to rely on such memorandum (of the latest memorandum if more than one) as sufficient evidence that the persons named therein are duly designated Beneficiaries.

2.5 The Trustees shall hold the Trust Assets during the Trust Period on trust for each Beneficiary equally or in such shares as may be designated by the Settlor in any notice designating a Beneficiary.

**3. DURATION OF THE TRUST**

3.1 Subject to Clause 3.2 below, the Trust shall remain in existence and endure for the period beginning on the date of this Instrument and ending on the first occurring of:

(a) the reversal of the conviction in the Adverse Proceeding via reversal, acquittal, dismissal, final decision of the government to not re-try the case following any mistrial or remand for new trial, pardon, commutation or other exoneration or discharge of any sentence, provided such reversal, acquittal, dismissal or decision is final with no further right to appeal, retrial or other recourse available to the government, together with written confirmation from the Company that the expiration of the Trust will not materially adversely affect the operations of the Group (to be determined in consultation with the Facility Agent (acting on the instructions of the Senior Lenders)); or

(b) the Trustees being satisfied (having consulted with the board of the Company) that the Trust is no longer required by reason of another trust having been interposed in the ownership structure such that no Restricted Person will become the ultimate beneficial owner of the Group following termination of the Trust; or

(c) the death of GL; or

(d) the Maturity Date; or

(e) the termination of the Trust as required pursuant to a final and binding court order,

(the "**Trust Period**").

3.2 The Trust Period shall only end in accordance with Clause 3.1 above if;

(a) the Trustee has notified the Facility Agent if any of the above events occur; and

(b) in each case;

(i) any time up to and including the Discharge Date (as defined in the Intercreditor Agreement), security has been or will be put in place to replace the security granted pursuant to the Security Documents in a form and substance satisfactory to the Security Agent; or

(ii) the Security Agent has confirmed in writing that the Security Period has ended under the relevant Security Documents at that time.

**4. POWERS OF THE TRUSTEE**

4.1 Subject to the provisions of Clause 5 below, The Trustees shall have all powers necessary and desirable to exercise all rights, privileges and discretions related to the Trust Assets at their absolute discretion including, but not limited to, those powers as set out in Schedule 1 to this Instrument insofar as the exercise of those powers shall not be inconsistent with the trust created by this Instrument.

4.2 During the Trust Period, without prejudice to Clause 10.1 the Trustees shall use all powers available to them pursuant to this Instrument to procure that no part of the Trust Assets (including the Shares and any other Trust Assets from time to time) shall be transferred directly

8

EU-DOCS\29987307

Case 3:23-cr-00048-MOC-DCK    Document 132-2    Filed 05/04/26    Page 485 of 508

or indirectly to a Restricted Person and such Trust Assets shall, at all times until the Discharge Date (as defined in the Intercreditor Agreement) remain subject to the security created in favour of the Security Agent.

4.3 Each power shall be a separate power in addition to and without prejudice to the generality of all other powers vested in the Trustees, subject to the provisions of Clause 5 below and the Trustees may exercise all or any of those powers from time to time, without the intervention of any Beneficiary, in such manner and to such extent as the Trustees in their absolute discretion see fit.

4.4 In the exercise of their powers and discretions, the Trustees may consider any recommendations made to them by the Company's board of directors but the Company's board of directors shall have no power to direct the Trustees to comply with such recommendations.

4.5 Notwithstanding the powers conferred on the Trustees by virtue of this Instrument or applicable law, none of the Trustees shall be obliged by this Instrument or by applicable law to perform any service or action other than or additional to:

(a) being the legal owner(s) of the Shares and any other Trust Asset, subject to and in accordance with this Instrument for the benefit of the Beneficiary;

(b) attending, in person or by proxy, and voting at the extraordinary general meetings or annual general meetings of the Company;

(c) complying with the obligations of the Trustee under this Instrument, the Trust Note and the Security Documents; and

(d) making a Disposition of Trust Assets back to the Settlor in accordance with this Instrument,

without prejudice to the foregoing the Trustees shall not owe a duty of care to any Group Company.

## 5. EXERCISE OF POWERS AND RESTRICTIONS ON EXERCISE

5.1 No power, authority or discretion conferred on the Trustees by this Instrument or by law shall (despite anything to the contrary expressed or implied in this Instrument) be exercised if it causes any part of the Trust Assets to become applicable for the benefit of a Restricted Person (provided, however, that it is stipulated that a payment of any amounts owing to the Settlor pursuant to Clause 10.1, or any payments on the Trust Note, whether of principal, fees, or interest, shall not be a violation hereof) and shall not constitute a Disposition.

5.2 The Trustees shall:

(a) not make or enter into an agreement to make a Disposition (including pursuant to paragraph (b) below) without the prior written consent of the Settlor;

(b) not make a Disposition to the Settlor or any Restricted Person other than upon expiry of the Trust Period by reason of the events or circumstances described in sub-Clause 3.1(a); and

(c) to the extent that is reasonably practicable, co-operate with the Settlor in respect of a broader refinancing of the Settlor Group.

5.3 The Trustees shall use such powers as are then available to it in their capacity as registered holder of the Shares to procure that:

9

(a) no Group Company shall enter into any arrangements in respect of any refinancing of the Senior Facility without the prior written approval of the Settlor; and

(b) the Clanwilliam Group shall, to the extent that is reasonably practicable, co-operate with the Settlor in respect of a broader refinancing of the Settlor Group.

5.4 The Trustees shall not and are not permitted to perform any business of the Trust in the Republic of Ireland.

## 6. TRUSTEE WARRANTIES AND UNDERTAKINGS

6.1 Each Trustee hereby warrants, represents and undertakes to the Settlor that:

(a) Save, in the case of a Trustee that is a Related Trustee, in relation the representations below which relate to its business relationship or fees received in connection with any Related Trustee role that the relevant Trustee holds from time to time (and any agreements relating to the performance by the Trustee of that role):

(i) it is independent of, and not associated with, and does not have any personal, business or other relationship with, GL, any GL Affiliate or any Restricted Person;

(ii) it is, independent of, and not associated with, and does not have any personal, business or other relationship with any entity, business, asset or person owned by GL any GL Affiliate or any Restricted Person or, to the best of its knowledge, any entity, business, asset or person controlled, directly or indirectly, GL, any GL Affiliate or any Restricted Person; and

(iii) to the best of its knowledge and belief, it has not received any financial support or assistance, other than the Fees paid or payable by the Trust under this Instrument, from GL, any GL Affiliate or any Restricted Person;

(b) excluding the Trust Assets and any assets of any trust of which the relevant Trustee is a Related Trustee, it does not own, directly or indirectly, any shares, rights, warrants or options to acquire or subscribe for, any shares or other securities, any other voting interest, or any property or interest in property in the Company or any entity owned or controlled by GL ,any GL Affiliate or any Restricted Person;

(c) it is capable of and shall at all times perform its duties as Trustee independent of, and without any influence from, GL, any GL Affiliate or any Restricted Person;

(d) it is capable of and shall at all times perform its duties as Trustee in accordance with all applicable laws;

(e) it is not and will not become resident in the United Kingdom for United Kingdom tax purposes and does not and will not act as Trustee in the course of a business which it carries on in the United Kingdom through a branch, agency or permanent establishment there; and

(f) it is not and will not become a Restricted Person.

6.2 Each Trustee covenants and undertakes to the Settlor to ensure that the matters as set out in sub-clauses 6.1(a)(i) to 6.1(f) shall remain true and correct for as long as it remains a trustee of the Trust.

10

## 7. POWERS OF THE BENEFICIARY

7.1 Save as provided by law, the Beneficiaries shall have no powers in the respect of the Trust or the Trust Assets during the Trust Period.

## 8. PROVISION OF INFORMATION TO TRUSTEES

8.1 The Trustees shall be entitled to rely upon any information relevant to the Trust and the Trust Assets supplied to them by the Settlor, by the Facility Agent, by the Security Agent or by any Group Company, or any Representative or agent thereof, as conclusive evidence of the matter to which it relates and without prejudice to the generality of Clause 15 shall (fraud, wilful misconduct and gross negligence excepted) be in no way liable to the Settlor, the Beneficiary or any other person claiming for any loss caused or allegedly caused as a consequence of the Trustees relying on such information.

8.2 Without prejudice to the Trustee's duties in respect of the Trust, the Trustees may but are not required to retain at the expense of the Trust and to rely upon the expertise of independent consultants in performing their duties.

8.3 The Settlor and the Beneficiary confirm that the Trustees shall be entitled to rely on (i) Principal Amount of the Trust Note as being representative of fair market value for the Shares; and (ii) a rate of 25% as being an appropriate rate of interest, in each case as at the date of this Instrument for the purpose of agreeing the principal value and rate of interest to be included in the Trust Note and in full satisfaction of the Trustee's duties to agree the same under the Trust.

## 9. CONFIDENTIALITY

9.1 Subject to Clauses 9.2 and 9.3, each Party:

(a) shall treat as strictly confidential the provisions of this Instrument and any confidential information relating to the Clanwilliam Group which they receive in connection herewith (whether before or following the date of this Instrument) (together "**Confidential Information**"); and

(b) shall not, except with the prior written consent of the other Parties (which shall not be unreasonably withheld or delayed), make use of (save for the purposes of performing its obligations under this Instrument) or disclose to any person (other than its Representatives in accordance with Clause 9.2) any Confidential Information.

9.2 Clause 9.1 shall not apply if and to the extent that the Party using or disclosing Confidential Information can demonstrate that:

(a) such disclosure is or reasonably appears to be required by law or by any stock exchange or any supervisory, regulatory, governmental or anti-trust body having applicable jurisdiction, (including, for the avoidance of doubt, any tax authority having applicable jurisdiction); or

(b) the Confidential Information concerned has come into the public domain other than through its fault (or that of its Representatives) or the fault of any person to whom such Confidential Information has been disclosed in accordance with this Clause 9.

9.3 Each Party undertakes that it shall (and shall procure that its affiliates shall) only disclose Confidential Information to Representatives where it is reasonably required for the purposes of exercising its rights or performing its obligations under this Instrument or the other Trust Documents and only where the Representatives are informed of the confidential nature of the Confidential Information and the provisions of this Clause 9. In addition, the Parties agree that to the extent that any public communication, press announcement or any formal communication

11

is required to be made in connection with this Instrument and the matters contained herein, each Party shall, acting in good faith, consult with the other Parties and take into account any reasonable feedback prior to making such announcement or communication.

9.4 The provisions of this Clause 10 shall survive termination or lapse, as the case may be, and shall continue for a period of five years from the date of this Instrument or (if later) two years from the date following the termination of this Instrument.

9.5 In no event shall any Trustee be required to make a public announcement or communication, save for any announcements or communication required by applicable laws or regulation.

## 10. RESIDUAL TRUSTS AND END OF TRUST PERIOD

10.1 At the end of the Trust Period, the Trust Assets shall be first used to settle in full all amounts owing on the Trust Note and, subject to (i) full repayment and settlement of the Trust Note; and (ii) the Discharge Date (as defined in the Intercreditor Agreement) having occurred, the Trustees shall (subject to any prior exercise by them of their powers under this Instrument) make arrangements for the distribution of any residual Trust Assets to one or more of the Beneficiaries then living and in such proportion(s) equally or otherwise as may have been designated in writing to the Trustees by the Settlor.

10.2 Subject to the terms of the Senior Facility, a transfer by the Trustees to the Settlor of the Trust Assets (including the proceeds of any Disposition) on the Maturity Date or, if earlier, the termination of this Instrument shall constitute the payment to the Settlor by the Original Trustee or any other Trustee who has acceded to the Trust Note as debtor of the Principal Amount (as defined in the Trust Note) plus all accrued but unpaid interest (after provision of all Trust Costs) in full, regardless of whether the value of the Trust Assets shall have decreased below the outstanding balance of the Principal Amount (as defined in the Trust Note) (plus all accrued but unpaid interest) at the time of such payment.

10.3 For the purposes of valuing the Shares at the end of the Trust Period the Trustees shall use a valuation multiple no greater than the valuation multiple used to determine the Principal Amount in the Trust Note (being a valuation multiple of 16.1 x EBITDA on a debt free cash free basis).

## 11. TREATMENT OF DIVIDENDS

11.1 Subject to Clause 11.2, following any deductions required for all Trust Costs as set forth in Clause 17, the Trustee shall use all net cash from any cash dividends received by the Trust in relation to the Shares to make interest payments in respect of the Trust Note pursuant to the terms as set out in therein and such payment shall not be deemed to be Disposition.

11.2 The Trustees acknowledge that dividends shall only be made by the Company on the Shares in compliance with law and subject to the terms of the Senior Facility.

## 12. VOTING

12.1 Subject to the provisions in Clause 5, the Trustees shall be entitled to vote in respect of the Shares held in the Trust Assets at any general meeting of the Company.

12.2 None of the Beneficiaries and no Restricted Person shall be entitled in any way to compel, control or force the exercise in any particular manner of any voting or other rights which may from time to time be exercisable by the Trustees.

12.3 The Trustees shall be entitled to rely on all information as set forth in Clause 8 in exercising their rights to vote Shares.

EU-DOCS\29987307

**13. INDEPENDENCE OF CLANWILLIAM GROUP BOARDS**

13.1 During the Trust Period, the Trustees shall use such powers as are available to them in their capacity as registered holder of the Shares to procure that there shall be:

(a) no change to the board of directors of the Company, except in the event of death, resignation or disability of a director; and

(b) no Restricted Person shall be a member of any board of directors of any member of the Clanwilliam Group.

13.2 The Trustee(s) shall consult with the Senior Lender prior to any changes to the board of directors of the Company; or any board of directors of any other member of the Clanwilliam Group in so far as the Trustee is aware of any proposed change to the board of directors of any member of the Clanwilliam Group.

**14. EXONERATION OF TRUSTEES**

14.1 None of the Trustees shall be liable for any loss or damage to the Trust Assets or the income thereof arising from any improper investment or purchase made or retained by the Trustees or other action taken or omitted to be taken by the Trustees (subject to the terms of this Instrument) in good faith unless such loss or damage is attributable to fraud, wilful misconduct or gross negligence on the part of the Trustees (or any of them).

14.2 The Trustees shall:

(a) be under no obligation to procure that the Trust prospers;

(b) be under no obligation to ensure that the Trust Assets increase in value;

(c) be under no obligation to ensure that Trust diversifies or makes any investment for and on behalf of the Trust;

(d) save to the extent the same is as a result of the Trustee's own gross negligence, wilful misconduct, bad faith or fraud, not be liable for any loss, reduction in value, destruction, damage, seizure or sequestration of the Trust Assets (or any part thereof) to the Settlor or any Beneficiary; or

(e) be under no obligation to take any action in relation to the Trust unless that action is appropriately funded in compliance with applicable law from the Trust Assets available to the Trustee.

14.3 Save to the extent the same is as a result of the Trustee's own gross negligence, wilful misconduct, bad faith or fraud, neither the Settlor nor any Beneficiary shall have recourse to any of the personal assets of Trustees as a result of any breach of the terms of this Instrument, including but not limited to any enforcement action brought against the principal private residence or any other residence maintained by any Trustee. Save to the extent the same is as a result of the Trustee's own gross negligence, wilful misconduct, bad faith or fraud, the Trust Assets shall be the only source of funds to satisfy a claim for damages by the Settlor against the Trustee for any reason. None of the Trustees shall be considered to have a conflict of interest by virtue of the fact that any of them have personal investments in industries or businesses of a similar nature of any business or going concern carried out by any part of the Trust Assets from time to time.

14.4 None of the Trustees shall be liable as above for a delegation or appointment made, or permitted to continue, by the Trustees, absent fraud, wilful misconduct or gross negligence.

13

14.5 The duty of care imposed upon the Trustees by law is not excluded by any term of this Instrument.

## 15. INDEMNITY

15.1 No Trustee shall be liable for any loss or damage to the Trust Assets (or any part thereof) or to the Settlor or any Beneficiary, caused by any act or omission of the Trustee, or other event or thing whatsoever, whether with respect to trust administration, modification, investment, management or distribution, any election, allocation or division, or the purchase or retaining of any property legally requiring remedial action or any other matter pertaining to the Trustee's services as such, unless the loss or damage is due to the Trustee's own gross negligence, wilful misconduct, bad faith or fraud or a breach of the Trustee's obligations under the Intercreditor Agreement (herein "**Indemnified Acts**"). Each Trustee serving at any time with respect to a trust hereunder shall be fully indemnified from the Trust Assets, subject at all times to the provisions of the Senior Facility and the Security Documents, (and thereafter, if the Trust Assets cannot adequately indemnify the Trustees, will be indemnified by the Settlor and the Settlor shall procure indemnification from the Settlor Group) for any liability, attorneys' fees or other reasonable expenses or costs incurred by, or judgment, amount paid in settlement or other damages assessed against, the Trustee with respect to all Indemnified Acts, and such amounts incurred in defending an action brought or threatened in respect of Indemnified Acts may be paid out of the Trust Assets in advance of final disposition upon delivery to the Settlor of a legal opinion of trust counsel that indemnification is likely to be warranted and the Trustee's written agreement to refund such amounts if it is ultimately determined that indemnification is not warranted.

15.2 Unless the Trustees have actual notice that an event has occurred affecting the beneficial interests in any trust hereunder, the Trustees shall not be liable to any beneficiary for distributions made as though the event had not occurred.

15.3 In addition, the Trustee shall have the benefit of all powers, privileges and immunities conferred upon a trustee by statute or by the law of England and Wales.

15.4 This Clause 15 survives the completion of any Trustee's service as Trustee and the termination of this Instrument.

## 16. APPOINTMENT, RETIREMENT AND REMOVAL OF TRUSTEES

16.1 Any Trustee may, at any time, by written notice given to the Settlor, the Facility Agent and any co-trustee, retire from office one month after the date when the notice is received by the Settlor and the Facility Agent (or any shorter period agreed in writing by the Settlor and the Facility Agent, acting on the instructions of the Senior Lenders) provided that where the retiring Trustee is the sole Trustee any such retirement shall take effect upon the appointment by the Settlor of a replacement Trustee pursuant to Clause 16.3.

16.2 Following consultation with the Facility Agent (on behalf of the Senior Lenders) the Settlor may:

(a) remove any Trustee from office by giving 30 days' prior written notice to that Trustee (unless such notice is waived by such Trustee and subject to as provided in Clause 16.3) without giving any reason for the removal. This power can only be exercised if there will be, on the removal, at least one remaining person as Trustee, or if the Trustee simultaneously designates a replacement Trustee;

(b) appoint a person (or persons) in place of any Trustee who ceases to be a Trustee for any reason; and

(c) appoint additional Trustees (without limitation as to number),

14

in each case provided that no Restricted Person shall be appointed as a Trustee at any time and provided that the new Trustee(s) shall accede to this Instrument, the Trust Note and the relevant Security Documents and the Intercreditor Agreement.

16.3    In the event that a Trustee gives notice to retire from office, dies, ceases to have capacity, becomes bankrupt or insolvent or unable to pay its debts as they fall due the Settlor shall, following consultation with the Facility Agent (on behalf of the Senior Lenders), replace the relevant Trustee (and in the event of the Trustee's death, loss of capacity, bankruptcy or insolvency, the removal of the relevant Trustee may be made immediately by written notice) provided that no Restricted Person shall be appointed as a Trustee at any time and provided that the new Trustee(s) shall accede to this Instrument, the Trust Note and the relevant Security Documents and the Intercreditor Agreement.

16.4    Subject to the requirements set out in Clause 16.2, any person may be appointed as Trustee, on the terms and conditions the Settlor agrees with that person, wherever that person is domiciled or resident (or is incorporated or carries on business, if it is a corporation), save that no person may be appointed as Trustee if it is resident in the United Kingdom for United Kingdom tax purposes or if it will act as Trustee in the course of a business which it carries on in the United Kingdom through a branch, agency or permanent establishment there or, if it is a corporation, if it is incorporated in any part of the United Kingdom.

16.5    A retiring or removed Trustee shall execute all transfers or other documents, and do all acts necessary to vest the Trust Assets in the new or continuing Trustees. A retiring or removed Trustee who is liable under this Instrument in any way shall not be bound to transfer the Trust Assets unless reasonable security is provided to indemnify that Trustee against the liability. In the event that the retiring or removed Trustee fails to take such acts the continuing Trustee or, in the case where the sole Trustee has retired or been removed, the Beneficiary shall have the power to execute all transfers or other documents, and do all acts necessary to vest the Trust Assets in the new or continuing Trustees, provided that reasonable security is provided to indemnify the retiring or removed Trustee against the liability.

16.6    Unless there is a sole Trustee, this Clause 16.6 shall govern the proceedings of the Trustees:

(a)    the trusts, powers and discretions vested in the Trustees by this Instrument shall be exercised by all the Trustees acting together;

(b)    without prejudice to sub-clause 16.6(a), if there are more than two Trustees then any disagreements between Trustees on the exercise of the trusts, powers and discretions vested in them shall be determined by majority vote;

(c)    without prejudice to sub-clauses 16.6(a) and 16.6(b), if no majority is reached by the Trustees in respect of a matter between Trustees on the exercise of the trusts, powers and discretions vested in them, then the Settlor may pursuant to the terms set out in this Instrument (i) appoint a replacement Trustee; or (ii) appoint an additional Trustee, in each case such that a majority vote can be reached; and

(d)    unless otherwise agreed by the Trustees, a resolution in writing signed by each Trustee (whether on the same document or in counterparts) shall be as valid as if it has been passed at a meeting of the Trustees.

16.7    On every change in the trusteeship a memorandum shall be endorsed on or permanently annexed to this Instrument stating the names of the persons who are the Trustees for the time being and shall be signed by the persons so named. Any person dealing with the affairs of this Trust shall be entitled to rely upon any such memorandum (or the latest of such memoranda if more than one) as sufficient evidence that the persons named therein are duly constituted the Trustees.

15

## 17. REMUNERATION AND PAYMENT OF TRUST COSTS

17.1 Each Trustee shall be remunerated by the Trust out of the Trust Assets subject to the Senior Facility and the Security Documents in such amount and on such terms as set out in Schedule 2 to this Instrument.

17.2 The Trustees shall, subject at all times to the provisions of the Senior Facility and the Security Documents, pay from the Trust Assets all trust costs and Taxes, including, but not limited to expenses incurred in the establishment of the Trust and any costs and Taxes incurred in connection with the establishment of the Trust, in the administration and devolution of the Trust Assets, the determination and payment of Taxes thereon, the services and expenses of agents retained by the Trustees in execution of their duties and other expenses described in this Instrument (the "**Trust Costs**"), and the Trustees shall be entitled to reimbursement for any Trust Costs incurred and advanced on behalf of the Trust. To the extent that the Trustees consider that there is not sufficient cash in the Trust Assets to pay or reimburse such expenses they shall request payment by the Company and the Company shall, subject to compliance with applicable laws and its obligations under the Senior Facility, the Intercreditor Agreement and the Security Documents, make such payment.

## 18. CLAIMANT'S OBLIGATIONS

18.1 Any person entitled to, or claiming, any benefit under the Trust shall produce any evidence and information required by the Trustees for the purposes of the Trust. Payment of any benefit under the Trust to any person shall be conditional on that person producing any evidence or information that the Trustees may require.

18.2 The Trustees shall be entitled to deduct from any benefit payable any Tax or duty for which the Trustees are or may be liable in respect of the benefit concerned.

18.3 The Trustees shall not be accountable for, or obliged to see to, the application of any payment made under this Instrument if it is made:

   (a)   directly to a minor, to his parent or guardian or to the person with whom he resides; or

   (b)   to any individual or institution who or which is or appears to be responsible for the care of a person to whom the payment is otherwise to be made;

if the Trustees in their absolute discretion consider that that person's incapacity does not warrant their making the payment to him direct.

## 19. RIGHTS OF SETTLOR CREDITORS

19.1 Nothing in this Instrument and the Trust hereby constituted is intended to impact on the rights of any existing creditors of the Settlor or its affiliates.

## 20. TAX MATTERS

20.1 The Trust shall not constitute a "business trust" within the meaning of Regulations Section 301.7701-4(b) or any other business entity for federal income tax purposes, but shall instead constitute a trust within the meaning of Regulations Section 301.7701-4(c) and a "grantor trust" under Subpart E of Part 1, Subchapter J of the Code (Code Sections 671 and following) in the United States. As such, all income and deductions of the Trust are treated for income tax purposes as income and deductions of the Settlor.

20.2 The Settlor and the Trustees agree that they will file all tax returns in a manner consistent with the intent set out in Clause 20.1 unless otherwise required by a taxing authority. Except as otherwise expressly provided herein, any tax elections required or permitted to be made by the

16

Trust under the Code or otherwise will be made by the Settlor. The Trust will not elect to be treated as a corporation for any tax purpose. In addition, notwithstanding any other provision of this Agreement, the Trustees shall pay to the Settlor such amounts from the net income of the Trust as shall be necessary for the Settlor pay any U.S. or non-U.S. federal, state and local income tax on the net income of the Trust that is required to be paid by the Settlor or its owners pursuant to Subpart E of the Code and the comparable provisions of any state or local income tax law or regulation. For purposes of this Clause 20.2, the "Settlor" shall include the person (individual or entity) ultimately liable for payment of U.S. or non-U.S. federal, state, and local income tax on the income of the Trust that is deemed to pass through the Settlor for Tax law purposes. The amount payable by the Trust to the Settlor for a particular tax period pursuant to this Clause 20.2 shall be determined based on a reasonable estimate of the amount of Tax that would be due based on the highest applicable tax rate applied to the amount of net income of the Trust for that tax period that would be deemed to pass through to the Settlor from the Trust. The Trust shall pay the amount required pursuant to this Clause 20.2 at least 10 days prior to the relevant statutory deadline for payment of the applicable Tax.

20.3 Notwithstanding the foregoing provisions of this Clause 20, if the Trustee shall receive any notice of Tax due or deficiency from any jurisdiction that has or appears to have taxing authority over the Trust, nothing shall prevent the Trustees from satisfying such amounts from the Trust Assets.

## 21. NOTICES

Any notice or information to be given hereunder by the Settlor to the Trustees shall be validly given if it is signed by any member of the board of directors of the Settlor or such person or persons as are authorised by the Board.

## 22. AMENDMENT OF TRUST INSTRUMENT

The Trustees may at any time by deed amend any of the provisions of this Instrument in any respect, provided that such amendment shall not have effect if:

(a)     it would affect the purpose of the Trust;

(b)     it would confer on the Settlor or any Restricted Person a benefit or possibility of a benefit out of the Trust Assets or income thereof except to the extent contemplated hereunder and pursuant to the Trust Note;

(c)     it would extend the power conferred in this Clause 22 to remove the restrictions in this Clause;

(d)     it would reduce or adversely affect the right or interest of any Beneficiary insofar as such right or interest has been granted, awarded or allocated pursuant to the prior exercise by the Trustees of their powers under this Instrument;

(e)     the deed making the amendment has not been executed by the Settlor (unless the Settlor is in liquidation or has previously confirmed in writing to the Trustees that its consent to any future amendment is no longer necessary); or

(f)     it would be in breach of the Intercreditor Agreement.

## 23. ACKNOWLEDGMENTS REGARDING SECURITY INTERESTS

Each Trustee and each Beneficiary hereby acknowledges for the benefit of the Security Agent and the Senior Lenders the security granted over the Trust Assets pursuant to the Security Documents and each Trustee and each Beneficiary irrevocably acknowledges that the Security Agent may take any enforcement action over any or all of the Trust Assets in accordance with

17

EU-DOCS\29987307

the Security Documents (including the exercise of any power of sale, appropriation and appointment of a Receiver (as defined in the Security Documents) over any or all of the Trust Assets and/or the exercise of any powers by any such Receiver in respect of such Trust Assets), and apply the proceeds of any such enforcement action in accordance with the Security Documents without any requirement for further consent from, consultation with or notification to any Trustee or Beneficiary. The occurrence of any such action shall not be deemed a default by any of the Trustees of their obligations hereunder.

## 24. COUNTERPARTS

This Instrument may be executed in any number of counterparts and by the parties on separate counterparts but shall not be effective until each Party has executed at least one counterpart and each counterpart shall constitute an original of this Instrument but all other counterparts shall together constitute one and the same instrument.

## 25. ASSIGNMENT

25.1 Without prejudice to the security interests granted pursuant to the Senior Facility, no benefits or rights under this Instrument can be assigned, charged or alienated in any way. No payment shall be made in respect of any benefit or right if:

(a) the person entitled to it has, to the knowledge of the Trustees, purported to assign or charge that payment (or any part of it or any interest in it); or

(b) the Trustees know of any act or event which would or may reasonably result in the benefit or right (or any part of or interest in it) belonging to that person to become vested in, or charged in favour of, any person(s) other than that person or his legal personal representatives.

25.2 Subject to other provisions of this Instrument, the Trustees shall have full discretion as to the payment or application of any benefit forfeited to, or for the benefit of, such person.

## 26. THIRD PARTY RIGHTS

26.1 The named beneficiaries shall be entitled to the rights and benefits of, and rely on, Clause 23 and shall, in each case, have the right to enforce the relevant terms by reason of the Contracts (Rights of Third Parties) Act 1999.

26.2 Except as provided for in Clause 26.1, a person who is not a party to this Instrument shall have no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

26.3 Subject to the provisions of the Intercreditor Agreement, each party represents to the other that their respective rights to terminate, rescind or agree any amendment, variation, waiver or settlement under this Instrument are not subject to the consent of any person that is not a party to this Instrument.

## 27. LAW

27.1 The Trust and the Instrument and any non-contractual obligations arising out of or in connection therewith shall be governed by and construed in accordance with the laws of England and Wales.

27.2 The Parties (and each Group Company) shall submit to the exclusive jurisdiction of the English courts, in relation to any dispute or claim arising under the Trust, this Instrument or any non-contractual obligation arising out of or in connection therewith, notwithstanding that one or more of the Trustees may from time to time be resident or domiciled elsewhere than in England.

18

This agreement has been entered into as a deed on the date stated at the beginning of it.

SIGNED and DELIVERED for and on behalf of and as a deed of
**TRITON FINANCIAL LIMITED**
by its lawfully appointed attorney

in the presence of:

Signature of Witness: *Kathryn Schueller*

Name of Witness: KAthryn Schueller

Address of Witness: 4916 W. 139Th St
Hawthorne, CA. 90250

Occupation of Witness: Executive Assistant

*[Signature Page – Trust Instrument]*

SIGNED AND DELIVERED as a Deed by **HUGH S. WILSON** in the presence of

_Terry W. Tyler_

**HUGH S. WILSON** ......................................

In the presence of

Name: ...... Terry W Tyler

Address: ...... 49 Sandlance Circle #4866
Santa Rosa Beach, FL 32459 USA

Position: ...... Retired physician

SIGNED AND DELIVERED as a Deed by **GEORGE A. VANDEMAN** in the presence of

_____

**GEORGE A. VANDEMAN**

In the presence of

Name: Kathryn Schueller

Address: 4916 W. 139th Street
Hawthorne, CA 90250

Position: Executive Assistant

# SCHEDULE 1

## ADMINISTRATIVE POWERS

Subject to the limitations set forth herein, the Trustees powers shall include, but shall not be limited to:

1.1     the power to receive notice of, attend and vote at any general meeting of the ordinary shareholders of the Company, including all or any adjournment of such meetings;

1.2     the power to sign any resolution as the registered holder of the Shares;

1.3     the power to complete and return proxy cards, consents to short notice and any other documents required to be signed by the registered holder of the Shares;

1.4     the power to otherwise execute, deliver and do all deeds, instruments and acts insofar as may be done in the Trustees' capacity as the registered holder of the Shares in exercising its powers as Trustees under the Trust;

1.5     to power to insure the Trust Assets (to the extent appropriate);

1.6     the power to procure that each of the Trustees obtains professional indemnity insurance for so long as they are a Trustee of the Trust together with any run-off cover deemed prudent by the relevant Trustee in respect of such professional indemnity insurance;

1.7     the power to perform the obligations of the Trustees under the Trust Note;

1.8     the power to perform the obligations of the Trustees under this Instrument;

1.9     the power to open a bank account or bank accounts for and on behalf of the Trust and carry on normal banking processes;

1.10    the power to file any tax returns the Trustees may determine in their absolute discretion are required and pay (or refrain from paying) Taxes and estimated income taxes on any reasonable basis the Trustees may determine in their absolute discretion without any liability whatsoever for overpayment, underpayment or non-payment of such Taxes or for any loss, interest or penalty because of such overpayment, underpayment or non-payment;

1.11    the power to collect, compromise, release or otherwise settle claims; to institute suits (at law or in equity); to collect any property or interest of the Trust Assets; to be reimbursed for expenses of litigation; and to be indemnified out of the Trust Assets for all such expenses prior to instituting any such legal action;

1.12    the power to accept the payment or transfer of further assets to the Trustees to hold on the terms of the Trust whether from the Settlor or a third party, where the Trustees believe that this is necessary or beneficial for the operation of the Trust; and

1.13    the power to amend this Instrument (i) to comply with any relevant court order; or (ii) to cure ambiguities or correct minor errors that are not inconsistent with the other provisions of this Instrument.

1

**SCHEDULE 2**

**TRUSTEE REMUNERATION**

1.1 The Original Trustee shall be paid the sum of EUR 20,000 (plus VAT, if applicable) per month (the "*Fees*"), for as long as it remains a Trustee. The Fees shall be paid out of the Trust Assets.

1.2 The Fees shall be paid into a bank account nominated in writing by the Original Trustee in arrears on the date falling three, six, nine or twelve months following the date of this Instrument (or on the Business Day next following such date to the extent that such date is not a Business Day) and on the same dates in every subsequent year.

1.3 Any other Trustee shall have his or its remuneration determined by the Settlor at the time of appointment of such Trustee and the terms of such remuneration shall be recorded in the relevant deed of accession to this Instrument.

1.4 Any Trustee shall be deemed to be an independent contractor and nothing in this Instrument shall give rise to an employment relationship between the Trustee (or its director or officers) and any other entity. No Trustee shall be required to perform his or its duties in Ireland or any other locale.

2

EU-DOCS\29987307

# UNITED STATES DISTRICT COURT
### for the
### Western District of Texas

| | | |
|---|---|---|
| GREG E. LINDBERG | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| HUGH STEVEN WILSON and TA Associates, L.P. | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   HUGH STEVEN WILSON
575 Circle Drive
Denver, CO 80206


A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or ~~plaintiff's attorney~~, whose name and address are:   Greg E. Lindberg, Pro Se
10652 Broadland Pass
Thonotosassa, FL 33592


If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.


*CLERK OF COURT , PHILIP J. DEVLIN*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

Western District of Texas

| | | |
|---|---|---|
| GREG E. LINDBERG | ) ) ) ) | |
| *Plaintiff(s)* | ) ) ) | Civil Action No. |
| v. | ) | |
| HUGH STEVEN WILSON and TA Associates, L.P. | ) ) ) ) | |
| *Defendant(s)* | ) ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  TA ASSOCIATES, L.P.
c/o The Corporation Trust Company, Registered Agent
Corporation Trust Center
1209 Orange St.
Wilmington, DE 19801

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Greg E. Lindberg, Pro Se
10652 Broadland Pass
Thonotosassa, FL 33592

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT , PHILIP J. DEVLIN*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

    ❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ❏ I returned the summons unexecuted because _____ ; or

    ❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

                           _____
                                    *Server's signature*

                           _____
                                    *Printed name and title*

                           _____
                                    *Server's address*

Additional information regarding attempted service, etc:

Name:  Greg E. Lindberg

Address: 10652 Broadland Pass

Thonotosassa, FL 33592

Phone Number:  919-308-9686

Email Address:  gelindberg@gmail.com

*Pro Se*

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| GREG E. LINDBERG | CASE NUMBER |
| PLAINTIFF(S) | |
| v.<br>HUGH STEVEN WILSON and TA ASSOCIATES, L.P. | **APPLICATION FOR PERMISSION**<br>**TO FILE ELECTRONICALLY** |
| DEFENDANT(S) | |

As the  ☒ Plaintiff   ☐ Defendant     in the above-captioned matter, I respectfully ask the Court for permission to participate in electronic filing ("e-filing") in this case.  I hereby affirm that:

1. I have reviewed the Administrative Policies and Procedures for Electronic Filing in Civil and Criminal Cases and the Local Court Rules available on the Court's website at www.txwd.uscourts.gov.

2. I understand that once I register for e-filing, I will receive notices and documents in this instant case only by e-mail and not by U.S. mail.

3. I understand that if my use of the Court's e-filing system is unsatisfactory, my e-filing privileges may be revoked and I will be required to file documents in paper, but will continue to receive documents via e-mail.

4. I understand that I may not e-file on behalf of any other person in this case.

5. I have regular access to the technical requirements necessary to e-file successfully:
   *Check all that apply.*

   ☑ A Computer with internet access.

   ☑ An email account on a daily basis to receive notifications from the Court and notices from the e-filing system.

   ☑ A scanner to convert documents that are only in paper format into electronic files.

   ☑ A printer or copier to create required paper copies such as chambers copies.

   ☑ A word-processing program to create documents; and

   ☑ A PDF reader and a PDF writer to convert word processing documents into PDF format, the only electronic format in which documents can be e-filed.

Date:  1/24/2025                              Signature:   /s/ Greg E. Lindberg

# Exhibit S2

From: Greg Lindberg
To: Mike Martinez
Date: August 14, 2025


Michael,

I am deeply concerned by your suggestion in your letter that I am somehow delaying the Clanwilliam sale or not doing everything I can to support the sale. These allegations are do not account for all the efforts I have taken to support the deal.

Among numerous actions I've taken in support of the Clanwilliam transaction, there are two big ones: (a) I agreed to waive receipt of the required tax distributions despite the fact that the tax liability from the transaction is at least $80 million and despite that fact that there was a $40 million allocation in the original Wake County court order for tax payments, and (b) I agreed to waive this tax distribution on the condition that the de minimis companies be transferred to me on an unrestricted basis. As you are aware, this never happened and I had to give up that right. I did. I accepted that aspect of the deal in order to get the deal done, as you asked me to do. Those were two large concessions on my part to help get the deal done.

As you know, M3 has already shut one of these de minimis companies down and as I understand it has plans to shut the remaining companies down. This is part of their plan to destroy anything that has value to me -- regardless of the impact on policyholders. I have had to let that go, despite the large financial impact.

Also, we had an agreement in writing that I would dismiss all of my Clanwilliam-related claims (not all my claims against Steve Wilson) as part of the Clanwilliam transaction. I did so in full in strict compliance with the agreement. Wilson was never part of our original agreement, and he has taken actions that have damaged me and my businesses. I was not trying to thwart or frustrate the process at all. I was just trying to stick by what we had originally agreed to.

But I do want to be clear regarding my agreement with the DOJ -- my support of the Clanwilliam deal – and my waiver of claims against TA -- in no way conveys any acceptance by me of the "value" of Clanwilliam. I am supporting the deal because you asked me to, not because I agree to the value. The fact is, Clanwilliam is being sold at a fire sale price $350 million below the market value of the assets when I transferred them to NHC in October 2024. We have preserved our right *to argue* that at sentencing and DOJ has agreed to that preserved right.

Just so you know, at the NHC board meeting in December of 2024, M3 was clear that Clanwilliam was being sold primarily to pay M3 and other's fees. This is in fact the case if you look at the sources and issues. The deal is an insider transaction between Steve Wilson and his old law firm Latham & Watkins and massively undermines the value to policyholders. That is why I needed to write this – to ensure I can argue the true value at my restitution/sentencing hearing – which DOJ has agreed to. I do not want this transaction to represent any type of waiver of my ability to argue at the restitution hearing.

I am waiving my claims against TA *because you asked me to*. I personally believe that they are taking advantage of policyholders and effectively acquiring Clanwilliam for hundreds of millions of dollars less than its true market value. Healthcare technology companies like Clanwilliam easily trade at 20x or more times EBITDA – not the mere 13 to 14x EBITDA that they are paying. Hundreds of millions of dollars of value are being lost to policyholders because all the North Carolina advisors want to get paid. The Quadro valuation of Clanwilliam from Q1 of 2024 was 22x EBITDA, which is an accurate reflection of the true market value of Clanwilliam in October 2024 when I transferred it to NHC. That equates to a price of around $800 million – not the $450 million that TA is acquiring the company for in the present transaction.

Finally, I just want to be clear that my waiver of claims on TA and my approval of the transaction does not offset, waive, or modify in any way my existing agreement with the DOJ that I am able to argue for what I believe the true value of Clanwilliam is, for the purposes of calculating the offsets to restitution. I am arguing at the sentencing/restitution hearing that the value, at the time I transferred the Clanwilliam assets to NHC in October 2024, is approximately $800M (based on the true market value of Clanwilliam at 22x EBITDA).

I remain available for a call to discuss the foregoing. I've consistently asked for a call or meeting with you to discuss these matters. To date, you have refused but I remain willing to meet at any time you desire. .

Sincerely,

GREG LINDBERG