# EXHIBIT 3
# Declaration of Ryan J. Meyer

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

        *Plaintiff*,

  v.

GREG E. LINDBERG,

        *Defendant.*

Case No. 3:23-CR-48-MOC

## DECLARATION OF RYAN J. MEYER IN SUPPORT OF DEFENDANT GREG E. LINDBERG'S RESPONSE AND OBJECTION TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING RESTITUTION

I, Ryan J. Meyer, declare and state as follows:

1. I am a Partner at the law firm of Katten Muchin Rosenman, LLP and counsel of record for Defendant Greg E. Lindberg in the above-captioned action. I am duly admitted to practice law in Texas, and have been admitted *pro hac vice* in this action.

2. Attached hereto as **Exhibit A** is a true and correct copy of the Verified Complaint filed on October 1, 2019, in *Southland Nat'l Insurance Corp., et al. v. Lindberg, et al.*, No. 19-CVS-13093 (N.C. Sup. Ct., Wake County).

3. Attached hereto as **Exhibit B** is a true and correct copy of the Amended Verified Complaint filed on October 28, 2019 in *Southland Nat'l Insurance Corp., et al. v. Lindberg, et al.*, No. 19-CVS-13093 (N.C. Sup. Ct., Wake County).

4. Attached hereto as **Exhibit C** is a true and correct copy of the Pre-Trial Order and Schedule A (Stipulated Facts) filed on June 21, 2021 in *Southland Nat'l Insurance Corp., et al. v. Lindberg, et al.*, No. 19-CVS-13093 (N.C. Sup. Ct., Wake County).

5. Attached hereto as **Exhibit D** is a true and correct copy of an email dated June 26, 2019, from Greg Johnson to Mike Dinius, among others, attaching a spreadsheet entitled "6.30.19 Restructure Tranches v20 final MOU".

6. Attached hereto as **Exhibit E** is a true and correct copy of the Confidential Side Settlement Agreement between Universal Life Insurance Co. and Greg Lindberg, dated December 19, 2022.

7. Attached hereto as **Exhibit F** is a true and correct copy of the Amendment to Confidential Side Settlement Agreement between Universal Life Insurance Co. and Greg Lindberg, dated December 30, 2022.

8. Attached hereto as **Exhibit G** is a true and correct copy of the Escrow Agreement, dated June 7, 2021, by and between Southland National Insurance Corp., GBIG Holdings, Inc., and Dogwood State Bank (as escrow agent).

9. Attached hereto as **Exhibit H** is a true and correct copy of "Payoff and Preferred Units Redemption Letter[s]" from AAPC Holdings, LLC to the PBLA ULICO Trust and Northstar Financial Services (Bermuda) Ltd.

10. Attached hereto as **Exhibit I** is a true and correct copy of a spreadsheet provided by the Special Master's Financial Advisor to the undersigned counsel on April 29, 2026, entitled "JPL 4.29.26 Non-MOU Proceeds Spreadsheet."

11. Attached hereto as **Exhibit J** is a true and correct copy of an email dated October 28, 2019 from Paul Brown to Greg Lindberg (copying Chris Herwig), and the attachment to that email.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 4, 2026

*/s/ Ryan J. Meyer*
Ryan J. Meyer
Partner
KATTEN MUCHIN ROSENMAN LLP
2121 North Pearl Street, Suite 1100
Dallas, TX 75201

# EXHIBIT A

NORTH CAROLINA

WAKE COUNTY

F I L E IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS ____

2019 OCT -1 P 2: 36

| | |
|---|---|
| SOUTHLAND NATIONAL INSURANCE CORPORATION in Rehabilitation, BANKERS LIFE INSURANCE COMPANY in Rehabilitation, COLORADO BANKERS LIFE INSURANCE COMPANY in Rehabilitation, and SOUTHLAND NATIONAL REINSURANCE CORPORATION in Rehabilitation, <br><br> Plaintiffs, <br><br> v. <br><br> GREG E. LINDBERG, ACADEMY ASSOCIATION, INC., EDWARDS MILL ASSET MANAGEMENT, LLC, NEW ENGLAND CAPITAL, LLC, and PRIVATE BANKERS LIFE AND ANNUITY CO., LTD., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FILED UNDER SEAL**

*Unsealed by Order entered on 10 January 2020

**[SEALED]**
**VERIFIED COMPLAINT,**
**APPLICATION FOR TEMPORARY**
**RESTRAINING ORDER, AND MOTION**
**FOR PRELIMINARY AND**
**PERMANENT INJUNCTION**

## INTRODUCTION

Prior to June 27, 2019, Defendant Greg E. Lindberg, directly and indirectly, was the sole owner of the four Plaintiff insurance companies. In June 2019, a long-term liquidity crisis that had been growing over time became severe enough to warrant Plaintiffs being placed under the control of a Rehabilitator. A substantial portion of Plaintiffs' investments are debt facilities or equity financing arrangements with entities that are also under the control of Greg Lindberg. These entities, purported to be revenue-generating companies that would provide returns on the insurance companies' investments, were not structured as subsidiaries of the insurance companies. Instead, Lindberg controls, directly and indirectly, several hundred entities—

1

consisting of operating and holding companies, special purpose vehicles, and trusts—formed and incorporated in this state and others and overseas, which are in a complex network of interrelated loans, financing arrangements, and investments. Of the many Lindberg-owned entities, only the four named Plaintiffs are subject to the rehabilitation regime imposed by this Court. The success or failure of Plaintiffs' rehabilitation will turn on whether the Lindberg-controlled operating companies can generate sufficient revenue to repay affiliated investments, so that Plaintiffs can meet their obligations to policyholders and creditors.

To that end, and prior to Plaintiffs entering rehabilitation, Lindberg, on behalf of himself and numerous entities, entered into an agreement with Plaintiffs on June 27, 2019. The Memorandum of Understanding[1] between the parties sets forth a plan to reorganize many, although not all, of the Lindberg-related entities under a newly-formed holding company governed by an independent board on which Lindberg would hold one directorship of seven. Through this centralized board, the parties plan to restructure the affiliated companies' loan obligations and to improve management to ensure that the operating companies' revenue will be sufficient to service their debt to Plaintiffs and other debt-holders. Even more importantly, the Memorandum of Understanding binds the board to manage the affiliated companies in the best interests of Plaintiffs' policyholders.

The deadline to reorganize the relevant companies under the new holding company was September 30, 2019. Defendants have failed to perform.

Without the reorganization of the relevant affiliated companies under the new holding company, it is impossible to undertake an orderly analysis and restructuring of these companies' debt obligations. The affiliated companies currently face an urgent cash flow crisis. If the

---

[1] This pleading adopts the same definitions of terms as set forth in the Memorandum of Understanding, unless stated otherwise.

2

affiliated companies default on their obligations to Plaintiffs and their other creditors, Plaintiffs will be forced to foreclose on these loans—with no guarantee that sufficient collateral exists, and, for such collateral that there is, at the cut-rate prices of a fire sale. Such a process would inevitably lead to losses of account value to policyholders, and a complete loss for other creditors.[2]

Greg Lindberg desperately wants to retain control of the affiliated companies that he agreed to transfer to the new holding company. For the reasons set forth in more detail below, Plaintiffs do not believe that Lindberg's continued control is in the interests of the affiliated companies' creditors, their employees, or Plaintiffs' policyholders—the protection of which is precisely why the parties entered into the Memorandum of Understanding. Plaintiffs respectfully request that this Court find that Defendants have breached the Memorandum of Understanding, direct specific performance of this contract, and, in the interim, order preliminary relief designed to preserve the long-term equity value of the affiliated companies and protect the interests of Plaintiffs' policyholders.

**PARTIES**

1. Plaintiff Southland National Insurance Corporation ("SNIC") is a licensed North Carolina domestic life and accident and health insurer.

2. Plaintiff Bankers Life Insurance Company ("BLIC") is a licensed North Carolina domestic life and accident and health insurer.

3. Plaintiff Colorado Bankers Life Insurance Company ("CBL") is a licensed North Carolina domestic life and accident and health insurer.

---

[2] State guaranty funds would pay claims only up to the amount of state guaranty fund limits. Policyholders with account values in excess of state guaranty fund limits would suffer the most severe losses. Plaintiffs' general creditors would suffer total losses.

3

4. Plaintiff Southland National Reinsurance Corporation ("SNRC") is a licensed North Carolina captive insurance company engaged in the business of reinsurance.

5. Plaintiffs' principal place of business is located at 2327 Englert Drive, Durham, Durham County, North Carolina.

6. On June 27, 2019, in a matter captioned *Causey v. Southland National Insurance Corporation, et al.*, 19-CV-8664 (Wake County Superior Court), this Court entered an Order of Rehabilitation pursuant to Article 30 of Chapter 58 of the North Carolina General Statutes and appointed Mike Causey, in his official capacity on behalf of the State of North Carolina as Commissioner of Insurance, as Rehabilitator for Plaintiffs.

7. Pursuant to N.C. Gen. Stat. § 58-30-85(a)(1), the Rehabilitator has the authority to appoint Special Deputy Rehabilitators.

8. On June 27, 2019, Rehabilitator Mike Causey appointed Mike Dinius and John Murphy of Noble Consulting Services, Inc. as Special Deputy Rehabilitators and conferred on them all the powers of the Rehabilitator under the Court's June 27, 2019 Order and Article 30 of Chapter 58 of the North Carolina General Statutes.

9. The Special Deputy Rehabilitators have the power to institute this action in the name of the insurer, pursuant to N.C. Gen. Stat. § 58-30-85(a)(6), (a)(12), (a)(13), (a)(19), (b), (c), and (d).

10. Defendant Greg E. Lindberg ("Lindberg") is a resident of Durham County, North Carolina.

11. Defendant Academy Association, Inc. ("AAI"), is a North Carolina corporation with a principal place of business in Durham County, North Carolina.

4

12. Edwards Mill Asset Management, LLC ("EMAM") is a North Carolina limited liability company with a principal place of business in Wake County, North Carolina.

13. New England Capital, LLC ("NEC") is a North Carolina limited liability company with a principal place of business in Durham County, North Carolina.

14. Private Bankers Life and Annuity Co., Ltd. ("PBLA") is a Bermuda limited company.

## JURISDICTION AND VENUE

15. Jurisdiction and venue are proper in this Court pursuant to N.C. Gen. Stat. § 58-30-15.

16. Additionally, the Memorandum of Understanding at issue provides that the Defendants consent to venue in Wake County.

17. This Court has personal jurisdiction over the Defendants pursuant to N.C. Gen. Stat. § 1-75.4(1).

18. All Defendants have consented to the jurisdiction of this Court pursuant to express agreement in the Memorandum of Understanding.

## FACTS

19. Plaintiffs SNIC, CBL, and BLIC were engaged in the business of selling annuities, life, accident, and critical condition insurance policies to consumers in North Carolina and elsewhere. SNRC is the reinsurer for SNIC and CBL.

20. Plaintiffs satisfy their obligations to policyholders through cash payments. Plaintiffs' revenue came from the sale of annuities and insurance policies and the collection of premiums. Plaintiffs also placed some of this revenue in other investments, to grow the money before obligations on it become due.

5

21. Lindberg, directly or indirectly, through one or more intermediaries, owns 100% of the shares of stock of all classes of each of Plaintiffs.

22. Lindberg is the sole and exclusive owner of 100% of the shares of stock of all classes of Defendant AAI.

23. Together, Lindberg and AAI control a large number of affiliated entities. These entities include various holding companies as well as operating companies that conduct business in a number of different industries. The "brand name" for this portfolio of companies is Eli Global.[3]

24. Defendant AAI is, in effect, the master holding company for the Eli Global portfolio.

25. The Lindberg- or AAI-controlled entities, including the Eli Global portfolio, are herein referred to as "affiliates" or "affiliated companies." The affiliates that conduct revenue-generating business are referred to as "operating companies."

26. A third-party restructuring firm that, upon information and belief, was engaged at the direction of AAI or one of its affiliates has made a preliminary finding that the operating companies should produce over $1 billion in gross annual revenue next year.

27. Moreover, the same restructuring firm has projected that the operating companies should yield approximately $129 to $154 million in earnings before interest, tax, depreciation, and amortization ("EBITDA") next year.

28. To finance their operations, the affiliated entities controlled by Lindberg and AAI have received credit facilities and preferred equity financing from a number of lenders, including Plaintiffs.

---

[3] Eli Global, LLC is one of the Lindberg-affiliated companies, but is not the parent holding company of all the various operating companies and is itself a subsidiary of AAI.

6

29.     Presently, the affiliated entities face a credit exposure of at least $2.1 billion.  Of that amount, Plaintiffs hold approximately $1.25 billion of the obligations.

30.     Defendant EMAM holds Class A common units of special purpose vehicles that served as borrowers and lenders in certain financing transactions involving the affiliated entities.

31.     Defendants NEC and PBLA are both affiliates of AAI and Lindberg.  Along with Plaintiffs CBL and SNIC, NEC and PBLA serve as agents under certain debt and equity financing arrangements and have the unilateral authority to bind the lenders on the financing agreements to which such lenders are a party.

<u>**Long-Term Liquidity Problems, Supervision, and Rehabilitation**</u>

32.     In 2018, the Commissioner of the North Carolina Department of Insurance raised concerns regarding whether Plaintiffs' transactions among affiliates, subsidiaries, and controlling persons provided sufficient long-term liquidity to meet Plaintiffs' outstanding obligations to policyholders as they came due.

33.     On October 18, 2018, the Commissioner entered a Consent Order for Administrative Supervision, under which Plaintiffs consented to confidential administrative supervision pursuant to N.C. Gen. Stat. § 58-30-60 et seq.

34.     During the administrative supervision, the Commissioner was unable to resolve the concerns regarding Plaintiffs' ability to have sufficient long-term liquidity to meet their outstanding obligations.

35.     On June 27, 2019, Plaintiffs and Lindberg consented to the appointment of a rehabilitator, agreeing that this step was necessary to protect their policyholders.

36.     On the same date, this Court entered an Order of Rehabilitation in *Causey v. Southland National Insurance Corporation, et al.*, 19-CV-8664 (Wake County Superior Court).

7

37. Upon the filing of the Order of Rehabilitation on June 27, 2019, title to Plaintiffs' assets vested in the Rehabilitator pursuant to N.C. Gen. Stat. § 58-30-80(a).

38. The Court also entered an Order the same day granting a moratorium on policy surrenders and other relief pursuant to N.C. Gen. Stat. § 58-30-85(b).

**Memorandum of Understanding**

39. At the same time, Plaintiffs agreed with Lindberg, AAI, and EMAM to undertake a series of transactions to protect the best interests of Plaintiffs' policyholders and to increase the long-term equity value of certain of the affiliated operating companies.

40. The operating and holding companies central to these transactions are referred to herein as the "Specified Affiliated Companies."

41. These transactions were memorialized in a Memorandum of Understanding that was made and entered into on June 27, 2019. A true and accurate copy of the Memorandum of Understanding is attached hereto as Exhibit A.

42. The Memorandum of Understanding sets forth agreements among the parties regarding: (i) immediate partial amendment of certain loans; (ii) a reorganization of the Specified Affiliated Companies under a new holding company; and (iii) a global restructuring and further modification of certain loans.

43. The interim loan amendment incorporated into the Memorandum of Understanding, among other terms, deferred payment of principal and interest payments from affiliates to Plaintiffs until the second quarter of 2020.

44. Because of this deferral, Plaintiffs and other lenders have not collected approximately $40 million in payments that otherwise would have been due since June 27, 2019.

8

45. With respect to the reorganization, Defendants agreed to restructure the Specified Affiliated Companies to become subsidiaries, either directly or indirectly, of a newly-formed holding company on or before September 30, 2019.

46. The newly-formed holding company, NHC Holdings, LLC ("NHC"), a limited liability company organized under the laws of North Carolina, filed Articles of Organization with the North Carolina Secretary of State on July 2, 2019.

47. The remaining affiliated companies that are not identified in the Memorandum of Understanding as Specified Affiliated Companies would not become subsidiaries of NHC.

48. The Memorandum of Understanding provides that NHC will be governed by a seven-member board of managers fashioned as a board of directors, with two directors appointed by Defendant AAI, three directors appointed by Plaintiffs, and two independent directors elected by the other five directors. The Memorandum of Understanding provides that Lindberg will be one of the AAI-appointed directors.

49. Under this agreement, the NHC board is not controlled by Lindberg and is charged with protecting the best interests of Plaintiffs' policyholders.

50. The NHC board is obligated to cause each of the Specified Affiliated Companies to operate in a manner intended to allow each to repay or refinance or support the repayment, redemption, or refinancing of each company's outstanding debt and equity financing obligations, including their obligations to Plaintiffs.

**Breach of Agreement**

51. The September 30, 2019 deadline for the reorganization of the Specified Affiliated Companies under NHC pursuant to the Memorandum of Understanding has expired.

9

52. Defendants have failed to take the necessary steps timely to reorganize the Specified Affiliated Companies as subsidiaries of NHC as required by the Memorandum of Understanding.

53. Plaintiffs have satisfied all conditions precedent and are ready, willing, and able to perform their obligations under the Memorandum of Understanding.

54. Absent the reorganization agreed to in the Memorandum of Understanding, Lindberg and AAI remain in control of the Specified Affiliated Companies.

55. As shown by their refusal to abide by the terms of the Memorandum of Understanding, Lindberg and AAI currently are unconstrained in how they choose to manage the affiliated companies, including their ability to dissipate assets, further encumber the companies, and operate the companies in a manner not in the best interest of Plaintiffs' policyholders.

56. In rehabilitation, Plaintiffs are prohibited from selling additional policies. Plaintiffs can resolve their long-term liquidity issues and meet their obligations to policyholders only through the affiliated companies' payments on their obligations to Plaintiffs.

57. The failure to effectuate the reorganization component of the Memorandum of Understanding also materially impairs the ability of the parties to implement the financing restructuring component of the agreement.

58. In addition to loans and equity infusions from Plaintiffs, the affiliated entities received financing from third parties and other affiliated entities.

59. At present, the various third-party lenders are dealing with various representatives of the affiliated entities and receiving various proposals. This effort, which Lindberg is spearheading independent from the NHC board of directors, is contrary to the intent and purpose of the Memorandum of Understanding.

10

60. The multiplicity of negotiations has caused, and will continue to cause, the affiliated companies and their assets to be subject to numerous and conflicting obligations to different lenders.

61. Only the organization imposed by the subsidiary structure set forth in the Memorandum of Understanding will allow a constructive dialogue regarding the further restructuring of the applicable debt and equity facilities.

62. Without the reorganization to facilitate the debt restructuring, the long-term liquidity issues that led to the imposition of the receivership will not be resolved.

63. For these reasons, the deadline for the reorganization set forth in the Memorandum of Understanding is a material term.

### Proposed Transactions in Contravention of Memorandum of Understanding

64. Plaintiffs are aware of multiple transactions that Lindberg and certain associates have attempted to complete that undermine the Memorandum of Understanding and threatens a successful loan restructuring.

### *Proposed ULICO Transaction*

65. PBLA is another insurance company owned, directly or indirectly, by Lindberg. It is domiciled in Bermuda and is not subject to this Court's rehabilitation order.

66. Universal Life Insurance Company ("ULICO") is a life and accident and health insurance company domiciled in Puerto Rico.

67. PBLA serves as a reinsurer for ULICO.

68. Because of PBLA's own financial difficulties and other issues, ULICO recently experienced a financial strength rating downgrade from A.M. Best and faces possible further downgrade.

11

69. Should ULICO experience further financial strength rating downgrades, it likely would be put into rehabilitation in Puerto Rico.

70. To help shore up ULICO's financial strength rating, Lindberg proposed creating a recapture trust to hold assets as collateral for the recapture of the reinsurance agreement with PBLA.

71. On August 19, 2019, PBLA entered into a term sheet with ULICO to restructure Lindberg's affiliated companies' debt to ULICO through the creation of the recapture trust. A true and accurate copy of the term sheet is attached hereto as Exhibit B.

72. The term sheet provides, among other things, that the trust assets will consist of $700 million in cash and loans from individual affiliated operating companies.

73. Although the particular operating companies that will serve as lenders in the restructuring are not identified in the term sheet, by necessity they will include Specified Affiliated Companies that are to be transferred to NHC under the Memorandum of Understanding.

74. In fact, the term sheet allows ULICO to choose which affiliated companies it would prefer to include in the restructuring. As a result, the Specified Affiliated Companies not encumbered through this transaction may be lower-performing entities that are less able to service the affiliated companies' debt.

75. Most significantly, PBLA pledged that the operating company debtors on the loans to the reinsurance trust would be entities that generate $95 million in forecast EBITDA for 2020. This amount is over half of the total forecast EBITDA for all of the operating companies.

12

76. In other words, the term sheet pledges over half of the funds that would be available to pay the affiliated companies' various obligations to a single creditor—ULICO—which holds only approximately 25% of the affiliated companies' debt.

77. If consummated, this transaction would vitiate the Memorandum of Understanding. No global loan restructuring could succeed if over half of the earnings that could be used to pay down the various debts is already committed elsewhere.

78. Moreover, the term sheet pledges equity interests in the affiliated companies to ULICO. This further undermines the Memorandum of Understanding by diluting NHC's ownership interests in the Specified Affiliated Companies involved.

79. The transaction may also constitute a fraudulent conveyance under North Carolina and other applicable laws.

80. The transaction contemplated by the term sheet is only possible because, until the corporate reorganization outlined in the Memorandum of Understanding is completed, Lindberg remains in control of the operating companies and is under no obligation to run those companies in the best interests of the insurance companies' policyholders.

### *Proposed Management Buy-Outs*

81. Plaintiffs also are aware of at least two proposed management buy-outs of Specified Affiliated Companies that do not appear to be in the best interests of Plaintiffs' policyholders.

82. Home Medical Equipment Specialists, LLC ("HME") is a durable medical equipment seller based in New Mexico, a Lindberg affiliate, and a Specified Affiliated Company.

13

83. In 2019, Texas denied HME's petition to renew its participation in that state's Medicaid program based on the pending federal criminal charges against Lindberg.

84. The management team overseeing HME asserted concerns that private payors in New Mexico would likewise remove HME from their networks.

85. On September 17, 2019, management for HME, with Lindberg's knowledge and approval, proposed a management buy-out.

86. Under the proposed terms of the buy-out, the Lindberg-affiliated entity would be sold to an affiliate of Chris Herwig.

87. Chris Herwig is the Chief Investment Officer and head of mergers and acquisitions for Eli Global.

88. The proposed sale would involve a purchase price of $130 million.

89. HME previously had been valued at approximately $90 million.

90. HME had attempted, and failed, to find another party willing to make an acceptable offer for the company.

91. The proposed terms of the transaction did not require Chris Herwig to contribute any cash.

92. Lindberg would be entitled to a $51 million seller note bearing 10% interest, as well as "observation rights" on the Herwig-affiliated company's board.

93. If this deal were consummated, it would breach Defendants' obligation to transfer HME to the control of NHC under the Memorandum of Understanding.

94. Client Services, Inc. ("CSI") is an accounts-receivable management firm with locations in Missouri, Kansas, and Costa Rica. It is a Lindberg affiliate and a Specified Affiliated Company.

14

95. A large portion of CSI's revenue derived from collections activities for large financial institutions.

96. Following Lindberg's federal indictment, at least one institution terminated CSI's services and others threatened to do so.

97. On September 23, 2019, management for CSI, with Lindberg's knowledge and approval, proposed a management buy-out.

98. Under the proposed terms of the transaction, CSI would be sold for $36 million.

99. The buyer, an Eli Global employee, would be entitled to a management fee of $400,000 per year.

100. Lindberg would be entitled to a $10 million seller note bearing 12% interest.

101. The board governing the new entity would be comprised of the Eli Global employee, a Lindberg appointee, and Lindberg's personal attorney, along with two appointees from the insurance company creditors. In other words, Lindberg would retain effective control of the new entity.

102. If this deal were consummated, it would breach Defendants' obligation to transfer CSI to the control of NHC under the Memorandum of Understanding.

103. Both proposed management buy-outs would erode the ability of the Specified Affiliated Companies to service the debt obligations to be restructured under the Memorandum of Understanding by removing two revenue-producing entities from the repayment base.

104. The transactions also involve the sale of these entities before any reliable valuation has been conducted. It is unclear whether the sales fairly capture the companies' value.

15

105. It is clear, however, that the present value of these companies—known to be affiliated with Lindberg and weeks away from his trial—are devalued by their association with Lindberg.

106. The process contemplated by the Memorandum of Understanding, which removes Lindberg from control immediately, also provides a longer timeframe to increase the value of the Specified Affiliated Companies if they are to be eventually sold.

107. Instead, Lindberg and his affiliates have proposed transactions that do not truly remove Lindberg from control, that sell the companies at a time when their value is necessarily depressed, and that individually profit Lindberg and his business colleagues.

### Lindberg's Efforts to Use Plaintiffs' Collateral for Improper Expenses

108. Plaintiffs also have reason to believe that the operating companies are being mismanaged and that at least some of their operating revenue is being diverted for Lindberg's personal use.

109. Academy Financial Assets, LLC ("AFA") is an affiliated company identified as a Specified Affiliated Company in the Memorandum of Understanding.

110. In May 2019, CBL agreed to extend a line of credit of $15 million ("revolver") to AFA, under the pretenses that, although certain operating companies were generating enough operating revenue to cover normal expenses, there were short-term liquidity needs necessitating an infusion of funds.

111. In other words, even though operating company revenues are supposed to be paying down the operating companies' debts to Plaintiffs, Plaintiff CBL was forced to extend additional credit to AFA to avoid other collateral consequences.

16

112. On June 27, 2019, in reliance on the agreement memorialized in the Memorandum of Understanding, the revolver was increased to $40 million and reduced to writing.

113. Contrary to AFA's forecasts, all but approximately $95,000 of the full $40 million of the revolver was exhausted by September 10, 2019.

114. The speedy exhaustion of the revolver is all the more concerning given that Plaintiffs' deferral of loan payments under the Memorandum of Understanding should have provided the affiliates with $40 million of working capital over the past three months that otherwise would have been used to satisfy their debt obligations to Plaintiffs.

115. Despite the exhaustion of the revolver, and despite the fact that the operating companies are not presently self-sufficient, Lindberg has made and continues to make demands for additional payments not permitted under the revolver and for payments that would benefit himself at the expense of the operating companies.

116. For instance, Lindberg has demanded payment of millions of dollars in management fees for various operating entities.

117. Lindberg has also made demands that AFA use affiliated company funds for improper payment of personal expenses, which would require use of the revolver proceeds.

118. Repeatedly, and as recently as last week, Lindberg demanded that funds be released from affiliated companies for payment of his airplane leases and for his personal public relations consultant.

119. Payment of personal expenses are not permitted under the terms of the revolver. The revolver's permitted use is only for working capital needs and general corporate purposes.

17

120. Additionally, the use of the revolver funds for personal expenses or large management fees removes cash that could otherwise be used to improve management and operations toward the end of moving the operating companies to self-sufficiency.

121. Without the operating companies being able to finance their own operations, it will not be possible for them to pay down their debts to Plaintiffs and others.

122. Until the corporate reorganization under the Memorandum of Understanding is completed, Lindberg is not forced to prioritize the interests of policyholders over competing interests, including his own personal interests.

### Additional Irreparable Harm

123. Absent immediate enforcement of the Memorandum of Understanding, Lindberg and others working in concert with him are able to engage in transactions like those described above, which would materially impair the ability of the operating companies to service the debt held by Plaintiffs and other creditors.

124. Because Lindberg has substantial overseas business interests, these transactions may result in the diversion of assets outside of the jurisdiction of United States courts.

125. Additionally, because of the immediacy of Plaintiffs' obligations to policyholders and the operating companies' obligations to debtholders, no legal action would be sufficient to remedy the harm from such transactions, particularly when a lawsuit may involve the need to repatriate assets from overseas.

126. Should the operating companies default on their obligations to lenders, Plaintiffs will have to foreclose on the loans.

18

127. Owing to the complex and circuitous nature of the loan transactions at issue,[4] despite months of work, Plaintiffs still have not been able to determine the value of the collateral on these loans.

128. If the loans are collateralized, the collateral would be liquidated during foreclosure at significantly reduced prices.

129. Such a liquidation will lead to substantial losses of account value to policyholders, and a complete loss for other creditors.

130. These circumstances would force Plaintiffs into liquidation.

131. If some or all of the loans are not properly collateralized, claims against state guaranty funds and losses to policyholders could be even greater.

132. Additionally, Lindberg currently is facing federal criminal charges in the United States District Court for the Western District of North Carolina. The trial of that matter is set for November 19, 2019 and is forecast to take two to three weeks.

133. At least for the duration of the trial, Lindberg will be effectively unavailable to effectuate the terms of the Memorandum of Understanding. Should he be convicted and incarcerated following trial, his ability to perform under the agreement will be further impaired.

134. Finally, the Special Deputy Rehabilitators understand that the United States Department of Justice and Federal Bureau of Investigation are conducting a separate criminal investigation into potential financial fraud within the Lindberg-related entities.

135. Special Deputy Rehabilitator Mike Dinius received a subpoena from a grand jury empaneled in the United States District Court for the Western District of North Carolina

---

[4] Loans to operating companies run through multiple intermediary borrowers pursuant to a number of different forms of financing transactions, including direct loans, preferred equity deals, special purpose vehicles, principal protected notes, and financing companies. The transactions involved are so complex that no one, with the possible exception of Lindberg, has been able to untangle the underlying economic realities at this point.

19

regarding the investigation into potential financial fraud. Plaintiffs arecooperating in this investigation.

136. Plaintiffs believe that effectuating the Memorandum of Understanding, and preserving the status quo in the meantime, will best serve the interests of justice during this period of investigation, and best protect any potential victims, including Plaintiffs and their policyholders, should proof of wrongdoing be uncovered through this process.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

137. The allegations contained in paragraphs 1 to 136 above are realleged and incorporated herein by reference.

138. The Memorandum of Understanding is a contract duly formed and entered into by the Parties.

139. Pursuant to the express terms of the Memorandum of Understanding, the Parties agreed to restructure the Specified Affiliated Companies to become subsidiaries of the new holding company on or before September 30, 2019.

140. Defendants represented in the Memorandum of Understanding that they control the Specified Affiliated Companies.

141. Defendants do, in fact, control the Specified Affiliated Companies, within the meaning of N.C. Gen. Stat. § 58-19-5.

142. Defendants have failed to restructure the Specified Affiliated Companies to become subsidiaries of the new holding company and the time within which to do so has expired.

143. Defendants' actions constitute a breach of the terms of the Memorandum of Understanding.

20

144. Plaintiffs have been damaged by Defendants' breach in an amount to be proven at trial in excess of $25,000.

145. The Memorandum of Understanding explicitly calls for specific performance as the remedy for a breach of that agreement.

146. Based on the nature of the Memorandum of Understanding and for the reasons set forth in more detail herein, both preliminary and permanent injunctive relief directing specific performance is the proper remedy for breach of the Memorandum of Understanding.

147. Plaintiffs are entitled to a preliminary and permanent injunction requiring Defendants to comply with the terms of the Memorandum of Understanding, plus any attendant damages.

## APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

148. The allegations of paragraphs 1 through 147 are re-alleged and incorporated herein by reference.

149. As set forth above, Defendants have materially breached the Memorandum of Understanding.

150. Pursuant to section 1A-1 of the North Carolina General Statutes and Rule 65 of the North Carolina Rules of Civil Procedure, Plaintiffs hereby move for a temporary restraining order, preliminary injunction, and permanent injunction directing Defendants to specifically perform according to the terms of the Memorandum of Understanding.

151. By virtue of the foregoing, Plaintiffs have demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendants.

21

152. Unless Defendants are preliminarily enjoined from the foregoing conduct, Plaintiffs will be immediately and irreparably harmed.

153. The Memorandum of Understanding provides that the Parties agree that irreparable damage would occur if any provision of the agreement was not performed, and that upon a breach the Parties shall be entitled to specific performance in addition to any other remedies at law or in equity.

154. Plaintiffs have no adequate remedy at law.

155. A temporary restraining order and preliminary injunction are reasonably necessary to protect the rights and interests of Plaintiffs and Plaintiffs' policyholders.

156. Plaintiffs are entitled to a Temporary Restraining Order directing Defendants, or any third-party acting in concert with them, to refrain from:

 i. Engaging, or causing any affiliated company to engage, in any activity that would constitute a further breach of the Memorandum of Understanding;

 ii. taking actions, or causing any affiliated company to take actions, inconsistent with maximizing the long-term equity value of the Specified Affiliated Companies;

 iii. taking actions, or causing any affiliated company to take actions, that would hinder the ability of the Specified Affiliated Companies to repay, refinance, or redeem their debt and equity obligations by December 31, 2029;

 iv. further encumbering, or causing any affiliated company to encumber, the Specified Affiliated Companies and their assets, or taking any action, or causing any affiliated company to take any action, which would impair Plaintiffs' priority

22

or interest in the Specified Affiliated Companies and their assets, to the extent such serve as collateral for obligations held by Plaintiffs;

v. except in accordance with the Memorandum of Understanding, consummating or entering into any agreement to consummate, or causing any affiliated company to consummate or enter into any agreement to consummate, a transaction that results in (i) a merger or consolidation of a Specified Affiliated Company into or with another entity, (ii) a sale, assignment, transfer or pledge of any equity interest in a Specified Affiliated Company, (iii) a person becoming a beneficial owner, holder, or controlling person, either directly or indirectly, of any securities of any Specified Affiliated Company, (iv) a change in the managers or directors of any Specified Affiliated Company, or (v) the termination of the business or liquidation of the assets of any Specified Affiliated Company;

vi. causing any Specified Affiliated Company to make any loan to or investment in any other entity, including affiliates;

vii. except in accordance with the Memorandum of Understanding, causing the payment of any distributions to the equity holders of, causing any membership redemptions, drawing from the capital accounts, or defalcating the assets of any Specified Affiliated Company;

viii. engaging in, or causing any affiliated company to engage in, a transaction which could constitute a fraudulent conveyance under applicable law or would otherwise result in a preference for any creditor of the Specified Affiliated Companies;

ix. transferring, withdrawing, concealing, defalcating, disposing of, or encumbering, or causing any affiliated company to transfer, withdraw, conceal, defalcate,

23

dispose of, or encumber, any of the Defendants' assets, other than the expenses of ordinary business operations, without express authority of the Court;

x. taking any action designed to, or negligently causing or allowing, the waste, disposal, theft or improper disposition of any of the Defendants' or the Specified Affiliated Companies' assets; and

xi. taking any action, or causing any affiliated company to take any action, that would violate the Order of Rehabilitation in *Causey v. Southland National Insurance Corporation, et al.*, Wake County Superior Court Civil Action No. 19-CV-8664, including specifically the prohibition against the dissipation, waste, or impairment of any of the Plaintiffs' assets, including their interest as creditors of the Specified Affiliated Companies; and

xii. acting, or causing any affiliated company to act, in a manner inconsistent with the best interests of Plaintiffs' policyholders.

157. As soon as practicable, Plaintiffs are entitled to a Preliminary Injunction directing Defendants, or any third-party acting in concert with them, to:

i. Continue complying with the terms set forth in Paragraph 156; and

ii. Grant Plaintiffs, through the Special Deputy Rehabilitators, access to the books and records of the Defendants and affiliated companies, upon request and under reasonable terms, to ensure compliance with the Memorandum of Understanding this Court's Orders, and the rehabilitator's duties under Chapter 58 of the North Carolina General Statutes.

158. Plaintiffs also request the preliminary relief of the appointment of a Receiver for the Specified Affiliated Companies, pursuant to N.C. Gen. Stat. §§ 1-501, 1-502, 1-507.1, and

24

this Court's inherent authority. Plaintiffs request that the receiver have all the powers and authority held by receivers appointed by North Carolina courts, as well as such powers as may be specifically enumerated by this Court. Plaintiffs further request that the receiver be directed to manage the Specified Affiliated Companies in accordance with the best interests of Plaintiffs' policyholders.

**WHEREFORE**, Plaintiffs respectfully pray the Court:

(a)     Accept this Verified Complaint as an affidavit;

(b)     Issue a temporary restraining order granting the relief set forth in Paragraph 156;

(c)     Enter a preliminary injunction Order granting the relief set forth in Paragraph 157;

(d)     Appoint a receiver for the Specified Affiliated Companies during the pendency of this litigation;

(e)     Enter a money judgment in favor of Plaintiffs and against Defendants for all damages occasioned by its breach of the Memorandum of Understanding;

(f)     Enter a permanent injunction directing Defendants and anyone acting in concert with them to specifically perform the terms of the Memorandum of Understanding, including: (i) the global restructuring of the Specified Affiliated Companies through the formation of a new holding company as called for in the Global Restructuring provision of the Memorandum of Understanding; and (ii) the global restructuring and modification of all loans, including the assignment of the loans to the new holding company as called for in the Global Loan Amendments provision of the Memorandum of Understanding, all of which should be done in the manner and according to the terms and conditions more particularly set forth in the Memorandum of Understanding;

25

(g)    Enter a judgment in favor of Plaintiffs and against Defendants for Plaintiffs' costs and fees associated with pursuing this action, including attorneys' fees, as allowed by law; and

(h)    Enter such other judgments and orders as are necessary and appropriate to provide Plaintiffs complete relief in accordance with their claims.

This the 1st day of October, 2019.

WILLIAMS MULLEN

By:_____

Wes J. Camden
N.C. State Bar I.D. No.: 33190
Caitlin M. Poe
N.C. State Bar I.D. No.: 44713
Post Office Box 1000
Raleigh, NC 27602-1000
Telephone: 919.981.4085
Facsimile: 919.981.4300
cpoe@williamsmullen.com
wcamden@williamsmullen.com

26

# EXHIBIT B

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 013093

SOUTHLAND NATIONAL INSURANCE )
CORPORATION in Rehabilitation, )
BANKERS LIFE INSURANCE )
COMPANY in Rehabilitation, )
COLORADO BANKERS LIFE )
INSURANCE COMPANY in )
Rehabilitation, and SOUTHLAND )
NATIONAL REINSURANCE )
CORPORATION in Rehabilitation, )
)
Plaintiffs, )
)
v. )
)
GREG E. LINDBERG, ACADEMY )
ASSOCIATION, INC., EDWARDS MILL )
ASSET MANAGEMENT, LLC, NEW )
ENGLAND CAPITAL, LLC, and )
PRIVATE BANKERS LIFE AND )
ANNUITY CO., LTD. a/k/a PB LIFE AND )
ANNUITY COMPANY LTD., )
)
Defendants. )

**FILED UNDER SEAL**

[SEALED]
**VERIFIED AMENDED COMPLAINT
AND MOTION FOR PRELIMINARY
AND PERMANENT INJUNCTION**

**\*Unsealed as redacted by trial court
order entered 10 January 2020**

## INTRODUCTION

Defendant Greg E. Lindberg, directly and indirectly, is the sole owner of the four Plaintiff

insurance companies. A substantial portion of Plaintiffs' investments are debt facilities or equity

financing arrangements with entities that are also under Lindberg's control. These affiliated

entities consist of operating and holding companies, special purpose vehicles, and trusts, formed

and incorporated in this state and others and overseas, which are in a complex network of

interrelated loans, financing arrangements, and investments.

In June 2019, Plaintiffs' long-term liquidity issues became severe enough to warrant

Plaintiffs being placed in rehabilitation. The success or failure of Plaintiffs' rehabilitation will

1

turn on whether the Lindberg-controlled operating companies can generate sufficient revenue to repay affiliated investments, so that Plaintiffs can meet their long-term obligations to policyholders and creditors. If the affiliated companies fail to repay their debts, Plaintiffs' only alternative will be to foreclose on the debts and to initiate liquidation of the companies and their assets—which will result in a substantial shortfall.[1]

To try to enable the affiliated companies to repay their debts, Lindberg, on behalf of himself and numerous entities, entered into an agreement with Plaintiffs on June 27, 2019. The Memorandum of Understanding[2] between the parties sets forth a plan to reorganize many, although not all, of the affiliated companies under a newly-formed holding company governed by an independent board. Through this centralized board, the parties plan to restructure the affiliated companies' loan obligations and to improve management to ensure that the operating companies' revenue will be sufficient to service their debt to Plaintiffs and other debt-holders. Even more importantly, the Memorandum of Understanding binds the board to manage the affiliated companies in the best interests of Plaintiffs' policyholders.

The deadline to reorganize the relevant companies under the new holding company was September 30, 2019. Defendants have failed to perform. Over the past several months, Defendants have proffered a variety of reasons for why they are unable to perform under the Memorandum of Understanding. A number of these reasons directly contradict the express representations and warranties that Defendants made to Plaintiffs during the contract negotiations. By contrast,

---

[1] Such a process would inevitably lead to losses of account value to policyholders. State guaranty funds would pay claims only up to the amount of state guaranty fund limits. Policyholders with account values in excess of state guaranty fund limits would suffer the most severe losses. Plaintiffs' general creditors would suffer total losses.
[2] This pleading adopts the same definitions of terms as set forth in the Memorandum of Understanding, unless stated otherwise.

2

Defendants have accepted without protest over $100 million in benefits under the Memorandum of Understanding.

Without the reorganization of the relevant affiliated companies under the new holding company, it is impossible to undertake an orderly analysis and restructuring of the affiliated companies' debt obligations. Greg Lindberg desperately wants to retain control of the affiliated companies that he agreed to transfer to the new holding company. For the reasons set forth in more detail below, Plaintiffs do not believe that Lindberg's continued control is in the interests of the affiliated companies' creditors, their employees, or Plaintiffs' policyholders—the protection of which is precisely why the parties entered into the Memorandum of Understanding. Plaintiffs respectfully request that this Court find that Defendants have breached the Memorandum of Understanding and defrauded Plaintiffs, direct specific performance of this contract, and, in the interim, order preliminary relief designed to preserve the long-term equity value of the affiliated companies and protect the interests of Plaintiffs' policyholders.

### PARTIES

1.      Plaintiff Southland National Insurance Corporation ("SNIC") is a licensed North Carolina domestic life and accident and health insurer.

2.      Plaintiff Bankers Life Insurance Company ("BLIC") is a licensed North Carolina domestic life and accident and health insurer.

3.      Plaintiff Colorado Bankers Life Insurance Company ("CBL") is a licensed North Carolina domestic life and accident and health insurer.

4.      Plaintiff Southland National Reinsurance Corporation ("SNRC") is a licensed North Carolina captive insurance company engaged in the business of reinsurance.

3

5. Plaintiffs' principal place of business is located at 2327 Englert Drive, Durham, Durham County, North Carolina.

6. On June 27, 2019, in a matter captioned *Causey v. Southland National Insurance Corporation, et al.,* 19-CV-8664 (Wake County Superior Court), this Court entered an Order of Rehabilitation pursuant to Article 30 of Chapter 58 of the North Carolina General Statutes and appointed Mike Causey, in his official capacity on behalf of the State of North Carolina as Commissioner of Insurance, as Rehabilitator for Plaintiffs.

7. Pursuant to N.C. Gen. Stat. § 58-30-85(a)(1), the Rehabilitator has the authority to appoint Special Deputy Rehabilitators.

8. On June 27, 2019, Rehabilitator Mike Causey appointed Mike Dinius and John Murphy of Noble Consulting Services, Inc. as Special Deputy Rehabilitators and conferred on them all the powers of the Rehabilitator under the Court's June 27, 2019 Order and Article 30 of Chapter 58 of the North Carolina General Statutes.

9. The Special Deputy Rehabilitators have the power to institute this action in the name of the insurer, pursuant to N.C. Gen. Stat. § 58-30-85(a)(6), (a)(12), (a)(13), (a)(19), (b), (c), and (d).

10. Defendant Greg E. Lindberg ("Lindberg") is a resident of Durham County, North Carolina.

11. Defendant Academy Association, Inc. ("AAI"), is a North Carolina corporation with a principal place of business in Durham County, North Carolina.

12. Edwards Mill Asset Management, LLC ("EMAM") is a North Carolina limited liability company with a principal place of business in Wake County, North Carolina.

4

13. New England Capital, LLC ("NEC") is a North Carolina limited liability company with a principal place of business in Durham County, North Carolina.

14. Private Bankers Life and Annuity Co., Ltd. a/k/a PB Life and Annuity Company Ltd. ("PBLA") is a Bermuda limited company.

## JURISDICTION AND VENUE

15. Jurisdiction and venue are proper in this Court pursuant to N.C. Gen. Stat. § 58-30-15.

16. Additionally, the Memorandum of Understanding at issue provides that the Defendants consent to venue in Wake County.

17. This Court has personal jurisdiction over the Defendants pursuant to N.C. Gen. Stat. § 1-75.4(1).

18. All Defendants have consented to the jurisdiction of this Court pursuant to express agreement in the Memorandum of Understanding.

## FACTS

19. Plaintiffs SNIC, CBL, and BLIC were engaged in the business of selling annuities, life, accident, and critical condition insurance policies to consumers in North Carolina and elsewhere. SNRC is the reinsurer for SNIC and CBL.

20. Plaintiffs satisfy their obligations to policyholders through cash payments. Plaintiffs' revenue came from the sale of annuities and insurance policies and the collection of premiums. Plaintiffs also placed some of this revenue in other investments, to grow the money before obligations on it become due.

21. Lindberg, directly or indirectly, through one or more intermediaries, owns 100% of the shares of stock of all classes of each of Plaintiffs.

5

22. Lindberg is the sole and exclusive owner of 100% of the shares of stock of all classes of Defendant AAI.

23. Together, Lindberg and AAI control a large number of affiliated entities. These entities include various holding companies as well as operating companies that conduct business in a number of different industries. The "brand name" for this portfolio of companies is Eli Global.[3]

24. Defendant AAI is, in effect, the master holding company for the Eli Global portfolio.

25. The Lindberg- or AAI-controlled entities, including the Eli Global portfolio, are herein referred to as "affiliates" or "affiliated companies." The affiliates that conduct revenue-generating business are referred to as "operating companies."

26. A third-party restructuring firm that, upon information and belief, was engaged at the direction of AAI or one of its affiliates has made a preliminary finding that the operating companies should produce over $1 billion in gross annual revenue next year.

27. Moreover, the same restructuring firm has projected that the operating companies should yield approximately $129 to $154 million in earnings before interest, tax, depreciation, and amortization ("EBITDA") next year.

28. To finance their operations, the affiliated entities controlled by Lindberg and AAI have received credit facilities and preferred equity financing from a number of lenders, including Plaintiffs.

29. Presently, the affiliated entities face a credit exposure of at least $2.1 billion. Of that amount, Plaintiffs hold approximately $1.25 billion of the obligations.

---

[3] Eli Global, LLC is one of the Lindberg-affiliated companies but is not the parent holding company of all the various operating companies and is itself a subsidiary of AAI.

6

30. Defendant EMAM holds Class A common units of special purpose vehicles that served as borrowers and lenders in certain financing transactions involving the affiliated entities.

31. Defendants NEC and PBLA are both affiliates of AAI and Lindberg. Along with Plaintiffs CBL and SNIC, NEC and PBLA serve as agents under certain debt and equity financing arrangements and have the unilateral authority to bind the lenders on the financing agreements to which such lenders are a party.

### Long-Term Liquidity Problems and Supervision

32. In 2018, the Commissioner of the North Carolina Department of Insurance raised concerns regarding whether Plaintiffs' transactions among affiliates, subsidiaries, and controlling persons provided sufficient long-term liquidity to meet Plaintiffs' outstanding obligations to policyholders as they came due.

33. On October 18, 2018, the Commissioner entered a Consent Order for Administrative Supervision, under which Plaintiffs consented to confidential administrative supervision pursuant to N.C. Gen. Stat. § 58-30-60 et seq.

34. Through the administrative supervision, the Commissioner was unable to resolve the concerns regarding Plaintiffs' ability to have sufficient long-term liquidity to meet their outstanding obligations.

35. The period of administrative supervision was extended by consent on February 5, 2019, and again on April 3, 2019.

36. The Second Amended Consent Order for Administrative Supervision established requirements for limiting Plaintiffs' exposure to the affiliates, with the ultimate goal of reducing total affiliate exposure to approximately 10%.

7

37. The Second Amended Consent Order set forth a timeline for liquidating the affiliated debt, with intermediate "Trigger Dates" by which specified amounts of affiliate exposure were to be reduced.

38. If the companies failed to reduce the affiliate exposure according to the timeline, they could purchase additional time to perform through a $30 million capital contribution. If they could not make the contribution, or if they made the contribution but still failed to reduce the exposure after an additional period, the companies agreed to consent to rehabilitation, the appointment of a receiver, and injunctive relief.

39. Pursuant to the Second Amended Consent Order, Lindberg and other Eli Global officers purported to make efforts to: (1) sell the insurance companies; (2) refinance loans to the affiliates with third party lenders; and (3) sell the affiliated companies.

40. However, Lindberg and other Eli Global officers working on his behalf represented that they were unable to find sellers willing to purchase the companies for their expected values.

41. Although Lindberg and other Eli Global officers reported numerous attempts to refinance the debt, they also represented that they could reach no agreement with third parties willing to refinance a sufficient amount of the affiliate debt to meet the milestones set out in the Second Amended Supervision Order.

42. By the end of April 2018, Special Deputy Rehabilitator Dinius had determined that the plan to liquidate the companies to resolve the outstanding debt obligations would result in a substantial shortfall of funds. In other words, the projected sales prices did not meet the companies' obligations.

43. Special Deputy Rehabilitator Dinius calculated this shortfall as over $1.3 billion.

8

44. Special Deputy Rehabilitator Dinius presented his analysis to Eli Global officers, who could not refute his findings.

45. At the same time, the affiliated companies were having trouble financing their operating expenses.

46. Special Deputy Rehabilitator Dinius already had been asked to approve a number of transactions that effectuated transfers of funds between affiliated companies to meet their operating expenses, rather than these entities supporting themselves through operating revenue.

47. In addition, on May 1, 2019, several affiliated companies failed to make payments on loan agreements, constituting events of default.

48. Because liquidation would result in a substantial shortfall on debt obligations, and because the operating companies also appeared to have acute financial problems, Special Deputy Rehabilitator Dinius prepared an alternative plan to seek to achieve solvency instead of the immediate sale of affiliated companies.

49. Under Special Deputy Rehabilitator Dinius's proposal: (1) the insurance companies would consent to rehabilitation immediately, (2) identified operating companies would be moved into a new holding company under a board with a majority of independent directors, (3) the existing debt would be restructured among the operating companies and the new holding company, and (4) the operating companies would generate cash for debt reduction and long-term equity preservation. Once the affiliated loans were resolved, the companies could be returned to Lindberg's control.

50. Accordingly, Special Deputy Rehabilitator Dinius's proposal envisioned a scenario in which both sides would compromise on certain issues in order to achieve a mutually beneficial long-term outcome and to protect the interests of policyholders. The reorganization of the

9

affiliated companies would create rationality among the borrowers, which would allow the loan relationships to be restructured. This would allow payment on the debt held by Plaintiffs, and also provide a longer time horizon to improve affiliated company operations and improve their value for potential sales.

51. On May 9, 2019, Special Deputy Rehabilitator Dinius sent his suggested plan to Christa Miller and Chris Herwig, both Eli Global officers.

52. On May 16, 2019, Special Deputy Rehabilitator Dinius met with Eli Global officers, including Lindberg, to discuss his proposal.

53. The officers from Eli Global represented that the general structure of the proposal would be acceptable.

54. At the meeting, the Eli Global officers offered a presentation identifying certain additions and changes, including (1) structuring the new holding company as a subsidiary of AAI to avoid adverse tax consequences and (2) adding seller notes and earned equity agreements to the debt to be refinanced.

55. In the same presentation, the Eli Global team represented that they believed they could accomplish the restructuring and rehabilitation plan by June 30, and requested that in exchange they be given a deferral on loan obligations, in order to allow them to focus their resources on consummating these transactions.

56. On May 22, 2019, Lindberg emailed Special Deputy Rehabilitator Dinius directly, reiterating the points from the Eli Global presentation described above, and setting forth additional thoughts and requests for the company reorganization and loan restructuring.

57. Lindberg and Eli Global volunteered to prepare the first draft of the documents to implement this deal.

10

58.     On June 2, 2019, Lindberg transmitted to Special Deputy Rehabilitator Dinius a proposed agreement to defer the affiliates' debt obligations while the new holding company restructuring was implemented.

59.     On June 3, 2019, Lindberg transmitted to Special Deputy Rehabilitator Dinius a draft agreement, styled as a Memorandum of Understanding, consenting to rehabilitation, setting out a reorganization of the affiliates under a new holding company, and outlining the restructuring of debt under the new holding company.

60.     The draft Memorandum of Understanding that Lindberg transmitted explicitly set forth that it was a nonbinding expression of interest subject to due diligence.

61.     On June 5, 2019, Lindberg transmitted to Special Deputy Rehabilitator Dinius an updated draft Memorandum of Understanding, with substantial revisions based on the parties' negotiations.

62.     Over the next several weeks the parties engaged in substantial negotiations regarding the terms of the Memorandum of Understanding, the Interim Loan Amendment (which deferred payment on the affiliates' loans), and the Consent Rehabilitation Order.

63.     These documents were negotiated in conjunction with one another and together constituted one overall transaction.

64.     During this time, Plaintiffs requested, and received, information and disclosures from Defendants. However, owing to the complexity of the underlying affiliated loan transactions and corporate structure, Plaintiffs were forced to rely on Defendants' representations as well.

65.     Over the course of the negotiations, the parties agreed to make the Memorandum of Understanding a legally binding agreement, as acknowledged in a June 19, 2019 email from Lindberg to Special Deputy Rehabilitator Dinius, in which Lindberg attempts to use the fact that

11

the Memorandum of Understanding would be legally binding as leverage to obtain more favorable terms in the Consent Rehabilitation Order.

66. On June 25 and 26, 2019, the parties met in person in Raleigh, North Carolina to finalize the deal.

67. The parties were represented by counsel present in the room and participating by telephone.

68. On June 27, 2019, the parties executed the Memorandum of Understanding, Interim Loan Amendment that defers debt payments by the affiliated companies, and Consent Rehabilitation Order.

69. On the same day, as part of the overall transaction as described above, Plaintiff CBL reduced to writing a loan to Academy Financial Assets, LLC ("AFA") that previously had been made in the amount of $15 million, increased the amount to $40 million, and structured the loan as a revolving line of credit.

70. On the same day, with the parties' consent and as part of the overall transaction as described above, this Court entered an Order of Rehabilitation in *Causey v. Southland National Insurance Corporation, et al.*, 19-CV-8664 (Wake County Superior Court).

71. Upon the filing of the Order of Rehabilitation on June 27, 2019, title to Plaintiffs' assets vested in the Rehabilitator pursuant to N.C. Gen. Stat. § 58-30-80(a).

72. The Court also entered an Order the same day granting a moratorium on policy surrenders and other relief pursuant to N.C. Gen. Stat. § 58-30-85(b).

### Memorandum of Understanding

73. The Memorandum of Understanding and ancillary documents represent a series of transactions intended to protect the best interests of Plaintiffs' policyholders and to increase the

12

long-term equity value of certain of the affiliated operating companies. A true and accurate copy of the Memorandum of Understanding is attached hereto as Exhibit A.

74. The operating and holding companies central to these transactions are referred to herein as the "Specified Affiliated Companies."

75. The Memorandum of Understanding sets forth agreements among the parties regarding: (i) immediate partial amendment of certain loans; (ii) a reorganization of the Specified Affiliated Companies under a new holding company; and (iii) a global restructuring and further modification of certain loans.

76. The Interim Loan Amendment incorporated into the Memorandum of Understanding, among other terms, deferred payment of principal and interest payments from affiliates to Plaintiffs until the second quarter of 2020.

77. Because of this deferral, Plaintiffs and other lenders have not collected approximately $100 million in payments that otherwise would have been due since June 27, 2019.

78. With respect to the reorganization, Defendants agreed to restructure the Specified Affiliated Companies to become subsidiaries, either directly or indirectly, of a newly-formed holding company on or before September 30, 2019.

79. The newly-formed holding company, NHC Holdings, LLC ("NHC"), a limited liability company organized under the laws of North Carolina, filed Articles of Organization with the North Carolina Secretary of State on July 2, 2019.

80. The remaining affiliated companies that are not identified in the Memorandum of Understanding as Specified Affiliated Companies would not become subsidiaries of NHC.

81. The Memorandum of Understanding provides that NHC will be governed by a seven-member board of managers fashioned as a board of directors, with two directors appointed

13

by Defendant AAI, three directors appointed by Plaintiffs, and two independent directors elected by the other five directors. The Memorandum of Understanding provides that Lindberg will be one of the AAI-appointed directors.

82. Under this agreement, the NHC board is not controlled by Lindberg and is charged with protecting the best interests of Plaintiffs' policyholders.

83. The NHC board is obligated to cause each of the Specified Affiliated Companies to operate in a manner intended to allow each to repay or refinance or support the repayment, redemption, or refinancing of each company's outstanding debt and equity financing obligations, including their obligations to Plaintiffs.

84. The Memorandum of Understanding also contains several representations and warranties from Defendants AAI, Lindberg, PBLA, and NEC.

85. Those representations and warranties include:

    i. Each of the Recitals, Schedules, and Exhibits attached to the Memorandum of Understanding are true and accurate in all respects;

    ii. Schedules 1 through 7 set forth all loan, financing, and investment arrangements of any nature by Plaintiffs with any party;

    iii. Every Lindberg or AAI affiliate is disclosed in Exhibits A, B, or C;

    iv. The execution, performance of obligations, and transactions contemplated in the Memorandum of Understanding have been duly authorized;

    v. The execution of the transactions set forth in the Memorandum of Understanding does not violate any law;

14

vi. The execution of the transactions set forth in the Memorandum of Understanding does not violate any provision of their organizational documents;

vii. The execution of the transactions set forth in the Memorandum of Understanding does not result in a breach of, constitute a default under, or result in the acceleration of any contract to which any of them is a party or is bound or to which any of their assets are subject;

viii. The execution of the transactions set forth in the Memorandum of Understanding does not create in any party the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them is a party or is bound or to which any of their assets are subject; and

ix. The Memorandum of Understanding is a valid, legal, and binding obligation on each of them, enforceable in accordance with its terms.

86. At the conclusion of the Recitals, the Memorandum of Understanding again states that the parties to the agreement intend to be legally bound by it.

87. The Memorandum of Understanding also provides that irreparable damage would occur if any provision is not performed in accordance with its terms, and that the proper remedy for a breach is specific performance, in addition to other remedies.

### Defendants' Failure to Perform Under Memorandum of Understanding

88. As soon as the Memorandum of Understanding was executed, Defendants began taking actions demonstrating that they would broadly construe their benefits and minimize their obligations under the Memorandum of Understanding.

15

89. For instance, Defendants have accepted the loan deferral, which, as noted above, has allowed them to avoid approximately $100 million in payments that otherwise would have been due since June 27, 2019.

90. Lindberg, individually, has received millions of dollars in management fees from the affiliated companies.

91. He also requested, and received, over $5 million in proceeds from the sale of an overseas contract, as agreed to in the Memorandum of Understanding.

92. Additionally, by July 1, 2019, Lindberg was claiming an absolute right to control the entities that were not identified as Specified Affiliated Companies in the Memorandum of Understanding, including to extract distributions and fees from them.

93. Lindberg stated his intention to make these transfers even after internal concerns were raised regarding issues this could cause, including harming the companies' banking relationships and potentially forming the basis for fraudulent conveyance claims.

94. Despite negotiating for, and receiving, numerous assets from which he can pay his personal expenses, Lindberg repeatedly has made demands for additional funds to cover his legal fees, public relations consultants, boats and planes, and other large expenses.

95. In fact, Lindberg demanded, and received, the concession that NHC would cover his independent legal fees for the negotiation of the Memorandum of Understanding and the corporate reorganization.

96. In sum, when Defendants stand to benefit, they are eager to cite to the Memorandum of Understanding as justification.

97. When it has come time for Defendants to perform their obligations, however, they identify no shortage of roadblocks.

16

98.     With respect to the corporate reorganization agreed to in the Memorandum of Understanding, Defendants have identified the following reasons, among others, for not moving forward:

    i.    That the seller notes and earned interest agreements are subject to breach and acceleration upon a reorganization, even though Defendants were the ones who demanded these instruments be included;

    ii.    That the reorganization will result in adverse tax consequences, even though Defendants suggested that NHC be structured as a subsidiary of AAI in order to avoid tax consequences;

    iii.    That the reorganization will trigger certain change in control provisions, even though Defendants warranted in the Memorandum of Understanding that performance would not result in a breach or acceleration of any contract;

    iv.    That the reorganization is prohibited by certain affiliate contracts, even though the Defendants warranted in the Memorandum of Understanding that performance would not conflict with or result in a breach of any contract;

    v.    That various consents are necessary for performance, even though Defendants warranted in the Memorandum of Understanding that no consents were necessary;

    vi.    That Plaintiffs must obtain D&O insurance for the NHC Board, even though the Memorandum of Understanding assigns this responsibility to NHC itself;

    vii.    Once Plaintiffs did in fact obtain a D&O quote, that the D&O quote was not acceptable, despite citing no authority to this effect;

viii.    That the D&O coverage cannot not be bound by anyone besides Lindberg, in his capacity as owner of AAI, who refused and continues to refuse to do so; and

ix.    That the loan amendment process has not been completed, even though the Memorandum of Understanding specifically contemplates the loan amendments as a subsequent step, which requires the existence and organization of NHC to even be possible.

99.    None of the foregoing excuses constitutes a legal defense for failure to perform. No other legal defense to performance exists.

100.    The excuses Defendants have proffered are pretextual. Their pretextual nature is illustrated by the fact that Defendants have offered a number of "solutions" that do not resolve issues like the purported change in control and tax issues—but that do allow Lindberg to remain in effective control of the affiliates.

<u>Breach of Reorganization Provision</u>

101.    The September 30, 2019 deadline for the reorganization of the Specified Affiliated Companies under NHC pursuant to the Memorandum of Understanding has expired.

102.    Defendants have failed to take the necessary steps timely to reorganize the Specified Affiliated Companies as subsidiaries of NHC as required by the Memorandum of Understanding.

103.    Plaintiffs have satisfied all conditions precedent and are ready, willing, and able to perform their obligations under the Memorandum of Understanding.

104.    Absent the reorganization agreed to in the Memorandum of Understanding, Lindberg and AAI remain in control of the Specified Affiliated Companies.

18

105. As shown by their refusal to abide by the terms of the Memorandum of Understanding, Lindberg and AAI currently are unconstrained in how they choose to manage the affiliated companies, including their ability to dissipate assets, further encumber the companies, and operate the companies in a manner not in the best interest of Plaintiffs' policyholders.

106. In rehabilitation, Plaintiffs are prohibited from selling additional policies. Plaintiffs can resolve their long-term liquidity issues and meet their obligations to policyholders only through the affiliated companies' payments on their obligations to Plaintiffs.

107. The failure to effectuate the reorganization component of the Memorandum of Understanding also materially impairs the ability of the parties to implement the financing restructuring component of the agreement.

108. In addition to loans and equity infusions from Plaintiffs, the affiliated entities received financing from third parties and other affiliated entities.

109. At present, the various third-party lenders are dealing with various representatives of the affiliated entities and receiving various proposals. This effort, which Lindberg is spearheading independent from the NHC Board of Directors, is contrary to the intent and purpose of the Memorandum of Understanding.

110. The multiplicity of negotiations has caused, and will continue to cause, the affiliated companies and their assets to be subject to numerous and conflicting obligations to different lenders.

111. Only the organization imposed by the subsidiary structure set forth in the Memorandum of Understanding will allow a constructive dialogue regarding the further restructuring of the applicable debt and equity facilities.

19

112. Without the reorganization to facilitate the debt restructuring, the long-term liquidity issues that led to the imposition of the receivership will not be resolved.

113. The alternative to the reorganization and debt restructuring, which is a liquidation of the Plaintiffs under Chapter 58 of the North Carolina General Statutes, will result in a shortfall of well over $1 billion.

114. For these reasons, the deadline for the reorganization set forth in the Memorandum of Understanding is a material term.

### Proposed Transactions in Contravention of Memorandum of Understanding

115. Plaintiffs are aware of multiple transactions that Lindberg and certain associates have attempted to complete that undermine the Memorandum of Understanding and threatens a successful loan restructuring.

#### *Proposed ULICO Transaction*

116. PBLA is another insurance company owned, directly or indirectly, by Lindberg. It is domiciled in Bermuda and is not subject to this Court's rehabilitation order.

117. Universal Life Insurance Company ("ULICO") is a life and accident and health insurance company domiciled in Puerto Rico.

118. PBLA serves as a reinsurer for ULICO.

119. Because of PBLA's own financial difficulties and other issues, ULICO recently experienced a financial strength rating downgrade from A.M. Best and faces possible further downgrade.

120. Should ULICO experience further financial strength rating downgrades, it likely would be put into rehabilitation in Puerto Rico.

20

121. To help shore up ULICO's financial strength rating, Lindberg proposed creating a recapture trust to hold assets as collateral for the recapture of the reinsurance agreement with PBLA.

122. On August 19, 2019, PBLA entered into a term sheet with ULICO to restructure Lindberg's affiliated companies' debt to ULICO through the creation of the recapture trust. A true and accurate copy of the term sheet is attached hereto as Exhibit B.

123. The term sheet provides, among other things, that the trust assets will consist of $700 million in cash and loans from individual affiliated operating companies.

124. Although the particular operating companies that will serve as lenders in the restructuring are not identified in the term sheet, by necessity they will include Specified Affiliated Companies that are to be transferred to NHC under the Memorandum of Understanding.

125. In fact, the term sheet allows ULICO to choose which affiliated companies it would prefer to include in the restructuring. As a result, the Specified Affiliated Companies not encumbered through this transaction may be lower-performing entities that are less able to service the affiliated companies' debt.

126. Most significantly, PBLA pledged that the operating company debtors on the loans to the reinsurance trust would be entities that generate $95 million in forecast EBITDA for 2020. This amount is over half of the total forecast EBITDA for all of the operating companies.

127. In other words, the term sheet pledges over half of the funds that would be available to pay the affiliated companies' various obligations to a single creditor—ULICO—which holds only approximately 25% of the affiliated companies' debt.

21

128. If consummated, this transaction would vitiate the Memorandum of Understanding. No global loan restructuring could succeed if over half of the earnings that could be used to pay down the various debts is already committed elsewhere.

129. Moreover, the term sheet pledges equity interests in the affiliated companies to ULICO. This further undermines the Memorandum of Understanding by diluting NHC's ownership interests in the Specified Affiliated Companies involved.

130. The transaction may also constitute a fraudulent conveyance under North Carolina and other applicable laws.

131. The transaction contemplated by the term sheet is only possible because, until the corporate reorganization outlined in the Memorandum of Understanding is completed, Lindberg remains in control of the operating companies and is under no obligation to run those companies in the best interests of the insurance companies' policyholders.

### *Proposed Management Buy-Outs*

132. Plaintiffs also are aware of at least two proposed management buy-outs of Specified Affiliated Companies that do not appear to be in the best interests of Plaintiffs' policyholders.

133. Home Medical Equipment Specialists, LLC ("HME") is a durable medical equipment seller based in New Mexico, a Lindberg affiliate, and a Specified Affiliated Company.

134. In 2019, Texas denied HME's petition to renew its participation in that state's Medicaid program based on the pending federal criminal charges against Lindberg.

135. The management team overseeing HME asserted concerns that private payors in New Mexico would likewise remove HME from their networks.

136. On September 17, 2019, management for HME, with Lindberg's knowledge and approval, proposed a management buy-out.

22

137. Under the proposed terms of the buy-out, the Lindberg-affiliated entity would be sold to an affiliate of Chris Herwig.

138. Chris Herwig is the Chief Investment Officer and head of mergers and acquisitions for Eli Global.

139. The proposed sale would involve a purchase price of $130 million.

140. HME previously had been valued at approximately $90 million.

141. Prior to suggesting the management buy-out, HME had attempted, and failed, to find another party willing to make an acceptable offer for the company.

142. The proposed terms of the transaction did not require Chris Herwig to contribute any cash, but did provide him with a management fee.

143. Lindberg would be entitled to a $51 million seller note bearing 10% interest, as well as "observation rights" on the Herwig-affiliated company's board.

144. By contrast, Plaintiffs and other lenders would only receive a 6% return.

145. If this deal were consummated, it would breach Defendants' obligation to transfer HME to the control of NHC under the Memorandum of Understanding.

146. Client Services, Inc. ("CSI") is an accounts-receivable management firm with locations in Missouri, Kansas, and Costa Rica. It is a Lindberg affiliate and a Specified Affiliated Company.

147. A large portion of CSI's revenue derived from collections activities for large financial institutions.

148. Following Lindberg's federal indictment, at least one institution terminated CSI's services and others threatened to do so.

23

149. On September 23, 2019, management for CSI, with Lindberg's knowledge and approval, proposed a management buy-out.

150. Under the proposed terms of the transaction, CSI would be sold for $36 million.

151. The buyer, an Eli Global employee, would be entitled to a management fee of $400,000 per year.

152. Lindberg would be entitled to a $10 million seller note bearing 12% interest.

153. By contrast, the insurance lenders would receive only 5% return on their existing debt investment in the company.

154. The board governing the new entity would be comprised of the Eli Global employee, a Lindberg appointee, and Lindberg's personal attorney, along with two appointees from the insurance company creditors. In other words, Lindberg would retain effective control of the new entity.

155. If this deal were consummated, it would breach Defendants' obligation to transfer CSI to the control of NHC under the Memorandum of Understanding.

156. Both proposed management buy-outs would erode the ability of the Specified Affiliated Companies to service the debt obligations to be restructured under the Memorandum of Understanding by removing two revenue-producing entities from the repayment base.

157. The transactions also involve the sale of these entities before any reliable valuation has been conducted. It is unclear whether the sales fairly capture the companies' value.

158. It is clear, however, that the present value of these companies—known to be affiliated with Lindberg and months away from his trial—are devalued by their association with Lindberg.

24

159. The process contemplated by the Memorandum of Understanding, which removes Lindberg from control immediately, also provides a longer timeframe to increase the value of the Specified Affiliated Companies if they are to be eventually sold.

160. Instead, Lindberg and his affiliates have proposed transactions that do not truly remove Lindberg from control, that sell the companies at a time when their value is necessarily depressed, and that individually profit Lindberg and his business colleagues.

### Lindberg's Efforts to Use Plaintiffs' Collateral for Improper Expenses

161. Plaintiffs also have reason to believe that the operating companies are being mismanaged and that at least some of their operating revenue is being diverted for Lindberg's personal use.

162. Academy Financial Assets, LLC ("AFA") is an affiliated company identified as a Specified Affiliated Company in the Memorandum of Understanding.

163. In May 2019, CBL agreed to extend a line of credit of $15 million ("revolver") to AFA, under the pretenses that, although certain operating companies were generating enough operating revenue to cover normal expenses, there were short-term liquidity needs necessitating an infusion of funds.

164. In other words, even though operating company revenues are supposed to be paying down the operating companies' debts to Plaintiffs, Plaintiff CBL was forced to extend additional credit to AFA to avoid other collateral consequences.

165. On June 27, 2019, as described above, in reliance on the agreement memorialized in the Memorandum of Understanding, the revolver was increased to $40 million and reduced to writing.

25

166. Contrary to AFA's forecasts, all but approximately $95,000 of the full $40 million of the revolver was exhausted by September 10, 2019.

167. The speedy exhaustion of the revolver is all the more concerning given that Plaintiffs' deferral of loan payments under the Memorandum of Understanding should have provided the affiliates with approximately $100 million of working capital over the past four months that otherwise would have been used to satisfy their debt obligations to Plaintiffs.

168. Despite the exhaustion of the revolver, and despite the fact that the operating companies are not presently self-sufficient, Lindberg has made and continues to make demands for additional payments not permitted under the revolver and for payments that would benefit himself at the expense of the operating companies.

169. For instance, Lindberg has demanded payment of millions of dollars in management fees for various operating entities.

170. Lindberg has also made demands that AFA use affiliated company funds for improper payment of personal expenses, which would require use of the revolver proceeds.

171. Repeatedly, Lindberg demanded that funds be released from affiliated companies for payment of his airplane leases. He has also demanded funds for his personal public relations consultant.

172. Payment of personal expenses are not permitted under the terms of the revolver. The revolver's permitted use is only for working capital needs and general corporate purposes.

173. Additionally, the use of the revolver funds for personal expenses or large management fees removes cash that could otherwise be used to improve management and operations toward the end of moving the operating companies to self-sufficiency.

26

174. Without the operating companies being able to finance their own operations, it will not be possible for them to pay down their debts to Plaintiffs and others.

175. Until the corporate reorganization under the Memorandum of Understanding is completed, Lindberg is not forced to prioritize the interests of policyholders over competing interests, including his own personal interests.

### Additional Irreparable Harm

176. Absent immediate enforcement of the Memorandum of Understanding, Lindberg and others working in concert with him are able to engage in transactions like those described above, which would materially impair the ability of the operating companies to service the debt held by Plaintiffs and other creditors.

177. Because Lindberg has substantial overseas business interests, these transactions may result in the diversion of assets outside of the jurisdiction of United States courts.

178. Additionally, because of the immediacy of Plaintiffs' obligations to policyholders and the operating companies' obligations to debtholders, no legal action would be sufficient to remedy the harm from such transactions, particularly when a lawsuit may involve the need to repatriate assets from overseas.

179. Should the operating companies default on their obligations to lenders, Plaintiffs will have to foreclose on the loans.

180. Owing to the complex and circuitous nature of the loan transactions at issue,[4] despite months of work, Plaintiffs still have not been able to determine the value of the collateral on these loans.

---

[4] Loans to operating companies run through multiple intermediary borrowers pursuant to a number of different forms of financing transactions, including direct loans, preferred equity deals, special purpose vehicles, principal protected notes, and financing companies. The transactions involved are so complex that no one, with the possible exception of Lindberg, has been able to untangle fully the underlying economic realities at this point.

27

181. If the loans are collateralized, the collateral would be liquidated during foreclosure at significantly reduced prices.

182. Such a liquidation will lead to substantial losses of account value to policyholders, and a complete loss for other creditors.

183. These circumstances would force Plaintiffs into liquidation.

184. If some or all of the loans are not properly collateralized, claims against state guaranty funds and losses to policyholders could be even greater.

185. Additionally, Lindberg currently is facing federal criminal charges in the United States District Court for the Western District of North Carolina. The trial of that matter is set for February 18, 2020 and is forecast to take two to three weeks.

186. At least for the duration of the trial, Lindberg will be effectively unavailable to effectuate the terms of the Memorandum of Understanding. Should he be convicted and incarcerated following trial, his ability to perform under the agreement will be further impaired.

187. Finally, the Special Deputy Rehabilitators understand that the United States Department of Justice and Federal Bureau of Investigation are conducting a separate criminal investigation into potential financial fraud within the Lindberg-related entities.

188. Special Deputy Rehabilitator Mike Dinius received a subpoena from a grand jury empaneled in the United States District Court for the Western District of North Carolina regarding the investigation into potential financial fraud. Plaintiffs are cooperating in this investigation.

189. Plaintiffs believe that effectuating the Memorandum of Understanding, and preserving the status quo in the meantime, will best serve the interests of justice during this period of investigation, and best protect any potential victims, including Plaintiffs and their policyholders, should proof of wrongdoing be uncovered through this process.

28

## FIRST CLAIM FOR RELIEF
### (Breach of Contract – All Defendants)

190. The allegations contained in paragraphs 1 to 189 above are realleged and incorporated herein by reference.

191. The Memorandum of Understanding is a contract duly formed and entered into by the Parties.

192. Pursuant to the express terms of the Memorandum of Understanding, the Parties agreed to restructure the Specified Affiliated Companies to become subsidiaries of the new holding company on or before September 30, 2019.

193. Defendants represented in the Memorandum of Understanding that they control the Specified Affiliated Companies.

194. Defendants do, in fact, control the Specified Affiliated Companies, within the meaning of N.C. Gen. Stat. § 58-19-5.

195. Defendants have failed to restructure the Specified Affiliated Companies to become subsidiaries of the new holding company and the time within which to do so has expired.

196. Defendants' actions constitute a breach of the terms of the Memorandum of Understanding.

197. Plaintiffs have been damaged by Defendants' breach in an amount to be proven at trial in excess of $25,000.

198. The Memorandum of Understanding explicitly calls for specific performance as the remedy for a breach of that agreement.

199. Based on the nature of the Memorandum of Understanding and for the reasons set forth in more detail herein, both preliminary and permanent injunctive relief directing specific performance is the proper remedy for breach of the Memorandum of Understanding.

29

200.   Plaintiffs are entitled to a preliminary and permanent injunction requiring Defendants to comply with the terms of the Memorandum of Understanding, plus any attendant damages.

**SECOND CLAIM FOR RELIEF**
(Fraud – Lindberg, AAI, NEC, and PBLA)

201.   The allegations contained in paragraphs 1 to 200 above are realleged and incorporated herein by reference.

202.   In the Memorandum of Understanding, Defendants Lindberg, AAI, NEC, and PBLA (collectively, "Fraud Defendants") represented and warrantied that the execution and performance of the Memorandum of Understanding were duly authorized by all requisite action on their parts.

203.   In the Memorandum of Understanding, Fraud Defendants represented and warrantied that the execution and performance of the Memorandum of Understanding would not violate any provision of their organizational documents.

204.   In the Memorandum of Understanding, Fraud Defendants represented and warrantied that the execution and performance of the Memorandum of Understanding would not result in a breach of, constitute a default under, or result in the acceleration of any contract to which any of them is a party or by which they are bound or to which any of their assets are subject.

205.   In the Memorandum of Understanding, Fraud Defendants represented and warrantied that the execution and performance of the Memorandum of Understanding would not require any notice or consent under any contract to which any of them is a party or by which they are bound or to which any of their assets are subject.

206.   As set forth in more detail above, Fraud Defendants made several representations and warranties that they now state were false at the time that they made them.

30

207. These misrepresentations were material to Plaintiffs' decision to enter into the Memorandum of Understanding and ancillary agreements including the loan deferral and $40 million revolving line of credit.

208. Plaintiffs requested and received information from Fraud Defendants during the negotiation process. However, owing to the complexity of the underlying affiliated loan transactions Plaintiffs were forced to rely on Fraud Defendants' representations as well.

209. Moreover, at the time of contracting the affiliated companies had no formal internal audit department and no current audited financials.

210. Due to Defendants' highly irregular financial practices, the bargained-for representations and warranties were essential to Plaintiffs.

211. Fraud Defendants had access to material information and documents that they did not provide to Plaintiffs at the time of contracting.

212. The failure to provide this information and these documents was an omission of material information amounting to a misrepresentation.

213. Fraud Defendants were represented by able counsel and were familiar with all of the underlying transactions and the contracts pertaining to those transactions.

214. Fraud Defendants knew that their representations and warranties were false at the time when they made them, or, alternatively, were reckless as to the truth or falsity of the representations.

215. Fraud Defendants intended to induce Plaintiffs to rely on their false representations and enter into the Memorandum of Understanding.

216. Plaintiffs reasonably relied on Fraud Defendants' representations and warranties regarding the underlying contracts.

31

217. Plaintiffs have taken actions in reliance on Fraud Defendants' representations and warranties, including entering into the Memorandum of Understanding, performing on Plaintiffs' agreement to defer loan payments from Defendants, and numerous other acts as set forth in more detail above.

218. Plaintiffs have been injured by Fraud Defendants' fraudulent inducement in an amount in excess of $25,000 to be proven at trial, including but not limited to their costs and fees for obtaining necessary consents, authorizations, and amendments that Fraud Defendants represented were not necessary, the diminution in value for any of the underlying Specified Affiliated Companies as a result of these encumbrances, and the value of any Specified Affiliated Company which cannot be transferred to NHC as a result of the encumbrances.

219. In addition, Fraud Defendants have taken numerous actions since the execution of the Memorandum of Understanding in derogation of that agreement, as set forth in more detail above.

220. Fraud Defendants have presented no evidence of concrete steps they have taken to attempt to perform, even partially, under the Memorandum of Understanding.

221. Fraud Defendants have not provided Plaintiffs with any draft loan documents, pro formas, or loan covenants.

222. Not a single Specified Affiliated Company has been transferred to NHC's control.

223. Upon information and belief based on the facts as set forth above, Fraud Defendants had no intention of performing under the Memorandum of Understanding at the time that they entered into the agreement.

224. Plaintiffs have been injured by Fraud Defendants' promissory fraud in an amount in excess of $25,000 to be proven at trial, including but not limited to damages arising from actions

32

taken in reliance on the Memorandum of Understanding and their costs and fees incurred attempting to effectuate the agreement.

### THIRD CLAIM FOR RELIEF
**(In the Alternative, Negligent Misrepresentation – Lindberg, AAI, NEC, and PBLA)**

225. The allegations contained in paragraphs 1 to 224 above are realleged and incorporated herein by reference.

226. In the Memorandum of Understanding, Fraud Defendants made the representations and warranties set forth above.

227. As detailed above, Fraud Defendants now take the position that these representations and warranties are not accurate.

228. If Fraud Defendants did not knowingly or recklessly make these false representations, they, at a minimum, prepared these representations and warranties and provided them to Plaintiffs without reasonable care.

229. Fraud Defendants owed Plaintiffs a duty of reasonable care with regard to providing Plaintiffs accurate information about their own businesses during the negotiation of the Memorandum of Understanding.

230. Plaintiffs justifiably relied on these representations.

231. Plaintiffs' justifiable reliance on these representations was to their detriment.

232. Plaintiffs have been injured by Fraud Defendants' negligent misrepresentation in an amount in excess of $25,000 to be proven at trial, including but not limited to their costs and fees for obtaining necessary consents, authorizations, and amendments that Fraud Defendants represented were not necessary, the diminution in value for any of the underlying Specified Affiliated Companies as a result of these encumbrances, and the value of any Specified Affiliated Company which cannot be transferred to NHC as a result of the encumbrances.

33

233. The allegations of paragraphs 1 through 232 are re-alleged and incorporated herein by reference.

234. As set forth above, Defendants have materially breached the Memorandum of Understanding.

235. On October 1, 2019, this Court entered a Temporary Restraining Order

236. Pursuant to section 1A-1 of the North Carolina General Statutes and Rule 65 of the North Carolina Rules of Civil Procedure, Plaintiffs hereby move for a preliminary injunction and permanent injunction directing Defendants to specifically perform according to the terms of the Memorandum of Understanding.

237. By virtue of the foregoing, Plaintiffs have demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendants.

238. Unless Defendants are preliminarily enjoined from the foregoing conduct, Plaintiffs will be immediately and irreparably harmed.

239. The Memorandum of Understanding provides that the Parties agree that irreparable damage would occur if any provision of the agreement was not performed, and that upon a breach the Parties shall be entitled to specific performance in addition to any other remedies at law or in equity.

240. Plaintiffs have no adequate remedy at law.

241. A preliminary injunction is reasonably necessary to protect the rights and interests of Plaintiffs and Plaintiffs' policyholders.

34

242.     The terms of the Temporary Restraining Order are set forth in detail in this Court's October 1, 2019 Order, as modified and extended by the Court's October 7, 2019 Order, and are incorporated by reference herein.

243.     As soon as practicable, Plaintiffs are entitled to a Preliminary Injunction directing Defendants, or any third-party acting in concert with them, to:

   i.     Continue complying with the terms set forth in the October 1, 2019 Temporary Restraining Order, as modified and extended by the Court's October 7, 2019 Order;

   ii.     Grant Plaintiffs, through the Special Deputy Rehabilitators, access to the books and records of the Defendants and affiliated companies, upon request and under reasonable terms, to ensure compliance with the Memorandum of Understanding this Court's Orders, and the rehabilitator's duties under Chapter 58 of the North Carolina General Statutes; and

   iii.     Such other terms and conditions as the Court determines to be appropriate in order to maintain the status quo, preserve the long-term equity value of the affiliated entities, and protect Plaintiffs' policyholders.

244.     Plaintiffs also request the preliminary relief of the appointment of a Receiver for the Specified Affiliated Companies, pursuant to N.C. Gen. Stat. §§ 1-501, 1-502, 1-507.1, and this Court's inherent authority.  Plaintiffs request that the receiver have all the powers and authority held by receivers appointed by North Carolina courts, as well as such powers as may be specifically enumerated by this Court.  Plaintiffs further request that the receiver be directed to manage the Specified Affiliated Companies in accordance with the best interests of Plaintiffs' policyholders.

35

**WHEREFORE**, Plaintiffs respectfully pray the Court:

(a)     Accept this Verified Amended Complaint as an affidavit;

(b)     Enter a preliminary injunction Order granting the relief set forth in Paragraphs 243 and 244, including the appointment of a receiver for the Specified Affiliated Companies during the pendency of this litigation;

(d)     Enter a money judgment in favor of Plaintiffs and against Defendants for all damages occasioned by its breach of the Memorandum of Understanding;

(e)     Enter a money judgment in favor of Plaintiffs and against Defendants for all damages occasioned by its fraud or, in the alternative, negligent misrepresentations;

(f)     Award punitive damages in favor of Plaintiffs and against Fraud Defendants;

(g)     Enter a permanent injunction directing Defendants and anyone acting in concert with them to specifically perform the terms of the Memorandum of Understanding, including: (i) the global restructuring of the Specified Affiliated Companies through the formation of a new holding company as called for in the Global Restructuring provision of the Memorandum of Understanding; and (ii) the global restructuring and modification of all loans, including the assignment of the loans to the new holding company as called for in the Global Loan Amendments provision of the Memorandum of Understanding, all of which should be done in the manner and according to the terms and conditions more particularly set forth in the Memorandum of Understanding;

(h)     Enter a judgment in favor of Plaintiffs and against Defendants for Plaintiffs' costs and fees associated with pursuing this action, including attorneys' fees, as allowed by law; and

(i)     Enter such other judgments and orders as are necessary and appropriate to provide Plaintiffs complete relief in accordance with their claims.

36

This the 28th day of October, 2019.

WILLIAMS MULLEN

By: _____
Wes J. Camden
N.C. State Bar I.D. No.: 33190
Caitlin M. Poe
N.C. State Bar I.D. No.: 44713
Post Office Box 1000
Raleigh, NC 27602-1000
Telephone: 919.981.4085
Facsimile: 919.981.4300
cpoe@williamsmullen.com
wcamden@williamsmullen.com

37

# EXHIBIT C

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 13093

SOUTHLAND NATIONAL INSURANCE
CORPORATION in Rehabilitation,
BANKERS LIFE INSURANCE
COMPANY in Rehabilitation,
COLORADO BANKERS LIFE
INSURANCE COMPANY in
Rehabilitation, and SOUTHLAND
NATIONAL REINSURANCE
CORPORATION in Rehabilitation,

Plaintiffs,

v.

GREG E. LINDBERG, ACADEMY
ASSOCIATION, INC., EDWARDS MILL
ASSET MANAGEMENT, LLC, NEW
ENGLAND CAPITAL, LLC, and
PRIVATE BANKERS LIFE AND
ANNUITY CO., LTD.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Pre-Trial Order**



---

PRE-TRIAL ORDER

---

Pursuant to the provisions of Rule 16 of the Rules of Civil Procedure and Rule 7 of the

General Rules of Practice, a Final Pre-Trial Conference was held in the above-entitled case on the

June 4, 2021 and again on June 10, 2021. Wes Camden, John Holton, and Caitlin Poe appeared

as counsel for Plaintiffs. Aaron Tobin and Jared Pace appeared as counsel for Defendants Greg

Lindberg, Academy Association, Inc., and New England Capital, LLC ("Defendants").

1. It is stipulated that all parties are properly before the Court, and that the Court has

jurisdiction of the parties and of the subject matter.

2. It is stipulated that all parties have been correctly designated, and there is no question as to misjoinder of parties.

3. Plaintiffs' claims against Defendant Private Bankers Life and Annuity Co., Ltd. were severed and stayed by Court Order on December 17, 2020 in Cause No. 20-12791-scc; *In re: PB Life and Annuity Co., Ltd. et al.*, in the United States Bankruptcy Court for the Southern District of New York.

4. On May 4, 2021 the Court entered a Consent Judgment resolving Plaintiffs' claims against Defendant Edwards Mill Asset Management, LLC ("EMAM").

5. In addition to the other stipulations contained herein, the parties hereto stipulate and agree with respect to the following undisputed facts: *See* Schedule A which is attached hereto and incorporated herein by reference.

6. The following is a list of all known exhibits the Plaintiffs may offer at trial: *See* Schedule "B" which is attached hereto and incorporated herein by reference.

7. It is stipulated and agreed that counsel for the Defendants have been furnished with or seen a copy of each exhibit identified by the Plaintiffs.

8. It is stipulated and agreed that each of the exhibits identified by the Plaintiffs are genuine, and if relevant and material and otherwise admissible, may be received into evidence without further identification or proof, except:

> a. Plaintiffs' Exhibit 116, Expert Report of William Epstein dated December 1, 2020.

9. The following is a list of known exhibits the Defendants may offer at trial: *See* Schedule C which is attached hereto and incorporated herein by reference.

2

10. It is stipulated and agreed that counsel for the Plaintiffs has been furnished with or seen a copy of each exhibit identified by the Defendants.

11. It is stipulated and agreed that each of the exhibits identified by the Defendants are genuine, and if relevant and material, and otherwise admissible, may be received into evidence without further identification or proof, except:

    a. Defendants' Exhibit 351, Non-Bates-stamped Commitment Transaction Advice tickets.

12. The following is a list of the names of all known witnesses the Plaintiffs may offer at the trial: *See* Schedule D which is attached hereto and incorporated herein by reference.

13. The following is a list of the names of all known witnesses the Defendants may offer at the trial: *See* Schedule E which is attached hereto and incorporated herein by reference.

14. The parties' deposition designations and counter-designations are attached as Schedule H and incorporated for all purposes.

15. Neither party desires further amendments to the pleadings at this time.

16. The Plaintiffs contend the contested issue(s) to be tried by the Court are set out in Schedule F which is attached hereto and incorporated herein by reference.

17. The Defendants contend the contested issues to be tried by the Court are set out in Schedule G which is attached hereto and incorporated herein by reference.

18. The probable length of the trial is estimated to be 8 days of testimonial time.

19. Counsel for the parties represent to the Court that in advance of the preparation of this Order, there has been discussion of settlement possibilities. Counsel for the Plaintiffs will immediately notify the Clerk in the event of a material change in settlement prospects.

3

This the 18th day of June, 2021.

CONSENTED TO:

Caitlin M. Poe
N.C. Bar. No.: 44713
cpoe@williamsmullen.com
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
*Attorney for Plaintiffs*

Matthew Nis Leerberg
Fox Rothschild LLP
434 Fayetteville Street
Suite 2800
Raleigh, NC 27601-2943
*Attorney for Defendants*

Aaron Z. Tobin
Condon Tobin Sladek Thornton Nerenberg, PLLC
8080 Park Lane, Suite 700
Dallas, TX 75231
atobin@condontobin.com
*Attorney for Defendants*

APPROVED AND ORDERED FILED

This the 21 day of June , 2021.

The Honorable Graham Shirley

4

I" = "I" "27437386v.3" "" 27437386v.3

## SCHEDULE A

## STIPULATED FACTS

1. Plaintiffs are North Carolina domesticated insurance companies ultimately owned by Defendant Greg Lindberg and regulated by the North Carolina Department of Insurance ("NCDOI").

2. Defendant Greg Lindberg, directly or indirectly, owns 100% of the shares of stock of all classes of the Plaintiffs.

3. Defendant Greg Lindberg is the sole and exclusive owner of 100% of the shares of stock of all classes of Defendant Academy Association, Inc. ("AAI"), now known as Global Growth Holdings, Inc.

4. As of June 27, 2019, Defendants Greg Lindberg and/or AAI owned – directly, indirectly, or beneficially – a number of entities that operated under the trade name of "Eli Global," and later "Global Growth."

5. These entities are referred to as "affiliated entities."

6. Some affiliated entities have combined debt totals of approximately $1.25 billion to Plaintiffs pursuant to the terms of various direct and indirect loans and financing arrangements.

7. The NCDOI approved and agreed that Plaintiffs could invest up to 40% of their total admitted assets in affiliated entities.

8. In November 2016, the NCDOI engaged Noble Consulting Services, Inc. ("Noble") to, *inter alia*, review Plaintiffs' investments in affiliated entities.

9. Mike Dinius owns and is the Chief Executive Officer of Noble.

5

10. In 2018, following Noble's review of Plaintiffs' investments in affiliated entities, the NCDOI required Plaintiffs' affiliated investments to be reduced to no more than 10% of all investments by the end of 2018.

11. On October 18, 2018, the North Carolina Commissioner of Insurance ("Commissioner") entered a Consent Order for Administrative Supervision, under which Plaintiffs consented to confidential administrative supervision.

12. On February 5, 2019, the Commissioner entered an Amended Consent Order for Administrative Supervision extending the term of the administrative supervision by an additional 120 days, or until June 15, 2019.

13. On April 3, 2019, the Commissioner entered a Second Amended Consent Order for Administrative Supervision.

14. During the administrative supervision, Lindberg and his team at Global Growth, made efforts to sell certain insurance companies, refinance loans from the Plaintiffs, and sell certain affiliated entities.

15. At that time, Mike Dinius and Noble Consulting believed selling affiliated entities or refinancing their loans would not achieve the highest return on Plaintiffs' investments.

16. Noble ultimately decided that Plaintiffs' best opportunity to achieve their highest return meant not immediately selling certain affiliated entities.

17. On June 27, 2019, the Superior Court of Wake County, North Carolina ordered Plaintiffs into rehabilitation pursuant to an Order of Rehabilitation, an Order Appointing Receiver, and Injunctive Relief.

18. Dinius and John Murphy of Noble were appointed as Special Deputy Rehabilitators of the Plaintiffs.

6

19. From June 27, 2019, to the present, the Special Deputy Rehabilitators have controlled the Plaintiffs, including their operations, management, and finances.

20. Plaintiffs Southland National Insurance Corporation, Colorado Bankers Life Insurance Company, and Bankers Life Insurance Company were engaged in the business of selling annuities, life, accident and critical condition insurance policies to consumers in North Carolina and elsewhere.

21. Plaintiffs generally satisfy obligations to policyholders through cash payments.

22. Part of Plaintiffs' revenue came from the sale of annuities and insurance policies and the collection of premiums.

23. Plaintiffs invested some of their revenue for the purpose of realizing a return on the investment.

24. Some of Plaintiffs' revenue was invested, directly and indirectly, in affiliated entity operating companies within the Global Growth portfolio.

25. In around August 2019, M3 Partners, an unaffiliated consulting firm, projected that some of the affiliated entities within the Global Growth portfolio would generate more than $1 billion in revenue in 2020.

26. M3 Partners projected those certain affiliated entities within the Global Growth portfolio would generate EBITDA between $129-154 million in 2020.

27. On May 9, 2019, Special Deputy Rehabilitator Mike Dinius sent a "Rehab Proposal" ("Proposal") to Christa Miller and Chris Herwig, Global Growth's CFO and CIO, respectively.

28. On May 16, 2019, Mike Dinius met with Greg Lindberg and others to discuss the Proposal.

7

29. Greg Lindberg in conjunction with his team prepared the first draft of the Memorandum of Understanding ("MOU") that was sent to Mike Dinius on June 3, 2019.

30. Between June 3 and June 27, 2019, the parties directly or through counsel exchanged drafts of the MOU, the Interim Amendment to Loan Agreements ("ILA"), Revolving Credit Agreement ("Revolver"), and the Consent Rehabilitation Order. During this time Plaintiffs also requested and received all information and disclosures from Global Growth that Plaintiffs requested.

31. On June 25 and 26, 2019, Dinius, Lindberg, and others met in person accompanied by counsel regarding the MOU and other items.

32. On June 27, 2019, the parties signed the MOU, ILA, Revolver, and Consent Rehabilitation Order. Each document was in fact signed by the person whose name appears on the signature line.

33. Defendant Lindberg executed the MOU on behalf of himself, NEC, and AAI.

34. William Wofford executed the MOU on behalf of EMAM.

35. Lou Hensley executed the MOU on behalf of Plaintiffs.

36. Dinius signed a letter authorizing Plaintiffs to enter into the MOU.

37. The parties agree the ILA was executed and is a valid and enforceable agreement.

38. Defendant Lindberg or AAI remain the ultimate owners, directly, indirectly, or beneficially of the affiliated entities.

8

## SCHEDULE B

### PLAINTIFFS' EXHIBITS

| No. | Date | Description | Bates No. |
|---|---|---|---|
| PX 1 | 06/27/2019 | Memorandum of Understanding ("MOU")<br><br>[Note: Judge Shirley Redacted Public Version pursuant to Order dated 1/10/2020 is not bates labeled] | WM 000717 |
| PX 2 | 06/27/2019 | Interim Amendment to Loan Agreements ("ILA")<br><br>[Note: Judge Shirley Redacted Public Version pursuant to Order dated 1/10/2020 is not bates labeled] | WM 000778 |
| PX 3 | 06/27/2019 | Revolving Credit Agreement ("Revolver") | WM 000850 |
| PX 4 | 06/27/2019 | Verified Petition for Rehabilitation | WM 100075 |
| PX 5 | 2014 | Diagram – Direct Loans to Affiliates (2014-2015) | WM 233355 |
| PX 6 | 2016 | Diagram – SPV Structure (2016) | WM 233363 |
| PX 7 | 04/05/2016 | Letter from NC DOI (Jessica Price) to Greg Lindberg (SNIC) re "Review Letter 1 – December 31, 2015, Annual Statement Financial Review" (50% of Affiliated Loans) | WM 233356 |
| PX 8 | 2017 | Diagram – FinCos Structure (Fall 2017) | WM 233364 |
| PX 9 | 10/01/2017 | Services Agreement | AAI 0000763 |
| PX 10 | 11/03/2017 | Investment Advisory Services Agreement | WM 157296 |
| PX 11 | 2018 | Diagram – PPN Structure (Spring 2018) | WM 233371 |
| PX 12 | 05/02/2018 | Remediation Plan - Letter from Greg Lindberg (Global Bankers) to Commissioner Causey (NC DOI) re "Remediation Plan – Global Bankers Insurance Group, LLC" | WM 159032 |

| PX 13 | 05/28/2018 | Email from Herwig to Lindberg re Revised Summary Master Liquidity File Here [Attachment: 5-28-19 Liquidity Model] | AAI 13176 AAI 13180 |
|---|---|---|---|
| PX 14 | 10/18/2018 | NC DOI Consent Order for Administrative Supervision | WM 215689 |
| PX 15 | 10/26/2018 | Global Bankers Corrective Action Plan for NC DOI (PowerPoint) | WM 233385 |
| PX 16 | 11/30/2018 | Global Bankers Insurance Group Remediation Plan to Address Conclusions Included in Rector & Associates' Report dated November 30, 2018 (updated January 13, 2017) (PowerPoint) | WM 233473 |
| PX 17 | 12/2018 | Actuary Report - Global Bankers 9/30 Preliminary CFT Update December 2018 (PowerPoint) | WM 233404 |
| PX 18 | 02/05/2019 | NC DOI Amended Consent Order for Administrative Supervision | WM 087311 |
| PX 19 | 04/03/2019 | NC DOI Second Amended Consent Order for Administrative Supervision | WM 233412 |
| PX 20 | 04/30/2019 | Dinius Analysis of Sales Plan | WM 233425 |
| PX 21 | 04/30/2019 | January Sales Plan | WM 233409 |
| PX 22 | 05/02/2019 | Email from M. Dinius to Brian Stewart, L. Hensley & C. Herwig re Updated Sales Forecast | WM 220368 |
| PX 23 | 5/02/2019 | Email from M. Dinius to B. Stewart re Updated Sales Forecast [Attachment: Summary of Sales Forecast v2.xlsx] | WM228535 WM228536 |
| PX 24 | 5/03/2019 | Email from B. Stewart to M. Dinius re Finco Trades for Monday P&I [Attachment: 5.6.19 Finco Interest Trades.xlsx | WM231910 WM214091 |
| PX 25 | 5/03/2019 | Email from L. Hensley to B. Stewart re Loans | WM228675 |
| PX 26 | 05/09/2019 | Email from Dinius to Miller & Herwig re Proposal – [Attachment: Rehab Proposal] | AAI 23370 |

10

| | | | |
|---|---|---|---|
| PX 27 | 5/9/2019 | Email from L. Hensley to M. Dinius et al. re Proposal [Attachment: Rehab Proposal_BS_LEH.docx] | WM228837 |
| PX 28 | 5/10/2019 | Letters from T. Edwards to G. Lindberg re Notification of Default | WM220553<br>WM220595<br>WM220633<br>WM220676<br>WM220716<br>WM220755 |
| PX 29 | 05/13/2019 | Email from Lindberg to Miller re Thoughts on Cash Flow Improvement for NHC | AAI 13124 |
| PX 30 | 5/13/2019 | Email from C. Herwig to C. Miller re P&I deferral | WM231953 |
| PX 31 | 05/14/2019 | Email from Herwig to Miller re Rehab Proposal CEH Edits [Attachment: Rehab Proposal CEH Edits 5-14-19] | AAI 13126<br>AAI 13127 |
| PX 32 | 05/15/2019 | Email from Herwig Email to McGuffin & Johnson re Debt Restructuring Option – [Attachment: NCDOI COS List; Eli Cash Flow Forecast-2019] | AAI 13129<br>AAI 13130<br>AAI 13131 |
| PX 33 | 05/15/2019 | Email from Miller to Lindberg re Noble Meeting – [Attachment: Noble Meeting May 16] | AAI 13132<br>AAI 13133 |
| PX 34 | 05/16/2019 | Email from Miller to Hensley re Meeting – [Attachment: Noble Meeting May 16 GEL Version] | AAI 13138<br>AAI 13139 |
| PX 35 | 05/16/2019 | Email from Miller to Hensley re Revised Draft Plan for Noble here – [Attachment: Noble Meeting May 16.v4] | AAI 13146<br>AAI 13147 |
| PX 36 | 05/16/2019 | Noble/Eli/GBIG Meeting Presentation | AAI 13139 |
| PX 37 | 05/17/2019 | Email from Dinius to Miller re Rehab Options – [Attachment: Rehab Options] | AAI 23378<br>AAI23379 |
| PX 38 | 05/17/2019 | Email from Khattar to Miller re Debt Restructuring – [Attachment: Entities Which are Not in Cashflow Model] | AAI 13155<br>AAI 13157 |

11

| PX 39 | 5/18/2019 | Email from C. Miller to M. Dinius re Introduction | AAI 0046340 |
|---|---|---|---|
| PX 40 | 05/20/2019 | Email from Herwig to Stewart re Where do we Stand on Brian's File? | AAI 13158 |
| PX 41 | 05/22/2019 | Email from Lindberg to Farrell & Dinius re Discussion Points [Attachments: 5-22-19 Discussion Points to Noble-BMA; 5-22-19 Summary Cash Flows & Paydown Plan to Noble-BMA] | AAI 23383 |
| PX 42 | 5/30/2019 | Email from B. Stewart to L. Hensley re Payroll | WM229674 |
| PX 43 | 06/03/2019 | Email from Greg Lindberg to Mike Dinius and Brian Stewart re "Hi Mike, we are making solid progress on the MOU…" with form MOU attached | WM 233427 |
| PX 44 | 6/04/2019 | Calendar Invite from M. Meghji to C. Miller et al. re MOU meeting for New HoldCo at Cadwalder in NYC | WM221022 |
| PX 45 | 6/04/2019 | Email from L. Hensley to T. Edwards re MOU draft | WM221019 |
| PX 46 | 06/05/2019 | Murphy – Email chain re: Noble Letter | AAI 23438 |
| PX 47 | 06/06/2019 | Email from Christa Miller to Mike Dinius re "Cash Needs" | WM 233462 |
| PX 48 | 6/06/2019 | Email from T. Edwards to L. Hensley re Revised docs here from today's meeting… [Attachments: AAI-MOU Mark-up from 6-5-19 Meeting.SEND TO NOBLE.DRAFT; AAI-MOU (6-5-19).CLEAN.SEND TO NOBLE.docx; 6.5.19 Omnibus Loan Amendment.SEND TO NOBLE.FIN.docx] | WM229946 |
| PX 49 | 06/07/2019 | Email from Christa Miller to Mike Dinius and Brian Stewart re "Cash needs" | WM 233463 |
| PX 50 | 06/07/2019 | Email from Dobson to Miller re Loan Restructuring Kick Off | AAI 13216 |

12

| PX 51 | 6/09/2019 | Email from M. Dinius to L. Hensley re MOU and Loan Amendment | WM230150 |
|---|---|---|---|
| PX 52 | 6/09/2019 | Email from L. Hensley to T. Edwards re MOU and Loan Amendment | WM230148 |
| PX 53 | 6/10/2019 | Email from G. Lindberg to M. Dinius re MOU and Loan Amendment | AAI 0046341 |
| PX 54 | 6/14/2019 | Email from J. Hoomani to T. Edwards re DRAFT Documents [Attachments: Petition for Rehabilitation (Consent) DRAFT – 6.14.19; Motion for Moratorium DRAFT-6.14.19] | WM232049 |
| PX 55 | 06/16/2019 | Email from Lindberg to Herwig re Team, Mo suggested a call on seller notes sometime this week | AAI 26501 |
| PX 56 | 06/19/2019 | Email from Greg Lindberg to Mike Dinius and John Murphy re "Rehab petition" | WM 233492 |
| PX 57 | 06/20/2019 | Email from Mike Dinius to Greg Lindberg, et al re MOU [Attachment: Memorandum of Understanding (Clean Version 6-20-19)] | AAI 26553 AAI 26554 |
| PX 58 | | OMITTED | |
| PX 59 | 6/21/2019 | Email from L. Hensley to T. Edwards re Entity legal names | WM221376 |
| PX 60 | 06/23/2019 | Email from Miller to Meghji re Revised List of NHC Exclusions Here – [Attachment: 6-22-19 Non-NHC Group] | AAI 13378 |
| PX 61 | 06/24/2019 | Email from Solow to Herwig re Does the Attached Sheet on the "Data" Tab Answer this Item in the MOU – This is from Master Debt Summary Circulated | AAI 13391 |
| PX 62 | 06/24/2019 | Email from Dinius to Lindberg, et al re MOU | AAI 26657 |
| PX 63 | 06/25/2019 | 6/25/19 Draft MOU | AAI 16505 |
| PX 64 | 06/26/2019 | Letter from Noble Consulting to Plaintiffs and Lindberg RE: MOU | WM 221758 |

13

| PX 65 | 6/26/2019 | Email from L. Hensley to M. Dinius re Board meeting and MOU | WM221528 |
|---|---|---|---|
| PX 66 | 6/26/2019 | Email from L. Hensley to M. Dinius re Revolver Draw | WM221568 |
| PX 67 | 6/26/2019 | Email from L. Hensley to M. Dinius re MOU and Pavonia/GBIG LLC | WM221707 |
| PX 68 | 06/27/2019 | Email from Dinius to Lindberg re Revolver Draws as We Discussed | AAI 17509 |
| PX 69 | 6/28/2019 | Email from G. Lindberg to S. White re Hi Sandi, per the MOU, these companies have no restrictions on dividends, mgt fees, or shareholder loans [Attachments: AAI-MOU, Interim Loan Amendment, Revolving Credit Agreement, and Side Letter (Executed)] | AAI 0046391 |
| PX 70 | 07/02/2019 | Miller Calendar Invite re MOU/July 4th Celebration | AAI 13440 |
| PX 71 | 7/18/2019 | Email from C. Miller to M. Dinius re Can you send to AD LLC tomorrow the CAD $400k mgt fee that CBV paid AAI today? | AAI 0046547 |
| PX 72 | 07/23/2019 | Email from Miller to Dinius re Current cash flow | WM 001669 |
| PX 73 | 07/30/2019 | Email from Lindberg to Dinius, et al re Hi Mike, I saw Paulson's comments on timing for NHC moves [Attachment: 7.30.19 NHC Closing Timeline] | AAI 27918 |
| PX 74 | 07/31/2019 | Email from Miller to Dinius re Management Fees | WM 000714 |
| PX 75 | 08/2019 | New HoldCo Liquidity Overview, August [2019] | WM 002510 |
| PX 76 | 8/03/2019 | Email from G. Vandeman to G. Lindberg re Two Versions of a MOU Amendment [Attachments: Version 1 and Version 2] | AAI 0046552 |
| PX 77 | 8/04/2019 | Email from G. Lindberg to G. Vandeman re An Urgent Question | AAI 0046556 |

14

| PX 78 | 8/04/2019 | Email from G. Vandeman to G. Lindberg re Conversation with Mike [Attachment: Version 3] | AAI 0046566 |
|---|---|---|---|
| PX 79 | 08/04/2019 | Email from Lindberg to Vandeman re addendum | AAI 46569 |
| PX 80 | 8/15/2019 | Email from C. Miller to M. Meghji re Approved Payments | AAI 0046573 |
| PX 81 | 08/18/2019 | Email from Lindberg to Jack Butler re FWD: Hi Mike, can you chat with Jack copied here? | AAI 46719 |
| PX 82 | 8/18/2019 | Email from G. Lindberg to Tug Swaffar renew Holdco Board Meeting Materials [Attachments: New HoldCo Board of Directors Presentation 2 of 2; New Holdco Board of Directors Presentation 1 of 2] | AAI 28219 |
| PX 83 | 08/19/2019 | Recapture Trust Term Sheet | AAI 16334 |
| PX 84 | 08/21/2019 | Email from Meghji to Gallagher re Follow Up Issues & Items | AAI 19566 |
| PX 85 | 08/28/2019 | Email from M. Dinius to C. Miller re Revolver Request | AAI 0015934 |
| PX 86 | 08/29/2019 | Email from Lindberg to Dinius re Hi Mike, I am fully committed to getting the MOU done on time... | AAI 29016 |
| PX 87 | 09/2019 | New HoldCo Liquidity Overview, September 2019 | WM 002469 |
| PX 88 | 09/01/2019 | Open Issues For Noble Discussion, DRAFT | WM 233451 |
| PX 89 | 09/03/2019 | Baucum – Eli Global/Deloitte Tax Workstreams | AAI 19664 |
| PX 90 | 09/03/2019 | Email from G. Vandeman to G. Lindberg re NMC Structure- DRAFT EMAIL | AAI 0046769 |
| PX 91 | 9/04/2019 | Email from G. Vandeman to G. Lindberg re Hi George: here is the NHC closing structure we proposed to Noble | AAI 0046772 |

15

| | | | |
|---|---|---|---|
| PX 92 | 09/05/2019 | Email from Dinius to Meghji re NHC D&O Coverage | WM 002573 |
| PX 93 | 9/6/2019 | Email from G. Lindberg to G. Vandeman re Keep this handy | AAI 0046781 |
| PX 94 | 09/09/2019 | Email from Greg Lindberg to Mo Meghji, Mike Dinius, David Paulson, and Mark Knowles re "NHC Organization and Structure" | WM 233455 |
| PX 95 | 09/13/2019 | Email from Herwig to Lindberg re Summary of Short-term Liquidity Moves | AAI 13811 |
| PX 96 | 09/16/2019 | Draft Term Sheet for MBO of Home Medical Equipment Specialists, LLC | WM 233464 |
| PX 97 | | OMITTED – Duplicate of PX 96 | |
| PX 98 | 09/17/2019 | Email from George Vandeman to Mike Dinius and David Paulson re "MOU Restructure" | WM 233457 |
| PX 99 | 09/20/2019 | Email from Lindberg to Meghji, et al re NHC Update | AAI 32639 |
| PX 100 | 09/22/2019 | Herwig – Draft Term Sheet for MBO of Client Services Inc. | WM 233466 |
| PX 101 | | OMITTED – Duplicate of PX 100 | |
| PX 102 | 09/22/2019 | Email from George Vandeman to David Paulson re "Implementation of MOU" | WM 233459 |
| PX 103 | 09/25/2019 | Email from Lindberg to Vandeman re MOU Implementation | AAI 32667 |
| PX 104 | 09/26/2019 | Email from Vandeman to Lindberg re MOU Implementation Status | AAI 22636 |
| PX 105 | 09/26/2019 | Email from Lindberg to Vandeman re Draft email to Board | AAI 32670 |
| PX 106 | 09/30/2019 | Email from Meghji to Dinius re NHC D&O Coverage | WM 000310 |

16

| | | | |
|---|---|---|---|
| PX 107 | 09/30/2019 | Email from George Vandeman to Greg Lindberg re "NHC D&O" | WM 233461 |
| PX 108 | 09/30/2019 | Email from Matt Lane to Brian Stewart re "Revolver" showing schedule of activity for the loan Apr. 2019 to Sept. 2019 | WM 140850 |
| PX 109 | 10/31/2019 | Herwig Affidavit and Exhibits<br><br>[Note: Judge Shirley Redacted Public Version pursuant to Order dated 1/10/2020 is not bates labeled] | |
| PX 109A | | Ex. A - Email communications among M. Dinius, et al. | CH006-CH09 |
| PX 109B | | Ex. B - Letter from M. Dinius to Universal Life Insurance Company, 08/19/2019 | CH094-CH095 |
| PX 109C | | Ex. C - Email received by C. Herwig | CH096-CH099 |
| PX 109D | | Ex. D - ULICO Term Sheet | CH100-102 |
| PX 110 | 10/31/2019 | Vandeman Affidavit and Exhibits<br><br>[Note: Judge Shirley Redacted Public Version pursuant to Order dated 1/10/2020 is not bates labeled] | |
| PX 110A | | Ex. A - Email correspondence with attachments among M. Dinius and various representatives of Eli Global. | GV008-GV264 |
| PX 110B | | Ex. B - Current draft of an excel spreadsheet generated by Eli Global. | GV265-GV271 |
| PX 110C | | Ex. C - Seller Note | GV272-GV277 |
| PX 110D | | Ex. D - Example of Equity Equivalence Agreement | GV278-GV286 |
| PX 110E | | Ex. E - Example of Loan Agreement | GV287-GV556 |

17

| | | | |
|---|---|---|---|
| PX 110F | | Ex. F - Email correspondence made a part of Eli Global's business records | GV557-GV589 |
| PX 110G | | Ex. G - Email correspondence | GV590-GV601 |
| PX 111 | 10/31/2019 | Nordberg Affidavit and Exhibit<br><br>[Note: Judge Shirley Redacted Public Version pursuant to Order dated 1/10/2020 is not bates labeled] | |
| PX 111A | | Ex. A - Email correspondence with attachments among various parties, including M. Dinius, et al. | PN 004-260 |
| PX 112 | 10/31/2019 | Meghji Affidavit | |
| PX 113 | 10/31/2019 | Pereira Affidavit and Exhibit | |
| PX 113A | | Ex. A - Email correspondence between M. Dinius, et al. | MP004-MP034 |
| PX 114 | 10/31/2019 | Beck Affidavit | |
| PX 115 | 12/01/2020 | Expert Report of William Epstein | NA |
| PX 116 | 2/03/2021 | Deposition of William Epstein | NA |
| PX 117 | 12/01/2020 | Deposition of Devin Solow | NA |
| PX 118 | 12/03/2020 | Deposition of Chris Herwig | NA |
| PX 119 | 01/11/2021 | Deposition of John Murphy | NA |
| PX 120 | 1/15/2021 | Deposition of George Vandeman | NA |
| PX 121 | 01/19/2021 | Deposition of Mo Meghji | NA |
| PX 122 | 02/04/2021 | 30(b)(6) Deposition of CBL – Mike Dinius – Volume I | NA |
| PX 122A | 02/05/2021 | 30(b)(6) Deposition of CBL – Mike Dinius – Volume II | NA |

18

| PX 122B | 02/05/2021 | 30(b)(6) Deposition of CBL – Brian Stewart | NA |
|---|---|---|---|
| PX 122C | 02/05/2021 | 30(b)(6) Deposition of CBL – Lou Hensley | NA |
| PX 122D | 02/11/2021 | 30(b)(6) Deposition of CBL – Matt Lane | NA |
| PX 122E | 02/11/2021 | 30(b)(6) Deposition of CBL – Joseph Lurie | NA |
| PX 123 | 02/11/2021 | Deposition of Christa Miller | NA |
| PX 124 | 02/22/2021 | Deposition of Mike Causey – Volume I | NA |
| PX 124A | 3/31/2021 | Deposition of Mike Causey – Volume II | NA |
| PX 125 | 03/04/2021 | 30(b)(6) Deposition of Edwards Mill Asset Management ("EMAM") – William Wofford | NA |
| PX 126 | 03/10/2021 | Deposition of Greg Bordes | NA |
| PX 127 | 3/31/2021 | Deposition of Mike Dinius | NA |
| PX 128 | 4/01/2021 | 30(b)(6) Deposition of BLIC and SNIC – Brian Stewart | NA |
| PX 128A | 4/01/2021 | 30(b)(6) Deposition of BLIC and SNIC – John Murphy | NA |
| PX 129 | 05/11/2021 | Deposition of Greg Lindberg, Deposition of Academy Association, Inc. (30(b)(6)) Deposition of New England Capital (30(b)(6)) – Volume I | NA |
| PX129A | 05/12/2021 | Deposition of Greg Lindberg, Deposition of Academy Association, Inc. (30(b)(6)) Deposition of New England Capital (30(b)(6)) – Volume II | NA |
| PX 130 | NA | Loan Deferrals | WM 233493 |

19

| PX 131 | NA | Organizational charts | WM 233494 |
|---|---|---|---|
| PX 132 | NA | Rehab Proposal | WM 233426 |
| PX 133 | NA | Dore – Insurance Cover Form | WM 000320 WM 0001488 |
| PX 134 | 12/27/2017 | PBX Junior Loan Agreement | AAI 0001044 |
| PX 135 | 11/07/2018 | PBLA Commitment Transaction Advice (CTA) | WM 066445 |
| PX 136 | 08/07/2019 | Email from hardships@globalbankers.com to T. Kleinschmidt et al re Hardships (policyholder email) [Attachment: Bankers Life Insurance Co.] | WM 234493 WM 234495 |
| PX 137 | 6/30/2020 | Email from H. Freeman to M. Dinius re Rehabilitation: Colorado Bankers Life (policyholder email) | WM 234499 |
| PX 138 | 02/07/2021 | Email from M. Zintel to J. Murphy re Quick Question -GBIG v. Greg Lindberg (policyholder email) | WM 234536 |
| PX 139 | 05/25/2021 | Q1 2021 Rehabilitator's Quarterly Report | NA |
| PX 140 | 06/26/2019 | Letter from M. Dinius to Southland National et al. re Memorandum of Understanding approving same (Approval Letter) | WM 000868 |
| PX 141 | NA | Demonstrative – Organizational Chart | NA |
| PX 142 | NA | All deposition transcripts, including all deposition exhibits, excerpts (and videos if recorded) in this action. | NA |
| PX 143 | NA | All written discovery responses served and/or filed by any party in this lawsuit. | NA |
| PX 144 | NA | All Pleadings filed by any party in this lawsuit. | NA |
| PX 145 | NA | All exhibits identified by the Defendants. | NA |
| PX 146 | NA | Any exhibits used for rebuttal or impeachment. | NA |

20

## SCHEDULE C

## DEFENDANTS' EXHIBITS

| DEFS' EXHIBIT NO. | BATES NO. | | DESCRIPTION |
|---|---|---|---|
| DX001 | AAI_LINDBERG 0013124 | 2019-05-13 | Email from Lindberg to Miller re Thoughts here oncash flow improvement for NHC - any additions? |
| DX002 | AAI_LINDBERG 0013126 | 2019-05-14 | Email from Herwig to Miller re Rahab Proposal CEHedits 5 14 2019 w/attachment |
| DX003 | WM233356 | 2016-04-05 | Letter from NCDOI to Lindberg re Review Letter 1 -December 31, 2015, Annual Statement Financial Review |
| DX004 | WM005718 | 2016-04-19 | Southland National Insurance letter to NCDOOI |
| DX005 | WM159032 | 2018-05-02 | Global Bankers Ins Group letter to NCDOI re Remediation Plan - Global Bankers InsuranceGroup, LLC |
| DX006 | WM005716 | 2019-03-05 | Email from Lindberg to Tug re FWD: Principal protection notes: a DBRS-rated alternative to current SPV structure with third party bond |
| DX007 | AAI_LINDBERG 0023370 | 2019-05-09 | Email from Dinius to Miller and Herwig re RehabProposal w/attachment |
| DX008 | AAI_LINDBERG 0013129 | 2019-05-15 | Email from Herwig to McGuffin and Johnson reDebt restructuring option w/attachments |
| DX009 | AAI_LINDBERG 0013155 | 2019-05-17 | Email from Khattar to Miller re Debt Restructuringw/attachment |
| DX010 | AAI_LINDBERG 0023378 | 2019-05-17 | Email from Dinius to Miller and Herwig re Yesterday w/attachment |
| DX011 | AAI_LINDBERG 0013158 | 2019-05-20 | Email from Herwig to Stewart and Miller re Wheredo we stand on Brian's file |
| DX012 | AAI_LINDBERG 0023380 | 2019-05-21 | Email from Dinius to Meghji, Nordberg, Miller reNHC Governance w/attachment |
| DX013 | WM006290 | 2019-05-23 | Email from Stewart to Dinius re Latest Investment Restructuring file w/attachment |
| DX014 | AAI_LINDBERG 0026095 | 2019-05-24 | Email from Lindberg to Miller and Dinius re Cash Flow Forecast w/attachment |

21

| | | | |
|---|---|---|---|
| DX015 | AAI_LINDBERG 0013176 | 2019-05-28 | Email from Herwig to Lindberg re Revised summary master liquidity file here w/attachment |
| DX016 | AAI_LINDBERG 0026112 | 2019-05-28 | Email from Herwig to Farrell, Dinius, Lindberg, Miller, Solow, Stewart re Agenda and attachmentsfor call at 4 w/attachment |
| DX017 | AAI_LINDBERG 0023398 | 2019-05-29 | Email from Lindberg to Dinius re Thursday June 6 |
| DX018 | AAI_LINDBERG 0023400 | 2019-06-02 | Email from Miller to Stewart and Dinius re RW:Cash Flow Forecast w/attachment |
| DX019 | WM229680 | 2019-06-02 | Email from Lindberg to Dinius, Stewart re Hi Mike, we are making solid progress on the MOU and should have a draft to you tomorrow eve….w/attachments |
| DX020 | WM229696 | 2019-06-02 | Email from Lindberg to Dinius, Stewart re Hi Mike, we are making solid progress on the MOU and should have a draft to you tomorrow eve….w/attachments |
| DX021 | WM233029 | 2019-06-03 | Email from Lindberg to Lindberg and Dinius and Stewart re Hi Mike, we are making solid progresson the MOU and should have a draft to you tomorrow eve… w/attachments |
| DX022 | WM220986 | 2019-06-04 | Email from Dinius to Stewart, Edwards, Hensley reMOU draft w/attachments |
| DX023 | AAI_LINDBERG 0023402 | 2019-06-05 | Email from Dinius to Lindberg, Miller, Herwig, Nordberg, Stewart, Hensley, Edwards, Farrell, Murphy, Brown re Fwd: MOU w/attachment |
| DX024 | AAI_LINDBERG 0023425 | 2019-06-05 | Email from Lindberg to Dinius re Hi Mike: attachedhere is a revision to the debt amendment per yourcomments w/attachment |
| DX025 | AAI_LINDBERG 0023438 | 2019-06-05 | Email from Dinius to Miller re Fwd: Noble Letter w/attachment |
| DX026 | AAI_LINDBERG 0023442 | 2019-06-05 | Email from Lindberg to Dinius re Revised docs herefrom today's meeting… w/attachments |
| DX027 | AAI_LINDBERG 0026215 | 2019-06-05 | Email from Lindberg to Dinius re Hi Mike: attached here is a revision to the debt amendment per your comments w/attachment |
| DX028 | AAI_LINDBERG 0026233 | 2019-06-05 | Email from Lindberg to Dinius re Revised docshere from today's meeting… w/attachments |

22

| | | | |
|---|---|---|---|
| DX029 | WM229784 | 2019-06-05 | Email from Dinius to Lindberg, Miller, Herwig, Stewart, Hensley, Edwards, Meghji, Murphy, Brown re Fwd: MOU w/ attachment |
| DX030 | WM232029 | 2019-06-06 | Email from Herwig to Lindberg and Dinius re Revised docs here from today's meeting... w/attachment |
| DX031 | AAI_LINDBERG 0013216 | 2019-06-07 | Email from Dobson to Miller re Loan RestructuringKick Off |
| DX032 | AAI_LINDBERG 0013218 | 2019-06-08 | Email from Lindberg to Herwig re 6.7.19 Omnibbus Loan Amendment w/attachment |
| DX033 | AAI_LINDBERG 0026352 | 2019-06-08 | Email from Dinius to Lindberg re Revised docs herefrom today's meeting.... |
| DX034 | AAI_LINDBERG 0026356 | 2019-06-08 | Email from Dinius to Lindberg re AAI-Memorandum of Understanding (6-8-19) w/attachment |
| DX035 | AAI_LINDBERG 0026375 | 2019-06-08 | Email from Lindberg to Dinius re AAI - Memorandum of Understanding (6-8-19) w/ attachment |
| DX036 | WM230116 | 2019-06-09 | Email from Dinius to Solow re our recent call |
| DX037 | WM230117 | 2019-06-09 | Email from Dinius to Lindberg re MOU and Loan Amendment w/attachments |
| DX038 | WM232551 | 2019-06-09 | Email from Lindberg to Dinius re AAI - Memorandum of Understanding (6-8-19) w/attachment |
| DX039 | AAI_LINDBERG 0026461 | 2019-06-10 | Email from Lindberg to Meghji re Potential Board Member CV's |
| DX040 | AAI_LINDBERG 0026465 | 2019-06-10 | Email from Lindberg to Meghji re Potential Board Member CV's |
| DX041 | WM179750 | 2019-06-10 | Email from Solow to Dinius re our recent call |
| DX042 | WM230155 | 2019-06-10 | Email from Dinius to Solow re FW: Eli Global Company Listing as of 12/31/18 and 3/31/19 w/attachments |
| DX043 | WM230162 | 2019-06-10 | Email from Nordberg to Lindberg and Dinius re MOU and Loan Amendment |
| DX044 | WM230185 | 2019-06-11 | Email from Dinius to Solow re our recent call |
| DX045 | AAI_LINDBERG 0026478 | 2019-06-12 | Email from Lindberg to Dinius re MOU and Loan Amendment |

23

| | | | |
|---|---|---|---|
| DX046 | AAI_LINDBERG 0026493 | 2019-06-13 | Email from Lindberg to Dinius re MOU and Loan Amendment |
| DX047 | WM033493 | 2019-06-13 | Email from Miller to Stewart re Exhibit A draft w/attachments |
| DX048 | AAI_LINDBERG 0026520 | 2019-06-18 | Email from Lindberg to Sufrin re MOU and Ln Amendment w/attachments |
| DX049 | WM221327 | 2019-06-18 | Email from Dinius to Edwards, Hensley, Brown, Stewart re MOU and Loan Amendmentw/attachments |
| DX050 | WM232067 | 2019-06-19 | Email from Dinius to Stewart, Hensley, Edwards re Schedule of loans w/attachments |
| DX051 | AAI_LINDBERG 0026553 | 2019-06-20 | Email from Dinius to Lindberg, Murphy, Petrick reMOU w/attachment |
| DX052 | WM181816 | 2019-06-21 | Email from Miller to Stewart re FW: Updated NHCmove exhibit docs |
| DX053 | AAI_LINDBERG 0016338 | 2019-06-24 | Email from Moore to Meghji, Lindberg, Murphy, Petrick, Dinius, Paulson, Smith, Nordberg, Miller re MOU Meeting |
| DX054 | AAI_LINDBERG 0026657 | 2019-06-24 | Email from Dinius to Lindberg re MOU |
| DX055 | AAI_LINDBERG 0026663 | 2019-06-24 | Email from Dinius to Meghji, Lindberg, Murphy reLoan Amendment w/attachment |
| DX056 | AAI_LINDBERG 0026677 | 2019-06-24 | Email from Lindberg to Dinius re Loan Amendment |
| DX057 | AAI_LINDBERG 0016339 | 2019-06-25 | Email from Hoomani to Lindberg, Edwards, Petrick,Smith, Finkelstein, Petersen, Blake, Eason, May, Crabtree, Meghji re Revised Petition and Motion w/ attachments |
| DX058 | AAI_LINDBERG 0016365 | 2019-06-25 | Email from Nordberg to Paulson re Sample Loan Docs w/attachments |
| DX059 | AAI_LINDBERG 0016486 | 2019-06-25 | Email from Lindberg to Nordberg re Sample Loan Docs |
| DX060 | AAI_LINDBERG 0016500 | 2019-06-25 | Email from Paulson to Nordberg re Sample Loan Docs |
| DX061 | AAI_LINDBERG 0026717 | 2019-06-25 | Email from Lindberg to Dinius re Hi Mike, from outdiscussion tonight, please find attached... w/attachments |
| DX062 | AAI_LINDBERG 0026779 | 2019-06-25 | Email from Lindberg to Herwig re Schedules w/attachments |

24

| DX063 | WM233186 | 2019-06-25 | Email from Lindberg to Dinius re Hi Mike, from ourdiscussion tonight, please find attached… w/attachments |
|---|---|---|---|
| DX064 | AAI_LINDBERG 0016502 | 2019-06-26 | Email from Moore to Paulson and Nordberg reSample Loan Docs w/attachment |
| DX065 | AAI_LINDBERG 0016526 | 2019-06-26 | Email from Moore to Paulson and Nordberg reSample Loan Docs w/attachment |
| DX066 | AAI_LINDBERG 0016553 | 2019-06-26 | Email from Paulson to Moore and Nordberg re MOU |
| DX067 | AAI_LINDBERG 0016560 | 2019-06-26 | Email from Moore to Paulson and Nordberg reMOU w/attachments |
| DX068 | AAI_LINDBERG 0016697 | 2019-06-26 | Email from Hoomani to Lindberg, Edwards, Petrick,Smith, Finkelstein, Petersen, Blake, Eason, May, Crabtree, Meghji re Revised Petition and Motion w/ attachment |
| DX069 | AAI_LINDBERG 0016705 | 2019-06-26 | Email from May to Meghji, Moore, Paulson,Nordberg re MOU |
| DX070 | AAI_LINDBERG 0016710 | 2019-06-26 | Email from Paulson to Meghji, Moore, Nordberg reMOU |
| DX071 | AAI_LINDBERG 0016715 | 2019-06-26 | Email from Moore to May, Meghji, Paul, Nordberg re MOU w/ attachment |
| DX072 | AAI_LINDBERG 0016736 | 2019-06-26 | Email from Smith to Moore, May, Meghji, Paulson Nordberg re MOU w/attachment |
| DX073 | AAI_LINDBERG 0016805 | 2019-06-26 | Email from Moore to May, Paulson, Miller, Nordberg re Rep and Warranty Language for MOU w/attachment |
| DX074 | AAI_LINDBERG 0016833 | 2019-06-26 | Email from Smith to Paulson, Moore re Spreadsheet w/attachment |
| DX075 | AAI_LINDBERG 0016835 | 2019-06-26 | Email from Lindberg to Paulson, Herwig,Greenberg, Petrick, Maman re MOU w/attachments |
| DX076 | AAI_LINDBERG 0016870 | 2019-06-26 | Email from Lindberg to Dinius, Moore, Paulson, May, Smith, Herwig, Miller, Murphy, Greenberg,Petrick, Nordberg, Maman re Exhibits A, B and Chere to the MOU w/attachments |
| DX077 | AAI_LINDBERG 0016874 | 2019-06-26 | Email from Paulson to Lindberg, Dinius Moore, May, Smith, Herwig, Miller, Greenberg, Petrick, Nordberg, Maman re Exhibits A, B and C here to the MOU |

25

| DX078 | AAI_LINDBERG 0016875 | 2019-06-26 | Email from Lindberg to Paulson, Moore, Dinius, Murphy, Smith, May, Nordberg, Herwig, Miller, Greenberg, Petrick, Maman re Mark-up to revolver from CWT here thanks-GREG w/attachment |
|---|---|---|---|
| DX079 | AAI_LINDBERG 0016896 | 2019-06-26 | Email from Greenberg to Lindberg, Paulson, Moore, Dinius, Murphy, Smith, May, Nordberg, Herwig, Miller, Petrick, Maman re Revised Interim Loan Amendment w/attachments |
| DX080 | AAI_LINDBERG 0016928 | 2019-06-26 | Email from Dinius to Greenberg, Lindberg, Paulson, Moore, Murphy, Smith, May, Nordberg, Herwig, Miller, Petrick, Maman re Revised Interim Loan Amendment w/attachment |
| DX081 | AAI_LINDBERG 0016944 | 2019-06-26 | Email from Hoomani to Lindberg, Edwards, Petrick,Smith, Finkelstein, Petersen, Blake, Eason, May, Crabtree, Meghji re Final Letter from Supervisor w/attachment |
| DX082 | AAI_LINDBERG 0016947 | 2019-06-26 | Email from Paulson to Greenberg, Lindberg, Moore, Dinius, Murphy, Smith, May, Nordberg, Herwig, Miller, Petrick, Maman re Revised Interim Loan Amendment |
| DX083 | AAI_LINDBERG 0016949 | 2019-06-26 | Email from Lindberg to Dinius re Revised Interim Loan Amendment |
| DX084 | AAI_LINDBERG 0016951 | 2019-06-26 | Email from Moore to Lindberg, Dinius, Paulson, May, Smith, Herwig, Miller, Murphy, Greenberg, Petrick, Nordberg, Hoomani, Maman re Exhibits A,B, and C here to MOU w/attachment |
| DX085 | AAI_LINDBERG 0017011 | 2019-06-26 | Email from Dinius to Paulson, Greenberg, Lindberg, Moore, Murphy, Smith, May, Nordberg, Herwig, Miller, Petrick, Maman re Revised Interim Loan Amendment |
| DX086 | AAI_LINDBERG 0017013 | 2019-06-26 | Email from Greenberg to Paulson Lindberg, Moore, Dinius, Murphy, Smith, May, Nordberg, Herwig, Miller, Petrick, Maman re Markup to Remover from CWT here thanks-GREG/DOI Comments w/attachments |

26

| | | | |
|---|---|---|---|
| DX087 | AAI_LINDBERG 0017072 | 2019-06-26 | Email from Smith to Greenberg, Paulson, Lindberg, Moore, Dinius, Murphy, May, Nordberg, Herwig, Miller, Petrick, Maman, Meghji re Mark-up to revolver from CWT here thanks-GREG/DOIComments w/ attachments |
| DX088 | AAI_LINDBERG 0017147 | 2019-06-26 | Email from Dinius to Nordberg, May, Moore,Meghji re Loan Amendment Exhibits w/attachment |
| DX089 | AAI_LINDBERG 0017155 | 2019-06-26 | Email from Dinius to Lindberg, Moore, Paulson, May, Smith, Herwig, Miller, Murphy, Greenberg,Petrick, Nordberg, Maman re Exhibits A, B and Chere to the MOU |
| DX090 | AAI_LINDBERG 0017156 | 2019-06-26 | Email from Moore to Smith, Paulson, Greenberg, Lindberg, Dinius, Murphy, May, Nordberg, Herwig,Miller, Petrick, Maman, Meghji re Mark-up to revolver from CWT here thanks-GREG/DOI Comments w/attachment |
| DX091 | AAI_LINDBERG 0017224 | 2019-06-26 | Email from Dinius to Nordberg, May, Moore,Meghji re Loan Amendment Exhibits |
| DX092 | AAI_LINDBERG 0017231 | 2019-06-26 | Email from Hoomani to Lindberg, Edwards, Petrick,Finkelstein, Petersen, May, Crabtree, Nordberg re Final Letter from Supervisor w/attachment |
| DX093 | AAI_LINDBERG 0017236 | 2019-06-26 | Email Greenberg to Paulson, Dinius, Lindberg, Moore, Murphy, Smith, May, Nordberg, Herwig, Miller, Petrick, Maman, Meghji re Revised InterimLoan Amendment w/attachments |
| DX094 | AAI_LINDBERG 0017272 | 2019-06-26 | Email from Nordberg to Paulson, Moore re FW: MOU |
| DX095 | AAI_LINDBERG 0017297 | 2019-06-26 | Email from Lindberg to Greenberg re Revised Interim Loan Amendment w/attachments |
| DX096 | AAI_LINDBERG 0017304 | 2019-06-26 | Email from Moore to Lindberg and Greenberg re Revised Interim Loan Amendment w/attachment |
| DX097 | AAI_LINDBERG 0026889 | 2019-06-26 | Email from Lindberg to Paulson, Herwig, Greenberg, Petrick Maman re MOU w/attachments |

27

| | | | |
|---|---|---|---|
| DX098 | AAI_LINDBERG 0026928 | 2019-06-26 | Email from Lindberg to Paulson, Moore, Dinius, Murphy, Smith, May, Nordberg, Herwig, Miller, Greenberg, Petrick, Maman re Mark-up to revolverfrom CWT here thanks -Greg w/attachment |
| DX099 | AAI_LINDBERG 0026963 | 2019-06-26 | Email from Moore to Lindberg re : Revised InterimLoan Amendment w/attachment |
| DX100 | AAI_LINDBERG 0017340 | 2019-06-27 | Email from Greenberg to Moore and Lindberg re Revised Interim Loan Amendment w/attachments |
| DX101 | AAI_LINDBERG 0017378 | 2019-06-27 | Email from Greenberg to Moore and Lindberg re Revised Interim Loan Amendment w/attachments |
| DX102 | AAI_LINDBERG 0017434 | 2019-06-27 | Email from Moore to Greenberg and Lindberg reRevised Interim Loan Amendment w/attachment |
| DX103 | AAI_LINDBERG 0017457 | 2019-06-27 | Email from Moore to Greenberg and Lindberg re Revised Interim Loan Amendment |
| DX104 | AAI_LINDBERG 0017463 | 2019-06-27 | Email from Greenberg to Moore and Lindberg re Revised Interim Loan Amendment w/attachments |
| DX105 | AAI_LINDBERG 0017502 | 2019-06-27 | Email from Paulson to Greenberg, Moore, Lindberg re Revised Interim Loan Amendment |
| DX106 | AAI_LINDBERG 0017509 | 2019-06-27 | Email from Dinius to Lindberg re Hi Mike, attachedhere are requested revolver draws as we discussed |
| DX107 | AAI_LINDBERG 0017533 | 2019-06-27 | Email from Nordberg to May, Paulson, Miller re MOU |
| DX108 | AAI_LINDBERG 0017635 | 2019-06-27 | Email from Moore to May re Exhibit A - List of NHCCompanies 6-2-26-19 v3.FINAL SEND TO ALL w/attachments |
| DX109 | AAI_LINDBERG 0017676 | 2019-06-27 | Email from Paulson to Nordberg, Moore, May reExhibit A - List of NHC Companies 6-2-26-19 v3.FINAL SEND TO ALL |
| DX110 | AAI_LINDBERG 0027049 | 2019-06-27 | Email from Moore to Paulson, Lindberg, Nordberg,May, Greenberg, Dinius re Executed Documents w/attachments |
| DX111 | WM230733 | 2019-06-27 | Email from Stewart to Dinius re Schedules |
| DX112 | WM230829 | 2019-06-27 | Email from Dinius to Hensley, Edwards, Stewart reFW: Revised Interim Loan Amendment w/attachments |

28

| | | | |
|---|---|---|---|
| DX113 | WM230836 | 2019-06-27 | Email from Dinius to Hensley, Edwards, Stewart reSupervisor letter w/attachment |
| DX114 | AAI_LINDBERG 0017987 | 2019-07-02 | Email from Nordberg to Miller, Gilbaugh, Herwig,Solow, Johnson, Capants, Bordes, Stewart, Lane, Smith, Crabtree, Meghji, Gallagher, Zatzkin, Dobson, Orton, Paulson, Petrick, Greenberg re New Holdco w/attachment |
| DX115 | AAI_LINDBERG 0018006 | 2019-07-11 | Email from Herwig to Dinius re Medical Physicssale and Met PG paydown of Beckett loan |
| DX116 | AAI_LINDBERG 0018010 | 2019-07-12 | Email from Nordberg to Dinius re Prime trustw/attachment |
| DX117 | AAI_LINDBERG 0027814 | 2019-07-12 | Email from Lindberg to Dinius and Meghji reSuggestion for independent director here w/attachment |
| DX118 | AAI_LINDBERG 0018015 | 2019-07-15 | Email from Nordberg to Miller, Gilbaugh, Herwig,Solow, Johnson, Capants, Bordes, Stewart. Lane, Smith, Crabtree, Meghji, Gallagher, Zatzkin, Dobson, Orton, Brown re Weekly debt restructuring meeting w/attachments |
| DX119 | AAI_LINDBERG 0018040 | 2019-07-17 | Email from Nordberg to Paulson, and Moore reNHC directors |
| DX120 | AAI_LINDBERG 0027850 | 2019-07-19 | Email from Lindberg to Meghji and Dinius re Hi Team: another director idea here... w/attachment |
| DX121 | AAI_LINDBERG 0027857 | 2019-07-19 | Email from Lindberg to Dinius re Hi Team: anotherdirector idea here... |
| DX122 | AAI_LINDBERG 0019281 | 2019-07-22 | Email from Bordes to Miller, Brown, Herwig, Nolan, Nordberg, Orton, Gilbaugh, Solow, Johnson,Capants, Dobson, Stewart, Lane, Smith, Fisher, Crabtree, May, Poplin, Meghji, Gallagher, Zatzkin, Petrick Greenberg, Naman, Paulson re Eli Global NHC/Debt Restructuring Call |
| DX123 | AAI_LINDBERG 0027905 | 2019-07-25 | Email from Lindberg to Bridgett, Dinius, Meghji, reTeam, suggest as follows for NHC directors...thanks for your considerationw/attachment |
| DX124 | WM001366 | 2019-07-25 | Email from Dinius to Miller, Meghji, Nordberg re D&O Coverage |

29

| DX125 | AAI_LINDBERG 0019298 | 2019-07-26 | Email from Nordberg to Greenberg, Maman, Paulson, Moore re NHC Indemnification Agreement w/attachment |
|---|---|---|---|
| DX126 | AAI_LINDBERG 0019313 | 2019-07-26 | Email from Nordberg to Greenberg, Maman, Paulson, Moore re NHC Indemnification Agreement w/attachment |
| DX127 | AAI_LINDBERG 0019334 | 2019-07-29 | Email from Bordes to Miller, Brown, Herwig, Nolan, Nordberg, Orton, Gilbaugh, Solow, Johnson, Capants, Dobson, Stewart, Lane, Smith, Fisher, Crabtree, May, Poplin, Meghji, Gallagher, Zatzkin, Petrick Greenberg, Maman, Paulson re Eli Global NHC/Debt Restructuring Call |
| DX128 | AAI_LINDBERG 0019335 | 2019-07-29 | Email from Gilad to Lindberg, Petrick, Smith, May, Finkelstein, Eason, Blake, Paulson, Moore, Dinius re Vista Life & Casualty Reinsurance Company - Direction Letter w/attachment |
| DX129 | AAI_LINDBERG 0019347 | 2019-07-30 | Email from Nordberg to Dinius and Moore re NHCBOD Meeting |
| DX130 | AAI_LINDBERG 0027917 | 2019-07-30 | Email from Lindberg to Dinius re Hi Mike, I saw Paulson's comments on timing for NHC moves |
| DX131 | WM000870 | 2019-07-30 | Email from Lindberg to Dinius re Hi Mike, I saw Paulson's comments on timing for NHC moves |
| DX132 | WM001351 | 2019-07-30 | Email from Miller to Dinius re D&O Coverage Update |
| DX133 | AAI_LINDBERG 0019355 | 2019-07-31 | Email from Smith to Gilad re Vista Life & Casualty Reinsurance Company |
| DX134 | AAI_LINDBERG 0027921 | 2019-07-31 | Email from Lindberg to Dinius and Meghji re Fwd:Leonard Optical w/attachments |
| DX135 | WM000658 | 2019-08-02 | Email from Lindberg to Miller re Management Fee Approval |
| DX136 | AAI_LINDBERG 0019387 | 2019-08-05 | Email from Bordes to Miller, Brown, Herwig, Nolan, Nordberg, Orton, Gilbaugh, Solow, Johnson, Capants, Dobson, Stewart, Lane, Smith, Fisher, Crabtree, May, Poplin, Meghji, Gallagher, Zatzkin, Petrick Greenberg, Naman, Paulson re Eli Global NHC/Debt Restructuring Call |
| DX137 | AAI_LINDBERG 0019394 | 2019-08-06 | Email from Nordberg to Paulson and Smith re weekly call |

30

| | | | |
|---|---|---|---|
| DX138 | AAI_LINDBERG 0019396 | 2019-08-06 | Email from May to Nordberg, Greenberg, Maman, Paulson, Moore re NHC Indemnification Agreement w/attachment |
| DX139 | AAI_LINDBERG 0019418 | 2019-08-07 | Email from Lindberg to Dinius and Vandeman re NHC Organizational Board Meeting w/attachment |
| DX140 | AAI_LINDBERG 0019424 | 2019-08-07 | Email from Vandeman to Lindberg re NHC Organizational Board Meeting |
| DX141 | AAI_LINDBERG 0019428 | 2019-08-07 | Email from Dinius to Vandeman and Lindberg re NHC Organizational Board Meeting |
| DX142 | AAI_LINDBERG 0019432 | 2019-08-07 | Email from Hurley to Dinius, Vandeman, Lindberg re NHC Organizational Board Meeting |
| DX143 | AAI_LINDBERG 0019436 | 2019-08-08 | Email from Nordberg to Moore, Dinius, Paulson re NHC BOD Meeting |
| DX144 | AAI_LINDBERG 0019440 | 2019-08-08 | Email from Dinius to Nordberg, Moore, Paulson re NHC BOD Meeting |
| DX145 | AAI_LINDBERG 0019448 | 2019-08-08 | Email from Peter Nordberg to Mike Dinius, Moore, Paulson re NHC BOD Meeting |
| DX146 | AAI_LINDBERG 0027961 | 2019-08-08 | Email from Dinius to Vandeman, Lindberg, Biaggi, Resnick, Atterholt, Heese, Meghji, Miller, Nordberg, Jason, re NHC Organization Board Meeting w/attachment |
| DX147 | WM002132 | 2019-08-12 | Email from Meghji to Dinius re FW: Pre-board meeting board matters |
| DX148 | AAI_LINDBERG 0027981 | 2019-08-12 | Email from Vandeman to Dinius re Executive Committee |
| DX149 | AAI_LINDBERG 0019479 | 2019-08-13 | Email from Bordes to Miller, Brown, Herwig, Nolan, Nordberg, Orton, Gilbaugh, Solow, Johnson, Capants, Dobson, Stewart, Lane, Smith, Fisher, Crabtree, May, Poplin, Meghji, Gallagher, Zatzkin, Petrick Greenberg, Naman, Paulson re Eli Global NHC/Debt Restructuring Call |
| DX150 | AAI_LINDBERG 0019497 | 2019-08-14 | Email from Meghji to Dinius and Paulson re FW: HiMo, open items with Noble here… |
| DX151 | AAI_LINDBERG 0028010 | 2019-08-15 | Email from Lindberg to Meghji and Dinius re Canwe do a call today on open items? Say 3pm ET? |
| DX152 | AAI_LINDBERG 0028012 | 2019-08-15 | Email from Lindberg to Meghji re Call re ULICO Background |

31

| DX153 | AAI_LINDBERG 0028015 | 2019-08-15 | Email from Dinius to Lindberg, Benitez, Farrell, Herwig, Greenspan, Bostic re Team, Duff and Phelps says they can do valuations on the 50+ NHC companies in 30 days |
|---|---|---|---|
| DX154 | AAI_LINDBERG 0028113 | 2019-08-15 | Email from Lindberg to Resnick re Upcoming NHCBoard Meeting |
| DX155 | AAI_LINDBERG 0019504 | 2019-08-16 | Email from Nordberg to Moore, Meghji, Dinius re Pre-board meeting board matter w/attachments |
| DX156 | AAI_LINDBERG 0020290 | 2019-08-16 | Email from Lindberg to Meghji, Dinius, Murphy re Team, thanks for your time tonight... |
| DX157 | AAI_LINDBERG 0023532 | 2019-08-16 | Email from Dinius to Meghji re NHC D&O |
| DX158 | WM005198 | 2019-08-16 | Email from Lindberg to Meghji and Dinius re Team,thanks for your time tonight... |
| DX159 | AAI_LINDBERG 0023512 | 2019-08-16 | Email from Stroud to Miller re NHC D&O |
| DX160 | AAI_LINDBERG 0023514 | 2019-08-16 | Email from Miller to Meghji and Dinius re FW: NHCD&O |
| DX161 | AAI_LINDBERG 0046702 | 2019-08-17 | Email from Lindberg to Dinius and Butler re HiMike, can you chat with Jack copied here? w/attachment |
| DX162 | WM001409 | 2019-08-17 | Email from Dinius to Resnick, Heese, Vandeman, Lindberg, Atterholt, Dinius re Indemnification Agreement w/attachment |
| DX163 | WM000887 | 2019-08-18 | Email from Dinius to Lindberg re Fwd: Northstar Liquidity Requirements as of Friday 9 August 2019 |
| DX164 | AAI_LINDBERG 0019512 | 2019-08-19 | Email from Nordberg to Paulson and Moore re Draft resolutions w/attachment |
| DX165 | AAI_LINDBERG 0019520 | 2019-08-19 | Email from Nordberg to Paulson and Moore re Draft resolutions |
| DX166 | AAI_LINDBERG 0021120 | 2019-08-19 | Dinius letter |
| DX167 | AAI_LINDBERG 0022161 | 2019-08-19 | Recapture Trust Term Sheet |
| DX168 | AAI_LINDBERG 0023611 | 2019-08-19 | Email from Nordberg to Meghji, VanderAkker, Miller, Lindberg, Vandeman, Atterholt, Heese, Biaggi, Resnick, Dinius re Agenda for Board Meeting August 20, 2019 w/attachments |

32

| DX169 | AAI_LINDBERG 0028379 | 2019-08-19 | Email from Lindberg to Meghji, and Dinius re Summary sheet here for tomorrow's discussion.... w/attachment |
|---|---|---|---|
| DX170 | AAI_LINDBERG 0046737 | 2019-08-19 | Email from Butler to Lindberg re FW: Eli Global /AAI / NHC Board of Directors - Birch Lake |
| DX171 | WM005202 | 2019-08-19 | Email from Meghji to VanderAkker, Miller, Lindberg, Vandeman, Atterholt, Heese, Biaggi, Resnick, re Agenda for Board Meeting August 20,2019 w/attachments |
| DX172 | AAI_LINDBERG 0023551 | 2019-08-19 | Email from Byrne to Miller re NHC Holdings, LLC w/attachment |
| DX173 | AAI_LINDBERG 0028374 | 2019-08-19 | Email from Dinius to Lindberg re NHC Holdings, LLC |
| DX174 | AAI_LINDBERG 0023581 | 2019-08-19 | Email from Miller to Dinius, Meghji, Gallagher re NHC Holdings, LLC w/attachment |
| DX175 | AAI_LINDBERG 0019562 | 2019-08-20 | Email from Miller to Paulson re Copies w/attachment |
| DX176 | AAI_LINDBERG 0019565 | 2019-08-20 | Email from Nordberg to Paulson re How did you think it went? |
| DX177 | WM002652 - WM002709 | 2019-08-20 | New Holdco Board Presentation |
| DX178 | AAI_LINDBERG 0023629 | 2019-08-20 | Email from Byrne to Miller re NHC D&O – excess quote terms w/attachments |
| DX179 | AAI_LINDBERG 0023626 | 2019-08-20 | Email from Byrne to Miller re NHC D&O |
| DX180 | AAI_LINDBERG 0019566 | 2019-08-21 | Email from Meghji to Gallagher, VandenAkker, Miller, Nordberg re Follow up issues and items |
| DX181 | AAI_LINDBERG 0019568 | 2019-08-21 | Email from Gallagher to Meghji re Follow up issuesand items |
| DX182 | AAI_LINDBERG 0019570 | 2019-08-21 | Email from Meghji to Gallagher re Follow up issuesand items |
| DX183 | AAI_LINDBERG 0013691 | 2019-08-22 | Email from Miller to Gallagher and Meghji re FW:NHC D&O - $15MM terms w/attachments |
| DX184 | AAI_LINDBERG 0028769 | 2019-08-22 | Email from Lindberg to Dinius, Murphy, Meghji, Knowles re BLACKLINE - (77758474_4) SuccessorAgent Agreement w/attachment |
| DX185 | AAI_LINDBERG 0028788 | 2019-08-22 | Email from Lindberg to Dinius re ULICO Trust |

33

| | | | |
|---|---|---|---|
| DX186 | AAI_LINDBERG 0023670 | 2019-08-22 | Email from Miller to Byrne re NHC D&O - update |
| DX187 | AAI_LINDBERG 0023676 | 2019-08-22 | Email from Byrne to Miller re NHC D&O - $15MM terms w/attachments |
| DX188 | WM000205 | 2019-08-24 | Email from Lindberg to Dinius, Atterholt, Heese, Meghji, Vandeman, dlr@woodlilyadvisros.com, Biaggi re Update on MBO's.... |
| DX189 | AAI_LINDBERG 0020277 | 2019-08-25 | Email from Dinius to Resnick, Heese, Vandeman, Lindberg, Atterholt, Dinius, Biaggi re ULICO |
| DX190 | WM000878 | 2019-08-25 | Email Dinius to Lindberg, Atterholt, Heese, Meghji, Vandeman, dlr@woodlilyadvisors.com, Biaggi re Update on MBOs... |
| DX191 | WM000645 | 2019-08-26 | Email from Lindberg to Dinius and Meghji re Hi Mike, requested info here on the HME, CSI, and   CCM MBOs...w/attachments |
| DX192 | AAI_LINDBERG 0019620 | 2019-08-27 | Email from Crabtree to Paulson, Maman, Petrick, Greenberg, Moore re Management Services Agreement w/attachment |
| DX193 | WM002569 | 2019-08-27 | Email from Meghji to Miller, Dinius re Fwd: Contact Information |
| DX194 | AAI_LINDBERG 0019643 | 2019-08-28 | Email from Meghji to Dinius, Paulson re FW: Call |
| DX195 | AAI_LINDBERG 0029016 | 2019-08-29 | Email from Lindberg to Dinius and Meghji re Hi Mike, I am fully committed to getting the MOU done on time |
| DX196 | AAI_LINDBERG 0029030 | 2019-08-29 | Email from Lindberg to Meghji re MOU Implementation Call |
| DX197 | AAI_LINDBERG 0029044 | 2019-09-01 | Email from Lindberg to Meghji and Dinius re Hi Mike, attached here is detailed memo on proposed NHC closing process... w/attachments |
| DX198 | AAI_LINDBERG 0029050 | 2019-09-02 | Email from Lindberg to Dinius re Hi Mike, attached here is detailed memo on proposed NHC closingprocess |
| DX199 | WM000920 | 2019-09-02 | Email from Dinius to Lindberg re Hi Mike, FYI, thisis what we are proposing to BMO to allow full ECFto insurance lenders on ARM |
| DX200 | WM001144 | 2019-09-02 | Email from Dinius to Paulson and Meghji re 9.1.19Open Issues for Nobel Discussion. SEND TO NOBLE.copy.docx w/ attachment |

34

| | | | |
|---|---|---|---|
| DX201 | WM001399 | 2019-09-02 | Email from Lindberg to Meghji and Dinius re Hi Mike, attached here is detailed memo on proposed NHC closing process... w/attachments |
| DX202 | WM001406 | 2019-09-02 | Email from Dinius to Lindberg re Hi Mike, FYI, thisis what we are proposing to BMO to allow full ECFto insurance lenders on ARM |
| DX203 | AAI_LINDBERG 0029056 | 2019-09-03 | Email from Vandeman to Dinius re Policyholder Information |
| DX204 | AAI_LINDBERG 0019662 | 2019-09-04 | Email from Dobson to Smith, Crabtree, May, Fisher, Beck, Meghji, Gallagher, Paulson re FW: Deloitte Tax Workstream Memo w/attachment |
| DX205 | AAI_LINDBERG 0019670 | 2019-09-04 | Email from Dobson to Smith, Crabtree, May, Fisher, Beck, Meghji, Gallagher, Paulson re FW: EliGlobal - COD Memo w/attachment |
| DX206 | AAI_LINDBERG 0024420 | 2019-09-06 | Email from Byrne to Keller re Eli Global - NHC |
| DX207 | AAI_LINDBERG 0023746 | 2019-09-06 | Email from Byrne to Kellner re Eli Global - NHC w/attachments |
| DX208 | AAI_LINDBERG 0029157 | 2019-09-09 | Email from Lindberg to Meghji, Dinius, Paulson, Knowles, Beck re NHC Organization and Structure |
| DX209 | WM001385 | 2019-09-09 | Email from Lindberg to Meghji, Dinius, Paulson, Knowles, Beck re Fwd: NHC Organization and Structure |
| DX210 | WM066185 | 2019-09-12 | Email from Stewart to Gallagher, Herwig re look through analysis w/attachments |
| DX211 | AAI_LINDBERG 0013811 | 2019-09-13 | Email from Herwig to Lindberg re Summary of short term liquidity moves... |
| DX212 | AAI_LINDBERG 0029186 | 2019-09-13 | Email from Dinius to Lindberg and Biaggi re JerryLombardo - Information |
| DX213 | WM000505 | 2019-09-13 | Email from Vandeman to Paulson re Bermuda |
| DX214 | AAI_LINDBERG 0029193 | 2019-09-14 | Email from Boug to Lindberg and Herwig re Jerry Lombardo - Information |
| DX215 | AAI_LINDBERG 0019764 | 2019-09-16 | Email from Dinius to Benitez, Miller, Paul re Conference Call |
| DX216 | AAI_LINDBERG 0019773 | 2019-09-16 | Email from Nordberg to Paulson re Seller note summary |

35

| DX217 | WM005214 | 2019-09-16 | Email from Dinius to Obusek re Eli Global Loan Update |
|---|---|---|---|
| DX218 | AAI_LINDBERG 0019781 | 2019-09-17 | Email from Vandeman to Dinius and Paulson re MOU Restructure |
| DX219 | AAI_LINDBERG 0020270 | 2019-09-17 | Email from Dinius to Lindberg and Meghji re Fwd:2018 1120S |
| DX220 | GG-PDFEMAILS7-008344 | 2019-09-17 | Email from Pereira to Dinius re HME MBO Term Sheet for Your Review |
| DX221 | WM000912 | 2019-09-17 | Email from Lindberg to Dinius and Meghji re Fwd:2018 1120S w/attachment |
| DX222 | AAI_LINDBERG 0019783 | 2019-09-18 | Email from Dinius to Resnick, Heese, Vandeman, Lindberg, Atterholt, Dinius, Biaggi, Miller, VanderAkker, Meghji, Nordberg re NHC Agenda w/attachment |
| DX223 | WM000212 | 2019-09-18 | Email from Gilad to Paulson re Follow-up Confidential/Subject to FRE 408 w/attachment |
| DX224 | WM001172 | 2019-09-18 | Email from Dinius to Edwards and Stewart re Fwd:MOU Restructure |
| DX225 | AAI_LINDBERG 0019801 | 2019-09-20 | Email from Nordberg to Mark Knowles and Paulson re MOU |
| DX226 | AAI_LINDBERG 0019803 | 2019-09-21 | Email from Meghji to Dinius, Lindberg, Paulson re Fwd: NHC D&O Coverage w/attachments |
| DX227 | WM000318 | 2019-09-21 | Email from Meghji to Dinius, Lindberg, Paulson re Fwd: NHC D&O Coverage |
| DX228 | AAI_LINDBERG 0019990 | 2019-09-22 | Email from Vandeman to Paulson re Implementation of MOU |
| DX229 | AAI_LINDBERG 0032650 | 2019-09-22 | Email from Lindberg to Meghji, Vandeman, Diniusre Fwd: Hi Anthony, congrats on two solid monthsin a row of strong cash flow... |
| DX230 | WM233045 | 2019-09-22 | Email from Vandeman to Paulson re Implementation of MOU |
| DX231 | GG-PDFEMAILS7-008347 | 2019-09-23 | Email from Pereira to Dinius re HME MBO: Recapand Next Steps |
| DX232 | AAI_LINDBERG 0019993 | 2019-09-24 | Email from Paulson to Knowles re Implementationof MOU |
| DX233 | AAI_LINDBERG 0019996 | 2019-09-24 | Email from Knowles to Paulson re Implementationof MOU |

36

| DX234 | AAI_LINDBERG 0020000 | 2019-09-24 | Email from Paulson to Knowles re Implementation of MOU |
|---|---|---|---|
| DX235 | AAI_LINDBERG 0032664 | 2019-09-24 | Email from Vandeman to Paulson re Implementation of MOU |
| DX236 | WM002164 | 2019-09-24 | Email from Paulson to Vandeman re Implementation of MOU |
| DX237 | WM000928 | 2019-09-26 | Email from Paulson to Meghji re D&O Insurance |
| DX238 | WM001484 | 2019-09-27 | Email from Meghji to Dinius re Fwd: NHC D&O Coverage w/attachment |
| DX239 | AAI_LINDBERG 0032683 | 2019-09-29 | Email from Vandeman to Lindberg, Atterholt, Biaggi, Dinius, Heese, Resnick re MOU Implementation |
| DX240 | WM001940 | 2019-09-29 | Email from Vandeman to Lindberg, Atterholt, Biaggi, Dinius, Heese, Resnick re MOU Implementation |
| DX241 | AAI_LINDBERG 0032692 | 2019-09-30 | Email from Vandeman to Dinius re NHC D&O |
| DX242 | WM000215 | 2019-09-30 | Email from Kellner to Meghji, Dinius re Fwd: NHC D&O Coverage |
| DX243 | WM000309 | 2019-09-30 | Email from Lindberg to Dinius, Meghji, Vandeman re NHC D&O |
| DX244 | WM000310 | 2019-09-30 | Email from Dinius re Fwd: NHC D&O Coverage |
| DX245 | WM001152 | 2019-09-30 | Email from Kroupa to Kellner re FW: NHC D&O Coverage |
| DX246 | WM001472 | 2019-09-30 | Email from Meghji to Dinius re Fwd: NHC D&O Coverage |
| DX247 | WM001635 | 2019-09-30 | Email from Meghji to Dinius re NHC D&O |
| DX248 | WM001740 | 2019-09-30 | Email from Dinius to Murphy re Fwd: NHC D&O Coverage |
| DX249 | AAI_LINDBERG 0020048 | 2019-10-01 | Email from Dinius to Vandeman, Lindberg, Meghji, Resnick, Heese, Atterholt, Dinius, Biaggi, VanderAkker, Nordberg re NHC D&O w/attachment |
| DX250 | AAI_LINDBERG 0032895 | 2019-10-01 | Email from Dinius to Vandeman and Lindberg re NHC D&O w/attachments |
| DX251 | AAI_LINDBERG 0020296 | 2019-10-10 | Email from Paulson to Knowles re FW: MOU Status |

37

| DX252 | AAI_LINDBERG 0020310 | 2019-10-10 | Email from Paulson to Vandeman and Dinius re MOU status |
|---|---|---|---|
| DX253 | AAI_LINDBERG 0020312 | 2019-10-10 | Email from Paulson to Vandeman, Dinius, Knowles, Nordberg, Moore, Meghji re MOU Implementation call |
| DX254 | AAI_LINDBERG 0020313 | 2019-10-10 | Email from Paulson to Vandeman re MOU Status |
| DX255 | AAI_LINDBERG 0036373 | 2019-10-10 | Email from Paulson to Vandeman re MOU Status |
| DX256 | AAI_LINDBERG 0020316 | 2019-10-11 | Email from Paulson to Vandeman, Knowles,Nordberg, Moore, Meghji re Follow-up on Implementation call |
| DX257 | AAI_LINDBERG 0020317 | 2019-10-11 | Email from Knowles to Paulson re Indemnification Agreement and Membership Interest ContributionAgreement/CTST Comments w/attachments |
| DX258 | AAI_LINDBERG 0020361 | 2019-10-12 | Email from Vandeman to Paulson, Tobin, Knowlesre D&O Insurance |
| DX259 | AAI_LINDBERG 0036384 | 2019-10-13 | Email from Paulson to Vandeman, Tobin, Knowles re D&O Insurance |
| DX260 | AAI_LINDBERG 0020368 | 2019-10-14 | Email from Paulson to Vandeman, Nordberg,Knowles, Moore, Meghji, Dinius re MOU Implementation Call on 10/16/2019 |
| DX261 | AAI_LINDBERG 0020369 | 2019-10-14 | Email from Paulson to Vandeman, Nordberg,Knowles, Moore, Meghji, Dinius re MOU Implementation Call on 10/21/2019 |
| DX262 | AAI_LINDBERG 0020370 | 2019-10-14 | Email from Paulson to Vandeman, Nordberg,Knowles, Moore, Meghji, Dinius re MOU Implementation call on 10.23.19 |
| DX263 | AAI_LINDBERG 0020371 | 2019-10-14 | Email from Paulson to Vandeman, Nordberg,Knowles, Moore, Meghji, Dinius re MOU Transaction Checklist w/attachment |
| DX264 | AAI_LINDBERG 0020386 | 2019-10-15 | Email from Paulson to Knowles re Indemnification Agreement and Membership Interest ContributionAgreement/CTST Comments |
| DX265 | AAI_LINDBERG 0020388 | 2019-10-16 | Email from Paulson to Knowles re WyattBooth/Mike Mueller Introduction |

38

| DX266 | AAI_LINDBERG 0020389 | 2019-10-16 | Email from Vandeman to Paulson re D&O Insurance Review/Vinson & Elkins Retainer |
|---|---|---|---|
| DX267 | AAI_LINDBERG 0020392 | 2019-10-16 | Email from Knowles to Paulson, Booth, Mueller re Wyatt Booth/Mike Mueller Introduction |
| DX268 | AAI_LINDBERG 0036390 | 2019-10-16 | Email from Vandeman to Paulson re D&O Insurance Review/Vinson & Elkins Retainer |
| DX269 | AAI_LINDBERG 0020409 | 2019-10-17 | Email from Knowles to Booth, Mueller, Paulson re NHC Master Credit Agreement |
| DX270 | AAI_LINDBERG 0036392 | 2019-10-17 | Email from Vandeman to Paulson re Chickens and Eggs |
| DX271 | AAI_LINDBERG 0036393 | 2019-10-17 | Email from Meghji to Lindberg, Dinius, Knowles, Paulson re Fwd: Quote Update |
| DX272 | AAI_LINDBERG 0020413 | 2019-10-18 | Email from Paulson to Dinius, Nordberg, Vandeman, Meghji, Knowles re Regular check in call at 12:30 |
| DX273 | AAI_LINDBERG 0020414 | 2019-10-18 | Email from Meghji to Vandeman, Lindberg, Dinius, Paulson, Knowles, Gallagher, Tobin, Nordberg re Quote Update |
| DX274 | AAI_LINDBERG 0036398 | 2019-10-18 | Email from Dinius to Resnick, Heese, Vandeman, Lindberg, Atterholt, Biaggi, VanderAkker, Meghji, Nordberg re NHC BOD Meeting via Conference Call on 10/22/2019 |
| DX275 | AAI_LINDBERG 0020416 | 2019-10-20 | Email from Paulson to Vandeman, Nordberg, Meghji, Dinius, Knowles re MOU Transaction Checklist / 10-20-19 Update w/attachment |
| DX276 | AAI_LINDBERG 0036401 | 2019-10-20 | Email from Vandeman to Paulson and Dinius re ULICO |
| DX277 | AAI_LINDBERG 0020422 | 2019-10-21 | Email from Knowles to Paulson, Wyatt, Mueller re NHC Credit Agreement Preliminary Issues List/Rule408 Confidential Communication w/attachment |
| DX278 | AAI_LINDBERG 0020432 | 2019-10-22 | Email from Paulson to Nordberg and Knowles re FW: Paulson |
| DX279 | AAI_LINDBERG 0020648 | 2019-10-23 | Email from Moore to Nordberg and Knowles re NHC Indemnification Agreement Contribution Agreement w/attachments |

39

| | | | |
|---|---|---|---|
| DX280 | AAI_LINDBERG 0020684 | 2019-10-24 | Email from Paul to Vandeman, Nordberg, Knowles,Moore, Meghji, Dinius re Canceled: MOU Implementation call on 10/25/19 |
| DX281 | AAI_LINDBERG 0036409 | 2019-10-25 | Email from Paulson to Vandeman re MOU Implementation |
| DX282 | WM193128 | 2019-10-25 | Email from Stewart to Blankenship re FW: AugustInvoice |
| DX283 | AAI_LINDBERG 0021112 | 2019-10-28 | Email from Paulson to Vandeman, Nordberg, Knowles, Moore, Meghji, Dinius re Canceled: MOU  Implementation call on 10/28/19 |
| DX284 | AAI_LINDBERG 0036415 | 2019-11-11 | Email from Vandeman to Dinius re Our Counter Proposa w/attachment |
| DX285 | WM233323 | 2019-11-12 | Email from Dinius to Obusek, Hoomani, Murphy reFwd: Our Counter Proposa w/attachment |
| DX286 | AAI_LINDBERG 0014294 | 2019-12-04 | Email from Herwig to Lindberg re Fortress just asked if Mo was still working with us on the restructuring |
| DX287 | WM232069 | 2021-06-19 | Email from Dinius to Stewart, Edwards, Hensley reEntity legal names w/attachment |
| DX288 | AAI_LINDBERG 0015463 | | Affidavit of Mike Pereira dated 10.28.19 |
| DX289 | AAI_LINDBERG 0015497 | | Affidavit of Steve Beck dated 10.31.19 |
| DX290 | AAI_LINDBERG 0015506 | | Affidavit of Mohsin Meghji dated 10.30.19 |
| DX291 | AAI_LINDBERG 0015516 | | Affidavit of George Vandeman dated 10.31.19 |
| DX292 | AAI_LINDBERG 0016235 | | Affidavit of Chris Herwig dated 10.31.19 |
| DX293 | AAI_LINDBERG 0020955 | | (FTGU) Promissory Note |
| DX294 | AAI_LINDBERG 0020960 | | Promissory Note Client Services (John Kastner) |
| DX295 | AAI_LINDBERG 0020966 | | Promissory Note Client Services ($2,500,000) |
| DX296 | AAI_LINDBERG 0020987 | | iMedicWare Promissory Note - $6MM (Mar 2019) |
| DX297 | AAI_LINDBERG 0021004 | | EG 4MM Promissory Note (MBW) |
| DX298 | AAI_LINDBERG 0021010 | | Next Level Promissory Note EXECUTED |

40

| | | | |
|---|---|---|---|
| DX299 | AAI_LINDBERG 0021014 | | Intralan Share Purchase Agreement |
| DX300 | AAI_LINDBERG 0021106 | | Promissory Note Client Services ($1,500,000) |
| DX301 | AAI_LINDBERG 0021201 | | Affidavit of Peter Nordberg dated 10/31/19 |
| DX302 | AAI_LINDBERG 0023621 | | Articles of Organization of NHC Holdings, LLC |
| DX303 | AAI_LINDBERG 0025121 | | Lares Equity Equivalence Agreement EXECUTED |
| DX304 | AAI_LINDBERG 0028398 | | US-#1015842-v1-Eli_Global - HME - Execution Copy EEA |
| DX305 | AAI_LINDBERG 0028414 | | 08b. Equity Equivalence Agreements Boston Laser |
| DX306 | AAI_LINDBERG 0028469 | | 06a. E&L Practice Equity Equivalence Agreementdelivered to FECA |
| DX307 | AAI_LINDBERG 0028492 | | 07a. Platform Equity Equivalence Agreementsdelivered to FECA |
| DX308 | AAI_LINDBERG 0028516 | | 07b. Platform Equity Equivalence Agreementsdelivered to ECS |
| DX309 | AAI_LINDBERG 0028540 | | CS Equity Equivalence Agreement EXECUTED |
| DX310 | AAI_LINDBERG 0028549 | | Eli Asset Purchase Agreement (CBCS) EXECUTED |
| DX311 | AAI_LINDBERG 0028564 | | CBCS Equity Equivalence Agreement EXECUTED |
| DX312 | AAI_LINDBERG 0028572 | | ASiM Equity Equivalence Agreement (Stephen Ciraulo) |
| DX313 | AAI_LINDBERG 0028582 | | ASiM Equity Equivalence Agreement (Daniel Guinee) |
| DX314 | AAI_LINDBERG 0028592 | | Local Web Results EEA |
| DX315 | AAI_LINDBERG 0028600 | | Fiasco Equity Equivalence FINAL |
| DX316 | AAI_LINDBERG 0028608 | | Equity Equivalence Agreement - Fortrex, LLC |
| DX317 | AAI_LINDBERG 0028615 | | WWS Equity Equivalence Agreement FINAL |
| DX318 | AAI_LINDBERG 0028622 | | (FTGU) - Equity Equivalence Agreement |

41

| | | | |
|---|---|---|---|
| DX319 | AAI_LINDBERG 0028631 | | Notochord Put and Call Option Agreement (EXECUTED) |
| DX320 | AAI_LINDBERG 0028650 | | Medisec Purchase Agreement |
| DX321 | AAI_LINDBERG 0028761 | | HRweb Equity Equivalence Agreement EXECUTED |
| DX322 | AAI_LINDBERG 0028840 | | Damovo Purchase Agreement |
| DX323 | AAI_LINDBERG 0028978 | | Eli Global - HME - Execution Copy Sellers Note |
| DX324 | AAI_LINDBERG 0038864 | | 05. (Brightwood) - Credit and Guaranty Agreement(Executed_03-05-19) |
| DX325 | AAI_LINDBERG 0039133 | | Executed Third Amended and Restated CreditAgreement (BMO) |
| DX326 | AAI_LINDBERG 0039288 | | Executed Third Amended and Restated CreditAgreement (BMOCP) |
| DX327 | AAI_LINDBERG 0045558 | | Obsidian transaction - Put-Call Option |
| DX328 | AAI_LINDBERG 0045598 | | River Source - EEA (not signed) |
| DX329 | AAI_LINDBERG 0045605 | | DictateIT, Clanwilliam Inv & GHTG - Put-Call Option |
| DX330 | AAI_LINDBERG 0045653 | | HPC - EEA |
| DX331 | AAI_LINDBERG 0045664 | | Informatica Equity Equivalence Agreement |
| DX332 | AAI_LINDBERG 0045723 | | Arcane Tinman and AT Denmark - 2.3 SharedPurchase Option Agreement |
| DX333 | AAI_LINDBERG 0045743 | | Arcane Tinman and AT Denmark - 7.2 SharedPurchase Agreement |
| DX334 | AAI_LINDBERG 0045759 | | Atlanta - SFA - Third Party Sr Loan betweenDamova and Ares |
| DX335 | AAI_LINDBERG 0046050 | | Project Chieftain - Third - Party Sr Loan between Clanwilliam and Alcentra |
| DX336 | AAI_LINDBERG 0046322 | | Borrower Security Pledge Agreement (Beckett)Senior (EXECUTED) - Third Party Loan |
| DX337 | AAI_LINDBERG 0046938 | | 09. Prairie EL Mgmt Equity Equivalence Agreement |

42

| DX338 | AAI_LINDBERG 0046940 | | 25. Stratford Equity Equivalence Agreement |
|---|---|---|---|
| DX339 | | | Report - Dan Baucum |
| DX340 | | | Report - John Dore |
| DX341 | | | Report - Steven Pully |
| DX342 | | | Report - Charles Lundelius |
| DX343 | | | Demonstrative - Redline 2019.06.09 MOU -2019.06.20 MOU |
| DX344 | AAI_LINDBERG 0026495 | 2019-05-14 | From Lindberg to Dinius re MOU and Loan Amendment |
| DX345 | AAI_LINDBERG 0036368 | 2019-10-10 | From Vandeman to Dinius and Paulson re MOU Status |
| DX346 | | | All Written Responses to Discovery |
| DX347 | | | Demonstrative exhibits for use at trial |
| DX348 | | | Any exhibit designated by Plaintiffs or identified inPlaintiffs' exhibit list(s) |
| DX349 | | | Any exhibits used for rebuttal or impeachment, the necessity of which cannot reasonably be anticipated before the time of trial |
| DX350 | | | Any of the 26 complaints filed regarding the Interim Loan Agreement |
| DX351 | | | Various Commitment Transaction Advice (CTA) tickets for CBL, SNIC and/or BLIC where trades approved |

43

**SCHEDULE D**

**PLAINTIFFS' WITNESSES**

1. Jim Atterholt
2. Tom Biaggi
3. Mike Dinius
4. William Epstein
5. Mike Farley
6. Greg Lindberg
7. Fred Heese
8. Lou Hensley
9. Chris Herwig
10. Matt Lane
11. Mohsin "Mo" Meghji
12. Christa Miller
13. John Murphy
14. Brian Stewart
15. Devin Solow
16. David Resnick
17. Videotaped 30(b)(6) Deposition of AAI
18. Videotaped 30(b)(6) Deposition of NEC
19. Videotaped 30(b)(6) Deposition of EMAM
20. All witnesses identified by Defendants

44

## SCHEDULE E

## DEFENDANTS' WITNESSES

1. Bob Alban
2. Daniel Baucum (by deposition or in person)
3. Stephen Beck
4. Greggory Bordes
5. Eric Bostic
6. Mike Causey
7. Mike Dinius
8. John Dore (by deposition or in person)
9. Tamre Edwards
10. Marc Greenspan
11. Lou Hensley
12. Chris Herwig
13. Mark Knowles
14. Sanjeev Kumar
15. Greg Lindberg
16. Ray Martinez
17. Moshin Meghji (by deposition or in person)
18. Christa Miller
19. Jackie Obusek
20. Mike Pereira
21. Steve Pully (by deposition or in person)
22. Brian Stewart
23. George Vandeman
24. Jason VandenAkker
25. Sandi White
26. William Wofford
27. Corporate Representative of Universal Life Insurance Company
28. Corporate Representative of Vista Reinsurance
29. Any witness called by Plaintiffs or identified in Plaintiffs' witness list(s).
30. Any rebuttal or impeaching witnesses.
31. William Epstein and/or Charles Lundelius (by deposition or in person) for purposes of rebuttal only, if necessary.
32. Peter Nordberg and/or David Paulson, in accordance with the parties' stipulation filed on March 15, 2021.

45

## SCHEDULE F

## PLAINTIFFS' ISSUES

### Contract

1. Was the MOU a legally binding contract entered into by the Parties?

2. Is the MOU enforceable?

3. If the Court determines that a portion of the MOU is not enforceable, is that portion severable?

4. Did Defendants breach an express term of the MOU by failing to restructure the Specified Affiliated Companies to become subsidiaries of the new holding company on or before September 30, 2019?

5. Is specific performance the appropriate remedy for Defendants' breach of the MOU?

6. What amount of damages are Plaintiffs entitled to for Defendants' breach?

7. Did Defendants accept benefits under the MOU, ILA, and Revolver?

8. Are Defendants estopped from denying that the MOU is a valid contract based on their acceptance of its benefits?

### Fraud

9. Did Defendants knowingly or recklessly make false representations and warranties within the MOU?

10. Did the Defendants intend to induce Plaintiffs to rely on their false representations and warranties to enter into the MOU?

11. Did Plaintiffs reasonably rely on Defendants' representations and warranties in entering into the MOU?

12. Were Plaintiffs injured by their reasonable reliance upon Defendants' false representations and warranties, and if so, in what amount?

### Negligent Misrepresentation

13. Did Defendants owe Plaintiffs a duty of reasonable care regarding the accuracy of the representations and warranties contained in the MOU?

46

14.     Did Defendants make false representations and warranties without reasonable care?

15.     Did Plaintiffs justifiably rely on Defendants' false representations and warranties to their detriment?

16.     Were Plaintiffs injured by Defendants' false representations and warranties, and if so, in what amount?

Case 3:23-cr-00048-MOC-DCK     Document 132-4     Filed 05/04/26     Page 116 of 194

## SCHEDULE G

## DEFENDANTS' ISSUES

### Contract

1. Was the MOU a legally binding contract entered into by the Parties?

2. Is the MOU enforceable?

   a. Is the MOU void as against public policy?
   b. Is the MOU illegal?
   c. Was the MOU procured by duress?
   d. Was the MOU based on mistake?

3. If the Court determines that a portion of the MOU is not enforceable, is that portion severable?

4. Were Defendants excused from performing under the MOU?

   a. Did Plaintiffs breach the MOU first, repudiate it, or prevent Defendants from performing?
   b. Was performance of the MOU possible?
   c. Was performance of the MOU practicable?
   d. Was the purpose of the MOU frustrated?
   e. Was there a failure of condition precedent?
   f. Did Plaintiffs waive Defendants' performance?
   g. Are Plaintiffs estopped from enforcing the MOU?
   h. Are Plaintiffs barred from enforcing the MOU based on the doctrine of unclean hands?

5. If the Court determines that Defendants were not excused, did Defendants breach an express term of the MOU by failing to restructure the Specified Affiliated Companies to become subsidiaries of the new holding company on or before September 30, 2019?

6. If so, was Defendants' breach material?

7. Were Plaintiffs injured by Defendants' alleged breach of the MOU?

8. If so, in what amount?

9. Is specific performance the appropriate remedy for Defendants' alleged breach of the MOU?

48

### Fraud

10. Did Defendants knowingly or recklessly make false representations and warranties within the MOU?

11. If so, were Defendants' false representations and warranties material?

12. Did the Defendants intend to induce Plaintiffs to rely on their allegedly false representations and warranties to enter into the MOU?

13. Did Plaintiffs reasonably rely on Defendants' representations and warranties in entering into the MOU by conducting reasonable diligence and an independent investigation?

14. Were Plaintiffs injured by Defendants' allegedly false representations and warranties, and if so, in what amount?

### Negligent Misrepresentation

15. May Plaintiffs recover on a claim for negligent misrepresentation based on Defendants' alleged breach of representations and warranties in the MOU?

16. If so, did Defendants owe Plaintiffs a duty of care?

17. Did Defendants prepare their representations and warranties in the MOU with reasonable care?

18. Did Plaintiffs justifiably rely on Defendants' representations and warranties to their detriment?

19. Were Plaintiffs injured by Defendants' representations and warranties, and if so, in what amount?

49

## SCHEDULE H

### DEFENDANTS' DEPOSITION DESIGNATIONS
### OF MOHSIN MEGHJI

| From: Pg:Ln | To Pg:Ln |
|---|---|
| 6:2 | 7:19 |
| 9:12 | 9:22 |
| 10:8 | 11:13 |
| 12:21 | 13:2 |
| 13:6 | 13:7 |
| 13:15 | 14:3 |
| 14:7 | 15:9 |
| 16:2 | 17:16 |
| 18:20 | 20:4 |
| 20:9 | 20:15 |
| 21:13 | 24:9 |
| 24:14 | 24:20 |
| 26:19 | 27:7 |
| 27:12 | 28:19 |
| 29:5 | 29:10 |
| 29:17 | 30:18 |
| 31:6 | 32:11 |
| 33:3 | 33:11 |
| 33:18 | 34:4 |
| 35:24 | 37:7 |
| 37:9 | 39:2 |
| 39:15 | 40:4 |
| 40:11 | 41:14 |
| 43:13 | 43:15 |
| 43:23 | 44:23 |

50

| | |
|---|---|
| 45:12 | 45:16 |
| 46:11 | 46:21 |
| 47:5 | 48:18 |
| 48:22 | 49:8 |
| 50:1 | 50:6 |
| 50:18 | 51:8 |
| 52:2 | 54:19 |
| 55:12 | 56:4 |
| 57:2 | 57:14 |
| 57:21 | 58:11 |
| 67:16 | 68:18 |
| 70:13 | 72:3 |
| 72:8 | 72:24 |
| 73:6 | 73:11 |
| 74:10 | 74:20 |
| 76:8 | 76:13 |
| 76:16 | 77:3 |
| 84:8 | 84:20 |
| 92:25 | 93:9 |
| 95:17 | 96:4 |
| 101:2 | 101:16 |
| 141:22 | 142:3 |
| 146:10 | 147:8 |
| 149:22 | 150:4 |

# EXHIBIT D

**From:** Greg Johnson <gjohnson@eliglobal.com>
**Sent:** Wednesday, June 26, 2019 8:38 PM
**To:** Chris Herwig <cherwig@eliglobal.com>; Mike Dinius <MDinius@noblecon.net>; 'Brian Stewart' <Brian.Stewart@globalbankers.com>
**Cc:** Henry Capants <hcapants@eliglobal.com>; 'Greg Lindberg' <gelindberg@gmail.com>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Brian,

Attached is the final version with the repos updated into the senior tab.

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email. gjohnson@eliglobal.com

---

**From:** Chris Herwig
**Sent:** Wednesday, June 26, 2019 7:36 PM
**To:** Mike Dinius <MDinius@noblecon.net>; Greg Johnson <gjohnson@eliglobal.com>; 'Brian Stewart' <Brian.Stewart@globalbankers.com>
**Cc:** Henry Capants <hcapants@eliglobal.com>; 'Greg Lindberg' <gelindberg@gmail.com>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

This is final.

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354
Email. cherwig@eliglobal.com

**From:** Mike Dinius <MDinius@noblecon.net>
**Sent:** Wednesday, June 26, 2019 7:15 PM
**To:** Greg Johnson <gjohnson@eliglobal.com>; Chris Herwig <cherwig@eliglobal.com>; 'Brian Stewart' <Brian.Stewart@globalbankers.com>
**Cc:** Henry Capants <hcapants@eliglobal.com>; 'Greg Lindberg' <gelindberg@gmail.com>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Is this the final version? We can't keep making changes.

Thank You,

Mike Dinius

---

**From:** Greg Johnson <gjohnson@eliglobal.com>
**Sent:** Wednesday, June 26, 2019 7:10 PM
**To:** Mike Dinius <MDinius@noblecon.net>; Chris Herwig <cherwig@eliglobal.com>; 'Brian Stewart' <Brian.Stewart@globalbankers.com>
**Cc:** Henry Capants <hcapants@eliglobal.com>; 'Greg Lindberg' <gelindberg@gmail.com>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Attached is an updated version. Pref accrual was removed per conversation about the recognition of the dividend accrual and I updated the debt structure to reference the amounts pre addback which tie out to the schedules.

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email. gjohnson@eliglobal.com

---

**From:** Greg Johnson
**Sent:** Wednesday, June 26, 2019 6:28 PM
**To:** Mike Dinius <MDinius@noblecon.net>; Chris Herwig <cherwig@eliglobal.com>; 'Brian Stewart' <Brian.Stewart@globalbankers.com>
**Cc:** Henry Capants <hcapants@eliglobal.com>; 'Greg Lindberg' <gelindberg@gmail.com>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; 'Matt Lane'

<william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Mike,

There other three repos are on the PBLA Main schedule. Anything PBLA Main is excluded from the senior/junior/etc schedules.

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email. gjohnson@eliglobal.com

---

**From:** Mike Dinius <MDinius@noblecon.net>
**Sent:** Wednesday, June 26, 2019 6:03 PM
**To:** Chris Herwig <cherwig@eliglobal.com>; 'Brian Stewart' <Brian.Stewart@globalbankers.com>
**Cc:** Greg Johnson <gjohnson@eliglobal.com>; Henry Capants <hcapants@eliglobal.com>; 'Greg Lindberg' <gelindberg@gmail.com>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Chris,

For the total on the debt structure sheet, you are starting with $2,417,048,589. The total of the sheets equal the amount below. The difference is Finanzen and Medical Physics, so it appears that these two are included in the detail sheets for senior and pref. This is fine, but we need to change the starting number.

| | |
|---|---|
| Senior | 1,297,775,506 |
| Junior | 50,627,880 |
| Pref | 199,310,520 |
| PBLA Main | 259,444,442 |
| Ins co holdcos | 278,259,510 |
| Agera | 188,138,463 |
| AAH Pref | 130,637,718 |
| NHC Exclusions | 87,755,931 |
| | |
| | 2,491,949,970 |

Also, I see that some of the repos are in the seniors, where are the remainder?

Thank You,

Mike Dinius

---

**From:** Chris Herwig <cherwig@eliglobal.com>
**Sent:** Wednesday, June 26, 2019 5:41 PM
**To:** Brian Stewart <Brian.Stewart@globalbankers.com>
**Cc:** Greg Johnson <gjohnson@eliglobal.com>; Henry Capants <hcapants@eliglobal.com>; Greg Lindberg <gelindberg@gmail.com>; Mike Dinius <MDinius@noblecon.net>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; Matt Lane <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** Re: [External Email] Re: Schedules

Ok, thought we were using $1B.  Then Greg's file is accurate in that regard.

Thanks,
Chris


Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354
Email. cherwig@eliglobal.com

On Jun 26, 2019, at 5:38 PM, Brian Stewart <Brian.Stewart@globalbankers.com> wrote:

> The senior loan should not be a plug, it should be the amount of the current senior exposure less the permitted exclusions.
>
> Brian Stewart – 804.625.5427

> **From:** Chris Herwig <cherwig@eliglobal.com>
> **Date:** Wednesday, June 26, 2019 at 5:34 PM
> **To:** Greg Johnson <gjohnson@eliglobal.com>, Brian Stewart <Brian.Stewart@globalbankers.com>, Henry Capants <hcapants@eliglobal.com>, 'Greg Lindberg' <gelindberg@gmail.com>, Mike Dinius <Mdinius@noblecon.net>
> **Cc:** Christa Miller <cmiller@eliglobal.com>, Eric Bostic <ebostic@eliglobal.com>, Matt Lane <william.lane@globalbankers.com>, Devin Solow <dsolow@eliglobal.com>

**Subject:** RE: [External Email] Re: Schedules

I changed this so the senior NHC loan is $1B.  No other changes.

Greg J will send a quick explanation on the accrued on the pref.

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354
Email. cherwig@eliglobal.com

---

**From:** Chris Herwig
**Sent:** Wednesday, June 26, 2019 5:17 PM
**To:** Greg Johnson <gjohnson@eliglobal.com>; Brian Stewart <Brian.Stewart@globalbankers.com>; Henry Capants <hcapants@eliglobal.com>; 'Greg Lindberg' <gelindberg@gmail.com>; Mike Dinius <MDinius@noblecon.net>
**Cc:** Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; Matt Lane <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Thanks Greg…Looping in Greg and Mike on this also while still subject to review of the broader group.

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354
Email. cherwig@eliglobal.com

---

**From:** Greg Johnson
**Sent:** Wednesday, June 26, 2019 5:12 PM

**To:** Brian Stewart <Brian.Stewart@globalbankers.com>; Henry Capants <hcapants@eliglobal.com>
**Cc:** Chris Herwig <cherwig@eliglobal.com>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; Matt Lane <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

All,

Please see version attached. Main changes:
- Fixed the AAPC underlying the PPNs Brian mentioned
- Removed Malta and added exclusions
- Added the subtractions to the schedules
- The lines under total on the summary tab tie out to the loan schedules for both principal and P+I
- Agera- Updated during tie out- I did not change Mckinley because it would cause a double count (Mckinley exposure is already accounted for on the Agera exposure list)
- Insurance- we caught these errors on the list while tying out and have updated here

I believe that addresses everything mentioned but, please let me know if there are any other concerns.

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email. gjohnson@eliglobal.com

---

**From:** Brian Stewart <Brian.Stewart@globalbankers.com>
**Sent:** Wednesday, June 26, 2019 4:13 PM
**To:** Henry Capants <hcapants@eliglobal.com>; Greg Johnson <gjohnson@eliglobal.com>
**Cc:** Chris Herwig <cherwig@eliglobal.com>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; Matt Lane <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** Re: [External Email] Re: Schedules

Henry,

Thanks for the feedback.  Let me know once you have updated the AAPC pref

outstanding.

Thanks

Brian Stewart – 804.625.5427

---

**From:** Henry Capants <hcapants@eliglobal.com>
**Date:** Wednesday, June 26, 2019 at 4:05 PM
**To:** Brian Stewart <Brian.Stewart@globalbankers.com>, Greg Johnson <gjohnson@eliglobal.com>
**Cc:** Chris Herwig <cherwig@eliglobal.com>, Christa Miller <cmiller@eliglobal.com>, Eric Bostic <ebostic@eliglobal.com>, Matt Lane <william.lane@globalbankers.com>, Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Hey Brian,

On Pierre Mendes it looks like your formula is including the 46M loan to CAF III in addition to all of the underlying investments which is why it's so much higher. Barclays and Franklin Street we need to update the AAPC pref outstanding, which will decrease affiliate investment in Barclays and increase affiliate investment in Franklin Street. The other three look good from our side

Thanks,

Henry Capants
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone: 919-295-9964
VOIP: 3761
Cell: 561-866-9209
Email: hcapants@eliglobal.com

---

**From:** Brian Stewart <Brian.Stewart@globalbankers.com>
**Sent:** Wednesday, June 26, 2019 3:36 PM
**To:** Greg Johnson <gjohnson@eliglobal.com>
**Cc:** Chris Herwig <cherwig@eliglobal.com>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; Matt Lane <william.lane@globalbankers.com>; Devin

Solow <<u>dsolow@eliglobal.com</u>>; Henry Capants <<u>hcapants@eliglobal.com</u>>
**Subject:** Re: [External Email] Re: Schedules

Greg,

I was trying to validate some of the numbers and saw a potential issue with the PPNs. When I pull out the holdings related to the PPNs I see situations where the underlying is much higher than expected, even higher than the investment in the PPN in one case. See attached a summary based on the Aggregate tab in your file.

Let me know your thoughts.

Thanks
Brian

Brian Stewart – 804.625.5427

---

**From:** Greg Johnson <<u>gjohnson@eliglobal.com</u>>
**Date:** Wednesday, June 26, 2019 at 2:01 PM
**To:** Brian Stewart <<u>Brian.Stewart@globalbankers.com</u>>, Chris Herwig <<u>cherwig@eliglobal.com</u>>, Christa Miller <<u>cmiller@eliglobal.com</u>>, Eric Bostic <<u>ebostic@eliglobal.com</u>>, Matt Lane <<u>william.lane@globalbankers.com</u>>, Devin Solow <<u>dsolow@eliglobal.com</u>>, Henry Capants <<u>hcapants@eliglobal.com</u>>
**Subject:** RE: [External Email] Re: Schedules

Brian/Chris,

Attached is a version with no Malta- same total. Please share with Mike if necessary.

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email. <u>gjohnson@eliglobal.com</u>

**From:** Mike Dinius <MDinius@noblecon.net>
**Sent:** Wednesday, June 26, 2019 1:26 PM
**To:** 'Brian Stewart' <Brian.Stewart@globalbankers.com>; Greg Johnson <gjohnson@eliglobal.com>; Chris Herwig <cherwig@eliglobal.com>; Christa Miller <cmiller@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>; Henry Capants <hcapants@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Why is Malta scheduled out separately?

Thank You,

Mike Dinius

---

**From:** Brian Stewart <Brian.Stewart@globalbankers.com>
**Sent:** Wednesday, June 26, 2019 12:54 PM
**To:** Mike Dinius <MDinius@noblecon.net>
**Subject:** [External Email] FW: [External Email] Re: Schedules

Mike – I'm sending this before final review in the interest of time. I am traveling back to Durham later this afternoon, but will review while I'm on the plane. Matt Lane is reviewing and will provide his comments later today as well.

Thanks

Brian Stewart – 804.625.5427

---

**From:** Greg Johnson <gjohnson@eliglobal.com>
**Date:** Wednesday, June 26, 2019 at 11:20 AM
**To:** Chris Herwig <cherwig@eliglobal.com>, Eric Bostic <ebostic@eliglobal.com>, Brian Stewart <Brian.Stewart@globalbankers.com>
**Cc:** Matt Lane <william.lane@globalbankers.com>, Devin Solow <dsolow@eliglobal.com>, Devin Solow <dsolow@eliglobal.com>, Henry Capants <hcapants@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Brian/Chris,

See attached with loan lists populated. Let me know if you have any questions/comments.

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email. gjohnson@eliglobal.com

---

**From:** Greg Johnson
**Sent:** Wednesday, June 26, 2019 9:33 AM
**To:** Chris Herwig <cherwig@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>; 'Brian Stewart' <Brian.Stewart@globalbankers.com>
**Cc:** 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Yes, updating that now. Will change agera valuations as well, we were told to use Q4 on the 4/30 version.

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email. gjohnson@eliglobal.com

---

**From:** Chris Herwig
**Sent:** Wednesday, June 26, 2019 9:31 AM
**To:** Eric Bostic <ebostic@eliglobal.com>; Greg Johnson <gjohnson@eliglobal.com>; 'Brian Stewart' <Brian.Stewart@globalbankers.com>
**Cc:** 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Other than Agera the numbers look reasonable to me.  Can you change AAPC to $14 mm at AIC which is all via NOM GB I believe.

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354
Email. cherwig@eliglobal.com

---

**From:** Chris Herwig
**Sent:** Wednesday, June 26, 2019 9:28 AM
**To:** Eric Bostic <ebostic@eliglobal.com>; Greg Johnson <gjohnson@eliglobal.com>;
'Brian Stewart' <Brian.Stewart@globalbankers.com>
**Cc:** 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow
<dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Numbers are pro-forma for 6/30 so should use the 3/31 valuation.

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354
Email. cherwig@eliglobal.com

---

**From:** Eric Bostic
**Sent:** Wednesday, June 26, 2019 9:26 AM
**To:** Chris Herwig <cherwig@eliglobal.com>; Greg Johnson <gjohnson@eliglobal.com>;
'Brian Stewart' <Brian.Stewart@globalbankers.com>
**Cc:** 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow
<dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Are we using 12/31 valuation or 3/31?

Best,

Eric

Eric Bostic
Eli Global, LLC

2222 Sedwick Road
Durham, NC 27713
Phone. 919-921-8114
Cell. 704-689-1459
VOIP. 3504
Email. ebostic@eliglobal.com

---

**From:** Chris Herwig
**Sent:** Wednesday, June 26, 2019 9:24 AM
**To:** Greg Johnson <gjohnson@eliglobal.com>; 'Brian Stewart'
<Brian.Stewart@globalbankers.com>
**Cc:** 'Matt Lane' <william.lane@globalbankers.com>; Devin Solow
<dsolow@eliglobal.com>; Eric Bostic <ebostic@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Agera seems too high especially given the writedowns.  Did Eric confirm those
numbers?

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354
Email. cherwig@eliglobal.com

---

**From:** Chris Herwig
**Sent:** Wednesday, June 26, 2019 9:20 AM
**To:** Greg Johnson <gjohnson@eliglobal.com>; Brian Stewart
<Brian.Stewart@globalbankers.com>
**Cc:** Matt Lane <william.lane@globalbankers.com>; Devin Solow
<dsolow@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Why did it increase so much?

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272

VOIP 3354
Email. cherwig@eliglobal.com

---

**From:** Greg Johnson
**Sent:** Wednesday, June 26, 2019 9:12 AM
**To:** Brian Stewart <Brian.Stewart@globalbankers.com>
**Cc:** Matt Lane <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>; Chris Herwig <cherwig@eliglobal.com>
**Subject:** RE: [External Email] Re: Schedules

Brian,

Attached is the updated model. I'm populating the exhibits with the loans listed out now. Should have that to you in 15-20 min. Main difference here are from the PPNs. Note that the amount subtracted for non-affiliate zeros is based on Carson's ledger rather than the file you had previously produced. I think this is more accurate after the unwinds but, let me know if you disagree (see read Through Principal lines 10-21).

Total increased to 2,481,806,421.33 overall principal compared to 2,413,730,981.51 in Greg L's file. Please let me know if you have any comments.

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email. gjohnson@eliglobal.com

---

**From:** Chris Herwig
**Sent:** Wednesday, June 26, 2019 7:08 AM
**To:** Greg Johnson <gjohnson@eliglobal.com>
**Cc:** Brian Stewart <Brian.Stewart@globalbankers.com>; Matt Lane <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** Re: [External Email] Re: Schedules

Practice Insight addback should go away since that is in 6/30 numbers. Finanzen and Med Physics addbacks should stay.

When you send out final version can you include something in the email that states the new total debt amount compared to what it was in Greg's L version.

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354
Email. cherwig@eliglobal.com

On Jun 26, 2019, at 6:23 AM, Greg Johnson <gjohnson@eliglobal.com> wrote:

Ok, will do.

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email. gjohnson@eliglobal.com

**From:** Chris Herwig
**Sent:** Wednesday, June 26, 2019 6:19 AM
**To:** Greg Johnson <gjohnson@eliglobal.com>
**Cc:** Brian Stewart <Brian.Stewart@globalbankers.com>; Matt Lane <william.lane@globalbankers.com>; Devin Solow <dsolow@eliglobal.com>
**Subject:** Re: [External Email] Re: Schedules

Also, please tie it in to the first tab like it is currently.

Thanks,
Chris


Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638

Cell. 443-928-3272
VOIP 3354
Email. cherwig@eliglobal.com

On Jun 25, 2019, at 11:35 PM, Greg Johnson <gjohnson@eliglobal.com>
wrote:

Got it.

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email. gjohnson@eliglobal.com

On Jun 25, 2019, at 11:34 PM, Chris Herwig
<cherwig@eliglobal.com> wrote:

See attached for the format.....keep the
summary tab as is with

Senior

Junior

Preference Shares

AAPC

Malta

PBLA Main

Insurance

Agera

You can remove Malta if you want or can leave
as is.

And add a tab for the exclusions like in the attached – MOU Exhibit D.

UKAT

Proactive

Fleet Assist

Future Source

BCC Research

Shopper Local

Targeted Metrics

PBO

ProEd Tech


Does that make sense?

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354
Email.
cherwig@eliglobal.com<mailto:cherwig@eliglobal.com>

From: Greg Johnson
Sent: Tuesday, June 25, 2019 11:28 PM
To: Chris Herwig <cherwig@eliglobal.com>
Cc: Brian Stewart <Brian.Stewart@globalbankers.com>; Matt

Lane <william.lane@globalbankers.com>; Devin
Solow <dsolow@eliglobal.com>
Subject: Re: [External Email] Re: Schedules

So remove the additional tranches on the
excluded list or leave similar to what I just
sent?

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road<x-apple-data-
detectors://1/1>
Durham, NC 27713<x-apple-data-
detectors://1/1>
Phone. 919-355-5602<tel:919-355-5602>
VOIP: 3774
Cell. 860-227-8049<tel:860-227-8049>
Email.
gjohnson@eliglobal.com<mailto:gjohnson@eli
global.com>

On Jun 25, 2019, at 11:25 PM, Chris Herwig
<cherwig@eliglobal.com<mailto:cherwig@eligl
obal.com>> wrote:
I talked to Greg L and he just asked to update
the spreadsheet as currently constructed so
summary tab would stay the same.
Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road<x-apple-data-
detectors://4/1>
Durham, NC 27713<x-apple-data-
detectors://4/1>
Tel. 239-280-4293<tel:239-280-4293>
Fax. 919-287-2638<tel:919-287-2638>
Cell. 443-928-3272<tel:443-928-3272>
VOIP 3354
Email.
cherwig@eliglobal.com<mailto:cherwig@eliglo

bal.com>

On Jun 25, 2019, at 11:23 PM, Brian Stewart <Brian.Stewart@globalbankers.com<mailto:Brian.Stewart@globalbankers.com>> wrote:
Only AAPC and the other excluded companies.
 I think Agera is a separate tranche, but everything else is according to its senior, junior, pref tranche.

Brian Stewart - 804.625.5427

_____

From: Greg Johnson <gjohnson@eliglobal.com<mailto:gjohnson@eliglobal.com>>
Sent: Tuesday, June 25, 2019 11:17 PM
To: Brian Stewart; Chris Herwig; Matt Lane; Devin Solow
Subject: RE: [External Email] Re: Schedules


Attached is the current version. As mentioned, we need to tie a few things out mainly regarding PPNs/unwinds. What is going on the summary page for the tranches- are agera, insurance holdco, malta, and AAPC being removed?

Thanks,

Greg Johnson
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Phone. 919-355-5602
VOIP: 3774
Cell. 860-227-8049
Email.
gjohnson@eliglobal.com<mailto:gjohnson@eliglobal.com>

From: Brian Stewart <Brian.Stewart@globalbankers.com<mailto:Brian.Stewart@globalbankers.com>>

Sent: Tuesday, June 25, 2019 10:38 PM
To: Chris Herwig
<cherwig@eliglobal.com<mailto:cherwig@eligl
obal.com>>; Greg Johnson
<gjohnson@eliglobal.com<mailto:gjohnson@el
iglobal.com>>; Matt Lane
<william.lane@globalbankers.com<mailto:willia
m.lane@globalbankers.com>>; Devin Solow
<dsolow@eliglobal.com<mailto:dsolow@eliglo
bal.com>>
Subject: Re: [External Email] Re: Schedules

9 is fine.  We're in Board meetings 8:30 -
10:30am, but I should be able to review
concurrently.

Brian Stewart - 804.625.5427

_____

From: Chris Herwig
<cherwig@eliglobal.com<mailto:cherwig@eligl
obal.com>>
Sent: Tuesday, June 25, 2019 10:31 PM
To: Brian Stewart; Greg Johnson; Matt Lane;
Devin Solow
Subject: RE: [External Email] Re: Schedules

Thanks....Greg, can you send your draft tonight
and send as close to final as possible by 9
tomorrow morning?  Brian, is 9 good for you or
you need earlier?  Not sure how much time you
need once you get the file.

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638
Cell. 443-928-3272
VOIP 3354

Email.
[cherwig@eliglobal.com](mailto:cherwig@eliglobal.com)<[mailto:cherwig@eliglobal.com](mailto:cherwig@eliglobal.com)>

_____

From: Brian Stewart
[[Brian.Stewart@globalbankers.com](mailto:Brian.Stewart@globalbankers.com)<[mailto:Brian.Stewart@globalbankers.com](mailto:Brian.Stewart@globalbankers.com)>]
Sent: Tuesday, June 25, 2019 10:24 PM
To: Chris Herwig; Greg Johnson; Matt Lane; Devin Solow
Subject: Re: [External Email] Re: Schedules
The whole file, please. But if there are specific pieces that can't be finished, let me know.


Brian Stewart
M - 804.625.5427
W - 919.864.2429

_____

From: Chris Herwig
<[cherwig@eliglobal.com](mailto:cherwig@eliglobal.com)<[mailto:cherwig@eliglobal.com](mailto:cherwig@eliglobal.com)>>
Sent: Tuesday, June 25, 2019 10:16:29 PM
To: Greg Johnson; Brian Stewart; Matt Lane; Devin Solow
Subject: FW: [External Email] Re: Schedules


Guys, we need to get this done by tomorrow morning at the latest….updating essentially all of the tabs in the attached.  The only new addition from your prior sheet Greg is the exclusions tab, which I think is pretty straightforward.  Brian, you need this whole file, is that correct?  Or just a certain piece?

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road
Durham, NC 27713
Tel. 239-280-4293
Fax. 919-287-2638

Cell. 443-928-3272
VOIP 3354
Email.
cherwig@eliglobal.com<mailto:cherwig@eliglobal.com>

From: Mike Dinius
<MDinius@noblecon.net<mailto:MDinius@noblecon.net>>
Sent: Tuesday, June 25, 2019 10:00 PM
To: Chris Herwig
<cherwig@eliglobal.com<mailto:cherwig@eliglobal.com>>
Cc: Greg Lindberg
<gelindberg@gmail.com<mailto:gelindberg@gmail.com>>; Brian Stewart
<Brian.Stewart@globalbankers.com<mailto:Brian.Stewart@globalbankers.com>>; Peter
Nordberg
<PNordberg@eliglobal.com<mailto:PNordberg@eliglobal.com>>; Greenberg, Andrew
<Andrew.Greenberg@cwt.com<mailto:Andrew.Greenberg@cwt.com>>; Maman, Michele
<Michele.Maman@cwt.com<mailto:Michele.Maman@cwt.com>>; Petrick, Gregory
<gregory.petrick@cwt.com<mailto:gregory.petrick@cwt.com>>
Subject: Re: [External Email] Re: Schedules

We need 6/30 numbers
Mike Dinius

On Jun 25, 2019, at 9:35 PM, Chris Herwig
<cherwig@eliglobal.com<mailto:cherwig@eliglobal.com>> wrote:
This is as of 4/30….we were rolling forward to
6/30….is that still what is needed?  Or 4/30 is
good?

Thanks,
Chris

Chris Herwig
Eli Global, LLC
2222 Sedwick Road

Durham, NC 27713

Tel. 239-280-4293

Fax. 919-287-2638

Cell. 443-928-3272

VOIP 3354

Email.
cherwig@eliglobal.com<mailto:cherwig@eliglobal.com>

From: Greg Lindberg
<gelindberg@gmail.com<mailto:gelindberg@gmail.com>>
Sent: Tuesday, June 25, 2019 9:10 PM
To: Mike Dinius
<MDinius@noblecon.net<mailto:MDinius@noblecon.net>>
Cc: Chris Herwig
<cherwig@eliglobal.com<mailto:cherwig@eliglobal.com>>; Brian Stewart
<Brian.Stewart@globalbankers.com<mailto:Brian.Stewart@globalbankers.com>>; Peter Nordberg
<PNordberg@eliglobal.com<mailto:PNordberg@eliglobal.com>>; Greenberg, Andrew
<Andrew.Greenberg@cwt.com<mailto:Andrew.Greenberg@cwt.com>>; Maman, Michele
<Michele.Maman@cwt.com<mailto:Michele.Maman@cwt.com>>; Petrick, Gregory
<gregory.petrick@cwt.com<mailto:gregory.petrick@cwt.com>>
Subject: Re: [External Email] Re: Schedules

Hi Mike,

Attached is what I believe is the final list of schedules for the debt amendment...

This lists out all the loans by the various categories.

Chris/Brian, please review and update if any changes ASAP -- no later than tomorrow morning.

Thanks,

GREG

On Tue, Jun 25, 2019 at 7:14 PM Mike Dinius <MDinius@noblecon.net<mailto:MDinius@noblecon.net>> wrote:
The team at Eli still do not have a draft of the schedules yet.
Mike Dinius

Begin forwarded message:
From: Brian Stewart <Brian.Stewart@globalbankers.com<mailto:Brian.Stewart@globalbankers.com>>
Date: June 25, 2019 at 7:05:10 PM EDT
To: Mike Dinius <MDinius@noblecon.net<mailto:MDinius@noblecon.net>>
Subject: [External Email] Re: Schedules
I do not yet. The Eli folks are still working to provide something for review. They said tomorrow. I will push for early in the day.


Brian Stewart
M - 804.625.5427
W - 919.864.2429

_____
From: Mike Dinius <MDinius@noblecon.net<mailto:MDinius@noblecon.net>>
Sent: Tuesday, June 25, 2019 5:38:34 PM
To: Brian Stewart
Subject: Schedules

Do you have draft schedules for the various types of loans that I can review?

Mike Dinius

<6.25.19. Restructure Tranches v17.DRAFT.SEND TO NOBLE.xlsx>

**Affiliate Exposure**
*Direct holdings of companies below only- See data tab for full list that includes underlying investments
*Principal Only

| | Senior | Junior | Preference Shares | AAPC | PBLA Main | Insurance | Agera | Other Exclusions | Total Principal |
|---|---|---|---|---|---|---|---|---|---|
| CBL | 632,110,464.35 | 31,216,732.27 | 83,026,291.28 | 69,916,155.75 | - | 80,606,516.55 | 86,953,983.22 | 42,883,123.51 | **983,830,143.41** |
| BLIC | 30,734,348.70 | 2,597,057.88 | 8,831,148.60 | 7,748,225.33 | - | 5,082,517.44 | 5,799,971.72 | 2,174,739.91 | **60,793,269.67** |
| SNIC | 78,643,967.23 | 5,194,115.75 | 14,229,097.16 | 16,888,467.16 | - | 21,160,934.01 | 7,112,222.74 | 7,598,441.70 | **143,228,804.03** |
| **Total GBIG** | 741,488,780.28 | 39,007,905.90 | 106,086,537.04 | 94,552,848.23 | - | 106,849,967.99 | 99,866,177.68 | 52,656,305.13 | **1,187,852,217.12** |
| | | | | | | | | | |
| PBLA | 409,364,370.69 | 686,668.05 | 5,304,224.84 | 9,807,106.21 | - | 55,296,322.45 | 882,058.68 | 3,470,664.89 | **481,340,750.92** |
| Northstar | 39,691,386.11 | 8,499,478.66 | 51,688,649.49 | 1,663,346.13 | - | 60,328,062.73 | 9,041,487.31 | 24,658,336.71 | **170,912,410.43** |
| PBIHL | - | - | 29,361,871.49 | - | - | 958,353.38 | 13,039,280.00 | - | **43,359,504.87** |
| OMNIA | - | - | 2,308,395.21 | - | - | 172,503.61 | 40,651,552.91 | - | **43,132,451.73** |
| **Total Bermuda** | 449,055,756.81 | 9,186,146.71 | 88,663,141.02 | 11,470,452.34 | 254,540,394.99 | 116,755,242.17 | 63,614,378.89 | 28,129,001.60 | **993,285,512.94** |
| | | | | | | | | | |
| Standard Re | - | 822,836.17 | - | - | - | 675,000.00 | - | - | **1,497,836.17** |
| Vista/USAP | 89,861,728.41 | - | 5,272,747.31 | 6,183,381.89 | - | 40,179,865.99 | 19,326,567.75 | 3,156,111.35 | **160,824,291.35** |
| Vista/AIC | - | - | (0.00) | 14,111,281.23 | - | - | - | - | **14,111,281.23** |
| **Total Others** | 89,861,728.41 | 822,836.17 | 5,272,747.31 | 20,294,663.12 | - | 40,854,865.99 | 19,326,567.75 | 3,156,111.35 | **176,433,408.75** |
| | | | | | | | | | |
| **Total All** | **1,280,406,265.49** | **49,016,888.78** | **200,022,425.37** | **126,317,963.69** | **254,540,394.99** | **264,460,076.15** | **182,807,124.32** | **83,941,418.07** | **2,441,512,556.87** |
| **Total on Schedule** | 1,280,406,265.49 | 49,016,888.78 | 200,022,425.37 | 126,317,963.69 | 254,540,394.99 | 264,460,076.15 | 182,807,124.32 | 83,941,418.07 | |
| **Difference** | - | - | - | 0.00 | - | (0.00) | 0.00 | (0.00) | |
| | | | | | | | | | |
| **Pro Forma Addbacks** | | | | | | | | | |
| SPA signed Finanzen Holdings Inc | 69,800,433.82 | - | 1,100,000.00 | | Addback trache is based on paydown from insurance company perspective. | | | | |
| LOI Signed Medical Physics LLC | 4,000,947.07 | - | - | | | | | | |
| **Total Addbacks** | 73,801,380.89 | - | 1,100,000.00 | | | | | | |
| | | | | | | | | | |
| **Proforma Total** | **1,206,604,884.60** | **49,016,888.78** | **198,922,425.37** | **126,317,963.69** | **254,540,394.99** | **264,460,076.15** | **182,807,124.32** | **83,941,418.07** | **2,366,611,175.98** |

**Affiliate Exposure P+I**
*Direct holdings of companies below only- See data tab for full list that includes underlying investments
*Principal and Accrued

| | Senior | Junior | Preference Shares | AAPC | PBLA Main | Insurance | Agera | Other Exclusions | Total Principal |
|---|---|---|---|---|---|---|---|---|---|
| CBL | 638,075,132.59 | 31,886,511.00 | 83,026,291.28 | 69,918,045.14 | - | 84,902,942.79 | 89,499,510.03 | 44,468,694.60 | **997,308,432.83** |
| BLIC | 30,799,768.33 | 2,652,779.73 | 8,831,148.60 | 7,748,307.31 | - | 5,398,553.03 | 5,981,081.48 | 2,229,544.08 | **61,411,638.49** |
| SNIC | 78,997,855.97 | 5,305,559.45 | 14,229,097.16 | 16,889,029.65 | - | 22,075,534.65 | 7,316,625.45 | 7,856,197.00 | **144,813,702.33** |
| **Total GBIG** | 747,872,756.90 | 39,844,850.19 | 106,086,537.04 | 94,555,382.10 | - | 112,377,030.47 | 102,797,216.96 | 54,554,435.68 | **1,203,533,773.66** |
| | | | | | | | | | |
| PBLA | 415,906,331.13 | 707,793.68 | 5,304,224.84 | 9,807,387.89 | - | 57,210,743.65 | 883,090.76 | 3,552,088.24 | **489,819,571.95** |
| Northstar | 42,098,299.98 | 9,111,350.46 | 51,688,649.49 | 1,663,188.47 | - | 62,195,681.23 | 9,326,587.68 | 24,668,308.29 | **176,083,757.30** |
| PBIHL | - | - | 29,361,871.49 | - | - | 958,353.38 | 13,039,280.00 | - | **43,359,504.87** |
| OMNIA | 84,443.83 | - | 2,308,395.21 | - | - | 172,503.61 | 40,651,552.91 | - | **43,216,895.56** |
| **Total Bermuda** | 458,089,074.94 | 9,819,144.14 | 88,663,141.02 | 11,470,576.36 | 259,399,369.50 | 120,537,281.87 | 63,900,511.35 | 28,220,396.53 | **1,011,879,099.18** |
| | | | | | | | | | |
| Standard Re | - | 963,885.57 | - | - | - | 686,650.68 | - | - | **1,650,536.25** |
| Vista/USAP | 94,043,831.30 | - | 5,272,747.31 | 6,180,724.01 | - | 42,771,228.70 | 20,004,603.54 | 3,346,432.61 | **168,273,134.85** |
| Vista/AIC | - | - | (0.00) | 14,111,281.23 | - | - | - | - | **14,111,281.23** |
| **Total Others** | 94,043,831.30 | 963,885.57 | 5,272,747.31 | 20,292,005.23 | - | 43,457,879.38 | 20,004,603.54 | 3,346,432.61 | **184,034,952.33** |
| | | | | | | | | | |
| **Total All** | **1,300,005,663.14** | **50,627,879.90** | **200,022,425.37** | **126,317,963.69** | **259,399,369.50** | **276,372,191.72** | **186,702,331.84** | **86,121,264.82** | **2,485,569,089.98** |
| **Total on Schedule** | 1,300,005,663.14 | 50,627,879.90 | 200,022,425.37 | 126,317,963.69 | 259,399,369.50 | 276,372,191.73 | 186,702,331.85 | 86,121,264.82 | |
| **Difference** | - | - | - | (0.00) | - | (0.00) | (0.01) | 0.00 | |
| | | | | | | | | | |
| **Pro Forma Addbacks** | | | | | | | | | |
| SPA signed Finanzen Holdings Inc | 69,800,433.82 | - | 1,100,000.00 | | | | | | |
| LOI Signed Medical Physics LLC | 4,000,947.07 | - | - | | | | | | |
| **Total Addbacks** | 73,801,380.89 | - | 1,100,000.00 | | | | | | |
| | | | | | | | | | |
| **Proforma Total** | **1,226,204,282.25** | **50,627,879.90** | **198,922,425.37** | **126,317,963.69** | **259,399,369.50** | **276,372,191.72** | **186,702,331.84** | **86,121,264.82** | **2,410,667,709.09** |

# EXHIBIT E
# filed under seal

# EXHIBIT F

*Execution Version*

## AMENDMENT TO CONFIDENTIAL SIDE SETTLEMENT AGREEMENT

The parties to this Amendment to Confidential Side Settlement Agreement (the "Amendment") are Universal Life Insurance Company ("ULICO") and Greg Lindberg ("Lindberg"), each are referred to herein, individually, as a "Party," and collectively as the "Parties." This Amendment is dated and effective December 30, 2022 (the "Effective Date").

**WHEREAS,** the Parties entered into a Confidential Side Settlement Agreement effective December 19, 2022 (the "Side Agreement") as part of an effort to continue good faith settlement discussions with all appropriate entities that would resolve all disputes between the Parties; and

**WHEREAS,** among the terms of the Side Agreement was an obligation that USD$218,000,000 of preferred equity in AAPC Holdings, LLC ("AAPC") would be conveyed to TMI, as Trustee to the ULICO/PBLA Trusts within two business days of the Effective Date of the Side Agreement (December 19, 2022); and

**WHEREAS,** certain other provisions of the Side Agreement addressed the rights and obligations of the Parties with respect to the transferred AAPC preferred equity and the impact that such transfer would have on the outstanding judgment entered in favor of ULICO and against Lindberg in the lawsuit styled *Universal Life Insurance Company v. Greg Lindberg*, M.D.N.C., Case No. 20-cv-00861 (the "Middle District Judgment"); and

**WHEREAS,** the Parties previously agreed to multiple extensions of the deadline for the transfer of the AAPC preferred equity called for in the Side Agreement; and

**WHEREAS,** multiple challenges have risen causing delay and that will continue to cause delay in the transfer of the AAPC preferred equity called for in the Side Agreement; and

**WHEREAS,** the Parties mutually wish to amend and modify the Side Agreement with respect to the transfer of the AAPC preferred equity, but to otherwise continue to abide by the terms of the Side Agreement;

**NOW, THEREFORE,** upon satisfaction of the foregoing, and the respective representations, warranties, covenants, and agreements set forth below, and for other good and valuable consideration, the receipt and sufficient of which are hereby acknowledged, pursuant to Section 9.(a) of the Side Agreement, and intending to be legally bound hereby, the Parties agree as follows:

## 1.    Removal of Certain Provisions in the Side Agreement

The following provisions in the Side Agreement are deemed deleted and removed therefrom, are null and void and are no longer binding on the Parties:

Section 1.(b)
Section 1.(c)
The third paragraph of Section 2.

4866-2750-0871\4

The parties waive and release any and all claims for default under Sections 1(b), 1(c) and the third paragraph of Section 2.

**2.    Transfer of Certain Rights in 195,500,000 Preferred Units of AAPC Holdings, LLC**

a.    Lindberg represents that Global Growth Holdings, LLC (Lindberg's directly and wholly-owned corporation) ("Global Growth") is the Non-Record Owner (as that term is defined in the Amended and Restated Voting Trust Agreement dated as of March 1, 2022 among Ankura Trust Company, LLC, not in its individual capacity but solely as Trustee for the AAPC Voting Trust ("Ankura"), AAPC, Lindberg, Global Growth, HPS Investment Partners, LLC, as administrative agent ("HPS") and Freedom 3 Capital, LLC, as second lien collateral agent ("F3"), as amended, amended and restated, supplemented or otherwise modified from time to time (the "Voting Trust Agreement")) of 195,500,000 Preferred Units of AAPC (the "Preferred Units").

b.    Lindberg represents that the AAPC Voting Trust is the Record Owner of the Preferred Units.

c.    Lindberg represents that the Non-Record Owner status of the Preferred Units, when considered with the accrued Preferred Return carried by such Preferred Units as of December 27, 2022, have a value plus Preferred Return of at least $218,000,000.

d.    By no later than December 31, 2022, Lindberg shall cause Global Growth to cause its interest as Non-Record Owner of the Preferred Units to be transferred and Assigned to ULICO.

**3.    Rights Concerning Future Transfer of Rights in the Preferred Units**

ULICO agrees not to sell its rights in the Preferred Units until a definitive settlement agreement among the Parties has been executed or March 31, 2023, whichever is earlier.  ULICO agrees that Global Growth and/or Lindberg shall have a right of first refusal to purchase ULICO's rights in the Preferred Units for cash subject to the terms and conditions contained in AAPC's equity and governing documents, if any third-party offers are received by ULICO and a further right to purchase ULICO's rights in the Preferred Units at any time for $218,000,000 plus 8% interest.

**4.**      **Partial Satisfaction of Outstanding Judgment**

The Parties agree that the transfer of rights in Section 2, above, is in partial satisfaction of the Middle District Judgment.  Accordingly, the Parties agree that such transfer is in compliance with the injunction filed on October 27, 2022 in the action captioned *Universal Life Insurance Company v. Greg E. Lindberg* pending in the North Carolina State Court of Durham County. Notwithstanding the foregoing, no credit will be granted on the Middle District Judgment until such time as ULICO's rights received pursuant to Section 2, above, are successfully transferred to the Reinsurance Trust.  Upon the consummation of such transfer to the Reinsurance Trust, Lindberg shall receive at minimum, a credit of USD$25,000,000 and the balance owing on the Middle District Judgment shall be reduced by a like amount.

The USD$25,000,000 credit referenced above is a minimum credit and shall be adjusted based on any of the following:

(a)      A market valuation of the rights in the Preferred Units transferred pursuant to Section 2 by a nationally-recognized valuation firm approved by ULICO, with such approval not to be unreasonably withheld;

(b)      A legitimate purchase agreement for the rights in the Preferred Units transferred pursuant to Section 2 from an accredited financial institution; or

(c)      A dollar-for-dollar credit of any repurchase of the rights in the Preferred Units by Global Growth and/or Lindberg for an amount no less than $218,000,000 plus 8% interest.

By way of example, under section (a) above, should a qualifying market valuation of USD$100,000,000 be obtained, then Lindberg shall receive an additional USD$75,000,000 credit on the balance owing on the Middle District Judgment.

**5.**      **Potential Unwinding of Transfer of Certain Rights in Preferred Units**

Pursuant to Sections 1 and 18 of the Assignment Agreement effecting the transfer of rights pursuant to Section 2, above, under certain circumstances that assignment may be unwound and the transferred rights in the Preferred Units returned to Global Growth.  In the event such unwinding takes place, or the assignment becomes void and of no effect, Lindberg shall be deemed in material breach of this Amendment and the Side Agreement.

**6.**      **Complete Transfer of Preferred Units By January 31, 2023**

Following the transfer of rights in the Preferred Units pursuant to Section 2, above, Lindberg shall use all best efforts to cause Global Growth  effectuate a complete transfer of all rights, including Record Owner rights, in the Preferred Units by no later than January 31, 2023.  The failure to effectuate a complete transfer of all such rights by no later than January 31, 2023 shall be deemed a material breach of the Side Agreement and the Amendment by Lindberg.

**7.**      **Expenses**

Pursuant to Section 7 of the Side Agreement, the Parties agreed to pay their own transaction expenses, including the fees and expenses of attorneys and other advisors incurred in connection with the Side Agreement.  For the avoidance of any doubt, Lindberg and/or Global Growth shall also be responsible for the payment of any fees and expenses incurred by or on behalf of Ankura, AAPC, HPS, and/or F3 in connection with the transfer of rights to the Preferred Units under this Amendment or the Side Agreement.

**8.**      **All Other Terms of Side Agreement Remain in Effect**

The Parties expressly acknowledge and agree that all terms of the Side Agreement not deleted or modified by this Amendment remain in effect.

**9.**      **Headings**

The descriptive headings herein are inserted for the convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this this Amendment.

**10.**      **Execution in Counterparts**

This Amendment may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.  Delivery of an executed counterpart of a signature page of this Amendment by electronic means shall be effective as delivery of a manually executed counterpart.

*(signature page follows)*

Page **4** of **5**

IN WITNESS WHEREOF, the Parties have executed this Amendment effective as of the Effective Date.

**UNIVERSAL LIFE INSURANCE COMPANY**

By: _____

Title: _____.President_____

**GREG LINDBERG**

_____

Page **5** of **5**

**IN WITNESS WHEREOF,** the Parties have executed this Amendment effective as of the Effective Date.

**UNIVERSAL LIFE INSURANCE COMPANY**

By: _____

Title: _____

**GREG LINDBERG**

_____

# EXHIBIT G

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is dated this the 7th day of June, 2021, by and between SOUTHLAND NATIONAL INSURANCE CORPORATION, a North Carolina insurance company ("SNIC") and GBIG HOLDINGS, INC., a North Carolina corporation ("GBIG" and together with SNIC, the "Parties" and each individually a "Party"), and DOGWOOD STATE BANK, a North Carolina banking company, as escrow agent ("Escrow Agent").

## RECITALS

R1.  On June 27, 2019, the Commissioner of Insurance for the North Carolina Department of Insurance (the "Commissioner") filed a Petition for a Consent Order of Rehabilitation of Southland National Insurance Corporation.  The Superior Court granted the Petition, and entered an Order of Rehabilitation that same day.  SNIC has been operating in rehabilitation, under the authority of the Superior Court, since that time (the "Proceeding").

R2.  On March 12, 2021, the Commissioner filed a "Verified Petition for an Order of Liquidation against Southland National Insurance Corporation and Petition Seeking Injunctive Relief" (the "Verified Petition"), seeking liquidation of SNIC pursuant to Article 30 of Chapter 58 of the North Carolina General Statutes.

R3.  On April 13, 2021, the judge presiding over the Verified Petition (the "Presiding Judge") calendared the Verified Petition for hearing on May 11, 2021.

R4.  On April 14, 2021, GBIG filed "GBIG Holdings, Inc.'s Objection to Petition for an Order of Liquidation against Southland National Insurance Corporation and Petition Seeking Injunctive Relief." (the "GBIG Objection").  The Commissioner filed a Response to the Objection on April 15, 2021.

R5.  The Presiding Judge continued the hearing on the Verified Petition to June 7, 2021.

R6.  The Parties have negotiated the terms of this Agreement, as more particularly set forth below, and have agreed to stay the conduct of the hearing on the Verified Petition on June 7, 2021.

NOW, THEREFORE, in consideration of the foregoing Recitals, the promises and agreements of the Parties, and such other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties and the Escrow Agent agree as follows:

## ARTICLE I
## ESCROW DEPOSIT

1.1.  <u>Establishment of Account</u>.

a.  Following execution of this Agreement, GBIG shall establish a deposit account with Escrow Agent (the "Account"), with SNIC and GBIG both having signature card authority over the Account and both Parties having withdrawal rights as provided in this Agreement.

b.  The Parties shall execute such other account opening or maintenance documentation as Escrow Agent may require from time to time. Any notice required to be provided to Escrow Agent must be satisfactory to Escrow Agent in Escrow Agent's sole discretion.  Escrow Agent may rely on notices and communications it believes in good faith to be genuine and given by the appropriate Party.  Escrow Agent

may accept, acknowledge or act upon any notice, instructions or other directions hereunder that contain minor mistakes or other irregularities.

c. For the avoidance of doubt, the Account is subject to the fees and charges outlined in the Escrow Agent's fee schedule, which Escrow Agent may revise from time to time in Escrow Agent's sole discretion. The fee schedule may be made available to a Party upon request by a Party. The Escrow Agent's fees shall be borne by GBIG.

1.2. Escrow Deposit. Upon establishment of the Account, GBIG shall deposit the sum of Nine Million and No/100 Dollars ($9,000,000.00) (the "Escrow Funds") in immediately available funds to the Account, and GBIG shall, as soon as reasonably practical following the deposit of the Escrow Funds, notify SNIC confirming the same.

1.3. Investments.

a. Escrow Agent shall receive and hold the Escrow Funds in the Account and the Escrow Funds are subject to the earning of ordinary interest pursuant to Escrow Agent's regular practices for the Account. Interest earned on the Escrow Funds, if any, shall become part of the Escrow Funds.

b. The Parties acknowledge that Escrow Agent is not providing investment supervision, recommendations, or advice.

1.4. Income Tax Allocation.

a. The Parties agree that, for tax reporting purposes, all interest and other income from investment of the Escrow Funds, if any, shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported as having been earned by GBIG, whether or not such income was disbursed during such calendar year.

b. The Parties acknowledge that the Escrow Agent is not liable for the payment of any taxes in respect of income derived, if any, from the investment of the Escrow Funds. The Escrow Agent may, in its sole discretion (without obligation), satisfy any tax liability to the extent possible from the Escrow Funds. The Parties, jointly and severally, shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Funds and the investment thereof unless such tax, late payment, interest, penalty or other expense was directly caused by the gross negligence or willful misconduct of the Escrow Agent. The indemnification provided by this Section 1.4(b) is in addition to, but not duplicative of, the indemnification provided in Section 4.1 and shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement.

ARTICLE II
USE OF ESCROW FUNDS

2.1. No Use of Escrow Funds by GBIG. During the pendency of this Agreement, GBIG and SNIC shall not withdraw any portion of the Escrow Funds, except as provided in Section 2.6 below.

2.2. SNIC Expense Reports. On or before the 15th day of each month following the date of this Agreement, SNIC shall submit a report (each a "Monthly Report") of SNIC's monthly cash requirement for claims and expenses (each a "Monthly Cash Requirement"), with a listing of expenses by vendor in a format reasonably similar to that which is provided quarterly to the court in the Proceeding. SNIC shall not be required to provide receipts or other evidence of payment to GBIG.

2.3.     GBIG Payment.  On or before the 15th day following GBIG's receipt of a Monthly Report (each a "Due Date"), GBIG shall remit full payment to SNIC of the Monthly Cash Requirement from funds other than Escrow Funds.

2.4.     SNIC Use of Escrow Funds.  In the event GBIG should fail to remit any Monthly Cash Requirement on or before any Due Date, SNIC shall be entitled to withdraw from the Escrow Funds an amount equivalent to the Monthly Cash Requirement in accordance with Section 2.6 below.

2.5.     Replenishment of Escrow Funds.  Within 15 days following receipt of notice from SNIC of any withdrawal of Escrow Funds, GBIG shall replenish the Escrow Funds to a balance of not less than $9,000,000.00.

2.6.     Withdrawal of Escrow Funds by the Parties.

a.   Withdrawals by GBIG. GBIG may withdraw the Escrow Funds in total that remain after 60 days (i) upon 60 days' prior written notice to Escrow Agent and SNIC (the "Withdrawal Notice") or (ii) 60 days following the Parties' receipt of notice from the Commissioner of the Commissioner's intent to proceed with hearing on the Verified Petition. In the event of the preceding (ii) of this Section 2.6(a), Escrow Agent shall be provided with a copy of said notice.

b.   Withdrawals by SNIC. SNIC may withdraw the Escrow Funds if it provides notice to Escrow Agent and GBIG notifying Escrow Agent of the withdrawal amount pursuant to Section 2.4 above.

2.7.     Automatic Lift of Stay; Waiver of Objection to Hearing.  The Parties agree the stay of the hearing on the Verified Petition agreed to by the Parties herein shall be automatically lifted upon (i) the failure of GBIG to replenish Escrow Funds as required by Section 2.5, or (ii) upon delivery of a Withdrawal Notice by GBIG pursuant to Section 2.6.  In either instance, SNIC shall notify the Commissioner who will seek a rescheduling of the hearing on the Verified Petition at the earliest convenience of the Presiding Judge.  The failure by GBIG to replenish Escrow Funds as required by Section 2.5, or the delivery of a Withdrawal Notice pursuant to Section 2.6, shall in each instance be deemed a waiver by GBIG of any objection to the conduct of a hearing on the Verified Petition, but shall not prejudice the rights of GBIG to present evidence and argument at said hearing.

2.8.     Escrow Agent has no Duty to Monitor. NOTWITHSTANDING ANYTHING TO THE CONTRARY:

ESCROW AGENT SHALL HAVE NO DUTY TO MONITOR COMPLIANCE WITH THE TERMS OR CONDITIONS OF ARTICLE II OR ANY OTHER TERMS OR CONDITIONS OF THE AGREEMENT. ESCROW AGENT MAY, WITHOUT ANY LIABILITY, HONOR ANY WITHDRAWAL REQUEST RECEIVED FROM SNIC OR GBIG IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT. ANY WITHDRAWAL OF FUNDS FROM THE ESCROW ACCOUNT BY GBIG OR SNIC IN ACCORDANCE WITH THIS AGREEMENT SHALL BE DEEMED TO BE AUTHORIZED. SNIC'S OR  GBIG'S FAILURE TO ADHERE TO THE TERMS AND CONDITIONS OF THIS AGREEMENT IS NOT THE RESPONSIBILITY OF ESCROW AGENT.

ARTICLE III
DUTIES OF ESCROW AGENT

3.1.	Scope of Responsibility.  The Escrow Agent is obligated only to perform the duties specifically set forth in this Agreement, which shall be deemed purely ministerial in nature.  Under no circumstance will the Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Agreement.  The Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Agreement or in accordance with any other agreement, instrument, document, court order, petition, proceeding, claim, or action involving any of the Parties. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Agreement or any court order, petition, proceeding, claim, or action involving the Parties, including without limitation the Proceeding, Verified Petition, or GBIG Objection, whether or not an original or a copy of such has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, document, court order, petition, proceeding, claim, or action involving any of the Parties.  References in this Agreement to any other agreement, instrument, document, court order, petition, proceeding, claim, or action are for the convenience of the Parties, and the Escrow Agent has no duties or obligations with respect thereto. The duties and obligations of Escrow Agent set forth in this Agreement shall be determined solely by the express provisions of this Agreement.  No implied covenants or obligations shall be read into this Agreement against Escrow Agent.  Escrow Agent makes no express or implied representations or warranties with respect to its obligations under this Agreement, except for those expressly set forth herein.

3.2.	Reliance.  Except for Escrow Agent's gross negligence or willful misconduct in performing its acts as Escrow Agent hereunder, the Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives, successors, or assigns.  Except for Escrow Agent's gross negligence or willful misconduct in performing its acts as Escrow Agent hereunder, the Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without further inquiry into the person's or persons' authority.

3.3.	No Financial Obligation.  No provision of this Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Agreement.

ARTICLE IV
PROVISIONS CONCERNING ESCROW AGENT

4.1.	Indemnification.  The Parties, jointly and severally, shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, attorneys' fees and expenses or other professional fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating in any way to this Agreement or any transaction to which this Agreement relates (including without limitation Escrow Agent following any instruction or request of either Party), unless such loss, liability, cost, damage or expense shall have been finally adjudicated to have been directly caused by the willful misconduct or gross negligence of the Escrow Agent. The provisions of this Section 4.1 shall survive the resignation or removal of the Escrow Agent and the termination of this Agreement.

4.2.	Limitation of Liability.  THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF OR RELATING TO THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED

FROM THE ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (II) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF ANY OTHER AGREEMENT, INSTRUMENT, DOCUMENT, COURT ORDER, PETITION, PROCEEDING, CLAIM, OR ACTION INVOLVING ANY OF THE PARTIES (INCLUDING WITHOUT LIMITATION, THE PROCEEDING, VERIFIED PETITION, OR GBIG OBJECTION), (III) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE TERMS AND CONDITIONS OF ANY OTHER AGREEMENT, INSTRUMENT, OR DOCUMENT OTHER THAN THIS AGREEMENT OR ANY COURT ORDER, PETITION, PROCEEDING, CLAIM, OR ACTION INVOLVING THE PARTIES, INCLUDING WITHOUT LIMITATION THE PROCEEDING, VERIFIED PETITION, OR GBIG OBJECTION, WHETHER OR NOT AN ORIGINAL OR A COPY OF SUCH HAS BEEN PROVIDED TO THE ESCROW AGENT, (IV) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE PERFORMANCE OR NONPERFORMANCE OF ANY PROVISION OF ANY AGREEMENT, INSTRUMENT, DOCUMENT, COURT ORDER, PETITION, PROCEEDING, CLAIM, OR ACTION INVOLVING ANY OF THE PARTIES, OR (V) SPECIAL, INDIRECT, PUNITIVE, OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF CLAIM OR ACTION, OR THE LEGAL THEORY ON WHICH IT IS BASED. ANY ACTION OR CLAIM AGAINST ESCROW AGENT BY GBIG OR SNIC UNDER OR RELATED TO THIS AGREEMENT MUST BE BROUGHT WITHIN 12 MONTHS AFTER THE CAUSE OF ACTION OR CLAIM ACCRUES.

4.3.    <u>Resignation or Removal</u>.  The Escrow Agent may resign by furnishing written notice of its resignation to the Parties, or the Parties may remove the Escrow Agent by furnishing to the Escrow Agent a joint written notice of its removal along with payment of all fees and expenses to which the Escrow Agent is entitled through the date of removal.  Such resignation or removal, as the case may be, shall be effective thirty (30) calendar days after the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Funds and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with the Escrow Agent or in accordance with a court order.  If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following the delivery of such notice of resignation or removal, the Escrow Agent may petition the Superior Court of Wake County in which the Proceeding is pending or another court that the Escrow Agent deems appropriate for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties. Upon appointment of a successor escrow agent, the Escrow Agent shall forward all reasonable documents and the Escrow Funds to the successor escrow agent. In the event of a resignation or removal, Escrow Agent shall be entitled to reimbursement of all costs and expenses incurred by Escrow Agent, including attorneys' fees and expenses, payable jointly and severally by the Parties.

4.4.    <u>Controversies</u>.  If any conflict, disagreement or dispute arises between, among, or involving any of the Parties concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Agreement (each a "Controversy"), or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent may, at its option, freeze the Account and retain the Escrow Funds until the Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction or a final non-appealable arbitration decision directing delivery of the Escrow Funds, (ii) receives a written agreement executed by each of the Parties directing delivery of the Escrow Funds, in which event the Escrow Agent shall be authorized to disburse the Escrow Funds in accordance with such final court order, arbitration decision, or agreement, or (iii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, the Escrow Agent shall be relieved of all liability as to the Escrow Funds and shall be entitled to recover attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action.  Regarding any such court order or arbitration decision from the preceding (i), Escrow Agent has the right to request that such order or decision be

accompanied by a written instrument of the presenting Party certifying that such court order or arbitration decision is final, non-appealable and from a court of competent jurisdiction or from a competent arbitration panel, upon which instrument the Escrow Agent shall be entitled to conclusively rely without further investigation. Regarding the preceding (i) through (iii), the Escrow Agent shall be entitled to act on any such agreement, action, court order, or arbitration decision without further question, inquiry, or consent.

4.5. Cost Recovery. In the event of a Controversy, Escrow Agent shall be entitled to reimbursement of all costs and expenses incurred by Escrow Agent, including attorneys' fees and expenses, payable jointly and severally by the Parties. If any amount due to the Escrow Agent hereunder is not paid within 30 calendar days of Escrow Agent's written notice to the Parties, the Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law. The Escrow Agent shall have, and is hereby granted, the right to set off and deduct any unpaid fees, non-reimbursed expenses, all items deposited in and credited to the Account and subsequently returned unpaid or with respect to which Escrow Agent fails to receive final settlement, items deposited in in and credited to the Account in error, and unsatisfied indemnification rights from the Escrow Funds. If amounts in the Account are insufficient to fully reimburse Escrow Agent for such amounts, the Parties are jointly and severally liable to pay such deficiency to Escrow Agent in immediately available funds within five days after demand of Escrow Agent. The Parties shall, jointly and severally, pay for Escrow Agent's attorneys' fees and expenses for all matters relating to or arising from this Agreement.

4.6. Attachment of Escrow Funds; Compliance with Legal Orders. In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Funds, the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction. In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated. The Escrow Agent shall further have no obligation to pursue any action that is not in accordance with applicable law.

ARTICLE V
MISCELLANEOUS

5.1. Binding Agreement, Successors and Assigns. The Parties and Escrow Agent represent and warrant that the execution and delivery of this Agreement and the performance of such party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms. This Agreement shall be binding on and inure to the benefit of the Parties and the Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Agreement. No assignment of the interest of any of the Parties shall be binding unless and until written notice of such assignment shall be delivered to the other Party and the Escrow Agent and shall require the prior written consent of the other Party and the Escrow Agent (such consent not to be unreasonably withheld, conditioned or delayed).

5.2. Notices. All notices, requests, demands, and other communications required under this Agreement shall be in writing and shall be deemed to have been duly given if delivered (i) personally, (ii) by overnight delivery with a reputable national overnight delivery service, or (iii) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five (5) Business Days after the date such notice is deposited in the United States mail. For the purpose of this Agreement, "**Business Day**" shall mean any day other than a Saturday, a Sunday, a federal or state holiday,

and any other day on which the Escrow Agent is closed.  If notice is given to a Party, it shall be given at the address for such party set forth below.  It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.  In the case of communications delivered to the Escrow Agent, such communications shall be deemed to have been given on the date received by the Escrow Agent.

If to SNIC:

Southland National Insurance Corporation
PO Box 168
New Palestine, IN 46163
Telephone: 317-683-1292
Email: mdinius@noblecon.net
Attn: Mike Dinius

with a copy (which shall not constitute notice) to:

Williams Mullen
301 Fayetteville St., Suite 1700
Raleigh, NC 27601
(PO Box 1000, Raleigh, NC 27602)
Telephone: 919-981-4000
E-mail: wcamden@williamsmullen.com
Attn: Wes Camden, Esq.

If to GBIG:

GBIG Holdings, Inc.
2222 Sedwick Rd.
Durham, NC 27713
Email:      pnordberg@globalgrowth.com
            gvandeman@globalgrowth.com
            jholbrook@globalgrowth.com

Attn:       Peter Nordberg
            George Vandeman
            Justin Holbrook

with a copy (which shall not constitute notice) to:

Condon Tobin Sladek Thornton Nerenberg PLLC
8080 Park Lane, Suite 700
Dallas, Texas 75231
Email:  atobin@condontobin.com
Attn:       Aaron Tobin

If to the Escrow Agent:

Dogwood State Bank
5401 Six Forks Road, Suite 100
Raleigh, NC 27609

Telephone: 919-863-2283
E-Mail: spatch@dsbnc.com
Attn:  J. Stewart Patch, Regional President

5.3.	Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina.

5.4.	Amendment.  This Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by the Parties and the Escrow Agent.

5.5.	Waivers.  The failure of any party to this Agreement at any time or times to require performance of any provision under this Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any party to this Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Agreement.

5.6.	Counterparts.  This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument. This Agreement shall be valid, binding, and enforceable against a party when executed and delivered by an authorized individual on behalf of the party by means of (i) an original manual signature; (ii) a faxed, scanned, or photocopied manual signature, or (iii) any other electronic signature permitted by the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, and/or any other relevant electronic signatures law, including any relevant provisions of the Uniform Commercial Code, in each case to the extent applicable. Each faxed, scanned, or photocopied manual signature, or other electronic signature, shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any other party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. Notwithstanding the foregoing, with respect to any notice provided for in this Agreement or any instrument required or permitted to be delivered hereunder, any party hereto receiving or relying upon such notice or instrument shall be entitled to request execution thereof by original manual signature as a condition to the effectiveness thereof.

5.7.	Survival. Article IV of this Agreement and Article V of this Agreement shall survive the resignation or removal of Escrow Agent under this Agreement.

[SIGNATURE PAGES FOLLOW]

**SOUTHLAND NATIONAL INSURANCE CORPORATION**

By: _____

Name: Michael Dinius _____

Title: Special Deputy Rehabilitator_____

DocuSign Envelope ID: 37AF5936-3AD0-4713-966D-4E7E51240269

**GBIG HOLDINGS, INC**

By: _Greg Lindberg_ _____

Name: Greg Lindberg _____

Title: Manager _____

**DOGWOOD STATE BANK**

By: _____

Name: _J. Stewart Patch_

Title: _Regional President_

Escrow Agreement

# EXHIBIT H

**PAYOFF AND
PREFERRED UNITS REDEMPTION LETTER**

AAPC Holdings, LLC
2233 S Presidents Dr., Suite F
Salt Lake City, Utah 84120

February 24, 2022

Re: Sixth Amended and Restated Operating Agreement of AAPC Holdings, LLC (the "**Company**") dated as of July 26, 2019 (as amended, supplemented or otherwise modified from time to time, the "**LLC Agreement**").

Ladies and Gentlemen:

The Company hereby notifies TMI Trust Company in its capacity as Trustee of the PBLA ULICO Trust established by the Coinsurance Reinsurance Agreement, dated June 30, 2017, and the Reinsurance Trust Agreement, effective February 16, 2018 ("**Preferred Member**") that the Company intends to redeem in full all **Class B Preferred Units** held by Preferred Member (the "**Preferred Units**") as provided under the LLC Agreement and repay all outstanding obligations owing by the Company to the Preferred Member under the LLC Agreement on account of such Preferred Units including any Preferred Return, tax distribution and other rights of distributions in respect thereof (collectively, the "**Preferred Unit Obligations**") on February 24, 2022 (the "**Redemption Date**"). Capitalized terms used and not defined in this letter shall have the respective meanings given them in the LLC Agreement.

The sum of the aggregate Preferred Unit Obligations, as of the Redemption Date, will be $1,883,251 (the "**Redemption Amount**"). The Redemption Amount consists of:

(i)    $693,177 in Preferred Return, as described in Sections 3.7.1 and 4.1.1 of the LLC Agreement; <u>plus</u>

(ii)    $1,190,074 in return of capital, as described in Section 4.1.2 of the LLC Agreement.

In order to effectuate the redemption, the Company shall pay or cause to be paid to Preferred Member, at the Company's cost and expense, (i) on or before the Redemption Date, the Redemption Amount or (ii) after the Redemption Date, the Redemption Amount plus any Per Diem Amount (as defined below) in either event by wire transfer of immediately available funds to the following account of the Preferred Member:

| | |
|---|---|
| Name: | PBLA ULICO Trust |
| ABA#: | ABA   031000053 |
| Acct. Name: | TMI Trust Company |
| Acct #: | Acct-5303762486 |
| | |
| Reference: | REF -ULICO |

27581366v3 93980.006.00

4872-7290-8303\4

For each day after the Redemption Date, additional distributions shall accrue and be payable by the Company to the Preferred Member in an amount equal to $652 (the "**Per Diem Amount**") in accordance with the LLC Agreement until the Preferred Unit Obligations are paid in full. Unless the Redemption Amount and any Per Diem Amount, if applicable, are received in immediately available funds, by 3:00 p.m. (Eastern Time) on a business day such amount shall be deemed to have been received on the next succeeding business day.

Upon receipt by the Preferred Member of the Redemption Amount plus any accrued Per Diem Amount , (a) the Preferred Unit Obligations shall be paid, redeemed and satisfied in full, (b) the Preferred Units shall automatically and irrevocably be deemed to be redeemed in full without any further action by any party, (c) the Preferred Units shall be redeemed free and clear of all liens, security interests and other encumbrances and (d) the Company shall update the Unit Register to reflect the redemption of the Preferred Units in full.

Preferred Member represents and warrants that it is the holder and owner of the Preferred Units and the Preferred Unit Obligations, and Preferred Member hereby agrees to indemnify the Company against all claims, demands, or causes of action relating to any breach of the foregoing representation and warranty.

It is expressly understood and agreed by the Company and the parties acknowledging and consenting hereto that (a) this letter is executed and delivered by TMI Trust Company ("TMI"), not individually or personally but solely as successor trustee of PBLA ULICO 2017 (the "Trust"), in the exercise of the powers and authority conferred and vested in it under the trust agreement of the Trust, (b) each of the representations, warranties, undertakings and agreements herein made on the part of the Preferred Member is made and intended not as personal representations, undertakings and agreements by TMI but is made and intended for the purpose of binding only the trustee on behalf of the Trust, (c) nothing herein contained shall be construed as creating any liability on TMI, individually or personally, to perform any covenant either expressed or implied contained herein of the Preferred Member, all such liability, if any, being expressly waived by the Company and the parties acknowledging and consenting hereto and by any person claiming by, through or under said parties, (d) TMI has not verified and has made no investigation as to the accuracy or completeness of any representations and warranties made by the Preferred Member in this letter and (e) under no circumstances shall TMI be personally liable for the payment of any indebtedness or expenses of the Preferred Member or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Preferred Member under this letter or any other related documents.

This letter may be executed in multiple counterparts and by electronic signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

[SIGNATURE PAGE FOLLOWS]

2

4872-7290-8303\4

Very truly yours,

**TMI TRUST COMPANY IN ITS
CAPACITY AS TRUSTEE OF THE
PBLA ULICO 2017 REINSURANCE
TRUST**

By: _____
Name: Jane Strobel
Title: Vice President

ACKNOWLEDGED AND CONSENTED TO BY:

**AAPC HOLDINGS, LLC**

By _____
Name: Saurabh Puri
Title: Finance Controller

**Universal Life Insurance Company,
As Ceding Company and Beneficiary of
the PBLA ULICO 2017 Reinsurance
Trust**

By: _____
Name: _____
Title: _____

**PB Life and Annuity Co., Ltd.,
As Reinsurer and Grantor of the PBLA
ULICO 2017 Reinsurance Trust**

By: _____
Name: _____
Title: Joint Provisional Liquidator
_____

Signature Page
Payoff and Preferred Units Redemption Letter

27581366v3 93980.006.00

Very truly yours,

**TMI TRUST COMPANY IN ITS
CAPACITY AS TRUSTEE OF THE
PBLA ULICO 2017 REINSURANCE
TRUST**

By: _____
Name: Jane Strobel
Title: Vice President

ACKNOWLEDGED AND CONSENTED TO BY:

**AAPC HOLDINGS, LLC**

By_____
Name: _____
Title: _____

**Universal Life Insurance Company,
As Ceding Company and Beneficiary of
the PBLA ULICO 2017 Reinsurance
Trust**

By: _____
Name: Roberto J. Martínez
Title: Chief Financial Officer

**PB Life and Annuity Co., Ltd.,
As Reinsurer and Grantor of the PBLA
ULICO 2017 Reinsurance Trust**

By: _____
Name: _____
Title: Joint Provisional Liquidator

Signature Page
Payoff and Preferred Units Redemption Letter

27581366v3 93980.006.00

4872-7290-8303\4

Very truly yours,

**TMI TRUST COMPANY IN ITS
CAPACITY AS TRUSTEE OF THE
PBLA ULICO 2017 REINSURANCE
TRUST**

By: _____
   Name: _____
   Title: _____

ACKNOWLEDGED AND CONSENTED TO BY:

**AAPC HOLDINGS, LLC**

By_____
Name: _____
Title: _____

**Universal Life Insurance Company,
As Ceding Company and Beneficiary of
the PBLA ULICO 2017 Reinsurance
Trust**

By: _____
Name: _____
Title: _____

**PB Life and Annuity Co., Ltd.,
As Reinsurer and Grantor of the PBLA
ULICO 2017 Reinsurance Trust**

By: _____
Name: _Rachelle Frisby_
Title: _Joint Provisional Liquidator_

Signature Page
Payoff and Preferred Units Redemption Letter

**PAYOFF AND**
**PREFERRED UNITS REDEMPTION LETTER**

AAPC Holdings, LLC
2233 S Presidents Dr., Suite F
Salt Lake City, Utah 84120

February 24, 2022

Re: Sixth Amended and Restated Operating Agreement of AAPC Holdings, LLC (the "**Company**") dated as of July 26, 2019 (as amended, supplemented or otherwise modified from time to time, the "**LLC Agreement**").

Ladies and Gentlemen:

The Company hereby notifies TMI Trust Company in its capacity as Trustee of the PBLA ULICO Trust established by the Coinsurance Reinsurance Agreement, dated June 30, 2017, and the Reinsurance Trust Agreement, effective February 16, 2018 ("**Preferred Member**") that the Company intends to redeem in full all **Class A Preferred Units** held by Preferred Member (the "**Preferred Units**") as provided under the LLC Agreement and repay all outstanding obligations owing by the Company to the Preferred Member under the LLC Agreement on account of such Preferred Units including any Preferred Return, tax distribution and other rights of distributions in respect thereof (collectively, the "**Preferred Unit Obligations**") on February 24, 2022 (the "**Redemption Date**"). Capitalized terms used and not defined in this letter shall have the respective meanings given them in the LLC Agreement.

The sum of the aggregate Preferred Unit Obligations, as of the Redemption Date, will be $15,257,558 (the "**Redemption Amount**"). The Redemption Amount consists of:

(i)     $5,234,724 in Preferred Return, as described in Sections 3.7.1 and 4.1.1 of the LLC Agreement; <u>plus</u>

(ii)    $10,023,472 in return of capital, as described in Section 4.1.2 of the LLC Agreement; <u>minus</u>

(iii)   $638 in withholding taxes paid by the Company.

In order to effectuate the redemption, the Company shall pay or cause to be paid to Preferred Member, at the Company's cost and expense, (i) on or before the Redemption Date, the Redemption Amount or (ii) after the Redemption Date, the Redemption Amount plus any Per Diem Amount (as defined below) in either event by wire transfer of immediately available funds to the following account of the Preferred Member:

| | |
|---|---|
| Name: | PBLA ULICO Trust |
| ABA#: | ABA   031000053 |
| Acct. Name: | TMI Trust Company |
| Acct #: | Acct-5303762486 |

27581366v3 93980.006.00

For each day after the Redemption Date, additional distributions shall accrue and be payable by the Company to the Preferred Member in an amount equal to $4,943 (the "**Per Diem Amount**") in accordance with the LLC Agreement until the Preferred Unit Obligations are paid in full. Unless the Redemption Amount and any Per Diem Amount, if applicable, are received in immediately available funds, by 3:00 p.m. (Eastern Time) on a business day such amount shall be deemed to have been received on the next succeeding business day.

Upon receipt by the Preferred Member of the Redemption Amount plus any accrued Per Diem Amount , (a) the Preferred Unit Obligations shall be paid, redeemed and satisfied in full, (b) the Preferred Units shall automatically and irrevocably be deemed to be redeemed in full without any further action by any party, (c) the Preferred Units shall be redeemed free and clear of all liens, security interests and other encumbrances and (d) the Company shall update the Unit Register to reflect the redemption of the Preferred Units in full.

Preferred Member represents and warrants that it is the holder and owner of the Preferred Units and the Preferred Unit Obligations, and Preferred Member hereby agrees to indemnify the Company against all claims, demands, or causes of action relating to any breach of the foregoing representation and warranty.

It is expressly understood and agreed by the Company and the parties acknowledging and consenting hereto that (a) this letter is executed and delivered by TMI Trust Company ("TMI"), not individually or personally but solely as successor trustee of PBLA ULICO 2017 (the "Trust"), in the exercise of the powers and authority conferred and vested in it under the trust agreement of the Trust, (b) each of the representations, warranties, undertakings and agreements herein made on the part of the Preferred Member is made and intended not as personal representations, undertakings and agreements by TMI but is made and intended for the purpose of binding only the trustee on behalf of the Trust, (c) nothing herein contained shall be construed as creating any liability on TMI, individually or personally, to perform any covenant either expressed or implied contained herein of the Preferred Member, all such liability, if any, being expressly waived by the Company and the parties acknowledging and consenting hereto and by any person claiming by, through or under said parties, (d) TMI has not verified and has made no investigation as to the accuracy or completeness of any representations and warranties made by the Preferred Member in this letter and (e) under no circumstances shall TMI be personally liable for the payment of any indebtedness or expenses of the Preferred Member or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Preferred Member under this letter or any other related documents.

This letter may be executed in multiple counterparts and by electronic signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

[SIGNATURE PAGE FOLLOWS]

2

Very truly yours,

**TMI TRUST COMPANY IN ITS CAPACITY AS TRUSTEE OF THE PBLA ULICO 2017 REINSURANCE TRUST**

By: _Jane Strobel_ *(signature)*
Name: _Jane Strobel_
Title: _Vice President_


ACKNOWLEDGED AND CONSENTED TO BY:

**AAPC HOLDINGS, LLC**

By _Saurabh_ *(signature)*
Name: _Saurabh Puri_
Title: _Finance Controller_

**Universal Life Insurance Company, As Ceding Company and Beneficiary of the PBLA ULICO 2017 Reinsurance Trust**

By: _____
Name: _____
Title: _____


**PB Life and Annuity Co., Ltd., As Reinsurer and Grantor of the PBLA ULICO 2017 Reinsurance Trust**

By: _____
Name: _____
Title: _Joint Provisional Liquidator_

_____


Signature Page
Payoff and Preferred Units Redemption Letter

27581366v3 93980.006.00

Case 3:23-cr-00048-MOC-DCK    Document 132-4    Filed 05/04/26    Page 174 of 194

Very truly yours,

**TMI TRUST COMPANY IN ITS
CAPACITY AS TRUSTEE OF THE
PBLA ULICO 2017 REINSURANCE
TRUST**

By: _Caue 8 the_

Name: _Jane Stobel_

Title: _Vice President_

ACKNOWLEDGED AND CONSENTED TO BY:

**AAPC HOLDINGS, LLC**

By_____

Name: _____

Title: _____

**Universal Life Insurance Company,
As Ceding Company and Beneficiary of
the PBLA ULICO 2017 Reinsurance
Trust**

By: _____

Name: _Roberto J. Martinez_

Title: _Chief Financial Officer_

**PB Life and Annuity Co., Ltd.,
As Reinsurer and Grantor of the PBLA
ULICO 2017 Reinsurance Trust**

By: _____

Name: _____

Title: _Joint Provisional Liquidator_

_____

Signature Page
Payoff and Preferred Units Redemption Letter

27581366v3 93980.006.00

4872-7290-8303\4

Very truly yours,

**TMI TRUST COMPANY IN ITS
CAPACITY AS TRUSTEE OF THE
PBLA ULICO 2017 REINSURANCE
TRUST**


By: _____
   Name: _____
   Title: _____


ACKNOWLEDGED AND CONSENTED TO BY:


**AAPC HOLDINGS, LLC**


By_____
Name: _____
Title: _____

**Universal Life Insurance Company,
As Ceding Company and Beneficiary of
the PBLA ULICO 2017 Reinsurance
Trust**


By: _____
Name: _____
Title: _____


**PB Life and Annuity Co., Ltd.,
As Reinsurer and Grantor of the PBLA
ULICO 2017 Reinsurance Trust**

By: _____
Name: Rachelle Frisby
Title: Joint Provisional Liquidator


Signature Page
Payoff and Preferred Units Redemption Letter

**PAYOFF AND**
**PREFERRED UNITS' REDEMPTION LETTER**

AAPC Holdings, LLC
2233 S Presidents Dr., Suite F
Salt Lake City, Utah 84120

February 24, 2022

Re: Sixth Amended and Restated Operating Agreement of AAPC Holdings, LLC (the "**Company**") dated as of July 26, 2019 (as amended, supplemented, or otherwise modified from time to time, the "**LLC Agreement**").

Ladies and Gentlemen:

The Company hereby notifies PB Life and Annuity Co., Ltd. formerly known as Private Bankers Life & Annuity Co., Ltd. ("**Preferred Member**") that the Company intends to redeem in full all **Class A Preferred Units** held by Preferred Member (the "**Preferred Units**") as provided under the LLC Agreement and repay all outstanding obligations owing by the Company to the Preferred Member under the LLC Agreement on account of such Preferred Units including any Preferred Return, tax distribution and other rights of distributions in respect thereof (collectively, the "**Preferred Unit Obligations**") on February 24, 2022 (the "**Redemption Date**"). Capitalized terms used and not defined in this letter shall have the respective meanings given them in the LLC Agreement.

Preferred Member has been requested to provide this letter setting forth the conditions upon which Preferred Member will release all right, title and interest it has in the Preferred Units and the other Preferred Unit Obligations under the LLC Agreement (the "**Release Conditions**").

The sum of the aggregate Preferred Unit Obligations, as of the Redemption Date, will be $1,387,461 (the "**Redemption Amount**"). The Redemption Amount consists of:

(i) $477,318 in Preferred Return, as described in Sections 3.7.1 and 4.1.1 of the LLC Agreement; <u>plus</u>

(ii) $913,970 in return of capital, as described in Section 4.1.2 of the LLC Agreement; <u>minus</u>

(iii) $3,826 in withholding taxes paid by the Company.

The Release Conditions are as follows:

1. The Company shall pay or cause to be paid to Preferred Member, at the Company's cost and expense, (i) on or before the Redemption Date, the Redemption Amount or (ii) after the Redemption Date, the Redemption Amount plus any Per Diem Amount (as defined below) in either event by wire transfer of immediately available funds to the following account of the Preferred Member:

27589292v.7 93980.006.00



| | |
|---|---|
| Correspondent Bank: | HSBC Bank USA, N.A. 452 Fifth Avenue New York, New York 10018 U.S.A. |
| SWIFT Code: | MRMD US33 |
| Fedwire ABA Code: | 021001088 |
| Beneficiary Bank: | HSBC Bank Bermuda Limited, Hamilton Swift Code: BBDA BMHM |
| Beneficiary Account No.: | 011-211885-511 |
| Beneficiary Name: | PB LIFE AND ANNUITY CO., LTD |
| Reference: | Redemption AAPC Holdings, LLC Class A Preferred |

2. At least one (1) Business Day prior to the Redemption Date Preferred Member shall have received an electronic copy of this letter duly executed by the parties hereto.

For each day after the Redemption Date, additional distributions shall accrue and be payable by the Company to the Preferred Member in an amount equal to $451 (the "**Per Diem Amount**") until the Preferred Unit Obligations are paid in full. Unless the Redemption Amount and any Per Diem Amount, if applicable, are received in immediately available funds, by 3:00 p.m. (Eastern Time) on a business day such amount shall be deemed to have been received on the next succeeding business day.

Upon the occurrence of the Release Conditions, (a) the Preferred Unit Obligations shall be paid, redeemed and satisfied in full, (b) any remaining commitments under the LLC Agreement to Preferred Member shall be terminated, and the Company shall have no further obligation to Preferred Member under the LLC Agreement and any documents related thereto (other than with respect to the indemnification and exculpation provisions set forth Section 7.2 of the LLC Agreement, which obligations shall survive until satisfied or terminated in accordance with their terms as in effect on the date hereof), (c) the Preferred Member shall, automatically and irrevocably, and without any further action, no longer be entitled to any rights under the LLC Agreement (other than the indemnification and exculpation provisions referenced in clause (b) above), under any documents related thereto, as a Member or Unitholder of the Company, or otherwise in respect of the Preferred Units or its status as a member of the Company, (d) the Preferred Units shall automatically and irrevocably be deemed to be redeemed in full without any further action by any party, (e) the Preferred Units shall be redeemed free and clear of all liens, security interests and other encumbrances and (f) the Company shall update the Unit Register to reflect the redemption of the Preferred Units in full.

Upon the occurrence of the Release Conditions, Preferred Member hereby absolutely and unconditionally releases and forever discharges the Company and each officer, director, employee, member and agent of the Company (the "**Released Parties**") from any and all claims, counterclaims, demands or causes of action (arising from the beginning of time to and including the later of the date of this letter) of any kind, nature or description, whether known or unknown, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, whether such claims, counterclaims, demands and causes of action are matured or unmatured, which Preferred Member has had, now has or has made claim to have against any Released Party for or by reason of any act, omission, matter, cause or thing arising out of or in any way related to the LLC Agreement or the Preferred Units, except for the indemnification and exculpation provisions referenced in above which shall survive.

2

In consideration of the payment in full of the Preferred Unit Obligations and upon the occurrence of the Release Conditions, Preferred Member agrees to procure, deliver or execute and deliver to the Company, from time to time, all further releases, termination statements, certificates, instruments and documents, each in form and substance satisfactory to the Company, and take any other actions, as may be reasonably requested by the Company or which are required to evidence the consummation of the payoff and redemption contemplated hereby, in each case at the sole cost and expense of the Company (including attorneys' fees and expenses).

This letter may be executed in multiple counterparts and by electronic signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

[SIGNATURE PAGE FOLLOWS]

3

Very truly yours,

**PB LIFE AND ANNUITY CO., LTD.**

By: _____
Name: Rachelle Frisby
Title: Joint Provisional Liquidator –
without personal liability


ACKNOWLEDGED AND CONSENTED TO BY:


**AAPC HOLDINGS, LLC**


By_____
Name: _____
Title: _____

27580292v7 93980.006.00

Very truly yours,

**PB LIFE AND ANNUITY CO., LTD.**

By: _____
Name: Rachelle Frisby
Title: Joint Provisional Liquidator –
without personal liability

ACKNOWLEDGED AND CONSENTED TO BY:

**AAPC HOLDINGS, LLC**

By _____
Name: Bevan Erickson
Title: CEO

Signature Page
Payoff and Preferred Units Redemption Letter

27589292v7 93980.006.00

**PAYOFF AND**
**PREFERRED UNITS REDEMPTION LETTER**

AAPC Holdings, LLC
2233 S Presidents Dr., Suite F
Salt Lake City, Utah 84120

February 24, 2022

Re: Sixth Amended and Restated Operating Agreement of AAPC Holdings, LLC (the "**Company**") dated as of July 26, 2019 (as amended, supplemented or otherwise modified from time to time, the "**LLC Agreement**").

Ladies and Gentlemen:

The Company hereby notifies Northstar Financial Services (Bermuda) Ltd. (In Liquidation) ("**Preferred Member**") that the Company intends to redeem in full all **Class B Preferred Units** held by Preferred Member (the "**Preferred Units**") as provided under the LLC Agreement and repay all outstanding obligations owing by the Company to the Preferred Member under the LLC Agreement on account of such Preferred Units including any Preferred Return, tax distribution and other rights of distributions in respect thereof (collectively, the "**Preferred Unit Obligations**") on February 24, 2022 (the "**Redemption Date**"). Capitalized terms used and not defined in this letter shall have the respective meanings given them in the LLC Agreement.

Preferred Member has been requested to provide this letter setting forth the conditions upon which Preferred Member will release all right, title and interest it has in the Preferred Units and the other Preferred Unit Obligations under the LLC Agreement (the "**Release Conditions**").

The sum of the aggregate Preferred Unit Obligations, as of the Redemption Date, will be $2,618,008 (the "**Redemption Amount**"). The Redemption Amount consists of:

(i)     $ 963,623 in Preferred Return, as described in Sections 3.7.1 and 4.1.1 of the LLC Agreement; plus

(ii)    $1,654,385 in return of capital, as described in Section 4.1.2 of the LLC Agreement.

The Release Conditions are as follows:

1. The Company shall pay or cause to be paid to Preferred Member, at the Company's cost and expense, (i) on or before the Redemption Date, the Redemption Amount or (ii) after the Redemption Date, the Redemption Amount plus any Per Diem Amount (as defined below) in either event by wire transfer of immediately available funds to the following account of the Preferred Member:

| | |
|---|---|
| Name: | Northstar Financial Services (Bermuda) Ltd. (In Liquidation) |
| ABA#: | 021-001-088 |
| Acct. Name: | NFSBi Operations |

27580213v7 93980.006.00

2. At least one (1) Business Day prior to the Redemption Date Preferred Member shall have received an electronic copy of this letter duly executed by the parties hereto.

For each day after the Redemption Date, additional distributions shall accrue and be payable by the Company to the Preferred Member in an amount equal to $907 (the "**Per Diem Amount**") until the Preferred Unit Obligations are paid in full. Unless the Redemption Amount and any Per Diem Amount, if applicable, are received in immediately available funds, by 3:00 p.m. (Eastern Time) on a business day such amount shall be deemed to have been received on the next succeeding business day.

Upon the occurrence of the Release Conditions, (a) the Preferred Unit Obligations shall be paid, redeemed and satisfied in full, (b) any remaining commitments under the LLC Agreement to Preferred Member shall be terminated, and the Company shall have no further obligation to Preferred Member under the LLC Agreement and any documents related thereto (other than with respect to the indemnification and exculpation provisions set forth Section 7.2 of the LLC Agreement, which obligations shall survive until satisfied or terminated in accordance with their terms as in effect on the date hereof), (c) the Preferred Member shall, automatically and irrevocably, and without any further action, no longer be entitled to any rights under the LLC Agreement (other than the indemnification and exculpation provisions referenced in clause (b) above), under any documents related thereto, as a Member or Unitholder of the Company, or otherwise in respect of the Preferred Units or its status as a member of the Company, (d) the Preferred Units shall automatically and irrevocably be deemed to be redeemed in full without any further action by any party, (e) the Preferred Units shall be redeemed free and clear of all liens, security interests and other encumbrances and (f) the Company shall update the Unit Register to reflect the redemption of the Preferred Units in full.

Upon the occurrence of the Release Conditions, Preferred Member hereby absolutely and unconditionally releases and forever discharges the Company and each officer, director, employee, member and agent of the Company (the "**Released Parties**") from any and all claims, counterclaims, demands or causes of action (arising from the beginning of time to and including the later of the date of this letter) of any kind, nature or description, whether known or unknown, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, whether such claims, counterclaims, demands and causes of action are matured or unmatured, which Preferred Member has had, now has or has made claim to have against any Released Party for or by reason of any act, omission, matter, cause or thing arising out of or in any way related to the LLC Agreement or the Preferred Units, except for the indemnification and exculpation provisions referenced in above which shall survive.

In consideration of the payment in full of the Preferred Unit Obligations and upon the occurrence of the Release Conditions, Preferred Member agrees to procure, deliver or execute and deliver to the Company, from time to time, all further releases, termination statements, certificates, instruments and documents, each in form and substance satisfactory to the Company, and take any other actions, as may be reasonably requested by the Company or which are required to evidence the consummation of the payoff and redemption contemplated hereby, in each case at the sole cost and expense of the Company (including attorneys' fees and expenses).

2

This letter may be executed in multiple counterparts and by electronic signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

[SIGNATURE PAGE FOLLOWS]

27589213v.7 92980.006.00

Very truly yours,

**NORTHSTAR FINANCIAL SERVICES (BERMUDA) LTD (IN LIQUIDATION).**

By: _____

Name: Rachelle Frisby
Title: Joint Liquidator – without personal liability

ACKNOWLEDGED AND CONSENTED TO BY:

**AAPC HOLDINGS, LLC**

By_____
Name: _____
Title: _____

Case 3:23-cr-00048-MOC-DCK     Document 132-4     Filed 05/04/26     Page 185 of 194

Very truly yours,

**NORTHSTAR FINANCIAL SERVICES (BERMUDA) LTD (IN LIQUIDATION).**

By: _____

Name: Rachelle Frisby
Title: Joint Liquidator – without personal liability


ACKNOWLEDGED AND CONSENTED TO BY:


**AAPC HOLDINGS, LLC**

By _____
Name: Bevan Erickson
Title: CEO

# EXHIBIT I

**The Joint Offical Liquidators make no representations or warranties regarding the attached schedule of non-IALA asset recoveries. In compiling this schedule, the JPLs relied on the Debtors' incomplete books and records, the MOU, the IALA, documents obtained in discovery from Lindberg and his affiliates, schedules provided upon their appointmentand, and information provided by ULICO.**

**PBLA - Realizations to Date and Remaining Assets**
**Bermuda Entities**
**31-Mar-26**

| Bermuda Company | Asset | Type | MOU Schedule | Initial Book Value ($) at Appointment | Realization ($) | Comment |
|---|---|---|---|---|---|---|
| PBLA | AAPC Holdings LLC | Preferred Equity | Non-MOU | unknown | 17,178,033 | |
| PBLA | ACE Foundation | Loan | Non-MOU | 4,284,195 | 5,657,765 | |
| PBLA | Clayton Plaza | Loan | Non-MOU | 850,000 | 979,802 | |
| PBLA | Erie Properties LLC | Real Estate | Non-MOU | 8,787,012 | 8,344,062 | |
| PBLA | Expro Group Holdings | Common Equity | Non-MOU | 658,726 | 823,169 | |
| PBLA | FMC Mortgage Loans | Mortgage Loan Pool | Non-MOU | 11,821,033 | 3,295,086 | |
| PBLA | Morning Mountain Holdings | Real Estate | Non-MOU | 4,500,000 | 3,315,339 | |
| PBLA | Paradigm Park Holdings LLC | Real Estate | Non-MOU | 1,181,898 | 1,328,156 | Katten paid c.$989,024 from amount sat in PPH account (i.e. from this realization) |
| PBLA | Tux Holdings | Real Estate | Non-MOU | 2,181,500 | 1,597,480 | |
| PBLA | UKAT | Settlement | NA | - | 1,571,036 | |
| PBLA | ASL Holdings LLC | Preferred Equity | Non-MOU | 2,899,894 | - | Listed on asset schedule but unrealized |
| PBLA | Limitless Research Inc. | | Non-MOU | 500,000 | - | Listed on asset schedule but unrealized |
| PBLA | Satori Waters | Loan | Non-MOU | 4,859,395 | - | Listed on asset schedule but unrealized |
| | | | | 42,523,651.63 | 44,089,928.90 | |

**The JPLs make no representations or warranties regarding the attached schedule of non-IALA asset recoveries. In compiling this schedule, the JPLs relied on the Debtors' incomplete books and records, the MOU, the IALA, documents obtained in discovery from Lindberg and his affiliates, and schedules provided upon their appointment**

**NFSB - Realizations to Date and Remaining Assets**
**Bermuda Entities**
**31-Mar-26**

| Bermuda Company | Asset | Type | MOU Schedule | Initial Book Value ($) at Appointment | Realization ($) | Comment |
|---|---|---|---|---|---|---|
| NFSB | AAPC Holdings LLC | Preferred Equity | Non-MOU | 2,844,459 | 2,623,450 | |
| NFSB | Carrington Holdings Compan LLC | | Non-MOU | 26,555,407 | 23,270,948 | |
| NFSB | Diversified Terra Holdings Ltd | | Non-MOU | unknown | 1,918,286 | |
| NFSB | DTH Holdings Ltd | | Non-MOU | 63,887,322 | 8,255,581 | |
| NFSB | UKAT | Settlement | Non-MOU | 18,040,415 | 4,396,278 | |
| NFSB | Agera Holdings, LLC | Preferred Equity | Non-MOU | 1,125,052 | - | Listed on asset schedule but unrealized |
| NFSB | AGH Parent LLC | Preferred Equity | Non-MOU | 416,576 | - | Listed on asset schedule but unrealized |
| NFSB | Capital Asset Management III | Promissory Note | Non-MOU | 3,272,720 | - | Listed on asset schedule but unrealized |
| NFSB | HealthLink | Loan | Non-MOU | 1,182,258 | - | Listed on asset schedule but unrealized |
| NFSB | Netherlands Insurance Holdings LLC | Promissory Note | Non-MOU | 1,944,322 | - | Listed on asset schedule but unrealized |
| NFSB | SNA Capital, LLC | Preferred Equity | Non-MOU | 9,905,425 | - | Listed on asset schedule but unrealized |
| | | | | 129,173,954.93 | 40,464,542.22 | |

**The JPLs make no representations or warranties regarding the attached schedule of non-IALA asset recoveries. In compiling this schedule, the JPLs relied on the Debtors' incomplete books and records, the MOU, the IALA, documents obtained in discovery from Lindberg and his affiliates, and schedules provided upon their appointment**

**Omnia - Realizations to Date and Remaining Assets**
**Bermuda Entities**
**31-Mar-26**

| Bermuda Company | Asset | Type | MOU Schedule | Initial Book Value ($) at Appointment | Realization ($) | Comment |
|---|---|---|---|---|---|---|
| Omnia | Platinum Partners Value Arbitrage Fund | NA | Non-MOU | 10,862,923 | - | Listed on asset schedule but unrealized |
| Omnia | PPMF - Agt Old Mutual | NA | Non-MOU | 805,802 | - | Listed on asset schedule but unrealized |
| Omnia | UKAT | Settlement | Non-MOU | - | 259,792 | |
| | | | | 11,668,725 | 259,792 | |

The JPLs make no representations or warranties regarding the attached schedule of non-IALA asset recoveries. In compiling this schedule, the JPLs relied on the Debtors' incomplete books and records, the MOU, the IALA, documents obtained in discovery from Lindberg and his affiliates, and schedules provided upon their appointment

**PBIHL - Realizations to Date and Remaining Assets**
**Bermuda Entities**
**31-Mar-26**

| Bermuda Company | Asset | Type | MOU Schedule | Initial Book Value ($) at Appointment | Realization ($) | Comment |
|---|---|---|---|---|---|---|
| PBIHL | ABS/RE | NA | Non-MOU | 201,466 | - | Listed on asset schedule but unrealized |
| PBIHL | Platinum Partners Value Arbitrage Fund | NA | Non-MOU | 2,034,982 | - | Listed on asset schedule but unrealized |
| PBIHL | UKAT | Settlement | Non-MOU | - | 277,885 | |
| | | | | 2,236,448 | 277,885 | |

# EXHIBIT J

| **From:** | Paul Brown <paul.brown@GlobalBankers.com> |
| **Sent:** | Monday, October 28, 2019 3:53 PM |
| **To:** | Greg Lindberg |
| **Cc:** | Chris Herwig |
| **Subject:** | some good news |
| **Attachments:** | Book1.xlsx |

I wanted to be sure you guys saw this on the PPN final outcome.  With the dip in rates a couple of weeks ago we went back at some of the issuers of the zeros underlying the remaining PPNs and, with a combination of veiled threats and negotiation, were able to improve their terms.  Recall that the ones that were left were the ones that were priced most out of the money.  Earlier in the year we talked about a best case loss on the zeros in the -50mm to -60mm range but we ended up making +6mm on the disposals.  Every little bit helps.


Best,
Paul

| Total Zero Gain/Loss | | |
|---|---|---|
| **Issuer** | **Cusip** | **Cash Gain/Loss** |
| CIBC | 13605AAY5 | 469,697 |
| CITI | 172967LX7 | 2,084,748 |
| TVA 2065 whole bond | 880591ES7 | 1,731 |
| TVA 2060 P Strip | 88059FBT7 | (3,068) |
| TVA 2065 P Strip | 88059FCG4 | (24,361) |
| Nomura | 65538XAG6 | 360,000 |
| Wells Fargo | 949746SW2 | (2,524,722) |
| Natixis | 63873DAA1 | 12,800,000 |
| Barclays | 06739FJM4 | 1,198,000 |
| RBC | 78013GSS5 | (5,394,600) |
| BMO | 06367UAA5 | 1,256,093 |
| UBS | 90270KVK2 | (3,726,745) |
| JPM | 48128GR77 | (460,008) |

| | | |
|---|---|---|
| **Total Gain** | | **6,036,766** |

| Total Cash Proceeds by Lender | | | | | |
|---|---|---|---|---|---|
| **Issuer** | **Cusip** | **CBL** | **BLIC** | **SNIC** | **Total** |
| CIBC | 13605AAY5 | 32,402,189 | 1,530,900 | 3,827,250 | 37,760,339 |
| CITI | 172967LX7 | 31,454,008 | 2,030,375 | 4,060,750 | 37,545,133 |
| TVA 2065 whole bond | 880591ES7 | 6,907,085 | 402,048 | 804,095 | 8,113,227 |
| TVA 2060 P Strip | 88059FBT7 | 7,843,635 | 448,786 | 897,572 | 9,189,993 |
| TVA 2065 P Strip | 88059FCG4 | 8,110,459 | 473,694 | 947,388 | 9,531,541 |
| Nomura | 65538XAG6 | 885,697 | 727,827 | 3,789,455 | 5,402,979 |
| Wells Fargo | 949746SW2 | 32,325,000 | 3,232,500 | 4,848,750 | 40,406,250 |
| Natixis | 63873DAA1 | 54,918,000 | 5,033,900 | 8,695,600 | 68,647,500 |
| Barclays | 06739FJM4 | 34,824,883 | 2,741,827 | 4,540,000 | 42,106,709 |
| RBC | 78013GSS5 | 20,370,085 | 1,430,400 | 3,576,000 | 25,376,485 |
| BMO | 06367UAA5 | 28,174,774 | 2,264,853 | 4,529,706 | 34,969,333 |
| UBS | 90270KVK2 | 21,413,398 | 1,525,381 | 3,050,762 | 25,989,542 |
| JPM | 48128GR77 | 49,539,875 | - | - | 49,539,875 |

| | | | | | |
|---|---|---|---|---|---|
| **Total Proceeds** | | **329,169,088** | **21,842,490** | **43,567,329** | **394,578,906** |

| | | | | | |
|---|---|---|---|---|---|
| Recent | | 210,365,734 | 11,074,084 | 22,012,567 | 243,452,385 |