| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREG E. LINDBERG,<br><br>        *Defendant.* | No. 5:19-CR-22-MOC<br><br>No. 3:23-CR-48-MOC |

## DEFENDANT GREG E. LINDBERG'S SENTENCING MEMORANDUM

Defendant Greg Lindberg, through counsel, respectfully submits this Sentencing Memorandum in *United States v. Lindberg, et. al.*, No. 5:19-cr-22-MOC (the "Public Contribution" case), and *United States v. Lindberg*, No. 3:23-cr-48-MOC (the "Financial" case). A consolidated sentencing hearing has been scheduled in this matter for May 26, 2026.

The Court previously sentenced Mr. Lindberg in the Public Contribution case to 87 months of incarceration more than five years ago, following his conviction after his first trial. Mr. Lindberg spent 633 days in prison at FPC Montgomery after that initial sentence was imposed. He was released on bond following the Fourth Circuit's decision in June 2022 vacating his initial conviction. He was convicted again in May 2024 following a retrial in the Public Contribution case.

Mr. Lindberg entered a plea in the Financial case on November 12, 2024. He voluntarily surrendered to the U.S. Marshals Service and began serving his sentence of imprisonment on the day of his guilty plea. As of the date of his sentencing, Mr. Lindberg will have served 561 days at the Gaston County Jail and thereafter in the Grayson County Detention Center in Leitchfield, Kentucky, and the Pike County Detention Center in Pikeville, Kentucky.

Primarily as a result of Mr. Lindberg's unprecedented restitution efforts since he was last sentenced in the Public Contribution case, as well as his substantial cooperation with the Special

1

Master, and the fact that the Sentencing Guidelines substantially overstate the impact of the loss amount, Mr. Lindberg respectfully requests that this Court (1) initially impose concurrent custodial sentences of 48 months in both cases; (2) then vary or adjust downward from the 48 month sentences in both cases by 39.8 months to ensure that Mr. Lindberg receives credit against both sentences for the time that he has spent in incarceration prior to the sentencing hearing in this case; (3) vary downward by an additional 9.5 months for the First Step Act sentence reduction that Mr. Lindberg previously earned while incarcerated at FPC Montgomery, but was lost as a result of the Fourth Circuit's vacating of his initial conviction in the Public Contribution case; (4) hold that, for the purposes of the sentence imposed in these cases and for the purposes of 18 U.S.C. § 3585(a), Mr. Lindberg arrived voluntarily at the Gaston County Jail to commence service of a portion of his sentence on November 12, 2024, and that the Gaston County Jail, the Grayson County Detention Center, and the Pike County Detention Center shall be considered official detention facilities where his sentence is to be served; and (5) delay Mr. Lindberg's federal prison reporting date for any additional time he is required to serve until after the conclusion of all restitution hearings and the entry of a final restitution order so that Mr. Lindberg is available to consult with his attorneys on restitution issues and is available to continue assisting the Special Master.

## I.      <u>Introduction</u>

The Court previously sentenced Mr. Lindberg to 87 months in the Public Contribution case, a sentence that was imposed prior to Mr. Lindberg's substantial restitution efforts, and that appears to have already included the interrelated conduct in the Financial case. *See infra* at 6. For the present sentencing hearing, the Government has agreed to recommend that the sentences in the Political Contribution and Financial cases run concurrently. In addition, the Government does not object to credit for time served being applied to the consolidated sentence.

The sentence requested by Mr. Lindberg properly reflects the seriousness of the underlying offenses while recognizing the extraordinary restitution and cooperation efforts Mr. Lindberg has undertaken in conjunction with the Court-appointed Special Master before and since the entry of his plea in the Financial case. These efforts include, but are not limited to: (1) promptly executing Assignment Agreements of his interests in the Primary Restitution Assets – including NHC Holdings LLC (which includes Clanwilliam)[1] – to the Special Master; (2) voluntarily relinquishing a $40 million tax escrow to facilitate the Clanwilliam sale through the Special Master process (thereby allowing $157 million in restitution to flow directly to individual North Carolina insurance company ("NCIC") policyholders); (3) executing a number of releases of trustees and other parties, and dismissing several lawsuits, in order to remove roadblocks to the Clanwilliam sale; (4) withdrawing notices of appeal in related state court civil proceedings during plea negotiations in the Financial case, which enabled state insurance guaranty associations to begin immediately making over $1.8 billion in payments to NCIC policyholders in 2024 (the appeals placed a hold on their ability to do this); (5) assisting the Special Master in selling Clanwilliam with this sale providing net proceeds of $348,723,359.44, of which $314,358,186.68 was immediately available for restitution;[2] (6) executing assignments and releases to enable the sale of

_____

[1] The Primary Restitution Assets include, among other assets, NHC Holdings LLC ("NHC"), which was created in 2019 as a part of the Memorandum of Understanding ("MOU") reached between Mr. Lindberg, his operating companies, his insurance companies, and the North Carolina Department of Insurance. Pursuant to the MOU, Mr. Lindberg ultimately transferred over 300 individual Specified Affiliated Companies ("SACs") into NHC, including Clanwilliam, a company that provides innovative healthcare management, software, and clinical system services. Clanwilliam was sold by the Special Master, generating net proceeds of $348,723,359.44. *See infra* at 13. Clanwilliam was purchased by Mr. Lindberg as an affiliated investment for a relatively small amount (€45 million) in 2014 and then grown into a much larger business by Mr. Lindberg until its sale. *See infra* at 11-12.

[2] Subsequent to the Court's Order authorizing the Clanwilliam sale, the Special Master brokered an agreement among the parties to reserve $20 million in escrow to satisfy potential Irish tax

assets if necessary to fully satisfy restitution obligations; (7) voluntarily providing tax refund checks in the amounts of $570,492.27 to the Special Master; (8) consenting to a motion for a protective order regarding the disclosure of excess policyholder data that authorized the guaranty associations and NCICs to share their policyholder level data with the Special Master, which was necessary to facilitate the $157 million in restitution payments made by the Special Master in December 2025 to all 43,000 North Carolina policyholders who had not yet been paid the full value of their individual insurance policies[3]; (9) voluntarily providing Mr. Lindberg's personal tax returns to the Special Master in October 2025 in order to provide information needed by the Special Master to analyze certain transactional tax issues related to the sale of NHC entities; (10) working with the Special Master and its Financial Advisor, Paladin, to address numerous tax issues to expedite NHC sales and increase the value of the NHC assets (thereby increasing the restitution value that can be monetized from those entities); and (11) providing certain substantial payments – over $500,000,000.00 – to the relevant insurance companies before the entry of his plea in the Financial Fraud case, as outlined in the Special Master's Report and Recommendation Regarding Restitution (Fin. Dkt. Entry No. 106 at 23-25). Additionally, as noted in Mr. Lindberg's Response and Objection to the Special Master's Report and Recommendations Regarding Restitution (Fin. Dkt. Entry No. 132), if the Court credits the payments/offsets contained in Mr. Lindberg's Response and Objection, Mr. Lindberg will have fully satisfied his restitution obligations via over $3.69 billion in cash payments, asset transfers, and credits due.

---

liabilities arising from the sale that NHC only identified immediately before closing. If the Irish tax liabilities are ultimately less than $20 million, then any remaining funds will be released for restitution.

[3] *See* Fin. Dkt. Entry No. 100.

These efforts, along with the hard work of the Special Master and his financial advisor, have resulted in **the total restitution paid in this case being among the largest amounts of restitution ever recovered in the United States**.

A sentence of 48 months (with credit then applied for time served and First Step Act credits previously earned) is longer than, but does not create an unjustified gulf between, the sentences handed down to co-defendants in both the Political Contribution and Financial cases, which include Non-Prosecution and Deferred Prosecution Agreements.

## II.     Procedural History and Background Information

### A.     The Political Contribution and Financial Case Histories

In the Political Contribution case, Mr. Lindberg is to be sentenced on two counts following a re-trial before a jury. Those counts relate to campaign contributions that Mr. Lindberg offered to the North Carolina Commissioner of Insurance to reassign the regulator previously assigned to review Mr. Lindberg's insurance business. Mr. Lindberg was indicted in the Political Contribution case along with three other defendants: John Gray, John Palermo, and Robin Hayes. The indictment contained five counts. Case No. 5:19-cr-22 ("PC Dkt."), Dkt. Entry No. 3. Mr. Lindberg, Mr. Gray, and Mr. Palermo were indicted on one count of conspiracy to commit honest-services wire fraud under 18 U.S.C. §§ 1343, 1346, and 1349, and one count of federal program bribery under 18 U.S.C. § 666(a)(2). Mr. Hayes was the only defendant charged in all five counts, including three additional false statement counts (18 U.S.C. § 1001).

Prior to the first trial, Mr. Hayes entered a plea to one false statement count and the other counts against him were dismissed. PC Dkt. Entry No. 70. The Government did not move under U.S.S.G. § 5K1.1 for a reduction based on substantial assistance, although it appears that Mr.

5

Hayes cooperated with the Government. Mr. Hayes was sentenced to one year of probation, PC Dkt. Entry No. 257, and was subsequently pardoned.

At the first trial, Mr. Palermo was acquitted. Mr. Lindberg was convicted on both counts and sentenced on August 19, 2020 to 87 months of imprisonment and three years of supervised release. PC Dkt. Entry No. 261. Following the jury's verdict in Mr. Lindberg's retrial in May 2024, the Court explained that it viewed the Financial and Public Contribution cases as "overarching cases" and "all [] part of the same parcel." Trial Transcript at 1032: 19-21, PC Dkt. Entry No. 450. The Court further noted that "[i]t's not one where the Court is going to go and try to be stacking stuff." *Id.* at 1032:19-24. Further, the Government referenced and incorporated facts integral to the Financial case during the Public Contribution case. *See, e.g.*, Trial Transcript at 1834: 8-10, PC Dkt. Entry No. 280 (Government asserting during the first Public Contribution trial that "there's up to a billion dollars of insurance proceeds that's missing or unaccounted for" in connection with post-trial bond motions).[4]

---

[4] *See also* August 19, 2020 Sentencing Transcript at 19, P.C. Dkt. Entry No. 281 (Court: "There's a lot of determination in this case to remove a regulator who wanted to change the 25 percent that it had moved down to to allow him to take more money out of the – his insurance companies and put it in other insurance companies"); PC Dkt. Entry No. 245 at 12 (Government arguing in sentencing brief: "[T]he defendants' broader goals, and the potential harms they threatened, provide further support for a significant prison sentence. As this Court noted, the defendants 'spared no effort or expense' in their attempts to remove the senior-most regulator of Lindberg's companies (Docket 240, pp. 4-5), which evidences what was at stake for them. When Jackie Obusek took responsibility for overseeing Lindberg's companies, Lindberg saw the permissive regulatory environment – which allowed him to operate his companies significantly outside of the industry standards – begin to rapidly disappear. He was no longer permitted to invest huge percentages of policyholders' money into his other companies, a practice already prohibited by most states. In short, by bribing the Commissioner, Lindberg sought to protect an investment strategy that allowed him to invest more than $750 million of insurance company assets into his other business ventures. Further, he sought to pave the way for his purchase of additional insurance companies worth hundreds of millions of dollars, giving him access to untold additional cash. In just one identified transaction, Lindberg was attempting to purchase an insurance company for $585 million. Lindberg & Gray PSRs ¶ 64.").

Mr. Gray was also convicted on both counts in the Political Contribution case and previously sentenced to 30 months of imprisonment and two years of supervised release. PC Dkt. Entry No. 262. His re-sentencing is pending.

In June 2022, the Fourth Circuit vacated the Political Contribution convictions and remanded for re-trial based on a jury instruction issue. *See United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022). On re-trial, Mr. Lindberg and Mr. Gray were found guilty on both counts in May of 2024. PC Dkt. Entry No. 435.

In the Financial case, Mr. Lindberg is before this Court for sentencing on two counts following a guilty plea, entered on November 12, 2024. Those counts relate to fraudulent statements he made to regulators about his insurance businesses. Mr. Lindberg pled guilty to one count of conspiracy in violation of 18 U.S.C. § 371, which carries a maximum term of imprisonment of five years, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), which carries a maximum term of imprisonment of 10 years.

Under the terms of the Financial case plea agreement, Mr. Lindberg agreed, among other things, to use his best efforts to pay full restitution and to the appointment of a Special Master "to identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." Case No. 3:23-cr-48 ("Fin. Dkt."), Dkt. Entry No. 40 at ¶ 9. The Government agreed to a consolidated sentencing hearing and concurrent sentences. *See id.* at ¶ 8(d)(i).

There have also been dispositions of other culpable individuals in the Financial case that are relevant to Mr. Lindberg's sentence under 18 U.S.C. § 3553(a)(6), including Chris Herwig, Devin Solow, and Eric Bostic. Mr. Herwig was the Chief Investment Officer and Portfolio Manager for Mr. Lindberg's companies. Mr. Solow was the Vice President of Investments, a

7

Mergers and Acquisitions associate, and had the primary responsibility for structuring the affiliate financing of Mr. Lindberg's non-insurance company acquisitions. *See Solow*, No. 3:22-cr-315, Dkt. No. 3 (W.D.N.C. 2022) (Bill of Information). Mr. Bostic worked with Mr. Lindberg from 2017 until 2021 in a role similar to Mr. Solow, with a particular focus on managing the investments of Mr. Lindberg's Bermuda insurance companies. Mr. Herwig supervised Mr. Solow and Mr. Bostic, and Mr. Lindberg supervised all three of them. *See Herwig*, No. 3:22-cr-314 (W.D.N.C. 2022), Dkt. No. 3 (Bill of Information). Although each of these individuals had varying levels of responsibility and culpability, they all were materially involved in misrepresenting the true financial condition of Mr. Lindberg's companies; whether these companies were in fact affiliated or unaffiliated entities; making misrepresentations about the capital position of some of Mr. Lindberg's companies; and misrepresenting that certain insurance and regulatory requirements were being complied with. Thus, they all had significant roles in the underlying Financial case.

Mr. Herwig entered a plea agreement with the Government that was filed on December 20, 2022. *Herwig*, No. 3:22-cr-314, Dkt. Entry No. 6. Pursuant to this agreement, Mr. Herwig pled guilty to a single 18 U.S.C. § 371 conspiracy count with a five-year maximum sentence. Mr. Herwig served as Mr. Lindberg's right-hand man for over a decade, ultimately receiving at least $13,686,190.63 in compensation for his key role in the charged conspiracy. Based on information and belief, Mr. Herwig will receive a substantial departure recommendation from the Government based on his substantial assistance. Thus, his ultimate sentence will likely be substantially less than the statutory maximum of five years. Mr. Herwig's case has not yet been scheduled for sentencing by the Court.

As for Mr. Solow, the Government entered a Deferred Prosecution Agreement with him. *Solow*, No. 3:22-cr-315, Dkt. Entry No. 6-1. Pursuant to this agreement, the Government agreed

to defer prosecution of Mr. Solow for a period of 60 months and thereafter dismiss his criminal charge following his payment of a $250,000.00 "Stipulated Forfeiture Amount" (approximately 7% of the approximately $3.4 million that Mr. Solow admitted being paid for his role in the conspiracy). *Id.* at ¶ 17.

And for Mr. Bostic, the Government entered into a Non-Prosecution Agreement with him on July 27, 2023, allowing him to avoid criminal charges entirely with the payment of a $75,000.00 "Stipulated Forfeiture Amount." *See* https://www.justice.gov/criminal/criminal-vns/case/united-states-v-greg-e-lindberg (last visited May 7, 2026).

### B. Time Served by Mr. Lindberg

Mr. Lindberg has been incarcerated twice related to these cases and is currently serving time on them. First, after his conviction following his initial trial in the Public Contribution case, Mr. Lindberg served 633 days in prison at FPC Montgomery before the Fourth Circuit vacated that conviction in June 2022; he was then released on bond pending re-trial. Second, following his guilty plea in the Financial case, Mr. Lindberg voluntarily surrendered to the U.S. Marshals Service and began serving his anticipated sentences in both cases on November 12, 2024. Since that time, Mr. Lindberg has been incarcerated in the Gaston County Jail, the Grayson County Detention Center, and the Pike County Detention Center. As of the day of his sentencing hearing, Mr. Lindberg will have served 561 days in the Gaston County Jail and the Kentucky detention facilities.

In total, as of the date of sentencing, Mr. Lindberg will have served 1,194 days (approximately 39.8 months). The Government has agreed in the plea agreement that it will not object to the Court recommending that the Bureau of Prisons apply credit for all time served by Mr. Lindberg to both cases in a consolidated sentence. Fin. Dkt. Entry No. 40 at ¶ 8(d)(ii). Mr.

9

Lindberg also respectfully requests that the Court hold that, for the purposes of the sentence imposed in these cases and for the purposes of 18 U.S.C. § 3585(a), Mr. Lindberg arrived voluntarily at the Gaston County Jail to commence service of a portion of his sentence on November 12, 2024, and that the Gaston County Jail, the Grayson County Detention Center, and the Pike County Detention Center shall be considered official detention facilities where his sentence is to be served.

### C.     The Special Master and Restitution Payments

On January 23, 2025, after the entry of Mr. Lindberg's plea in the Financial case, the Court granted a joint motion by Mr. Lindberg and the Government to appoint a Special Master to, *inter alia*, determine who are bona fide victims in these cases; determine the amount of restitution owed by Mr. Lindberg; identify assets available for liquidation for the benefit of victims; liquidate these assets; and make payment of available funds to victims. Fin. Dkt. Entry No. 56. The Court appointed Joseph Grier of Grier Wright Martinez PA as Special Master and Paladin Management as the Special Master's Financial Advisor.[5]

The Special Master Order provides that, "[t]o assist in meeting his restitution obligations, Defendant [Mr. Lindberg] has agreed to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the [S]pecial [M]aster, … within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth Holdings, LLC's rights and interests, whether held directly or indirectly, in [the Primary Restitution Assets]." *Id*. at ¶ 9.  As noted, the Primary Restitution Assets include NHC Holdings LLC, which is the parent company of over 300 SACs (the vast majority of which are operating companies generating ongoing revenue).  NHC was created as the result of the MOU, which was

---

[5] Mr. Grier retained his partner, Michael Martinez, to serve as counsel to the Special Master.

entered in 2019 among Mr. Lindberg, his operating companies, insurers, and their respective regulators. Most significantly for the restitution process, these SACs include Clanwilliam, a company that provides healthcare products and services focusing on IT management systems, software, connectivity and clinical systems. Clanwilliam is a global player in the healthcare industry, operating in 20 countries with 1.5 million clinical users and $90 million in annual revenue. Clanwilliam was sold in September 2025, generating net proceeds of $348,723,359.44, with $314,358,186.88 already disbursed as restitution payments.[6]

Mr. Lindberg purchased Clanwilliam for a fraction of its current value and grew it into a multi-million-dollar company. Mr. Lindberg acquired Clanwilliam in 2014 for €45 million. He built it into a multi-million-dollar company because of an investment model that focused on recurring revenue, low capital expenditure requirements, and high barriers to entry, characteristics well suited to insurance fund investments.[7]

Clanwilliam (originally Helix Health) had established a solid position in Irish and British healthcare management software with 11 million euros in revenue and 100 employees when it was acquired by Mr. Lindberg in 2014. Mr. Lindberg then expanded it into a global healthcare IT platform by acquiring 19 strategically placed companies, including Healthlink in 2017 (the leading Australian healthcare IT network). Clanwilliam eventually developed IT systems and solutions in five key healthcare segments: practice management systems, pharmacy systems, acute care

---

[6] As discussed in note 2, $20 million of the Clanwilliam proceeds have been set aside in an escrow account to be utilized to satisfy any potential Irish tax liabilities. To the extent the liabilities are less than $20 million, the remaining funds will be disbursed as restitution. Also, pursuant to the Court's Order Approving the Clanwilliam Sale (Dkt. Entry No. 68), 4.4438% of the sale proceeds were set aside as an administrative reserve to pay the expenses of the Special Master, Financial Advisor, and Mr. Lindberg's defense counsel.

[7] The company's annual revenue increased from €11 million to €106 million in 2024 (the last year before the company was sold).

solutions, aged care platforms and healthcare analytics. As a result, Clanwilliam's revenue grew from 11 million euros to 96 million euros; it expanded from operations in two countries to more than 20 countries; went from 100 to over 950 employees when it was sold; and was valued at over $850 million prior to its sale.

Clanwilliam was also part of the affiliate investment strategy of Mr. Lindberg, which has produced the assets that have been, and are available for, sale in connection with the restitution process. Affiliate investments are a standard practice for many of the largest names in the insurance business, including Blackstone, Brookfield, and KKR. Data published by Apollo illustrates that some large life insurers have up to 35-43 percent of their assets in affiliate investments, similar to the 40 percent limit that Mr. Lindberg proposed to NCDOI in 2014.

During the first few weeks following entry of the Special Master Order, the Special Master and Mr. Lindberg (through counsel) devoted significant time working with the attorneys and board members for certain of the Primary Restitution Assets (and certain of those entities' lenders) to prepare documentation (namely, Assignment Agreements) evidencing the transition of Mr. Lindberg's and Global Growth Holding's interests in these assets to the Special Master. Mr. Lindberg timely executed such Assignment Agreements within the 21-day window established by the Special Master Order and relinquished all rights (except tax distribution rights) in these Primary Restitution Assets to the Special Master. Even prior to this time and during plea negotiations, Mr. Lindberg agreed to withdraw his appeals of certain matters in the state court proceedings, which enabled state guaranty associations to immediately begin paying policyholders.[8]

---

[8] In July of 2024, in *Causey v. SNIC*, Case Nos. 23-961 and 94P24, Mr. Lindberg voluntarily withdrew his appeals on certain matters in the North Carolina Court of Appeals and the North

After exhaustive work by the Special Master, the Government, Paladin and Mr. Lindberg, Clanwilliam was sold on September 12, 2025, pursuant to this Court's Order of sale, plus several other authorizing orders from other courts, for the net sales price of $348,723,359.44, and these monies were distributed by the Special Master as follows:

- $178,012,178.57 allocated to the North Carolina Insurance Companies to be disbursed first to directly pay the North Carolina Insurance Companies' policyholders with uncovered loss amounts as restitution pursuant to 18 U.S.C. § 3664(j)(1), with the remaining balance to be distributed to the North Carolina Insurance Companies for distribution pursuant to the North Carolina insurance liquidation priority statute(s), including to, or for the benefit of, state guaranty associations as Class 2 claimants. Fin. Case Dkt. Entry No. 68 at 3. The Special Master advised in a December 23, 2025 Notice to the Court that it had mailed paper checks to approximately 43,000 individual policyholders with "excess" or "uncovered" claim amounts totaling approximately $157 million. *See* Fin. Case Dkt. Entry No. 100 at 1.

- $112,027,442.59 to the Bermuda Insurance Companies (through the JPLs). $83,862,700.95 was specifically allocated to PBLA in satisfaction of the amounts ultimately owed to ULICO.

- $24,318,603.51 to Vista. Fin. Case Dkt. Entry No. 80 at 6.

- $14,591,162.11 to the Special Master as a reserve for satisfying administrative expenses. Fin. Case Dkt. Entry No. 80 at 13.

As reported in the Special Master's Third Status Report (Fin. Case Dkt. Entry No. 94), a group of Specified Affiliated Companies known as the Beckett Group were sold by its parent portfolio group (Collectivus) during the fall of 2025. Because of the extensive debt encumbering Beckett and Collectivus, the sale did not yield proceeds that could be distributed as restitution payments. However, the sale significantly reduced the debt associated with Collectivus and will therefore make the future sale of companies within the Collectivus portfolio more likely to yield more value for restitution purposes. Fin. Case Dkt. Entry No. 94 at 6-7.

Carolina Supreme Court to enable the state guaranty associations to immediately begin paying policyholders. The appeals had prevented this from occurring.

Since the appointment of the Special Master, and in conjunction with the asset sales, Mr. Lindberg has taken several cooperative steps to assist the Special Master in his efforts to sell assets to make restitution payments to qualified victims:

- Beginning in February of 2025, Mr. Lindberg, through defense counsel, participated in weekly prescheduled conferences with the Special Master, the United States Attorney's Office and Paladin in order to facilitate the activities of the Special Master, execute asset sales for the payment of restitution, and assist the Special Master and Paladin in understanding the complex business structures involved in the Primary Restitution Assets and Secondary Assets. In addition, Mr. Lindberg's defense counsel have had numerous (sometimes lengthy) additional conference calls and Zoom meetings with the USAO/DOJ, Special Master, Paladin and other parties outside of the regular meetings in order to provide needed information and facilitate asset sales (the weekly conference calls and other meetings began in February of 2025, and do not count hundreds of other electronic communications and calls).

- Pursuant to the corporate governance documents of NHC, Mr. Lindberg has the right to appoint two members to the Board of Directors of NHC. As part of the assignment of his interests in NHC, Mr. Lindberg assigned that appointment power to the Special Master. The Special Master exercised this power to remove Kathy Million and Lonna Carter, both affiliates of Mr. Lindberg, from the NHC board and appointed Don Harer, a member of the Paladin team, as one of the Special Master's board designees. The Special Master has not yet exercised his right to name a second NHC board member. For the other Primary Restitution Assets, the Special Master removed Mr. Lindberg's affiliate from this board and named another board member.

- To facilitate the sale of Clanwilliam, Mr. Lindberg agreed to relinquish a $40,000,000.00 tax escrow established by a prior North Carolina state superior court order so that these proceeds could be used to pay restitution to victims. Without Mr. Lindberg's consent, the transaction likely would not have happened, or the funds may have been disbursed through the North Carolina state case, which could have prevented the 43,000 excess policyholders from receiving the $157,000,000.00 they had not previously been paid by the state guaranty associations.

- In August of 2025, Mr. Lindberg dismissed lawsuits he previously filed against TA Associates in Texas and Colorado to facilitate the Special Master's sale of Clanwilliam, and pursuant to a voluntary request from the Special Master. *Lindberg v. Wilson*, No. 1:25-cv-00133, Dkt. Entry No. 22 (W.D. Tex.); *Lindberg v. Wilson*, No. 1:25-cv-00317, Dkt Entry No. 41 (D. Colo.). Mr. Lindberg also executed a related comprehensive release for TA Associates.

- Mr. Lindberg consented to a motion for a protective order regarding the disclosure of excess policyholder data authorizing the guaranty associations and insurance companies to share their policyholder level data with the Special Master, and for the Special Master to

keep that data confidential, so that individual restitution payments could be made to these victims.

- After his plea and before the appointment of the Special Master, Mr. Lindberg withdrew his appeals of certain state court cases which enabled the state guaranty associations to make immediate payments to policyholders prior to the asset sales by the Special Master.

- Mr. Lindberg voluntarily provided his personal tax returns to the Special Master in October of 2025 in order to provide information needed by the Special Master to analyze certain tax transactional issues related to the sale of the Primary Restitution Assets.

In addition, prior to the appointment of the Special Master, Mr. Lindberg made substantial repayments to the North Carolina insurance companies, including well over $500 million in payments credited by the Special Master and an additional $2.889 billion in payments, transfers, and credits as included in Mr. Lindberg's Response and Objection to the Special Master's Restitution Recommendations. *See* Fin. Dkt. Entry No. 132.

### III.     Eligible Victims and Restitution Amounts

The Special Master and its Financial Advisor filed a Report and Recommendations Regarding Restitution on April 3, 2026 that identifies qualified victims and initial restitution amounts for the Court (the "Special Master's Restitution Recommendation"). Fin. Dkt. Entry No. 106. The Special Master's Restitution Recommendation states that, in addition to the Clanwilliam sale, approximately $1.625 billion is currently owed in further restitution by Mr. Lindberg, with this figure including interest at a time value of money rate. *Id.* at 21. Without interest, the Special Master calculates the total restitution amount to be $1.362 billion. *Id.* The Special Master also notes in his Recommendation that the mid-range value for restitution to be recovered in the future from the Primary Restitution Assets is $1.454 billion. *Id.* at 30. Further the Special Master's position is that Mr. Lindberg should not receive credit for the following restitution payments (although on at least one of these items, the credit is just an issue of timing and amount):

- A credit for all of the assets on the victims' balance sheets, or, at least, a credit for those assets that are ultimately distributed to the victims' creditors, and/or a credit for the enterprise value of each victim at the time the applicable supervising governmental authority took control of the victim.

- Mr. Lindberg's transfer of a preferred equity position in one of the Primary Restitution Assets to ULICO, for which ULICO agreed to reduce the amount of ULICO's civil judgment against Mr. Lindberg by at least $218 million.

- CBL's receipt of a $3 million subordination fee in connection with a new loan to some of Mr. Lindberg's other companies.

- SNIC's receipt of approximately $28 million in expense reimbursements from Mr. Lindberg in 2021–2022.

- Approximately $59 million in payments made to the Pre-Designated Restitution Parties for debts not included in the IALA.

- CBL's receipt of a $5 million transaction fee in connection with a debt restructuring of one of the Primary Restitution Assets.

- Various reductions totaling at least $129 million relating to one or more entities referred to as "Agera."

- A reduction in the amount of $118.3 million based on CBL's purchase of a group of affiliated companies known as "Eye Care Leaders."

*Id.* at 23-25.

On May 4, 2026, Mr. Lindberg filed a Response and Objection to the Special Master's Restitution Recommendation relating to the above amounts. *See* Fin. Dkt. Entry No. 132. The Response and Objection outlines why these payments should be credited, and with other offsets and credits, shows that full restitution has already been paid.

## IV. Plea Agreement Terms

Pursuant to the terms of Mr. Lindberg's plea agreement in the Financial case, the Government has agreed to recommend that the sentences imposed in the Public Contribution and Financial cases run concurrently. *See* Fin. Dkt. Entry No. 40 at ¶ 8(d)(i). The Government has also

agreed not to object to the Court crediting the time already served by Mr. Lindberg to both cases in a consolidated sentence. *Id.* at ¶ 8(d)(ii).

### A. The Sentences for the Financial and Political Contribution Cases Should be Ordered to Run Concurrently.

Per the Government's recommendation, the Court should order the sentences in Mr. Lindberg's cases to run concurrently. Such a determination is in accordance with U.S.S.G. § 5G1.2. *See* Application Note 1, U.S.S.G. § 5G1.2 (instructing that sentences on multiple counts of conviction "are to be imposed to run concurrently to the extent allowed by the statutory maximum sentence of imprisonment for each count of conviction").

Indeed, this Court has previously stated that it views the Financial and Political Contribution cases as "overarching cases" and clarified that "[i]t's not one where the Court is going to go and try to be stacking stuff." May 15, 2024 Trial Transcript at 1032: 19-24, PC Dkt. Entry No. 450. The Court is correct that the two cases are inextricably intertwined. The Government has claimed that Mr. Lindberg sought a different regulator in the Political Contribution case to allow his insurance companies to maintain largely illiquid affiliated investments of forty percent of their total holdings, and it alleges in the Financial case that Mr. Lindberg misrepresented the status of those affiliated investments to the regulator. *See* Bill of Indictment in Financial case (Dkt. Entry No. 1).

In addition to Section 5G1.2, the imposition of concurrent sentences is consistent with the provisions of U.S.S.G. § 5G1.3.  *See* U.S.S.G. § 5G1.3(b) ("If … a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction … the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment").  *See* further discussion of Section 5G1.3 in Section IV.B *infra*.

**B.** **Mr. Lindberg's Concurrent Sentences Should be Reduced for Time Served.**

As noted, the Government has agreed in the plea agreement to not object if the Court recommends that the Bureau of Prisons ("BOP") applies credit for any time served to the consolidated sentence for each case. Fin. Dkt. Entry No. 40 ¶ 8(d)(ii). Here, Mr. Lindberg should receive credit against a consolidated sentence for the two separate periods of time that he has served: (1) the 633 days that he spent in federal prison at FPC Montgomery following his initial conviction in the Public Contribution case before the Fourth Circuit's reversal of that conviction in June of 2022; and (2) the 561 days that he has served at the Gaston County Jail, the Grayson County Detention Center, and the Pike County Detention Center since entering a plea in the Financial Case and voluntarily surrendering to the U.S. Marshals Service in November 2024. The time served by Mr. Lindberg totals approximately 39.8 months. As explained in detail below, due to the complexity of the issue of applying credit for time served given the unprecedented procedural posture of this case, Mr. Lindberg respectfully requests that the Court reduce the sentences that it ultimately imposes in each case by 39.8 months to ensure that Mr. Lindberg receives credit for the time that he has served in advance of sentencing.

Credit for time served against both sentences is supported by the fact that the two cases are "all part of the same parcel" (May 15, 2024 Trial Transcript at 1032:19-21) and involve relevant conduct to one another under the principles of U.S.S.G. § 1B1.3. Giving Mr. Lindberg credit for time served against both sentences is also consistent with U.S.S.G. § 5G1.3(b), which covers the analogous situation of when credit for time served should be applied for an undischarged term of imprisonment. In such a case, if "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction … the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the

18

Bureau of Prisons." 18 U.S.C. § 3553(b); *see also United States v. Jones*, 1998 U.S. App. LEXIS 19171, at *21 (4th Cir. 1998) (Section 5G1.3 "attempts to achieve some coordination of sentences imposed in such situations with an eye toward having such punishments approximate the total penalty that would have been imposed had the sentences for the different offenses been imposed at the same time (i.e., had all of the offenses been prosecuted in a single proceeding)") (nonpublished disposition) (quoting *Witte v. United States*, 515 U.S. 389, 404 (1995)).

Although Mr. Lindberg is entitled to credit for time served against both sentences, whether BOP would apply credit for time served against both sentences is a complex issue and appears unlikely given the unique procedural posture of this case. Counsel for Mr. Lindberg has conducted extensive research on this issue, but has been unable to locate any case involving the issue of credit for time served by a defendant in a similar posture – that is, where a defendant has been charged in two separate prosecutions involving relevant conduct more than three years apart; where the first prosecution resulted in a conviction that was vacated and the defendant served time in prison prior to the vacating of that conviction; where the two cases are subsequently consolidated for a sentencing hearing; and where a defendant voluntarily surrendered and served additional time in prison prior to the consolidated sentencing hearing. Thus, this case appears to involve an issue of first impression as to whether BOP would apply credit for the two separate periods of imprisonment that Mr. Lindberg has served in advance of the consolidated sentencing hearing.

18 U.S.C. § 3585(b) sets forth the circumstances under which BOP can award credit for prior time spent in custody. *See United States v. Wilson*, 503 U.S. 329 (1992). It provides as follows:

> A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—

> (1) as a result of the offense for which the sentence was imposed; or

> (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

that has not been credited against another sentence.

18 U.S.C. § 3585(b).

In the present case, it does not appear that BOP will apply credit against Mr. Lindberg's sentence in the Financial case for the 633 days Mr. Lindberg spent in federal custody after his first trial (and before the Fourth Circuit's reversal) given the fact that this sentence was imposed in the Political Contribution case more than three years before Mr. Lindberg was ever charged in the Financial case. Moreover, Section 3585 only permits credit for time served "that has not been credited against another sentence." 18 U.S.C. § 3585(b). Thus, it appears that this language would prevent BOP from awarding credit for time served against the Financial case sentence if it awards credit for this same time against the Political Contribution sentence.

Likewise, it does not appear that BOP would give Mr. Lindberg credit against both sentences for the 561 days that he has served after pleading guilty in the Financial case and voluntarily surrendering in November 2024. Once again, because Section 3585(b) only allows credit to be given for time "that has not been credited against another sentence," BOP would not be able to credit Mr. Lindberg for the time he has served against both the Political Contribution sentence and the Financial case sentence. Rather, BOP would only be able to credit this time against one of the sentences that it imposes. *See Wilson*, 503 U.S. at 337 (noting that under Section 3585(b) "Congress made clear that a defendant could not receive a double credit for his detention time").

Because it is unlikely that BOP will award Mr. Lindberg credit against both sentences for the 39.8 months that he has spent in custody prior to the date of sentencing, Mr. Lindberg

respectfully requests that the Court adjust or vary downward its ultimate sentence in each case by an additional 39.8 months and make clear that this adjustment or variance is being granted as a credit for a period of imprisonment that will not be credited by BOP. *Cf.* U.S.S.G. § 5G1.3, cmt. n. 2(C) (noting that if the court adjusts a sentence for a period of time already served, the court should note on the Judgment "that the sentence imposed is a sentence reduction pursuant to § 5G1.3(b) for a period of imprisonment that will not be credited by the Bureau of Prisons"). Such a result is justified by the fact that the two cases involve "relevant conduct" to each other; Mr. Lindberg has, in fact, served this time and deserves full credit for it; the Government does not object to concurrent sentences and for credit for time served being applied to both sentences; and any other result would result in Mr. Lindberg being penalized for the fortuity of the timing of the separate prosecutions. *See United States v. Coles*, 721 Fed. Appx. 257, 258 (4th Cir. 2018) (Section 5G1.3 "operates to mitigate the possibility that the fortuity of two separate prosecutions will grossly increase a defendant's sentence") (internal quotation marks and citations omitted).

If the Court is not inclined to adjust or vary downward 39.8 months against both sentences, the Court can attempt to ensure that Mr. Lindberg receives credit for time served against both cases by: (1) directing that BOP credit Mr. Lindberg for the 39.8 months that he has served as against the Political Contribution sentence only; and (2) adjusting downward the Financial case sentence by an additional 39.8 months pursuant to U.S.S.G. § 5G1.3(b) or (d).

It appears that BOP would be able to credit the time served against the Political Contribution sentence only (if the Court does not adjust or downward vary by this amount under U.S.S.G. § 5G1.3) pursuant to 18 U.S.C. § 3585(b). However, as discussed, if BOP credits the prior time served against the Political Contribution sentence, it does not appear that BOP would also credit the time served against the Financial case sentence under 18 U.S.C. § 3585(b).

Nevertheless, if the Court directs BOP to credit the time served against the Political Contribution sentence only, the time served essentially become an "undischarged" term of imprisonment when viewed against the Financial case sentence.

As discussed, U.S.S.G. § 5G1.3(b) requires a downward adjustment by the Court for any imprisonment already served on an undischarged term of imprisonment that will not be credited by BOP where the offense involves relevant conduct. This guideline provides, in pertinent part:

> If subsection (a) does not apply[9], and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed as follows:
>
> (1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons

U.S.S.G. § 5G1.3(b)(1).

According to Application Note 2, "Subsection (b) applies in cases in which all of the prior offense is relevant conduct to the instant offense under the provisions of subsection (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct)." U.S.S.G. § 5G1.3, cmt. n. 2(A). Thus, Section 5G1.3(b) applies where, as here, the term of imprisonment at issue (the Financial case conviction) results from another offense that is relevant conduct to that case (the Political Contribution case). In such instances, Section 5G.1.3(b) makes clear that the Court "shall" adjust the sentence for any period of imprisonment not already served if the court determines that such period of imprisonment will

---

[9] Subsection (a) provides that "[i]f the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status), or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment." U.S.S.G. § 5G1.3(a). Here, this section is not applicable because the conduct resulting in the Financial case conviction did not occur while Mr. Lindberg was serving time in the Political Contribution case or after sentencing in the Political Contribution case.

not be credited to the federal sentence by BOP. U.S.S.G. § 5G1.3(b)(1); *see also United States v. Descally*, 254 F.3d 1328, 1333-34 (11th Cir. 2001) (where state sentence arose out of conduct which formed part of federal conspiracy and constituted relevant conduct at the federal sentencing, district court erred in failing to apply Application Note 2 to Section 5G1.3(b) and take into account time already served for the robbery that constituted part of the same misconduct in violation of the Hobbs Act).[10]

Even if the Court were to determine that only part of the Political Contribution case consists of relevant conduct with respect to the Financial case, a downward adjustment from the Financial case sentence for the 39.8 months Mr. Lindberg has served would be appropriate pursuant to subsection (d) of U.S.S.G. § 5G1.3. "Cases in which only part of the prior offense is relevant conduct to the instant offense are covered in subsection (d)." U.S.S.G. § 5G1.3(d), cmt. n. 2(A); *see also United States v. Nelson*, 982 F.3d 1141, 1145 (8th Cir. 2020) ("a term for non-relevant conduct or a mixture of relevant and non-relevant conduct is covered by § 5G1.3(d)").[11]

---

[10] Application Note 2(C) to U.S.S.G. § 5G1.3(b) further instructs the Court: "If subsection (b) applies, and the court adjusts the sentence for a period of time already served, the court should note on the Judgment in a Criminal Case Order (i) the applicable subsection (e.g. § 5G1.3(b)); (ii) the amount of time by which the sentence is being adjusted; (iii) the undischarged term of imprisonment for which the adjustment is being given and the relevant case information (including docket number); and (iv) that the sentence imposed is a sentence reduction pursuant to § 5G1.3(b) for a period of imprisonment that will not be credited by the Bureau of Prisons."

[11] Section 5G1.3(d) provides that "[i]n any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." Application Note 4(E) further provides that "[i]f the court does account for an undischarged term of imprisonment under subsection (d) in imposing the sentence, the Commission recommends that the court clearly state that the sentence was imposed pursuant to 18 U.S.C. § 3553(a), rather than as a credit for time served, to avoid confusion with the Federal Bureau of Prisons' exclusive authority provided under 18 U.S.C. § 3585(b) to grant credit for time served under certain circumstances." U.S.S.G. § 5G1.3, cmt. n. 4(E).

Thus, Application Note 4(E) makes it clear that where the prior time served was for a mixture of relevant and non-relevant conduct, the court has discretion under Section 5G1.3(d) to adjust the

23

In short, the issue of credit for time served is complicated due to the unique and complex procedural history of this case.  Mr. Lindberg should receive credit for time served against both sentences since the conduct at issue is interrelated, he has already spent nearly 40 months incarcerated, and the Government does not object to concurrent sentences or to credit for time served being applied to both sentences.  It is respectfully submitted that the simplest manner of ensuring that Mr. Lindberg gets credit for this time served against both sentences is to adjust or vary downward by an additional 39.8 months from the sentences imposed in both cases.  Alternatively, the Court may direct BOP to credit the Political Contribution sentence only for the 39.8 months Mr. Lindberg has served, and for the Court to adjust downward the Financial case sentence by an additional 39.8 months pursuant to U.S.S.G. § 5G1.3(b) or (d) to help ensure that Mr. Lindberg receives credit for time served across both sentences.

> C. **Mr. Lindberg's Concurrent Sentences Should be Reduced Further Based on the Amount of Credits he Earned under the First Step Act that were Forfeited when the Fourth Circuit Vacated his Initial Sentence.**

The Court should vary downward from both sentences by an additional 285 days (approximately 9.5 months) for the reduction in Mr. Lindberg's sentence that Mr. Lindberg earned during his incarceration at FPC Montgomery under the First Step Act that was forfeited following the vacating of his initial sentence by the Fourth Circuit.  "The First Step Act of 2018 ('FSA') provides qualified federal prisoners the incentive of time credits to shorten their sentences in

---

sentence downward and provide credit for the prior time served when imposing a federal sentence. *See Nelson*, 982 F.3d at 1145 ("All of the time that [the defendant] served in state custody was for a mixture of relevant and non-relevant conduct, so the district court had discretion whether to give credit for that time when imposing the federal sentence"); *United States v. Tapia*, No. 12-cr-3012 JB, 2018 WL 839998, at *23, 37 (D.N.M. Feb. 12, 2018) (downward departure pursuant to U.S.S.G. § 5G1.3(d) for prior time served was warranted where the offense for which the defendant was serving a term of imprisonment was "partially within the relevant conduct for the initial offense").

exchange for participation in programs designed to reduce recidivism." *Miles v. Bowers*, 2026 U.S. App. LEXIS 11998, at *1 (1st Cir. 2026) (citing Pub. L. No. 115-391, §§ 101-102, 132 Stat. 194). The FSA sets forth a detailed scheme for awarding credits that certain federal prisoners may earn for participating in "evidence-based recidivism reduction [('EBRR')] programming." *Id.* at *2 (citing 18 U.S.C. § 3632(d)(4)). The statute also provides for the earning of credits when certain prisoners participate in "productive activities," which are defined as activities "designed to allow prisoners determined as having a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating." *Id.* at 2 n.3 (citing 18 U.S.C. § 3635(5)).

The "relevant timing for FSA eligibility is commencement of the sentence," and the FSA requires that federal prisoners be provided with the opportunity to actively participate in EBRR "throughout their entire term of incarceration." *Id.* at *18, 24 (citing 18 U.S.C. § 3621(h)(6)). An inmate initially earns FSA time credits at a rate of "10 days of time credits for every 30 days of successful participating in [EBRRs] or productive activities." 18 U.S.C. § 3632(d)(4)(A)(i). However, a prisoner determined to be at a minimum or low rate of recidivating over two consecutive assessments "shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(ii).[12] Inmates who qualify for the additional five days of FSA time credits generally do so after the first six months of earning FSA credits at the rate of 10 days per month. *See, e.g.*, *Lakosen v. Eischen*, No. 22-cv-2868, 2023 U.S. Dist. LEXIS 71518, at *3 (D. Minn. Apr. 25, 2023); *Aipoalani v. Derr*, No. 23-cv-00375, 2023 U.S. Dist. LEXIS 180605, at *6 (D. Haw. Oct. 6, 2023).

---

[12] An inmate may earn a maximum of 365 days of FSA credit towards early transfer to supervised release. 18 U.S.C. § 3624(g)(3).

Here, following Mr. Lindberg's initial sentencing on August 19, 2020, Mr. Lindberg was incarcerated at FPC Montgomery for 633 days. During this time period, Mr. Lindberg was determined to be at a minimal or low-level risk of recidivating, and he participated in EBRR and "productive activities" throughout the entire term of his incarceration. Mr. Lindberg's EBRRs and productive activities included the following: employment as an orderly for housekeeping work from the beginning of his incarceration until he was released; Mr. Lindberg took classes and became a certified prison housekeeper; Mr. Lindberg taught several classes including stress management, start-ups, goal setting, and preparing for a job interview; Mr. Lindberg took several classes at Adams State University's prison correspondence program and earned credits toward a master's degree; and Mr. Lindberg took other classes at FPC Montgomery on a wide range of topics, including health and wellness and business.

Based on the above EBRRs and productive activities, Mr. Lindberg earned 10 days of FSA credits during the first six months of his incarceration. During the remaining approximately 15 months of his incarceration, he earned FSA credits at the rate of 15 days per month. In total, Mr. Lindberg earned approximately 285 days of FSA credits.

However, as the result of the Fourth Circuit's vacating of Mr. Lindberg's initial sentence, all of the FSA credits Mr. Lindberg earned have now been lost. Since the sentence was vacated, the FSA credits effectively disappeared. As noted, such credits are only earned when a federal sentence "commences." *See* 18 U.S.C. § 3632(d)(4)(B(ii). Here, because his earlier sentence was vacated, Mr. Lindberg's sentence has not yet commenced. The 633 days that Mr. Lindberg served will either be accounted for via a downward adjustment (if the Court agrees with Mr. Lindberg's request in Section IV.B above), or, at most, treated as "credit for prior custody" under 18 U.S.C. § 3585(b). Since the 633 days will not be considered time served following the commencement

of Mr. Lindberg's sentence, Mr. Lindberg will not receive credit for the time reduction that he previously earned under the FSA.

Given the above, the Court should downward vary an additional 285 days (approximately 9.5 months) from the concurrent sentences in each case to provide credit for the FSA credits that Mr. Lindberg previously earned. Mr. Lindberg earned these credits during his prior service through his prison jobs, the classes that he attended and taught, and the other EBRRs and productive activities he participated in. Mr. Lindberg deserves credit for this time that was previously earned. Mr. Lindberg should not be penalized by 9.5 months for the vacating of his earlier conviction.

## V.     Request for Downward Variance Based on Extraordinary Restitution

Even before the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), extraordinary restitution was well-recognized as a basis for a downward departure. *See United States v. Weinberger*, 91 F.3d 642, 645 (4th Cir. 1996) (holding pre-*Booker* that extraordinary restitution may be a basis for downward departure where it "shows a degree of acceptance of responsibility that is truly extraordinary and substantially in excess of that which is ordinarily present") (internal quotation marks omitted); *United States v. Kim*, 364 F.3d 1235, 1240-41 (11th Cir. 2004) (citing numerous authorities holding that extraordinary restitution may support downward departure).

Following *Booker*, courts have similarly concluded that a defendant's restitution can support a downward variance from the Guidelines range. *See, e.g.*, *United States v. Curry*, 523 F.3d 436, 440 (4th Cir. 2008) (varying downward where defendant had made full restitution); *United States v. Brisson*, No. 5:13-cr-34, 2015 U.S. Dist. LEXIS 340, at *11 (D. Vt. Jan. 5, 2015)

(noting that "the court has granted variances from the Sentencing Guidelines based upon full or substantial payment of restitution").

As discussed in more detail in Section II.C. *supra*, both before and since the Special Master's appointment in January 2025, Mr. Lindberg has taken numerous significant steps to facilitate the payment of restitution and, per his Response and Objection to the Special Master's Restitution Recommendation (Fin. Dkt. Entry No. 132), has made full restitution. These steps include, as examples, making hundreds of millions of dollars in principal and interest payments to the victim insurance companies; voluntarily executing assignment agreements and releases to assist the Special Master and facilitate his work in selling the Primary Restitution Assets; dismissing lawsuits at the request of the Special Master to facilitate asset sales; providing tax refund checks totaling more than $570,000.00 from one of the SACs to the Special Master; and voluntarily relinquishing a $40 million tax escrow to facilitate the Clanwilliam sale. To date, Mr. Lindberg's assistance has been extremely beneficial to victims in the Financial case. For example, the Clanwilliam sale has resulted in the distribution of $157 million to individual policyholders.

Mr. Lindberg and his counsel have also provided substantial assistance to the Special Master through numerous weekly conferences (since February of 2025) with the Special Master, Paladin and the USAO, which helped the Special Master understand the complex financial history of Mr. Lindberg's assets and break through a logjam of lawsuits and orders that stalled restitution efforts at the State level and in other federal courts. *See* Section II.C. *supra*. Indeed, had Mr. Lindberg not cooperated with the Special Master, it is likely that the Clanwilliam sale would have been delayed, resulting in creditors taking over the entity and having no proceeds available for restitution. Based on the totality of Mr. Lindberg's restitution efforts and payments to date, he

28

respectfully requests that the Court grant a downward variance based on this well-established variance factor.

## VI. The Sentencing Guidelines and Additional Factors to be Considered Under 18 U.S.C. § 3553

As discussed in more detail below, it is respectfully submitted that the following factors further justify a variance or reduction of the offense level in this case: (1) the loss amount in the Presentence Report substantially overstates the seriousness of the offense; (2) the need to consider sentencing disparities among co-defendants under 18 U.S.C. § 3553(a)(6); and (3) Mr. Lindberg's history and characteristics, including procuring and building the assets that have been used to make restitution payments.

Mr. Lindberg specifically withdraws any other objections to the PSR other than those mentioned above and briefed in this Memorandum.

### A. The Fraud Guidelines Drastically Overstate the Seriousness of the Offense.

The Guidelines range in this case drastically overstates the nature of the offense. Although there were no victims in the Political Contribution case, there was a financial loss applied under the Sentencing Guidelines in the Financial case, and the resulting adjusted Guidelines range is driven largely by the fraud loss table contained in U.S.S.G. § 2B1.1, which increases the offense level by 30 points.

Courts have recognized that the Guidelines' formulaic and excessive emphasis on the loss amount in fraud cases can cause the offense level to substantially overstate the seriousness of the offense. Indeed, there is judicial consensus that the Section 2B1.1 loss table can produce unduly harsh sentencing ranges that go far beyond what is sufficient to deter illicit conduct, as they bear little or no connection to the seriousness of the offense or the defendant's culpability. *See, e.g.*, *United States v. Moody*, No. 13-cr-87-JLK, 2013 U.S. Dist. LEXIS 109506, at *14 (D. Colo. Aug.

5, 2013) (finding that the loss guidelines are "fundamentally flawed"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (in securities fraud case, district court rejected Guidelines sentence of 85 years and imposed sentence of 42 months imprisonment, while noting the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); Hon. Mark W. Bennett et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 941-44 (2017) ("[A]s the guidelines have become harsher and crimes both more complex and involving larger loss amounts, judges regularly sentence economic criminals well below the minimum guideline in all but the smallest of loss cases.").

Thus, numerous courts, including the Western District of North Carolina, have substantially departed or varied from the Guidelines range where, as here, the loss amount results in an offense level that does not properly reflect the seriousness of the offense. For example, in *United States v. Kipp*, this Court sentenced a defendant in a securities fraud case who was convicted at trial and faced life imprisonment under the Guidelines based on the Probation Office's loss calculation of more than $96 million. *Kipp*, No. 3:15-cr-244 (W.D.N.C. 2015), Dkt. Entry No. 237 at 9-10. Like Mr. Lindberg, Mr. Kipp argued that the loss amount substantially overstated Mr. Kipp's culpability. *Id.* at 50. This Court disagreed with the Guidelines sentence and varied downward from life imprisonment and sentenced Mr. Kipp to 54 months' imprisonment. *Kipp*, No. 3:15-cr-244, Dkt. Entry No. 246; *see also United States v. Anderson*, No. 3:10-cr-260-MOC, 2022 U.S. Dist. LEXIS 195407, at *4 (W.D.N.C. 2022) (varying downward where "the 16-level increase for loss overstates the Defendant's responsibility and gain in this matter").

Numerous other courts have also varied downward substantially from the Guidelines range where the loss amount overstates the seriousness of the offense. *See, e.g.*, *United States v. Block*, No. 16-cr-595 (S.D.N.Y. 2016), Dkt. Entry No. 155 at 20, Dkt. Entry No. 162 (where defendant faced a Guidelines sentence of life imprisonment based on a purported loss of $3 billion, court varied downward and sentenced defendant to 18 months' imprisonment); *United States v. Kalili*, 100 Fed. Appx. 903, 905-06 (4th Cir. 2004) (affirming downward departure where offense level was based on intended loss and it "substantially overstated the seriousness of the crime") (non-published disposition); *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (where defendant faced an 18 level increase based on loss amount under U.S.S.G. § 2B1.1, district court rejected Guidelines sentence and imposed a sentence of 24 months imprisonment, noting that "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology – thus maximizing the risk of injustice").[13]

It is respectfully submitted that the combination of the extraordinary restitution in this case and the Guidelines' general overemphasis on loss amount warrants a substantial downward variance from the Guidelines range.

---

[13] *See also United States v. Faibish*, No. 12-cr-265, 2015 U.S. Dist. LEXIS 101200, at *7 (E.D.N.Y. Aug. 3, 2015) ("the Court finds that a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon Faibish's sentencing range beyond any reasonable proportion to his crimes"); *United States v. Cheng*, 96 F.3d 654, 656 (2d Cir. 1996) (district court departed downward because $3.5 million loss overstated the seriousness of the offense); *United States v. Edwards*, 595 F.3d 1004, 1010, 1018 (9th Cir. 2010) (upholding a probationary sentence far below the Guideline range as substantively reasonable in a fraud case where the sentencing judge stated that the Guidelines range calculated using intended loss "overstated the circumstances" of the defendant's case).

**B.    The Need to Consider Sentencing Disparities Also Supports a Downward Variance.**

Mr. Lindberg respectfully requests that the Court also consider the sentences imposed (or to be imposed) on other culpable defendants in the Political Contribution and Financial cases pursuant to 18 U.S.C. § 3553(a)(6). While it is true that the other defendants had lesser roles than Mr. Lindberg, and that Mr. Lindberg was no doubt managing the relevant activities, they were executive-level defendants who were integrally involved in the fraudulent activities. Mr. Lindberg is admittedly not identically situated to each of these co-defendants, but there should not be a significant gulf between their sentences (including no sentence through a DPA/NPA) and Mr. Lindberg's sentence. *See United States v. Shields*, 126 F.4th 356, 360 (4th Cir. 2025) (vacating and remanding for resentencing where district court failed to address defendant's "non-frivolous argument for a downward variance" based on an unwarranted sentencing disparity; "Congress has expressly instructed sentencing courts to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct'") (quoting 18 U.S.C. § 3553(a)(6)). Additionally, based upon information and belief, Mr. Lindberg's co-defendants have paid financial amounts that are dwarfed by Mr. Lindberg's restitution efforts and asset sales.

In the Political Contribution case, co-defendant John Gray was integrally involved in the relevant bribery activities, and he received a 30-month sentence. Co-defendant Robin Hayes was sentenced to probation and subsequently pardoned. Mr. Hayes' actions and role were indisputably integral to carrying out the charged conspiracy – indeed, he is on video promising to "getter dun." And unlike Mr. Lindberg, Mr. Hayes compounded his complicity by lying repeatedly to the FBI, which resulted in additional charges under 18 U.S.C. § 1001. Mr. Lindberg acknowledges, of

course, that Mr. Hayes is not equally situated to Mr. Lindberg in terms of his overall involvement in the relevant charges.

Similarly, the Court should consider the dispositions and sentences of other culpable individuals in the Financial case, including Mr. Herwig, Mr. Solow and Mr. Bostic. As discussed, the Government filed separate Bills of Information against Mr. Herwig and Mr. Solow on December 19, 2022, charging them with conspiring with Mr. Lindberg and each other to engage in wire fraud, money laundering, and investment advisor fraud. *See Solow*, No. 3:22-cr-315, Dkt. Entry No. 3; *Herwig*, No. 3:22-cr-314, Dkt. Entry No. 3. Shortly thereafter, the Government filed a Deferred Prosecution Agreement with Mr. Solow. *Solow*, No. 3:22-cr-315, Dkt. Entry No. 6-1 (agreeing to defer prosecution for a period of 60 months and thereafter dismiss the Information). Thus, Mr. Solow will likely not face prosecution for his involvement in the Financial case.

Mr. Herwig was permitted to plead to a single conspiracy charge with a five-year maximum sentence. Mr. Herwig has not yet been scheduled for sentencing by the Court. Based on information and belief, Mr. Herwig will receive a recommendation from the Government for a substantial departure below the 60-month statutory maximum.

As for Mr. Bostic, the Government entered into a Non-Prosecution Agreement with him on July 27, 2023. *See* https://www.justice.gov/criminal/criminal-vns/case/united-states-v-greg-e-lindberg (last visited May 7, 2026).

None of the above defendants, in either the Political Corruption or Financial cases, have paid any significant restitution or financial penalty. For example, Mr. Bostic's and Mr. Solow's agreements with the Government only require them to pay "Stipulated Forfeiture Amount[s]" of $75,000.00 and $250,000.00, respectively. By contrast, Mr. Lindberg has embraced his restitution obligations via billions of dollars in cash payments, asset transfers and sales, and credits due, as

outlined in his Response and Objection to the Special Master's Restitution Recommendation. *See* Fin. Dkt. Entry No. 132.

**C.      Mr. Lindberg's History and Characteristics Warrant Varying Below the Guideline Range.**

A downward variance to concurrent 48-month sentences (with credit/variance then applied for all time served and for FSA credits) is also supported by Mr. Lindberg's history and characteristics under 18 U.S.C. § 3553(a)(1). As discussed in more detail below, Mr. Lindberg has worked incredibly hard his entire life and has positively impacted the lives of many people, including family members, employees, and strangers. He has also provided significant support to numerous charities and other worthwhile causes.

Mr. Lindberg came from a very modest upbringing. He was the youngest of six children and the first of his siblings to graduate from college.

Mr. Lindberg attended Yale University. He earned excellent grades and graduated magna cum laude and Phi Beta Kappa, earning a degree in economics in 1993. While in college, Mr. Lindberg started his first company – a home care newsletter he managed out of his dorm room with a $5,000.00 loan.

Following college, Mr. Lindberg moved to the Raleigh-Durham area to start a business. He leased an office, which he initially lived and slept in using a sleeping bag because money was tight. By 1998, Mr. Lindberg's business consisted of 12 people working out of a single room full of folding tables and computers. As he expanded his businesses, later called the Global Growth companies, Mr. Lindberg overcame a number of challenges – for example, changes in regulations for home care agencies led to the loss of over half of his customers in less than six months. Nevertheless, Mr. Lindberg continued to work long hours and was successful in overcoming this setback.

In 2009, Mr. Lindberg faced a personal health crisis that completely derailed his life. Doctors discovered a golf-ball sized tumor at the base of his brain stem. The operation to remove the tumor left Mr. Lindberg unable to walk and permanently deaf in one ear as his left ear canal had to be completely removed. Mr. Lindberg had to re-learn how to walk and make adjustments for his deafness. While overcoming these significant physical challenges, Mr. Lindberg was able to keep his companies afloat and moving forward. And today, the Global Growth family of companies operates in over a dozen countries and has over 7,000 employees worldwide. PSR ¶ 170.

Through Mr. Lindberg's companies, he created well-paying jobs for thousands of employees in North Carolina and elsewhere. As attested to by former employees in letters previously provided to the Court, Mr. Lindberg invested in his employees, was fair to them with opportunities and compensation, and regularly accommodated his employees due to family issues or other hardships. *See, e.g.*, PC Dkt. Entry No. 246 at 16-20; 246-1; 246-3; 246-4; 246-6; 246-16.

In addition to the jobs he created for thousands of employees, Mr. Lindberg has used his success to improve the lives of numerous others – including friends, family members, colleagues, employees, and total strangers.[14] Similarly, Mr. Lindberg and his companies (at Mr. Lindberg's behest) have a lengthy history and record of giving money to, and otherwise supporting, numerous

---

[14] Representative examples of Mr. Lindberg's benevolence include:  the payment of all expenses for the sister of a friend to enter an alcohol treatment and rehabilitation center even though Mr. Lindberg had never met this individual (PC Dkt. Entry No. 246-28); providing full support and compensation to an employee and his family after this employee was diagnosed with cancer, saving this employee from "financial ruin" (PC Dkt. Entry No. 246-25); paying for a niece who had been diagnosed with brain cancer to have her eggs frozen so that she and her husband were able to have children in the future (PC Dkt. Entry No. 246-32); and paying four years of tuition and other expenses for a niece to get through college (PC Dkt. Entry. No. 246-32).

charities and worthwhile causes, including setting up eye care clinics and providing eyeglasses for poor people in India; creating scholarships at historically black colleges and universities in North Carolina; and providing substantial donations to food banks and the Special Olympics of North Carolina. *See* PC Dkt. Entry No. 246 at 15-16; 246-16.

Even while incarcerated, Mr. Lindberg has taken advantage of this time to help other inmates. He has taught a number of classes for other inmates, including classes on stress management, goal setting, and preparing for a job interview. He has used these classes to try to inspire others to be successful when they are released from incarceration. At the same time, Mr. Lindberg has tried to further educate himself by working on a master's degree through Adams State University's prison correspondence program and taking numerous other classes that have been offered. At the same time, Mr. Lindberg has always accepted his role in doing his required duties, such as cleaning toilets and serving as an orderly for housekeeping work during his entire term of incarceration at FPC Montgomery.[15]

## VII. <u>Conclusion</u>

Based on the foregoing reasons, Mr. Lindberg respectfully asks the Court to (1) initially impose a concurrent sentence of 48-months imprisonment in both the Financial and Political Contribution cases; (2) then vary or adjust downward from the 48-month sentences in both cases by 39.8 months to ensure that Mr. Lindberg receives credit against both sentences for the time that he has spent in incarceration prior to the sentencing hearing in this case; (3) vary downward by an additional 9.5 months for the First Step Act sentence reduction that Mr. Lindberg previously earned while incarcerated at FPC Montgomery, but was lost as a result of the Fourth Circuit's

---

[15] Mr. Lindberg provided the Court with numerous character letters and additional supporting background information as part of his Sentencing Memorandum that he filed in advance of the initial sentencing hearing held in August 2020. *See* P.C. Dkt. Entry Nos. 246, 246-1 – 246-42. Mr. Lindberg refers the Court to this submission for further supporting background information.

vacating of his initial conviction in the Public Contribution case; (4) hold that for the purposes of 18 U.S.C. § 3585(a), Mr. Lindberg arrived voluntarily at the Gaston County Jail to commence service of a portion of his sentence on November 12, 2024, and that the Gaston County Jail, the Grayson County Detention Center, and the Pike County Detention Center shall be considered official detention facilities where his sentence is to be served; and (6) delay Mr. Lindberg's federal prison reporting date for any additional time he is required to serve until after the conclusion of all restitution hearings and the entry of a final restitution order so that Mr. Lindberg is available to consult with his attorneys regarding restitution and continue to assist the Special Master.

This the 14th day of May, 2026.

Respectfully submitted,

Robert T. Smith (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006
202-625-3500
robert.smith1@katten.com

/s/ James F. Wyatt, III
James F. Wyatt, III
  (NC State Bar No. 13766)
Robert A. Blake, Jr.
  (NC State Bar No. 20858)
WYATT & BLAKE, LLP
402 W. Trade Street, Suite 101
Charlotte, NC 28202
704-331-0767
jwyatt@wyattlaw.net
rblake@wyattlaw.net

Brandon N. McCarthy (*pro hac vice*)
Rachel M. Riley (*pro hac vice*)
Ryan J. Meyer (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
2121 North Pearl Street, Suite 1100
Dallas, TX 75201-2591
214-765-3600
brandon.mccarthy@katten.com
rachel.riley@katten.com
ryan.meyer@katten.com

*Counsel for Greg E. Lindberg*

# ARTIFICAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 Standing Order, which was published to the Bar of

the Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 14th day of May, 2026.

/s/ James F. Wyatt, III
James F. Wyatt, III
 (NC State Bar No. 13766)
WYATT & BLAKE, LLP
402 W. Trade Street, Suite 101
Charlotte, NC 28202
704-331-0767
jwyatt@wyattlaw.net