## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREG E. LINDBERG,<br><br>*Defendant.* | No. 5:19-CR-22-MOC<br><br>No. 3:23-CR-48-MOC |

**DEFENDANT GREG E. LINDBERG'S EMERGENCY MOTION (I) TO STAY ALL FURTHER ASSET SALES AND ASSET-SALE PROCESSES AND TO STAY ENFORCEMENT OF THE PRELIMINARY ORDER OF RESTITUTION (DOC. NO. 161); (II) TO CORRECT AND AMEND THE PRELIMINARY ORDER OF RESTITUTION TO CONFORM TO THE MANDATORY VICTIMS RESTITUTION ACT; (III) TO RETURN THE PRIMARY RESTITUTION ASSETS TO DEFENDANT'S CONTROL ON THE GROUND THAT RESTITUTION HAS BEEN FULLY PAID AND OVERPAID; AND (IV) IN THE ALTERNATIVE, TO RETURN THE DE MINIMIS SACS IDENTIFIED IN THE CLANWILLIAM SALE ORDER TO DEFENDANT'S CONTROL WITH IMMEDIATE EFFECT**

Defendant Greg E. Lindberg, by and through undersigned counsel, respectfully moves this Court, pursuant to its inherent supervisory authority over the Special Master and the proceedings on its docket, the Mandatory Victims Restitution Act (the "MVRA"), 18 U.S.C. §§ 3663A–3664, Federal Rule of Civil Procedure 53 (as applied by analogy to the Court's supervision of court-appointed officers in this criminal proceeding), and the All Writs Act, 28 U.S.C. § 1651(a), for an Order: **(i)** staying all further sales of Mr. Lindberg's assets, and all further asset-sale processes, that have been initiated, are being conducted, or are contemplated as a means of generating proceeds to satisfy any preliminary or final order of restitution in this case, and staying enforcement of the Preliminary Order of Restitution entered on May 28, 2026 (Doc. No. 161) (the "Preliminary Restitution Order"), including the issuance or recording of any abstract of judgment, pending the Court's adjudication of Defendant Greg E. Lindberg's Response and Objection to

Special Master's Report and Recommendations Regarding Restitution (the "Response"); **(ii)** correcting and amending the Preliminary Restitution Order to conform to the MVRA, including by striking the unexplained $30,000,000 by which the Order exceeds the figure the Special Master recommended, by itemizing and applying the $2.89 billion mandatory offsets and credits documented in the Response, by excluding any pre-judgment interest, and by deferring enforceability until those corrections are made, as set forth in Paragraph 6 below; **(iii)** directing that the Primary Restitution Assets, as defined in the Order Appointing Special Master (Doc. No. 56) (the "Special Master Order"), be returned to Mr. Lindberg's full ownership and control, because restitution under the MVRA has been fully paid and, indeed, overpaid by approximately $1.244 billion measured against the Court's own entered figure; and (iv) in the alternative, directing that the eight de minimis Specified Affiliated Companies expressly identified in the Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Group of Companies (Doc. No. 66) (the "Clanwilliam Sale Order") as having no further material value to NHC Holdings, LLC ("NHC") — namely, SixSails, LLC; Certitrek Group, LLC; ELP Holdings, LLC; Global TIC CE, LLC; Fiasco Fine Wine, LLC; Century Vision Global, LLC; Marval Investments Limited; and Intralan Investments Limited (collectively, the "De Minimis SACs") — be returned to Mr. Lindberg's full ownership and control with immediate effect.

In support of this Motion, Mr. Lindberg states as follows:

1. On May 4, 2026, Mr. Lindberg filed his Response objecting to the Special Master's Report and Recommendations Regarding Restitution (ECF No. 106) (the "Restitution Report"), and to the Special Master's preliminary proposed restitution figure of **$1,625,000,000**. On May 28, 2026 — without first adjudicating that Response — the Court entered the Preliminary Restitution Order (Doc. No. 161), ordering restitution in the total amount of $1,655,000,000, which is $30,000,000 more than the Special Master recommended. The Preliminary Restitution Order

declares that the restitution is "due and payable immediately," provides that it "shall be enforceable as a judgment of the United States," and authorizes the Clerk, at the request of any payee or the Special Master, to issue an abstract of judgment that becomes a lien on Mr. Lindberg's property. Doc. No. 161 at 3–5. This Motion is addressed to that Order.

2. The Response demonstrates, on the basis of contemporaneous documentary evidence and verified statements of fact, that the Special Master's proposed figure is overinflated by **at least $2.899 billion** in required offsets, reductions, and credits, with the result that — when the MVRA is correctly applied — Mr. Lindberg's net restitution obligation is **zero**, and Mr. Lindberg has **overpaid by approximately $1.274 billion** the maximum sum the Special Master proposed.

3. The documented categories of mandatory offsets and reductions identified in the Response and the supporting Statement of Facts (filed May 4, 2026) and Supplemental Statement of Facts filed herewith total **$2,899,418,383**, against a maximum proposed restitution figure of $1,625,000,000 — a documented **net overpayment** of approximately **$1,274,418,383**. Measured against the Court's own entered figure of $1,655,000,000, those same documented offsets exceed the Preliminary Restitution Order by approximately $1,244,418,383, so that net restitution remains zero and the documented overpayment is approximately $1.244 billion even on the Court's own numbers.

4. The contrast between Mr. Lindberg's twenty-year track record of value creation and the Rehabilitator's six-plus years of documented value destruction is dispositive and is directly relevant to the relief sought here. The factual record before this Court establishes the following on the basis of contemporaneous, third-party documentary evidence:

a) **Mr. Lindberg's twenty-year track record of value creation.** Mr. Lindberg built the Specified Affiliated Companies (the "SACs") from nothing over more than two decades. Through that work, he generated nearly $1 billion of his own personal capital, which he invested into the North Carolina Insurance Companies (the "NCICs") as a net contributor to those companies' surplus. SOF ¶ 5. Under his management between 2019 and 2024, the SACs grew from approximately $1.5 billion in aggregate value to approximately $3.4 billion — an increase of approximately $1.9 billion in enterprise value over a five-year period — corroborated by the arm's-length, signed Q1 2024 purchase agreement with Quadro Acquisition Corp. One (NASDAQ: QRDO) at a 22.14x EBITDA multiple consistent with public-market comparables. Lindberg's companies collectively generated EBITDA in excess of $300 million in 2024. The public-company EBITDA multiples used in the Quadro pricing have not declined; the comparable five-company average has in fact increased from 22.14x in Q1 2024 to approximately 24.37x as of November 2025, further confirming that the Quadro valuation was conservative, not inflated.

b) **The Rehabilitator destroyed the $454 million NCIC baseline.** By contrast, under the management of Mike Dinius as Special Deputy Rehabilitator, the NCICs were ultimately liquidated, destroying the $454 million baseline value that the NCICs' own management — operating under the Rehabilitator's supervision — had established as of November 5, 2018, eighteen days after Mr. Lindberg transferred operational control. SOF ¶¶ 55–62 & Ex. J.

c) **More than $165 million in fees extracted from the NCIC rehabilitation estates.** Over the past seven years, the Rehabilitator and his consultants have charged the NCIC rehabilitation estates more than $165 million in fees. Those fees continue today at the rate of approximately $2.5 million per month — a draining of the very estates the Rehabilitator was supposed to be preserving for the benefit of policyholders. SOF ¶ 58(a)–(d).

d) **$137 million in investment losses on portfolio decisions unrelated to Mr. Lindberg.** Independent of any conduct of Mr. Lindberg, the Rehabilitator and his agents incurred approximately $137 million in losses on corporate bond and other investment decisions that were made by the Rehabilitator's team after Mr. Lindberg transferred control. These losses occurred on the Rehabilitator's portfolio, on the Rehabilitator's watch, and have no causal connection to Mr. Lindberg whatever. SOF ¶ 58(b).

e) **Multiple billion-dollar-plus monetization transactions blocked or sabotaged.** The Rehabilitator blocked, refused, or sabotaged at least four separate monetization transactions, each of which would have fully paid the NCIC policyholders and creditors: (i) the November 22, 2018 Ares Management Letter of Intent, covering 100% of GBIG (including the NCICs and the affiliated-loan portfolio); (ii) the February 8, 2019 Oaktree Capital Management $1.0 billion Global Solution; (iii) the 2023 Montshire/Alban offer; and (iv) the Q1 2024 Quadro Acquisition Corp. One transaction valuing the SAC group at approximately $3.4 billion. Each of these was a free, deliberate, and informed choice of the victim's representative, made

after Mr. Lindberg transferred control. SOF ¶¶ 9, 16, 58, 75, 76; Supp. SOF ¶¶ 4–29.

f) **Suing prospective buyers to prevent monetization.** In at least one instance, the Rehabilitator and his agents went so far as to file litigation against a prospective arm's-length buyer that had submitted an offer to purchase the NCICs — a transaction that would have produced cash to pay the policyholders in full. That litigation succeeded in driving the buyer away. The Rehabilitator's entities did not merely fail to sell to a willing arm's-length buyer; they affirmatively used the courts to prevent the sale. This is the very definition of a victim's "choice to hold collateral rather than to reduce it to cash within a reasonable time" under *Robers v. United States*, 572 U.S. 639, 647 (2014) (Sotomayor, J., concurring).

g) **Below-market fire-sale of Clanwilliam.** On the Rehabilitator's watch in September 2025, the Clanwilliam Group was sold to TA Associates for approximately $450 million — approximately $474 million below the $880 million signed Quadro purchase-agreement valuation negotiated by Mr. Lindberg less than eighteen months earlier. SOF ¶ 75 & Exs. G3, I3, I4. Public-company comparables establish that Clanwilliam's value did not decline; if anything, the comparable EBITDA multiples appreciated over that interval. The undervaluation is a direct consequence of selling a public-company-quality asset to a private-equity buyer at a discount, after the Rehabilitator blocked the higher public-market Quadro transaction.

h) **Pre-maturity sale of $1.006 billion in protective bank zero-coupon bonds.** Rather than holding to maturity the $1,006,239,867 face-value bank-issued zero-

coupon bonds backing the Principal Protected Notes — instruments whose entire purpose was to protect the affiliated-loan principal from any credit-related downside — the Rehabilitator unilaterally sold those instruments for approximately $394 million, crystallizing a $611.6 million loss on assets that, by their structure, were contractually guaranteed to pay par. SOF ¶¶ 48–54.

5.      The Preliminary Restitution Order declares the full $1,655,000,000 "due and payable immediately" and enforceable as a judgment, and the Special Master and/or the Government are presently conducting, or are about to conduct, additional asset-sale processes intended to generate proceeds to satisfy that figure. Allowing those sales and that enforcement to proceed before the Court corrects the Order and resolves the Response would (i) cause the irreversible liquidation of Mr. Lindberg's assets to pay a restitution obligation that, on the documentary record, does not exist as a matter of law; (ii) compound an already documented overpayment of approximately $1.244 billion; (iii) create the very type of windfall to the Pre-Designated Restitution Parties that the MVRA expressly forbids, *see United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017); (iv) transfer further assets from the proven value-creator (Mr. Lindberg) to a control structure (NHC, operating under the Rehabilitator's supervision) with a documented six-year track record of value destruction; (v) inflict the further, separate, and continuing irreparable harm of degrading the going-concern value of the Specified Affiliated Companies, all of which are now being managed on a short-term, for-sale basis rather than for sustained operation — a management posture that, by its nature and irrespective of the merits of any underlying sale, depresses enterprise value, defers needed investment, disrupts customer and counter-party relationships, accelerates senior-management attrition, and has already produced one documented $474 million below-market sale (the September 2025 Clanwilliam transaction,

Doc. No. 66 & SOF ¶ 75); (vi) cause the irretrievable disbursement of further sale proceeds to the Pre-Designated Restitution Parties, from whom — once funds have been paid out under an MVRA order — the statute provides Mr. Lindberg with *no* mechanism to recover the funds even if the restitution figure is later corrected downward, *see* 18 U.S.C. § 3664(j)(2) (statutory remedy is offset against future payments, not clawback from the payee); and (vii) compel further asset sales when, on the documentary record, no further sales are necessary, because the entire gap between Mr. Lindberg's documented offset position ($2,899,418,383) and the Court's entered figure ($1,655,000,000) consists exclusively of credits attributable to prior sales and other transactions that have *already occurred* — so that, on Mr. Lindberg's documented numbers, the proceeds of any further sales would be owed to Mr. Lindberg, not to the Pre-Designated Restitution Parties, and the present sale program is liquidating Mr. Lindberg's property to fund a recovery that has, by approximately $1.244 billion, already been completed; and (viii) ratify and extend the precedent already set by the recent Beckett sale, which was effectuated *without the prior court approval* that Paragraph 6(e) of the Order Appointing Special Master expressly requires (Doc. No. 56, ¶ 6(e)) (the Special Master "shall seek Court approval to liquidate … any available assets for the benefit of victims")) — itself a violation of this Court's express supervisory architecture and a concrete demonstration that, absent the requested stay, further sales of Mr. Lindberg's property will continue to be consummated in derogation of the Court's order, without any opportunity for the Court or Mr. Lindberg to evaluate them *ex ante* and without any avenue, once consummated, to undo them.

This Motion asks only that asset sales be stayed long enough — until the Court's § 3664 restitution determination fixes the amount actually owed if any — to prevent the irreparable, below-value losses that premature liquidation would inflict. Those forced-sale losses would

reduce, not increase, the funds available to victims. Preserving value until the § 3664 determination serves the same make-whole purpose the plea agreement and the MVRA share, and is consistent with Mr. Lindberg's commitment to marshal assets toward full restitution.

The balance of equities weighs decisively in favor of a brief stay. On one side of the ledger is a concrete, irreparable harm: assets sold below value cannot be recovered, and every dollar lost to a premature, forced sale is a dollar that will never reach the victims this restitution is meant to make whole. On the other side is only delay — a stay lasting no longer than the Court's § 3664 determination, after which any restitution properly owed can be satisfied from assets preserved at their full value. A short stay that protects the estate's value imposes no cognizable hardship on the victims, whose interest lies in maximizing recovery, not in hastening sales that diminish it.

The conduct relevant to the equities is the post-2024 cooperation the sentencing court credited as "extraordinary" — the assignment of interests in more than 300 companies, the dismissal of litigation that impeded asset sales, the waiver of a $40 million tax escrow, and more than $1 billion in restitution already realized. That record reflects an effort to marshal value for victims, not to frustrate it.

Finally, the public interest favors a stay. The public has no interest in compelling sales that destroy value and reduce the funds available to victims, and a substantial interest in ensuring that restitution is fixed accurately under § 3664 before irreversible dispositions are made.

6.      The Preliminary Restitution Order should be corrected and amended now, before it is enforced, because it does not conform to the MVRA in at least the following respects — each of which remains subject to correction notwithstanding the Order's "final judgment" status, 18 U.S.C. § 3664(o), and Federal Rule of Criminal Procedure 36, and each of which this Court must determine de novo, 18 U.S.C. § 3664(d)(6): (i) the Order's total of $1,655,000,000 exceeds, by

$30,000,000, the $1,625,000,000 the Special Master recommended, with no explanation for the increase, even though the Government and the Special Master bear the burden of proving the amount of each victim's loss by a preponderance of the evidence, 18 U.S.C. § 3664(e); (ii) the Order recites that its figures "already account for monetary recoveries realized by the payees prior to the entry of this Order" (Doc. No. 161 at 4), but it itemizes no such recoveries and does not apply the $2,899,418,383 in mandatory offsets and credits documented in the Response, as the statute requires, 18 U.S.C. §§ 3663A(b)(1)(B)(ii), 3664(j)(2); *Robers v. United States*, 572 U.S. 639 (2014); (iii) the Order reduces only PBLA's $416,000,000 award, and only by the speculative "ultimate value" ULICO may later receive (Doc. No. 161 at 3), even though — as documented in the Response — the AAPC preferred equity was already transferred to ULICO in December 2022 with dollar-for-dollar credit for the current $357 million par value, so that the offset is presently fixed and due "as of the date the property is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), and even though the Order applies no parallel offset for the cash and property returned to the other payees; (iv) the Order reserves four separate categories of further reductions — prior recoveries on "non-IALA assets," prior recoveries on "zero coupon bonds," the payments itemized at page 22 of Doc. No. 132, and transfers to "SFL" and "SASL" — for investigation after sentencing (Doc. No. 161 at 5), yet simultaneously declares the un-reduced gross figure "due and payable immediately" and enforceable as a judgment now, guaranteeing the over-recovery the MVRA forbids, *Ritchie*, 858 F.3d at 216; (v) the Order makes no finding tying any payee's award to the loss directly and proximately caused by the offense of conviction (Counts One and Thirteen), as *Hughey v. United States*, 495 U.S. 411 (1990), and *United States v. Blake*, 81 F.3d 498 (4th Cir. 1996), require; (vi) to the extent the figures embed pre-judgment interest, the MVRA does not authorize it; (vii) the Order is captioned "preliminary" precisely because it "precedes sentencing" (Doc. No. 161 at 1

n.1), yet it imposes restitution as "due and payable immediately" and (viii) the Order declares the full amount immediately due without the findings on the manner and schedule of payment that the MVRA requires, 18 U.S.C. § 3664(f)(2). Each defect independently requires correction; together they require that enforcement be stayed until the Order is conformed to the statute.

7. The Preliminary Restitution Order, and the Government's and the Special Master's underlying position, also contravene the express intent of Congress as stated in the MVRA's legislative history. The Senate Judiciary Committee declared that restitution exists to "restore the victim to his or her prior state of well-being," S. Rep. No. 104-179, at 13 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 926 — not to confer the approximately $1.244 billion windfall the uncorrected Order would produce. The Committee confined mandatory restitution to losses "directly and proximately caused by the course of conduct under the count or counts for which the offender is convicted," *id.* at 19, 1996 U.S.C.C.A.N. at 932 — not the losses the Rehabilitator's own post-transfer discretionary decisions caused. The Committee clarified that the anti-double-recovery rule of 18 U.S.C. § 3664(j)(2) exists "to ensure that the victim is not compensated twice for the same loss," *id.* at 21, 1996 U.S.C.C.A.N. at 934 — yet the uncorrected Order would compensate the Pre-Designated Restitution Parties a second time for assets and cash they have already received and, in many instances, still hold. The Committee instructed that "highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution," and that losses that are "speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution," *id.* at 19, 1996 U.S.C.C.A.N. at 932 — yet the Order resolves precisely such issues. And the Committee recognized that "the sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the basis of invalid premises or inaccurate information," *id.* at 20, 1996 U.S.C.C.A.N. at 933 — a right the uncorrected Order violates by resting on a figure that ignores $2,899,418,383 in documented offsets and credits. These departures from Congress's express intent independently support the relief requested. Nor did the plea agreement waive the causal requirement that limits the Special Master's determination. The agreement commits Mr. Lindberg to "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by [his] criminal conduct," Plea Agreement ¶ 10(a) (Doc. 40) — language the Government drafted, which must be construed against it. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986). Paragraph 10(a)

reaches only losses "harmed by [his] criminal conduct," and "regardless of the resulting loss amount" goes to quantum, not causation. The losses produced by the Rehabilitator's independent, discretionary decisions were caused neither directly nor indirectly by Mr. Lindberg, *see Hughey v. United States*, 495 U.S. 411, 420 (1990); *Robers v. United States*, 572 U.S. 639, 645 (2014), and, together with the documented offsets, leave no additional restitution owing. The Government's own sentencing memorandum confirms the causal disconnect: it concedes that North Carolina did not restrict affiliate investment by statute until 2019 — after the charged conduct — and relies on a source describing the prior regime as an "investment loophole." Gov't Sentencing Mem. at 22–23 & n.12 (Doc. 508).

8. Because the MVRA limits restitution to losses directly and proximately caused by the offense of conviction, 18 U.S.C. § 3663A(a)(2); because the MVRA mandates that restitution be reduced by the value of any property returned, 18 U.S.C. § 3663A(b)(1)(B)(ii); because the MVRA prohibits any recovery in excess of the victim's actual loss, *Ritchie*, 858 F.3d at 216; and because — under *Ellingburg v. United States*, 607 U.S. \_\_\_, slip op. at 1–2 (Jan. 20, 2026) — restitution under the MVRA constitutes **criminal punishment** subject to the constitutional limits applicable to criminal punishment, the continued retention and management of the Primary Restitution Assets by the Special Master and/or NHC is unauthorized by law now that restitution has been fully paid by Lindberg.

9. In the alternative, this Court should order the immediate return of the De Minimis SACs to Mr. Lindberg. The Clanwilliam Sale Order itself — to which the United States, the Special Master, NHC, and Mr. Lindberg are all parties — expressly identifies eight SACs that NHC, in its own assessment, may "ha[ve] no further material value to NHC and NHC does not otherwise intend to sell" (Doc. No. 66, ¶ 20(h)). And as set forth in Paragraph 4 above, the only party with a demonstrated track record of building enterprise value across the Lindberg-related companies is Mr. Lindberg himself. Returning the De Minimis SACs to his control is the only

outcome that, on the present record, is rational, equitable, and consistent with the MVRA's requirement that the apparatus of criminal punishment serve a victim-compensatory purpose. *See Ritchie*, 858 F.3d at 216.

10.     This Motion is supported by the accompanying Memorandum of Law, by the previously filed Response and supporting documentation, by the Statement of Facts filed on May 4, 2026, and by the Supplemental Statement of Facts filed contemporaneously herewith.

**WHEREFORE**, Defendant Greg E. Lindberg respectfully requests that this Court enter an Order:

a)  **Staying**, immediately and until further order of this Court, all further sales of Mr. Lindberg's assets and all further asset-sale processes initiated, conducted, or contemplated for the purpose of generating proceeds to satisfy any preliminary or final order of restitution in this case, and staying enforcement of the Preliminary Restitution Order (Doc. No. 161), including the issuance or recording of any abstract of judgment, pending further order of this Court;

b)  **Directing** the Special Master to suspend any pending asset-sale activities and to refrain from initiating any new asset-sale activities until further order of this Court;

c)  **Directing** that any proceeds presently held in escrow or in the constructive possession of the Special Master, the Government, or any other person acting on behalf of the Pre-Designated Restitution Parties be preserved and not disbursed pending further order of this Court;

d)  **Correcting and amending** the Preliminary Restitution Order (Doc. No. 161), pursuant to the Court's retained authority, the Order's own provision for amendment, 18 U.S.C. § 3664(o), and Federal Rule of Criminal Procedure 36, to (i) strike the

unexplained $30,000,000 by which the Order exceeds the Special Master's recommendation; (ii) itemize and apply the $2,899,418,383 in mandatory offsets and credits documented in the Response; (iii) recognize the credit for the current par value of the ULICO/AAPC preferred-equity as presently due, and apply the credit for all other cash and property returned to the payees; (iv) exclude any pre-judgment interest; (v) make findings tying each payee's award to the loss directly and proximately caused by the offense of conviction, or set that issue for determination; and (vi) provide that the Order is not enforceable, and that no abstract of judgment shall issue, until those corrections are made and until sentencing;

e) **Adjudicating** that, on the voluminous contemporaneous documentary record before the Court, restitution under the MVRA has been fully satisfied and, indeed, overpaid by approximately $1.244 billion, and **ordering** the return of the Primary Restitution Assets, as defined in the Special Master Order, to Mr. Lindberg's ownership and control;

f) **In the alternative**, and at a minimum, **ordering** the immediate return to Mr. Lindberg's full ownership and control of the De Minimis SACs identified in the Clanwilliam Sale Order at Paragraph 20(h) — namely, SixSails, LLC; Certitrek Group, LLC; ELP Holdings, LLC; Global TIC CE, LLC; Fiasco Fine Wine, LLC; Century Vision Global, LLC; Marval Investments Limited; and Intralan Investments Limited;

g) **Setting** an expedited hearing on the Response and on this Motion; and

h) **Granting** such other and further relief as the Court deems just and proper.

**[SIGNATURE PAGE FOLLOWS.]**

Dated: June 9, 2026.

Respectfully submitted,

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of June 2026, I caused a true and correct copy of the foregoing Defendant Greg E. Lindberg's defendant Greg E. Lindberg's Emergency Motion (I) To Stay All Further Asset Sales And Asset-Sale Processes And To Stay Enforcement Of The Preliminary Order Of Restitution (Doc. No. 161); (Ii) To Correct And Amend The Preliminary Order Of Restitution To Conform To The Mandatory Victims Restitution Act; (Iii) To Return The Primary Restitution Assets To Defendant's Control On The Ground That Restitution Has Been Fully Paid And Overpaid; And (Iv) In The Alternative, To Return The De Minimis Sacs Identified In The Clanwilliam Sale Order To Defendant's Control With Immediate Effect, together with the supporting Memorandum of Law, to be filed with the Clerk of the Court for the United States District Court for the Western District of North Carolina using the Court's electronic filing system, which will serve notice on all counsel of record.

/s/        /s/ Kenneth Barnes_____
Kenneth Barnes