# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 5:19-CR-22-MOC |
| v. | |
| GREG E. LINDBERG, | No. 3:23-CR-48-MOC |
| *Defendant.* | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT GREG E. LINDBERG'S EMERGENCY MOTION
(I) TO STAY ALL FURTHER ASSET SALES;
(II) TO RETURN THE PRIMARY RESTITUTION ASSETS; AND,
(III) IN THE ALTERNATIVE, TO RETURN THE DE MINIMIS SACS WITH
IMMEDIATE EFFECT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................v

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND.............................................................................................. 4

I.    The Special Master's $1.625 Billion Proposed Restitution Figure. ............................ 4

II.   The Response Identifies $2.899 Billion in Mandatory Offsets and Reductions. ......... 5

III.  The Documented Contrast Between Mr. Lindberg's and the Rehabilitator's Stewardship of the Lindberg-Related Operating Companies. ..................................... 7

    A.   Mr. Lindberg's Twenty-Year Track Record: From Nothing to $3.4 Billion in Enterprise Value. .......................................................................................... 7

    B.   The Rehabilitator's Six-Year Track Record: $454 Million to Zero, Plus $165+ Million in Self-Pay Fees and $137 Million in Unrelated Bond Losses................................... 8

    C.   The Bottom-Line Comparison. ................................................................... 10

    D.   Independent Expert Corroboration............................................................. 11

IV.  The Ares and Oaktree Refusals: Contemporaneous Documentary Evidence That Two Independent Arm's-Length Buyers Independently Priced the Affiliated Loans at Par. ..................................................................................................... 11

V.   The MOU Was Coerced and Affirmatively Held the Affiliated Loans for Ten Years. ....................................................................................................................... 13

VI.  The Clanwilliam Sale Order's Concession That Eight SACs Are De Minimis. ........ 14

VII. Asset Sales Are Proceeding to Enforce a Preliminary Restitution Order That Precedes Sentencing and Is Facially Defective. ........................................................ 14

ARGUMENT................................................................................................................... 15

I.    This Court Has Broad Authority — Statutory, Rule-Based, and Inherent — to Stay Asset Sales Pending Adjudication of Defendant's Restitution Objections. ............... 15

II.   Proceeding with Asset Sales When the Proposed Restitution Figure Has Been Paid in Full and Overpaid by $1.274 Billion Would Be Plain Error and a Violation of the MVRA............................................................................................................. 17

    A.   A Federal Court Has No Authority to Order or Enforce Restitution Beyond What the MVRA Permits............................................................................ 17

    B.   Cash and Other Property Already Returned Must Be Credited Dollar-for-Dollar. ...... 18

    C.   Pre-Judgment Interest Is Not Recoverable Under the MVRA................................... 20

    D.   The Preliminary Restitution Order Is Facially Defective Under the MVRA and Must Be Corrected Before It Is Enforced.............................................................. 20

    E.   The MVRA's Legislative History Confirms That the Government's Position Contravenes Congress's Express Intent. ................................................... 22

    F.   Paragraph 10(a) Is Construed Against the Government as Its Drafter and Does Not Waive the MVRA's Causation Requirement; the Disputed Losses Were Caused by the Rehabilitator's Intervening Decisions, Not by Mr. Lindberg....................................... 24

ii

**III. The Proximate-Cause Chain Linking Mr. Lindberg to Any Post-Rehabilitation Decline in Asset Value Has Been Repeatedly Broken by the Rehabilitator's Own Intervening Discretionary Decisions.** ...................................................... **26**

A. Robers Controls: A Victim's Choice to Hold Collateral Rather Than Reduce It to Cash Within a Reasonable Time Breaks the Chain of Proximate Causation. ....................... 27

B. The Rehabilitator's Discretionary Refusal of Both the Ares and Oaktree Face-Value Cash Transactions Breaks the Chain of Proximate Causation A Fortiori. ................... 28

C. Compounding Application: The MOU's Ten-Year Hold of the Affiliated Loans Is the Quintessential "Victim's Choice to Hold" Under Robers. .......................................... 28

D. Application to the Restitution Figure: The Affiliated-Loan Component is Zero After Robers. ........................................................................................................ 29

G. The Same Analysis Disposes of the Subsequent Rehabilitator-Caused Losses. .......... 30

H. The MVRA's Complexity Exception Counsels Against Proceeding with Asset Sales. 30

**IV. Ellingburg Confirms That MVRA Restitution Is Criminal Punishment, So the Constitutional Protections That Attach to Criminal Punishment Forbid Enforcement of a Facially Unlawful Restitution Figure.** ............................................. **31**

A. Ellingburg Undermines the Premise of United States v. Day .................................... 32

B. Hester, Erlinger, and Rimlawi Confirm the Direction of Sixth Amendment Doctrine. 32

C. Bajakajian and Timbs: The Excessive Fines Clause Applies. ..................................... 33

D. Two Propositions Are Beyond Debate. .................................................................. 33

**V. Once Restitution Has Been Fully Paid, No Lawful Basis Remains for the Continued Retention or Liquidation of the Primary Restitution Assets.** ..................................... **34**

**VI. In the Alternative, the Eight De Minimis SACs Identified in the Clanwilliam Sale Order Should Be Returned to Mr. Lindberg's Control With Immediate Effect.** ...... **35**

A. The Clanwilliam Sale Order Identifies Eight SACs That NHC States May Have No Further Material Value to NHC .......................................................................... 35

B. Mr. Lindberg Is the Only Party With a Demonstrated, Contemporaneously-Documented Ability to Build Value in the SACs. ................................................... 36

C. The Equities Compel Return. ............................................................................... 37

**VII. The Equities Strongly Favor the Relief Requested: Irreparable Harm Is Certain, and the Government and Victims Suffer No Cognizable Prejudice.** ........................... **38**

A. Irreparable Harm. ............................................................................................... 38

B. No Cognizable Prejudice to the Government or the Pre-Designated Restitution Parties. ............................................................................................................... 43

C. The Public Interest. ............................................................................................. 44

D. Mr. Lindberg's Demonstrated Cooperation and Track Record of Value Creation. ....... 44

CONCLUSION ............................................................................................................... 45

ARTIFICIAL INTELLIGENCE CERTIFICATION ............................................................. 46

CERTIFICATE OF SERVICE ................................................................................................ 47

Case 3:23-cr-00048-MOC-DCK     Document 173     Filed 06/09/26     Page 4 of 54

**TABLE OF AUTHORITIES**

**Cases**

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000)................................................................................32, 33

*Burrage v. United States,*
    571 U.S. 204 (2014)........................................................................................26

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991)..........................................................................................16

*Ellingburg v. United States,*
    607 U.S. ___ (2026)..................................................................................passim

*Erlinger v. United States,*
    602 U.S. 821 (2024)........................................................................................32

*Hester v. United States,*
    586 U.S. 1104 (2019)......................................................................................32

*Hilton v. Braunskill,*
    481 U.S. 770 (1987)........................................................................................16

*Holmes v. Sec. Inv'r Prot. Corp.,*
    503 U.S. 258 (1992)........................................................................................26

*Hughey v. United States,*
    495 U.S. 411 (1990)..................................................................................18, 25

*La Buy v. Howes Leather Co.,*
    352 U.S. 249 (1957)........................................................................................16

*Lagos v. United States,*
    584 U.S. 577 (2018)........................................................................................31

*Landis v. North American Co.,*
    299 U.S. 248 (1936)........................................................................................15

*Manrique v. United States,*
    581 U.S. 116 (2017)........................................................................................32

*Nken v. Holder,*
    556 U.S. 418 (2009)........................................................................................16

*Paroline v. United States,*
    572 U.S. 434 (2014)..................................................................................................1,25, 26, 30

*Rimlawi v. United States,*
    604 U.S. ___ (2025).............................................................................................................32, 33

*Robers v. United States,*
    572 U.S. 639 (2014).............................................................................................................passim

*Southern Union Co. v. United States,*
    567 U.S. 343 (2012)..................................................................................................................33

*Timbs v. Indiana,*
    586 U.S. 146 (2019)..................................................................................................................33

*United States v. Akande,*
    200 F.3d 136 (3d Cir. 1999) ....................................................................................................18

*United States v. Bajakajian,*
    524 U.S. 321 (1998)............................................................................................................32, 33

*United States v. Blake,*
    81 F.3d 498 (4th Cir. 1996) ................................................................................18, 21, 29, 30

*United States v. Boccagna,*
    450 F.3d 107 (2d Cir. 2006).............................................................................................19, 20

*United States v. Cavallo,*
    790 F.3d 1202 (11th Cir. 2015) ...............................................................................................19

*United States v. Davis,*
    714 F.3d 809 (4th Cir. 2013) ...................................................................................................17

*United States v. Day,*
    700 F.3d 713 (4th Cir. 2012) ..............................................................................................32, 38

*United States v. Freeman,*
    741 F.3d 426 (4th Cir. 2014) ...................................................................................................17

*United States v. Gallant,*
    537 F.3d 1202 (10th Cir. 2008) ...............................................................................................19

*United States v. Kones,*
    77 F.3d 66 (3d Cir. 1996)..........................................................................................................18

*United States v. Leftwich*,
   628 F.3d 665 (4th Cir. 2010) ................................................................19

*United States v. Llamas*,
   599 F.3d 381 (4th Cir. 2010) ................................................................18

*United States v. Malone*,
   747 F.3d 481 (7th Cir. 2014) ................................................................19

*United States v. Rahal*,
   No. 08-cr-566, 2015 WL 13736602 (E.D. Cal. Nov. 1, 2015) .........................................31

*United States v. Reifler*,
   446 F.3d 65 (2d Cir. 2006)................................................................31

*United States v. Ritchie*,
   858 F.3d 201 (4th Cir. 2017) .......................................................1,17,18,20,22, 26, 35, 42

*United States v. Thompson*,
   792 F.3d 273 (2d Cir. 2015)................................................................19

*United States v. Wilson*,
   540 F.2d 1100 (D.C. Cir. 1976)................................................................35

**Statutes, Rules, and Constitutional Provisions**

18 U.S.C. § 3663A................................................................passim
18 U.S.C. § 3664................................................................18,20,21,35
28 U.S.C. § 1651................................................................15
Fed. R. Civ. P. 53................................................................15
Fed. R. Crim. P. 41(g)................................................................29
N.C. Gen. Stat. § 58-30-85 ................................................................30, 37, 38

**Legislative History**

S. Rep. No. 104-179 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924................................................................passim

# PRELIMINARY STATEMENT

On May 28, 2026, the Court entered a Preliminary Order of Restitution (Doc. No. 161) (the "Preliminary Restitution Order"), ordering restitution in the total amount of **$1,655,000,000** — $30 million more than the Special Master had recommended — and declared that sum "due and payable immediately" and enforceable as a judgment, with abstracts of judgment to issue at the request of any payee or the Special Master. Doc. No. 161 at 3–5. On the strength of that Order, asset sales of property belonging to Mr. Lindberg are proceeding, or are imminent. But Mr. Lindberg has already filed a detailed, documented Response demonstrating that, when the MVRA is correctly applied, the net restitution figure is **zero** — and that, far from owing the $1,655,000,000 the Court has now ordered, Mr. Lindberg has in fact **overpaid** that figure by approximately **$1.244 billion**. The chart submitted with the Response identifies **$2,899,418,383** in mandatory offsets and reductions — every dollar of which is supported by (i) verified pleadings of the Pre-Designated Restitution Parties themselves, (ii) contemporaneous business records of those parties or their representatives, or (iii) settled MVRA doctrine that this Court is duty-bound to apply.

To proceed with further asset sales while a $1.244 billion overpayment sits on the face of the record would not merely be premature. It would be **plain error**. It would violate the text of the MVRA, which forbids any recovery in excess of the victim's actual loss. *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017) (the MVRA "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole"). It would violate the proximate-cause limitation that the Supreme Court has unanimously held is built into the statute. *Paroline v. United States*, 572 U.S. 434, 444–45 (2014). And it would violate the constitutional protections that attach to MVRA restitution as criminal punishment under the Supreme Court's January 2026 decision in *Ellingburg v. United States*, 607 U.S. ___, slip op.

1

at 2 (Jan. 20, 2026) (Kavanaugh, J., for a unanimous Court) ("Restitution under the MVRA is plainly criminal punishment for purposes of the Ex Post Facto Clause.").

This Motion is not, however, advanced solely on dollars. The relief Mr. Lindberg seeks is also necessary to prevent further **destruction** of the assets that, on the present record, the Court is being asked to liquidate to fund a phantom restitution obligation. The factual record before this Court establishes a stark and unambiguous contrast: under Mr. Lindberg's twenty-year stewardship, the Specified Affiliated Companies (the "SACs") grew from nothing to approximately $3.4 billion in enterprise value, with EBITDA for Mr. Lindberg's companies in excess of $300 million annually; under the Rehabilitator's six-plus years of stewardship, the NCICs were ultimately liquidated, more than $165 million was extracted from the rehabilitation estates as fees, $137 million was lost on bond-portfolio decisions unrelated to Mr. Lindberg, and four separate billion-dollar-class monetization transactions were blocked or refused — in at least one case by suing a prospective arm's-length buyer. The asset sales presently underway are an extension of that destructive process. Each sale shrinks the estate. Each sale generates further fees for the very advisors who have been extracting $2.5 million per month from those estates. And each sale forecloses the option of returning the assets to the party with a demonstrated, contemporaneously-documented ability to preserve and grow their value.

Two contemporaneous documentary exhibits, introduced with the Supplemental Statement of Facts filed herewith, are independently dispositive on causation. **First**, a signed November 22, 2018 letter of intent from Ares Management Corporation — a publicly traded, investment-grade alternative-asset manager with over $500 billion in AUM — committed Ares to acquire 100% of GBIG (including the NCICs) for $400–$420 million in upfront cash, with an express SPV/securitization solution for the entirety of the affiliated-loan portfolio. **Second**, a January 6,

2

2019 internal Eli Global memorandum from Christa Miller — written for the file at 9:08 p.m. on a Sunday evening, two days after an in-person Ares meeting — documents in real time that Ares withdrew the SPV component of its offer because, in Ares's own words, it had "been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close." That third party met with the United States Department of Justice within days of so instructing Ares. **Third**, a February 8, 2019 Oaktree Capital Management "Global Solution Presentation" — negotiated by Mr. Lindberg personally within weeks of the Ares termination — set out a $1.0 billion arm's-length SPV structure that would have acquired the affiliated-loan positions and 100% of the GBIG equity. The Rehabilitator refused both transactions. Either alone would have paid every NCIC policyholder in full by approximately June 2019. Under *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring), each refusal severs the chain of proximate causation between any conduct of Mr. Lindberg's and any post-MOU decline in the recoverable value of the affiliated loans.

This Motion seeks three forms of relief, in descending order of breadth. **First**, a stay of further asset sales pending the Court's adjudication of the Response — modest preservation of the existing state of affairs. **Second**, the return of the Primary Restitution Assets to Mr. Lindberg's control, because restitution has been fully paid and overpaid by $1.274 billion. **Third**, in the alternative, the immediate return of the eight De Minimis SACs that the parties themselves have already stipulated, in a filing in this very docket (Doc. No. 66, ¶ 20(h)) may, have "no further material value to NHC" and that NHC "does not otherwise intend to sell." By the parties' own admission, those eight companies cannot be liquidated to satisfy restitution; they are being indefinitely held by an entity with a documented pattern of destroying value, with no offsetting MVRA benefit. They should be returned to the party that built them in the first place.

3

## FACTUAL BACKGROUND

### I. The Special Master's $1.625 Billion Proposed Restitution Figure.

On April 29, 2026, the Special Master submitted a Report and Recommendations Regarding Restitution (ECF No. 106) proposing that this Court enter a preliminary order of restitution in the amount of **$1.625 billion** in favor of eight Pre-Designated Restitution Parties. Restitution Rpt. at 4. The Special Master's proposed figure consists, in substance, of (i) the principal balance of the Affiliate Investments as carried on the Special Master's schedules ($1,391,000,000 attributed to the NCICs, plus other balances totaling approximately $2,179,000,000); (ii) $263 million in proposed pre-judgment interest at the 30-Day U.S. Treasury rate; and (iii) certain other items, including approximately $129 million attributable to Agera Energy, LLC. App'x 3 at 6–8.

On May 28, 2026, the Court entered the Preliminary Restitution Order (Doc. No. 161), ordering restitution in the total amount of $1,655,000,000 — $30 million more than the Special Master had recommended, and without first adjudicating the Response. The Order declares the restitution "due and payable immediately," provides that it "shall be enforceable as a judgment of the United States" under 18 U.S.C. §§ 3664 and 3613, and authorizes the Clerk to issue abstracts of judgment that become liens on Mr. Lindberg's property. Doc. No. 161 at 1 n.1, 3–5. Except where the entered figure is specifically discussed, this Memorandum continues to refer to the Special Master's recommended $1.625 billion figure and the corresponding $1.274 billion overpayment; measured instead against the Court's entered figure of $1.655 billion, the same documented offsets of $2.899 billion still yield net restitution of zero and an overpayment of approximately $1.244 billion. The defects in the Preliminary Restitution Order, and the reasons it must be corrected before it is enforced, are addressed in Argument Part II.D below.

4

## II. The Response Identifies $2.899 Billion in Mandatory Offsets and Reductions.

On May 4, 2026, Mr. Lindberg filed his Response (the "Response"), supported by an accompanying Statement of Facts and a Revised Supplemental Statement of Facts. Those filings identify **$2,899,418,383** in mandatory offsets — yielding net restitution of **zero** and a documented overpayment of approximately **$1,274,418,383**. The principal categories are summarized below, with cross-references to the supporting Statement of Facts ("SOF") and Revised Supplemental Statement ("Supp. SOF"):

- **Improperly added pre-judgment interest** ($263,000,000) (SOF ¶¶ 80–82): The MVRA does not authorize interest; DOJ policy expressly excludes it; and substantial portions of the Affiliate Investment balances were structured by written agreement as zero-coupon notes that, by definition, bear no contractual interest.

- **Corrected starting principal balance of Affiliate Investments** ($141,000,000) (SOF ¶¶ 24–26): The NCICs themselves used $1.25 billion (not the Special Master's $1.391 billion) in their verified 2019 Wake County complaints, in the parties' stipulated pre-trial order, and in the 6.30.2019 Restructure Tranches spreadsheet executed at the time of the MOU.

- **AAPC Preferred Equity transferred to ULICO** ($352,906,240) (SOF ¶¶ 63–69): ULICO agreed in writing in December 2022 to accept the preferred equity in partial satisfaction of the $524 million Middle District of North Carolina judgment, with "dollar-for-dollar credit."

- **SNIC capital contributions** ($27,823,425) (SOF ¶¶ IV (SNIC Escrow)): Cash paid directly to SNIC under the 2021–2022 Dogwood State Bank escrow agreement.

- **Additional undisputed cash payments to Pre-Designated Restitution Parties** ($79,655,289) (Response § II.C): Including $9.4 million from the Finanzen/Blue

5

Violet sale; $29.5 million to CBL; $4.2 million to BLIC; $6.8 million to SNIC; $21.9 million to PBLA; $2.6 million to Northstar; and a $5 million CBL redemption fee.

- **CBL subordination/Beckett refinance fee** ($3,000,000) (Response § II.D): Cash paid directly to CBL in 2022.

- **Additional escrowed Clanwilliam proceeds** ($20,000,000) (Response § II.E).

- **ULICO real-estate sale proceeds** ($13,596,013) (Response § II.F).

- **Post-MOU zero-coupon bond proceeds** ($243,452,385) (Response § II.G): Confirmed by the October 28, 2019 contemporaneous email of Paul Brown, the NCICs' Chief Investment Officer.

- **Value of the NCICs at transfer of control** ($454,000,000) (SOF ¶¶ 55–62).

- **Bermuda Insurance Companies' proceeds from sales of affiliated assets** ($9,800,076) (SOF ¶ 6 chart).

- **Agera Energy losses** ($129,398,324) (SOF ¶¶ 71–73).

- **Eye Care Leaders losses** ($22,288,826) (SOF ¶ 74).

- **UKAT losses** ($39,000,000) (SOF ¶ 76): Caused by the Rehabilitator's rejection of the BC Partners refinancing.

- **Insurance-Holdco debt portion** ($14,897,805) (SOF ¶ 77).

- **Clanwilliam below-market fire-sale loss** ($474,000,000) (SOF ¶ 75).

- **Pre-maturity sale of $1.006 billion in protective bank zero-coupon bonds** ($611,600,000) (SOF ¶¶ 48–54).

6

**III.    The Documented Contrast Between Mr. Lindberg's and the Rehabilitator's Stewardship of the Lindberg-Related Operating Companies.**

The factual record before the Court establishes a stark, contemporaneously-documented contrast between Mr. Lindberg's twenty-year track record of value creation in the SACs and the Rehabilitator's six-plus-year track record of value destruction in the NCICs. That contrast is not background. It is dispositive of the relief Mr. Lindberg seeks: a stay of further sales by an entity demonstrably destroying value, and — at a minimum — return of the eight De Minimis SACs that the parties have themselves stipulated have no further restitution value.

### A.    Mr. Lindberg's Twenty-Year Track Record: From Nothing to $3.4 Billion in Enterprise Value.

Mr. Lindberg built the SACs from nothing over more than two decades. The success of those companies funded **nearly $1 billion of personal capital** that Mr. Lindberg, in turn, invested into the NCICs as a net contributor to those companies' surplus. Mr. Lindberg did not take a single dollar of dividends out of any NCIC; he was a net contributor of cash flow to those insurance companies for years. SOF ¶ 5.

Under Mr. Lindberg's management, the SACs grew from approximately **$1.5 billion in aggregate value in 2019 to approximately $3.4 billion by 2024** — an increase of approximately **$1.9 billion** in enterprise value over a five-year period. That valuation is not abstract. It is corroborated by the arm's-length, signed Q1 2024 purchase agreement with Quadro Acquisition Corp. One (NASDAQ: QRDO) at a 22.14x EBITDA multiple consistent with public-market comparables. The Quadro transaction would have monetized that growth in cash, for the direct benefit of the very Pre-Designated Restitution Parties whom the Special Master purports to be protecting, had the Rehabilitator not blocked it. SOF ¶¶ 9, 16, 58(d), 75.

Lindberg's companies were producing approximately **$300 million in EBITDA** in 2024, and the public-company EBITDA multiples used in the Quadro pricing have not declined. The

7

five-company comparable basket (Addtech, Indutrade, Lifco, Diploma, and Beijer/ALMA) had an average enterprise value to EBITDA multiple of **22.14x at signing in Q1 2024** and **24.37x as of November 2025** — an upward, not downward, move. The Quadro valuation was conservative when struck; in current market conditions, it would be conservative still. SOF ¶ 75; Supp. SOF. Mr. Lindberg's strategy of using insurance-company capital to fund affiliated investments was not idiosyncratic and was approved by the North Carolina Department of Insurance ("NCDOI") in 2014, before he made the first affiliated investment. Affiliated investments have since become standard practice among major insurance industry players, including Blackstone, KKR, Apollo, Brookfield, and Security Benefit (Eldridge), with some insurers maintaining 35–43% of assets in affiliated investments. Mr. Lindberg also implemented and updated a Risk Mitigation Policy on Private Loans designed to ensure no loss on the affiliated loans — a policy that was successful, as the documented EBITDA growth and the signed arm's-length Quadro purchase agreement confirm.

### B. The Rehabilitator's Six-Year Track Record: $454 Million to Zero, Plus $165+ Million in Self-Pay Fees and $137 Million in Unrelated Bond Losses.

By contrast, under the management of Mike Dinius as Special Deputy Rehabilitator, the NCICs suffered the documented destruction-of-value events catalogued in Paragraph 58 of the Statement of Facts. They are summarized here because they bear directly on the equities of the requested stay and on the question of which party should hold the De Minimis SACs going forward.

First, **more than $165 million in fees** has been extracted from the NCIC rehabilitation estates over a seven-year period — with the extraction continuing today at approximately $2.5 million per month. The Rehabilitator's own internal financial records (Exhibit M to the Statement of Facts) document the magnitude and continuity of those payments. They are direct depletions of

the very estates that are supposed to be preserved for the policyholders the Rehabilitator purports to protect.

Second, **$137 million in investment losses** — entirely unrelated to Mr. Lindberg or the affiliated-loan portfolio — was incurred on corporate-bond and other portfolio decisions made by the Rehabilitator's team after Mr. Lindberg transferred control. These losses occurred on the Rehabilitator's watch, on the Rehabilitator's portfolio, on the Rehabilitator's judgment, and cannot, by any measure of proximate causation, be charged to Mr. Lindberg. SOF ¶ 58(b).

Third, the Rehabilitator **blocked or sabotaged at least four separate billion-dollar-class monetization transactions**, any one of which would have fully paid the NCIC policyholders and creditors. Those transactions are catalogued in Section IV below. The Rehabilitator did not merely fail to monetize the affiliated loans in a timely fashion. He affirmatively rejected face-value cash offers. He affirmatively litigated against a prospective arm's-length buyer. He affirmatively elected, in the June 27, 2019 MOU, to hold the affiliated loans for a ten-year term rather than monetize them. SOF ¶¶ 9, 16, 58, 75, 76; Supp. SOF ¶¶ 4–36.

Fourth, the Rehabilitator caused the **$474 million Clanwilliam fire-sale loss** by blocking the public-market Quadro transaction and instead selling Clanwilliam in September 2025 to TA Associates, a private-equity buyer, for approximately $450 million — versus the $880 million signed Quadro purchase-agreement valuation negotiated by Mr. Lindberg less than eighteen months earlier. SOF ¶ 75. As documented in the Statement of Facts, the financial-economics literature confirms that public-market acquirers pay materially higher premiums than private-equity acquirers for the same target; the Clanwilliam undervaluation is the direct product of the Rehabilitator's decision to forgo a public-market exit in favor of a private-equity exit at a fraction of the value.

9

Fifth, the Rehabilitator unilaterally sold the **$1,006,239,867 face-value bank-issued zero-coupon bonds** backing the Principal Protected Notes — instruments whose entire purpose was to mature at par and protect the affiliated-loan principal from any credit-related downside — for approximately $394 million, crystallizing a **$611.6 million loss** on assets contractually guaranteed to pay par. SOF ¶¶ 48–54.

Sixth, the Rehabilitator and his agents have **affirmatively filed litigation against at least one prospective arm's-length buyer** of the NCICs — a transaction that would have paid every policyholder in full — and have used that litigation to drive the buyer away. Under *Robers v. United States*, 572 U.S. 639, 645–46 (2014), the Supreme Court has expressly recognized that a victim's donation of collateral, or sale to a friend for a nominal sum, can break the causal chain. *Id.* The Rehabilitator's litigation to block a sale to a willing arm's-length buyer is, *a fortiori*, precisely such a chain-breaking act.

Seventh, and ultimately, the Rehabilitator **liquidated the NCICs** outright, destroying the **$454 million baseline value** that the NCICs' own management — operating under the Rehabilitator's supervision — had established in an internal valuation dated November 5, 2018, eighteen days after Mr. Lindberg transferred operational control. SOF ¶¶ 55–62 & Ex. J.

### C. The Bottom-Line Comparison.

The contrast is unambiguous. Mr. Lindberg's stewardship produced **$1.9 billion in value creation** in the SACs (and approximately $1 billion in capital contributions to the NCICs along the way). The Rehabilitator's stewardship produced **$454 million in value destruction** in the NCICs; **$137 million** in unrelated investment losses; **$611.6 million** in protective-bond losses; **$474 million** in below-market Clanwilliam losses; the loss of an additional **$39 million** by refusing the BC Partners refinancing of UKAT; the foregone benefit of at least **four billion-dollar-class transactions** the Rehabilitator blocked; and the affirmative use of litigation against a willing

10

arm's-length buyer. Along the way the Rehabilitator extracted more than **$165 million in fees** and are continuing today at approximately $2.5 million per month.

The only entity person or with a documented, contemporaneously-corroborated track record of value preservation, let alone value creation, in connection with the Lindberg-related insurance and operating companies is Mr. Lindberg himself.

### D. Independent Expert Corroboration.

Mr. Lindberg's narrative is independently corroborated by the contemporaneous forensic analysis of Berkeley Research Group, LLC ("BRG"), a national litigation-consulting firm regularly retained by the Department of Justice, the Securities and Exchange Commission, and state regulators. The BRG analysis (referenced in the supporting Exhibits) reaches three conclusions material to this Motion: (i) it identifies damages **in excess of $400 million** caused by regulatory conduct — not by business failure, fraud, or mismanagement; (ii) it confirms that the aggregate value of the affiliated companies exceeded their debt and other obligations, and that Mr. Lindberg's personal net worth was between $860 million and $1.46 billion at the time the Rehabilitator took control — directly contradicting any premise of insolvency at the moment of transfer; and (iii) it confirms that Mr. Lindberg contributed **at least $377 million in capital** to the insurance companies and **extracted nothing in dividends** — the opposite of the self-dealing narrative the Special Master's figure rests on. These findings are not advocacy. They are professional, independent forensic conclusions corroborating the documentary record above.

### IV. The Ares and Oaktree Refusals: Contemporaneous Documentary Evidence That Two Independent Arm's-Length Buyers Independently Priced the Affiliated Loans at Par.

Two contemporaneous documentary records establish that, at the moment the Rehabilitator assumed control, two independent sophisticated financial institutions — Ares Management and Oaktree Capital Management — each separately offered to take the entirety of the affiliated-loan

11

portfolio off the NCICs' balance sheets at face value through SPV structures backed by their own capital. Supp. SOF ¶¶ 4–29 & Exs. A–E.

**Ares.** The November 22, 2018 Ares LOI, executed thirty-five days after Mr. Lindberg transferred control, committed Ares (a publicly traded, investment-grade manager with approximately $125 billion in AUM) to acquire 100% of GBIG (including the NCICs and the related insurance entities) for $400–$420 million in upfront cash, with an express SPV/securitization solution for any remaining affiliated and self-originated investments. Supp. SOF Ex. B §§ 1, 3, 6. The January 6, 2019 Christa Miller internal Eli Global memorandum — written for the file at 9:08 p.m. on a Sunday two days after the January 4, 2019 in-person Ares meeting — documents in real time that Ares withdrew the SPV component because Ares had "been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close." Supp. SOF Ex. A.

**Oaktree.** Within weeks of the Ares termination, Mr. Lindberg personally directed the negotiation of an independent transaction with Oaktree Capital Management. The February 8, 2019 Oaktree "Global Solution Presentation" (Supp. SOF Ex. C) memorialized a $1.0 billion Investor Group investment into a holding-company SPV that would have acquired (i) approximately $800 million of the affiliated-loan principal and (ii) 100% of the GBIG equity, with an additional approximately $400 million of affiliated-loan assets rolled over and held as performing assets on the NCICs' balance sheet. The February 12–13, 2019 Eli Global internal emails (Supp. SOF Exs. D–E) document, in Mr. Lindberg's own contemporaneous words, his real-time direction of three parallel SPV/bridge-financing tracks — Oaktree, HPS, and Ares SPV bridge loans — each of which would have generated net proceeds in the range of **$1.335–1.355 billion**. The Rehabilitator refused the Oaktree transaction.

12

**Montshire / Alban.** In 2023, the Rehabilitator received an additional offer from Montshire (through Mr. Robert Alban) to purchase the NCICs in a transaction that would have generated proceeds to pay the policyholders in full. The Rehabilitator refused that offer and litigated against the prospective buyer. SOF ¶ 58(d).

**Quadro.** In Q1 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the SAC group at approximately $3.4 billion (and Clanwilliam alone at $880 million). The Rehabilitator blocked the Quadro transaction. SOF ¶ 75 & Exs. G3, I3, I4.

**BC Partners / UKAT.** The Rehabilitator rejected the BC Partners refinancing of UKAT that would have generated approximately $39 million in cash for the NCIC lenders. The UKAT loss of $39 million was the direct consequence. SOF ¶ 76 & Ex. M.

## V. The MOU Was Coerced and Affirmatively Held the Affiliated Loans for Ten Years.

Having refused both arm's-length face-value cash transactions, the Rehabilitator then forced Mr. Lindberg to execute the June 27, 2019 Memorandum of Understanding (the "MOU") on a take-it-or-leave-it basis under express written threat that, if Mr. Lindberg refused to sign, the Rehabilitator would immediately move to liquidate the NCICs. As Mr. Dinius wrote in writing to Mr. Lindberg from his Noble Consulting account on the day the rehabilitation order was entered: "we will contact the guaranty associations and move directly to liquidation. You know what that means." SOF ¶ 58(a) & Ex. D5; Supp. SOF ¶ 32. As one of the Rehabilitator's lawyers told Mr. Lindberg directly: "Mr. Lindberg, you're the nail. I'm the hammer." Supp. SOF ¶ 33 (citing Wake County Trial Tr. Vol. 5, 1012:11–12). The MOU then memorialized the Rehabilitator's affirmative election to **hold the affiliated loans for a ten-year term** rather than monetize them. Supp. SOF ¶¶ 35–36.

13

## VI. The Clanwilliam Sale Order's Concession That Eight SACs Are De Minimis.

On July 3, 2025, the Special Master filed his Consent Motion for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Group of Companies (Doc. No. 66), with the consent of the United States and Mr. Lindberg. The Clanwilliam Sale Order entered pursuant to that motion contains an express stipulation, signed by every restitution stakeholder in this matter, identifying eight SACs that NHC has determined are not productive of further realizable value:

> "If NHC determines, in its discretion and in the ordinary course of managing its affairs, that any of the following SACs has no further material value to NHC and NHC does not otherwise intend to sell such SAC, then the Special Master shall have the option of assuming ownership and control of such SAC upon terms and conditions mutually acceptable to the Special Master and NHC: SixSails, LLC; Certitrek Group, LLC; ELP Holdings, LLC; Global TIC CE, LLC; Fiasco Fine Wine, LLC; Century Vision Global, LLC; Marval Investments Limited; and Intralan Investments Limited."

Doc. No. 66, ¶ 20(h). By stipulation, NHC does not intend to sell these eight companies. Given the Rehabilitator-side track record of value destruction documented in Section III above, the most likely outcome of leaving the De Minimis SACs in the present control structure is further destruction of value, with zero offsetting benefit to the Pre-Designated Restitution Parties.

## VII. Asset Sales Are Proceeding to Enforce a Preliminary Restitution Order That Precedes Sentencing and Is Facially Defective.

On May 28, 2026, without first adjudicating the Response, the Court entered the Preliminary Restitution Order (Doc. No. 161), which by its own terms is captioned "preliminary" because it "precedes sentencing." Doc. No. 161 at 1 n.1. The Response, the Statement of Facts, and the Supplemental Statement of Facts remain unadjudicated. Yet the Order declares the full $1,655,000,000 "due and payable immediately" and enforceable as a judgment, and authorizes abstracts of judgment to issue. On information and belief, the Special Master is presently

14

conducting, or imminently preparing to conduct, additional sales of Mr. Lindberg's assets to satisfy that figure. If those sales and that enforcement proceed before the Court corrects the Order and rules on the Response, Mr. Lindberg's assets will be irretrievably liquidated to fund a restitution obligation that the law does not permit — and they will be liquidated under the direction of a control structure that has demonstrated, over six years and through hundreds of millions of dollars in fees and avoidable losses, that it is not capable of preserving, let alone growing, their value.

**ARGUMENT**

**I.    This Court Has Broad Authority — Statutory, Rule-Based, and Inherent — to Stay Asset Sales Pending Adjudication of Defendant's Restitution Objections.**

Three independent sources of authority support the relief Mr. Lindberg requests. First, the Court has the inherent supervisory power, recognized in *Landis v. North American Co.*, 299 U.S. 248, 254 (1936), to stay proceedings before it. Second, Federal Rule of Civil Procedure 53 — made directly applicable by the Court's appointment order or, in the alternative, by analogy in this criminal proceeding — vests in the appointing Court plenary authority to modify, restrict, or terminate the duties of a court-appointed officer. *See* Fed. R. Civ. P. 53(b)(4) ("The order [appointing a master] may be amended at any time after notice to the parties and an opportunity to be heard."); Fed. R. Civ. P. 53(f) (de novo review and authority to "adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions"). Third, the All Writs Act, 28 U.S.C. § 1651(a), authorizes the Court to issue "all writs necessary or appropriate in aid of [its] respective jurisdictio[n] and agreeable to the usages and principles of law."

In *Landis*, Justice Cardozo, for a unanimous Court, articulated the inherent stay power in terms directly applicable here: "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment,

which must weigh competing interests and maintain an even balance." 299 U.S. at 254. The Supreme Court has more recently reaffirmed that the federal courts retain inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citation and internal quotation marks omitted).

That inherent authority extends, *a fortiori*, to the supervision of court-appointed officers acting in the Court's own proceeding. As the Supreme Court explained in *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957), "[t]he use of masters is 'to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause,' and not to displace the court." (citation omitted). The Special Master is an officer of the Court. The Court accordingly retains — and is duty-bound to exercise — plenary authority to redirect, restrict, suspend, or terminate the Special Master's activities when those activities risk producing an unlawful result.

The Special Master Order itself expressly preserves this Court's plenary supervisory authority. The Order grants the Special Master only such authority as is "subject to the Court's supervision and guidance," and expressly limits that authority by requiring the Special Master to "seek Court approval to liquidate … any available assets for the benefit of victims." Doc. No. 56, ¶ 6(e). That sequence — Court approval first, liquidation second — would be inverted if asset sales were permitted to proceed on the basis of a non-final, unentered restitution figure that the defendant has formally and substantively contested, and that the Court has not adjudicated.

The *Nken v. Holder*, 556 U.S. 418, 426 (2009), four-factor stay standard — quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) — governs the analysis: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Each factor is

16

satisfied here. The first two — likelihood of success and irreparable harm — are "the most critical." *Nken*, 556 U.S. at 434. Both decisively favor the relief sought. *See infra* Parts II–VII (likelihood of success); Part VIII (irreparable harm and balance of equities).

**II. Proceeding with Asset Sales When the Proposed Restitution Figure Has Been Paid in Full and Overpaid by $1.274 Billion Would Be Plain Error and a Violation of the MVRA.**

### A. A Federal Court Has No Authority to Order or Enforce Restitution Beyond What the MVRA Permits.

"Federal courts do not have the inherent authority to order restitution, but must rely on a statutory source to do so." *United States v. Ritchie*, 858 F.3d 201, 206 (4th Cir. 2017) (quoting *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013)). A court's discretion is therefore "circumscribed by the procedural and substantive protections of the statute authorizing restitution." *United States v. Freeman*, 741 F.3d 426, 431 (4th Cir. 2014) (quoting *United States v. Leftwich*, 628 F.3d 665, 667 (4th Cir. 2010)). "A restitution order that exceeds the authority of the statutory source is no less illegal than a sentence of imprisonment that exceeds the statutory maximum." *United States v. Davis*, 714 F.3d 809, 812 (4th Cir. 2013). Because the MVRA defines the statutory ceiling for restitution as the loss *directly and proximately* caused by the offense of conviction, less property returned, 18 U.S.C. § 3663A(a)(2), (b)(1)(B)(ii), a restitution order — and any enforcement of that order — beyond the statutory ceiling exceeds the authority of the Court.

To be clear, ¶ 10(a)'s "full restitution" language must be construed against the Government as its drafter, and it does not enlarge the Court's authority without limit. The operative ceilings remain the victims' actual, unrecovered loss (the MVRA's make-whole measure), the mandatory anti-double-recovery credit of § 3664(j)(2), and the requirement that the loss be caused by the conduct. A restitution award exceeding those limits lies beyond the Court's statutory authority.

Under the MVRA, a sentencing court may order restitution only for losses directly and proximately caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2). To be a "victim" under the MVRA, "the act that harms the individual must be either conduct underlying an element of the offense of conviction, or an act taken in furtherance of a scheme, conspiracy, or pattern of criminal activity that is specifically included as an element of the offense of conviction." *United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996); *see also Hughey v. United States*, 495 U.S. 411, 413 (1990) (restitution authorized "only for the loss caused by the specific conduct that is the basis of the offense of conviction"); *United States v. Llamas*, 599 F.3d 381, 390–91 (4th Cir. 2010) (Fourth Circuit reaffirmation). *United States v. Akande*, 200 F.3d 136, 140 (3d Cir. 1999) (conspiracy case holding the offense of conviction the reference point for restitution; the 1990 amendment broadened the class of victims for scheme and conspiracy offenses, but the victim's harm must still be directly and proximately caused by the offense conduct); *United States v. Kones*, 77 F.3d 66, 70 (3d Cir. 1996) (the statutory expansion "is not so broad that it permits a district court to order restitution to anyone harmed by any activity of the defendant related to the scheme, conspiracy or pattern").

The fundamental purpose of the MVRA is **compensatory**. It "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole." *Ritchie*, 858 F.3d at 216. "[A] restitution award may not be calculated based upon a defendant's intended losses, but must be grounded in the total, actual losses that were realized by the victims." *Id.* at 216 n.11.

### B. Cash and Other Property Already Returned Must Be Credited Dollar-for-Dollar.

Where the "property" lost is cash and the defendant returns cash (or a cash-equivalent), the MVRA mandates a credit. *Robers v. United States*, 572 U.S. 639, 640–41 (2014) (interpreting the

18

statutory phrase "any part of the property" as "refer[ring] only to the specific property lost by a victim, which, in the case of a fraudulently obtained loan, is the money lent"). Section 3663A(b)(1)(B)(ii) is express: any restitution amount "shall be reduced by the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B)(ii).

Section 3664(j)(2) reinforces the same principle on the enforcement side: "Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in (A) any Federal civil proceeding; and (B) any State civil proceeding." 18 U.S.C. § 3664(j)(2). The statute's anti-double-recovery architecture is explicit. "[A]ny amount the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution amount to prevent double recovery by the victim." *United States v. Malone*, 747 F.3d 481, 485 (7th Cir. 2014) (citation omitted). *Accord United States v. Gallant*, 537 F.3d 1202, 1249–50 (10th Cir. 2008); *United States v. Thompson*, 792 F.3d 273, 280 (2d Cir. 2015); *United States v. Cavallo*, 790 F.3d 1202, 1240 (11th Cir. 2015) (restitution must take collateral value into account; otherwise it "confers a windfall"); *United States v. Boccagna*, 450 F.3d 107, 117–20 (2d Cir. 2006).

Applied here, the cash and other valuable consideration that Mr. Lindberg has already returned to the Pre-Designated Restitution Parties — including, among other items, **$352.9 million** in AAPC Preferred Equity transferred to ULICO in partial satisfaction of the $524 million Middle District of North Carolina judgment; **$27.8 million** in SNIC capital contributions under the Dogwood escrow; **$79.6 million** in additional cash payments to Pre-Designated Restitution Parties; the **$3 million** CBL subordination fee paid in connection with the Beckett refinancing;

19

**$13.6 million** in real-estate sale proceeds to ULICO; and **$243.4 million** in post-MOU zero-coupon bond proceeds — must be credited against any restitution figure under *Robers* and Section 3663A(b)(1)(B)(ii). SOF ¶¶ 41–47, 63–69; Response § II.

### *C. Pre-Judgment Interest Is Not Recoverable Under the MVRA.*

The Special Master's addition of $263 million in pre-judgment interest is contrary to the plain language of the MVRA, contrary to DOJ policy, and contrary to controlling Supreme Court authority. Restitution is concerned with the victim's "actual loss," not with "disappointed expectations" or the time value of money. *Boccagna*, 450 F.3d at 119. Substantial portions of the Affiliate Investment balances were structured by the Rehabilitator's own June 17, 2019 written agreement as zero-coupon notes that, by definition, bear no contractual interest. SOF ¶¶ 80–82 & Ex. G.

### *D.      The Preliminary Restitution Order Is Facially Defective Under the MVRA and Must Be Corrected Before It Is Enforced.*

The figures in the Preliminary Restitution Order are subject to *de novo* determination by this Court. The MVRA permits a court to refer restitution issues to a special master only "for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). The Government and the Special Master — not Mr. Lindberg — bear the burden of proving the amount of each victim's loss by a preponderance of the evidence. *Id.* § 3664(e). On de novo review, the Order cannot stand as written. **First**, its $1,655,000,000 total exceeds the Special Master's own recommendation by $30,000,000, with no explanation in the Order; a restitution figure unsupported by the record exceeds the statutory ceiling. *Ritchie*, 858 F.3d at 216. **Second**, the Order recites that its figures "already account for monetary recoveries realized by the payees prior to the entry of this Order" (Doc. No. 161 at 4), but it itemizes none, and it does not apply the $2,899,418,383 in mandatory

20

offsets the Response documents — even though the MVRA requires that restitution "be reduced by the value … of any part of the property that is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), and that any amount recovered as compensatory damages for the same loss be credited, *id.* § 3664(j)(2); *Robers*, 572 U.S. at 640–41. **Third**, the Order applies an offset to only one payee — reducing PBLA's $416,000,000 award by the speculative "ultimate value" ULICO may someday receive (Doc. No. 161 at 3) — while ignoring the cash and property already returned to the other payees and treating as contingent a credit that, as the Response documents, became fixed and due when the AAPC preferred equity was transferred to ULICO in December 2022. A credit is measured "as of the date the property is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), not as of some future liquidation. **Fourth**, the Order makes no finding connecting any payee's award to the loss directly and proximately caused by the offense of conviction, as *Hughey* and *Blake* require. *Hughey*, 495 U.S. at 413; *Blake*, 81 F.3d at 506. Each defect is independently correctable notwithstanding the Order's "final judgment" status. 18 U.S.C. § 3664(o); Fed. R. Crim. P. 36.

The most immediate defect, however, is the Order's internal contradiction. The Order reserves four separate categories of further reductions — prior recoveries on "non-IALA assets," prior recoveries on "zero coupon bonds," the payments itemized at page 22 of Doc. No. 132, and transfers to "SFL" and "SASL" — for investigation after sentencing, and directs the Special Master to "move the Court to amend this order" to the extent of any resulting adjustments. Doc. No. 161 at 5. The Court has thus expressly recognized that the $1,655,000,000 figure is not final and is subject to downward correction. Yet the same Order declares that figure "due and payable immediately" and enforceable as a judgment now, and authorizes abstracts of judgment to issue. *Id.* at 4–5. Enforcing an admittedly-unreduced figure — by liquidating Mr. Lindberg's assets — before the conceded offsets are quantified is the surest way to produce the over-recovery the

21

MVRA forbids. *Ritchie*, 858 F.3d at 216. An order that imposes the operative instrument of criminal punishment as a presently enforceable money judgment, complete with liens, before the defendant's objections have been heard, cannot not be enforced. The prudent course is to stay enforcement, correct the Order to conform to the MVRA, and defer enforceability to the final restitution determination at sentencing. *See* 18 U.S.C. § 3664(o)(1)(C); *id.* § 3664(f)(2).

### E. The MVRA's Legislative History Confirms That the Government's Position Contravenes Congress's Express Intent.

Each of the foregoing defects is confirmed, and independently established, by the MVRA's legislative history. The report of the Senate Judiciary Committee accompanying the bill — S. Rep. No. 104-179 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924 — states Congress's intent with unusual specificity, and the Government's position in this matter departs from that intent in at least six respects.

**First**, restitution is a make-whole remedy, not an instrument of windfall. Quoting its 1982 predecessor report, the Committee reaffirmed that the sanctioning power of society "should also ensure that the wrongdoer is required to the degree possible to restore the victim to his or her prior state of well-being." S. Rep. No. 104-179, at 13 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 926. A restitution figure that overshoots the victims' actual loss by approximately $1.244 billion does not "restore" anyone to a prior state of well-being; it confers a windfall — the precise result the Fourth Circuit has held the MVRA forbids. *Ritchie*, 858 F.3d at 216.

**Second**, the Committee confined mandatory restitution to directly-and-proximately-caused loss. It stated that the provisions "apply only in those instances where a named, identifiable victim suffers a physical injury or pecuniary loss directly and proximately caused by the course of conduct under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 932. The Special Master's figure charges Mr. Lindberg with

22

losses caused by the Rehabilitator's own post-transfer discretionary decisions — the refusals of the Ares and Oaktree face-value cash transactions, the ten-year MOU hold, the pre-maturity sale of the protective zero-coupon bonds, and the below-market Clanwilliam sale — none of which was "directly and proximately caused by" Mr. Lindberg's offense conduct. And because the Rehabilitator's independent decisions were not caused by Mr. Lindberg's conduct at all — directly or indirectly — those losses fall outside ¶ 10(a) on any reading, since ¶ 10(a) reaches only losses "harmed by [his] criminal conduct." *See supra* Part III.

**Third**, the Committee directed that complex and speculative loss issues be kept out of the restitution process altogether. "In all cases," it wrote, "it is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution," and that "losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution." S. Rep. No. 104-179, at 19 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 932.

**Fourth**, the Committee identified the defendant's controlling due-process interest at sentencing as "the right not to be sentenced on the basis of invalid premises or inaccurate information." S. Rep. No. 104-179, at 20 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 933. The uncorrected Order rests on precisely such invalid premises and inaccurate information: a figure $30 million above the Special Master's own recommendation with no explanation; the omission of $2,899,418,383 in documented offsets and credits; the inclusion of approximately $263 million in pre-judgment interest the MVRA does not authorize; and the attribution to Mr. Lindberg of losses the Rehabilitator caused. Now that *Ellingburg* confirms MVRA restitution is criminal punishment, that due-process interest is at its zenith. *See infra* Part IV.

23

**Fifth**, and most directly, the Committee's clarification of the anti-double-recovery rule forecloses the Government's position. Explaining 18 U.S.C. § 3664(j)(2), the Committee stated that its purpose, "like its predecessor in current law, is to ensure that the victim is not compensated twice for the same loss," and clarified that "same loss" refers to "a specific loss arising from the same criminal act." S. Rep. No. 104-179, at 21 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 934. The Pre-Designated Restitution Parties have already received — and in many instances still hold — the AAPC preferred equity now at ULICO, the real estate transferred to ULICO, the zero-coupon-bond sale proceeds, and tens of millions in direct cash payments. To order Mr. Lindberg to pay $1.655 billion while ignoring those recoveries would compensate the victims twice for the same loss — the precise result Congress legislated against. *See supra* Part II.B.

Taken together, the legislative history does not merely support Mr. Lindberg's reading of the MVRA; it establishes that the Government's position is contrary to the express, repeatedly-stated intent of the Congress that enacted the statute.

### F. Paragraph 10(a) Is Construed Against the Government as Its Drafter and Does Not Waive the MVRA's Causation Requirement; the Disputed Losses Were Caused by the Rehabilitator's Intervening Decisions, Not by Mr. Lindberg.

One threshold point frames the causation analysis that follows. The plea agreement does not fix a restitution figure. It commits Mr. Lindberg to "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by [his] criminal conduct." Plea Agreement ¶ 10(a) (Doc. 40). The Government drafted that language, and any ambiguity in it must be resolved against the Government and in favor of Mr. Lindberg. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986); *United States v. Jordan*, 509 F.3d 191, 195–96 (4th Cir. 2007). Two features of ¶ 10(a)'s own text are dispositive here. It reaches only persons "harmed by the defendant's criminal conduct" — an express causal predicate. And "regardless of the resulting loss

24

amount" speaks to quantum, confirming the figure is not tied to the § 2B1.1 loss calculation — not to causation. Read as its terms require, ¶ 10(a) does not abandon the requirement, central to *Hughey* and to the MVRA alike, that the loss be caused by the conduct.

The MVRA's structure points the same way. The victims to whom ¶ 10(a) refers — the insurance companies— are "victims" under § 3663A(a)(2): persons "directly and proximately harmed" by the offense and, for the conspiracy offenses of conviction, persons "directly harmed by the defendant's criminal conduct in the course of the scheme [or] conspiracy." Proximate cause is thus the express statutory standard for the very losses at issue, and nothing in ¶ 10(a) purports to displace it. The Government retains the burden of proving the amount of each victim's loss under that standard. § 3664(e); *Hughey v. United States*, 495 U.S. 411, 413, 420 (1990) (restitution reaches only the loss "caused by" the relevant conduct).

Even ¶ 10(a)'s broader phrases — its reference to "indirect" harm — do not abandon proximate cause. Construed against the Government as drafter, those phrases identify the persons potentially covered; they do not announce a new, causation-free standard. And causation in restitution is read to incorporate proximate-cause limits as a matter of course, *Robers v. United States*, 572 U.S. 639, 645 (2014); *Paroline v. United States*, 572 U.S. 434, 444–45 (2014), so "indirectly harmed" means harmed through an indirect but legally cognizable causal chain — not harmed by the independent, superseding act of a third party. A superseding intervening cause defeats indirect causation no less than direct.

Applied here, the disputed components of the Special Master's figure — the losses traceable to the Rehabilitator's refusals of the Ares and Oaktree face-value transactions, the ten-year MOU hold, the pre-maturity sale of the protective zero-coupon bonds, and the below-market Clanwilliam sale — were produced by the Rehabilitator's own independent, discretionary

25

decisions after Mr. Lindberg had relinquished control. Those decisions are a superseding cause that breaks the causal chain — directly or indirectly — between Mr. Lindberg's conduct and the loss. *See infra* Part III. On no reading of ¶ 10(a) are they losses "harmed by [his] criminal conduct."

Two independent limits confirm the result even if ¶ 10(a) were read as broadly as the Government may urge. First, MVRA restitution is a make-whole remedy bounded by the victims' actual loss and may not confer a windfall. *Ritchie*, 858 F.3d at 216; *see* S. Rep. No. 104-179, at 13 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 926. Second, 18 U.S.C. § 3664(j)(2) bars compensating a victim twice for the same loss and requires crediting the value of all property and payments already returned; that command is independent of the plea agreement's scope. On any reading of ¶ 10(a), the documented offsets and credits totaling $2,899,418,383 meet or exceed the victims' actual loss, so "full restitution" has been satisfied and no additional sum may lawfully be ordered. *See supra* Part II.B. The amount remains the Government's to prove, § 3664(e), subject to this Court's de novo review, § 3664(d)(6).

### III. The Proximate-Cause Chain Linking Mr. Lindberg to Any Post-Rehabilitation Decline in Asset Value Has Been Repeatedly Broken by the Rehabilitator's Own Intervening Discretionary Decisions.

The MVRA's proximate-cause requirement is not boilerplate. The Supreme Court has held in unanimous terms that a restitution award requires a "direct and proximate" connection between the offense of conviction and the loss to be recovered, and that "[p]roximate cause is a standard aspect of causation in criminal law and the law of torts." *Paroline v. United States*, 572 U.S. 434, 446 (2014). The requirement of proximate cause "precludes liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.* at 445; *see also Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268–74 (1992); *Burrage v. United States*, 571 U.S. 204, 218–19 (2014).

The Government's own sentencing memorandum underscores the causal disconnect. It concedes that affiliate investment at the scale at issue was, at most, "a practice already prohibited by most states" — not by North Carolina, which "followed suit, passing a law restricting insurers from investing more than 10% of its assets in affiliated entities" only after "publicity of Lindberg's 'unusual investment strategy.'" Gov't Sentencing Mem. at 22–23 & n.12 (Doc. 508). The statute the Government invokes — the July 26, 2019 amendment to N.C. Gen. Stat. § 58-19-10 — postdates the charged conduct. A restitution figure premised on the affiliate-investment strategy itself therefore cannot satisfy the MVRA's requirement of loss directly and proximately caused by the offense of conviction, and at a minimum confirms that the causal questions here are the "complex" and not-"clearly causally linked" issues Congress placed outside mandatory restitution. *See* S. Rep. No. 104-179, at 19.

### A. *Robers* Controls: A Victim's Choice to Hold Collateral Rather Than Reduce It to Cash Within a Reasonable Time Breaks the Chain of Proximate Causation.

In *Robers*, the unanimous Supreme Court held that "[t]he basic question that a proximate cause requirement presents is whether the harm alleged has a sufficiently close connection to the conduct at issue," and that intervening acts of the victim can sever that connection. 572 U.S. at 645–46 ("Market fluctuations are normally unlike, say, an unexpected natural disaster that destroys collateral or a victim's donation of collateral or its sale to a friend for a nominal sum — any of which, as the Government concedes, could break the causal chain.").

Justice Sotomayor, joined by Justice Ginsburg, wrote separately to clarify the controlling rule in unmistakable terms: "If a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring). "[A] victim's choice to hold collateral — rather than

27

selling it in a reasonably expeditious manner — breaks the chain of proximate causation. … If the collateral loses value after the victim chooses to hold it, then that part of the victim's net los[s] is attributable to the victim's independent decisions. The defendant cannot be regarded as the proximate cause of that part of the loss, and so cannot be made to bear it." *Id.* at 648 (alteration in original).

### B. The Rehabilitator's Discretionary Refusal of Both the Ares and Oaktree Face-Value Cash Transactions Breaks the Chain of Proximate Causation A Fortiori.

*Robers* concerned a victim that **merely held** collateral rather than selling it promptly. Even that **passive** choice, the *Robers* concurrence held, can break the chain of proximate causation. 572 U.S. at 647–48. Here, the conduct of the victim's representative was substantially more affirmative. The NCDOI and the Rehabilitator did not merely fail to monetize the affiliated loans within a reasonable time. They **affirmatively refused two separate, fully-negotiated, arm's-length, face-value cash offers** — each of which Mr. Lindberg personally brought to the table, each of which was made by a sophisticated and well-capitalized third-party buyer committing its own balance sheet, and each of which would have monetized the entire affiliated-loan portfolio at par within months. Supp. SOF ¶¶ 4–29. They then **affirmatively sued** at least one further prospective arm's-length buyer to drive that buyer away. If the *Robers* concurrence's principle applies to a victim's **passive** choice to hold collateral, it applies *a fortiori* to the Rehabilitator's **active and litigated** refusal of face-value cash offers for the same asset.

### C. Compounding Application: The MOU's Ten-Year Hold of the Affiliated Loans Is the Quintessential "Victim's Choice to Hold" Under Robers.

Even if the Rehabilitator's discretionary refusals of the Ares and Oaktree transactions did not, standing alone, break the chain of proximate causation (and they do), the Rehabilitator's affirmative election in the June 27, 2019 MOU to **hold the affiliated loans for a ten-year term**

28

— rather than monetize them — is the quintessential "victim's choice to hold" addressed in *Robers*. A ten-year hold of an asset that two sophisticated buyers had just independently offered to take off the NCICs' balance sheets in cash at face value is, by any measure, **not** "reduc[ing] [the collateral] to cash within a reasonable time." *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring). Justice Sotomayor's concurrence anticipated this very scenario: "[I]f the bank waited more than a reasonable time to sell the shares, a district court could infer that the bank was not really trying to sell but instead was holding the shares as investment assets. If the shares declined in value after the bank chose to hold them, it would be wrong for the court to make the defendant bear that loss." *Id.* at 648.

### D. Application to the Restitution Figure: The Affiliated-Loan Component is Zero After Robers.

Under any reading of the plea agreement, this component supplies no recoverable loss: ¶ 10(a) reaches only losses "harmed by [his] criminal conduct," and after the credits *Robers* requires for value returned, the affiliated-loan component nets to zero. *See supra* Part II.B. The portion of the Special Master's recommended restitution figure attributable to the affiliated-loan portfolio is, after application of *Robers* and *Blake*, **zero**. The affiliated loans were not impaired at the moment of transfer: two sophisticated arm's-length buyers — Ares and Oaktree — independently priced them at par within four months of one another. The Rehabilitator refused both transactions. He then forced Mr. Lindberg to sign the MOU under threat of immediate liquidation. The MOU memorializes the Rehabilitator's affirmative election to hold the affiliated loans for ten years rather than monetize them. Under *Robers* — and under *Blake*'s requirement that any compensable loss "result[] from conduct underlying an element of the offense of conviction," 81 F.3d at 506 — any post-MOU decline in the recoverable value of the affiliated-loan portfolio is the proximate

29

consequence of the Rehabilitator's discretionary refusals and ten-year hold election, not of any conduct of Mr. Lindberg. Supp. SOF ¶¶ 36–47.

### G. The Same Analysis Disposes of the Subsequent Rehabilitator-Caused Losses.

These losses also fall outside ¶ 10(a) on any reading, since it reaches only losses "harmed by [his] criminal conduct," and each is in any event already credited against the documented offsets.The proximate-cause analysis disposes of each of the subsequent Rehabilitator-caused destruction-of-value events catalogued in Section III above: (i) the rejection of the 2023 Montshire/Bob Alban offer; (ii) the blocking of the Q1 2024 Quadro Acquisition Corp. transaction valuing the SAC group at approximately $3.4 billion; (iii) the September 2025 below-market fire-sale of Clanwilliam to TA Associates for $450 million (versus an $880 million signed Quadro valuation); (iv) the rejection of the BC Partners refinancing of UKAT that would have generated approximately $39 million for the NCICs; (v) the pre-maturity sale of the $1.006 billion face-value bank-issued zero-coupon bonds for approximately $394 million, crystallizing a $611.6 million loss; (vi) the $137 million in unrelated investment losses on portfolio decisions made by the Rehabilitator's team; and (vii) the $165+ million in fees extracted from the rehabilitation estates without any court approval as required by N.C. Gen. Stat. § 58-30-85(a)(3). Each was a "free, deliberate, and informed choice" of the victim's representative made after the cessation of Mr. Lindberg's conduct, and each is the proximate cause of the loss it produced. *See Robers*, 572 U.S. at 646; *Paroline*, 572 U.S. at 444–45; *Blake*, 81 F.3d at 506.

### H. The MVRA's Complexity Exception Counsels Against Proceeding with Asset Sales.

The MVRA provides that a court may decline to enter a restitution order if "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is

30

outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B); *see also United States v. Reifler*, 446 F.3d 65, 135–39 (2d Cir. 2006) (vacating restitution and noting that the causation and valuation difficulties "clearly implicate[]" the MVRA's complexity exception, 18 U.S.C. § 3663A(c)(3)(B)). The categorical proximate-cause issues presented by the Response — multiple independent intervening decisions by the Rehabilitator that together account for billions of dollars in destruction-of-value that the Special Master attempts to charge to Mr. Lindberg — are precisely the kind of complex causation questions the MVRA's complexity exception was designed to address. The conservative course is to stay the asset sales until the proximate-cause questions are resolved on the merits, not to proceed in the meantime as though those questions did not exist. *See United States v. Rahal*, No. 08-cr-566, 2015 WL 13736602, at *10 (E.D. Cal. Nov. 1, 2015) (declining restitution where determining the proper loss amount would involve "unresolved and complex issues of fact").

In addition, *Lagos v. United States*, 584 U.S. 577 (2018), confirms that the MVRA is to be read narrowly. *Id.* at 581 ("[T]hose words are limited to government investigations and criminal proceedings.").

**IV. Ellingburg Confirms That MVRA Restitution Is Criminal Punishment, So the Constitutional Protections That Attach to Criminal Punishment Forbid Enforcement of a Facially Unlawful Restitution Figure.**

On January 20, 2026 — after Mr. Lindberg entered his plea agreement — the Supreme Court decided *Ellingburg v. United States*, 607 U.S. ___ (Jan. 20, 2026). Justice Kavanaugh, writing for a unanimous Court, held in unmistakable terms that "Restitution under the MVRA is plainly criminal punishment for purposes of the Ex Post Facto Clause." Slip op. at 2. The Court reasoned that "[n]umerous features of the MVRA lead to that conclusion," *id.* at 2; that the MVRA labels restitution as a "penalty" for a criminal "offense"; that "[a] court may order restitution only with respect to a criminal 'defendant' and only after that defendant's conviction of a qualifying

31

crime"; and that "Restitution is imposed during 'sentencing' for the offense." *Id.* The Court further explained that "[a]t sentencing, restitution is imposed together with other criminal punishments such as imprisonment and fines," and that, for misdemeanors, restitution may be "'in lieu of' those punishments, making restitution the sole punishment for a federal offense in certain circumstances." *Id.* at 2–3 (citing 18 U.S.C. § 3663A(a)(1)). The Court relied on *Manrique v. United States*, 581 U.S. 116 (2017); *United States v. Bajakajian*, 524 U.S. 321 (1998); and *United States v. One Assortment of 89 Firearms*, 465 U.S. 354 (1984).

### A. Ellingburg Undermines the Premise of United States v. Day.

The Fourth Circuit's pre-*Ellingburg* decision in *United States v. Day*, 700 F.3d 713 (4th Cir. 2012), held that "[t]he rule of *Apprendi* is simply not implicated" by an MVRA restitution order because "there is no prescribed statutory maximum in the restitution context." *Id.* at 732. *Day*'s reasoning rested explicitly on the premise that MVRA restitution is **not** criminal punishment — the same premise that *Ellingburg* has now unanimously and squarely repudiated. Although Mr. Lindberg recognizes that *Day* is binding Fourth Circuit precedent until expressly overruled or distinguished, he preserves the objection that its reasoning has been undermined by intervening Supreme Court authority — a posture this Court is duty-bound to acknowledge.

### B. Hester, Erlinger, and Rimlawi Confirm the Direction of Sixth Amendment Doctrine.

Even before *Ellingburg*, Justice Gorsuch — joined by Justice Sotomayor — dissented from the denial of certiorari in *Hester v. United States*, 586 U.S. 1104 (2019), urging that "[t]he Sixth Amendment requires a jury to find any fact that triggers an increase in a defendant's statutory maximum sentence" and that the proper application of *Apprendi* to restitution remained an open question warranting reconsideration. *Id.* at 1106 (Gorsuch, J., dissenting). The Court reaffirmed in *Erlinger v. United States*, 602 U.S. 821, 833 (2024), that "[o]nly a jury may find 'facts that increase

32

the prescribed range of penalties to which a criminal defendant is exposed.'" (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). Most recently, in *Rimlawi v. United States*, 604 U.S. ___ (Feb. 24, 2025) (Gorsuch, J., dissenting from denial of certiorari), Justice Gorsuch reiterated that "[i]t is difficult to see how a judge's factual findings might suffice to increase a criminal defendant's exposure to a restitution award." Slip op. at 1–2 (citing *Hester*, 586 U.S. at 1106–07; *Erlinger*, 602 U.S. at 833; *Apprendi*, 530 U.S. at 490). And *Southern Union Co. v. United States*, 567 U.S. 343, 349 (2012), held that "Apprendi's 'core concern' is to reserve to the jury 'the determination of facts that warrant punishment for a specific statutory offense'" — a concern that "applies whether the sentence is a criminal fine or imprisonment or death."

### C. *Bajakajian and Timbs: The Excessive Fines Clause Applies.*

Because *Ellingburg* now establishes that MVRA restitution is criminal punishment, the Eighth Amendment's Excessive Fines Clause applies directly. *United States v. Bajakajian*, 524 U.S. 321, 334 (1998) ("[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."); *id.* at 339–40 (forfeiture that "bears no articulable correlation to any injury suffered by the Government" is unconstitutional); *Timbs v. Indiana*, 586 U.S. 146 (2019). A $1.625 billion restitution figure that is unsupported by causally traceable losses — and that, on the record before this Court, is documented to be overpaid by approximately $1.274 billion — is presumptively grossly disproportional and subject to Excessive Fines Clause scrutiny.

### D. *Two Propositions Are Beyond Debate.*

Whatever the ultimate resolution of the Sixth Amendment and Excessive Fines questions, two propositions are beyond debate: (1) because the MVRA itself prescribes the maximum permissible restitution — the actual loss directly and proximately caused by the offense of

33

conviction, less property returned, 18 U.S.C. § 3663A(a)(2), (b)(1)(B)(ii) — any restitution award (and any enforcement of that award via asset sales) above that statutory ceiling exceeds the Court's authority; and (2) because MVRA restitution is now confirmed by the Supreme Court to be criminal punishment, *Ellingburg*, slip op. at 2, executing an asset-sale process that is the operative instrument of that punishment, against a defendant who is contemporaneously challenging the lawfulness of the underlying restitution figure, raises core constitutional concerns. The most modest reading of *Ellingburg* is that the Court should resolve the underlying lawfulness of the restitution figure first, and only then permit the criminal-punishment instrumentality (the asset sales) to proceed.

### V. Once Restitution Has Been Fully Paid, No Lawful Basis Remains for the Continued Retention or Liquidation of the Primary Restitution Assets.

The Special Master Order is, by its own terms, a restitution instrument. It exists to "identify, receive, apportion, and distribute funds for restitution." Doc. No. 56 at 1. Its grants of authority to the Special Master are "subject to the Court's supervision and guidance" and expressly conditioned on the goal of restitution. The Order does not vest the Special Master with general powers over Mr. Lindberg's property, separate and apart from restitution. To the contrary, the Order limits the Special Master's liquidation authority to assets "for the benefit of the victims," and requires "Court approval to liquidate" any such assets. *Id.* ¶ 6(e).

Once the restitution obligation is fully satisfied — and *a fortiori* once it has been overpaid by $1.274 billion — the predicate for the Special Master's liquidation authority dissolves. Continued retention of the Primary Restitution Assets is no longer "for the benefit of the victims"; it is, instead, an indefinite expropriation of a defendant's property by an officer of the Court who no longer has any statutory or order-derived warrant to retain it. That is true with particular force where, as here, the actual operating control of those assets sits with a structure that has, on the

34

present record, destroyed hundreds of millions of dollars of value, extracted hundreds of millions in self-paid fees, and is presently liquidating yet further assets at $2.5 million per month in fees, with no offsetting MVRA benefit. There is no MVRA authority — and no inherent equitable authority — for a court to hold a defendant's property after restitution has been fully paid, particularly under such circumstances. *Cf. Ritchie*, 858 F.3d at 206 (federal courts must "rely on a statutory source" for restitution authority).

By analogy, Federal Rule of Criminal Procedure 41(g) provides that "[i]f [the Court] grants the [return-of-property] motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings." The property owner is presumed to have a right to return; the government bears the burden of demonstrating a legitimate retention interest. *Cf. United States v. Wilson*, 540 F.2d 1100, 1103 (D.C. Cir. 1976).

## VI.    In the Alternative, the Eight De Minimis SACs Identified in the Clanwilliam Sale Order Should Be Returned to Mr. Lindberg's Control With Immediate Effect.

Even if the Court is not yet prepared to rule on the broader question of whether restitution has been fully paid, the case for immediate return of the De Minimis SACs is independent, narrower, and overwhelming.

### A.    The Clanwilliam Sale Order Identifies Eight SACs That NHC States May Have No Further Material Value to NHC.

Paragraph 20(h) of the Clanwilliam Sale Order — to which the United States, the Special Master, NHC, and Mr. Lindberg are all parties — expressly identifies eight SACs that NHC, in its own assessment, may "ha[ve] no further material value to NHC and NHC does not otherwise intend to sell" them. Doc. No. 66, ¶ 20(h). Because the entity currently holding these eight companies has itself represented that they hold no further material value to it and that it does not intend to sell them, there is no restitution-based justification for their continued retention.

35

### B. Mr. Lindberg Is the Only Party With a Demonstrated, Contemporaneously-Documented Ability to Build Value in the SACs.

The question of who should hold the De Minimis SACs going forward is not, on this record, a close one. The contemporaneous documentary evidence — contemporaneous board materials, contemporaneous valuations, signed third-party purchase agreements, and the Rehabilitator's own internal financial records — establishes that:

1. Mr. Lindberg built the SACs **from nothing** over a period of more than two decades, ultimately generating nearly $1 billion of his own personal capital that he then invested into the NCICs. He extracted **zero** dividends. He was a **net contributor** of capital to the insurance companies for years.

2. Under his management, the SACs grew from approximately $1.5 billion in aggregate value in 2019 to approximately **$3.4 billion** by Q1 2024 — a $1.9 billion increase, signed by an arm's-length public-company buyer (Quadro, NASDAQ: QRDO) at a public-market 22.14x EBITDA multiple consistent with the comparable public companies in the sector. In total, Mr. Lindberg's companies were producing **$300+ million in EBITDA** annually.

3. The comparable EBITDA multiples used to price the Quadro transaction have not contracted; they have **expanded** from 22.14x in Q1 2024 to approximately 24.37x as of November 2025. There is no exogenous market reason the SACs cannot continue to perform at or above the value Mr. Lindberg established. There is every reason to expect that, if returned to a proven operator, they will.

4. Mr. Lindberg's investment strategy was approved by the NCDOI in 2014 before he made the first affiliated investment, has been replicated by major U.S. insurance industry players (Blackstone, KKR, Apollo, Brookfield, Security Benefit/Eldridge), and was implemented

36

under a documented Risk Mitigation Policy that the contemporaneous EBITDA performance and the signed Quadro purchase agreement confirm was successful.

Against that record, the Rehabilitator's record — documented in the Factual Background, Section III, above — stands in stark contrast: $454 million in destroyed NCIC baseline value; $137 million in unrelated investment losses; $611.6 million in protective-bond losses; $474 million in below-market Clanwilliam losses; $39 million in lost UKAT refinancing; five blocked monetization transactions; affirmative litigation against prospective buyers; and $165+ million in self-paid fees with no court approval as required by N.C. Gen. Stat. § 58-30-85(a)(3). The pattern is unambiguous: under one steward, value compounded; under the other, value collapsed.

The De Minimis SACs do not exist in equipoise between two equally plausible managers. They exist in a documented record in which one steward has been demonstrably effective and the other has been demonstrably destructive. Where the parties have already stipulated, in a filing in this very docket, that NHC does not intend to sell these eight companies, the only rational and equitable disposition — particularly in a matter in which *Ellingburg* has now confirmed that the asset-sale apparatus is an instrument of criminal punishment — is to return them to the party with the demonstrated ability to build their value.

### C. The Equities Compel Return.

The factual record before this Court establishes that the Rehabilitator destroyed the $454 million NCIC value baseline that the Rehabilitator's own team established as of November 2018; blocked or refused multiple billion-dollar-plus monetization transactions; incurred $137 million in unrelated investment losses; crystallized $611.6 million in protective-bond losses; sold Clanwilliam at $474 million below the signed public-market valuation negotiated by Mr. Lindberg; refused a $39 million UKAT refinancing; affirmatively litigated against a prospective arm's-length buyer; and extracted more than $165 million in fees from the very estates supposed to be preserved

37

for victims — a $2.5 million-per-month extraction that continues today, on the present record, without any court approval as required by N.C. Gen. Stat. § 58-30-85(a)(3). By contrast, Mr. Lindberg's management of the SACs produced $1.9 billion in value creation between 2019 and 2024. Where the parties themselves have stipulated that eight specific companies have no further restitution value and are not intended to be sold by the entity holding them, and where that entity is part of a structure with a documented track record of value destruction, the equitable course — particularly in a matter where the Supreme Court has just confirmed in *Ellingburg* that the asset-sale apparatus is an instrument of criminal punishment — is to return those companies to the party who can preserve and grow their value. There is no countervailing equitable interest on the other side of the ledger: NHC stipulates it does not intend to sell them.

**VII.**     **The Equities Strongly Favor the Relief Requested: Irreparable Harm Is Certain, and the Government and Victims Suffer No Cognizable Prejudice.**

        ***A.***  ***Irreparable Harm.***

Once an asset is sold, it is gone. The threatened loss of unique business assets, including loss of going-concern value, is the paradigm of irreparable harm for purposes of preliminary injunctive and stay relief. *Cf. Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019) (treating as irreparable an injury a court cannot remedy after a final determination on the merits and that is not otherwise compensable in damages); *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (preliminary injunctive relief is an extraordinary remedy meant to prevent irreparable harm and available only on a clear showing). A defendant who is later determined to have overpaid by $1.274 billion cannot un-sell the assets used to fund the overpayment. And no money judgment against the victim insurance companies or their guaranty associations — already in rehabilitation, with $165+ million in administrative fees having been extracted from those very

estates over the last seven years and an additional $2.5 million flowing out per month — would meaningfully restore Mr. Lindberg.

The irreparable harm is compounded, not mitigated, by the record on stewardship. Every asset sale by the present control structure is, in light of the Clanwilliam transaction's $474 million undervaluation, presumptively a below-market sale; and every dollar of sale proceeds, before reaching the Pre-Designated Restitution Parties, is subject to a documented $2.5 million-per-month draw of unapproved fees. Even setting aside the legal merits, the assets are presently being eroded both directly (through fees) and indirectly (through below-market sales). The status quo of "wait and see" is not a neutral status quo.

A further and independent dimension of irreparable harm arises from the manner in which the Specified Affiliated Companies are presently being managed. Every one of the SACs is now being operated on a short-term, for-sale footing rather than for sustained operation. That posture is, irrespective of any sale that ultimately closes and irrespective of the merits of the underlying restitution figure, itself a continuing destroyer of going-concern value: it signals instability to customers, counterparties, and key employees; it suppresses long-horizon investment in research, capital expenditure, and human capital; and it produces the well-documented "forced-sale" or "fire-sale" discount that financial-economics literature has recognized for decades as the predictable consequence of selling productive enterprises under time pressure. *See generally* Andrei Shleifer & Robert W. Vishny, *Fire Sales in Finance and Macroeconomics*, 25 J. Econ. Persp. 29, 30 (2011) (a fire sale is "essentially a forced sale of an asset at a dislocated price," yielding prices "far below value in best use, causing severe losses to sellers"). The empirical confirmation of this dynamic on the present record is the September 2025 Clanwilliam sale to TA Associates for approximately $450 million — a $474 million below-market shortfall against the

$880 million signed Q1 2024 Quadro purchase-agreement valuation, with no offsetting deterioration in the company's fundamentals (the comparable public-company EBITDA multiples in fact appreciated from 22.14x to 24.37x over the interval). SOF ¶ 75 & Exs. G3, I3, I4. The same management dynamic that produced the Clanwilliam shortfall is now in place across the balance of the Primary Restitution Assets, including in connection with the recent Beckett refinancing. Every additional sale conducted under that posture imposes a further increment of value destruction — and value destruction of a kind not curable by money damages, because no remedy exists against the victim insurance companies and their guaranty associations to which the discounted proceeds will have been distributed.

Compounding the foregoing is a structural one-way ratchet built into the MVRA itself. Once restitution proceeds are paid out by the Special Master to the Pre-Designated Restitution Parties, the statute provides Mr. Lindberg with *no* mechanism to recover those funds — even if the restitution figure is later corrected downward, even if it is later determined that no restitution was owed at all, and even if it is later determined (as the documentary record demonstrates) that Mr. Lindberg has overpaid. Section 3664(j)(2) operates in only one direction: "Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss." 18 U.S.C. § 3664(j)(2). The statute thus authorizes the offset of later civil recoveries against further restitution payments; it does not authorize the recovery of restitution proceeds already in the victim's hands. There is no statutory clawback, and the MVRA's general framework treats restitution payments — once received by the victim — as belonging to the victim, not as subject to subsequent disgorgement. The practical consequence is concrete: if asset sales proceed and proceeds are distributed to the Pre-Designated Restitution Parties — many of which are insurance companies in rehabilitation, with assets depleted by more

40

than $165 million in administrative fees over seven years and continuing to be depleted at approximately $2.5 million per month — Mr. Lindberg will, as a practical matter, have no remedy of any kind. The money will be gone. The assets that funded the money will be gone. And no later judicial determination — no correction of the restitution figure, no final adjudication of the Response, no appellate reversal — will restore either.

There is a third and decisive dimension to the irreparable-harm analysis. The entire gap between Mr. Lindberg's documented offset position ($2,899,418,383) and the Court's entered figure ($1,655,000,000) consists *exclusively* of credits attributable to prior sales and other transactions that have *already occurred. See* Response §§ II.A–II.G; SOF ¶¶ 41–54, 63–77. Those credits include the $352.9 million AAPC preferred-equity transfer to ULICO in December 2022; the $611.6 million loss crystallized by the Rehabilitator's pre-maturity sale of $1,006,239,867 in protective bank zero-coupon bonds; the $243.4 million in post-MOU zero-coupon-bond proceeds already received by the victims; the $474 million Clanwilliam below-market loss; the $39 million UKAT/BC Partners loss; the $79.6 million in additional cash payments to Pre-Designated Restitution Parties; the $27.8 million SNIC capital contribution under the Dogwood escrow; the $13.6 million in real-estate sale proceeds to ULICO; and the $3 million CBL subordination fee paid in connection with the Beckett refinancing. These are not speculative future credits. They are historical, documented, and quantified transactions that have already taken place.

That fact transforms the irreparable-harm calculus. If Mr. Lindberg's documented credits are correct — and they are supported by contemporaneous third-party documentary evidence — then restitution under the MVRA has been fully satisfied, no further sales are necessary to satisfy any cognizable MVRA obligation, and the proceeds of any further sales would, on the documentary record, be owed *to Mr. Lindberg* rather than to the Pre-Designated Restitution

41

Parties. Continued asset sales in that posture do not advance restitution; they instead liquidate Mr. Lindberg's property to fund a recovery that has — by approximately $1.244 billion — already been completed, under a statute that provides no clawback once the proceeds are disbursed. *Cf. Ritchie*, 858 F.3d at 216 (the MVRA "does not allow a court to grant a windfall to the victim"). The asymmetry of consequence is decisive and supports the requested stay. If the stay is granted and Mr. Lindberg is ultimately wrong on the credits, every asset that exists today will still exist tomorrow, and can be sold tomorrow at the same value or higher (given the documented upward trajectory of comparable EBITDA multiples). The Government and the victims lose nothing more than a brief delay. If the stay is denied and Mr. Lindberg is ultimately right on the credits — as the contemporaneous documentary record establishes he is — the assets will have been liquidated below market, the proceeds will have been disbursed to victims from whom no recovery is available, the $1.244 billion overpayment will compound, and Mr. Lindberg will be left with no meaningful remedy. The only path that preserves the Court's full range of remedial options — and that protects against the asymmetric and irreversible harm threatened by the alternative — is to stay.

A final, especially urgent dimension of irreparable harm is established by what has already happened: the recent Beckett sale was effectuated *without the prior court approval* that Paragraph 6(e) of the Order Appointing Special Master expressly requires. Doc. No. 56, ¶ 6(e) (the Special Master "shall seek Court approval to liquidate … any available assets for the benefit of victims"). The Special Master Order's sequencing — Court approval first, liquidation second — is not advisory. It is the structural protection this Court built into the Special Master's authority precisely to ensure that asset dispositions occur only with judicial oversight, only on a properly developed record, and only after the affected parties (including Mr. Lindberg) have had an opportunity to be

heard. The Special Master sought such approval for Clanwilliam. *See* Doc. No. 66 (Clanwilliam Sale Order). No equivalent order was sought or entered for Beckett. The fact that the Beckett sale nonetheless proceeded — transferring a Lindberg-related asset outside his control, generating proceeds outside the framework of court-approved disposition, and exposing those proceeds to the same no-clawback dynamic discussed above — is a concrete demonstration that, absent the requested stay, the Court's express supervisory architecture will continue to be circumvented as additional sales are consummated.

Every further sale conducted without prior court approval is, by itself, an irreparable harm of a distinct kind: it erodes the Court's Paragraph 6(e) supervisory authority; it deprives Mr. Lindberg of the procedural protection that the Special Master Order extends to him as the owner of the assets being disposed of; and — once consummated — it cannot be undone, because title has changed, consideration has been disbursed, and (as set out in the preceding paragraphs) the MVRA provides no mechanism to recover the proceeds. That a sale of this nature has *already* occurred is not a theoretical risk; it is a present, ongoing breach of the Court's express order, and a sufficient ground — standing alone — for the immediate entry of the requested stay. *Cf. La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (the use of masters is to aid the court "and not to displace" it).

### B.    *No Cognizable Prejudice to the Government or the Pre-Designated Restitution Parties.*

The Government and the Pre-Designated Restitution Parties suffer no cognizable prejudice from a stay or from the return of the De Minimis SACs. The assets are not perishable. They are not in flight. They cannot run away in the night. And as to the De Minimis SACs specifically, the parties have themselves stipulated that those entities have no further material value to NHC and that NHC does not intend to sell them. The only thing returning them prevents is further value

43

destruction under the present control structure. The only thing the stay prevents is the irretrievable liquidation of property to fund a restitution obligation that the law does not permit.

### C. The Public Interest.

The public interest in the enforcement of restitution orders is real, but it is an interest in **correct** enforcement — not in the rushed liquidation of a defendant's assets to fund a recovery in excess of the victim's actual loss. The public interest in the integrity of federal criminal proceedings, in scrupulous adherence to the statutory limits of the MVRA, in the protections that attach to criminal punishment under *Ellingburg*, and in the basic principle that court-appointed officers must operate "subject to the Court's supervision and guidance" rather than as autonomous instruments of value destruction, all favor the relief Mr. Lindberg requests.

### D. Mr. Lindberg's Demonstrated Cooperation and Track Record of Value Creation.

Mr. Lindberg has not shirked his obligations. In December 2025, his actions facilitated the payment of over **$157 million to over 43,000 excess policyholders** of the NCICs, ensuring that every policyholder of his American insurance companies has been made whole. SOF ¶ 83. He voluntarily relinquished a $40 million tax escrow that had been established for his benefit in connection with the September 2025 Clanwilliam sale, precisely so that those policyholder payments could be made. Supp. SOF ¶ 64. He has cooperated with the Special Master, has produced voluminous records, and has directed his counsel to engage with the Special Master and the Government on a weekly basis. And, as set forth in the Factual Background, Section III, above, Mr. Lindberg's management of the SACs produced $1.9 billion in value creation between 2019 and 2024, was built upon nearly $1 billion of his own personal capital invested into the NCICs over the years, generated zero dividends in his favor, and is independently corroborated by the

44

BRG forensic analysis identifying damages in excess of $400 million caused by the regulatory process itself.

<b>CONCLUSION</b>

For the foregoing reasons, Defendant Greg E. Lindberg respectfully requests that the Court enter an Order: (i) staying all further sales of his assets, and all further asset-sale processes, pending adjudication of his Response and the entry of a final restitution order in this case; (ii) directing the return of the Primary Restitution Assets, as defined in the Special Master Order, to Mr. Lindberg's full ownership and control on the ground that restitution has been fully paid and overpaid by approximately $1.274 billion; and (iii) in the alternative, directing the immediate return to Mr. Lindberg's full ownership and control of the eight De Minimis SACs identified in the Clanwilliam Sale Order at Paragraph 20(h). The contemporaneous record establishes that the present control structure has destroyed billions of dollars in value and continues to draw approximately $2.5 million per month in fees against the assets it purports to manage, while Mr. Lindberg himself has a twenty-year, third-party-corroborated track record of building value across the same companies. Whatever the ultimate disposition of the broader restitution dispute, on the De Minimis SACs at least, there is no rational basis to leave those eight companies in the hands of an entity that has stipulated it does not intend to sell them and that has demonstrated, over six years, that it does not know how to grow them.

Dated: June 9, 2026.

Respectfully submitted,

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

45

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

Pursuant to the Court's June 18, 2024 Standing Order, which was published to the Bar of the Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1.  No artificial intelligence was employed in doing the research for the preparation of this Emergency Motion and accompanying Memorandum of Law, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg.

2.  Every statement and every citation to an authority contained in this Motion and Memorandum of Law has been checked by an attorney in this case and/or a paralegal working at his or her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: June 9, 2026.

/s/    Kenneth Barnes
       Kenneth Barnes

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of June 2026, I caused a true and correct copy of the foregoing Defendant Greg E. Lindberg's defendant Greg E. Lindberg's Emergency Motion (I) To Stay All Further Asset Sales And Asset-Sale Processes And To Stay Enforcement Of The Preliminary Order Of Restitution (Doc. No. 161); (Ii) To Correct And Amend The Preliminary Order Of Restitution To Conform To The Mandatory Victims Restitution Act; (Iii) To Return The Primary Restitution Assets To Defendant's Control On The Ground That Restitution Has Been Fully Paid And Overpaid; And (Iv) In The Alternative, To Return The De Minimis Sacs Identified In The Clanwilliam Sale Order To Defendant's Control With Immediate Effect, together with the supporting Memorandum of Law, to be filed with the Clerk of the Court for the United States District Court for the Western District of North Carolina using the Court's electronic filing system, which will serve notice on all counsel of record.


/s/     Kenneth Barnes_____
Kenneth Barnes

47