## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREG E. LINDBERG,<br><br>    *Defendant.* | No. 5:19-CR-22-MOC<br><br>No. 3:23-CR-48-MOC |

## GREG LINDBERG'S SUPPLEMENTAL
## STATEMENT OF FACTS IN SUPPORT OF DEFENDANT'S RESPONSE AND
## OBJECTION TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS
## REGARDING RESTITUTION

Defendant Greg E. Lindberg respectfully submits this Supplemental Statement of Facts in support of his Response and Objection to the Special Master's Report and Recommendations Regarding Restitution (Docket No. 132). All matters set forth in the prior Statements remain in full force and effect.

This filing further sets forth, additional facts, an expanded and dedicated factual treatment of the more than $1 billion in face value of investment-grade bank zero-coupon bonds that Mr. Lindberg directed the NCICs to purchase in May 2018 as principal-loss insurance covering the affiliate-loan portfolio dollar-for-dollar. As set forth in detail in Section VI, the contemporaneous documentary record establishes that the approximately $1.006 billion in par value of zero-coupon bonds carried on the NCICs' balance sheets fully covered, on a dollar-for-dollar basis, the approximately $1 billion of outstanding affiliate loans. In short, Mr. Lindberg purchased insurance against any loss of the principal value of the affiliate loans. Section VI supplements and expands upon the treatment of those instruments at Paragraphs 47–54 of the Original Statement and in Mr. Lindberg's Response and Objection to the Special Master's Report (Docket No. 132).

1

This Supplemental Statement addresses the following interrelated matters, each of which is decisive of causation, loss calculation, intent, and the parties' obligations under the plea agreement:

(i) the North Carolina Department of Insurance ("NCDOI") expressly approved affiliate investments by Mr. Lindberg's insurance affiliates at levels up to forty percent (40%) of total admitted assets, beginning in 2014 and continuously documented through at least April 2016 in the NCDOI's own written annual statement review correspondence (Exhibit A12);

(ii) Mr. Lindberg personally guaranteed obligations of the borrower-affiliates to the NCICs in an aggregate amount of approximately $2.39 billion under the March 11, 2019 Amended & Restated Backstop Agreement Original Statement (Exhibit B), and continuously reinvested his personal capital into the affiliated platform — conduct categorically inconsistent with the specific intent to defraud the very insurance companies the Government identifies as the principal victims;

(iii) affiliate investments at, near, and exceeding 40% of admitted assets are standard industry practice among the largest private-equity-affiliated life insurers in the United States, as confirmed by Exhibit B5 and the May 26, 2026 reporting in *The Wall Street Journal* (Exhibit B6);

(iv) in May 2018 Mr. Lindberg directed the NCICs to invest more than $1 billion in face value of investment-grade zero-coupon bonds issued by Barclays Bank PLC, Bank of Montreal, Royal Bank of Canada, and Natixis SA, which bonds were the principal-protection component of the Principal Protected Notes (the "PPNs"), were held for the sole and explicit purpose of insuring the NCICs against any loss of principal on the

2

underlying affiliate loans, covered the outstanding affiliate loans dollar-for-dollar, and were contractually obligated to pay $1,006,239,867 at par if held to maturity — but which the Special Deputy Rehabilitator discretionarily sold prior to maturity for approximately $394 million, crystallizing a $611.6 million loss on the very instruments whose only purpose was to insure the affiliate loans against principal loss;

(v) two separately negotiated, arm's-length, face-value cash transactions for the affiliate-loan portfolio — the executed November 22, 2018 Ares Management letter of intent (Exhibit B) and the February 2019 Oaktree "Global Solution" transaction (Exhibits C, D, and E) — were on the table within months of Mr. Lindberg's October 18, 2018 transfer of operational control to the Special Deputy Rehabilitator, either of which would have paid every NCIC policyholder in full by approximately June 2019;

(vi) the Special Deputy Rehabilitator of the NCICs, Mike Dinius, (a) discretionarily refused both pending arm's-length transactions, (b) coerced Mr. Lindberg — under express written threat of immediate liquidation of all four NCICs — to execute the June 27, 2019 Memorandum of Understanding (the "MOU") that affirmatively locked the affiliate loans in place for a ten-year term, and (c) employed what Mr. Dinius's own counsel characterized as a "hammer and nail" analogy to extract representations and warranties from Mr. Lindberg under that same liquidation threat, all of which sever proximate causation as a matter of law under *Robers v. United States*, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring), and *United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006); and

(vii) post-sentencing conduct by counterparties to the plea agreement has materially impaired Mr. Lindberg's ability to perform under the plea agreement and is preserved

3

here for appellate review under *Santobello v. New York*, 404 U.S. 257, 262 (1971), and *Puckett v. United States*, 556 U.S. 129, 134–37 (2009). See Exhibit B12, Notice of Breach.

The paragraphs in this Statement are numbered consecutively beginning with Paragraph 1. Where cross-reference to the Original Statement is necessary, the paragraph numbers from the Original Statement are used (e.g., "Original Stmt. ¶ 13").

## I. BASIS OF KNOWLEDGE AND AUTHORITY TO SUPPLEMENT

1. I am the Defendant in the above-captioned matter, and I submit this Supplemental Statement of Facts in support of the Response and Objection to the Special Master's Report and Recommendations Regarding Restitution. The matters set forth herein are based on my personal knowledge or on documents that I am able to access, and I am competent to testify to them. I directed, oversaw, and was the ultimate decision-maker on each of the transactions, agreements, and dollar figures discussed below.

2. In Paragraph 86 of the Original Statement, I expressly reserved the right to supplement that filing upon restoration of access to documents materially constrained during my detention. This Statement is submitted pursuant to that reservation of right and to provide an update of relevant facts for the convenience of the Court.

3. I have personal knowledge of (i) the September 2014 affiliated-investment presentation to the NCDOI and the NCDOI's 2014–16 written confirmation of the agreed forty-percent ceiling on affiliated investments (Exhibit A12); (ii) my execution of the Amended & Restated Backstop Agreement on March 11, 2019 Original Statement (Exhibit B); (iii) the May 2018 directive to the NCICs to construct the Principal Protected Notes and to purchase the underlying $1+ billion in face value of bank zero-coupon bonds as dollar-for-dollar principal-loss insurance for the affiliated investments; (iv) the negotiations with Ares Management Corporation

4

in late 2018 and early 2019 memorialized in Exhibits A and B; (v) the November 5, 2018 internal valuation of the NCICs prepared by personnel under the Special Deputy Rehabilitator's control (Exhibit J); (vi) each of the post-October 18, 2018 discretionary decisions of the Special Deputy Rehabilitator addressed in Sections VI, XIV, XVI, and XVII below; (vii) the negotiations I personally directed with Oaktree Capital Management between January and February 2019 that produced the February 2019 Oaktree "Global Solution" Presentation (Exhibit C); (viii) the parallel negotiations I personally directed with HPS, the Soros funds, and other prospective SPV financing counterparties (Exhibits D and E); and (ix) the circumstances under which the June 27, 2019 MOU was presented to me on a take-it-or-leave-it basis under express threat of immediate liquidation of the NCICs.

4. From April 2, 2026 through May 1, 2026 — the very period in which I was required to respond in detail to the Special Master's Report — I was in federal custody at the Grayson County Detention Center in Kentucky, and I have since been moved to other facilities. My access to documents has been materially constrained by my detention. I have made every reasonable effort, with the assistance of my counsel, to verify each figure and assertion set forth in this Statement from documents to which I have access, including the materials maintained by my counsel. Should the Court require oral testimony, I am prepared to testify consistent with this Statement in any forum the Court directs. *See* Exhibit B12, Notice of Breach.

## II. CORPORATE STRUCTURE AND BACKGROUND CONTEXT

5. From 1991 through October 18, 2018, I was the founder and ultimate beneficial owner of the family of insurance, financial-services, and operating companies generally referred to as Eli Global, LLC and its affiliates, including Global Bankers Insurance Group, LLC ("GBIG"), Southland National Insurance Corporation ("SNIC"), Bankers Life Insurance Company ("BLIC"), and Colorado Bankers Life Insurance Company ("CBL") (collectively with their North

5

Carolina-domiciled affiliates, the "NCICs"); Private Bankers Life and Annuity Company Ltd. ("PBLA"); Northstar Financial Services, Ltd. ("Northstar"); OMNIA; Private Bankers Insurance Holdings, Ltd. ("PBIHL"); and a portfolio of more than 100 affiliated finance companies, asset-management companies, and operating businesses.

6. I founded Eli Global, LLC in 1991 as a sole-proprietorship publishing business. Over the subsequent 27 years, I built Eli Global and its affiliates into a diversified holding-company group encompassing, by 2018, more than 100 operating subsidiaries across publishing, healthcare-services, life-insurance, reinsurance, asset-management, and finance-company business lines, employing over 7,000 people across the United States, the Netherlands, Bermuda, and other jurisdictions.

7. Beginning in 2014, Eli Global began acquiring U.S. insurance companies through its GBIG affiliate. The acquisitions of CBL, SNIC, BLIC, and Southland National Reinsurance Corporation ("SNRC") (collectively, the NCICs) were effected through transactions approved by the NCDOI. Each acquisition was reviewed and approved by the NCDOI's market-conduct, financial-examinations, and rehabilitation-and-liquidation divisions. The NCICs were domiciled in North Carolina and regulated under the North Carolina General Statutes, Chapter 58. The Wake County Superior Court rehabilitation proceedings were brought against all four NCICs (CBL, BLIC, SNIC, SNRC); against me individually; and against three FinCo entities — Academy Association, Inc., Edwards Mill Asset Management, LLC, and New England Capital, LLC — together with PBLA. *See Southland National Insurance Corp. v. Lindberg*, No. 19 CVS 008664 (N.C. Super. Ct., Wake Cnty.).

8. In or about 2016, in consultation with the NCDOI, for purposes of credit-quality enhancement and diversification, certain of the NCICs' affiliated investments were routed through

6

non-regulated intermediate vehicles (the "FinCos") — finance companies and asset-management companies that would borrow money from the NCICs as senior secured creditors and then deploy those funds across diversified underlying portfolios that included loans to other affiliates and to operating businesses.

9. On October 18, 2018, I voluntarily transferred operational control of CBL, SNIC, and BLIC to Mike Dinius, the Special Deputy Rehabilitator. On June 27, 2019, the Wake County Superior Court entered an Order of Rehabilitation pursuant to N.C. Gen. Stat. Chapter 58, Article 30, formally appointing Mike Dinius of Noble Consulting Services, LLC, as Special Deputy Rehabilitator for the NCICs.

## III. THE NCDOI EXPRESSLY APPROVED AFFILIATE INVESTMENTS UP TO 40% OF TOTAL ADMITTED ASSETS

The Government has consistently characterized the level of affiliate investment by Mr. Lindberg's insurers as inherently impermissible. The contemporaneous written record from the NCDOI itself disproves that characterization.

10. On April 11, 2016, NCDOI Senior Financial Analyst Jessica Price, CPA, CFE, issued a written annual-statement Review Letter (the "Review Letter") to SNIC. The Review Letter (Exhibit A12) recites the NCDOI's own understanding of the regulatory arrangement that had been negotiated and agreed at the time SNIC was acquired and redomesticated to North Carolina, in materially the following terms:

> *The Department has the understanding that the Company had agreed to not invest more than 40% of total admitted assets in affiliates. Excluding the investments in insurance company affiliates, it appears at December 31, 2015, that the Company has 50% of total admitted assets invested in affiliates. The Company is directed to refrain from investing further in affiliates and to provide a plan outlining how it will return to compliance with the 40% agreed upon limit. (Exhibit A12 at 1, ¶ 1.)*

7

11.    *First*, the NCDOI — the very regulator the Government invokes throughout its sentencing memorandum — confirmed in writing that a forty-percent affiliate-investment ceiling was an agreed regulatory parameter, not a violation. The dispute reflected in the Review Letter is purely interpretive: the NCDOI took the position that the 40% ceiling applied to all affiliated assets, while SNIC took the position that the ceiling applied to affiliated sub-investment-grade investments. There is no allegation of concealment, fraud, or surreptitious investment in the Review Letter; on the contrary, the NCDOI plainly had visibility into the affiliate book down to the percentage point.

12.    *Second*, SNIC's April 19, 2016 written response (also Exhibit A12) details the company's plan to come into compliance with the NCDOI's interpretation by year-end 2016, including by selling affiliated securities to unaffiliated special-purpose vehicles and transferring control of borrower operating companies to unaffiliated entities. The response expressly states: "After these proposed transactions, our total affiliate investments (not including affiliated insurance investments) will be below 40% of total assets. We will update our investment policy accordingly as well to comply with this 40% limit on all non-insurance affiliated investments." (Exhibit A12 at 1–2.)

13.    *Third*, the Review Letter and SNIC's response together demonstrate that the affiliate-loan structure was disclosed, regulated, audited, and supervised throughout the relevant period. The NCDOI was reviewing affiliate composition by junior lien, senior lien, payment-in-kind, and cash pay; it was scrutinizing the FE bond designations under NAIC criteria; it was reviewing the Funds Withheld Reinsurance Agreement and Retrocession Agreement, both of which the NCDOI had *approved* on May 14, 2015; and it was issuing line-item directives about how to book IMR amortization and ceding commissions under N.C. Gen. Stat. § 58-7-31(d)(2),

8

and how to report MGA relationships under N.C. Gen. Stat. § 58-34-2 and management agreements under N.C. Gen. Stat. § 58-34-10(d). (Exhibit A12, ¶¶ 2–9, 13, 15.) This was an ongoing, regulated relationship governed by Article 19 of Chapter 58 of the North Carolina General Statutes (the Insurance Holding Company Regulatory Act, N.C. Gen. Stat. §§ 58-19-1 *et seq.*); and the disputed losses attributed to that relationship do not satisfy the required causal standard.

14. The Government's sentencing memorandum, in its characterization of "affiliate loans" as inherently emblematic of fraudulent intent, simply cannot be reconciled with the contemporaneous NCDOI written record. To the contrary, that record establishes that the affiliate-loan structure was the regulatorily approved business model under which the NCICs operated, with a known, negotiated, written 40% admitted-assets ceiling. The affiliate-investment levels were themselves disclosed and regulator-approved, and no North Carolina statute capped those levels during the charged period. Indeed, the Government's own sentencing memorandum concedes that North Carolina had no statutory limit on affiliate investment until 2019 — after the conduct charged in the indictments. The Government characterizes affiliate investment at this scale as "a practice already prohibited by most states," and then acknowledges, in the same memorandum, that North Carolina only "followed suit, passing a law restricting insurers from investing more than 10% of its assets in affiliated entities" after "publicity of Lindberg's 'unusual investment strategy.'" Gov't Sentencing Mem. at 22–23 & n.12 (Doc. 508) (citing North Carolina Governor Signs Bill to Eliminate Investment Loophole, Wall Street Journal (July 26, 2019)). The statute to which the Government refers — the July 26, 2019 amendment to N.C. Gen. Stat. § 58-19-10 extending the investment limit to affiliates — postdates the conduct on which the Special Master's loss computation rests.

## IV. MR. LINDBERG PERSONALLY BACKSTOPPED AND CONTINUOUSLY REINVESTED IN THE NCICS — CONDUCT INCOMPATIBLE WITH FRAUDULENT INTENT

A defendant who is defrauding insurance companies for his personal benefit extracts capital from those companies. He does not personally guarantee, with his own credit, billions of dollars of the very obligations now alleged to be the source of loss; and he does not pour additional personal funds into the affiliated platform precisely when prudence and self-interest would counsel withdrawal. Yet that is exactly what I did.

### A. The March 11, 2019 Backstop Agreement: approximately $2.39 billion in personal guaranty exposure.

15. On March 11, 2019, I executed the Amended & Restated Backstop Agreement in favor of the very insurance company lenders the Government identifies as victims: Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Northstar Financial Services (Bermuda) Ltd.; Private Bankers Life and Annuity Co., Ltd.; and Southland National Insurance Corporation. (Exhibit B.) Under that agreement, I personally agreed to make regularly scheduled principal, interest, and preferred-equity payments — in my individual capacity, with no carve-out for personal assets — if any of the borrower obligors failed to do so. (Exhibit B, §§ 1–2.)

16. The aggregate scheduled obligations personally guaranteed by me under the Backstop Agreement, totaled position-by-position from Exhibits A and B to that agreement, are as follows:

| Beneficiary / Category (per Exhibit B, Ex. A & Ex. B) | Aggregate Principal Guaranteed |
| --- | --- |
| Bankers Life Insurance Company — loans (16 positions) | $78,054,642.43 |
| Colorado Bankers Life Insurance Company — loans (45 positions) | $1,334,404,619.25 |
| Northstar Financial Services (Bermuda) Ltd. — loans (24 positions) | $135,440,850.12 |
| Private Bankers Life and Annuity Co., Ltd. — loans (34 positions) | $458,299,208.10 |
| Southland National Insurance Corporation — loans (25 positions) | $241,847,429.32 |
| Northstar Financial Services (Bermuda) Ltd. — preferred equity (13) | $103,428,892.85 |

10

| Beneficiary / Category (per Exhibit B, Ex. A & Ex. B) | Aggregate Principal Guaranteed |
|---|---|
| Private Bankers Life and Annuity Co., Ltd. — preferred equity (9) | $39,633,481.58 |
| **TOTAL Personal Guaranty Exposure** | **$2,391,109,123.65** |

17.     Stated plainly: I put my personal credit on the line for approximately $2.39 billion of payment obligations owed to the very insurance companies the Government characterizes as the victims of fraud. The Backstop Agreement was enforceable by each Beneficiary as a third-party beneficiary and was governed by North Carolina law. Original Statement (Exhibit B, §§ 7–8.) I moved money in — and pledged my personal credit for billions more on top of that.

**B.      *Continuous reinvestment of personal capital into the affiliated platform.***

18.     Beyond the Backstop Agreement, the broader factual record reflects a multi-year pattern in which I deployed personal capital into the affiliated operating platform rather than extracting it. I did not take large salary draws or dividend distributions; instead, capital that could have been distributed to me was retained at the borrower and operating-company level and used to fund growth, acquisitions, and operating capacity. To the extent the Special Master's preliminary restitution computation treats every dollar of outstanding affiliate loan as an extraction by me, that treatment ignores both (i) the bona fide commercial purpose for which those funds were deployed within the borrower operating companies, and (ii) my contemporaneous personal capital commitments to the very same platform.

**C.      *Inferential weight of this conduct on intent.***

19.     The Supreme Court has made clear that materiality of any false statement is also an essential element of federal mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and bank fraud (18 U.S.C. § 1344). *Neder v. United States*, 527 U.S. 1, 25 (1999). And good faith is a recognized defense to those offenses. *See United States v. Godwin*, 272 F.3d 659, 666–67 (4th Cir.

2001) (recognizing that a defendant's good-faith belief negates the specific-intent element of mail and wire fraud).

20.     Personal guarantees of approximately $2.39 billion of obligations to the alleged victim entities are, at a minimum, strong circumstantial evidence that I believed in good faith that the affiliate-loan structure was financially sound and would be repaid — and that I was willing to stand behind it with my own personal credit if it were not. The Government has offered no evidence — because none exists — that I believed the affiliate loans would not be repaid, that I intended to default on the Backstop Agreement, or that I disposed of, encumbered, or shielded the personal assets that stood behind that commitment.

21.     Equally important, the same Backstop Agreement that demonstrates my good faith provides the Government's alleged victims with a direct, contractual, individual-capacity recovery mechanism against me — a mechanism wholly independent of the criminal restitution order. To the extent any Beneficiary under the Backstop Agreement has already collected from me, from the obligors, or from collateral, those recoveries must be credited against the Special Master's preliminary restitution figure under the Backstop Agreement's own offset clause Original Statement (Exhibit B, § 3(d)) and, in any later civil proceeding, under 18 U.S.C. § 3664(j)(2) ("Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in — (A) any Federal civil proceeding; and (B) any State civil proceeding . . . ."). *See generally United States v. Alalade*, 204 F.3d 536, 540 n.4 (4th Cir. 2000) (discussing operation of § 3664(j)(2)).

## V.     AFFILIATE INVESTMENTS AT, NEAR, AND ABOVE 40% OF ADMITTED ASSETS ARE STANDARD INDUSTRY PRACTICE

The Government's sentencing memorandum further asserts, expressly and by implication, that the use of affiliate loans on the scale undertaken by the NCICs falls outside ordinary insurance-

12

industry practice. Recent peer-industry data and contemporaneous reporting in the financial press demonstrate that the opposite is true.

### A. Peer-insurer affiliate exposure (Exhibit B5).

22. Exhibit B5 reproduces a chart compiled by Athene/Apollo from peer-insurer 2024–25 statutory filings and standalone 2Q 2025 10-Q disclosures. That chart shows the following affiliated-asset percentages of total assets at the largest U.S. life insurers, as of the dates indicated:

| Insurer (Affiliate Sponsor) | Related-Party Assets as % of Total Assets |
|---|---|
| NY Life (NY Life IM) | 5% |
| MetLife (MetLife IM) | 8% |
| Prudential (PGIM) | 8% |
| Athene (Apollo) | 12% |
| MassMutual (Barings) | 13% |
| Global Atlantic (KKR) | 22% |
| American National (Brookfield) | 30% |
| Everlake (Blackstone) | 35% |
| Security Benefit (Eldridge) | 43% |
| **SNIC (NCDOI-approved ceiling, 2014–2018)** | **40% (cap)** |

23. Six of the nine large U.S. life insurers depicted in Exhibit B5 operate with affiliate exposures of 12% or higher; four exceed 22%; three exceed 30%; and Security Benefit (owned by Eldridge alongside Todd Boehly) operates at 43% — a level higher than the 40% ceiling that the NCDOI itself negotiated as acceptable for SNIC and the other NCICs.

### B. Wall Street Journal reporting confirms the trend.

24. On May 26, 2026, the same day I was sentenced in this matter, *The Wall Street Journal* published "For Wall Street's Private Investments, In-House Insurers Are the Go-To Buyer," by Heather Gillers (the "WSJ Article," Exhibit B6). The WSJ Article reports the following objective facts about the use of affiliated investments by U.S. life insurers, each of which is dispositive of the Government's industry-practice claim:

13

a. U.S. life and annuity insurers reported $413 billion in affiliated investments in 2025 — **twice** the amount reported in 2020 — according to insurance ratings firm AM Best, as cited in the WSJ Article;

b. at six private-equity-linked life insurers tracked by *The Wall Street Journal* (Athene/Apollo, American Equity/Brookfield, American National/Brookfield, Forethought/KKR, Commonwealth/KKR, and Security Benefit/Eldridge), affiliated assets grew **22%** over the past year to a combined $127 billion;

c. Athene (Apollo) reported the **largest** affiliated-asset portfolio of any U.S. life insurer at $52 billion in 2025 — $12 billion more than in 2024;

d. American Equity Investment Life Insurance's affiliated-asset portfolio **grew from $450 million in 2023 to $6.5 billion in 2025** — a 14-fold increase — after acquisition by Brookfield Wealth Solutions;

e. at Security Benefit Life, **more than one-third of total assets** were classified as affiliated in 2025; and

f. Kevin Clark, chief accounting specialist at the Iowa Insurance Division, is quoted in the WSJ Article as describing this trend as the principal driver of recent growth in affiliated investments — not as an aberration, but as the mainstream evolution of the U.S. life insurance industry.

### C.     *Three-part refutation of the Government's sentencing-memorandum claim.*

25.     Taken together, Exhibits A12, B5, and B6 refute the Government's sentencing-memorandum claim that affiliated loans are not standard industry practice. The refutation operates at three independent levels:

a. ***Regulatory approval.*** The NCDOI itself approved the SNIC affiliated-investment structure at a 40% cap of total admitted assets in 2014, documented that 40% level in writing in the NCDOI's own 2016 financial review (Exhibit A12), and continuously examined SNIC under that approved framework thereafter. A practice that the State of North Carolina Department of Insurance approved in writing in 2014 and re-confirmed in writing in 2016 is, by definition, not outside standard industry practice.

b. ***Peer-company concentration.*** The largest U.S. life insurers — including those owned by Apollo, Brookfield, KKR, MassMutual, Blackstone, and Eldridge — currently hold affiliated investments at concentrations of 12% to 43% of total assets (Exhibit B5). The 40% concentration the NCDOI approved for SNIC in 2014 is squarely within that mainstream band. Indeed, Security Benefit Life (owned by Eldridge) maintains 43% affiliated investments — *above* the 40% cap the NCDOI approved for SNIC — with full ongoing approval of its primary state insurance regulator.

c. ***Industry-wide aggregate.*** U.S. life and annuity insurers in the aggregate held $413 billion in affiliated investments in 2025, twice the 2020 level, with year-over-year growth of 22% at the six PE-linked life insurers tracked by the WSJ (Exhibit B6). An aggregate $413 billion of affiliated investments held openly across the U.S. life insurance industry, with full regulatory disclosure, is *the definition* of standard industry practice.

26.     The implication for sentencing and restitution is straightforward: nothing in the structural decision to deploy affiliated investments at or below the 40% level supplies either the mens rea required for the underlying offense or the proximate-cause linkage required for MVRA restitution. The Government's industry-practice argument should be rejected, and the Special

15

Master's preliminary restitution computation should not treat affiliate-loan composition as evidence of either.

**VI.    THE MORE THAN $1 BILLION IN BANK ZERO-COUPON BONDS THAT MR. LINDBERG DIRECTED THE NCICS TO PURCHASE AS DOLLAR-FOR-DOLLAR PRINCIPAL-LOSS INSURANCE FOR THE AFFILIATE LOANS — AND THE REHABILITATOR'S DISCRETIONARY PRE-MATURITY SALE THAT CRYSTALLIZED $611.6 MILLION IN LOSS**

Independent of the Ares and Oaktree transactions (Sections XII and XIII below), independent of the Backstop Agreement (Section IV above), and independent of every other credit identified in this Statement, I implemented in May 2018 a dedicated principal-protection layer for the affiliate-loan portfolio. The structure consisted of more than $1 billion in face value of investment-grade zero-coupon bonds issued by four global money-center banks, held inside the Principal Protected Notes (the "PPNs") on the NCICs' balance sheets, whose only economic purpose was to insure the NCICs, dollar-for-dollar, against any loss of principal on the affiliate loans. The contemporaneous documentary record — including Exhibits H, H2, I2, and M5 to the Original Statement and Exhibit M6 attached hereto — establishes that the approximately $1.006 billion in par value of those bonds fully covered the approximately $1 billion of outstanding affiliate loans. In short, I purchased insurance against any loss of the principal value of the affiliate loans. The Rehabilitator's subsequent unilateral pre-maturity sale of those bonds, without the supervising court's approval, crystallized $611.6 million of loss on the very instruments whose only function was to prevent such loss.

*A.    The May 2018 directive: more than $1 billion in bank zero-coupon bonds purchased as a one-to-one principal-loss overlay on the affiliate-loan portfolio.*

27.    In May 2018, pursuant to a memorandum of understanding with the NCDOI (Original Stmt. Exhibit M5), I directed the NCICs to construct the Principal Protected Notes and to purchase, as the protective layer inside those PPNs, more than $1 billion in face value of

investment-grade zero-coupon bonds issued by Barclays Bank PLC, Bank of Montreal, Royal Bank of Canada, and Natixis SA. Held to maturity, those bonds were contractually obligated to pay $1,006,239,867 at par. *See* Original Stmt. ¶¶ 48–49 & Exhibits H2, I2.

28.     The economic and regulatory purpose of those bond purchases was singular and explicit: to place inside the NCICs a portfolio of bank-credit zero-coupon instruments whose maturity payouts — each backed by the balance sheet of a major global bank — would equal or exceed the entire face value of the affiliate-loan portfolio. The bonds were not investments in the ordinary commercial sense. They were a principal-loss insurance overlay on the affiliate-loan portfolio. If any single affiliate borrower had defaulted on principal, the contractually mandated par payment of the corresponding zero-coupon bond at maturity was available to the NCICs to make the policyholders whole without recourse to any other balance-sheet asset of the NCICs.

### B.     *How a Principal Protected Note works: the insurance mechanism.*

29.     A Principal Protected Note, as the name indicates, is an instrument that protects the principal of a loan. Each PPN was a special-purpose vehicle that paired (i) an investment-grade, bank-issued zero-coupon bond with (ii) an underlying affiliate investment. The structure and approval of the PPNs were reviewed by the NCDOI's financial-examinations division as part of the disaffiliation framework established under the first NCDOI memorandum of understanding in 2018. (Original Stmt. Exhibit M5.)

30.     The bank zero-coupon bonds underlying the PPNs were issued by major investment-grade financial institutions, including Barclays Bank PLC, Bank of Montreal, Royal Bank of Canada, and Natixis SA. These bonds carried credit ratings on par with their issuing institutions (each in the investment-grade range), traded at or near treasury yields, and were freely tradable in institutional markets.

17

31.     The architecture of a representative PPN, using a Barclays Bank zero-coupon bond, illustrates the insurance mechanism: Barclays issued a 30-year zero-coupon bond with a face amount of $70 million; the NCICs purchased the bond at a discounted present value of approximately $28 million (approximately 40 cents on the dollar); and Barclays was contractually obligated to redeem the bond at par ($70 million) at maturity. The implied yield on that purchase was approximately 3% over the 30-year term. The $28-million-cost / $70-million-face Barclays zero was placed inside a PPN whose principal was, by construction, fully protected — no matter what happened to any other investment inside the PPN, the embedded bank zero would pay $70 million at maturity. This is a standard institutional principal-protection arrangement, not an exotic structure.

32.     The PPN thus functions like an insurance policy that protects the principal of the affiliate loan from downside. And like an insurance policy, a PPN delivers its full protective value only if it is allowed to run its course. A PPN, when sold early, will return only a fraction of the principal that is guaranteed at maturity. Just as cashing out a life-insurance policy years before it matures returns only a small fraction of the death benefit, selling a zero-coupon bond before maturity drastically reduces the amount of money recovered relative to its contractually guaranteed par value. The entire point of the structure — the reason these instruments are called Principal Protected Notes — is that the principal is protected, precisely for the downside scenario the affiliate loans were said to present.

**C.     *Dollar-for-dollar coverage: the approximately $1.006 billion in zero-coupon bonds fully covered the approximately $1 billion in outstanding affiliate loans.***

33.     The decisive fact for the restitution analysis is the one-to-one correspondence between the protective bonds and the affiliate loans they were purchased to insure. I directed the NCICs to purchase $1,006,239,867 in par value of bank zero-coupon bonds for the express purpose

18

of protecting the principal of each individual affiliate investment in its entirety, so long as the corresponding zero-coupon bond was held to maturity. As of October 18, 2018 — the date I transferred operational control to the Special Deputy Rehabilitator — every dollar of affiliate loan held by the NCICs was matched, dollar-for-dollar at par, by a corresponding investment-grade bank zero-coupon bond contractually scheduled to pay $1,006,239,867 at maturity.

34. Stated directly: the approximately $1 billion of zero-coupon bonds carried on the balance sheets of the NCICs fully covered the approximately $1 billion of outstanding affiliate loans. The protective bond portfolio was not partial, not approximate, and not subordinate. It was a complete, par-for-par overlay on the affiliate-loan book. That structural redundancy is the single most important fact bearing on any claim that the affiliate-loan portfolio threatened a "hole" in the NCICs' balance sheets at the moment of transfer: it did not, because the bank zero-coupon bonds stood directly behind it, dollar-for-dollar, with the credit of four global money-center banks.

35. The implication for the Special Master's loss calculation is direct and dispositive. The premise on which the restitution figure ultimately rests — that the affiliate loans were impaired and that their continued presence on the NCICs' balance sheets created an uncovered deficit — cannot be reconciled with the contemporaneous existence of a $1.006 billion par-payable bank-bond portfolio purchased and held for the sole purpose of insuring those very loans against any loss of principal. The loans were insured. I insured them. The insurance was in place, on the balance sheet, dollar-for-dollar, on the day I transferred control.

### D. The NCDOI expressly permitted the purchase of the protective bonds.

36. The principal-protection structure was not a unilateral or concealed maneuver. It is customary for insurance companies to hold high-quality bonds to maturity, and particularly so for highly rated instruments like the PPN zero-coupon bonds; life insurers routinely purchase highly

19

rated, long-dated bonds carrying very low regulatory capital charges. Indeed, PPNs with guaranteed payoffs at maturity are one of the policy levers insurance regulators themselves rely upon to ensure the security of capital. The NCDOI expressly permitted the NCICs, acting under my direction, to purchase these bonds in May 2018. (Original Stmt. Exhibit M5.) The purchase was intended to prevent any downside risk to policyholders or the NCICs and to ensure that the capital underlying the affiliate loans was secure for as long as the PPNs were held to maturity.

### E. Bond-by-bond cross-walk to the affiliated investments.

37. The cross-walk between the bank zero-coupon bond positions and the underlying affiliated investments they were purchased to protect is established by the contemporaneous PPN/zero-coupon worksheet produced by the Rehabilitator (via Paladin) and circulated to counsel in May 2026. See Exhibit M6 attached hereto. As reflected in that worksheet, the bank zero-coupon bond positions tie directly to specific PPN names and to the underlying affiliate-loan positions they were structured to protect. By way of example, the Natixis Bank zero-coupon note in the aggregate face amount of $150 million was originally allocated $75 million to the PPN held by Pierre Mendes and $75 million to the PPN held by White Tree, on a 50/50 basis; White Tree was dissolved before June 30, 2019 and therefore does not appear in the post-dissolution Independent Actuarial Loss Analysis, and the corresponding Citi position on the worksheet was sold on September 16, 2019. The operative point is that the more than $1 billion in zero-coupon bond face value was **solely backing affiliated investments** — not generic investment exposure, not surplus, and not any other purpose. See Exhibit M6.

### F. The Rehabilitator's discretionary pre-maturity sale crystallized $611.6 million in loss on the very instruments designed to prevent affiliate-loan loss.

38. After taking operational control of the NCICs on October 18, 2018, and notwithstanding the contractual obligation of each issuer to pay par at maturity, the Special Deputy

20

Rehabilitator made the unilateral discretionary decision to sell the bank zero-coupon bonds underlying the PPNs *prior to maturity* for aggregate proceeds of approximately $394 million, rather than holding them to maturity for the full par recovery of $1,006,239,867. Dinius had represented to me that his intention at the time of the execution of the MOU was to rehabilitate the NCICs. After the MOU was signed, however, Dinius promptly switched into liquidation mode and sold all of the zero-coupon bonds. Instead of holding the PPNs to maturity to recover the full $1.006 billion, Dinius sold them for less than 40% of their guaranteed value. That decision — made without advance approval by the Wake County Superior Court and without notice to me — crystallized a loss of approximately $611.6 million on instruments whose entire purpose was to protect the principal of the affiliated investments from any credit-related downside.

39. The injury the Rehabilitator caused has two analytically distinct components, both of which point to the same dispositive conclusion. *First*, the Rehabilitator's affirmative decision to sell the embedded bank zero-coupon bonds prior to maturity crystallized the time-value-of-money discount embedded in the zeros' market price. Had the bonds simply been held to maturity — which would have required no action whatsoever, because the issuers were contractually obligated to redeem at par — the NCICs would have realized the full par redemption value of over $1 billion with zero credit risk. Dinius's unilateral decision to sell early, not the asset itself, gave rise to any time-value loss. *Second*, and entirely separate from the first, the Rehabilitator collected the cash and gave no credit for it against the borrowers' principal balance. Whether he sold the zeros at a discount or at a premium, the cash actually received must reduce principal dollar-for-dollar. Crediting fewer dollars than the Rehabilitator received from the sale of an affiliated asset results in a windfall to the Rehabilitator.

### G. The Rehabilitator had multiple alternatives to the fire-sale and chose to ignore each of them.

40. Dinius had at least three alternatives to selling the bonds at a loss, each of which he chose to ignore. ***First***, Dinius could have simply continued to hold the zero-coupon bonds to maturity, requiring no action and yielding the full $1.006 billion par payment. ***Second***, Dinius could have used the zero-coupon bonds to credit-enhance the affiliate investments in order to complete a sale of the insurance companies — precisely the kind of structure that Ares and Oaktree had each independently proposed. ***Third***, Dinius could have borrowed against the zero-coupon bonds, monetizing near-term liquidity while preserving the $1 billion maturity payoff. He pursued none of these. He chose instead the single alternative that destroyed the most value: a pre-maturity fire-sale for less than 40 cents on the dollar of guaranteed par.

### H. Two distinct, separately-supportable credits totaling approximately $1.006 billion.

41. Two distinct credit entries follow from the Rehabilitator's pre-maturity disposition of the bank zero-coupon bonds, each of which must be applied against any restitution figure the Court ultimately enters, and each of which the Special Master's preliminary computation appears not to credit:

(i) ***$394 million credit for actual sale proceeds.*** The Rehabilitator's sale of the bank zero-coupon bonds produced approximately $394 million in cash proceeds for the NCIC estates. Those proceeds, by their nature, are available to the very victim entities the Special Master identifies. Under 18 U.S.C. § 3664(j)(2) and *United States v. Alalade*, 204 F.3d 536, 540 n.4 (4th Cir. 2000), any restitution figure entered by this Court must be reduced dollar-for-dollar by the $394 million already in the NCIC estates as a direct consequence of the bonds whose only purpose was to protect those very estates.

22

(ii) ***$611.6 million credit for crystallized loss caused by the Rehabilitator's discretionary pre-maturity sale.*** The $611.6 million differential between the $1,006,239,867 par maturity value and the $394 million sale proceeds is, under *Robers v. United States*, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring, joined by Ginsburg, J.), and the binding Fourth Circuit authority of *United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006), the proximate consequence of the Rehabilitator's discretionary post-October-18-2018 election not to hold the bonds to maturity. It is not the proximate consequence of any conduct underlying any element of my offense of conviction. That $611.6 million is therefore not properly attributable to me and is fully credit-eligible against any preliminary restitution figure.

42. Together, those two credits total approximately **$1.006 billion** — a credit that, applied alone, would reduce the Special Master's preliminary $1.655 billion figure to approximately $649 million *before* any of the other credits set forth in this Statement and in my Response and Objection to the Special Master's Report (Docket No. 132) are applied.

    ***I.    Robers v. United States controls: the Rehabilitator's pre-maturity sale breaks the chain of proximate causation.***

43. Justice Sotomayor's concurrence in *Robers* squarely addresses this very scenario. "If a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring). And: "If the collateral loses value after the victim chooses to hold it, then that part of the victim's net loss is attributable to the victim's independent decisions. The defendant cannot be regarded as the proximate cause of that part of the loss, and so cannot be made to bear it." *Id.* at 648.

23

44. The converse of that principle applies with even greater force here. Where *Robers* teaches that a *passive* victim choice to hold collateral past a reasonable time breaks the chain of proximate causation, an *affirmative* victim choice to *liquidate* a held-to-maturity, par-payable principal-protection instrument before maturity — thereby foregoing $611.6 million of contractually-mandated par value that was the entire purpose of holding the instrument — breaks the chain *a fortiori*. The $611.6 million crystallized loss is "attributable to the victim's independent decisions" and "cannot be made to [be borne]" by me. *Robers*, 572 U.S. at 648 (Sotomayor, J., concurring). The bonds were a held-to-maturity, par-payable instrument; the Rehabilitator chose to sell them before maturity; and the resulting loss is his, not mine.

**J. The Rehabilitator's failure to obtain Wake County Superior Court approval before selling the bonds.**

45. Under N.C. Gen. Stat. § 58-30-85 and the Wake County Superior Court's June 27, 2019 Consent Order of Rehabilitation, the Special Deputy Rehabilitator is required to obtain advance court approval for material asset dispositions, compensation arrangements, and transactions affecting the estates of the NCICs in rehabilitation. The Rehabilitator's discretionary pre-maturity sale of the bank zero-coupon bonds underlying the PPNs in 2019 was not presented to the Wake County Superior Court for approval before the sales occurred. The failure to obtain court approval before the transaction is independently relevant to the restitution analysis because it confirms that the disposition was the discretionary act of the Rehabilitator alone, exercised without supervising-court oversight, and therefore cannot be laid at my feet for purposes of MVRA proximate-cause analysis.

**K. The Principal Protection Structure.**

46. The bank zero-coupon bond facts set forth in this Section VI are not a peripheral accounting matter. They are the heart of the principal-protection structure I built into the NCICs

24

in 2018 precisely to ensure that no affiliate-loan credit event could ever cause a loss of principal to the NCICs. I purchased, with the credit of four global banks, more than $1 billion of par-payable insurance against exactly the loss the Government now seeks to charge to me. The Rehabilitator's discretionary decision to dismantle that protection prior to maturity is exactly the kind of post-offense, intervening, discretionary act of the victim's own representative that the Supreme Court in *Robers*, the Fourth Circuit in *Davenport*, and this Court in administering the MVRA must treat as breaking the chain of proximate causation.

## VII. THE CORRECTED STARTING BALANCE OF THE AFFILIATE INVESTMENTS — THE $141 MILLION REDUCTION

47. The Special Master uses $1,391 million as the NCIC starting principal balance for purposes of the restitution calculation. Restitution Rpt., App'x 3 at 6. That figure is overstated by $141 million. The correct opening balance, as agreed by all parties at the time of execution of the MOU on June 27, 2019, is $1,250 million — the same number used extensively in the NCICs' 2019 litigation filings. *See* Original Statement Exhibit O (evidencing the agreed opening principal balance for the NCICs); Original Statement Exhibit K1.

48. The NCICs have consistently relied on this $1.25 billion figure in verified pleadings. In both a Verified Complaint and an Amended Verified Complaint filed by the NCICs against me in the General Court of Justice of Wake County, North Carolina in October 2019, the NCICs stated that the amount of Affiliate Investments they held was "approximately $1.25 billion." Declaration of Ryan Meyer ("Meyer Decl."), Exh. 3-A ¶ 29; *accord* Meyer Decl., Exh. 3-B ¶ 29. Similarly, in a pre-trial order in that case, the parties stipulated that entities affiliated with me "have combined debt totals of approximately $1.25 billion to Plaintiffs pursuant to the terms of various direct and indirect loans and financing arrangements." Meyer Decl., Exh. 3-C at

25

5. There is no basis to allow the NCICs to back away from these verified pleadings to claim a higher amount now.

49.     This $141 million discrepancy is documented in two independent ways. *First*, the June 30, 2019 Restructure Tranches spreadsheet agreed upon by the parties signing the MOU (cell K44 of the MOU Schedule worksheet, attached as part of Original Statement Exhibit K1) shows the agreed $1,250 million figure, including the addbacks referenced in the spreadsheet; the formula in cell C41 (the net balance of senior debt owed to CBL) computes the CBL net senior balance as the gross balance reduced by the Read-Through Principal value of $215,786,742.08 (cell E4), reflecting the FinCo-level read-through reduction discussed in Section X below. *Second*, the same $1,250 million figure (after adding in the addbacks noted on the spreadsheet) is the figure used by the NCICs themselves in their 2019 litigation filings in the Wake County Superior Court rehabilitation proceedings. The $141 million difference between the Special Master's $1,391 million and the agreed $1,250 million is an arithmetic consequence of two adjustments — both of which were specifically negotiated with Mr. Dinius and reflected in his own June 17, 2019 email (Original Statement Exhibit G).

## VIII.     THE JUNE 17, 2019 EMAIL FROM MIKE DINIUS ORIGINAL STATEMENT (EXHIBIT G)

50.     Attached as Original Statement Exhibit G to the Response is a true and correct copy of an email I received on June 17, 2019, at the email address gelindberg@gmail.com (and/or my then-active corporate-email accounts), from Mike Dinius at his Noble Consulting account, MDinius@noblecon.net. The email was copied to John Murphy of Noble Consulting and Mohsin Meghji of M-III Partners. The subject line was "MOU and Loan Amendment." I have personal knowledge of receiving the email contemporaneously, and I have reviewed the email and the

attached "NHC Debt Structure (Proposed Revised)" table to confirm that Original Statement Exhibit G is authentic and that no language has been altered.

51.    The Dinius email of June 17, 2019 contains in its body Mr. Dinius's own table titled "NHC Debt Structure (Proposed Revised)." In Mr. Dinius's own writing, that table sets forth the following, which is quoted without alteration:

a.    *"Total outstanding less adjustments: $2,258,210,171."*

b.    *"Less all Agera to 10-year zero on NHC: $(200,985,363) — to be repaid by NHC cash flow or refi within 10 years."*

c.    *"Less all PBLA main to 10-year zero on NHC: $(203,276,330) — $300M of PBLA surplus will cover."*

d.    *"Less Malta debt and pref, stays in place as zero coupon 7-year note: $(140,566,677) — Cash flow from offshore growth, remaining SASL, then refi if needed."*

e.    *"Less ins co debt and pref stays in place as zero coupon 7-year note: $(250,481,888) — $350M value of CBL, SNIC, BLIC covers this."*

f.    *"Less NHC pref 10 year: $(375,252,161) — NHC cash flow or refi within 10 years."*

g.    *"Less NHC junior 10 year: $(87,647,752) — NHC cash flow."*

h.    *"New NHC Senior, Cash Pay, due 6-30-23: $1,000,000,000 — As agreed — NHC cash flow or refi by 6-30-23."*

52.    The arithmetic of Mr. Dinius's own table confirms the $1 billion cap. Starting from $2,258,210,171 in total outstanding obligations, the table applies $1,258,210,171 in reductions across the seven non-cash-pay tranches (Agera, PBLA Main, Malta, insurance-co, NHC pref, NHC junior, and the NHC 10-year zero). The result is exactly $1,000,000,000 in cash-pay senior debt, which Mr. Dinius personally identifies as "As agreed." The figure $1,000,000,000 was the figure I agreed to with Mr. Dinius.

53.    Mr. Dinius's June 17, 2019 email is one in a series of emails between Mr. Dinius and me in the days immediately preceding the rehabilitation order. The June 26, 2019 emails between Mr. Dinius (MDinius@noblecon.net), Greg Johnson (gjohnson@eliglobal.com), Chris

27

Herwig (cherwig@eliglobal.com), and Brian Stewart (Brian.Stewart@globalbankers.com) — sent the day before the rehabilitation order — confirm in Mr. Dinius's own words how he personally directed the FinCo / read-through schedule architecture. In Mr. Dinius's own writing on June 26, 2019:

> *Just so we are clear, I would like it scheduled as it is from the Insurance companies to the fincos. Don't worry about how it is structured from the fincos to the underlying borrowers. Also, since we are pulling Agera, Ins holdcos and others out separately, we are going to deduct those at the bottom of each individual exhibit. For example, if there is $10m of Agera in the senior loans to fincos, those amounts of fincos will be at the full amount, then we will show a negative at the bottom for Agera.*

54. Mr. Dinius's June 26, 2019 directive — "we are going to deduct those at the bottom of each individual exhibit" — is the precise read-through reduction architecture that I agreed to with Mr. Dinius at the Durham meeting and that is reflected in the Read-Through Principal worksheet of the MOU schedule. He directed the architecture in his own words, in writing, the day before the rehabilitation order was entered. There is no colorable basis on which the read-through reduction can now be characterized as anything other than what Mr. Dinius personally directed.

## IX. THE DURHAM MEETING AND PRE-MOU NEGOTIATIONS

55. The MOU was first proposed by Mr. Dinius on or about May 9, 2019. Following his proposal, in late May or early June 2019, prior to the execution of the MOU, I met in person with Mr. Dinius at offices located in Durham, North Carolina. At that meeting and in subsequent communications, I told Mr. Dinius the following, in substance:

a. The Agera Energy investment, which I had inherited as part of my June 2017 acquisition of the PBLA-Bermuda reinsurance portfolio from Beechwood Partners, was originated by Platinum Partners, not by me. The investment was, by mid-2019, a

known write-off following the discovery of financial fraud by Agera's independent Chief Financial Officer.

b. The Insurance-Holdco debt — debt issued by the holding companies that owned the NCICs — had originated through GBIG-management-driven acquisitions and would be unable to service principal in the ordinary course because the NCICS were in rehabilitation. Mr. Dinius and I agreed that, with the NCICs not generating cash to service the holding-company debt, the Insurance-Holdco debt could not be treated as cash-pay senior debt.

c. At the time of the Durham meeting, I estimated the combined Agera-attributable balance at approximately $200 million and the combined Insurance-Holdco-attributable balance at approximately $250 million. Mr. Dinius's subsequent June 17, 2019 email refined these figures (using $200,985,363 for Agera, $250,481,888 for insurance-co debt and pref, and $140,566,677 for Malta debt and pref); the refined figures are the figures used herein.

d. The combined Agera, Malta, and Insurance-Holdco exposure (totaling $592,033,928 across the three categories per Mr. Dinius's June 17, 2019 table) had to be converted to long-dated zero-coupon obligations rather than treated as performing cash-pay debt.

e. Where a FinCo's portfolio contained zero-coupon paper of this character, the senior debt that FinCo had issued back to the NCICs had to be reduced proportionally — because no cash-paying asset could service that senior debt. I explained this principle to Mr. Dinius using the AFA structure as the worked example: a FinCo with a $500 million portfolio, of which $100 million (20%) consisted of zero-coupon paper, would need to have 20% of its senior debt to the NCICs eliminated.

29

56.     Mr. Dinius agreed to each of these propositions in our discussions in May–June 2019. His subsequent June 17, 2019 email memorialized the agreement at the NHC level (the $1 billion cap and the seven non-cash-pay tranches). His subsequent June 26, 2019 email — quoted above — memorialized the corresponding read-through architecture at the FinCo / exhibit level. The corresponding read-through reduction at the FinCo level was implemented through the June 30, 2019 Restructure Tranches spreadsheet, which was agreed by all parties at the time of the MOU execution. *See* Original Statement Exhibit K1.

## X.     THE $139 MILLION FINCO READ-THROUGH REDUCTION

57.     The FinCo read-through reduction, in the amount of $132,993,217.98 (rounded to $133 million in earlier discussions and refined to $139 million based on the most current input data), is the proportional reduction in senior debt issued by the FinCos to the NCICs to reflect the percentage of each FinCo's portfolio that consisted of zero-coupon paper. The $132,993,217.98 figure is computed as the sum of three components:

a.   $103,195,834.06 — CBL FinCo-zero attribution;

b.   $9,806,363.87 — BLIC FinCo-zero attribution; and

c.   $19,991,020.05 — SNIC FinCo-zero attribution.

58.     These components are reflected in the Read-Through Principal tab of the MOU schedule (cells E12:G13 of the Original Statement Exhibit K1 spreadsheet on the Read-Through Principal tab). The $139 million figure includes minor refinement to the underlying inputs but is, to my knowledge, the most accurate current figure based on data presently available.

59.     The $139 million figure is also independently corroborated by the figure used by the NCICs in their own 2019 litigation filings: $1.391 billion (the Special Master's NCIC starting balance) less approximately $133–$139 million read-through equals approximately $1.258 billion, which is the figure the NCICs themselves used in their verified court filings. The convergence of

30

the contemporaneous spreadsheet, Mr. Dinius's June 17, 2019 email, and the NCICs' own verified litigation positions is strong corroboration that the read-through reduction was understood and applied at the time of MOU execution. Further, the NCICs' use of the $1.25 billion principal balance in their 2019 litigation is alone dispositive evidence that this is the correct starting principal balance.

## XI. DISPOSITION OF THE PPN-EMBEDDED ZERO-COUPON BONDS — THE $243 MILLION MINIMUM CASH CREDIT

60. Following the entry of the Order of Rehabilitation on June 27, 2019, the Special Deputy Rehabilitator took possession of all of the PPN positions and, with the assistance of Paul Brown, the NCICs' Chief Investment Officer, began unwinding the PPNs and disposing of the underlying zero-coupon bonds. Section VI above addresses the $611.6 million in loss caused by the pre-maturity sale; this Section XI addresses the separate, undisputed cash proceeds the NCICs received from those dispositions, which must be credited dollar-for-dollar against principal.

61. Attached as Original Statement Exhibit H is a true and correct copy of an email I received on October 28, 2019 from Paul Brown at his Global Bankers email address (paul.brown@globalbankers.com), copying Chris Herwig. In that email, Mr. Brown contemporaneously documented the NCICs' final disposition of the remaining PPN-embedded zero-coupon bonds, reporting that, with a dip in rates, the team went back to the issuers of the remaining zeros and, through a combination of negotiation and pressure, improved their terms, and that the NCICs "ended up making +6mm on the disposals." He attached a spreadsheet summarizing the total cash proceeds by lender of the zero-coupon bonds, which provides that the recent (i.e., post-MOU/IALA) proceeds were $243,452,385.

62. Based on (i) Mr. Brown's October 28, 2019 email; (ii) the absence of any communication from the Rehabilitator or his agents indicating that the final tranche was disposed

of for any amount other than $243 million; and (iii) the disposition records provided by Paul Brown, the final-tranche disposition produced $243 million in cash to the NCICs, post-MOU. *See* Original Statement Exhibit H.

63. The full PPN-zeros cash receipts to the NCICs total approximately $394 million. The $243 million October 2019 final-tranche figure is, by Mr. Brown's own description, the "remaining" PPN zeros — i.e., what was left after earlier dispositions. The earlier dispositions plus the final tranche aggregate to approximately $394 million in total cash receipts to the NCICs from the PPN zeros. It cannot be precisely identified, given my current lack of information, what portion (if any) of the $394 million total was disposed of prior to the MOU's execution on June 27, 2019, versus after that date. The complete set of disposition records is held by the Special Deputy Rehabilitator and Noble Consulting, and I respectfully request that the Special Master direct production of those records so that the precise pre-MOU versus post-MOU split can be determined. The $243 million October 2019 final-tranche figure is unambiguously post-MOU and is the conservative minimum credit; the full $394 million is the maximum credit if all dispositions are determined to have been post-MOU. This Statement and the Response chart adopt $243 million as the minimum.

64. There is no basis to refuse to credit me for these funds. The zero-coupon bonds constitute losses to the Pre-Designated Restitution Parties as a result of the Affiliate Investments, and the Special Master captured those losses in the principal balance of those loans when calculating the restitution obligation. Because the NCICs received cash back as a result of disposing of the zero-coupon bonds, the proceeds from those sales must be credited to me. To date, the NCICs have failed to produce data sufficient to demonstrate that they have fully accounted for

32

the proceeds of the zero-coupon bonds. Accordingly, any restitution figure must be reduced by at least $243.4 million.

## XII. EXHIBITS A AND B — THE EXECUTED NOVEMBER 22, 2018 ARES LETTER OF INTENT ESTABLISHES THAT THE ARES TRANSACTION WAS A FULLY-FORMED, ARM'S-LENGTH, FACE-VALUE ACQUISITION DEFEATED BY THIRD-PARTY GOVERNMENT PRESSURE — NOT BY ANY CONDUCT OF MINE

### A. Exhibit B — Authentication and content of the executed November 22, 2018 Ares Letter of Intent.

65. Attached as Exhibit B is a true and correct copy of the Proposal dated November 22, 2018 transmitted by Ares Management, L.P. ("Ares") to me as Chairman & Founder of Eli Global, to Lou Hensley as CEO & President of GBIG, and to Paul Brown as CIO of GBIG (the "Ares LOI"). The Ares LOI is signed on behalf of Ares by Michael Arougheti, Co-Founder, Director, Chief Executive Officer & President of Ares Management, and by David Reilly, Partner of Ares Management. The Ares LOI is countersigned by Lou E. Hensley as CEO of GBIG, accepting the binding provisions (Sections 12 and 16) of the Ares LOI on behalf of GBIG.

66. The Ares LOI proposed a 100% equity acquisition by Ares of the U.S. business of GBIG, expressly defined as comprising nine enumerated entities, including each of the NCICs that are the principal claimed victims of the Special Master's recommended restitution figure. The Ares LOI is not a speculative or unfunded expression of interest. It is an executed letter of intent — countersigned by GBIG's CEO — from a public, investment-grade alternative-asset manager committing its own balance sheet. As Ares represented to me in writing in Section 3 of the LOI (titled "Sources of Financing"):

> *Ares will be the singular, fully funded cash purchaser of GBIG equity. In May 2014, Ares completed an initial public offering (current market capitalization of approximately $5 billion) on the New York Stock Exchange (NYSE: ARES). As a result of the IPO, our $1.0bn revolving credit facility, our investment grade*

*rating and historical public debt and preferred offerings, we have access to significant capital to fund the Proposal.*

67. Ares proposed two priced cash structures in Section 1 of the LOI. "Purchase Price Option A" called for an upfront cash payment of $400 million at closing plus an additional up-to-$50 million earnout. "Purchase Price Option B" called for a higher upfront cash payment of $420 million at closing subject to a $20 million claw-back. In either case the upfront consideration was payable *in cash at transaction closing* — not in stock or contingent paper.

68. Of decisive importance to the proximate-cause analysis below, Section 6 of the Ares LOI (titled "Investment Portfolio") expressly committed Ares to a structure pursuant to which the entirety of the affiliated-loan portfolio could be removed from the NCICs' balance sheets through a securitization vehicle backed by Ares's own balance sheet:

> *We expect the asset portfolio delivered at closing to be free of affiliate investments and self-originated investments (including the principal protected notes); however, to the extent some of these investments are outstanding at transaction close, Ares would be willing to work to arrive at a mutually agreeable solution for remaining investments with the Company. As discussed with management, Ares is willing to entertain a structure whereby any remaining affiliate and self-originated investments would be contributed to a securitization along with a material amount of other Eli Global assets and the Company or Ares would retain the senior most tranche.*

**B.     *Exhibit A — The January 6, 2019 Christa Miller email attributes the withdrawal of the SPV component to a "third party constituent" with "power."***

69. Attached as Exhibit A is a true and correct copy of an internal Eli Global email dated January 6, 2019, sent at 9:08 PM by Christa Miller of Eli Global (cmiller@eliglobal.com) to Peter Nordberg (PNordberg@eliglobal.com), and copied to me (gel@eliequity.com) and Chris Herwig (cherwig@eliglobal.com). The subject line is "For the files." Ms. Miller's stated purpose was to memorialize comments made in the January 4, 2019 meeting with Ares. Ms. Miller's email confirms each of the following, in her own contemporaneous words quoted without alteration:

a. Ares and Eli Global had entered exclusivity, and the SPV-backed retention of affiliated loans was a key driver of the deal: "When we entered into exclusivity with Ares related to their proposed purchase of the US insurance companies, a key component of their offer was that they were willing to keep a certain limited amount of affiliated loans after closing through an SPV structure that they proposed."

b. At the January 4, 2019 meeting, Ares disclosed that it was withdrawing the SPV component and attributed the withdrawal to a "third party constituent": "In response, they said that they had been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close."

c. Ares had made the same disclosure on December 21, 2018 and refused to identify the source when asked: "They had made a similar comment in a call that we had with them on December 21. In that call, they said that they had been advised to not have any ongoing ties to Eli Global after close. When we asked who had given them this advice, they refused to say."

d. Ms. Miller documented the temporal proximity of the Ares disclosure to a meeting between Ares and the U.S. Department of Justice: "This call took place soon after a meeting/call that Ares had with the DOJ."

e. Ms. Miller's contemporaneous conclusion, written for the Eli Global file, is unequivocal: "In neither the meeting on Friday or the call on December 21 did Ares specifically mention the DOJ or NCDOI. However, it seems very likely from their comments on both occasions that they have been heavily influenced by a third party with power."

**C.** ***Exhibits A and B together establish that the Ares transaction was defeated by third-party government pressure on the buyer, not by any conduct of mine.***

70. As of November 22, 2018 — just thirty-five days after I transferred operational control of the NCICs to the Special Deputy Rehabilitator — Ares Management had executed a written, signed letter of intent committing to acquire 100% of the NCICs and the rest of GBIG for $400–$420 million in upfront cash plus contingent consideration, with an express SPV/securitization solution for the affiliated-loan portfolio. As documented contemporaneously by Christa Miller, the SPV-backed retention component was withdrawn between November 22, 2018 and January 4, 2019 not because of any change in the credit quality of the affiliated loans, not because of any change in the value of the NCICs, and not because of any act or omission of mine — but because Ares was directly instructed by a "third party constituent" with "power" to "avoid any ongoing connection to Eli Global after the close." Had the Ares transaction closed on the parties' working timetable, the entirety of the NCICs' policyholder obligations would have been assumed by an investment-grade, publicly-traded alternative-asset manager; every NCIC policyholder would have been paid in full by approximately June 2019; and no state Guaranty Association would have advanced a single dollar.

**XIII. EXHIBITS C, D, AND E — THE INDEPENDENT FEBRUARY 2019 OAKTREE CAPITAL MANAGEMENT $1.0 BILLION SPV TRANSACTION I PERSONALLY NEGOTIATED WOULD LIKEWISE HAVE REMOVED ALL AFFILIATED LOANS FROM THE NCICS' BALANCE SHEETS AT FACE VALUE BY JUNE 2019**

71. The Ares letter of intent was not the only contemporaneous arm's-length evidence that the affiliated-loan portfolio was marketable and capable of being acquired by a sophisticated financial buyer at face value. Within weeks of the termination of the Ares affiliated-loan-SPV component, I personally directed the structuring and negotiation of a separate, independent arm's-length transaction with Oaktree Capital Management, L.P. ("Oaktree") — one of the largest credit-

focused alternative-asset managers in the world. Those negotiations produced the February 2019 Oaktree "Global Solution Presentation," the most current version of which (as of February 8, 2019) is attached as Exhibit C.

72.     The Oaktree Global Solution Presentation describes an arm's-length transaction structured around a $1.0 billion Investor Group (defined therein as "IG") investment into a holding-company special purpose vehicle that would have acquired both (a) the affiliated-loan positions then held by GBIG and (b) 100% of the GBIG equity, with the Investor Group's investment at the SPV holding-company level structured as a loan secured by 100% of the SPV's assets. In Oaktree's own words in the "Executive Summary" of Exhibit C:

> *IG will fund a [$1.0B] investment into an SPV Holding Company that will be used to acquire 1. loan positions held by GBIG and 2. 100% of the GBIG equity from Owner. The IG investment at the SPV Holding Company level will be structured as a loan secured by 100% of the SPV's assets.*

73.     Translated into operative effect on the NCICs, the Oaktree structure would have (a) paid down approximately $800 million of the affiliated-loan principal in cash at the SPV-level acquisition, (b) paid an additional $200 million to acquire 100% of the NCIC equity, and (c) caused approximately $400 million of additional affiliated-loan assets to be rolled over and held as performing assets on the NCICs' balance sheet — a $1.4 billion aggregate transaction. The remaining affiliated-loan balance after the Oaktree SPV paydown would have been substantially below the threshold that the Special Deputy Rehabilitator subsequently used to justify the rehabilitation order and the ten-year hold prescribed by the June 27, 2019 MOU.

> **A.     *Exhibits D and E — Contemporaneous February 12–13, 2019 internal correspondence confirming multiple independent SPV-financing tracks were live and actionable.***

74.     Attached as Exhibit D is a true and correct copy of an email I sent on Tuesday, February 12, 2019 at 4:57 PM to Christa Miller, Chris Herwig, and Rob Kiesel, with the subject

37

line "Re: Ares." In that email I instructed my team to advance, in parallel, three independent SPV/bridge-financing tracks — Oaktree, HPS, and "Ares SPV bridge loans and/or Ares retained assets" — each of which by itself would have monetized the affiliated-loan portfolio at face value. In my own words in Exhibit D: "suggest we push these three options daily with some vigor."

75. Attached as Exhibit E is a true and correct copy of my email of Wednesday, February 13, 2019 at 4:23 PM to Chris Herwig (cc Christa Miller and Rob Kiesel), with the subject line "Re: Ares." Exhibit E forwards Mr. Herwig's contemporaneous status update sent earlier that same day: "Rob received new LOI from OakTree … he will circulate and we can mark up this evening. Issue with those guys is that they are looking for longer term hold but we can propose shorter and move that forward. Meeting in LA Friday." My contemporaneous response — preserved verbatim in Exhibit E — was: **"Excellent progress. Suggest we push these options hard. Happy to help."** That sequence is decisive contemporaneous evidence that, far from being passive or obstructionist, I was personally directing, in real time and in writing, the parallel pursuit of multiple arm's-length face-value transactions, any one of which would have monetized the affiliated loans and paid every NCIC policyholder in full.

### B. Two independent arm's-length market tests of the same affiliated-loan portfolio — each priced at par.

76. That two unrelated, sophisticated financial institutions — Ares in November 2018 and Oaktree in February 2019 — each independently underwrote, in writing and on the basis of their own capital, separately negotiated SPV structures capable of taking the entirety of the affiliated-loan portfolio off the NCICs' balance sheets at face value, is decisive contemporaneous market evidence that the affiliated loans were not impaired and were not the source of any "hole" in the NCICs' balance sheets at the time the Rehabilitator took control. The relevant decision-makers at Ares (Michael Arougheti, David Reilly) and Oaktree did not need to take my word for

38

the quality of the affiliated-loan portfolio. They conducted their own due diligence, on their own dime, with their own counsel and advisors, and they concluded — independently of one another — that the portfolio could be taken off the NCICs' balance sheets at par.

77. Read together with the bank zero-coupon bonds described in Section VI above, Exhibits B and C provide an unbroken three-layer cushion behind the affiliated-loan portfolio as of late 2018 and early 2019: (i) the underlying borrower-operating-company cash flow (in excess of $300 million in consolidated EBITDA by 2024); (ii) the more than $1 billion in face value of investment-grade bank zero-coupon bonds held inside the PPNs as a dollar-for-dollar principal-loss overlay; and (iii) two arm's-length face-value cash transactions, each independently underwritten by a sophisticated buyer, either of which would have monetized the entire affiliated-loan portfolio at par within months. No rational fact-finder, on this record, can attribute the bulk of the Special Master's preliminary loss figure to my offense conduct.

## XIV. THE NCDOI AND THE REHABILITATOR — NOT I — DISCRETIONARILY CHOSE NOT TO PROCEED WITH EITHER TRANSACTION; HAVING REFUSED BOTH, THEY THEN COERCED ME TO SIGN THE JUNE 27, 2019 MOU UNDER EXPRESS THREAT OF IMMEDIATE LIQUIDATION AND AFFIRMATIVELY ELECTED TO HOLD THE AFFILIATED LOANS FOR A TEN-YEAR TERM

78. At the time each transaction was on the table, I no longer held operational control of the NCICs. The NCDOI and the Special Deputy Rehabilitator did. I transferred operational control of the NCICs to the Special Deputy Rehabilitator on October 18, 2018 with the express understanding that he would close the pending Ares sale. *See* Original Stmt. ¶ 13. The November 5, 2018 internal valuation prepared by personnel under Mr. Dinius's own control (Exhibit J) valued the NCICs at $454 million as of the transfer date.

79. The discretionary decision whether to close each transaction therefore rested with the Rehabilitator and the NCDOI, subject only to the supervisory authority of the Wake County

39

Superior Court — not with me. The Rehabilitator and the NCDOI made the discretionary choice not to proceed with the Ares transaction in early 2019, and separately and independently elected not to proceed with the Oaktree transaction in or after February 2019. Each refusal was a free, deliberate, and informed choice of the victim's own representative; each occurred after I had ceded operational control; and neither was within my power to direct or to prevent.

### A. The MOU was presented to me on a take-it-or-leave-it basis under express threat of immediate liquidation of the NCICs.

80. The June 27, 2019 MOU between GBIG-related entities and the NCDOI/Rehabilitator was not the product of arm's-length negotiation. It was presented to me on a take-it-or-leave-it basis approximately 48 hours before the rehabilitation order was to be entered by the Wake County Superior Court, and was accompanied by an express written threat that, if I refused to sign, the Rehabilitator would immediately move to liquidate the NCICs. As Mr. Dinius wrote to me — in writing, from his Noble Consulting account — at the time of the MOU's execution:

> *we will contact the guaranty associations and move directly to liquidation. You know what that means.*

81. I signed the MOU only because the alternative the Rehabilitator placed before me was the immediate destruction of the NCICs through liquidation. I executed the MOU under that explicit duress, in order to protect policyholders from the harm that the Rehabilitator was threatening to inflict on them.

### B. The MOU affirmatively chose to hold the affiliated loans for ten years — a choice the Rehabilitator made after refusing two face-value cash offers for the same asset.

82. The MOU itself memorializes the Rehabilitator's affirmative election to *hold* the affiliated-loan portfolio for a ten-year term rather than monetize it. In the months leading up to the

40

MOU, the Rehabilitator had refused both the Ares transaction (which would have monetized the loans at face value in cash, with an Ares-backed securitization option for any residual) and the Oaktree transaction (which would have paid down $800 million of the affiliated-loan principal in cash and rolled the remainder into an Oaktree SPV). Instead of monetizing the loans at par with either Ares or Oaktree, the Rehabilitator chose, in the MOU, to keep the affiliated loans on the NCICs' balance sheets on a ten-year schedule.

## XV. THE REHABILITATOR'S "HAMMER AND NAIL" COERCION OF REPRESENTATIONS AND WARRANTIES

83.     Closely related to the foregoing is a second category of rehabilitator coercion that bears directly on the integrity of any representations and warranties signed by me during the rehabilitation. Special Deputy Rehabilitator Mike Dinius, in negotiating those representations and warranties, employed what he himself characterized to me, through his counsel, as a "hammer and nail" analogy: I was the nail; Mr. Dinius held the hammer; and the choice presented was to sign or face liquidation of all four NCICs. As one of the Rehabilitator's lawyers told me directly in the days before the MOU was signed: ***Mr. Lindberg, you're the nail. I'm the hammer.*** (Trial Tr. (Vol. 5) p. 1012:11–12.) There was no meaningful negotiation, no opportunity to revise material terms, and no realistic alternative. The representations and warranties were not arm's-length, market-consistent terms; they were dictated.

84.     The doctrine of economic duress is well established. Under generally accepted contract principles, "if a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim." Restatement (Second) of Contracts § 175(1) (Am. Law Inst. 1981); *see also id.* § 176 (defining "improper threat" to include threats that breach a duty of good faith and fair dealing, and threats that use power for illegitimate ends). The threat of liquidation was wrongful because it leveraged

41

the Rehabilitator's statutory control over the NCICs to extract from me, in my personal capacity, instruments and admissions that the Rehabilitator could not have obtained by lawful means.

85.     To the extent the Government, the Special Master, or any civil litigant relies upon representations and warranties signed by me during the rehabilitation as the basis for either a finding of fact, a measure of loss, or a credit determination, the record must reflect the conditions under which those instruments were executed. The "hammer and nail" demand renders those instruments evidence of the Rehabilitator's leverage, not of my voluntary acknowledgment. This is independently relevant to the restitution proceedings because (i) several of the components of the Special Master's preliminary restitution computation appear to rest, directly or indirectly, on representations and warranties extracted by the Rehabilitator under these conditions, and (ii) the conduct described establishes a pattern — documented contemporaneously — in which the Rehabilitator deliberately preserved and locked in the very exposures whose continued presence is now invoked against me.

## XVI.     MEMORANDUM OF LAW: UNDER ROBERS V. UNITED STATES AND ITS PROGENY, THE ARES AND OAKTREE TRANSACTIONS — EACH REFUSED BY THE REHABILITATOR — BREAK THE CHAIN OF PROXIMATE CAUSATION AS A MATTER OF LAW, AND THE REHABILITATOR'S TEN-YEAR MOU HOLD AND PRE-MATURITY BOND SALE COMPOUND THAT BREAK BEYOND REPAIR

### A.     *The MVRA's proximate-cause requirement.*

86.     Under the Mandatory Victims Restitution Act, restitution is permitted only for losses "directly and proximately" caused by the offense conduct. 18 U.S.C. § 3663A(a)(2). The burden of demonstrating the amount of the loss "shall be on the attorney for the Government," 18 U.S.C. § 3664(e), and "any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," *id.* The Supreme Court has expressly limited restitution to "the loss caused by the specific conduct that is the basis of the offense of conviction."

42

*Hughey v. United States*, 495 U.S. 411, 413 (1990). The Fourth Circuit has held in binding terms that, to be a "victim" under the MVRA, a person must show that the harm "result[ed] from conduct underlying an element of the offense of conviction." *United States v. Blake*, 81 F.3d 498, 506 (4th Cir. 1996); *see also United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006). The Supreme Court has confirmed that proximate cause "is a standard aspect of causation in criminal law and the law of torts," *Paroline v. United States*, 572 U.S. 434, 444 (2014), requires "a sufficient connection" between the offense and the result, and "preclude[s] liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity," *id.* at 444–45. The legislative history confirms this limitation in the Government's own words: the Senate Judiciary Committee stated that mandatory restitution provisions "apply only in those instances where a named, identifiable victim suffers a physical injury or pecuniary loss directly and proximately caused by the course of conduct under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 932. The plea agreement's "full restitution" commitment (¶ 10(a)) must be construed against the Government as its drafter, and it did not waive the requirement that the loss be caused by Mr. Lindberg's conduct. The losses traceable to the Rehabilitator's intervening discretionary decisions were caused neither directly nor indirectly by Mr. Lindberg, and in any event have already been offset. The amount of restitution was instead committed to the Special Master for determination under 18 U.S.C. § 3664, subject to the Court's de novo review. § 3664(d)(6). The proximate-cause limitation therefore remains fully applicable to the determination of the restitution owed. Indeed, *Hughey* itself arose from a plea agreement, yet the Supreme Court confined restitution to "the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey*, 495 U.S. at 413.

87.    The Supreme Court further confirmed in *Lagos v. United States*, 584 U.S. 577 (2018), that the MVRA is to be "narrowly" construed, *id.* at 582–84, and that the statute "specifically lists the kinds of losses" that it covers, *id.* Where the harm alleged did not result from conduct underlying an element of the offense of conviction — and a fortiori where the harm was caused by the discretionary decisions of third parties acting after the cessation of the defendant's conduct — restitution is unavailable.

### B.    *Robers v. United States* controls: a victim's choice to hold collateral rather than reduce it to cash within a reasonable time breaks the chain of proximate causation.

88.    In *Robers v. United States*, 572 U.S. 639 (2014), the Supreme Court — unanimously — addressed the very proximate-cause question presented here under the very same MVRA provisions invoked by the Special Master. The Court held that intervening acts of the victim can sever the causal connection: "Market fluctuations are normally unlike, say, an unexpected natural disaster that destroys collateral or a victim's donation of collateral or its sale to a friend for a nominal sum — any of which, as the Government concedes, could break the causal chain." *Id.* at 646.

89.    Justice Sotomayor, joined by Justice Ginsburg, wrote separately to clarify the rule that controls here in unmistakable terms: "If a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring). And: "[A] victim's choice to hold collateral — rather than selling it in a reasonably expeditious manner — breaks the chain of proximate causation. … If the collateral loses value after the victim chooses to hold it, then that part of the victim's net loss is attributable to the victim's independent decisions. The defendant

44

cannot be regarded as the proximate cause of that part of the loss, and so cannot be made to bear it." *Id.* at 648 (alterations, citations, and internal quotation marks omitted).

### C. Application to the Ares and Oaktree refusals.

90. *Robers* concerned a victim that *merely held* collateral rather than selling it promptly. Even that *passive* choice, the *Robers* concurrence held, can break the chain of proximate causation. Here, the conduct of the victim's representative was substantially more affirmative. The NCDOI and the Rehabilitator did not merely fail to monetize the affiliated loans within a reasonable time. They affirmatively refused two separate, fully-negotiated, arm's-length, face-value cash offers — each of which I personally brought to the table, each of which was made by a sophisticated and well-capitalized third-party buyer committing its own balance sheet, and each of which would have monetized the entire affiliated-loan portfolio at par within months. If the *Robers* concurrence's principle applies to a victim's passive choice to hold collateral, it applies *a fortiori* to the Rehabilitator's affirmative choice to refuse two separately negotiated full-value cash offers for the same asset.

### D. Compounding application: the MOU's ten-year hold and the pre-maturity bond sale.

91. Even if the Rehabilitator's discretionary refusals of the Ares and Oaktree transactions did not, standing alone, break the chain of proximate causation (and they do), the Rehabilitator's affirmative election in the June 27, 2019 MOU to *hold the affiliated loans for a ten-year term* — rather than monetize them — is the quintessential "victim's choice to hold" addressed in *Robers*. A ten-year hold of an asset that two sophisticated buyers had just independently offered to take off the NCICs' balance sheets in cash at face value is, by any measure, *not* "reduc[ing] [the collateral] to cash within a reasonable time." *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring). And as detailed in Section VI above, the Rehabilitator's pre-

45

maturity sale of more than $1 billion in face value of bank zero-coupon bonds whose only purpose was to insure the affiliated-loan portfolio against any loss of principal compounds the proximate-cause break a second and independently dispositive time.

### E. The Special Master's loss figure cannot survive the Robers analysis.

92. The portion of the Special Master's recommended restitution figure attributable to the affiliated-loan portfolio is, after application of *Robers* and *Davenport*, **zero**. The affiliated loans were not impaired at the moment of transfer: two sophisticated arm's-length buyers — Ares and Oaktree — independently priced them at par within four months of one another. The Rehabilitator refused both transactions. He then forced me to sign the MOU under threat of immediate liquidation. The MOU memorializes the Rehabilitator's affirmative election to hold the affiliated loans for ten years rather than monetize them. The Rehabilitator separately and discretionarily sold the bank zero-coupon bonds before maturity, crystallizing $611.6 million in loss on principal-protection instruments. Under *Robers* — and under *Davenport*'s requirement that any compensable loss "result from conduct underlying an element of the offense of conviction," 445 F.3d at 374 — any post-MOU decline in the recoverable value of the affiliated-loan portfolio is the proximate consequence of the Rehabilitator's discretionary refusals and ten-year hold election, not of any conduct of mine.

93. In any event, were the Court to undertake the inquiry into whether and to what extent any portion of the claimed loss is attributable to my offense conduct as distinct from the post-October 18, 2018 discretionary conduct of the Rehabilitator and the unidentified third-party constituent who pressured Ares, that inquiry would require litigation extending "over many months, if not years," which would "unduly complicate and prolong the sentencing process." *United States v. Purdue Frederick Co.*, 495 F. Supp. 2d 569, 574–75 (W.D. Va. 2007). For offenses

46

described in 18 U.S.C. § 3663A(c)(1)(A)(ii) or (iii), the MVRA itself provides that it "shall not apply" where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B); *see also United States v. Reifler*, 446 F.3d 65, 135–39 (2d Cir. 2006). Congress's intent is to the same effect. The Senate Judiciary Committee directed that "highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution," and that "losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution." S. Rep. No. 104-179, at 19 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 932. The causation and valuation questions the Special Master's figure resolves are precisely the "highly complex" and "speculative" issues Congress placed beyond the reach of mandatory restitution.

94. The point is dispositive: the NCICs and the Rehabilitator cannot, in 2026, demand approximately $1.655 billion in restitution measured by a claimed decline in the recoverable value of an asset that *they themselves* affirmatively chose to hold for ten years — after refusing two separate arm's-length face-value cash offers for the same asset, after threatening to liquidate the NCICs if I did not sign the very MOU that imposed that ten-year hold, and after separately liquidating the more than $1 billion in bank zero-coupon bonds whose only purpose was to ensure that no such loss could occur. This result is irreconcilable with the make-whole purpose Congress assigned to restitution. The Senate Judiciary Committee reaffirmed that restitution exists to "restore the victim to his or her prior state of well-being." S. Rep. No. 104-179, at 13 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 926. A restitution figure measured by a loss that the victim's

own representative caused, and that exceeds the victim's actual loss, does not restore anyone to a prior state of well-being; it confers a windfall the MVRA does not permit.

XVII. **THE DESTRUCTION OF THE $454 MILLION IN NCIC VALUE WAS NOT PROXIMATELY CAUSED BY MY OFFENSE CONDUCT — FULL CREDIT IS REQUIRED UNDER THE MVRA**

95. As set forth in Paragraphs 55–62 of the Original Statement, eighteen days after I transferred operational control of the NCICs to the Special Deputy Rehabilitator — on November 5, 2018 — the management of the NCICs (acting under the Rehabilitator's supervision and on a record hostile to me) prepared an internal valuation valuing the NCICs at $454 million. *See* Original Stmt. ¶ 56 & Exhibit J. That valuation is the most reliable contemporaneous measure of fair market value at the moment of transfer because (i) it was prepared by persons under the Rehabilitator's control; (ii) it was prepared just 18 days after the transfer, when no material change in the underlying businesses had occurred; and (iii) it was prepared for the Rehabilitator's internal financial-management purposes, not as litigation evidence.

96. Applying the *Robers*-based proximate-cause framework set forth in Section XVI above to the $454 million in NCIC value that was destroyed after October 18, 2018 yields a single, dispositive conclusion: that destruction was not proximately caused by my offense conduct. Each of the discretionary acts set forth below was undertaken after I had ceased to control the NCICs, was within the exclusive discretion of third parties (principally the Rehabilitator), and represented a free, deliberate, and informed choice to act in a manner that destroyed value rather than preserve it:

   a. **Refusal of the Ares Transaction.** As established by Exhibits A and B and Sections XII and XIV above, the Ares Management acquisition would have paid every NCIC policyholder in full by approximately June 2019. The transaction was defeated by third-

48

party government pressure on the buyer and by the Rehabilitator's subsequent refusal to re-engage. That refusal is the proximate cause of the loss of the Ares alternative. It is not my conduct.

b. **Refusal of the Oaktree Transaction.** As established by Exhibits C, D, and E and Sections XIII and XIV above, the Oaktree "Global Solution" structure would have channeled a $1.0 billion Oaktree investment into a holding-company SPV that would have acquired the affiliated-loan positions held by the NCICs and 100% of the GBIG equity. The Rehabilitator elected not to proceed. That discretionary refusal is an independent, intervening, and superseding cause of the post-October 18, 2018 destruction of NCIC value.

c. **"Day One" Liquidation Posture, Hammer-and-Nail Coercion, and Ten-Year MOU Hold.** On June 27, 2019 — the very day the rehabilitation order was entered — Mr. Dinius wrote to me from his Noble Consulting account stating: "we will contact the guaranty associations and move directly to liquidation. You know what that means." Original Stmt. ¶ 58(a) & Exhibit D5. His counsel told me directly, "Mr. Lindberg, you're the nail. I'm the hammer." Trial Tr. (Vol. 5) p. 1012:11–12. He never re-engaged with Ares or Oaktree. He forced me to sign the MOU under threat of immediate liquidation. He then elected, in the MOU itself, to hold the affiliated loans for a ten-year term rather than monetize them.

d. **Refusal of the 2023 Montshire/Alban Offer.** In 2023, I negotiated with Montshire Advisors and an investment group formed by Bob Alban to submit a purchase agreement to the NCDOI for the NCICs. Original Stmt. ¶ 58(c) & Exhibits O3, O4. That transaction, like Ares and Oaktree before it, would have generated proceeds

sufficient to pay every NCIC policyholder in full. The Rehabilitator's response was to reject the offer and to file litigation against Mr. Alban.

e. **Blocking the Q1 2024 Quadro Transaction.** In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the Specified Affiliated Companies at approximately $3.4 billion (at a 22.14x EBITDA multiple consistent with public comparables), and valuing Clanwilliam alone at $880 million. Original Stmt. ¶¶ 16, 58(d), 75 & Exhibits G3, I3, I4. The Rehabilitator blocked the Quadro transaction over my repeated objections and then forced a September 2025 below-market fire-sale of Clanwilliam to TA Associates for $450 million — a $474 million destruction of value attributable entirely to the Rehabilitator's discretionary decision to block the Quadro deal.

f. **Pre-Maturity Sale of the $1.006 Billion in Protective Bank Zero-Coupon Bonds.** As detailed in Section VI above and in Paragraphs 47–54 of the Original Statement, the Rehabilitator made the unilateral discretionary decision to sell the bank zero-coupon bonds underlying the Principal Protected Notes prior to maturity for approximately $394 million, rather than holding them to maturity for the full par recovery of $1,006,239,867. That decision crystallized a $611.6 million loss on instruments whose entire purpose was to protect the principal of the affiliated investments from any credit-related downside.

g. **Extraction of More Than $165 Million in Administrative Fees.** The Rehabilitator extracted more than $165 million in administrative fees from the very NCIC estates the Special Master now seeks to have me further compensate, including over $25 million

paid to Noble Consulting and Mr. Dinius personally. *See* Original Stmt. ¶ 58(i) & Exhibit M.

97.     Each of the discretionary acts described above satisfies the classic definition of an intervening, superseding cause: each was a free, deliberate, and informed choice of a third party — principally the Rehabilitator — made after the cessation of my conduct, and each was the proximate cause of the loss it produced. Under *Paroline*, *Davenport*, *Robers*, 572 U.S. at 647 (Sotomayor, J., concurring), and *Purdue Frederick Co.*, the chain of proximate causation linking my offense conduct to the destruction of the $454 million in NCIC value is broken. I am due a full $454 million credit in addition to full credit for the $611.6 million loss on the bank zero-coupon bonds.

## XVIII.    THE AAPC PREFERRED EQUITY TRANSFERRED TO ULICO — THE $352 MILLION CREDIT

98.     As set forth in Paragraphs 63–69 of the Original Statement, a substantial portion of the affiliated investments that the Special Master attributes to me as restitution-eligible loss consisted of approximately $352 million in preferred equity issued by Academy Association, Inc.-related entities (the "AAPC Preferred Equity") that was, in fact, transferred to and is now held by ULICO ("ULICO") in connection with the resolution of the ULICO reinsurance relationship. To the extent the AAPC Preferred Equity is now an asset of ULICO, its value cannot also be counted as an unrecovered loss of the NCICs; doing so double-counts the same asset.

99.     The ULICO relationship has been the subject of separate federal litigation. *See Universal Life Insurance Co. v. Lindberg*, No. 1:20-cv-861 (M.D.N.C.) [D.E. 122] (M.D.N.C. May 3, 2022). That litigation resulted in a judgment in the approximate amount of $524 million, which was thereafter resolved by a December 2022 settlement (Original Stmt. Exhibits A and B). The AAPC Preferred Equity transferred in connection with that resolution carried an 18% payment-in-

kind ("PIK") accrual rate and was subject to transfer restrictions for only approximately four months, after which it was freely transferable. The economic value of the AAPC Preferred Equity — approximately $352 million — is presently held by ULICO and must be credited against any restitution figure under 18 U.S.C. § 3664(j)(2) and the anti-double-recovery principles discussed in Sections IV and XVI above. This matter is the subject of the pending Puerto Rico federal arbitration. *See Lindberg v. ULICO*, No. 26-cv-01026-MAJ (D.P.R.). Congress enacted § 3664(j)(2) precisely to prevent this. The Senate Judiciary Committee explained that the provision's purpose "like its predecessor in current law, is to ensure that the victim is not compensated twice for the same loss," and clarified that "same loss" refers to "a specific loss arising from the same criminal act." S. Rep. No. 104-179, at 21 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 934. Because ULICO already holds the AAPC Preferred Equity, counting its approximately $352 million value as an unrecovered loss of the NCICs would compensate the victims twice for the same loss — the precise result Congress legislated against.

## XIX. ADDITIONAL LOSSES NOT PROXIMATELY CAUSED BY MY OFFENSE CONDUCT

100. As set forth in Paragraphs 70–77 of the Original Statement, several additional categories of claimed loss included in the Special Master's preliminary computation were not proximately caused by any conduct underlying an element of my offense of conviction, and each is fully credit-eligible under Hughey, Blake, Davenport, and Robers:

a. **Agera Energy — approximately $129 million.** The Agera Energy investment was originated by Platinum Partners and was inherited by me as part of the June 2017 acquisition of the PBLA-Bermuda reinsurance portfolio from Beechwood. It became a write-off following the discovery of financial fraud committed by Agera's independent Chief Financial Officer — the criminal conduct of a third party wholly independent of

52

any conduct of mine. The approximately $129 million in Agera-attributable loss was not proximately caused by my offense conduct.

b. **ECL — approximately $22.2 million.** The approximately $22.2 million in ECL-attributable loss arose from circumstances independent of any conduct underlying an element of my offense of conviction and is fully credit-eligible.

c. **Clanwilliam — approximately $474 million.** As set forth in Section XVII(e) above, the Rehabilitator blocked the Q1 2024 Quadro transaction (which valued Clanwilliam at $880 million) and then forced a September 2025 below-market sale of Clanwilliam to TA Associates for approximately $450 million, destroying approximately $474 million in value. That destruction is attributable to the Rehabilitator's discretionary decision, not to my offense conduct.

d. **UKAT — approximately $39 million.** The approximately $39 million in UKAT-attributable loss arose from circumstances independent of any conduct underlying an element of my offense of conviction and is fully credit-eligible.

e. **Insurance-Holdco Debt — approximately $14.87 million.** As set forth in Section IX above, the Insurance-Holdco debt could not be serviced as cash-pay senior debt because the NCICs in rehabilitation were not generating cash to service holding-company debt — a fact Mr. Dinius expressly agreed to and reflected in his June 17, 2019 email. The approximately $14.87 million in Insurance-Holdco-attributable loss is not properly chargeable to me.

101. Each of these categories is independently supported by the proximate-cause authorities set forth in Section XVI above. The Government has not carried, and cannot carry, its

burden under 18 U.S.C. § 3664(e) of demonstrating by a preponderance of the evidence that any of these losses resulted from conduct underlying an element of the offense of conviction.

## XX.  OTHER CREDITS DUE

102.  As set forth in Paragraphs 78–79 of the Original Statement, I am entitled to the following additional credits, each of which represents value already received by or available to the NCIC estates and each of which the Special Master's preliminary computation does not appear to credit:

a.  **Idaho and North Carolina Real Estate — approximately $13.5 million.** Real-estate assets located in Idaho and North Carolina, with an approximate aggregate value of $13.5 million, was transferred to ULICO and must be credited against any restitution figure.

b.  **Additional Clanwilliam Escrow — approximately $20 million.** An additional approximately $20 million Clanwilliam-related escrow is available to the NCIC estates and must be credited. As set forth in Section XXII below, in September 2025 I voluntarily relinquished a $40 million tax escrow established for my benefit so that the Clanwilliam sale could proceed and the excess policyholders could be paid.

## XXI.  PRE-JUDGMENT INTEREST SHOULD NOT BE AWARDED — THE $263 MILLION REDUCTION

103.  As set forth in Paragraphs 80–82 of the Original Statement, the Special Master's preliminary computation includes approximately $263 million in pre-judgment interest. That interest should not be awarded, for two independent reasons.

104.  *First*, the restructured affiliate-loan tranches were, by the express terms of the June 17, 2019 Dinius email and the MOU, converted to *zero-coupon* obligations that bear no interest.

(Original Statement Exhibit G; *see* Section VIII above.) Mr. Dinius's own June 17, 2019 table converts the Agera, PBLA-main, Malta, insurance-co, and NHC tranches to "10-year zero," "7-year note" zero-coupon, and similar non-interest-bearing instruments. An award of pre-judgment interest on obligations that the victim's own representative contractually converted to zero-coupon, non-interest-bearing instruments would be contrary to the parties' agreement and would manufacture a category of loss that does not exist.

105.    *Second*, pre-judgment interest is not available under the MVRA where, as here, the underlying loss figure is itself contested and the delay in resolution is attributable to the victim's own representative — the Rehabilitator — whose discretionary refusals of the Ares, Oaktree, Montshire/Alban, and Quadro transactions, and whose pre-maturity sale of the protective bonds, are the proximate cause of any delay in policyholder recovery. *See* Sections XVI and XVII above. The approximately $263 million in pre-judgment interest should be eliminated from any restitution figure.

## XXII.    A DECADE OF CONTEMPORANEOUSLY-DOCUMENTED CONDUCT PLACING POLICYHOLDER SECURITY AHEAD OF MY OWN ECONOMIC INTERESTS

106.    The proximate-cause analysis set forth above does not stand alone. It is reinforced by — and is the natural product of — a sustained, decade-long course of conduct in which, from the very inception of my investments in the insurance business, I took repeated, costly, and well-documented steps to ensure that policyholders were fully secure.

107.    **2014 — NCDOI Approval and Personal Guarantee of All Affiliated Investments.** When I first proposed the affiliated-investment structure to the NCDOI in September 2014, I did not merely seek approval of the structure — I affirmatively offered to personally guarantee every affiliated investment held by my North Carolina insurers. *See* Original Stmt. ¶ 4

& Exhibit A2. The affiliated-investment strategy that the NCDOI approved in 2014 — capped at 40 percent of total admitted assets — has since been adopted (and in some cases exceeded) by Blackstone, Brookfield, KKR, Eldridge, and Apollo. *See* Sections III and V above and Exhibits A12, B5, and B6.

108.    **2015 — Formal Affiliate-Investment Risk-Management Policy.** In 2015, I implemented a formal, written affiliate-investment risk-management policy governing how the NCICs would underwrite, monitor, and limit affiliated exposures. The policy instituted credit-quality requirements, concentration limits, periodic reporting, and reserve-style protections — none of which were required by the NCDOI but all of which I adopted and followed in order to enhance the protection of policyholders. *See* Exhibit B21.

109.    **2017 — Personal $17 Million Cash Infusion to CBL Within 48 Hours of the McCord Fraud Discovery.** In 2017, when fraud committed by Ron McCord and First Mortgage Company was discovered as having affected an investment held by CBL, within 48 hours of the fraud's discovery I personally funded $17 million directly into CBL to absorb the loss and restore the affected balances. The McCord fraud was the criminal conduct of a third party wholly independent of any conduct of mine. The 2017 infusion is the paradigmatic example of how I actually behaved in the face of unexpected losses to my insurance companies: I wrote a personal check.

110.    **May 2018 — $1+ Billion in Investment-Grade Bank Zero-Coupon Bonds Purchased as Principal-Loss Insurance for the Affiliate Loans.** As detailed in Section VI above and in Paragraphs 47–54 of the Original Statement, in May 2018, pursuant to a memorandum of understanding with the NCDOI (Original Stmt. Exhibit M5), I directed the NCICs to construct the Principal Protected Notes and to purchase, as the protective layer inside those PPNs, more than $1

billion in face value of investment-grade zero-coupon bonds issued by Barclays Bank PLC, Bank of Montreal, Royal Bank of Canada, and Natixis SA. Held to maturity, those bonds were contractually obligated to pay $1,006,239,867 at par — covering the affiliate loans dollar-for-dollar.

111. **November 2018 — Executed Ares Letter of Intent.** On November 22, 2018, just thirty-five days after I had transferred operational control of the NCICs to the Special Deputy Rehabilitator, I executed an arm's-length letter of intent with Ares Management Corporation (Exhibit B) that committed Ares to acquire 100% of the NCICs and the rest of GBIG for upfront cash consideration of $400–$420 million. Had it closed, every NCIC policyholder would have been paid in full by approximately June 2019.

112. **February 2019 — Independent Oaktree Capital Management $1.0 Billion SPV Transaction.** Within weeks of the Ares termination, I personally directed the negotiation with Oaktree Capital Management memorialized in Exhibits C, D, and E. As I wrote to my team in Exhibit D, "suggest we push these three options daily with some vigor." The Rehabilitator elected not to proceed.

113. **March 10–11, 2019 — Execution of the Amended & Restated Backstop Agreement.** On March 11, 2019, I executed the Amended & Restated Backstop Agreement in favor of the very insurance company lenders the Government identifies as victims, personally guaranteeing approximately $2.39 billion of affiliated-loan and preferred-equity obligations. *See* Section IV above and Original Statement Exhibit B.

114. **June 27, 2019 — Forced Execution of the MOU Under Threat of Immediate Liquidation.** As established in Section XIV above, I executed the MOU under express written threat from the Rehabilitator that, if I did not sign, he would immediately contact the guaranty

associations and "move directly to liquidation." I signed in order to protect policyholders from the harm the Rehabilitator was threatening to inflict on them.

115. **2014–2018 — Zero Dividends Taken From the NCICs.** During the entire period from 2014 through 2018 — when I controlled the NCICs — I never took a single dollar in dividends from the North Carolina insurance companies. The capital I committed to the insurance companies, and the earnings of those companies, were retained in the regulated insurance estates rather than distributed to me.

116. **2023 — Montshire/Bob Alban Investor Group Offer.** In 2023, undeterred by the Rehabilitator's refusals of the Ares and Oaktree transactions, I negotiated with Montshire Advisors and an investment group formed by Bob Alban to submit a purchase agreement to the NCDOI for the NCICs. The Rehabilitator's response was to reject the offer and to file litigation against Mr. Alban.

117. **Q1 2024 — Signed $880 Million Quadro Acquisition Corp. (NASDAQ: QRDO) Transaction.** In Q1 2024, Quadro Acquisition Corp. One signed a purchase agreement valuing the SAC group at approximately $3.4 billion and Clanwilliam alone at $880 million. The Rehabilitator blocked the Quadro transaction over my repeated objections.

118. **September 2025 — Consent to the Clanwilliam Sale and Voluntary Relinquishment of $40 Million in Tax Distributions.** In September 2025, when the Clanwilliam sale through the Special Master process was finally permitted to proceed, I voluntarily consented to the sale and agreed to relinquish a $40 million tax escrow that had been established for my benefit. Without that consent, the 43,000 excess policyholders would not have received the $157 million they had not previously been paid.

119. Taken in chronological sequence, the conduct described above establishes a single, unbroken pattern beginning in 2014 and continuing to the present: at every juncture at which I had a choice between protecting policyholders and protecting myself, I chose the policyholders. The cause of the six-year-plus delay in policyholder payments is the conduct of the NCDOI and the Rehabilitator in defeating the Ares, Oaktree, Montshire/Alban, and Quadro transactions — and in liquidating the bank zero-coupon bonds pre-maturity — and is not my conduct.

## XXIII. POLICYHOLDER PAYMENTS — THE POLICYHOLDERS HAVE BEEN PAID

120. As set forth in Paragraphs 83–84 of the Original Statement, the NCICs' policyholders have been paid. In December 2025, following my September 2025 consent to the Clanwilliam sale and my voluntary relinquishment of the $40 million tax escrow, a distribution of more than $157 million was made to more than 43,000 excess policyholders — the amounts those policyholders had not previously been paid.

121. The Special Master's preliminary computation does not appear to credit these recoveries from collateral and obligor entities, the bank zero-coupon bond proceeds, the AAPC/ULICO offset, or the asset-sale proceeds already received by the Rehabilitator. Each of these must be credited against any restitution figure.

## XXIV. SUMMARY OF REQUIRED OFFSETS, CREDITS, AND REDUCTIONS

122. The following table summarizes the principal offsets, credits, and reductions established in the foregoing sections and in the Original Statement. Each figure is detailed, and its evidentiary and legal basis set forth, in the section of this Statement cross-referenced in the right-hand column. Certain categories below are alternative or partially overlapping measures of the same underlying value destruction (for example, the destruction of NCIC enterprise value and certain discretionary post-transfer dispositions); the categories are reconciled in their respective

59

sections, and the figures below are presented as claimed in the Original Statement. The dispositive point is that the aggregate of the offsets and credits established herein exceeds the Special Master's preliminary restitution figure, such that the net restitution properly owed is $0.

| Offset / Credit / Reduction | Amount | § |
|---|---:|---|
| Correction of NCIC starting principal balance ($1.391B → $1.25B) | $141,000,000 | VII |
| FinCo read-through reduction | $139,000,000 | X |
| Zero-coupon bond cash proceeds (18 U.S.C. § 3664(j)(2)) | $394,000,000 | VI, XI |
| Zero-coupon bond crystallized loss from pre-maturity sale (Robers) | $611,600,000 | VI |
| Destruction of NCIC enterprise value at transfer | $454,000,000 | XVII |
| AAPC preferred equity now held by ULICO | $352,000,000 | XVIII |
| Agera Energy (not proximately caused) | $129,000,000 | XIX |
| ECL (not proximately caused) | $22,200,000 | XIX |
| Clanwilliam value destruction (Quadro blocked; forced fire-sale) | $474,000,000 | XIX |
| UKAT (not proximately caused) | $39,000,000 | XIX |
| Insurance-Holdco debt (non-cash-pay) | $14,870,000 | XIX |
| Idaho and North Carolina real estate | $13,500,000 | XX |
| Additional Clanwilliam escrow | $20,000,000 | XX |
| Pre-judgment interest (should not be awarded) | $263,000,000 | XXI |
| **Special Master's preliminary restitution figure** | **$1,655,000,000** | |
| **NET RESTITUTION PROPERLY OWED (offsets exceed figure)** | **$0** | |

123.     Even on the most conservative view — crediting only the zero-coupon bond credits (approximately $1.006 billion, Section VI), the starting-balance correction ($141 million, Section VII), the FinCo read-through ($139 million, Section X), and the AAPC/ULICO offset ($352 million, Section XVIII) — the aggregate offsets of approximately $1.638 billion, supplemented by any single additional category established above, exceed the Special Master's preliminary figure. The net restitution properly owed, after application of the offsets and credits to which I am entitled under the MVRA and applicable Fourth Circuit authority, is $0.

## XXV.   CONCLUSION AND SUMMARY

124.   The foregoing facts, supported by contemporaneous documentary exhibits, establish the following propositions, each of which is material to the restitution determination and to the integrity of the plea-agreement record:

1. **Affiliate investment up to a 40% admitted-assets ceiling was the expressly approved NCDOI regulatory framework** for the NCICs, documented in the April 19, 2016 SNIC/NCDOI correspondence (Original Statement Exhibit A12).

2. **I personally guaranteed approximately $2.39 billion of obligations owed to the very insurance companies the Government identifies as victims**, and continuously reinvested personal capital into the affiliated platform — conduct categorically incompatible with fraudulent intent Original Statement (Exhibit B; Section IV above).

3. **Affiliate investment at, near, and exceeding 40% is standard industry practice** among the largest private-equity-affiliated U.S. life insurers, as confirmed by Exhibit B5 and the May 26, 2026 *Wall Street Journal* reporting (Exhibit B6).

4. **In May 2018, I directed the NCICs to invest more than $1 billion in face value of investment-grade bank zero-coupon bonds as dollar-for-dollar principal-loss insurance for the affiliate loans** (Section VI above and Original Stmt. ¶¶ 47–54). The approximately $1.006 billion in par value fully covered the approximately $1 billion in outstanding affiliate loans. The Rehabilitator's discretionary pre-maturity sale of those bonds for approximately $394 million crystallized a $611.6 million loss on the very instruments whose only purpose was to prevent affiliate-loan loss — yielding two separate credits totaling approximately $1.006 billion against the Special Master's preliminary restitution figure.

61

5. **Two arm's-length, face-value cash transactions for the affiliate-loan portfolio — Ares (November 2018) and Oaktree (February 2019) — were on the table within months of my October 18, 2018 transfer of operational control**, either of which would have paid every NCIC policyholder in full by approximately June 2019 (Exhibits A, B, C, D, and E).

6. **The Special Deputy Rehabilitator broke the chain of proximate cause** by (a) refusing both pending transactions, (b) compelling me, under threat of immediate liquidation, to execute the MOU locking the affiliate loans in place for ten years, (c) extracting representations and warranties under the express "hammer and nail" framing, and (d) discretionarily selling the bank zero-coupon bonds before maturity.

125.    As summarized in Section XXV above, the aggregate of the offsets, credits, and reductions established herein exceeds the Special Master's preliminary restitution figure, such that the net restitution properly owed is $0. I respectfully submit this Supplemental Statement of Facts to ensure that the foregoing matters are fully and accurately before the Court as it addresses the contested preliminary restitution order, the pending Emergency Motion to Stay, and related restitution-phase matters.

## XXVI.    PRESERVATION OF ERROR FOR APPELLATE REVIEW

126.    To the extent any factual or legal contention set forth above has not previously been raised in a discrete filing in this matter, I expressly preserve each such contention for appellate review. The contentions specifically preserved by this filing include, without limitation: (i) the lack of "direct and proximate" causation between the offense of conviction and the losses asserted in the Special Master's preliminary restitution computation, *see* 18 U.S.C. § 3663A(a)(2); *Hughey v. United States*, 495 U.S. 411, 413 (1990); *United States v. Blake*, 81 F.3d 498, 506 (4th Cir.

1996); *Paroline v. United States*, 572 U.S. 434, 444–46 (2014); (ii) the intervening-cause and offset arguments arising from the Rehabilitator's conduct — including the discretionary refusals of the Ares and Oaktree transactions, the ten-year MOU hold, the "hammer and nail"-coerced representations and warranties, and the pre-maturity sale of the bank zero-coupon bonds — and the failure of the preliminary restitution computation to credit recoveries and offsets to which I am entitled under 18 U.S.C. § 3664(e), (j)(2), *see Robers v. United States*, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring, joined by Ginsburg, J.); *United States v. Davenport*, 445 F.3d 366, 374 (4th Cir. 2006); *United States v. Alalade*, 204 F.3d 536, 540 n.4 (4th Cir. 2000); and (iii) the duress-based challenge to representations, warranties, and ten-year lock-in agreements extracted by the Rehabilitator, *see* Restatement (Second) of Contracts §§ 175–176 (Am. Law Inst. 1981).

## XXVII.  RESERVATION OF RIGHTS

127.  I expressly reserve the right to further supplement this Statement to (i) provide additional documentary support upon further restoration of access to my files, including, in particular, the PPN/zero-coupon worksheet and the bond-by-bond cross-walk to the underlying affiliated investments described in Section VI above, and the complete disposition records for the PPN-embedded zero-coupon bonds described in Section XI above; (ii) reflect any disposition records produced by the Special Deputy Rehabilitator regarding the PPN-zero dispositions, including the precise pre-MOU versus post-MOU split of the $394 million in total proceeds; (iii) reflect any updated valuations of the AAPC Preferred Equity beyond the $352 million figure set forth in Section XVIII above; (iv) provide further sworn testimony at any evidentiary hearing the Court may convene; (v) introduce further documentary evidence concerning the negotiations with Ares, Oaktree, HPS, the Soros funds, Landmark Partners, Collier Capital, Lexington, Nomura, and

63

other prospective SPV-financing counterparties between November 2018 and June 2019; (vi) incorporate by reference any additional matters set forth in my contemporaneously filed Emergency Motion , Memorandum of Law ,and Response and Objection to the Special Master's Report (Docket No. 132); and (vii) seek any further relief from this Court necessary to remediate the Rehabilitator's ongoing impairment of my access to counsel as described in Section VI(K) above. All matters set forth in the Original Statement are incorporated herein by reference and remain in full force and effect.