**EXHIBIT B**



November 22, 2018

**<u>VIA ELECTRONIC MAIL</u>**

Greg Lindberg
Chairman & Founder, Eli Global

Lou Hensley
CEO & President, Global Bankers Insurance Group

Paul Brown
CIO, Global Bankers Insurance Group

*Re: Non-binding Proposal*

Gentlemen:

Ares Management, L.P., (together with its affiliates and subsidiaries, "***Ares***", "***we***" and "***our***"), is excited to submit this non-binding (other than in respect of Section 12 (*Exclusivity*, *Conditions and Approvals*) and Section 16 (*Confidentiality*), below which are binding), Proposal (the "***Proposal***") to acquire (the "***Transaction***") a 100% ownership interest in the U.S. Business of Global Bankers Insurance Group, comprised of the following entities: (i) Pavonia Holdings (US), Inc., (ii) Pavonia Life Insurance Company of Michigan, (iii) Pavonia Life, (iv) Colorado Bankers Life Insurance Company, (v) Southland National Reinsurance Corporation, (vi) Southland National Insurance Corporation, (vii) American Funeral and Cremation Plans, LLC, (viii) Preferred Financial Corporation, LLC and (ix) Bankers Life Insurance Company (together, "***Global Bankers***", "***GBIG***" or the "***Company***").

Our due diligence efforts, including meetings with members of GBIG management and detailed review of the pertinent information provided by GBIG in the electronic data room prior to the date hereof, have reinforced our strong conviction that Global Bankers has tremendous upside potential over the near and long term. We believe that fixed and indexed life & annuity sales are poised for continued material growth. The market and policyholders will continue to best be served by an independent and growing GBIG that continues to create innovative solutions to enhance value to customers. We look forward to the opportunity to partner with and support GBIG to further position the franchise for strong growth in the years to come.

1

## Overview of Ares Management:

Ares is a leading publicly-traded global alternative asset manager with approximately $125 billion[1] of assets under management and over 1,000 employees in more than fifteen offices in the United States, Europe, Asia and Australia. We have three complementary investment groups – Credit, Private Equity and Real Estate – each a market leader based on assets under management and investment performance. Ares has a large and diversified portfolio with over 215 funds and accounts invested in over 1,500 companies, over 500 structured assets and over 160 properties. This provides tremendous advantages in terms of deal sourcing, due diligence and management access for each pool of capital and its respective investor base across Ares' investment platform. Ares also has an extensive research team, which produces proprietary research on approximately 60 industries.



| | CREDIT | PRIVATE EQUITY | REAL ESTATE |
|---|---|---|---|
| | A leading participant in the non-investment grade corporate credit markets | One of the most consistent private equity managers in the U.S. with a growing international presence | A leading participant in the real estate private equity markets and a growing direct lender |
| Assets Under Management | $91.5 billion | $23.0 billion | $10.6 billion |
| Key Strategies | High Yield Bonds Syndicated Loans Structured Credit Direct Lending | Corporate Private Equity Special Opportunities Energy Opportunities Infrastructure and Power | Real Estate Debt Real Estate Private Equity |

Ares was built upon the fundamental principle that each investment group benefits from being part of the greater whole. This multi-asset expertise provides the Firm's professionals with insights into industry trends, access to deal flow and the ability to assess relative value. Each of our investment groups has generated strong returns through investment cycles. This is the result of several factors, which include: (i) a consistent, disciplined approach to investing; (ii) long-tenured, dedicated leadership; and (iii) an exceptionally integrated network of investment professionals who communicate with their colleagues throughout the firm.

---

[1] As of September 30, 2018, AUM amounts include funds managed by Ivy Hill Asset Management, LP., a wholly owned portfolio company of the Ares Capital Corporation and a registered investment advisor.

2

Ares has a deep and expanding investor base founded on our long-term performance and focus on patient, long term flexible capital.



Ares has extensive experience with the insurance industry which ranges from managing general account assets of insurance companies to minority ownership interests in insurance companies. Today we manage approximately $13 billion of assets for over 95 insurance company clients, which continues to be our fastest growing client base. We work with a broad array of insurance clients (life/P&C, domestic/foreign, etc.) to be a differentiated source of portfolio yield enhancement across multiple asset sectors such as structured credit (CLOs and ABS), middle market corporate loans, commercial mortgage loans and syndicated credit. We currently have several separately managed accounts for insurers with mandates greater than $500 million. For example, Ares manages a $700 million commercial mortgage loan SMA with a life insurance company rated A- by A.M. Best and a $2 billion credit SMA with a P&C insurance company with a $200 billion general account balance sheet.

We have relevant experience and capabilities in the insurance industry as outlined below:

- As a result of our robust insurance client base, Ares is familiar with investment guidelines under regimes such as NAIC and Solvency II and has proven its ability to work with insurance clients to optimize investment portfolios subject to regulatory constraints.

- Similarly, we have deep experience in asset-liability management, not only with insurers, but also with over 250 pension fund clients seeking relevant solutions.

- Over the last several years, Ares has been proactively pursuing strategic opportunities in the life and annuity sectors to deploy Ares' and its respective partners' capital in platforms where our differentiated asset origination capabilities are able to enhance equity returns.

- Ares has deployed balance sheet capital in other life insurance related opportunities in addition to reviewing and participating in numerous opportunities on behalf of our funds.

3

- Our ability to leverage our extensive network of distribution partners, reinsurers and capital providers can further support the successful growth of the Company.

- Members of the Ares team have significant relevant industry experience, with several portfolio managers having previously worked at U.S. life insurers.

**Proposal:**

Based on recent discussions, we understand GBIG's strategic priority is to find a counterparty that will: (i) provide execution certainty, (ii) act quickly and (iii) provide long-term strategic capital to invest in the future of the business.

We offer execution certainty with immediate access to balance sheet capital and are confident that we will be positively supported by insurance regulators and industry participants.

We believe that the Proposal will be attractive to all relevant constituents including but not limited to policyholders, regulators, and employees, particularly due to our:

- Strong belief in and commitment to the long-term growth of the life and annuity market.

- Strong appreciation for GBIG's imbedded capabilities, people and vision for the business.

- Ability to accelerate growth in the business through new product development, continued investment in an end-to-end digital platform, supporting increased new business volumes, pursuing opportunistic inorganic transactions and originating differentiated assets to optimize portfolio composition.

- Ability to fund future growth of the Company and better capitalize the business to position it for a possible ratings upgrade through access to long-term patient capital.

- Strong relationships with Wall Street, distribution channels, reinsurance partners, corporate counterparties, and capital providers with a lower cost of capital.

4

We outline below the key elements of the Proposal:

1. Purchase Price:

   - Purchase Price Option A:
     - Upfront Purchase Price: We propose an upfront purchase price of $400 million paid at transaction closing in cash.

     - Earnout: Up to $50 million payable at the third anniversary of transaction close provided that the Company achieves defined levels of new business sales, from the fourth quarter of 2018 to the third anniversary of transaction close ("*Earnout New Business Sales*"), as defined herein. Should the Company achieve $5 billion of Earnout New Business Sales, a $50 million earnout would be payable. Should the Company achieve $2.5 billion of Earnout New Business Sales, a $25 million earnout would be payable. The Company may receive a pro-rata earnout between $25 and $50 million if Earnout New Business Sales are less than $5 billion but greater than or equal to $2.5 billion. No earnout will be payable to the extent that the Company's Earnout New Business Sales are less than $2.5 billion.

   - Purchase Price Option B:
     - Upfront Purchase Price: We propose an upfront purchase price of $420 million paid at transaction closing in cash.

     - Purchase Price Claw Back: Upfront Purchase Price subject to a $20 million claw back, paid by Eli Global, should the Company achieve less than $2.5 billion of new business sales from the fourth quarter of 2018 to the third anniversary of transaction close; provided that we will operate the business in a commercially reasonable manner designed to generate adequate sales, including (a) maintaining capital sufficient to support target Risk Based Capital and ratings and (b) pricing products at competitive rates taking into account then current market conditions.

2. Valuation Methodology: Our proposed purchase price values the Company at a premium to statutory capital and offers upside participation in the form of an earnout, acknowledging Eli Global's unrealized investment in the platform. Our methodology is based on the management provided appraisal assuming a transaction closes on 12/31/18.

3. Sources of Financing: Ares will be the singular, fully funded cash purchaser of GBIG equity. In May 2014, Ares completed an initial public offering (current market

5

capitalization of approximately $5 billion) on the New York Stock Exchange (NYSE: ARES). As a result of the IPO, our $1.0bn revolving credit facility, our investment grade rating and historical public debt and preferred offerings, we have access to significant capital to fund the Proposal. Furthermore, we have access to highly-reputable and well-recognized capital providers, as additional sources of long-term capital for the Proposal.

4.  Rationale and Business Plans: Ares believes the life and annuity market is and will continue to be an attractive and growing market space. While our first and foremost priority is supporting GBIG's existing business, we will also focus on building an enduring insurance platform and bringing significant additional resources to bear, enabling GBIG to grow both organically and through acquisitions. Our capital structure can position GBIG for higher financial strength ratings while also supporting significant growth.

5.  Risk Based Capital Requirements: We have assumed Colorado Bankers Life Insurance Company's RBC level is at least 400% at 12/31/2018 and expect to maintain that level going forward. We have assumed the remaining entities RBC levels are at least 300% at 12/31/2018 and expect to maintain that level going forward[2]. As discussed with management, Ares believes the transaction can be structured to enhance combined business' capitalization. To the extent Eli Global has to inject capital into the business between 9/30/18 and 12/31/18 to maintain the RBC levels above, Ares would intend to dividend excess capital to Eli Global at closing equal to the capital injected by Eli Global between 9/30/18 and 12/31/18 with any excess benefit going to the ongoing Company. In the event regulators limit the size of the dividend at closing, Ares is willing to bear the risk and pay any additional dollars required to make Eli Global whole for the capital injected into the business as outlined in the previous sentence. This dividend would be incremental to the Upfront Purchase Price.

6.  Investment Portfolio: We expect the asset portfolio delivered at closing to be free of affiliate investments and self-originated investments (including the principal protected notes); however, to the extent some of these investments are outstanding at transaction close, Ares would be willing to work to arrive at a mutually agreeable solution for remaining investments with the Company. As discussed with management, Ares is willing to entertain a structure whereby any remaining affiliate and self-originated investments would be contributed to a securitization along with a material amount of other Eli Global assets and the Company or Ares would retain the senior most tranche. This structure would be subject to adequate subordinated value and collateral as determined by Ares. In addition, we would expect GBIG's home office to be transferred from Eli Global's balance sheet to GBIG's balance sheet at market value prior to closing. We have assumed no

---

[2] With the exception of SNRC, which we have assumed to be at least 200% RBC.

value decline or impairment occurs in the investment portfolio from 9/30/18 values in the appraisal provided by management.

7. <u>Management and Operations:</u> We are thoroughly impressed by senior members of the Company's management team and would anticipate that they remain with GBIG. We would also expect continuing senior management to invest alongside Ares in a meaningful amount to ensure strong partnership alignment. We intend to keep GBIG's operations and employees in Durham, NC. Ares would encourage complementary incremental hires to support our collective growth ambitions. While we will continue to explore ways to fund purchase of the existing operations and transactions in execution in Europe, we would like to explore the retention of certain European employees by GBIG.

8. <u>Ownership and Governance:</u> Ares Insurance Partners, a to be formed subsidiary of Ares, will be the acquiring entity of 100% of the common shares of GBIG. The Company will ultimately be governed by a Board of Directors consisting of independent directors, Ares representatives and GBIG representatives. We may bring in third-party investors to further support the growth of the business and those investors may have board participation at some point in the future. The total size of the Board of Directors to be determined at a later date.

9. <u>Termination of Affiliate Agreements:</u> By closing, we would expect GBIG to terminate the existing investment management agreement with SASL and any other affiliated agreements, not to include any intercompany surplus notes or preferred stock. We have assumed the intercompany financings remain in place and that the regulatory treatment of those financings does not change. Subject to due diligence and underwriting, we are open to keeping the Conservatrix reinsurance agreement with Colorado Bankers Life Insurance Company in place for 1 year following transaction closing, after which we would expect that Eli Global remove the risk.

10. <u>Representations, Warranties and Indemnifications:</u> We would expect certain assets to be placed into escrow as collateral against representations, warranties and indemnifications by Eli Global in the Sale and Purchase Agreement (*"**SPA**"*).

11. <u>Due Diligence and Timing:</u> We have completed a material amount of due diligence over the last several weeks. We are confident that given the experience of the Ares team, we can complete confirmatory diligence and negotiate and sign an SPA in a highly expeditious manner within 30 days, but realize the process may take 45 days given the upcoming holiday season. We expect our remaining due diligence will be confirmatory in nature and include, but not be limited to customary third-party diligence (legal and litigation due diligence, corporate governance, quality of earnings, tax structuring

7

analysis, financial reporting and compliance, regulatory review, background checks, statutory & tax reserve review, distribution channels diligence, actuarial diligence, technology due diligence, etc.).

1.  Exclusivity, Conditions and Approvals: The Proposal is subject to the completion of, and our satisfaction in all respects in our sole discretion of the results of: remaining due diligence, the negotiation of definitive binding documentation, obtaining all required approvals and consents to consummate the Proposal (governmental, Ares board or otherwise). To induce Ares to undertake the effort and expense of exploring the Transaction, the Company covenants and agrees that for a period of forty five (45) days from the date hereof (the "***Exclusivity Period***"), the Company will not, and will cause its representatives and affiliates not to, directly or indirectly (orally or in writing): (i) initiate, solicit, encourage, respond to, discuss, negotiate or accept any inquiries, indications of interest, proposals or offers from, or make any inquiries, indications of interest, proposals, offers, counterproposals or counteroffers to, or furnish any information to any other party relating to any transaction having effect or result similar to the Transaction or (ii) solicit or initiate any sale of all or any part of the Company's business, provided, however, that the Company shall have the right to respond to any inquiries, indications of interest, proposals or offers if such response is limited to a rejection of such inquiry, indication of interest, proposal or offer and/or an explanation that such inquiry, indication of interest, proposal or offer cannot be discussed before the end of the Exclusivity Period due to contractual restrictions. The Company will promptly (but in any event within 48 hours) notify Ares in writing regarding any such inquiries, indications of interests, proposals, offers or discussions with respect thereto prior to end of the Exclusivity Period. The parties hereto may, by agreement in writing, extend or accelerate the Exclusivity Period. During the Exclusivity Period, Ares agrees to take all commercially reasonable steps which a prudent and determined buyer acting in their own respective interests would take, to complete the remaining due diligence, negotiation of definitive binding documentation, and obtaining all required approvals and consents to consummate the Proposal.

2.  Regulatory: We believe that we will be in a position to obtain governmental and regulatory approvals for this Transaction on a timely basis. Subject to the completion of due diligence, we do not expect any other material external approvals will be required. We believe we can secure all required approvals expeditiously prior to signing definitive documentation, and we have worked with our advisors to create a transaction structure that we believe will offer significant regulatory certainty.

3.  International Scope: Based on preliminary dialogue and meetings with management of the European business, we would welcome the opportunity to pursue an acquisition of

8

GBIG's European business. We have started diligence and will work quickly to make an indicative offer to acquire this business.

4.    <u>Advisors:</u> As evidence of commitment to this Proposal, we have supplemented our internal diligence activities and resources by hiring Milliman to serve as our actuarial advisor. Subject to receiving exclusivity, we plan to hire Proskauer Rose LLP and DLA Piper as legal counsel, Ernst & Young as our tax and accounting advisor, Oliver Wyman as our technology advisor, Aon as our human resources advisor and are prepared to engage additional third-party financial advisors. We are mobilized and ready to move efficiently.

5.    <u>Confidentiality:</u> We are submitting the Proposal on a confidential basis in reliance on your agreement that neither the existence, status, nor contents of the Proposal nor the fact that we are in discussions with you regarding the Proposal may be disclosed to any person or entity without our written consent, other than the directors and officers of GBIG and its affiliates and your representatives and advisors who are involved in the Proposal and GBIG hereby covenants and agrees to such confidentiality obligations on behalf of itself and its affiliates.

6.    <u>Term:</u> This Proposal will expire if not executed by 5:00PM EST on November 22, 2018.

We believe this transaction is a strategic opportunity for Ares to provide GBIG with a highly executable transaction structure and compelling value for the business. We strongly believe that our work to date, existing knowledge base and technical expertise, and the limited conditionality that our structure contemplates, positions us to deliver a more certain transaction execution in a shorter timeframe than proposed by any other potentially interested party.

We look forward to progressing with this exciting opportunity and welcome further discussions.

Sincerely,

Michael Arougheti
*Co-Founder, Director, Chief Executive Officer & President of Ares Management*
Phone: (212) 750-4912
Email: arougheti@aresmgmt.com

Sincerely,

David Reilly
*Partner, Ares Management*
Phone: (310) 921-7347
Email: dreilly@aresmgmt.com

*It is understood that this letter (the "Proposal"), other than in relation to Section 12 (Exclusivity, Conditions and Approvals) and Section 16 (Confidentiality) hereto, is not legally binding, subject to change and does not constitute an offer or commitment on the part of Ares or any of its affiliates to make an offer or submit a definitive agreement to enter into a transaction on these or any other terms at any future time. Any such offer or commitment may only be made by the execution in writing by Ares, the Company and the requisite owners of the Company in the case of a commitment, of definitive agreements expressly so stating. This Proposal and its terms are confidential and should be treated as such and should not be discussed with any other party. Neither this Proposal nor any other discussions pursuant hereto constitute an offer to sell or the solicitation of an offer to buy any securities of Ares or any of its affiliates (including, without limitation, Ares Management, L.P.) and neither Ares nor its affiliates make any representation as to the future performance of Ares Management, L.P. or its publicly traded common units. Ares makes no representations or guarantees as to the achievement of any results described herein.*

10

Agreed and accepted solely in relation to Sections 12 (*Exclusivity, Conditions and Approvals*) and 16 (*Confidentiality*) hereto:

**Global Bankers Insurance Group**

By: _____

Name: Lou E. Hensley

Title: CEO