**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

GREG E. LINDBERG,

        Defendant.

No. 5:19-cr-22-MOC

No. 3:23-cr-00048-MOC

**DEFENDANT'S SUPPLEMENTAL STATEMENT OF FACTS (ADDENDUM) IN SUPPORT OF EMERGENCY MOTION TO STAY ALL ASSET SALES AND CONSOLIDATED OBJECTIONS (ATTACHMENT TO MOTION)**

1. I am the Defendant in the above-captioned matter. I submit this Supplemental Statement of Facts (Addendum) as an attachment to, and in support of, my Emergency Motion to Stay All Asset Sales and Asset-Sale Processes and Consolidated Objections, filed contemporaneously herewith. The facts stated herein are within my personal knowledge or are drawn from the cited record documents.

2. The Special Master was appointed on January 23, 2025, pursuant to 18 U.S.C. § 3664(d)(6). Doc. No. 56. I was sentenced on May 26, 2026, and a Preliminary Order of Restitution in the amount of $1.655 billion was entered on May 28, 2026. [Doc. 161.] No final order of restitution has been entered.

**No Disclosure of the Use of Proceeds**

3. The Special Master has not disclosed to me how the proceeds of completed asset dispositions have been used or applied. I have received no accounting of the proceeds of the Becket sale—whether they were applied to restitution, to administrative expenses, to the Special Master's professionals, or otherwise. Nor has the Special Master disclosed whether other sales or

1

dispositions of assets have occurred; on information and belief, other dispositions may have occurred that remain unknown to me because none has been disclosed.

### The Promised Zero Coupon Bond Correction, Never Delivered

4. On or about April 2026, I produced to the Special Master emails documenting the Zero Coupon Bond sales. Doc. No. 173 Exhibit M. Following that production, the Special Master promised that the restitution analysis would be corrected to credit the Zero Coupon Bond sales, and that the correction would be made even before my objections were due.

5. That promised correction was never delivered. No correction crediting the Zero Coupon Bond sales was ever filed or made—before my sentencing on May 26, 2026, or at any time since.

### Other Promised Credits, Never Delivered

6. The Special Master also indicated that other sales would be credited to me in the restitution analysis, including the ECL credits. None of those credits—including the ECL credits—materialized before sentencing, and none has materialized since.

### The De Minimis Companies, Promised as Inducement and Never Delivered

7. In connection with the Clanwilliam transaction, I waived my right to the $40,000,000 tax escrow that the Wake County Superior Court had previously approved, on the condition that the de minimis companies would be transferred to me on an unrestricted basis. That condition was never fulfilled, and I was required to relinquish that right to allow the transaction to close. I communicated these facts in writing to the Special Master's counsel on August 14, 2025. [Ex. S2.] Rather than transferring the de minimis companies to me, the Clanwilliam disposition afforded the Special Master an option to assume ownership and control of those companies. Doc.

2

No. 66, ¶ 20(h). On information and belief, at least one of those companies has since been shut down. [Ex. S2.]

**The One-Way Pattern Culminating at Sentencing**

8. On May 14, 2026, the Special Master presented me with a "Consent, Waiver, and Acknowledgement" bearing an effective date of May 15, 2026, whose operative provisions would waive my right to object to any sale, its manner, timing, and price; confine me to a single objection in the approval proceeding; and release—and covenant not to sue—a beneficiary class expressly including the Special Master himself. [Ex. W.] I have not executed that instrument.

9. On May 22, 2026—four days before my sentencing—the Special Master filed his Statement Concerning Defendant's Cooperation, Doc. No. 159, itemizing my non-execution of waivers among its "clarifications" and announcing that he "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. No. 159, at 3, 5 & nn.5–6.

10. The asymmetry of the foregoing is one-way: every commitment that would have reduced the restitution figure or benefited me—the Zero Coupon Bond correction, the other promised credits, the de minimis companies—was promised and never delivered; the filing adverse to me was made promptly, four days before sentencing; and the application of proceeds from completed dispositions has never been disclosed to me.

**Additional Facts**

11. There is no evidence on the record of this Court that the Becket asset was sold: no motion seeking approval of a Becket sale, no notice of such a sale, and no order authorizing one appears on the docket. My counsel and I learned that Becket had been sold orally, in one of the weekly meetings with the Special Master's team referenced in Doc. No. 159, ¶ 1, in or about

December 2025. With sentencing approaching, the matter was not brought before the Court prior to sentencing.

12.     By agreement with the United States, I expressly preserved my right to contest the true value of Clanwilliam for restitution purposes. My preserved position, communicated in writing to the Special Master's counsel, is that Clanwilliam was sold at approximately $450 million against a market value of approximately $800 million as of October 2024. [Ex. S2.]

13.     My pending submissions document offsets, recoveries, transfers, and payments to the recipient insurance company estates totaling approximately $2.9 billion, exceeding the $1.655 billion preliminary figure. [Doc. 132 and 133.]

14.     On information and belief, the statements presented to the Court at the May 26, 2026 sentencing were obtained and prepared before the Clanwilliam proceeds were distributed and before the other restitution payments and recoveries described in my offset submissions had been received. Those statements therefore described losses and harm without accounting for the substantial amounts already received.

15.     Under the restitution framework recommended by the Special Master and reflected in his Report and Recommendations Regarding Restitution, restitution is payable to the recipient insurance company estates identified in that report—not to individual policyholders directly. The Special Master's report states that it recommends "directing restitution payments through the insurance companies themselves rather than directly to the individual policyholders." Doc. No. 106, App. 2.