# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| United States of America,<br><br>v.<br><br>Greg E. Lindberg, *et al.*,<br>   *Defendants*. | No. 5:19-cr-22 |

| | |
|---|---|
| United States of America,<br><br>v.<br><br>Greg E. Lindberg,<br>   *Defendant*. | No. 3:23-cr-48 |

## DECLARATION OF GREG E. LINDBERG

I, Greg E. Lindberg, declare as follows:

1. I am the defendant in the above-captioned action. I am over the age of eighteen, am competent to testify, and make this declaration on personal knowledge except where stated on information and belief, and as to those matters I believe them to be true. If called as a witness, I could and would testify competently to the facts stated herein.

2. I was convicted and, on May 26, 2026, sentenced in this case. The restitution phase of my case remains open: a Preliminary Order of Restitution exceeding $1.655 billion has been entered, a Special Master has been appointed, and the final restitution hearing has not yet been scheduled. I have asserted offsets and objections approaching $2.9 billion, and I have an appeal pending. The accuracy of the restitution accounting is squarely at issue.

3. At my sentencing hearing, the Court expressly rejected the position urged by Assistant United States Attorney Daniel Ryan that I be housed at the Pike County Detention Center (PCDC) for 90 days only, until the final restitution hearing.

1

4.      Despite the Court's ruling, within approximately one day of sentencing I was moved to the Pike County Detention Center, where I was held for about one day, and then I was transferred again to another facility.

5.      Through counsel, I filed a first emergency motion to stay all asset sales. That motion placed on the record my contention that the prosecution had acted vindictively. Among other things, it described the reuse at my sentencing of victim statements that had been collected roughly two and one-half years earlier—before restitution had been paid—and that were presented as though they were current by Department of Justice Trial Attorney Lyndie Freeman.

6.      I am informed and believe, and on that basis state, that after the first emergency motion was filed on or about June 10, 2026, Trial Attorney Lyndie Freeman contacted my counsel at Katten and asked that the emergency motion be removed from the ECF docket, and stated that if it was not removed, the Government would treat it as a breach of my plea agreement. The filing she objected to directly concerned her own conduct.

7.      I am informed and believe, and on that basis state, that on or about June 12, 2026, AUSA Daniel Ryan (with a copy to Trial Attorney Lyndie Freeman and a couple of other attorneys) communicated that the Government is reconsidering whether it will continue to support my request to delay reporting to the Bureau of Prisons—a request that had been premised on my continuing cooperation with the Special Master's efforts.

8.      I am informed and believe that the question of delaying my reporting to the Bureau of Prisons is presently before United States Magistrate Judge Keesler, and that the wording proposed by the Government both limits any delay to 90 days and walks back the understanding that was discussed at my sentencing hearing – namely housing me at Pike County Detention Center with daily access to counsel, access to computers, internet and spreadsheets.

9.      My prior counsel at Katten Muchin Rosenman LLP was informed by the Special Master, at or about the time a requested waiver (ECF No. 537) was refused, that the firm's fees would not be paid until after year-end. To continue representing me through the end of the year, I understand that the firm would have had to advance an estimated $2 million to $2.5 million in

2

unpaid fees. This placed my continuous representation in jeopardy at a critical stage of the restitution proceedings.

10. At my current facility I am held in a single cell. I am not permitted to touch or use any computer or to access the internet, and I cannot use spreadsheet software. My access to counsel is restricted largely to in-person visits and to video calls, on which I am unable adequately to explain the complicated positions involved in the restitution accounting and the disputed assets.

11. Access to records, spreadsheets, and counsel is essential to my defense of the restitution figure. By way of example, with approval from the North Carolina Department of Insurance, I had purchased approximately $1 billion in AAA-rated zero-coupon bonds issued by leading banks, including Barclays and JPMorgan. These instruments were the financial equivalent of gold bars: like gold, they would hold their value unless the entire economy were wiped out; and, because insurance claims do not all come due at once, the bonds could have been held to maturity to satisfy obligations as they arose. The content of these instruments was discussed in detail with counsel before any investment decision was made. But for the decision of Mr. Dinius to sell these bonds in a forced sale—rather than holding them to maturity, selling the company with the bonds as collateral, or placing them under mortgage—there would have been no loss on them. The "gold" was sold, but the proceeds and the avoidable losses from that fire sale were never properly accounted for in the restitution figures. This is only one example of an offset that the current restitution figure ignores, and presenting it accurately requires access to computers, internet, the records, the spreadsheets, and daily access to counsel who are remote that I am currently denied.

12. There are further examples. In 2018, Ares Management signed an exclusive letter of intent to acquire my North Carolina insurance companies in a transaction that would have ensured that policyholders saw no interruption in their policy benefits. I am informed and believe that Ares withdrew from that transaction after someone from the government told Ares not to do business with me. That proposed Ares transaction, and other transactions of similar character, were structured sales that would have preserved value for policyholders; they were blocked, and the resulting, avoidable diminution in value is a further offset that should be credited in any honest

3

restitution accounting. Motions described the sale of the Beckett affiliate, valued at approximately $133 million, without court approval. Establishing these offsets and the related causation requires access to computers, the internet, the financial records, the spreadsheets, and daily assistance of counsel who are remote, requirements that I am presently denied.

13. While I was held at the Gaston County jail, I was placed in a housing block with individuals charged with violent offenses. I was the only white-collar detainee in that block. I did not complain, because at that facility I had access to spreadsheets, financial records, computers, and the internet, and access to counsel daily. I did everything I could to meet the requirements of the plea agreement.

14. I have asked only that there be a full and accurate accounting of all restitution payments before any further assets are liquidated, and that I be afforded the access to counsel, to a computer and the internet, and to the financial records necessary to litigate the offsets and credits to which I believe I am entitled.

15. The threats and conduct described above have impeded my ability to defend the restitution offsets and to exercise my constitutional and appellate rights. I respectfully ask the Court to grant the relief requested in the accompanying motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 15, 2026.

**Greg E. Lindberg**
Declarant

4