# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

|  |  |
|---|---|
| United States of America, <br><br> v. <br><br> Greg E. Lindberg, *et al.*, <br><br> *Defendants*. | No. 5:19-cr-22 |

|  |  |
|---|---|
| United States of America, <br><br> v. <br><br> Greg E. Lindberg, <br><br> *Defendant*. | No. 3:23-cr-48 |

**DEFENDANT'S EMERGENCY MOTION TO ENFORCE THE PLEA AGREEMENT AND THE ORDER APPOINTING THE SPECIAL MASTER, TO PRESERVE HIS DUE-PROCESS AND COUNSEL-ACCESS RIGHTS IN THE PENDING RESTITUTION PROCEEDINGS, AND TO REQUIRE THAT THE GOVERNMENT BE REPRESENTED BY CONFLICT-FREE COUNSEL**

1

# TABLE OF CONTENTS

Table of Contents.................................................................................................................. 2

Table of Authorities ............................................................................................................. 3

Introduction and Request for Expedited Consideration.................................................... 5

Statement of Facts................................................................................................................ 5

Argument .............................................................................................................................. 6

    I.    The Government May Not Treat Protected Advocacy as a Breach of the Plea Agreement; Doing So Is Prosecutorial Vindictiveness............................................. 6

    II.   The Plea Agreement Is a Binding Promise the Government Must Honor; Its Terms Concerning Access Must Be Enforced. .............................................................. 7

    III.  Due Process Guarantees Defendant a Meaningful Opportunity to Be Heard on Restitution, Which Requires Access to Counsel, a Computer, and the Financial Records. 8

    IV.  Denying Defendant Access to Counsel, a Computer, and Legal Materials Violates His Sixth Amendment and Access-to-Courts Rights. .............................................. 11

    V.   The Government's Conduct Violates the Duties of a Federal Prosecutor and Raises Serious Ethical Questions. .................................................................................. 12

    VI.  The Prosecutors Who Engaged in the Challenged Conduct Are Necessary Witnesses with a Personal Stake and Must Be Replaced with Conflict-Free Counsel for the Government. ....................................................................................................... 12

Conclusion and Relief Requested ..................................................................................... 13

Certification Regarding Use of Artificial Intelligence.................................................... 16

Certificate of Service ......................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Berger v. United States,*
295 U.S. 78 (1935)...............................................................................................12, 13

*Blackledge v. Perry,*
417 U.S. 21 (1974)........................................................................................................6

*Bounds v. Smith,*
430 U.S. 817 (1977)....................................................................................................11

*Ellingburg v. United States,*
607 U.S. ___ (2026)......................................................................................................8

*In re McNulty,*
597 F.3d 344 (6th Cir. 2010) ....................................................................................10

*In re Zetteler,*
No. 26-1749 (4th Cir. June 13, 2026) ......................................................................10

*Lewis v. Casey,*
518 U.S. 343 (1996)....................................................................................................11

*Mathews v. Eldridge,*
424 U.S. 319 (1976)......................................................................................................9

*North Carolina v. Pearce,*
395 U.S. 711 (1969)......................................................................................................6

*Robers v. United States,*
572 U.S. 639 (2014)....................................................................................................10

*Santobello v. New York,*
404 U.S. 257 (1971)......................................................................................................7

*United States v. Goodwin,*
457 U.S. 368 (1982)......................................................................................................7

**Constitutional Provisions**
U.S. Const. amend. V....................................................................................................9
U.S. Const. amend. VI ..................................................................................................9

**Statutes**
18 U.S.C. § 3663A..................................................................................................5, 9
18 U.S.C. § 3663A(a)(2)............................................................................................10
18 U.S.C. § 3664..........................................................................................................9

18 U.S.C. § 3664(e) ............................................................................................................7
18 U.S.C. § 3664(j)(2) .......................................................................................................9
28 U.S.C. § 530B ..............................................................................................................12

**Rules**

N.C. R. Prof'l Conduct r. 3.7...........................................................................................12
N.C. R. Prof'l Conduct r. 3.8...........................................................................................12
N.C. R. Prof'l Conduct r. 8.4...........................................................................................12

4

**INTRODUCTION AND REQUEST FOR EXPEDITED CONSIDERATION**

Defendant Greg E. Lindberg respectfully moves this Court on an emergency basis for relief necessary to preserve his constitutional and statutory rights while the restitution phase of this case remains open. The supporting facts are set out in the accompanying *Declaration of Greg E. Lindberg* ("Lindberg Decl."), filed herewith. This motion is grounded on the plea agreement entered in this case, the Order appointing the Special Master, the Fifth and Sixth Amendments to the United States Constitution, the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A and 3664, and this Court's inherent and statutory authority.

Expedited consideration is warranted. The final restitution hearing has not been scheduled, yet Defendant faces imminent designation and transfer by the Bureau of Prisons ("BOP") to a facility at which he has no access to a computer, the internet, spreadsheets, or the financial records he needs to litigate the disputed offsets, and only limited access to counsel. Once such a transfer occurs, the harm to Defendant's ability to be heard on a restitution figure exceeding one and one-half billion dollars—against which he asserts offsets approaching $2.9 billion—cannot meaningfully be undone. (Lindberg Decl. ¶¶ 2, 10–15.)

**STATEMENT OF FACTS**

Consistent with the requirement of Local Criminal Rule 47.1, the operative facts are established by the accompanying affidavit and are summarized here only for the Court's convenience. Defendant rests the factual basis of this motion exclusively on the Lindberg Decl. and not on any extrinsic correspondence.

At sentencing on May 26, 2026, this Court expressly rejected the Government's position—advanced by Assistant United States Attorney Daniel Ryan—that Defendant be housed at the Pike County Detention Center ("PCDC") for 90 days only, until the final restitution hearing. (Lindberg Decl. ¶ 3.) Notwithstanding that ruling, within a day of sentencing Defendant was moved to the Pike County Detention Center (PCDC) for approximately one day and then transferred again. (Id. ¶ 4.)

After Defendant, through counsel, filed his first emergency motion to stay all asset sales—a filing that raised prosecutorial vindictiveness, including the reuse at sentencing of victim statements collected roughly two and one-half years earlier, before restitution had been paid, presented as though current by Department of Justice Trial Attorney Lyndie Freeman—Ms. Freeman contacted defense counsel and asked that the emergency motion be removed from the ECF docket, stating that a failure to do so would be treated as a breach of the plea agreement. (Id. ¶¶ 5–6.)

Most recently, on June 12, 2026, the Government, through AUSA Ryan, communicated that it is reconsidering whether it will continue to support Defendant's request to delay reporting to BOP—a request the Government had previously premised on Defendant's cooperation with the Special Master. The reporting-delay question is presently before United States Magistrate Judge Keesler, and the Government's proposed wording both shortens the period to 90 days and walks back the understanding reflected at the sentencing hearing. (Lindberg Decl. ¶¶ 7–8.)

Defendant's prior counsel at Katten Muchin Rosenman LLP was informed by the Special Master, at or about the time the requested waiver (ECF No. 537) was refused, that its fees would not be paid until after year-end. To continue representing Defendant through the end of the year, that firm would have had to advance an estimated $2 to $2.5 million in unpaid credit. (Id. ¶ 9.) Defendant's access to counsel and to the tools of self-representation is now materially impaired: he is held in a single cell with no access to any computer, the internet, or spreadsheet software, and his contact with counsel is largely confined to in-person visits and video calls on which complex restitution positions cannot adequately be developed. (Id. ¶¶ 10–11.)

## ARGUMENT

I. **The Government May Not Treat Protected Advocacy as a Breach of the Plea Agreement; Doing So Is Prosecutorial Vindictiveness.**

A defendant has the right to seek relief from the courts and to pursue an appeal without governmental retaliation, and due process forbids vindictiveness against a defendant for having exercised those rights. *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969); *Blackledge v. Perry*,

6

417 U.S. 21, 27–28 (1974). That prohibition on actual vindictiveness applies with full force after trial-level proceedings are complete, where retaliation for the exercise of post-conviction rights is of special concern. *United States v. Goodwin*, 457 U.S. 368, 372–84 (1982). Defendant does not rest on any presumption of vindictiveness; the sequence here establishes actual retaliation.

Here, the sequence speaks for itself. Defendant filed an emergency motion that placed on the public record his contention that the prosecution had acted vindictively including by recycling stale, pre-payment victim statements at sentencing as if they were current. The named prosecutor whose conduct the motion challenged, Trial Attorney Lyndie Freeman, then demanded that the motion be stricken from the docket and threatened a breach of the plea agreement if it was not. (Lindberg Decl. ¶¶ 5–6.) That is not a neutral enforcement of the plea; it is the use of the breach mechanism to suppress a protected filing that was adverse to the very lawyer making the threat. The timing—an adverse demand made directly in response to a protected, post-conviction filing implicating the prosecutor personally—establishes actual prosecutorial vindictiveness—and, at the very least, the "realistic likelihood of vindictiveness" the Constitution forbids.

The Government compounded the problem on June 12, 2026, when it signaled that it may withdraw support for Defendant's reporting-delay request in apparent response to Defendant's recent exercise of his rights—a request the Government had previously supported and had tied to Defendant's cooperation with the Special Master. (Id. ¶¶ 7–8.) Conditioning a custodial accommodation on a defendant's agreement to abandon protected advocacy, or penalizing him for declining to do so, is an unconstitutional condition that cannot stand.

## II. The Plea Agreement Is a Binding Promise the Government Must Honor; Its Terms Concerning Access Must Be Enforced.

A plea agreement is enforced according to its terms because a defendant's waiver of his most fundamental rights rests upon the Government's promises. When a guilty plea rests in any significant degree on a promise of the prosecution, that promise "must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). The obligation runs to the entire prosecution team; the staff

of a prosecutor's office bears the burden of "letting the left hand know what the right hand is doing." *Id.* at 262.

Defendant's plea agreement and the Order appointing the Special Master contemplate that Defendant will participate in, and cooperate with, the orderly marshaling and accounting of assets—participation that is impossible without access to counsel, to a computer and the internet, and to the financial records underlying the disputed offsets. (Lindberg Decl. ¶¶ 9–12, 15.) The Government cannot demand cooperation under the agreement while simultaneously engineering conditions that make cooperation and defense impossible, and it cannot recast Defendant's insistence on a full accounting before assets are liquidated as a "breach." The promises that induced the plea must be honored, and the access necessary to perform under the agreement must be preserved.

Critically, the access Defendant invokes is not a discretionary courtesy or a bargaining chip. The access provisions of the plea agreement exist to protect Defendant's constitutional rights—to the assistance of counsel, to due process, and to access the courts—as the restitution phase proceeds; they are not a quid pro quo for Defendant's cooperation with an out-of-order, premature liquidation of assets, and the Government may not treat them as one. Conditioning Defendant's access to counsel, computers, the internet, and records on his cooperation with asset sales, or withdrawing that access because he has exercised protected rights, converts a constitutional guarantee into leverage and invokes the very violations described throughout this motion. The concern is heightened now that Defendant is represented by new counsel, who must absorb a voluminous and technical restitution record—making timely, meaningful, and daily access all the more essential, not less.

III. **Due Process Guarantees Defendant a Meaningful Opportunity to Be Heard on Restitution, Which Requires Access to Counsel, a Computer, and the Financial Records.**

Restitution under the MVRA is criminal punishment. *Ellingburg v. United States*, 607 U.S. ___, No. 24-482 (Jan. 20, 2026). Because the restitution Defendant faces is punishment—here, a

8

preliminary figure exceeding $1.655 billion (Doc. 161)—the full protections of due process attach to the proceedings that fix it. The MVRA itself guarantees procedural participation: it requires the court to resolve disputes and places defined burdens on the parties. 18 U.S.C. § 3664; see also 18 U.S.C. § 3663A. The statute also forbids double recovery: a victim's losses must be reduced by amounts later recovered, 18 U.S.C. § 3664(j)(2)—the precise issue Defendant seeks to litigate through his offsets and his request for a full accounting before any further liquidation.

The process due is measured by weighing the private interest at stake, the risk of erroneous deprivation under the current procedures and the value of additional safeguards, and the Government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). At its core, due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* at 333. Every factor favors Defendant. The private interest—liberty and more than a billion dollars in punishment—is enormous. The risk of error is acute: the offsets turn on technical financial questions (for example, the treatment of approximately $1 billion in AAA-rated zero-coupon bonds and whether losses were caused by a forced sale rather than by Defendant's conduct) that cannot be presented without computers, the internet, records, spreadsheets, and counsel who can absorb them. (Lindberg Decl. ¶¶ 11–12, 15.) The Government has no legitimate interest in a restitution figure inflated by the denial of these basic tools. U.S. Const. amend. V.

The burden of proof makes access indispensable. Under the MVRA, the Government bears the burden of proving the amount of the victims' loss, but the burden of demonstrating entitlement to the offsets and credits a defendant asserts rests on the defendant. 18 U.S.C. § 3664(e). It is therefore Defendant who must marshal the records and analysis establishing, among other things, that the losses were caused by a forced sale rather than by the offense of conviction, and that amounts have been or will be recovered that must reduce any restitution. Denying Defendant the counsel, the computer, the internet, and the financial records needed to carry that statutory burden does not lighten it—it ensures that it cannot be met, and that the resulting restitution figure will be inflated by default rather than fixed on the merits.

9

These offsets are not collateral; they go to the heart of proximate causation, which the MVRA makes essential. Restitution reaches only those losses directly and proximately caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2). The Supreme Court has confirmed that restitution must be reduced by the amount a victim actually realizes upon selling property, and that a defendant is not the proximate cause of a decline in value that flows from the victim's own decision whether and when to dispose of assets. *Robers v. United States*, 572 U.S. 639 (2014). A restitution figure measured in the billions—here, the approximately $1.6 billion stated in the Preliminary Order—can sound, at first, as though every dollar reflects loss the Defendant proximately caused. It does not. Whether the losses were instead caused by a fire-sale liquidation of AAA-rated, gold-equivalent securities that should have been held to maturity, or by the blocking of value-preserving transactions such as the proposed Ares sale, is precisely the causation inquiry the statute requires—an inquiry into who sold the assets, on what terms, and with what intention. (Lindberg Decl. ¶¶ 11–12.) The Government's demands—that Defendant's filing be pulled from the docket, and that he be designated and transferred to a Federal Prison Camp (FPC) in violation of this Court's own ruling at sentencing—operate to strip Defendant of the ability to develop and present this causation and offset evidence at the very moment the record is being made.

Nor is the danger of uncounted, unauthorized liquidation hypothetical. Motions described the sale of the Beckett affiliate, valued at approximately $133 million, without court approval. (Lindberg Decl. ¶ 12.) Assets of that magnitude cannot be sold out from under the restitution determination without a full accounting; that is precisely why no further sale or liquidation should occur before restitution is finally determined.

This is not an abstract point; the same causation screen has already been applied in this very case. In denying a crime victim's mandamus petition arising directly out of the Preliminary Order of Restitution, the Fourth Circuit reaffirmed that restitution reaches only harm "directly and proximately" caused by the offense, and that a claimed loss must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." *In re Zetteler*, No. 26-1749 (4th Cir. June 13, 2026) (per curiam) (unpublished) (quoting *In re McNulty*, 597 F.3d 344, 352 (6th

10

Cir. 2010)). The panel sustained the exclusion of a claimant precisely because its losses were not closely tied to the conduct inherent in Defendant's offense. Because that decision was entered in this very case, it is the law of the case and governs the restitution determination here; and the causation screen it applied cuts both ways: the causation screen that kept losses out of the restitution figure must equally keep out losses charged against Defendant that flowed not from the offense of conviction but from the rehabilitator's fire-sale of gold-equivalent securities and the blocking of value-preserving sales. Offsets and causation are therefore not "collateral" to the restitution inquiry; under the law governing this case, they define it, and Defendant must be given the access necessary to litigate them.

**IV.     Denying Defendant Access to Counsel, a Computer, and Legal Materials Violates His Sixth Amendment and Access-to-Courts Rights.**

The right to the assistance of counsel extends through sentencing, of which restitution is a part. U.S. Const. amend. VI. Independently, the constitutional right of access to the courts guarantees a person held in custody a reasonable opportunity to prepare and present nonfrivolous legal claims, and to obtain relief he must show actual injury—that the challenged conditions have hindered his efforts to pursue such a claim. *Lewis v. Casey*, 518 U.S. 343, 350–51 (1996); see also *Bounds v. Smith*, 430 U.S. 817 (1977) (recognizing the right of meaningful access to the courts), as limited by *Lewis*, 518 U.S. at 350–55.

Defendant readily makes that showing. He is litigating live, plainly nonfrivolous matters—objections to a multi-billion-dollar restitution recommendation, offsets approaching $2.9 billion, and a pending appeal—yet he is confined where he cannot touch a computer, cannot access the internet, cannot use the spreadsheets these issues demand, and cannot meet with counsel except in person or by video calls unsuited to complex financial analysis. (Lindberg Decl. ¶¶ 10–12, 15.) These restrictions are not incidental; they directly impede Defendant's ability to be heard on the very questions now before the Court, and a transfer to BOP designation would deepen that injury. The conditions necessary to cure it—meaningful counsel access and the ability to review records electronically—should be ordered now.

11

### V. The Government's Conduct Violates the Duties of a Federal Prosecutor and Raises Serious Ethical Questions.

A federal prosecutor represents a sovereign whose interest "is not that it shall win a case, but that justice shall be done;" the prosecutor may strike hard blows but "is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). Federal prosecutors are bound by the rules of professional conduct of the State in which they practice. 28 U.S.C. § 530B (the McDade Amendment). North Carolina's Rules of Professional Conduct accordingly govern the prosecutors here, including the special responsibilities of a prosecutor and the prohibition on conduct that is prejudicial to the administration of justice. N.C. R. Prof'l Conduct r. 3.8; N.C. R. Prof'l Conduct r. 8.4.

Measured against those standards, the conduct described in the declaration is deeply troubling. Demanding that opposing counsel strike a protected filing from the public docket—and threatening a breach of the plea agreement to coerce that result—uses the prosecutor's unique leverage not to do justice but to suppress advocacy adverse to the prosecutor personally. Presenting years-old victim statements gathered before restitution was paid as though they were current and then leveraging custodial accommodations to discourage Defendant from contesting the restitution accounting, compound the concern. AUSA Daniel Ryan and Trial Attorney Lyndie Freeman are the officers responsible for this course of conduct, which the Court should not condone.

### VI. The Prosecutors Who Engaged in the Challenged Conduct Are Necessary Witnesses with a Personal Stake and Must Be Replaced with Conflict-Free Counsel for the Government.

The prosecutors who engaged in the conduct described above can no longer fairly serve as the Government's advocates, because they are now necessary witnesses to the very facts the Court must evaluate. The demand that Defendant's emergency motion be removed from the docket, the threat to treat that filing as a breach of the plea agreement, and the presentation at sentencing of years-old victim statements are events known firsthand to AUSA Daniel Ryan and Trial Attorney Lyndie Freeman. A lawyer who is likely to be a necessary witness shall not act as advocate in the proceeding. N.C. R. Prof'l Conduct r. 3.7; see 28 U.S.C. § 530B. The advocate-witness conflict is

squarely presented here, and it cannot be cured by the same attorneys continuing to litigate the propriety of their own conduct.

These prosecutors also have a personal stake that conflicts with the Government's overriding duty to see that justice is done. The filing they sought to suppress accused Ms. Freeman personally of vindictiveness; their response was to threaten Defendant rather than to address the accusation through the orderly processes of the Court. A prosecutor who reacts to a protected, personally adverse filing by wielding the plea's breach mechanism is no longer the disinterested representative of the sovereign the law requires. *See Berger v. United States*, 295 U.S. at 88. That personal interest is itself a disqualifying conflict.

Accordingly, and pursuant to the Court's supervisory authority to protect the integrity of the proceedings before it, the prosecutors who engaged in the conduct described herein—including AUSA Daniel Ryan and Trial Attorney Lyndie Freeman—should be replaced with conflict-free counsel for the United States: attorneys who were not personally involved in, and are not witnesses to, that conduct, and who can fairly discharge the Government's duty to do justice in the restitution proceedings.

**CONCLUSION AND RELIEF REQUESTED**

For the foregoing reasons, Defendant respectfully requests that the Court enter an Order:

(a) Directing that Defendant not be designated or transferred to Bureau of Prisons custody until the final restitution hearing in this case has been completed; or, in the alternative, directing that Defendant be held only at a facility that affords him adequate access to a computer, the internet, spreadsheet software, his financial records, and reasonable daily access to his counsel;

(b) Finding that meaningful daily access to counsel, to a computer, the internet, and spreadsheet software, and to the relevant financial records is necessary for Defendant to receive due process and to participate as the MVRA contemplates in the determination of restitution, offsets, and credits;

13

(c) Enforcing the access-related provisions of the plea agreement and the Order appointing the Special Master, and stating expressly that Defendant is entitled to reasonable daily access to counsel and to computer and internet resources sufficient to prepare his restitution submissions;

(d) Directing that the practice of moving Defendant to facilities at which he has no computer or internet access—and which thereby impair his ability to defend his restitution offsets—be discontinued immediately;

(e) Directing that no further sale or liquidation of Defendant's assets occur prior to the Court's final restitution determination, so that the offsets and credits at issue may be adjudicated before any further disposition of assets; acknowledging that Defendant's access—to counsel, to a computer and the internet and his records, and to a reasonable place and date of confinement during the restitution phase—rests on his constitutional rights to counsel, to due process, and to access the courts, and is not contingent on his cooperation with any asset-sale or liquidation process; and expressly directing that counsel for the United States, including the Assistant United States Attorney, shall not use Defendant's access (or his reporting date or place of confinement) as a lever to obtain his cooperation or to discourage his exercise of those rights;

(f) Directing that the prosecutors who engaged in the conduct described in this motion— including Assistant United States Attorney Daniel Ryan and Trial Attorney Lyndie Freeman—be replaced with conflict-free counsel for the United States who were not personally involved in, and are not witnesses to, that conduct; and

14

(g) Granting such other and further relief as the Court deems just and proper.

Respectfully submitted, this 15th day of June, 2026.

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

15

# CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order of this Court, In re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked—as to the accuracy of the proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

16

# CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: 6 /15/26

/s/ Kenneth Barnes
**KENNETH BARNES**
Kenneth Barnes Legal, PLLC
N.C. Bar No. 14035
356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977
Email: barnesatty@aol.com
Counsel for Defendant Greg E. Lindberg

17