**EXHIBIT O**

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 008664

MIKE CAUSEY, COMMISSIONER
OF INSURANCE OF NORTH
CAROLINA,

Petitioner,

v.

SOUTHLAND NATIONAL
INSURANCE CORPORATION,
SOUTHLAND NATIONAL
REINSURANCE CORPORATION,
BANKERS LIFE INSURANCE
COMPANY, COLORADO BANKERS
LIFE INSURANCE COMPANY,
North Carolina Domiciled Insurance
Companies,

Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**JOINT MOTION FOR INJUNCTION
TO PROHIBIT INTERFERENCE
WITH REHABILITATION AND
LIQUIDATION PROCEEDINGS**

NOW COME Respondents Bankers Life Insurance Company ("BLIC"),

Colorado Bankers Life Insurance Company ("CBL"), and Southland National

Reinsurance Corporation ("SNRC"), all in rehabilitation, and Southland National

Insurance Corporation in liquidation ("SNIC") (collectively, "Respondents"), and

Petitioner, Commissioner of Insurance Mike Causey, as the duly-appointed

Rehabilitator and Liquidator of Respondents, and jointly move for an injunction

pursuant to N.C. Gen. Stat. §§ 58-19-45 and 58-30-20(a) prohibiting GBIG

Holdings, LLC ("GBIG"), Universal Financial Holdings, LLC ("Universal"), and

Robert Alban ("Alban") from interfering with these rehabilitation and liquidation

1

proceedings. In support of this request, Respondents and Petitioner show the following:

1. At the November 21, 2022 liquidation hearing for Respondents BLIC and CBL, Alban testified—on behalf of his client GBIG–that he, through his company Universal, intended to submit a Form A request to approve the transfer of ownership and control of CBL, BLIC, and SNIC to Universal. Ex. 1, Hrg. Tr. 217:1-23; 226:13-227:6 (Nov. 21, 2022). At the hearing, Alban provided an unexecuted, non-binding letter of intent between Universal and GBIG setting forth that proposal. Ex. 1 at 246:4-25.

2. In April 2023, in support of GBIG's Motion to Reconsider this Court's prior order denying GBIG's Motion to Propose a Plan of Rehabilitation, Alban submitted a declaration and an executed Letter of Intent where Universal agreed to purchase Respondents from GBIG. Alban Dec., ¶ 10 (April 18, 2023). In connection with the transaction contemplated by that letter, Alban testified that Universal intended to submit a Form A for approval to operate SNIC. *Id.*

3. On May 15, 2023, Universal and Alban[1] submitted three separate Statements Regarding the Acquisition of Control of or Merger with a Domestic Insurer on Form A in connection with acquiring "control" of each of the Respondents except Southland National Reinsurance Corporation (the "Insolvent Insurance

---

[1] Universal and Alban subjected themselves to the jurisdiction of this Court by filing the Form A. N.C. Gen. Stat. § 58-19-15(j).

2

Companies"), pursuant to N.C. Gen. Stat. § 58-19-15 (the "Form A").[2] Ex. 2 – Form A Filings.

4. The Form A applications anticipate Universal acquiring "control" of the Insolvent Insurance Companies through the purchase of their parent company, GBIG. Ex. 2 at 3, 24.

5. However, GBIG does not presently have "control" of the Insolvent Insurance Companies, as defined by N.C. Gen. Stat. § 58-19-5(2). Specifically, GBIG lacks the "direct or indirect possession of the power to direct or cause the direction of the management and policies of [the Insolvent Insurance Companies], whether through the ownership of voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise." N.C. Gen. Stat. § 58-19-5(2). As such, GBIG has no "control" of the Insolvent Insurance Companies that it can lawfully offer to Universal.

6. Rather, "control" of Respondents CBL and BLIC is vested in the Petitioner as Rehabilitator, pursuant to N.C. Gen. Stat. § 58-30-85(a)(19) and (c) and this Court's order of June 27, 2019. Similarly, "control" of Respondent SNIC is vested in the Petitioner as Liquidator pursuant to N.C. Gen. Stat. § 58-30-120(a)(19) and this Court's order of May 2, 2023.

7. Sections 58-30-85(a)(19) and 58-30-120(a)(19) expressly provide that the Rehabilitator and/or Liquidator has the authority to "exercise and enforce all rights,

---

[2] The Form A submitted by Universal is materially different from the letter of intent discussed at the liquidation hearing for BLIC and CBL.

3

remedies, and powers of any creditor, *shareholder*, policyholder, or member." (emphasis added). That "control" of the Insolvent Insurance Companies is vested in the Rehabilitator is further evidenced by the language of section 58-30-85(c), which states in relevant part that the Rehabilitator has "all the powers of the directors, officers, and managers, whose authority shall be suspended."

8. Put simply, GBIG lacks the authority to sell or transfer "control" of the Insolvent Insurance Companies to Universal.

9. Any agreement to transition control of the Insolvent Insurance Companies from the Rehabilitator and Liquidator must first be negotiated with and approved by the Special Deputy Rehabilitators and Special Deputy Liquidators on behalf of the Insolvent Insurance Companies. Only then would such agreement be ripe for Form A review.[3]

10. The proposed transaction between Universal and GBIG was not approved by the Special Deputy Rehabilitators and Special Deputy Liquidators. *See* Ex. 3, Aff. of J. Murphy at ¶ 8. Moreover, the details of the transaction were first provided to the Special Deputy Rehabilitators and Special Deputy Liquidators when the Form A submissions were forwarded to them by the North Carolina Department of Insurance. *See id.*; N.C. Gen. Stat. § 58-19-15(a) (requiring the Form A to be filed with the domestic insurer when it is filed with the Commissioner).

---

[3] Any approved sale would also need to satisfy the Form A regulatory review process and be approved by this Court as the Court overseeing the rehabilitation and liquidation of Respondents. Because the Form A submitted does not meet the first requirement—approval of the sale or transfer by the persons in control of the domestic insurer—the remaining hurdles are not discussed herein.

4

11. Based on a preliminary review, it appears that the Form A submissions would require the Rehabilitator and Liquidator and Special Deputy Rehabilitators and Special Deputy Liquidators, (or this Court) to approve certain transactions that the Rehabilitator has previously opposed due to the use of funds, such as the sale and refinancing of certain SACs, including the Clanwilliam Group, Castle & Cooke Mortgage ("CCM"), Claris Vision Group ("CVG"), and the ARM group of companies. Ex. 2 at 3, 47, 56; Ex. 3 at ¶ 9.

12. Each of these transactions are included in Global Growth Holdings Inc.'s alternative "Global Rehabilitation Plan for North Carolina and Bermuda Policyholders." Ex. 3 at ¶ 10.

13. On February 17, 2022, this Court entered an order finding that "GBIG Holdings lack the authority to sell or otherwise encumber [the Insolvent Insurance Companies'] assets while they are in Rehabilitation as such power lies with the Rehabilitator pursuant to N.C.G.S. 58-30-85." Order Denying GBIG Holdings, LLC's Motion for Authority to Propose Plan of Rehabilitation, ¶ 17 (Feb. 17, 2022).

14. In the face of that finding, GBIG went a step further and sought to sell not only the Insolvent Insurance Companies' assets, but the Insolvent Insurance Companies themselves.

15. In that same February 17, 2022 Order, this Court found that "allowing GBIG Holdings to propose a plan or rehabilitation is not appropriate and would interfere with the authority provided to the Commissioner as Rehabilitator pursuant to Chapter 58 of the North Carolina General Statutes." *Id.* at ¶ 15.

5

16. The agreements contained in the Form A submissions are conditioned on the Rehabilitator and Liquidator, essentially, consenting to Global Growth's alternative plan of rehabilitation. Ex. 3 at ¶ 11.

17. GBIG has once again flouted this Court's orders and interfered with these insolvency proceedings by both unlawfully agreeing to sell the Insolvent Insurance Companies without proper legal authority and, again, attempting to implement its alternative plan of rehabilitation. Ex. 3 at ¶ 12.

18. Universal did not negotiate the terms of the transactions set out in the Form A filings with the Insolvent Insurance Companies, the Special Deputy Rehabilitators, or the Special Deputy Liquidators, and those terms have not been approved by the parties currently in "control" of the Insolvent Insurance Companies.

19. Universal and Alban have also interfered with these insolvency proceedings by submitting the Form A applications to the North Carolina Department of Insurance knowing that GBIG lacks the authority to sell the Insolvent Insurance Companies. *See id.*

WHEREFORE, Respondents respectfully request the Court enter an order that:

1. Enjoins GBIG from further attempts to act on behalf of Respondents;

2. Enjoins GBIG from further interfering with these insolvency proceedings;

3. Directs Universal and Alban to withdraw the Form A applications submitted on May 15, 2023, and submit any proposed transaction involving

6

the Respondents to the Rehabilitator and/or Liquidator through the Special Deputy Rehabilitators and/or Special Deputy Liquidators; and

4. Enjoins Universal and Alban from any further attempt to acquire Respondents without receiving the Special Deputy Rehabilitators' or Special Deputy Liquidators' approval of those terms on behalf of the Insolvent Insurance Companies.

Respectfully submitted, this the 30th day of May, 2023.

JOSHUA H. STEIN
ATTORNEY GENERAL

By: _____
Daniel S. Johnson
North Carolina State Bar No. 9289
Special Deputy Attorney General
Insurance Section
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6620
Email: djohnson@ncdoj.gov

By: ___ M. Denise Stanford (by D.S.J.)
M. Denise Stanford
North Carolina State Bar No. 17601
Special Deputy Attorney General
Insurance Section
N. C. Department of Justice
P.O. Box 629
Raleigh, N.C. 27602-0629
Telephone: (919) 716-6621
Email: dstanford@ncdoj.gov

*Attorneys for Petitioner*

WILLIAMS MULLEN

By: /s/ *Wes J. Camden*
Wes J. Camden
NC State Bar No. 33190
Caitlin M. Poe
NC State Bar No. 44713
Lauren E. Fussell
NC State Bar No. 49215
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
wcamden@williamsmullen.com
cpoe@williamsmullen.com
lfussell@williamsmullen.com
Telephone: (919) 981-4000
Facsimile: (919) 981-4300

*Attorneys for the Respondents*

7

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a copy of the foregoing pleading or paper was served by electronic mail on the following:

Matthew N. Leerberg
Mark A. Finkelstein
Stephen W. Petersen
Fox Rothschild LLP
434 Fayetteville St., Suite 2800
Raleigh, NC 27601-2943
mleerberg@foxrothschild.com
mfinkelstein@foxrothschild.com
spetersen@foxrothschild.com
*Attorneys for GBIG Holdings, LLC*

Aaron Z. Tobin
Jared T.S. Pace
Condon Tobin Sladek Thornton PLLC
8080 Park Lane, Suite 700
Dallas, TX 75231
atobin@condontobin.com
jpace@condontobin.com
*Attorneys for GBIG Holdings, LLC*

Universal Financial Holdings, LLC
Robert Alban
19 Essex Road
Bedford, NH 03110
alban@montshireadvisors.com

David Liggett
Ragsdale Liggett
2840 Plaza Place, Suite 400
Raleigh, NC 27612
dliggett@rl-law.com
*Attorneys for Robert Alban and Universal Financial Holdings, LLC*

to the email addresses of record with the court set forth above in accordance with Rule 5(b)(1)a. of the North Carolina Rules of Civil Procedure. Universal Financial Holdings, LLC and Robert Alban were also served via designated delivery service authorized pursuant to 28 U.S.C. § 7502(f)(2) at the address above.

8

This 30th day of May, 2023.

Daniel S. Johnson
Special Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Telephone: (919) 716-6620
N.C. State Bar # 9289
djohnson@ncdoj.gov

9

IN THE NORTH CAROLINA GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

MIKE CAUSEY, COMMISSIONER OF
INSURANCE OF NORTH CAROLINA,

        Petitioner,

   v.

SOUTHLAND NATIONAL INSURANCE
CORPORATION, SOUTHLAND NATIONAL
REINSURANCE CORPORATION, BANKERS
LIFE INSURANCE COMPANY, COLORADO
BANKERS LIFE INSURANCE COMPANY,
North Carolina Domiciled Insurance
Companies,

        Respondents.

WAKE COUNTY

19 CVS 008664

## TRANSCRIPT - HEARING

*Monday, November 21, 2022*

Transcript of proceedings in the General Court of Justice, Superior Court Division, Wake County, North Carolina at the November 21, 2022, Civil Session, before the Honorable A. Graham Shirley, III, Judge Presiding.

Tammy L. Johnson, CVR-CM-M, RVR
Official Court Reporter
Tenth Judicial District
Wake County, North Carolina



EXHIBIT
1

TAMMY JOHNSON, CVR-CM-M, RVR
OFFICIAL COURT REPORTER

Q.   So what are you proposing to buy in this transaction?  What would Universal be buying?

A.   I'm proposing to buy GBIG Holdings, which is the holding company of the three insurance companies.

Q.   Okay.  Would that require any type of -- based on your experience in the insurance industry, would that require any type of regulatory approval?

A.   It would -- it would require Form A approval for change of control of the three insurance companies.

Q.   Okay.  And so that Form A approval would be applied for where?

A.   It would be applied for in the -- in the domiciliary reg- -- from the domiciliary regulator.  I -- I have --

Q.   Which is who here?

A.   Well, it would be -- it would -- we've also proposed for the Department to consider redomestication, so it would be the -- the new domicile or this domicile, depending on whether redomestication is pursued or not.

Q.   Now, you say "this domicile."  What do you mean? What domicile --

A.   North Carolina.  North Carolina Department of Insurance.

Q.   And you said you may apply for redomestication to Oklahoma.  Is that a necessary prerequisite to close this

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 12 of 83

Q.    We have $15 million in capital that you're prepared to infuse either through your own personal wealth or through your investor relationships?

A.    Yes.

Q.    And how much of your own personal wealth are you contemplating putting into this transaction?

A.    Two million.

Q.    Okay.  So, again, I do lawyer math, which is not necessarily helpful here, but rough math is we're talking over $500 million capital that's going into the insurance companies in this transaction that could close?

A.    Yes.

Q.    Okay.  And what is your estimation of when this transaction, given -- you've spelled out some regulatory commitments that would be required.  given that, what is your estimation of when realistically this transaction could close?

A.    Realistically, I believe this is a transaction that would close in April or May.  The LOI sets forth the transaction closing date of May 31st, so I think we can try to improve upon that, but it's -- it's in that vicinity.

Q.    Okay.  And so that's -- that's roughly six months from now, right?

A.    Yes.

Q.    And why would it take six months to go through a

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 13 of 83

transaction?

A.   Well, there's a lot of steps involved here, and some of it is outside of my control.  It requires regulatory approval.  In the Michigan transaction, we -- it took 110 days to get Form A approval, so that consumes a big chunk of the six months.

Q.   And in this cover letter, you mentioned talking to Mr. Dinius about the concept of redomesticating to Oklahoma, right?

A.   Yes.

Q.   Okay.  But, again, is that necessary to be able to close this transaction?

A.   No.

Q.   But if that were to happen as part of this transaction, the net effect of that would be these companies would no longer be domiciled in North Carolina and they'd be domiciled in Oklahoma?

A.   Correct.

Q.   Okay.  Now, if this Court grants the liquidation petition today for -- first of all, do you know who I'm talking about when I say BLIC?

A.   Yes.

Q.   And you know who I'm talking about when I say CBL?

A.   Yes.

Q.   You understand those are the two life insurance

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 14 of 83

Causey v. Southland National, et al. - 19 CVS 8664
November 21, 2022
Robert Thomas Alban - Examination by the Court    Page 246

"For Discussion Purposes Only," doesn't it?

THE WITNESS:  That's -- yes, that's -- but that's a normal thing you find in a term sheet.

THE COURT:  And it says, "The summary of proposed terms of acquisition sets forth the principal terms of the proposed acquisition of GBIG Holdings, LLC, and is an expression of intent only and is not a binding agreement or commitment to execute the proposed transaction.  There is no binding obligation on the part of any party to proceed with the proposed transaction described in the Acquisition Term Sheet unless and until definitive agreements regarding the proposed transaction are signed by the relevant parties and all required internal approvals of each party are secured"; is that correct?

THE WITNESS:  That -- that's correct.  I --

THE COURT:  That's bold, isn't it?

THE WITNESS:  Yeah, I've sent about a hundred of those, and I'm a business guy, but my lawyers always tell me to put that kind of language in there.

THE COURT:  Because this is essentially an agreement to agree, isn't it?

THE WITNESS:  That's, I guess, how you would characterize a Letter of Intent.

THE COURT:  I don't have any further questions.  Do you have any further questions?

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 15 of 83



# RAGSDALE LIGGETT PLLC
## LAWYERS

David K. Liggett | D 919.881.2206 | dliggett@rl-law.com

May 15, 2023

***Via Hand Delivery and Electronic Mail, Susan.Coble@ncdoi.gov***

Susan Coble, Chief Regulatory Specialist
Financial Analysis & Receivership Division
N.C. Department of Insurance
325 N. Salisbury Street
Raleigh, NC 27603

> *Re:* *Form A*
> *Universal Financial Holdings, LLC, Applicant*

Dear Susan,

As discussed, enclosed are three hard copies of three separate Statements Regarding the Acquisition of Control of or Merger with a Domestic Insurer on Form A. In each case, the Applicant is Universal Financial Holdings LLC, a Missouri limited liability company controlled by Robert Alban. The North Carolina domestic insurers the Applicant seeks to acquire are Southland National Insurance Company, Bankers Life Insurance Company and Colorado Bankers Life Insurance Company.

I will send three separate electronic files to you via email to ensure that the files are not too large to open.

Yours truly,

RAGSDALE LIGGETT PLLC

David K. Liggett

Enclosures

**EXHIBIT**

**2**

PENGAD 800-631-6989

FORM A

STATEMENT REGARDING THE ACQUISITION OF CONTROL OF
OR MERGER WITH A DOMESTIC INSURER
(this "Statement")

**COLORADO BANKERS LIFE INSURANCE COMPANY**

(the "Domestic Insurer - CBL")

BY

**UNIVERSAL FINANCIAL HOLDINGS LLC**
**ROBERT ALBAN**

(each an "Applicant")

**Filed with the North Carolina Department of Insurance and Financial Services**

(the "Department")

Dated:  May 2, 2023

Name, Title, Address and Telephone Number of Individuals to Whom Notices and
Correspondence Concerning this Statement Should Be Addressed:

To:

Bob Alban
CEO, Universal Financial Holdings
Principal, Montshire Advisors
19 Essex Road
Bedford NH 03110
Telephone:  617-500-0008
Email:  alban@montshireadvisors.com

With a copy to:
David Liggett
Ragsdale Liggett
2840 Plaza Place,
Suite 400,
Raleigh NC  27612
Telephone: 919.881.2209
Email: dliggett@rl-law.com

1007716119v3

## Item 1.        METHOD OF ACQUISITION

### (a)        Domestic Insurer - CBL

This Form A Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer (this "Application") relates to a proposed acquisition of control of the Domestic Insurer, Bankers Life Insurance Company.  The Domestic Insurer - CBL's statutory home office and is located at 2327 Englert Drive Durham North Carolina 27713. The Domestic Insurer - CBL is currently in rehabilitation pursuant to order of rehabilitation issued by Wake County Superior Court on June 27, 2019. (the "Rehabilitation").

### (b)        Method of Acquisition

The Domestic Insurer - CBL is a direct wholly-owned subsidiary of GBIG Holdings, LLC, a limited liability company organized under the laws of the State of Delaware ("GBIG Holdings"). GBIG Holdings is a wholly owned subsidiary of GBIG Capital LLC, a limited liability company organized under the laws of the State of Delaware ("Seller")

On December 2, 2022, Universal Financial Holdings, LLC ("UFH") entered into an agreement to acquire GBIG Holdings from Seller as amended by that certain First Amendment to the Purchase Agreement (collectively, the "Purchase Agreement"), pursuant to which UFH agreed to purchase from Seller all of the membership interests of  GBIG Holdings (the "Proposed Acquisition"), subject to satisfaction of all conditions to closing, including receipt of required regulatory approvals from the North Carolina Department of Insurance (the "Department") of this Application approving the change of control of GBIG's wholly owned subsidiary, the Domestic Insurer - CBL and Form D application relating to the issuance of a surplus note by Domestic Insurer – CBL.  The Proposed Acquisition is also conditioned upon and subject to regulatory approvals from the Department of a Form A approving the change of control of GBIG Holding's wholly owned subsidiaries, Southland National Insurance Company ("SNIC") and Bankers Life Insurance Company ("BLIC") and the Rehabilitation Court approval of the termination of the Rehabilitation Proceeding of SNIC, BLIC, and CBL, the approval of the sale of Clanwilliam and UKAT, and the approval of refinancing of ARM.

A copy of the Purchase Agreement and the First Amendment thereto is attached as Exhibit 1 to this Statement and incorporated herein by reference.

Universal Financial Holdings is controlled by Robert Alban.  Universal Financial Holdings was formed for the purpose of acquiring insurance companies and, as of the date hereof, has no assets or liabilities.  Universal Financial Holdings will issue $30 million of preferred equity to outside investors concurrent with the closing of the Proposed Acquisition.  Such preferred equity investors will be passive investors who will not control the Domestic Insurer - CBL. No investors will transact any business in Universal Financial Holdings or the Domestic Insurer - CBL or will have the power to sign documents for or otherwise bind Universal Financial Holdings.

1007716119v3

1

**Item 2.        IDENTITY AND BACKGROUND OF THE APPLICANTS**

### (a)        Name and Address of the Applicants

The names and principal business addresses of the Applicants are as follows:

>       Universal Financial Holdings
>       Robert Alban
>       19 Essex Road
>       Bedford, NH 03110

### (b)        The Applicants' Business Operations

Universal Financial Holdings is a newly formed limited liability company organized under the laws of the State of Missouri for the purpose of acquiring insurance related businesses.

Robert Alban is an insurance industry entrepreneur and advisor with expertise in risk based capital models, reinsurance, Federal Home Loan Bank ("FHLB") matters, as well as an understanding of insurance tax and accounting considerations and the insurance product and distribution marketplace. Mr Alban is currently Principal of Montshire Advisors, a firm he co-founded in 2011, where he brokers reinsurance, advises insurers on product, distribution, and FHLB matters, and represents investments and investment firms to the US insurance industry. Montshire's clients have included numerous insurance companies, investment managers, and regional Federal Home Loan banks. Mr Alban is also a shareholder in an insurance distribution business focused on marketing insurance and administering benefits for federal employees and employer groups. In 2020, Mr Alban acquired intellectual property from Great American Insurance Company for a supplemental unemployment insurance product which he is in the process of commercializing. Prior to forming Montshire, Mr. Alban led corporate development at National Life Group, a Fortune 1000 insurance company where he focused on capital optimization structures and transactions such as reinsurance, corporate owned life insurance, certified capital companies and other tax advantaged investments, interest rate and equity market hedging, and Federal Home Loan bank programs. Prior to National Life, Mr. Alban led mergers and acquisitions at Sentry Insurance, a Fortune 1000 property and casualty insurer. Prior to Sentry, Mr Alban held business development positions with GXS (formerly GE Information Services), ITOCHU International (an $86 Billion Japanese conglomerate) and Westinghouse. Mr Alban has a BS in Mechanical Engineering from West Virginia University and an MBA from Georgetown University. Mr Alban has his Series 7 and Series 66 securities licenses and is a registered representative of Castle Hill Partners. Mr Alban has his life producer and reinsurance intermediary licenses.

### (c)        Applicants' Organizational Charts

Attached to this Application as Exhibit 2 is the current organizational chart of the Domestic Insurer - CBL immediately prior to the Proposed Acquisition.

A simplified organizational chart presenting the identities of, and interrelationships among, the Applicants and their subsidiaries and affiliates, including the ultimate controlling persons, prior to consummation of the Proposed Acquisition is attached hereto as Exhibit 3. The

2

organizational chart indicates the percentage of voting securities of each entity owned or controlled by the Applicants or any other such persons, the type of organization (e.g., corporation, trust, partnership) and the state or other jurisdiction of domicile or incorporation, as applicable. Unless otherwise indicated on such organizational charts or in this Application, each entity is a corporation and control is maintained by the ownership or control of all outstanding voting securities.

An abbreviated post-closing organizational chart of the Applicants, showing the Domestic Insurer - CBL's place within the Applicants' organizational structure after consummation of the Proposed Acquisition, is attached hereto as Exhibit 4.

There are currently no pending court proceedings involving a reorganization or liquidation of the Applicants or any of the subsidiaries or affiliates of the Applicants.

## Item 3. IDENTITY AND BACKGROUND OF INDIVIDUALS ASSOCIATED WITH THE APPLICANTS

The directors, executive officers and natural persons controlling 10% or more of the voting security of the Applicants are listed in Exhibit 5 hereto. Completed NAIC biographical affidavits of such individuals are attached hereto as Exhibit 6. Third party background checks will be also be performed in connection with this Statement's submission.

A list setting forth the names and business addresses of the prospective members of the board of the Domestic Insurer - CBL is set forth below under Item 5.

## Item 4. NATURE, SOURCE AND AMOUNT OF CONSIDERATION

### (a) Nature, Source and Amount of Consideration

The total consideration for the Proposed Acquisition of GBIG Holdings is $1 plus deferred consideration of $290 million payable concurrent with the redemption of the remaining Global Growth related assets. Prior to closing, Domestic Insurer – CBL shall convert $200 million of GBIG Holding's equity in CBL into a $200 million face amount surplus note with the following terms:

- 10-year term

- 10% interest, can be accrued at borrower's option for the first three years

- Repayable in cash or Global Growth related assets

- The surplus note shall become an asset of GBIG Holdings and be acquired by UFH.

### (b) Criteria in Determining Consideration

The basis and terms of the Purchase Agreement, including the nature and amount of consideration, were determined through arms' length negotiations between representatives of the Applicants and Seller, and their respective financial, legal and other advisors. The amount and type of consideration were determined in view of the consideration paid in other recent acquisitions

3

of similar businesses, as well as the financial position and results of operations of the business to be acquired, including the past and present business operations, historical and potential earnings, financial condition and prospects, assets and liabilities and such other factors and information as the Applicants considered relevant under the circumstances.

### Item 5. FUTURE PLANS FOR DOMESTIC INSURER - CBL

#### (a) Plans for Domestic Insurer - CBL

A Plan of Operations describing the Applicants' intentions with respect to the operations of the Domestic Insurer - CBL following the consummation of the Proposed Acquisition is attached hereto as Exhibit 7.

The tables below set forth a list of all individuals who are proposed to be directors and officers of the Domestic Insurer - CBL following the closing of the Proposed Acquisition:

Directors:

| Name | Title |
|------|-------|
| Robert Alban | Executive Chairman |
| Michael Reidy | Director |

Officers:

| Name | Title |
|------|-------|
| Robert Alban | President, Secretary |

Biographical affidavits for Robert Alban are included in Exhibit 8 hereto. The Applicants intend to identify several additional directors for appointment to the Board of the Domestic Insurer – CBL at or shortly after the closing of the Proposed Acquisition. Once these directors are identified, biographical affidavits will be filed.

The Domestic Insurer - CBL is being acquired without a management team, officers or employees. The Applicants' will have an initial management team engaged upon the closing of the Proposed Acquisition to manage third-party service providers and to ensure operational continuity. Over the near-to-medium term, the Applicants expect to continue hiring additional members of Management and support staff and thoughtfully, in a fully coordinated strategy with all parties, transition away from third-party support.

Other than as set forth herein or in the Plan of Operations attached hereto as Exhibit 7, the Applicants have no plans for the Domestic Insurer – CBL to pay a dividend (whether extraordinary or otherwise), liquidate the Domestic Insurer - CBL, sell its assets or merge it with any person or persons or make any other material change in its business operations or corporate structure or management.

4

Applicant intends to pursue discussions with other state regulators regarding re-domestication. Applicant shall file a copy of any UCAA primary application filings it makes with other state insurance departments for approval of re-domestication.

### (b) Five-Year Financial Projections

Five-year financial projections for the Domestic Insurer - CBL are also attached as Exhibit 7 hereto.

### (c) Absence of Other Proposed Changes

There are no proposed changes with respect to the Domestic Insurer – CBL's compliance plan.

### Item 6. VOTING SECURITIES TO BE ACQUIRED

The Applicants will acquire, indirectly, 100 percent of the Domestic Insurer - CBL's capital stock.

Please refer to Item 4(b) above for a description of the method by which the terms of the Purchase Agreement were determined.

### Item 7. OWNERSHIP OF VOTING SECURITIES

None of the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement beneficially owns or has, directly or indirectly, a right to acquire beneficially any voting securities of the Domestic Insurer - CBL or any securities convertible into or evidencing a right to acquire any such voting securities whether or not such right of conversion or acquisition is exercisable immediately or at some future time.

### Item 8. CONTRACTS, ARRANGEMENTS OR UNDERSTANDINGS WITH RESPECT TO VOTING SECURITIES OF THE DOMESTIC INSURER - CBL

Except for the Purchase Agreement, which provides for the acquisition of all of the shares of capital stock of the Domestic Insurer - CBL, there are no contracts, arrangements or understandings with respect to any voting securities of the Domestic Insurer - CBL in which the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement is involved, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits, or the giving or withholding of proxies.

### Item 9. RECENT PURCHASES OF VOTING SECURITIES

There have been no purchases of any voting securities of the Domestic Insurer - CBL by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants,

5

any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

## Item 10.     RECENT RECOMMENDATIONS TO PURCHASE

Except in connection with the execution of the Purchase Agreement, there have been no recommendations to purchase any voting security of the Domestic Insurer - CBL made by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement, or by anyone based upon interviews or at the suggestion of the Applicants, any person controlling, controlled by or under common control with the Applicants or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

## Item 11.     AGREEMENTS WITH BROKER-DEALERS

There are no written or oral agreements, arrangements or understandings made or proposed to be made by any Applicants or any affiliate of the Applicants with any broker-dealer as to solicitation of voting securities of the Domestic Insurer - CBL for tender.

## Item 12.     FINANCIAL STATEMENTS AND EXHIBITS

### (a)     Exhibits and Financial Statements

The financial statements and exhibits attached to this Statement are as follows:

Exhibit 1.     Purchase Agreement

Exhibit 2.     Pre-Acquisition Organizational Chart of the Domestic Insurer - CBL

Exhibit 3.     Pre-Acquisition Organizational Chart of the Applicants

Exhibit 4.     Simplified Organizational Chart of the Applicants and Domestic Insurer - CBL Following the Proposed Acquisition

Exhibit 5.     Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 6.     Biographical Affidavits of Current Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 7.     Plan of Operations and Five Year Financial Projections for the Domestic Insurer - CBL

Exhibit 8.     Personal financial statements of Robert Alban as of April 17, 2023

6

The Applicants respectfully request that Exhibit 8, the personal financial statements of Mr. Alban and Exhibit 6, biographical affidavits of directors be afforded confidential treatment and be excepted from disclosure under G.S. 132-1.2. The information in Mr. Alban's personal financial statement and biographical affidavit contains information of a personal nature. Disclosure of such information would constitute a clearly unwarranted invasion of the relevant individuals' privacy.

### Financial Statements

Attached as Exhibit 8 hereto are the personal financial statements of Robert Alban as of April 17, 2023. Universal Financial Holdings is a newly formed entity and does not have financial statements.

**(c)     Tender Offers, Agreements for Voting Securities, Annual Reports**

Other than the Purchase Agreement, which provides for the change of control of all of the shares of capital stock of the Domestic Insurer - CBL, there are no tender offers for, requests or invitations for, tenders of, exchange offers for or agreements to acquire or exchange any voting security of the Domestic Insurer - CBL or additional soliciting materials relating thereto. Other than as indicated herein, there will be no employment, consultation, advisory, managing general agent, controlling producer, or management contracts concerning the Domestic Insurer - CBL, and there have been no annual reports to stockholders of the Domestic Insurer – CBL for the last two (2) fiscal years.

**Item 13.     ENTERPRISE RISK MANAGEMENT**

The Applicants agree to provide, to the best of their knowledge and belief, the information required by Form F within fifteen (15) days after the end of the month in which the acquisition of control occurs.

**Item 14.     SIGNATURE AND CERTIFICATION**

*[Signature Pages Follow]*

7

Case 3:23-cr-00048-MOC-DCK     Document 234-47     Filed 07/14/26     Page 24 of 83

## SIGNATURE

Pursuant to the requirements of NC General Statutes - Chapter 58 Article 19, Universal Financial Holdings, LLC has caused this application to be duly signed on its behalf in the City of _Bedford_ and State of _NH_ on the _2nd_ day of _MAY_, 2023.

(Seal)

UNIVERSAL FINANCIAL HOLDINGS, LLC

By: _____

Name:    Robert Alban

Title:     Authorized Person

Attest:

By: _____

Name: _Caitlin Loving_

Title: _Notary Public_

**CAITLIN E. LOVING**
Notary Public - New Hampshire
My Commission Expires June 30, 2026

## CERTIFICATION

The undersigned deposes and says that he has duly executed the attached application dated _MAY 2_, 2023, for and on behalf of Universal Financial Holdings, LLC; that he is the authorized signatory of such company and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with the instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information and belief.

_____
(Signature)

_Robert Alban_
(Type or Print Name)

Exhibit 1 Purchase Agreement and First Amendment

**First Amendment To The Purchase Agreement Executed December 2nd 2022 Between GBIG Capital, LLC and Universal Financial Holdings, LLC**

Section I.2, entitled PURCHASE PRICE shall be hereby amended as per the below:

The amount of "$307 million" shall be replaced with "$290 million" in the sentence, "In addition, within 36 months following the Closing, the Buyer shall deliver to the Seller additional consideration consisting of Seller-Related Assets, as listed on Schedule 1.02 which the parties have agreed to collectively to have cash and accrued interest equal to $307 million"

Section VII.1, entitled CONDITIONS TO CLOSING AND RELATED MATTERS shall be hereby amended to add item (k) as per the below:

(k) The sale of Clanwilliam, the sale of UKAT, and the closing of the ARM refinancing, or the closing of alternative transactions having the same effect in the sole discretion of the Buyer, shall be conditions precedent to the obligations of the Buyer hereunder.

Section IX.1, entitled TERMINATION shall be hereby amended to modify item (e) and item (f) as per the below:

(e) The June 30, 2023 and September 30, 2023 referenced dates shall be increased by 90 days to September 30, 2023, and December 31, 2023, respectively.

(f) "180 days" shall be replaced by "270 days"

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date the first written above by their respective duly authorized officers.

GBIG Capital, LLC
a Delaware limited liability company

By: _____
Name: Greg E. Lindberg
Title: Sole Member

UNIVERSAL FINANCIAL HOLDINGS, LLC a Missouri limited liability company

By: _____
Name: Robert T. Alban
Title: CEO

# LIMITED LIABILITY COMPANY INTEREST PURCHASE AGREEMENT

Dated as of December 2, 2022

between

## GBIG CAPITAL, LLC

and

## UNIVERSAL FINANCIAL HOLDINGS, LLC

This LIMITED LIABILITY COMPANY INTEREST PURCHASE AGREEMENT (including all schedules, exhibits and amendments hereto, this "Agreement"), dated as of December 2, 2022, is made by and between GBIG CAPITAL, LLC, a Delaware limited liability company ("Seller"), and Universal Financial Holdings, LLC a Missouri limited liability company ("Buyer"). Capitalized terms not otherwise defined herein used in this Agreement have the meanings given to such terms herein. In this Agreement, Seller or Buyer may be referred individually as "Party" or collectively as "Parties".

## PRELIMINARY STATEMENTS

A.  Seller is the beneficial and record owner of 100% of the membership interests in GBIG Holdings, LLC (the "Company");

B.  Company owns all of the issued and outstanding shares of Colorado Bankers Life Insurance Company, a life insurance company domiciled under the laws of North Carolina ("CBL"); Bankers Life Insurance Company, a life insurance company domiciled under the laws of North Carolina ("BLIC"); Southland National Reinsurance Corporation, an insurance company domiciled under the laws of North Carolina ("SNRC"); and Southland National Insurance Corporation, a life insurance company domiciled under the laws of North Carolina ("SNIC"), together the "Acquired Insurance Companies;

C.  On June 27, 2019, the Superior Court for Wake County, North Carolina (the "Rehabilitation Court") placed the Acquired Insurance Companies into rehabilitation (the "Rehabilitation Proceeding") under Article 30 of Chapter 58 of the North Carolina General Statutes, such that title to their assets was vested in the Commissioner of Insurance of the State of North Carolina as Rehabilitator;

D.  On November 21, 2022, the Rehabilitation Court rendered an oral ruling that CBL and BLIC would be placed into liquidation under Article 30 of Chapter 58 of the North Carolina General Statutes, but the Rehabilitation Court has not yet identified the future date on which such liquidation would be effective; and

E.  Seller desires to sell to Buyer and Buyer desires to purchase from Seller all of Seller's membership interest in the Company, ("Seller's Interest") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

2

**Section I.1** **Purchase and Sale of the Seller's Interest**. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer (or to an Affiliate or to a designated assignee of Buyer approved in writing by Buyer), free and clear of all Liens, and Buyer shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to all of the Seller's Interest for the Purchase Price set forth in Section 1.02, and in accordance with the wire transfer instructions set forth in Section 1.02 of the Disclosure Schedules. The term "Disclosure Schedules" means the disclosure schedules, attached hereto and made a part hereof, either delivered by Seller and Buyer at least two Business Days prior to the execution and delivery of this Agreement or subsequent thereto, but in any event prior to the Closing, consistent with the requirements of Section 4.09(b). For avoidance of doubt any Disclosure Schedule or Exhibit not attached hereto upon execution of this Agreement shall be assumed to be delivered prior to Closing.

**Section I.2** **Purchase Price.** The Parties agree that the "Purchase Price", subject to adjustments in this Agreement, will be $1.00 and other valuable consideration which shall be paid in United States currency. In addition, within 36 months following the Closing, the Buyer shall deliver to the Seller additional consideration consisting of a combination of Seller-Related Assets, as listed on Schedule 1.02, which the Parties have agreed to collectively to have cash and accrued interest equal to $307 million at Closing. Each Seller-Related Asset shall consist of assets related to the Seller or related to Global Growth Holdings, Inc. and shall be selected at the Buyer's sole discretion.

**Section 1.02B** **Withholding**. Notwithstanding any other provision of this Agreement, and for the avoidance of doubt, (a) each payment made pursuant to this Agreement shall be made net of any Taxes required by applicable Law to be deducted or withheld from such payment and (b) any amounts deducted or withheld from any such payment shall be remitted to the applicable taxing authority and shall be treated for all purposes of this Agreement as having been paid. Seller shall provide Buyer with a valid IRS Form W-9 on or prior to the Closing, or other documentation reasonably satisfactory to Buyer to establish that no withholding under Section 1445 of the Code is required with respect to the Purchase Price.

**Section I.3** **Expense Deposit**. Contemporaneous with the execution hereof, the Seller transfers to the Buyer the sum of five hundred thousand dollars ($500,000) (the "**Expense Deposit**"). The Buyer shall use the Expense Deposit to pay the Buyer's reasonable and necessary, actually-incurred third party expenses incurred in connection with the transactions contemplated hereby. Upon written request at any time prior to the Closing, the Buyer shall produce to the Seller, which shall maintain a detailed accounting of all debits from the expense deposit, evidence of the balance of the Expense Deposit and such reasonable documentation as the Seller may require of the expenses funded thereby prior to the date of such request. As of the Closing, the Seller shall return the balance of the Expense Deposit, if any, to the Buyer.

**Section I.4** **Redomestication**. As a condition precedent to the Closing of this Stock Purchase Agreement, the Buyer shall cause to be filed a redomestication application and/or whatever similar documentation as may be required for the Acquired Insurance Companies with the Oklahoma Insurance Department ("OID") and shall cause a similar motion or petition to be filed with the Rehabilitation Court. The Parties acknowledge that this is a material term of this agreement and that this term constitutes valuable consideration to the Seller. If the OID does not

3

grant the Buyer's request for redomestication within 90 days from the date that the redomestication petition is filed with the OID, then this Stock Purchase Agreement shall have no further force or effect.

## ARTICLE II
## CLOSING

**Section II.1** <u>Closing</u>. In accordance with the terms and subject to the conditions set forth in this Agreement, the closing of the purchase and sale of the Seller's Interest contemplated by this Agreement (the "<u>Closing</u>") shall take place remotely by electronic exchange of documents and electronic signatures, or at such other physical location as the parties may mutually agree, as soon as reasonably practicable upon fulfillment or waiver of all conditions precedent to Closing (the "<u>Closing Date</u>").

**Section II.2** <u>Payments</u>. At the Closing, Buyer shall deliver to Seller payment, by wire transfer of immediately available funds, an amount determined in accordance with <u>Section 1.02(a)</u> in accordance with the wire transfer instructions set forth in <u>Section 1.02</u> of the Disclosure Schedules.

**Section II.3** <u>Seller Closing Deliverables</u>. At the Closing, Seller shall deliver to Buyer the following:

    (a)    an Assignment and Assumption of Limited Liability Company Interest, substantially in the form attached hereto as Exhibit B, duly executed by Company's Manager.

    (b)    the resignation of the Manager of the Company, duly executed by the Company's Manager;

    (c)    <u>The Excluded Items Assignment and Assumption (as defined below), in form and substance reasonably acceptable to the Buyer, effective as of the Closing, executed by each of the Seller, the Company, and any third parties required to consent to the Excluded Items Assignment and Assumption</u>.

    (d)    Share certificates for the Acquired Insurance Companies evidencing the Company's Interest, free and clear of all Encumbrances, accompanied by stock powers or other instruments of transfer duly executed substantially in the form of **Exhibit 2.03(a)** (the "<u>CBL, BLIC, SNRC, and SNIC Stock Powers</u>").

    (e)    a true and correct copy of the unanimous written consent of the Members of Company, authorizing the execution and delivery of this Agreement and the consummation of the transaction contemplated hereby;

    (f)    Certificates of Authority of CBL, BLIC, SNRC, and SNIC for the State of North Carolina and for the applicable states which it is qualified to do business as foreign insurance corporation.

4

(g)     Certificate of nonforeign status pursuant to Treasury Regulation Section 1.1445-2(b)(2) (the Foreign Investment in Real Property Tax Act of 1980; "FIRPTA") substantially in the form of **Exhibit 2.03(d)**.

(h)     All Third-Party Consents, if any, contemplated by Sections 3.02 and 3.03, and set forth in Disclosure Schedules, including but not limited to any and all consents required by any applicable Rehabilitation Court orders.

(i)     A certificate, in the form and substance reasonably satisfactory to Buyer, certifying that all of the closing conditions have been fulfilled or waived.

(j)     Evidence of repayment of all indebtedness that would affect the purchase and transfer of the Seller's Interest.

(k)     Written resignations of each of the directors, officer and managers of CBL, BLIC, and SNIC, if any, effective as of the date of the Closing.

(l)     A release agreement in the form of **Exhibit 2.03(i)** from Seller of any and all Seller's claims against CBL, BLIC, and SNIC (the "CBL, BLIC, SNRC, and SNIC Release Agreement").

(m)     Evidence of the resolution, to the satisfaction of Buyer, of any pending litigation or regulatory action, including but not limited to all mattes relating to rehabilitation and liquidation which may apply to the Acquired Insurance Companies.

(n)     Evidence of the approval of the redomestication applications for the Acquired Insurance Carriers by the Oklahoma Department of Insurance, as further described herein.

**Section II.4**     **Buyer's Closing Deliverables**.     At Closing, Buyer shall deliver the following to Seller:

(a)     The portion of the Purchase Price payable to Seller pursuant to Section 1.02(a).

(b)     A certificate of the Secretary (or other officer) of Buyer certifying: (i) that attached thereto are true and complete copies of all resolutions of the board of directors or governing body of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and that such resolutions are in full force and effect; and (ii) the names, titles and signatures of the officers of Buyer authorized to sign this Agreement.

(c)     The Form A acquisition of control approval of the OID as contemplated by Section 5.02 and set forth in the Buyer Disclosure Schedules.

(d)     Any necessary approvals of the transactions contemplated by this Agreement, including but not limited to the purchase and re-domestication, as may be

5

required from the North Carolina Department of Insurance ("NCDOI") pursuant to North Carolina law.

(e)     A certificate, in the form and substance reasonably satisfactory to Seller, certifying all of the Closing conditions have been fulfilled or waived.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Subject to and as qualified by the matters set forth in the Disclosure Schedules, Seller hereby represents and warrants to Buyer as follows that as of the Closing Date (except for such representations and warranties which address matters only as of a specific date, which representations and warranties shall be true and correct as of such specific date):

**Section III.1    Incorporation and Authority of Seller**.

(a)     Seller is a Delaware limited liability company, duly incorporated, validly existing and in good standing under the Laws of Delaware.

(b)     Seller has all requisite corporate power to enter into this Agreement and, consummate the Transaction, and carry out its obligations under this Agreement, *provided however* that Closing may not occur until such conditions precedent and closing deliverables set forth in Sections 2.03, 2.04, 7.01, and 7.02 have been satisfied. The execution and delivery by Seller of this Agreement and the consummation by Seller of the Transaction by, and the performance by Seller of its obligations under, this Agreement have been duly authorized by all requisite corporate action on the part of Seller. The execution and delivery by Seller and the Company of this Agreement and each other agreement related to the Transaction to which Seller and the Company is or will be a party, the consummation by Seller and the Company of the Transaction, and the performance by Seller and the Company of its obligations under this Agreement, have been duly authorized by all requisite corporate action on the part of Seller and the Company (including the approval of Seller's and Acquired Insurance Companies' board of directors). No other corporate proceedings on the part of Seller or the Company, and no other votes or approvals of any membership interests of Company or class or series of Capital Stock of the Acquired Insurance Companies, are necessary to authorize this Agreement or to consummate the Transaction. This Agreement has been duly executed and delivered by Seller, this Agreement constitutes (and at Closing, will constitute) the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, rehabilitation, liquidation, fraudulent conveyance or similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law); provided, that the fact that the Acquired Insurance Companies are under a Rehabilitation order will not be deemed to provide any exception to the enforceable nature of this Agreement as against Seller, except to the

6

extent of the required government approvals provided under <u>Section 7.02(f)</u> and <u>Section 7.02(g)</u>.

(C)     The Acquired Insurance Companies are under the control and supervision of the Rehabilitator.  As a result, Seller cannot make any representations as to their current internal workings, financial statements, assets, insurance coverages, or otherwise.  To the extent any portion of this Agreement includes a Seller representation about the Acquired Insurance Companies, such statement shall be construed only as Seller's reasonable belief based on information made available to it by the Rehabilitator in public filings.

**Section III.2     No Conflict**.  Except as set forth in <u>Section 3.02</u> of the Disclosure Schedules, as set forth in the conditions precedent and closing deliverables appearing in Sections 2 and 7, and, in the case of clauses (b) and (c) below, except as may result from any facts or circumstances solely relating to Buyer or its Affiliates (as opposed to any other third party), the execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the Transaction do not (a) violate, conflict with or require a Consent under the organizational documents of Seller, the company the  Acquired Insurance Companies, (b) subject to the required resolution of the pending regulatory action and court orders governing the Acquired Insurance Companies prior to Closing, violate or conflict with any Law, Permit or other Governmental Order applicable to Seller, Company or the Acquired Insurance Companies or by which any of them or any of their respective properties or assets is bound or subject or (c) result in any breach of, or constitute a default (or event which, with the giving of notice or lapse of time, or both, would become a default) under, result in the loss of any right, entitlement or obligation in, or give to any Person any entitlement or right under, including rights of termination, acceleration or cancellation of, or result in the loss of any right or benefit to which Seller, Company, or the Acquired Insurance Companies is entitled under, or result in the creation of any Lien on any of the assets or properties of Seller, Company, or the Acquired Insurance Companies pursuant to, any Contract to which Seller, Company, or the Acquired Insurance Companies or any of their properties or assets are bound, other than, in the case of clauses (b) and (c), any such conflicts, violations, breaches, defaults, rights or Liens that, individually or in the aggregate, do not have, and would not reasonably be expected to result in, (i) a material impairment or delay of the ability of Seller to perform its material obligations under this Agreement taken as a whole or (ii) an Acquired Insurance Companies Material Adverse Effect. For the purposes of this Agreement, an Acquired Insurance Companies Material Adverse Effect shall mean any event<u>, change or effect that is materially adverse to the condition (financial or otherwise), properties, assets, liabilities, business, operations or results of operations of the Acquired Insurance Companies.</u>

**Section III.3     Consents and Approvals**.  Except as set forth in <u>Section 7.02(f)</u>, <u>Section 7.02(g)</u>, or in <u>Section 3.03</u> of the Disclosure Schedules, or as may result from any facts or circumstances solely relating to Buyer or its Affiliates (as opposed to any other third party), the execution and delivery by Seller of this Agreement to which Seller is or will be a party does not, and the performance by Seller of, and the consummation by Seller of the Transaction, does not require any material Governmental Authority approval to be obtained or made by Seller prior to the Closing.

7

Case 3:23-cr-00048-MOC-DCK     Document 234-47     Filed 07/14/26     Page 34 of 83

**Section III.4** <u>**Title to the Seller's Interest**</u>. Seller is the sole record and beneficial owner of the Membership Interest of Company. The Membership Interests are owned by Seller, and are free and clear of all Liens, other than any restrictions put in place by the Rehabilitation Court. The Company is the sole record and beneficial owner of all of the outstanding shares of each of CBL, BLIC, and SNIC.

**Section III.5** <u>**Undisclosed Liabilities**</u>. To the knowledge of the Seller, the Company has no liabilities, obligations or commitments of any sort that would be required to be reflected on a balance sheet prepared in accordance with GAAP, except (i) those which are adequately reflected or reserved against in the <u>Section 3.05</u> of the Disclosure Schedules; and (ii) those which have been incurred in the ordinary course of business since December 31, 2021 and which are not, individually or in the aggregate, material in amount. The Acquired Insurance Companies have no liabilities, obligations or commitments of any sort that would be required to be reflected on a balance sheet prepared in accordance with SAP, except (i) those which are adequately reflected or reserved against in the <u>Section 3.05</u> of the Disclosure Schedules; and (ii) those which have been incurred in the ordinary course of business since December 31, 2021 and which are not, individually or in the aggregate, material in amount.

**Section III.6** <u>**Financial Statements; Reserves; Investment Assets; Accounting Controls**</u>.

<u>The following representations are based solely on the reasonable belief of the Seller, given that the Acquired Insurance Companies are in rehabilitation supervised by the NCDOI.</u> Seller has access only to quarterly statements prepared by the NCDOI and the following representations are based solely on such public filings.

(a) Seller has made available to Buyer copies of the following financial statements (collectively, the "<u>Financial Statements</u>"): (i) the audited financial statements of the Company as of December 31, 2019, December 31, 2020, and December 31, 2021, (ii) the quarterly financial statements of the Company for the fiscal quarter ended March 31, 2022, June 31, 2022, and September 30, 2022, (iii) the annual statutory statement of the Acquired Insurance Companies as of and for the annual periods ended December 31, 2019, December 31, 2020, and December 31, 2021 in each case, as filed with the Rehabilitation Court and (iv) the quarterly statutory statement of the Acquired Insurance Companies for the fiscal quarters ended March 31, 2022 and June 30, 2022. The financial statements of the Company have been prepared in accordance with GAAP applied on a consistent basis (except as may be indicated in the notes thereto) and present fairly in all material respects as of their respective dates and for the respective periods indicated thereby. The financial statements of the Acquired Insurance Companies have been prepared in accordance with SAP applied on a consistent basis (except as may be indicated in the notes thereto) and present fairly in all material respects the statutory financial position, admitted assets, liabilities, capital and surplus and results of operations of the applicable entity as of their respective dates and for the respective periods indicated thereby.

(b) The statutory reserves carried on the financial statements of the Acquired Insurance Companies (i) were or will be computed in all material respects in accordance

8

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 35 of 83

with generally accepted actuarial principles consistently applied throughout the periods covered by such Financial Statements taken together; (ii) are fairly stated, in all material respects, in accordance with sound actuarial principles; (iii) have been based on actuarial assumptions and methods which produced reserves at least as great as those called for in any applicable Insurance Contract and (iv) satisfied or will satisfy all applicable Law and the requirements of SAP, as the case may be, in all material respects.

(c)     Seller has made available to Buyer (i) a true and complete list of all Investment Assets of the Acquired Insurance Companies as of September 30, 2022 and (ii) true and complete copies of the investment policies and guidelines applicable to the Acquired Insurance Companies' investment activities as of the date hereof.

(d)     The Acquired Insurance Companies has designed and maintained systems of internal accounting controls sufficient to provide reasonable assurances that, in all material respects, (i) all transactions are executed in accordance with management's general or specific authorization, (ii) all transactions are recorded as necessary to permit the preparation of financial statements in conformity with SAP, (iii) access to its property and assets is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for items is compared with the actual levels at reasonable intervals and appropriate action is taken with respect to any differences.

**Section III.7     Insurance.** Section 3.07 of the Disclosure Schedules sets forth a list, as of the date hereof, of all material insurance policies maintained by the Company and the Acquired Insurance Companies or with respect to which the Acquired Insurance Companies is a named insured or otherwise the beneficiary of coverage (collectively, the "Insurance Policies"). Such Insurance Policies are in full force and effect on the date of this Agreement and all premiums due on such Insurance Policies have been paid, except as would not have an Acquired Insurance Companies Material Adverse Effect.

**Section III.8     Legal Proceedings; Governmental Orders.**

(a)     Except as set forth in Section 3.08(a) of the Disclosure Schedules, there are no Actions pending or, to Seller's knowledge, threatened against or by the Company or the Acquired Insurance Companies affecting the Seller's Interest or assets (or by or against Seller or any Affiliate thereof and relating to the Acquired Insurance Companies), which if determined adversely to the Acquired Insurance Companies (or to Seller or any Affiliate thereof) would be reasonably likely to result in an Acquired Insurance Companies Material Adverse Effect.

(b)     Except as set forth in Section 3.08(b) of the Disclosure Schedules, there are no outstanding Governmental Orders against, relating to, or affecting the Seller or any Affiliate thereof or the Company or the Acquired Insurance Companies or any of its properties or assets which would be reasonably likely to have an Acquired Insurance Companies Material Adverse Effect.

**Section III.9     Compliance with Laws; Permits.**

9

(a)     Except as set forth in Section 3.09(a) of the Disclosure Schedules, the Acquired Insurance Companies is and has been since January 1, 2019, in compliance with all material Laws applicable to it or its business, properties or assets.

(b)     All material Permits required to be obtained from Governmental Authorities for the Acquired Insurance Companies to conduct its business have been obtained and are valid and in full force and effect.

**Section III.10  Taxes.**

(a)     Except as set forth in Section 3.10(a) of the Disclosure Schedules:

(i)  The Acquired Insurance Companies has filed (taking into account any valid extensions) all material Tax Returns. Such Tax Returns are true, complete and correct in all material respects. The Acquired Insurance Companies is not currently the beneficiary of any extension of time within which to file any material Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business. All material Taxes due and owing by the Acquired Insurance Companies (whether or not reflected on such Tax Returns) have been paid or accrued.

(ii)  No extensions or waivers of statutes of limitations have been given or requested with respect to any material Taxes of the Acquired Insurance Companies.

(iii)  There are no ongoing Actions by any taxing authority against the Acquired Insurance Companies.

(iv)  The Acquired Insurance Companies is not a party to any Tax-sharing agreement.

(v)  All material Taxes which the Acquired Insurance Companies is obligated to withhold have been duly and timely withheld, and such withheld Taxes have been either duly and timely paid to the proper governmental authority or properly set aside in accounts for such purpose and has complied in all material respects with applicable Tax information reporting requirements.

(vi)  All accounting entries (including charges and accruals) for Taxes with respect to the Acquired Insurance Companies reflected on the books of the Acquired Insurance Companies (excluding any provision for deferred income taxes reflecting either differences between the treatment of items for accounting and income tax purposes or carryforwards) are adequate to cover any material Tax liabilities accruing through the end of the last period for which the Acquired Insurance Companies ordinarily records items on its books. Since the end of the last period for which the Acquired Insurance Companies ordinarily records items on its books, the Acquired Insurance Companies has not engaged in any transaction, or taken any other action, other than in the ordinary course of

10

business, that would reasonably be expected to result in a materially increased Tax liability or materially reduced Tax asset.

(vii) The time for filing any Tax Return with respect to the Acquired Insurance Companies has not been extended to a date later than the date of this Agreement except that the Acquired Insurance Companies has filed an extension for its federal and state 2020 tax year return. No Taxes with respect to the Acquired Insurance Companies are currently under audit, examination or investigation by any governmental authority or the subject of any judicial or administrative proceeding. No governmental authority has asserted or threatened to assert any deficiency, claim or issue with respect to Taxes or any adjustment to Taxes against the Acquired Insurance Companies with respect to any taxable period for which the period of assessment or collection remains open. No jurisdiction (whether within or without the United States) in which the Acquired Insurance Companies has not filed a particular type of Tax Return or paid a particular type of Tax has asserted that the Acquired Insurance Companies is required to file such Tax Return or pay such type of Tax in such jurisdiction.

(viii) The Acquired Insurance Companies (i) has not received or applied for a Tax ruling or entered into a closing agreement pursuant to Section 7121 of the Code (or any predecessor provision or any similar provision of state or local law), in either case that would be binding upon the Acquired Insurance Companies after the Closing Date, (ii) is not or has not been a member of any affiliated, consolidated, combined or unitary group for purposes of filing Tax Returns or paying Taxes (other than a group of which Seller is the common parent) or (iii) has not had any liability for the Taxes of any Person (whether under Treasury Regulation Section 1.1502-6 or any similar provision of state, local or foreign law, as a transferee or successor, pursuant to any Tax sharing or indemnity agreement or other contractual agreements ("Tax Agreements"), or otherwise).

(ix) The Acquired Insurance Companies will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date, as a result of any (i) change in method of accounting for a taxable period ending on or prior to the Closing Date under Section 481 of the Code (or any corresponding provision of state, local or foreign income Tax law), (ii) installment sale or open transaction disposition made prior to the Closing Date, or (iii) prepaid amount received on or prior to the Closing Date. The Acquired Insurance Companies has not participated in a listed transaction within the meaning of Treasury Regulations Section 1.6011-4(c). The Acquired Insurance Companies has not been a "distributing corporation" or a "controlled corporation" within the meaning of Section 355 of the Code (x) in the two years prior to the date of this Agreement or (y) in a distribution that could otherwise constitute a "plan" or "series of related transactions" in conjunction with the transaction contemplated by this Agreement. The Acquired Insurance Companies is not party to a "gain recognition agreement" within the meaning of the Treasury Regulations under Section 367 of the Code.

11

(x) The Tax treatment of each Reinsured Insurance Policy is not, and since the time of issuance (or subsequent modification) has not been, less favorable to the purchaser, policyholder or intended beneficiaries thereof, than the Tax treatment either that was purported to apply in materials provided at the time of issuance (or any subsequent modification of such policy) or for which such policy was intended or reasonably expected to apply at the time of issuance (or subsequent modification). For purposes of this Section 3.9(a)(x), the provisions of law relating to the Tax treatment of such Reinsured Insurance Policies shall include, but not be limited to, Sections 72, 101, 401 through 409A, 412, 415, 417, 457, 817, 7702 and 7702A of the Code and any Treasury Regulations and administrative guidance issued thereunder.

**Section III.11   Brokers**.  Seller agrees to pay any broker, consultant and banker fees relating to the Transaction directly and to indemnify, defend and hold Buyer harmless from any such fees or expenses owed to any broker, consultant or banker.

**Section III.12   Transactions with Affiliates**.  All agreements, arrangements and other commitments or transactions to or by which the Acquired Insurance Companies, on the one hand, and Seller or any of its Affiliates, on the other hand, are parties or are otherwise bound or affected are set forth in Section 3.12 of the Disclosure Schedules.  At the Closing, all such agreements, arrangement and other commitments or transactions shall have been terminated, with no liability to the Acquired Insurance Companies, with the exception of agreements related to those assets listed in Section 3.12 of the Disclosure Schedules which shall be retained by the Buyer (the "Retained Assets").  At Closing the Retained Assets shall be at no greater than $462 million of Seller-Related Assets with Closing expected by the Parties to occur after closing of the sale of the Castle & Cook Mortgage, Claris Vision Group, and the Clanwilliam Group. The Retained Assets shall be collateralized with $200 million of AAPC preferred stock and $252 million of junior debt issued by the Beckett Group (together the "Additional Collateral").  The Buyer shall have the right to sell all of the Retained Assets to the Seller, and the Seller shall the obligation to purchase the same for a price equal to the original principal value as of the date of Closing plus 12 percent interest at 60 months from the date hereof. Upon purchase of the Retained Assets by the Seller, the Additional Collateral shall be released.  The Buyer's right to sell the Retained Assets to the Seller shall be guaranteed by an unconditional guarantee from Global Growth Holdings, Inc. which is attached as Schedule XX hereto. The Seller shall have the right to purchase the Retained Assets at any time prior to the 60 months required purchase date for a price equal to the original principal value plus 12 percent interest.

**Section III.13   Employees and Employee Benefits**.

(a)     The Acquired Insurance Companies is not a party to or otherwise bound by any collective bargaining agreement with respect to its employees and, as of the date of this Agreement, there are no labor unions or other organizations or groups representing, purporting to represent or attempting to represent any employees. The Acquired Insurance Companies is in material compliance with all applicable Laws respecting labor, employment, fair employment practices, terms and conditions of employment, disability, immigration, health and safety, harassment, non-discrimination, workers' compensation, unemployment compensation, sick leave and leaves of absence,

12

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 39 of 83

including those related to the COVID-19 pandemic, employee privacy, employee classification, and wages and hours, and the collection and payment of withholding and payroll Taxes and similar Taxes with respect to its employees.

(b)     Section 3.13(b) of the Disclosure Schedules sets forth a true and correct list of all material employee benefit plans, policies and programs, including any long term incentive plans, in which any current or former Acquired Insurance Companies employee is entitled to participate. There is no material liability under ERISA or with respect to any employee benefit plan that provides or promises benefits beyond retirement or other termination of service, except for coverage mandated by applicable Law. The Acquired Insurance Companies does not contribute to and is not obligated to contribute to a Multiemployer Plan or a "multiple employer plan" within the meaning of section 4063 or 4064 of ERISA.

(c)     Neither the execution, delivery and performance of this Agreement by Seller nor the consummation of the transactions contemplated by this Agreement will (alone or in combination with any other event) result in an increase in the amount of compensation or benefits or the acceleration of the vesting or timing of payment of any compensation or benefits payable to or in respect of any employee or any increased or accelerated funding obligation with respect to any employee benefit plan, (B) require the Acquired Insurance Companies to fund any liabilities or place in trust or otherwise set aside any amounts in respect of any employee benefit plan, (C) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code (or any comparable provision of state, local or foreign Tax Laws), or (D) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code (or any comparable provision of state, local or foreign Tax Laws).

## Section III.14  Contracts.

(a)     Section 3.14(a) of the Disclosure Schedules sets forth to Seller's Knowledge: (i) any contract that is material to the business or operations of the Company or the Acquired Insurance Companies; (ii) any contract containing covenants binding upon the Company or the Acquired Insurance Companies that materially restricts the ability of the Acquired Insurance Companies to compete in any business or in any geographic area that is material to the Acquired Insurance Companies; (iii) any contract with respect to a joint venture or partnership agreement; (iv) any contract which provides for any guarantee of third party obligations; (v) any contract which provides for payments to be made by the Company or the Acquired Insurance Companies upon a change in control thereof (other than a Benefit Plan); (vi) any reinsurance agreement; and (vii) any contract relating to indebtedness of any sort. Each such contract described in clauses (i) through (vii) is referred to herein as a "Material Contract." To Seller's Knowledge, each of the Material Contracts is valid and binding on the Acquired Insurance Companies and each other party thereto and is in full force and effect. To Seller's Knowledge, there is no default under any Material Contract by the Company or the Acquired Insurance Companies or any other party thereto, and no event has occurred that with the lapse of time or the giving of notice or both would

13

constitute a default thereunder by the Acquired Insurance Companies or any other party thereto.

(b)     With respect to each Material Contract that is an assumed reinsurance agreement, the Acquired Insurance Companies is in full compliance with all the terms and conditions thereof, there is no active dispute with any cedant thereunder, and no cedant currently has asserted any right to recapture or terminate the agreement; provided, that Section 3.14(b) of the Disclosure Schedules sets forth any formal waivers that have been received from cedants under any such reinsurance agreements.

**Section III.15     Insurance Policies**. Subject to orders issued by the Rehabilitation Court regarding the Acquired Insurance Companies, all policies, binders, slips, certificates, guaranteed insurance contracts, annuity contracts and participation agreements and other agreements of insurance, whether individual or group, in effect as of the date hereof (including all applications, supplements, endorsements, riders and ancillary documents in connection therewith) that are issued by the Acquired Insurance Companies, and any and all marketing materials are, to the extent required under applicable Laws, on forms and at rates approved by the insurance regulatory authority of the jurisdiction where issued or, to the extent required by applicable Laws, have been filed with and not objected to by such authority within the period provided for objection. The Acquired Insurance Company has made available to Buyer true and complete copies of (i) any material reports on financial examination (including draft reports where final reports are not yet available) and (ii) any material reports on market conduct examination (including draft reports where final reports are not yet available), in the case of each of (i) and (ii) delivered by any insurance regulatory authority in respect of the Acquired Insurance Companies since January 1, 2019.

**Section III.16     Real Property; Environmental**.     Section 3.16 of the Disclosure Schedules sets forth a true and complete list as of the date hereof of each lease and/or sublease to which the Company or the Acquired Insurance Companies Subsidiaries is a party. Other than the leases and/or subleases set forth in Section 3.16 of the Disclosure Schedules, the Company or the Acquired Insurance Companies does not own or hold any interest in any real property. The Acquired Insurance Companies or the Company (a) has not received written notice from any Governmental Authority or other Person alleging that the Company or the Acquired Insurance Companies is in violation of any applicable environmental Law and (b) the Company or the Acquired Insurance Companies is in compliance with applicable environmental Laws.

**Section III.17     No Other Representations and Warranties**. Except for the representations and warranties contained in this ARTICLE III (including the related portions of the Disclosure Schedules), none of the Seller, the Company, the Acquired Insurance Companies or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, Company, or the Acquired Insurance Companies, including any representation or warranty as to the accuracy or completeness of any information regarding the Company or the Acquired Insurance Companies furnished or made available to Buyer any information, documents or material delivered to Buyer/made available to Buyer in the Seller's virtual data room maintained by Seller for purposes of this Agreement or any management presentations made in expectation of the transactions contemplated hereby or as to

14

the future revenue, profitability or success of the Acquired Insurance Companies, or any representation or warranty arising from statute or otherwise in law.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller as follows as of the date hereof and as of the Closing Date (except for such representations and warranties which address matters only as of a specific date, which representations and warranties shall be true and correct as of such specific date):

**Section IV.1**    **Incorporation and Authority of Buyer**.

(a)    Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Missouri.

(b)    Buyer and, as of the Closing Date, has all requisite power to enter into, consummate the Transaction, and carry out its obligations under this Agreement. The execution and delivery by Buyer of this Agreement, the consummation by Buyer of the Transaction and the performance by Buyer of its obligations under this Agreement has been duly authorized by all requisite action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium, rehabilitation, liquidation, fraudulent conveyance or similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section IV.2**    **No Conflicts**. Provided that all consents, approvals, authorizations and other actions described in Section 4.03 have been obtained or taken, except as otherwise provided in this ARTICLE IV and except in the case of clauses (b) and (c) below as may result from any facts or circumstances solely relating to Seller or its Affiliates (as opposed to any other third party), the execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the Transaction do not (a) violate, conflict with or require a Consent under the organizational documents of Buyer, (b) violate or conflict with any Law, Permit or other Governmental Order applicable to Buyer or by which Buyer or its properties or assets is bound or subject or (c) result in any breach of, or constitute a default (or event which, with the giving of notice or lapse of time, or both, would become a default) under, result in the loss of any right, entitlement or obligation in, or give to any Person any rights of termination, acceleration, or cancellation of, or result in the creation of any Lien on any of the assets or properties of Buyer pursuant to, any material note, bond, mortgage, indenture or Contract to which Buyer is a party or by which any of such assets or properties is bound, other than, in the case of clauses (b) and (c), any such conflicts, violations, breaches, defaults, rights or Liens that, individually or in the aggregate, do not have, and would not reasonably be expected to have, a Buyer Material Adverse Effect. For the purposes of this Agreement, a Buyer Material Adverse Effect shall mean any

15

event, change or effect that is materially adverse to the condition (financial or otherwise), properties, assets, liabilities, business, operations or results of operations of the Buyer.

**Section IV.3** **Consents and Approvals**. Except as set forth in Section 4.03 of the Buyer Disclosure Schedules, or as may result from any facts or circumstances solely relating to Seller or its Affiliates (as opposed to any other third party), the execution and delivery by Buyer of this Agreement does not, and the performance by Buyer and each other Buyer Party of, and the consummation by Buyer of the Transactions and this Agreement do not, require any Governmental Approval to be obtained or made by Buyer prior to the Closing, except for such Governmental Approvals, the failure of which to be obtained or made has not had, and would not reasonably be expected to have a Buyer Material Adverse Effect.

**Section IV.4** **Absence of Litigation**. There are no Actions pending or, to the Knowledge of Buyer, threatened in writing, against Buyer or any other Buyer Party that question the validity of, seek injunctive relief with respect to, this Agreement or the Ancillary Agreements or the right of Buyer to enter into this Agreement or the Ancillary Agreements to which Buyer or any other Buyer Party is or will be a party, and would reasonably be expected to have a Buyer Material Adverse Effect.

**Section IV.5** **Financial Ability**. Buyer will have at the Closing sufficient immediately available funds (including through available capacity under revolving debt facilities, loans or other debt and equity investments) to pay, in cash, the Purchase Price and all other amounts payable pursuant to this Agreement or otherwise necessary to timely consummate the Transaction. None of Buyer or any of its Affiliates has incurred any Liabilities or obligations, or is contemplating or aware of any Liabilities or obligations, in either case, that would impair or adversely affect such resources and capabilities. The obligations of Buyer to effect the Transaction is not conditioned upon the availability to Buyer or any of its Affiliates of any debt, equity or other financing in any amount whatsoever.

**Section IV.6** **Investment Purpose**. Buyer is acquiring the Seller's Interest solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof or any other security related thereto within the meaning of the Securities Act. Buyer acknowledges that Seller has not registered the offer and sale of the Seller's Interest under the Securities Act or any state securities laws, and that the Seller's Interest may not be pledged, transferred, sold, offered for sale, hypothecated or otherwise disposed of except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Buyer is able to bear the economic risk of holding the Seller's Interest for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

**Section IV.7** **Brokers**. No broker, finder, or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section IV.8** **Legal Proceedings**. Except as set forth in Section 4.09 of the Buyer Disclosure Schedules, there are no Actions pending or, to Buyer's knowledge, threatened against

Case 3:23-cr-00048-MOC-DCK     Document 234-47     Filed 07/14/26     Page 43 of 83

or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

### Section IV.9    Independent Investigation.

(a)    Buyer has conducted its own independent investigation, review and analysis of the Acquired Insurance Companies, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Seller and the Acquired Insurance Companies for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in ARTICLE III of this Agreement (including related portions of the Disclosure Schedules); and (b) none of Seller, the Acquired Insurance Companies or any other Person has made any representation or warranty as to Seller, the Company or this Agreement, except as expressly set forth in Article III of this Agreement (including the related portions of the Disclosure Schedules).

(b)    Updates to Exhibits and Schedules. Seller shall have the right to supply or supplement the Exhibits or Disclosure Schedules prior to the Closing by delivery to the Buyer of one or more Exhibit, Schedule, or supplement thereto (each, an "Exhibit Supplement" or "Disclosure Supplement," respectively), provided that any matter set forth in an Exhibit Supplement or Disclosure Supplement shall not be deemed to amend or supplement any Exhibit or Disclosure Schedule attached hereto at the time of execution of this Agreement  or to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement for purposes of determining whether or not the conditions to Closing set forth in Article VII have been satisfied, provided, further that if the disclosure  shall have given rise to the right to terminate this Agreement under Section 9.01(b), the Buyer may either (i) terminate this Agreement by written notice to Seller within five (5) Business Days after receipt of the Disclosure Supplement and all information regarding such Exhibit Supplement or Disclosure Supplement that may be reasonably requested by Buyer or (ii) consummate the Transaction, in which case the applicable Exhibit or Disclosure Schedules shall be deemed amended and supplemented as set forth in such Exhibit Supplement or Disclosure Supplement, and no Person may make any claim in respect thereof following the Closing.

### Section IV.10    Regulatory Matters.

Within the past five (5) years, no Governmental Authority has revoked any license or status held by Buyer or any of its Affiliates to conduct insurance operations. Buyer and its Affiliates and the investors in Buyer or its Affiliates meet all of the requirements on the part of such respective entity set forth by applicable Law (including the Laws of its jurisdiction of formation) for all necessary Consents from Governmental Authorities for the consummation of the Transactions to be obtained, and there are no facts, events or circumstances, involving or relating to Buyer or any of its Affiliates or the investors in Buyer or its Affiliates, that may prevent or delay the granting of any such Consents from Governmental Authorities.

17

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 44 of 83

**Section IV.11** Buyer expressly represents and warrants that it is aware that the Acquired Insurance Companies are the subject of rehabilitation orders, and that CBL and BLIC are the subject of an orally rendered liquidation order, and recognizes that the closing of the transaction contemplated herein is subject to the resolution of such matters pursuant to ordinary legal processes. To the extent such matters are not resolved in a manner which would permit the contemplated transactions to close, Buyer hereby agrees that this Agreement shall be of no force or effect and that it shall have no claims of any kind against the Seller or Seller's affiliates concerning the transaction described herein.

# ARTICLE V
# COVENANTS

The Seller and Buyer covenant and agree as follows:

**Section V.1** **General**. In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement or any Ancillary Document, each of the Parties shall take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party with respect to reasonable out-of-pocket costs. Seller shall use commercially reasonable efforts to cooperate with and assist Buyer in obtaining, after the Acquired Insurance Companies Closing, any regulatory approvals required to enable the Seller to make the appropriate closings or transfers, including transfers of signature authorization, and in providing all notices thereof as may be required by appropriate Governmental Authorities.

**Section V.2** **Regulatory Approvals**.

(a) Each Party shall furnish to each other Party all information reasonably required for any application or other filing to be made pursuant to any applicable Law and any written materials to be furnished to any Governmental Authority in connection with the Transaction contemplated by this Agreement (including, to the extent permitted by applicable Law, providing to such other Party a reasonable opportunity to comment thereon prior to filing, and considering in good faith all reasonable additions, deletions or changes suggested in connection therewith). Each Party shall use its commercially reasonable efforts to obtain (and to cooperate with the other Parties hereto to obtain) any consent, authorization, order or approval of, any exemption by, or any waiver from, any Governmental Authority required to be obtained by the Buyer, the Acquired Insurance Companies, the Seller or any of their respective Affiliates in connection with the Transaction, specifically including but not limited to Seller's engagement in efforts within the Rehabilitation Court to obtain the approval by the Rehabilitation Court or termination of the Rehabilitation Proceeding required by Section 7.02(f). Each Party shall (i) keep the other Parties informed of the status of the filings, consents and approvals pursuant to this Section 5.02, (ii) inform the other Parties of any material oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or any such transaction, and provide copies of the Transaction Regulatory Filings, if any, and each amendment or supplement

18

thereto in final form upon the submission thereof to the applicable Governmental Authority, and (iii) to the extent permitted by the applicable Governmental Authority and to the extent related to the transactions contemplated hereby, give the other Parties prior written notice of the time and place of any meetings, hearings or other proceedings with any Governmental Authority regarding any such filings or the transactions contemplated hereby and the opportunity for such other Parties (and their representatives) to attend and participate in any such meetings, hearings or proceedings (other than telephone calls initiated by such Governmental Authority and not scheduled in advance or ministerial telephone calls not expected to invoke a substantive discussion of the transactions contemplated hereunder). Notwithstanding the foregoing, nothing in this Agreement shall require any Party to provide to the other Party any information or materials that (A) are commercially sensitive, (B) are sensitive personally identifiable information, or (C) are legally privileged.

(b) Without limiting the foregoing, Buyer shall (i) file or cause to be filed with OID (A) the Form A filing with OID, and (B) if required, any transaction notifications on "Form D" or similar notifications; (collectively, the "Transaction Regulatory Filings"), in each case, as promptly as practicable and, in any event, within twenty (20) Business Days after the date of the completion of the redomestication of the Acquired Insurance Companies to Oklahoma, and (ii) comply as promptly as practicable with any request by OID for additional information, documents, or other materials (including supplements or amendments to the Transaction Regulatory Filings). Each Party shall provide the other Party with prompt notice of any consent, notice or other communication of any Authority with respect to the Transaction Regulatory Filings.

(c) Notwithstanding anything the contrary contained in this Section 5.02, Section 5.07 or otherwise in this Agreement, in no event shall Buyer or any of its Affiliates, be required to agree to or accept (and Seller and its Affiliates shall not agree to or accept) any action, restriction, limitation, obligation, requirement or condition requested or imposed by any Governmental Authority that would, individually or in the aggregate with any other such actions, restrictions, limitations, obligations, requirements or conditions, reasonably be expected to constitute a Burdensome Condition.

Section V.3 **Access to Information; Due Diligence**. To the extent available to the Seller, during the period between the date of this Agreement and the Closing Date, Buyer shall be entitled, through its employees, agents and representatives, to make such reasonable investigation of the assets, liabilities, financial condition, properties, business and operations of the Acquired Insurance Companies as Buyer reasonably deems to be necessary or appropriate, and for such purposes to have access to the Books and Records and of the Acquired Insurance Companies Tax Returns and other Tax information of the Acquired Insurance Companies in each case wherever located (including, without limitation, access to the amount of Unrealized Gains as reported in the Clearwater accounting system as of any time prior to the Closing), and provided the same shall not require the Acquired Insurance Companies to provide any such access or furnish any such information that in its reasonable judgment would (A) result in the disclosure of any protected confidential information or trade secrets of third parties, (B) violate any applicable Law, or (C) compromise or constitute a waiver of any attorney-client or work product privilege of the Acquired Insurance Companies or the Seller. Buyer shall conduct any such investigation, access

19

and examination during regular business hours upon reasonable prior notice in a manner that would not cause undue disruption of the business activities of the Acquired Insurance Companies. To the extent permitted by the limitations in existence as a result of the Rehabilitation Proceeding, Seller shall cause the Acquired Insurance Companies to, and Seller shall, cooperate as reasonably requested with Buyer's employees, agents and representatives in connection with such investigation, access and examination. Buyer shall hold all documents and other materials accessed, obtained or otherwise reviewed in connection with such investigation, access and examination, in confidence unless and until such time as such documents and other materials become publicly available. In the event of the termination of this Agreement, upon the Seller's request in the event of termination of this Agreement, Buyer shall deliver to Seller all of such documents and other materials so obtained by Buyer, including all excerpts, abstracts and copies thereof.

**Section V.4** **Confidentiality.** Buyer acknowledges and agrees that the Confidentiality Agreement, dated as of June 2, 2021 (set forth in an agreement entitled "Joinder Agreement") between Buyer and Seller (the "Confidentiality Agreement") remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement.

**Section V.5** **Excluded Assets and Liabilities.** Contemporaneous with the Closing, each of the Seller and the Company shall cause the Company to assign and distribute to the Seller those assets and liabilities that are not assets and liabilities of the Acquired Insurance Companies to the Seller (such assets and liabilities, the "Excluded Assets and Liabilities," and the instruments effecting such assignment and assumption, the "Excluded Items Assignment and Assumption"). For the avoidance of doubt, the Buyer shall purchase the Seller's Interest free and clear of the Excluded Assets and Liabilities including all assets and liabilities that are not related to the Acquired Insurance Companies or are not assets of liabilities of the Acquired Insurance Companies.

**Section V.6** **Cooperation.**

(a) Between the date of this Agreement and the Closing Date, the Parties shall each use his, her or its commercially reasonable efforts to cause the conditions in ARTICLES II and VII to be satisfied, and the Parties shall cooperate with each other, to take or cause to be taken all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement.

(b) Between the date of this Agreement and the Closing Date, the Parties shall each use his, her or its commercially reasonable efforts to review and amend this Agreement as may be necessary to effect the contemplated transactions based on future developments in the Rehabilitation Court affecting the Acquired Insurance Companies.

**Section V.7** **Notification.** During the Pre-Closing Period, Seller shall promptly notify Buyer in writing if the Acquired Insurance Companies or Seller becomes aware of any fact or condition that causes or constitutes a breach of any representations and warranties of the Seller contained herein, or if Seller becomes aware of the occurrence after the date hereof of any fact or

20

condition that would (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty. During the same period, Seller shall notify Buyer of the occurrence of any breach of any covenant of the Acquired Insurance Companies or the Seller or of the occurrence of any event that may make the satisfaction of the conditions contained in this Agreement impossible or unlikely. The closing conditions set forth in ARTICLES II and VII shall be read without giving effect to any notices delivered pursuant to this Section 5.08.

Section V.8    Exclusive Dealing. Until the earlier of the Closing Date or the date this Agreement is terminated pursuant to ARTICLE IX below, neither the Acquired Insurance Companies nor the Seller, nor any of their officers, directors, employees, Affiliates or representatives shall: (a) solicit, initiate, or encourage the submission of any proposal or offer from any Person relating to the acquisition of all or any substantial part of the Acquired Insurance Companies (including any acquisition structured as an asset sale, merger, consolidation, reinsurance transaction, or share exchange); (b) assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing; or (c) taken any actions that would be reasonably likely to interfere with the ability of Buyer to consummate the Transaction (any of the foregoing, an "Acquisition Proposal"). The Seller shall promptly inform Buyer of any inquiries or proposals for and provide Buyer with copies of all related documentation concerning, any Acquisition Proposal.

Section V.9    Termination of Services Agreement. Prior to the Closing, Seller and the Acquired Insurance Companies shall take all steps necessary to terminate, without any liability to the Acquired Insurance Companies, the agreements listed in Schedule 5.10: provided that Seller shall and shall cause the Acquired Insurance Companies to cooperate with Buyer to determine and provide any ongoing services that may be necessary following Closing in order to ensure continuity of operations and policyholder servicing in the event that Buyer has not been able to identify a satisfactory replacement service provider by such time.

Section V.10    Tax Matters.

(a)    Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with transactions contemplated by this Agreement (including any real property transfer tax and any similar Tax) shall be paid when due, 50% by Seller and 50% Buyer, and each party will, at its own expense, file all necessary Tax returns and other documentation with respect to all such Taxes and fees.

(b)    Consolidated Return Elections. Seller shall make or cause to be made (and shall refrain from making or causing to be made, as applicable) Tax elections (including on a protective basis) so that the Acquired Insurance Companies shall suffer any reduction in tax basis or other attributes pursuant to Treasury Regulations Section 1.1502-36.

(c)    Tax Returns. From the date of this Agreement through and after the Closing Date, Seller shall prepare and file as required by applicable Law with the appropriate taxing authority (or cause to be prepared and filed) in a timely manner (i) all consolidated, combined, unitary, affiliated or similar Tax Returns that include the

21

Acquired Insurance Companies on the one hand and Seller or any Affiliate thereof on the other hand for all Pre-Closing Periods and (ii) all other Tax Returns of the Acquired Insurance Companies that are required to be filed on or prior to the Closing Date. All such Tax Returns shall be prepared in a manner consistent with most recent past practice, except as otherwise required by applicable Law.

(d)     Tax Agreements; Powers of Attorney.  Prior to the Closing Date, Seller shall terminate all Tax Agreements to which the Acquired Insurance Companies is a party such that the Company shall not have any obligations thereunder following the Closing.  Seller shall cause any and all existing powers of attorney with respect to Taxes or Tax Returns to which the Company or any of its Subsidiaries is a party to be terminated as of the Closing.

**Section V.11   Reserved.**

## ARTICLE VI
## NON-SURVIVAL OF REPRESENTATIONS, WARRANTIES AND PRE-CLOSING COVENANTS

**Section VI.1     Non-Survival of Representations, Warranties and Pre-Closing Covenants.**  None of the representations or warranties of any party hereto contained in this Agreement or any of the other documents contemplated hereby (including any certificate to be delivered under Article VII) shall survive the Closing. None of the covenants of any party hereto required to be performed by such party before the Closing shall survive the Closing and unless otherwise indicated, the covenants and agreements set forth in this Agreement which by their terms are required to be performed after the Closing shall survive the Closing until they have been performed and satisfied. Notwithstanding anything to the contrary herein, nothing herein shall be deemed to apply to, or limit in any way, any party's rights and remedies in the case of intentional fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement.

**Section VI.2     No Indemnity.** No indemnification is provided by this agreement. The parties agree to bear their respective liability for any acts or omissions resulting under this agreement as the same shall be determined under the laws of the state of New York.

## ARTICLE VII
## CONDITIONS TO CLOSING AND RELATED MATTERS

**Section VII.1   Conditions Precedent to Obligation of Buyer.**  The obligation of Buyer to consummate the Closing is subject to satisfaction of the following conditions on or before the Closing Date (unless expressly waived in writing by Buyer on or before the Closing Date):

(a)     Compliance by Seller.  All of the terms, covenants and conditions of this Agreement to be complied with and performed by Seller and the Acquired Insurance Companies before the Closing Date shall have been complied with and performed by it in all material respects; and the representations and warranties made by Seller in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the

22

Closing Date, except that any such representations and warranties that relate to a particular date or period shall be true and correct as of such date or period.

(b) <u>Compliance Certificate</u>. The Seller shall have delivered to Buyer a certificate dated the Closing Date and signed by the Seller certifying on behalf of the Seller that the conditions specified in <u>Section 7.01(a)</u> have been fulfilled.

(c) <u>No Injunctions or Restraints</u>. No temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation of the Closing shall be in effect.

(d) <u>Closing Deliveries</u>. Sellers shall have delivered to Buyer the items described in <u>ARTICLES II</u> and <u>VII</u>.

(e) <u>No Material Adverse Effect</u>. During the period between the date of this Agreement and the Closing Date, there shall not have occurred an Acquired Insurance Companies Material Adverse Effect or any change, event or state of circumstances or facts that may reasonably be expected to have an Acquired Insurance Companies Material Adverse Effect.

(f) The approvals or prior written non-approvals from Governmental Authorities listed on **Schedule 2.03(e)** shall have been obtained and be in full force and effect, in each case, without imposition of any Burdensome Condition;

(g) All other required consents listed on **Schedule 2.03(e)**, including but not limited to any consent, approval or authorization required under any Material Contract as a result of the Transaction, shall have been made or obtained and shall be in full force and effect at the Closing; and

(h) The Buyer shall have underwritten in its sole discretion $462 million of Seller-Related Assets to be retained on the CBL and BLIC balance sheets as Retained Assets and the Buyer shall be satisfied in its sole discretion with the Additional Collateral provided for the same.

(i) Seller shall have delivered evidence reasonably satisfactory to Buyer of the cancellation of any previously issued and outstanding membership interests of the Company and the cancellation of any previously issued and outstanding shares of CBL, BLIC, and SNIC, including any such shares that may have been lost, stolen or the transfer of which is otherwise not recorded in the stock transfer records.

(j) The redomestication of the Acquired Insurance Companies to Oklahoma shall be complete.

**Section VII.2** **Conditions Precedent to Obligation of Sellers as to Buyer**. The obligation of the Seller to consummate the Closing is subject to satisfaction of the following conditions on or before the Closing Date (unless expressly waived in writing by the Seller on or before the Closing Date):

23

(a)   Compliance by Buyer.  All of the terms, covenants and conditions of this Agreement to be complied with and performed by Buyer on or before the Closing Date shall have been complied with and performed by it in all material respects, and the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except that any such representations and warranties that relate to a particular date or period shall be true and correct in all material respects as of such date or period.

(b)   Compliance Certificate.  Buyer shall have delivered to Seller a certificate dated the Closing Date and signed by an officer of Buyer certifying that the conditions specified in Section 7.2(a) have been fulfilled.

(c)   No Injunctions or Restraints.  No temporary restraining order, preliminary or permanent injunction or other order issued by any Authority or other legal restraint or prohibition preventing the consummation of the Closing shall be in effect.

(d)   Closing Deliveries.  Buyer shall have delivered the items described in Section 2.04 to the Sellers or other Persons, as applicable.

(e)   Rehabilitation Court Approval or Termination.  The Rehabilitation Court shall have entered an Order either: (a) approving the sale of the Acquired Insurance Companies by Seller to Buyer; or (b) terminating the Rehabilitation Proceeding.

(f)   Regulatory Approval.  Prior to Closing, Buyer and Seller shall have received approval to purchase the Acquired Insurnace Companies from the OID and the NCDOI, as applicable, and shall provide evidence of such approval to Seller.

## ARTICLE VIII
## MISCELLANEOUS

**Section VIII.1**      **Expenses**.  Except as set forth in Section 1.04 above, all costs and expenses (including, without limitation, the fees and disbursements of legal counsel) incurred in connection with this Agreement and the transaction contemplated under this Agreement shall be paid by the Party incurring such expenses.

**Section VIII.2**      **Notices**.  All notices, requests, consents, claims, demands and other communications under this Agreement shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile or electronic mail with receipt confirmed or if no failure message is generated (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02:

(a) If to Seller:
GBIG Capital, LLC

4750 New Broad Street, Suite 125
Orlando, FL 32814


Attention:             Greg Lindberg
Justin Holbrook
Peter Nordberg (General Counsel)

Telephone:   919-246-9409
E-mail:       pnordberg@globalgrowth.com

With a copy to:

Condon Tobin Sladeck Thornton Nerenberg PLLC
8080 Park Lane Suite 700
Dallas, TX 75231

| Attention: | Aaron Z. Tobin, Esq. |
|---|---|
| Office: | (214) 265-3800 |
| Mobile: | (214) 448-4835 |
| E-mail: | atobin@condontobin.com |


(b) If to Buyer:
UNIVERSAL FINANCIAL HOLDINGS, LLC

209 West Lexington Avenue
Independence Missouri

| Attention: | Bob Alban |
|---|---|
| Telephone: | (617) 500-0008 |
| E-mail: | alban@montshireadvisors.com |


**Public Announcements**. No party to this Agreement shall, and each party shall cause its respective Affiliates and Representatives not to, issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of this Agreement or the Transaction without the prior written consent of the other parties (which consent shall not be unreasonably withheld, conditioned or delayed), except as may be required by Law or applicable securities exchange or listing authority rules or except with respect to the press releases to be issued by Seller and Buyer in respect of the execution and delivery of this Agreement, the forms of which were approved in advance of the execution and delivery of this Agreement. In such case the party required to publish such press release or public announcement

25

shall allow the other parties a reasonable opportunity to the extent reasonably practicable and permitted by applicable Law to comment on such press release or public announcement in advance of such publication. Prior to the Closing, neither of the parties to this Agreement, nor any of their respective Affiliates or Representatives, shall make any public disclosure concerning plans or intentions relating to the customers, agents, producers or employees of, or other Persons with significant business relationships with, the Acquired Insurance Companies without first obtaining the prior written approval of the other parties, which approval shall not be unreasonably withheld, conditioned or delayed.

**Section VIII.3        Severability.** If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transaction is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner so that the Transactions be consummated as originally contemplated to the greatest extent possible.

**Section VIII.4        Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement, any Exhibits, or Ancillary Agreements, and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section VIII.5        Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, that the Buyer may assign its rights under this Agreement to another Person. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section VIII.6        Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof. No single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section VIII.7        Schedules.** Any disclosure set forth in the Disclosure Schedules with respect to any Section of this Agreement shall be deemed to be disclosed for purposes of other Sections of this Agreement to the extent that such disclosure sets forth facts in sufficient detail so that the relevance of such disclosure would be reasonably apparent to a reader of such disclosure. Matters reflected in any Section of the Disclosure Schedules are not necessarily

26

limited to matters required by this Agreement to be so reflected. Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature. No reference to or disclosure of any item or other matter in the Disclosure Schedules shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in this Agreement. Without limiting the foregoing, no such reference to or disclosure of a possible breach or violation of any Contract, Law or Governmental Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred.

**Section VIII.8** **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a) Seller and Buyer irrevocably and unconditionally submits for itself and its property in any Action arising out of or relating to this Agreement, the Transaction, the formation, breach, termination or validity of this Agreement or the recognition and enforcement of any judgment in respect of this Agreement, to the exclusive jurisdiction of any federal court sitting in the Borough of Manhattan in the City of New York, State of New York or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and any appellate court from any thereof, over any suit, action or proceeding arising out of or relating to the transactions contemplated by this Agreement, and agrees that all claims in respect to any such action or proceeding shall be heard and determined in such New York state or, to the extent permitted by law, in such federal court. Each party hereto irrevocably waiver, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding arising out of or relating to this Agreement or transactions contemplated hereby (whether based on contract, tort or any other theory).

(b) Any such Action may and shall be brought in such courts and each of Seller and Buyer irrevocably and unconditionally waives any objection that it may now or hereafter have to the venue or jurisdiction of any such Action in any such court or that such Action was brought in an inconvenient court and shall not plead or claim the same.

(c) Service of process in any Action may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage repaid, to such party at its address as provided in Section 8.02.

(d) Nothing in this Agreement shall affect the right to effect service of process in any other manner permitted by the Laws of the State of New York.

(e) Governing Law. This Agreement, and the formation, termination or validity of any part of this Agreement shall in all respects be governed by, and construed in accordance with, the Laws of the State of New York, excluding any of its conflict-of-law provisions that would cause the laws of any other jurisdiction to be applied.

(f) Waiver of Jury Trial. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHER THEORY)

27

ARISING OUT OF OR RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ITS PERFORMANCE UNDER OR THE ENFORCEMENT OF THIS AGREEMENT. ANY PARTY HERETO MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT BY AND AMONG THE PARTIES TO WAIVE IRREVOCABLY THEIR RIGHT TO TRIAL BY JURY IN ANY SUCH ACTION. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) EACH PARTY HERETO UNDERSTANDS AND HAS CONSIDERED THE IMPLICATION OF THIS WAIVER, (c) EACH PARTY HERETO MAKES THIS WAIVER VOLUNTARILY, AND (d) EACH PARTY HERETO HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.09

**Section VIII.9        Specific Performance**. The Parties agree that irreparable damage would occur in the event that any of the covenants or obligations contained in this Agreement are not performed in accordance with their specific terms or were otherwise breached. Subject to any termination of this Agreement pursuant to ARTICLE IX each of the Parties hereto shall be entitled to injunctive or other equitable relief to prevent or cure any breach by the other parties of its covenants or obligations contained in this Agreement and to specifically enforce such covenants and obligations in any court referenced in Section 8.09 having jurisdiction, such remedy being in addition to any other remedy to which any party may be entitled at law or in equity. The Parties acknowledge and agree that, in the event that the other parties seek an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement, the party seeking an injunction will not be required to provide any bond or other security in connection with any such order or injunction.

**Section VIII.10        Waivers**. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, in writing at any time by the party or parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any party, it is authorized in writing executed by an authorized officer of such party. The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any preceding or subsequent breach.

**Section VIII.11        Rules of Construction**. Interpretation of this Agreement shall be governed by the following rules of construction: (a) defined terms in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include all other genders as the context clearly requires; (b) references to Articles, Sections, paragraphs, Exhibits and Schedules are references to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified; (c) references to "$" shall mean United States Dollars; (d) the word "*including*" and words of similar import when used in this Agreement shall mean

28

*"including without limiting the generality of the foregoing,"* unless otherwise specified; I the word *"or"* shall not be exclusive, unless the context clearly otherwise requires; (f) the table of contents, articles, titles and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (g) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted; (h) the Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein; (i) unless the context otherwise requires, the words *"hereof,"* *"herein"* and *"hereunder"* and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (j) all terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein; (k) any agreement or instrument defined or referred to herein or any agreement or instrument that is referred to herein means such agreement or instrument as from time to time amended, modified or supplemented, including by waiver or consent, as permitted under this Agreement and references to all attachments thereto and instruments incorporated therein; (l) any statement that a document has been *"delivered,"* *"provided"* or *"made available"* (or any phrase of similar import) to Buyer means that such document has been uploaded to the electronic data room maintained by Seller at least two (2) Business Days prior to the date of this Agreement; (m) any statute or regulation referred to herein means such statute or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, includes any rules and regulations promulgated under such statute), and references to any section of any statute or regulation include any successor to such section; (n) all time periods within or following which any payment is to be made or act to be done shall be calculated by excluding the date on which the period commences and including the date on which the period ends and by extending the period to the first succeeding Business Day if the last day of the period is not a Business Day; (o) references to any Person include such Person's predecessors or successors, whether by merger, consolidation, amalgamation, reorganization or otherwise; and (p) references to any Contract (including this Agreement) or organizational document are to the contract or organizational document as amended, modified, supplemented or replaced from time to time, unless otherwise stated.

        **Section VIII.12**      **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**ARTICLE IX**
**TERMINATION AND WAIVER**

        **Section IX.1**    **Termination**. This Agreement may be terminated at any time before the Closing:

        (a)    By mutual written consent of the Buyer and the Seller;

        (b)    By Buyer if the Acquired Insurance Companies or the Seller breaches or fails in any material respect to perform or comply with any of its representations,

29

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 56 of 83

warranties, covenants or agreements set forth in this Agreement, so as to cause any of the conditions set forth in Section 2.03 and Section 7.01 not to be satisfied, and either:

(i) Such breach or default in performance is not capable of being cured or shall not have been cured or waived within thirty (30) days after written notice thereof from the Buyer to the Seller, or

(ii) The Acquired Insurance Companies or the Seller shall not have provided reasonable written assurance that such breach or default in performance shall be cured on or before the expected Closing Date;

(c) By the Seller, if Buyer breaches or fails in any material respect to perform or comply with any of its representations, warranties, covenants or agreements set forth in this Agreement, so as to cause any of the conditions set forth in Sections 2.04 or 7.02 not to be satisfied, and either:

(i) Such breach or default in performance is not capable of being cured or shall not have been cured or waived within thirty (30) days after written notice thereof from the Seller to Buyer, as applicable, or

(ii) Buyer, as applicable, shall not have provided reasonable written assurance that such breach or default in performance shall be cured on or before the expected Closing Date; or

(d) By the Seller or Buyer if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited or if consummation of the Transactions contemplated under this Agreement would violate any non-appealable final order, decree or judgment of any court or Authority having competent jurisdiction;

(e) By the Seller or Buyer if the Closing shall not have occurred on or before June 30, 2023, or such other date as may be mutually agreed to by the Parties, and provided that if Buyer is pursuing regulatory approval of the Transaction in good faith, and such approval has not been obtained by June 30, 2023, then Buyer shall have the option to extend the date of termination until September 30, 2023 (such date, as it may be extended, the "End Date"), but the right to terminate this Agreement under this Section 9.01(e) shall not be available to any Party whose failure to fulfil any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date; or

(f) If the Buyer's redomestication petition to Oklahoma is not granted by the OID within 180 days from the date hereof.

(g) By the Seller if at any time the Rehabilitation Court or present regulator of the Acquired Insurance Companies orders or directs withholds or denies approval for same.

The termination of this Agreement shall be effectuated by the delivery of a written notice of termination from the Party terminating this Agreement to the other Party.

30

**Section IX.2    Effect of Termination.** If this Agreement is terminated under Section 9.01 above:

(a)    (a)    This Agreement shall immediately become void and there shall be no liability or obligation on the part of the Sellers or Buyers or their respective officers, directors, stockholders, general or limited partners, members or Affiliates, except that the provisions of Sections 9.02 (Effect of Termination), 9.03 (Limited Remedies Upon Termination), and Article VIII (Miscellaneous), shall remain in full force and effect and survive any termination of this Agreement; and

(b)    Such termination shall relieve each Party to this Agreement from all breaches or defaults under this Agreement except as provided in this Section 9.02 or Section 9.03, below.

**Section IX.3    Limited Remedies Upon Termination.** In the event of termination of this Agreement under Section 9.01(b), Section 9.01(c), or Section 9.01(e), any Party shall have the right to recover direct out-of-pocket damages sustained by such Party as a result of any knowing and intentional breach of any representation, warranty, covenant or agreement contained in this Agreement by another Party before such termination, but such damages shall be limited to the reasonable and documented costs and expenses incurred by such Party in connection with the negotiation of, and the performance under, this Agreement.

[SIGNATURE PAGE FOLLOWS]

31

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 58 of 83

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date the first written above by their respective duly authorized officers.

GBIG Capital, LLC
  a Delaware limited liability company

By: _____
Name:  Greg E. Lindberg
Title:  Sole Member

UNIVERSAL FINANCIAL HOLDINGS, LLC  a Missouri limited liability company

By: _____
Name: Robert T. Alban
Title:  CEO

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 59 of 83

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the date the first written above by their respective duly authorized officers.

GBIG Capital, LLC
a Delaware limited liability company

By: _____
Name:  Greg E. Lindberg
Title:  Sole Member

UNIVERSAL FINANCIAL HOLDINGS, LLC  a Missouri limited liability company

By: _____
Name: Robert T. Alban
Title:  CEO

32

FORM A

STATEMENT REGARDING THE ACQUISITION OF CONTROL OF
OR MERGER WITH A DOMESTIC INSURER
(this "Statement")

**BANKERS LIFE INSURANCE COMPANY**
(the "Domestic Insurer - BLIC")

BY

**UNIVERSAL FINANCIAL HOLDINGS LLC**
**ROBERT ALBAN**
(each an "Applicant")

**Filed with the North Carolina Department of Insurance and Financial Services**
(the "Department")

Dated: May 2, 2023

Name, Title, Address and Telephone Number of Individuals to Whom Notices and
Correspondence Concerning this Statement Should Be Addressed:

To:

Bob Alban
CEO, Universal Financial Holdings
Principal, Montshire Advisors
19 Essex Road
Bedford NH 03110
Telephone: 617-500-0008
Email: alban@montshireadvisors.com

With a copy to:
David Liggett
Ragsdale Liggett
2840 Plaza Place,
Suite 400,
Raleigh NC 27612
Telephone: 919.881.2209
Email: dliggett@rl-law.com

1007716119v3

Case 3:23-cr-00048-MOC-DCK    Document 234-47    Filed 07/14/26    Page 61 of 83

## Item 1.   METHOD OF ACQUISITION

### (a)   Domestic Insurer - BLIC

This Form A Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer (this "Application") relates to a proposed acquisition of control of the Domestic Insurer, Bankers Life Insurance Company. The Domestic Insurer - BLIC's statutory home office and is located at 2327 Englert Drive Durham North Carolina 27713. The Domestic Insurer - BLIC is currently in rehabilitation pursuant to order of rehabilitation issued by Wake County Superior Court on June 27, 2019. (the "Rehabilitation").

### (b)   Method of Acquisition

The Domestic Insurer - BLIC is a direct wholly-owned subsidiary of GBIG Holdings, LLC, a limited liability company organized under the laws of the State of Delaware ("GBIG Holdings"). GBIG Holdings is a wholly owned subsidiary of GBIG Capital LLC, a limited liability company organized under the laws of the State of Delaware ("Seller")

On December 2, 2022, Universal Financial Holdings, LLC ("UFH") entered into an agreement to acquire GBIG Holdings from Seller as amended by that certain First Amendment to the Purchase Agreement (collectively, the "Purchase Agreement"), pursuant to which UFH agreed to purchase from Seller all of the membership interests of GBIG Holdings (the "Proposed Acquisition"), subject to satisfaction of all conditions to closing, including receipt of required regulatory approvals from the North Carolina Department of Insurance (the "Department") of this Application approving the change of control of GBIG's wholly owned subsidiary, the Domestic Insurer – BLIC and a Form D application relating to the issuance of surplus note by Domestic Insurer - BLIC. The Proposed Acquisition is also conditioned upon and subject to regulatory approvals from the Department of a Form A approving the change of control of GBIG Holding's wholly owned subsidiaries, Southland National Insurance Company ("SNIC") and Colorado Bankers Life Insurance Company ("CBL") and the Rehabilitation Court approval of the termination of the Rehabilitation Proceeding of SNIC, BLIC, and CBL, the approval of the sale of Clanwilliam and UKAT, and the approval of refinancing of ARM.

A copy of the Purchase Agreement and the first amendment thereto is attached as Exhibit 1 to this Statement and incorporated herein by reference.

Universal Financial Holdings is controlled by Robert Alban. Universal Financial Holdings was formed for the purpose of acquiring insurance companies and, as of the date hereof, has no assets or liabilities. Universal Financial Holdings will issue $30 million of preferred equity to outside investors concurrent with the closing of the Proposed Acquisition. Such preferred equity investors will be passive investors who will not control the Domestic Insurer - BLIC. No investors will transact any business in Universal Financial Holdings or the Domestic Insurer - BLIC or will have the power to sign documents for or otherwise bind Universal Financial Holdings, or Domestic Insurer – BLIC.

1007716119v3

1

### Item 2. IDENTITY AND BACKGROUND OF THE APPLICANTS

#### (a) Name and Address of the Applicants

The names and principal business addresses of the Applicants are as follows:

> Universal Financial Holdings
> Robert Alban
> 19 Essex Road
> Bedford, NH 03110

#### (b) The Applicants' Business Operations

Universal Financial Holdings is a newly formed limited liability company organized under the laws of the State of Missouri for the purpose of acquiring insurance related businesses.

Robert Alban is an insurance industry entrepreneur and advisor with expertise in risk based capital models, reinsurance, Federal Home Loan Bank ("FHLB") matters, as well as an understanding of insurance tax and accounting considerations and the insurance product and distribution marketplace. Mr Alban is currently Principal of Montshire Advisors, a firm he co-founded in 2011, where he brokers reinsurance, advises insurers on product, distribution, and FHLB matters, and represents investments and investment firms to the US insurance industry. Montshire's clients have included numerous insurance companies, investment managers, and regional Federal Home Loan banks. Mr Alban is also a shareholder in an insurance distribution business focused on marketing insurance and administering benefits for federal employees and employer groups. In 2020, Mr Alban acquired intellectual property from Great American Insurance Company for a supplemental unemployment insurance product which he is in the process of commercializing. Prior to forming Montshire, Mr. Alban led corporate development at National Life Group, a Fortune 1000 insurance company where he focused on capital optimization structures and transactions such as reinsurance, corporate owned life insurance, certified capital companies and other tax advantaged investments, interest rate and equity market hedging, and Federal Home Loan bank programs. Prior to National Life, Mr. Alban led mergers and acquisitions at Sentry Insurance, a Fortune 1000 property and casualty insurer. Prior to Sentry, Mr Alban held business development positions with GXS (formerly GE Information Services), ITOCHU International (an $86 Billion Japanese conglomerate) and Westinghouse. Mr Alban has a BS in Mechanical Engineering from West Virginia University and an MBA from Georgetown University. Mr Alban has his Series 7 and Series 66 securities licenses and is a registered representative of Castle Hill Partners. Mr Alban has his life producer and reinsurance intermediary licenses.

#### (c) Applicants' Organizational Charts

Attached to this Application as Exhibit 2 is the current organizational chart of the Domestic Insurer - BLIC immediately prior to the Proposed Acquisition.

A simplified organizational chart presenting the identities of, and interrelationships among, the Applicants and their subsidiaries and affiliates, including the ultimate controlling persons, prior to consummation of the Proposed Acquisition is attached hereto as Exhibit 3. The

2

organizational chart indicates the percentage of voting securities of each entity owned or controlled by the Applicants or any other such persons, the type of organization (e.g., corporation, trust, partnership) and the state or other jurisdiction of domicile or incorporation, as applicable. Unless otherwise indicated on such organizational charts or in this Application, each entity is a corporation and control is maintained by the ownership or control of all outstanding voting securities.

An abbreviated post-closing organizational chart of the Applicants, showing the Domestic Insurer - BLIC's place within the Applicants' organizational structure after consummation of the Proposed Acquisition, is attached hereto as Exhibit 4.                                                         .

There are currently no pending court proceedings involving a reorganization or liquidation of the Applicants or any of the subsidiaries or affiliates of the Applicants.

### Item 3.      IDENTITY AND BACKGROUND OF INDIVIDUALS ASSOCIATED WITH THE APPLICANTS

The directors, executive officers and natural persons controlling 10% or more of the voting security of the Applicants are listed in Exhibit 5 hereto. Completed NAIC biographical affidavits of such individuals are attached hereto as Exhibit 6. Third party background checks will be also be performed in connection with this Statement's submission.

A list setting forth the names and business addresses of the prospective members of the board of the Domestic Insurer - BLIC is set forth below under Item 5.

### Item 4.      NATURE, SOURCE AND AMOUNT OF CONSIDERATION

#### (a)      Nature, Source and Amount of Consideration

The total consideration for the Proposed Acquisition of GBIG Holdings is $1 plus deferred consideration of $290 million payable concurrent with the redemption of the remaining Global Growth related assets. Concurrent with closing, UFH shall buy a $30m surplus note in Domestic Insurer – BLIC shall to recapitalize and provide additional liquidity to BLIC. The surplus note shall have the following terms:

- 10-year term

- 10% interest, can be accrued at borrower's option for the first three years

- Repayable in cash or Global Growth related assets

- The surplus note shall become an asset of GBIG Holdings and be acquired by UFH.

.

#### (b)      Criteria in Determining Consideration

The basis and terms of the Purchase Agreement, including the nature and amount of consideration, were determined through arms' length negotiations between representatives of the

3

Applicants and Seller, and their respective financial, legal and other advisors. The amount and type of consideration were determined in view of the consideration paid in other recent acquisitions of similar businesses, as well as the financial position and results of operations of the business to be acquired, including the past and present business operations, historical and potential earnings, financial condition and prospects, assets and liabilities and such other factors and information as the Applicants considered relevant under the circumstances.

### Item 5. FUTURE PLANS FOR DOMESTIC INSURER - BLIC

#### (a) Plans for Domestic Insurer - BLIC

A Plan of Operations describing the Applicants' intentions with respect to the operations of the Domestic Insurer - BLIC following the consummation of the Proposed Acquisition is attached hereto as Exhibit 7.

The tables below set forth a list of all individuals who are proposed to be directors and officers of the Domestic Insurer - BLIC following the closing of the Proposed Acquisition:

Directors:

| Name | Title |
| --- | --- |
| Robert Alban | Executive Chairman |
| Michael Reidy | Director |

Officers:

| Name | Title |
| --- | --- |
| Robert Alban | President, Secretary |

Biographical affidavits for Robert Alban are included in Exhibit 8 hereto. The Applicants intend to identify several additional directors for appointment to the Board of the Domestic Insurer – BLIC at or shortly after the closing of the Proposed Acquisition. Once these directors are identified, biographical affidavits will be filed.

The Domestic Insurer - BLIC is being acquired without a management team, officers or employees. The Applicants' will have an initial management team engaged upon the closing of the Proposed Acquisition to manage third-party service providers and to ensure operational continuity. Over the near-to-medium term, the Applicants expect to continue hiring additional members of Management and support staff and thoughtfully, in a fully coordinated strategy with all parties, transition away from third-party support.

Other than as set forth herein or in the Plan of Operations attached hereto as Exhibit 7, the Applicants have no plans for the Domestic Insurer – BLIC to pay a dividend (whether extraordinary or otherwise), liquidate the Domestic Insurer - BLIC, sell its assets or merge it with any person or persons or make any other material change in its business operations or corporate structure or management.

4

Applicant intends to pursue discussions with other state regulators regarding re-domestication. Applicant shall file a copy of any UCAA primary application filings it makes with other state insurance departments for approval of re-domestication.

### (b) Five-Year Financial Projections

Five-year financial projections for the Domestic Insurer - BLIC are also attached as Exhibit 7 hereto.

### (c) Absence of Other Proposed Changes

There are no proposed changes with respect to the Domestic Insurer – BLIC's compliance plan.

### Item 6. VOTING SECURITIES TO BE ACQUIRED

The Applicants will acquire, indirectly, 100 percent of the Domestic Insurer - BLIC's capital stock.

Please refer to Item 4(b) above for a description of the method by which the terms of the Purchase Agreement were determined.

### Item 7. OWNERSHIP OF VOTING SECURITIES

None of the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement beneficially owns or has, directly or indirectly, a right to acquire beneficially any voting securities of the Domestic Insurer - BLIC or any securities convertible into or evidencing a right to acquire any such voting securities whether or not such right of conversion or acquisition is exercisable immediately or at some future time.

### Item 8. CONTRACTS, ARRANGEMENTS OR UNDERSTANDINGS WITH RESPECT TO VOTING SECURITIES OF THE DOMESTIC INSURER - BLIC

Except for the Purchase Agreement, which provides for the acquisition of all of the shares of capital stock of the Domestic Insurer - BLIC, there are no contracts, arrangements or understandings with respect to any voting securities of the Domestic Insurer - BLIC in which the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement is involved, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits, or the giving or withholding of proxies.

### Item 9. RECENT PURCHASES OF VOTING SECURITIES

There have been no purchases of any voting securities of the Domestic Insurer - BLIC by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants,

5

any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

### Item 10.    RECENT RECOMMENDATIONS TO PURCHASE

Except in connection with the execution of the Purchase Agreement, there have been no recommendations to purchase any voting security of the Domestic Insurer - BLIC made by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement, or by anyone based upon interviews or at the suggestion of the Applicants, any person controlling, controlled by or under common control with the Applicants or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

### Item 11.    AGREEMENTS WITH BROKER-DEALERS

There are no written or oral agreements, arrangements or understandings made or proposed to be made by any Applicants or any affiliate of the Applicants with any broker-dealer as to solicitation of voting securities of the Domestic Insurer - BLIC for tender.

### Item 12.    FINANCIAL STATEMENTS AND EXHIBITS

#### (a)    Exhibits and Financial Statements

The financial statements and exhibits attached to this Statement are as follows:

Exhibit 1.    Purchase Agreement

Exhibit 2.    Pre-Acquisition Organizational Chart of the Domestic Insurer - BLIC

Exhibit 3.    Pre-Acquisition Organizational Chart of the Applicants

Exhibit 4.    Simplified Organizational Chart of the Applicants and Domestic Insurer - BLIC Following the Proposed Acquisition

Exhibit 5.    Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 6.    Biographical Affidavits of Current Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 7.    Plan of Operations and Five Year Financial Projections for the Domestic Insurer - BLIC

Exhibit 8.    Personal financial statements of Robert Alban as of April 17, 2023.

6

The Applicants respectfully request that Exhibit 8, the personal financial statements of Mr. Alban and Exhibit 6, biographical affidavits of directors be afforded confidential treatment and be excepted from disclosure under G.S. 132-1.2. The information in Mr. Alban's personal financial statement and biographical affidavit contains information of a personal nature. Disclosure of such information would constitute a clearly unwarranted invasion of the relevant individuals' privacy.

### Financial Statements

Attached as Exhibit 8 hereto are the personal financial statements of Robert Alban as of April 17, 2023. Universal Financial Holdings is a newly formed entity and does not have financial statements.

### (c)    Tender Offers, Agreements for Voting Securities, Annual Reports

Other than the Purchase Agreement, which provides for the change of control of all of the shares of capital stock of the Domestic Insurer - BLIC, there are no tender offers for, requests or invitations for, tenders of, exchange offers for or agreements to acquire or exchange any voting security of the Domestic Insurer - BLIC or additional soliciting materials relating thereto. Other than as indicated herein, there will be no employment, consultation, advisory, managing general agent, controlling producer, or management contracts concerning the Domestic Insurer - BLIC, and there have been no annual reports to stockholders of the Domestic Insurer – BLIC for the last two (2) fiscal years.

### Item 13.    ENTERPRISE RISK MANAGEMENT

The Applicants agree to provide, to the best of their knowledge and belief, the information required by Form F within fifteen (15) days after the end of the month in which the acquisition of control occurs.

### Item 14.    SIGNATURE AND CERTIFICATION

*[Signature Pages Follow]*

7

**SIGNATURE**

Pursuant to the requirements of NC General Statutes - Chapter 58 Article 19, Universal Financial Holdings, LLC has caused this application to be duly signed on its behalf in the City of _Bedford_ and State of _NH_ on the _2nd_ day of _MAY_, 2023.

(Seal)

UNIVERSAL FINANCIAL HOLDINGS, LLC

By: _____

Name:    Robert Alban

Title:    Authorized Person

Attest:

By: _____

Name: _Caitlin Loving_

Title: _Notary Public_

**CAITLIN E. LOVING**
**Notary Public - New Hampshire**
**My Commission Expires June 30, 2026**

**CERTIFICATION**

The undersigned deposes and says that he has duly executed the attached application dated _MAY 2_, 2023, for and on behalf of Universal Financial Holdings, LLC; that he is the authorized signatory of such company and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with the instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information and belief.

_____
(Signature)

Robert Alban_____
(Type or Print Name)

FORM A

STATEMENT REGARDING THE ACQUISITION OF CONTROL OF
OR MERGER WITH A DOMESTIC INSURER
(this "Statement")

**SOUTHLAND NATIONAL INSURANCE COMPANY**
(the "Domestic Insurer - SNIC")

BY

**UNIVERSAL FINANCIAL HOLDINGS LLC**
**ROBERT ALBAN**
(each an "Applicant")

**Filed with the North Carolina Department of Insurance and Financial Services**
(the "Department")

Dated: May 2, 2023

Name, Title, Address and Telephone Number of Individuals to Whom Notices and
Correspondence Concerning this Statement Should Be Addressed:

To:

Bob Alban
CEO, Universal Financial Holdings
Principal, Montshire Advisors
19 Essex Road
Bedford NH 03110
Telephone: 617-500-0008
Email: alban@montshireadvisors.com

With a copy to:
David Liggett
Ragsdale Liggett
2840 Plaza Place,
Suite 400,
Raleigh NC 27612
Telephone: 919.881.2209
Email: dliggett@rl-law.com

## Item 1.   METHOD OF ACQUISITION

### (a)   Domestic Insurer - SNIC

This Form A Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer (this "Application") relates to a proposed acquisition of control of the Domestic Insurer, Southland National Insurance Company. The Domestic Insurer - SNIC's statutory home office and is located at 2327 Englert Drive Durham North Carolina 27713. The Domestic Insurer - SNIC is currently in rehabilitation pursuant to order of rehabilitation issued by Wake County Superior Court on June 27, 2019. (the "Rehabilitation").

### (b)   Method of Acquisition

The Domestic Insurer - SNIC is a direct wholly-owned subsidiary of GBIG Holdings, LLC, a limited liability company organized under the laws of the State of Delaware ("GBIG Holdings"). GBIG Holdings is a wholly owned subsidiary of GBIG Capital LLC, a limited liability company organized under the laws of the State of Delaware ("Seller")

On December 2, 2022, Universal Financial Holdings, LLC ("UFH") entered into an agreement to acquire GBIG Holdings from Seller as amended by that certain First Amendment to Purchase Agreement (collectively, the "Purchase Agreement"), pursuant to which UFH agreed to purchase from Seller all of the membership interests of GBIG Holdings (the "Proposed Acquisition"), subject to satisfaction of all conditions to closing, including receipt of required regulatory approvals from the North Carolina Department of Insurance (the "Department") of this Application approving the change of control of GBIG's wholly owned subsidiary, the Domestic Insurer - SNIC and a Form D application relating to the issuance of a surplus note by Domestic Insurer – SNIC. The Proposed Acquisition is also conditioned upon and subject to regulatory approvals from the Department of a Form A approving the change of control of GBIG Holding's wholly owned subsidiaries, Bankers Life Insurance Company ("BLIC") and Colorado Bankers Life Insurance Company ("CBL") and the Rehabilitation Court approval of the termination of the Rehabilitation Proceeding of SNIC, BLIC, and CBL, the approval of the sale of Clanwilliam and UKAT, and the approval of refinancing of ARM and GGHI.

A copy of the Purchase Agreement and the First Amendment thereto is attached as Exhibit 1 to this Statement and incorporated herein by reference.

Universal Financial Holdings is controlled by Robert Alban. Universal Financial Holdings was formed for the purpose of acquiring insurance companies and, as of the date hereof, has no assets or liabilities. Universal Financial Holdings will issue $30 million of preferred equity to outside investors concurrent with the closing of the Proposed Acquisition. Such preferred equity investors will be passive investors who will not control the Domestic Insurer - SNIC. No investors will transact any business in Universal Financial Holdings or the Domestic Insurer - SNIC or will have the power to sign documents for or otherwise bind Universal Financial Holdings.

1007716119v3

1

## Item 2. IDENTITY AND BACKGROUND OF THE APPLICANTS

### (a) Name and Address of the Applicants

The names and principal business addresses of the Applicants are as follows:

> Universal Financial Holdings
> Robert Alban
> 19 Essex Road
> Bedford, NH 03110

### (b) The Applicants' Business Operations

Universal Financial Holdings is a newly formed limited liability company organized under the laws of the State of Missouri for the purpose of acquiring insurance related businesses.

Robert Alban is an insurance industry entrepreneur and advisor with expertise in risk based capital models, reinsurance, Federal Home Loan Bank ("FHLB") matters, as well as an understanding of insurance tax and accounting considerations and the insurance product and distribution marketplace. Mr Alban is currently Principal of Montshire Advisors, a firm he co-founded in 2011, where he brokers reinsurance, advises insurers on product, distribution, and FHLB matters, and represents investments and investment firms to the US insurance industry. Montshire's clients have included numerous insurance companies, investment managers, and regional Federal Home Loan banks. Mr Alban is also a shareholder in an insurance distribution business focused on marketing insurance and administering benefits for federal employees and employer groups. In 2020, Mr Alban acquired intellectual property from Great American Insurance Company for a supplemental unemployment insurance product which he is in the process of commercializing. Prior to forming Montshire, Mr. Alban led corporate development at National Life Group, a Fortune 1000 insurance company where he focused on capital optimization structures and transactions such as reinsurance, corporate owned life insurance, certified capital companies and other tax advantaged investments, interest rate and equity market hedging, and Federal Home Loan bank programs. Prior to National Life, Mr. Alban led mergers and acquisitions at Sentry Insurance, a Fortune 1000 property and casualty insurer. Prior to Sentry, Mr Alban held business development positions with GXS (formerly GE Information Services), ITOCHU International (an $86 Billion Japanese conglomerate) and Westinghouse. Mr Alban has a BS in Mechanical Engineering from West Virginia University and an MBA from Georgetown University. Mr Alban has his Series 7 and Series 66 securities licenses and is a registered representative of Castle Hill Partners. Mr Alban has his life producer and reinsurance intermediary licenses.

### (c) Applicants' Organizational Charts

Attached to this Application as Exhibit 2 is the current organizational chart of the Domestic Insurer - SNIC immediately prior to the Proposed Acquisition.

A simplified organizational chart presenting the identities of, and interrelationships among, the Applicants and their subsidiaries and affiliates, including the ultimate controlling persons, prior to consummation of the Proposed Acquisition is attached hereto as Exhibit 3. The

2

organizational chart indicates the percentage of voting securities of each entity owned or controlled by the Applicants or any other such persons, the type of organization (e.g., corporation, trust, partnership) and the state or other jurisdiction of domicile or incorporation, as applicable. Unless otherwise indicated on such organizational charts or in this Application, each entity is a corporation and control is maintained by the ownership or control of all outstanding voting securities.

An abbreviated post-closing organizational chart of the Applicants, showing the Domestic Insurer - SNIC's place within the Applicants' organizational structure after consummation of the Proposed Acquisition, is attached hereto as Exhibit 4.

There are currently no pending court proceedings involving a reorganization or liquidation of the Applicants or any of the subsidiaries or affiliates of the Applicants.

## Item 3. IDENTITY AND BACKGROUND OF INDIVIDUALS ASSOCIATED WITH THE APPLICANTS

The directors, executive officers and natural persons controlling 10% or more of the voting security of the Applicants are listed in Exhibit 5 hereto. Completed NAIC biographical affidavits of such individuals are attached hereto as Exhibit 6. Third party background checks will be also be performed in connection with this Statement's submission.

A list setting forth the names and business addresses of the prospective members of the board of the Domestic Insurer-SNIC is set forth below under Item 5.

## Item 4. NATURE, SOURCE AND AMOUNT OF CONSIDERATION

### (a) Nature, Source and Amount of Consideration

The total consideration for the Proposed Acquisition of GBIG Holdings is $1 plus deferred consideration of $290 million payable concurrent with the redemption of the remaining Global Growth related assets. Prior to closing, Domestic Insurer – SNIC shall convert $40 million of GBIG Holding's equity in SNIC into a $40 million face amount surplus note with the following terms:

- 10-year term

- 10% interest, can be accrued at borrower's option for the first three years

- Repayable in cash or Global Growth related assets

- The surplus note shall become an asset of GBIG Holdings and be acquired by UFH.

### (b) Criteria in Determining Consideration

The basis and terms of the Purchase Agreement, including the nature and amount of consideration, were determined through arms' length negotiations between representatives of the

3

Applicants and Seller, and their respective financial, legal and other advisors. The amount and type of consideration were determined in view of the consideration paid in other recent acquisitions of similar businesses, as well as the financial position and results of operations of the business to be acquired, including the past and present business operations, historical and potential earnings, financial condition and prospects, assets and liabilities and such other factors and information as the Applicants considered relevant under the circumstances.

## Item 5.     FUTURE PLANS FOR DOMESTIC INSURER - SNIC

### (a)     Plans for Domestic Insurer - SNIC

A Plan of Operations describing the Applicants' intentions with respect to the operations of the Domestic Insurer - SNIC following the consummation of the Proposed Acquisition is attached hereto as Exhibit 7.

The tables below set forth a list of all individuals who are proposed to be directors and officers of the Domestic Insurer - SNIC following the closing of the Proposed Acquisition:

Directors:

| Name | Title |
|------|-------|
| Robert Alban | Executive Chairman |
| Michael Reidy | Director |

Officers:

| Name | Title |
|------|-------|
| Robert Alban | President, Secretary |

Biographical affidavits for Robert Alban are included in Exhibit 8 hereto. The Applicants intend to identify several additional directors for appointment to the Board of the Domestic Insurer – SNIC at or shortly after the closing of the Proposed Acquisition. Once these directors are identified, biographical affidavits will be filed.

The Domestic Insurer - SNIC is being acquired without a management team, officers or employees. The Applicants' will have an initial management team engaged upon the closing of the Proposed Acquisition to manage third-party service providers and to ensure operational continuity. Over the near-to-medium term, the Applicants expect to continue hiring additional members of Management and support staff and thoughtfully, in a fully coordinated strategy with all parties, transition away from third-party support.

Other than as set forth herein or in the Plan of Operations attached hereto as Exhibit 7, the Applicants have no plans for the Domestic Insurer – SNIC to pay a dividend (whether extraordinary or otherwise), liquidate the Domestic Insurer - SNIC, sell its assets or merge it with any person or persons or make any other material change in its business operations or corporate structure or management.

4

Applicant intends to pursue discussions with other state regulators regarding re-domestication. Applicant shall file a copy of any UCAA primary application filings it makes with other state insurance departments for approval of re-domestication.

### (b) Five-Year Financial Projections

Five-year financial projections for the Domestic Insurer - SNIC are also attached as Exhibit 7 hereto.

### (c) Absence of Other Proposed Changes

There are no proposed changes with respect to the Domestic Insurer SNIC's compliance plan.

### Item 6. VOTING SECURITIES TO BE ACQUIRED

The Applicants will acquire, indirectly, 100 percent of the Domestic Insurer - SNIC's capital stock.

Please refer to Item 4(b) above for a description of the method by which the terms of the Purchase Agreement were determined.

### Item 7. OWNERSHIP OF VOTING SECURITIES

None of the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement beneficially owns or has, directly or indirectly, a right to acquire beneficially any voting securities of the Domestic Insurer - SNIC or any securities convertible into or evidencing a right to acquire any such voting securities whether or not such right of conversion or acquisition is exercisable immediately or at some future time.

### Item 8. CONTRACTS, ARRANGEMENTS OR UNDERSTANDINGS WITH RESPECT TO VOTING SECURITIES OF THE DOMESTIC INSURER - SNIC

Except for the Purchase Agreement, which provides for the acquisition of all of the shares of capital stock of the Domestic Insurer - SNIC, there are no contracts, arrangements or understandings with respect to any voting securities of the Domestic Insurer - SNIC in which the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement is involved, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guarantees against loss or guarantees of profits, division of losses or profits, or the giving or withholding of proxies.

### Item 9. RECENT PURCHASES OF VOTING SECURITIES

There have been no purchases of any voting securities of the Domestic Insurer - SNIC by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants,

5

any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

## Item 10. RECENT RECOMMENDATIONS TO PURCHASE

Except in connection with the execution of the Purchase Agreement, there have been no recommendations to purchase any voting security of the Domestic Insurer - SNIC made by the Applicants, their affiliates or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement, or by anyone based upon interviews or at the suggestion of the Applicants, any person controlling, controlled by or under common control with the Applicants or, to the best knowledge, information and belief of the Applicants, any person listed in Item 3 of this Statement during the twelve (12) calendar months preceding the filing of this Statement.

## Item 11. AGREEMENTS WITH BROKER-DEALERS

There are no written or oral agreements, arrangements or understandings made or proposed to be made by any Applicants or any affiliate of the Applicants with any broker-dealer as to solicitation of voting securities of the Domestic Insurer - SNIC for tender.

## Item 12. FINANCIAL STATEMENTS AND EXHIBITS

### (a) Exhibits and Financial Statements

The financial statements and exhibits attached to this Statement are as follows:

Exhibit 1.    Purchase Agreement

Exhibit 2.    Pre-Acquisition Organizational Chart of the Domestic Insurer - SNIC

Exhibit 3.    Pre-Acquisition Organizational Chart of the Applicants

Exhibit 4.    Simplified Organizational Chart of the Applicants and Domestic Insurer - SNIC Following the Proposed Acquisition

Exhibit 5.    Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 6.    Biographical Affidavits of Current Directors, Executive Officers and Natural Persons controlling 10% or more of the voting security of the Applicants

Exhibit 7.    Plan of Operations and Five Year Financial Projections for the Domestic Insurer - SNIC

Exhibit 8.    Personal financial statements of Robert Alban as of April 17, 2023

6

The Applicants respectfully request that Exhibit 8, the personal financial statements of Mr. Alban and Exhibit 6, biographical affidavits of directors be afforded confidential treatment and be excepted from disclosure under G.S. 132-1.2. The information in Mr. Alban's personal financial statement and biographical affidavit contains information of a personal nature. Disclosure of such information would constitute a clearly unwarranted invasion of the relevant individuals' privacy.

### Financial Statements

Attached as Exhibit 8 hereto are the personal financial statements of Robert Alban as of April 17, 2023. Universal Financial Holdings is a newly formed entity and does not have financial statements.

### (c)  Tender Offers, Agreements for Voting Securities, Annual Reports

Other than the Purchase Agreement, which provides for the change of control of all of the shares of capital stock of the Domestic Insurer - SNIC, there are no tender offers for, requests or invitations for, tenders of, exchange offers for or agreements to acquire or exchange any voting security of the Domestic Insurer - SNIC or additional soliciting materials relating thereto. Other than as indicated herein, there will be no employment, consultation, advisory, managing general agent, controlling producer, or management contracts concerning the Domestic Insurer - SNIC, and there have been no annual reports to stockholders of the Domestic Insurer – SNIC for the last two (2) fiscal years.

## Item 13.  ENTERPRISE RISK MANAGEMENT

The Applicants agree to provide, to the best of their knowledge and belief, the information required by Form F within fifteen (15) days after the end of the month in which the acquisition of control occurs.

## Item 14.  SIGNATURE AND CERTIFICATION

*[Signature Pages Follow]*

7

# SIGNATURE

Pursuant to the requirements of NC General Statutes - Chapter 58 Article 19, Universal Financial Holdings, LLC has caused this application to be duly signed on its behalf in the City of *Bedford* and State of *NH* on the *2nd* day of *MAY*, 2023.

(Seal)

UNIVERSAL FINANCIAL HOLDINGS, LLC

By: _____

Name: Robert Alban

Title: Authorized Person

Attest:

By: _____

Name: Caitlin Loving

Title: Notary Public

**CAITLIN E. LOVING**
**Notary Public - New Hampshire**
**My Commission Expires June 30, 2026**

# CERTIFICATION

The undersigned deposes and says that he has duly executed the attached application dated *May 2*, 2023, for and on behalf of Universal Financial Holdings, LLC; that he is the authorized signatory of such company and that he is authorized to execute and file such instrument. Deponent further says that he is familiar with the instrument and the contents thereof, and that the facts therein set forth are true to the best of his knowledge, information and belief.

_____
(Signature)

Robert Alban _____
(Type or Print Name)

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 008664

MIKE CAUSEY, COMMISSIONER
OF INSURANCE OF NORTH
CAROLINA,

Petitioner,

v.

SOUTHLAND NATIONAL
INSURANCE CORPORATION,
SOUTHLAND NATIONAL
REINSURANCE CORPORATION,
BANKERS LIFE INSURANCE
COMPANY, COLORADO BANKERS
LIFE INSURANCE COMPANY,
North Carolina Domiciled Insurance
Companies,

Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

AFFIDAVIT OF JOHN MURPHY

I, John Murphy, after being sworn, do hereby state the following to be true and accurate based upon my firsthand knowledge:

1.      I am a resident of Indiana, am more than eighteen years old, and am not subject to any legal disabilities. I make the following statements on my own personal knowledge.

2.      I am an employee of Noble Consulting Services, Inc., and one of the appointed Special Deputy Rehabilitators for Respondents Colorado Bankers Life Insurance Company ("CBL"), Bankers Life Insurance Company ("BLIC") and,



**EXHIBIT**

3

Southland National Reinsurance Corporation ("SNRC"), as well as one of the Special Deputy Liquidators for Respondent Southland National Insurance Corporation ("SNIC") (collectively, the "Receiver").

3. The court-appointed Rehabilitator and Liquidator of Respondents delegated his statutory powers set out in N.C. Gen. Stat. §§ 58-30-85, and 58-30-120 to me as one of the Special Deputy Rehabilitators and Special Deputy Liquidators.

4. The Rehabilitator, Liquidator, and Special Deputy Rehabilitators and Special Deputy Liquidators have "control" of each of the Respondents, in that they are the only persons who have "direct or indirect possession of the power to direct or cause the direction of the management and policies of [Respondents], whether through the ownership of voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise," which I understand to be the definition of control set out in N.C. Gen. Stat. § 58-19-5(2).

5. I have reviewed each of the three Form A submissions filed by Universal Financial Holdings, LLC ("Universal") on May 15, 2023.

6. In those Form A submissions, Universal seeks to acquire "control" of each of Respondents CBL, BLIC, and SNIC, (collectively, the "Insolvent Insurance Companies") by purchasing all of the membership interests of GBIG Holdings, LLC ("GBIG") (the "Proposed Transaction").

7. GBIG lacks the ability to offer "control" of the Insolvent Insurance Companies. Control of those companies is vested in the Rehabilitator and Liquidator, and therefore his appointed Special Deputy Rehabilitators and Special Deputy

2

Liquidators, for the reasons set out above and as set out in this Court's June 27, 2019 Order of Rehabilitation relating to CBL and BLIC, and this Court's May 2, 2023 Order of Liquidation relating to SNIC. Any proposal for change of control of Respondents would need to be approved first by the Special Deputy Rehabilitators and Special Deputy Liquidators.

8. The Proposed Transaction between Universal and GBIG was not approved by the Special Deputy Rehabilitators and Special Deputy Liquidators. Moreover, the details of the Proposed Transaction as set out in the Form A application were first provided to the Special Deputy Rehabilitators and Special Deputy Liquidators when the Form A submissions were forwarded to them by the North Carolina Department of Insurance.

9. Based on a preliminary review, it appears that the Form A submissions would require the Rehabilitator and Liquidator and Special Deputy Rehabilitators and Special Deputy Liquidators, (or this Court) to approve certain transactions that the Rehabilitator has previously opposed due to the use of funds, such as the sale and refinancing of certain SACs, including the Clanwilliam Group, Castle & Cooke Mortgage ("CCM"), Claris Vision Group ("CVG"), and the ARM group of companies.

10. Each of these transactions is included in Global Growth Holdings Inc.'s alternative "Global Rehabilitation Plan for North Carolina and Bermuda Policyholders."

11. The agreements contained in the Form A submissions are conditioned on the Rehabilitator and Liquidator, and Special Deputy Rehabilitators and Special

3

Deputy Liquidators, essentially, consenting to Global Growth's alternative plan of rehabilitation.

12. The actions of GBIG Holdings, LLC and Universal Financial Holdings, LLC have and continue to interfere with the insolvency proceedings conducted under Chapter 58 of the North Carolina General Statutes, by diverting resources of the Receiver and seeking to take unauthorized control of the Respondents.

Declarant sayeth nothing further.

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK]

4

I declare under penalty of perjury under the laws of Indiana that the foregoing is true and correct.

_John Murphy_  
John Murphy

_May 30, 2023_  
Date

STATE OF _Indiana_

COUNTY OF _Hendricks_

Sworn to and subscribed before me this the 30th day of May, 2023.

_Rochelle Atkins_

Notary Public

_Rochelle Atkins_

Printed Name

My Commission expires:  
_November 8, 2026_

(Notarial stamp or seal)

ROCHELLE ATKINS  
Notary Public, State of Indiana  
Hendricks County  
Commission Number NP0716900  
My Commission Expires  
November 08, 2026

5