**EXHIBIT ST**

Case 3:23-cr-00048-MOC-DCK    Document 234-52    Filed 07/14/26    Page 1 of 77

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

UNITED STATES OF AMERICA    )
                            )
                            )
                            )
          vs.               )    DOCKET NOS. 5:19-cr-22-1,
                            )       5:19-cr-22-2, and
JOHN D. GRAY and            )          3:23-cr-48
GREG E. LINDBERG,           )
                            )
                            )
Defendants.                 )


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
MAY 26, 2026


Deborah Cohen-Rojas, R.D.R., C.R.R., F.C.R.R.
Official Court Reporter
Deborah_CohenRojas@ncwd.uscourts.gov  704.350.7497
*Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.*

APPEARANCES:

On Behalf of the Government:

    Benjamin Bain-Creed
    Daniel S. Ryan
    Dana Washington
    United States Attorney's Office
    227 W. Trade Street, Suite No. 1650
    Charlotte, North Carolina  28202

    Lyndie Freeman
    Department of Justice, Fraud Section
    1400 New York Avenue, NW
    Washington, District of Columbia  20005

On Behalf of Defendant Lindberg:

    Brandon N. McCarthy
    Katten Law
    1717 Main Street, #3750
    Dallas, Texas  75201

    Ryan Meyer
    Katten Muchin Rosenman LLP
    2121 N. Pearl Street, Suite 1100
    Dallas, Texas  75214

    Robert Adams Blake, Jr.
    James F. Wyatt
    Wyatt & Blake, LLP
    402 West Trade Street, Suite 101
    Charlotte, North Carolina  28202

On Behalf of Defendant Gray

    Stephen Lacy Cash
    Barbour, Searson, Jones & Cash, PLLC
    21 Battery Park Avenue, Suite 201
    Asheville, North Carolina  28801

    Andrew D. Banzhoff
    Devereux Banzhoff, PLLC
    The Jackson Building
    22 South Pack Square, Suite 1100
    Asheville, North Carolina  28801

On Behalf of Joseph W. Grier, III

Michael L. Martinez
Grier Wright Martinez, PA
521 E. Morehead Street, Suite 440
Charlotte, North Carolina  28202

THE COURT: Good morning. Got a couple of cases this morning, Mr. Greg Lindberg and Mr. Gray is here, also.

These cases -- and the case involving Mr. Lindberg and Mr. Gray, those cases went to trial twice. Two juries heard this evidence, a little bit different instruction on one of them, but, in the end, they found both defendants guilty twice so far. So there's not been any question about any kind of a thing going on there.

So let me start off with Mr. Lindberg. Mr. Lindberg, do you recall appearing before a United States magistrate judge for the purpose of entering a plea of guilty in the case of 3:23-cr-48?

DEFENDANT LINDBERG: Yes, Your Honor.

THE COURT: Okay. Do you remember being placed under oath at that time?

DEFENDANT LINDBERG: Yes, I do.

THE COURT: Do you remember answering the questions of the judge?

DEFENDANT LINDBERG: Yes, I do.

THE COURT: Do you remember signing a plea form, indicating the answers you gave the Court that day were true and accurate to the best of your knowledge?

DEFENDANT LINDBERG: Yes, I do.

THE COURT: The answers you give the Court that day, were they true and correct?

DEFENDANT LINDBERG: Yes, they were.

THE COURT: Okay. If I were to ask you the same questions today, would your answers be the same?

DEFENDANT LINDBERG: Yes.

THE COURT: Okay. Mr. Wyatt, do you believe your client fully understood the questions that the magistrate judge asked at the Rule 11 hearing?

MR. WYATT: Yes, Your Honor.

THE COURT: Okay. Thank you.

Mr. Lindberg, did you answer the questions the way you did and are you going forward with your guilty plea today because you did commit the crime you're pleading guilty to?

DEFENDANT LINDBERG: Yes.

THE COURT: Then based upon those representations and the answers given by the defendant at the Rule 11 hearing before the magistrate judge, the Court affirms the judge's finding that the defendant's plea was knowingly and voluntarily made. The Court also affirms the judge's finding that the defendant understood the charges, the potential penalties, and the consequences of his plea. Accordingly, the Court affirms the magistrate judge's acceptance of the defendant's plea of guilty at the Rule 11 hearing and accepts the same here today.

Does the Government have a factual basis?

MR. RYAN: Yes, Your Honor. The Government would proffer the factual basis set forth in the PSR, which is

Document 63 in the 3:23-cr case.

THE COURT: Okay. Does the defense agree that the Court may use the offense conduct set forth in the presentence report to form the factual basis for this?

MR. WYATT: Yes, Your Honor.

THE COURT: All right. Thank you.

Based upon that stipulation and the offense conduct as set forth in the presentence report, the defendant's plea of guilty before the magistrate judge, and the defendant's admissions in open court today, the Court finds there is a factual basis for the entry of the plea of guilty and enters a verdict and judgment of guilty in this case.

Now, Mr. Lindberg, your case was referred to the United States Probation Office for a presentence investigation and the preparation of a presentence report. The Court has received that report. Have you read that report?

DEFENDANT LINDBERG: Yes, I have.

THE COURT: Have you gone over that report with your attorney?

DEFENDANT LINDBERG: Yes, I have.

THE COURT: Do you now believe you understand the contents of that report?

DEFENDANT LINDBERG: I do.

THE COURT: All right. Mr. Wyatt, have you gone over that report with your client and are you satisfied he

understands the contents of that report?

MR. WYATT: Yes, Your Honor, I have, as well as Mr. McCarthy and Mr. Meyer from the Katten law firm.

THE COURT: Okay. And are there any objections to the presentence report today?

MR. WYATT: None at this time, Your Honor.

THE COURT: All right. Thank you.

Any from the Government?

MR. RYAN: No, Your Honor.

THE COURT: All right. Then the Court will adopt the information contained in the presentence report for the purpose of applying the guidelines.

Okay. In this particular matter, in the case that Mr. Lindberg has pled guilty to, he's pled guilty to two counts, and Count 1 is 60 months and Count 2 is 120 months. Does the defense agree?

MR. WYATT: Yes, Your Honor.

THE COURT: Does the Government agree?

MR. RYAN: Yes, Your Honor.

THE COURT: All right. On the case that the defendant was convicted on, have you all read the presentence report with regard to that?

MR. WYATT: Yes, Your Honor.

THE COURT: Okay. And any objections to that presentence report?

MR. WYATT: No, Your Honor.

THE COURT: Okay. Have you gone over that with Mr. Lindberg?

MR. WYATT: Yes, sir.

THE COURT: Mr. Lindberg, do you understand that presentence report?

DEFENDANT LINDBERG: Yes, I do.

THE COURT: Okay. Do you understand that the guideline sentencing range in the public corruption case, which is 5:19-cr-22, is 240 months on Count 1 and 120 months on Count 2? Do you understand that?

DEFENDANT LINDBERG: Understood.

THE COURT: Okay. Any objections to those figures? Yes, sir.

MR. RYAN: Your Honor, I think what you just referenced was the stat max on those counts.

THE COURT: Yeah.

MR. RYAN: Not that -- I thought I heard "guideline sentence."

THE COURT: Okay. And what is the guideline range?

MR. RYAN: The guideline range for that case -- it's a 34/1, which I believe is 151 to 188, Your Honor.

THE COURT: Okay. Thank you.

Any objection from the defense on that?

MR. WYATT: No, Your Honor.

THE COURT: All right. Thank you.

All right. I'll hear from the defense on sentencing. First, let's go ahead and do Mr. Gray.

Mr. Gray, you're in the -- were convicted and previously sentenced in the first case. Let me hear from your counsel on that.

MR. CASH: Yes, Your Honor. Good morning.

THE COURT: I understand Mr. Devereux cannot be here today.

MR. WYATT: He can't. He's out of town, but --

MR. BANZHOFF: I'm doing my best Mr. Devereux impersonation.

THE COURT: I understand that. You can be on "Saturday Night Live." You look just like him.

MR. CASH: And that's Andy Banzhoff. He's Mr. Devereux's partner.

THE COURT: Yes.

MR. CASH: Your Honor, I think a reasonable place to start is the fact that you've been here before. You've heard the case yourself twice, and I've read the transcript of the first trial, and I attended the second trial and defended Mr. Gray. I don't think there's anything that makes the second round cut out any different than the first round in terms of what the sentence should be.

And so I'll save my breath and just ask Your Honor to

remember the findings you made a few months ago in response to our motion to terminate supervision. And your order is Doc No. 503. And in that order, you recited what the sentence was in the original trial, which was 30 months active, followed by two years supervised release.

And you found that Mr. Gray did actually complete his active portion of that sentence before it was vacated by the Fourth Circuit, so he has served his entire active sentence from the first time. And he's been on probation I think for, in total, 57 months of supervision. And then the last four months since this order was entered, he's not been supervised, but has gotten in no trouble or done anything unlawful.

So what we would ask for today is a sentence of time served, which reflects what he has done and what -- the previous sentence that was issued by Your Honor. So unless you have other questions, that's all I've got to say.

THE COURT: Okay. Let me hear from the Government.

MR. WASHINGTON: Thank you, Your Honor.

Your Honor, as the Court will recall, Mr. Gray's conduct was serious, and he was certainly in partnership with Mr. Lindberg. But the Court acknowledged, during the first sentencing, that they were very different in that Mr. Gray did not stand to benefit from this horrific bribery case as Mr. Lindberg did. He was being paid as a consultant for Mr. Lindberg.

At the original sentencing, the United States in its memorandum asked for 121 months. After Mr. Lindberg's sentencing, we dropped that significantly, and the Court imposed a sentence of 30 months imprisonment to be followed by two years of supervised release. By the time we got to trial, he had served his sentence, all of it. I think he had even served -- the supervised release portion of it was over.

So -- and the Court has indicated previously that it was inclined to impose the same sentence again, so the United States has no objections to that. So that would essentially be a time-served sentence for Mr. Gray.

THE COURT: Yeah, I think it is. I think that the complicated -- and that includes the supervised release. Is that what the Government is saying?

MR. WASHINGTON: I think so, yeah.

THE COURT: Then I think to impose any other sentence -- to go forward with any formal sentence is going to confuse the folks at the Bureau of Prisons, is going to confuse the issue. I think it's better if we do a time-served sentence on this.

The Court -- he had a right to try the -- to try the case again and he did that. He -- and so the Court's not going to punish him for doing that. And he served the sentence the Court thought he should get for the conduct that he did.

And this was serious conduct. I mean, we -- I think we

learn even more every day. It just has the feeling that so much of our government is available to be bought and sold like sacks of potatoes, and it's a very, very bad thing. It's a very, very bad thing out there that goes on. Only the people can stop it from happening. Only the people -- and the Court has very limited ability to do things.

But, Mr. Gray, you did -- there was some very serious conduct. And I am going to impose a sentence, when I get to the sentence impositions, of time served on you because you've already -- you've served the time that the Court believed you deserved for the conduct that you did. It was serious. Two separate juries have found that. Two different groups of folks sat in this jury box and heard the same evidence and convicted you of participating in this crime.

And these crimes can't go on without people helping them. I mean, there's always -- there are plenty of billionaires that can get out there and get the money, but they've got to have folks to help them do it. And those people, when they participate and know that what they're doing is wrong, they're going to suffer and be convicted. And so you were, and this will remain on your record. But I do believe, Mr. Gray, you've served your time, so I'm not going to impose any further amount on it.

I'm going to formally figure out how to pronounce the sentence on it, but I don't want to confuse the Bureau of

Prisons into causing any issue with you having to stand around in custody somewhere while they try to figure out that what I meant was that's it.

So -- okay. Let's move on to Mr. Lindberg.

MR. WYATT: May it please the Court, there are five indisputable facts that weigh heavily in favor of a significant variance in this case. They are indisputable as of this moment. They are largely -- the Government in its brief largely fails to credit them or completely discounts them, but they are factors this Court is authorized to consider under 3553, and we respectfully request that the Court do that.

The first -- that is, according to the independent Special Master's calculations, not any of our calculations -- there are already restitution payments that have been made or credited that exceed a billion dollars.

Those funds include 4 -- approximately 484 million that was paid to the North Carolina Department of Insurance and Bermuda through interest and principle payments. It includes at least 320 million, and the figure may rise to 340 million, proceeds from the sale of the Clanwilliam business, that it includes 2 to 300 million of a preferred equity transaction that the Special Master has indicated should be credited, but it's an issue of timing, and it hasn't been credited yet.

That is the largest amount, we believe, ever paid in restitution in this state and among the largest in this

country. That could not have happened without Mr. Lindberg's cooperation with the Special Master in the process in this case. And it stands in stark comparison to the national average of approximately 5 percent of all restitution judgments actually being fulfilled.

Secondly, since the entry of his plea in the financial fraud case, Mr. Lindberg has cooperated extensively with the Special Master and with the Government in getting funds directly to policyholders and victims. It stands in stark contrast, of course, to the state court litigation, which has been mutually antagonistic.

The cooperation started during the plea discussions relating to the financial fraud case and when Mr. Lindberg withdrew his appeals in state court, which allowed the guaranty associations to begin their payments of $1.8 billion to policyholders. It continued from there with the execution of assignments of all his interests in the primary restitution assets. One of those assets consists of over 300 companies. The other is a major, billion-dollar business.

After the signing of those agreements, we, as defense counsel, engaged cooperatively with the Government, the Special Master, Paladin, the Special Master's advisor, to cooperatively work together to resolve issues for two reasons: one, to get assets sold to benefit policyholders, and, second, to narrow the issues for this Court.

And I would like to recognize the excellent work of the Special Master and of its financial advisor in this case. They listened to all sides, they're experienced, and then they make their own independent judgments about what should occur. And if there are dustups, which there were, they work to resolve those and have resolved those.

We engaged in weekly meetings, hour-long meetings, with the US Attorney's Office, with the Special Master, with Paladin, in order to effectuate these asset sales, the payment of restitution, and the future payment of restitution. In those meetings, we could not have cooperated with them to the extent we did without Mr. Lindberg's input to us. It has been a very, very productive process, probably the first productive process relating to this whole global issue of -- the issues between Mr. Lindberg and various insurance companies.

He took three actions that were indispensable to selling Clanwilliam's asset. The first was signing the assignment agreements of the primary restitution assets, giving the authority of the Special Master to sell them. The second was dismissing two lawsuits that were impeding the sale according to the buyer of that asset and then, after that, executing a release so the buyer had full comfort in terms of the sale. The third was waiving a $40 million tax escrow that he was entitled to. I think the Special Master will tell you, in the absence of those things, the sale of Clanwilliam would not have

occurred.

In addition to the $1 billion that has already been paid or will shortly be paid and credited to the victims in this case, due to the nonaffiliate assets that Mr. Lindberg grew, the Department of Insurance has an additional $892 million on its books that it has used and it can use to reimburse the guaranty associations. We believe they've already paid over $500 million of those funds to the guaranty associations.

And these assets that are providing this restitution didn't drop out of thin air. They're a result of Mr. Lindberg's hard work, his growing companies, and his providing these assets so victims could be made whole. I know, in their brief, the Government makes great hey out of the fact that Mr. Lindberg used funds for personal purposes, but, if you analyze the assets and the funds, 90 percent of the funds involved in the criminal conduct were invested in other companies, and those companies grew and they prospered.

Clanwilliam is a perfect example. When Mr. Lindberg purchased it, it was named Helix Health, and it was a management -- healthcare management software company primarily located in Britain and Ireland. It had $11 million of revenue and a hundred employees. Through 19 strategic acquisitions, including the purchase of Australia's healthcare IT provider, he grew the company to almost a thousand employees and had revenue of almost a hundred million euros per year. It was

valued at more than 140 million before it was sold for approximately 450 million, so these assets that are available are as a result of his hard work in terms of growing those companies.

Additionally, according to the Special Master, with the remaining assets, there's somewhere between $1 and $2 billion available to provide further restitution payments.

The fourth point, Your Honor, is his plea in the financial fraud case. Honestly, that was a watershed moment in terms of his approach to this litigation. He accepted responsibility for his conduct, he voluntarily signed the factual basis, he entered his plea, he cooperated extensively since then.

Prior to that, and in the first probable -- in the first political corruption or contribution case, Mr. Lindberg was fighting on every front, and I think this Court saw that in the first trial. But that has changed, and it has led to a very productive relationship with the Special Master and for the victims.

Now, Mr. Lindberg owes an apology to all the victims, and he will apologize to those victims. They have been victimized not only by the criminal conduct in this case, but by the processes since then. And honestly, the first productive process has been the Special Master's involvement in terms of the asset sales, in addition to certain actions taken in the state court proceedings that have resulted in funds going to

the victims.

The fifth point is comparing the original sentencing in the political corruption case to the present time. In the original sentencing, which occurred almost six years ago, Mr. Lindberg was aggressively contesting all aspects of that case. The Government was arguing the financial loss in the financial fraud case, arguing to this Court that there was a $1 billion hole in assets caused by his conduct, saying he had not accepted responsibility. And the Court sentenced Mr. Lindberg, after weighing the various factors, to 87 months.

Now he comes before the Court with a billion dollars of restitution that's been paid, with another close to a billion dollars on the Department of Insurance books that can be used to pay the guaranty associations, with $1 to $2 billion as valued by the Special Master in additional assets for the payment of restitution. He has pled in the financial fraud case, he has cooperated with the Special Master, and that has greatly benefited the victims in this case.

The Government now, essentially, through a concurrent structure, asks this Court to stack sentences. They're asking the Court to double the original sentence. And in the original sentence, they already argued the financial fraud part of the case.

There are also additional grounds for variance in this case, and those are set forth in detail in our brief. One is

the overstatement of loss.  When 90 percent of the relevant assets go into other assets, even though that occurred via misrepresentations, via the admitted conduct in this case, then the guideline figure for loss overstates the loss.  This Court has recognized that factor in other cases, including United States versus Kipp, as have numerous other courts.

The second additional variance factor is the dispositions of other co-defendants in the relevant financial fraud case, especially.  We certainly recognize that there will be different dispositions because the other defendants chose to either plead and cooperate and had evidentiary value, or they got an NPA, a non-prosecution agreement, or a deferred-prosecution agreement.

Mr. Herwig, of course, pled guilty to a five-year maximum sentence.  I am sure that his counsel is going to argue for a period of non-incarceration based on his cooperation and the length of time involved in that case.

But just as those people should get credit for their evidentiary cooperation, Mr. Lindberg should get credit for his cooperation relating to restitution.  No other defendant has contributed 1/1000th of the restitution that Mr. Lindberg has provided in this case, and we ask the Court to judge that when it weighs all the various factors it has to in this case.

Finally, Your Honor, in his background, as set forth in our brief, he was the youngest of six children, first one to go

to college, went to Yale, is obviously very hardworking, has had a tremendous, positive impact on other inmates. And we ask you to take that into consideration in addition to all the other factors in this case.

With regard to the technicalities of the sentence the Court would impose, the Government has been able to talk to the Bureau of Prisons, and they, we believe, will represent on the record that the Bureau of Prisons will give Mr. Lindberg full credit for the time he served prior to the second political corruption case, for the time he served in connection with the financial fraud case.

I've rarely had a client, Your Honor, who has served more than 1,100 days prior to sentencing, but that's the case. It's still time served that should be credited toward his sentence, as well as the First Step Act credits. But if the Court is not inclined to accept our proposals relating to how to sentence Mr. Lindberg so that he gets that credit, if the BOP puts on the record that they will credit both sentences in the full amount of all time served, plus FSA credits, then hopefully that will resolve that aspect of the case.

Now, we respectfully request that the Court balance all those factors in reaching what it deems to be the appropriate sentence in this case. And I'll be happy to answer any questions that the Court may have at this point.

THE COURT: All right. Thank you. Does Mr. Lindberg

at this time wish to say something?

DEFENDANT LINDBERG: Thank you, Your Honor. I appreciate the opportunity to speak. I come before this Court accepting full responsibility, and I'm deeply regretful and apologize to the policyholders. They didn't sign up for this. So I'm -- I owe the policyholders the deepest apology here. I'm very regretful for the delay they experienced.

In the meantime, I've cooperated extensively with the Special Master, and particularly the financial advisor to the Special Master. They put in a ton of hours to make sure that the -- the American policyholders were fully paid as of last December. So I'm happy about that. Thank you, Your Honor.

THE COURT: All right. Thank you.

Let me hear from the Government.

MS. FREEMAN: Your Honor, at this time we'd like to make a brief presentation regarding victim impact in the financial fraud case.

THE COURT: You may.

MS. FREEMAN: Your Honor, the DOJ fraud section in DC has been managing the victim process in this case due to its large volume, and we have been managing a website, an email address, a hotline, all for these victims since we indicted the case back in 2023.

We offer, for the Court's consideration, by request of a few of the 200,000 people irrevocably harmed by the defendant

in this case, of the impact this fraud has had on them. And this is all information submitted in a second financial fraud case, that these statements from victims wanting to be heard under the CERA was not under the Court's consideration in the initial sentencing on the bribery case, and that's because the true extent of the financial fraud was not known at that time. It was basically only estimated and still being investigated then.

This set of binders here, should the Court wish to review it further in formulating its sentence, though everything has also been electronically submitted, is a small percentage of the contact we've had with victims, but these are formal victim impact statements that they wish the Court to review. This is what we could physically carry into the courtroom. There are other statements out there, some of which have 300 pages of attachments with all their financial statements, just begging, trying to be heard about how much they've lost.

This is 1,500 victim statements that we have received, formal victim impact statements in this case, which is less than 1 percent of the total victims in the case. In addition, DOJ has fielded thousands of phone calls and emails, and we have been in contact with a number of victims who have repeatedly pleaded with us to make sure the Court knows how defendant's brazen, parasitic scheme to enrich himself at working people's expense has ruined their lives.

Many of them express a desire to be here today, but every single one of them that we spoke to in preparation for this hearing has decided that they are actually too ill or advanced in years to travel. And they know -- they have expressed with regret to us that sending a couple of pieces of paper in a pile of thousands and thousands is not as likely to get the Court's attention as it -- as speaking face-to-face would do. They wrestled with the decision not to travel.

And thousands of these victims are 90 years and older, not to mention how many are in their 70s and 80s. And as you've seen in the victim impact statements previously submitted to the Court, many of them have had battles with cancer, mobility difficulties, all kinds of physical infirmities, such that traveling could cost them their lives, and they didn't want that taken from them, too.

And then there were the people that the Department of Justice couldn't reach for this hearing because they had passed away before seeking justice -- before seeing justice. From the North Carolina insurance companies alone, there are conservatively estimated at least 20,000 policyholders who died without seeing the money they needed, that they'd saved to support them in their advanced years.

At least one of the victims we quoted in our sentencing memo, we have since learned, has died. It's especially impactful considering we have just celebrated Memorial Day in

this country.

Mr. Lanem [phonetic], who was 90 years old in 2023 when he submitted his first victim impact statement, was a Korean War veteran with an 86-year-old wife and 56-year-old disabled son that they were having to still raise in his state. He wanted Your Honor to know that, even though he lives in Pennsylvania, he is a North Carolinian by birth. He called this state home once. He wanted to ask the Court to see if he could get his money before it's too late and the rest of his family becomes a burden on other people and he's not able to care for them anymore.

I have been asked by some other victims who could not be here to share some of their statements and other information, including from Mr. Shire [phonetic]. He would like the Court to know that, if these charges prove to be true, that this man has ruined my life, my family security, and our future. And while I'm sure he doesn't care, he hoped that maybe these insurance policyholders could restore their dignity and be made whole.

Ms. Papf [phonetic] asked us to communicate that she has experienced such guilt since this happened to her for allowing herself to be in this situation. It was a common theme with a lot of other victims, too, that they thought they were making a safe investment, that their money would be there for them, and they feel duped. She expresses sadness for being so stupid,

even though she worked and saved for over 50 years for her retirement. And she was proud of the accomplishment of saving $400,000 for her future, and now all she can do is ask herself, oh, God, what have I done? How could something like this happen?

Another victim told us that she was born in a DP camp in Germany, where her parents met and married after the loss of all they had during the Holocaust. She grew up watching what it was like to lose all that you worked for and saved for, and now it seems she's experiencing a loss again of what she and her family have worked for and saved for, and that there are no words to justify Mr. Lindberg's behavior.

Mr. Rowe [phonetic] emailed us to tell us desperately that he had prostate cancer metastasize to the bone, and he was begging to have access to his money for an experimental treatment on a newly FDA-approved treatment for his tumors, but he would have to go overseas to obtain some of his treatment and that this is a life-or-death matter. We reached out to Mr. Rowe and since have been unable to find him or any next of kin to speak on his behalf.

Another veteran, Mr. Sharf [phonetic], wanted us to know that money he put away 10 years ago for college for his kids is now no longer available. He paid out-of-pocket for his daughter's freshman year, but now she has to take on student debt and discontinue her college for a brief while to save up.

He wants the Court to know that he thinks the defendant clearly has no respect for anyone and that he cannot be trusted in society or around the public or with other people's money.

There are other messages, Your Honor, of people postponing retirement, going back to work in their 70s in order to make ends meet because they cannot access their retirement savings in this case. There are a number of stories, as the Court has seen, very similar, people losing their life savings.

These are working people. This is not the kind of scheme where you see -- you know, some Ponzi defendants have celebrity clients investing millions and millions and millions of dollars. Annuities are supposed to be safe.

Every single people -- every single one of these people were told that their money was guarantied. And Mr. Lindberg knew that at the time that he was raiding the coffers of these companies, that that money was there for a reason, those companies needed to have liquid assets for a reason, under the law. And his lies and schemes have affected 200,000 people, 20,000 of whom, at least, will never see justice in this life.

At this time we have some speakers that want to address the Court. I believe the first is from ULICO out of Puerto Rico.

THE COURT: And if you would -- so I can get it down, if you'd state your full name, please.

AUDIENCE MEMBER: Yes. My name Luis Llach, Your

Honor, may it please the Court.

(Reporter seeks clarification.)

AUDIENCE MEMBER: Yes. It's Llach, L-l-a-c-h.

Your Honor, good morning. I appear today on behalf of my client, Universal Life Insurance Company, or ULICO, and its thousands of Puerto Rican policyholders. ULICO is a life insurance company based in Puerto Rico and one of the victim insurance companies referenced in the indictment in the financial fraud case.

I am not here today to discuss the underlying fraud or the years of litigation involving PBLA and Mr. Lindberg. I am here to discuss specifically Mr. Lindberg's conduct following his plea agreement with the Government and his guilty plea before this Court.

Despite agreeing to cooperate and provide full restitution to the victims, Mr. Lindberg has continued to use frivolous and repetitive litigation to delay, obstruct, and unnecessarily increase the cost of recovery and restitution efforts, refusing to withdraw those frivolous lawsuits, despite the Special Master's request to withdraw them.

Beginning in November of 2024, after entering into his plea agreement, and just one day before pleading guilty in this court, Mr. Lindberg filed multiple lawsuits against ULICO in different federal jurisdictions, including the Middle District of Florida and the District of Puerto Rico, seeking to compel

arbitration and stay final judicial proceedings. Those efforts have been consistently rejected by the courts.

As recognized by the Special Master and other federal courts, these lawsuits constitute collateral attacks on final rulings and, more importantly, attempts to interfere with the ongoing restitution process in this case. The Special Master even requested that Mr. Lindberg voluntarily dismiss these lawsuits against ULICO, a victim entitled to restitution in this case. Mr. Lindberg refused.

As a direct result of his post-guilty-plea conduct, ULICO has incurred more than $2.5 billion in legal fees simply defending itself against frivolous and unnecessary litigation commenced after he pled guilty. These are resources that could have otherwise gone towards policyholders and recovery efforts, but instead have been diverted to responding to deliberate obstruction.

Even more troubling, while the Special Master and the Government continued diligently working toward full restitution for the victims, Mr. Lindberg has gone so far as to argue, despite knowing it to be false, that he has already fully satisfied his obligations to ULICO. That conduct does not reflect remorse, acceptance of responsibility, or genuine cooperation. It reflects a continuing effort to delay and complicate the restitution process.

Lastly, I would like to recognize and thank the

Government, and particularly the Special Master and his team, for the serious, professional, and tireless work they continue to perform on behalf of the victims in this case.

Your Honor, we respectfully request that the Court adopt the Special Master's recommendations regarding restitution at the appropriate time.

THE COURT: Thank you.

All right. And are you included in the Special Master's restitution to get -- how much restitution are you due to get?

AUDIENCE MEMBER: Per the Special Master's recommendation?

THE COURT: Yes, yes.

AUDIENCE MEMBER: $416 million dollars for purposes of restitution, Your Honor.

THE COURT: Okay. All right. Thank you.

AUDIENCE MEMBER: Thank you.

MS. FREEMAN: And, Your Honor, I believe we have a representative from the North Carolina Insurance Companies.

THE COURT: Okay.

AUDIENCE MEMBER: Good morning, Your Honor. My name is Wes Camden, and I'm here on behalf of a group of North Carolina-based insurance companies that Mr. Lindberg owned and operated from 2014 until 2019, as the Court is well aware. My clients have submitted two victim impact statements already and set out our arguments there in full, so I'll try to be brief

this morning.

When he was in control of my clients, Mr. Lindberg treated their assets like a piggy bank, one that he could go to and take money from at any time. He used the money taken from my clients to buy other businesses and to fund his lavish lifestyle.

So among the incontestable facts is that, at one point in time, Mr. Lindberg took tens of millions of dollars, shuffled that money over to another business that he owned in Malta, and then he immediately took $40 million of that money, and he used it to make a downpayment on a yacht.

The money funding these purchases came from my clients' policyholders, which, as you've heard, largely purchased annuities from these insurance companies, believing they would be a safe investment for their retirement funds. I'm certain that you've reviewed the letters that have been submitted to the Court by these policyholders, each of which provides a unique window into the specific violence that Mr. Lindberg rendered in their lives. And for what? One man's greed.

The reality is the North Carolina insurance companies faced significant financial hardships the entire time they were under his control. The Department of Insurance had grave concerns that they would not be able to meet their obligations to policyholders when they came due. When confronted with regulatory oversight, Mr. Lindberg resisted. When that

resistance didn't work, he tried to bribe the insurance commissioner, all in service of keeping the money flowing.

Even after the Department of Insurance wrested control of my clients from Mr. Lindberg, he aggressively resisted efforts to provide relief to policyholders. Had Mr. Lindberg simply acknowledged the also incontestable fact that my clients were insolvent, then the state guaranty associations could have stepped in years earlier and started the process of repaying policyholders on their annuities. But he didn't. And in the meantime, those policyholders suffered, and many of them died.

Sadly, we now know that the department's concerns were well-founded. As our filings have shown, the North Carolina insurance companies presently owe -- again, an incontestable fact -- over a billion dollars to the various state guaranty associations. That doesn't even credit any of our other creditors, including people who were the agents who sold these policies.

The North Carolina insurance companies hope that they will receive enough money through the restitution process to at least partially repay those guaranty associations, but, if they can't, then the economic consequences of Mr. Lindberg's crimes will ultimately be borne by policyholders and state taxpayers in the 47 states where the guaranty associations have had to step in. Put differently, the harm and scope of Mr. Lindberg's crimes will continue to be felt by innocent people for years to

come.

In the face of all this, Mr. Lindberg stands proud and defiant. He provided this Court a very clear view of how he sees his conduct through pro se filings in his own hand in various state courts. To hear him tell it, Mr. Lindberg is the true victim here. His understanding of the role that he played in his own crimes is untethered from the evidence and, candidly, is untethered from reality.

There is no doubt that his words are salt in the wounds of the victims, and his rambling should also give this Court great pause in terms of thinking about what other harms Mr. Lindberg might unleash on the community given the opportunity.

Having said all this, the North Carolina insurance companies respectfully request this Court fashion a sentence that captures the truly breathtaking scope of harm that Mr. Lindberg has done so many and, in so doing, honors his victims, including those who have already passed. Thank you, Your Honor.

THE COURT: Yes, sir. Thank you.

MR. RYAN: Thank you, Your Honor. I'm not going to rehash what's in our sentencing memo or what you just heard about the victims and from the victims. I do want to spend some time addressing the 3553(a) factors, in particular in responding to some of defendant's arguments for a variance.

I guess I'll start by saying the obvious, which is, when

you steal or misappropriate or lie and cheat and then try to bribe your way into $2 billion-plus of insurance policyholder reserves, 10 percent of that is a big number, $200 million. Ninety percent of that is a big number, too, which is why, as the Government recognizes and Special Master recognizes and counsel recognizes, Mr. Lindberg was in a unique position to pay back some, but not all, of the money he took from policyholders.

And so, yes, big numbers. Big numbers paid back, big numbers still owed. And I don't want to speak for the Special Master, but I think the Special Master would tell you, at the end of the day, big numbers still missing.

Even if everything gets sold, even if everything comes back, there's still -- putting aside what you've heard about the people who couldn't access their money, one of the most amazing things about this that I don't want to get lost is that these victim impact statements you heard, by and large, are from people who ultimately got their money back. It's from people who, by their very definition, were trying to avoid risk. That's why you buy insurance.

Many of them, as you heard, bought annuities. Some of them bought things like bearer bond insurance. They weren't chasing a buck. All they wanted was safety. And the defendant's actions destroyed that safety and exposed them to risks they could have never fathomed, to lead a lifestyle they

could have never fathomed.

THE COURT: And how many of those folks did you talk to today that ultimately got their money or their survivors got their money?

MR. RYAN: So the North Carolina policyholders -- and I'm sure I'll be corrected if I'm wrong -- I think by and large at this point in time have been repaid, and that debt now sits with the state guaranty associations.

THE COURT: Right. So most of the debt is going to go the -- is going to go to the state of North Carolina or the guaranty associations who guarantied this?

MR. RYAN: With respect to the North Carolina victims. That's the other point I wanted to make, which is you did not hear -- although I do want to recognize them -- representatives from the Bermudian insurance companies and their policyholders.

And as we put forth in our memo, at the end of the day, it's likely -- I mean, there are thousands of policyholders in Bermuda who don't have access to their money and haven't for years, and it's likely, at the end of the day, there's going to be 2,000-plus of them who aren't going to get their money back.

So -- and then --

THE COURT: And what -- didn't Bermuda, once they heard of the reputation of Mr. Lindberg, they sort of shut things down over there and wouldn't -- wouldn't allow things to go until they had some proof of things and -- was there some

sort of action by the Bermudian insurance companies?

MR. RYAN: Correct. The Bermudian insurance companies, much like the North Carolina insurance companies, are in liquidation. The representative here represents the liquidators of those Bermuda companies. Unfortunately for those policyholders, unlike in the United States, there's no state guaranty associations in Bermuda. So they're -- they got what they got and they'll get whatever they get, but there's no lifeline for them.

And then, of course, there's ULICO, who is -- has its own policyholders, who's also owed money, although ULICO's policyholders, thanks to the work of ULICO and its parent company, have not been impacted in the same way that other policyholders have.

So looking at counsel's reasons for a variance in this case, I'm going to start with the fact that, first and foremost, the Government agrees a variance is appropriate here. That's why we offered it in the plea agreement, a 15-year cap on the financial fraud case.

I mean, I don't think we went through it, but Mr. Lindberg's guidelines are life in prison. So the 15-year cap that we offered as part of the plea agreement is a substantial variance. And we're fulfilling our --

THE COURT: What do you say the guidelines in this case should be for all this money? Did you do the calculations

for it to know what it would be without an agreement?

MR. RYAN: Well, it's life. The guidelines call for life for this much money. And, I mean, according to the sentencing data, which, you know, is -- honestly, first and foremost, we all agree that every defendant gets his own day in court, every defendant's circumstances are unique. But when you start to get to life on a financial fraud case, you're in rarefied air.

THE COURT: Well, why it -- yeah, it is. It is, because it's always based on the amount of money. It doesn't matter about a lot of the other things.

With regard to that, the -- you all -- you will agree that this is an extraordinary amount of effort to get this restitution back. In other words, I sit here all the time, and I've got people that stole millions of dollars, and it comes in, and they're dead broke. I mean, I don't know where they blew it, but they blew it, millions of dollars. And I order restitution of a million dollars, and you -- and the people will get back zero from that guy when he comes back. And in this one, there's been a significant amount of restitution.

MR. RYAN: There has, but I -- and I'll go back to that because there's a significant amount taken.

And, I mean, to his credit, he didn't blow it all. He bought companies. He grew companies. They have value. But it would be not that much different if he just was an art

collector and bought lots and lots of Picassos, and then we seized them and sold them. Like they have value, there's no doubt about it, but not all the value.

So with respect to the reasons, number one, we agree a variance is applicable here. And that's why we have offered the 15-year cap. Number two, we agree that the loss overstates, which is why we offered the 15-year cap. Number two, we -- or, number three, I suppose -- we agree that he cooperated with the Special Master.

As Mr. Wyatt said, we've spent a lot of time together over the last two years, same with Mr. McCarthy and Mr. Meyer. We spoke, I'm sure, more than we ever cared to speak, on a weekly basis. The Special Master and his counsel and the financial advisors have worked countless hours, which also just goes to show the extraordinary scope of the fraud, when it takes that many people that much work and that much time to try to recover and get things in order. It's just all part and parcel of the massive scope of the fraud here.

But -- without a doubt, effort has been done, but also what I say is that was contemplated by the plea agreement. And the -- part of the plea agreement was the agreement to the Special Master. Part of the agreement to the Special Master was agreement to cooperate with the Special Master so that we could get the work done.

And part of all of that, obviously, the Government's goal

and the defendant's goal was to get as much money back as possible so that he could sit here in the best light possible. And so I think we all worked hard towards that goal, defendant included.

THE COURT: What about the -- what about concurrent or consecutive?

MR. RYAN: The Government agrees that concurrent should apply.

THE COURT: Okay.

MR. RYAN: And we're starting from the point obviously -- and counsel raised this in the first sentencing. The financial fraud was part of -- part of the story. It -- you can't separate --

THE COURT: Yeah. The Court has always considered that the bribery was part of the mechanism to get the money. I mean, that was -- that was the big goal. So it's all part of the same thing. If they'd been sentenced together, the probation report would have been done together, and the sentences would have been pronounced in a way that resulted in one sentence with two different convictions on there.

MR. RYAN: But as Ms. Freeman pointed out, at the time much was unknown about the scope of the fraud, about where it was gonna end up, about how much restitution would be available, about what the final numbers would be, and about how -- for people who even got their money back, how badly they

were impacted.

And so I wouldn't say that you're writing on the exact same slate when you sentenced him the first time. There's a lot more information.

THE COURT: Oh, yeah. I agree with that.

MR. RYAN: So anyway, with respect -- I think I wrote down five reasons for a variance here. With the first three, I think the Government agrees. And I -- but again, I think that's taken into account with the Government's recommendation and the stat maxes on the financial fraud plea.

With respect to the co-defendant's disparity, I'll spend a little bit of time on that. Certainly something the Court should take into account, but there's no doubt there was one person who -- first of all, there's only one person before the Court who was involved on both sides of this. There's only one person who was involved in the bribery and knew anything about the financial fraud.

The financial fraud co-defendants don't know anything about the bribery, and the bribery co-defendants don't really know anything about the financial fraud. So there's only one person who was involved in both. There's also only one person who benefited to the tune of more than a hundred million dollars.

As you already heard, his co-defendant in this case was a consultant. His co-defendants in the other case were employees

of his conglomerate. They were paid well, but they weren't -- they didn't benefit anything like this defendant.

They were also, by and large, one, very young. Their first job out of college in the financial fraud was for -- was for this defendant. They learned everything they learned about business from this defendant, which I'm sure they regret.

So the Government respectfully submits that no further variance is warranted based upon the disparity with the co-defendants.

With respect to Mr. Lindberg's personal characteristics, he is obviously a very smart man, and he's obviously a very driven businessman. But as Your Honor is well aware, the same traits that make people good can make them very good at fraud when that's what they get tangled up in.

And as you heard from some of the victims and in our memo -- I'll take nothing away from defendant's acceptance of responsibility in this financial fraud case or his work he did with the Special Master, but his actions outside of that context do not show a man who is remorseful or respects the law or, frankly, who isn't a danger to continue this kind of behavior when he gets out.

Finally, I just want to address -- and I know Mr. Washington might address some of this, as well, but general deterrence, promoting respect for the law. Respectfully, the Government submits that a defendant can't personally benefit in

a fraud and bribery case to the tune of more than a hundred million dollars and not get a substantial prison sentence. He can't refuse to show remorse, real remorse, attack the judicial system, judges, his victims, in the press and in civil litigation, and not get a substantial prison sentence.

This type of unapologetic conduct, it undermines the public's trust in our judicial systems, our government institutions, and it feeds the narrative that those with enough money can play outside the rules. And the public has a right to demand equal treatment from their Government, regardless of their station in life.

And so for those reasons, we think our requested sentence is fair. And I think Mr. Washington wants to spend a few minutes talking about that, if the Court would allow it.

THE COURT: Always glad to hear from Mr. Washington.

MR. WASHINGTON: Thank you, Your Honor. I'll be brief, and my colleagues have covered quite a bit.

First of all, with respect to the public corruption case, you know, we don't have the victims' little statements that we can read or the polished attorneys who can come in here and speak on behalf, but there are victims in that public corruption case because, in the public corruption case, it was an attempt to subvert our Government action. It was a bribe of the person who was in charge of regulating insurance companies in our state.

And, Your Honor, it feeds into this idea that people -- that, if you've got enough money, you can get what you want. And that's exactly what happened here.

THE COURT: And you're saying that -- you see that in the news every day.

MR. WASHINGTON: Yeah.

THE COURT: I mean, the people that -- the people get what -- the people with all the money are getting what they want. You know, the old song that the fat man's busy dancing while the poor man pays the band, and that's true, and we see it every day.

And judges are attacked not only from defendants, but public figures attack the judges. We got to be -- we have to -- we have to have a little iron and let it roll off of us a little bit.

MR. WASHINGTON: Yes, Your Honor. So, I mean, the public as a whole was a victim of this type of bribery, and we certainly don't want people thinking that you can go in and give a $2 million bribe and get a light sentence.

I would note that Mr. Lindberg today, while he expressed some remorse for some policyholders who didn't sign up for that, as he said, he didn't say a word about that public corruption case because, to this day, he has shown no remorse for what transpired there with his bribery, his attempted bribery of a statewide elected official.

THE COURT: Well, he was given a sentence in that case, and then the Court of Appeals sent that back for additional instruction, at the time, of the jury. The jury found him guilty of it again, but it's the same -- it's the same corruption. I mean, you don't -- just -- just because somebody appeals and gets reversed, you don't give him a heavier sentence when they come back.

MR. WASHINGTON: True, Your Honor, and we understand, and we've taken that into account in the sentence that we recommended.

We believe that this pre -- or the conduct that followed -- we cite a lot of it in our brief, the lawsuits, the public statements. The Court would be justified, we believe, in going up to a higher sentence. But we understand you've --

THE COURT: Yeah. And I think you could, but then I think that the loss of trust -- in other words, someone would always think that I may have done it because I didn't like the fact we had a second trial. And so when you balance that out, it's more important that the integrity of the Court stand up.

So I'm going to give him the same sentence on that. I just want to tell you. I've thought about it, and I'm going to do it. But you're right, there is some additional information that came up that the Court could use and has been approved.

I remember back, Judge Potter one time had one where the guy appealed it. And when the trial came up, there was a

kidnapping that hadn't come up the first time. And he wishes he hadn't appealed that case.

MR. WASHINGTON: So, Judge -- so we agree with you, but we understand the position that you're taking. We think there is plenty out there that would justify a --

THE COURT: Yes, sir. And I understand that argument. Yes, sir.

MR. WASHINGTON: So, Your Honor, I'll get to it. We're recommending 87 months on Counts 1 and 2 in the public corruption case, which is what you gave him before, to run concurrent with a term of imprisonment of 174 months on Counts 1 and 13.

Your Honor, that would actually still be within the guideline range for the bribery alone, which is 151 to 188. Of course, the guidelines for the fraud case are like 43 -- one is life. But we've all agreed that a lower sentence is appropriate. So 174 months for fraud of this magnitude, Your Honor, we believe is, in fact, generous and very, very reasonable in this case.

As counsel -- as has already been pointed out, Your Honor, the Government agreed to this 15-year stat max for the fraud case with the understanding that there was work to do and that Mr. Lindberg would cooperate with the Special Master and make sure that -- to some extent, that we --

THE COURT: And while I'm not aware of his efforts for

sure, each of them being done with the Special Master, the result of that is an extraordinary amount of money that's been recovered --

MR. WASHINGTON: Yes.

THE COURT: -- I mean, compared to a lot of the frauds that are -- that I see here.

MR. WASHINGTON: Yes. Clearly. And the Court certainly should take that into account, of course. As we've said in our briefings, if you steal a lot, you got a lot to give back.

THE COURT: You do, you do. But unfortunately most people can't do that or they -- if they don't do that --

MR. WASHINGTON: Yes, Your Honor.

THE COURT: It's amazing the amount of money people can go through.

MR. WASHINGTON: So we think 174 months is reasonable on the fraud case to run concurrent.

THE COURT: In other words, you're going to go six months under the --

MR. WASHINGTON: Yes. We've given him -- we don't -- we want to give him some credit for his efforts. We don't want to say we just came in here and just kind of went for the --

THE COURT: All right.

MR. WASHINGTON: Yes, Judge.

THE COURT: Yeah.

MR. WASHINGTON: Your Honor, the Government contends that the Court should not attempt to give some kind of order -- a variance based on the amount of time he spent in pretrial confinement. We have conferred with BOP, and they have assured us that they will give him credit.

THE COURT: So on the record, you're assuring that they're gonna -- because it would be the Court's -- when the Court gives these sentences, the higher sentence, which there will be a higher sentence for this second crime, is going to be -- that's the time -- and he's supposed to get credit for the time he served on both of these sentences.

These things would have been sentenced together had they been indicted at the same time --

MR. WASHINGTON: Right.

THE COURT: -- and I know the other one -- the Government was working on it at least at the time of the second trial substantially. And it -- the alarm bells were going off all over the place with regards to this when the public corruption case came about.

So it would be the Court's intention that, whatever years the Court pronounces today in the second case involving these folks that have lost money, that that's gonna be -- that's the sentence the Court intends, and he's to receive credit for the time served so far in these cases.

MR. WASHINGTON: Yes, Your Honor. Thank you.

THE COURT: So if I pronounce it in a way that the Bureau of Prisons doesn't understand, I'm sure it will get sent back and we can redo it, make sure they understand if they don't.

MR. WASHINGTON: Thank you, Your Honor. I think you've expressed it clearly. He'd also have access to a motion pursuant to 28 U.S.C. 2241, should that become necessary, but the Court has made clear its intentions.

And our speaking with BOP has said that they will look at it as one sentence that he has, and then they will apply the credits that are appropriate to that one -- they view it as one sentence when he gets there.

THE COURT: And I've always viewed this once, with the two cases together, because they were really part of the same thing. This was an attempt for him to be able to use the money for what he wants. He would say investments, and essentially it puts everybody at risk.

The fact that all of it wasn't lost -- and it never probably would have been lost because he kept it from being invested in these companies -- only means that the loss was overstated. There still was loss, but the loss is overstated because the real loss there was risk. It all could have been lost, but it wasn't all lost.

MR. WASHINGTON: Fortunately.

THE COURT: Fortunately there's a lot of money that

can be paid back. Fortunately for the North Carolina folks, there's money to cover that and for some of the other folks. There's money to back up these insurance companies. That's why you got -- that's why you have an insurance commissioner, to watch this stuff. And that's why you got to keep him honest, and he was in this case. He's the one that said uh-uh, this is wrong.

MR. WASHINGTON: He was, thank goodness.

THE COURT: Yeah.

MR. WASHINGTON: Your Honor, along those lines, we'd ask for full restitution for the statutory victims and at least the amounts identified by the Special Master's supplemental report and recommendation regarding restitution in the financial fraud case, which is Document 146.

THE COURT: And what's that figure on Document 146?

MR. WASHINGTON: Document 146. The proposed order is Document 146-1.

THE COURT: And what's that amount again so we've got that on the record here in the courtroom?

MR. WASHINGTON: Okay. The amount is -- it's -- $1,655,000,000? I'm not used to reading numbers that big.

THE COURT: Okay.

MR. WASHINGTON: Your Honor, we are asking for a forfeiture money judgment in the amount of 230 million, representing the fraud conspiracy proceeds and property

involved in the money laundering conspiracy in the financial fraud case. We're asking for the forfeiture of the $1,454,758.45 in seized funds from the public corruption case subject to your forfeiture order, which is Document 477 in the corruption case.

And we're asking Your Honor for a term of supervised release with special requirements that Mr. Lindberg continue to cooperate with the effort of the Special Master and follow any instructions given to him by the Special Master regarding restitution matters.

Your Honor, this is a serious matter, both of these cases. We spent most of the time talking about the fraud case, and that's appropriate, but as the Court remembers, the corruption case was very serious in this case, as well. And we believe that the Government's recommended sentence is entirely appropriate in this case.

THE COURT: Yeah. There's just -- there's too much money out there and for all the -- and all -- in all that we have in this country right now in politics and everything. There's just too much money available. And everybody wants to be rich, and they'll do just about anything. So --

MR. WASHINGTON: Your Honor, I do also have a consent order and judgment of forfeiture for the fraud case signed by the parties that I'd like to hand up to the Court.

THE COURT: Okay. Thank you.

MR. WASHINGTON: Thank you, Your Honor.

THE COURT: Okay. This is the judgment of the 230 million, correct?

MR. RYAN: Correct, Your Honor.

THE COURT: Okay. The document is at --

THE CLERK: 160.

THE COURT: -- 160. I just signed the document in ECF, $230 million, the agreed-upon forfeiture.

MR. WYATT: Your Honor, may I just offer two clarifications?

THE COURT: Yes, sir, and any further arguments you want to make. This is too important a case to not let everybody say what they want to say.

MR. WYATT: With regard to the payment of North Carolina policyholders, they have been paid in full. That is not just because the state guaranty associations stepped in. Obviously, when it stepped in, it provided the most immediate relief that could occur, but with regard to assets available to reimburse the state guaranty association, we have the moneys that Mr. Lindberg paid, the almost $1 billion to the Department of Insurance, the additional 892 million that the Department of Insurance has through nonaffiliated investments. And the Clanwilliam sale, the final $157 million paid to North Carolina policyholders came through that sale. That is not money that the guaranty association is obligated to pay again. So North

Carolina policyholders have been paid in full.

With regard to ULICO, there is an asset that has been pledged, that the timing is just when it's converted. And it has been valued at somewhere between 200 and $300 million that, obviously, continuing efforts will be made to make every policyholder paid in full.

Finally, with regard to the Bureau of Prisons, we just wanted to be crystal clear that the credit they are to give Mr. Lindberg is 633 days that he served at FPC Montgomery prior to the second political corruption case, 561 days that he has served in Gaston County, Grayson County, Kentucky, Pike County, Kentucky, and now obviously Catawba County since the entry of his financial fraud plea, and 285 days for FSA credits. Thank you, Your Honor.

THE COURT: What says the Government about that calculation? Any of those served days -- days served that the Government believes is not related to these two offenses?

MR. RYAN: No, Your Honor. The only hesitation I have -- I can't confirm FSA -- BOP has told the Government that they will give him all of his FSA credits he deserves. I can't speak to the number that he deserves, but they said he will get all of his FSA credits. But the other two days, no objection to that, Your Honor.

THE COURT: Okay. Mr. Wyatt.

MR. WYATT: That's all, Your Honor. And this Court

and the Special Master, with the Government's cooperation and with Mr. Lindberg's cooperation, there has been substantial restitution, in fact, paid and will be paid. And just as defendants should get credit for cooperating as evidentiary witnesses, Mr. Lindberg should be credited substantially for his efforts in paying restitution here. He generated the assets, he's made the payments, and the Government's proposal gives him six months for that, which is woefully --

THE COURT: But it really gives him -- they could have pushed for a longer sentence than the 15-year cap. You're right on the 15-year cap. They're doing that. But in terms of the statutory maximum and what the guidelines are, he could have received a lot more of a sentence than 180 months.

MR. WYATT: He could have, Your Honor, but that includes the assumption that the loss figure is an accurate loss figure. And this Court and numerous courts have said just the empirical analysis of the guidelines is not accurate. Obviously this Court has to weigh big competing factors in fashioning the sentence that it believes is appropriate.

THE COURT: Okay. Well, there's a lot to pack in here. There's been an extraordinary amount of cooperation and getting a lot of money back, but this is a serious crime.

I'm going to take about a 15-minute recess at this time. I'm going to unpack and go through this stuff again, and we'll be back.

(A recess was taken.)

THE COURT: Okay. I think we'll sentence Mr. Gray first.

All right. Mr. Gray, your case was once again referred to the United States Probation Office for a presentence investigation and report. The Court's got the report. You've gone over the report with your attorneys?

DEFENDANT GRAY: Yes, Your Honor.

THE COURT: You believe you understand the contents of that report?

DEFENDANT GRAY: I do.

THE COURT: Okay. And, counsel, do you believe that your client fully understands the contents of that report?

MR. CASH: Yes, Your Honor.

THE COURT: Okay. Are there any objections to the presentence report?

MR. CASH: Not at this time, Your Honor.

THE COURT: All right. In the instant case, the advisory guidelines provide for an offense level of 30, a category of 1. The guideline sentencing range was 97 to 121 months on Count 1 and 97 to 121 counts -- months on Count 2 to be served concurrently.

Previously, as has been noted, the Court gave a much lower sentence than that to Mr. Gray on the trial of the matter, and we are now before sentencing in this case, him having been

convicted a second time of the same offense that we had before.

I think the Court has noted that, in the past and today, that the Court intends to sentence the defendant to the same sentence, which would result in a time-served. I will now pronounce the sentence, but since we've -- he's already done the supervised release, it's going to be an abbreviated version of the sentence the Court has previously done.

Pursuant to the Sentencing Reform Act of 1984 and US v. Booker, it is the judgment of the Court, having considered the factors noted in 18 United States Code Section 3553(a), that the defendant, John D. Gray, is hereby committed to the custody of the United States Bureau of Prisons for a term of time served on each count to be served concurrently.

Since the defendant has done everything, there is -- is there any forfeiture or fines that are -- that were in the last one that have not been paid yet?

MR. BAIN-CREED: Your Honor, the Government filed a motion for forfeiture of the public corruption proceeds. We filed it as to Mr. Gray and Mr. Lindberg. You issued an order, and it was only captioned as to Mr. Lindberg. I don't believe Mr. Gray is claiming any interest in the funds.

MR. CASH: We are not, Your Honor.

MR. BAIN-CREED: So I don't think we need to do anything in this case, Your Honor.

THE COURT: All right. Thank you very much.

So since he served all of that and all of the supervised release that he has served, there won't be any additional time to serve as a result of that.

Mr. Gray, you still have a right to appeal this -- the conviction and sentence in this case to the Fourth Circuit Court of Appeals. Any notice of appeal must be filed within 14 calendar days of when I enter the written judgment in this case. If you're unable to pay for the cost of an appeal, you can appeal at Government expense.

I suggest you speak with your excellent counsels about these rights and whether or not in this circumstance you wish to exercise them, but do you understand your right to appeal as I just explained it to you?

DEFENDANT GRAY: Yes, Your Honor.

THE COURT: All right. Thank you.

Anything further from counsel?

MR. CASH: No, sir.

THE COURT: All right. This matter is concluded.

All right. We'll move on now to Mr. Lindberg.

It looks like a lot of the heavy -- you know, I've gone through everything in here. And while the Government talks about the guideline being life -- which it's actually about 540 months -- when you come down to it, you're really talking about what comes off of -- what the Government has come

off and given him any kind of plea agreement, what comes off 240 months, 20 years, the statutory max. In other words, you're limited -- you've not limited for life, you've limited it down from 20 years.

MR. RYAN: Fifteen years is the max.

THE COURT: Right. You limited it to 15 years, but the statutory maximum was 240 months, which is 20 years.

MR. RYAN: I'm not sure I follow.

THE COURT: What I'm saying is, when you come up with this particular sentence that you're doing, a variance that you're doing, you gave him 15 years, you're giving him credit. But if you hadn't done that, he would have gotten 240 months. If you hadn't limited it to 15 years based on these --

MR. RYAN: Oh, you mean with the counts of conviction?

THE COURT: Correct, on the counts of conviction.

MR. RYAN: Other than if Your Honor chose to run all those counts of conviction concurrently. You could have stacked them all.

THE COURT: Yeah, could have gone consecutive, but I don't know any courts that would do that. Used to be, you had to do a lot of that. I mean, we had some people that got a thousand years back in the old days, when Judge Potter was here. But later on the courts changed all that, and people had to come back to be resentenced so --

MR. RYAN: Your Honor, not to interrupt, but I just

did want to clarify for the record, having talked to probation during the break and counsel, because this is a consolidated PSR, we talked about the guideline range if it was only the PC case, and we talked about the guideline if it was only the financial fraud case. But since it's one PSR, the guideline for everything is the 540 months.

So did I get that right?

PROBATION AGENT: Yes.

THE COURT: Right. That's what's in there. Right. That would be the guideline range. And frequently the guideline range does exceed the statutory maximum in cases, and that's particularly true in financial cases because the folks that did the guidelines -- it's all based on the amount of money that's stolen and the amount of money that's gone.

In this case, there is -- there is an argument that's made by the defense, and I think there is some validity to that, that most of this money that's lost is really there, it's just been moved over to one corporation to another. That's why there's so much -- that's why the Special Master has had such success in finding this money. If this money was spent, you would have no money out there, which is what frequently happens in these cases.

On the other hand, looking at the 3553(a) factors, the Court has to look at general deterrence and specific deterrence. Mr. Lindberg is at a criminal history Category 1,

and the Court gives credit that there's a possibility, in terms of specific deterrence, that he might not offend again. The Court's not sure about that. Hopefully Mr. Lindberg is not going to do -- is going to use -- take that big brain of his and use it for good from now on. There's plenty of ways to make money that's legal. It may not be as fast as moving stuff around and using other people's money to gamble with, essentially. But they get to know what they're doing.

I mean, the -- a lot of these funds that are out there, they're just out there betting on some things and gambling on things, but the people in those know they're being gambled with. They know their money is being used, and they take their chances. And there's specific things in there, you know, to say that there's no promise you're going to make money, you may lose all this money.

But in this case, these folks all thought their money was safe, and it obviously was being used to do these things. And you really didn't have a right to do any of that, and that's the problem that the Court struggles with.

Now, I look at these things. And, Mr. Wyatt, I've read your papers in here. You're thinking that he's only supposed to get 48 months on every count? Is that what you're saying? To run concurrent?

MR. WYATT: Your Honor, we are going to leave the sentence to what the Court believes is most appropriate. We

saw the initial sentence, we've seen the billions of dollars of restitution that has been already paid and will be paid. And we didn't think a recommendation from us of 87 months would value that in these circumstances. But obviously this Court has many factors to weigh. There's a number of substantial variance factors, and we'd respectfully ask the Court to consider those.

THE COURT: I understand. And you believe that, because of all the things that Mr. Lindberg has done, and they are substantial, that the sentence ought to be essentially 48 months on each count. But the amount of money here and the fact that these folks had -- the things they've had to suffer with the loss, I mean, if you could take that much money and have a billion dollars and play the game with it, a lot of people would be doing that and would risk the 48 months.

I mean, the sentence, in terms of general deterrence, has got to be something that other folks out there who want to use other people's money to make their fortune are scared to do in a case like this. There's got to be some deterrence there.

I will agree with you that I think the Government has shorted it a little bit on their recommendation, but their recommendation is closer to what the Court's thinking about than the defense is in this particular case. It's a -- it's a -- there's a serious matter here that's before this Court, and I can't do everything about what I see all day long reported

out there, the things going on out there.

And I'm wondering if the people that are involved understand what's happening because, if this guy here is making one dollar more, somebody is making one dollar less. I mean, there's not just some big pot of money out there that's just exploding money into the air and everybody's got their shot at it. Every time somebody takes a dollar, somebody's going to be losing a dollar. It's a little more complicated than that, but not a lot, not a lot.

I do think that these cases go together, and Mr. Lindberg has to get credit for every single day he has served in time. I believe that he needs to continue to work to try to get as much money of this back as he can, and I hope that he will.

I really believe that, Mr. Lindberg, if you will just, you know, stop futzing around with stuff like these little lawsuits that you've got out here with these -- the folks down there in Puerto Rico and maybe some others out there, and just sit around and use that big brain to figure out what you're gonna do to invest money in an investment when you get out, you're gonna do fine.

You're -- but I've read some of the stuff in there, and it seems like that you are caught up in the fact that -- and you're not alone in this -- that you believe that you're just a lot smarter than everybody else. And you are smarter, probably, than most of us are. But I think that one of the

things that is true out there is that, the smarter people are, the more they overestimate their intelligence vis-a-vis everybody else. And people can figure this thing out.

So I think, if you concentrate yourself on making -- even from prison, you probably can make money. I probably couldn't make any money. I'd probably -- I'd probably have to sell cigarettes in prison, if you could do that anymore, to make money. But I think you could probably figure ways to make money while you're in jail.

Okay. Get over here to the sentence part.

Okay. Let me talk to probation for one second.

(Discussion off the record.)

THE COURT: All right. Mr. Lindberg, if you would, please stand.

Pursuant to the Sentencing Reform Act of 1984 and US v. Booker, it is the judgment of the Court, having considered the factors noted in 18 United States Code Section 3553(a), that the defendant, Greg E. Lindberg, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of -- I think this is in 5:19-cr, 87 months on Count 1 and 87 months on Count 2, to be served concurrently, for a total of 87 months.

And then, in Case No. 3:23-cr-48, it is the judgment of the Court that defendant is to serve a term of 60 months on Count 1 and a term of -- and what's the statute -- what's the

statutory maximum --

(Discussion off the record.)

THE COURT: Okay. Okay. That -- and the term in the second -- in Count 13 is to be -- let's see. On that count, it's to be 84 months to run consecutive to the 60 months, to produce a sentence of 144 months.

The Court is varying from the guideline range due to the extraordinary cooperation of Mr. Lindberg.

These sentences are to run concurrent with the sentences pronounced in the 5:19-cr-22 case, for a total sentence of 144 months, against which Mr. Greg Lindberg is to get full credit for all time that he has served up to this time.

The Court, in doing that, has looked at the 3553(a) factors and determined that, in order to promote respect for the law and provide just punishment for this offense, to protect the public from further crimes of this defendant, and -- very, very importantly -- to deter other folks who may think that this extensive amount of money is worth the effort and possibility of the time you may have to serve -- the Court believes that, even looking at all of the personal situation of Mr. Lindberg and his extraordinary mind and his ability to legally make funds, he chose to use that to enrich himself and to gamble with other people's money. Therefore, although these cases are together and he's previously been sentenced in one of those, this sentence will run with that.

And it's much more serious because, in the first case -- the bribery cause was serious, and the Court gave that the seriousness that it felt it needed and felt like the guidelines overstated that.

And in this case, I don't think the guidelines overstated. I think Mr. Lindberg has earned his way, not only to a 15-year cap -- that's where the heavy lifting was done to start out with, was getting this case down to a 15-year cap. But then he's done a lot more, and I think the Court has taken all that into consideration.

But when looking at all the 3553(a) factors, this sentence of 144 months is sufficient, but not greater than necessary, to meet all of those 3553(a) factors. And, therefore, the Court pronounces that as the time on the sentence.

It's further ordered defendant will be required to support all his dependents from prison earnings while incarcerated as outlined in the presentence report.

The Court calls to the attention of the custodial authorities the defendant has a history of mental-health issues and recommends the defendant be allowed to participate in any available mental-health treatment program while incarcerated.

The Court calls to the attention of the custodial authorities that the defendant has a history of substance abuse and recommends the defendant be allowed to participate in any available substance-abuse treatment while incarcerated and, if

eligible, receive the benefit of 18 United States Code Section 3621(e)(2).

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years. I believe that's the maximum. Isn't it?

PROBATION AGENT: Yes, Your Honor, on each count.

THE COURT: On each count, correct.

This term consists of three years on each of Counts 1 and 2 in Case No. 5:19-cr-22 and Counts 1 and 13 in Case No. 3:23-cr-48, all of these to run concurrently for a total of three years.

Within 72 hours of release from the custody of the Bureau of Prisons, defendant shall report in-person to the probation office in the district to which the defendant is released. While on supervised release, the defendant shall not commit another federal, state, or local crime and shall comply with the mandatory and discretionary conditions of supervised release that have been adopted by the Court in the Western District of North Carolina, and shall comply with the following additional conditions.

The defendant shall participate in a mental-health evaluation and treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise the defendant's participation in the program, including, but not

limited to, provider, location, modality, duration, and intensity. The defendant shall take all mental-health medications as prescribed by a licensed healthcare practitioner.

It's further ordered defendant shall pay to the United States a special assessment of $400.

It's further ordered, having determined the amount of restitution owed to each victim, that the victims [sic] shall make restitution pursuant to 18 United States Code Section 3663(a) as directed to the United States District Court to be paid to the victims.

Now, Mr. Washington, you've given me some information on it. What about the other -- the victim -- we got a lot of individual victims here.

MR. RYAN: Yes, Your Honor. So --

MR. WASHINGTON: Mr. Ryan will address that.

THE COURT: Okay. That's fine. You're the one that gave me all that stuff, so that's why I was looking at you.

MR. RYAN: The restitution in this case, through the Special Master's recommendation, is to run it through the insurance companies themselves, which are then --

THE COURT: We'll see to it that those victims who have not yet been compensated -- and they're going to get a lot of this back. I mean, there is a problem that some of this has been delayed. I mean, the defense would -- says that justice

delayed is justice denied. Well, if you get denied your money and you die before you get it, there may be some folks that are happy about it, but you don't have an opportunity to be one of those. So -- so the fact that they're getting it back late is not a good thing.

MR. RYAN: Your Honor, with respect to restitution, what the Government would respectfully request is that -- the Special Master prepared a preliminary order of restitution --

THE COURT: Okay.

MR. RYAN: -- which we'd ask that you enter at this time, understanding that, within the next 90 days, people are going to want to be heard about aspects of that.

THE COURT: You got it right there?

MR. RYAN: I do, Your Honor. May I hand it up?

THE COURT: You may.

MR. RYAN: So this identifies the amounts and victims that the Special Master is recommending receive restitution.

THE COURT: Okay. Any comment from the defense at this time?

MR. WYATT: No, Your Honor. That's obviously subject to the objections of numerous parties and further hearings with the Court.

THE COURT: Okay. I'm going to order it. And certainly there may be some additional litigation over that, but the Fourth Circuit wants us to order forfeiture, even when

there's -- even when there's a contest about the amounts to later be determined.

Okay.  It looks like the special preliminary order of restitution, which says that the Colorado Bankers Life Insurance gets -- it's $821 million?

MR. RYAN:  Yes, Your Honor.

THE COURT:  You sure they have that much money in Colorado?

Bankers Life Insurance Company, 21 million; Southland National Insurance Company, 131 million; Southland National Reinsurance Corporation, there's not any here ordered; North Star Financial Services, Bermuda Limited, 179 million; Omnia Limited, 43 million; PB Life and Annuity Company Limited, Universal Life Insurance Company, 416 million; PB Investment Holdings Limited, $44 million.  The total, $1,655,000.00.

So I'm gonna -- the Court's going to order that at this time, understanding that there may be some dispute.

Okay.  I've signed that.  That is going to be -- what document number will that be?

THE CLERK:  161.

THE COURT:  Document No. 161 in ECF.  The Court gives notice that this case may involve other defendants who may be held jointly and severally liable for payments of all or part of the restitution ordered and could order such in the future.

It's further ordered the victims' recovery is limited to

the amount of their loss, and defendant's liability for restitution ceases if and when the victims receive full restitution.

Any payment that's not payment in full shall be divided proportionately among the victims named.

Okay. Any argument on fine? With it -- based on this, it looks like there's an awful lot of restitution being paid here. Is the Government asking for a fine in this case?

MR. RYAN: No, Your Honor, the Government is not asking for a fine. Obviously, the primary objective here is getting the restitution, and then we also have the consent order and judgment of forfeiture.

THE COURT: And I'm not sure what the defendant's -- I can't tell that -- having paid this restitution and his continued efforts to do that, what his financial situation will be when all this is over with. He's giving up an extraordinary amount of assets and -- as he should, but the result of that is going to be that he's going to be in a financial situation that the Court cannot make a determination of whether he even is going to be solvent when it's over. He may be. He may be very solvent. He may be more solvent than we are.

MR. RYAN: Just to develop the record, from the Government's point of view, the Government is not aware of him having substantial assets outside of what he owes in restitution.

THE COURT: Okay. All right.

All right. The Court finds that the defendant does not have the ability to pay a fine or interest and, having considered the factors noted in 18 United States Code Section 3572(a), will waive the payment of a fine and interest in this case.

Payment of the $400 monetary penalty is due and payable immediately. However, the Court has considered the financial and other information found in the presentence report and finds the following is feasible. If the defendant is unable to pay the $400 monetary penalty immediately, during the period of imprisonment, payments shall be made through the Federal Bureau of Prisons Inmate Financial Responsibility Program.

Upon release from imprisonment, any remaining balance shall be paid in monthly installments of not less than $1,000 -- excuse me -- monthly installments of not less than $50 a month to commence within 60 days of going on supervision.

Throughout the period of supervision, the probation officer shall monitor the defendant's economic circumstances and shall report to the Court with recommendations as warranted any material changes that affect the defendant's ability to pay these court-ordered penalties.

Is there any legal reason why that should not be the sentence from the Government?

MR. RYAN: The only request, Your Honor, is with

respect to the supervised release conditions. The Government is requesting a special condition that, should the Special Master still be working when the defendant goes on supervised release, that a term of the supervised release is to continue cooperating with the Special Master. Otherwise, no.

THE COURT: Any comment before I make that pronouncement?

MR. WYATT: No, Your Honor. We would ask that the Court recommend that Mr. Lindberg be returned to the Pike County facility. The US Marshal Service has been remarkably helpful in enabling communications, which are essential to our interaction with the Special Master. And so we would ask the Court to recommend that. I don't believe the Government would oppose that.

MR. RYAN: No, Your Honor, the Government does not oppose that.

And I see Mr. Ben Bain-Creed standing up, which means I forgot to mention forfeiture.

MR. BAIN-CREED: Your Honor, we would just ask that -- and I think the Court already issued the consent order for a $230 million money judgement. The Court already issued the restitution order. There's also a public corruption order for the almost $1.5 million that was seized there. We would just ask you to incorporate that into the oral pronouncement of the sentence, as well. You already issued the order at Docket 477,

Your Honor.

THE COURT: I've already put the order in for the --

MR. BAIN-CREED: Correct, Your Honor.

THE COURT: -- for what you're asking for, and it's what document?

MR. BAIN-CREED: 477 in the public corruption case.

(Discussion held off the record.)

THE COURT: Okay. But he's not asking -- not the 230, but for an additional --

MR. BAIN-CREED: Right, Your Honor. You've already issued this order months, if not years, ago.

THE COURT: Do you know where in the ECF it is?

MR. BAIN-CREED: I believe it's at 477.

THE COURT: Okay, 477 in the public corruption case?

MR. BAIN-CREED: Yes, Your Honor. It's the preliminary order for the seized --

THE COURT: Okay. I'll make that order a part of this judgment. Whatever amount that was for is now part of this judgment.

MR. BAIN-CREED: Thank you, Your Honor.

THE COURT: Yes, sir.

MR. WYATT: Your Honor, if you could, with regard to Pike County, recommend to the Bureau of Prisons that they not designate him to another facility while the restitution process is ongoing.

THE COURT: Yeah. I mean, I think that -- that -- that's -- and they should be happy for that, to not have to put him -- yeah. I agree. I agree a hundred percent with that.

Any comment from the Government? It seems like, if he's working well down there, yeah, let's keep him working well down there.

MR. RYAN: Yeah. Just to be clear, so then -- for the -- while restitution -- within the 90-day period while we're finalizing any restitution, the Government has no objection to that.

THE COURT: But you want -- you want him to stay down there and continue to get assets; is that right?

MR. WYATT: Yes, Your Honor. The communication is a hugely important issue.

THE COURT: Yeah, I think it is. I mean, they could designate him to that facility. If that facility is happy about that, he can stay there if he'd rather be there than at some other facility.

MR. WYATT: Yes, Your Honor.

THE COURT: Any comment?

MR. RYAN: I'll leave that to the Court and the marshals.

THE COURT: Yeah. I'll make that recommendation. I can't -- I mean, the Bureau of Prisons makes these decisions. But it would certainly help these folks to get the rest of

their money, which is really and truly -- I mean, I've thought about these cases before, and, you know, you don't want somebody to be able to -- because they can pay the money, they get a lot better sentence. But the reality of it is, if I was a victim in a case and had lost a good bit of money, and the effort that -- the Court got to the point where it said we can either give this guy the most time in the world or you get your money back, and it was an either/or, I'd take the money. I'd want my money back. I mean, I think that's the reality that most people are. I got to be able to live. I got to have the money back. So we got to get this money back to these folks, is what we got to do. We got to get it back.

And he's serving a sentence. There's been a significant sentence in this case. And I think it recognizes the wrong of the case, and it recognizes the fact that the defendant, through the efforts of a lot of people who -- the Special Master, his counsel, and everybody, has been able to get a lot of this money back. And I think that's very critically important because people -- people need their money. And it's more so now that -- with things the way they are, that people are going to have to have their money to live.

Okay. The Court is going to -- is going to recommend that the Bureau of Prisons continue to house the defendant at the -- it's Pike County?

MR. WYATT: Pike County, Kentucky, Your Honor --

THE COURT: Pike County, Kentucky --

MR. WYATT: -- detention facility center.

THE COURT: -- detention center, where he currently is and has been working with the Special Master.

For such time as he continues to work with the Special Master and continues to successfully locate and get back some of this money to these folks, then, yes, I think he should be housed at the Pike County facility. Once again, Bureau of Prisons decides designation, but they do listen to the Court's recommendations in most cases. So hopefully in this case, where there's a huge reason for that, that they will listen to the Court. But we'll see what we can do.

All right. Any legal why that's not the sentence in this case?

MR. WYATT: No, Your Honor.

THE COURT: All right. That is the sentence in the case.

Now, Mr. Lindberg, you can appeal this -- the -- the conviction both -- both in the corruption case, where the jury came back, and in this case, where you've pled but the sentencing has gone this way. You may appeal this to the Fourth Circuit Court of Appeals. Any appeal must be done in writing and must be done within 14 calendar days of when I enter the written judgment in this case. If you wish to appeal and can't afford to appeal, you can appeal at Government

expense.

I suggest you speak with your excellent lawyers -- and you've had great lawyers throughout this case, but speak to them about this matter and whether or not in this case you wish to exercise that right. But do you understand your right to appeal as I've just told to you about?

DEFENDANT LINDBERG: Yes.

THE COURT: Okay. Thank you.

Anything further from the defense?

MR. WYATT: No, Your Honor.

THE COURT: Anything further from the Government on this matter?

MR. RYAN: No, Your Honor.

THE COURT: All right. This matter is concluded.

(Discussion held off the record.)

THE COURT: Yeah. We got to dismiss --

MR. RYAN: Except for that. I'd move to dismiss --

THE COURT: That's -- we -- this is -- it's regular currents. We get lost in what happens. Yeah. Let it be dismissed. And anything further from Mr. Gray that -- I can give him -- I gave him his appellate rights?

MR. CASH: Yes, you did, Your Honor.

THE COURT: I just want to make sure. All right. Very good. This matter is concluded. Thank you very much.

(End of proceedings.)

C E R T I F I C A T E

I, DEBORAH COHEN-ROJAS, Federal Official Court Reporter for the United States District Court for the Western District of North Carolina, a Registered Diplomate Reporter, Certified Realtime Reporter, and Federal Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the foregoing proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing pages constitute a full, true and correct transcript.

Dated this 30th day of May, 2026.

_____

DEBORAH COHEN-ROJAS
RDR, CRR, FCRR
Federal Official Court Reporter