IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 3:23-CR-48-MOC |
| | Judge Max O. Cogburn, Jr. |
| GREG E. LINDBERG, | |
| Defendant. | |

**DEFENDANT GREG E. LINDBERG'S MOTION TO RECOUP THE DISTRIBUTION TO VISTA, AND FOR RELATED RELIEF, BASED ON CELL 1.16'S MATERIALLY OVERSTATED AND DUPLICATIVE RESTITUTION CLAIM**

Defendant Greg E. Lindberg respectfully moves the Court, pursuant to its continuing jurisdiction over restitution, 18 U.S.C. § 3664, and its inherent authority, for an order (i) recouping the $23,520,710 in net Clanwilliam sale proceeds that the Special Master distributed to Vista Life & Casualty Reinsurance Company ("Vista"); (ii) crediting that amount against the aggregate restitution obligation; (iii) denying the request of Vista's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16"), to be treated as a restitution victim, and rejecting its claimed loss of $131,207,799 as materially overstated and duplicative; (iv) to the extent the Court concludes that a materially overstated or duplicative restitution claim was knowingly submitted, grant such further relief to offset or redistribute the $23,520,710 in net Clanwilliam sale proceeds; and (v) granting such further relief as is just. In support of this Motion, Defendant states as follows.

# INTRODUCTION

Cell 1.16 asks to be treated as a victim and to recover $131,207,799 in restitution—and Vista has already received a $23,520,710 distribution—on a premise that Cell 1.16's own principal and declarant, Donald D. Solow, cannot square with his own contemporaneous records. Cell 1.16 says it was an innocent party that relied on the credit ratings. But Mr. Solow's own correspondence shows that he knew the investments were affiliated with the Lindberg enterprise, that he knew the affiliated assets were worth a fraction of the book values on which the claim rests, and that he treated the agency ratings as a regulatory device rather than a measure of value. His sworn Declaration (Doc. No. 113) confirms the point twice over: it admits that the assets were "Lindberg-related loans" managed by a "Lindberg-affiliated entity," Doc. No. 113 ¶¶ 7, 17, and it concedes that the very loans underlying Cell 1.16's claim are the "same loans" already awarded to the North Carolina and Bermuda insurers. *Id.* ¶¶ 18, 25. The $131,207,799 Cell 1.16 now seeks is the book or par value of defaulted affiliated loans that its own principal valued, in real time, at roughly half that amount—and much of it duplicates recoveries already awarded to other victims on the same loans. A party may not obtain or retain a distribution from the restitution estate on a loss figure its own records refute and on loans for which others are already being made whole. The Court should recoup the distribution to Vista, credit it against restitution, and deny or reduce Cell 1.16's claim.

# BACKGROUND

**A.      The Special Master excluded Cell 1.16; Vista nonetheless received a $23.5 million distribution.**

The Special Master found that Cell 1.16 "satisf[ies] almost all of the elements" of a restitution victim but "fall[s] short" on one—it had not "pointed to specific instances where Defendant misrepresented or concealed the nature of the Affiliate Investments." Doc. No. 106-3 at 23. The Court adopted that recommendation and excluded Cell 1.16. Doc. Nos. 161, 162. Separately, in administering the Clanwilliam sale, the Special Master distributed $23,520,710 to Vista. Defendant has contested the Special Master's payments and distributions to Vista, which remain disputed and pending, and reserves the right to seek their disgorgement, an offset or credit, and related relief by this Motion.

The Special Master's own Consent Motion confirms that the $23,520,710 paid to Vista was disbursed without any finding that Vista is a victim. *See Consent Mot. for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Grp. of Cos.*, Doc. No. 66 (July 3, 2025). The Special Master sought only to credit that sum against Defendant's restitution obligation "to the extent Vista is determined to be a victim entitled to restitution." *Id.* ¶ 21. He acknowledged that he "is unsure whether [he] will recommend that the Court treat Vista as a victim in this proceeding," and that Vista's "potentially 'out of order' distribution" was made not because Vista is a victim, but because, "without Vista's cooperation," the Wake County Clanwilliam Order "could not be modified without further litigation." *Id.* ¶ 26 n.8. A payment made

3

to secure a non-victim's cooperation, expressly conditioned on a victim finding that has never been made, is the recoupable windfall this Motion addresses.

**B.    Cell 1.16 claims $131,207,799, measured at book value.**

Through the Solow Declaration, Cell 1.16 represents that "Cell 1.16 relied on those ratings reports in its financial reporting to the VT DFR," Doc. No. 113 ¶ 21, that the affiliated loans were "recorded at book value and reported at those values" in its financial statements, *id.* ¶¶ 23, 27, and that the defaults "left Cell 1.16 with $131,207,799 of impaired assets as of 12/31/25." *Id.* ¶ 30. That $131,207,799 is the book or par value of the defaulted affiliated loans; it is the figure on which Cell 1.16's victim claim, and Vista's distribution, depend.

**C.    Solow's own contemporaneous records show he knew the assets were worth a fraction of book, and that the loans overlapped with other victims.**

Mr. Solow's 2017–2019 correspondence—compiled as Exhibits A (2019) and B (2017–2018) and previously furnished to the Special Master—refutes that premise:

**He knew the affiliated assets were sub-investment grade.** In August 2018, Mr. Solow wrote that "[n]on investment grade is 44%, which is based on Milliman's original appraisal." Ex. B (Solow, Aug. 6, 2018). In October 2018, Cell 1.16's Treasurer wrote that "any haircut puts the trust underwater." Ex. B (Lo, Oct. 12, 2018). In November 2018, Mr. Solow valued the affiliated position at "about 52 cents on the dollar," Ex. B (Solow, Nov. 26, 2018), and repeated that valuation in January 2019. Ex. A, Tab 24 (Solow, Jan. 14, 2019).

4

**He knew and administered the affiliation.** Doc. No. 113 ¶¶ 11, 17 (admitting NEC was "ultimately owned by Defendant Lindberg" and the assets were "Lindberg-related loans"); Ex. A, Tab 42 (Solow, July 29, 2019) (Vermont order to "sever ties to the Eli Global group"); Ex. A, Tab 20 (Solow, Feb. 6, 2019) (administering "the private loans in the USAP/AIC trusts").

**He treated the ratings as a regulatory device, not a valuation.** Ex. A, Tab 32 (Solow, Mar. 31, 2019) (assets "essentially mini-CLOs"; buyers "don't want to rely on the ratings reports"); Ex. A, Tabs 10, 36 (soliciting any rating, "even if … NAIC-5 ('CCC')," to preserve reserve credit).

## ARGUMENT

### I. The Court Has Continuing Authority to Correct Its Restitution Process, Determine the Amount of Loss, and Recoup a Distribution Obtained on a False Premise.

The Court retains jurisdiction over "all matters covered by, or related to," its restitution Order. Doc. No. 161. The restitution statute confirms that authority: the Court determines who is entitled to restitution and in what amount, resolves disputes "by the preponderance of the evidence," and awards each victim no more than "the full amount of [its] losses." 18 U.S.C. § 3664(e), (f)(1)(A). A district court possesses the inherent power to protect the integrity of its own proceedings and to prevent a party from securing or retaining relief by imposing a materially false premise on the court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991). A claimant who obtains a restitution distribution on a false premise should fare no better than a litigant who obtains a judgment that way.

5

That authority is not diminished by the Special Master's role. Under 18 U.S.C. § 3664(d)(6), a special master's determinations are proposed findings that the Court reviews and, on any disputed issue, determines *de novo*; the ultimate responsibility for the restitution determination—including who is a victim, the amount of any loss, and the propriety of any distribution already made—rests with the Court. *See id.* § 3664(e), (f)(1)(A). The Court may therefore correct the distribution to Vista on *de novo* review regardless of the Special Master's position, and no deference is owed to a distribution the record does not support. Correction is especially warranted here, where the Special Master did not fully defend his own determination and had access to many of the same contemporaneous records—Mr. Solow's 2018–2019 correspondence—that refute Cell 1.16's claim. A distribution that cannot be reconciled with records the Special Master possessed should not stand simply because it has already been made. The Defendant reserves all rights concerning the Special Master's administration of the estate.

The Special Master himself acknowledged that the Vista distribution preceded the very analysis that should have grounded it. He conceded that "[i]n an ideal set of circumstances, the Special Master would have completed his restitution victim analyses—and made recommendations to the Court concerning the same—before seeking Court approval of . . . how funds from such a sale would be disbursed," and that the resulting distribution "almost certainly will deviate . . . from the general victim restitution apportionment later approved by the Court." Doc. No. 66 ¶ 24. Because a special master's distribution proposals are subject to this Court's *de novo*

review, 18 U.S.C. § 3664(d)(6), an interim distribution made ahead of any victim determination—and expressly made subject to a later one, *id.* ¶ 21—is squarely within the Court's authority to revisit and correct.

## II. Cell 1.16 Is Not a Victim: Its Own Principal Knew the Affiliation and the Impairment, and Treated the Ratings as a Regulatory Formality.

The single element the Special Master found wanting is a material misrepresentation or omission to Cell 1.16 or its regulator on which Cell 1.16 relied. Doc. No. 106-3 at 23. That element is absent, because the affiliated character of the investments was known to Cell 1.16's own principal—indeed, his Declaration admits it, Doc. No. 113 ¶¶ 11, 17—and because he did not treat the agency ratings as truthful measures of value. His contemporaneous words show a principal who described the assets as "mini-CLOs," who said the parties would not "rely on the ratings reports," and who solicited any rating, "even if … NAIC-5 ('CCC')," to preserve regulatory reserve credit. Ex. A, Tabs 32, 10, 36. A sophisticated principal who knew the affiliation and used the ratings as a regulatory device is not a party to whom the affiliated investments were concealed. The Special Master reached the same conclusion. Doc. No. 206 ¶ 3.

The Fourth Circuit's decision in this case confirms the point. In *In re Zettler*, No. 26-1749 (4th Cir. 2026) (unpublished) (Doc. No. 203), the panel declined to disturb this Court's exclusion of another restitution claimant, Conservatrix, holding that "[p]etitioners fail to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct," and that direct harm under the Crime Victims' Rights Act "requires the harm to be 'closely related to the conduct inherent to the offense,

7

rather than merely tangentially linked.'" Doc. No. 203 at 4–5. Cell 1.16 stands in the same position; and to the extent it invokes the separate opinion in *Zettler* for the proposition that a motion under the Act is the proper vehicle, that opinion concurred in part and dissented in part and is not the holding of the Court.

These admissions are not merely evidentiary; they are dispositive of victim status. The Crime Victims' Rights Act reaches only a person "directly and proximately harmed as a result of the commission" of the offense, 18 U.S.C. § 3771(e)(2)(A), and the harm must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." Doc. No. 203 at 5 (quotations omitted). A restitution claim built on misrepresentation therefore depends on reliance—the claimant must have actually been misled. Cell 1.16 was not. A party whose own principal selected the rating agencies, solicited the ratings, described the affiliated assets as "mini-CLOs," said the parties would not "rely on the ratings reports," and valued the position at roughly half its book value cannot have relied on those ratings as measures of value, and cannot have been proximately harmed by any representation to the contrary. Whatever loss Cell 1.16 suffered flowed from defaults on affiliated loans it understood, administered, and valued in real time—not from the conduct inherent to the offense of conviction. That is a harm at most "tangentially linked" to the offense, and it is why Cell 1.16 is not a victim.

A court in this Circuit dismissed a restitution claim on precisely this ground. In *United States v. Blankenship*, 179 F. Supp. 3d 647 (S.D.W. Va. 2016), the court held that a claimant whose asserted losses flowed from its own later, independent

8

decisions—rather than from the conduct of conviction—was "not a victim," because the harm was not the "direct and proximate result" of the defendant's conduct. *Id.* at 655; see *id.* at 652–53 (restitution reaches "only … the loss caused by the specific conduct that is the basis of the offense of conviction" (quoting *United States v. Freeman*, 741 F.3d 426, 434 (4th Cir. 2014))). Cell 1.16 stands in the same position: whatever loss it suffered flowed from defaults on affiliated investments its own principal solicited, administered, and valued—not from the bribery that is the offense of conviction. The *Blankenship* court further observed, without deciding the point, that "awarding restitution to the successor in interest of an entity which was one of the intended beneficiaries of the conduct resulting in the offense of conviction would be contrary to the statutory purpose of restitution." *Id.* at 656 n.5.

### III. Cell 1.16 Procured the Ratings It Now Claims To Have Innocently Relied Upon; That Material Misrepresentation Independently Warrants Recouping the Distribution.

Cell 1.16's victim theory depends on the premise that it passively and innocently relied on the agency ratings. The contemporaneous record shows the opposite: Cell 1.16's own principal selected and engaged the rating agencies, and solicited the ratings, to obtain the regulatory result he needed. In August 2018, Mr. Solow tracked which agencies the Pennsylvania regulator would accept, noting that "[f]or non PPN securities, PA wants to exclude DBRS and Kroll as rating agencies, leaving only S&P, Moody's, and Fitch," Ex. B (Solow, Aug. 1, 2018), and that "[t]he department will not accept Kroll or DBRS, except for the PPNs," Ex. B (Solow, Aug. 6, 2018). Cell 1.16's side chose among agencies and moved to engage them, asking

whether "HR or E-J would rate the loans currently in the USAP trust," seeking "a contact at HR we could call," and asking the agencies to "assign ratings, even if the ratings are NAIC-5 ('CCC')," because "[t]he key is that there needs to be some rating, even if it's very low." Ex. A, Tab 10 (Solow, Jan. 14, 2020). A party that chooses the rating agencies, engages them, and solicits any rating it can obtain—all while knowing, as shown above, that the assets were worth roughly half their face amount—did not innocently rely on those ratings. It procured them.

Cell 1.16's principal did more than select the agencies; he engineered the investment structure to meet the reinsurance trust's regulatory guidelines. On February 21, 2018, Mr. Solow set out a six-point plan under which the parties would "terminate the repo structure and move all the SPV loans into the reinsurance trust"; "meet the investment guidelines of the trust, especially the single-risk limit … and the non-investment grade limit," and "look for ways to adjust the portfolio" if it fell "outside the guidelines"; "Devin [would] send over all the ratings letters"; "an investment professional [would] write a short paragraph stating that the loans … are NOT asset-backed securities but corporate obligations"; obtain "a short description of E-J's surveillance process"; and secure "a member of the EG group … [would] provide a liquidity and credit guarantee of each loan."[1] Ex. 237-7 (Solow, Feb. 21, 2018). A

---

[1]    In the relevant period, between 2016 and 2019 Vista/Cell 1.16 and other similar insurance providers operated in a very low-interest rate environment following the 2008 financial crisis, and willingly and knowingly took on much higher risk on funds that were in their care. This email shows Vista/Cell 1.16/Don Solow being the architect that directed the structure of the investments to satisfy the regulatory guidelines including the structure of how the ratings were obtained.

principal who dictated how the affiliated loans would be moved, rated, described, and guaranteed to pass regulatory muster was the transaction's architect, not its victim. He did not rely on the ratings; he engineered the structure that produced them.

That distinction is dispositive, and it is more than a failure of proof. Cell 1.16 has come to this Court with a sworn declaration representing that it "relied on th[e] ratings reports," Doc. No. 113 ¶¶ 21, 24, and has obtained—and now seeks further— distributions from the restitution estate on that representation. A claimant that itself procured the ratings it now swears, under penalty of perjury, that it innocently relied upon, and that presents that account to the Court to extract a recovery from a fund reserved for the Defendant's victims, has at a minimum made a material misrepresentation going to the heart of its claim. That misrepresentation independently warrants recouping the distribution to Vista and denying the Motion: the Court's continuing authority over the restitution estate, 18 U.S.C. § 3664, together with its inherent authority, *Chambers,* 501 U.S. at 43–46, permits it to deny and recoup a distribution obtained on a materially false premise. The Defendant does not contend that this conduct rises to the level of "fraud on the court," a doctrine the Fourth Circuit confines to "the most egregious cases" and construes "very narrowly" lest it swallow Rule 60(b)(3). *Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.,* 675 F.2d 1349, 1356–57 (4th Cir. 1982); *Fox v. Elk Run Coal Co.,* 739 F.3d 131, 136–37 (4th Cir. 2014) (fraud on the court "must … touch on the public interest in a way that fraud between individual parties generally does not," and "[f]raud between parties" is not fraud on the court "even if it

11

involves … perjury by a party or witness" (quoting *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 130 (4th Cir. 2000))). The conduct here need not meet that demanding standard. It is, at most, fraud between the parties—conduct the Court may fully remedy through its continuing authority over the restitution estate and its power to deny and recoup a distribution procured by material misrepresentation.

## IV. Cell 1.16's $131,207,799 Loss Figure Is Materially Overstated and Duplicative, as Its Own Principal's Records and Sworn Admissions Establish.

Even if Cell 1.16 could establish victim status, its claimed loss cannot stand. Restitution is limited to the victim's actual loss, and the proponent bears the burden of proving the amount by a preponderance. 18 U.S.C. § 3664(e), (f)(1)(A); *United States v. Catone*, 769 F.3d 866, 876–77 (4th Cir. 2014). That award must rest on the victim's actual loss, supported by sufficient evidence; a figure that does not reflect actual loss cannot support restitution. *United States v. Harvey*, 532 F.3d 326, 340 (4th Cir. 2008). And the measure of that loss is the actual, fair-market value of what was lost—not the book, par, or face figure a claimant prefers. As the Fourth Circuit has held, "fair market value generally provides the best measure of value" of a restitution loss, and a court may not allow a claimant "to obtain a 'windfall.'" *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018); *see also United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017) (restitution may not require payment of "more money than [was] st[olen]"). Cell 1.16's $131,207,799 figure fails that standard twice over.

**First, it is overstated.** The $131,207,799 is the book or par value of the defaulted affiliated loans, Doc. No. 113 ¶¶ 23, 27, 30—not a measure of the assets'

actual value, which is what the law requires. *Steele*, 897 F.3d at 611. Mr. Solow's own contemporaneous records show he knew those assets were worth a fraction of book: "[n]on investment grade is 44%, which is based on Milliman's original appraisal," Ex. B (Aug. 6, 2018); the trust was "underwater" under any haircut, Ex. B (Oct. 12, 2018); and the affiliated position was worth "about 52 cents on the dollar," Ex. B (Nov. 26, 2018); Ex. A, Tab 24 (Jan. 14, 2019). Those contemporaneous figures—roughly half face—are the closest thing in this record to the assets' fair-market value; the $131,207,799 book figure is not. A claimant whose own principal valued the assets at roughly half face, contemporaneously, cannot carry its burden of proving a $131 million loss measured at book value, and to award that figure would confer precisely the "windfall" the Fourth Circuit forbids. *Steele*, 897 F.3d at 611.

**Second, it is duplicative.** Cell 1.16's own Declaration concedes that the loans underlying its claim are the "same loans" already awarded to other victims. Doc. No. 113 ¶ 18 (the term loans "were participations in loans where other participants included [the North Carolina and Bermuda insurers] … that the Special Master has concluded should receive restitution respecting the same loans"); *id.* ¶ 25 (same). Restitution is "to each victim in the full amount of each victim's losses," not multiple recoveries on a single underlying loss. 18 U.S.C. § 3664(f)(1)(A). Cell 1.16 has not— and on this record cannot—disaggregate its claimed $131 million from the recoveries already awarded to the North Carolina and Bermuda insurers on the same loans.

Together these defeat the claim. Cell 1.16 seeks book value for assets its own principal knew were worth far less, on loans for which other victims are already being

made whole. That is an attempt to extract a windfall from the restitution estate—the same premise on which Vista obtained its $23,520,710 distribution.

## V. The Court Should Find the Declaration Materially False for Purposes of the Relief Sought.

Mr. Solow submitted his Declaration (Doc. No. 113) under penalty of perjury, 28 U.S.C. § 1746, in this criminal proceeding, and Vista and Cell 1.16 have used it both to obtain a $23,520,710 distribution and to seek a further $131,207,799 from the restitution estate. On the present record, that Declaration advanced a materially false or misleading account. A statement is material if it "has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998) (citation omitted). Cell 1.16's representations meet that standard readily, because they were submitted to obtain—and did obtain—a distribution from the restitution estate. The Declaration represented that Cell 1.16 innocently "relied on th[e] ratings reports," Doc. No. 113 ¶¶ 21, 24, when its own principal had selected the rating agencies, solicited the ratings, and knew the affiliated assets were worth roughly half their stated book value. And it advanced a $131,207,799 loss that its own principal's contemporaneous records show to be overstated, and that its own Declaration concedes is duplicative of awards to other victims on the same loans. *See id.* ¶¶ 18, 25, 30. Whether that conduct amounts to a false declaration or perjury, 18 U.S.C. §§ 1621, 1623, is a determination for the authorities charged with making it. The Defendant does not ask the Court to adjudicate criminal liability. He respectfully requests that the Court find the Declaration materially false for purposes of the relief

sought above. An allegedly false submission was made under oath to a federal court to obtain a share of a fund reserved for the Defendant's victims.[2]

## VI. The Court Should Recoup the Vista Distribution, Credit It Against Restitution, and Deny or Reduce Cell 1.16's Claim.

For these reasons, the Court should (i) order Vista to disgorge, and the Special Master to recoup, the $23,520,710 distributed to Vista; (ii) credit or offset that amount against the aggregate restitution obligation, pursuant to the Court's continuing and inherent authority set forth in Part I; and (iii) deny Cell 1.16's request to be treated as a victim and reject its $131,207,799 claim as overstated and duplicative. Defendant does not ask the Court to adjudicate criminal liability; the appropriate course is to make the findings the record supports and, if warranted, refer the matter. Given the amounts at stake, Defendant respectfully requests an evidentiary hearing at which Cell 1.16's claimed loss and Mr. Solow's representations may be tested against his own correspondence.

## VII. Reservation of Rights.

Nothing in this Motion waives, and Defendant expressly reserves, all other rights, objections, and arguments concerning the restitution determination, including as to causation, offsets, and credits, whether raised on motions practice or at the hearing, all of which will further change the restitution determination.[3]

---

[2] The Court may refer Vista and Mr. Solow to the United States Attorney for the Western District of North Carolina and the Department of Justice for investigation and any prosecution those authorities deem warranted.

[3] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this filing without conceding its constitutionality. Because restitution

## CONCLUSION

For these reasons, Defendant respectfully requests that the Court recoup the $23,520,710 distributed to Vista, credit that amount against the restitution obligation, deny Cell 1.16's request to be treated as a restitution victim and reject its $131,207,799 claim as overstated and duplicative, set the matter for an evidentiary hearing, and grant such further relief as is just.

Dated: July 17, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*

Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*Counsel for Greg E. Lindberg*

---

under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. 163 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

# ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order *In Re: Use of Artificial Intelligence* entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 17, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes

*Counsel for Greg E. Lindberg*

# CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 17, 2026

/s/ Kenneth Barnes
Kenneth Barnes

*Counsel for Greg E. Lindberg*