**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

**UNITED STATES OF AMERICA v. GREG E. LINDBERG**

**Case No. 3:23-CR-48-MOC**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>v.<br>GREG E. LINDBERG,<br>*Defendant.* | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC |

# DECLARATION OF GREG E. LINDBERG PURSUANT TO 28 U.S.C. § 1746

I, Greg E. Lindberg, do hereby state and declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief. I submit this Declaration in support of my Response and Objection to the Special Master's Second Supplement to the Report and Recommendations Regarding Restitution (Doc. 245), a draft of which was filed as Exhibit A to the unopposed motion for extension of time on July 30, 2026 (Doc. 267, 267-1), and in further support of the mandatory offsets, credits, and reductions documented there.

1. All American policyholders of my former insurance companies have been paid in full. In December of 2025, more than $157 million was distributed to the remaining more than 43,000 policyholders — a distribution my conduct facilitated, including my relinquishment of a $40 million tax escrow to allow it — and the Special Master's filings acknowledge that payment. See Doc. 174 ¶ 120; Doc. 267-1, Part VIII.

2. All remaining liabilities that the Special Master alleges are owing from me to Northstar, OMNIA, and PBIHL can be fully satisfied with the attached offer, dated July 31, 2026, from Twelve Seas Investment Company III (NASDAQ: TWLV), a special purpose acquisition company holding approximately $175 million in trust capital, signed by its Chief Executive Officer, Dimitri Elkin, proposing a business combination with Damovo at a $400 million enterprise value. A true and correct copy of that letter is attached hereto as Exhibit A. My former attorneys

at Katten told me that the Special Master is intending to sell Damovo "for the debt," which is approximately $100 million. This would be a $300 million loss caused by the actions of the Special Master.

3. The Special Master alleges that the remaining unpaid principal balance owing to Northstar, OMNIA, and PBIHL is $208 million. A sale of Damovo at a $400 million enterprise value produces $300 million in proceeds net of Damovo's approximately $100 million in outstanding obligations. This is an initial offer, and the ultimate sale price that could likely be negotiated with Twelve Seas is approximately $450 million. In short, the sale of Damovo can easily cover all remaining alleged obligations owed to Northstar, OMNIA, and PBIHL. A sale could be conducted and all proceeds placed in escrow to allow the required accounting to be performed, as stated in my filings. See Doc. 267-1, Part XIII (the accounting the MVRA requires).

4. A sale of Damovo "for the debt" would repeat the pattern already documented in my Response and Objection: Beckett Collectibles, valued at approximately $1 billion by the Cabrillo Advisors appraisal and by Blackstone's own acquisition proposal and analysis, was sold in December of 2025 for just $134 million; and Clanwilliam, valued at approximately $880 million in the signed Quadro purchase agreement [Doc. 235 ¶ 32; Doc. 174 ¶ 117; Ex. I3], was sold in September of 2025 for approximately $450 million. See Doc. 267-1, Parts XIII.B, XIV.E, XV.G & n.6. The Twelve Seas indication of interest is contemporaneous, arm's-length market evidence that Damovo is worth approximately four times what my former attorneys advised me the Special Master intends to accept. That valuation is corroborated by a prior arm's-length transaction: in Q1 of 2024, just months before control of my interests was transferred, a deal was in place valuing Damovo at approximately $371 million, with approximately $100 million of debt on Damovo's books — the same arm's-length character as the current Twelve Seas indication of interest.

5. The Special Master alleges that there is $339 million in remaining unpaid principal balance owing to ULICO. This amount has been entirely satisfied by ULICO's acceptance of AAPC preferred equity with a par value of $352,906,240 as of May 26, 2026 — the same figure the Special Master lists in his own table. See Doc. 245 at 6 (Issue 3). Under the Confidential Side Settlement Agreement dated December 19, 2022, and its Amendment dated December 30, 2022, resolving ULICO's $524 million civil judgment in Universal Life Insurance Co. v. Lindberg, No.

1:20-cv-861 (M.D.N.C.), ULICO accepted $25 million in cash and the transfer of the AAPC preferred equity, and agreed that the preferred equity would apply as a dollar-for-dollar credit against the amounts owed, regardless of whether ULICO sells the preferred or holds it. See Doc. 132-1, Exs. A & B; Doc. 267-1, Part XV.C. ULICO has chosen to hold the preferred because its value has increased from $218 million at transfer in 2022 to over $352 million today, and because ULICO is accruing over $35 million a year in payment-in-kind dividends per the terms of the preferred. By the end of next year, the AAPC preferred held by ULICO will be worth approximately $400 million. ULICO has not once disputed that the AAPC preferred is worth anything less than its par value.

6. Over the last seven years, I have made four transfers of control of my assets to third parties, as summarized in the chart below:

| # | Date | Assets / Interests Transferred | Control Transferred To | Approx. Value | Valuation Basis |
|---|---|---|---|---|---|
| 1 | October 2018 | The North Carolina insurance companies (NCICs) | Rehabilitator | ~$450 million | Signed Ares LOI (Nov. 22, 2018); KPMG appraisal (Aug. 24, 2018); Rehabilitator's own internal valuation of $454M (Nov. 5, 2018). Doc. 235 ¶¶ 13–15, 26; Doc. 245 at 18 |
| 2 | June 2019 | Memorandum of Understanding establishing the process to transfer the Specified Affiliated Companies (SACs) | Rehabilitator | $1.5 billion | Value stipulated by the Rehabilitator in 2019 litigation filings. MOU dated June 27, 2019; Doc. 235 ¶ 30 |
| 3 | October 2024 | Specified Affiliated Companies (SACs) | Rehabilitator | $3.4 billion | Signed Quadro purchase agreement (Q1 2024), 22.14x EBITDA multiple. Doc. 235 ¶ 32; Doc. 174 ¶ 117; Doc. 132-2 (Ex. 13) at 15 |
| 4 | February 2025 | My interests in AAPC and NHC Holdings, LLC (including all of the SACs) | Special Master | $2.7–$3.0 billion (AAPC) | Houlihan Lokey: 18–20x EBITDA applied to AAPC's forecasted 2026 |

| # | Date | Assets / Interests Transferred | Control Transferred To | Approx. Value | Valuation Basis |
|---|---|---|---|---|---|
| | | | | | EBITDA of ~$150 million. Doc. 235 ¶¶ 13–17; Doc. ___-1, Part XIV.D |

With respect to Transfer #3: while the SACs were under my control from 2019 through October of 2024, they gained $1.9 billion in value, based on the $3.4 billion Quadro valuation and the $1.5 billion value that the Rehabilitator assigned to the SACs in 2019. With respect to Transfer #4: I have not had any access to AAPC's financial data since the Special Master took control of my interest in AAPC, so the 2026 EBITDA forecast referenced above is an estimate. My motions for access to those records remain pending and opposed. See Docs. 202, 248; Doc. 267-1, Part XIX.

7. In summary, I transferred $6.4 billion in value to the Special Master in February of 2025, including $3.4 billion for the SACs and $3 billion for AAPC. See Doc. 267-1, Part XIV.D. At my first sentencing in August of 2020, the government alleged that there was a "$1 billion hole" in the consolidated enterprise, implying that the liabilities were $1 billion in excess of the assets. This was a false statement to the court, and it highly prejudiced my original sentence of 87 months. The fact is, based on the valuations cited above, there are billions of dollars in enterprise value in excess of all liabilities.

8. In September 2024, the Clanwilliam credit facility was approaching its five-year maturity, which presented two ordinary options: roll over (refinance) the maturing debt, or pursue a sale or other M&A transaction. Middle-market companies such as Clanwilliam routinely borrow on five-year terms and refinance — "roll over" — those loans at maturity as a matter of course. Clanwilliam carried only approximately four times leverage, a conservative level well within normal market parameters, and it had substantially reduced its leverage since the original Alcentra facility was underwritten. A company that well-secured can ordinarily refinance a maturing loan of this kind routinely — effectively with a phone call — so the maturity created no genuine refinancing crisis and no default or forced-sale risk that made a sale necessary. Rather than roll the debt over, the loan's maturity was instead used as the occasion for a sale, and Clanwilliam was

sold for approximately $450 million against the $880 million Quadro valuation signed months earlier. See Doc. 267-1, Parts XIV.E, XV.G.

9. AAPC presents a similar risk. AAPC has a refinancing requirement approaching in 2027, and the same maturity-driven dynamic could be used as the occasion for a below-value sale rather than a routine refinancing. Failure to roll over maturing debt that could readily be refinanced — a usual and customary process for almost all corporate borrowers — would reflect mismanagement and a breach of the fiduciary duties owed in the administration of these assets. As with Clanwilliam, a maturing, well-secured obligation of this kind can ordinarily be rolled over rather than used to justify a forced sale at a fraction of the company's value.

10. The Special Master's apparent premise — that these companies should be sold "for the debt" — reflects a basic misunderstanding of how businesses are valued. Having built, financed, and operated companies for more than two decades, I know that a company's value is determined by its assets, earnings, and cash flows, not by the amount of debt it happens to carry. A firm's enterprise value is independent of how it is financed; debt is a claim to be paid out of that value, not a reduction of it. See Franco Modigliani & Merton H. Miller, *The Cost of Capital, Corporation Finance and the Theory of Investment*, 48 Am. Econ. Rev. 261 (1958). Selling a company "for the debt" therefore captures only what is owed to lenders and none of the enterprise value that belongs to the owner — it is not a measure of the company's worth.

11.Nor is the presence of debt a sign of weakness or a reason to sell at a loss. Virtually every substantial operating company carries debt and uses it deliberately as an instrument of growth, because debt is ordinarily a cheaper source of capital than equity: interest is tax-deductible, and lenders, who hold a senior, secured claim, require a lower return than equity investors. See Franco Modigliani & Merton H. Miller, Corporate Income Taxes and the Cost of Capital: A Correction, 53 Am. Econ. Rev. 433 (1963) (tax deductibility of interest); Thomas R. Piper & Wolf A. Weinhold, How Much Debt Is Right for Your Company?, Harv. Bus. Rev. (July 1982) (prudent use of debt capacity). The deliberate use of debt can also add value by disciplining management and reducing the agency costs of free cash flow. See Michael C. Jensen, Agency Costs of Free Cash Flow, Corporate Finance, and Takeovers, 76 Am. Econ. Rev. 323 (1986). The arm's-length market evidence bears this out: Damovo, carrying approximately $100 to $125 million of debt,

was the subject of a Q1 2024 arm's-length transaction valuing it at approximately $371 million, and is now the subject of the July 31, 2026 Twelve Seas indication of interest at a $400 million enterprise value, with a negotiated price of up to approximately $450 million achievable at arm's length. Damovo is thus worth roughly four times its debt. It was and remains entirely foreseeable that these debt-financed operating companies carry enterprise value far in excess of their debt; disposing of them "for the debt" predictably destroys hundreds of millions of dollars in value that the Special Master was charged with preserving. The difference between these companies' true value and the depressed prices at which they have been, or are being, sold is not a loss I caused; it is value that existed, that I preserved, and that the Special Master has destroyed.

12.Attached as Exhibit A is a true and correct copy of the term sheet titled "Term Sheet—Scope of the Special Master's Rights and Responsibilities," bearing the comments of Williams Mullen, counsel to the North Carolina insurance companies. The Special Master circulated this term sheet to define the scope of his rights and responsibilities and to seek a clarifying order from the Court. I am familiar with the document from my own involvement in this matter and through my former attorneys, who acted on my behalf, and through Paladin Management, which raised the matter with the Special Master independently, and I authenticate the attached copy as a true and correct copy of the term sheet as it was circulated and commented in those negotiations. My former counsel at Katten Muchin Rosenman LLP, and Paladin Management acting independently, each sent the term sheet to the Special Master and urged him to press for access to the books, records, valuations, and loss information held by the insurance companies and the other parties — the very information a complete and accurate restitution accounting requires — and to push back against those parties' refusal to provide it. The Special Master refused to push back. As a result, the information necessary to prepare an accurate and complete accounting was never obtained.

13. Based on the foregoing, I respectfully request that, before any restitution amount is fixed and before any further sale or liquidation of my assets, the Court order a full and verified accounting under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664 — including a determination of the full amount of each victim's losses, § 3664(f)(1)(A); the crediting of all amounts already recovered or satisfied, § 3664(j)(2); the disclosure of every material change in my economic circumstances resulting from the Special Master's dispositions, § 3664(k); and the application of the substantial resources already realized from those dispositions, § 3664(n). I

further request that the Court order the Special Master to disclose every sale, offer, or expression of interest for any of my assets that came before him — every such transaction that landed on his desk — but that he did not approve, did not pursue, or did not take, including the price and terms offered and his reasons for declining, so that the value he chose to forgo, as well as the value he realized, is on the record. The evidence set out above — all American policyholders paid in full, the ULICO preferred-equity satisfaction, the arm's-length Damovo valuations, and the below-value sales of Beckett and Clanwilliam — cannot be reconciled with the Special Master's alleged balances without such an accounting, and the amounts at stake are far too large to be fixed without one.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of August, 2026, at the Pike County Detention Center in Pikeville, Kentucky.

Greg E. Lindberg

BOP Inmate # 34-828-058
Designated to FCI Atlanta

<u>**Term Sheet—Scope of Special Master's Rights and Responsibilities**</u>

The following is intended to build consensus regarding the parameters of the Special Master's limited role within the larger landscape of courts, regulatory agencies, fiduciaries, and other entities dealing with the fallout of Greg E. Lindberg's conglomeration of insurance companies and subsequent dissipation of assets to the detriment of such companies (the "Scheme"). The Special Master intends to use this term sheet as a basis for a motion seeking an order from the U.S. District Court for the Western District of North Carolina (the "Court") clarifying how the Court wants the Special Master to function under these circumstances (the "Clarification Order").

This term sheet is built around the primary duties imposed on the Special Master by the *Order Appointing Special Master*, Case No. 3:23-cr-48 (W.D.N.C. Jan. 23, 2025) (the "Appointment Order"), Decretal Paragraph 3. General references to the Special Master throughout this term sheet are intended to include the Special Master's professionals.

[The Special Master has two jobs:

1. Calculate what each victim is owed in restitution and make a recommendation to the Court, and
2. Facilitate the sale of AAPC through the rights that GEL and GGH have assigned to him.

If the Special Master identifies additional GEL assets that could be used to pay victims, it would be appropriate for the Special Master to seek a court order authorizing him to secure those assets as well.

The Special Master has no role with respect to NHC or the SACs, because GEL has no property rights in these companies. Paragraph 16 in the Special Master Order was meant to clarify this. But even without that paragraph, the Special Master has no rights to property other than those the defendant holds.]

- **Verify and quantify losses suffered by each victim and any offsetting amounts [¶ 3(a)]**
  - No clarification from the Court needed at this time

[The NCICs propose the following process to establish victim losses:

1. The Special Master should ask the Court to set a date by which potential victims provide written notice to the Special Master in which they assert their status as victims of the Scheme, and explain why they are entitled to restitution under federal law. Insurance company victims may assert victim status on behalf of their injured policyholders.
2. The Special Master should ask the Court to set a second date by which potential victims are required to submit to the Special Master their calculation of the restitution they are owed, along with supporting documentation.
3. The Special Master should ask the Court to set a third date by which the Special Master shall submit to the Court, the parties, and any persons or entities who have asserted victim status a report and recommendation regarding (1) who the victims are, (2) to what restitution they are entitled, and (3) priority of payment among victims, if applicable. In preparing his report and recommendation, the Special Master will evaluate the submissions of the potential victims and confer with potential victims and/or the Department of Justice as appropriate.
4. The Special Master should ask the Court <u>to</u> sets a fourth date for the parties and any potential victims to submit any objections to the Special Master's report and recommendation. The Court will make a final restitution determination at sentencing or at a separate hearing specifically regarding restitution.

This provides a process for the Special Master to fulfill his duties under 18 U.S.C. § 3664(d)(6), the relevant authorizing statute.]

- **Identify all assets available for liquidation and determine estimated value thereof [¶ 3(b)]**
  - The cooperation obligations set forth in ¶ 8 of the Appointment Order shall be expanded to require Greg E. Lindberg ("GEL"), any Specified Affiliated Company and its subsidiaries (each a "SAC" and, collectively, the "SACs"), and any other entity owned, directly or indirectly, by GEL or otherwise affiliated with GEL (including their respective officers, directors, managers, trustees, auditors, employees, and agents), regardless of whether such entities are controlled by a trust, NHC Holdings, LLC ("NHC"), or otherwise, to: (I) provide the Special Master with reasonable access during normal business hours to all of the corresponding company's books and records, (II) furnish to the Special Master all financial and operating data, reports, projections and other information concerning the business, properties, and personnel as the Special Master may reasonably request, and (III) cooperate fully with any reasonable requests made by the Special Master in connection with the examination of the respective company.

    [The Special Master has no interest in or control over NHC or the SACs except to the extent that GEL or GGH had such interest or control. The NCICs do not consent and object to their borrowers being forced to spend money that could otherwise be used to repay policyholders.

    Moreover, under the Special Master Order the Special Master does not need to do any analysis of whether the Primary Restitution Assets are sufficient to pay back the victims unless he is seeking to liquidate a non-Primary Restitution Asset. We are not aware of any such step being contemplated, so this expensive analysis is unnecessary and premature.]

  - Furthermore, and without limiting any of the foregoing, to the extent (i) NHC, (ii) any insurance companies directly or indirectly owned or controlled, now or formerly, by GEL, or (iii) the special master appointed in the action pending before the Wake County, North Carolina Superior Court as *Southland Nat'l Ins. Co.* et al. *v. Lindberg* et al., No. 19-CVS013093 (the "MOU Action") refuse to furnish to the Special Master any documents and information in their possession reasonably requested by the Special Master, whether relating to loss calculations, asset valuations, or otherwise, the Special Master shall follow appropriate legal processes to obtain such documents or information.

    [The Special Master has no authority to compel the NCICs to provide him with information. The NCICs are subject to complex regulatory schemes governing what information they can share and with whom. If the Special Master is unable to complete a task because of a lack of information, his job is to report that to the Court.]

  - The Special Master shall have no obligation to determine the value of GEL's direct or indirect interest in the insurance companies that are victims of the Scheme for purposes of fulfilling the Special Master's obligations under ¶ 3(b) of the Appointment Order.
  - All non-public information provided to the Special Master and the Special Master's agents shall be treated as confidential and used solely in connection with carrying out the Special Master's responsibilities set forth in the Appointment Order or Clarification Order. The Special Master shall maintain appropriate data security measures and may share such information only (i) with the Court, (ii) with parties as authorized by Court order, (iii) with experts, advisors, and other agents who have agreed to maintain confidentiality, and (iv) as otherwise agreed by the furnishing party. Any public filings containing confidential information shall be made under seal as appropriate. This provision shall not restrict the Special Master's ability to report findings to the Court or carry out other Court-ordered duties.

- **Select method and timetable to liquidate assets with Court approval [¶ 3(c)]; Oversee the liquidation of any available assets with Court approval [¶ 3(d)]; Clear title of assets for transfer to bona-fide buyers [¶ 3(e)]**
  - <u>Method of Liquidating Assets</u>
    - Absent further order of the Court, the Special Master has no right or responsibility to directly liquidate Primary Restitution Assets, other than to:
      - facilitate the liquidation activities taken by: (i) AAPC Holdings, LLC ("AAPC") and NHC through their respective boards and (ii) any trustees controlling a SAC that has not yet been contributed to NHC;

[The NCICs do not consent to the Special Master collaborating with a SAC's trustee to liquidate that SAC without the NHC board's consent. GEL and GGH were legally obligated to contribute the SACs to NHC, an obligation the Special Master now holds due to GEL and GGH's assignment of rights. Allowing the trustee to liquidate a SAC without NHC board consent is in derogation of the MOU judgment, contrary to paragraph 16 of the Special Master Order, and would violate the terms of the restraining order in the MOU litigation.]

- work with NHC to update NHC's corporate governance documents to explicitly permit the liquidation of SACs for the benefit of all "Policyholders" (as defined in the MOU that is the subject of the MOU Action) consistent with the Clarification Order or to otherwise obtain some acknowledgment from NHC that NHC will pursue the liquidation of SACs for the benefit of all such "Policyholders" consistent with the Clarification Order;

[The NHC operating agreement already binds the NHC board to take actions in the best interests of the policyholders. NHC has the right to determine whether those interests involve liquidating the SACs and when to do so.]

- recover, and take any and all actions necessary to recover, any funds that would otherwise be payable to GEL, Global Growth Holdings, Inc., or Global Growth Holdings, LLC (collectively, "GGH"), by any and all SACs or AAPC, directly or indirectly;

[To the extent that the Special Master is trying to recoup the fraudulent "management fees" and other sham obligations that GEL was using to extract funds from the SACs, the NCICs do not agree. Moreover, the Special Master only has the interests in GGH that GEL has assigned to him.]

- work with the special master appointed in the MOU Action to facilitate the contribution of all SACs to NHC for subsequent liquidation, absent a compelling reason not to contribute a particular SAC to NHC, including, without limitation, by (if the Special Master deems appropriate) facilitating the creation of a trust wherein the SACs would form the *res* of the trust and NHC would be the beneficiary;

[As noted above, only the NHC board is authorized to make decisions regarding liquidation of the SACs. The NCICs do not consent to the trust concept identified above and reserve the right to respond to this idea with the benefit of more information.]

- file a notice with the Court summarizing any proposed sale—or other transaction disposing of substantially all assets—of any Primary Restitution Asset, which shall not require any confirmatory Court order to proceed, *provided, however*, that, in the event a proposed purchaser of assets or the Special Master prefers to secure an order from the Court approving the corresponding transaction, the Special Master may so petition the Court for entry of an order approving the transaction; and

[The Special Master would have no role in the sale of any SAC.]

- report to the Court on the status of (i) the contribution of SACs to NHC; and (ii) the liquidation efforts of NHC, AAPC, and any SACs that have not been contributed to NHC.

[Same note as above regarding the NHC board's exclusive authority to determine whether or when to sell a SAC.]

- Timetable of Liquidating Assets
  - The Special Master shall work with NHC's and AAPC's management to develop a plan for disposing of Primary Restitution Assets in a manner designed to maximize and expedite victim recoveries, taking into account the particular business operations, financial affairs, and other circumstances of each particular entity to be monetized.

  [The Special Master has no role in NHC's plan to manage or sell the SACs.]

  - In the event the Special Master determines that, in light of the totality of the circumstances, insufficient steps have been taken toward initiating the liquidation plan for one or more particular SACs within six (6) months of entry of the Clarification Order, the Special Master shall report the same to the Court and seek further instructions from the Court.

  [The Special Master has no authority to direct NHC's actions.]

- **Fashion proposed restitution order [¶ 3(f)]**
  - No clarification from the Court needed at this time

    [See the note above regarding a process for creating this order. This should be the Special Master's first order of business. We need to know what the restitution obligation looks like to make informed decisions about the assets at issue.]

- **Apportion available funds among victims [¶ 3(g)]; Propose an apportionment methodology [¶ 3(g)]; Receive and distribute restitution payments to victims [¶ 3(h)]**
  - Court Determination of Victim Restitution Apportionment Methodology
    - The Special Master shall propose for the Court's consideration a method of apportioning funds recovered by the Special Master for the benefit of victims, giving advance notice to all potential institutional victims identified by the Special Master.

    [See proposed process above.]

    - The Special Master shall propose an apportionment methodology that: (i) treats all similarly-situated victims fairly in accordance with applicable restitution laws; (ii) prioritizes payments to individual policyholder victims over those to institutional victims; and (iii) does not honor payment priorities established by GEL; *provided, however*, that the Special Master's recommendation shall provide for ULICO's preferred equity in AAPC being satisfied in full prior to AAPC's net sale proceeds being turned over to the Special Master, subject to such payment(s) to ULICO being duly accounted for in connection with any victim distributions made by the Special Master.

    [No objection to this. It would be appropriate to recalculate ULICO's share of further restitution distributions after it has been paid out on its preferred equity.]

  - Distribution Process
    - Upon the liquidation of AAPC or any SAC, the proceeds generated from such liquidation shall be immediately turned over to the Special Master, net of the following items (the result being termed "Net Liquidation Proceeds"):

    [The Special Master has no role with respect to the sale of any SAC and is not entitled to the proceeds of such sale—because GEL would not be entitled to the proceeds.]

      - (i) customary closing costs and other costs necessary to the liquidation;

- (ii) all arms'-length liabilities owed to third parties unaffiliated with GEL incurred by the applicable operating company in exchange for reasonably equivalent value (not including debts for losses or damages arising out of the Scheme);
- (iii) all other senior or equal-priority equity interests in the applicable operating company held by third parties unaffiliated with GEL (not including interests given to satisfy losses or damages arising out of the Scheme, in whole or in part, with the sole exception being ULICO's preferred equity in AAPC);
- (iv) all outstanding reasonable and necessary liabilities and expenses incurred by NHC (except in the event of AAPC's liquidation); and
- (v) funding or replenishing a reasonable operating reserve for NHC, in whole or in part (except in the event of AAPC's liquidation).

▪ On or before the 30th day following the later of (A) the Special Master's receipt of funds generated by the liquidation of a SAC or AAPC or (B) the entry of a Court Order approving a victim restitution apportionment methodology, the Special Master shall file a motion with the Court seeking to distribute all funds collected, less and excepting any outstanding administrative expenses incurred by the Special Master, Court-approved fees and expenses incurred by GEL's criminal defense counsel, and a reasonable administrative expense reserve for the Special Master's future activities pursuant to the Appointment Order and Clarification Order.

[Again, the Special Master would never be in receipt of the proceeds of the sale of a SAC.]

▪ The Special Master shall move the Court to enjoin any and all third parties receiving actual notice of the Clarification Order from, absent leave of the Court, seeking recovery for losses or damages arising out of the Scheme from the Primary Restitution Assets, including any SACs or intermediary companies in the chain of ownership between the SACs and GGH and/or GEL, or from otherwise interfering with the Special Master's receipt of the Net Liquidation Proceeds.

[With regard to the above and the below, we are not aware of authority that would allow the Court to block otherwise valid claims from third parties. The normal answer to this problem is for the government to forfeit GEL's interest in property, which gives it a property interest that would predate most third parties.]

▪ The Special Master shall move the Court to either: (a) impose a lien against the Primary Restitution Assets—including, without limitation, GGH's equity interests in any SACs or intermediary companies in the chain of ownership between the SACs and GGH and/or GEL—in the preliminary amount of $3,000,000,000.00 (subject to adjustment upon the establishment of a final, aggregate victim loss amount), enforceable by the Special Master pursuant to the Federal Debt Collection Procedures Act or otherwise to the same extent the United States government may enforce a federal tax lien; or, in the alternative, (b) issue one or more writ(s) of attachment or garnishment against the Primary Restitution Assets—including, without limitation, GGH's equity interests in any SACs or intermediary companies in the chain of ownership between the SACs and GGH and/or GEL—in the preliminary amount of $3,000,000,000.00 (subject to adjustment upon the establishment of a final, aggregate victim loss amount), pursuant to 28 U.S.C. §§ 3102 and 3104.

[See comment immediately above]

- **Cooperate and coordinate with any receivers previously appointed over assets available for the benefit of victims, including seeking the modification of any existing orders if necessary [¶ 3(i) (¶ 16 also implicated)]**
  - The Special Master shall continue to comply with all existing federal or state court orders, except to the extent in conflict with the Clarification Order or the Appointment Order, and may seek modification(s) from the corresponding court of any existing federal or state court orders that the Special Master deems in conflict with the Clarification Order or the Appointment Order.
    [We are not aware of authority for the Special Master to do so.]
  - The Special Master shall alert the Court of any future federal or state court order that may interfere with the Special Master's right to receive the Net Liquidation Proceeds and obligation to distribute funds derived from the Primary Restitution Assets pursuant to the apportionment methodology ultimately established by the Court, including, without limitation, any orders entered in the MOU Action or in *ULICO v. Lindberg*, 1:20-CV-681 (M.D.N.C.), and seek further instructions or direction from the Court regarding the same.

    [The Special Master does not have the right to receive proceeds from NHC or SACs.]
  - Without limiting the foregoing, the Special Master shall work together with the parties to the MOU Action to seek a modification of the Order of that court entered on March 14, 2023 in order to permit the proceeds generated from the sale of the "Clanwilliam group of companies" to be disbursed either: (a) consistent with the Clarification Order; or (b) pursuant to some other methodology mutually acceptable to the Special Master and such parties.

    [The NCICs do not agree to seek the modification of the existing order.]

- **Retain professionals [¶ 3(j)]**
  - No clarification from the Court needed at this time

- **Provide periodic reports to the Court [¶ 3(k)]**
  - No clarification from the Court needed at this time

- **Pay Defendant's legal fees approved by the Court [¶ 3(l)]**
  - No clarification from the Court needed at this time