**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br>Case No. 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

## DECLARATION OF GREG E. LINDBERG

1. I am the Defendant in the above-captioned matter. I make this declaration in support of my Reply in response to the Government's Omnibus Response in Opposition (Doc. 279) and my Motion for a Determination That No Restitution Is Owed (Doc. 234). Except where I state that a matter is on information and belief, the facts set forth below are within my personal knowledge, and if called as a witness I could and would testify competently to them. As to matters stated on information and belief, I am informed and believe them to be true based on the business records of the companies, the reports and filings identified below, and my involvement in the events described.

2. I have read the accompanying Statement of Facts Regarding the Disaffiliation Structure and the exhibits identified in its Exhibit Index (Exhibits DS-1 through DS-21), and the factual statements set forth in that Statement of Facts are true and correct to the best of my knowledge, information, and belief.

## The Structure and the Capital I Placed Behind It

3. The insurers' affiliated investments were designed, documented, and opined upon by outside counsel, and were built and repeatedly revised to comply with the requirements of the North Carolina Department of Insurance, as set out in the accompanying Statement of Facts and its exhibits. I proceeded in reliance on counsel's structuring of these arrangements and on counsel's opinions that they were lawful and achieved non-affiliation under North Carolina law.

4. I contributed approximately $1 billion of my own capital to the insurance group, and I took no dividends from the insurers. Independent analysis by Berkeley Research Group confirmed capital contributions exceeding $377 million and confirmed that I took no dividends.

5. I personally guaranteed the affiliates' obligations to the insurers in an amount of approximately $2.39 billion.

6. As a required component of the principal-protection-note structure, the insurers held more than $1.006 billion in par value of investment-grade, third-party zero-coupon bonds as dollar-for-dollar protection of the affiliated-loan principal. Those bonds were contractually scheduled to pay $1,006,239,867 at maturity and, if held to maturity, would have repaid the affiliated-loan principal in full. They were high-grade, independently rated third-party bonds—not affiliate paper.

7. Every affiliated loan carried a minimum rating from an SEC-approved nationally recognized statistical rating organization. In 2018, KPMG valued the twenty-one operating-company borrowers at an aggregate enterprise value

of approximately $2.45 billion, and Houlihan Lokey concluded that the affiliated loans were conservatively underwritten at approximately fifty-percent loan-to-value, with asset values exceeding the loan balances by more than $1 billion.

8. While I controlled the insurers, the affiliated loans performed and there were no defaults.

**Arm's-Length Offers That Would Have Repaid the Loans**

9. Before and around the time my control of the companies ended, arm's-length purchasers were prepared to acquire the businesses or refinance the affiliated loans at or near face value. These included a signed transaction with Ares, a February 8, 2019 Oaktree proposal referred to as the "Global Solution," and the Quadro and Montshire/Alban transactions. Each of these transactions would have repaid the affiliated loans.

**I Surrendered Control of the Companies and Their Records**

10. I surrendered control of the companies, and of the books and records documenting their value, on four separate occasions. First, in 2018, custody of the North Carolina Insurance Companies and their books and records passed to the State of North Carolina's rehabilitation, administered by the Commissioner of Insurance as Rehabilitator through his Special Deputy. Second, on January 23, 2025, the Court's Order Appointing the Special Master transferred custody of the operating companies, held through NHC Holdings, LLC, to the Special Master/Receiver. Third, the voting interests in the affiliated vehicles were assigned to the Special Master/Receiver under the

AAPC voting trust. Fourth, record ownership of the NHC Holdings, LLC equity was assigned so that the Special Master/Receiver became its record owner. Two of these were transfers of custody, in 2018 and 2025; the other two were transfers of ownership.

11. Since those transfers, the companies, their assets, and the records documenting both have been controlled by the Rehabilitator, NHC Holdings, LLC, the North Carolina Insurance Companies, and the Special Master/Receiver—not by me. I have sought those records, including through requests to the Special Master/Receiver and the Rehabilitator and through my motion for Rule 17(c) subpoenas, and I have been unable to obtain them. I am presently in the custody of the United States Marshals Service and the Bureau of Prisons. Although the Special Master/Receiver communicated with the other participants in this matter—the Government, the North Carolina Insurance Companies, NHC Holdings, LLC, and their advisors—he did not communicate directly with me. I attempted to reach the Special Master/Receiver more than a dozen times to provide and to obtain the information necessary to document the offsets, the credits, and the value of the companies, and I was not afforded that communication or the access I sought.

**Matters Occurring After Control Passed From Me**

12. On information and belief, based on the North Carolina Insurance Companies' own quarterly reports and the records identified in my objections to the Special Master/Receiver's Report, from 2019 through December 2023 the North

Carolina Insurance Companies at all times held over $1 billion of cash and marketable securities in the form of third-party bonds.

13. On information and belief, notwithstanding that liquidity, the Rehabilitator sold the zero-coupon protection bonds years before their maturity for approximately $394 million—less than forty cents on the dollar—crystallizing a loss of approximately $611.6 million measured against the $1,006,239,867 those bonds were scheduled to pay at maturity. There was no need to sell those bonds.

14. On information and belief, the Rehabilitator refused the arm's-length, face-value offers described above and, under a threat of immediate liquidation, imposed a ten-year hold of the affiliated loans through the June 27, 2019 Memorandum of Understanding.

15. On information and belief, the Special Master/Receiver sold Beckett Collectibles, LLC—an operating company appraised at approximately $1 billion, including a Cabrillo appraisal valuing it at $1,003,924,000—for approximately $134 million, or roughly thirteen cents on the dollar, and without an accounting of the proceeds. That sale destroyed approximately $866 million in value.

16. On information and belief, the losses the Special Master/Receiver attributes to me materialized after control passed from me, through the intervening decisions of the Rehabilitator, the Special Master/Receiver, and other court-

appointed fiduciaries, and did not result from the affiliated-investment structure as it stood while I controlled the companies.

17. The facts set forth above are offered pursuant to the reservation in the Factual Basis permitting either party to present additional relevant facts, and without waiver of any objection. I expressly reserve the causation, offset, credit, and constitutional issues to be determined by the Court de novo.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 13th, 2026.

**Greg E. Lindberg**
Defendant
BOP Inmate # 34-828-058