IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 5:19-CR-22-MOC<br>Case No. 3:23-CR-48-MOC<br>Judge Max O. Cogburn, Jr. |

## AFFIDAVIT OF GREG E. LINDBERG

I, Greg E. Lindberg, declare as follows:

1. I am the Defendant in this matter. I make this Affidavit in support of Defendant's motions to compel the Government and the Special Master to produce their ex parte communications, and to set aside the Special Master's report and Final Supplement.

2. I did not personally participate in the periodic—in substance, weekly—meetings and calls concerning the restitution calculation, in which the Government (Assistant United States Attorney Daniel Ryan) and the Special Master and his financial advisor, Paladin Management Group, participated. My counsel participated on my behalf—my former counsel, Katten Muchin Rosenman—and reported to me, after those meetings, what had occurred.

3. Based on my counsel's reports after the meetings, each time a question or a request for information arose, I reviewed my own records and provided to my counsel whatever responsive information I had to share with the Special Master. I did not withhold information.

4. My records reflect communications concerning the restitution calculation only with the Government and with the Special Master. The information from NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, M3, and Michael Dinius would simply appear as final

values, without any disclosure from the Special Master as to how or why those adjustments, made from ex parte communications, were arrived at, and without access to the underlying data for me or my counsel. My former counsel asked for that data and were invariably denied access to it. These reports and values were provided ex parte to the Special Master, in violation of my rights, and neither I nor my counsel could ever test them, because the basis for many of the values was never provided and is still being denied. On information and belief, at least some of the entities involved—including Michael Dinius, NHC, and the North Carolina insurance companies—told the Government (Assistant United States Attorney Daniel Ryan) that if the Government wanted some of the information, it should obtain an order from the Court. Therefore, the information was never officially before the Special Master in a form in which I, through my counsel, could contest these values. Indeed, the basis for these values—the how and why of the adjustments, and the underlying data—was never before the Special Master in any form that could be examined; the values were adopted as final numbers, not established on a record.

5. Based on my counsel's reports and my own records, the sequence of requests and refusals was as follows:

   a. January 23, 2025 — The Special Master was appointed (Doc. 56). My counsel began requesting the underlying loss and valuation data—the data and methodology on which any restitution figure would rest—as soon as he was in place, because without it the figure could not be tested.

   b. Spring 2025 — My counsel requested the M3 "desktop" valuations—the low, middle, and high values placed on all of the Primary Restitution

Assets and Specified Affiliated Companies, which drive both the credits against restitution and the forfeiture—as soon as we learned they existed. They were never received.

c. June 16–17, 2025 — My counsel requested the North Carolina insurance companies' loan and restitution data—the starting loan balances from which the loss figure is built. On June 17, 2025 the Special Master agreed to share what those companies had provided him; he never did.

d. July 29–30, 2025 — During the restitution-calculation process, my counsel supplied the defense's own BRG analysis and repayment data as the starting point—the defense produced its information while receiving none in return.

e. August 13, 2025 — My counsel wrote to the Special Master's counsel regarding the Clanwilliam valuation and the offsets—including that Clanwilliam was worth far more than the price at which it was later sold—data required to fix the offsets that reduce restitution.

f. August 2025 — The Government orally conceded, in the weekly meetings, that my investment in the North Carolina insurance companies is an offset against restitution—a concession that directly reduces the figure—and declined to confirm it in writing.

g. September 16, 2025 — My counsel sent the Restitution Calculation letter to the Special Master and the Financial Advisor, setting out the calculation and the credits and offsets the defense contended were owed.

h. November 22–23, 2025 — My counsel wrote again on causation and offsets, including that Mr. Dinius valued the North Carolina insurers at approximately $641 million in November 2018—a receiver-side

valuation that, if applied, is a direct offset against the loss now claimed.

i. December 2025 — My counsel served written information requests on the Special Master's counsel—the specific data and methodology behind the figure; on December 18, 2025 the Special Master deferred them and did not respond.

j. March 2026 — The Special Master's report offered only to place the valuation detail on the record under seal or in camera—an offer to show conclusions without the underlying data.

k. April 3, 2026 — The Report and Recommendation (Doc. 106 at 29) repeated that under-seal / in-camera offer, again without producing the data.

l. July 2026 — The Special Master filed updated low, middle, and high figures under seal, with no underlying data—the very figures that trigger the forfeiture, filed in a form no one could test.

m. August 15–17, 2026 — My counsel demanded, in writing, that the data be placed on the record under seal so it could be examined and appealed; the Special Master would produce only "under a confidentiality agreement," the Government responded that it was "reserving [its] position," and the Special Master's final answer was "No."

6. The M3 "desktop" valuations relate to the valuation of all of the Primary Restitution Assets and the Specified Affiliated Companies, and that information was used to value the assets available for restitution. The nature and the manner in which those companies were liquidated were never disclosed to me. Because the valuations and the manner of the liquidations were withheld from me, I could not contest how the liquidations of the companies were carried out, or on what terms and for what proceeds they

were sold. I had no opportunity to independently test or value the companies before they were sold, and I was never informed when the companies were being sold. The Special Master has now, in a further report, claimed that the companies are worth less than before. Without the original valuations and the data behind them, neither I nor anyone else can assess why the companies are said to be worth less—whether the decline resulted from the offense, or from what happened to the companies after they were taken from me, managed, and sold. That is why the original valuations, and every later revaluation, are required.

7. Based on my counsel's reports after the meetings, I learned that the Special Master, the Government, and the interested custodians exchanged information about the valuations and the loss figure outside the meetings my counsel attended—that is, ex parte—and that this information was never produced to me or to my counsel. Each event in the sequence above, and each category of information the defense has requested, is ex parte information that was never provided to my former counsel (Katten Muchin Rosenman) or to me. I had no access to it, and I have never seen it. On information and belief, many of the participants refused to recognize the authority of the Special Master. As a result, the restitution flows in one direction only, without any accountability to me as to how or why I am being asked to pay these values, and the entire process is infected with ex parte data that cannot be separated from it.

8. All of the information developed in that manner is ex parte information that was never produced to my counsel or to me. That includes all of Mr. Dinius's data—his own valuation of the North Carolina insurers at approximately $641 million in November 2018, and all of the credits and the offsets he

supplied and those he disallowed—as well as the data from NHC, the North Carolina insurance companies, Wes Camden, Williams Mullen, M3, and Paladin. I have never been given access to any of it.

9. My counsel reported to me that, on the weekly calls, the Government represented that I would be permitted to argue the ClanWilliam offset at a value of approximately $800 million, and that the investments in the North Carolina insurance companies would be treated as offsets against restitution. The valuations against which those offsets would run, however, were developed in communications I never saw.

10. I seek the Government's ex parte communications because I understand they are Brady and Giglio material to which I am entitled, and because I should not be subjected to a criminal punishment—restitution and forfeiture—fixed on the basis of communications and data I was never permitted to see, and which, as I understand it, the Government has now stated in writing that it does not possess.

11. The two tables set out below show why the information the defense has requested is relevant and where each item rests within the restitution figure. The first is the schedule of offsets, credits, and reductions that, applied against the Special Master's figure, reduces restitution to zero (totaling $3,765,418,383). The second identifies each of the 47 categories of information the defense has requested and shows, for each, both where it fits and why it matters—whether it fixes the baseline loss, supports an offset or credit, establishes an intervening cause, or consists of the ex parte communications themselves. Every category reflected in these tables is ex parte information, or the data underlying it, that was never provided to my former counsel (Katten Muchin Rosenman) or to me. The list is deliberately

confined to materials I do not have and cannot obtain—those in the hands of the Government, the Special Master and his advisors, or the third-party custodians. It does not include any of my own materials, which in any event are not the Government's or the Special Master's to withhold.

## EXHIBIT 1 — Schedule of Offsets, Credits, and Reductions

| Schedule line | Amount | Categories |
|---|---|---|
| Special Master's gross figure (baseline) | $1,625,000,000 | 8, 15, 41 |
| Improper addition — prejudgment/"time value" interest | +$263,000,000 | 8, 15, 16 |
| Improper additions to affiliate-loan balances | (per schedule) | 9, 10, 12, 13, 19 |
| Credit — AAPC/ULICO preferred equity | $352,906,240 | 14, 20 |
| Credit — SNIC payments | $27,823,425 | 20 |
| Credit — CBL subordination fee (Beckett) | $3,000,000 | 20, 29 |
| Credit — CWG (Clanwilliam) income-tax escrow | $20,000,000 | 20, 29 |
| Credit — ULICO real-estate transfer | $13,596,013 | 20 |
| Credit — Bermuda insurers' asset sales | $9,800,076 | 20, 29, 37 |
| Credit — zero-coupon bond cash recovery (PPNs) | ~$394,578,906 | 10, 12, 20 |
| Credit — zero-coupon bond sale proceeds | $243,000,000 | 20, 30 |
| Offset — NCIC-investment (Government conceded) | (per data) | 17 |
| Offset — Clanwilliam (Government agreed) | ~$800M vs. ~$450M | 18 |
| Offset basis — $641M Dinius valuation (Nov. 2018) | ~$641,000,000 | 21 |
| Additional Dinius offsets and additions (itemization owed) | ~$100,000,000 | 19 |
| Intervening cause — No. 11 NCIC Oct. 2018 value | $454,000,000 | 12, 22 |
| Intervening cause — No. 12 Agera | $129,000,000 | 22 |
| Intervening cause — No. 13 ECL | $22,288,826 | 13, 22 |
| Intervening cause — No. 14 UKAT | $39,000,000 | 22 |
| Intervening cause — No. 15 Insurance-Holdco debt | $14,897,805 | 22 |
| Intervening cause — No. 16 CWG/Clanwilliam sale | $474,000,000 | 18, 28, 29, 22 |
| Intervening cause — No. 17 zero-coupon early sale | $611,600,000 | 20, 30, 22 |
| Intervening cause — Beckett destruction | ~$866,000,000 | 28, 29, 30, 44 |
| **TOTAL REDUCTIONS → Net restitution: $0** | $3,765,418,383 | |

## EXHIBIT 2 — The 47 Categories, Where Each Rests, and Why It Matters

| # | Category | Where it fits / why relevant |
|---|---|---|
| 1 | M3 low/mid/high valuations + M3 disclosure rec. | Forfeiture; baseline valuation |
| 2 | Data/methodology underlying M3 | Baseline; § 3664(e) |
| 3 | Every valuation/revaluation, Jan. 2025→present | Forfeiture; credits |
| 4 | Low/mid/high filed under seal (July 2026) | Forfeiture |
| 5 | March 2026 data the SM said he'd provide | Forfeiture; valuation |
| 6 | AAPC downgrade to ~zero + forfeiture trigger | Forfeiture |
| 7 | Communications with M3 | Baseline; ex parte |
| 8 | Complete data/methodology for ~$1.655B | Schedule baseline |
| 9 | Paladin/Dinius spreadsheets (starting balances) | Improper additions |
| 10 | Repayment data & loan-balance base data | Credits (PPN); baseline |
| 11 | LoanIQ outputs | Baseline; § 3664(e) |
| 12 | Affiliated-loan base data (Oct. 18, 2018; MOU; Bermuda) | Issue 11 ($454M); credits |
| 13 | ILA/MOU reconciliations (ECL; Apr. 2022 refinance) | Improper additions; Issue 13 |
| 14 | ULICO reconciliation | AAPC/ULICO credit ($352.9M) |
| 15 | Iteration history (~$2.9B→~$1.6B) | Baseline; $263M interest |
| 16 | Method of calc for every offset/credit | All credit/offset lines |
| 17 | NCIC-investment offset (conceded) | Offset line (conceded) |

| | | |
|---|---|---|
| 18 | DOJ-agreed Clanwilliam offset (terms + data) | Offset line; Issue 16 |
| 19 | ~$100M in Dinius offsets and additions (itemized) | Improper additions; offsets |
| 20 | Disallowed offsets (SNIC, CBL, ULICO, Finanzen, etc.) | SNIC/CBL/ULICO/Bermuda/PPN credits |
| 21 | $641M Dinius valuation (Nov. 2018) + Govt↔SM comms | Offset basis ($641M) |
| 22 | Intervening-cause data (Issues 11–17) | All seven intervening-cause lines |
| 23 | AAPC board books/packs | Forfeiture; Issue 11 |
| 24 | NHC board books | Credits; forfeiture |
| 25 | Board minutes/financial reports/presentations | Valuation; credits |
| 26 | Letters of intent received | Forfeiture; valuation |
| 27 | Offers to purchase received | Forfeiture; valuation |
| 28 | Marketing/sale docs (Becket, Clanwilliam, Damovo) | Issue 16; Beckett; forfeiture |
| 29 | Terms/proceeds of completed sales (Becket; Clanwilliam) | Beckett (~$866M); credits |
| 30 | Sales/offers that did not close — why | Issue 17; Beckett |
| 31 | Damovo figures/terms | Forfeiture; valuation |
| 32 | SM ↔ New Holding Company | Ex parte; valuation |
| 33 | SM ↔ AAPC and its board | Ex parte; AAPC downgrade |
| 34 | SM ↔ the bankers | Ex parte; sale value |
| 35 | SM ↔ NC counsel / Wes Camden / Williams Mullen | Ex parte |
| 36 | SM ↔ NHC (valuation/restitution) | Ex parte |
| 37 | SM ↔ Bermuda JPLs | Bermuda credit ($9.8M) |
| 38 | Grier/Martinez ↔ any party | Ex parte (all) |
| 39 | "Do not tell Greg Lindberg" communications | Ex parte; disqualification |
| 40 | DOJ ↔ custodians communications | Ex parte (Govt); baseline |
| 41 | DOJ data/methodology supporting ~$1.655B | Baseline |
| 42 | Materials Government relied on at sentencing | Baseline; sentencing |
| 43 | M3 desktop valuation files | Forfeiture; baseline |
| 44 | SM's Appendix 1 to the Final Supplement + data | Beckett; valuation methodology |
| 45 | Wes Camden authority-dispute letters | "Available by other means" fails |
| 46 | AAPC-waiver requests + communications | Forfeiture; AAPC value |
| 47 | Trustee (Steve Wilson) communications | Issue 16; credits |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 30, 2026.

August 30th 2026:

Affidavit of Greg E. Lindberg, signature page:

/S/

Greg E. Lindberg
BOP Inmate 34-828-058