**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC |

**SPECIAL MASTER'S RESPONSE TO DEFENDANT'S**
**MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

NOW COMES Joseph W. Grier, III, the Court-appointed special master (the "Special Master") in the above-captioned proceeding (this "Case"), through counsel, who hereby presents this response (this "Response") to the *Defendant's Motion to Compel the Special Master to Produce the Data Underlying the Restitution Figure and his Ex Parte Communications, and to Set Aside his Report and Final Supplement* (the "Motion")[1] and respectfully represents as follows:

## INTRODUCTION

The Motion's premise is a distorted retelling of what transpired between the Special Master and Defendant between the time the Court entered the Order appointing the Special Master (the "Appointment Order")[2] and Defendant's sentencing hearing. The factual support for the Motion is an affidavit from Defendant (the "Lindberg Affidavit") that is, at a minimum, misleading. The Special Master's version of the facts relevant to the Motion are supported by the *Affidavit of Michael L. Martinez* filed contemporaneously herewith (the "Martinez Affidavit"), and, more reliably and importantly, by the record in this Case. Contrary to the picture painted by the Motion

[1] Doc. No. 332.
[2] Doc. No. 56.

and the Lindberg Affidavit, the restitution resolution process in this Case was **NOT** an adversarial process (a) whereby the Special Master served as adjudicator and/or prosecutor or (b) to which Defendant was excluded. Very much to the contrary, the Special Master conducted a diligent investigation into Defendant's restitution liability and prepared a report to the Court (together, with the supplements thereto subsequently filed, the "Report") pursuant to a **collaborative process, in which Defendant was a primary participant**. Defendant and the Court each has all the information needed to evaluate the restitution-related findings and conclusions contained in the Report, including the Special Master's positions on Defendant's offset requests (all or nearly all of which may be disposed of as a matter of law and do not involve dispositive questions of fact). There is no need for the voluminous document discovery sought through the Motion, especially not at this stage in the Case.

## FACTUAL AND PROCEDURAL BACKGROUND

### Pending Motions Seeking Effectively Same Relief

On July 23, 2026, Defendant filed a motion for authority to issue subpoenas duces tecum to the Special Master, the Special Master's financial advisors ("Paladin"), victims, and other third parties, seeking expansive document discovery (the "First Subpoena Motion").[3] After the government and the Special Master submitted objections[4] (and Defendant submitted a notice of supplemental authority[5]), the Court denied the First Subpoena Motion.[6]

On August 18, 2026, Defendant filed a motion asking the Court to reconsider its denial of the First Subpoena Motion (the "Second Subpoena Motion").[7] The Special Master objected to the

---

[3] Doc. No. 248.
[4] Doc. Nos. 261 & 266.
[5] Doc. No. 294.
[6] Doc. No. 304.
[7] Doc. No. 309.

Second Subpoena Motion on August 24, 2026,[8] and Defendant filed a reply in support of the Second Subpoena Motion on August 31, 2026.[9] The Court has yet to rule on the Second Subpoena Motion.

The Motion requests essentially the same relief as the First Subpoena Motion and the Second Subpoena Motion. Although the Special Master has not methodically compared the forty-seven (47) categories of documents the Motion asks that the Court compel the Special Master to provide with the six (6) subpoenas the First Subpoena Motion and Second Subpoena Motion seek to issue (each with dozens of categories of documents requested), the basic request is the same—compel overly burdensome discovery disproportionate to Defendant's need for the same, especially considering the current procedural posture of this Case (*i.e.*, the eve of entry of the final restitution order following sentencing).

**<u>Collaboration Between Defendant and the Special Master Resolved Most Restitution Issues</u>**

All restitution-related document and information requests directed to the Special Master had been resolved to the satisfaction of Defendant's counsel before the Special Master filed the Report.[10] Although there were (and are) outstanding document and information requests by Defendant relevant only to the valuation, and forthcoming liquidation, of "Primary Restitution Assets," no requests relevant to establishing Defendant's primary restitution liability were outstanding at the time the Report was filed or the preliminary restitution order was entered.[11] Again, Defendant and the Court each has all the information needed to evaluate the findings and conclusions contained in the Report.

Prior to Defendant's sentencing, Defendant's counsel and the Special Master worked

---

8 Doc. No. 323.
9 Doc. No. 333.
10 Martinez Affidavit, ¶¶ 25–28.
11 Martinez Affidavit, ¶¶ 24–28.

collaboratively to facilitate the Special Master's investigation into restitution issues implicated by this Case.[12] In addition to weekly video conferences, Defendant's counsel and the Special Master's team engaged in in-person meetings, frequent exchanges of documents and information, and open discourse concerning the restitution-related issues in this Case.[13] Prior to filing the initial Report, Defendant's counsel and the Special Master team agreed that Defendant's base restitution responsibility (*i.e.*, principal amounts owed in restitution before factoring in credits or offsets) would be established using the unpaid loan balances agreed to by Defendant and the North Carolina insurance company victims in connection with that certain *Interim Amendment to Loan Agreement* ("IALA"), rolled forward.[14] Much of the documents and information that enabled the Special Master team to understand IALA balances originated with Defendant's counsel, and, where critical data considered by the Special Master came from the North Carolina insurance company victims or some other source, such information was provided to the satisfaction of Defendant's counsel.[15] At a minimum, at the time of filing the initial Report, there were no open restitution-related document requests owed by the Special Master to Defendant.[16]

Notably, Defendant's initial written response to the Special Master's initial Report ("Defendant's Initial Response") confirmed this understanding and agreement concerning

---

12 Martinez Affidavit, ¶¶ 8, 10, 12–14.

13 Martinez Affidavit, ¶¶ 13–14. Recent filings by Defendant feign surprise that the Special Master was communicating one-on-one with various constituencies to this Case outside of the joint presence of both the government and Defendant, which Defendant characterizes as "ex parte" communications. The Lindberg Affidavit references multiple instances whereby Defendant himself was communicating directly with the Special Master outside of the knowledge or presence of the government. Doc. No. 332-1, at 2–4. In addition, the Lindberg Affidavit also acknowledges that Defendant was personally aware that the Special Master was communicating with third parties outside the presence of Defendant or Defendant's counsel (or the government). Doc. No. 332-1, at 1–2. Defendant's statements in other pleadings representing that Defendant only recently learned that the Special Master was openly communicating with various third parties about this Case are not only false or misleading, but they also undermine the credibility and reliability of factual contentions made by Defendant in this Case.

14 Martinez Affidavit, ¶ 21.

15 Martinez Affidavit, ¶¶ 22, 25–28.

16 Martinez Affidavit, ¶ 26.

Defendant's base restitution responsibility.[17] Defendant's Initial Response states that, "[a]lthough **Mr. Lindberg agrees with several portions of the Special Master's Restitution Report**," Defendant disagrees with **certain aspects** of how the Special Master calculated Defendant's base restitution liability.[18] These disagreements were limited to: (1) a $141 million discrepancy between the IALA balances and a subsequent concession made by the North Carolina insurance company victims; and (2) the Special Master's inclusion of $263 million in interest.[19] Consistent therewith, Defendant conceded throughout this process (at least up to and through the time of sentencing) that some restitution was owed and made no complaint about a lack of information to make that determination or to assess the Special Master's precise calculation of the same.

Nowhere in Defendant's Initial Response does Defendant complain about the inability to obtain critical documents or information, at least not from the Special Master.[20] Similarly, Defendant's presentation during the May 26, 2026 sentencing hearing, through counsel, not only contains zero references to an inability to obtain critical documents or information from the Special Master, but rather repeatedly praises the collaborative manner in which the Special Master and Defendant resolved their differences on most restitution issues, including *inter alia*:

> the Defendant recognizes "the excellent work of the Special Master and of its financial advisor in this case. They listened to all sides, they're experienced, and then they make their own independent judgments about what should occur. And if there are dustups, which there were, *they work to resolve those and have resolved those*";

---

17 *See generally* Doc. No. 132 (objecting to the Special Master's inclusion of an interest component and refusal to accept certain admissions by some of the victims to reduce the IALA figure (*see* pgs. 15–16) but not otherwise refuting the Special Master's IALA-based calculation or complaining of a lack of information regarding the same).

18 *See* Doc. No. 132, at 6–7 (emphasis added).

19 *See* Doc. No. 132, at 6–7.

20 *See generally* Doc. No. 132. The Defendant's Initial Response's only reference to lacking information was made in connection with the refusal of Defendant's counsel to adopt some of Defendant's (then-) newly-raised offset arguments, which Defendant's counsel could not adopt as their own "in part because of Mr. Lindberg's lack of access to information." Doc. No. 132, at 3 n.2. These newly-raised offset theories related exclusively to transactions that occurred years ago, such that the Special Master similarly lacks access to the pertinent information and/or Defendant could have obtained the same information from those third parties, through formal process or otherwise, years ago, but failed to do so.

"[w]e engaged in weekly meetings, hour-long meetings, with the US Attorney's Office, with the Special Master, with Paladin, in order to effectuate these asset sales, the payment of restitution, and the future payment of restitution";

"we, as defense counsel, engaged cooperatively with the Government, the Special Master, Paladin, the Special Master's advisor, to cooperatively work together to resolve issues for two reasons: one, to get assets sold to benefit policyholders, and, second, to narrow the issues for this Court";

whereas the Defendant was previously "fighting on every front, and I think this Court saw that in the first trial. But that has changed, and it has led to a very productive relationship with the Special Master and for the victims";

"[i]t has been a very, very productive process, probably the first productive process relating to this whole global issue of -- the issues between Mr. Lindberg and various insurance companies";

"the first productive process has been the Special Master's involvement in terms of the asset sales";

just as defendants "should get credit for their evidentiary cooperation, [the Defendant] should get credit for his cooperation relating to restitution";

"there has been substantial restitution, in fact, paid and will be paid" and "we've seen the billions of dollars of restitution that has been already paid and will be paid"; and

when discussing entry of the Preliminary Restitution Order, which only holds open objections relating to certain discrete issues with the Special Master's analysis (defined below as the "Open Restitution Issues"), the Court asked the Defendant's counsel if the defense had any comment on the proposed form of the Preliminary Restitution Order, to which the Defendant responded "No, Your Honor. That's obviously subject to the objections of numerous parties and further hearings with the Court."[21]

(Emphasis added by the undersigned to a transcript of the sentencing hearing provided to the Special Master by the government.) Defendant's (former) counsel continues to tout the cooperation between the Special Master and Defendant, as recently as in Katten Muchin Rosenman

[21] The Preliminary Restitution Order elaborates on the "preliminary" nature of the order as being limited as follows: "This Order is captioned "preliminary" as it precedes sentencing in this matter. At sentencing, this Court will incorporate this Order, in its present form or in a subsequently modified form, into the Judgment in this Criminal Case." This language was included in the draft proposed form of the order in the event the Court entered the order in advance of the sentencing hearing as the parties had requested in their Joint Motion to Bifurcate Sentencing Hearing (*see* Doc. No. 107, at 3 ("Specifically, the parties request that the Court schedule the sentencing hearing after it enters a preliminary restitution order but before any necessary hearings to finalize restitution")).

LLP's fee application filed in this Case on September 1, 2026, which discusses "voluminous meetings and communications [with the Special Master that] have helped to narrow the restitution issues in this case and to facilitate [the Report]."[22] The Lindberg Affidavit attempts to undermine this Case history with a timeline of unsatisfied requests; however, as further detailed in the Martinez Affidavit, this timeline is at times vague, at times demonstrably incorrect, and at times misleadingly incomplete.[23]

## ARGUMENT

### The Special Master Provided Defendant with All Necessary Documentation Required by Defendant for Purposes of Establishing Restitution Amounts

As summarized above and detailed in the Martinez Affidavit,[24] no requests for documents or information pertinent to the Special Master's calculation of Defendant's primary restitution responsibility (based on the IALA rolled forward) were unresolved at the time the initial Report was filed or the preliminary restitution order was entered. This is confirmed not only by Defendant's presentation at the sentencing hearing, but also by Defendant's Initial Response, which: (1) contains no allegations that Defendant lacks necessary documents or information to understand how the Special Master was calculating Defendant's restitution responsibility; (2) celebrates the Special Master and Defendant resolving several restitution issues[25]; and (3) itemizes specific restitution-related issues upon which the Special Master and Defendant do not agree.[26] Defendant's Initial Response thus demonstrates that the restitution analysis in this Case (at least prior to sentencing) was not a question of "if" but rather was a question of "how

---

22 Doc. No. 337, at 7.

23 Martinez Affidavit, ¶¶ 31–36.

24 Martinez Affidavit, ¶¶ 19–20, 28.

25 One such issue was the decision to rely on IALA balances as the basis for restitution amounts. Martinez Affidavit, ¶ 21.

26 *See generally* Doc. No. 132 (at most, Defendant's Initial Response complains of a lack of information relating to newly-raised offsets, for which Defendant has the burden of proof and which Defendant had failed to obtain, through discovery or otherwise, earlier in this Case.

much," and Defendant had sufficient information to understand (and, where Defendant deemed appropriate, contest) the Special Master's calculation of how much.

While the Special Master recognizes Defendant's need for some of the information sought through the Motion for purposes of evaluating any proposed dispositions of Defendant's assets by the Special Master in the future, that information is not critical to the restitution determination and otherwise need not be produced on an urgent timeline.[27] To the extent the information sought is necessary to prove-up one or more of Defendant's new offset requests based on previous asset liquidations (the Special Master refutes that there is such necessity), then the source of such information would be third parties (not the Special Master), meaning that: (A) the Special Master does not have such information; and (B) Defendant could and should have sought this third party discovery earlier in this Case. In any event, the information is not critical to resolving restitution issues in this Case, as the Special Master's objections to the open offset requests are overwhelmingly legal in nature, not factual.

For the Special Master's part, the Special Master resolved all restitution-related document and information requests to the satisfaction of Defendant's counsel in advance of filing the Report and again in advance of entry of the preliminary restitution order. Defendant's efforts to rewrite the history of this Case warrant no weight in evaluating the relief requested through the Motion.

**The Special Master Team Investigated and Reported and Did Not Adjudicate or Prosecute, and Defendant is Not Otherwise Entitled to Every Communication with the Special Master**

The Motion seeks to recharacterize the Special Master's role in this Case to one of either adjudication, prosecution, or both.[28] From there, Defendant complains of the Special Master

[27] As explained in the Special Master's response in opposition to the Second Subpoena Motion, the Special Master is willing to produce some of the information requested provided sufficient guardrails designed to protect against disclosure of sensitive financial information be implemented. *See* Doc. No. 323, at 4–6.

[28] *See, e.g.*, Doc. No. 332, at 11–15.

participating in "ex parte" communications with various parties as part of a "proceeding to which the Defendant had no access."[29] Ironically, the Lindberg Affidavit admits repeatedly that Defendant (and Defendant's counsel) were communicating frequently with the Special Master outside of the presence of the government and acknowledges that Defendant had known early on that the Special Master was communicating with others about this Case outside of his (or his counsel's) presence. Thus, the Motion lacks a factual foundation for the argument that all Special Master communications must now be immediately produced because Lindberg only recently discovered that the Special Master was not including Defendant's counsel (or the government) on each and every communication.

The Special Master engaged in a cooperative and collaborative process with Defendant from the time of the Appointment Order through the time of sentencing, a process that earned Defendant a reduced custodial sentence. Not only was Defendant aware that the Special Master was investigating for the purpose of reporting—rather than prosecuting or adjudicating—including through one-on-one communications, but also Defendant and Defendant's counsel had more frequent one-on-one communications with the Special Master team about restitution issues than any victim, other interested third-party, or the government.[30] Defendant, through counsel, praised the Special Master's manner of handling this Case during Defendant's sentencing hearing. Neither Defendant nor Defendant's counsel ever complained to the Special Master (with one exception not relevant here)—or filed a motion with the Court—concerning how the Special Master was fulfilling his duties under the Appointment Order, at least not until after the sentencing hearing.[31] Defendant's actions in this Case evidence his willing participation in, and outright consent to, the

---

29 Doc. No. 332, at 2.
30 Martinez Affidavit, ¶ 10.
31 Martinez Affidavit, ¶ 12.

collaborative manner in which the Special Master sought to resolve the complicated restitution questions at issue in this Case.

The Appointment Order does not envision a special master process whereby the special master sits as an arbitrator or adjudicator of sorts, reviewing only the competing evidence presented by adversaries pursuant to rules of evidence and making rulings to which the parties would be bound. Rather, the Appointment Order envisions that the Special Master—in addition to conducting an independent investigation, reporting to the Court about that investigation, and recommending a form restitution order for the Court's consideration—would: analyze how to best liquidate Defendant's assets and "oversee and help accomplish the liquidation"; immediately take control of and manage certain of Defendant's interests in various business entities, including by appointing members of multiple boards of directors; update Defendant on the status of sale processes "regularly" and "consult with the Parties to the extent the Special Master deems it helpful"; receive and distribute restitution payments; coordinate with state court receivers; and retain a law firm and financial advisors to help complete these tasks and others.[32]

To accomplish his assignment, the Special Master required voluminous meetings with various interested third parties, including victims, receivers, officers and directors of Primary Restitution Assets, lenders and other creditors, regulators, and representatives of state guaranty associations.[33] These tasks would be ill-suited for the adjudicator-like or arbitrator-like role Defendant recently insists the Special Master is limited to fill under applicable law. It is precisely because a court-supervised, adversarial process would be an unworkable manner of accomplishing these tasks that a special master appointment was appropriate in this Case.[34] Defendant makes

32 Doc. No. 56, at 6–7.
33 Martinez Affidavit, ¶ 11.
34 Martinez Affidavit, ¶ 11.

similar points in Defendant's brief filed in support of the special master appointment, observing that: other special masters appointed in this district have fulfilled similar functions; this sort of special master appointment would "promote cooperative efforts between the parties, the Court, and others," would be administratively reasonable, and would increase efficiency in the collection and timely distribution of restitution; and the special master fulfilling these various roles would otherwise further the interests of justice.[35]

The Special Master behaved in the precise manner that Defendant requested that the Special Master behave, which involved communications outside of the presence of Defendant (and the government), of which Defendant has always been generally cognizant. Once again, Defendant's efforts to rewrite the history of this Case warrant no weight in evaluating the relief requested through the Motion. In any event, Defendant is not automatically entitled to the Special Master's entire file in this Case and has not articulated any just reason for the expansive discovery sought for the first time after entry of the preliminary restitution order and after sentencing.

**Defendant Agreed with the Special Master's Methodology for Calculating Defendant's Base Restitution Liability**

Defendant agreed to the Special Master's methodology for determining Defendant's primary restitution liability, being a roll forward of the IALA balances (subject to potential offsets reducing that prime responsibility).[36] This is confirmed by Defendant's Initial Response to the Report, which does not take issue with the Special Master's methodology generally, but only raises two discrete issues with how the Special Master is calculating the initial restitution amount (*i.e.*, independent of various offset arguments for which Defendant has the burden of proof). These two discrete issues are: (1) whether to tack on interest; and (2) whether to reduce Defendant's exposure

---

35 *See* Doc. No. 55, at 4–5.
36 Martinez Affidavit, ¶ 21.

based on concessions made by victims in companion civil litigation.[37] Both of those issues are legal in nature. Defendant needs no further discovery on how the Special Master calculated Defendant's restitution responsibility.

To the extent some of the document discovery the Motion now seeks would help demonstrate Defendant's offsets reducing restitution, those, too, are not relevant because the Special Master's Report rejects the corresponding offsets based on legal theories, not because the Special Master disagrees with the underlying objective facts asserted by Defendant. In addition, the Special Master does not have the historical data that Defendant would presumptively use to demonstrate these offsets, such that ordering the Special Master to produce the same would serve no purpose. Moreover, Defendant had years to seek the discovery Defendant now seeks.

Therefore, no cause exists to mandate further discovery at this time—let alone the expansive discovery requested by Defendant—because (A) Defendant has agreed with the Special Master's methodology for calculating restitution (with limited, non-fact-based exceptions) and (B) because the Special Master's refusal to accept certain of Defendant's requested offsets was based primarily on legal argument and not on a disagreement over the underlying objective facts.

## CONCLUSION

The Motion unjustifiably revises the history of this Case as a pretext to ask for the same relief the Court rejected when denying the First Subpoena Motion. Defendant was a willing, knowing, and consensual participant in a collaborative special master process that involved the Special Master team meeting with all sorts of parties outside of the presence of Defendant (or the government). Defendant should not get yet another crack at getting the documents sought through

---

37 *See generally* Doc. No. 132 (objecting to the Special Master's inclusion of an interest component and refusal to accept certain admissions by some of the victims to reduce the IALA figure (*see* pgs. 15–16) but not otherwise refuting the Special Master's IALA-based calculation or complaining of a lack of information regarding the same).

the First Subpoena Motion and Second Subpoena Motion by feigning surprise at how the Special Master has conducted himself in this Case.

Regardless, additional discovery is not needed at this point in this Case, especially not the broad fishing expedition requested through the Motion. Defendant has taken no factual issue with the Special Master's methodology for calculating Defendant's base restitution responsibility; rather, Defendant's issues with the Special Master's calculation are legal disputes—(1) whether interest is appropriate and (2) whether admissions by victims on loss numbers are irrefutably binding in a criminal restitution proceeding. Likewise, when it comes to Defendant's several offset requests, the Special Master mostly assumes the underlying objective facts asserted by Defendant are true but rejects them on a legal basis.

At a minimum, the Court should refrain from ruling on this Motion until after the Court rules on the Second Subpoena Motion, which effectively seeks the same relief as this Motion.

Finally, the Motion's request that the Court set aside the Report fares no better than its request for further discovery. In addition to the other arguments made by the government in its response in opposition to a companion motion to compel (which equally apply here),[38] Defendant identifies no fraud, misconduct, bias, or procedural irregularity in the Special Master's investigation or reporting process that could warrant setting aside the Report—nor could he, given the collaborative nature of the process detailed above, a process in which Defendant's own counsel participated at every stage and repeatedly praised on the record in this Case. A litigant's disagreement with the substance of a court-appointed special master's conclusions is not, by itself, grounds to set aside the special master's report; it is, at most, grounds to sustain the objections

[38] *See generally Response in Opposition to Defendant's Motion to Compel* (Doc. No. 341).

Defendant has already lodged and which remain pending before the Court. The Motion offers no basis, factual or legal, to disturb the Report on the record.

WHEREFORE, the Special Master prays that the Court deny the Motion and grant such further relief as is just and proper.

Respectfully submitted this 10th day of September, 2026.

*/s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

*Attorneys for Joseph W. Grier, III, Special Master*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that copies of the foregoing *Special Master's Response to Defendant's Motion to Compel Production of Documents* were served on those parties who have requested electronic service in this case through the CM/ECF system.

Respectfully submitted this 10th day of September, 2026.

*/s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202