IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case Nos. 3:23-CR-48-MOC / 5:19-CR-22-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S RESPONSE TO THE GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANT'S "UPDATES" (DOC. 367), AND RESERVATION OF THE REMEDY FOR THE GOVERNMENT'S BREACH OF THE PLEA AGREEMENT, INCLUDING RESTORATION OF DOCS. 440 AND 441 (NO. 5:19-CR-22)**

Defendant Greg E. Lindberg respectfully submits this Response to the Government's Consolidated Response in Opposition to Defendant's "Updates" (Doc. 367), filed on October 13, 2026, under the Court's Order of October 6, 2026 (Doc. 361), and expressly reserves, under paragraph 18 of the plea agreement, the remedy for the Government's breach of that agreement, including restoration of Docs. 440 and 441 (No. 5:19-CR-22). Part III.E, *infra*.[1] The Order of October 6, 2026 permitted the Government and the Special Master to respond to Defendant's supplementation and

[1] Unless otherwise noted, docket citations are to No. 3:23-CR-48. The Government filed its Consolidated Response in both cases; the corresponding entries in No. 5:19-CR-22 are Doc. 642 (the Consolidated Response, Doc. 367 here) and Doc. 641 (the Order of October 6, 2026, Doc. 361 here). Defendant's pending motions and supplements are likewise docketed in both cases: Docs. 331, 332, 347, and 281 here are Docs. 621, 622, 627, and 591 in No. 5:19-CR-22, and Docs. 355 through 360 here are Docs. 635 through 640. Doc. 320 and the Special Master's Response (Doc. 366) appear on the docket of No. 3:23-CR-48 only. The No. 5:19-CR-22 number is also given in parentheses at the first citation of each of these entries below.

did not address a reply. To the extent leave is required to file this Response, Defendant respectfully moves for it and asks that this Response be deemed filed. For the reasons set forth below, the Court should direct the Government to disclose to defense counsel all of its ex parte communications relating to this proceeding, including any attachments, before any hearing is set; decline the Government's request to restrict Defendant's filings, direct the Government to designate counsel other than the three attorneys who took part in the communications at issue, and grant the relief requested in Docs. 281, 320, 331, 332, and 347, as supplemented by Docs. 356 through 360.

## INTRODUCTION

Current counsel appeared in this case on June 9, 2026, two weeks after sentence was imposed. Doc. 170. Former counsel withdrew on August 10, 2026. Most of the records on which Defendant's recent filings rest were not on the docket when current counsel appeared: the Special Master's billing entries for the sentencing period were filed on July 30, 2026, sixty-five days after sentencing, Doc. 263; former counsel's invoices were filed on September 1, 2026, Doc. 336-2; and former counsel's complete e-mail export—approximately 1.8 gigabytes—has now been reviewed in full by current counsel, working with former counsel. Exs. A–C, F, G. Each filing Defendant has made since has placed on the record what those documents show: communications between the Government and the Court's appointee outside Defendant's presence, about the report, the sentencing, and the assets. The Government's answer, now that counsel has the records and has read them, is that

the filings should stop. Doc. 367 at 5 (No. 5:19-CR-22, Doc. 642). A restriction imposed at the moment the defense has caught up with the record is not docket management. It is, by other means, the gag order the Government sought in the week after sentencing, when it demanded that Defendant's first emergency motion be removed from the docket on pain of a breach of the plea agreement. Doc. 201 at 5–6; Doc. 201-1 ¶ 6. The due process violations these filings describe are not characterizations. They are concrete, and they are proven by records that already exist and that the Special Master himself filed: the Government's edits to the report two days before it was filed, Doc. 148 at 43; 85.1 hours on Conservatrix and 74.8 hours on Vista with no disclosure to the defense, Doc. 365 at 1–3; and the private call to the prosecutor after the Special Master's counsel had edited the defense's sentencing memorandum, Doc. 263 at 11. Those records show concrete harm, and they show that the harm was caused by the conduct of the prosecution. That is prosecutorial misconduct, and it is on the docket. Part I.

The Government accuses Defendant of "attempting to rewrite history." Doc. 367 at 3. The history is in the Special Master's own billing records, and it is the Government's. Two days before the Special Master filed the restitution report on which the Government now relies as its proof of loss, his counsel held a "[c]onference call with Dan Ryan" on "specific language in various parts of the restitution report and appendices" and exchanged e-mails with AUSA Dan Ryan "re futher [sic] edits to draft report from the government." Doc. 148 at 43. When the defense shared its draft sentencing memorandum with the Special Master's counsel and the prosecution

alike, the Special Master's counsel followed up with a private "[t]elephone call to Dan Ryan re the same and related sentencing issues." Doc. 263 at 11. The content of those communications has never been disclosed to the defense, and the sentencing call surfaced only as a billing line item filed sixty-five days after sentence was imposed. Doc. 263 (filed July 30, 2026). The Government does not deny any of it. It says the communications were "authorized by the Special Master Order (Doc. 56 ¶ 5)." Doc. 367 at 2. The Order never uses the words "ex parte." Paragraph 5 directs the Special Master to "update the Parties"—plural—and to "consult with the Parties." Doc. 56 at 7. The statute says the same thing in one word: the court "shall disclose to both the defendant and the attorney for the Government" the report on which restitution rests. 18 U.S.C. § 3664(b). The Government asks instead for a hearing, and for limits on Defendant's filings.

**Before any hearing, Defendant asks the Court to direct the Government to disclose to defense counsel all of its ex parte communications relating to this proceeding—with the Special Master, his counsel, and his financial advisor, and with third parties—including any attachments.** 18 U.S.C. § 3664(b) ("all portions"); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Government asks for a hearing. Doc. 367 at 5. A hearing on communications the defense has never seen, held while the Government holds them, would compound the harm, not cure it; the disclosure must come first, and any hearing after. Part II, *infra*. Part I sets out what the Government's own record shows: that it edited the Court's appointee's report in private; that the Special Master's team

spent 85.1 hours on one claimant and 74.8 on another, in at least 48 communications *without the defense*, none of which Defendant has ever received; and that nothing in the Order or the statute authorized any of it. The rest of the Government's Response should be rejected. It omits the record that explains how this restitution process came to exist—Defendant's undecided post-trial motion in No. 5:19-CR-22 (Docs. 440, 441), which he withdrew under the plea agreement that created this process, Doc. 488 (No. 5:19-CR-22)—and it seeks to restrict the filings of the one party that was kept out of the room.

## ARGUMENT

### I. The Government's Own Record: It Edited the Report in Private, Its Appointee Spent Months With the Claimants Outside Defendant's Presence, and Nothing Authorized Either.

#### A. The Government edited the Special Master's report in private and took part in preparing the final supplement.

The Government bears "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense." 18 U.S.C. § 3664(e).[2] To carry it, the Government relies on the Special Master/Magistrate's report.[3] The Special Master's

[2] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Response without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

[3] The Government objects to the term "Special Master/Magistrate." Doc. 367 at 1–2. Defendant uses it because 18 U.S.C. § 3664(d)(6) authorizes the Court to refer restitution issues "to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." The term describes the role the statute assigns; it is not a criticism of anyone. The Government's own descriptions of the role have been less fixed. In the

own billing records show that the Government did not merely talk with the Special Master about restitution; it worked on the report itself, *outside the presence of the defense*. These are the most important entries in the record, and the Government's Response does not mention one of them:

> February 23, 2026: a "[c]onference call with Ben Bain-Creed, Dan Ryan, JWG, and BDR re restitution concepts," and a "[c]onference D. Ryan, B. Bain-Creed, M. Martinez & B. Rhodes re special master's report." Doc. 148 at 30.
>
> March 16, 2026: "[r]eview comments to draft restitution report and redline of proposed order from DOJ." *Id.* at 37.
>
> April 1, 2026—two days before the report was filed: a "[c]onference call with Dan Ryan and Andrew Cowie re specific language in various parts of the restitution report and appendices," and "[e]mails with Dan Ryan re futher [sic] edits to draft report from the government." *Id.* at 43; *see* Doc. 106 (filed April 3, 2026).
>
> May 14, 2026: "[e]mails with Dan Ryan, Lyndie Freeman, and Ben Bain-Creed re revised proposed preliminary restitution order. Revise the same." Doc. 263 at 12. The Court entered the Preliminary Order of Restitution on May 28, 2026. Doc. 161.
>
> June 25, 2026: a "[v]ideo conference with Dan Ryan, Ben Bain-Creed, Scott Avila, Don Harer, David Elkin, BDR, and JWG re preparation of final supplement to restitution report and related issues." Doc. 263 at 22.

---

Government's draft of the appointing order, the role was a "receiver," with the Government's "proposed receiver's counsel." Doc. 75-1 at 65. When the subject is Defendant's cooperation and his sentence, the Special Master reports to the Court on Defendant's conduct and "litigious history," Doc. 159 ¶¶ 2(a), 3, and the Government relies on the report, Doc. 367 at 2—the function of a parole officer. When the subject is Damovo, the Special Master stands aside while a Primary Restitution Asset is transferred to lenders and liquidators, professing "no input," Doc. 334 at 3–4, and the Government calls Defendant's objection "harassment," Doc. 367 at 4—the function of a bankruptcy trustee. Depending on the Government's brief of the day, the Special Master is a receiver, a parole officer, a bankruptcy trustee, or whatever the argument requires. Defendant uses the statute's term.

That supplement was circulated to the defense on July 22, 2026, at 4:48 p.m., with the statement that it would be filed "by Friday," Doc. 332-2 at 19–20 (No. 5:19-CR-22, Doc. 622-2), and was filed the next morning, Doc. 245—while the defense's request for time for Mr. Lindberg, in Bureau of Prisons custody, to see it was pending, a day before the date announced, and more than four weeks before the ninety-day date of 18 U.S.C. § 3664(d)(5). It came within two hours of the defense's notice that it would seek emergency relief in the Fourth Circuit that day, and fifteen minutes after it was filed the Government's appellate counsel asked whether the filing had "mooted" the mandamus. Doc. 346 at 51–52; *United States v. Lindberg*, No. 26-4309, Doc. 27-1 at 11–12 (4th Cir. July 29, 2026). The report was moved up to moot the mandamus. Defendant went to the Fourth Circuit the following day. Doc. 251 & Ex. A (No. 26-1965); *see* Doc. 272. The Government, which had taken part in preparing the supplement four weeks earlier, did not join the request for time.

Defense counsel were, at times, sent carefully curated sections of drafts. But the conference "re special master's report," the call on the report's "specific language," the Government's "redline" and its "futher [sic] edits to draft report," and the conference on the "preparation of final supplement" all took place *without the defense*, and their content has never been disclosed. The report on which the Government relies to carry its statutory burden was shaped, in its specific language, by the Government in private. The Government cannot edit the Court's appointee's report behind closed doors, offer the result as neutral proof of loss, and then call the defendant's objection "baseless." Doc. 367 at 2. The attorneys on those entries are

AUSA Dan Ryan, AUSA Benjamin Bain-Creed, and Trial Attorney Lyndie M. Freeman—two of whom signed the Response. Doc. 367 at 6; Part VII, *infra*.

### B. The Conservatrix record was built in 85.1 billed hours outside Defendant's presence, and Defendant has had to answer it in the Fourth Circuit without access to any of it.

Defendant has already placed the prejudice on this record and does not repeat it here. Doc. 365 at 1–5 & Ex. A (Oct. 11, 2026) (74 entries and 85.1 hours on Conservatrix, 37 of them communications between the Special Master's team and Conservatrix or its counsel *with no defense counsel named*; 70 entries and 74.8 hours on Vista; at least 48 communications *in which the defense took no part*; none disclosed). The Government disputes none of it; it calls the filing "redundant." Doc. 367 at 5. What matters here is the consequence.[4] Conservatrix's insolvency practitioners told this Court that they had "previously provided to the Special Master and the Special Master's financial advisor information regarding the harm Defendant has inflicted on Conservatrix and its policyholders," Doc. 258 at 11, and then petitioned the Fourth Circuit for mandamus on that record. Defendant was directed to respond by noon the next day, *In re Zetteler*, No. 26-1749, Doc. 8 (4th Cir. June 11, 2026), and had to do so without access to any of the documents—information conveyed to the Special Master and processed over 85.1 billed hours that Defendant has never seen. The Fourth Circuit thus became the court of first impression on Conservatrix's claim, on twelve hours' notice to Defendant, Doc. 365 at 7, and Defendant had no

[4] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

opportunity to correct the misstatements by Conservatrix and the Special Master that were carried into that court's decision; the facts and issues cannot be fully placed before any court in twelve hours, much less an appellate court. The Fourth Circuit denied the petition, *In re Zetteler*, No. 26-1749, slip op. at 4 (4th Cir. June 13, 2026) (per curiam) (unpublished), *as amended* (June 15, 2026), and that decision and this Court's restitution record have since been invoked against Defendant in *Van Faassen v. Lindberg*, No. 1:23-cv-879, Doc. 81 at 10–11, 13–14 (M.D.N.C. Oct. 5, 2026). Doc. 365 at 5. And the report on which that record rests was edited by the Government without the knowledge of the defense. Part I.A, *supra*; Doc. 148 at 30, 37.

### C. Neither the Special Master Order nor the MVRA authorizes ex parte communications. The words appear in neither; the Order speaks to "the Parties," and the statute to "both." Any ex parte communication would have to be provided for expressly, and the Order provides for exactly one: a written directive from the Special Master to Defendant under paragraph 8.

The Government's answer to the communications documented in the billing records is that they "were authorized by the Special Master Order (Doc. 56 ¶ 5)," that "[t]his is evident by the clear language of the Order," Doc. 367 at 2, and that the Order "explicitly authorized" the Special Master's "direct communications with each of the parties and with interested third parties," *id.* at 5. The Order says no such thing. The words "ex parte" do not appear anywhere in the ten-page Order. *See* Doc. 56. Neither does the phrase "direct communications," neither does "each of the parties," and neither does "interested third parties." *Id.* Those are the Government's words, describing the Special Master's practice, which the Government then told the Court the Order "explicitly authorized." Doc. 367 at 5. The only "third parties" the Order

mentions are the custodians—"one or more third parties selected by the Special Master"—in whose "exclusive possession and control" the Primary Restitution Assets were to be placed. Doc. 56 at 3, 7 (¶ 4). They are the holders of the assets, not persons the Special Master is authorized to consult in private; and the word "parties," wherever else it appears in the Order, refers to the United States and Defendant together—"the parties recommend," "the parties and/or the Special Master shall be authorized to make motion or application." *Id.* at 3, 10 (¶ 15). Paragraph 5 reads, in its entirety: "The Special Master shall regularly update the Parties throughout the diligence and/or sales process concerning any of the Primary Restitution Assets and should consult with the Parties to the extent the Special Master deems it helpful in fulfilling his duties under this Order." Doc. 56 at 7 (¶ 5). The noun, both times, is "the Parties"—plural and capitalized. The Order was entered on the "Joint Motion for Appointment of Special Master, filed by the United States and Defendant Greg E. Lindberg," *id.* at 1, and "the Parties" are the two of them. Paragraph 5 directs the Special Master to update both parties and permits him to consult both. It does not say "either party," "each party," or "the Government." A provision requiring the Special Master to keep both parties informed is the opposite of a license to inform one of them. Paragraph 5 does not authorize ex parte communications. It is a joint-communication provision: it tells the Special Master to keep both sides informed, and it says nothing about communicating with either of them alone.

The statute the Order implements says the same thing, and it uses the word "both." The Mandatory Victims Restitution Act provides that "[t]he court shall

disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to" restitution. 18 U.S.C. § 3664(b). The restitution report here is such a report—a "separate report, as the court may direct," *id.* § 3664(a), prepared on referral under § 3664(d)(6). The statute's design is symmetrical. Both sides receive the report. "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." *Id.* § 3664(e). "Any dispute as to the proper amount or type of restitution shall be resolved by the court." *Id.* And the Special Master's work product is "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." *Id.* § 3664(d)(6). The Government is the party that bears the burden in that dispute. A party that bears the burden of proof cannot also be the undisclosed editor of the fact-finder's proposed findings on the very question it must prove. Nothing in the MVRA, any more than in the Order, permits the fact-finder to take one side's "edits," Doc. 148 at 43, in private and disclose to the other side only the result. And the statute confines the rules that govern this proceeding to "[t]he provisions of this chapter, chapter 227, and Rule 32(c) of the Federal Rules of Criminal Procedure." 18 U.S.C. § 3664(c). None of them authorizes ex parte communications either. An appointing order could not authorize what the statute does not, and this one does not try.

Paragraph 5 is also confined to its subject. The updates and consultation it describes are "throughout the diligence and/or sales process concerning any of the Primary Restitution Assets." *Id.* at 7 (¶ 5). The paragraph says nothing about the

restitution report, the sentencing hearing, Defendant's cooperation statement, or the forfeiture. The communications Defendant has placed on the record are not updates on a sales process: a conference "re special master's report," Doc. 148 at 30; the Government's "redline of proposed order," *id.* at 37; the Government's "edits to draft report" two days before it was filed, *id.* at 43; and a private "[t]elephone call to Dan Ryan re the same and related sentencing issues," Doc. 263 at 11. If the Government's only authority for those communications is a paragraph about updating "the Parties" on the sale of the Primary Restitution Assets, then those communications were not authorized at all.

The rest of the Order confirms the reading its text compels. The Court appointed "an experienced, neutral, and disinterested person" to make "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." Doc. 56 at 3 (¶ 7) (quoting 18 U.S.C. § 3664(d)(6)). A neutral's communication with one side alone is the exception to the structure the statute sets up—"both the defendant and the attorney for the Government," 18 U.S.C. § 3664(b)—and an exception of that kind is not implied; if any ex parte communication is to be permitted, the Order must provide for it expressly. This Order does so exactly once, and the one communication it provides for runs from the Special Master to Defendant. Paragraph 5, the provision the Government cites, is not it; paragraph 5 speaks to "the Parties," both of them, and authorizes no ex parte communication with anyone. Paragraph 8 requires Defendant to "take all necessary steps identified by the Special Master to assist the Special

Master in carrying out his duties pursuant to this Order," and provides that "[i]f Defendant fails to comply with a directive of the Special Master within 14 days of the Special Master advising Defendant, through Defendant's counsel, of such directive in writing, the Special Master may take any actions and/or cease taking any actions for, or on behalf of, Defendant to enable the Special Master to carry out his duties." *Id.* at 8 (¶ 8). That is the only ex parte communication the Order authorizes: a written directive to Defendant, through his counsel, about a step necessary to the Special Master's duties under the Order, with fourteen days to comply and a remedy confined to acting in Defendant's stead. It does not run to the Government, and nothing like it runs from the Government; there is no paragraph under which the Government may communicate with the Special Master alone, and none under which the Special Master may communicate with the Government alone. An order that spells out the one ex parte channel it allows, in a paragraph with its own notice requirement, its own time limit, and its own remedy, has not silently allowed every other. Where the Special Master needs instruction, the Order sends him to the Court by "motion or application." *Id.* (¶ 10). Nothing in the Order contemplates one party editing the Special Master's recommendation out of the other's presence, or the Special Master's counsel discussing the defendant's sentence with the prosecutor alone. The Government's "clear language" argument rests on language the Order does not contain.

The Government also wrote the Order. The Special Master's own billing records show his counsel's December 2024 "conversations with Assistant US

Attorney" on the "form of motion seeking special master, and form of order appointing special master," Doc. 69 at 11, and a December 17, 2024 conference with AUSA Dan Ryan, Trial Attorney Freeman, and AUSA Stout "re contents of brief in support of order appointing special master," *id.* at 12. Former defense counsel's records show the "draft memorandum and order from opposing counsel," the "memorandum of law . . . received from DOJ," the "late-night special master motion proposed by D. Ryan," and AUSA Dan Ryan's "special master order markup and proposed edits." Doc. 75-1 at 67–68. The Government drafted the motion, the memorandum, and the order, and its conversations with the prospective Special Master about them preceded the defense's. Ex. E. If the Government wanted an order permitting it to communicate with the Special Master outside the presence of the defense, it held the pen. It wrote "the Parties." It did not write "ex parte." A drafter that leaves a provision out cannot read it back in after the fact, and in the plea context the Government is held "to a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities" in what it drafts. *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986). "Neither side should be able, any more than would be private contracting parties, unilaterally to renege or seek modification simply because of uninduced mistake or change of mind." *Id.* And having written an order that left ex parte communication out, what the Government ended up excluding was Defendant's access to the ex parte communications it and the Special Master had.

One further point about the Government's description of the Order must be made, because it recurs. A statement to the Court that an order "explicitly

authorized" a practice is a statement about what the order says, not an argument about what it means. The Order does not contain the words the Government attributes to it, and the Government, which drafted the Order, knows what it contains. An attorney for the Government is "subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). In this State, a lawyer "shall not knowingly . . . make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." N.C. Rev. R. Prof'l Conduct 3.3(a)(1). "Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal." *Id.* cmt. [4]. The statement follows the same method the Government uses throughout its Response, already laid out above: it picks one entry and builds on it an argument that the entry does not support. Parts I.A, I.D, *supra*. Two such arguments are addressed below: that "Defendant's counsel, including his current counsel, engaged in such communications," Doc. 367 at 3–4, and that former counsel's "eve of sentencing" entry shows the same, *id.* at 2. Each rests on a directive the Special Master sent to Defendant—one under paragraph 8 of the Order, the other in violation of it—and on Defendant's response to it. Parts I.D, I.G, *infra*. The representation that the Order "explicitly authorized" what it does not mention is the same method applied to the Order. Defendant asks that the Government correct both on the record, and that the Court weigh the Response accordingly.

**D. The Government's "defense counsel did it too" argument is specious: (1) the Order's only ex parte provision runs from the Special Master to Defendant; (2) many of the contacts the Government cites were not ex parte at all; (3) the declaration it cites contradicts the sentence it quotes; and (4) its principal examples predate the Order—while the Government's own contacts fit no provision of the Order and were never shared with Defendant.**

The Government's principal response is that Defendant's former counsel also communicated directly with the Special Master/Magistrate, Doc. 367 at 2–4. It rests that response on one sentence of the Special Master's counsel's declaration: that "the Special Master and Paladin had more one-on-one communications with Defendant's counsel than any other person or group involved in this Case, including the government." *Id.* at 3 (quoting Doc. 343 ¶ 10). The argument is specious, for two reasons. First, the Government ignores the only ex parte communication authorized by the Order appointing the Special Master—a written directive from the Special Master to Defendant under paragraph 8—which is what its own examples are. Second, many of the contacts it cites were not ex parte at all. Third, the Government reads the declaration it cites out of context; the rest of it contradicts the sentence the Government quotes. Fourth, the Government does not distinguish between contacts before the Order appointing the Special Master and contacts after it; the entries it relies on most heavily predate the Order, when there was no Special Master and nothing to communicate outside of.

### 1. The Order's only provision for ex parte communication runs from the Special Master to Defendant.

Greg Lindberg handed over multiple assets—the Primary Restitution Assets—to the Special Master, to be held as a receiver holds them, in his "exclusive possession and control." Doc. 56 at 7 (¶ 4); Doc. 65 at 6. The entire Order appointing the Special Master has only one provision for ex parte communication, and it runs from the Special Master to the defendant. Paragraph 8 requires Defendant to "take all necessary steps identified by the Special Master to assist the Special Master in carrying out his duties pursuant to this Order," and provides that if Defendant "fails to comply with a directive of the Special Master within 14 days of the Special Master advising Defendant, through Defendant's counsel, of such directive in writing, the Special Master may take any actions and/or cease taking any actions for, or on behalf of, Defendant to enable the Special Master to carry out his duties." Doc. 56 at 8 (¶ 8).

That is the whole of it: a written directive to the defendant, through his counsel, about a step necessary to the Special Master's duties under the Order, with fourteen days to comply and a remedy confined to acting in the defendant's stead. It does not run to the Government, and nothing in the Order runs from the Government. Part I.C, *supra*. Every communication the Government cites as the defense's is a paragraph 8 directive from the Special Master to Defendant, a demand that paragraph 8 did not permit, or a contact that preceded the Order or included the Government. Every communication of the Government's own fits no provision of the Order at all.

The quantum of contacts therefore proves nothing. Greg Lindberg contributed the assets; he has to communicate with the Special Master about them, and he has to comply with the Special Master's directives. Doc. 56 at 8 (¶ 8). That the defense had contacts with the Special Master does not mean that the Government's contacts were permitted; to reason that way is to misread the Order the Government itself drafted. The factors that matter—who initiated each contact, what it was about, whether the other side was on it, and whether it was ever disclosed—are set out below, and each of them cuts the other way.

**2. Many of the contacts the Government cites were not ex parte at all; the entries fall into three groups, and none discloses an ex parte communication.**

The "defense counsel did it too" argument is a red herring. The entries the Government cites fall into three groups. The first is the late-2024 negotiation of the appointing order: contacts with prospective appointees whom the Government had proposed, on a draft the Government had written, before there was a Special Master or an Order to communicate outside of. Doc. 75-1 at 65; Ex. E; Part I.D.10, *infra*. The second is the May 2–12, 2026 exchange on the defense's sentencing memorandum, which carried all four Government attorneys on every e-mail. Ex. F. The third is directives and requests initiated by the Special Master: a demand, under threat of a negative sentencing report, that Defendant sign a waiver—which the Special Master did not send to the Government, and which paragraph 8 did not permit him to make; the AAPC tax-return request to current counsel, which is the very definition of a paragraph 8 directive and the only ex parte communication the Order authorizes; and

requests, once again initiated by the Special Master's counsel, that Defendant provide information—such as the documentation on the zero-coupon bonds, an open restitution issue reserved by the Preliminary Order, which Defendant has since placed on the record of this Court, Doc. 295 & Exs. A–N (Aug. 10, 2026).

What Defendant supplied in response to those requests *went straight back to the Government*. Even where the defense was asked to send the Special Master's team documents, information about the documents Defendant had, or information about the numbers and the data—a request initiated by the Special Master, just like the waiver demand—the data and documents *went right back to the Special Master and the Government*, and much of it is now on this docket. Doc. 295 & Exs. A–N; Doc. 332 at 1–2 (No. 5:19-CR-22, Doc. 622). Each of these contacts was initiated from the other side—a demand for Defendant's signature; a tax form sent for his signature; a negotiation the Government ran on its own terms before there was an Order—and what Defendant supplied has been made available to the Court and to the Government, in the very filings the Government now calls "redundant" and asks the Court to limit. Doc. 367 at 5.

The Government's contacts are another matter entirely. They fit no provision of the Order—not paragraph 5, which speaks to "the Parties," and not paragraph 8, which runs only to Defendant—and they were never shared with Defendant. They moved the Government's words into the Special Master's drafts: its "redline" of the appointing order, Doc. 316-2 at 25; its "comments to draft restitution report and redline of proposed order," Doc. 148 at 37; its "futher [sic] edits to draft report," *id.* at

43; its e-mails on the "revised proposed preliminary restitution order," Doc. 263 at 12; its call while the cooperation statement was being drafted, *id.* at 13; its conference on the "preparation of final supplement," *id.* at 22. None of it was disclosed when it occurred. Those communications are not merely pervasive; they go to the core of who controlled the process: the drafting of the Order, the editing of the report, the shaping of the statement on Defendant's cooperation. The only time the Government has acknowledged them is in the Response itself, where it calls them "authorized," which they are not. Doc. 367 at 2; Part I.C, *supra*.

Most of the documents that came from Defendant are in the Government's hands, and many, if not most, are already on this docket, because Defendant has had to build the record himself from what little he has. Very little of the underlying documents and data ever reached him, even when he asked. Doc. 343 ¶ 24; Part II, *infra*. The entries the Government cites are examined below in that light.

**3. The Government reads the declaration out of context; the rest of it contradicts the sentence the Government quotes.**

The sentence the Government quotes from Doc. 343 ¶ 10 is contradicted by the declaration it comes from. One paragraph earlier, the same affiant swears that he "continue[s] to communicate about this Case outside the presence of both the government and Defendant's counsel with third parties on a daily (or near daily) basis." *Id.* ¶ 9. One paragraph later, he describes "voluminous interviews and other meetings with various interested third parties, including victims, receivers, officers and directors of Primary Restitution Assets, lenders and other creditors, regulators, and representatives of state guaranty associations." *Id.* ¶ 11. Daily one-on-one contact

with third parties and "voluminous" third-party interviews cannot be reconciled with the claim that defense counsel had "more one-on-one communications" with the Special Master's team "than any other person or group involved in this Case." *Id.* ¶ 10.

The communications at issue are the ones outside the joint weekly calls, which show the Government on the calls that shaped the report and the sentencing, *with the defense absent*. Parts I.A and I.D. The Government's own cherry-picked entries show why that narrative fails.

**4. The sentencing memorandum: the Government was on every e-mail; the Special Master's counsel then called the prosecutor alone.**

The Government's lead example is the defense's contact with the Special Master's counsel about the sentencing hearing. Doc. 367 at 2 (citing Doc. 336-2 at 18, 21). The e-mails show who was on that contact. On May 2, 2026, defense counsel sent the draft sentencing memorandum to AUSA Dan Ryan, AUSA Dana Washington, Trial Attorney Lyndie Freeman, AUSA Benjamin Bain-Creed, the Special Master, his counsel, and Paladin, together: "All – attached is a draft of Mr. Lindberg's sentencing memo for your review. We would like to know if any inaccurate or objectionable information is contained in this memo." Ex. F. The attachment was named for its recipients: "(2026 5-1) Revised Sent Memo USAO SM Copy.docx"—one copy, prepared for the U.S. Attorney's Office and the Special Master together. *Id.* AUSA Dan Ryan answered on May 8, to the same group: "I'll defer to the Special Master and Paladin on redactions and the accuracy of the various financial numbers, etc. With respect to

the remaining facts, while I might take issue with the degree of 'voluntariness' of some of Mr. Lindberg's actions, I did not notice anything materially inaccurate." *Id.* The Special Master's counsel answered on May 11, to the same group, returning the draft as a Word file with his comments ("Revised Sent Memo USAO SM Copy - MLM COMMENTS, 1.docx"). *Id.* Defense counsel replied on May 12, to the same group, that "[w]e incorporated most of your comments." *Id.* Every e-mail in the exchange carried all four Government attorneys. The Special Master's own records match: on May 11, 2026, his counsel billed for "[e]mails with James Wyatt, Dan Ryan, and others re the same" and for "[p]rovid[ing] feedback to James Wyatt and Dan Ryan re the same." Doc. 263 at 11. That exchange was not ex parte; the prosecution was on all of it.

What was ex parte is what came next, in the same entry: a "[t]elephone call to Dan Ryan re the same and related sentencing issues." *Id. The defense was not on that call.* The defense shared its sentencing memorandum with both sides; the Special Master's counsel then took the defense's draft to the prosecutor privately. The one party without information about what was said about sentencing was Defendant, who learned of the call from a billing entry filed sixty-five days after he was sentenced.

The comments are in the record exchange. Ex. F. Five of the twelve concern one subject: AAPC and its value. The Special Master's counsel asked whether "AAPC's name need[s] to be included," and wrote, of the defense's statement that AAPC "has been valued as worth at least $2.7 billion": "I'm sure it is going to hurt AAPC's sale efforts to include valuations. At a minimum, we certainly would never

receive any offers above $2.7 billion." *Id.* He called the defense's description of AAPC's growth "harmful," asked that it be redacted or sealed, and twice noted that he was "not signing" the pleading. *Id.* The defense complied. Its May 12 reply, to the same group, reads: "We incorporated most of your comments and there will be no reference to AAPC or its valuation." *Id.* The memorandum filed two days later contains no reference to AAPC. Doc. 507. The same day it was filed, the Special Master's counsel sent the waiver demand. Ex. G. Eight days after that, the Special Master told the Court that Defendant had "never complied" and had a "litigious history." Doc. 159 ¶¶ 2(a), 3. And, as set out in the next sub-section, the Special Master then moved the midpoint of his own valuation down by $456 million—months after his counsel had treated $2.7 billion as the figure that would cap the bids ("we certainly would never receive any offers above $2.7 billion"), Ex. F. Under the consent forfeiture order, the forfeiture amount is the difference between the restitution and the value of the assets, and "[i]f the difference . . . is less than zero, the forfeiture amount would be zero." Doc. 160 at 2 n.1. A lower midpoint is what turns a forfeiture amount of zero into a forfeiture. Doc. 106 at 30; Doc. 245 at 36.

#### 5. What the Special Master's counsel said about AAPC's value in May and what the Special Master told the Court in July cannot both be true.

In May the stated concern was that a published figure of $2.7 billion would cap the bids: "we certainly would never receive any offers above $2.7 billion." Ex. F. On July 23, 2026, the Special Master reported that the Primary Restitution Assets—AAPC among them—were worth, in the aggregate, between $826 million and $1,231

million, with a midpoint of $998 million, down from the $1,162 million to $1,878 million he had reported on April 3. Doc. 245 at 36; Doc. 106 at 30. He attributed the change to "new information discovered since filing the Initial Report" and to "markets shift[ing]," called the result his "current guess," and disclosed that the figures rest in part on "illustrative valuation analyses" that "do not constitute formal valuations or fairness opinions" but "reflect a desktop exercise." Doc. 245 at 36 & n.31, 37. The reasons for the reduction were reserved for a proposed sealed appendix. *Id.* at 36–37 & n.32. The asset that in May could not be described at $2.7 billion without capping the offers was, ten weeks later, part of a group he valued at no more than $1,231 million—less than half that figure—on a "desktop exercise" and a "guess," with the explanation under seal. In May, disclosure of a high figure would "hurt AAPC's sale efforts"; in July, disclosure of his own lower figures "would negatively impact liquidation efforts." Ex. F; Doc. 245 at 36 n.32. Both statements are the Special Master's. They cannot both be true, and the Court has been given the data for neither.

If the answer is that the July figure nets out liabilities and the May figure did not, the April figure was net too—it was the Special Master's estimate of what could be recovered "from Defendant's interests" in the assets, interests he described as "subordinated to those of other persons," Doc. 106 at 29–30—and it fell by $456 million at the midpoint between April and July. The liabilities the Special Master's counsel said Defendant "placed on AAPC," Ex. F, have never been identified, quantified, or placed on the record; they are item 6 of the data Defendant moved to compel. Doc. 332 at 19.

The shift was driven by what the Special Master describes as his "independent investigation." Doc. 288 at 10. It was not independent. By his own account, his estimate "merely reflects the Special Master's best guess at what might happen in the future," "relying heavily on information from the persons managing the 'Primary Restitution Assets' and not relying on independently-commissioned business valuations." Doc. 323 at 4. The "illustrative valuation analyses" behind the July figures were "prepared by the financial advisors to NHC Holdings, LLC," Doc. 245 at 36 n.31—the entity that holds and sells the assets, to whose board the Special Master appoints two directors, Doc. 288 at 10, and on which his own financial advisor, Don Harer of Paladin, sits as "the Special Master's appointee." Doc. 94 at 7; Doc. 147 at 4. A number produced by the seller's advisors, for a seller whose board includes the Special Master's own appointee, adopted by the Special Master as his "guess," and explained only under seal, is not an independent valuation. It is the Special Master valuing his own work. Defendant, for his part, has placed on the record the materials bearing on the value of his interests in AAPC—under seal, because the Special Master's own valuation is sealed—and has asked that Appendix 1 be unsealed so that the two can be compared on an open record. Doc. 318 (Part Two) (filed Aug. 23, 2026; sealed by Doc. 325); Doc. 349 (refiled Sept. 15, 2026; sealed by Doc. 351); *see* Doc. 348 ¶¶ 1, 3. On the public record stands the Houlihan Lokey valuation of AAPC at approximately $3 billion, on identified projections and a disclosed multiple. Doc. 281 at 47–48 (No. 5:19-CR-22, Doc. 591). A valuation that moves by this much in ten weeks, on a "desktop exercise," with the reasons under seal, is not a valuation; it is

whatever number is needed at the time. That is the person whose estimates the Government asks the Court to adopt as proof of loss.

#### 6. The "eve of sentencing" entry is a waiver demand that paragraph 8 did not permit, and the Special Master's side of it was a private call with the prosecutor.

The "eve of sentencing" entry, Doc. 367 at 2, is this: "call and correspondence with SM regarding the Waiver requested," followed by counsel's note, "Legally cannot sign the waiver until these legal issues are resolved." Doc. 336-2 at 21. The "Waiver requested" was the Special Master's demand, not the defense's initiative. On May 14, 2026, the Special Master's counsel wrote to defense counsel that "the Special Master asks Mr. Lindberg to immediately sign that attached waiver document by no later than Friday, May 22, 2026," four days before the sentencing hearing. Ex. G. No Government attorney was on that e-mail. *Id.*

Measured against paragraph 8—the only provision under which the Special Master may direct Defendant in writing and alone—the demand fails on every term. Paragraph 8 gives Defendant fourteen days; the demand gave him four. Paragraph 8 reaches "necessary steps identified by the Special Master to assist the Special Master in carrying out his duties pursuant to this Order"; a release of, and a covenant not to sue, a class that expressly included "the Special Master" himself, Doc. 347 at 41–42 (quoting Doc. 190 at 10 & Ex. W), is not a step toward liquidating the Primary Restitution Assets with Court approval, Doc. 56 ¶ 3(c)–(d). And paragraph 8's only consequence for non-compliance is that the Special Master "may take any actions and/or cease taking any actions for, or on behalf of, Defendant"; it says nothing about

the sentencing court. Doc. 56 at 8 (¶ 8). The Special Master used none of it. On May 22, 2026—his own deadline, eight days after the demand—he filed a "Statement Concerning Defendant's Cooperation" telling the sentencing court that Defendant had "never complied," had a "litigious history," and that he "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. 159 ¶ 2(a) (at 3 & n.4). A special master appointed under 18 U.S.C. § 3664(d)(6) to make "proposed findings of fact and recommendations as to disposition" of restitution issues has no role in sentencing, as Defendant has said throughout, Doc. 356 at 38–39 (No. 5:19-CR-22, Doc. 636); Doc. 347 at 41–42 (No. 5:19-CR-22, Doc. 627), and the statement itself concedes that the requests were "arguably exceeding the scope of the Special Master's authority," Doc. 159 at 3 n.4. The waiver demand was therefore not a communication the Order authorized, and the Order authorizes no other ex parte communication. What the Government cites as the defense "engag[ing] in such communications" is a demand the Special Master had no authority to make, answered by a refusal.

The waiver personally benefited the Special Master; it did nothing for Defendant. A demand from the Court's appointee, on the eve of sentencing, that the defendant sign a release the appointee had no authority to require—and the defendant's answer that he could not lawfully do so—is not a defense "communication with the Special Master" of the kind the Government describes. It is the Special Master using the sentencing hearing as leverage, and the Government citing the defense's refusal as proof that the defense endorsed the practice.

On the Special Master's side of that same episode, while drafting the Special Master's statement on Defendant's cooperation for the sentencing hearing, his counsel took a "[t]elephone call from Dan Ryan re the same." Doc. 263 at 13 (May 20, 2026). The next day the Special Master's counsel exchanged e-mails on the draft with "Dan Ryan, Ben Bain-Creed, and Lyndie Freeman" and, separately, with "James Wyatt, Ryan Meyer, and Brandon McCarthy." *Id.* at 13. The two sides were handled in separate channels, and the prosecution had already been heard in private before the defense saw a draft.

**7. After the appointment, the Government conferred alone with the Special Master's counsel about the Special Master's own powers; its contacts dwarf the defense's, and it has not shown that any defense contact was not a paragraph 8 contact.**

After the appointment, the Government's contacts continued, on the subject of the Special Master's own powers. On March 6, 2025, the Special Master's counsel held a one-hour video conference with AUSA Dan Ryan, AUSA Julia Park, AUSA Benjamin Bain-Creed, and AUSA Taylor Stout "re special master rights and responsibilities clarification term sheet." Doc. 69 at 36. *No defense counsel is listed.* On March 26, 2025, he placed a "[t]elephone call to Dan Ryan re special master's role and responsibilities." *Id.* at 46. *No defense counsel is listed.* The one meeting on the "scope of rights and duties of special master" that included Katten—the March 20, 2025 Teams meeting "with attorneys at DOJ, Katten and principals at Pal[a]din," *id.* at 43—is the one the Government does not mention. What the Government describes as "identical communications" were not identical: the Government's came first, were

held *without the defense*, and were never disclosed. They were also longer: the Special Master's entries recording Government-only contacts in the same periods total 17.0 hours—2.8 hours in entries consisting of nothing but the Government contact, and 14.2 hours in block-billed May 2026 entries in which the call or e-mails with AUSA Dan Ryan and his colleagues are one of several tasks. Doc. 69 at 11–12, 36, 43, 46; Doc. 263 at 11–13. On the Government's own selection of dates, the Government's undisclosed contacts dwarf the defense's.

The Government has not shown that any of these contacts are not paragraph 8 contacts. The Government cites invoice lines. Doc. 367 at 2–3. It does not say who initiated the contact, what was asked, whether it came to Defendant's counsel in writing as paragraph 8 requires, or whether the Government was on it. The one entry it describes in any detail—the "Waiver requested"—was a written demand from the Special Master to Defendant's counsel. Ex. G; Part I.D.6, *supra*. A defendant who is ordered to "take all necessary steps identified by the Special Master," Doc. 56 at 8 (¶ 8), will have contacts with the Special Master; that is the Order working as written. It is the Government that calls those contacts ex parte, and it is the Government that must show they were something other than the defense answering the Special Master's requests. It has not tried.

**8. "Everyone else's interpretation" was a unilateral choice by the Government and the Special Master, not an interpretation of the Order.**

The Government's remaining point is that "everyone else's interpretation of the Special Master Order, including [current counsel's] predecessors' and this

Court's," permitted the communications. Doc. 367 at 3–4. Defendant was not among the "everyone." In custody throughout, and not always able to communicate with his counsel in real time, Doc. 316-1 at 216 (Lindberg Decl. ¶ 1), he did not know that the Order did not authorize the Government's and the Special Master's communications outside his presence until his current counsel, having read the Order against the records, told him so.

The record shows something other than an interpretation. Within months of his appointment, the Special Master reported to the Court that "not all third parties having a relationship with the Primary Restitution Assets were initially willing to recognize the Special Master's authority." Doc. 65 at 6. As Defendant's former counsel have confirmed, many of the parties involved—"for example, the guaranty associations, the NHCs, and the NCICs"—"generally refused to recognize this Court's jurisdiction and did not want to be subject to it." Doc. 365 at 4. The custodians—Mr. Dinius, NHC, the North Carolina insurance companies, and their counsel at Williams Mullen—told the Government that if it wanted their information it should obtain an order from the Court. Doc. 332 at 9–10. The Order supplied the mechanism: the Special Master "shall have the power to . . . obtain such further order(s) from the Court that he deems prudent or necessary," Doc. 56 at 8 (¶ 10), and matters affecting the restitution assets are "heard upon notice and hearing," *id.* at 10 (¶ 15). What happened instead is on the record: "the government and the Special Master refused to return to this Court and obtain the required authorization," and the communications at issue "were therefore precipitated by the government's own

reluctance to approach this Court and obtain the orders and subpoenas needed to commence its work consistently with the Mandatory Victims Restitution Act and the Constitution." Doc. 365 at 4–5.

The refusal was not for want of urging, and the urging is on the docket. In early 2025 the Special Master circulated a "Term Sheet—Scope of Special Master's Rights and Responsibilities," which he "intend[ed] to use . . . as a basis for a motion seeking an order from [this Court] clarifying how the Court wants the Special Master to function." Doc. 283-3 at 2. Williams Mullen, counsel to the North Carolina insurance companies, commented on it. Doc. 283-1 ¶ 12; Doc. 283-3. The Special Master's counsel discussed it with the Government alone. Doc. 69 at 36. And Defendant's former counsel and the Special Master's financial advisor "each sent the term sheet to the Special Master and urged him to press for access to the books, records, valuations, and loss information held by the insurance companies and the other parties—the very information a complete and accurate restitution accounting requires—and to push back against those parties' refusal to provide it. The Special Master refused to push back." Doc. 283-1 ¶ 12. The docket reflects no motion for the clarification order the term sheet contemplated.

It was a unilateral choice by the Government and the Special Master, made after Paladin and former defense counsel had urged that an order be obtained: they chose to proceed without the Court, outside Defendant's presence, and now call the result an "interpretation" of the Order. The Special Master's counsel has since explained the reason. Documents were withheld from the defense "primarily due to a

desire to preserve the free-flow of information to the Special Master." Doc. 343 ¶ 24. That is not an interpretation of the Order by anyone's counsel, current or former. It is a choice by the Government and the Special Master: to keep access to custodians who would not submit to this Court's authority by dealing with them off the record, rather than obtaining the orders and subpoenas that would have brought them, and their information, onto it. A proceeding in which the Government declines to obtain the necessary order, communicates ex parte instead, and then blames the defendant for the result is not a proceeding conducted under anyone's reading of Doc. 56.

**9. The defense's contacts deprived the Government of nothing; the imbalance runs one way; and the Government has not shown that any of them was not a paragraph 8 contact.**

Nor did the defense's contacts deprive the Government of anything. On information and belief, all of the documents sent to the Special Master and his team *have also been shared with the Government*, and much of it is now on this docket in Defendant's own filings. Most of the documents sent to the Special Master's team concern the restitution assets, the tax issues surrounding the sale of those assets, and other matters raised in the restitution process—the very subjects the Special Master was appointed to address. All of this information is available to the Government as well. The imbalance runs one way only: *what the defense sent was available to the Government*, while what the Government and others communicated to the Special Master has never been made available to the defense. *See* Doc. 332 at 1–2. And here too, the Government has not shown that any of these contacts are not paragraph 8 contacts. Documents sent to the Special Master's team at the Special Master's

request, about the assets the Special Master holds, are the Order working as written. Doc. 56 at 8 (¶ 8).

**10. Before the Order was entered, there was no Special Master and nothing to communicate outside of; the late-2024 entries show the Government's candidates, the Government's draft, and the Government first.**

The remaining entries the Government cites all predate the Order. Doc. 367 at 3 (citing Doc. 75-1 at 65, 67, 68, 70). The Order was entered on January 23, 2025. Doc. 56. Before that date there was no Special Master, no appointee, and no Order to communicate outside of; what the entries record is the negotiation of a joint proposed order, with candidates both sides were vetting. Doc. 75-1 at 65. A contact cannot be "ex parte" under an Order that did not yet exist. What those entries do show is who ran that negotiation, and that is the opposite of what the Government cites them for.

The entries concern the "proposed special masters" and the terms of the agreed order. Doc. 367 at 3. The Government quotes the first entry with an ellipsis. The words it removes are "proposed receiver's counsel proposed by the government"; the entry reads, "Work on special master order with proposed special masters S. Avila of Paladin as well as proposed receiver's counsel proposed by the government J. Grier and M. Martinez." Doc. 75-1 at 65. Two facts follow. The Government had already spoken to Mr. Martinez, more than once: the day before that entry, before defense counsel's first contact, Mr. Grier wrote that Mr. Martinez "has had conversations with the US Attorney's office re same." Ex. E. And what the Government proposed was not a special master but a "receiver"; Mr. Grier and Mr. Martinez were the Government's proposed receiver's counsel. Doc. 75-1 at 65.

The candidates were the Government's, and so was the draft. The defense entries of November 26 and 27, 2024 record "correspondence with D. Ryan on same," "edits in response to government's edits," and "attention to special master motion edits in order recently received." *Id.* at 65. The Government's transmittal is in the record: on December 18, 2024, AUSA Dan Ryan sent former counsel "a redline and a clean version of our changes," explaining that the Government had "discussed it with Mike and Joe"—Mr. Martinez and Mr. Grier—"and tried to incporate [sic] their thoughts in this draft." Doc. 316-2 at 25; *see* Doc. 316-1 at 219 (Lindberg Decl. ¶ 9). The order was negotiated between the Government and the defense; that is how the process was supposed to work. And the Government came first. Defense counsel first wrote to Mr. Grier about "a possible appointment as the Special Master" on November 26, 2024, and learned in reply that the Government had already been talking to his partner, in "conversations"—plural. Ex. E. The Special Master's own records show what the Government did alone: December 4, 2024, Mr. Martinez's "conversations with Assistant US Attorney" on the "form of motion … and form of order"; December 5, Mr. Grier's "email to Dan Ryan"; December 17, a 1.2-hour conference with AUSA Dan Ryan, Trial Attorney Freeman, and AUSA Stout "re contents of brief in support of order appointing special master." Doc. 69 at 11–12.

**E. Under the Order appointing the Special Master, the Government could not have ex parte communications—about "sentencing issues" or anything else.**

Paragraph 8 contacts—written directives from the Special Master to Defendant, through his counsel—are the only ex parte communications the Order

appointing the Special Master allows. Doc. 56 at 8 (¶ 8); Part I.C, *supra*. Nothing in the Order runs from the Government to the Special Master, or from the Special Master to the Government alone; paragraph 5 directs the Special Master to update and consult "the Parties," both of them. *Id.* at 7 (¶ 5). The Government explains the {SM}'s discussions of "sentencing issues" with the prosecution by noting that "restitution issues were likely to be, and in fact were, addressed at the sentencing hearing." Doc. 367 at 2. The explanation answers the wrong question. The question is not what the communications were about; it is whether the Order allowed the Government to have them. It did not. A private call between the prosecutor and the Court's appointee is outside the Order whether its subject is "sentencing issues," "restitution issues," or both. What the Special Master gave the Government was a private hearing—on the report's "specific language," Doc. 148 at 43; on the "revised proposed preliminary restitution order," Doc. 263 at 12; and on the statement concerning Defendant's cooperation, *id.* at 13—and that private hearing for the Government is the ex parte communication the Order does not allow. It violated the Order no matter what the Government and the Special Master's counsel called the subject.

The subject matters only in showing the harm. Under the plea agreement, the Government's recommendation that the sentence in this case run concurrently with any sentence in No. 5:19-CR-22 depended on whether Defendant took the steps necessary "to secure assets sufficient to pay full restitution . . . in the exclusive possession and control of one or more approved third parties," Doc. 40 ¶ 8(d);

restitution and the custodial sentence were linked by the agreement itself. And the loss figure carried into the sentencing was not the one the plea agreement stipulated—"[t]he amount of loss that was known to or reasonably foreseeable by the defendant exceeded $550,000,000," Doc. 40 ¶ 8(a)—but the approximately $1.655 billion recommended in the report the Government edited in private two days before it was filed, Doc. 106; Doc. 148 at 43, and entered as the Preliminary Order of Restitution two days after sentence was imposed, Doc. 161. The private "sentencing issues" calls of May 11 and May 20, 2026, Doc. 263 at 11, 13, took place while that figure was being carried into the sentencing through the report the Government had helped write. The term of imprisonment is before the Fourth Circuit in Nos. 26-4309 and 26-4310, and Defendant does not ask this Court to revisit it here. Doc. 347 at 17. The facts are stated to show what the Court's appointee and the prosecutor had to discuss in private, and why the defense needed to be in the room.

### F. The plea agreement expressly preserves claims of prosecutorial misconduct.

The Government calls Defendant's request to be resentenced "baseless" and says he "provides no legal support" for it. Doc. 367 at 2. The plea agreement answers part of that objection. By its terms, "[c]laims of (1) ineffective assistance of counsel and (2) prosecutorial misconduct, and those claims only, are exempt from the waiver." Doc. 40 ¶ 18. Defendant's claims concerning undisclosed communications between the prosecution and the Special Master/Magistrate on sentencing and restitution are claims of that kind, and the agreement preserves them.

The grounds themselves are these, stated explicitly, each on this Court's record.

**(1)** The Government edited the Court's appointee's restitution report in private before it was filed—"[e]mails with Dan Ryan re futher [sic] edits to draft report from the government," two days before filing—and worked with him again on the final supplement. Doc. 148 at 43; Doc. 263 at 22. The report so edited was then offered to the Court as the neutral recommendation on which the loss figure and the restitution order rest. Doc. 161; Doc. 308 at 1.

**(2)** The Court's appointee communicated privately with the prosecution about Defendant's sentencing: a "[t]elephone call to Dan Ryan re the same and related sentencing issues" after the defense's draft sentencing memorandum had been shared with both sides, and a "[t]elephone call from Dan Ryan" about the Special Master's "statement concerning defendant's cooperation." Doc. 263 at 11, 13. None of it was disclosed before sentence was imposed; it surfaced in a fee application filed sixty-five days afterward. Doc. 263.

**(3)** Sentence was imposed on a loss figure that its author calls his "best guess," reached through an "independent investigation . . . outside of the rules of evidence or criminal procedure," whose underlying data has never been produced. Doc. 323 at 4; Doc. 288 at 10; Doc. 332 at 7–8. A sentence resting on "assumptions . . . which were materially untrue" is "inconsistent with due process of law." *Townsend v. Burke*, 334 U.S. 736, 741 (1948).

**(4)** The forfeiture consent order was obtained on representations made by Government counsel on May 20, 2026, which were not honored. Doc. 360-1 ¶¶ 27–35 (No. 5:19-CR-22, Doc. 640-1); Doc. 160 at 2 n.1; Part VI, *infra*. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971).

**(5)** Four days before sentencing, the Court's appointee demanded that Defendant sign a release in his own favor—a demand outside paragraph 8 of the Order in its timing, its subject, and its remedy—and when Defendant declined, filed a statement to the sentencing court that he had "never complied" and had a "litigious history." Ex. G; Doc. 159 ¶¶ 2(a), 3 & n.4; Doc. 56 at 8 (¶ 8). A neutral who demands a release from the defendant and then addresses the sentencing court against him is not a neutral. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955).

**(6)** A Primary Restitution Asset was sold without court approval and without notice to Defendant, with the Special Master's own designee voting to approve the sale, while the Special Master reported the sale to the Court "[u]pon information and belief" and told it he "was not involved." Doc. 94 at 6–7; Doc. 288 at 5, 13–14; Doc. 148 at 14, 16–17; Doc. 95 at 51–52.

**(7)** The loss and valuation data were offered to the Court in April 2026 "under seal or in an in camera setting," then filed as bare figures under seal with no data, then refused outright; the Government adopted the figures without producing the

data and answered the request for it with "we do not litigate via email" and "reserving our position." Doc. 106 at 30; Doc. 245 at 36–37; Doc. 276; Doc. 323 at 5, 8; Doc. 308 at 1; Doc. 332-2 at 3. That is suppression of material bearing on punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

**(8)** The Government has told this Court that current counsel "engaged in such communications," Doc. 367 at 3–4, when the only communication at issue was a paragraph 8 AAPC tax-return request from the Special Master's counsel—the one ex parte communication the Order authorizes—which defense counsel nonetheless chose to disclose to the Government, Exs. A–C; Part I.G, *infra*; and it told the Court that current counsel "never made any genuine attempts" to identify what had been produced, "refused to identify any material," and "incorrectly explained" the production history, Doc. 341 at 12, 14–15, on an exhibit that ends before the defense's answer of the same day, while the record shows the categories identified, the conferral held, and the fifty-four-category chronology sent on August 28, 2026. Doc. 356 at 4; Doc. 345-4 at 13–14.

**(9)** Within days of sentencing, the Government demanded that Defendant's first emergency motion be removed from the docket on pain of a breach of the plea agreement, Doc. 201 at 5–6; Doc. 201-1 ¶ 6; it now asks that his filings be limited. Doc. 367 at 5.

**(10)** The Government's answer to all of it is to ask the Court to enter a final order "substantially similar to that proposed by the Special Master," Doc. 308 at 1, to

adopt the Special Master's positions in place of its own, and to set a hearing on a record it will not produce, Doc. 367 at 5—while the three attorneys who took part in the communications are themselves fact witnesses to them. Part VII, *infra*.

Those are the grounds. Here too, former counsel was informed that the plea agreement and the order appointing the Special Master were in pursuit of internal statistics deadlines, in violation of Departmental policy. *See* Justice Manual § 9-27.260. Each of the grounds above is a claim of prosecutorial misconduct that the plea agreement preserves, Doc. 40 ¶ 18. Each arose, or came to light, after Defendant withdrew Docs. 440 and 441 on November 18, 2024 in reliance on the process the agreement promised. Together they are why Defendant preserves restoration of his pre-plea position, including those motions, as a remedy for the breach, Part III.E, *infra*, and why a sentence that rests on the figure this process produced cannot stand.

**G. Current counsel's only exchange with the Special Master/Magistrate's team without the Government was a paragraph 8 directive—the one ex parte communication the Order authorizes—and current counsel added the Government to it anyway, the morning after learning it was not copied. The Government, for five weeks, chose silence.**

The Government asserts that "Defendant's counsel, including his current counsel, engaged in such communications until Defendant's current counsel decided to argue that everyone else's interpretation of the Special Master Order, including his predecessors' and this Court's, was wrong." Doc. 367 at 3–4. As to current counsel, the record shows one exchange, and it was initiated by the Special Master/Magistrate's own counsel. On July 31, 2026, Mr. Martinez e-mailed current counsel AAPC Holdings, LLC's 2025 federal tax-return package and asked that Mr.

Lindberg "execute these AAPC tax documents and return them either to Saurabh or to me." Ex. A. An AAPC tax return is the very definition of a paragraph 8 request: a written directive, through Defendant's counsel, that Defendant take a step the Special Master identified as necessary to his duties under the Order—the signature of a Primary Restitution Asset's tax forms so that the asset can be held and sold. Doc. 56 at 8 (¶ 8); *id.* ¶ 3(c)–(d) (at 6). It is the one ex parte communication the Order authorizes, and the Order authorizes no other. Part I.C, *supra*. Current counsel responded to Mr. Martinez about the logistics of getting the documents to Mr. Lindberg, who was then "in transit through the BOP system." Ex. A. Current counsel did not realize that the Government had not been copied on that thread until the Government itself asserted that defense counsel had engaged in ex parte contact. On August 26, 2026, pressed for the information underlying the restitution figures, AUSA Dan Ryan asked whether it was counsel's "position that Mr. Lindberg's counsel did not receive any information or materials from the Special Master and/or Paladin during its ex parte communications with them or the government in discovery relating to restitution." Doc. 332-2 at 30–31. The immediate reaction, six minutes later, was that Defendant had not engaged in any ex parte communication with the Special Master—and a question: "I would like to know what communication the government had." *Id.* at 29. What followed is what any reasonable attorney would do. Current counsel went back to the Order appointing the Special Master and read it. Doc. 56. Current counsel then searched his own inbox, and searched whatever little material had come from former counsel, for every e-mail to and from the Special

Master's team. That search turned up one thread initiated by the Special Master's counsel without the Government on it—the AAPC tax-return request—and the very next morning, August 27, 2026, current counsel forwarded it to the Government: "We are adding you to the thread," Ex. A (9:50 a.m.); "We have now regularized the one ex parte communication initiated by the master," Ex. B; Doc. 332-2 at 27 (10:03 a.m.). Paragraph 8 did not require that. A directive to Defendant under paragraph 8 may be sent to Defendant's counsel alone; the Order does not say the Government must be copied, and current counsel could have left the thread as the Special Master's counsel had framed it. Current counsel chose otherwise. That a communication can be read as falling under paragraph 8 does not mean current counsel would withhold it from the Government; in ethics, there is a choice, and current counsel made it within a day of learning that the Government was not on the thread. Current counsel chose to hold its own conduct to the stricter ex parte standard rather than to the paragraph 8 framing available to it. Indeed, current counsel wrote to the Government the next day that it had "regularized the one ex parte communication initiated by the master"—calling it ex parte, not a paragraph 8 directive, and treating disclosure to the Government as required rather than optional. Ex. B; Doc. 332-2 at 27. Current counsel then asked Government counsel for all of the ex parte communications the Government had engaged in, because much of it was Brady/Giglio material: "communicating with a judge ex parte is not constitutional. It's a due process issue. It's Brady/Giglio material which defense is entitled to have. All of it." *Id.* at 27.

Set that beside the Government's conduct over the five weeks that followed. The Government's answer on August 26 was that the defense already had everything: it "d[id] not agree with your suggestion that he has not already received materials underpinning the restitution amount," and it "d[id] not have any obligation to reproduce materials already in Defendant's possession." Doc. 332-2 at 30. Then it went silent. Current counsel asked again on August 28 at 10:01 a.m. ("We asked about ex parte communications two or three days ago. You have not responded yet."), at 11:35 a.m. ("Your silence over the past three days on this ex parte issue is disconcerting. How extensive was your ex parte contact with the special master and his representatives (including paladin)? What was discussed?"), at 1:29 p.m., and at 3:30 p.m. ("Once again following up on the ex parte communications. We need an answer. . . . Silence is not an option."). *Id.* at 25–26. The Government's only other answer was to send the defense to the Court: "we do not litigate via email. If you file a motion with the court with your requested relief, we will respond accordingly," *id.* at 3 (Aug. 17, 2026); "feel free to file whatever additional motions you feel are appropriate with the Court, and we will respond as appropriate," Doc. 345-4 at 13–14 (Aug. 28, 2026); Part V, *infra*. From August 28 until October 5 and 11, 2026, when Defendant filed the supplements tabulating all of the Government's ex parte communications and their severity, Docs. 356, 360, 365, the Government did not disclose a single ex parte communication. It still has not; the Response does not even say what the communications were about. Only when the entire list had been reverse-engineered from the Special Master's billing entries alone, with every contact and its

severity placed on the record, did it become obvious why the Government had been silent. Those entries show that the Government's communications did not merely touch the report but drafted and shaped it: its "comments to draft restitution report and redline of proposed order," its "futher [sic] edits to draft report," its conference on "specific language in various parts of the restitution report and appendices," Doc. 148 at 37, 43; its e-mails on the "revised proposed preliminary restitution order," Doc. 263 at 12; and, before any of it, its redline of the appointing order itself, Doc. 316-2 at 25. It was that inquiry, prompted by the Government's own e-mails, that sent current counsel to the files, and it is what uncovered the record of ex parte communications set out in Parts I.A and I.D—a record the Government had every opportunity to disclose and never did. Doc. 332 at 4. On October 13, 2026, within hours of the Government's filing, current counsel asked the Government to identify any communication in which current counsel contacted the Special Master ex parte and to "file a notice of correction with the court with immediate effect." Ex. A; *see also* Ex. C.

That is the difference. On one side is a single paragraph 8 directive, begun by the Special Master/Magistrate's counsel, about getting a restitution asset's tax returns signed—a communication the Order permitted to be one-sided—which current counsel nonetheless disclosed to the Government the morning after learning the Government was not on it. Exs. A, B. On the other side are eighteen months of private calls, conferences, and e-mails between the Government and the Special Master's team on the restitution report, its "specific language," the prosecution's

"edits," and "sentencing issues," Parts I.A and I.D, *supra*, which fit no provision of the Order, none of which was disclosed when it occurred, the content of which has still not been disclosed, and which the Special Master's counsel has sworn were withheld "primarily due to a desire to preserve the free-flow of information to the Special Master," Doc. 343 ¶ 24—followed, when the defense asked, by five weeks of silence and an invitation to go file a motion. One is doing the best one can under the rules of professional conduct; the other is a willful violation of them. The two situations are chalk and cheese. A report whose "specific language" the prosecution supplied in private, offered for adoption under a statute that requires "a de novo determination of the issue by the court," 18 U.S.C. § 3664(d)(6), is not the product of a de novo determination. It is the Government's work, presented through the Court's appointee. Nor does "everyone else" answer anything. That other parties communicated with the Special Master's team in a particular way does not bind current counsel to do the same once the Order, read against the records, says otherwise. Ethics is a choice. Current counsel read the Order, applied it, and followed it; and the very next day, current counsel advised Mr. Lindberg that the entire process had been proceeding ex parte and that this was a grave ethics violation, Doc. 332 at 4, and that the defense should voluntarily disclose any materials it had shared with the Special Master under paragraph 8. Mr. Lindberg was amenable to that: most of the material was already on this Court's docket, and the rest could be placed there without difficulty. Part I.D.9, *supra*. Government attorneys who communicated with the Court's appointee outside the defendant's presence for eighteen months, and disclosed none of it, cannot

cast a defense attorney who received a paragraph 8 directive from Mr. Martinez about Mr. Lindberg's AAPC tax return—and who added the Government to it—as the one who engaged in the communications at issue. The conduct the Government describes is its own.

## II. Before Any Hearing, the Government Must Disclose All of Its Ex Parte Communications, With Attachments.

The Government states that "[i]f the Court requires additional information on any of these topics, the United States respectfully requests that it set a hearing." Doc. 367 at 5. Defendant does not oppose a hearing, but not on the Government's terms. The parties disagree about what information reached the defense, what information was exchanged outside its presence, and what data the restitution recommendation rests on. Those are factual disputes that should be resolved on testimony and documents, not on competing characterizations of billing entries.

Defendant's position on the hearing is that it should not begin until the Government and the Special Master have first turned over to defense counsel every e-mail, with its attachments, and every other record of their communications outside the presence of the defense—with the Special Master, his counsel, and his financial advisor, and with third parties concerning the restitution assets, victim status, losses, or Defendant's sentence. The statute does not permit selective disclosure. It provides, in full: "The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section." 18 U.S.C. § 3664(b). "All portions," not the portions the Government or the Special Master select. Those communications are also

*Brady* and *Giglio* material. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Restitution under the MVRA is punishment, *see Ellingburg v. United States*, 607 U.S. ___, 146 S. Ct. 564 (2026), and the communications bear directly on it: they are the Government's own "edits" to the report offered as proof of loss, Doc. 148 at 43, and its private discussion of "sentencing issues" with the Court's appointee, Doc. 263 at 11. They are impeachment material as well. The Government proposes to prove loss through the Special Master's report and the testimony of those who prepared it, and "nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972). The three attorneys who took part in the communications are themselves fact witnesses to them. Part VII, *infra*. And the obligation extends to what the Government's counterparts hold: "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). What passed between the Government and the Special Master's team outside the joint weekly calls is in the Government's hands or within its reach. The same is true of the Government's own ex parte communications with third parties about this proceeding. The Government has met with the victims' representatives and the Special Master, without the defense, on at least two occasions the Special Master's reports disclose: on July 21, 2025 ("Conference DOJ attorneys and NOLHGA

attorneys in DOJ office," with AUSA Dan Ryan, AUSA Stout, Trial Attorney Freeman, and AUSA Park among those attending), Doc. 80 at 8; Doc. 81 at 26, and on October 15, 2025 (with AUSA Dan Ryan and AUSA Bain-Creed), Doc. 94 at 6; Doc. 95 at 15. The custodians and claimants—Conservatrix, Vista, NHC, the North Carolina insurance companies and their counsel, the guaranty associations, and Mr. Dinius—have dealt with the Government directly. Doc. 332 at 9–10; Doc. 365 at 4. Defendant asks that the Government be directed to disclose all of its ex parte communications with any third party concerning the restitution assets, victim status, losses, or Defendant's sentence, with attachments, on the same terms as its communications with the Special Master's team. Defendant has requested this material repeatedly. Docs. 331, 332, 356 (No. 5:19-CR-22, Docs. 621, 622, 636). A hearing at which the defense must cross-examine on communications it has never seen, while the Government holds them, is not the hearing the Government says it wants. There is a further reason the production must come first. The Government has chosen to defend its conduct by pointing to former defense counsel's invoices—descriptions of privileged work, filed in redacted form for fee approval—as proof that the defense "did it too." Doc. 367 at 2–3. Many of those records, read in full, show the opposite of what the Government attributes to them. Part I.D, *supra*; Exs. E–G. All of them are privileged. Defendant does not waive, and expressly preserves, the privilege over every communication between himself and his former counsel and over former counsel's work product. A party that holds the ex parte communications cannot keep them, mine the other side's privileged records for fragments, and then

ask for a hearing on the result. The production should come first, in full, with attachments, and the hearing after.

## III. The Government Omits Doc. 441—the Record Behind the Plea.

The Government accuses Defendant of "attempting to rewrite history," Doc. 367 at 3, and characterizes his civil suit against, among others, the Commissioner of Insurance as "continued harassment," *id.* at 4. The history the Government leaves out is in its own case file.

### A. What Doc. 441 is.

On May 29, 2024, after the retrial in No. 5:19-CR-22, Defendant moved for a judgment of acquittal or, alternatively, a new trial. Doc. 440 (No. 5:19-CR-22). His fifty-five-page supporting memorandum, filed by his then-counsel at Katten Muchin Rosenman LLP and Wyatt & Blake, LLP, argued first that the evidence was insufficient to show a prohibited *quo*, because "[n]either the reassignment of tasks nor the internal movement of personnel qualifies as an 'official act,'" and because a request for a different regulator is not "the business" or a "transaction" of the Department of Insurance under 18 U.S.C. § 666(a)(2). Doc. 441 at 8 (No. 5:19-CR-22). It argued, in the alternative, that a new trial was warranted because of errors in the instructions on corrupt intent, the exclusion of two North Carolina statutes, the refusal to instruct on an alternative method for valuing the $5,000 element, and the admission of two e-mails. *Id.* at 2–3 (table of contents). The motion followed the Fourth Circuit's vacatur of the convictions from the first trial. *United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022).

**B. What Doc. 441 recounts.**

Doc. 441 summarized the trial record this way: "As it turns out, the Commissioner had solicited the contributions at the behest of the Federal Bureau of Investigation." Doc. 441 at 9 (No. 5:19-CR-22). It recounted that the Commissioner asked, "[W]hat's in it for me?," *id.* (quoting GEL Exh. 164, at 53:1, 54:2), and that he "pressed Mr. Lindberg for a payment to his personal checking account," a request that Mr. Lindberg and Mr. Gray questioned and that "went nowhere," *id.* at 10. It noted that the Government conceded in closing that there was "no evidence" that the deputy commissioner the defendants requested "was corrupt or had some sort of side deal" with them. *Id.* at 14–15 (quoting Day 7 Rough Tr. 19:10-11). And it recorded the Court's own observation, after the verdict, that the jury could have gone "either way." *Id.* at 11 (quoting Day 7 Rough Tr. 128:7-8).

**C. What became of the motion.**

The motion was never decided. On November 5, 2024, Defendant pleaded guilty in this case. Doc. 40. The plea agreement waived his right to contest "the conviction and sentence . . . in Case No. 5:19-cr-22," Doc. 40 ¶ 18, and on November 18, 2024, his counsel filed a notice withdrawing the motion. Doc. 488 (No. 5:19-CR-22).

**D. Why Doc. 441 matters here.**

Defendant reserves below his right to seek the reinstatement of Doc. 440 as a remedy for the Government's breach. Part III.E, *infra*. The record matters here for two further reasons. First, it answers the charge that Defendant's civil claims against

the Commissioner are an invention of recent vintage. Defendant's prior counsel described the Commissioner's solicitation, and the FBI's role in it, from the trial record more than two years before any civil filing. Whatever the merits of that suit—a question for the court in which it is pending—it is not new and it is not baseless.

Second, it shows what Defendant gave up. He withdrew an undecided post-trial challenge—one the Court itself observed could have gone "either way"—in exchange for the concessions in the plea agreement, including a court-supervised restitution process and the Government's concurrent-sentence recommendation tied to that process. Doc. 40 ¶¶ 8(d), 18. A defendant who surrendered that much is entitled to a restitution process conducted as the plea agreement and the Special Master Order contemplated, and to disclosure of how that process was in fact conducted. That is what the pending motions seek.

### E. Reservation of the remedy for the Government's breach, including restoration of Docs. 440 and 441.

Defendant withdrew Docs. 440 and 441 in reliance on a restitution process that the plea agreement and the Special Master Order promised would be conducted in the open and determined de novo by the Court. 18 U.S.C. § 3664(d)(6); Doc. 40 ¶¶ 8(d), 18; Doc. 56. That process has instead been conducted through prosecutorial misconduct—private edits to the Court's appointee's report, private calls on sentencing with the defense's own draft in hand, representations made to obtain the forfeiture consent order and then not honored, and a refusal to disclose any of it—that has not been cured and is continuing. Parts I.A, I.D, and VI, *supra*; Doc. 360-1

¶¶ 27–35.[5] The grounds are stated explicitly in Part I.F, *supra*. That misconduct has only now been brought to light. The Government's edits to the report surfaced in a fee application filed May 15, 2026, Doc. 148; the private sentencing calls in one filed July 30, 2026, sixty-five days after sentence was imposed, Doc. 263; the Special Master first acknowledged that "[f]rom the outset" he "has had ex parte communications with various interested parties" on August 7, 2026, Doc. 288 at 10; and his counsel swore to daily contacts outside the presence of both parties on

[5] The Criminal Division sections that staffed this prosecution—the Fraud Section and the Public Integrity Section—have had problems of their own in the past. The two sections shared personnel on this prosecution. The 2024 retrial in No. 5:19-CR-22 was tried by Public Integrity Section Trial Attorney William Gullotta with AUSAs Lawrence Cameron and Dana Washington, Minute Entry of May 15, 2024 (No. 5:19-CR-22); the plea agreement in this case was entered through the Fraud Section, Doc. 40 at 1, 8 (Glenn S. Leon, Chief, Fraud Section; Trial Attorney Lyndie M. Freeman); and AUSA Washington, who tried the Public Integrity Section's case, signs the Fraud Section's filings here with Trial Attorney Freeman. Doc. 367 at 6. For example, the Public Integrity Section's prosecution of Douglass Mackey in the Eastern District of New York was overturned: the Second Circuit agreed that the evidence "was insufficient to prove that he knowingly agreed to join the charged conspiracy" and reversed the conviction "with instructions to enter a judgment of acquittal." *United States v. Mackey*, 143 F.4th 129 (2d Cir. 2025). The Section's Trial Attorney William Gullotta appeared on the Government's brief in *Mackey* and was among the prosecutors at the 2024 retrial in No. 5:19-CR-22, where he opened the Government's rebuttal by telling the jury, "I did not expect to walk into the closings to see drugs and money strewn about the courtroom, certainly not by defense counsel," and described the case as "bribery, plain and simple." Trial Tr., Doc. 450 at 974–75 (No. 5:19-CR-22). *Mackey*, 143 F.4th 129; Press Release, U.S. Dep't of Just., Chairman of Multinational Investment Company and Company Consultant Convicted of Bribery Scheme at Retrial (May 16, 2024), https://www.justice.gov/archives/opa/pr/chairman-multinational-investment-company-and-company-consultant-convicted-bribery-scheme. In the wake of those problems, the Public Integrity Section was hollowed out: a section of "about 30 prosecutors" at the end of the prior administration was to be reduced so that "as few as five lawyers may remain," with its cases "transferred to U.S. attorney's offices around the country." Alanna Durkin Richer & Eric Tucker, *Justice Department Is Expected to Slash Public Corruption Unit, AP Sources Say*, Associated Press (Mar. 11, 2025). Defendant's own first conviction in No. 5:19-CR-22 was vacated. *United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022). A prosecution team with that record now asks the Court to accept its account of the Special Master's communications without producing them. The same priorities appear in this case: former counsel was informed that the Government was chasing an internal statistics deadline, in violation of Department policy, on the plea agreement and the order appointing the Special Master. *See* U.S. Dep't of Just., Justice Manual § 9-27.260 (decisions may not be influenced by "[t]he possible effect of the decision on the attorney's own professional or personal circumstances"). Defendant includes this footnote only because the Government raised the subject in a footnote of its own. Doc. 367 at 5 n.10. The investigation of the conduct of the prosecutors' offices themselves is continuing, and Defendant will supplement the record as further evidence is gathered.

September 10, 2026, Doc. 343 ¶ 9. None of it was known to Defendant when he withdrew Docs. 440 and 441 on November 18, 2024, and none of it could have been, because none of it had been disclosed. And it has now reached the Government's filings themselves. The Government told this Court that current counsel "engaged in such communications," Doc. 367 at 3–4, when the only communication at issue was a paragraph 8 AAPC tax-return request from the Special Master's counsel—the one ex parte communication the Order authorizes—which defense counsel nonetheless chose to disclose to the Government, Exs. A, B; Part I.G, *supra*; it has been asked to correct that statement, Exs. A, C; and it offers the Special Master's report as neutral proof of loss without disclosing that it edited the report's "specific language" in private, Doc. 148 at 43. The Government has decided that its own duty of candor to the Court no longer applies to it.

A defendant who gives up an undecided post-trial motion in exchange for the Government's promises is entitled to the benefit of the bargain or to the position he held before he made it. *See Santobello v. New York*, 404 U.S. 257, 262–63 (1971) (remedy for the prosecution's breach of a plea bargain is specific performance or restoration of the defendant's prior position). The plea agreement expressly preserves claims of prosecutorial misconduct, Doc. 40 ¶ 18, and Defendant has preserved this one since June: his supplemental statement of facts preserved the Government's post-sentencing conduct "for appellate review under *Santobello v. New York*, 404 U.S. 257, 262 (1971), and *Puckett v. United States*, 556 U.S. 129, 134–37 (2009)," Doc. 174 at 3–4, and his motion to enforce the plea agreement followed, Doc. 201; Doc. 546 (No. 5:19-

CR-22). Defendant does not move here to reinstate Docs. 440 and 441, and he does not attempt to withdraw his guilty plea. Doc. 40 ¶ 3(b). He expressly reserves, as the remedy for the Government's breach, restoration of the position he held before he relied on the Government's promises—including the reinstatement of Docs. 440 and 441, which remain on the docket of No. 5:19-CR-22, the Notice of Withdrawal having been a notice by a party on which no order ever acted, Doc. 488 (No. 5:19-CR-22)—to be sought in this Court upon a finding of breach or on appeal. Defendant likewise reserves every other remedy available for the Government's breach and for the misconduct described in this Response, in this Court or on appeal, including specific performance; rescission of the agreement and restoration of the parties to their pre-agreement positions; vacatur or modification of any order, including the restitution and forfeiture orders, to the extent it rests on the product of the breach; resentencing; disqualification of the attorneys who took part in the communications at issue; sanctions; and relief under 28 U.S.C. § 2255 and Federal Rule of Criminal Procedure 33(b)(1), which paragraph 18 does not waive as to claims of prosecutorial misconduct. The remedies named are illustrative, not exhaustive. Nothing in this Response waives any of them, and Defendant's election among them is reserved until the breach has been adjudicated. Defendant further reserves the right to seek from the Court of Appeals, in the pending appeals, Nos. 26-4309(L) and 26-4310, or in any later appeal, any relief available on this record—including a determination that the Government's breach is continuing, that it excuses the waiver in paragraph 18, and that Docs. 440 and 441 be reinstated and decided, on remand or otherwise, or, to the extent the

record permits, that the issues they raise be reviewed. This reservation extends to every issue of prosecutorial misconduct, and to every objection, reservation, claim, argument, and request for relief—including but not limited to the constitutional issues raised, under the Fifth, Sixth, and Eighth Amendments, the Due Process and Ex Post Facto Clauses, and Article III—identified in any other document Defendant has filed in No. 3:23-CR-48 or No. 5:19-CR-22—including his objections to the Special Master's report and its supplements, his motions to compel, to enforce the plea agreement, for reconsideration, and to stay, his supplemental statements of facts, his notices, and the reservations stated in each of them—and in the pending appeals, Nos. 26-4309(L) and 26-4310, and the related mandamus proceedings in the Court of Appeals. Each is incorporated here by reference; none is waived, narrowed, or abandoned by anything in this Response; and the reservation extends to any such issue identified in a later filing. Defendant likewise preserves, without repeating them, the reservations stated in notes 2 and 4 above—the jury-trial and beyond-a-reasonable-doubt reservation and the de novo causation, offsets, and credits reservation—and his objection to the constitutionality of the restitution process as conducted.

## IV. The Colorado Order Shows the Special Master Speaking Out of Both Sides of His Mouth on Damovo.

The Government attaches the District of Colorado's order denying Defendant's pro se motion for a temporary restraining order concerning Damovo. Doc. 367-1 (No. 5:19-CR-22, Doc. 642-1). That court "decline[d] as a matter of discretion to intervene in proceedings related to restitution for the criminal proceedings against Plaintiff,

which are being capably overseen by a sister court." *Id.* at 4. The order thus recognizes that the disposition of a Primary Restitution Asset belongs to this Court. The Government offers it for the opposite proposition: that Defendant's efforts to stop the sale are "continued harassment." Doc. 367 at 4.

Consider what the Special Master/Magistrate has told the courts about Damovo. To this Court, he said that he has "no input into the secured lenders' enforcement process," that no one "seeks the consent of the Special Master," and that this Court should not "enjoin … strangers to this proceeding." Doc. 334 at 3–4. His own billing records show that in the same period his team was preparing a "letter from Special Master re non-opposition to Damovo transaction" and reviewing a "comfort letter re. Damovo transaction." Doc. 263 at 15, 30. The party preparing the letter of non-opposition to the Damovo sale was not a stranger to this proceeding; it was the Special Master himself, in his own name. A Special Master who writes the letter of non-opposition to a sale, and furnishes comfort to its participants, is a participant in it. Damovo is an asset for which a $500 million offer was made in March 2026 and a financed $400 million proposal was pending in August 2026—figures established on this Court's record. Doc. 320 at 2–3; Doc. 283-1 ¶ 2. It is being disposed of through a lender-driven process that, by the Special Master's own account, "will not satisfy Damovo's creditors in full," Doc. 334 at 4, in a transfer for the assumption of debt that generates no sale proceeds at all—only approximately $17.5 million in "consent fees" to third parties (about $13 million to the Bermuda insurers' liquidators and $4.5 million to NHC) and ten dollars to the North Carolina insurance estates.

Doc. 320-1 ¶¶ 3, 6; *Lindberg v. Wilson*, No. 1:26-cv-03939, Doc. 1 ¶ 4 (D. Colo. Aug. 26, 2026). When Defendant sought to stop that sale—pro se in Colorado, and through counsel here—the Government and the Special Master opposed him here, Docs. 334, 367, and the Government now invokes the Colorado court's deference to this Court as a reason this Court should do nothing. The Special Master cannot tell this Court that it should not interfere with Damovo because the matter belongs to strangers, and in the same breath treat Defendant's effort to protect the asset in another forum as harassment. Either this Court supervises the disposition of its restitution assets, as its appointing order provides, Doc. 263 at 1–2 (quoting Doc. 56 at 6), or the Colorado court should be allowed to do so. If it is this Court, then the Special Master and the Government should be answering here for the disposition of a Primary Restitution Asset for no proceeds, not opposing Defendant's efforts to stop it. If it is not this Court, then neither the Special Master nor the Government has any objection to make in a different court to Defendant's effort to protect the asset there. They cannot have it both ways. Defendant asks that this Court supervise the disposition, on a complete record; and if this Court is not inclined to act, Defendant asks that it allow the Colorado court to act, so that a Primary Restitution Asset for which $400 million to $500 million was on the table is not transferred for no proceeds and a loss of value in that amount. Doc. 320 at 2–3; Doc. 283-1 ¶ 2; Doc. 320-1 ¶¶ 3, 6.

The Court-approval requirement the Special Master now treats as optional was the Government's own term, and the record of how it got into the order is already before the Court. Defendant instructed former counsel to seek an appointment under

which the special master "would owe a fiduciary duty to all stakeholders." Doc. 316-1 at 217–18 (Lindberg Decl. ¶ 5). The Government refused. On December 18, 2024, AUSA Dan Ryan sent former counsel "a redline and a clean version of our changes," having "discussed it with Mike and Joe"—Mr. Martinez and Mr. Grier—and wrote that "requiring the special master to handle the assets in any particular manner or on any particular timeline, or requiring him to 'consult' with the parties on a weekly basis to maximize value does not accomplish this," that "[t]he Special Master does not owe a duty to Mr. Lindberg or to the assets, but rather to the Court and to victims," and that "if we cannot get on the same page, we have no issue with filing competing memos and proposed orders." Doc. 316-2 at 25–26. The Government "rejected nearly all of the changes the defense proposed," including the fiduciary duty, "took control of the drafting of the proposed order and produced the operative version itself." Doc. 316-1 at 218–19 (Lindberg Decl. ¶¶ 8–9). What the Government's order left in place of a fiduciary duty was Court approval: the Special Master shall "select an appropriate method and timetable and seek Court approval to liquidate" and "oversee and help accomplish the liquidation with Court approval." Doc. 56 ¶ 3(c)–(d) (at 6). The Special Master now says Court approval of a sale "was not required," Doc. 288 at 13; Beckett was sold for $134 million "without any court approval or notice before the sale," Doc. 360-1 ¶ 23; and the Government, which refused a fiduciary duty on the ground that the Special Master answers "to the Court," has not objected to the Court being read out of its own order.

## V. There Is No Basis to Restrict Defendant's Filings.

The Government asks the Court to "put appropriate limits on any future filings." Doc. 367 at 5. It asks the Court to restrict the filings of the one party that was not in the room, on a record the Government helped shape in private. *See* Part I.A, *supra*. The filings it criticizes were made with leave: the Court granted Defendant's motion to supplement the record and set the response deadline. Doc. 361 (No. 5:19-CR-22, Doc. 641). A pre-filing restriction is a "drastic remedy" that "must be used sparingly, however, consistent with constitutional guarantees of due process of law and access to the courts." *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 817 (4th Cir. 2004). Before any such restriction issues, "even a narrowly tailored one," the litigant must be afforded "notice and an opportunity to be heard." *Id.* at 819. The Government has not addressed the factors *Cromer* requires, *id.* at 818, and no such restriction is warranted. The timing of the request tells the Court its purpose. The Government asked for limits on Defendant's filings in the same response in which it was confronted with the records—filed July 30 and September 1, 2026, and the e-mail export reviewed since—that current counsel, who appeared on June 9, 2026, needed in order to show what had occurred. Doc. 170; Doc. 263; Doc. 336-2. To stop the filings when the defense has at last caught up with the record is to stop them at the only moment they could be made.

The Government cites no authority for restricting the counseled filings of a criminal defendant in a pending restitution proceeding. *Cromer* arose in a civil case, but its requirements are the floor in this Circuit for any litigant in any docket, and

the Fourth Circuit has vacated prefiling restrictions entered in criminal and post-conviction matters that did not honor them. *United States v. Hill*, No. 22-6223, slip op. at 2–3 (4th Cir. Sept. 22, 2022) (per curiam) (vacating a "prefiling injunction in Hill's criminal case" because the defendant "did not have an actual opportunity to be heard prior to imposition of the prefiling injunction"); *In re Head*, 174 F. App'x 167, 168 (4th Cir. 2006) (per curiam) (vacating this District's order that it would "accept no further filings" from a federal prisoner; a prefiling injunction "should not be so broad as to effectively deny all access to the courts"). A represented defendant in a restitution proceeding stands on more than *Cromer*. The Government bears the burden of proving the loss, 18 U.S.C. § 3664(e); the Court must determine every disputed issue de novo, *id.* § 3664(d)(6); and the filings the Government would restrict are the defendant's objections to the facts on which his punishment is being fixed. Those are not the rights of a civil litigant with a grievance. They are the rights of a criminal defendant, and no court has held that they may be cut off because the Government finds the objections inconvenient. The Government's remedy for a filing it believes is wrong is the one it used here: a response. A response is not a prior restraint, and the Government is not entitled to one.

Consider what the Government is asking the Court to restrict. Defendant placed on this record the Conservatrix communications—a claimant's one-sided presentation to the Special Master that Defendant has never seen, Doc. 258 at 11, and that had already cost him a mandamus proceeding in the Fourth Circuit answered on less than a day's notice, *In re Zetteler*, No. 26-1749, Doc. 8—to show the

harm done by the Government's choice not to approach this Court for an order and to proceed outside Defendant's presence instead. Part I.B, *supra*. He placed on this record the Special Master's own billing entries showing eighteen months of communications with the prosecution about the report, the sentencing, and the restitution assets, none disclosed when it occurred. Parts I.A and I.D, *supra*. The Government's answer is not to explain those communications. It is to ask that a criminal defendant be restrained from putting them on the Court's record. Attorneys who for eighteen months communicated with the Court's appointee outside the defendant's presence created the circumstances the Government now calls extraordinary, and now that the extent of those contacts has been revealed, they ask the Court to prevent further filings. That is the same message the Government has delivered to Defendant's counsel at every turn. Within days of sentencing, after Defendant filed his first emergency motion to stay the asset sales, Trial Attorney Freeman "contacted defense counsel and asked that the emergency motion be removed from the ECF docket, stating that a failure to do so would be treated as a breach of the plea agreement." Doc. 201 at 5–6 (June 15, 2026); Doc. 201-1 ¶ 6; Doc. 546 at 5–6 (No. 5:19-CR-22). Defendant moved then, in both cases, for conflict-free counsel, Doc. 201 at 12–13; Doc. 546 at 12–13 (No. 5:19-CR-22); the motion was not acted on. When Defendant asked for the data, AUSA Dan Ryan wrote: "we do not litigate via email. If you file a motion with the court with your requested relief, we will respond accordingly," and the Government was "reserving our position until we see your motion." Doc. 332-2 at 3 (e-mail of Aug. 17, 2026). When Defendant filed it,

the same counsel wrote that "rather than work with [the Special Master] … you filed a motion with the Court," and, "[i]n short, feel free to file whatever additional motions you feel are appropriate with the Court, and we will respond as appropriate." Doc. 345-4 at 13–14 (e-mail of Aug. 28, 2026). The response was to accuse Defendant of a "strategic decision to wait," Doc. 341 at 1–2; and when he supplemented the motion with the Special Master's own records, to accuse him of "attempting to rewrite history" and ask the Court to limit what he may file, Doc. 367 at 3, 5. "Feel free to file" has become "put appropriate limits on any future filings." The object is not docket management. It is to keep the Government's conduct from being exposed. A pre-filing restriction sought for that purpose cannot survive *Cromer*.

The reason the Government wants nothing further filed is in its own Response. Without one page of production from the Government or the Special Master, and working only from the fee applications on the public docket, Defendant has shown the Court what the process outside his presence produced: thirty-seven billed communications between the Special Master's team and Conservatrix or its counsel, 85.1 hours, none shared with the defense, followed by a mandamus petition answered on twelve hours' notice and a decision that is now being used against him in the Middle District of North Carolina. Doc. 365 at 1–5 & Ex. A (Oct. 11, 2026); Doc. 362 (Oct. 9, 2026). He has shown the Government's "edits" to the report and its private sentencing calls. Docs. 356, 358–360. Each of those filings was made under the Court's Order granting leave to supplement, Doc. 361, and each rests on the Special Master's own records. The Government does not say any of it is wrong. It says it is

"redundant," Doc. 367 at 5, and asks that there be no more of it. A party that cannot answer what has been filed, and asks instead that the filer be silenced, has told the Court what the next filing would show.

What Conservatrix says outside this Court shows why the record here matters. In the insolvency practitioners' Fifteenth Public Report, dated July 31, 2026 and posted on Conservatrix's website for its policyholders, they report that the Special Master recommended that Conservatrix and its policyholders "were not victims" of the offenses; that "[i]n a preliminary order the District Court adopted that recommendation by not designating Conservatrix as a victim"; that Conservatrix challenged that decision and "[t]he Fourth Circuit Court of Appeals, however, refused to intervene"; and that a final order "is not expected to include victims beyond those identified in the preliminary order." Ex. I ¶ 7.9 (pp. 7–8) (counsel's rendering). The same report states that their American attorneys "have close contact with both the 'receiver' and the 'Special Master.'" *Id.* ¶ 7.10 (p. 8). None of that is on this docket. Conservatrix's last filing here is its response of July 28, 2026, Doc. 258; what it has since told its policyholders, what its attorneys continue to tell the Special Master, and what it told the Middle District on October 5, 2026, *Van Faassen*, Doc. 81, appear nowhere in this record. That is why Defendant files updates: so that the next time Conservatrix, Vista, or the Government invokes this proceeding in another court, there is a record here to point to, and Defendant is not again given twelve hours to answer a claim built on communications he has never seen. Doc. 365 at 5. The Government's request is that there be no such record. For a defendant facing a Special

Master and a prosecution who have declined to place any of their communications on the docket, a restriction on his own filings would be an extreme sanction: it would leave, as the only record of this proceeding, the one the other side chooses to keep.

## VI. Defendant Has Not Waived Privilege; the Filing Shows Only What the Government Told Former Counsel.

The Government asserts that Defendant chose "to divulge attorney-client communications and waive any privilege over his communications with former counsel about forfeiture issues." Doc. 367 at 1 & n.3 (citing Doc. 360-1 ¶¶ 27–35). He did not. The paragraphs the Government cites disclose one thing: a May 20, 2026 telephone call between the Government's attorneys—AUSA Dan Ryan, AUSA Benjamin Bain-Creed, and Trial Attorney Lyndie M. Freeman—and Defendant's then-counsel, Brandon N. McCarthy of Katten Muchin Rosenman LLP, about the proposed Consent Order and Judgment of Forfeiture. Doc. 360-1 ¶¶ 27, 32. What Defendant described is what the Government's attorneys said on that call: that the Government agreed to the defense's proposed edits to the order; that it would state on the record at sentencing that it had no plans to enforce the forfeiture judgment and would not use the judgment to interfere with restitution, so long as Defendant continued to assist the Special Master/Magistrate in paying restitution; and that, if the difference between the restitution and the value of the assets was less than zero, the forfeiture amount would be zero. *Id.* Defendant signed the consent order two days later in reliance on those representations. *Id.* ¶¶ 28, 32.

The filing shows only what the Government told former counsel. It discloses no advice former counsel gave Defendant, no instruction Defendant gave former counsel,

and no communication between them. Because no privileged communication was disclosed, there is nothing to waive. There is no waiver of privilege, and none is waived; Defendant expressly reserves the privilege as to all of his communications with former counsel.

## VII. AUSA Dan Ryan, AUSA Benjamin Bain-Creed, and Trial Attorney Lyndie M. Freeman Are Parties to the Ex Parte Communications Documented in the Billing Records and Should Not Be the Government's Counsel on Them.

The Special Master/Magistrate's own billing records identify the Government attorneys who took part in the communications at issue. AUSA Dan Ryan and AUSA Benjamin Bain-Creed were on the February 23, 2026 conferences "re restitution concepts" and "re special master's report," Doc. 148 at 30, and on the June 25, 2026 video conference "re preparation of final supplement to restitution report," Doc. 263 at 22. Trial Attorney Lyndie M. Freeman, AUSA Bain-Creed, and AUSA Dan Ryan were on the March 16, 2026 e-mails "re draft restitution report," the same day the Special Master's team reviewed the "redline of proposed order from DOJ." Doc. 148 at 37. AUSA Dan Ryan was on the April 1, 2026 call on the report's "specific language" and the e-mails on "edits to draft report from the government," *id.* at 43, and took the private calls on sentencing on May 11 and May 20, 2026, Doc. 263 at 11, 13. All three were on the May 20, 2026 call with former counsel on which the forfeiture representations were made. Doc. 360-1 ¶¶ 27, 32.

Those three attorneys are therefore fact witnesses to the communications at issue—communications in which, apart from the May 20 call with former counsel, *no one from the defense was present*, and whose content exists today only in the

recollection of the participants. What was said on the February 23 conferences "re special master's report," what the Government's "redline" and "edits to draft report" changed, what was discussed with AUSA Dan Ryan about the defense's sentencing memorandum and about Defendant's cooperation, and what the Government promised on May 20 about the forfeiture judgment are facts that only the participants can supply. The Government's Response was signed by two of them. Doc. 367 at 6. An attorney cannot be a witness to the events in dispute and the Government's advocate on what those events were. If the Court sets the evidentiary hearing the Government requests, these three attorneys will be called. Defendant asked for conflict-free Government counsel on June 15, 2026, when the same attorneys reacted to a protected filing by threatening to treat it as a breach of the plea agreement. Doc. 201 at 12–13; Doc. 546 at 12–13 (No. 5:19-CR-22). The record since then has only added to the reasons. Defendant respectfully asks that the Court direct the Government to designate counsel other than AUSA Dan Ryan, AUSA Bain-Creed, and Trial Attorney Freeman to respond on the communications at issue.

## CONCLUSION

For these reasons, Defendant respectfully requests that the Court, to the extent leave is required, grant leave to file this Response, and that it (1) grant the motions to compel, Docs. 331 and 332, and order the Government and the Special Master to produce directly to defense counsel all of their ex parte communications—with each other and with any third party—including any attachments and data, together with the data underlying the restitution figure; (2) set an evidentiary

hearing on the pending motions, as the Government requests, to be held only after that production; (3) deny the Government's request to limit Defendant's filings; (4) direct the Government to designate counsel other than AUSA Dan Ryan, AUSA Benjamin Bain-Creed, and Trial Attorney Lyndie M. Freeman to respond on the communications at issue; (5) grant the relief requested in Docs. 281, 320, and 347, as supplemented by Docs. 356 through 360, and, as to Damovo, if the Court is not inclined to act, allow the District of Colorado to do so. Defendant expressly reserves, under paragraph 18 of the plea agreement, restoration of the position he held before he relied on the Government's promises—including the reinstatement of Docs. 440 and 441 (No. 5:19-CR-22)—as the remedy for the Government's breach, to be sought in this Court upon a finding of breach or on appeal, together with every other remedy available for the breach and the misconduct described above, including specific performance, rescission, vacatur or modification of the orders that rest on the product of the breach, resentencing, disqualification, sanctions, and relief under 28 U.S.C. § 2255 and Rule 33(b)(1), and the right to seek any of that relief, including a determination that the breach is continuing and the reinstatement and decision of Docs. 440 and 441, from the Court of Appeals; the reservation extends to every issue of prosecutorial misconduct and every objection, reservation, claim, argument, and request for relief, including but not limited to the constitutional issues raised, identified in any other document Defendant has filed in either case or in the pending appeals, none of which is waived. *Santobello*, 404 U.S. at 262–63; Part III.E, *supra*.

Dated: October 15, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
*Admitted pro hac vice*

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: October 15, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*