**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GREG E. LINDBERG,<br><br>Defendant. | Case No. 3:23-CR-48-MOC<br><br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S REPLY TO THE SPECIAL MASTER'S RESPONSE TO DEFENDANT'S SUPPLEMENTATIONS (DOC. 366)**

Defendant Greg E. Lindberg respectfully submits this Reply to the Special Master's Response to Defendant's Supplementation to Various Motions and Other Requests for Relief (Doc. 366), filed on October 13, 2026, under the Court's Order of October 6, 2026 (Doc. 361). The Order of October 6, 2026 permitted the Government and the Special Master to respond to Defendant's supplementation and did not address a reply. To the extent leave is required to file this Reply, Defendant respectfully moves for it and asks that this Reply be deemed filed. For the reasons set forth below, the Court should direct production, directly to defense counsel, of all of the Special Master's ex parte communications—with the Government and with any third party—including any attachments and data, and of the data underlying the restitution recommendation, under the existing protective order; set an evidentiary hearing to be held only after that production; and grant the relief requested in Docs. 281, 320, 331, 332, and 347, as supplemented by Docs. 356 through 360.

## INTRODUCTION

The Special Master/Magistrate[1] does not dispute the central facts. He states that he "regularly communicates with constituencies to this Case without copying all other constituencies to this Case," Doc. 366 at 2 n.5, and he agrees that the central restitution dispute remains for the Court: "The Court will resolve this dispute by entering a final restitution order premised on one method or the other." *Id.* at 3. Those two statements are the reason the pending motions should be granted. The most important entries in this record are the ones the Response does not mention: the Government's "redline" of the proposed order and its "comments to draft restitution report," Doc. 148 at 37; the "[c]onference call with Dan Ryan … re specific language in various parts of the restitution report and appendices" and the "[e]mails with Dan Ryan re futher [sic] edits to draft report from the government" two days before the report was filed, *id.* at 43; the Government's e-mails on the "revised proposed preliminary restitution order," Doc. 263 at 12; and the video conference with AUSA Dan Ryan and AUSA Bain-Creed "re preparation of final supplement to restitution report," *id.* at 22. No defense counsel is named on any of them. The Response does not deny them, does not deny that his counsel took the defense's draft sentencing memorandum to the prosecutor in a private call, Doc. 263 at 11, and does not deny that he has withheld documents to "preserve the free-flow of information" to himself, Doc. 343 ¶ 24. It rewrites the record instead. Part I sets his filings against his own

[1] Defendant uses this term because 18 U.S.C. § 3664(d)(6) authorizes the Court to refer restitution issues "to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." The term describes the role the statute assigns; it is not a criticism of anyone.

records; Part II sets out the harm; Part III answers the Response's remaining characterizations; and Part IV addresses the hearing. Defendant's counsel, working with former counsel, have reviewed former counsel's complete e-mail export—approximately 1.8 gigabytes—and come to the Court again with what it shows.

## ARGUMENT

### I. The Special Master/Magistrate's Own Records Contradict His Filings.

#### A. The Government edited the report and the final supplement in private; the Special Master calls the communications "irrelevant."

The Special Master/Magistrate states that his "communications are irrelevant to those recommendations (except as some evidence of the Special Master's diligence)." Doc. 366 at 3. His own time records say otherwise. On June 25, 2026, his counsel billed for a "[v]ideo conference with Dan Ryan, Ben Bain-Creed, Scott Avila, Don Harer, David Elkin, BDR, and JWG re preparation of final supplement to restitution report and related issues." Doc. 263 at 22. The next day, his counsel billed for a "[t]elephone call from Jason Cowley [re] status of preparation of final supplement to restitution report" and a "[t]elephone call from Wes Camden re the same." *Id.* No defense counsel is listed among the participants in any of those entries. Communications about the preparation of the final supplement are, by definition, communications about the recommendations.[2]

[2] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

The final supplement was then filed on the same terms. On July 22, 2026, at 4:48 p.m., the Special Master's counsel circulated the draft to the parties, quoted the sentence the draft already contained—"The Special Master has conferred with both the government and the Defendant's counsel in relation to this Supplement"—asked to be told "by the end of the day tomorrow" if it misstated Defendant's position, and wrote: "We have to file this by Friday." Doc. 332-2 at 19–20. Defense counsel asked that the filing await an extension consistent with the Court's schedule, because Mr. Lindberg, in Bureau of Prisons custody, had not seen the draft, and when the Special Master answered that he would file regardless, went to the Fourth Circuit. Doc. 251 & Ex. A (Pet. for Writ of Mandamus, No. 26-1965 (4th Cir. July 24, 2026)); *see* Doc. 272. The Special Master filed on the morning of July 23, 2026, Doc. 245—before the end-of-day deadline he had set for the defense's position, a day before the Friday he had announced, and more than four weeks before the ninety-day date of 18 U.S.C. § 3664(d)(5). The filing came within two hours of the defense's notice that it would seek emergency relief in the Fourth Circuit that day, and fifteen minutes later the Government's appellate counsel asked whether it had "mooted" the mandamus. Doc. 346 at 51–52; *United States v. Lindberg*, No. 26-4309, Doc. 27-1 at 11–12 (4th Cir. July 29, 2026). The report was moved up to moot the mandamus. The "conferral" the supplement recites, Doc. 245 at 44, was written before it took place, and the filing did not wait for it.

The same is true of the original report. Before it was filed, the Special Master's team reviewed "comments to draft restitution report and redline of proposed order

from DOJ." Doc. 148 at 37. Two days before filing, his counsel held a "[c]onference call with Dan Ryan and Andrew Cowie re specific language in various parts of the restitution report and appendices" and exchanged "[e]mails with Dan Ryan re futher [sic] edits to draft report from the government." *Id.* at 43; *see* Doc. 106 (filed April 3, 2026). Defense counsel were on the March 31 call "re final revisions to restitution report," *id.* at 41; the Government's "futher [sic] edits" came the next day, after the last joint call and two days before filing, in the same entry that records defense counsel's e-mails "re restitution report, access to documents and information underlying analysis," *id.* at 43. Defense counsel were, at times, sent carefully curated sections of drafts. The defense was asking for the data; the Government was editing the report. On May 14, 2026, his counsel exchanged "[e]mails with Dan Ryan, Lyndie Freeman, and Ben Bain-Creed re revised proposed preliminary restitution order" and revised it. Doc. 263 at 12. And when the defense shared its draft sentencing memorandum with the Special Master's counsel and the prosecution alike, the Special Master's counsel provided "feedback to James Wyatt and Dan Ryan" and then made a separate "[t]elephone call to Dan Ryan re the same and related sentencing issues." Doc. 263 at 11. The first exchange included the defense; the call to AUSA Dan Ryan did not. The Government was on every e-mail about the defense's memorandum; the one party without information about what was said about sentencing was Defendant. A report whose "specific language" was worked out privately with the prosecution is not one to which the communications are "irrelevant."

That matters under the statute under which he serves. A special master appointed under § 3664(d)(6) makes "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). The statute's design is parity: "[t]he court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to" restitution. *Id.* § 3664(b). The Court cannot determine de novo what it cannot see. If information received outside the presence of the defense informed a proposed finding, the Court and the defense are entitled to know what that information was.

**B. The pattern runs through every filing: the Special Master's statements to the Court, set against his own records.**

The Response is the Special Master/Magistrate's sixth filing addressed to Defendant's objections to his process. Doc. 366 at 2 n.2 (citing Docs. 266, 268, 268-1, 288, 308, 323, 334, 343, 344). Read against the billing records he filed with his fee applications, those filings share a method: each states, as fact, something the records contradict, or omits what the records disclose. The table that follows sets the statements against the records. The quotations are verbatim; the records are the Special Master's own, as filed at Docs. 69, 95, 148, and 263, and former defense counsel's invoices at Docs. 75-1 and 336-2. Reply Exhibit A is the Special Master's counsel's e-mail of May 14, 2026, demanding that Defendant sign a waiver, drawn from former counsel's e-mail export. Reply Exhibit B is the May 2–12, 2026 e-mail exchange in which former defense counsel sent the draft sentencing memorandum to the Government and the Special Master's team together and the Special Master's

counsel returned it with his comments, together with the pages of his commented copy, from the same source.

| **What the Special Master told the Court** | **What his own records show** |
|---|---|
| "[T]he Special Master conducts weekly video conferences, jointly, with the prosecution team and Defendant's defense team in this Case." Doc. 65 at 4 (July 2, 2025). To the same effect, Doc. 80 at 9; Doc. 147 at 4; Doc. 106 at 2 (positions "discussed … with both the government and Defendant's counsel on a weekly basis"). | The status reports describe only the joint weekly calls. They do not disclose the Government-only contacts the same records contain: Dec. 4, 2024 ("conversations with Assistant US Attorney, form of motion seeking special master, and form of order appointing special master"), Doc. 69 at 11; Dec. 5, 2024 ("email to Dan Ryan"), *id.*; Dec. 17, 2024 (1.2-hour conference with D. Ryan, L. Freeman, T. Stout "re contents of brief in support of order appointing special master"), *id.* at 12; Jan. 24, 2025 (e-mails with Ryan, Freeman, Stout "re indictment, factual basis"), *id.*; Feb. 3, 2025 (e-mails with Dan Ryan "re: plea agreement" and "re victim restitution issues"), *id.* at 17; Mar. 6, 2025 (video conference with Ryan, Park, Bain-Creed, Stout "re special master rights and responsibilities clarification term sheet"), *id.* at 36; Mar. 24, 2025 (video conference with Ryan, Bain-Creed, Freeman and Paladin "re asset valuation"), *id.* at 45; Mar. 26, 2025 ("Telephone call to Dan Ryan re special master's role and responsibilities"), *id.* at 46; Dec. 19, 2025 and Jan. 9, 2026 (calls to Dan Ryan), Doc. 148 at 11, 15; Feb. 23, Mar. 16, and Apr. 1, 2026 (the report's "specific language," the Government's "redline" and "edits"), *id.* at 30, 37, 43; May 11, 14, 20, 2026 (sentencing issues; the proposed preliminary restitution order; the cooperation statement), Doc. 263 at 11, 12, 13; June 25, 2026 ("preparation of final supplement"), *id.* at 22. |
| "Immediately upon entry of the Appointment Order, (a) Defendant's counsel engaged in one-on-one communications with the Special Master that excluded the government." Doc. 343 ¶ 8. | The first one-on-one entries after the Order are with the Government: Jan. 24, 2025, "Emails with Dan Ryan, Lyndie Freeman, Taylor Stout, JWG, and BDR re indictment, factual basis," Doc. 69 at 12; Feb. 3, 2025, "Emails with Dan Ryan re: plea agreement" and "Emails with Dan Ryan and BDR re victim restitution issues," *id.* at 17. The first defense one-on-one is Feb. 10, 2025, on the assignment agreements the Order required, *id.* at 19. The affidavit reports one side's contacts and not the other's. |

| What the Special Master told the Court | What his own records show |
|---|---|
| "[M]y impression is that the Special Master and Paladin had more one-on-one communications with Defendant's counsel than any other person or group involved in this Case, including the government." Doc. 343 ¶ 10 ("[w]ithout having tallied"). Restated as fact: Defendant's counsel "had more frequent one-on-one communications with the Special Master team … than any victim, other interested third-party, or the government." Doc. 344 at 9; *see* Doc. 288 at 10. | The same affidavit swears to third-party contact "on a daily (or near daily) basis," Doc. 343 ¶ 9, and to "voluminous interviews and other meetings with various interested third parties," *id.* ¶ 11. The fee applications contain 762 entries recording communications with third parties that name no defense counsel. Doc. 365 at 7 & Ex. A, Sched. 3. The weekly calls were joint; the one-on-one contacts with the Government—on the order, the report, the preliminary order, the sentencing, and the final supplement—are the ones listed in the first row. |
| "[T]he Court entered the Appointment Order in the form proposed by Defendant with minimal or no revisions." Doc. 288 at 2–3. "Defendant filed the motion seeking the Special Master's appointment and proposed the form of the Appointment Order." *Id.* at 12. | "[W]hile the government recommended that the Special Master be appointed in this Case, Defendant's counsel preferred that Scott Avila or Paladin be named special master." Doc. 343 ¶ 7. The Special Master's counsel had "conversations with Assistant US Attorney" on the "form of motion seeking special master, and form of order appointing special master," Doc. 69 at 11, and conferred with three Government attorneys "re contents of brief in support of order appointing special master," *id.* at 12. Former defense counsel billed for the "draft memorandum and order from opposing counsel," the "memorandum of law … received from DOJ," the "late-night special master motion proposed by D. Ryan," and AUSA Dan Ryan's "special master order markup and proposed edits," Doc. 75-1 at 67–68, and described Mr. Grier and Mr. Martinez as "proposed receiver's counsel proposed by the government," *id.* at 65. The billing records thus show that the Government produced the draft, and that the draft was for a receiver. *Id.* at 65, 67–68. Mr. Grier himself wrote to defense counsel on November 26, 2024—before defense counsel's first contact with him—that Mr. Martinez "has had conversations with the US Attorney's office re same." Reply Ex. F. The Government's transmittal is in the record: on December 18, 2024, AUSA Dan Ryan sent former counsel "a redline and a clean version of our changes," having "discussed it with Mike and Joe"—the Special Master's counsel and the Special Master—"and tried to incporate [sic] their thoughts in this draft." Doc. 316-2 at 25. |

| What the Special Master told the Court | What his own records show |
|---|---|
| The process "was NOT an adversarial process (a) whereby the Special Master served as adjudicator and/or prosecutor or (b) to which Defendant was excluded." Doc. 344 at 1–2. "Defendant identifies no fraud, misconduct, bias, or procedural irregularity in the Special Master's investigation or reporting process." *Id.* at 13. | "[C]omments to draft restitution report and redline of proposed order from DOJ," Doc. 148 at 37 (Mar. 16, 2026); "[c]onference call with Dan Ryan and Andrew Cowie re specific language in various parts of the restitution report and appendices" and "[e]mails with Dan Ryan re futher [sic] edits to draft report from the government," *id.* at 43 (Apr. 1, 2026, two days before filing); "[t]elephone call to Dan Ryan re the same and related sentencing issues," Doc. 263 at 11 (May 11, 2026); "[t]elephone call from Dan Ryan re the same" on the cooperation statement, *id.* at 13 (May 20, 2026). No defense counsel is named on any of them. |
| "The Special Master's communications are irrelevant to those recommendations (except as some evidence of the Special Master's diligence)." Doc. 366 at 3. | The communications were about the recommendations' "specific language," the Government's "redline," and its "edits to draft report." Doc. 148 at 37, 43. The "final supplement to restitution report" was prepared in a video conference with Dan Ryan, Ben Bain-Creed, and Paladin, with no defense counsel named. Doc. 263 at 22 (June 25, 2026). |
| "The Special Master has conferred with both the government and the Defendant's counsel in relation to this Supplement. The government does not oppose the positions articulated by the Special Master through this Supplement." Doc. 245 at 44. | Doc. 263 at 22 (June 25, 2026): "[v]ideo conference with Dan Ryan, Ben Bain-Creed, Scott Avila, Don Harer, David Elkin, BDR, and JWG re preparation of final supplement to restitution report and related issues." The Government did not merely "not oppose" the supplement; it took part in preparing it. |
| "All restitution-related document and information requests directed to the Special Master had been resolved to the satisfaction of Defendant's counsel before the Special Master filed the Report." Doc. 344 at 3; *see id.* at 8 ("resolved … to the satisfaction of Defendant's counsel"). | "Admittedly, the Special Master did not provide to Defendant's counsel each and every document received by the Special Master that Defendant's counsel asked to review, primarily due to a desire to preserve the free-flow of information to the Special Master." Doc. 343 ¶ 24 (filed the same day). |
| "The purchaser of Beckett did not require or otherwise request that the Special Master approve the sale of Beckett." Doc. 288 at 5 (quoting Doc. 94 at 6–7). "The purchaser … did not seek the Special Master's consent." *Id.* at 15. | Dec. 8, 2025: "Review communications from NHC counsel re: buyers requesting Special Master letter of approval." Doc. 95 at 30. Dec. 9, 2025: "Emails with John Babcock and Cassidy Willard re special master official opinion on various potential liquidation transactions." *Id.* at 31. |

| What the Special Master told the Court | What his own records show |
|---|---|
| "The only connection the Special Master had to the Beckett Sale was … the Special Master's NHC board designee voted in favor … and the Special Master signed a letter (after the fact)—addressed to the Special Master's NHC board designee—confirming that the Special Master would not oppose the Beckett Sale." Doc. 288 at 5. "The Special Master was not involved in the Beckett Sale." *Id.* at 14. But: the designee "voted in favor of the Beckett Sale after reviewing both an independent third-party's fairness opinion and a letter from the Special Master indicating that the Special Master would not oppose the transaction." *Id.* at 15 n.50. | The designee, Paladin's Don Harer, reviewed "NHC board discussion materials about proposed sale of specified affiliated company" (Dec. 1), "asset sale materials in advance of NHC board meeting" (Dec. 11), the "SAC consultancy agreement relating to sale of primary restitution asset" (Dec. 12), and the "fairness opinion for sale of primary restitution asset" (Dec. 13–14), and participated in NHC board calls on Dec. 2, 12, and 14, 2025. Doc. 95 at 28, 47, 51–52. He spoke with "M. Menji (NHC) regarding sale of primary restitution asset" (Dec. 11). *Id.* at 51. His own records then show two letters on the sale: a "letter to John Babcock re Beckett transaction," Doc. 148 at 14, and a "letter to Don Harer re December Beckett transaction," which Mr. Grier reviewed and signed, *id.* at 16–17. A Special Master who writes to NHC's counsel about the sale and signs a letter of non-opposition to it took part in it; the second letter, to NHC's counsel, is not mentioned in any filing. |
| "[T]he Special Master disclosed as much on weekly calls with Defendant's counsel in November and December of 2025." Doc. 288 at 5. | The weekly-call entries for Nov. 13, Nov. 20, Dec. 4, Dec. 11, and Dec. 18, 2025 record their subjects as "loss calculation issues," "tax issues," "tax issues, liquidation of primary restitution assets, and calculation of victim loss amounts," "policyholder distribution issues, restitution analysis, and other issues," and "distributions to policyholders with uncovered claims." Doc. 95 at 24, 26, 29, 32; Doc. 148 at 10. The Beckett work was billed outside those calls, with NHC, its counsel, and Paladin. Doc. 95 at 28–32, 51–52. On Dec. 19, 2025—after the closing—defense counsel wrote demanding a court order for the sale, Doc. 148 at 11, 12. |
| The Special Master "refus[ed] to file such a clarification motion," and "even after the Special Master refused …, Defendant never did so and the Special Master assumed Defendant dropped the issue." Doc. 288 at 6, 13 n.47. | On Dec. 19, 2025, the day of the defense demand, the Special Master's counsel held conferences "re various issues impeding the liquidation of specified affiliated companies and the existing procedure for the same" and placed a "[t]elephone call to Dan Ryan re the same." Doc. 148 at 11. He then spent January and February 2026 "drafting term sheet to clarifying process for liquidating specified affiliated companies," revised the "draft clarification order term sheet" repeatedly, and circulated it to NOLHGA's attorneys and to NHC's counsel. *Id.* at 20, 23, 24, 25, 28, 29 (Jan. 23–Feb. 20, 2026). The issue was not dropped; it was pursued with the Government, the guaranty associations, and NHC, outside the presence of the defense and off the docket. |

| What the Special Master told the Court | What his own records show |
|---|---|
| "[T]he Court is supervising neither the judgment execution process nor NHC's sale of any SACs," Doc. 288 at 17; Court approval of the Beckett sale "was not required," *id.* at 13. | Three months earlier, the Special Master's counsel wrote that the waiver he demanded was meant "to encourage the sale approval process running through our supervising court" and "to induce NHC to refrain from doing what NHC did with the Beckett sale (i.e., not get Judge Cogburn to approve the transaction in advance)." Reply Ex. A (May 14, 2026). |
| "Neither Damovo's secured lenders nor the potential acquiror of Damovo seeks the consent of the Special Master." Doc. 334 at 3. "Neither Defendant nor NHC nor the Special Master has any input into the secured lenders' enforcement process." *Id.* He "does not intend to interfere with, or otherwise oppose, the transaction." *Id.* The Response "accomplishes" the request that he inform the Court of the status and terms. *Id.* at 5. | "Review draft letter prepared by potential purchaser of a primary restitution asset" (May 27, 2026); "Review proposed letter to Holland & Knight re Damovo Group Transaction" (May 28), Doc. 263 at 14; "Review of comfort letter re. Damovo transaction" (May 29), *id.* at 30; "Review of letter from Special Master re non-opposition to Damovo transaction; revision to same" and "edit Damoco letter" (June 1), *id.* at 15. The acquiror sought, and the Special Master prepared, a letter of non-opposition and a comfort letter. Neither was disclosed to the Court or to Defendant. Doc. 356 at 3; Doc. 360 at 6. |
| "[T]he Special Master would voluntarily provide to Defendant some of what Defendant is requesting … if he would first agree to an adequate confidentiality agreement and protective order. But Defendant refuses to engage." Doc. 366 at 2. | Part III.E, *infra*: Defendant asked for production under the protective order already in place. Doc. 332 at 1; Doc. 309 at 8. The Special Master has produced nothing under it. |
| "Until Defendant filed motions in this case after the sentencing hearing expressing an unwillingness to sign the New Waiver, the Special Master was unaware that Defendant had any issue with it, other than a question regarding potential adverse tax consequences." Doc. 288 at 6 n.31. | The waiver was demanded on May 14, 2026, for signature "by no later than Friday, May 22, 2026." Reply Ex. A. On May 25, 2026—the eve of sentencing—defense counsel billed a "call and correspondence with SM regarding the Waiver requested," with the note, "Legally cannot sign the waiver until these legal issues are resolved." Doc. 336-2 at 21. What was said on that call and in that correspondence is in the Special Master's files. |
| "Defendant (and now the Special Master standing in Defendant's shoes) has no veto right to prevent dispositions of SACs by NHC." Doc. 334 at 4. The Special Master "cannot prevent any sales of SACs by NHC." Doc. 288 at 17. | Mar. 3, 2025: "Review Primary Restitution Asset corporate governance documents to determine whether lenders have veto right over Lindberg's assignment to special master." Doc. 69 at 32. By June 2025 he had "agreed not to veto a sale of the company conducted pursuant to an appropriate marketing process" to obtain a lender's consent. Doc. 65 at 7. For the remaining Primary Restitution Asset he concedes "a vote that could block any transaction" and says he "intends to seek Court approval prior to voting." Doc. 288 at 10 n.43. He researched the veto, bargained it away, and holds a blocking vote; he has never sought that approval for Damovo. |

| What the Special Master told the Court | What his own records show |
|---|---|
| The Special Master "has conducted an independent investigation," is "functioning like an examiner," and "is not taking evidence and rendering decisions." Doc. 288 at 10. | The Government reviewed his status report before it was filed: Oct. 27, 2025, "Review AUSA comments to draft status report"; Oct. 28, 2025, "Review revisions to proposed status report recommended by Dan Ryan," after which the revised draft was circulated to both sides. Doc. 95 at 18–19; *see* Doc. 80 (filed Oct. 30, 2025). It prepared him for the status conference: Aug. 20, 2025, "Call with JWG, MLM, Dan Ryan, Taylor Stout, Ben Bain-Creed, and Lyndie Freeman re: 8/26 status hearing"; "Teams meeting with DOJ to prepare for status hearing on 8/26." Doc. 81 at 41. It reviewed his invoices: July 14, 2025, "Review feedback from Dan Ryan re: invoices"; "Email to Dan Ryan re: invoice." *Id.* at 24. And it heard from him about buyers: Mar. 5, 2026, "Emails with Dan Ryan re potential purhcaser [sic] of primary restitution assets." Doc. 148 at 34. No defense counsel is named on any of them. The Order requires that the Parties be updated on the sales process. Doc. 56 at 7 (¶ 5). |
| "Prior to Defendant's sentencing hearing, I do not recall Defendant or his counsel ever articulating a concern to me concerning how the Special Master was fulfilling his duties under the Appointment Order," except as to Beckett. Doc. 343 ¶ 12. "[T]he Special Master, at that time, owed no outstanding documents or information to Defendant relating to restitution issues." *Id.* ¶ 19. "I do not recall open" document requests before the Report. *Id.* ¶ 20; *see id.* ¶ 26. | His own filings record the concern and the requests. Dec. 19, 2025: defense counsel "demand[ed] that the Special Master file a motion seeking clarification from the Court on whether NHC's sales of SACs needed to be approved by this Court," and "expressed disagreement with the Special Master's interpretation of the Appointment Order." Doc. 288 at 6, 13 n.47. December 2025: "Defendant had asked for more information." Doc. 343 ¶ 33. Apr. 1, 2026—the day of the Government's "futher [sic] edits"—"Emails with Ryan Meyer and James Wyatt re restitution report, access to documents and information underlying analysis, and related issues." Doc. 148 at 43. And nine paragraphs after swearing nothing was owed: "Admittedly, the Special Master did not provide to Defendant's counsel each and every document received by the Special Master that Defendant's counsel asked to review." Doc. 343 ¶ 24. |
| The Appointment Order directs the Special Master to "update Defendant on the status of sale processes 'regularly.'" Doc. 344 at 10. | The Order says "the Parties": "The Special Master shall regularly update the Parties throughout the diligence and/or sales process concerning any of the Primary Restitution Assets." Doc. 56 at 7 (¶ 5). The Order never uses the words "ex parte." |

The entries speak for themselves, and they speak against the filings. A Special Master who tells the Court the weekly calls were joint, and whose own records show the Government alone on the calls that shaped the order, the report, the sentencing, and the final supplement; who tells the Court the Beckett purchaser never asked for

his approval, and whose records show "buyers requesting Special Master letter of approval"; who tells the Court he "was not involved in the Beckett Sale," and whose records show his letters to NHC's counsel and to his own designee on that sale; who tells the Court he has no input into the Damovo transaction, and whose records show him revising a comfort letter and a letter of non-opposition for it; and who tells the Court the clarification issue was dropped, and whose records show a "clarification order term sheet" negotiated with the Government, the guaranty associations, and NHC—is not clarifying the record. He is rewriting it. The Court should weigh his Response, and his prior responses, accordingly.

### C. The five status reports, set against the Special Master's later filings and his records.

The Special Master/Magistrate has filed five status reports: Doc. 65 (July 2, 2025); Doc. 80 (Oct. 30, 2025); Doc. 94 (Dec. 18, 2025); Doc. 147 (May 15, 2026); and Doc. 262 (July 30, 2026). Each was filed under the Appointment Order, each is signed by his counsel, and each closes with the same assurance: "The Special Master is ready to provide additional documents or information to the Court pertaining to any of the matters referenced in this report upon request." Doc. 65 at 12–13; Doc. 80 at 11; Doc. 94 at 10; Doc. 147 at 6–7; Doc. 262 at 7. Read against the responses he filed after Defendant objected, and against his billing records, the reports contradict the responses, the responses contradict the reports, and the records contradict both. The table sets them side by side. The quotations are verbatim.

| What the status reports say | What the Special Master said afterward, or what his records show |
|---|---|
| Every report opens the same way: "NOW COMES Joseph W. Grier, III, as special master appointed pursuant to 18 U.S.C. § 3664(d)(6)." Doc. 65 at 1; Doc. 80 at 1; Doc. 94 at 1; Doc. 147 at 1; Doc. 262 at 1. | Section 3664(d)(6) authorizes a referral "to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." In August 2026 the Special Master told the Court that "[n]o [a]djudicative [f]unction was [a]ssigned," that he "is functioning like an examiner," and that he has conducted his investigation "outside of the rules of evidence or criminal procedure" and "[f]rom the outset … has had ex parte communications with various interested parties." Doc. 288 at 10. He invoked the magistrate provision five times; he now disclaims the role it describes. |
| The only contact with the parties the reports describe is joint: "the Special Master conducts weekly video conferences, jointly, with the prosecution team and Defendant's defense team in this Case." Doc. 65 at 4. "[T]he Special Master continued to have weekly video conferences with the Defendant's counsel and the Assistant U.S. Attorneys handling this matter." Doc. 80 at 9; Doc. 94 at 8; Doc. 147 at 4; Doc. 262 at 5. | The weekly calls were joint, and the reports describe them accurately. What none of the five reports discloses is a single contact with the Government outside those calls. The records contain dozens, from December 2024 through June 2026, listed in Part I.B above. Doc. 69 at 11–12, 17, 36, 45–46; Doc. 148 at 11, 15, 30, 37, 43; Doc. 263 at 11–13, 22. The Special Master now says that he "regularly communicates with constituencies to this Case without copying all other constituencies to this Case," Doc. 366 at 2 n.5, and that he has done so "[f]rom the outset," Doc. 288 at 10. Five reports describe the joint calls and nothing else. |
| Two reports do disclose meetings with the Government and the victims' representatives: on July 21, 2025, "the Special Master, his counsel, and representatives from Paladin met with the representatives from the U.S. Attorney's office, certain state guaranty associations, and NOLHGA," Doc. 80 at 8; and on October 15, 2025, the same group "met with the representatives from the U.S. Attorney's office, certain state guaranty associations, and NOLHGA," Doc. 94 at 6. Neither report says the defense was there. | It was not. July 21, 2025: "Conference DOJ attorneys and NOLHGA attorneys in DOJ office" (3.5 hours); "Attend conference with Dan Ryan, Taylor Stout, Joel Glover, Katie Wade, Bill O'Sullivan, Brad Taman, John Colpean (via Zoom), Lyndie Freeman (via Zoom), Julia Park (via Zoom), BDR, and JWG re NOLHGA issues" (3.5 hours). Doc. 81 at 26. October 15, 2025: "Conference with Joel Glover, Jason Cowley, Kate Wade, Bill O'Sullivan, Brad Taman, John Colpean, Dan Ryan, Ben Bain-Creed, Scott Avila, Don Harer, JWG, and BDR re NOLHGA issues" (2.5 hours). Doc. 95 at 15. No defense counsel is named on any entry for either day. The Special Master's affidavit swears that it was the defense that "engaged in one-on-one communications … that excluded the government," Doc. 343 ¶ 8, and his Response says the process was not one "to which Defendant was excluded," Doc. 344 at 1–2. His own reports disclose two meetings, one in the U.S. Attorney's office, from which the defense was excluded. |

| What the status reports say | What the Special Master said afterward, or what his records show |
|---|---|
| On his authority over NHC and the SACs, the first report was tentative: "the extent of the Special Master's role regarding NHC and the SACs has been the subject of widespread disagreement among the victim constituencies, the Department of Justice, Defendant, and other parties"; the Special Master "arguably received only those limited rights from Defendant"; "[t]he Special Master's negotiations to reach a mutual agreement among all constituencies concerning the Special Master's role vis-à-vis NHC and the SACs are ongoing"; and he "anticipates resuming efforts to obtain clarity and consensus regarding the Special Master's role and responsibilities as to NHC and the SACs." Doc. 65 at 9–11. | Thirteen months later the position was categorical: Court approval of a SAC sale "was not required," Doc. 288 at 13; "all the Special Master can do is appoint two (2) members to NHC's board of directors," *id.* at 10; "the Court is supervising neither the judgment execution process nor NHC's sale of any SACs," *id.* at 17. The "clarity" was never sought from the Court. The Special Master "refus[ed] to file such a clarification motion," *id.* at 6, and instead negotiated a "special master rights and responsibilities clarification term sheet" with four Government attorneys on March 6, 2025, Doc. 69 at 36, and a "clarification order term sheet" with the Government, NOLHGA's attorneys, and NHC's counsel in January and February 2026, Doc. 148 at 20, 23–25, 28–29. What was "arguabl[e]" and the "subject of widespread disagreement" in July 2025 became settled by August 2026 without a ruling, and without the defense in the room. |
| The first report describes rights the Special Master held and exercised over SAC sales. The Clanwilliam closing conditions "were resolved during the Reporting Period, other than certain consents needed from the Special Master, Defendant, and the Bermuda Insurance Companies." Doc. 65 at 10. A lender recognized the assignment only "so long as (i) the Special Master agreed not to veto a sale of the company conducted pursuant to an appropriate marketing process." *Id.* at 7. | "[B]ecause NHC (and not the Special Master) controlled CWG, the Court never approved or authorized the CWG sale itself." Doc. 288 at 4. With respect to the SACs, "Defendant had no direct interests whatsoever and certainly no rights to control a sale process or otherwise approve or veto any sales," and the Special Master could acquire no more. *Id.* at 14. A consent that was a closing condition, and a veto that had to be bargained away, are rights over a sale. The Response says there were none. |
| A footnote in the third report states the scope of what he received: "The Special Master Order gives the Special Master all of the Defendant's rights and interests in NHC and the Specified Affiliated Companies, as later memorialized by an assignment agreement between the Defendant and the Special Master." Doc. 94 at 6 n.5. And every report describes the same recurring task: "The Special Master has continued to work with counsel for NHC and the Specified Affiliated Companies to provide documentation showing that the Special Master is the ultimate beneficial owner of the Specified Affiliated Companies for KYC regulation purposes." Doc. 80 at 9; Doc. 94 at 8; Doc. 147 at 5; Doc. 262 at 6; *see* Doc. 65 at 12 ("the Special Master authorized NHC to list the Special Master as the ultimate beneficial owner"). | "With respect to the SACs, Defendant had no direct interests whatsoever." Doc. 288 at 14. The Appointment Order "appears carefully crafted to avoid putting the Special Master in full and exclusive control of the Primary Restitution Assets, including the SACs," and "[w]hen it comes to NHC/SACs, all the Special Master can do is appoint two (2) members to NHC's board of directors." *Id.* at 9–10. To the banks, on documentation he "authorized" and "continued to … provide," he is the ultimate beneficial owner of the SACs; to this Court, he has no interest in them. The documentation continued through sentencing. Doc. 263 at 13 (May 20, 2026: "Translate and review Danish-language notices regarding UBO registration of certain SACs"). Both statements cannot be true, and the Court has not been told which one is. |

| **What the status reports say** | **What the Special Master said afterward, or what his records show** |
|---|---|
| Three reports describe the plan for the sale of a Primary Restitution Asset as one "to secure both the necessary court approvals for the sale of that asset and the releases of liability that a buyer of that asset is likely to demand." Doc. 80 at 8; Doc. 94 at 7; *accord* Doc. 147 at 3–4 ("to secure both the court approvals and releases of liability that a buyer of the asset is likely to demand"). | Court approval of the Beckett sale "was not required," Doc. 288 at 13, and "the Court is supervising neither the judgment execution process nor NHC's sale of any SACs," *id.* at 17. Yet in May 2026 his counsel wrote that the waiver demanded of Defendant was meant "to encourage the sale approval process running through our supervising court" and "to induce NHC to refrain from doing what NHC did with the Beckett sale (i.e., not get Judge Cogburn to approve the transaction in advance)." Reply Ex. A. Court approval is "necessary" in three reports and in his own e-mail, and unnecessary in his Response—depending on which sale is being defended. |
| The third report describes the Beckett sale as something learned secondhand: "Upon information and belief, during the Reporting Period, a group of Specified Affiliated Companies (known as 'Beckett') was sold …. Upon information and belief, a fairness opinion analyzing the transaction prepared by JPMorgan Chase Bank was provided to the NHC board, which voted to approve the transaction. The purchaser of Beckett did not require or otherwise request that the Special Master approve the sale of Beckett." Doc. 94 at 6. | His own designee sat on that board. In December 2025 Mr. Harer reviewed the "NHC board discussion materials about proposed sale of specified affiliated company," the "asset sale materials in advance of NHC board meeting," the "SAC consultancy agreement relating to sale of primary restitution asset," and the "fairness opinion for sale of primary restitution asset," joined the NHC board calls of December 2, 12, and 14, and voted to approve. Doc. 95 at 28, 47, 51–52; Doc. 288 at 5, 15 n.50. Ten days before the report was filed, his counsel billed: "Review communications from NHC counsel re: buyers requesting Special Master letter of approval." Doc. 95 at 30 (Dec. 8, 2025). A report "upon information and belief" about a vote his own designee cast is not a report, and its statement about the purchaser was contradicted by his file on the day it was written. |
| Four reports: "As the Special Master's appointee on the NHC board, Don Harer of Paladin has been kept apprised of NHC's discussions and general plans to monetize Specified Affiliated Companies." Doc. 94 at 7; Doc. 147 at 4; *accord* Doc. 80 at 9 ("As a board member of NHC, Don Harer of Paladin has been kept apprised of NHC's discussions and plans to monetize SACs."); Doc. 262 at 4. "The Special Master is therefore working with all stakeholders in an attempt to reach a global resolution of these issues that clear the way for the monetization of the SACs for the benefit of all victims." Doc. 80 at 9. | "The Special Master was not involved in the Beckett Sale." Doc. 288 at 14. He "did not sign any bill of sale, assignment agreement, or any other transactional documents in connection with the Beckett Sale, nor was the Special Master involved in finding a potential purchaser for Beckett Collectibles or negotiating any deal terms with such potential purchaser." *Id.* at 5. Kept apprised of every plan to monetize the SACs, and working with every stakeholder toward it; involved in none of the sales. His designee's December 2025 entries, and the two letters on the sale in his own records—to NHC's counsel and to his designee, the second reviewed and signed by Mr. Grier, Doc. 148 at 14, 16–17—show which account is accurate. |

| What the status reports say | What the Special Master said afterward, or what his records show |
|---|---|
| The reports describe the Special Master directing Defendant's civil litigation. He "(b) does not believe these suits should be pursued, at least not at this time; and (c) intends to facilitate the dismissal of these suits, in toto." Doc. 65 at 9. He "sent a letter to the Defendant asking that the Defendant dismiss the Wilson Lawsuits with prejudice," and when Mr. Wilson was "unsatisfied by the dismissals without prejudice," the Special Master solved it "by negotiating and signing a release of claims against Steve Wilson relating to Clanwilliam acceptable to the Special Master." Doc. 80 at 6. He "has made efforts to stay abreast of Defendant's lawsuits," including "arguments made by the Defendant in the MOU Action." Doc. 147 at 5; Doc. 262 at 6. | The process "was NOT an adversarial process (a) whereby the Special Master served as adjudicator and/or prosecutor." Doc. 344 at 1–2. "When it comes to NHC/SACs, all the Special Master can do is appoint two (2) members to NHC's board of directors." Doc. 288 at 10. An appointee who decides which of the Defendant's suits should be pursued, demands their dismissal with prejudice, signs releases to satisfy the Defendant's adversary, and monitors the Defendant's arguments in state court is exercising power over the Defendant, not over two board seats. |
| On the loss analysis: Paladin's "strategies for characterizing victims and calculating restitution loss estimates … were circulated for discussion purposes only to the Defendant's counsel and the U.S. Attorney's office, seeking their review and comment." Doc. 80 at 8; *accord* Doc. 94 at 6. The Special Master "engaged in extensive discussions with the alleged victims, Defendant's counsel, the U.S. Attorney's office, and other interested parties." Doc. 147 at 3. | What the reports do not say is what the Government did with the report itself: "comments to draft restitution report and redline of proposed order from DOJ," Doc. 148 at 37 (Mar. 16, 2026); "[c]onference call with Dan Ryan and Andrew Cowie re specific language in various parts of the restitution report and appendices"; "[e]mails with Dan Ryan re futher [sic] edits to draft report from the government," *id.* at 43 (Apr. 1, 2026). The strategies were circulated to both sides for comment; the report was edited by one of them—the Government. The fourth report, filed six weeks after those entries, mentions none of it. |
| The fifth report, on sentencing: "the Special Master reviewed a draft of the Defendant's sentencing memorandum and provided feedback to the Defendant's lawyers regarding the same prior to filing. Similarly, the Special Master prepared a draft statement concerning the Defendant's cooperation with the Special Master in advance of the Sentencing Hearing, which the Defendant's attorneys reviewed in advance of filing and proposed various edits with respect thereto." Doc. 262 at 5. | The records for the same two tasks: "Provide feedback to James Wyatt and Dan Ryan re the same. Telephone call to Dan Ryan re the same and related sentencing issues." Doc. 263 at 11 (May 11, 2026). "Draft statement concerning defendant's cooperation …. Telephone call from Dan Ryan re the same." *Id.* at 13 (May 20, 2026). "Revise draft statement concerning cooperation …. Emails with Dan Ryan, Ben Bain-Creed, and Lyndie Freeman re the same." *Id.* (May 21, 2026). The report names the defense as the audience for both documents; the records show the prosecutor on the telephone for both. The report was filed on July 30, 2026, six weeks after Defendant's motions put those contacts in issue. Docs. 201, 202. |

| What the status reports say | What the Special Master said afterward, or what his records show |
|---|---|
| The fifth report: after sentencing "the Defendant bombarded the docket in this Case with an array of pleadings attacking not only the Special Master's recommendations, but also the overall special master process previously agreed to by the Defendant." Doc. 262 at 3. | The Special Master's own filings date Defendant's disagreement from the first reporting period. Doc. 65 at 9 (the role "has been the subject of widespread disagreement among … Defendant"); Doc. 94 at 7 (the October 27, 2025 acknowledgment Defendant did not sign); Doc. 288 at 6, 13 n.47 (December 19, 2025: defense counsel "demand[ed] that the Special Master file a motion seeking clarification"; "Defendant's counsel expressed disagreement with the Special Master's interpretation of the Appointment Order"); Doc. 336-2 at 21 (May 25, 2026: "Legally cannot sign the waiver until these legal issues are resolved"). The objections were not new; the forum was. |
| The fourth report, in a footnote: "At a hearing in the MOU Action during the Reporting Period, the supervising judge expressed a desire for the Special Master and this Court to review the hearing's transcript. The Special Master has reviewed this hearing transcript (and others) from the MOU Action. If the Court is interested in reviewing said transcript, the Special Master can file a copy on the docket in this Case." Doc. 147 at 5 n.3 (May 15, 2026). The fifth report repeats the sentence about the MOU Action, and the footnote is reduced to the case number. Doc. 262 at 6 & n.3. | No transcript from the MOU Action has been filed by the Special Master on this docket. The footnote records three things. The Special Master has collected transcripts from state-court litigation in which Defendant is the adverse party—material of the kind he describes as "documents and information that exist outside of the formal record," Doc. 288 at 10. The Wake County judge asked that this Court review one of them. And the Special Master offered it to the Court, provided it to no one, and dropped the offer from the next report. Whatever he read, and whatever he took from it, is in his files and not on this record. It belongs in the production. |
| All five reports: "The Special Master is ready to provide additional documents or information to the Court pertaining to any of the matters referenced in this report upon request, provided that any confidential proprietary information be provided to the Court under seal." Doc. 65 at 12–13; Doc. 80 at 11; Doc. 94 at 10; Doc. 147 at 6–7; Doc. 262 at 7. | When the request came, under the protective order already entered, Doc. 332 at 1; Doc. 309 at 8, the answer was that production would follow only "if he would first agree to an adequate confidentiality agreement and protective order," Doc. 366 at 2, and that he "did not provide to Defendant's counsel each and every document … primarily due to a desire to preserve the free-flow of information to the Special Master," Doc. 343 ¶ 24. The Damovo letters, the Beckett letters, and the clarification term sheets have been provided to no one. Doc. 356 at 3; Doc. 360 at 6. The offer was made to the Court five times and honored once a request was actually made: not at all. |

Two features of the reports deserve separate mention. First, each disclaims completeness—the narrative "is not intended to reflect a detailed account" and "is not a comprehensive accounting of each and every task performed." Doc. 65 at 12; Doc. 80 at 11; Doc. 94 at 10; Doc. 147 at 6; Doc. 262 at 7. A summary may omit detail. It

may not describe the weekly calls as the Special Master's contact with the parties while the Government is being consulted privately on the order, the report, the preliminary restitution order, the sentencing memorandum, the cooperation statement, and the final supplement; and it may not report a sale "upon information and belief" when the reporter's own designee cast a vote on it. Second, the reports were filed before Defendant objected, when there was no reason to shade them. They are the closest thing in this record to a contemporaneous account by the Special Master himself, and on the points that matter—what he held, what he could approve, what the Court's role was, and who was in the room—they do not match what he told the Court once the questions were asked.

## II. The Communications Outside the Presence of the Defense Have Already Caused Concrete Harm.

Defendant has already placed the prejudice on this record, from the Special Master/Magistrate's own fee applications, and does not repeat it here. Doc. 365 at 1–5 & Ex. A (Oct. 11, 2026) (74 entries and 85.1 hours on Conservatrix, 37 of them communications between the Special Master's team and Conservatrix or its counsel with no defense counsel named; 70 entries and 74.8 hours on Vista; at least 48 communications in which the defense took no part; none disclosed). The Response, filed two days after that Notice, disputes none of it. *See* Doc. 366. The consequence is concrete. Conservatrix's insolvency practitioners told this Court that they had "previously provided to the Special Master and the Special Master's financial advisor information regarding the harm Defendant has inflicted on Conservatrix and its policyholders," Doc. 258 at 11, and then petitioned the Fourth Circuit for mandamus

on that record. Defendant was directed to respond by noon the next day, *In re Zetteler*, No. 26-1749, Doc. 8 (4th Cir. June 11, 2026), and had to do so without access to any of the documents—information conveyed to the Special Master and processed over 85.1 billed hours that Defendant has never seen. The Fourth Circuit thus became the court of first impression on Conservatrix's claim, on twelve hours' notice to Defendant, Doc. 365 at 7, and Defendant had no opportunity to correct the misstatements by Conservatrix and the Special Master that were carried into that court's decision; the facts and issues cannot be fully placed before any court in twelve hours, much less an appellate court. The Fourth Circuit denied the petition, *In re Zetteler*, No. 26-1749, slip op. at 4 (4th Cir. June 13, 2026) (per curiam) (unpublished), *as amended* (June 15, 2026), and that decision and this Court's restitution record have since been invoked against Defendant in *Van Faassen v. Lindberg*, No. 1:23-cv-879, Doc. 81 at 10–11, 13–14 (M.D.N.C. Oct. 5, 2026). Doc. 365 at 5. Conservatrix's insolvency practitioners have since told their policyholders that the Special Master recommended that Conservatrix and its policyholders "were not victims," that the Fourth Circuit "refused to intervene," and that their American attorneys "have close contact with both the 'receiver' and the 'Special Master.'" Reply Ex. E ¶¶ 7.9–7.10 (pp. 7–8) (counsel's rendering). None of that is on this docket. And the report on which that record rests was edited by the Government without the knowledge of the defense. Part I, *supra*; Doc. 148 at 30, 37.

## III. The Response's Remaining Characterizations Do Not Survive the Record.

The Special Master/Magistrate accuses Defendant of "mischaracterizing the record in this Case and disregarding material facts and circumstances." Doc. 366 at 1. Each of the Response's remaining characterizations is answered below.

### A. The communications are not "narratives recently conjured"; they come from the Special Master's own records and his counsel's sworn statements.

The Special Master/Magistrate describes Defendant's showing as "a manufactured pretext" and as "narratives recently conjured by Defendant." Doc. 366 at 1. The communications at issue are recorded in the Special Master's own time records, filed with his own fee applications. *Id.* at 2. His counsel has sworn: "I continue to communicate about this Case outside the presence of both the government and Defendant's counsel with third parties on a daily (or near daily) basis as part of assisting the Special Master in fulfilling his responsibilities under the Appointment Order." Doc. 343 ¶ 9. His counsel has also acknowledged that the Special Master withheld documents from Defendant's counsel "primarily due to a desire to preserve the free-flow of information to the Special Master." *Id.* ¶ 24. And the Response itself states that the Special Master/Magistrate "has freely admitted" that he "regularly communicates with constituencies to this Case without copying all other constituencies to this Case." Doc. 366 at 2 n.5. A fact the Special Master/Magistrate admits is not a narrative Defendant conjured.

### B. The Order authorizes none of the communications the Special Master "freely admit[s]"; its only ex parte provision runs from the Special Master to Defendant.

The Special Master/Magistrate does not contend that the Order authorized his communications with the Government or with third parties outside Defendant's presence; he says only that he "regularly communicates with constituencies to this Case without copying all other constituencies," Doc. 366 at 2 n.5, and that the communications are "irrelevant," *id.* at 3. The Order does not authorize them. Paragraph 5 directs the Special Master to "regularly update the Parties" and to "consult with the Parties"—both of them, the United States and Defendant, on whose joint motion the Order was entered. Doc. 56 at 1, 7 (¶ 5). It is a joint-communication provision, and it authorizes no ex parte communication with anyone. Any ex parte communication would have to be provided for expressly, and the Order provides for exactly one. Paragraph 8 requires Defendant to "take all necessary steps identified by the Special Master to assist the Special Master in carrying out his duties pursuant to this Order," and provides that if Defendant "fails to comply with a directive of the Special Master within 14 days of the Special Master advising Defendant, through Defendant's counsel, of such directive in writing, the Special Master may take any actions and/or cease taking any actions for, or on behalf of, Defendant to enable the Special Master to carry out his duties." *Id.* at 8 (¶ 8). That is a written directive from the Special Master to Defendant, through his counsel, with fourteen days to comply and a remedy confined to acting in Defendant's stead. Nothing in the Order permits the Special Master to communicate with the Government alone, or with

"constituencies" alone; where he needs instruction, the Order sends him to the Court by "motion or application." *Id.* (¶ 10). The communications the Special Master "freely admit[s]" are therefore communications outside the Order, not within it.

The Special Master/Magistrate's own filings show the difference. The AAPC tax-return request his counsel sent to current counsel on July 31, 2026 was a paragraph 8 directive—a written request, through Defendant's counsel, for a signature on a Primary Restitution Asset's tax forms—and current counsel nonetheless added the Government to it the morning after learning that the Government was not copied. Doc. 332-2 at 27; Reply Exs. C, D. The waiver demand of May 14, 2026 was not a paragraph 8 directive. It gave Defendant four days, not fourteen; it sought not a step necessary to the Special Master's duties under the Order but a release of, and a covenant not to sue, a class that expressly included "the Special Master" himself, Doc. 347 at 41–42 (quoting Doc. 190 at 10 & Ex. W); and when Defendant did not sign, the Special Master did not take the one action paragraph 8 allows but filed, on the deadline day, a "Statement Concerning Defendant's Cooperation" telling the sentencing court that Defendant had "never complied" and had a "litigious history." Reply Ex. A; Doc. 159 ¶¶ 2(a), 3 & n.4. A special master appointed under 18 U.S.C. § 3664(d)(6) to make "proposed findings of fact and recommendations as to disposition" of restitution issues has no role in sentencing, Doc. 356 at 38–39; Doc. 347 at 41–42, and the statement concedes that the requests were "arguably exceeding the scope of the Special Master's authority." Doc. 159 at 3 n.4. The Order gave the Special Master one ex parte channel, and he used it to

demand a release in his own favor under threat of a negative report to the sentencing court.

Nor does counting contacts prove anything. Greg Lindberg handed over the Primary Restitution Assets to the Special Master, to be held in his "exclusive possession and control," Doc. 56 at 7 (¶ 4); Doc. 65 at 6, and the Order requires him to communicate with the Special Master about them and to comply with the Special Master's directives. *Id.* at 8 (¶ 8). His counsel's "impression," formed "[w]ithout having tallied," that the Special Master's team "had more one-on-one communications with Defendant's counsel than any other person or group," Doc. 343 ¶ 10, is therefore no evidence that the defense engaged in ex parte communication; it is evidence that paragraph 8 was working as written. The {SM} has not shown that any defense contact he counts was anything other than a paragraph 8 request from his own team—and what Defendant supplied in response, such as the documentation on the zero-coupon bonds that the Special Master's counsel asked for, went to the Special Master and the Government and is now on this Court's docket. Doc. 295 & Exs. A–N (Aug. 10, 2026); Doc. 332 at 1–2. The imbalance runs one way: what the defense sent was available to the Government; what the Government and third parties communicated to the Special Master has never been made available to the defense.

### C. The Court has not "previously denied" the relief sought in the motion to compel.

The Special Master/Magistrate states that "the Court previously denied that relief when it was cast as a request to subpoena the Special Master," and that, "[a]fter the Court did not immediately rule on Defendant's motion to reconsider," Defendant

"reframed his request for the very same relief as a motion to compel." Doc. 366 at 2. The relief was not the same. The Order the Response cites addressed six subpoenas under Rule 17(c), directed to six recipients—the Special Master, his financial advisor, the Special Deputy Rehabilitator, the North Carolina insurance companies, the Bermuda insurance companies, and the Rehabilitator's lawyers—for "a vast array of communications (including categories of privileged communications), court filings, contracts, accounting records, and other documents dating back as far as 2018." Doc. 304 at 1. The Court held those six subpoenas "patently overbroad." *Id.* The motion to compel is directed to one person, the Court's own appointee, and asks that he place on the record the data, methodology, and communications underlying the figures he recommended. Doc. 332 at 1–2.

Nor was the motion to compel a response to delay in ruling on reconsideration. Defendant moved for reconsideration four days after the Order, because in conferral on August 17, 2026 the Special Master "conceded that the underlying valuation documents exist and could be produced, but refused to place them on the Court's record." Doc. 309 at 1. The Government, for its part, did not object to the defense obtaining that data from the Special Master and opposed only the subpoenas to the other recipients. *Id.* at 2, 8. The motion to compel then followed the meet-and-confer correspondence of August 15–29, 2026, in which the Special Master's counsel stated that he would produce "documents in [his] possession" only "under a confidentiality agreement," or upon "a court order compelling" production. Doc. 332 at 2, 5 (quoting

Martinez e-mail of Aug. 17, 2026). Defendant asked for the order the Special Master himself identified.

### D. Defendant's request for the data is not "late in the process."

The Special Master/Magistrate characterizes the requested data as "voluminous document discovery Defendant now seeks late in the process." Doc. 366 at 2. The defense has sought the underlying loss and valuation data since the Special Master's appointment on January 23, 2025, and renewed the request in writing throughout 2025 and 2026. Doc. 332 at 6–7. In his April 3, 2026 report, the Special Master himself stated that, "[u]pon request by the Court, the Special Master could provide additional detail concerning the Special Master's estimates under seal or in an in camera setting." Doc. 106 at 30. Data the Special Master offered to provide six months ago is not a late request.

### E. Defendant has not "refuse[d]" a protective order; he asked for production under the one already in place.

The Special Master/Magistrate asserts that "Defendant refuses to engage with the Special Master in negotiating a satisfactory confidentiality agreement and protective order." Doc. 366 at 2. The record shows otherwise. The motion to compel asks the Court to order production "under the existing protective order (under seal where appropriate)." Doc. 332 at 1. In conferral, Defendant "agreed to proceed on a protective-order basis," stated "that he would not contest confidential treatment of genuinely sensitive business information," and offered to use "the Government's own standing protective order, the order that already governs all of the Government's discovery in this criminal case." Doc. 309 at 8. The Government agreed that "a

protective order, not just filing it under seal, is appropriate here at least with respect to the most sensitive types of business data." *Id.* (quoting Ex. 1). The disagreement is not whether there should be a protective order. It is whether the data should be produced under a private confidentiality agreement that keeps it off the Court's record, or under a court order that keeps it on the record for the Court's de novo determination and for appellate review. *Id.* at 8–9.

The Special Master's stated reason for refusing that order is on the record. He has told the Court that he is "unaware of any such protective order entered in this Case," and that, "to the extent such a protective order exists," it "does not sufficiently shield the disclosure of produced materials." Doc. 323 at 8. In the same filing he invoked this Court's Standard Criminal Discovery Order as the model for the safeguards he wants—the order that defines "sensitive materials" to include "financial information" and governs how the Government's discovery is handled. *Id.* at 5 & n.10. That is the order Defendant offered to proceed under. Doc. 309 at 8. It is the order under which the Government produced its discovery in this criminal case, including, as defense counsel reminded the Government in conferral, the FBI 302s. Doc. 345-3 at 17. The Special Master's position is that an order adequate for the Government's investigative files and for policyholders' financial information is inadequate for the "proprietary business information" of the restitution assets and the "work product of various third-party professionals." Doc. 323 at 5. That is a reason to produce under seal, which Defendant proposed, Doc. 332 at 1; it is not a reason to withhold. And the request is not general. Defendant requested the communications

in writing, Doc. 331-2 at 25–27, moved to compel them, Docs. 331, 332, and on October 11, 2026 identified every one of them by date, participants, subject, and ECF page. Doc. 365 at 13–14 & Ex. A; Doc. 356 at 19–26. Nothing has been produced.

### F. The docketed time records do not disclose what was communicated.

The Special Master/Magistrate states that his time records "have been on the docket in this Case since before the motion to compel was filed," and that they "speak for themselves on whether defense counsel was copied or not." Doc. 366 at 2 & n.5. The time records show that communications took place, with whom, and on what subject. They do not show what was said, what documents were exchanged, or what the Special Master was told about the value of the assets. That is the information the motion to compel seeks, and it is the information the Special Master has withheld. Doc. 343 ¶ 24.

### G. The communications are not "irrelevant" to the recommendations.

The Special Master/Magistrate states that his "communications are irrelevant to those recommendations (except as some evidence of the Special Master's diligence)." Doc. 366 at 3. His own time records say otherwise; they show the Government's comments, redline, and "edits to draft report," its e-mails on the preliminary restitution order, and its participation in the "preparation of final supplement." Part I.A, *supra*. Communications about the preparation of the report and its supplement are, by definition, communications about the recommendations.

### H. The valuations the Special Master now calls "stale" are his own, and the forfeiture judgment is keyed to them.

The Special Master/Magistrate describes Defendant's position as seeking offsets "for the difference between stale valuation estimations and what the Primary Restitution Assets ultimately yield for victims." Doc. 366 at 3. The valuation estimates are the Special Master's. In his April 3, 2026 report he gave the Court low, mid, and high values for the Primary Restitution Assets of $1,162 million, $1,454 million, and $1,878 million. Doc. 106 at 30. In his July 23, 2026 supplement he cut them to $826 million, $998 million, and $1,231 million, Doc. 245 at 36, and called the result his "current guess on the value of the Primary Restitution Assets," *id.* at 37. And the Consent Order and Judgment of Forfeiture fixes the forfeiture money judgment by reference to "the Special Master's estimate, as of the date restitution is ordered, of the 'Mid' point value of the 'Primary Restitution Assets.'" Doc. 160 at 1. The Special Master's estimates cannot be current enough to set the forfeiture and too stale to measure the offsets. He nonetheless agrees that the Court must decide which method governs, Doc. 366 at 3, and the Court cannot decide that question without the data on which the estimates rest.

"Stale" is also a conclusion offered without proof. As the motion to compel explained, the Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e), "the burden of producing the data follows the burden of proving the loss," and "any uncertainty must be resolved against the party that withheld the records, not against the Defendant." Doc. 332 at 7–8 (citing 18 U.S.C. § 3664(a), (e)). An assertion by the Court's appointee that a valuation is "stale"

is not evidence. Defendant has placed on the record the valuation history of Beckett for the period when the asset was under his control—the January 31, 2022 Cabrillo valuation, the Blackstone indication of interest, and the CCG term sheet and the correspondence concerning it. Doc. 256 & Exs. A–D (correcting Doc. 234); *see* Doc. 332 at 16–17 (Beckett "sold for approximately $134 million against an approximately $1 billion appraisal"). The Special Master has produced nothing for 2025, the year in which control passed to him and in which the sale was made. Doc. 94 at 6–7. The one 2025 valuation document his own records identify—the "fairness opinion for sale of primary restitution asset" his designee reviewed before voting, Doc. 95 at 51–52; Doc. 288 at 5—he has not produced either. Nor has he produced the two letters on the sale that his own records show: the "letter to John Babcock re Beckett transaction," Doc. 148 at 14, and the "letter to Don Harer re December Beckett transaction" that Mr. Grier reviewed and signed, *id.* at 16–17—the letter he has told the Court confirmed that he "would not oppose the Beckett Sale," Doc. 288 at 5; Doc. 268-1 ¶ 10. He took part in the sale. A Special Master who signs a letter of non-opposition to a sale has the documents on which he based it. A party that holds the only contemporaneous valuation, withholds it, and answers the other side's documented valuation history with the word "stale" has not met a burden; it has declined to meet one. The exhibits on the record are the only proof before the Court, and they are Defendant's.

The Special Master's own side has said what AAPC is worth, and said it in writing. On May 2, 2026, former defense counsel sent the draft sentencing memorandum to the Government and the Special Master's team together. Reply Ex.

B. The draft stated that AAPC "has been valued as worth at least $2.7 billion." *Id.* On May 11, 2026, the Special Master's counsel returned it with his comments, to the same group. *Id.* Of the valuation he wrote: "I'm sure it is going to hurt AAPC's sale efforts to include valuations. At a minimum, we certainly would never receive any offers above $2.7 billion." *Id.* He called the description of AAPC's growth "harmful," asked that it be redacted or sealed, and twice noted that he was "not signing" the pleading. *Id.* The defense complied: "We incorporated most of your comments and there will be no reference to AAPC or its valuation." *Id.* (May 12, 2026). The memorandum as filed contains none. Doc. 507. Ten weeks later, on July 23, 2026, the Special Master told the Court that the Primary Restitution Assets—AAPC among them—were worth, in the aggregate, no more than $1,231 million and as little as $826 million, attributed the reduction to "new information discovered since filing the Initial Report" and to "markets shift[ing]," called the result his "current guess," disclosed that it rests in part on "illustrative valuation analyses" that "do not constitute formal valuations or fairness opinions" but "reflect a desktop exercise," and reserved the reasons for a proposed sealed appendix. Doc. 245 at 36 & nn.31–32, 37. In May, a $2.7 billion figure could not be published because it would cap the offers; in July, the same asset was part of a group worth less than half that figure, on a "guess," with the explanation under seal. In May, disclosure of a high figure would "hurt AAPC's sale efforts"; in July, disclosure of his own lower figures "would negatively impact liquidation efforts." Reply Ex. B; Doc. 245 at 36 n.32. Both statements are the Special Master's. They cannot both be true. The first was a market

judgment made when the defense's number was on the table; the second is an estimate he himself disclaims as a formal valuation. If the answer is that the July figure nets out liabilities and the May figure did not, the April figure was net too—it was the Special Master's estimate of what could be recovered "from Defendant's interests" in the assets, interests he described as "subordinated to those of other persons," Doc. 106 at 29–30—and it fell by $456 million at the midpoint between April and July. The liabilities his counsel said Defendant "placed on AAPC," Reply Ex. B, have never been identified, quantified, or placed on the record; they are item 6 of the data Defendant moved to compel. Doc. 332 at 19. The shift in AAPC's value between May and August was driven by what the Special Master describes as his "independent investigation." Doc. 288 at 10. It was not independent. By his own account, his estimate "merely reflects the Special Master's best guess at what might happen in the future," "relying heavily on information from the persons managing the 'Primary Restitution Assets' and not relying on independently-commissioned business valuations." Doc. 323 at 4. The "illustrative valuation analyses" behind the July figures were "prepared by the financial advisors to NHC Holdings, LLC," Doc. 245 at 36 n.31—the entity that holds and sells the assets, to whose board the Special Master appoints two directors, Doc. 288 at 10, and on which his own financial advisor, Don Harer of Paladin, sits as "the Special Master's appointee." Doc. 94 at 7; Doc. 147 at 4. A number produced by the seller's advisors, for a seller whose board includes the Special Master's own appointee, adopted by the Special Master as his "guess," and explained only under seal, is not an independent valuation. It is the Special Master

valuing his own work. Defendant, for his part, has placed on the record the materials bearing on the value of his interests in AAPC—under seal, because the Special Master's own valuation is sealed—and has asked that Appendix 1 be unsealed so that the two can be compared on an open record. Doc. 318 (Part Two) (filed Aug. 23, 2026; sealed by Doc. 325); Doc. 349 (refiled Sept. 15, 2026; sealed by Doc. 351); *see* Doc. 348 ¶¶ 1, 3. On the public record stands the Houlihan Lokey valuation of AAPC at approximately $3 billion, on identified projections and a disclosed multiple. Doc. 281 at 47–48. The Court has two valuations of the same asset before it: one by a named firm on disclosed data, and one its author calls a "guess" from a "desktop exercise" and will explain only under seal. That is the author of the word "stale," and those are the valuations he asks the Court to treat as current enough to fix a forfeiture judgment. Doc. 160 at 1. The Court cannot decide which of the Special Master's numbers to believe without the data behind each, and he has produced the data for neither.

## I. The Special Master's representations to the Court about Damovo were inaccurate.

The Special Master/Magistrate describes Defendant's Damovo motion as one to "enjoin the conduct of various strangers to this Case," and says his time records show at most "what the Special Master knew and when." Doc. 366 at 3–4. That repeats what he told the Court on August 31, 2026. He represented then that "neither the Special Master nor NHC is conducting or otherwise responsible for the Potential Damovo Transaction," Doc. 334 at 2; that "[n]either Defendant nor NHC nor the Special Master has any input into the secured lenders' enforcement process," *id.* at 3;

that "[n]either Damovo's secured lenders nor the potential acquiror of Damovo seeks the consent of the Special Master," *id.*; and that, "[b]ased on the Special Master's evaluation," he "does not intend to interfere with, or otherwise oppose, the transaction," *id.* He told the Court that his Response "accomplishes" Defendant's request that he inform the Court of the status and terms of the Damovo disposition. *Id.* at 5.

His own billing records show that those representations were not accurate. Three months earlier, his team had reviewed a "draft letter prepared by potential purchaser of a primary restitution asset" and a "proposed letter to Holland & Knight re Damovo Group Transaction," Doc. 263 at 14; reviewed and revised a "letter from Special Master re non-opposition to Damovo transaction" and edited the "letter to Holland & Knight," *id.* at 15; and reviewed a "comfort letter re. Damovo transaction," *id.* at 30. His team had also held a "[v]ideo conference with counsel for prospective purchaser of certain specified affiliated companies" and a "Teams meeting with representatives of primary restitution asset re sale process," *id.* at 8–9, and participated in an "NHC board call," *id.* at 30. A Special Master who drafts a letter of non-opposition and reviews a comfort letter for a transaction has "input" into it. And the party who prepared the letter of non-opposition to the Damovo sale was not a stranger to this Case; it was the Special Master himself, in his own name—"letter from Special Master re non-opposition to Damovo transaction." *Id.* at 15. The person who writes the letter of non-opposition to a sale is a participant in that sale. His August 31 Response did not mention either letter. It described as a present "intent"

not to oppose a position he had already put in writing in June. Whether the non-opposition letter was sent, to whom, and on what terms, the Special Master has never told the Court or Defendant. None of those communications or letters has been provided to Defendant. Doc. 360 at 6. A response that "accomplishes" the Court's request for the status of the Damovo disposition while omitting the Special Master's own letters about it does not accomplish it.

The Court-approval requirement the Special Master now treats as optional was the Government's own term, and the record of how it got into the order is already before the Court. Defendant instructed former counsel to seek an appointment under which the special master "would owe a fiduciary duty to all stakeholders." Doc. 316-1 at 217–18 (Lindberg Decl. ¶ 5). The Government refused. On December 18, 2024, AUSA Dan Ryan sent former counsel "a redline and a clean version of our changes," having "discussed it with Mike and Joe"—Mr. Martinez and Mr. Grier—and wrote that "requiring the special master to handle the assets in any particular manner or on any particular timeline, or requiring him to 'consult' with the parties on a weekly basis to maximize value does not accomplish this," that "[t]he Special Master does not owe a duty to Mr. Lindberg or to the assets, but rather to the Court and to victims," and that "if we cannot get on the same page, we have no issue with filing competing memos and proposed orders." Doc. 316-2 at 25–26. The Government "rejected nearly all of the changes the defense proposed," including the fiduciary duty, "took control of the drafting of the proposed order and produced the operative version itself." Doc. 316-1 at 218–19 (Lindberg Decl. ¶¶ 8–9). What the Government's order left in place

of a fiduciary duty was Court approval: the Special Master shall "select an appropriate method and timetable and seek Court approval to liquidate" and "oversee and help accomplish the liquidation with Court approval." Doc. 56 ¶ 3(c)–(d) (at 6). The Special Master now says Court approval of a sale "was not required," Doc. 288 at 13; Beckett was sold for $134 million "without any court approval or notice before the sale," Doc. 360-1 ¶ 23; and the Government, which refused a fiduciary duty on the ground that the Special Master answers "to the Court," has not objected to the Court being read out of its own order. Either this Court supervises the disposition of its restitution assets, as the Order provides, or the Colorado court should be allowed to do so. Defendant asks that this Court supervise the disposition, on a complete record; and if this Court is not inclined to act, Defendant asks that it allow the Colorado court to act, so that a Primary Restitution Asset for which $400 million to $500 million was on the table is not transferred for no proceeds. Doc. 320 at 2–3; Doc. 283-1 ¶ 2; Doc. 320-1 ¶¶ 3, 6.

### J. The supplementations were filed under the Court's Order, and the Response asks the Court to deny relief it does not address.

The Special Master/Magistrate describes the supplementations as part of "redundant and convoluted filings that the Defendant has overloaded the docket in this Case with since he was sentenced," and as "a regurgitation of prior arguments, complaints, and grievances." Doc. 366 at 1, 4. The supplementations were filed with leave, and the Court set the schedule for responding to them. Doc. 361. The Response then asks the Court to "deny any and all relief requested by the Defendant since his sentencing hearing." Doc. 366 at 4. It does not address most of that relief, and a

recommendation from the Court's appointee to deny motions he has not addressed gives the Court nothing on which to rule.

## IV. Before Any Hearing, the Special Master and the Government Must Produce Their Communications, With Attachments.

The Government has asked that, if the Court "requires additional information on any of these topics," it "set a hearing." Doc. 367 at 5. Defendant agrees. The Special Master/Magistrate has acknowledged communications without the defense, has called them "irrelevant" to his recommendations, and has offered production only on conditions that would keep the data off the record. Doc. 366 at 2–3 & n.5. Whether those communications informed the recommendations, and what data underlies them, are factual questions that should be resolved on testimony and documents.

Defendant's position on the hearing is that it should not begin until the Special Master/Magistrate and the Government have first turned over to defense counsel every e-mail, with its attachments and data, and every other record of their communications outside the presence of the defense—with each other and with any third party, including the victims' representatives, the custodians, and the claimants with whom the Special Master's counsel swears he communicates "on a daily (or near daily) basis," Doc. 343 ¶ 9. Two reasons compel that sequence. First, the statute does not permit selective disclosure. The Mandatory Victims Restitution Act provides, in full: "The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section." 18 U.S.C. § 3664(b). "All portions," not the portions the Special Master or the Government select; and the Special Master's report

is such a report, prepared on referral under § 3664(d)(6) from information the Government supplied and edited in private. Doc. 148 at 37, 43. A hearing at which the defense must cross-examine on communications it has never seen, while the other participants hold them, is not the hearing the Government says it wants. Second, the Special Master and the Government have chosen to defend their own conduct by pointing to former defense counsel's invoices—descriptions of privileged work, filed in redacted form for fee approval—as proof that the defense "did it too." Doc. 366 at 2 n.5; Doc. 344 at 4 n.13, 6–7; Doc. 367 at 2–3. Many of those records, read in full, show the opposite of what is attributed to them, Reply Ex. A; Doc. 75-1 at 65; Defendant's counsel and former counsel have reviewed that export in full; and all of them are privileged. Defendant does not waive, and expressly preserves, the privilege over every communication between himself and his former counsel and over former counsel's work product. The party that holds the ex parte communications cannot keep them, mine the other side's privileged records for fragments, and then ask for a hearing on the result. The production should come first, in full, with attachments, and the hearing after.

## CONCLUSION

For these reasons, Defendant respectfully requests that the Court, to the extent leave is required, grant leave to file this Reply, and that it (1) grant the motion to compel, Doc. 332, and order the Special Master to produce directly to defense counsel all of his ex parte communications—with the Government and with any third party—including any attachments and data, together with the loss and valuation

data underlying his recommendations, under the existing protective order and on the record; (2) set an evidentiary hearing on the pending motions, to be held only after the Special Master and the Government have made that production; and (3) grant the relief requested in Docs. 281, 320, 331, and 347, as supplemented by Docs. 356 through 360, and, as to Damovo, if the Court is not inclined to act, allow the District of Colorado to do so.

Dated: October 15, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
*Admitted pro hac vice*

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: October 15, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*