IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREG E. LINDBERG | Case No. 3:23-CR-48-MOC |

# SPECIAL MASTER'S SIXTH STATUS REPORT

NOW COMES Joseph W. Grier, III, as special master appointed pursuant to 18 U.S.C. § 3664(d)(6) (the "Special Master"), by and through counsel, who files this *Special Master's Sixth Status Report* (this "Report") pursuant to this Court's *Order Appointing Special Master* entered on January 23, 2025 (Doc. No. 56) (the "Special Master Order"), covering the period beginning on July 1, 2026, and ending on September 30, 2026 (the "Reporting Period").

## I. PROCEDURAL BACKGROUND

The procedural background sections found in the Special Master's first five status reports (Doc. Nos. 65, 80, 94, 147, and 262)[1] covering the history of the above-captioned case (this "Case"), from the indictment of Greg E. Lindberg ("Defendant") through the appointment of the Special Master, are incorporated herein by reference.

## II. SUMMARY OF SPECIAL MASTER'S ACTIVITIES

### A. Payments to Policyholders with Uncovered Claims

As described in prior status reports, the Clanwilliam Order (Doc. No. 68) directed the Special Master to pay the North Carolina Insurance Companies' (the "NCICs") share of the Clanwilliam proceeds first to the Policyholders with Uncovered Claims, with the remainder then

[1]Capitalized terms not otherwise defined in this Report have the meanings assigned to them in the Special Master's prior status reports.

paid to the NCICs. Throughout the Reporting Period, the Special Master's distribution agent, Epiq, continued to monitor the status of payments, reissue checks upon the request of policyholders, research issues related to uncleared checks, and maintain a call center and dedicated email inbox to answer policyholder inquiries related to those payments. Epiq has also mailed letters to policyholders whose checks remain outstanding notifying them of their right to request a reissued check.

As of the close of the Reporting Period, more than $151,500,000 of the nearly $158,000,000 (*i.e.*, approximately 96%) of the funds the Special Master distributed to Policyholders with Uncovered Claims had been deposited. Expressed in terms of number of checks, 32,983 of the 43,793 (*i.e.*, approximately 75%) checks that were issued by the Special Master had cleared by the end of the Reporting Period. Notwithstanding repeated notices to the affected policyholders, more than 10,000 distribution checks totaling more than $6,000,000 remain uncashed or undeliverable.

During the Reporting Period, the Special Master, Paladin, and Epiq conferred regarding the appropriate treatment of uncashed and undeliverable distribution checks, including the potential escheatment of the corresponding unclaimed funds to the appropriate states and territories. The Special Master solicited and began evaluating proposals from vendors that specialize in multi-state unclaimed property reporting. Because state unclaimed property laws vary significantly from jurisdiction to jurisdiction and because some laws generally require that checks be outstanding for a period of three (3) to five (5) years before funds may be escheated, the Special Master anticipates that he may in the future seek an order from this Court authorizing the escheatment of unclaimed distributions on an accelerated basis and establishing appropriate procedures for doing so.

## B. Recommendations as to Restitution

Early in the Reporting Period, the Special Master, his counsel, and Paladin completed the Special Master's second supplement to the Restitution Report, which was filed on July 23, 2026 (Doc. No. 245) (the "Second Supplement"). The Second Supplement (i) responds to various restitution-related arguments that had been raised at that time by Defendant—including those embedded within a litany of documents filed since Defendant parted ways with his former attorneys at Katten and Wyatt (itemized in the Special Master's fifth status report and defined as "Defendant's Supplemental Responses")—and other parties in interest and (ii) otherwise updates the Special Master's recommendations to the Court on restitution issues. The Special Master also submitted a revised proposed final order of restitution for the Court's consideration contemporaneously with the filing of the Second Supplement.

Various interested persons other than Defendant filed written responses to the recommendations appearing in the Second Supplement, including: Conservatrix (Doc. No. 258) (asking the Court to reject the Special Master's recommendation that Conservatrix NOT receive restitution through this Case); ULICO (Doc. No. 275) (limited objection focused primarily on the priority of payments as between different victims); the Bermuda Insurance Companies (Doc. No. 297) (limited objection focused primarily on the priority of payments as between different victims); the NCICs (Doc. No. 307) (limited response (in support) focused primarily on the priority of payments as between different victims); NOLHGA (Doc. No. 310) (limited response (in support) focused primarily on the priority of payments as between different victims); and the Pennsylvania Commissioner of Insurance (Doc. No. 311) (amicus brief asking the Court to reject the Special Master's recommendation that Vista NOT receive restitution through this action). In addition, the government filed an omnibus response to the Defendant's Supplemental Responses

(Doc. No. 279) and consolidated position concerning restitution issues (Doc. No. 308), generally supporting the positions taken by the Special Master in the Second Supplement.

Separate and apart from the Defendant's Supplemental Responses, Defendant filed various responses to the restitution-related recommendations appearing in the Second Supplement, including, without limitation:

> (1) a petition filed with the Fourth Circuit Court of Appeals for a writ of mandamus compelling this Court to reject the recommendations in the Second Supplement (among other relief requested) (*see* Doc. No. 255-1)[2];
>
> (2) preliminary objections to the Second Supplement (Doc. No. 280);
>
> (3) a preliminary response to the Second Supplement (Doc. No. 281);
>
> (4) a motion to hold the Second Supplement in abeyance (Doc. No. 282);
>
> (5) a response to the Second Supplement focused on a credit against restitution requested by Defendant based on certain "zero-coupon principal-protected bonds" (Doc. No. 295);
>
> (6) a response to the government's consolidated position concerning restitution issues (Doc. No. 316); and
>
> (7) objections to entry of a final restitution order and reservation of constitutional and statutory issues relating to restitution (Doc. No. 329).

In addition, after filing the Defendant's Supplemental Responses to the Restitution Report and to the Preliminary Restitution Order but before the Special Master filed the Second Supplement, Defendant filed an affirmative motion asking the Court to determine that no restitution is owed by Defendant whatsoever (Doc. No. 234).

Meanwhile, during the Reporting Period, Defendant asked the Fourth Circuit Court of Appeals to stay the effect of the Preliminary Restitution Order pending its appeal. The Fourth Circuit denied the motion to stay during the Reporting Period (*see* Doc. No. 306).

---

[2] The Fourth Circuit denied the petition on August 4, 2026 (*see* Doc. No. 272).

The Special Master, his legal counsel, and Paladin reviewed and analyzed each of the aforementioned filings to determine whether and to what extent any of them warranted a further written response from the Special Master, and the Special Master responded where the Special Master deemed necessary and appropriate.

## C. "Increasingly Specious Challenges to the Special Master" and Other Litigation by Defendant Seeking to Prevent or Delay Restitution

After Defendant received a reduced custodial sentence during the prior reporting period, Defendant overloaded the docket in this Case with redundant and convoluted filings basically challenging the Special Master Order—which Defendant agreed to while represented by competent counsel and which was used by Defendant to obtain the reduced custodial sentence—as unconstitutional and otherwise objectionable. The contrast between Defendant's approach to this Case pre-sentencing from that post-sentencing is severe. Prior to receiving his reduced sentence (a period of approximately two years and three months), Defendant filed fewer than 70 items on the docket in this Case, totaling fewer than 1,700 pages and using fewer than 384,000 words in the aggregate; this tally includes *pro hac vice* applications, fee applications for Defendant's counsel, and joint filings with the government. After sentencing until the filing of this Report (a period of approximately five months), Defendant has filed more than 330[3] items on the docket, totaling more than 10,500 pages and using more than 2.9 million words in the aggregate.[4] As a result, a substantial portion of the Special Master's time during the Reporting Period was devoted to reviewing, analyzing, and otherwise addressing these voluminous filings by Defendant in this Case, as well as emails from Defendant's counsel regarding the same.

---

[3] This figure includes affidavits, exhibits, and other attachments to the primary document.

[4] Thus, Defendant has increased his filings in this Case from approximately 63 pages per month on average to approximately 2,100 pages per month on average.

In addition to the filings described above more directly pertaining to the Restitution Report and Preliminary Restitution Order, Defendant's campaign to confuse and burden the restitution process in this Case includes filings during the Reporting Period summarized in the chart below.[5]

| Doc. No. | Description | Status |
|---|---|---|
| 238 | Defendant's Motion to Recoup Distribution Made to Vista in Connection with the Clanwilliam Compromise Previously Approved by the Court | Awaiting Court Order |
| 248 | Defendant's Motion for Authority to Issue Subpoenas to the Special Master, NHC, Certain Victims, and the N.C. Commissioner of Insurance | Denied by Court |
| 269 | Defendant's Motion to Remove the Special Master | Denied by Court |
| 278 | Defendant's Second Motion to Set Aside the Restitution Report and Preliminary Restitution Order | Denied by Court |
| 290 | Defendant's Motion to Strike the Government's Omnibus Response to Various of Defendant's Motions | Awaiting Court Order |
| 309 | Defendant's Motion to Reconsider the Order Denying Defendant's Previous Motion to Issue Various Subpoenas | Awaiting Court Order |
| 320 | Defendant's Motion to Enjoin Disposition of Damovo | Awaiting Court Order |
| 331 | Defendant's Motion to Compel the Government to Produce Various Data and Documents and to Set Aside the Restitution Report | Awaiting Court Order |
| 332 | Defendant's Motion to Compel the Special Master to Produce Various Data and Documents and to Set Aside the Restitution Report | Awaiting Court Order |
| 347 | Defendant's Motion to Reconsider the Order Denying Defendant's Previous Motions to Remove Special Master and Set Aside Restitution Report and Preliminary Restitution Order | Awaiting Court Order |

These filings by Defendant have, at least to some extent, complicated and otherwise interfered with NHC's ability to extract value from the Specified Affiliated Companies ("SACs") for the benefit of victims and, by extension, the restitution process in this Case.

A large part of the confusion stems from Defendant taking extreme contrary positions concerning the scope of the Special Master's power during the Reporting Period. Whereas at times Defendant argues that the Special Master Order is unconstitutional, has no legal effect, and therefore the Special Master has no power over any of Defendant's interests in property, Defendant, at other times, interprets the Special Master Order as giving the Special Master total dominion and control, not only over Defendant's interests in NHC and AAPC, but also over the many companies held directly or indirectly by NHC, such that—notwithstanding corporate

[5] This Report does NOT specifically identify all of the filings made by Defendant in this Case during the Reporting Period.

governance documents (executed prior to the Special Master Order) distancing Defendant from controlling those companies—transactions involving these companies must be approved by the Special Master and this Court. The Special Master's interpretation of the Special Master Order—read together with the corporate governance documents provided to the Special Master—is that the affirmative approval of the Special Master and this Court is not required for the SACs (or NHC) to enter into transactions. Unless and until the Court provides additional clarity on these issues (and others) by ruling on Defendant's various requests for relief, the Special Master believes the restitution process in this Case will remain at a standstill.

Unfortunately, Defendant's campaign throughout the Reporting Period seeking to prevent, or at least postpone, victim recoveries through litigation was not limited to this Case. For example, in addition to filing a motion in this Case seeking to enjoin various third parties (including some domiciled in the United Kingdom) from foreclosing on and selling, or otherwise disposing of, certain companies known as "Damovo" (Doc. No. 320),[6] Defendant filed a lawsuit in the District of Colorado similarly seeking to enjoin any disposition of Damovo, including a motion seeking an injunction to that effect (the "Colorado Damovo Lawsuit").[7] Notably, although secured lenders are primed to foreclose their security interests encumbering the Damovo assets imminently, a party that intends to purchase those assets through the foreclosure proceeding has offered payments to certain of Defendant's victims (who would otherwise receive nothing from Damovo) in exchange for releases from those victims (thereby providing the purchaser additional peace of mind concerning clean title to the asset(s)). On information and belief, during the Reporting Period:

---

[6] The Special Master filed a response to Defendant's motion (Doc. No. 334) explaining, among other things, that: (a) Damovo is held by a trust governed by English law rather than directly within NHC's ownership chain; (b) the potential disposition of Damovo is being conducted through the enforcement of rights by Damovo's secured lenders following Damovo's default under its loan documents; and (c) neither the Special Master nor NHC is conducting or controls that process.

[7] The Colorado Damovo Lawsuit is captioned as *Lindberg v. Wilson* et al., Case No. 26-cv-03939 (D. Colo.).

(1) the NCICs (in the Wake County "MOU Action") and the Bermuda Insurance Companies (in the chapter 15 bankruptcy proceeding in the Southern District of New York) each filed motions to approve the above-described transaction concerning Damovo during the Reporting Period; and (2) Defendant objected to those motions in both proceedings.

The U.S. District Court for the District of Colorado, *sua sponte*, denied Defendant's request to enjoin a disposition of Damovo (a copy of which order is attached hereto as Exhibit B). This order denying the injunction characterizes the Colorado Damovo Lawsuit as a "collateral attack" on this Case. After reviewing the docket in this Case, the Colorado District Court characterized Defendant's filings in this Case during the Reporting Period as "**increasingly specious challenges to the special master's actions**" (emphasis added).

The Colorado court also recognized that the Colorado Damovo Lawsuit was not the only collateral attack on the restitution process in this Case, referencing a lawsuit Defendant is prosecuting before the U.S. District Court for the Southern District of New York (the "N.Y. RICO Lawsuit"). In the N.Y. RICO Lawsuit, Defendant has sued the North Carolina Commissioner of Insurance, the law firm representing the NCICs, the liquidators of the NCICs, and the chief executive officer of NHC (the entity charged with marshaling the SACs), alleging that they are operating a racketeering enterprise seeking self-enrichment (and/or political retribution) at Defendant's expense. What is most troubling to the Special Master about Defendant's allegations in the N.Y. RICO Lawsuit is that Defendant maintains that the alleged racketeering enterprise has, since the entry of the Special Master Order, operated "**through the federal restitution proceeding itself**" (emphasis added). So, while Defendant is careful not to name this Court or the Special Master as party-defendants, Defendant's allegations make clear that Defendant is asserting that the

conduct of both the Court and the Special Master is at least enabling, if not a critical component of, the alleged racketeering enterprise by his victims and others.

Another similar attempt to interfere with victim recoveries is a lawsuit Defendant filed with the U.S. District Court for the District of Utah against AAPC Holdings, LLC and American Academy Holdings, LLC (together, "AAPC") seeking, among other things, a permanent injunction "barring any sale, transfer, assignment, encumbrance, pledge, refinancing, or other disposition of AAPC . . . until his restitution obligations . . . are fully adjudicated, including final resolution of any pending appeals" (the "Utah AAPC Lawsuit"). Defendant's interest in AAPC is one of the two "Primary Restitution Assets" in this Case.[8] On information and belief, as Defendant is aware, the loan of AAPC's senior secured lender comes due in the second quarter of 2027; therefore, if Defendant succeeds in obtaining the injunction requested (which would bar AAPC from selling itself or refinancing in lieu of foreclosure), then any value that could be extracted from AAPC for the benefit of victims in this Case would evaporate upon the lender's foreclosure. Because of the detrimental impact on the restitution process should Defendant succeed in the Utah AAPC Lawsuit, AAPC (an entity domiciled in Utah) has moved to transfer the case to the Western District of North Carolina. On information and belief, Defendant opposes the transfer.

In addition to the Colorado Damovo Lawsuit, the N.Y. RICO Lawsuit, and the Utah AAPC Lawsuit, Defendant has initiated other litigation matters impacting the victims that the Special Master believes are due restitution in this Case, including, without limitation, a lawsuit Defendant filed against ULICO pending before the U.S. District Court for the District of Puerto Rico as case number 3:26-cv-1026.

---

[8] The other of the "Primary Restitution Assets" is Defendant's interest in NHC.

At the Special Master's direction, Paladin prepared and updated a comprehensive analysis of Defendant's various filings in this Case and categorized the new or expanded arguments raised therein. Based in part on Paladin's analysis, the Special Master identified a limited number of discrete issues that may warrant further attention, which the Special Master continues to evaluate.

### D. Efforts to Facilitate Liquidations of Primary Restitution Assets

As previously reported, one of the Primary Restitution Assets that had been conducting a sale process decided to suspend such process in the prior reporting period. During the Reporting Period, the Special Master worked with such asset's management and other stakeholders to evaluate and determine next steps toward extracting value from the asset for victims.

Concerning the remaining Primary Restitution Assets, the Special Master's appointee on the NHC board has been kept apprised of NHC's discussions and general plans to monetize SACs. Many of the issues that presented themselves during the Clanwilliam sale process (and which required extensive negotiation to resolve) are likely to recur during NHC's monetization of other SACs. Representatives of the Special Master continued to work with various NHC stakeholders during the Reporting Period in an attempt to resolve, or at least help alleviate, these common sale and distribution barriers burdening the process for monetizing the SACs. Notably, the complex corporate governance structure of NHC and the SACs continues to cause significant administrative burdens. The Special Master, NHC, and other stakeholders are exploring options to streamline and simplify the structure of NHC, the SACs, and the related trusts.

### E. Other Miscellaneous Efforts and Activities

During the Reporting Period, the Special Master maintained open and frequent communications with representatives of the Primary Restitution Assets, the likely victim constituencies, and other interested parties impacted by Defendant's conduct.

On September 4, 2026, the Special Master filed a limited objection (Doc. No. 338) to Katten's fifth fee application. The Special Master does not oppose the amount of fees requested by Katten but asked that the Court's order make clear that the Special Master may pay approved fees if and when the Special Master determines that sufficient funds are reasonably available, consistent with the treatment afforded Wyatt in the Court's order approving Wyatt's fifth fee application and with the allocation of the administrative expense reserve established in connection with the Clanwilliam compromise. Katten filed a reply.

The Special Master's counsel attended the Court's August 10, 2026 hearing on the government's motion for inquiry of counsel and other matters. The Special Master's counsel also attended the August 12, 2026 sentencing hearing of Chris Herwig.

## III. RECEIPTS AND DISBURSEMENTS

The Special Master did not receive any funds during the Reporting Period other than interest earned on already-deposited funds.

In accordance with the Court's August 26, 2026 Order (Doc. No. 327) approving the Special Master's fifth interim fee application (Doc. No. 263), the Special Master disbursed $128,764.87 to Grier Wright Martinez, PA and $217,058.45 to Paladin during the Reporting Period. The Special Master also disbursed approximately $90,920 to Epiq during the Reporting Period for services rendered in connection with the management and disbursement of restitution funds. The aggregate amount disbursed to Epiq over the course of this Case totals approximately $615,126. An accounting of deposit account balances and cash flows is attached to this Report as Exhibit A.

## IV. REQUEST FOR APPROVAL OF COMPENSATION

Contemporaneously with the submission of this Report, the Special Master intends to file a separate application for compensation seeking court approval of the fees and expenses incurred by Paladin and Grier Wright Martinez, PA in connection with this Case during the Reporting Period.

## V. REPORT INTENDED AS A SUMMARY

The narrative description of the Special Master's activities in this Report is intended to summarize some of the more significant tasks that the Special Master undertook—through Paladin, the Special Master's law firm, or otherwise—in connection with this Case during the Reporting Period and is not intended to reflect a detailed account of the same. Similarly, the narrative description of the Special Master's activities in this Report is not a comprehensive accounting of each and every task performed by the Special Master during the Reporting Period. The Special Master is ready to provide additional documents or information to the Court pertaining to any of the matters referenced in this Report upon request, provided that any confidential proprietary information be provided to the Court under seal.

Respectfully submitted this 3d day of November, 2026.


*/s/ Michael L. Martinez*
Joseph W. Grier, III (State Bar No. 7764)
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

*Attorneys for the Special Master*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing *Special Master's Sixth Status Report* were served via electronic mail through the Court's CM/ECF system on those parties registered to receive such automatic notices through the CM/ECF system.

Respectfully submitted this 3d day of November, 2026.

*/s/ Michael L. Martinez*
Michael L. Martinez (State Bar No. 39885)
Grier Wright Martinez, PA
521 East Morehead Street, Suite 440
Charlotte, North Carolina 28202
Telephone: 704.332.0209; Fax: 704.332.0215
Email: mmartinez@grierlaw.com

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**
**Account Number x2732**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 9/22/25 | Transfer from account x7844 | $8,582,680.84 | | $8,582,680.84 |
| 9/30/25 | Interest | $456.39 | | $8,583,137.23 |
| 10/27/25 | Interest | $8,056.94 | | $8,591,194.17 |
| 11/12/25 | Transfer from account x7852 | $1,998.79 | | $8,593,192.96 |
| 11/28/25 | Interest | $5,302.18 | | $8,598,495.14 |
| 12/23/25 | Transfer to account x7852 | $0.60 | ($8,598,701.22) | ($205.48) |
| 12/31/25 | Interest | $5,927.55 | | $5,722.07 |
| 1/13/26 | Interest | $95.97 | | $5,818.04 |
| 2/20/26 | Transfer to account x7844 | | ($5,818.04) | ($0.00) |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**
**Account Number x7844**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 8/19/25 | Tax refund to Lindberg re. Boston Eye Care transaction | $570,492 | | $570,492 |
| 9/10/25 | Test wire from Steve Wilson with funds held in Clanwilliam Trust fund | $10 | | $570,502 |
| 9/12/25 | Clanwilliam Sale / Remittance to Special Master | $236,921,944 | | $237,492,446 |
| 9/15/25 | Clanwilliam Sale / Remittance directly to JPLs | $112,027,405 | ($112,027,405) | $237,492,446 |
| 9/15/25 | Tranfer to account x7852 | | ($24,318,604) | $213,173,843 |
| 9/19/25 | Transfer to account x7836 | | ($14,591,162) | $198,582,681 |
| 9/22/25 | Transfer to account x2737 | | ($8,582,681) | $190,000,000 |
| 9/30/25 | Interest | $208 | | $190,000,208 |
| 10/15/25 | Transfer to account x7852 | | ($20,000,000) | $170,000,208 |
| 10/15/25 | Interest | $221,193 | | $170,221,401 |
| 11/28/25 | Interest | $139,985 | | $170,361,386 |
| 12/18/25 | Transfer to account x7852 | | ($143,766,868) | $26,594,518 |
| 12/24/25 | Transfer to account x7852 | | ($13,868,317) | $12,726,201 |
| 12/24/25 | Transfer to account x7852 | | ($11,413,519) | $1,312,682 |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**
**Account Number x7844**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 12/31/25 | Interest | $89,390 | | $1,402,072 |
| 1/8/26 | Transfer to account x7852 | | ($366,773) | $1,035,299 |
| 1/30/26 | Interest | $869 | | $1,036,168 |
| 2/2/26 | Transfer from account x2737 | $5,818 | | $1,041,986 |
| 2/27/26 | Interest | $714 | | $1,042,699 |
| 3/31/26 | Interest | $769 | | $1,043,469 |
| 4/15/26 | Hugh Steven Wilson (Clainwilliam Proceeds) | $139,014 | | $1,182,483 |
| 4/30/26 | Interest | $816 | | $1,183,299 |
| 5/29/26 | Interest | $896 | | $1,184,194 |
| 6/10/26 | Interest | $874 | | $1,185,069 |
| 7/31/26 | Interest | $952 | | $1,186,021 |
| 8/31/26 | Interest | $1,165 | | $1,187,186 |
| 9/30/26 | Interest | $976 | | $1,188,162 |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**
**Account Number x7836**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 9/19/25 | Transfer from account x7844 | $14,591,162 | $0 | $14,591,162 |
| 9/30/25 | Interest | $20 | | $14,591,182 |
| 10/31/25 | Interest | $16,571 | | $14,607,753 |
| 11/5/25 | Grier Wright Martinez | $0 | ($246,873) | $14,360,880 |
| 11/5/25 | Paladin Management Group | $0 | ($1,095,063) | $13,265,817 |
| 11/5/25 | Wyatt & Blake, LLP | $0 | ($158,044) | $13,107,773 |
| 11/5/25 | Epiq Corporate Restructuring | $0 | ($33,764) | $13,074,009 |
| 11/6/25 | Katten Muchin Rosenman LLP | $0 | ($2,061,281) | $11,012,728 |
| 11/6/25 | Katten Muchin Rosenman LLP | $0 | ($491,065) | $10,521,663 |
| 11/6/25 | Grier Wright Martinez | $0 | ($208,908) | $10,312,755 |
| 11/6/25 | Paladin Management Group | $0 | ($588,733) | $9,724,023 |
| 11/6/25 | Wyatt & Blake, LLP | $0 | ($87,272) | $9,636,750 |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**

**Account Number x7836**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 11/28/25 | Interest | $9,118 | | $9,645,869 |
| 12/16/25 | Epiq Corporate Restructuring | | ($22,458) | $9,623,410 |
| 12/16/25 | Epiq Corporate Restructuring | | ($170,000) | $9,453,410 |
| 12/31/25 | Interest | $5,565 | | $9,458,975 |
| 1/20/26 | Epiq Corporate Restructuring | | ($14,441) | $9,444,534 |
| 1/30/26 | Interest | $7,943 | | $9,452,477 |
| 2/12/26 | Epiq Corporate Restructuring | | ($52,780) | $9,399,696 |
| 2/20/26 | Grier Wright Martinez | | ($102,120) | $9,297,576 |
| 2/20/26 | Wyatt & Blake, LLP | | ($49,377) | $9,248,200 |
| 2/20/26 | Katten Muchin Rosenman LLP | | ($232,306) | $9,015,893 |
| 2/23/26 | Grier Wright Martinez | | ($150,000) | $8,865,893 |
| 2/23/26 | Wyatt & Blake, LLP | | ($68,000) | $8,797,893 |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**
**Account Number x7836**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 2/23/26 | Katten Muchin Rosenman LLP | | ($361,685) | $8,436,208 |
| 2/23/26 | Paladin Management Group | | ($500,000) | $7,936,208 |
| 2/23/26 | Paladin Management Group | | ($391,528) | $7,544,680 |
| 2/28/26 | Interest | $6,880 | | $7,551,560 |
| 3/16/26 | Epiq Corporate Restructuring | | ($48,893) | $7,502,668 |
| 3/31/26 | Interest | $6,279 | | $7,508,947 |
| 4/15/26 | Epiq Corporate Restructuring | | ($58,337) | $7,450,610 |
| 4/30/26 | Interest | $6,051 | | $7,456,661 |
| 5/14/26 | Epiq Corporate Restructuring | | ($80,189) | $7,376,472 |
| 5/29/26 | Interest | $6,188 | | $7,382,660 |
| 6/2/26 | Wyatt & Blake, LLP | | ($212,001) | $7,170,660 |
| 6/2/26 | Katten Muchin Rosenman LLP | | ($1,110,473) | $6,060,187 |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**
**Account Number x7836**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 6/9/26 | Grier Wright Martinez | | ($276,124) | $5,784,063 |
| 6/10/26 | Epiq Corporate Restructuring | | ($43,344) | $5,740,719 |
| 6/10/26 | Paladin Management Group | | ($1,018,699) | $4,722,020 |
| 6/10/26 | Interest | $4,215 | | $4,726,235 |
| 7/15/26 | Epiq Corporate Restructuring | | ($36,647) | $4,689,588 |
| 7/31/26 | Interest | $3,945 | | $4,693,532 |
| 8/18/26 | Epiq Corporate Restructuring | | ($30,881) | $4,662,651 |
| 8/27/26 | Grier Wright Martinez | | ($128,765) | $4,533,886 |
| 8/27/26 | Paladin Management Group | | ($217,058) | $4,316,828 |
| 8/31/26 | Interest Adjust. | $48,278 | | $4,365,106 |
| 9/15/26 | Epiq Corporate Restructuring | | ($23,392) | $4,341,713 |
| 9/30/26 | Interest | $3,579 | | $4,345,293 |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**

**Account Number x7852**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 9/19/25 | Transfer from account x7844 | $24,318,604 | | $24,318,604 |
| 9/22/25 | VISTA LIFE & CASUALTY REINSURANCE | | ($683,893) | $23,634,710 |
| 9/22/25 | THE BRYN MAWR TRUST COMPANY OF DELAWARE (VISTA LIFE) | | ($774,715) | $22,859,995 |
| 9/22/25 | VISTA LIFE & CASUALTY REINSURANCE | | ($22,859,995) | $0 |
| 10/15/25 | Transfer from account x7844 | $20,000,000 | $0 | $20,000,000 |
| 10/15/25 | Waldrep Wall Babcock & Bailey PLLC/Clanwilliam tax escrow | | ($20,000,000) | $0 |
| 10/27/25 | Interest | $1,999 | | $1,999 |
| 11/12/25 | Transfer to account x2737 | | ($1,999) | $0 |
| 12/11/25 | Interest | $1 | | $1 |
| 12/15/25 | Transfer to account x2737 | | ($1) | $0 |
| 12/18/25 | Transfer from account x7844 | $143,766,868 | | $143,766,868 |
| 12/24/25 | Transfer from account x7844 | $13,868,317 | | $157,635,186 |
| 12/24/25 | Transfer from account x7844 | $11,413,519 | | $169,048,704 |
| 12/24/25 | Transfer from account x2737 | $8,598,701 | | $177,647,405 |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**

**Account Number x7852**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 12/24/25 | Payment to Policy Holders | | ($3,640) | $177,643,766 |
| 12/24/25 | Colorado Bankers Life Insurance | | ($16,646,502) | $160,997,263 |
| 12/24/25 | Bankers Life Insurance | | ($968,495) | $160,028,769 |
| 12/24/25 | Southland National Insurance | | ($2,395,223) | $157,633,545 |
| 12/24/25 | Wire Service charge (x3) | | ($30) | $157,633,515 |
| 12/26/25 | Various Payments to Policy Holders | | ($6,122,958) | $151,510,557 |
| 12/29/25 | Various Payments to Policy Holders | | ($32,980,645) | $118,529,912 |
| 12/29/25 | ARP (Account Reconciliation Program) Adjustment | $767 | ($9) | $118,530,670 |
| 12/30/25 | Various Payments to Policy Holders | | ($16,895,229) | $101,635,441 |
| 12/31/25 | Various Payments to Policy Holders | | ($8,936,701) | $92,698,739 |
| 01/01 - 01/15 | Various Payments to Policy Holders | | ($48,945,469) | $43,753,271 |
| 01/16 - 01/31 | Various Payments to Policy Holders | | ($15,422,485) | $28,330,786 |
| 01/01 - 01/31 | ARP (Account Reconciliation Program) Adjustment | $5,102 | ($94) | $28,335,794 |
| 1/8/26 | Transfer from account x7844 | $366,773 | | $28,702,566 |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**

**Account Number x7852**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 2/2/26 | Various Payments to Policy Holders | | ($1,304,016) | $27,398,551 |
| 2/3/26 | Various Payments to Policy Holders | | ($782,038) | $26,616,513 |
| 2/4/26 | Various Payments to Policy Holders | | ($403,828) | $26,212,684 |
| 2/5/26 | Various Payments to Policy Holders | | ($1,556,008) | $24,656,676 |
| 2/5/26 | Various Payments to Policy Holders | | ($199,016) | $24,457,660 |
| 2/6/26 | Various Payments to Policy Holders | | ($146,154) | $24,311,506 |
| 2/9/26 | Various Payments to Policy Holders | | ($394,516) | $23,916,990 |
| 2/10/26 | Various Payments to Policy Holders | | ($492,401) | $23,424,589 |
| 2/11/26 | Various Payments to Policy Holders | | ($954,138) | $22,470,451 |
| 2/12/26 | Various Payments to Policy Holders | | ($140,927) | $22,329,524 |
| 2/13/26 | Various Payments to Policy Holders | | ($487,901) | $21,841,623 |
| 2/17/26 | Various Payments to Policy Holders | | ($1,732,081) | $20,109,542 |
| 2/18/26 | Various Payments to Policy Holders | | ($165,660) | $19,943,882 |
| 2/19/26 | Various Payments to Policy Holders | | ($312,287) | $19,631,595 |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**

**Account Number x7852**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 2/19/26 | ARP (Account Reconciliation Program) Adjustment | | ($21,057) | $19,610,538 |
| 2/20/26 | Various Payments to Policy Holders | | ($473,629) | $19,136,909 |
| 2/23/26 | Various Payments to Policy Holders | | ($2,045,342) | $17,091,567 |
| 2/24/26 | Various Payments to Policy Holders | | ($1,760,663) | $15,330,904 |
| 2/25/26 | Various Payments to Policy Holders | | ($434,350) | $14,896,554 |
| 2/26/26 | Various Payments to Policy Holders | | ($269,346) | $14,627,208 |
| 2/27/26 | Various Payments to Policy Holders | | ($128,408) | $14,498,800 |
| 2/27/26 | ARP (Account Reconciliation Program) Adjustment | $26,773 | | $14,525,573 |
| 3/31/26 | Various Payments to Policy Holders | | ($5,938,831) | $8,586,742 |
| 3/24/26 | ARP (Account Reconciliation Program) Adjustment | $122,366 | | $8,709,109 |
| 4/30/26 | Various Payments to Policy Holders | | ($1,483,652) | $7,225,457 |
| 4/28/26 | ARP (Account Reconciliation Program) Adjustment | $288 | | $7,225,744 |
| 5/1/26 | Various Payments to Policy Holders | | ($450,418) | $6,775,327 |
| 5/20/26 | Various Payments to Policy Holders | | ($80,693) | $6,694,634 |

# EXHIBIT A

## USA vs Lindberg

**Citizens Bank - Check Register**

**Account Number x7852**

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 5/19/26 | ARP (Account Reconciliation Program) Adjustment | $362 | | $6,694,995 |
| 06/01 - 06/30 | Various Payments to Policy Holders | | ($180,354) | $6,514,641 |
| 6/15/26 | ARP (Account Reconciliation Program) Adjustment | $260 | | $6,514,901 |
| 7/1/26 | Various Payment to Policy Holders | | ($38,982) | $6,475,919 |
| 7/15/26 | ARP (Account Reconciliation Program) Adjustment | $121 | | $6,476,040 |
| 8/1 - 8/31/26 | Various Payment to Policy Holders | | ($17,871) | $6,458,170 |
| 8/12/26 | ARP (Account Reconciliation Program) Adjustment | $96 | | $6,458,266 |
| 9/1 -9/30/26 | Various Payment to Policy Holders | | ($5,595) | $6,452,671 |

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 26-cv-03939-GPG

GREG E. LINDBERG,

Plaintiff,

v.

HUGH STEVEN WILSON;
CHRIS NICKERSON;
UK ATLANTA HOLDINGS LLC;
DAMOVO GLOBAL SERVICES (UK) LIMITED;
DAMOVO DEUTSCHLAND GMBH & CO. KG;
DAMOVO IRELAND LIMITED;
DAMOVO SCHWEIZ AG;
DAMOVO LUXEMBOURG S.à R.L.;
DAMOVO COSTA RICA SRL; and
JOHN DOE BUYER COMPANY,

Defendants.

---

**ORDER**

---

Before the Court are Plaintiff's Motion for Judicial Notice of Verified Complaint Filed in the United States District Court for the Southern District of New York (Fed. R. Evid. 201) (D. 10) and Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction Enjoining any Sale or Transfer of Damovo or its Assets, and Request for Immediate Remote Hearing (D. 11). [1]

[1] The Court must construe the Plaintiff's filings liberally because Plaintiff is not represented by an attorney. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the Court should not be an advocate for a pro se litigant. *See Hall*, 935 F.2d at 1110.

EXHIBIT B

This case is an attempted collateral attack on proceedings related to the prosecution and conviction of Plaintiff Greg E. Lindberg in the Western District of North Carolina. *See U.S. v. Lindberg*, No. 5:19-cr-22, D. 245 at 2–3 (W.D.N.C.). Plaintiff pled guilty to conspiracy to commit crimes in connection with the insurance business, wire fraud, and investment advisor and money laundering conspiracy. He agreed to and was ordered to pay substantial restitution and a special master was appointed, with Plaintiff's consent, to oversee restitution. Plaintiff later began filing increasingly specious challenges to the special master's actions (*see id.* D. 330 (Aug. 31, 2026)). *See* Fed. R. Evid. 201(c)(1) (allowing a court to "take judicial notice on its own"); *see Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006) (allowing judicial notice of the contents of documents, not the facts stated therein (citing *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002))). Plaintiff has filed a collateral attack action similar to this case in the Southern District of New York, *Lindberg v. Causey*, No. 1:26-cv-07938 (S.D.N.Y. filed Sept. 11, 2026).

In his first motion, "Plaintiff asks the Court to take judicial notice that the SDNY Action was filed and is pending, and of the parties, claims, relief, and allegations set out in the SDNY Complaint [and] does not ask the Court to take judicial notice of the truth of any contested allegation in that pleading, which is for the Southern District of New York to determine" (D. 10 at 6). The Court grants this motion to the extent that it takes judicial notice of the existence of the filing only. *See* Fed. R. Evid. 201(c)(2); *see Tal*, 453 F.3d at 1265 n.24.

The Court denies Plaintiff's requests for preliminary injunctive relief. Preliminary injunctions and temporary restraining orders are ultimately discretionary relief. Fed. R. Civ. P.

**EXHIBIT B**

65(a), (b)(1). The Court declines as a matter of discretion to intervene in proceedings related to restitution for the criminal proceedings against Plaintiff, which are being capably overseen by a sister court. *See U.S. v. Lindberg*, No. 5:19-cr-22, D. 330 (W.D.N.C. Aug. 31, 2026).

Even if the Court were to consider Plaintiff's request on the merits, it would deny them. The circumstances supporting an *ex parte* Temporary Restraining Order (TRO) are extremely limited—under Federal Rule of Civil Procedure 65(b)(1)(A), an *ex parte* TRO may issue only if the movant "*clearly shows* that immediate and irreparable injury will result to the movant *before the adverse party can be heard in opposition*." Fed. R. Civ. P. 65(b)(1)(A) (emphasis added). This limitation acknowledges "the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). The Court has reviewed Plaintiff's briefing (including its irreparable harm arguments) and concludes that the circumstances of this case do not pose a threat of irreparable harm so imminent that Defendants cannot be heard.

Further, Plaintiff admits he is "without means to post a substantial bond" as would be required to secure a TRO or preliminary injunction of the multi-million-dollar transaction that he seeks to prevent (D. 11-1 at 5). Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

Accordingly, Plaintiff's Motion for Judicial Notice of Verified Complaint Filed in the United States District Court for the Southern District of New York (Fed. R. Evid. 201) (D. 10) is

# EXHIBIT B

GRANTED and Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction Enjoining any Sale or Transfer of Damovo or its Assets, and Request for Immediate Remote Hearing (D. 11) is DENIED WITH PREJUDICE.

DATED September 21, 2026.

BY THE COURT:



Gordon P. Gallagher
United States District Judge